UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,

                Plaintiff,

         -against-

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City Department
of Buildings,

              Defendants,

-------------------------------------------------------------x

07-CV-_/C96 2

**DECLARATION OF
THOMAS G. DRAPER, Jr.**

I, THOMAS G. DRAPER, Jr., pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am the Vice Chairman of the Board of Trustees of the Third Church of
Christ, Scientist, of New York City (the "Church"). I make this declaration in support of the
Church's motion for a temporary restraining order, preliminary injunction, and other relief.

### The Church and its Historic Building

2.     The Church began in the 1880s as a congregation of students dedicated to
the Christian Science religion. By 1895, as its membership grew substantially, the Church
applied for a charter and was registered under the laws of the State of New York.

3.     In 1920, the Church purchased property at 583 Park Avenue, New York,
New York, and retained the renowned architectural firm Delano & Aldrich to design a house of
worship for the congregation. Completed in or around 1924, the red-brick, Georgian-Colonial
building topped with its tall lantern (the "Building") is one of the architectural highlights of Park
Avenue. A true and accurate photograph of Building is attached hereto as Exhibit A.

4.     The Church has continuously used the Building as its primary place of

worship since 1924.

5.    By the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings attended by 1,000 to 1,400 people, Sunday school in the Building's basement, adult socials and youth forum activities, and lectures and workshops focusing on religious and spiritual healing topics. During this period, lectures in the Church's Building would frequently be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in the basement.

6.    Over the years, the Church's membership has declined. It currently has fewer than one hundred members. True to its mission, however, the Church continues to use the Building for religious worship every Wednesday evening and Sunday morning, as well as for other religious uses such as Sunday School and lectures.

7.    A significant contributing factor to the decline in membership has been the growing state of disrepair of the Building and the prohibitive costs of the necessary major capital repairs and renovations to the Building's aging infrastructure to bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), in addition to the burden of the on-going costs of maintaining the Building into the future.

8.    The Required Capital Repairs necessary to revive the aging Building's infrastructure and to bring it into compliance with the New York City Building Code include modernization of all major building systems, including electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and, where necessary, replacement of the Building's façade, roof, windows, doors and other exterior components; and significant restoration of the main auditorium and other rooms regularly used for Church-related activities, inlcuding the construction of a new room in the basement for the Church's Sunday School.

9.     For example, the roof of the Building is in such a state of disrepair that it would cost almost $1 million to repair it. Leaks from the roof caused water damage to the auditorium walls, as well as walls and ceiling throughout the Building. The subbasement had standing water seeping in from the underground stream. The malfunctioning plumbing system frequently caused flooding in the restroom and in the subbasement.

10.     In order to save the historic Building, the Church needed to raise substantial capital. For many years, the Church survived largely because of bequests made by deceased members of its congregation. But as the membership declined, the bequests declined, and the Church, year after year, was running at a significant deficit.

11.     Beginning at least in the late 1990s, the Church explored several alternatives to raise capital, including low-cost loans from the Historic Properties Fund (administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

12.     From 1999 to 2006, the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship simply did not yield enough money to meet the Church's needs.

13.     In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

14.     Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for the renovation and maintenance of the Building.

NYC 190601v6 0085520-000001

15.     After considering numerous alternatives, the Church decided to do what we understand many other churches and non-profit organizations routinely do: we decided to raise funds by allowing the Building to be used by the general public as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events In Order to Raise Needed Capital

16.     As is common, the Church contracted with a third party to conduct these catered events. Because the Church had substantial financial needs, however, we did not believe that an ad hoc or short-term contractual relationship with a caterer would provide the Church with the funds it needed to make the Required Capital Repairs. Accordingly, the Church retained J. Gregory Saver of Satterlee Stephens Burke & Burke LLP to negotiate a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company.

17.     The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and on-going maintenance costs (the "Lease"). A true and accurate copy of the Lease, and the two amendments thereto, is attached hereto as Exhibit B.

18.     The express purpose of the Lease is to supplement the Church's income, and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at 1 (emphasis added).

19.     In addition to hosting events for non-profit groups, companies and other firms – to date, events for New Yorkers for Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups have been held in the Building – the Lease requires the Rose Group to conduct catered events for members of the Church at reduced cost. 2nd Amn. to Lease, at ¶ 2.

20.     We understand that the Rose Group will invest more than $8 million on the Required Capital Repairs, of which $6.5 million has already been spent. Because the Building lies within the Upper East Side Historic District, any renovations to the exterior of the Building must be undertaken in a painstaking manner so as to preserve, wherever possible, the Building's original architectural details. Among the significant work that remains to be completed, the Rose Group plans to restore the Building's roof with slate from the same Vermont quarry that supplied the Church more than 80 years ago.

21.     In addition to Required Capital Repairs, the Rose Group is further obligated to undertake general maintenance of the Building throughout the 20-year Lease term, and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain threshold, from the catered events) to the Church. This supplemental income is a crucial source of operating revenue for the Church's religious activities, which will be especially necessary when new community activities and outreach programs are implemented.

22.     Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's

religious services or activities.

23.    Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1.  Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities.  Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5.  Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief.  Lease, at ¶ 35.6.

24.    The primary purpose of the Building is to serve as the Church's place of worship.  But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment.  Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a reasonable chance to profit from the arrangement.  In the second amendment to the Lease, dated March 27, 2007, the parties provided that, in the event that the Building could not be used for catering activity, the Rose Group would be able to require the Church to reimburse the Rose Group for Required Capital Repairs it had undertaken, even if the Church had to sell the Building.  2nd Amn. to Lease, at ¶ 3.

25.    The service entrance to our Building is directly across 63rd street from an

active restaurant and catering facility on the south side of the street, so we well know that there

can be concerns regarding deliveries, noise, garbage and other related issues. As a result, the

Church went out of its way to be sensitive to our neighbors. Thus, the Lease requires the Rose

Group to "[p]ermit no act or practice which may … be a nuisance," and to "[l]oad and unload its

merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the

premises[.]" Lease, at ¶ 32.1.

      26.     The Church also insisted that the Rose Group take the extraordinary step

of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any

offensive odors[.]" When this system is completed, all trash from catered events will be stored

and refrigerated within the Building and taken to 63rd Street only when it is to be collected by

the trash truck. Lease, at ¶ 32.1.

      27.     Moreover, the Lease does not "permit any advertising medium or loud

speaker, radio broadcast, etc. to be heard outside of the premises." Lease, at ¶ 32.1.

      28.     In addition, the Second Amendment to the Lease provides that the Church

and the Rose Group will together "establish standards concerning sound, light levels, traffic

control, signage." 2nd Amn. to Lease, at ¶ 5.

      29.     The Rose Group has retained a highly professional and comprehensive

security team, Global Security Service, in order to ensure that all events at the Church are

orderly, quiet, and safe. A true and accurate copy of the Rose Group's security policy is

attached hereto as Exhibit C.

      30.     At all events, in addition to other security measures, there are usually off-

duty members of the New York City Police Department patrolling the area, monitoring the

event and managing any crowds. There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws. These security measures

are implemented from an abundance of caution. Thus far, all of the catered events that have occurred in the Building have occurred without incident.

## The Purpose of the Building Remains the Same: It Is a
## Place of Worship for the Church Congregation

31.     The primary purpose of the Building is to remain a house of worship. For over 80 years, the Building has been property devoted to the Christian Science faith, and it remains the center of the Church's congregation. The Church currently conducts Sunday Church Services and Sunday School services, Wednesday evening church service, Thanksgiving and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church classes (all-day class for a two-week period, twice a year), Church corporate or organizational meetings, and occasional non-regularly scheduled events and Association meetings.

32.     The Church has been attracting new members because of the recent repairs to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be able to hold additional services and lectures for its members and other attendees. Among other events, the Church expects to host additional Sunday church services and Sunday school sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee meetings, youth forum activities, musical rehearsals and recitals, and various religious workshops.

33.     In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years. Following the renewal of the Church and its congregation, we expect that the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members. The Church described these current and future uses of the Building in a memorandum dated May 7, 2007 that was submitted to the City, a true and accurate copy of which is attached hereto as Exhibit D.

NYC 190601v6 0085520-000001

34.    The Church likewise informed its neighbors about its past, current, and future plans for the Building in a memorandum circulated throughout its neighborhood, a true and accurate copy of which is attached hereto as Exhibit E.

35.    Finally, the Church's purpose in working with the Rose Group is more than merely economical; the Church also hopes that opening up the Building to public events will introduce the Christian Science faith to the larger community, thereby aiding the Church in augmenting its membership.  In addition to increased exposure, the historic Building will again be enjoyed and appreciated by the general public, as it had been for many decades until the Building began its decline.

### The Required Capital Repairs Were Undertaken in Reliance on the City's Approval of Catering Events at the Building

36.    Prior to initiating the extensive and costly Required Capital Repairs, the Church and the Rose Group sought the City's approval for this catering arrangement.  On April 19, 2006, the New York City Department of Buildings (the "DOB") issued a pre-consideration determination, which was subsequently affirmed and clarified on June 2, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-Consideration").  A true and accurate copy of the Pre-Consideration is attached hereto as Exhibit F.

37.    The Pre-Consideration provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building, pursuant to Section 12-10 of the Zoning Resolution.

38.    The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").  True and accurate copies of the Permits are attached hereto as Exhibit G.

39.    Based on the Church's truthful representation that the catered events were to be "operated by a highly qualified, fully insured, professional caterer who will be under

contract with the Church" and that the "functions will be restricted by the contract with the Church," the DOB granted its Pre-Consideration permitting the Church to have catered events in the Building.   *See* Pre-Consideration, attached hereto as Exhibit F.

40.    The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees.  During these conversations, DOB's consistent position has been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and the Manhattan Borough Commissioner of DOB stated that the only limitation on the size of events related to the capacity of the Building.  To date, approximately $6.5 million has been expended on the Required Capital Repairs, a liability the Church incurred in reliance on the City's Pre-Consideration approvals.

## Opposition by Neighboring Residents Results in the Revocation of the Pre-Consideration

41.    By March 2007, after the Required Capital Repairs were well underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings – 570 Park Avenue and 580 Park Avenue – began to complain about the Church's arrangement with the Rose Group.  These buildings are across Park Avenue from the Church. After initially discussing the matter with the Church and the Rose Group, residents of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a public relations campaign against the Church.  Their avowed purpose was to maintain the "residential" character of their Park Avenue neighborhood, and their leaflet contended that the Church's plans to permit catered events at its historic premises – although no different than the practices of many neighboring non-profit institutions – would cause significant disruption in their

immediate vicinity. Their flyers, however, failed to mention that if the Church were unable to supplement its revenues, it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

42.    On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused us of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall. The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night." A true and accurate copy of this October 3, 2007 flyer is attached hereto as Exhibit H.

43.    This is a selective and baseless attack on the Church. As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory three blocks to the north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

44.    The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007. The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, and distorts the real import of the Lease. True and accurate copies of these three letters are attached hereto as Exhibit I.

45.    Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group

the limited right to use the Building for catered events when it is not being used for religious activities.

46.    Unfortunately, the City has succumbed to the demands of these influential neighbors.  On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly substantially completed.  A true and accurate copy of the DOB Letter is attached hereto as Exhibit J.

47.    The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now adopted the neighbors' unfair characterization of our Church as a commercial catering facility and concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church."  The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008).  The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

48.    Upon receiving the letter, the Church engaged litigation counsel.  Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation.  Our counsel advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the

Building to satisfy its liabilities.

49.     Moreover, both before and after receipt of the DOB Letter, the Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts).  Indeed, we have tried hard to avoid having to resort to litigation and to reach an amicable resolution that was fair to the Church and protected the legitimate interests of all concerned.

50.     Unfortunately, these efforts have not succeeded.  On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination").  The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

51.     By revoking the Permits and preventing the Church from hosting catered events on its premises, the Defendants have threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease.  The implementation of the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship -- the epicenter of its religious practice for the past 80 years.

**Revocation of the Pre-Consideration will Impose Substantial Burdens on the Church's Religious Exercise and Cause Immediate and Irreparable Injury**

52.     The impact of the DOB's decision will be devastating and immediate.

The DOB Letter stated that its prior approval would be revoked within 10 days.  Though the Church has tried to persuade the DOB to reinstate the approval it had previously (and correctly) granted, the Defendants have refused.  As of October 29, 2007, the Church has been prohibited from allowing any additional catered events to be booked for the Building, and as of April 29, 2008, the Church will be forbidden to permit any additional catered events in the Building.

53.    As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled.  This prohibition will therefore effectively require the Rose Group to cease its catering operations in the Building.

54.    Finally, the November 30, 2007 Final Determination revokes the Permits forthwith.  Having to cease construction work means that the following work, which has yet to be completed, will not be completed, thereby creating safety and other risks in the Building: completion of installation of the elevator (from the sub-basement to the 4th floor), which is the only way for handicapped persons to access the handicap-access restrooms or the Sunday School facilities in the basement; testing and installation of portions of the fire safety system; and installation of a ramp to make the Building accessible for disabled persons.

55.    If the Church can no longer make the Building available for catered events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed.

56.    Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its

congregation, spreading its religious teaching, and thereby impeding its religious exercise.

57.    If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

58.    The Church has only one goal:  to restore, preserve, and maintain the Building as a home for its congregation.  The Church entered into the Lease with the Rose Group only as a means to raise the money necessary to accomplish our desired end.  If the City's decision is not enjoined, the Church likely will be forced to sell the Building and its congregation will be deprived of its place of worship.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December _3_, 2007.

THOMAS G. DRAPER, Jr.

# EXHIBIT A



# EXHIBIT B
# PART 1

**THIRD CHURCH CHRIST, SCIENTIST, OF NEW YORK CITY**

**LANDLORD**

**WITH**

**ROSE GROUP PARK AVENUE LLC**

**TENANT**

**<u>FINAL AGREEMENT OF LEASE</u>**

PREMISES –  583 PARK AVENUE
NEW YORK, NEW YORK

NY1 26400900.3

# TABLE OF CONTENTS

ARTICLE 1 DEMISE..................................................................................2

ARTICLE 2 TERM.....................................................................................2

ARTICLE 3 BASIC RENT – ADDITIONAL RENT ..............................4

ARTICLE 4 UTILITIES AND SERVICES ............................................20

ARTICLE 5 LANDLORD'S WORK, TENANT WORK, REPAIR AND
        MAINTENANCE............................................................20

ARTICLE 6 CHANGES AND ALTERATIONS — SURRENDER OF PREMISES ...........27

ARTICLE 7 COMPLIANCE WITH ORDERS, ORDINANCES, ETC. .................29

ARTICLE 8 MECHANIC'S LIENS ........................................................31

ARTICLE 9 USE OF PREMISES BY LANDLORD .............................32

ARTICLE 10 RIGHT TO PERFORM COVENANTS ..........................33

ARTICLE 11 DAMAGE OR DESTRUCTION.......................................34

ARTICLE 12 CONDEMNATION............................................................37

ARTICLE 13 BANKRUPTCY OR OTHER DEFAULT ......................39

ARTICLE 14 CUMULATIVE REMEDIES — NO WAIVER ..............48

ARTICLE 15 SUBORDINATION............................................................48

ARTICLE 16 QUIET ENJOYMENT.......................................................49

ARTICLE 17 NOTICES............................................................................50

ARTICLE 18 DEFINITION OF CERTAIN TERMS, ETC....................51

ARTICLE 19 INVALIDITY OF PARTICULAR PROVISIONS...........52

ARTICLE 20 COVENANTS TO BIND AND BENEFIT RESPECTIVE PARTIES ...........52

ARTICLE 21 INSURANCE.......................................................................52

ARTICLE 22 USE, ASSIGNMENT OR SUBLETTING .......................56

ARTICLE 23 LANDLORD'S LIABILITY ..............................................59

ARTICLE 24 ENTIRE AGREEMENT.....................................................60

ARTICLE 25 CERTIFICATES.................................................................60

ARTICLE 26 BROKER .............................................................................60

ARTICLE 27 SIGNS .................................................................................61

ARTICLE 28 HOLDING OVER...............................................................61

ARTICLE 29 LANDLORD'S RESERVATION OF RIGHTS.................62

ARTICLE 30 OPTION TO RENEW ........................................................63

ARTICLE 31 GENERATOR .....................................................................64

i

ARTICLE 32 RESTRICTIONS ON TENANT ................................................................... 64

ARTICLE 33 MAINTENANCE OF SIDEWALKS ......................................................... 65

ARTICLE 34 INDEMNIFICATION ............................................................................... 65

ARTICLE 35 USE OF PREMISES BY LANDLORD .................................................... 66

ARTICLE 36 RIGHT OF FIRST REFUSAL .................................................................. 71

ARTICLE 37 STRUCTURAL REPAIRS ........................................................................ 75

ARTICLE 38 PREVAILING PARTY FEES .................................................................... 77

ARTICLE 39 FORCE MAJEUR .................................................................................... 77

ARTICLE 40 COMPLETION OF TENANT WORK ...................................................... 77

ARTICLE 41 AFFILIATE TRANSFERS ........................................................................ 78

<u>EXHIBITS:</u>

Exhibit A SITE PLAN

Exhibit B LANDLORD'S WORK LETTER

Exhibit C TENANT IMPROVEMENTS WORK

Exhibit D LANDLORD'S ARCHITECTURAL PLANS FOR LANDLORD'S WORK

Exhibit E PRELIMINARY LAYOUT DRAWINGS

THIS INDENTURE OF LEASE ("Lease") made as of the 31 day of JANUARY

2006, by and between **THIRD CHURCH CHRIST, SCIENTIST, OF NEW YORK CITY** a

New York Religious Corporation, with offices at 583 Park Avenue, New York, NY 10021,

hereinafter referred to as the "LANDLORD" or "CHURCH" and **ROSE GROUP PARK**

**AVENUE LLC**, a New York limited liability company, with offices at 1111 Park Avenue, New

York, NY 10128, hereinafter referred to as the "TENANT".

## WITNESSETH

WHEREAS, LANDLORD is the owner in fee of the building located at 583 Park

Avenue, New York, NY (the "Building") which includes the Premises, as defined below,

hereinafter demised; and

WHEREAS, LANDLORD is a church organization which currently uses the

Building and the Premises for church services and related activities; and

WHEREAS, LANDLORD is desirous of leasing the Premises during those times

when there are no scheduled Church services or Church related activities as more particularly

delineated in Paragraph 35 below in order to generate income that can be used to maintain the

Building and to support the Church activities while still permitting LANDLORD to continue to

use on an exclusive and non-exclusive basis the Building for Church services and related

activities as it has in the past and as more particularly set forth in Article 35 below; and

WHEREAS, TENANT is in the business of high end, upscale catering and

hosting of events such as weddings, bar mitzvahs, family reunions, corporate meetings, events

and the like; and

WHEREAS, TENANT and LANDLORD intend that TENANT utilize the

Premises for its catering business without interfering with church services and related activities

such as association meetings, lectures, classes, Sunday school and corporate church governance meetings as more particularly set forth in Article 35 below; and

WHEREAS, LANDLORD and TENANT desire to enter into this Lease.

NOW, THEREFORE, LANDLORD and TENANT covenant and agree as follows:

ARTICLE 1
DEMISE

1.1    LANDLORD, for and in consideration of the rents, covenants and agreements hereinafter reserved and contained herein, hereby leases and TENANT does hereby take and hire, subject to the reservations, covenants and conditions hereinafter expressed which TENANT agrees to keep and perform, the land and building known as 583 Park Avenue, New York, New York, also known as Section 1, Block 1398, Lot 1, hereinafter called the Building or "Premises".

ARTICLE 2
TERM

2.1    The term of this Lease (the "Term") shall commence (the "Commencement Date") on the second business day after LANDLORD shall have given notice of delivery of possession of the Premises to TENANT free of all tenancies and occupancies except the use and occupancy of certain portions of the Premises by LANDLORD as more particularly set forth herein and the license rights of Cingular (formerly AT&T Wireless) and Nextel relating to the operations of cellular wireless relay stations pursuant to existing or imminent license agreements, copies of which have been initialed by the parties hereto.

2.2    The Term of this Lease shall be for a period of approximately twenty years (subject to 2 five-year renewal options) from the December 31 following the Rent

NY1 26400900.3

2

Commencement Date (as herein defined). The Lease shall terminate, unless extended as provided herein, on December 31, 2026 (the "Expiration Date").

The term "Lease Year" as used herein or "year" as used herein, shall mean a twelve (12) month period. The first Lease Year, however, shall commence on the Commencement Date and end on December 31, 2007. Each succeeding Lease Year shall cover the twelve (12) full calendar months commencing the first day of January of each year.

2.3   A.   Promptly after the execution of this Lease, TENANT, at TENANT's sole cost and expense, shall apply for, and with reasonable due diligence seek, any necessary license (the **"License"**) from the New York State Liquor Authority (the **"SLA"**) and this Lease is conditioned upon the SLA issuing the License. If for any reason the License is not received prior to the end of one hundred and twenty (120) days after the execution of this Lease or if prior to such date the SLA denies the issuance of the License, TENANT may by notice to LANDLORD given within five (5) days after the earlier of the SLA denial or the end of said one hundred and twenty (120) days, cancel and terminate this Lease, in which event LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder.

B.   Promptly after the execution of this Lease, LANDLORD, at LANDLORD's sole cost and expense, shall apply for, and with reasonable due diligence seek, any necessary approval of this Lease (the "Approval") from the New York State Supreme Court (the "Court"). If for any reason the Approval is not received prior to the end of one hundred and fifty (150) days after the execution of this Lease or if prior to such date the Court denies the issuance of the Approval, the TENANT may by notice to the LANDLORD given after the end of said one hundred and fifty (150) days, cancel and terminate this Lease, in which event

3

LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder, provided that this Lease shall automatically terminate upon the date that the Court in a final unappealable order denies the issuance of the Approval, in which event LANDLORD shall return to TENANT any sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder.

C.    Promptly after the execution of this Lease, LANDLORD, with TENANT's assistance and cooperation, at their joint cost and expense, shall apply for an accessory use permit (the "Permit") from the New York City Department of Buildings ("DOB") to permit catering activities in the Premises as an accessory use to the use of the Premises as a church. If for any reason the Permit is not received prior to the end of one hundred and twenty (120) days after the execution of this Lease or if prior to such date the DOB denies the issuance of such Permit, either party may, by notice to the other party, given within five (5) days after the end of said one hundred and twenty (120) days, cancel and terminate this Lease, in which event LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder. The parties shall share the expense of said application, including without limitation all outside legal and other professional fees, and all other related costs and expenses, equally.

ARTICLE 3
BASIC RENT – ADDITIONAL RENT

3.1    Commencing upon the later to occur of the Commencement Date or the date that the last of the contingencies set forth in Article 2 above shall have been satisfied (the "Rent Commencement Date") and continuing throughout the Term and any renewal terms, TENANT shall pay an Annual Basic Rent, prorated for any portion of a calendar year, in the amount of

Two Hundred and Fifty Thousand ($250,000) Dollars in equal monthly installments in advance of or on the first day of each month without notice or demand as provided in Section 3.2 hereof. The Annual Basic Rent shall be adjusted as follows:

| Lease Years | Annual Basic Rent |
|---|---|
| 6th Lease Year through 10th Lease Year | $319,070.00 |
| 11th Lease Year through 15th Lease Year | $407,224.00 |
| 16th Lease Year through 20th Lease Year | $519,732.00 |

The first monthly installment of Basic Rent ($20,833.34) shall be paid upon the execution of this Lease and shall be held in escrow by LANDLORD in a segregated, interest bearing bank account and released to LANDLORD upon the satisfaction of all of the conditions set forth in Paragraph 2.3 above, or to TENANT upon the cancellation and termination of the Lease in accordance with the provisions of Paragraph 2.3 above, as the case may be. The fractional rent, if any, from the Rent Commencement Date to the first day of the following month shall be paid by TENANT to LANDLORD on the first day of the first full calendar month following the Commencement Date.

3.2     Annual Basic Rent and Additional Rent shall be payable in lawful money of the United States to LANDLORD at 583 Park Avenue, New York, New York, or at such other place as LANDLORD may from time to time designate, in advance, without notice, demand, offset or deduction except as specifically set forth herein. In the event any payment of Annual Basic Rent or Additional Rent shall not be made to LANDLORD within ten (10) days after the due date thereof, there shall be added to the amount a sum equal to five (5%) percent of the unpaid items as a fee and not as a penalty to, inter alia, help defray LANDLORD'S additional costs for bookkeeping and other costs in connection therewith.

3.3     Any payment to LANDLORD provided for herein shall be deemed Additional

Rent and if no specific time period is set forth within which it is to be paid, same must be paid

within ten (10) days of TENANT's receipt of notice that same is due.

3.4     A.     The Premises is currently exempt from the payment of real estate taxes.

The parties anticipate that, as a result of this Lease, the Premises may become subject to real

estate taxes.  As Additional Rent, TENANT shall pay to LANDLORD, within ten (10) days of

LANDLORD rendering a bill therefor, all Real Estate Taxes imposed against the land and/or

Building constituting the Premises as same become due and payable to the Department of

Finance of the City of New York or to such other agency as may be duly authorized to collect

such Taxes.  Notwithstanding the foregoing, at LANDLORD's option, if monthly payments are

required by LANDLORD's mortgagee or if TENANT shall have failed to pay taxes within the

ten (10) day period stated above, thereafter TENANT shall deposit with LANDLORD within

fifteen (15) days of LANDLORD's written demand therefore a tax escrow amount equal to the

sum which, when added to the monthly payments referred to hereinafter, would be sufficient to

permit LANDLORD to pay in full the next installment of real estate taxes and any assessments at

least thirty (30) days prior to the due date, and thereafter one-twelfth of the annual taxes shall be

paid by TENANT together with the Basic Annual Rent on a monthly basis, in advance, in such

amounts so that LANDLORD shall have sufficient amounts collected to pay any tax coming due

at least thirty days prior to the due date and if said amounts are insufficient to pay the taxes

coming due, TENANT shall be billed by LANDLORD for the difference.  Any such advance

payments shall be deposited into an interest bearing account mutually agreed upon by

LANDLORD and TENANT with all interest earned thereon paid by LANDLORD to TENANT

6

on January 15 and July 15 of each year. In no event shall TENANT be liable for any taxes attributable to the Church as reflected on the New York City Tax assessor's rate card.

B.    As further Additional Rental during the Term, TENANT shall pay or cause to be paid, within ten (10) days after LANDLORD renders a bill therefor, all other taxes, assessments, charges, rates and water and sewer charges, and other governmental charges, which shall or may, during the Term, be assessed, levied, charged, confirmed or imposed upon or become payable out of or become a lien on the land and/or Building constituting the Premises or any part thereof or the appurtenances thereto, and such franchise, license and permit fees as may be appurtenant to the use of the Premises, applicable to the period within the Term, but shall not pay any municipal, state or federal income taxes, assessed against LANDLORD or any municipal, state or federal, estate, succession, inheritance, or transfer taxes of LANDLORD, or any franchise taxes imposed upon LANDLORD or any income, profits, or revenue tax, assessment or charge imposed upon the rent received as such by LANDLORD under this Lease or any tax attributable to the Church as reflected on the New York City Tax assessor's rate card; provided, however, that if at any time during the term of this Lease, the present method of taxation or assessments shall be so changed that there shall be added to, or substituted for the whole or any part of the taxes, assessments, levies, impositions, or charges, hereafter levied, assessed, or imposed on real estate and the improvements, a capital tax or other tax imposed on the rents received by LANDLORD from the Premises or the rents reserved herein, or any part thereof, then all such capital taxes or added or substituted other taxes shall, to the extent that they are so imposed and/or substituted, be deemed to be included within items to be paid by TENANT as set forth in this Section to the extent that such tax or payment would be payable if the Premises were the only property of LANDLORD subject thereto.

7

C.      Where any assessment is permitted by law to be paid in installments, TENANT may pay such assessment to LANDLORD in installments, together with the interest thereon, as and when each such installment becomes due.  TENANT shall not be obligated to pay the amount or portion of any installments of any assessment or assessments which are applicable to any period prior to the Rent Commencement Date or subsequent to the expiration or termination date of this Lease.

D.      The certificate, advice, bill, receipt or statement issued or given by the appropriate officials authorized or designated by law to issue or give the same or to receive payment of any tax or any payment in lieu thereof shall be prima facie evidence for all purposes of the existence, payment, non-payment or amount of such tax or payment upon TENANT's receipt thereof.

E.      TENANT shall have the option in LANDLORD's name and with LANDLORD's full cooperation to contest the validity or amount of the assessed valuation for real estate taxes levied against the Premises, for any or all of the years during the term of this Lease.  TENANT shall pay all counsel fees and disbursements in connection with said contest. In the event TENANT is successful in reducing the taxes and obtaining a tax saving and/or tax refund, and if TENANT has paid the taxes for which the refund has been obtained, TENANT shall receive the full refund.  In the event that there is no refund of taxes paid, but the recovery is represented by a reduction in assessed valuation for future years, resulting in a tax savings during the term of this Lease, TENANT shall receive the full benefit of such savings.

F.      Notwithstanding anything to the contrary contained herein, TENANT shall not be required to pay any interest, penalties or late fees assessed by any municipality for

the late payment of Taxes except to the extent same are payable as a consequence of TENANT's failure to pay Taxes to LANDLORD within the time periods set forth herein.

3.5    TENANT represents, warrants, covenants and agrees that it shall pay to LANDLORD at the time and in the manner set forth herein Percentage Rent as follows:

A.    (i)    In addition to the Annual Basic Rent and all other rents and charges reserved hereunder and as part of the total rent to be paid in any Lease Year in which the amount of Gross Sales exceeds an amount equal to the Annual Basic Rent then payable multiplied by ten (10) (the "Gross Sales Base") (as such amount may be prorated as provided in clause (ii) below), TENANT shall pay to LANDLORD as Additional Rent for each Lease Year or fractional part thereof from and after the Rent Commencement Date and throughout the remainder of the Term, an amount (the "Percentage Rent") equal to the sum of the product of (x) the Excess Gross Sales (as hereinafter defined) for such Lease Year, multiplied by (y) ten (10%) percent.

(ii)    As used herein, the term "Excess Gross Sales" shall mean, for the period to which reference is made, the excess of (x) Gross Sales for such period over (y) the Gross Sales Base (as pro rated for any period which is a partial Lease Year).

(iii)    Percentage Rent shall be determined and paid, without prior demand being required therefor and without any offsets or deductions whatsoever, in the manner hereinafter provided in Subsection (C) below.

B.    (i)    Each Lease Year shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rent due, if any.  The amount of Gross Sales in any Lease Year shall not be carried over into any other Lease Year.

9

(ii)    The term "Quarter" as used in this Lease shall mean a period of three (3) consecutive full calendar months commencing on each of the first day of January, April, July and October. The first Quarter shall be a period from the Rent Commencement Date through and including the day immediately preceding the January 1, April 1, July 1, or October 1 next following, as the case may be. The second Quarter and every subsequent Quarter shall cover the next succeeding three (3) full calendar months commencing the first day of the next succeeding calendar quarter provided that last Quarter shall expire upon the Expiration Date. Each Quarter shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rent due, if any, for the Quarter in question, subject to adjustment at the end of each Lease Year, as set forth below.

C.    In the event that Gross Sales for any Quarter during the Term exceeds the Gross Sales Base divided by four (4), then TENANT shall pay to LANDLORD, at the time the applicable Monthly Report is submitted to LANDLORD as provided in Section F (i) (a) in respect of the last month of each such Quarter, an interim Percentage Rent payment based upon the amount of such excess. Any such interim payment shall be accounted for when the annual Percentage Rent is paid as hereinafter provided. At the end of each Lease Year, (or partial Lease Year, if applicable) the actual Percentage Rent shall be computed on a full Lease Year (or partial Lease Year, if applicable) basis and the balance of the Percentage Rent due, if any, shall be paid to LANDLORD within ninety (90) days after the end of such Lease Year, including if such is the last Lease Year (or partial Lease Year, as to which TENANT's obligation shall survive the expiration of the Term of this Lease). If at the end of any Lease Year the total amount of interim Percentage Rent payments made by TENANT exceeds the total amount of Percentage Rent required to be paid by TENANT for such Lease Year as shown in TENANT's Annual Report,

10

the amount of such excess shall be first applied as a credit (in any order LANDLORD shall elect) against any past due amounts payable by TENANT under this Lease but not collected by LANDLORD, and with respect to the balance, TENANT shall thereafter receive a credit equal to such excess (after such application shall be made) which may be deducted by TENANT from the next accruing payment (s) of Annual Basic Rent and Additional Rent following submission of TENANT's annual report.  If such overpayment occurred in the last Lease Year or partial Lease Year of Term, LANDLORD shall pay the remainder (if any) of the amount of such overpayment to TENANT within thirty (30) days after the later of (x) LANDLORD's receipt of TENANT's Annual Report for the last Lease Year or partial Lease Year as described in Section F.(i)(c) or (y) the final resolution of any audit performed by LANDLORD under this Section 3.5., but in no event later than ninety (90) days following LANDLORD's receipt of TENANT's annual report for the last Lease Year.

   D.    (i)    The term "Gross Sales" shall mean (A) the dollar aggregate of the actual sales price collected and retained by TENANT or by any TENANT affiliates for all facility rentals, foods and beverages, both alcoholic and non-alcoholic, and all merchandise, wares and other goods sold or leased and the actual charges collected and retained for all services performed, business conducted and accommodations (including, without limitation, cover charges, admission fees, membership fees, other dues, and the like) rendered by TENANT or by any TENANT affiliates in, at, from, or arising out of the use of the Premises (and all fees, charges, subrents, concession payments or other payments collected and retained by TENANT from any subtenant, licensee, concessionaire and other occupant in, at, or arising out of the Lease of the Premises in respect of any such party's use or occupancy of the Premises), including the fair market value of all consideration other than money received for any of the foregoing and (B)

11

all monies or other things of value received by TENANT from any concessionaire or licensee of its operations at the Premises; and (C) any deposit accepted and retained by TENANT as being forfeited shall be included in Gross Sales; and (D) subject to adjustment relating to TENANT's costs of collection, refunds, and all amounts received under insurance policies in respect of loss of business, sales or profits, but excluding insurance proceeds received by TENANT with respect to Basic Annual Rent (except to the extent LANDLORD collects insurance proceeds for loss of Percentage Rent in respect thereof), shall be deemed actual sales prices collected and retained. No franchise tax, capital stock tax, tax based upon assets or net worth, and no income or similar tax based on income or profits shall be deducted from Gross Sales.

(ii)    Notwithstanding the foregoing, only the following shall be excluded from Gross Sales: (A) credits for returns to suppliers, shippers or manufacturers; (B) cash or credit refunds to customers on transactions otherwise included in Gross Sales not exceeding the selling price of goods and services; (C) sales of TENANT's trade fixtures, machinery and equipment, which are not stock for sale or trade, after use thereof in the conduct of TENANT's business; (D) amounts separately stated in the sales receipt and collected from customers which are paid by TENANT to any government for any sales or excise tax on such sales imposed by law at the point of sale; (E) receipts resulting from sales at a discount to TENANT's employees made in the ordinary course of their employment; (F) monies representing tips, gratuities and service charges paid by a customer that are directly paid by TENANT to employees; (G) the actual amount of charges for services performed by unaffiliated contractors and service providers which are itemized and billed to TENANT's customers including, but not limited to, florists, musicians, lighting, performers and other entertainers, printers, decorators, travel services, caterers and bakers (exclusive of any surcharge, mark-up or

12

other amount charged by TENANT); (H) interest, service charges, or other carrying charges separately stated and paid to TENANT for the extension of credit by TENANT on account of sales made or services rendered by TENANT, provided no discount on the sale price of the item or service is provided in return; (I) proceeds of claims for damage to merchandise or fixtures; (J) interest, finance and other charges paid to third party credit card companies; (K) uncollected or uncollectible credit accounts in respect of which TENANT shall have made commercially reasonable efforts to collect; (L) gross revenues of non-affiliated third party hat check, men's room and similar concessionaires to the extent not retained, paid or remitted to and retained by TENANT and (M) unearned deposits.  In no event shall any franchise tax or capital stock tax income tax or any similar tax based upon income, profits or gross sales be deducted from Gross Sales.  If TENANT shall incur any costs for collection for Gross Sales, the costs shall be deducted from any recovery in determining such Gross Sales.

(iii)    TENANT shall not cause the nature or location of any transaction which would otherwise be included in the definition of Gross Sales set forth above to be altered or changed in such a manner that would cause such transaction to be excluded from Gross Sales. In the event of a breach of the foregoing covenant, LANDLORD, in addition to any other right or remedy available under this Lease, at law or in equity, may require that any such transaction be included in Gross Sales for the purpose of computation of the Percentage Rent hereunder and for all other purposes of this Section 3.5, as though said transaction had been made at the Premises.

E.    TENANT shall prepare and keep, for a period of not less than one (1) year following the end of each Lease Year, adequate books and records in customary form (including electronic media, if used by TENANT) from which LANDLORD and its professional

13

consultants can determine with reasonable ease the amount of Gross Sales for any given period, including but not limited to, records of inventories, purchases, and receipts of merchandise, and all sales and other transactions made by TENANT described in the definition of Gross Sales set forth above, which books and records shall be conveniently segregated from other business matters. TENANT shall record, at the time thereof, each sale or other transaction described in the definition of Gross Sales set forth above. No food, beverage or other item may be sold or otherwise provided in connection with TENANT's business operations at the Premises unless the transaction in respect thereof is recorded in such system. All original records, in their original and unaltered form, shall be part of the books and records required to be retained hereunder. TENANT shall keep, for at least one (1) year following the end of each Lease Year, all pertinent original sales records relating to TENANT's operation of its business at the Premises as follows: (a) such records which would normally be examined and reasonably required to be kept by an independent accountant pursuant to generally accepted auditing standards in performing an audit of TENANT's Gross Sales, (b) duplicate bank deposit slips and bank statements for all bank accounts, as well as all canceled checks and checkbooks, (c) credit card receipts and monthly reports from credit and clearing companies, (d) sales journals, and (e) cash receipts journals. If TENANT fails to maintain such books of account and records as is reasonably necessary to determine Gross Sales and the respective categories thereof as described in Section D.(i), or to make the same available as provided in Section G.(i) and such failure shall continue for fourteen (14) business days after LANDLORD shall have given TENANT written notice thereof, then LANDLORD, without limiting any other rights or remedies hereunder, at law or in equity, may hire an accountant, at TENANT's sole cost and expense (the amount of which shall be payable by TENANT to LANDLORD as Additional Rent within ten (10) business days after TENANT's

receipt of written demand therefor), to maintain such books of account and records, and TENANT shall cooperate with such accountant with respect thereto.

F.    (i)    TENANT shall deliver to LANDLORD the following reports of Gross Sales (collectively, the "Reports") in the manner and at the times as set forth below, time being of the essence in each instance:

(a)    TENANT shall deliver to LANDLORD on or before the fifteenth (15th) day following the end of each month during the term hereof (including the fifteenth (15th) day of the month following the end of the Term), the statement of Gross Sales for TENANT's business in the Premises during the immediately preceding month on a cash basis (the "Monthly Report").

(b)    TENANT shall deliver to LANDLORD on or before the thirtieth (30th) day following the end of each Quarter a written statement signed by TENANT and certified by an authorized officer or member of TENANT to be true and correct, showing the amount of Gross Sales during the immediately preceding Quarter (the "Quarterly Report");and

(c)    TENANT shall deliver to LANDLORD on or before the ninetieth (90th) day following the end of each Lease Year (including the ninetieth (90th) day following the Expiration Date) a written statement signed by TENANT and certified by an authorized officer or member of TENANT to be true and correct showing the amount of Gross Sales during the preceding full or partial Lease Year, as applicable (the "Annual Report").

(ii)    Each Monthly Report, Quarterly Report and Annual Report shall be prepared using the cash method of accounting and shall have separate detailed calculations of the amounts of Gross Sales for the period covered by such statement and a reasonable detailed itemization of all inclusions and permitted deductions and exclusions used in said calculations.

(iii)    TENANT shall submit to LANDLORD photocopies of the federal, State or local sales tax returns concurrently with the filing of same with the appropriate governmental agency.

(iv)    The acceptance by LANDLORD of payments of Percentage Rent or Reports thereon shall be without prejudice and shall in no case constitute a waiver of LANDLORD's right to examine TENANT's books and records of its Gross Sales and LANDLORD's right to any further sums subsequently shown to be due for any period.

G.    (i)    Upon thirty (30) days' prior written notice to TENANT and not more frequently than one (1) time in any Lease Year, LANDLORD, at its sole cost and expense (except as set forth below), shall have the right to cause a complete audit to be made of Gross Sales by TENANT and of all books and records pertaining thereto, including but not limited to those specified in Section E, and TENANT will make all of TENANT's books and records available, or cause the same to be made available, for examination (and photocopying or duplicating) at the Premises, or at TENANT's business office in New York City by LANDLORD or its authorized representatives (and TENANT shall make TENANT's photocopy or duplicating machines available to LANDLORD, with the actual cost of photocopies and duplication to be borne by LANDLORD, subject to the provisions of this Section G.(i). If the results of any such audit described above show that TENANT's statement of Gross Sales for any full or partial Lease Year has been understated, TENANT shall pay LANDLORD the amount of any such deficiency, together with interest thereon computed at the Interest Rate from the date due to the date LANDLORD shall collect payment thereof from TENANT. If any such understatement shall exceed three (3%) percent of the actual amount of Gross Sales for the period in question, then all reasonable, actual costs and expenses incurred by LANDLORD in

16

connection with such audit shall be paid by TENANT to LANDLORD as Additional Rent within ten (10) business days after written demand therefor, together with interest thereon computed at the Interest Rate from the date due to the date LANDLORD shall collect payment thereof from TENANT.

(ii)    Without limiting LANDLORD's rights and remedies under this Section 3.5 or elsewhere in this Lease, or otherwise available at law and in equity, if TENANT, at any time, is two (2) or more months delinquent in the furnishing of any Quarterly or Annual Report and such delinquency shall continue for ten (10) days after LANDLORD gives TENANT written notice thereof, in addition to all other remedies available to LANDLORD hereunder or at law or in equity, LANDLORD may, on five (5) days' notice, conduct an audit on the conditions set forth in subsection (i) above at TENANT's sole cost and expense with all reasonable, actual costs and expenses incurred by LANDLORD in connection therewith payable by TENANT to LANDLORD as Additional Rent, within ten (10) business days after written demand therefor. The willful furnishing by TENANT of any materially inaccurate statement shall constitute a default under this Lease and TENANT agrees any information obtained by LANDLORD through the means described in Section G.(ii) above shall be deemed furnished by TENANT. Any information obtained by LANDLORD as a result of any audit described in this Section G shall be held in strict confidence by LANDLORD, except in any action or proceeding to recover such deficiency or any costs or expenses in respect of such audit, or in connection with any existing financing or any prospective sale, lease or leaseback or financing of all or any part of the Premises, or in connection with any registration or filing with any governmental authority or pursuant to a subpoena or other judicial process, or, if otherwise required pursuant to Legal Requirements.

17

(iii)    Pending the determination of any dispute in respect to Gross Sales and as a condition precedent to TENANT's right to dispute the correctness of any LANDLORD's audit (as referred to in Subsection (i) above), TENANT shall pay to LANDLORD, as Additional Rent, the amount shown as due from TENANT based upon Gross Sales as determined by LANDLORD's auditor. TENANT shall have the right within thirty (30) days of receipt of the results of LANDLORD's audit, to submit any dispute in respect of Gross Sales on the correctness of LANDLORD's audit to a determination by a certified public accountant with at least ten (10) years experience, mutually selected by the parties. Such dispute will be determined without a hearing solely upon TENANT's books and records and LANDLORD's audit report with respect thereto (the "Audit Documents") and the arbitrator shall make such decision within thirty (30) days of its appointment. If the parties cannot agree on an accountant, or if such certified public accountant fails to make its decision within such time period, both parties shall apply to the American Arbitration Association of the City of New York for the appointment of an accountant possessing the qualifications set forth above, who shall receive the Audit Documents within thirty (30) days of the appointment, and whose decision shall be conclusive, final and binding on the parties hereto. The party against whom the determination is made shall bear the cost of such arbitration, and if each party is partially successful, the arbitrator will apportion such costs between the parties. If such dispute is ultimately determined in TENANT's favor, LANDLORD shall, within ten (10) business days after the arbitrator shall have rendered its final determination, pay to TENANT any amount so overpaid by TENANT, plus interest at the Interest Rate for the period commencing on the date such overpayment was paid by TENANT until the date TENANT shall have received payment in full, plus interest, of the entire amount of the overpayment.

H.    IF TENANT shall fail to operate its business in the Premises for a period

of 60 days in any 12 month period then, for the purpose of computing Percentage Rent (and not

in lieu of any rights or remedies of LANDLORD in respect thereof), Gross Sales for the period

in excess of said 60 days shall be deemed to be the average Gross sales for the corresponding

period of the immediately preceding two (2) Lease Year periods (taking into account day of the

week and week of the month) or the highest Gross Sales in any Lease Year for the corresponding

period during the entire previous portion of the Term if the period since the Lease

Commencement Date has been less than three (3) Lease Years.

I.    LANDLORD and TENANT expressly agree that nothing in this Lease

(including, without limitation, the payment of Additional Rent by TENANT based on a portion

of Gross Sales) shall create or be deemed to create any relationship between LANDLORD and

TENANT, whether as partners, joint venturers, or otherwise, other than that of LANDLORD and

TENANT under this Lease.

J.    The obligations of TENANT in any and all Lease Years during the Term

(i) to pay Percentage Rent due under this Section 3.5 and (ii) to keep its books and records in

accordance with Section 3.5E shall survive termination of this Lease for a period of one (1) year

from the date on which the Percentage Rent was paid or became payable by TENANT.

LANDLORD's right to audit any Annual Report pursuant to Section 3.5G shall survive the

termination of this Lease for a period of twelve (12) months following the month in which

TENANT delivers its Annual Report pursuant to Section 3.5.F in respect of the final Lease Year

and, in any event, until the resolution of any dispute in respect of any amount of Percentage Rent

which LANDLORD shall determine is due and payable under this Section 3.5, provided the

dispute resolution is commenced and diligently pursued by LANDLORD within the time period

specified above. Sums collected and retained by TENANT for a period of six (6) months after termination or expiration of the Lease shall be deemed included in the final Quarter prior to said expiration or termination, which Quarter shall be promptly readjusted after the expiration of said six (6) month period to include such sums.

## ARTICLE 4
## UTILITIES AND SERVICES

4.1    TENANT shall contract directly with the local utility companies for all electric, gas and water (including any stand-by water required for any sprinkler system) used and consumed in the Premises. TENANT shall pay for all such utilities and services. TENANT shall not be required to pay for any electricity supplied to Cingular or Nextel.

## ARTICLE 5
## LANDLORD'S WORK, TENANT WORK, REPAIR AND MAINTENANCE

5.1    TENANT has inspected the Premises and accepts the Premises in "as is" condition and LANDLORD shall not be obligated to do any work other than the removal of the existing personal property and equipment in the Sunday School section of the basement and the storage area of the 4th floor (LANDLORD's Work"). LANDLORD's work shall be completed prior to the Commencement Date.

5.2    TENANT at TENANT's sole cost and expense shall renovate the Premises substantially in accordance with the preliminary plans (Exhibit C) and specifications (Exhibit E) attached hereto (the "TENANT Work").

5.3    A.    TENANT shall provide LANDLORD with detailed plans and specifications for the renovation of the Premises, which shall include, inter alia, electrical and mechanical drawings (the "Plans and Specifications"). The Plans and Specifications shall include provisions for the following, all of which shall be done by TENANT at TENANT's sole

20

cost and expense: removal and storage off site of the pews from the main floor of the auditorium and the first (lowest) row of the balconies (and restore the balcony cosmetically so that the removal of the first pew is not noticeable), said pews to be reinstalled by TENANT upon the expiration or termination of this Lease (provided that TENANT, at TENANT's option may elect not to store the pews in which case TENANT shall install new pews, of similar design and quality to existing pews upon the expiration or termination of this Lease), renovation of a building entrance to make it ADA compliant (as required by law), upgrading of restrooms in the Premises and making one restroom ADA compliant (as required by law), specifications for at least 350 custom stackable chairs to be located on the ground floor of the Premises, installation of a fully equipped catering kitchen in the area now used by LANDLORD's Child Care and Sunday School offices, creation of a new room in the basement to serve as LANDLORD's Sunday School office and nursery with a door providing direct access to the Sunday School area, cosmetic refurbishment of the auditorium as well as other rooms such as the existing Board Room and existing storage areas, leveling of the auditorium floor and installation of high quality carpeting, painting and repairing of the auditorium, 4th floor hallway and other public portions of the Premises which will be used by TENANT's clients, and LANDLORD's congregation, repair of all existing damage in the auditorium, design and installation of curtains to cover the organ pipes if TENANT shall so elect, and existing religious messages in the auditorium, installation of facilities and equipment to render the Premises in compliance with applicable legal requirements, installation, if TENANT shall so elect, of a VIP room/Bridal Suite on the North side of the lower level including separate bathroom, power and wiring upgrades as needed or required to accommodate TENANT's catering business with TENANT removing any visible abandoned wiring or conduit, modifications to the existing heating, ventilating and air conditioning systems

to accommodate TENANT's catering business, installation of a new communications system,

upgrading and repair of the existing elevator, all installations needed to bring the Premises into

code compliance for TENANT's catering business, other than conditions which are in violation

of applicable code on the day prior to the Commencement Date (other than conditions which are

to be remedied by TENANT Work) renovation of the existing 4th floor Literature Distribution

Room into TENANT's office and presentation room with the option for TENANT to relocate or

expand such space, installation of replacement Literature Distribution Room/Committee Room,

storage facilities and a Treasurer's office for LANDLORD in the fourth floor attic area in a

location adjacent to the existing Board Room, installation of kitchen ventilation and fire

suppression systems, installation of a new electronic sign compatible with the appearance of the

Building at approximately eye level on the corner of the Building facing Park Avenue at 63rd

Street identifying at the times herein specified the various uses of the Building as further

delineated in this Lease and/or in the Exhibits hereto, installation of a new electronic sign to the

left of the 63rd Street side entrance which will indicate the existence of LANDLORD's Sunday

School and Sunday and Wednesday services at all times except when TENANT is using or

actively marketing the Premises for a 3rd party function, provide a storage area for

LANDLORD's Hymnals, hand-out literature and that upon which such literature will be

displayed and signs in a location to be mutually determined installation of a new sound system

with controls in the auditorium.  LANDLORD will approve or provide comments on TENANT's

plans and specifications within two (2) weeks after submission, and within ten (10) days after

resubmission in response to comments made by LANDLORD.  Except for the design and

engineering in connection with the work described in this Paragraph 5.3 and in Paragraph 5.4,

22

TENANT shall not commence any physical work until the contingencies in Paragraph 2.3 have been satisfied.

       B.     In furtherance of the foregoing, subject to all the non-monetary covenants, agreements, terms, provisions and conditions of this Lease including, but not limited to, the prohibition against physical work in Paragraph 5.3.A, effective after the signing of this Lease, LANDLORD hereby grants to TENANT use of the existing Literature Distribution Room and treasurer's office on the 4th floor of the Premises and grants to TENANT's decorators, suppliers, and contractors access to the Premises for the purpose of arranging for and making improvements and installing TENANT's equipment, telephones, trade fixtures, movable partitions, furniture, and other furnishings, provided that TENANT's contractors obtain and maintain Comprehensive General Liability insurance with a combined single limit of at least $2,000,000.00 and including LANDLORD as an additional insured, and Worker's Compensation Insurance. TENANT agrees that it shall use reasonable efforts not to disturb the current occupant of the Basement portion of the Premises (the Geneva School) in connection with TENANT's preparations of its plans and specifications or in the conduct of any of TENANT Work hereunder.

    5.4    In addition to the foregoing improvements and work, after the Rent Commencement Date TENANT agrees to complete the repair of the Building's roof in accordance with proposals previously obtained by LANDLORD. It is estimated that the cost of such repairs is approximately $650,000. Upon completion of the roof repair project LANDLORD shall reimburse TENANT for the cost incurred by TENANT to complete said roof repair together with an amount equal to (i) the actual rate of interest paid or payable by TENANT in connection with TENANT's financing of all or a portion of the cost of such repair

or (ii) the Interest Rate if TENANT shall not have financed such cost, said reimbursement to be deducted from the Percentage Rent to be paid to LANDLORD pursuant to Section 3.5 of this Lease in an amount equal to Fifty Thousand ($50,000.00) Dollars per year until the final year of payment at which time the balance shall be due and payable. In no event shall this reimbursement obligation reduce the Basic Annual Rent payable hereunder. LANDLORD shall make available to TENANT all warranties and guarantees relating to the work heretofore performed to the roof of the Premises. LANDLORD shall cooperate with and assist TENANT should TENANT desire to enforce any of such warranties or guaranties. All warranties or guaranties relating to the roof work to be performed by TENANT shall be in the name of LANDLORD and TENANT.

5.5    TENANT covenants throughout the Term, at TENANT's sole cost and expense, to take good care of the interior of the Premises and keep the same in good order and condition and to make all repairs therein except as provided for herein.

5.6    A.    TENANT covenants throughout the term of the Lease, at TENANT's sole cost and expense, to maintain and keep in good repair the Building's sanitary, electrical, heating, air conditioning and other systems, subject to the allocation of the cost between TENANT and LANDLORD, as set forth below. LANDLORD will assign to TENANT any mechanical equipment warranties which may be in effect on the Commencement Date.

B.    In the event that TENANT fails to maintain or repair any portion of the Premises required to be maintained or repaired by TENANT hereunder, and said failure continues for a period of thirty (30) days after TENANT receives written notice of such failure, LANDLORD may, but is not obligated to, make such repair unless TENANT is then in the process of making such repair. In the event LANDLORD makes any repairs which are the

24

obligation of TENANT hereunder, LANDLORD shall submit a copy of the bill for same and TENANT shall pay to LANDLORD within ten (10) days of TENANT's receipt thereof the amount of such bill, together with interest at the Interest Rate.

5.7    Except as expressly provided otherwise in this Lease, there shall be no allowance to TENANT or diminution of rent and no liability on the part of LANDLORD by reason of inconvenience, annoyance or injury to business arising from the necessity to make any repairs, alterations, additions or improvements in or to any portion of the Building or the Premises, or in and to the fixtures, appurtenances and equipment thereof.

5.8    TENANT shall, to the extent same are cost effective, during the entire Term or any Extended Term maintain maintenance contracts for the HVAC system, the elevator and all other systems which as a matter of law require such maintenance contracts, at TENANT's sole cost and expense.

5.9    LANDLORD shall not be required to furnish any services for the Premises, including, but not limited to, heat, water, light and electric power, and shall not be liable for interference with light or other incorporeal hereditaments or easements not caused or placed upon the Building by LANDLORD, or for any failure of water supply or electric current or of any services by any utility, nor for injury or damage (including death) to person or property caused by or resulting from steam, gas, electricity, water, rain or snow, which fall upon, flow or leak from any part of the Premises, or from any pipes, appliance or plumbing works of the same, or from the street or sub-surface or from any other place unless same are a consequence of LANDLORD's negligence, gross negligence or willful default.

5.10    INTENTIONALLY DELETED

5.11    TENANT shall contract and pay for, at its sole cost and expense, all utilities supplied to the Premises by any utility company, whether public or private, including, but not limited to, gas, electricity, water and telephone.  LANDLORD shall reimburse TENANT for all telephone charges incurred by LANDLORD or its employees, officers or trustees through its use of TENANT's communication system.

5.12    TENANT agrees to take all reasonable precautions to protect the Church's organ in the Premises during the performance of TENANT Work and promptly to repair any damage to said organ caused by TENANT or any of TENANT's employees or contractors.

5.13    The hiring and retention by Landlord at the Building of any and all employees in the capacities of custodian and/or Building maintenance, including the terms and conditions of employment, shall be subject to the prior written approval and consent of Tenant (each, an "Employee"), which may be given or withheld, at Tenant's sole discretion.  The terms and conditions of employment shall include, without limitation, each Employee's working hours, compensation, job description and benefits shall be determined by Tenant at Tenant's reasonable discretion.  Tenant shall reimburse Landlord within thirty (30) days of written demand therefor, in an amount equal to any such Employee's compensation, including FICA and similar costs, provided Tenant shall have theretofore approved such amounts in writing.  Subject to the foregoing, LANDLORD shall continue to employ the current Church custodians.  The LANDLORD shall inform the custodians, and any replacement custodians approved by TENANT, that they shall be subject to the direction and supervision of TENANT, except when the Building is being used exclusively for Church Activities, during which periods the custodians with respect to Church activities only shall be subject to the direction of the Church.  Nothing in

26

NY1 264000003

this Lease shall be deemed to create any claims of third party beneficiary right or remedies whatsoever.

## ARTICLE 6
### CHANGES AND ALTERATIONS — SURRENDER OF PREMISES

6.1    TENANT shall have the right, at any time and from time to time, during the Term to make such nonstructural changes and alterations to the interior of the Premises as TENANT shall deem necessary or desirable. However, all changes and alterations must be made with the prior written consent of LANDLORD, which consent will not be unreasonably withheld, conditioned or delayed. In determining the reasonableness of LANDLORD's refusal to consent the parties shall bear in mind the fact that during the term of this Lease the Premises will continue to be used by LANDLORD as a place of worship and for Sunday School services and for other Church related activities, and that the Premises is intended to be used as a church facility after the termination of this Lease. Prior to TENANT doing any work in the Premises, TENANT shall deliver to LANDLORD a description thereof (including samples of paint colors, wallpaper and carpet) (if same are limited to cosmetic work) or detailed plans and specifications thereof prepared by a licensed architect or licensed engineer for any other work. LANDLORD shall notify TENANT in writing of its approval or disapproval (setting forth in detail the basis of such disapproval) no later than two (2) weeks following TENANT's request for consent and shall notify TENANT of its approval no later than ten (10) days following TENANT's resubmissions satisfying LANDLORD's reasonable basis of disapproval.

6.2    TENANT without the prior written consent of LANDLORD, shall not place any signs on the roof or on or about the inside or outside of the Building, except as noted in Articles 5 and 27 of this Lease.

27

6.3    All permanent improvements and alterations made or installed by or on behalf of TENANT, shall at the expiration or sooner termination of this Lease be and become the property of LANDLORD without payment therefor by LANDLORD, except as hereinafter provided.

6.4    TENANT shall, upon the expiration or earlier termination of this Lease, surrender to LANDLORD the Premises, together with all alterations and replacement thereto, in good order and condition, except for reasonable wear and tear or damage by fire or casualty. In addition to the foregoing, TENANT shall, at the expiration or sooner termination of the Lease, label all telephone and other communications wiring installed in the Premises. TENANT shall also re-install or replace, as the case may be, all of the church pews which were removed prior to the initial alterations.

If TENANT shall make any alterations or changes or additions to the Premises other than TENANT Work, which are not customarily found in a church type facility, after the commencement of the Term, and LANDLORD shall desire the same to be removed upon the expiration of the Term, then, providing TENANT, in its request for consent, specifically requests LANDLORD to indicate whether or not such alteration must be removed and LANDLORD gives notice to TENANT of its desire to have the same removed prior to the installation of same, TENANT shall remove same prior to the expiration of the Term at TENANT's sole cost and expense and TENANT shall, at its own cost and expense, restore the Premises to the condition which they were in prior to such installation, normal wear and tear and damage by fire excepted.

6.5    In connection with any alterations to the Premises done by TENANT including decorating, prior to any work being commenced, TENANT shall supply to LANDLORD: (i) liability insurance from the Contractor doing the work in an amount not less than Two Million Dollars ($2,000,000), naming LANDLORD as an additional insured; (ii) evidence that all

28

workers doing work in the Premises are covered by Workmen's Compensation Insurance, to the extent required by applicable laws, rules and regulations; (iii) an agreement from TENANT's contractor to remove all debris from the Premises after 6:00 P.M. at the end of each day's work and prior to 7:00 a.m. the following day.  In the event TENANT's contractor shall fail to remove debris on a daily basis, as hereinabove provided, and continue such failure after written notice from LANDLORD, LANDLORD may order said contractors off the Premises and refuse them access thereafter.

## ARTICLE 7
## COMPLIANCE WITH ORDERS, ORDINANCES, ETC.

7.1    TENANT covenants and agrees that all work to be done by TENANT shall comply with all building codes and regulations, laws, ordinances and regulations and the American's with Disabilities Act applicable thereto.  TENANT further represents that all such work will be done in accordance with the Plans and Specifications.

7.2    TENANT covenants throughout the Term and any renewals hereof, at TENANT's sole cost and expense, to comply with all laws and ordinances and the orders and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof ("Legal Requirements"), which may be applicable to TENANT's use or occupancy of the Premises, excepting all conditions existing at the Premises or the Building prior to the Commencement Date (excluding these conditions which are to be remedied by TENANT work), and LANDLORD shall comply with all Legal Requirements the compliance with which is specifically necessitated by the use of the Building and the Premises as a Church facility.

7.3    TENANT shall have the right to contest by appropriate legal proceedings, in the name of TENANT or LANDLORD or both, but without cost or expense to LANDLORD, the validity of any Legal Requirement to be complied with by TENANT herein.  Provided such

29

noncompliance does not subject LANDLORD to any criminal liability for failure so to comply or create any dangerous or hazardous condition either to person or property, TENANT may postpone compliance therewith until the final determination of any proceedings, provided that all such proceedings shall be prosecuted with all due diligence and dispatch, and if any lien or charge is incurred by reason of noncompliance, TENANT may nevertheless make the contest aforesaid and delay compliance as aforesaid, provided that TENANT indemnifies LANDLORD against any loss or injury by reason of such noncompliance or delay therein excepting therefrom all conditions existing at the Premises prior to the Commencement Date except those conditions which are to be remedied by TENANT Work.

7.4    A.    TENANT, as to any hazardous substances brought into, on or under the Premises by TENANT or its invitees, agents, employees and contractors subsequent to the Commencement Date, hereby agrees to indemnify, defend and hold harmless LANDLORD, its employees, agents, successors, and assigns, from and against any and all damages, claims, lawsuits, liability, or loss, including reasonable attorney fees, arising out of or in any way connected with the generation, treatment, storage or disposal of hazardous substances by TENANT or any of TENANT's employees, agents, contractors, or invitees, in the Premises, under all Federal, State and Local Environmental laws, rules and ordinances, strict liability and common law.  TENANT acknowledges that it has been informed by LANDLORD of the existence of asbestos containing tiles under the carpet in the auditorium and TENANT agrees to use due care during the performance of TENANT Work not to disturb any such asbestos containing materials or to remove same in accordance with applicable rules and regulations. Any hazardous substances in, on or under the Premises prior to the Commencement Date which are required to be removed pursuant to applicable law will be so removed by LANDLORD prior

30

to the Commencement Date or within thirty (30) days thereafter unless such removal is required as a result of TENANT's proposed alterations or TENANT Work.

B.    TENANT agrees promptly to notify LANDLORD of any disposal of hazardous substance in the Premises or of any discovery of hazardous substances in the Premises, or of any notice received by TENANT from a governmental authority or private party alleging that a disposal of hazardous substances on the Premises or the Building may have occurred. Furthermore, TENANT agrees to provide LANDLORD with full and complete access to any documents or information in its possession or control relevant to the question of generation, treatment, storage, or disposal of hazardous substances on the Premises or the Building.

## ARTICLE 8
## MECHANIC'S LIENS

8.1    TENANT covenants not to suffer or permit any mechanic's liens to be filed against the fee interest of LANDLORD nor against TENANT's leasehold interest in the Premises by reason of work, labor, services or materials supplied or claimed to have been supplied to TENANT or any contractor, subcontractor or any other party or person acting at the request of TENANT (other than LANDLORD), or anyone holding the Premises or any part thereof through or under TENANT. TENANT agrees that in the event any mechanic's lien shall be filed against the fee interest of LANDLORD or against TENANT's leasehold interest as the result thereof, TENANT shall, within forty five (45) days after TENANT's receiving notice of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or order of a court of competent jurisdiction or otherwise.

If TENANT shall fail to cause such lien to be discharged or bonded within the aforesaid forty five (45) day period, then, in addition to any other right or remedy, LANDLORD

31

# EXHIBIT B
# PART 2

may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or

by bonding the said lien, and in any such event, LANDLORD shall be entitled, if LANDLORD

so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and

to pay the amount of any judgment in favor of the lienor with interest, costs and allowances.

Any amount so paid by LANDLORD and all reasonable costs and expenses incurred by

LANDLORD in connection therewith, including, but not limited to premiums on any bonds and

reasonable attorneys' fees, shall constitute Additional Rental payable by TENANT to

LANDLORD within ten (10) business days of TENANT's receipt of LANDLORD's written

demand therefore.

ARTICLE 9

USE OF PREMISES BY LANDLORD

9.1     During the term of this Lease, LANDLORD shall continue to occupy the existing

Church office, the Board Room, the two readers' rooms, the organist's room, the new Literature

Distribution/Committee Room, Treasurer's office, 4th floor storage space, Sunday School office

and nursery in the basement and all areas of the Building which contain portions of the Church's

organ, including, but not limited to, organ pipes and mechanical equipment, which areas are not

part of the Premises and shall not be accessed by TENANT, its employees, agents, invitees and

contractors except in the event of an emergency or as otherwise specifically set forth herein.

LANDLORD shall also have access to all other parts of the Premises not specifically designated

for the exclusive use of TENANT, such as the 4th floor offices of TENANT, for the conduct of

church services, Sunday School services, lectures, corporate meetings, classes and associations

as more particularly set forth in Article 35 below.  TENANT shall install a door separating such

4th floor TENANT space from the Church space.  The 4th floor TENANT space shall be

designated by a sign specifying "583 Park," and the 4th floor Church space shall be designated by

32

a sign specifying "Private Offices." LANDLORD, at LANDLORD'S expense, shall also maintain a literature distribution box on the 63rd Street side of the Building at a location to be mutually agreed upon by the parties, which shall be constructed by LANDLORD at LANDLORD's expense, and shall be of the same quality and architectural detail as the new electronic signs, and which will conform to the aesthetics of the Building, such design and the materials used to construct same to be mutually agreed upon by the parties; however, the parties agree that the box shall have a transparent front.

## ARTICLE 10
## RIGHT TO PERFORM COVENANTS

10.1    TENANT covenants and agrees that if TENANT shall, at any time, fail to make any payment or perform any other act on its part to be made or performed under this Lease, LANDLORD, after the expiration of any time limitation set forth in this Lease (except in cases of emergency) and, in all events, after not less than five (5) days' written notice having been received by TENANT, may, but shall not be obligated to, make such payment or perform such other act to the extent LANDLORD may reasonably deem necessary to protect LANDLORD's interest in the Premises or to protect the condition of the Premises or the Building, and in connection therewith to pay expenses and employ counsel. All sums so paid by LANDLORD and all expenses in connection therewith shall be deemed Additional Rent hereunder and be payable to LANDLORD on the first day of the next month following TENANT's receipt of not less than ten (10) days' written notice thereof from LANDLORD, and LANDLORD shall have the same rights and remedies for the nonpayment thereof as in the case of default in the payment of the Annual Basic Rent reserved hereunder.

33

## ARTICLE 11
### DAMAGE OR DESTRUCTION

11.1    A.    If the Premises or any part thereof shall be damaged by fire or other casualty, TENANT shall give prompt notice thereof to LANDLORD and this Lease shall continue in full force and effect except as hereinafter set forth.

B.    If the Premises are partially damaged or rendered unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of LANDLORD utilizing due diligence, and to the extent of the proceeds of the insurance policies required to be maintained by TENANT or LANDLORD hereunder, as the case may be.

C.    If the Premises are rendered wholly unusable or if the Building shall be so damaged to the extent of fifty (50%) percent or more in square footage or value and LANDLORD shall decide to demolish it or not to rebuild it, then, in such event, LANDLORD or TENANT may elect to terminate this Lease by written notice to the other given within ninety (90) days after such fire or casualty specifying a date for the expiration of the Lease, which date shall not be more than thirty (30) days after receipt of such notice. Upon the date specified in a notice of termination given under and pursuant to this Article 11, the Term shall expire as fully and completely as if such date were the date set forth above for the termination of this Lease and TENANT shall forthwith quit, surrender and vacate the Premises without prejudice however, to each party's rights and remedies against the other under the Lease provisions in effect prior to such termination, and any rent owing shall be paid up to the date of the occurrence. Any payments of rent made by TENANT which were on account of any period subsequent to such date shall be returned to TENANT within thirty (30) days after the effective date of such termination. Also, LANDLORD shall repay to TENANT the balance of the cost to repair the roof as set forth in Paragraph 5.4 of this lease which has not previously been deducted by

34

TENANT from the Percentage Rent to be paid hereunder. Unless LANDLORD or TENANT shall serve a termination notice as provided for herein, LANDLORD shall make the repairs and restorations under the conditions of this Article 11, with all reasonable expedition, subject to delays due to adjustment of insurance claims, labor troubles and causes beyond LANDLORD'S control.

D.    Except as specifically provided herein, LANDLORD and TENANT each hereby releases the other, and waives its entire right of recovery against the other, for loss or damage to its respective property (real and personal) in, on or about the Premises, whether due to the negligence of LANDLORD or TENANT or their agents, employees, contractors and/or invitees and any subtenants of TENANT or otherwise. LANDLORD and TENANT further agree that their respective policies of property insurance shall contain a waiver of the insurer's right of subrogation (or a provision permitting the insured to waive the insurer's right of subrogation, in which event LANDLORD and TENANT hereby waive their insurer's right of subrogation) against the other party to this Lease for any claims for the loss or damage to the insured's property (real and personal). In the event that there are additional premiums for such waiver of subrogation, the party in whose favor such waiver is intended shall have the option to either pay the additional premium or waive the condition that the other's policy contains the same. TENANT acknowledges that LANDLORD will not carry insurance on TENANT's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by TENANT and agrees that LANDLORD will not be obligated to repair any damage thereto or replace the same. If thirty (30%) percent or more of the Premises is damaged by said fire or other casualty and less than two (2) years would remain in the Term, either LANDLORD or TENANT shall have the right to terminate this Lease upon written notice to the other within

thirty (30) days after said occurrence, and in such event, this Lease and the tenancy hereby created shall cease as of the date of said occurrence, and the Base Rent and additional rent will be adjusted and apportioned as of said date. Notwithstanding the foregoing, however, if LANDLORD shall terminate this Lease as aforesaid and TENANT shall, at that time, have not exercised either of the two (2) options to extend the Term, then, provided TENANT shall exercise the next remaining unexercised option, LANDLORD's notice shall be deemed null and void and LANDLORD, subject to the provisions of Section D hereof, shall restore the Premises as hereinbefore provided.

E.    TENANT hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this Article shall govern and control in lieu thereof.

11.2    TENANT shall not knowingly do or permit to be done any act or thing upon the Premises, which will invalidate or be in conflict with fire insurance policies covering the building of which Premises form a part, and fixtures and property therein. TENANT shall, at its expense, comply with all rules, orders, regulations or requirements of the New York Board of Fire Underwriters, or any other similar body, which may be applicable to TENANT's use and occupancy of the Premises, provided that the necessity for such compliance results from the use and occupancy of the Premises by TENANT, and shall not do, or permit anything to be done, in or upon the Premises or bring or keep anything therein, or use the Premises in a manner which shall increase the rate of fire insurance on the building. This provision shall not prohibit TENANT from construction of the kitchen facilities in the Premises as set forth in Paragraph 5.3A and Exhibits C and E, nor from the use of the Premises as in this Lease provided.

36

11.3    Notwithstanding anything to the contrary contained in this Lease, during any period after damage or destruction and until the Premises have been restored, TENANT shall be entitled to an abatement of Annual Basic Rent and Additional Rent for the unusable portion of the Premises.

ARTICLE 12
CONDEMNATION

12.1    If the whole of the Premises shall be taken for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain (hereinafter called "Taking"), the Term and all rights of TENANT hereunder, except as hereinafter provided, shall cease and expire as of the date of vesting of title as a result of the Taking and the rent or additional rent paid for a period after such date shall be refunded to TENANT upon demand.

12.2    In the event of a Taking of less than the whole of the Premises, this Lease shall cease and expire in respect of the portion of the Premises taken upon vesting of title as a result of the Taking, and LANDLORD shall promptly restore the remaining portion of the Premises to a complete secure building.  If the Taking results in the portion of the Premises remaining after the Taking being inadequate, in the judgment of TENANT, for the efficient, economical operation of TENANT's business conducted at such time in the Premises, TENANT may elect to terminate this Lease by giving notice to LANDLORD of such election not more than forty-five (45) days after the actual Taking by the condemning authority, stating the date of termination, which date of termination shall be not more than thirty (30) days after the date on which such notice to LANDLORD is given, and upon the date specified in such notice to LANDLORD, this Lease and the Term shall cease and expire and LANDLORD, on demand, shall reimburse TENANT for

37

the cost of all or the portion of the roof that TENANT shall not as then have recouped from the Percentage Rent.  If TENANT does not elect to terminate this Lease as aforesaid:

(i)     The Annual Basic Rent and Additional Rent payable under this Lease shall be proportionately adjusted, and

(ii)    The net award for the Taking shall be paid to and first used by LANDLORD, subject to the rights of any mortgagee, to restore the portion of the Premises and the building remaining after the Taking to substantially the same condition and tenantability (hereinafter called the "Pre-Taking Condition") as existed immediately preceding the date of the Taking; and

(iii)   The balance, if any, shall be shared by LANDLORD and TENANT, pro rata to their respective interests in the Premises.

12.3    In the event of a Taking of less than the whole of the Premises which occurs during the period of two (2) years next preceding the date of expiration of the Term, other than a de minimus taking, LANDLORD or TENANT may elect to terminate this Lease by giving notice to the other party to this Lease of such election, not more than forty-five (45) days after the actual Taking by the condemning authority, unless TENANT, if TENANT, shall at that time have not exercised either of the options to extend the Term, then TENANT shall exercise the next remaining unexercised option, in which event, LANDLORD shall promptly restore the remaining portion of the Premises to a complete secure building.  If either party elects to terminate this Lease, the notice shall state the date of termination, which date of termination shall not be more than thirty (30) days after the date on which such notice of termination is given. Upon the date specified in such notice, this Lease and the term hereof shall cease and expire all Annual Basic Rent and Additional Rent paid under this Lease for a period after such date of

38

termination shall be refunded to TENANT on or prior to the termination date. On or before such date of termination, TENANT shall vacate the Premises, and any of TENANT's property remaining in the Premises subsequent to such date of termination shall be deemed abandoned by TENANT and shall become the property of LANDLORD.

12.4   In the event of a Taking of the Premises or any part thereof, and whether or not this Lease is terminated, TENANT shall have no claim against LANDLORD or the condemning authority for the value of the unexpired term of this Lease, but TENANT may interpose and prosecute a claim in any proceedings in respect of the Taking and shall be entitled to the value of TENANT's leasehold improvements and the unreimbursed cost of the roof repairs (if any) caused to be performed by TENANT pursuant to this Lease and the reasonable value of TENANT's fixtures and its moving expenses.

12.5   If, as a result of a Taking, TENANT shall no longer have the use and occupancy of the entire Premises as provided in this Lease, the Annual Base Rent and Additional Rent and the percentage of Percentage Rents shall be reduced pro rata to the square footage of the Premises no longer usable by TENANT as contemplated in this Lease transaction.

## ARTICLE 13
## BANKRUPTCY OR OTHER DEFAULT

13.1   A.   <u>Events of Bankruptcy.</u> The following shall be Events of Bankruptcy under this Lease:

(i)   TENANT's becoming insolvent, as the term is defined in Title 11 of the United States Code, entitled Bankruptcy, 11 U.S.C. Sec. 101 et seq. (the "Bankruptcy Code") or under the insolvency laws of New York State;

(ii)   The appointment of a Receiver or Custodian for any or all of TENANT's property or assets;

39

(iii)    The filing of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws;

(iv)    The filing of an involuntary petition against TENANT as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is either not dismissed within ninety (90) days of filing, or results in the issuance of an order for relief against the debtor, whichever is later; or,

(v)    TENANT's making or consenting to an assignment for the benefit of creditors of a common law composition of creditors.

B.    LANDLORD's Remedies

(i)    Termination of Lease.  Upon the occurrence of an Event of Bankruptcy, LANDLORD shall have the right to terminate this Lease by giving fifteen (15) days prior written notice to TENANT that LANDLORD intends to terminate this Lease and, if within said fifteen (15) day period, the Event of Bankruptcy is not cured, LANDLORD may serve a thirty (30) day notice of termination, provided, however, that this Section "13.1 (B) (i)" shall have no effect while a case in which TENANT is the subject debtor under the Bankruptcy Code is pending, unless TENANT or its Trustee in Bankruptcy is unable to comply with the provisions of Sections "13.1B (v)" and "13.1B (vi)" below.  If TENANT or its Trustee is unable to comply with Sections "13.1 B(v)" and "13.1 B(vi)" below, this Lease shall automatically cease and terminate, and TENANT shall be immediately obligated to quit the Premises upon the giving of notice pursuant to this Section "13.1 B(i)".  Any other notice to quit, or notice of LANDLORD'S intention to re-enter is hereby expressly waived.  If LANDLORD elects to terminate this Lease, everything contained in this Lease on the part of LANDLORD to be done and performed shall cease without prejudice, subject, however to the right of LANDLORD to recover from TENANT

40

all rent and any other sums accrued up to the time of termination or recovery of possession by LANDLORD, whichever is later, and any other monetary damages or loss of reserved rent sustained by LANDLORD provided that any unamortized portion of TENANT's cost for the repair of the roof shall be refunded to TENANT prior to the Termination date.

(ii)    <u>Suit for Possession</u>.  Upon termination of this Lease, pursuant to Section "13.1 (B) (i)", LANDLORD may proceed to recover possession under and by virtue of the provisions of the laws of the State of New York, or by such other proceedings, including re-entry and possession, as may be applicable.

(iii)    <u>Reletting of Premises</u>.  Upon termination of this Lease, pursuant to Section "13.1 (B) (i)", the Premises may be relet by LANDLORD for such rent and upon such terms as are not unreasonable under the circumstances (bearing in mind the need for LANDLORD to continue to occupy the Premises as a church facility at all times), and if the full rental reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be realized by LANDLORD, TENANT shall be liable for all damages sustained by LANDLORD, including, without limitation, deficiency in rent, reasonable attorneys' fees, brokerage fees, and expenses of placing the Premises in good condition.  LANDLORD, in putting the Premises in good order or preparing the same for re-rental may, at LANDLORD'S option, make such alterations, repairs, or replacements in the Premises as LANDLORD, in LANDLORD'S reasonable judgment, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs, or replacements shall not operate or be construed to release TENANT from liability hereunder as aforesaid.  LANDLORD shall, in no event, be liable in any way whatsoever for failure to relet the Premises, or in the event that the Premises are relet, for failure to collect the rent thereof under such reletting, and in

41

no event shall TENANT be entitled to receive any excess, if any, of such net rent collected over the sums payable by TENANT to LANDLORD hereunder.

      (iv)   <u>Monetary Damages</u>.  Any damage or loss of rent sustained by LANDLORD as a result of an Event of Bankruptcy may be recovered by LANDLORD, at LANDLORD'S option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive relettings, or in a single proceeding deferred until the expiration of the term of this Lease (in which event TENANT hereby agrees that the cause of action shall not be deemed to have accrued until the date of expiration of said term).  In the event TENANT becomes the subject debtor in a case under the Bankruptcy Code the provisions of this Section "13.1 B(iv)" may be limited by the limitations of damage provisions of the Bankruptcy Code.

      (v)   <u>Assumption or Assignment by Trustee</u>.  In the event TENANT becomes the subject debtor in a case pending under the Bankruptcy Code, LANDLORD'S right to terminate this Lease pursuant to this Section "13.1" shall be subject to the rights of the Trustee in Bankruptcy to assume or assign this Lease.  The Trustee shall not have the right to assume or assign this Lease unless the Trustee: (a) promptly cures all defaults under this Lease, (b) promptly compensates LANDLORD for monetary damages incurred as a result of such default, and (c) provides adequate assurance of future performance.

      (vi)   <u>Adequate Assurance of Future Performance</u>.  LANDLORD and TENANT hereby agree in advance that adequate assurance of future performance, as used in Section "13.1 B(v)" above, shall mean that all of the following minimum criteria must be met:

      (a)   The Trustee must pay to LANDLORD, at the time the next payment of the monthly installment of Annual Basic Rent is due under this Lease, in addition to

42

such payment of Annual Basic Rent, an amount equal to the next three months Annual Basic Rent due under this Lease, said amount to be held by LANDLORD in escrow until either the Trustee or TENANT defaults in its payment of Annual Basic Rent or other obligations under this Lease (whereupon LANDLORD shall have the right to draw such escrow funds) or until the expiration of this Lease (whereupon the funds shall be returned to the Trustee or TENANT);

    (b)    TENANT or Trustee must agree to pay to LANDLORD, at any time LANDLORD is authorized to and does draw on the funds escrowed pursuant to Section "13.1 B(vi)(a)" above, the amount necessary to restore such escrow account to the original level required by said provision;

    (c)    TENANT must pay its estimated pro-rata share of the cost of all services provided by LANDLORD (whether directly or through agents or contractors, and whether or not the cost of such service is to be passed through to TENANT) in advance of the performance or provision of such services;

    (d)    The Trustee must agree that TENANT's business shall be conducted in a first class manner, and that no liquidating sales, auctions, or other non-first class business operations shall be conducted on the premises;

    (e)    The Trustee must agree that the use of the Premises as stated in this Lease will remain unchanged, including, but not limited to, the requirement that LANDLORD continue to operate as a church in the Premises as set forth herein and that TENANT shall continue to perform its obligations in support of such church use as set forth herein;

    (f)    The Trustee must agree that the assumption or assignment of this Lease will not violate or affect the rights of other tenants of LANDLORD.

(vii)    Failure to Provide Adequate Assurance.  In the event TENANT is unable, within the time periods in the Lease provided, to:

(a)    Cure its defaults; or

(b)    Reimburse LANDLORD for its monetary damages; or

(c)    Pay the rent due under this Lease, on time (or within applicable grace and notice periods); or

(d)    Meet the criteria and obligations imposed by Section "13.1B(vi)" above; then TENANT agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by LANDLORD in accordance with Section "13.1B(i)" above.

13.2    Events of Default.  The following shall be Events of Default under this Lease.

(i)    TENANT's failure to pay any monthly installment of Annual Basic Rent, Percentage Rent or Additional Rent, the amount of which has been ascertained, within ten (10) business days after TENANT has received written notice of such failure from LANDLORD; nothing herein shall be deemed an election by LANDLORD of remedies and LANDLORD shall also have the right to commence a non-payment landlord/tenant proceeding against TENANT arising out of TENANT's failure to pay Annual Base Rent, Percentage Rent and Additional Rent under this Lease.

(ii)    TENANT's failure to make any other payment required under this Lease if such failure shall continue beyond thirty (30) days after LANDLORD'S notice that the same has not been paid.

(iii)    TENANT's violation or failure to perform any of the other terms, conditions, covenants or agreements herein made by TENANT if such violation or failure

44

continues for a period of thirty (30) days after LANDLORD'S written notice thereof to TENANT.

(iv)    In the event of any violation or failure to perform a covenant as contemplated in Section 13.2 A(iii), and if such covenant cannot be performed within the said thirty (30) day period, then and in that event, providing TENANT has promptly commenced to cure such violation and is diligently proceeding with the cure the time within which TENANT may cure the same shall be extended to such reasonable time as may be necessary to cure the same with all due diligence.

B.    If an Event of Default as hereinabove specified in Section 13.2 A(i), (ii) or (iii)' shall occur, and shall not be cured within the time period specified in LANDLORD'S notice, or as to a default provided for in Section 13.2A(iv) if TENANT has commenced a cure but fails to diligently proceed with same after thirty (30) days' written notice from LANDLORD then:

(i)    LANDLORD may give TENANT a ten (10) day written notice of its termination, and thereupon, at the expiration of said ten (10) day period following TENANT's receipt of such notice, this Lease shall expire as fully and completely as if the day were the date herein originally fixed for the expiration of the Term, and TENANT shall then quit and surrender the Premises to LANDLORD but TENANT shall continue to remain liable as hereinafter provided; or, (ii) LANDLORD, without prejudice to any other right or remedy of LANDLORD, held hereunder or by operation of law, and notwithstanding any waiver of any breach of a condition or Event of Default hereunder may, at its option and without further notice, dispossess TENANT and any legal representative or successor of TENANT or other occupant of the

45

Premises by summary proceedings or other appropriate suit, action or proceeding and remove his, her or its effects and hold the Premises as if this Lease had not been made.

13.3   Notwithstanding such default, re-entry, expiration and/or dispossession by summary proceedings, as provided in Section '13.2' above, TENANT shall continue liable during the full period which would otherwise have constituted the balance of the Term, and shall pay as liquidated damages at the same times as the Annual Basic Rent and Additional Rent and other charges become payable under the terms hereof, a sum equivalent to the Annual Basic Rent and Additional Rent and other charges reserved herein (less only the net proceeds of reletting as hereinafter provided), and LANDLORD may, but is not obligated to, rent the Premises either in the name of LANDLORD or otherwise, reserving the right to rent the Premises for a term or terms which may be less than or exceed the period which would otherwise have been the balance of the Term or any renewal term without releasing the original TENANT from any liability, applying any monies collected, first to the expense of resuming or obtaining possession, next to restoring the Premises to a rentable condition, and then to the payment of any brokerage commissions and legal fees in connection with the reletting of the Premises and then to the payment of the Annual Basic Rent, Additional Rent and other charges due and to grow due to LANDLORD hereunder, together with reasonable legal fees of LANDLORD therefor.

13.4   LANDLORD and TENANT do hereby mutually waive trial by jury in any action, proceeding or counterclaim brought by either LANDLORD or TENANT against the other with regard to any matters whatsoever arising out of or in any way connected with this Lease, the relationship of LANDLORD and TENANT, and TENANT's use or occupancy of the Premises, provided such waiver is not prohibited by any laws of the State of New York.  Any action or proceeding brought by either party hereto against the other, directly or indirectly, arising out of

46

this agreement (except for a summary proceeding), shall be brought in a court in the County in which the Premises are located and all motions in any such action shall be made in such County.

13.5    TENANT hereby agrees that in any action or summary proceeding brought by LANDLORD for the recovery of Annual Basic Rent, it will not interpose any counterclaim nor will TENANT seek to consolidate or join for trial any such action or proceeding with any other action or proceeding, unless TENANT will, as a matter of law, lose its cause of action for failure to institute such counterclaim or effectuate such joinder.

13.6    If TENANT shall default in the observance or performance of any term or covenant on TENANT's part to be observed or performed under or by virtue of any of the terms or provisions in this Article of this Lease, LANDLORD may immediately or at any time thereafter and, after at least ten (10) days' prior written notice to TENANT and the opportunity to cure or to commence to cure, perform the same for the account of TENANT, and if LANDLORD makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to, reasonable attorneys' fees in instituting, prosecuting or defending any action or proceeding such sums paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and the sum shall be due immediately upon LANDLORD incurring same and may be included as an item of additional rent in any summary proceeding instituted by LANDLORD.

13.7    In the event that TENANT shall, twice within any twelve (12) month period, fail to pay, within ten (10) days of receipt of written notice that same is due, any installment of Annual Basic Rent, Percentage Rent or Additional Rent then, in addition to all of the other rights and remedies reserved to LANDLORD herein, LANDLORD may, upon giving TENANT ten (10) days' prior written notice, require that all future payments of Annual Basic Rent, Percentage

47

Rent and Additional Rent shall be paid for the next twelve (12) calendar months during the Term by certified check or bank check only. The failure of TENANT to comply with the terms and provisions of this paragraph shall be deemed to constitute a breach of a material and substantial covenant of this Lease.

## ARTICLE 14
## CUMULATIVE REMEDIES — NO WAIVER

14.1    The specific remedies to which LANDLORD or TENANT may resort under the terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or means of redress of which they may be lawfully entitled in case of any breach or threatened breach by either of them of any provision of this Lease. The failure of LANDLORD or TENANT to insist in any one or more cases upon the strict performance of any of the covenants of this Lease, or to exercise any option herein contained, shall not be construed as a waiver or relinquishment for the future of such covenant or option. A receipt by LANDLORD of rent with knowledge of the breach of any covenant thereof shall not be deemed a waiver of such breach, and no waiver, change, modification or discharge by either party hereto of any provision in this Lease shall be deemed to have been made or shall be effective unless expressed in writing and signed by both LANDLORD and TENANT. In addition to the other remedies in this Lease provided, LANDLORD or TENANT shall be entitled to restraint by injunction of any violation, or attempted or threatened violation, of any of the covenants, conditions or provisions of this Lease or to a decree compelling performance of any such covenants, conditions or provisions.

## ARTICLE 15
## SUBORDINATION

15.1    Subject to the provisions set forth below, it is hereby expressly agreed that this Lease and all rights of TENANT hereunder shall be subject and subordinate at all times to any

mortgages and any renewals, replacements, extensions or modifications thereof, which may now be or shall hereafter become liens on the Premises provided, however, that TENANT's estate in the Premises shall not be disturbed so long as TENANT shall be making payment of all rents due under this Lease and shall attorn to any lender or other party which succeeds to the interest of LANDLORD under this Lease.  TENANT agrees that at any time upon ten (10) days' written notice, TENANT will execute and deliver to LANDLORD a subordination, nondisturbance and attornment agreement on terms reasonably acceptable to TENANT confirming the provisions of this Article and failure of TENANT to execute and deliver such agreement shall not affect the subordination provided for hereunder.

15.2    LANDLORD represents that there is currently no mortgage encumbering the Premises.  Any future mortgage obtained by LANDLORD shall be subordinate to this Lease, unless LANDLORD obtains a mutually acceptable subordination and non-disturbance agreement ("SNDA") from such mortgagee, in which event this Lease shall be subordinate to the mortgage and TENANT agrees to sign such SNDA on terms reasonably acceptable to TENANT with ten (10) days of LANDLORD presenting same to TENANT.

## ARTICLE 16
### QUIET ENJOYMENT

16.1    LANDLORD covenants and agrees that TENANT, upon paying the Annual Basic Rent and all other charges herein provided and observing and keeping the covenants, agreements and conditions of this Lease on its part to be kept on the terms in this Lease provided, shall and may peaceably and quietly hold, occupy and enjoy the Premises during the Term, subject to LANDLORD's right to continue to occupy and utilize those portions of the Premises for Church purposes as set forth herein.

ARTICLE 17
NOTICES

17.1    All notices, demands and requests, which may, or are required to, be given by

either party to the other shall be in writing. All notices, demands and requests by LANDLORD

to TENANT shall be deemed to have been properly given if sent by United States registered or

certified mail, return receipt requested, postage prepaid, by facsimile transmission with receipt

confirmed by the sender, or by a nationally recognized overnight carrier, such as Federal

Express, as follows:

    A.    If to LANDLORD:

    Clerk
    Third Church of Christ, Scientist, of New York City
    583 Park Avenue
    New York, NY  10021
    Fax No. 212-838-7824

    With a Copy to:

    SATTERLEE STEPHENS BURKE & BURKE LLP

    230 Park Avenue
    New York, NY 10169
    Attention:  J. Gregory Saver, Esq.
    Fax No. 212-818-9606

    B.    If to TENANT prior to the Commencement Date:

    1111 Park Avenue
    New York, NY  10128
    Attention:  Louis Rose
    Fax No. 212-410-1217

    If to TENANT subsequent to the Commencement Date at the Premises.

50

With a Copy to:

Seyfarth Shaw LLP
1270 Avenue of the Americas
New York, New York 10020
Attention: Barry H. Mandel, Esq.
Fax No. 212-218-5526

Either party may, by notice given to the other party, designate a new address to which notices, demands and requests will be sent and, thereafter, any of the foregoing shall be sent to the address most recently designated by such party. Notices in the aforesaid manner shall be deemed to have been served or given for all purposes under this Lease at the time such notice, demand or request shall be received by the party to whom addressed or returned by the Post Office as having been "refused" or "undeliverable". Notices given by the attorney for either party shall be deemed given by said party.

## ARTICLE 18
### DEFINITION OF CERTAIN TERMS, ETC.

18.1    The captions of this Lease are for convenience and reference only and, in no way, define, limit or describe the scope or intention of this Lease or in any way affect this Lease.

18.2    The term "TENANT" as referred to hereunder shall refer to this TENANT and any successor or assignee of this TENANT.

18.3    The term "LANDLORD" as used hereunder shall mean only the owner for the time being of the land and building of which the Premises form a part, so that in the event of any sale of the Building (subject to TENANT's right of first refusal as set forth in Article 36 below), this LANDLORD shall be and hereby is entirely free and relieved of all covenants and obligations of LANDLORD hereunder and it shall be deemed and construed without further agreement between the parties, or their successors in interest, that the purchaser of the Building agreed to carry out all of the terms and covenants and obligations of LANDLORD hereunder.

51

18.4    The term "Interest Rate" shall mean the prime rate of interest as published in the Wall Street Journal (or successor publication) plus two (2%) percent.

## ARTICLE 19
## INVALIDITY OF PARTICULAR PROVISIONS

19.1    If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## ARTICLE 20
## COVENANTS TO BIND AND BENEFIT RESPECTIVE PARTIES

20.1    It is further covenanted and agreed by and between the parties hereto that the covenants and agreements herein contained shall bind and inure to the benefit of LANDLORD, its successors and assigns, and TENANT, its successors and assigns, subject to the provisions of this Lease.

20.2    Each party hereby agrees to cooperate with and assist the other party in a commercially reasonable manner in order to carry out and effectuate the purposes of this Lease. Without limitation, the parties shall execute such documents (including all necessary or desirable governmental filings) and take such actions in compliance with the provisions of the foregoing sentence.

## ARTICLE 21
## INSURANCE

21.1    A.    TENANT shall, at all times during the Term, carry Public Liability Insurance (including liquor liability coverage if available at commercially reasonable rates) for

the Premises naming LANDLORD as an additional insured with combined single limits of $2,000,000.00 for injury to persons, death and property damage. LANDLORD reserves the right during the term and any extension term to reasonably increase the limit of insurance to an amount which is commercially reasonable and comparable to the limits required by landlords of properties in which similar operations are carried out.

      B.     LANDLORD shall, at all times during the Term, carry Public Liability Insurance for the Premises naming TENANT as an additional insured with combined single limits of $2,000,000.00 for injury to persons, death and property damage. TENANT reserves the right during the term and any extension term to reasonably increase the limit of insurance to an amount which is commercially reasonable and comparable to the limits required by landlords of properties in which similar operations are carried out.

     21.2   A.     Prior to taking possession, TENANT shall deliver to LANDLORD a certificate of the insurance company licensed to do business in the State of New York with a Bests rating of A, certifying that the aforesaid liability policy is in full force and effect. A certificate evidencing the renewal of such liability insurance policy shall be delivered to LANDLORD at least twenty (20) days before the expiration thereof and each such renewal certificate shall include LANDLORD as an additional insured. TENANT may carry the aforesaid insurance as a part of a blanket policy provided, however that a certificate thereof naming LANDLORD as an additional insured is delivered to LANDLORD as aforesaid. Such policy of insurance or certificate shall also provide that said insurance may not be canceled unless ten (10) days' notice is given to LANDLORD prior to such cancellation and that the insurance as to the interest of LANDLORD shall not be invalidated by any act or neglect of TENANT.

B.      Prior to taking possession, LANDLORD shall deliver to TENANT a certificate of the insurance company licensed to do business in the State of New York with a Bests rating of A, certifying that the aforesaid liability policy is in full force and effect. A certificate evidencing the renewal of such liability insurance policy shall be delivered to TENANT at least twenty (20) days before the expiration thereof and each such renewal certificate shall include TENANT as an additional insured. LANDLORD may carry the aforesaid insurance as part of a blanket policy provided, however, that a certificate thereof naming TENANT as an additional insured is delivered to TENANT as aforesaid. Such policy of insurance or certificate shall also provide that said insurance may not be canceled unless ten (10) days' notice is given to TENANT prior to such cancellation and that the insurance as to the interest of TENANT shall not be invalidated by any act or neglect of LANDLORD.

21.3    TENANT shall, prior to doing any work in the Premises, obtain any and all permits necessary therefor and will provide Worker's Compensation Insurance and Liability Insurance in the limits provided for in Section "21.1" hereof if and as required by law.

21.4    LANDLORD shall throughout the term of this Lease provide and keep in force the following insurance:

A.      All-risk insurance against loss or damage or injury or destruction to the Building and appurtenances thereto resulting from fire or other casualty and malicious mischief and including sprinkler leakage, in a stated amount equal to the replacement cost of the Building, but in any event in an amount not less than eighty (80%) percent of the replacement value of the Premises. Such insurance shall cover the Building, LANDLORD'S Work and TENANT Improvements.

54

B.    Rent insurance in an amount equal to one year's Basic Annual Rent and Taxes either as a separate policy or as a part of LANDLORD's casualty policy.

C.    War risk insurance upon the Building if, as and when such insurance is obtainable from the United States Government or any agency or instrumentality thereof at commercially reasonable rates, and a state of war or national or public emergency exists or threatens, in an amount not less than the full insurable value thereof.

21.5    TENANT shall pay to LANDLORD the premiums for the insurance set forth in Section 21.4 hereof as Additional Rent, which amount shall be paid to LANDLORD within ten days after LANDLORD renders a bill therefor.

21.6    The proceeds of rent insurance provided for herein shall be paid solely to LANDLORD who shall apply them, from time to time, to TENANT's obligation to pay Rent and Additional Rental during the period of any restoration as provided for herein.

21.7    TENANT shall not take out separate insurance concurrent in form or contributing in the event of loss with that carried by LANDLORD pursuant to this Article 21.  The foregoing shall in no way prohibit TENANT from having the right to take out business interruption insurance and contents insurance, among others.

21.8    TENANT shall cause LANDLORD to be named as an additional insured on any insurance policy required by TENANT from any of TENANT's vendors or suppliers in connection with any TENANT related event in the Premises.

21.9    LANDLORD shall cause TENANT to be named as an additional insured on all policies of insurance required to be maintained by LANDLORD hereunder.  The insurance coverage to be secured by LANDLORD hereunder shall be secured through an insurance broker or brokers approved by TENANT.

# EXHIBIT B
# PART 3

## ARTICLE 22
### USE, ASSIGNMENT OR SUBLETTING

22.1    TENANT shall use and occupy the Premises solely as a high end, first class

catering facility and for banquets, special events and meetings, all of which may include the

preparation and service of food and alcoholic and non-alcoholic beverages and may include

music and dancing as well as the use by TENANT of LANDLORD's organ and piano located at

the Premises (subject to the restrictions set forth below).  TENANT may also use the Premises

for related uses, including but not limited to a venue for TENANT's corporate meetings, storage,

telecommunications equipment, video display terminals, computer terminals, personal

computers, computer room and conference and copy rooms, all of which must be related to and

ancillary to the operation of TENANT's business for the uses and purposes set forth above.  Any

items stored by TENANT in the auditorium during use of the auditorium by LANDLORD must

be appropriately covered and screened.  All events conducted by TENANT at the Premises shall

be private events, not open to the general public.  In connection with any event conducted by

TENANT at the Premises.  TENANT shall exercise commercially reasonable efforts to insure

that no smoking shall be permitted at any of the front doors to the Building.  TENANT shall

provide and maintain sand urns to the left of the front entrance and to the right of the side

entrance to the Building, similar to those utilized outside the Pierre Hotel.

22.2    Unless LANDLORD shall have given its consent thereto, this Lease may not be

assigned nor may the Premises be sublet in whole or in part.  In determining whether or not to

consent, LANDLORD shall take into consideration the use to which the sub-tenant or assignee

will put the space and the nature of the sub-tenant's or assignee's business, the location of the

space within the building (in the event of a sublease), the character and reputation of the

proposed subtenant or assignee, any alterations which may be necessary to accommodate the

56

subtenant or assignee and the impact of all of the foregoing on the Premises and LANDLORD's right to continue to occupy and utilize the Premises or portions thereof for Church purposes as set forth herein. Notwithstanding the foregoing, LANDLORD shall not unreasonably withhold its consent to an assignment of this Lease in connection with a sale of TENANT's business operations on the following terms and conditions:

A.    At least sixty (60) days prior to any proposed assignment or sublease, TENANT shall submit to LANDLORD a statement containing the name and address of the proposed assignee and all of the principal terms and conditions of the proposed assignment including, but not limited to, the proposed effective date of the assignment, the nature of the proposed assignee's business, the prior three (3) year history of the proposed assignee and its principals, together with satisfactory proof of financial responsibility and personal references to substantiate the required financial statements and such financial and other information as LANDLORD may reasonably request.

B.    LANDLORD shall not be deemed unreasonable in withholding its consent to any assignment if LANDLORD's determines, in LANDLORD's reasonable discretion that:

(i)    the character, reputation or nature of the business of the proposed assignee or subtenant is not in keeping with that of the Premises or would interfere with LANDLORD's right to continue to occupy and utilize the Premises or portions thereof for Church purposes on the terms herein provided;

(ii)    the proposed occupancy shall impose an extra burden on the Premises' HVAC or other systems or Premises' services;

(iii)    the proposed assignment shall not prohibit any further assignment except in compliance with the provisions of this Lease;

(iv)    TENANT is in default beyond applicable grace and notice periods under this Lease either at the time LANDLORD's consent to such assignment is requested or at the effective date of any assignment;

(v)    TENANT shall fail to reimburse Owner for Owner's reasonable costs incurred in connection with said assignment, including, without limitation, reasonable attorneys fees and disbursements, investigation as to the acceptability of a proposed assignee and the preparation and review of documents relating to such transaction;

(vi)    the proposed assignee has diplomatic or sovereign immunity or is not subject to the service of process in or the jurisdiction of the courts of New York State;

(vii)    the proposed assignee (or any principal thereof) is not a person held in high regard or does not have a reputation equivalent to or better than that enjoyed by the Rose Group Park Avenue LLC or does not possess the financial resources to meet the obligations of the TENANT under this Lease;

(viii)    the proposed assignee has not been engaged in a business substantially similar to that conducted by TENANT on the Premises for at least three (3) years;

(ix)    TENANT fails to deliver to LANDLORD the information and documents required by Article 22 or the form and substance of the assignment and all ancillary documents shall not have been approved by LANDLORD.

22.3    TENANT shall, at least thirty (30) days prior to the effective date thereof, deliver to LANDLORD a fully executed counterpart of the assignment and all ancillary documents thereto, in form and substance reasonably satisfactory to LANDLORD, and in which the assignee assumes TENANT's obligations under this Lease.

58

22.4    In the event that any sub-tenant or assignee should hold over in the Premises beyond the expiration of the Term, TENANT hereunder shall be responsible to LANDLORD for all Annual Basic Rent and additional rent until the Premises are delivered to LANDLORD in the condition provided for in this Lease.

22.5    In the event of any sublease, notwithstanding the terms and conditions thereof, the terms and conditions of this Lease shall be controlling between LANDLORD and TENANT and in the event of an assignment, the assignee must execute an assumption agreement assuming all of TENANT's obligations under this Lease. A copy of the executed sublease and assignment and assumption agreement shall be delivered to LANDLORD prior to the effective date thereof.

22.6    TENANT shall pay LANDLORD'S reasonable legal fees in connection with LANDLORD's approval of any subletting or assignment.

ARTICLE 23
LANDLORD'S LIABILITY

23.1    In the event that LANDLORD shall default under the terms of this Lease and TENANT shall recover a judgment against LANDLORD by reason of such default or for any reason arising out of the tenancy or use of the Premises by TENANT or the Lease of the Premises to TENANT, LANDLORD'S liability hereunder shall be limited to LANDLORD'S interest in the Premises and no further, and TENANT agrees that in any proceeding to collect such judgment, TENANT's right to recovery shall be limited to LANDLORD'S interest in the Premises.

## ARTICLE 24
## ENTIRE AGREEMENT

24.1    This instrument contains the entire agreement between the parties hereto and the same may not be changed, modified or altered except by a document in writing executed and delivered by the parties hereto.

## ARTICLE 25
## CERTIFICATES

25.1    Upon request, LANDLORD or TENANT agrees to execute and deliver to the other any certificate or certificates evidencing the Commencement Date and the fact that the Lease is in full force and effect, if such is the case, and that there are no pending set-offs or other claims against the other or stating those claims which such party might have against the other.

25.2    Simultaneously with the execution of this Lease, LANDLORD and TENANT shall execute a memorandum of lease in recordable form, which memorandum shall set forth the Commencement Date, the Expiration Date and the subordination of the Lease to a permanent first mortgage to be held by an institutional lender subject to the terms of this Lease and subject to TENANT's right of attornment.

## ARTICLE 26
## BROKER

26.1    LANDLORD and TENANT each represent that it dealt only with Rhoda Forman, as broker in connection with this transaction and LANDLORD and TENANT each agree to indemnify the other against any claims or expenses which the indemnified party may incur by reason of the indemnifying party having dealt with any other broker in connection with this transaction.  LANDLORD and TENANT agree THAT EACH SHALL PAY ONE-HALF OF the commission due Rhoda Forman pursuant to a separate agreement.

NY1 26400000 3

## ARTICLE 27
## SIGNS

27.1    TENANT shall, subject to obtaining LANDLORD's written consent, which shall not be unreasonably withheld, conditioned or delayed, and any necessary permits therefor (including any permits needed from the Landmarks Preservation Commission, if any), install a sign above the center doorway of the center front of the Building identifying it as "583 Park Avenue" or "583". TENANT shall also remove or cover, at TENANT'S option, the existing signs on the building façade and replace or cover them with blank ("faux") windows. TENANT shall also install, in such a manner as to not damage the existing engraving a blank piece of limestone or limestone veneer over the engraved lettering over the front pillars. Tenant shall also install an electronic sign to the left of the 63rd Street side entrance (the "63rd Street Sign") and another electronic sign at approximately eye level on the corner of the Building facing Park Avenue (the "Park Avenue Sign"), both of which will indicate the existence of LANDLORD's Sunday School and Church at all times except when TENANT is using the Premises for a third-party function or marketing the Premises. TENANT shall not market the Premises whenever a Church Related Activity, as defined below, is taking place in the Premises (except for Church Classes).

## ARTICLE 28
## HOLDING OVER

28.1    TENANT covenants that it will vacate the Premises not later than 5:00 p.m. on the last day of the Term as same may be extended.

28.2    If TENANT, or anyone holding through TENANT, retains possession of the Premises or any part thereof after the termination of the Term or any renewal term, TENANT shall pay LANDLORD a fee for use and occupancy equal to one hundred fifty (150%) percent of

the Annual Basic Rent, Percentage Rent and Additional Rent payable during the last year of the

Term or renewal term for the period TENANT thus remains in possession. TENANT shall not

become a month-to-month tenant without a writing signed by LANDLORD. The provisions of

this Section do not exclude LANDLORD'S other rights hereunder, including without limitation,

the right to remove TENANT through summary proceedings for holding over beyond the

expiration of the Term or renewal term.

28.3    TENANT shall remove all of its property from the Premises prior to the

expiration or sooner termination of the Lease. In the event TENANT should leave any fixtures,

equipment or any other personal property in the Premises after the date fixed for the expiration of

this Lease (or an earlier termination of this Lease), any such property shall be deemed abandoned

by TENANT and shall, at LANDLORD's option, become the property of LANDLORD, or the

same may be disposed of by LANDLORD at TENANT's cost and expense.

## ARTICLE 29
## LANDLORD'S RESERVATION OF RIGHTS

29.1    LANDLORD reserves to itself all rights to the use and access to the roof of the

Building to install on the Building roof the antennas required by Cingular and Nextel or their

successors and assigns. LANDLORD acknowledges that TENANT intends to repair the roof as

hereinabove provided, and agrees that the installation of antennas on the roof will not void any

roof guaranty or warranty. LANDLORD also reserves to itself all air rights or development

rights appurtenant to the Building and TENANT agrees that it has no rights or interest

whatsoever in or to any of said air rights or development rights or to any unused allowable floor

to area ratio as permitted by the Zoning Code of the City of New York. TENANT consents to

any utilization of such rights by LANDLORD and agrees promptly to execute and deliver any

instruments which may be reasonably requested by LANDLORD, including instruments merging

62

zoning lots, evidencing such acknowledgement and consent if and to the extent TENANT's

rights under this Lease are not adversely affected, except to a de minimus extent, and

TENANT's signature is required. LANDLORD shall pay TENANT's reasonable costs and

expenses, including reasonable attorneys' fees, incurred in connection therewith. The provisions

of this paragraph shall be deemed to be and shall be construed as an express waiver by TENANT

of any interest TENANT may have as a "party in interest" (as such term is defined in Section 12-

10 of the Zoning Resolution of the City of New York) in the Building. LANDLORD also

reserves to itself all rights to use and occupy the existing church office, the two readers' rooms,

the existing Board Room, the organist's room, the new Literature Distribution/Committee Room,

4th floor storage area and Treasurer's office, the new Sunday School office and nursery in the

basement and all areas of the Building containing portions of the Church's organ, as herein

further provided in this Lease. LANDLORD agrees that TENANT shall be permitted the use of

the Board Room on a "when available" basis. TENANT agrees that its renovation of the

Premises shall include a cosmetic refurbishment of the Board Room in accordance with the Plans

and Specifications to be approved by LANDLORD, which approval is not to be unreasonably

withheld, delayed or conditioned.

## ARTICLE 30
## OPTION TO RENEW

30.1    Provided that TENANT is not in default beyond any applicable grace and notice

periods either at the time of the exercise of this option or at the commencement of the Renewal

Term, TENANT shall have the option to extend the Term of this Lease for two (2) additional

periods of five (5) years each (the "Renewal Term").

30.2    In order to exercise this option, TENANT shall notify LANDLORD of the exercise not later than June 30, 2025 as to the first Renewal Term and June 30, 2030 as to the second Renewal Term.

30.3    All of the terms, covenants and conditions of this Lease shall attach to the Renewal Terms and the Annual Basic Rent to be paid by TENANT during the first Renewal Term shall be $663,224.00 and during the second Renewal Term shall be $846,589.00.

## ARTICLE 31
## GENERATOR

31.1    TENANT shall have the right to install an emergency generator and related equipment in an area mutually determined by LANDLORD and TENANT.

## ARTICLE 32
## RESTRICTIONS ON TENANT

32.1    TENANT agrees that at all times during the Term, it shall:

A.    Load and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the Premises, at TENANT's cost and expense.  TENANT shall supply refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors.  TENANT's rubbish storage and removal system must present no unreasonable physical or aesthetic hindrance to persons entering or leaving the Premises through the 63rd Street door. TENANT shall retain the services of a private carting company to remove all rubbish from the Premises.

B.    Permit no act or practice which may tend to injure the building or its equipment or be a nuisance, or unreasonably obstruct the sidewalks or areas outside the Premises, nor burn any rubbish in or about the Premises, or, change the exterior color of the

NY1 26400900 3

Premises or the color, size or location of any sign approved by LANDLORD, nor permit any advertising medium or loudspeaker, radio broadcasts, etc. to be heard outside of the Premises.

## ARTICLE 33
## MAINTENANCE OF SIDEWALKS

33.1    TENANT shall, throughout the Term, maintain the sidewalks adjacent to the Building and shall shovel snow and sand or salt ice on the sidewalks and promptly repair same and any curbs and curb cuts.

33.2    In the event TENANT shall fail to maintain the sidewalks, after ten (10) business days' prior written notice from LANDLORD, LANDLORD may do any work necessary to preserve the sidewalks and TENANT shall pay to LANDLORD the cost in connection therewith.

## ARTICLE 34
## INDEMNIFICATION

34.1    TENANT shall and does hereby hold harmless, indemnify and defend LANDLORD and its employees, agents, servants, customers, vendors, tenants or invitees against all claims, demands and action or loss, liability, damage, cost and expense resulting from injury or death to any person and damage to property on or in connection with the Premises and this lease, except that resulting from LANDLORD's negligence or willful misconduct, or from or as a result of LANDLORD's use and occupancy of any portion of the Premises.

34.2    TENANT hereby releases LANDLORD and its agents and employees and any lessor under an over-lease and each mortgagee in respect of any claim (other than for LANDLORD's negligence or willful misconduct) which it might otherwise have against LANDLORD or its agents or employees or any lessor under an over-lease or mortgagee for loss, damage or destruction with respect to TENANT's property by fire or other casualty (including rental value or business interest, as the case may be) occurring during the term of this Lease and

which is required to be covered under a fire insurance policy with extended coverage and endorsement in the form required to be carried by TENANT pursuant to the provisions of this Lease.

34.3    LANDLORD shall and does hereby hold harmless, indemnify and defend TENANT and its employees, agents, servants, customers, vendors, tenants or invitees against all claims, demands and action or loss, liability, damage, cost and expense resulting from injury or death to any person and damage to property on or in connection with the Premises and this lease, except that resulting from TENANT's negligence or willful misconduct, or from or as a result of TENANT's use and occupancy of any portion of the Premises.

34.4    LANDLORD hereby releases TENANT and its agents and employees in respect of any claim (other than for TENANT's negligence or willful misconduct) which it might otherwise have against TENANT or its agents or employees or any lessor under an over-lease or mortgagee for loss, damage or destruction with respect to LANDLORD's property by fire or other casualty (including rental value or business interest, as the case may be) occurring during the term of this Lease and which is required to be covered under a fire insurance policy with extended coverage and endorsement in the form required to be carried by LANDLORD pursuant to the provisions of this Lease.

## ARTICLE 35
## USE OF PREMISES BY LANDLORD

35.1    TENANT acknowledges and agrees that during the term of this Lease and any renewal thereof, LANDLORD shall continue to use and occupy the Premises for the conduct of church services and other church related activities as herein set forth, subject to the relocation of certain Church or Church related rooms and offices and to the exclusive use by TENANT of

66

certain portions of the Premises, all as more particularly set forth herein. Such Church services and other related activities are as follows:

A.     Sunday Church Services and Sunday School Services. These services will require the use of the auditorium, the entrances to the Premises and the Sunday School Room and offices in the basement of the building from 7:00 a.m. until 1:00 p.m.

B.     Church services on each Wednesday evening and on Christmas Eve. This will require the use of the auditorium and the entrances to the Premises from 5:30 p.m. until 9:00 p.m.

C.     Thanksgiving Church Services. This will require the use of the auditorium and the use of the entrances to the Premises from 7:00 a.m. until 1:00 p.m. on each Thanksgiving Day.

D.     Association Meetings. Association Meetings may be held in both the auditorium and the basement on four (4) Saturdays during each calendar year and will require the use of the entire Building from 7:00 a.m. until 7:00 p.m. on those days when such Association Meetings are scheduled. Currently, Association Meetings are scheduled for the second Saturday in June 2006, the third Saturday in August 2006, the fourth Saturday in August 2006 and the first Saturday in November 2006. The dates for the Association Meetings, subject to Paragraph 35.1G below, not to exceed four (4) in any calendar year, may change in the future and LANDLORD agrees to give TENANT not less than one (1) year's prior written notice of any such change in the date of an Association Meeting and will use reasonable efforts to accommodate TENANT's use of the Premises on those days.

E.     Church Classes. Classes are held for two (2) weeks in late June/early July and two (2) weeks in August. LANDLORD will notify TENANT in writing at least one (1) year

in advance of the actual dates on which the Church will conduct its classes.  Church Classes are customarily conducted in the Board Room on the fourth floor of the Premises and are usually scheduled for 9 am – 5 pm, Monday through Sunday.  TENANT will have no access to the 4th floor during the pendency of the activities contemplated by this Section 35.1E and will temporarily relocate its offices to the basement to accommodate the Church on those dates and during the specified times.

F.      Church Corporate or Organizational Meetings.  The dates for certain of these meetings are mandated by LANDLORD's by-laws.  They are the third Tuesday in May from 6 pm to 11 pm or 12 midnight.  The fourth Tuesday in September from 6 pm to 11 pm or 12 midnight and the fourth Saturday in January from 12 noon to 6 pm.  In addition, there is a church meeting every three years on the second Tuesday in November for the purpose of electing the church readers.  The first such meeting during the term of this Lease will be on the Second Tuesday of November 2008.  Such meetings will be conducted from 6 pm – 10 pm.  All corporate meetings will require the use of the auditorium and the entrances to the Premises.

G.      Occasional non-regularly scheduled events, association meetings, classes and special meetings of the Church may be scheduled from time to time at times mutually agreed upon by LANDLORD and TENANT.  Since it is difficult or impossible to predict when such a meeting may be required, LANDLORD and TENANT agree to consult with each other in order to schedule such meetings (i) in a manner which causes no disruption to TENANT's scheduled events in the Premises and (ii) at such times as do not conflict with TENANT's reasonably anticipated use of the Premises.

35.2    TENANT agrees that the auditorium of the Premises will be set up for Church services or related activities at all times when not being prepared or utilized for TENANT

functions.  TENANT will set up the Premises for TENANT's use as soon as reasonably practicable prior to the time scheduled for TENANT's event and will restore the Premises to LANDLORD's use following each such event.  Setting up the Premises for LANDLORD's use includes setting up at least 100 chairs and the podium and opening the curtains.  TENANT will turn on the lights and HVAC system and remove the protective covering from the organ pit, if any, shortly prior to the time when the Church activity is scheduled to commence as set forth above, and will turn off the lights and HVAC system and cover the organ pit promptly after the Church activity is concluded.  Any items (such as tables and excess chairs) stored by TENANT in the auditorium must be stored along the walls and appropriately covered and screened from sight.  TENANT also agrees to set up the Sunday School each Sunday.  All of the foregoing required to be done by TENANT hereunder will be done by TENANT at TENANT's sole cost and expense.

35.3     Both LANDLORD and TENANT acknowledge and agree that during the period when TENANT is renovating the Premises to make it ready for TENANT's permitted use, Church Services will be held in the basement area where the Sunday School Services are currently conducted.  LANDLORD and TENANT will mutually agree on how the set-up for such services will be handled.  The hours for such services will be the same as the hours set forth above.  TENANT shall maintain the access to the temporary meeting space and the meeting space itself in a clean condition, free of dust, dirt and debris.  During construction, TENANT shall notify LANDLORD as far in advance as is possible of any interruption of any utilities or other services.

35.4     TENANT acknowledges and agrees that the organ currently installed in the Premises is exclusively for the use of LANDLORD in connection with Church Services and

related activities. TENANT shall not have the use of the organ on any occasion whatsoever unless TENANT first receives LANDLORD's prior written consent and utilizes LANDLORD's organist or such other organist as is reasonably acceptable to LANDLORD in connection with any such use. TENANT acknowledges that it has been informed that the organ is a very sensitive and expensive musical instrument. TENANT will use due care in connection with its renovation of the Premises to protect the organ and all of its appurtenances including the pipes and bells wherever located throughout the Premises. TENANT also agrees to build a custom cover for the organ pit which will be put in place whenever the organ is not being used in connection with Church Services or related activities. Part of TENANT's duties in connection with setting up the Premises for Church Services will be to remove the cover from the organ and to replace the cover at the end of the Church Service. TENANT agrees to repair any damage to the organ which may be caused as a result of TENANT's alterations or TENANT's modifications of the Premises at any time during the term of this Lease.

35.5    TENANT understands and acknowledges that TENANT must respect LANDLORD'S privacy during all Church related activities. Specifically, TENANT agrees that it shall not enter any portion of the Premises or the Building or permit or allow any of TENANT's employees, principals, clients, guests, customers, suppliers or vendors to enter the Premises or the Building during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve services, Thanksgiving services, Association meetings, Church Corporate or Organizational Meetings and non regularly scheduled or special meetings of the Church (subject to Paragraph 35.1G above) (collectively, the "Church Related Activities"). During Church Classes no one other than the teachers and students will be permitted on the fourth floor of the Building.

35.6    TENANT acknowledges that a violation of the privacy of LANDLORD during church related activities is a serious and material default under this lease. In addition, to the other remedies LANDLORD has for default under this Lease, LANDLORD shall have the right to seek an injunction to enjoin TENANT from any further violations of said Section 35.5.

35.7    LANDLORD understands and acknowledges that LANDLORD must respect TENANT's privacy during all TENANT related events.

ARTICLE 36
RIGHT OF FIRST REFUSAL

36.1    So long as the Rose Group Park Avenue LLC is the TENANT, if LANDLORD shall desire to sell the Building, LANDLORD shall notify TENANT in writing (an "Offering Notice") that LANDLORD intends to offer to sell the Building, prior to offering to sell the Building to any third party. The Offering Notice shall set forth, among other things, the asking price and all other material terms and conditions of the proposed offer. In addition to the foregoing, in the event LANDLORD enters into a contract of sale in respect of the Building, promptly after entering into such contract with a prospective purchaser (the "Contract"), LANDLORD shall forward a copy of the executed Contract to TENANT. TENANT shall have ten (10) business days from the date of TENANT's receipt of a copy of the Contract to notify LANDLORD that it elects to purchase the Building on the same terms and conditions specified in the Contract. In such event, TENANT shall execute an agreement of sale substantially similar to the Contract. Upon TENANT's failure or refusal to match such offer within ten (10) business days after receipt of a copy of the Contract from LANDLORD (the "ROFR Date"), LANDLORD shall be free to sell the Building to such third party purchaser in accordance with the terms and conditions of the Contract, provided that the sale is consummated within 270 days but not less than 180 days from the ROFR Date. In the event of the sale of the Premises to such

71

third party purchaser is not consummated within such 270 day period in accordance with the

terms of the Contract, then any sale of the Premises shall again be subject to TENANT's rights

as set forth in this Article. This right of first refusal is personal to the Rose Group Park Avenue

LLC and may not be assigned and shall not apply to any sale or transfer of the Building to

another Christian Science Church. The LANDLORD acknowledges that TENANT's right to use

and occupy the Premises is contingent upon such use being approved as accessory to the

continued use and occupancy of the Building and the Premises by the Church for Church

services and Church Related Activities, and that a sale to certain third parties (each, a "Non

Qualified User") will jeopardize TENANT's right to continue to use the Premises for catering

purposes. Accordingly, for the first full five calendar (5) years of the Term, LANDLORD shall

not offer to sell the Building to a Non Qualified User and any attempt to do so will be null and

void. Thereafter, so long as this Lease is in force and effect and the Rose Group Park Avenue

LLC is the TENANT hereunder, if LANDLORD shall desire to sell the Building to a Non

Qualified User and if TENANT chooses not to exercise its right of first refusal with respect to

such a sale, simultaneously with the closing of such a sale this Lease shall terminate and

LANDLORD or the prospective purchaser shall pay to TENANT an amount equal to the lesser

of the net proceeds received by LANDLORD from the sale of the Building after paying all

customary and reasonable closing costs and expenses or the sum of (i) the then value of

TENANT's business as a going concern (the "Value"), and (ii) the unamortized costs incurred by

TENANT relating to (A) TENANT's Work (as reflected on TENANT's books and records), (B)

repairs, replacements and improvements to the Building (to the extent such costs are engineer

allocated pursuant to a provision of this Lease, as allocated between LANDLORD and

TENANT; to the extent such costs are not engineer allocated pursuant to a provision of this

Lease, then as reflected on TENANT's books and records), and (C) the balance of the costs incurred by TENANT in connection with the repair of the roof of the Building which have not been reimbursed to TENANT as set forth in Paragraph 5.4 above.

LANDLORD and TENANT shall negotiate in good faith to attempt to reach a mutually acceptable agreement regarding same. In the event that the parties are unable to agree as to the Value within thirty (30) days after TENANT has notified LANDLORD that TENANT will not so exercise TENANT's right of first refusal, then LANDLORD and TENANT shall each designate, as an arbitrator, a person or entity in the business of valuing businesses as on-going concerns. Each such person or entity designated by the parties shall have a minimum of ten (10) years experience in the New York Metropolitan area in the valuation of businesses in the food service and catering industry. The arbitrators selected by the parties shall attempt to agree on the Value, taking into consideration all relevant factors that would customarily be considered in making such a determination with respect to the sale of such a business in an arms length transaction where neither party is under any compulsion to either sell or purchase. Such factors shall include but need not be limited to: the earnings of TENANT derived from the Premises, adding back into net income interest, depreciation, amortization, nonrecurring costs and other appropriate adjustments, the earnings history of the TENANT at the Premises, TENANT's good will, the projected rate of growth of TENANT's earnings derived from the Premises, TENANT's market share in the Manhattan marketplace, the TENANT's client list and such other reasonable factors as the arbitrators shall determine. It is acknowledged and agreed that the LANDLORD intends to compensate TENANT for damages sustained by TENANT as the result of the sale of the Building to a Non Qualified User. In measuring the damages, the arbitrators shall consider such mitigating factors as the availability to TENANT of comparable replacement Premises, and

73

the cost thereof, in the vicinity of the Building. In the event that the arbitrators selected by each

of the parties are unable to agree upon a Value, then each arbitrator shall state in writing and

deliver to each of the parties the Value which said arbitrator has determined and then the

arbitrators shall mutually select a third arbitrator who shall meet the same qualifications as the

initial arbitrators selected by the parties. In the event that the two arbitrators selected by the

parties shall fail to agree on the choice of the third arbitrator within ten (10) days after said

arbitrators have delivered their determinations of Value, then both parties shall apply to the

American Arbitration Association or any successor thereto to designate the third arbitrator. The

third arbitrator appointed by the arbitrators selected by the parties or by the American Arbitration

Association of the City of New York or its successor, as the case may be, shall conduct such

hearings and investigations as said arbitrator may deem appropriate and shall, within thirty (30)

days after being designated, determine the Value for TENANT's business, which shall not be

lower than the lowest value determined by a parties' arbitrator nor higher than the highest value

determined by a parties' arbitrator. Such determination by the third arbitrator shall be binding

upon LANDLORD and TENANT. Each party shall pay its own counsel fees and expenses in

connection with any arbitration under this clause and the parties shall share equally all other

expenses and fees of any such arbitration.

36.2    LANDLORD or TENANT at both parties' mutual cost and expense, at any time

after the first five (5) full calendar years of the term, may apply for a special use permit which, if

granted, would permit the use of the Building as a catering facility. The foregoing

notwithstanding, the party obligated to do so by law shall make the application to the applicable

authorities, it being agreed that TENANT shall be obligated to take all steps reasonably

necessary to facilitate the process. The parties shall cooperate with and assist each other in

seeking the special use permit. Thereafter, if the special use permit is granted and the

TENANT's use of the Building as a catering facility would not be jeopardized by a sale of the

Building by LANDLORD, then LANDLORD may sell and offer to sell the Building (subject to

TENANT's right of first refusal and subject to this Lease) without being obligated to pay

TENANT any sum for the Value of TENANT'S business. The parties agree that if TENANT

shall exercise its right of first refusal and acquire the Building, TENANT shall, at closing,

reimburse LANDLORD for LANDLORD'S share of the costs to acquire the special use permit.

Similarly, if TENANT does not exercise its right of first refusal and the Building is acquired by a

third party, LANDLORD shall, at closing, reimburse TENANT for TENANT'S share of the cost

to acquire the special use permit.

## ARTICLE 37
## STRUCTURAL REPAIRS

37.1    A.    Notwithstanding anything contained elsewhere in this Lease to the

contrary, in the event that during the term of this Lease structural repairs or capital repairs or

replacements are required for any portion or component or system of the Premises (a "Capital

Repair"), all such required repairs shall be performed by LANDLORD and TENANT with the

cost therefor apportioned between LANDLORD and TENANT as set forth in Section 37.1.B.

B.    If the need for such a Capital Repair has been determined and the scope of

the repair has been established, the parties shall endeavor in good faith to allocate the costs of the

repair or replacement, including all incidental costs, in a fair and equitable manner bearing in

mind the balance of the Term (assuming TENANT shall not exercise its right(s) to extend)

remaining, the realistic (not pursuant to the Internal Revenue Code) useful life of the repair or

replacement to be made and the effect on the component of the Premises to be repaired or

replaced caused by the manner, extent and type of use of the Premises by LANDLORD and

TENANT.  In the event that the parties are unable to agree upon an equitable allocation of the cost of the repair, the parties shall retain as an arbitrator an engineer possessing skills in the area of the structural component requiring repair or replacement, said engineer to have a minimum of ten (10) years experience in the City of New York directly involving structural components similar to the structural component of the Premises requiring repair or replacement.  In the event that the parties are unable to agree on an engineer to act as arbitrator, both parties shall apply to the American Arbitration Association of the City of New York for the appointment of an engineer possessing the qualifications set forth above.  The engineer appointed either by the parties or by the American Arbitration Association shall, within thirty (30) days of his or her appointment, receive submissions from LANDLORD and TENANT concerning the position of each party on the allocation of the cost of the subject repair or replacement.  The engineer shall then determine the fair and equitable allocation of the cost of said repair or replacement between LANDLORD and TENANT taking into consideration all of the factors set forth above.  The decision of the engineer acting as arbitrator shall be conclusive, final and binding to the parties hereto.  The repair shall be completed and paid for by TENANT and LANDLORD with the cost apportioned and paid consistent with the determination of LANDLORD and TENANT or the arbitrator, as the case may be.  If at the time of the incurring of such cost, TENANT shall not have exercised either or both of its options to extend the term of this Lease, and thereafter TENANT shall exercise such option or options, within thirty (30) days following the expiration of the Lease, TENANT shall remit to LANDLORD such portion of the cost paid by LANDLORD which is attributable to the five (5) or ten (10) year extension of the Term, as the case may be together with interest thereon at the Interest Rate.

76

## ARTICLE 38
## PREVAILING PARTY FEES

38.1    In the event of any litigation, arbitration, or other dispute between the parties regarding this Lease, any Lease provision or the Premises, the prevailing party in any such litigation shall be entitled to reasonable attorneys' fees and disbursements and court costs. All of the sums paid or obligations that are incurred by either party as aforesaid, shall be paid to the other party within thirty (30) days after demand accompanied by appropriate evidence of same.

## ARTICLE 39
## FORCE MAJEUR

39.1    In the event LANDLORD or TENANT shall be delayed, hindered or prevented from the performance of any act required under this Lease (except for the payment of Rent), by reason of governmental restrictions, scarcity of labor or materials, strikes, fire or any other reason beyond its reasonable control, the performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for the period necessary to complete performance. If LANDLORD or TENANT is delayed as hereinabove provided during the Term of this Lease, the party so delayed shall not be liable to the other for any losses or damages resulting therefrom.

## ARTICLE 40
## COMPLETION OF TENANT WORK

40.1    TENANT covenants to use commercially reasonable efforts to complete TENANT Work as promptly after the Commencement Date as possible. TENANT agrees to open for business in the Demised Premises promptly upon completion of TENANT Work.

## ARTICLE 41
### AFFILIATE TRANSFERS

41.1    Notwithstanding anything contained in this Lease to the contrary, the parties agree

that a merger, reorganization or consolidation of TENANT shall not be deemed an assignment of

this Lease provided that same is done for a bona fide business purpose and not merely to

accomplish a transfer of this Lease.  Any partner or member of TENANT shall have the right to

transfer its interest (all or part), through death or otherwise, to any family member of such

partner or member.  However, a change in control of TENANT outside of the Rose family shall

be considered an assignment of this Lease and shall require LANDLORD's consent, in

accordance with the provisions of Article 22 of this Lease.

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and

seals the day and year first above written.

LANDLORD, **Third Church of Christ, Scientist**

BY: _____ Chairman

_____ Vice CHAIRMAN

**TENANT, Rose Group Park Avenue LLC**

BY: _____

1-31-06

**EXHIBIT A**

**SITE PLAN**

**EXHIBIT B**

**LANDLORD'S WORK LETTER**

**None**

# EXHIBIT C

## TENANT IMPROVEMENTS WORK

1. Upgrade all power and wiring systems as necessary for TENANT's use
2. Upgrade one entrance to the building to make entrance handicapped accessible as required by law
3. Upgrade all restrooms to make one of said restrooms handicapped accessible as required by law
4. Install a new telephone/communication system
5. Upgrade or replace the existing heating, ventilating and air-conditioning systems as required for the operation of TENANT's business in the Premises
6. Remove and store off-site all pews on the main floor of the auditorium and the first (lowest) row of pews in the balconies. Pews are to be reinstalled upon the termination or expiration of the Lease unless TENANT, at TENANT's option, elects to replace the pews with ones of substantially similar design and quality upon the termination of the Lease.
7. Install a new lighting system as required to meet the needs of TENANT's business and which will also facilitate use of the Building as a Church
8. Install two (2) new signs on the exterior of the Premises one on Park Avenue above the cornerstone and the other on the left side of the 63rd Street entrance to be electronically controlled from an office in the Premises. The signage shall identify the Premises as the Third Church of Christ, Scientist at all times except on those occasions when tenant is utilizing the Premises for the purposes permitted pursuant to this Lease or for actively marketing the Premises for a third party event. Marketing shall not be done during Church services or activities (except for classes). Install a new sign over the center front door on the Park Avenue center front of the Building.
9. If TENANT shall so elect construct on the North side of the lower level a VIP and/or bridal suite with adjoining bathroom for the sole and exclusive use of TENANT.
10. Upgrade cosmetically the existing bathrooms in a manner consistent with the current fixtures in the existing men's room to the extent reasonably possible
11. Install a complete banquet kitchen and prep-kitchen and all associated equipment
12. Install a dumb-waiter to connect the lower level with the sidewalk (at TENANT's option). TENANT shall have the right and license to utilize the dumb-waiter, subject only to the rights of the City of New York.
13. Level the floor in the auditorium and remove the existing heat and ventilation ducts above the floor
14. Re-carpet the auditorium
15. Cosmetically upgrade and refurbish the Board Room
16. Install TENANT's offices in the current Literature Distribution Room (the skylight room) with an option to expand that office space into the adjacent attic space on the fourth floor
17. Re-paint the auditorium, fourth floor hallway and, where necessary, other public areas used by TENANT's clients in the Premises and repair all existing damage within the auditorium
18. Install a new Sunday School Office and Nursery to replace the existing facilities which will be displaced by the new kitchen facilities. The size and location to be mutually agreed upon. However, there shall be a door providing direct access to the Sunday School area.

19.  Construct a new Literature Distribution/Committee room and Treasurer's office for LANDLORD in the attic adjacent to existing Board Room to replace storage space and Literature Distribution Room being converted to TENANT's office space.

20.  Install a door on fourth floor to separate Church office area from TENANT's office area.

NY1 26400900 3

**EXHIBIT D**

**LANDLORD'S ARCHITECTURAL PLANS FOR LANDLORD'S WORK**

**None**

## EXHIBIT E

## PRELIMINARY LAYOUT DRAWINGS





583 Park Avenue
New York, New York

## FIRST LEASE AMENDMENT AGREEMENT

THIS FIRST LEASE AMENDMENT AGREEMENT is made and entered into as of the 15th day of September, 2006 (the "Effective Date"), by and between Rose Group Park Avenue LLC, hereinafter referred to as "Tenant", and Third Church Christ, Scientist, of New York City, hereinafter referred to as "Landlord" or "Church";

WHEREAS, Landlord and Tenant entered into that certain Final Agreement of Lease dated January 31, 2006, and that certain Commencement Date Agreement dated July 3, 2006, hereinafter collectively referred to as the "Lease", wherein Landlord demised to Tenant the premises known as 583 Park Avenue, New York, New York (the "Premises"); and

WHEREAS, among other things, the Lease obligates the Tenant to secure and maintain Public Liability Insurance of the types and in the amounts specified in the Lease; and

WHEREAS, among other things, the Lease obligates the Landlord to secure and maintain Public Liability Insurance of the types and in the amounts specified in the Lease, naming Tenant as an additional insured; and

WHEREAS, Landlord and Tenant desire to clarify and amend the types and amounts of Public Liability Insurance to be secured and maintained by Tenant and Landlord during the Lease Term; and

WHEREAS, in any Lease Year in which Gross Sales exceeds an amount equal to the then Annual Basic Rent multiplied by ten(10), the Lease obligates the Tenant to pay Percentage Rent in an amount equal to the sum of the Excess Gross Sales for such Lease Year, multiplied by ten (10%) percent; and

WHEREAS, Landlord and Tenant desire to clarify and amend the definition of Gross Sales as set forth in Subsections 3.5D.(i) and (ii) of the Lease; and

WHEREAS, in light of the foregoing, the parties desire to modify Sections 21.1A, 21.1B., 21.2B. and 21.9 concerning, among other things, certain insurance provisions in the Lease and  Subsections 3.5D.(i) and (ii) concerning, among other things, the definition of Gross Sales; and

WHEREAS, the Lease permits Tenant to remove the pews from the main floor of the auditorium and the first row of the balconies; and

WHEREAS, the Landlord and Tenant desire to permit the Tenant to remove all of the pews from the balconies subject to the same conditions which apply to removal of the other pews.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants hereinafter contained and for other good, lawful and valuable consideration received by each of the parties to be bound hereby, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree as follows:

1.    Effect of this Document.  This First Lease Amendment Agreement shall operate to amend the Lease only to the extent that the terms of the Lease are inconsistent with the provisions of this First Lease Amendment Agreement.    Except as amended or modified by this First Lease Amendment Agreement, all terms and conditions of the Lease shall remain in full force and effect and Landlord and Tenant shall be bound thereby.

2.    Builder's Risk Insurance.  Section 6.5 is hereby amended by deleting the period at the end of the penultimate sentence thereof and adding the following: "; and (iv) evidence of builder's risk insurance for the period during which TENANT shall be performing alterations to the Premises, naming LANDLORD as additional insured."

3.    Tenant Public Liability Insurance.  Section 21.1A. of the Lease is hereby deleted in its entirety, and the following substituted in its place and stead:

"21.1A.    TENANT shall, at all times during the Term, carry Public Liability Insurance (including liquor liability coverage if available at commercially reasonable rates) for the Premises naming LANDLORD as an additional insured with (i) a combined single limit of $2,000,000.00 for injury to persons, death and property damage, or (ii) split limits of $1,000,000 each occurrence, $2,000,000 general aggregate for injury to persons, death and property damage.  LANDLORD reserves the right during the Term and any extension Term to reasonably increase the limit of insurance to an amount which is commercially reasonable and comparable to the limits required by landlords of properties in which similar operations are carried out."

4.    Landlord Public Liability Insurance.  (i) Section 21.1B. of the Lease is hereby deleted in its entirety, and the following substituted in its place and stead:

"B.    LANDLORD shall, at all times during the Term, carry Public Liability Insurance for the Premises with (i) a combined single limit of $2,000,000.00 for injury to persons, death and property damage, or (ii) split limits of $1,000,000 each occurrence, $2,000,000 general aggregate for injury to persons, death and property damage.  TENANT reserves the right during the term and any extension term to reasonably increase the limit of insurance to an amount which is commercially reasonable and comparable to the limits customarily carried by landlords of properties in which similar operations are carried out."

2

(ii) Section 21.2B. of the Lease is hereby deleted in its entirety, and the following substituted in its place and stead:

"B.    Prior to taking possession, LANDLORD shall deliver to TENANT a certificate of the insurance company licensed to do business in the State of New York with a Bests rating of A, certifying that the aforesaid liability policy is in full force and effect. A certificate evidencing the renewal of such liability insurance policy shall be delivered to TENANT at least twenty (20) days before the expiration thereof. LANDLORD may carry the aforesaid insurance as part of a blanket policy provided, however, that a certificate thereof is delivered to TENANT as aforesaid. Such policy of insurance or certificate shall also provide that said insurance may not be canceled unless ten (10) days' notice is given to TENANT prior to such cancellation and that the insurance as to the interest of TENANT shall not be invalidated by any act or neglect of LANDLORD."

5.    <u>Removal and Replacement of Pews.</u>  The first listed item after the colon in the second sentence of Paragraph 5.3A is hereby deleted in its entirety and the following is substituted in its place instead: "Removal and storage off site of the pews from the main floor of the auditorium and the balconies, said pews to be reinstalled by TENANT upon the expiration or termination of this lease (provided that TENANT, at TENANT'S option may elect not to store the pews in which case TENANT shall install new pews, of similar design and quality to existing pews, upon the expiration or termination of this lease)". In addition, the first sentence of Item 6 in Exhibit C is hereby deleted in its entirety and the following substituted in its place and stead: "Removal and store off-site of all pews on the main floor of the auditorium and in the balconies."

<u>Landlord General Insurance Obligation.</u>  Section 21.9 of the Lease is hereby deleted in its entirety, and the following substituted in its place and stead:

"21.9  The insurance coverage to be secured by LANDLORD hereunder shall be secured through an insurance broker or brokers reasonably approved by TENANT."

7.    <u>Gross Sales.</u>  Subsections 3.5D.(i) and (ii) of the Lease are hereby deleted in their entirety, and the following substituted in their place and stead.

"D.(i)  The term "Gross Sales" shall mean (A) the dollar aggregate of the actual sales price collected and retained by TENANT or by any TENANT affiliates for all facility rentals, foods and beverages, both alcoholic and non-alcoholic, and all merchandise, wares and other goods sold or leased and the actual charges collected and retained for all services performed, business conducted and accommodations (including, without limitation, cover charges, admission fees, membership fees, other dues, and the like)

3

rendered by TENANT or by any TENANT affiliates arising out of the use of the Premises (and all fees, charges, subrents, concession payments or other payments collected and retained by TENANT from any subtenant, licensee, concessionaire and other occupant in, at, or arising out of the Lease of the Premises in respect of any such party's use or occupancy of the Premises), including the fair market value of all consideration other than money received for any of the foregoing and (B) all monies or other things of value received by TENANT from any concessionaire or licensee of its operations at the Premises; and (C) any deposit accepted and retained by TENANT as being forfeited shall be included in Gross Sales; and (D) subject to adjustment relating to TENANT's costs of collection, refunds, and all amounts received under insurance policies in respect of loss of business, sales or profits, but excluding insurance proceeds received by TENANT with respect to Basic Annual Rent (except to the extent LANDLORD collects insurance proceeds for loss of Percentage Rent in respect thereof), shall be deemed actual sales prices collected and retained. No franchise tax, capital stock tax, tax based upon assets or net worth, and no income or similar tax based on income or profits shall be deducted from Gross Sales.

(ii)    Notwithstanding the foregoing, only the following shall be excluded from Gross Sales: (A) credits for returns to suppliers, shippers or manufacturers; (B) cash or credit refunds to customers on transactions otherwise included in Gross Sales not exceeding the selling price of goods and services; (C) sales of TENANT's trade fixtures, machinery and equipment, which are not stock for sale or trade, after use thereof in the conduct of TENANT's business; (D) amounts separately stated in the sales receipt and collected from customers which are paid by TENANT to any government for any sales or excise tax on such sales imposed by law at the point of sale; (E) receipts resulting from sales at a discount to TENANT's employees made in the ordinary course of their employment; (F) monies representing tips, gratuities and service charges paid by a customer that are directly paid by TENANT to employees or to a staffing agency, which may be affiliated with TENANT, but only to the extent such monies are paid to or for the benefit of such agency's employees relating to their performance of services at the Premises; (G) the actual amount of charges for services performed by unaffiliated contractors and service providers which are itemized and billed to TENANT's customers including, but not limited to, florists, musicians, lighting, performers and other entertainers, printers, decorators, travel services, caterers and bakers (exclusive of any surcharge, mark-up or other amount charged by TENANT); (H) interest, service charges, or other carrying charges separately stated and paid to TENANT for the extension of credit by TENANT on account of sales made or services rendered by TENANT, provided no discount on the sale price of the item or service is provided in return; (I) proceeds of claims for damage to merchandise or fixtures; (J) interest, finance and other charges paid to third party credit card companies; (K) uncollected or uncollectible

4

credit accounts in respect of which TENANT shall have made commercially reasonable efforts to collect; (L) gross revenues of non-affiliated third party hat check, men's room and similar concessionaires to the extent not retained, paid or remitted to and retained by TENANT and (M) unearned deposits. In no event shall any franchise tax or capital stock tax income tax or any similar tax based upon income, profits or gross sales be deducted from Gross Sales. If TENANT shall incur any costs for collection for Gross Sales, the costs shall be deducted from any recovery in determining such Gross Sales.

8.    **Binding Effect**.    The covenants, agreements, terms, provisions and conditions contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, successors, legal representatives and assigns.

9.    **Modifications**.  This Agreement may not be modified orally, but only by an agreement in writing signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

10.    **Capitalized Terms**.    All capitalized terms used but not defined in this Agreement shall be deemed to have the meanings ascribed to them in the Lease.

11.    **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall constitute but one and the same instrument.

12.    **Authority**.    Each individual executing this First Lease Amendment Agreement on behalf of Landlord and Tenant represents and warrants that he/she is duly authorized to execute and deliver this Lease Amendment/Extension Agreement on behalf of said party and that this Lease Amendment Agreement is binding upon said party in accordance with the terms and conditions herein.


SIGNATURE PAGE FOLLOWS


5

IN WITNESS WHEREOF, the parties have executed this Lease Amendment Agreement as of the date first above written.

LANDLORD, Third Church of Christ, Scientist

BY: _____

Thomas C. Chapen h.

TENANT, Rose Group Park Avenue LLC

BY: 583 PARK LLC

By: _____

Louis Rose, Managing Member

6

## SECOND AMENDMENT TO LEASE

This Second Amendment to Lease (this "Amendment") is made as of March 27, 2007 by and between Rose Group Park Avenue LLC ("Tenant") and Third Church Christ, Scientist, of New York City ("Landlord").

Whereas, Landlord and Tenant entered into that certain Final Agreement of Lease dated as of January 31, 2006, a certain Commencement Date Agreement dated July 3, 2006 and a certain First Lease Amendment Agreement dated as of September 15, 2006 (such lease, as amended, hereinafter referred to as the "Lease"), pursuant to which Landlord demised to Tenant premises known as 583 Park Avenue, New York, New York (such premises, as more particularly described in the Lease, hereinafter referred to as the "Premises");

Whereas, Tenant has heretofore has expended approximately $2,500,000.00 in connection with improvements made to the Premises in order to prepare the Premises for the conduct of Tenant's business therein for the permitted use under the Lease ("Initial Expenditures");

Whereas, Tenant anticipates spending an additional approximately $5,000,000 to make further improvements to the Premises in order to prepare the Premises for the conduct of Tenant's business therein for the permitted use under the Lease ("Additional Expenditures"); and

Whereas, because of zoning and land use restrictions affecting the Premises and beyond the control of Landlord and Tenant, Tenant may be unable to use the Premises for the permitted use as set forth in the Lease and may be compelled to discontinue using the Premises for the permitted use under the Lease (such date of Tenant's discontinuing the permitted use of the Premises referred to herein as the "Discontinuance Date"), and Landlord and Tenant wish to set forth the rights of the respective parties in such event.

NY1 26453971.4 / 63739-000009

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms.  All capitalized terms used but not defined in this Amendment shall be deemed to have the meanings ascribed to them in the Lease.

2.    Church Functions.  Tenant shall provide, at cost, catering for up to twenty (20) functions during each Lease Year related to Church activity.  Church functions in excess of twenty (20) in any Lease Year and functions on behalf of Church members shall be provided by Tenant at ten percent (10%) discount off Tenant's standard pricing.

3.    Tenant's Inability to Use Premises for Permitted Use.  Landlord and Tenant acknowledge and agree that, because of restrictions under the New York City Zoning Resolution and other governmental regulations and requirements, Tenant may not be able to use the Premises for the permitted use under this Lease for reasons beyond the control of both Landlord and Tenant.  If, notwithstanding commercially reasonable efforts exercised by both Landlord and Tenant, including such subletting as may be appropriate, Tenant is unable to use the Premises for the permitted use under the Lease, then:

(a)    Landlord shall use its best efforts to make a disposition of the Premises, mutually acceptable to Landlord and Tenant, so as to generate sufficient proceeds to pay to Tenant the Additional Expenses, together with interest as set forth in subparagraph (i) below.  If Landlord and Tenant shall be unable to agree upon such disposition, then Landlord shall use its best efforts to sell the Premises in an arms-length transaction at a purchase price to be paid in cash upon closing (the proceeds derived from either a disposition or sale of the Premises hereinafter referred to as the "Proceeds").  Landlord shall at all times keep Tenant informed of its

negotiations with respect thereto and of any agreements made by Landlord in connection with the disposition or sale of the Premises and shall deliver to Tenant, within two business days of the execution and delivery thereof, a true and correct copy of any executed written agreement entered into by Landlord with respect to the Premises.  Landlord and Tenant hereby agree that the Proceeds, net of Landlord's actual costs and expenses incurred in the disposition or sale of the Premises for brokerage commissions, New York City and New York State real estate transfer taxes, if any, and reasonable attorneys' fees, shall be disbursed immediately upon receipt, as follows:

(i)    First, to Tenant, in reimbursement of Tenant for its Additional Expenditures, the amount of up to $5,000,000;

(ii)    Next, to Landlord and Tenant in equal amounts until Tenant has been reimbursed in full for the Initial Expenditures plus fifty (50%) percent of all costs incurred by tenant in connection with the 74-711 application to the New York City Landmarks Commission (the "74-711 Application").

(iii)    Next, to Landlord, up to $10,000,000;

(iv)    Next, to Tenant, an amount equal to interest on the Additional Expenditures and the Initial Expenditures for the period commencing on the Discontinuance Date through and including the date upon which Tenant receives payment in full of the Additional Expenditures and Initial Expenditures, such interest to be calculated upon the rate paid by Tenant to its lender(s); and

(v)    Finally, the balance of the net Proceeds, if any, to Landlord.

(b)    If and to the extent that Tenant has realized any net profits from the use of the Premises as a catering facility prior to the Discontinuance Date, as determined by Tenant's

3

certified public accountant in accordance with generally accepted accounting principles, then such amounts, if any, shall be deducted from the payments to which Tenant is entitled under the provisions of Section 3(a)(i) of this Amendment.

(c)    Provided that Landlord has fully and faithfully complied with its obligations and undertakings as set forth in this Amendment, Article 36 shall not apply to Landlord's sale of the Premises pursuant to the provisions of this Amendment.

(d)    Upon the sale of the Premises in accordance with the terms and conditions set forth in this Amendment, the Lease shall be terminated and neither Landlord nor Tenant shall have any further rights or obligations thereunder except for those rights and obligations that are expressly set forth in the Lease to survive termination. All of the provisions set forth in this Amendment shall survive termination of the Lease.

(e)    Tenant's right to receive the payments due pursuant to Section 3(a) of this Amendment shall be conditioned upon Tenants completing all work required to be performed by Tenant under the Lease and Tenant's prosecuting the 74-711 Application with the appropriate municipal authorities through final appeal.

4.    <u>Ratification of Lease</u>.  Except as expressly modified herein, the parties hereto affirm that the Lease is in full force and effect, and, as modified hereby, the Lease is hereby ratified and confirmed in all respects.

5.    <u>Standards</u>.  Landlord and Tenant shall negotiate in good faith to establish standards concerning sound, light levels, traffic control, signage, external marketing, communications, number of events and number of guests at such events. Until such time as the standards have been established and set forth in a written form to be agreed upon by Landlord and Tenant, Tenant agrees to consult with Landlord in advance concerning the anticipated sound

and light levels, signage, advertising, traffic control plans and number of guests for each planned event. Tenant shall also consult with Landlord in connection with Tenant's marketing to the public and advertising programs.

6.    <u>Governing Law</u>.  This Amendment shall be governed by, construed in accordance with and enforced under the laws of the State of New York, without regard to the principles of conflicts of law of such state.

7.    <u>Binding Effect</u>.  The covenants, agreements, terms, provisions and conditions contained in this Amendment shall bind and inure to the benefit of the parties hereto and their respective heirs, successors, legal representatives and assigns.

8.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall constitute one and the same instrument.

9.    <u>Authority</u>.  Each individual executing this Amendment represents and warrants that he/she is duly authorized to execute and deliver this Amendment of behalf of Tenant or Landlord, as the case may be, and that this Amendment is binding upon said party in accordance with the terms and conditions contained herein.

10.    <u>Broker</u>. Tenant and Landlord each represents to the other that no broker was instrumental in consummating this Amendment and that it had no conversations or prior negotiations with any broker concerning this Amendment.  Tenant and Landlord each hereby indemnifies and agrees to hold the other party harmless from and against any loss, cost, damage, expense, claim or liability (including, without limitation, attorneys' fees, disbursements and court costs suffered or paid directly or indirectly by the indemnified party in any action or

proceeding between Landlord and Tenant or between the indemnified party and any third party or otherwise) arising out of any inaccuracy or alleged inaccuracy of the above representation.

In witness whereof, the parties have executed this Amendment as of the date first above written.

Landlord:                    Third Church of Christ, Scientist, of New York City

By:
Name: *Chairman*
Title:

*Thomas S. Draper*   b.  THOMAS S. DRAPER, Jr.
Tenant:                    Rose Group Park Avenue LLC   VICE CHAIRMAN
By:    583 Park LLC, Manager

By:
Louis Rose, Managing Member

NY1 26453971.4 / 63739-000009

# EXHIBIT C



## 583 PARK AVENUE
### NEW YORK

### 583 PARK AVENUE SECURITY POLICY

Global Security Services is the exclusive security company for 583 Park Avenue.  All security must be hired through this company.  Additionally, all street activity permits needed by client must be acquired through Global Security. Please contact David Stone at 212-260-7444 or David@Globsec.com

Mandatory Basic Security (required for all events)_____$1,000.00
Includes two* uniformed NYPD officers to direct traffic and to ensure that private cars obey traffic laws
* If event is over 400 guests, two more officers are required to manage traffic on 63rd Street and on the southbound side of Park Avenue .

### Required Security:
Over 200 guests, 1 additional guard required_____$250.00
Over 300 guests, 2 additional guards required_____$500.00
Over 400 guests, 3 additional guards required_____$750.00
Over 500 guests, 4 additional guards required_____$1,000.00
Each additional 100 guests requires 1 additional guard at $250.00

All prices are based on a 5-hour minimum and include guard presence for one half hour prior to and after event.   Additional hours are charged at a rate of $50.00 per hour per guard.

### Required Permits:

Arrival/Departure Drop Zone Permit_____$1, 000.00
This permit allows exclusive use of the parking lane for one half of our block of Park Avenue as a drop-off and pick-up zone.  This service is required for all events.

63rd Street Loading Zone Permit_____$1,000.00
This permit allows for exclusive use of the north side of 63rd Street as a truck loading zone for your vendors during the setup and breakdown of your event.

### Additional Services

Standing Zone Permit_____$1,000.00
This permit creates a parking zone on Fifth Avenue for livery drivers, limousines, buses or private cars with chauffeurs. If you are hiring a car service for your guests, this permit is required and a dispatcher must be hired to coordinate with our Director of Security.

Sidewalk Activity Permit_____ _____$1, 000.00
This permit is required for any sidewalk activity in front of the venue such as rope and stanchion, red carpet arrivals, step and repeat press areas and press pens.

# EXHIBIT D

583 PARK AVENUE   NEW YORK, NY 10021-7363   (212) 838-1870
E-Mail Third ChurchOffice@Juno.com

# MEMORANDUM

Date:   May 7, 2007

Re:   **Church Activities, Past and Expected Church Use of Our Building, 583 Park**

---

I.   <u>Perspective</u>

Third Church of Christ, Scientist began in the 1880's as a group of dedicated students of Christian Science, which by 1895 applied for a charter and was registered under the laws of the State of New York.

By 1905, the members had purchased an existing building, formerly the Harlem Presbyterian Church, able to seat 800 people, as membership grew substantially.

By 1918 Third Church members had concluded that it could best serve the growing nature of New York City by relocating to the southern portion of its literature distribution territory[i]. The Church first opened a Reading Room at 680 Madison ($61^{st}/62^{nd}$ and Madison) and then in 1920 purchased the property at 583 Park. Engaging the architects Delano and Aldrich, the members funded and built a classic Georgian-Colonial building, simple while elegant, both in interior and exterior, with a seating capacity of 1500[ii].

First Sunday services were held at 583 Park in December 1923.

By the middle of the 20th Century, Third Church evidenced the following dynamic activity:

o   Two Sunday Services, mornings and afternoons, with attendance sometimes at the 1,500 seating capacity.

o   Wednesday Testimony Meeting in the evening with attendance in the 1,000 to 1,400 levels. Note: Some other NYC Christian Science (C.S.) Churches had two Meetings: Noon and Evening, to handle Wednesday Testimony demand.

o   Thanksgiving Services similarly packed with attendance.

o   Folding chairs added in the aisles and in the Sunday School basement space would expand seating to close to 2,000 attendees.

o   Spillover attendance chauffeured[iii] to other Christian Science churches when seating was full.

o   A half-dozen or more Christian Science Lectures each year that would result in lines of people outside the church building and around the corner from Park to 63rd waiting to be ushered in.

o   Significant Committee Meetings held most days of each week: Ushers, Sunday School, Reading Room, Property, Music, Finance, Care, Reception, Cloak Room, Literature Sales Room, Literature Distribution (which alone had dozens of members involved in sorting, organizing, and distributing free literature to dozens of locations in the immediate neighborhood and Greater New York City area), and other committees.

- o On average four Corporate Meetings for the full membership in the main auditorium each year that often ran well into the evening to complete (10 - 11 PM).

- o Trustee Meetings at least once each month (up to 10 – 11 PM).

- o Special workshop meetings, frequently running two or more days and evenings with emphasis on the Bible and spiritual healing topics.

In addition, the Christian Science Movement concurrently stimulated and sponsored[iv]:

- o Youth Forum activities for late teens and young adult singles emphasizing wholesome social as well as church related activities (many revolving around the Christian Science Monitor). Socials could run past midnight.

- o Some adult socials (such as a dance) that could run past midnight.

- o Encouragement of use of church auditoriums as a place for quiet prayer, reading of Christian Science literature made available on tables in the Foyer and elsewhere, and informal Q&A between visitors and active members.

## 2.    Third Church Renewal

The effort to structure the church and its building, so that it can provide sufficient economic self-sufficiency to restore 583 Park to quality and full-functioning status, includes with it an expectancy of renewed growth of membership and attendance. Just within the past year, with the beginning of renewal, Third Church has added more members than in any previous year within the past fifteen.

While the direction of its Founder, Mary Baker Eddy, is not to focus on or publish membership numbers, it can be reasonably assumed that Third Church at 583 Park Avenue was built for and can support church activity well exceeding 1,000 in attendance.

In addition, the needs of New York City and of contemporary lifestyles encourage a less formal and more open outreach process to serve the community such as making the church available specific evenings for such as *Prayer Time at Third Church, NY*, with appropriate reading material, soft music accompaniment, and some access to "Class Taught" Christian Scientists[v] to answer questions and provide a level of immediate ministry. Thus the Church could, when ready[vi], open its doors to the community from 9 PM to Midnight on Wednesdays and Sundays -- as a prayerful retreat in the middle of Manhattan.

Further, the inclusion of a working kitchen[vii] – generally present in most churches and synagogues today, opens up for the members the opportunity to extend and expand meetings (inclusion of lunch or dinner in support of long study and discussion sessions) and makes church activities more convenient and efficient (not having to break for 1.5-2 hours while participants scatter across the neighborhood seeking meal service).

Changes and improvements to the building provide the Church with greater flexibility in configuring space and conducting meetings tailored to the needs and convenience of its congregation and the range of activities hosted by the Church. This new building flexibility includes:

- o Removal of fixed, tightly-spaced pews
- o Availability of stackable chairs that can be positioned in rows, semi-circles, study group circles, or however best serves the function needs
- o Digital-controls that can set thematic light framing, tailored to a specific church meeting or event

- o  Substantially strengthened and more effective elevator system, especially desirable for attendees in wheel chairs or of elder age
- o  More bathrooms – modernized and now ADA-compliant, though in restorative quality and design
- o  Planned replacement of the worn physical sign on Park Avenue by a digitally-controlled sign that facilitates updating of church activities to passers-by and the community, designed with highest quality aesthetics

Finally, the Church has wanted to give back to the community even more and to become clearly integrated with the neighborhood; consideration is being given, for example, to being available for Open House tours (www.OpenHouseNY.org) and/or also to offering two or more specially prepared free organ concerts for the general public.

3.    Church Standards Affecting the Community

Members typically join Third Church after experiencing spiritual healing.  As their understanding of Christian Science grows, they choose to abstain from drugs and other material dependencies.  Often they attend services, use the Reading Room, study the Bible and the writings of Mary Baker Eddy, Founder and Pastor Emeritus, for months or even years before they are ready to commit to the mission of Christian Science through church membership.  Attendance is often much larger than membership, especially evident at Christian Science Lectures and such popular services as Thanksgiving.

Church services, Lectures, the Reading Rooms and many other outreach activities are open to "all honest seekers of Truth"."

Third Church historically has been known as an institution and body of members holding high standards, and sensitive to neighbors, the community, and the City. Christian Scientists believe in the Golden Rule, and just as they would not want impositions placed on their practice of Christian Science, they do not impose restrictions or Christian Science rules on others.

Concurrently, however, the Church strives to be sensitive to its neighbors and to any impact the Church or anyone associated with it might have on the community.  Members abstain from alcohol and smoking and urge others to also, but seek only to impose standards reached by community consensus.  These standards currently include the ban on smoking in public places, laws against disorderly conduct, driving while intoxicated, noise pollution, and illegal parking.

Third Church chose to enter into an agreement with the Rose Group, skilled caterers, because it believes they share the Church's appreciation of high standards.  The following steps have been taken or are being taken to cushion any material impact that expanded use of the Church and its building might create:

- o  Refrigeration of garbage within the sub-basement of the Church building.  Reactivation of the "Sidewalk Lift" (once used to transport coal into the building) to move trash up to 63rd Street during authorized garbage removal periods only when authorized trash removal vehicles arrive.

- o  Master-system digital control of all sound and light systems within 583 Park so that individual participants cannot project sound or light above or beyond pre-set limits, in keeping with established standards and rules.

- o  Employment of a professional Sound Study by Third Church to measure acoustic and decibel level impacts inside and outside its building and, especially, what might be heard or seen by neighboring buildings. The Church ordered proposals from three qualified NYC sound study firms and has selected one for this important work; all reasonable steps from study recommendations will be taken.

> o  Use of upwards of a half-dozen ushers to speed passenger drop-off in front of the Church building. Employment of Valet Parking for many events as well as arrangements with nearby parking garages to handle private vehicles.
>
> o  Planned use of off-duty policemen from the nearby Precinct to control traffic on Park Avenue and 63[rd] Street, to mitigate illegal parking, double-parking, or other hindrances.   Enforcement of the "no parking zone" in front of 583 Park.

4.    **Church Activities Expected (I) Within a Few Years Following Restoration and Restoral, and also (II) When Third Church Approximates its Earlier Attendance Levels**

For most of its existence and up to just four years ago, Third Church sponsored and held two Sunday Services. With renewal -- stimulated by physical restoration of its decaying 85-year old building coupled with sustained increases in income permitting a growth agenda once again, the Church expects to bring back an array of activities and services that were prevailing not long ago and/or have been considered, to reflect a more contemporary set of church-going needs.

The following table reflects the activities of the Church and expected use of hours, drawing on its rich and dynamic history as well as present experience of other Christian Science churches with dynamic, community-serving programs.

5.    **Expected Weekly and Monthly Church Activities**

| Activity | General Hours of Use | At Full Activity[1] Comments | Within a Few Years[2] Comments |
|---|---|---|---|
| Sunday Church Services | 9:30-1 PM, 6-9:30 PM | Two/week; up to 1,500 attendees | Two/week; up to 200 attendees |
| Sunday School | 10 – 1 PM | Located in basement. 80-100 children and adult staff | Located in basement. 25- 30 children and adult staff |
| Wednesday Testimony Meetings | 11-1:30 PM, 6-9:30 PM | Two/week[ix]; often with 1,000 or more attendees | Two/week; often with 100 - 150 or more attendees |
| Thanksgiving Service | 9:30-1 PM | Popular service on Thanksgiving Day, up to 1,500 attendees. | Popular service on Thanksgiving Day, up to 500 attendees. |
| Christian Science Lectures | 11-2 PM for Noontime, 6-10:30 PM Evening | About six/year; up to 2,000 attendees | About four/year; up to 800 attendees |
| C.S. Association Meetings[x] | 7 AM – 8 PM, Saturdays prep days before, after | About seven/year; up to 800 members each. | About four/year; up to 600 members each. |
| C.S. Class Instruction[xi] | 7:30 AM – 7 PM, Mon-Fri for two weeks | About five/year[xii]; up to 30 students + Teacher | About four/year; up to 30 students + Teacher |
| Branch Committee Meetings | AM, PM, Evenings, upwards of three/day. | At minimum several times per week year-round; 5-50 members per meeting | At minimum several times per week year-round; 5-20 members per meeting |
| Third Church Trustee Meetings | Evenings 5:30 – 11 PM | Up to two/month, 6 members | Up to two/month, 6 members |

---

[1] Based on Church attendance regaining levels of the 1940's and 1950's
[2] Based on expected attendance and Church activity within three-five years (2010-2012)

| Activity | General Hours of Use | At Full Activity<br>Comments | Within a Few Years<br>Comments |
|---|---|---|---|
| Corporate Meetings of Membership | Full day Saturday in Jan, May, Sept, other usually in evenings, up to 11 PM | Minimum of three, to five/year; full Membership expected. | Minimum of three, to five/year; full Membership expected. |
| Readers Rehearsals | Generally: Wed, 5-6 PM, Fri, 7-8:PM, Sun 9-10 | Usually at least three/week; some Readers in church many hours, many days; have their own suites | Usually at least three/week; some Readers in church many hours, many days; have their own suites |
| Soloist Rehearsals | Sat or early Sun AM | Generally one, Sunday prep | Generally one, Sunday prep |
| Organist Rehearsals | Wed, Sun hours before services start | Generally two/week, though more necessary for special meetings, Lectures, other | Generally two/week, though more necessary for special meetings, Lectures, other |
| Piano Rehearsals | 2-3 hours each week, usually late PM Thurs/Fri | For the Sunday School | For the Sunday School |
| Clerk/Treasurer/Building Mgmt. | Six-seven days/week | Physically on 4th Floor, all over the building during day | Physically on 4th Floor, all over the building during day |
| Superintendent Staff focused on Church activities and needs | In parallel with all Church meetings, services, events, before and after, six-seven days/week | Housed in Superintendent Office but all over the building during day and evenings | Housed in Superintendent Office but all over the building during day and evenings |
| Coordinated support to 3rd Church Reading Room now on 62nd and also Jointly-Maintained Reading Room now on Church Street in area of City Hall | Six-seven days/week Involves Clerk's Office + special committee work | Reading Rooms are located elsewhere but coordination is from 583 Park | Reading Rooms are located elsewhere but coordination is from 583 Park |
| Coordinated support for Spanish-speaking Services, Lectures, and radio lectures for the Tri-State area | Weekly planning, coordination, staffing as well as financial support | Spanish speaking services are held at 9th Church but run from 3rd | Spanish speaking services are held at 9th Church but run from 3rd |
| Tri-State C.S. Committee Meetings | Either Saturdays or Evenings, up to 11 PM | One-two per month; 5-50 per | One-two per month; 5-20 per |
| Coordinated support for Tri-State advertising that spans several institutions and activities | Weekly planning, coordination, and commitment of other resources to specific missions | Generally about a half dozen C.S. supporting institutions look to 3rd | Generally about a half dozen C.S. supporting institutions look to 3rd |
| Bookmobile coordination and prep for the Tri-State area | Generally once a week involving many hours; up to 12 people involved. | In support of special events, some outdoors (NYC street fairs, etc) | In support of special events, some outdoors (NYC street fairs, etc) |
| Periodic Special Meetings for the Tri-State area that often include senior representatives from The Mother Church (TMC) | Can cover two-four days each; meetings generally in the evenings or on Saturdays | TMC: The First Church of Christ, Scientist, in Boston, MA; C.S. Headquarters 3-4 per year | TMC: The First Church of Christ, Scientist, in Boston, MA; C.S. Headquarters 1-2 per year |
| Literature Distribution prep and coordination for Third Church area | Twice/week involving many hours: daytime, evenings. | Can be intense, time- and people-demanding work. Up to 50 people involved | Can be intense, time- and people-demanding work. Up to 20 people involved |
| Special Workshops, generally Bible-centered, encouraged by TMC, sponsored by Third Ch. | Sometimes two-three days; can be all day Sat or several evenings. | Attendance from a couple dozen to many hundreds, depending on focus, scope | Attendance from a couple dozen to hundreds, depending on focus, scope |

| Ancillary Activity | General Hours of Use | At Full Activity<br><br>Comments | Within a Few Years<br><br>Comments |
|---|---|---|---|
| Youth Forum activities (see: www.TMCYouth.com), quasi-social | From a couple to many hours, centered generally on young adult singles. Some quite deep metaphysically; a few 9 PM – Past Midnight. | Can concentrate on The Christian Science Monitor or Spiritual Activist Summits; some events merely social, such as a dance; about ten active events/year. | Can concentrate on The Christian Science Monitor or Spiritual Activist Summits; some events merely social, such as a dance; two-three/year. |
| Operation of an active, information-current website for Third Church to connect members, attendees, guests, the young, all interested. (re: http://www.thirdchurchny.com/ plan) | Several hours per day six days per week to maintain and enrich an interactive website that is relevant. | Headquartered in 583 Park Avenue, communicating locally and as far as the Internet spans. | Headquartered in 583 Park Avenue, communicating locally and as far as the Internet spans. |
| "Prayer Time at Third Church[xiii]" | Two evenings per week keeping Church open to the public for quiet prayer, study, Q&A with Class Taught Christian Scientists;9 PM-Midnight | Providing the City and the immediate community a safe prayer-focus haven. Soft music accompaniment[xiv]. | Providing the City and the immediate community a safe prayer-focus haven. Soft music accompaniment. |
| Adult socials[xv] | On a Friday or Saturday evening; 9 PM – Past Midnight. | Dance, dinner event, or centered on a serious subject. 3-4/year | Dance, dinner event, or centered on a serious subject 1-2/year |
| Weddings and Memorial Services[xvi] | As needed. Planning, coordinating, overseeing. Weddings can run late. | As needed; at least a dozen per year. Memorial Services handled by First Reader. Weddings require an outside Minister. | As needed; at least a dozen per year. Memorial Services handled by First Reader. Weddings require an outside Minister. |

6.     Expected Average <u>Hourly Use of Church Building</u>

| Activity | Timing of Use | At Full Activity[3]<br><br>Average Hours in Use/ Month[xvii] | Within a Few Years[4]<br><br>Average Hours in Use/ Month |
|---|---|---|---|
| Sunday Church Services | AM, PM | 7/week = (calculated into Totals) | 7/week = (calculated into Totals) |
| Sunday School (basement space) | AM to about 1 PM | 3/week = (within same hours as church) | 3/week = (within same hours as church) |
| Wednesday Testimony Meet. | Noon and eve periods | 6/week = (totals by month) | 6/week = (totals by month) |
| Thanksgiving Service | AM to about 1 PM | Thanksgiving Day only | Thanksgiving Day only |
| Christian Science Lectures | Eve period during week Noon period on a Sat | Lecture Day + planning meeting, at least ½ day every two months | Lecture Day + planning meeting, almost ½ day every two months |
| C.S. Association Meetings[xviii] | All day on a Saturday | 10-12 hours for event, 2-3 hours day before, after. About 7 Saturdays during the year | 10-12 hours for event, 2-3 hours day before, after. About 5-6 Saturdays during the year |

[3] Based on Church attendance regaining levels of the 1940's and 1950's
[4] Based on expected attendance and Church activity within three-five years (2010-2012)

|  |  | At Full Activity | Within a Few Years |
|---|---|---|---|
| **Activity** | **Timing of Use** | **Average Hours in Use/ Month** | **Average Hours in Use/ Month** |
| C.S. Class Instruction[xix] | Generally Summer months | 9-10 hours for two weeks straight. Space for 30 people. | 9-10 hours for two weeks straight. Space for 30 people. |
| Branch Committee Meetings | Concentrated in eves, Sat, Sun (outside of services) | 30-40 hours/week. Space for from 5 – 50 per meeting. | 15-20 hours/week. Space for from 5 – 15 per meeting. |
| Third Church Trustee Meetings | 6 PM – completion, can be as late as 11 PM | Including prep work, averages 20 hours per month. 4th Floor Board Room. | Including prep work, averages 20 hours per month. 4th Floor Board Room. |
| Corporate Meetings of Membership | 3rd Saturday in January, May, Sept, Other Eves | Including prep, averages 14 hours per quarter. Main space | Including prep, averages 14 hours per quarter. Main space |
| Readers Rehearsals | Usually squeezed in Fri Eve Sun AM, Wed early Eve | 6-11 hours/week = Readers' Suites + Platform time | 6-11 hours/week = Readers' Suites + Platform time |
| Soloist Rehearsals | Usually squeezed in early Sun AM | 2-3 hours/week = | 2-3 hours/week = |
| Organist Rehearsals | Usually squeezed in Wed early eve, Sun AM | 3-4 hours/week = | 3-4 hours/week = |
| Piano Rehearsals | Fri eve or Sun AM, Sunday School space | 1-2 hours/week = | 1-2 hours/week = |
| Clerk/Treasurer/Building Mgmt. | Better part of seven days/wk | 60-100 hours/week = 4th Floor + "walking the church" | 50-80 hours/week = 4th Floor + "walking the church" |
| Superintendent Staff focused on Church activities and needs | Better part of seven days/wk | 70-90 hours/week = Maintenance Office + "working the church building" | 70-90 hours/week = Maintenance Office + "working the church building" |
| Coordinated support to 3rd Church Reading Room (RR) and also Jointly-Maintained RR | Varies by need but usually some every day | 3-8 hours/week = Largely done from 4th Floor | 2-4 hours/week = Largely done from 4th Floor |
| Coordinated support for Spanish-speaking Services & Lectures | Varies by time period, some months relatively quiet. | 1-5 hours/week = Largely done from 4th Floor | 1-2 hours/week = Largely done from 4th Floor |
| Tri-State C.S. Committee Meetings | Some activity every month, some quite demanding | 1-5 hours/week = Coordination from 4th Floor, meetings can take major space and involve many participants | 1-3 hours/week = Coordination from 4th Floor, meetings can take major space and involve many participants |
| Coordinated support for Tri-State advertising | Varies by time period, some months quiet. | A couple hours per week. Largely done from 4th Floor | A couple hours per week. Largely done from 4th Floor |
| Bookmobile coordination and prep for the Tri-State area | Some activity every month, some quite demanding | 2-8 hours/week = Coordination from 4th Floor, team work takes space | 2-3 hours/week = Coordination from 4th Floor, team work takes space |
| Periodic Special Meetings for the Tri-State area | Varies by time period, some months relatively quiet. | Coordination from 4th Floor. Special Meetings usually involve a lot of people and much space. | Coordination from 4th Floor. Special Meetings usually involve a lot of people and much space. |

|  |  | At Full Activity | Within a Few Years |
|---|---|---|---|
| **Activity** | **Timing of Use** | **Average Hours in Use/ Month** | **Average Hours in Use/ Month** |
| Literature Distribution | Late PM, evenings; some Sat and Sun work | 4-8 hours/week = Involves a lot of people and much space to sort, prep. | 3-5 hours/week = Involves a lot of people and much space to sort, prep. |
| Special Workshops | Daytime, evening and Sat prep. Workshops can be relatively intimate or huge (a couple hundred people). | Workshops themselves run from ½ day to several days, from two to a few times per year. Much coord. and prep. Attendance can be very large. | Workshops themselves run from ½ day to several days, from one to a few times per year. Much coord. and prep. Attendance can be sizeable. |
| Youth Forum activities (see: www.TMCYouth.com), quasi-social | Keyed on non-school timing so weekends are priorities as are Summer months. | 2-8 hours/week by Youth task forces; much prep around school holidays/breaks. Youth workshops from 1-3 days. Socials can run past midnight. | 1-3 hours/week by Youth task forces; much prep around school holidays/breaks. Youth workshops from 1-3 days. Socials can run past midnight. |
| Operation of an active, information-current website for Third Church http://www.thirdchurchny.com/ plan | Most work done during daytime hours.  Maintenance 24x7 (largely uses an outside hosting service). | Maintaining a dynamic, interactive website requires a "Webmaster" 20-40 hrs/wk = Largely directed from 4th Floor. Keys into ALL Church activities and outreach. | Maintaining a dynamic, interactive website requires a "Webmaster" 20-40 hrs/wk = Largely directed from 4th Floor. Keys into ALL Church activities and outreach. |
| "Prayer Time at Third Church" | Targeting Wednesday and Sunday evenings/late. | 10 hours of focused time, 6 open to public. | 10 hours of focused time, 6 open to public. |
| Adult socials | Generally Friday or Satur-day events, in the evening. | 1-6 hours/week. Coordination includes Clerk's Office and adult special subcommittees. Socials can run past midnight. | 1-6 hours/month. Coordination includes Clerk's Office and adult special subcommittees. Socials can run past midnight. |
| Weddings and Memorial Services | Memorial Services can be anytime, as requested (First Reader presides). Weddings similar to general practice (Ordained Minister). | As requested[xx]. From a couple of hours to a couple of days/month. Requires major space (one of two major church floor spaces). | As requested[xxi]. From a couple of hours to a couple of days/month. Requires major space (one of two major church floor spaces). |

**Catering Support**

|  |  |  |  |
|---|---|---|---|
| Catering for Church-Specific | Church activities, meetings, Lectures, weddings, and the like. | 4-6 hours/week, once in full operational use. Most large scale. | 4-6 hours/week, once in full operational use. Some small scale. |
| Catering for Outside Events | Mostly in evenings; some late; Sunday after morning Church and Sunday School services | 13 hours/week for "live" events, "prep time" is behind kitchen and other workspace areas, not interfering with Church. | 13 hours/week for "live" events, "prep time" is behind kitchen and other workspace areas, not interfering with Church. |
| Total Catering Activity | As needed (see above) | 17-19 hours/week, some with other church functions | 17-19 hours/week, some with other church functions |

| | At Full Activity[5] | | Within a Few Years[6] | |
|---|---|---|---|---|
| **TOTAL HOURS OF USE** | **Average Participants** | **Average Hours Per Month**[xxii] | **Average Participants** | **Average Hours Per Month**[xxiii] |
| Categories of Church Use | | | | |
| 1) Totals for Church-only activities[xxiv]: | 800 – 1,000 | 102 - 128 discrete[xxv] hours | 100 – 600[xxvi] | 98 - 101 discrete hours |
| 2) Totals for Church activities mandating that other activities are isolated[xxvii]: | 30 | 58 - 70 discrete[xxviii] hours | 30 | 58 - 64 discrete hours |
| 3) Totals for Church activities that can work around other schedules[xxix]: | 20 - 70 | 280 - 340 overlap: more than one activity at the same time | 12 - 25 | 260 - 310 overlap: more than one activity at the same time |
| 4) Totals for Church activities that are largely "behind the scenes"[xxx]: | 10 | 510[xxxi] more than one activity at a time | 10 | 447 more than one activity at a time |
| Totals for Catering Support | | | | |
| 5) Church membership primarily: | staffed by event need | 22 work runs in parallel to other Church activities | staffed by event need | 22 work runs in parallel to other Church activities |
| 6) Others/outside events: | staffed by event | 58 hours/month[xxxii] | staffed by event | 58 hours/month |
| 7) Total catering support: | defined by nature of event | 80 hours/month[xxxiii] | defined by nature of event | 80 hours/month |
| Total Church Operating Hours | | | | |
| 8) Expected Hours of Church Operations: | | 7am-Midnight[xxxiv] | | Varies by day, 4 days: 7am-10pm, 2 days: 7am-12pm, 1 day: 9am-8pm |
| 9) Total Church operating hours[xxxv]: | | 514[xxxvi] hours/month | | 451[xxxvii] hours/month |
| **Other or Outside Events** (category 6 above) vs. **Total Church Use** (category 9 above) | | **11%** | | **13%** |

[5] Based on Church attendance regaining levels of the 1940's and 1950's
[6] Based on expected attendance and Church activity within three-five years (2010-2012)

Page 9, Proprietary document by Third Church of Christ, Scientist, of New York City, 583 Park

7.    Average[xxxviii] <u>Monthly Calendars of Use</u> of Church Building by Hour by Day
(totaled and summarized into categories; color coded)

(Calendar summary follows, attached)

---

[i] Each branch church has a Literature Distribution Committee that makes available Christian Science Literature where it is welcome and needed. Third Church covered the Upper East Side down to 59th Street

[ii] From *The History of Third Church of Christ, Scientist, New York City*, a pamphlet published by the church in 1953 at the celebration of its complete payment of debt, referred to as Dedication.

[iii] As part of its large Usher Committee, a transportation subcommittee stood by with cars to take visitors and members to other nearby Christian Science churches when absolutely no seating was left available.

[iv] Most of the Youth Forum and all of the socials were held outside of the Church. However, with removal of the fixed pews and a more open Church building, it is expected that Third Church could hold a number of these quasi-social events going forward.

[v] Those who have successfully gone through two weeks of authorized Christian Science instruction by a designated Christian Science Teacher, one who is authorized by TMC to use the initials C.S.B. following his/her name. Each student of Christian Science is allowed to be "Class Taught" once. See other references on C.S. Classes and C.S. Associations (those who have been Taught by a C.S. Teacher and meet once/year in an Association Meeting addressed by the Teacher or authorized substitute.

[vi] Current restoration is helping to prepare the Church: making bathrooms and access ADA compliant, constructing the Auditorium to be more visitor-friendly and flexible, improving lighting, clarity and precision of sound for listeners, installation of sprinkler systems, and other steps to make the church building safer, improved security systems, and more.

[vii] Designed and installed by the catering-proficient Rose Group in support of church and outside meetings and events.

[viii] From the Preface to *Science and Health with Key to the Scriptures* by Mary Baker Eddy

[ix] In the past, Third Church has held one Wednesday Testimony Meeting/week but would consider two to meet demand at attendance levels of its peak periods and contemporary work and lifestyles.

[x] All day events, usually on a Saturday. Associations also have prep meetings the day before and some have follow-on meetings the day after as well

[xi] Each student of Christian Science is eligible to take Class Instruction from an authorized (by The Mother Church, Boston, MA) Teacher. Classes are not expected to be larger than 30 in size, run all day, Mon-Fri, for two weeks. At Third Church, classes, depending upon size, can be held in the Sunday School space (Basement), Board Room (4th Floor) and potentially in the renewed Church Committee Room (4th Floor). Class Instruction cannot be disturbed.

[xii] Because Class Instruction requires complete privacy, an increase of the number of Classes or two weeks each would be coordinated with the Caterer and might include the construction of a more privately sealed-off study and meeting room, which could probably be accommodated in what is now referred to as Attic space off the 4th Floor

[xiii] All significant activities and programs of Third Church require Membership approval and those not specifically called for in The Manual of The Mother Church by Mary Baker Eddy can be added or dropped according to Membership wishes

[xiv] At appropriate times, the Church will also offer free organ concerts emphasizing more popular music though keeping with the dignity of the Church

[xv] Some other Christian Science churches individually or grouped have sponsored adult socials that are almost only independent of a church building, however, the restoration and renovation of Third Church, NY, lends itself for occasional socials for its members and their guests and/or for Tri-State socials in upper-mid Manhattan

[xvi] Not commonly conducted in Christian Science church buildings but can be; the more flexible structure of the restored 583 Park facilitates a much wider range of events and activities than historically capable

[xvii] Based on 4.5 weeks/month as an average calculation

[xviii] All day events, usually on a Saturday. Associations also have prep meetings the day before and some have follow-on meetings the day after as well.

[xix] Each student of Christian Science is eligible to take Class Instruction from an authorized (by The Mother Church, Boston, MA) Teacher. Classes are not expected to be larger than 30 in size, run all day, Mon-Fri, for two weeks. At Third Church, classes, depending upon size, can be held in the Sunday School space (Basement), Board Room (4th Floor) and potentially in the renewed Church Committee Room (4th Floor). Class Instruction cannot be disturbed.

[xx] Time needs not calculated into totals.

[xxi] Time needs not calculated into totals.

[xxii] Approximate, as this deals with a forecast, though based on substantive experience

[xxiii] Approximate, as this deals with a forecast, though based on substantive experience

[xxiv] Such as main Church Services and C.S. Lectures, can also include major workshops

[xxv] Nothing can happen in the Church but those Church activities/Services/Meetings

[xxvi] C.S. Lectures are already pulling in between 400-500; Thanksgiving Service very well attended, Association Meetings today are in the many hundreds and can be higher

[xxvii] Such as Trustee Meetings and C.S. Class Instruction

[xxviii] Nothing can happen anywhere in the vicinity, such as on the 4th Floor or Basement while these activities are going on

[xxix] The many Church Committee Meetings, Rehearsals, Literature Distribution, etc.

[xxx] Church Office, Treasurer, Clerk, church-focused custodial work, Church website maintenance and updating, etc

[xxxi] Clerk, Office, Custodial, Website maintenance, support that parallels Church hours

[xxxii] Note: many Church activities can continue behind the scenes

[xxxiii] Note: many Church activities can continue behind the scenes

[xxxiv] Based on Expected Use at membership and attendance of the 1940's, 50's and contemporary use of building to meet modern lifestyle and spiritual-searching needs

[xxxv] Note: 2, 3, 4 & 5 can overlap. Activities from 4 and some of 3 can occur with Activity 6

[xxxvi] 451 vs 447, as an average of four hours/month would run past midnight to complete catered events

[xxxvii] Wed-Sun to Midnight, Mon, Tues, Thurs, Fri to 10 pm except special church events. Sat. 9am-8pm, though can run longer for special church events

[xxxviii] Using two calendar months such as April and August to provide a balanced perspective of Church activity, which varies slightly through the year



Third Church of Christ, Scientist, of New York City
Typical Month of Activities

**KEY**

| | |
|---|---|
| | "Church Only" Activities |
| | Church Activities with "Isolated other activities" |
| | Church Activities that "Work around other schedules" |
| | Church Activities that are "Behind the Scenes" |
| | Church Catering Events |
| | Church Operating Hours |
| | Outside Catering Events |

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

# EXHIBIT E

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE, NEW YORK, NY 10065  (212) 838-1870

September 18, 2007

Dear The              Family:

We are writing to clarify communications forwarded to you concerning our church. We believe we will mutually benefit from this explanation. Please consider the following:

- o Our Church began in the 1880's and has occupied 583 Park Avenue, designed by the famed architectural firm Delano and Aldrich, since its construction in 1923.

- o Over the years, congregants and visitors have attended meetings and lectures, often more than 1,500 at a time, for which the size of our Church was constructed.

- o Over the last several decades, our congregation has become smaller. For several years, our membership has shared the use of its space with a tenant in an effort to maintain our building.

- o After examining numerous alternatives, it became clear that we must make new arrangements to secure urgently-needed funds for required capital repairs as well as the costly maintenance of our building.

In light of these serious challenges, we were pleased to enter into an arrangement that would permit our building, like many other houses of worship in our community, to be used for catered functions. After careful deliberations, the Church entered into an agreement with the Rose Group, prominent caterers, because it shares the Church's dedication to high standards.

- o The Rose family has generations of experience in managing elegant events and restoring historic buildings to their previous grandeur.

- o They have carefully preserved, wherever possible, the original architectural details of the building's interior and would restore our roof with slate from the same Vermont quarry that supplied the church more than 80 years ago.

- o They have been responsive to our concerns and to the concerns of our neighbors regarding the impact of the special events on the neighborhood.

At a series of meetings, the Rose Group has provided the community a detailed program of steps that it would take to mitigate both traffic and noise (see following). We have been willing to limit the number of functions per year and the number of persons at each event. This would distinguish our building from other houses of worship, for which there are no limitations.

4004

The Rose Group and the Church plan the <u>following to mitigate traffic and noise</u>:

o   **We have already monitored the sound audible outside the church** during a few events held in June and found the functions not to be audible from across either street outside the church. Nevertheless, we have retained an acoustical engineer to objectively measure sound levels and to advise us on steps to reduce sound outside the building.

o   **Deliveries to our building will be minimal**, once improvements have been completed, as we are building in storage, trash refrigeration, kitchen and other self-contained facilities.

o   **Trash collection is being scheduled at a time that should not inconvenience** or disturb our neighbors. Any trash that can spoil will be refrigerated within the building and then brought onto the street only when a collection truck has arrived.

o   **Professional management will oversee taxi and limousine drop-off and pick-up.** A drop-off zone already exists in front of the Church. Persons authorized to prevent double parking are being employed. Valet parking service will be provided. For larger events, organizations can legally arrange for limousines to park after a late evening hour in the bus lane on Fifth Avenue.

o   **New York City Police Department personnel off-duty** are being engaged to make certain that our neighbors are not inconvenienced or disturbed by sidewalk traffic.

Our Church is not being converted into a "large scale catering operation" as has been asserted.

Our building, 583 Park Avenue, will be used continuously by our Church for services, testimony meetings, lectures, committee meetings, Sunday School, and other Church activities.

On those occasions when specific catered events are scheduled, there will not be church activity during the hours of the event. It should be noted that our building was constructed to house well over 1,000, while almost all -- more than 85% -- of the Rose Group functions expected to take place at the church building will be for less than 450 people.

It is our hope and expectation that with a restored and well-maintained building, we will experience renewed growth of Church membership and attendance. As we have historically, we very much want to work together with our neighbors to maintain this wonderful community, in this great City.

A few of our neighbors who call themselves "The Preservation Coalition," have opposed our efforts. We have sought to meet with them to find a method of operation that is acceptable to all concerned. To date, our requests for a meeting have been rebuffed.

o   If no accommodation can be reached and the city agencies deny permits that would allow use of our building for catered events, it is likely that our church would not survive at its current location.

o   The next owner or developer would determine how the building and the site would thereafter be used.

Please consider the facts set forth above and we trust that you too will conclude that we should be able to sit together and work out a compromise concerning the use of our Church building.

Very truly yours,
Board of Trustees

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE    NEW YORK, NY 10065-7363    (212) 838-1870
E-Mail: thirdchurchoffice@Juno.com

September 11, 2007

Dear *Neighbor*:

**We are writing to clarify communications forwarded to you concerning our church. We believe we will mutually benefit from this explanation.** Please consider the following:

- Our Church began in the 1880's and has occupied 583 Park Avenue, designed by the famed architectural firm Delano and Aldrich, since its construction in 1923.

- Over the years, congregants and visitors have attended meetings and lectures, often more than 1,500 at a time, for which the size of our Church was constructed.

- Over the last several decades, our congregation has become smaller. For several years, our membership has shared the use of its space with a tenant in an effort to maintain our building.

- After examining numerous alternatives, it became clear that we must make new arrangements to secure urgently-needed funds for required capital repairs as well as the costly maintenance of our building.

In light of these serious challenges, we were pleased to enter into an arrangement that would permit our building, like many other houses of worship in our community, to be used for catered functions. After careful deliberations, the Church entered into an agreement with the Rose Group, prominent caterers, because it shares the Church's dedication to high standards.

- The Rose family has generations of experience in managing elegant events and restoring historic buildings to their previous grandeur.

- They have carefully preserved, wherever possible, the original architectural details of the building's interior and would restore our roof with slate from the same Vermont quarry that supplied the church more than 80 years ago.

- They have been responsive to our concerns and to the concerns of our neighbors regarding the impact of the special events on the neighborhood.

At a series of meetings, the Rose Group has provided the community a detailed program of steps that it would take to mitigate both traffic and noise (see following). We have been willing to limit the number of functions per year and the number of persons at each event. This would distinguish our building from other houses of worship, for which there are no limitations.

The Rose Group and the Church plan the <u>following to mitigate traffic and noise</u>:

o **We have already monitored the sound audible outside the church** during a few events held in June and found the functions not to be audible from across either street outside the church. Nevertheless, **we have retained an acoustical engineer** to objectively measure sound levels and to advise us on steps to reduce sound outside the building.

o **Deliveries to our building will be minimal**, once improvements have been completed, as we are building in storage, trash refrigeration, kitchen and other self-contained facilities.

o **Trash collection is being scheduled at a time that should not inconvenience** or disturb our neighbors. Any trash that can spoil will be refrigerated within the building and then brought onto the street only when a collection truck has arrived.

o **Professional management will oversee taxi and limousine drop-off and pick-up.** A drop-off zone already exists in front of the Church. Persons authorized to prevent double parking are being employed. Valet parking service will be provided. For larger events, organizations can legally arrange for limousines to park after a late evening hour in the bus lane on Fifth Avenue.

o **New York City Police Department personnel** off-duty are being engaged to make certain that our neighbors are not inconvenienced or disturbed by sidewalk traffic.

Our Church is **not being converted into a "large scale catering operation"** as has been asserted.

Our building, **583 Park Avenue, will be used continuously by our Church** for services, testimony meetings, lectures, committee meetings, Sunday School, and other Church activities.

On those occasions when specific catered events are scheduled, there will not be church activity during the hours of the event. It should be noted that **our building was constructed to house well over 1,000**, while almost all -- more than 85% -- of the Rose Group functions expected to take place at the church building will be for **less than 450 people.**

It is our hope and expectation that with a restored and well-maintained building, we will experience renewed growth of Church membership and attendance. As we have historically, we very much want to work together with our neighbors to maintain this wonderful community, in this great City.

A few of our neighbors who call themselves "The Preservation Coalition," have opposed our efforts. We have sought to meet with them to find a method of operation that is acceptable to all concern. . **To date, our requests for a meeting have been rebuffed.**

o If no accommodation can be reached and city agencies should deny permits that would allow use of our building for catered events, it is likely that our church would not survive at its current location.

o The next owner or developer would determine how the building and the site would thereafter be used.

Please consider the facts set forth above and we trust that you too will conclude that we should be **able to sit together and work out a compromise** concerning the use of our Church building.

Very truly yours,
Board of Trustees

# EXHIBIT F

06/29/2006  11:44    2126198550                                    PAGE  02/03

B

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE   NEW YORK, NY 10021-7363  (212) 838-1870
E-Mail Third ChurchOffice@Juno.com

June 2, 2006

To Whom It May Concern:

"For limited periods when the church building is not being utilized for our congregation, we have provided for various catered events which will also contribute to the church's ability to sustain itself.  These functions will be operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church.  These ancillary functions are necessary because they will not only ensure our building will be upgraded and rehabilitated but will also allow us to be exposed to and reach out to a larger community.  The functions will be restricted by the contract with the Church and will make certain that 583 Park Avenue continues to serve as our Church in New York City well into the future."

Respectfully submitted,

R. Fulton Macdonald
Chairman of the Board

Thomas G. Draper, Jr.
Vice Chairman of the Board

*ok To accept catered events under contract with the Church as complying with necessary "Social Hall" requirement of April 10, 2006 determination by L. Oscari*

6/29/06

06/29/2006  11:44    2126190550                    AEC                           PAGE  03/03
03/29/2006  13:29    2126190550                    AEC                           PAGE  02/03

# NYC BUILDINGS

## Additional Information

### 1 Filing Status

683 - 689 Park Avenue

| Job Number | | | | | |
|---|---|---|---|---|---|
| Sheet Number | 1 | of | 1 | Sheets | As an attachment to: Block 1398, lot 1 |

Third Church of Christ Scientist

### 2 Additional Information

Respectfully request pre consideration before filing a professional certification application that a proposed accessory social hall, ballroom and catering within the existing church is an accessory use to the existing building.

The building is an existing two story and cellar structure, located in a landmark district, and constructed in 1921 under application NB 390/1921. The lot is located in R-10 Park Improvement ( PI ) zoning district.

The existing plans from 1922 indicate the first floor as the main auditorium and church, and lower level as Sunday school room. Since the building was constructed in 1921, it does not have a certificate of occupancy.

It is proposed to continue the use as a church , and add an accessory use of social hall, ballroom and catering on first floor and cellar , for the periods that the hall is not being used as a church . The accessory ballroom and catering meets the accessory use definition in Zoning Resolution 12-10 in that they are located in the same zoning lot as the principal use. They will remain under the same ownership of the Third Church of Christ Scientist. The use is clearly incidental and customarily found in connection with the principal use, as a catering and ballroom is substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the principal use. The use, therefore remains the same use group 4 church and accessory uses.

The occupancy group will also remain as F occupancy as a place of assembly and will have F-1b and F-4 occupancy. Under the old code of 1938, the occupancy of the building remains as a public building.

Based on above, there is no change in use and occupancy of the building. The work should not require a new certificate of occupancy. The building will be upgraded for ADA and handicapped access (LL 58/87), and also for exits, and fire protection equipment. The work will be filed as ALT-2 directive 14 applications. A place of assembly permit will also be obtained for both church and ballroom catering.

*OK To accept provided a new certificate of occupancy is obtain with a restrictive declaration and note on The C.O that The accessory social Hall is to be use and operated exclusively and only by The church and for its member*

### 3 Statements and Signatures

I hereby state that the above information is correct and complete to the best of my knowledge.

It is unlawful to give to a city employee, or for a city employee to accept, any benefit, monetary or otherwise, either as a gratuity for properly performing the job or in exchange for special consideration. Violation is punishable by imprisonment or fine or both.

Applicant Name    MICHAEL L. GOLDBLUM, R.A.

Signature

Date  3-29-06

4/10/06

(seal: REGISTERED ARCHITECT MICHAEL GOLDBLUM 019536 STATE OF NEW YORK)

Revised 6-88 NII

# EXHIBIT G

# A.E.C. Consulting & Expediting, Inc.

Ronny A. Livian, P.E.
Mohamed Azadi, P.E., M.S., B.E.
29 Vesey Street, Suite 909
New York, N.Y. 10007
Tel.: (212) 619-0200, 0400, 0600    Fax: (212) 619-0550

Architectural & Engineering Consultants in
*Building Code, Zoning Resolution, Multiple Dwelling Laws, Fire Protection & Violation Removal*

## Facsimile

DATE:     June 13, 2007

TO:       Joe Garella

FROM:     Noreen A. O'Malley

RE:       Permits issued/in process
          583 Park Avenue

Memo:     Please find following, for your reference and use, a list of all permits
          issued or in process for 583 Park Avenue.

          Should any further questions arise, please feel free to contact me.

NO. OF SHEETS INCLUDING THIS SHEET:  2

7/3/2007 12:35    2128190551    AEC    PAGE 02/03

Permits In-Process / Issued by Premises

BIS Menu | Application Data | Property Profile | Property Permits | Back

# NYC BUILDINGS

NYC Department of Buildings

## Permits In-Process / Issued by Premises

☐ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

FAQs | Glossary    Jun 13, 2007

Page 1 of 1

Premises: 983 PARK AVENUE MANHATTAN    BIN 1042906    Block 1395  Lot 1

| NUMBER | JOB TYPE | SEQ NO | ISSUED DATE | EXPIRATION DATE | STATUS | APPLICANT NAME |
|---|---|---|---|---|---|---|
| 104545842.01.EQ | A3 - ALT3 | 01 | 05/17/2007 | 06/01/2008 | ISSUED | O'FARRELL PETER |
| 104672208.01.EW | A2 - ALT2 | 01 | 05/04/2007 | 04/11/2008 | ISSUED | ROSE LOUIS |
| 104681809.01.EN | A2 - ALT2 | 01 | 05/04/2007 | 07/18/2007 | ISSUED | ROSE LOUIS |
| 104852165.01.PL | A2 - ALT2 | 01 | 03/12/2007 | 07/18/2007 | ISSUED | ROSE LOUIS |
| 104650940.01.EW | A2 - ALT2 | 01 | 03/29/2007 | 03/27/2008 | ISSUED | HARRIS JR JOSEPH |
| 104581427.01.PL | A2 - ALT2 | 01 | 02/09/2007 | 02/07/2008 | ISSUED | HARRIS JR JOSEPH |
| 104544783.01.EW | A2 - ALT2 | 01 | 02/09/2007 | 02/08/2008 | ISSUED | HARRIS JR JOSEPH |
| 104544783.01.MH | A2 - ALT2 | 01 | 01/01/2007 | 01/01/2008 | ISSUED | HARRIS JR JOSEPH |
| 104582312.01.PL | A2 - ALT2 | 01 | 05/04/2007 | 05/23/2008 | ISSUED | GESSNER THOMAS |
| 104582312.01.EN | A1 - ALT1 | 01 | 11/24/2008 | 07/16/2007 | ISSUED | HARRIS JR JOSEPH |
| 104681684.01.AL | A1 - ALT1 | 01 | | | IN PROCESS  WITHDRAWN | |
| 104609817.01.SH | A1 - ALT1 | 01 | 09/27/2006 | 09/11/2007 | ISSUED | ROSE LOUIS |
| 103195517.01.SH | A3 - ALT3 | 01 | 04/25/2007 | 07/18/2007 | ISSUED | ROSE LOUIS |
| 102802395.01.PL | A2 - ALT2 | 01 | 12/21/2005 | 12/21/2006 | ISSUED | MARONAS TONY |
| 102802395.01.EQ | A1 - ALT1 | 01 | 12/12/2000 | 12/11/2001 | ISSUED | BELLINI THOMAS |
| 100900714.01.EW | A2 - ALT2 | 01 | 06/20/1994 | 10/01/1994 | ISSUED | O'FARRELL PETER |
| 100900711.01.EW | A2 - ALT2 | 01 | 06/20/1994 | 10/01/1994 | ISSUED | MARONAS TONY |



If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by calling 311 or (212) NEW YORK outside of New York City.

BIS Menu | Application Data | Property Profile | Property Permits | Back

# EXHIBIT H

**THE PRESERVATION COALITION**
570 PARK AVENUE
NEW YORK, NEW YORK 10065
thepreservationcoalition@gmail.com.

Dear Neighbor:

October 3, 2007

Recently, you may have received a letter from The Third Church of Christ, Scientist on Park Avenue and 63rd Street in which its Board of Trustees said it was writing to "clarify communications forwarded to you concerning our church." Rather than clarifying the issues, the letter is less than forthcoming about the use of the church by a large commercial catering business, and it mischaracterizes the Preservation Coalition.

**The Preservation Coalition** is spearheaded by the seven neighboring buildings listed below; it was formed to preserve the residential character of our neighborhood. We have been joined by residents from at least 24 buildings (not "a few of our neighbors" as the church claims), who have attended numerous committee and board hearings of Community Board 8, and who have written hundreds of e-mails and letters to local and state officials opposing the use of the church as a commercial catering hall.

**The church has entered into a 20-year multi-million dollar net lease, with two 5-year renewal options, with a catering concern called the Rose Group.** Both the Rose Group and the church claim the catering facility is an "accessory use" of the church. In fact, the reverse is true. **The church** – with only a small number of members - **has become an accessory use to the catering business.** All the pews have been removed from the main sanctuary and the church name has been covered.

It is an insult to our intelligence that the church's letter states, "Our church is not being converted into a 'large scale catering operation.'" **The caterer's own words demonstrate otherwise, as set forth in the attached copies of the Rose Group's online ads.**

We believe that **this use of the church as a commercial catering hall violates the New York City zoning laws.** Serious concerns also exist about whether serving liquor at these events complies with State Liquor Authority regulations.

And there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood -- commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night.

The church's statement that "requests for a meeting have been rebuffed" is simply untrue. Our outreach to the church began in November 2006, when the Board of 580 Park Avenue invited the Church Trustees and tenant to meet and start a dialogue about their plans, but **the church declined.**

We are disappointed that the church has now resorted to the scare tactic of suggesting the property might have to be sold to a developer unless the commercial catering operation is allowed to continue. Nevertheless, we understand that the church has financial problems. **We believe appropriate alternatives exist.** A commercial catering hall, however, especially for events of up to 1,500 people, is simply unacceptable for our *residentially zoned* neighborhood.

We are meeting with various City agencies and officials to urge them to stop granting temporary permits for these events and to rule that this use violates the law. If such a ruling is not forthcoming, we shall continue to challenge what we believe to be a clearly illegal use of the church building through various administrative channels, and, if necessary, in court.

Sincerely,

The Preservation Coalition Steering Committee
Representing the Boards of Directors of 550, 555, 563, 565, 570, 575, and 580 Park Avenue

583 Park Avenue in BizBash New York







PREMIUM SPONSORED LISTING

## 583 Park Avenue

PRINT | SEND TO A FRIEND

583 Park Ave.
New York, NY 10021
Telephone: 212.583.7200
Fax: 212.583.7206
Web: www.583parkave.com

CONNECT TO THIS RESOURCE

### OVERVIEW

Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of experience, 583 Park Avenue is poised to deliver a luxurious and memorable experience for your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City.

### BIZBASH EDITORIAL COVERAGE

New Yorkers for Children Decor Underscores Evening's Message
De la Renta Leaves Tents, Gets Exclusive With Church

### ROOM DIMENSIONS AND CAPACITY INFORMATION

| NAME | DIMENSIONS | SQ. FEET | RECEPTION | BANQUET | THEATER | CLASSROOM | CONFERENCE | U-SHAPE |
|---|---|---|---|---|---|---|---|---|
| 583 Park Avenue:Arcade | - x - | 3854 | 800 | - | 400 | 250 | - | - |
| 583 Park Avenue:Ballroom | - x - | 6500 | 1200 | - | 900 | 500 | - | - |
| 583 Park Avenue:Balcony | - x - | 3428 | 300 | - | 300 | 150 | - | - |

http://www.bizbash.com/newyork/content/resource/r815236.php



PHOTO GALLERY

Photo: 583 Park Avenue

# LocationsMagazine.*com*

WEDDINGS, SOCIAL OCCASIONS, & CORPORATE EVENTS

**WIN** A **FREE**
Honeymoon to
Jamaica or Brazil

**Largest Wedding Hall Site**
In The NY/NJ Metro Area

Oct 3, 2007

Home | Search | Help Line | Partners | Biz Opp | Contact !

## 583 Park Avenue

Photo     Map



Address: 583 Park Avenue
New York, New York 10021
Phone: 212-583-7200
Fax: 212-583-7206
Website: www.583PARKAVE.com
Email: events@583parkave.com
Contact: Louis Rose

Room Capacity cocktail reception: 1,000
Room Capacity dinner w/dancing: 800
Cuisine: Classic American
Kosher: Available
Room accommodates ceremony: Yes
Room available: Monday - Sunday

Comments:
*The most exciting new event space in New York City.*

583 Park Avenue is a breathtakingly glorious building that is now available for private events.

Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of combined experience, 583 Park Avenue is poised to deliver a remarkably luxurious and memorable experience to your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City. It is with great pleasure that we introduce to you this uniquely elegant venue with the hope that we will have the opportunity to be of service to you. Please call for an appointment.

http://www.locationsmagazine.com/display.php?id=7951

info@locationsmagazine.com
© 2007 LOCATIONS Magazine. All rights reserved.

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE, NEW YORK, NY 10065  (212) 838-1870

September 18, 2007

Dear The            Family:

**We are writing to clarify communications forwarded to you concerning our church. We believe we will mutually benefit from this explanation.** Please consider the following:

- Our Church began in the 1880's and has occupied 583 Park Avenue, designed by the famed architectural firm Delano and Aldrich, since its construction in 1923.
- Over the years, congregants and visitors have attended meetings and lectures, often more than 1,500 at a time, for which the size of our Church was constructed.
- Over the last several decades, our congregation has become smaller. For several years, our membership has shared the use of its space with a tenant in an effort to maintain our building.
- After examining numerous alternatives, it became clear that we must make new arrangements to secure urgently-needed funds for required capital repairs as well as the costly maintenance of our building.

In light of these serious challenges, we were pleased to enter into an arrangement that would permit our building, like many other houses of worship in our community, to be used for catered functions. After careful deliberations, the Church entered into an agreement with the Rose Group, prominent caterers, because it shares the Church's dedication to high standards.

- The Rose family has generations of experience in managing elegant events and restoring historic buildings to their previous grandeur.
- They have carefully preserved, wherever possible, the original architectural details of the building's interior and would restore our roof with slate from the same Vermont quarry that supplied the church more than 80 years ago.
- They have been responsive to our concerns and to the concerns of our neighbors regarding the impact of the special events on the neighborhood.

At a series of meetings, the Rose Group has provided the community a detailed program of steps that it would take to mitigate both traffic and noise (see following). We have been willing to limit the number of functions per year and the number of persons at each event. This would distinguish our building from other houses of worship, for which there are no limitations.

The Rose Group and the Church plan the <u>following to mitigate traffic and noise</u>:

o   We have already monitored the sound audible outside the church during a few events held in June and found the functions not to be audible from across either street outside the church. Nevertheless, we have retained an acoustical engineer to objectively measure sound levels and to advise us on steps to reduce sound outside the building.

o   **Deliveries to our building will be minimal**, once improvements have been completed, as we are building in storage, trash refrigeration, kitchen and other self-contained facilities.

o   **Trash collection is being scheduled at a time that should not inconvenience** or disturb our neighbors.  Any trash that can spoil will be refrigerated within the building and then brought onto the street only when a collection truck has arrived.

o   **Professional management will oversee taxi and limousine drop-off and pick-up.**  A drop-off zone already exists in front of the Church. Persons authorized to prevent double parking are being employed. Valet parking service will be provided.  For larger events, organizations can legally arrange for limousines to park after a late evening hour in the bus lane on Fifth Avenue.

o   **New York City Police Department personnel** off-duty are being engaged to make certain that our neighbors are not inconvenienced or disturbed by sidewalk traffic.

Our Church is **not being converted into a "large scale catering operation"** as has been asserted.

Our building, 583 Park Avenue, **will be used continuously by our Church** for services, testimony meetings, lectures, committee meetings, Sunday School, and other Church activities.

On those occasions when specific catered events are scheduled, there will not be church activity during the hours of the event.  It should be noted that **our building was constructed to house well over 1,000**, while almost all -- more than 85% -- of the Rose Group functions expected to take place at the church building will be for **less than 450 people**.

It is our hope and expectation that with a restored and well-maintained building, we will experience renewed growth of Church membership and attendance.  As we have historically, we very much want to work together with our neighbors to maintain this wonderful community, in this great City.

A few of our neighbors who call themselves "The Preservation Coalition," have opposed our efforts. We have sought to meet with them to find a method of operation that is acceptable to all concerned. **To date, our requests for a meeting have been rebuffed.**

o   If no accommodation can be reached and the city agencies deny permits that would allow use of our building for catered events, it is likely that our church would not survive at its current location.

o   The next owner or developer would determine how the building and the site would thereafter be used.

Please consider the facts set forth above and we trust that you too will conclude that we should be **able to sit together and work out a compromise** concerning the use of our Church building.

Very truly yours,
Board of Trustees

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE    NEW YORK, NY 10065-7363    (212) 838-1870
E-Mail: thirdchurchoffice@Juno.com

September 11, 2007

Dear *Neighbor*:

**We are writing to clarify communications forwarded to you concerning our church. We believe we will mutually benefit from this explanation.** <u>Please consider the following</u>:

- o   Our Church began in the 1880's and has occupied 583 Park Avenue, designed by the famed architectural firm Delano and Aldrich, since its construction in 1923.

- o   Over the years, congregants and visitors have attended meetings and lectures, often more than 1,500 at a time, for which the size of our Church was constructed.

- o   Over the last several decades, our congregation has become smaller. For several years, our membership has shared the use of its space with a tenant in an effort to maintain our building.

- o   After examining numerous alternatives, it became clear that we must make new arrangements to secure urgently-needed funds for required capital repairs as well as the costly maintenance of our building.

In light of these serious challenges, we were pleased to enter into an arrangement that would permit our building, like many other houses of worship in our community, to be used for catered functions. After careful deliberations, the Church entered into an agreement with the Rose Group, prominent caterers, because it shares the Church's dedication to high standards.

- o   The Rose family has generations of experience in managing elegant events and restoring historic buildings to their previous grandeur.

- o   They have carefully preserved, wherever possible, the original architectural details of the building's interior and would restore our roof with slate from the same Vermont quarry that supplied the church more than 80 years ago.

- o   They have been responsive to our concerns and to the concerns of our neighbors regarding the impact of the special events on the neighborhood.

At a series of meetings, the Rose Group has provided the community a detailed program of steps that it would take to mitigate both traffic and noise (see following). We have been willing to limit the number of functions per year and the number of persons at each event. This would distinguish our building from other houses of worship, for which there are no limitations.

The Rose Group and the Church plan the <u>following to mitigate traffic and noise</u>:

o  **We have already monitored the sound audible outside the church during** a few events held in June and found the functions not to be audible from across either street outside the church. Nevertheless, **we have retained an acoustical engineer** to objectively measure sound levels and to advise us on steps to reduce sound outside the building.

o  **Deliveries to our building will be minimal**, once improvements have been completed, as we are building in storage, trash refrigeration, kitchen and other self-contained facilities.

o  **Trash collection is being scheduled at a time that should not inconvenience** or disturb our neighbors. Any trash that can spoil will be refrigerated within the building and then brought onto the street only when a collection truck has arrived.

o  **Professional management will oversee taxi and limousine drop-off and pick-up.** A drop-off zone already exists in front of the Church. Persons authorized to prevent double parking are being employed. Valet parking service will be provided. For larger events, organizations can legally arrange for limousines to park after a late evening hour in the bus lane on Fifth Avenue.

o  **New York City Police Department personnel** off-duty are being engaged to make certain that our neighbors are not inconvenienced or disturbed by sidewalk traffic.

Our Church is **not being converted into a "large scale catering operation"** as has been asserted.

Our building, **583 Park Avenue, will be used continuously by our Church** for services, testimony meetings, lectures, committee meetings, Sunday School, and other Church activities.

On those occasions when specific catered events are scheduled, there will not be church activity during the hours of the event. It should be noted that **our building was constructed to house well over 1,000**, while almost all -- more than 85% -- of the Rose Group functions expected to take place at the church building will be for **less than 450 people**.

It is our hope and expectation that with a restored and well-maintained building, we will experience renewed growth of Church membership and attendance. As we have historically, we very much want to work together with our neighbors to maintain this wonderful community, in this great City.

A few of our neighbors who call themselves "The Preservation Coalition," have opposed our efforts. We have sought to meet with them to find a method of operation that is acceptable to all concern. . **To date, our requests for a meeting have been rebuffed.**

o  If no accommodation can be reached and city agencies should deny permits that would allow use of our building for catered events, it is likely that our church would not survive at its current location.

o  The next owner or developer would determine how the building and the site would thereafter be used.

Please consider the facts set forth above and we trust that you too will conclude that we should be **able to sit together and work out a compromise** concerning the use of our Church building.

Very truly yours,
Board of Trustees

# EXHIBIT I



LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW L. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL
STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER
ARTHUR R. BLOCK

October 5, 2007

**BY HAND**

Hon. Daniel Doctoroff
Deputy Mayor for Economic Development and Rebuilding
Office of the Mayor
City Hall
New York, NY 10007

583 Park Avenue/ Third Church of Christ, Scientist

Dear Deputy Mayor Doctoroff:

We represent The Preservation Coalition, a coalition of buildings located in the vicinity of the Third Church of Christ, Scientist at 583 Park Avenue. The Preservation Coalition seeks to preserve its residentially zoned neighborhood; to that end it opposes the commercial catering hall now operating at 583 Park Avenue under guise of this commercial operation being an accessory use to the church.

We enclose for your information copies of a letter distributed this week by the Third Church of Christ, Scientist to residents of the neighborhood, along with our client's response thereto.

187879.1

KURZMAN KARELSEN & FRANK, LLP

Hon. Daniel Doctoroff
October 5, 2007
Page 2 of 2

Thank you for your attention to this matter.

Respectfully,

KURZMAN KARELSEN & FRANK, LLP

*Phylis H. Weisberg*

Phylis H. Weisberg

PHW:alj
Encls.

BY HAND DELIVERY WITH ENCLOSURES

cc:    Hon. Patricia Lancaster
       Hon. Robert Tierney
       Hon. Adrian Benepe
       Phyllis Arnold, Esq.
       David Karnovsky, Esq.
       Elizabeth Weinstein

187879.1

### THE PRESERVATION COALITION
**570 PARK AVENUE**
**NEW YORK, NEW YORK 10065**
thepreservationcoalition@gmail.com

Dear Neighbor:                                                                                          October 3, 2007

Recently, you may have received a letter from The Third Church of Christ, Scientist on Park Avenue and 63rd Street in which its Board of Trustees said it was writing to "clarify communications forwarded to you concerning our church." Rather than clarifying the issues, the letter is less than forthcoming about the use of the church by a large commercial catering business, and it mischaracterizes the Preservation Coalition.

**The Preservation Coalition** is spearheaded by the seven neighboring buildings listed below; it was formed to preserve the residential character of our neighborhood. We have been joined by residents from at least 24 buildings (not "a few of our neighbors" as the church claims), who have attended numerous committee and board hearings of Community Board 8, and who have written hundreds of e-mails and letters to local and state officials opposing the use of the church as a commercial catering hall.

**The church has entered into a 20-year multi-million dollar net lease, with two 5-year renewal options, with a catering concern called the Rose Group.** Both the Rose Group and the church claim the catering facility is an "accessory use" of the church. In fact, the reverse is true. **The church – with only a small number of members - has become an accessory use to the catering business.** All the pews have been removed from the main sanctuary and the church name has been covered.

It is an insult to our intelligence that the church's letter states, "Our church is not being converted into a 'large scale catering operation.'" **The caterer's own words demonstrate otherwise, as set forth in the attached copies of the Rose Group's online ads.**

We believe that **this use of the church as a commercial catering hall violates the New York City zoning laws.** Serious concerns also exist about whether serving liquor at these events complies with State Liquor Authority regulations.

And there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood -- commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night.

The church's statement that "requests for a meeting have been rebuffed" is simply untrue. Our outreach to the church began in November 2006, when the Board of 580 Park Avenue invited the Church Trustees and tenant to meet and start a dialogue about their plans, but **the church declined.**

We are disappointed that the church has now resorted to the scare tactic of suggesting the property might have to be sold to a developer unless the commercial catering operation is allowed to continue. Nevertheless, we understand that the church has financial problems. **We believe appropriate alternatives exist.** A commercial catering hall, however, especially for events of up to 1,500 people, is simply unacceptable for our *residentially zoned* neighborhood.

We are meeting with various City agencies and officials to urge them to stop granting temporary permits for these events and to rule that this use violates the law. If such a ruling is not forthcoming, we shall continue to challenge what we believe to be a clearly illegal use of the church building through various administrative channels, and, if necessary, in court.

Sincerely,

The Preservation Coalition Steering Committee
Representing the Boards of Directors of 550, 555, 563, 565, 570, 575, and 580 Park Avenue

583 Park Avenue in BizBash New York



**NEW YORK**
OTHER MARKETS



SUPPLIERS   VENUES   EVENT COVERAGE   TRENDS & IDEAS   TIPS & STRATEGIES

PREMIUM SPONSORED LISTING

PRINT | SEND TO A FRIEND

# 583 Park Avenue

583 Park Ave.
New York, NY 10021
Telephone: 212.583.7200
Fax: 212.583.7206
Web: www.583parkave.com



CONNECT TO THIS RESOURCE

**OVERVIEW**
Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of experience, 583 Park Avenue is poised to deliver a luxurious and memorable experience for your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City.

**BIZBASH EDITORIAL COVERAGE**
New Yorkers for Children Decor Underscores Evening's Message
De la Renta Leaves Tents, Gets Exclusive With Church

**ROOM DIMENSIONS AND CAPACITY INFORMATION**

| NAME | DIMENSIONS | SQ. FEET | RECEPTION | BANQUET | THEATER | CLASSROOM | CONFERENCE | U-SHAPE |
|---|---|---|---|---|---|---|---|---|
| 583 Park Avenue:Arcade | - x - | 3854 | 800 | | 400 | 250 | | |
| 583 Park Avenue:Ballroom | - x - | 6500 | 1200 | | 900 | 500 | | |
| 583 Park Avenue:Balcony | - x - | 3423 | 300 | | 300 | 150 | | |

http://www.bizbash.com/newyork/content/resource/r815236.php

PHOTO GALLERY



Photo 583 Park Avenue

**LocationsMagazine** *.com*
*WEDDINGS, SOCIAL OCCASIONS, & CORPORATE EVENTS*

Oct 3, 2007

**WIN A FREE**
Honeymoon to
Jamaica or Brazil

Largest Wedding Hall Site
In The NY/NJ Metro Area

Home | Search | Help Line | Partners | Biz Opp | Contact

## 583 Park Avenue

Photo        Map



Address: 583 Park Avenue
New York, New York 10021
Phone: 212-583-7200
Fax: 212-583-7206
Website: www.583PARKAVE.com
Email: events@583parkave.com
Contact: Louis Rose

Room Capacity cocktail reception: 1,000
Room Capacity dinner w/dancing: 800
Cuisine: Classic American
Kosher: Available
Room accommodates ceremony: Yes
Room available: Monday - Sunday

Comments:
*The most exciting new event space in New York City.*

583 Park Avenue is a breathtakingly glorious building that is now available for private events.

Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of combined experience, 583 Park Avenue is poised to deliver a remarkably luxurious and memorable experience to your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City. It is with great pleasure that we introduce to you this uniquely elegant venue with the hope that we will have the opportunity to be of service to you. Please call for an appointment.

http://www.locationsmagazine.com/display.php?id=7951

© 2007 LOCATIONS Magazine. All rights reserved.

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL
STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER

March 12, 2007

## VIA ELECTRONIC MAIL & OVERNIGHT MAIL

Christopher Santulli, PE
Manhattan Borough Commissioner
New York City Department of Buildings
280 Broadway
New York, NY 10007

> 583 Park Avenue (the "Premises")
> Block 1398 – Lot 0001
> Job No. 104511495

Dear Commissioner Santulli:

As we have previously advised, this office represents 580 Park Avenue, Incorporated, and 570 Park Avenue Apartments, Inc, the cooperative apartment corporations that own 580 Park Avenue and 570 Park Avenue, respectively. We refer to our letters of January 9, 2007, January 16, 2007 and January 18, 2007, copies of which are enclosed.

We write to formally request the revocation of all permits and approvals related to the above job number including, without limitation, the permit for a change of use.

As we previously advised you, our clients believe that the proposed change in use is in violation of law. Since our prior letters, we have received additional information which we believe makes that even clearer. Specifically, we call to your attention a Confidential Private Placement Memorandum (the "Memorandum") filed with the New York State Attorney General and dated September 29, 2006. This was filed in connection with an offering to potential investors in Rose Group Park Avenue LLC (the "Rose Group"), the commercial caterer leasing the Premises. Relevant extracts from the Memorandum are annexed as Exhibit "A." The Memorandum establishes that the applicant is attempting to establish a commercial catering establishment, essentially a "Use Group 9" commercial use, in an R-10 Park Improvement District and that such use can in no way be considered "accessory."

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 2 of 5

In our prior letters we discussed the application for a change of use, the description of the proposed use, and the notation by Commissioner Osorio concerning that use. On March 5, 2007, we became aware, for the first time, of an additional letter and your notation concerning use. That letter was not in the file when we initially examined and reproduced same.

That letter, dated June 6, 2006, a copy of which is annexed as Exhibit "B," represents that the use by the caterer was to be for "limited periods," that the caterer was operating "under contract with the Church," that the functions were "ancillary," and that the "functions will be restricted by contract." On the basis of those representations, you agreed to "accept catered events under contract with the Church as complying with 'accessory Social Hall' requirements of April 10, 2006 determination by L. Osorio."

We submit that the Church's characterization is disingenuous. First, as discussed below and set forth in the contemporaneous liquor license application, the so-called contract with the caterer is actually a thirty (30) year lease (a twenty (20) year term with two (2) five year renewal options) for the premises. The difference between a contract with restrictions and a thirty (30) year lease is staggering. Among other things, a lease is an interest in real estate.

Second, the suggestion that the church building would be utilized by the caterer only "for limited periods" is simply wrong. The Memorandum describes the operation of the Premises. Nowhere is there a mention of restrictions.[1] Nowhere is there mention of use only for limited periods – except for limited Church use. Indeed, there is barely a mention of Church use. Most importantly, page 13 of the Memorandum states that "[t]he Company has entered into a Lease for the Facility Space, which permits the current congregation to use the Facility Space on a limited basis at times when the Company is not using the Facility Space." [Emphasis added] When read in the context of the statement on the same page that the Church only has forty members "and only a few of these members participate in the Church's Wednesday and Sunday services," it is clear that the use by the Church is extremely limited and that the use by the caterer is the primary use.

This is reinforced by the advertisements on the website of LocationsMagazine.com, which refer to the availability of the Premises every night of the week. We enclose as Exhibit "D" copies of the original listing and the modified listing; this modification was posted only after our clients raised the issue concerning the proposed maximum size of events as 2500. The maximum size is now described as 1000.

---

[1] Notably, the offeror, the Rose Group, is listed on the application for a change of use as the general contractor; we annex as Exhibit "C" the relevant printout from BIS evidencing this.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 3 of 5

Nor has the Church "provided for various catered events" or are the Rose Group's events "ancillary" to events sponsored by the Church as stated in the June 2nd letter. The Memorandum describes the types of events (see page 14). None relate to the Church. Instead, there are a myriad of corporate, individual and charity functions listed. Clearly, it is the Rose Group, the tenant, that will exclusively provide for these catered events. The Church has no role or participation in providing for such events.

We believe that documents submitted to two separate governmental agencies, i.e., the Memorandum filed with the Attorney General, and the June 2nd letter submitted to your Department, both of which presumably have been certified as true, are totally inconsistent. They cannot both be correct. We believe that this inconsistency requires immediate revocation of all permits.

Moreover, the described catering use is no way consistent with your notation on the June 2, 2006 letter. Your note relates to "catered events under contract with the Church." As described in the Memorandum, there will be no catered events under contract with the Church. The catered events are to take place under contracts between the Church's tenant, the Rose Group, and the individual or entity having the event. Unlike the typical arrangement where a religious institution has an in-house caterer, but the contract is with the institution and includes rental of the institution, the Church is not a party to such contract. In fact, as discussed below, the Church has made efforts to disassociate itself from the events because liquor will be served.[2] For this reason, too, the permits should be revoked.

While we recognize that the inquiry into whether a use is an accessory use is often a fact-intensive inquiry, we believe, that based on the documentary evidence before you, this use cannot under any circumstances be viewed as an accessory use. We enclose copies of two recent BSA decisions involving Yeshiva Imrei Chaim Viznitz (the "Yeshiva case") involving similar issues. In those decisions, the BSA upheld the DOB view that the catering use was not accessory. As those decisions make clear, the DOB and the BSA look at, among other things, intensity and frequency to determine whether the use is an accessory use. Here, the Memorandum makes clear that the primary user of the premises is the caterer.

Moreover the Memorandum makes clear that the attraction of the space is the potential intensity – that it can accommodate over 500 people. Thus, on page 13 it states "[t]he Company believes that the beauty and grandeur of the building located at 583 Park Avenue, New York, New York (the 'Facility Space'), its ability to handle over 500 people, and the prestigious location on Park Avenue represents a unique business opportunity." On page 15, the Rose Group states that "[t]he Facility Space will be one of the few properties in and around its location that can accommodate seated dinners with

---

[2] Christian Scientists, we understand, do not partake of alcohol.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 4 of 5

over 500 guests." See also page 3. This is far greater than the intensity of the use in the Yeshiva case. In that case, the use was for approximately 400 guests.

As to frequency, the Rose Group has represented it will hold approximately two to three events per week on average, but acknowledges it could be more. It has acknowledged that it will likely hold events almost every night in December. Given the financial pressures created by the involvement of investors pursuant to the Memorandum, the Rose Group has every incentive to have as many events as possible. The website listing at LocationsMagazine.com makes clear that the Premises is available every night. We understand the Premises has already been booked for a number of events. And, while the use in the Yeshiva case included use for the synagogue, the use here, which involves liquor, weddings and bar mitzvahs, none of which are part of Christian Science, will not be used at all by the members of the Church. In fact, the Church currently has an application pending with the Landmarks Preservation Commission for permission to put a block over the entrance to the building to cover the name of the Church, since presumably it does not want to be associated with events at which alcohol is served.

Indeed, even if the Church used the Premises for events, given that the Memorandum states the membership is now 40, it would certainly be a very small number of events.[3] Notably, in the Yeshiva cases, that at least 50% of the events were _not_ related to the Synagogue or School was one of the factors that led to the determination that the use was not accessory.

In the Yeshiva cases, the BSA also noted that the Zoning Resolution "does not anticipate that primary uses can normal qualify as accessory uses." Yet what is planned here is clearly a commercial catering establishment, a primary use under Use Group 9.

Finally, as noted in the Yeshiva cases, the hours of operation are relevant. Here, the catering use will only be when the Church is _not_ using the premises. The uses are mutually exclusive. That in and of itself is one of the clearest indicia that this is not an accessory use.

We believe the foregoing establish that the contemplated use is neither consistent with the representations to you nor an accessory use under Zoning Resolution 12-10. The uses are unrelated and only share a building.

---

[3] In the Yeshiva cases the Board noted that the DOB also looks to the "relationship between the size of the membership of the religious entity and the size of events." Here, with only forty members, it is hard to imagine why or how events of over 500 would be warranted.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 5 of 5

The construction continues to go forward; in fact, we have reason to believe that it is or will soon be substantially complete. Where the evidence is clear – for the Rose Group cannot disclaim its own filing with the Attorney General - there is no point in delaying the revocation of permits.

For all the foregoing reasons, we respectfully request that any permits and approvals issued to date be immediately revoked.

Thank you for your consideration.

Respectfully,

KURZMAN KARELSEN & FRANK, LLP

Phyllis H. Weisberg

PHW:alj
Encls.

cc:    Mona Seghal, Esq. (via overnight mail)
       Benjamin Colombo, Manhattan IGA Liaison, Executive Assistant to Borough
          Commissioner (via overnight mail)
       David G. Liston, Chair, Community Board 8 (via overnight mail)
       Terry Slater, Co-Chair, Zoning and Development Committee, Community Board 8
          (via overnight mail)
       Elaine Walsh, Co-Chair, Zoning and Development Committee, Community Board 8
          (via overnight mail)
       Hon. Liz Krueger (via overnight mail)
       Hon. Jonathan Bing (via overnight mail)
       Hon. Scott Stringer (via overnight mail)
       Hon. Dan Garodnick (via overnight mail)
       Board of Directors, 580 Park Avenue, Incorporated (via electronic mail)
       Board of Directors, 570 Park Avenue Apartments, Inc. (via electronic mail)

181018.1

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

ERNEST L. ISAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALEULA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL:
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL

STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
    (JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER

March 30, 2007

BY HAND & VIA OVERNIGHT MAIL

Christopher Santulli, PE
Manhattan Borough Commissioner
New York City Department of Buildings
280 Broadway
New York, NY 10007

> 583 Park Avenue (the "Premises")
> Block 1398 – Lot 0001
> Job No. 104511495

Dear Commissioner Santulli:

On behalf of our clients, 580 Park Avenue, Incorporated and 570 Park Avenue Apartments, Inc, we write to address issues that you raised at the meeting with Joanne Seminara and me on March 21, 2007. We also write to provide you with additional information, including a copy of the lease between The Third Church of Christ, Scientist (the "Church") and the Rose Group and our analysis thereof. A copy of the lease is annexed as Exhibit A.

This letter will address the following issues: 1) the significance of the leasing arrangement and the specifics of the lease; 2) the authority of the Department of Buildings ("DOB") to revoke a permit prior to the commencement of use; and 3) the implications of the Church's status as a religious institution.

At issue here is whether this catering operation is a proper accessory use for the Church. As discussed in our March 12th letter and below, we believe it is clear that the catering use will now be the primary, and not the accessory or incidental, use. Simply put, what is proposed is a commercial catering establishment in a building owned by a church. The relationship is merely that of landlord and tenant. No interrelationship or integration exists between the church use and the catering use, as is required for an accessory use.

181832.2

05/03/2007  14:54    2125665575    BORO COMM OFFICE    PAGE  03/13

**KURZMAN KARELSEN & FRANK, LLP**

Christopher Santulli, PE
March 30, 2007
Page 2 of 12

*The Leasing Arrangement Cedes Control of the Property and the Catering Operation*

At our meeting you raised an issue concerning the difference between a lease and a typical catering arrangement. A lease confers a possessory right. It transfers absolute possession and control of the premises to the tenant. In law, this is often referred to as a right of "exclusive possession" which, in lay terms, is the right to "exclude" others from using the property.

In the usual catering arrangement, the relationship revolves around the service to be provided and the quality of that service. Here the relationship revolves around a piece of real estate and a convenient "cover" for the tenant's use as a commercial catering establishment.

That this is a lease effectively for thirty years (twenty years plus two five year renewal terms) is critical to this issue. Unlike the typical arrangement with a caterer, either as a "house" or exclusive caterer, a long term lease – and in particular this long term lease – involves ceding control over both the building and the tenant's operation.

Granting a possessory interest for a period of thirty years is functionally equivalent to a sale of the building. New York's Religious Corporations Law §12 requires a religious institution that is selling, mortgaging or leasing for a period in excess of <u>five</u> years to obtain prior court approval.[1] This is a recognition by the New York State legislature that a lease is in many ways equivalent to a sale. As discussed below, this is particularly true here.

In contrast to the lease arrangement here, the typical religious institution that permits catering has a house or exclusive caterer; that caterer has no possessory rights, but is merely permitted entry on the property for the purpose of providing a service. The arrangement with a house caterer is usually terminable at will or lasts only for a limited period of time. In the event of a dispute, the religious institution can refuse to renew the caterer's contract or bar the caterer from entering the premises.

In the case of a lease, however, because of the possessory interest in real estate, self-help is generally not permitted and the institution's only recourse would be to institute dispossess proceedings. Such proceedings, although dubbed "summary," i.e., expedited, proceedings, often take several years to resolve. In the interim, the caterer would continue to have access to and a right to occupy and use the premises.

An example of what could happen is discussed in a decision involving the Lombardy Hotel, <u>109 East 56th Street v. 111 East 56th Street,</u> Supreme Court, New York

---

[1] The Church sought and obtained such approval in an uncontested submission to the Supreme Court, New York County. The standard for approval of such application is essentially whether fair consideration is involved for the transfer so as to protect the congregants.

181832.2

05/03/2007  14:54    2125665575                    BORO COMM OFFICE                              PAGE  04/13

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 3 of 12

County, a copy of which decision is annexed as Exhibit B.  The legal proceedings were instituted by service of a notice to cure in June, 2002.  Because of motion practice and the tenant's filing two bankruptcy cases, the matter was not finally determined until January, 2006, some three and one half years later.[2]  And even then, the tenant was given a further period to cure, and absent such cure, only then could the actual dispossess proceeding be instituted.  While the action was pending, the tenant continued in occupancy and continued to operate in a manner ultimately determined to violate the lease.  In other words, the ability to control the tenant's conduct was seriously limited.

In the context of a claimed accessory use, such a result is untenable.  Yet the possibility of such result demonstrates the significance of a lease creating a possessory interest, let alone one for thirty years.

The lease between the Church and the Rose Group underscores, among other things, the loss of control.  For your information, we have only recently obtained a copy of the lease.  In our settlement discussions with the Church and the Rose Group, we had requested a copy of the lease.  While the Church and the Rose Group were reluctant to provide same, they did agree that excerpts from the lease would be made available to us, provided it appeared we were moving close to a settlement.  Since our talks broke down, they did not provide us with any of the promised excerpts.  We have, however, located a copy of the lease as public record (filed with the application pursuant to the Religious Corporations Law).

This lease highlights the difference between this arrangement and the typical arrangement with a caterer in a religious institution.  Notwithstanding the references to accessory use, the lease makes the Rose Group's use primary.  The lease demonstrates the lack of any integration between the Church's operations and the Rose Group.

The lease is what is typically referred to as a "triple" net lease, where the landlord hands the key to the tenant and charges the tenant with the responsibility for maintaining the property in its entirety.  Although in this lease  the Church has retained a right to use a portion of the premises, that right is limited.  As more fully discussed below, the Church has virtually no obligations to provide services or to maintain or repair the premises.  It cannot hire building staff without the Rose Group's consent.  Its ability to sell the building is limited by the Rose Group and the Church may be required to pay the entire net proceeds of a sale to the Rose Group.  And, conspicuously absent from the lease are any references to catering or religious services to be provided to the Church.  Reading the lease, one gets the distinct impression that, but for the economic terms (which we submit are irrelevant to the determination of accessory use), the Rose Group is in significant respects the owner and the Church the tenant.

---

[2] Had the tenant chosen to appeal, the matter could have gone on much longer.

181832.2

Christopher Santulli, PE
March 30, 2007
Page 4 of 12

Some of the more relevant portions of the lease are as follows:

1) The Premises

.   By its definition of the premises, the lease gives the Rose Group a possessory right not only in the entire building, but also in the land (Paragraph 1.1, p.2). The control of the interior and the exterior of the property is underscored by such provisions as that contained in Paragraph 9.1, p. 33 in which the Church is given the right to maintain a literature distribution box on the 63rd Street side of the Building" at a location "to be mutually agreed upon by the parties,...." [emphasis added]  In other words, the Church cannot even unilaterally determine where to place a box on its exterior at a side entrance to its own building.  This is one indicia of the Church's having ceded control over its own premises.

While, notwithstanding the grant to the Tenant of the right to occupy the entire building, limited portions are reserved for the Church, those are, at least in part, to be physically separated from the Tenant's space.  Thus, on the 4th floor, where, based on the plans submitted to DOB, it appears the Church will maintain what little space it is reserving for itself, the Tenant is required to "install a door separating such 4th floor TENANT space from the Church space...and the 4th floor Church space shall be designated by a sign specifying "Private Offices.'"  Paragraph 9.1, p. 32. This partitioning, among other things, demonstrates the lack of integration between the Church and the catering operation.

2) The Right of First Refusal and Restrictions Upon Sale

Article 36, p. 71 contains provisions that, perhaps more than any other, highlight that this is anything but a use accessory to the Church. This article grants the Rose Group a right of first refusal in the event of a proposed sale of the building. This confirms that this lease is exclusively a real estate agreement.

Article 36 also restricts a sale of the premises by the Church in the first five years of the lease if the sale is to a "Non-Qualified User," i.e., an entity not a religious institution. Rather than the Church controlling its own property and its operations, the Rose Group, through the lease, is in control.  After five years, the Church may sell to a Non-Qualified User, but if such sale occurs, and if the Tenant does not chose to exercise its right of first refusal, then, unless the Rose Group has obtained a special use permit to allow the use of the building as a catering facility (Paragraph 36.2, p. 74 allows either the Church or the Rose Group to apply for a special use permit after the first five years of the term of the lease), the Tenant is to be paid the lesser of the net proceeds received from the sale or the value of both a) its business as a going concern and b) the costs of repairs and improvements to the building. In other words, unless the Rose Group can obtain a special use permit for a commercial catering establishment, it is entitled to the entire net proceeds

181832.2

Exhibit A

Christopher Santulli, PE
March 30, 2007
Page 5 of 12

of any sale or the value of its business and improvements to the premises.  If it is entitled
to the proceeds of any sale, its interest is, in fact, a de facto ownership interest.

   3)  The Responsibility for Repairs and Maintenance

      As is typical in a net lease situation, the Tenant is responsible for all repairs.  See,
e.g., Paragraphs 5.5 and 5.6 at p. 24, Paragraph 5.8 at p. 25..  Tenant is also required to
maintain the sidewalks and shovel ice and snow (Article 33, p. 65), an obligation consistent
with its being the primary user of the premises.

      In addition, under Article 37, p. 75, the cost of structural repairs shall be borne by
landlord and tenant according to a formula set forth in Paragraph 37.1.B.  That formula is
based on the useful life of the repairs and the term remaining on the lease.  Given the
length of the lease, it effectively means that most if not all expenses for structural repairs,
at least at the outset, will be the Rose Group's responsibility.

      Paragraph 5.9 at p. 25 makes clear that the Church has no obligation to furnish any
services for the Premises, including heat, water, light and electric power.  Pursuant to
Paragraph 4.1, p. 20, the Rose Group is to contract directly for "all...utilities used and
consumed in the Premises."  See also Paragraph 5.11 at p. 26.

      Under Paragraph 3.4, p. 6, Tenant is also responsible for all real estate taxes and
has the authority to contest assessed valuation (the lease anticipates that the tenant's use
will eliminate the exemption from real estate taxes).

      These provisions again make clear that the primary use is that of the Rose Group,
and because of that primary use, it has assumed these responsibilities with respect to the
realty.

      Even clearer evidence of the Rose Group's responsibility and control is found in
Paragraph 5.13, p. 26.  This provision contains a limitation upon hiring custodians without
the Rose Group's prior consent.  It states as follows:

      [t]he hiring and retention by Landlord of any and all employees in the
      capacities of custodian and/or Building maintenance, including the terms
      and conditions employment, shall be subject to the prior written approval
      and consent of Tenant (each, an "Employee"), which may be given or
      withheld at Tenant's sole discretion.  Tenant shall reimburse Landlord
      within thirty (30) days of written demand therefor, in an amount equal to
      any such Employee's compensation, including FICA and similar costs,
      provided Tenant shall have theretofore approved such amounts in
      writing....[t]he custodians ...shall be subject to the direction and
      supervision of TENANT, except when the Building is being used

181832.2

Exhibit A

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 6 of 12

exclusively for Church Activities, during which period the custodians with
respect to Church activities only shall be subject to the direction of the
Church. [emphasis added].

The unequivocal import of this provision is that the Rose Group is operating the real estate
and effectively has total control.   The Church cannot even hire employees without the
Rose Group's consent.

The Rose Group is also given permission to remove the pews, Paragraph 5.3A, p.
20 and Exhibit C to the lease, but, contrary to the public statements of the Church that
such pews are not needed or even wanted, the Rose Group is required to restore the pews
or provide new ones at the conclusion of the lease, thereby demonstrating their importance
if the building is to be used primarily as a church.

Paragraph 6.4, p. 28, acknowledges the possibility of alterations "not customarily
found in a church type facility" and provides that the Church may require the removal of
such items at the end of the lease term, which means that elements not customarily found
in a religious facility may be there for up to thirty years.

   4)  Church Activities

While the lease attempts to delineate the Church's activities, it makes clear how
limited those activities are.  Thus, Article 35, p. 66, sets forth the use of the premises by
the Church.  Article 9, p. 32 sets forth the limited areas of the building which the Church
may use for its activities.[3]  The permitted use includes the use for the conduct of church
services (which occur Wednesday evenings and Sunday mornings).

As to the areas that the Church may use, notably, only with respect to services
(Paragraphs 35.1A, B, and C, p. 67) and church corporate or organization meetings
(Paragraph 35.1F, p. 68) does the lease specifically state that such use will require the use
of the "entrance to the Premises." Presumably then, all other uses (except for Association
meetings, held four days each year, for which the Church reserves the entire building) will
require the Church to use the small side entrance toward the rear of the building on 63rd
Street. The Church's use is so limited that it has only limited use of its own front doors.

In enumerating its uses, the Church reserves dates for Association meetings, and
provides that "LANDLORD agrees to give TENANT not less than (1) year's prior written
notice of any such change in the date of an Association Meeting and will use reasonable
efforts to accommodate TENANT's use of the Premises on those days." (Paragraph 35.D.
p. 67). [emphasis added].  Similarly, the Church classes that are held over the summer for

---

[3] While this Article refers to use of Sunday School in the basement, it appears, based on plans submitted to
the DOB, that the Sunday School will be sited in the back portion of the 4th floor to be used by the Church.

181832.2

Christopher Santulli, PE
March 30, 2007
Page 7 of 12

two, two-week sessions require notification "at least one(1) year in advance of the actual date" even though such classes require only that the Rose Group temporarily relocate its office on the 4th floor.    (Paragraph 35.1E, p. 67). [emphasis added]. Again, the unmistakable conclusion is that the Tenant's use is the primary use, and the Church's use is incidental.

While Paragraph 35.1 contains an enumeration of Church uses with great specificity as to dates, Paragraph 35.1G, p. 68 allows for

occasional non-regularly scheduled events...[to be] scheduled from time to time at times mutually agreed upon by LANDLORD and TENANT.  Since it is difficult or impossible to predict when such a meeting may be required, LANDLORD and TENANT agree to consult with each other in order to schedule such meetings (i) in a manner which causes no disruption to TENANT's scheduled events in the Premises and (ii)at such times as do not conflict with TENANT's reasonably anticipated use of the Premises.

While such terms would seem commercially reasonable from a commercial caterer's perspective, they lead to the inescapable conclusion that it is the Tenant's use that is driving the scheduling.  Again, it is the Tenant's use that is primary.

Although, as noted, this Article reserves certain areas of the building for the Church's use, the Church's use of those areas is not necessarily exclusive. Thus, Article 29, p. 62 provides that the Tenant shall be permitted use of the Board Room, previously reserved by the Church, on a "when Available" basis.

5)  Tenant's Activities

While the Church's reservation of a right to use portions of the premises is delineated in detail, the Rose Group's right to use the premises is clearly much broader. Paragraph 22.1, p. 56 provides that "TENANT shall use and occupy the Premises solely as a high end, first class catering facility and for banquets, special events and meetings,...." Paragraph 16.1, p. 49 provides that the Tenant is granted the right of quiet enjoyment subject, only to the "LANDLORD'S right to occupy and utilize those portions of the Premises for Church purposes as set forth herein." Thus, the Tenant has the right to the whole, subject only to the express reservations by the Church.

Tenant has a right to sublet in whole or in part, subject, however, to the consent of the Church. Paragraph 22.2, p. 56. Again, this right underscores the possessory nature of

181832.2

Exhibit A

05/03/2007  14:54    2125665575    BORO COMM OFFICE    PAGE  09/13

**KURZMAN KARELSEN & FRANK, LLP**

Christopher Santulli, PE
March 30, 2007
Page 8 of 12

the interest and its prime focus on real estate, not the performing of a function related, even loosely, to the Church.[4]

In addition, Tenant is given control over the facade.  As you may know, an application is currently pending before the Landmarks Preservation Commission concerning covering up the Church's name on the facade.  Paragraph. 27.1 , p. 61 of the lease provides that "TENANT shall also remove or cover, at TENANT's option, the existing signs on the building facade and replace or cover them with blank ("faux") windows." Tenant is also obligated to install signs which "will indicate the existence of LANDLORD'S Sunday School and Church at all times except when TENANT is using the Premises for a third-party function or marketing the Premises."  The attempt to separate and distinguish the uses further demonstrates the lack of integration.

While admittedly some of the provisions of the lease are consistent with a more traditional arrangement, (for example the Tenant must respect the Church's privacy and not enter any portion of the premises during hours of Church activity, Paragraph 35.5, p. 70, what  is clear from the totality of this lease is that the occupancy by the Rose Group is primary, with the Church retaining limited secondary use.

\*\*\*

We annex, as Exhibit C, a copy of a resolution adopted by the Church concerning the approval of the lease.  The resolution states that the Church has 64 members; at the meeting, however, only 32 attended, and only a bare majority of those approved the lease.  The limited number. of members, and the  extensive activities proposed by the Church, underscore the primary use of the building will be as an event space and commercial catering establishment.

*Under the Facts Here the Department of Buildings May Revoke the Change of Use Permit Prior to Commencement of Use*

At our meeting, you raised the issue of enforcement and whether the DOB is authorized to revoke a permit prior to commencement of the use in question. We believe the answer is yes.

Our conclusions as to the use are not speculative.  Rather, they are based on documentary evidence – documents generated by the Church and the Rose Group themselves.   These documents, the lease and the  Confidential  Private  Placement

---

[4]  This provision also has implications for your notation on the June 2, 2006 letter from the Church.  The subtenant, who may be holding catered events, clearly would have no direct relationship with the Church, thereby violating the requirement that the events be "under contract with the Church."  Such would violate the conditions under which DOB issued its permit.  That the parties entered into a lease with such a provision, and allowing such a possibility, without disclosing it to DOB, raises a serious issue.

05/03/2007  14:54    2125665575    BORO COMM OFFICE    PAGE  10/13

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 9 of 12

Memorandum (the "Memorandum"), referred to in our March 12, 2007 letter, undermine the application made to DOB to obtain the permit for a change of use. Moreover, they contain clear statements as to what the use will be and, in particular, that the Rose Group's use will be primary.

As noted above, the lease demonstrates that the Rose Group's use is primary and unrelated to the Church. The Memorandum confirms that. It states that the Rose Group "has entered into a Lease for the Facility Space [583 Park Avenue], which permits the current congregation [described as forty members] to use the Facility Space on a limited basis at times when the Company is not using the Facility Space." [Emphasis added] How clearer could it be that the catering use will be primary and the Church use will be secondary.[5] The quoted language is in significant ways diametrically opposed to the submissions to the DOB upon which a change of use permit was granted. The submissions and the Memorandum cannot both be correct.

The "frequency" and "intensity" of the purported accessory use were referred to as highly relevant in the Board of Standards and Appeals decisions involving Yeshiva Imrei Chaim Viznitz (the "Yeshiva case"), which we discussed in our March 12, 2007 letter. As to those factors, too, the documentary evidence is clear. The Memorandum makes clear that the intent is to hold large events (the over 500 person capacity of 583 Park Avenue is cited as one of its distinguishing features). As set forth in the March 13, 2007 letter by the elected officials to Commissioner Lancaster, a copy of which is annexed as Exhibit D, the Church and the Rose Group have represented they would hold up to 208 events per year. While they have apparently in later discussions offered to reduce that number of events to 169, they have also stated that events under 100 should be unlimited in number.[6]

The submissions to the DOB do not establish the necessary interrelationship between the Church and the Rose Group or the integration of their activities. The lease between the Church and the Rose Group makes clear that no other connection exists aside from their interests in the same piece of real estate. The uses are mutually exclusive uses and unconnected. The Memorandum makes clear the Rose Group's use will be the primary use.

Accordingly, examining the application and the additional documentary evidence, it is clear that the Church has failed to make the requisite showing to entitle it to the change of use permit.

---

[5] This document was filed with a certification as to its accuracy. As an offering of securities, under the securities laws it subjects an issuer to claims if any statements are untrue.

[6] Given the size of the congregation, somewhere between 40, as set forth in the Memorandum and 64, as set forth in Exhibit C, serious question exists whether a lesser number could even meet the requirement of the Yeshiva case that the frequency and intensity bear some reasonable relationship to the size of the congregation.

181832.2

05/03/2007  14:54  2125665575          BORO COMM OFFICE                    PAGE  11/13
KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 10 of 12

Given the foregoing, under the authority of 9th & 10th Street LLC v. Board of Standards and Appeals of the City of New York, 12 Misc.3d 1183(A), decided in July, 2006, it is clear that the Department would be acting properly in revoking the permit at this time. We annex for your convenience a copy of that decision as Exhibit E. In the 9th & 10th Street case, a permit was denied for a dormitory use prior to the time the use commenced because the applicant failed to meet the criteria for a college or school dormitory (this was prior to the enactment of Rule 51-01). Both the court and the Board of Standards and Appeals upheld DOB's determination.

As in that case, the issue presented here is not whether the building might be used in a non-conforming manner, but whether the applicant made the requisite showing for the claimed future use. While the Church's application on its face would arguably appear to make the requisite showing,[7] the documentary evidence contradicts that. Had the lease and the Memorandum, or the provisions thereof, been disclosed on the application, we believe DOB would have denied the application. After review of the documentary evidence, the application fails to meet the threshold to establish the Church's right to a permit based on accessory use.

Earlier cases that stated that the DOB should not speculate about future use, are inapposite here. Here there is no speculation. In the Memorandum, a private offering filed under certification of truth with the New York State Attorney General's office, the true use of the premises was disclosed. To argue otherwise would expose the Rose Group to securities fraud claims. The lease also makes clear how the premises will be used. At issue is not possible future use, but actual intended use.

While revoking a permit in advance of commencement of use may be unusual, it is not impermissible. As the court noted in the 9th & 10th Street case, in response to the claim that what DOB had done was unprecedented, an "agency may engage in 'ad hoc decision making based on individual facts and circumstances.'....Ad hoc decision making may lead to 'unprecedented' decisions if the facts and circumstances are unique.'" Here the facts and circumstances are unique. The future use is admitted. Speculation is unnecessary.

As the court also noted in that case, "[e]ven proposed 'as-of-right' projects, when exposed to public scrutiny, may turn out to be not legitimately 'as-of-right.'" That scrutiny here has yielded documentary evidence. That evidence establishes this is not an accessory use and is, therefore, not "as-of-right." Therefore, even in advance of the commencement of the use, the permit can and should be revoked.

---

[7] As noted above, however, we do not believe it made the requisite showing of integration or interrelationship between the Church's use and the Rose Group's use. We are, therefore, not conceding the sufficiency of the application on its face.

181832 2

Exhibit A

Christopher Santulli, PE
March 30, 2007
Page 11 of 12

     Furthermore, we note that the condition you wrote on the June 2, 2006 letter required "events under contract with the Church." Taken literally, anyone having an event at the Church would have to contract directly with the Church and the Church would have a house caterer under its control. The parties have acknowledged that will not be the case. As discussed above, the Church does not have the Rose Group effectively under its control. By entering into the arrangement with the Rose Group in the manner it has, the Church has acknowledged that the use will not comply with the condition set by you as a basis for granting the permit. On this ground, too, the permit may be revoked.

*The Church's Status As a Religious Institution Is Not Relevant to the Determination*

     You had raised some concerns about limitations regarding operations of religious institutions. We believe you were referring to the recent decision involving St. Brigid's (Committee to Save St. Brigid v. Edward Cardinal Egan, Sup. Ct. N.Y. Co. (NYLJ 2/16/06). We annex a copy of that decision as Exhibit F. In that case, both the decision of the Archdiocese to close a parish and the decision to demolish the church were challenged. The Court refused to intervene, noting that it would not interfere with ecclesiastical decisions. In the St. Brigid case, the court noted that judicial involvement in disputes involving church property would be appropriate in cases which "can be decided solely upon the application of neutral principles of contract law...and where the underlying controversy does not involve determining religious doctrines or ecclesiastical issues.'" The court refused to interfere with the archdiocese's decision to demolish one of its churches on the grounds that "it would be an 'impermissible intrusion' into Cardinal Egan's ecclesiastical authority to mandate" that he reopen the derelict facility and/or operate a parish there.

     The situation at 583 Park Avenue is clearly distinguishable from that of St. Brigid where the church's authority to select a place of worship was called into question. The decision to permit the operation of a commercial catering facility does not involve the determination of religious doctrine nor does it present an ecclesiastical issue. Were DOB to revoke the permit, its decision would neither prevent nor compel the members of the Church from using the church facility to exercise their religion. Indeed, the Church has presumably carried out its religious mandate for decades without benefit of a formal catering "arrangement."

     Most importantly, St. Brigid did not involve an attempt to circumvent the Zoning Resolution to establish an otherwise illegal use in a residential district. To argue that St. Brigid prohibits DOB from enforcing the law would mean that any religious institution could with impunity violate laws as it chooses. Obviously, that is not the state of the law. Therefore, we believe that such decision in no way limits the DOB's ability to act in this matter.

                  \*\*\*\*\*\*\*

181832.2

Exhibit A

Christopher Santulli, PE
March 30, 2007
Page 12 of 12

For all the foregoing reasons, we respectfully request that any permits and approvals issued to date be immediately revoked.

Thank you for your consideration.

Respectfully,

KURZMAN KARELSEN & FRANK, LLP

Phyllis H. Weisberg

PHW:alj
Encls.

cc:    Mona Seghal, Esq. (by-hand delivery w/encls.)
        Benjamin Colombo, Manhattan IGA Liaison, Executive Assistant to Borough
            Commissioner (via overnight mail w/encls.)
        David G. Liston, Chair, Community Board 8 (via overnight mail w/encls.)
        Hon. Liz Krueger (via overnight mail w/encls.)
        Hon. Jonathan Bing (via overnight mail w/encls.)
        Hon. Scott Stringer (via overnight mail w/encls.)
        Hon. Dan Garodnick (via overnight mail w/encls.)
        Board of Directors, 580 Park Avenue, Incorporated (via electronic mail)
        Board of Directors, 570 Park Avenue Apartments, Inc. (via electronic mail)

181832.2

Exhibit A

# EXHIBIT J

BUILDINGS LEGAL          Fax:212-566-3843          Oct 29 2007  12:30          P.02



NYC Department of Buildings
280 Broadway, New York, NY 10007

Patricia J. Lancaster, FAIA. Commissioner

**Phyllis Arnold**
Deputy Commissioner, Legal Affairs and
Chief Code Counsel
212.566.3291
212.566.3843 fax
phyllisa@buildings.nyc.gov

October 29, 2007

R. Fulton Macdonald
Third Church of Christ, Scientist
583 Park Avenue
New York, NY 10021

Louis Rose
Rose Group Park Avenue LLC
583 Park Avenue
New York, NY 10021

Michael L. Goldblum
The Building Studio LLP
307 West 38 Street – Room 1701
New York, NY 10018

Re:    Intent to Revoke Approval and Permit
       583 Park Avenue, Manhattan (the "premises")
       Application No. 104511495

Gentlemen:

The Commissioner of Buildings intends to revoke the approval(s) and permit(s) issued for work at the premises in connection with the application referenced above, pursuant to Section 27-197 of the Administrative Code of the City of New York ("AC"), within 10 days of the posting of this letter by mail unless sufficient information is presented to the Department of Buildings ("Department") to demonstrate that the permit should not be revoked.

Pursuant to AC §27-197, the Commissioner may revoke a permit for failure to comply with the provisions of any applicable law or regulation, or a false statement or misrepresentation of material fact in the application, accompanying plans or papers on the basis of which the permit was issued, or whenever any permit has been issued in error.

We have reviewed letters dated March 12, 2007, March 30, 2007, and October 5, 2007 from counsel for neighboring buildings challenging the permit issued for a catering activity at the premises to the extent of its status as an "accessory use" to the Church at the premises. We have also reviewed letters submitted by the Church's attorney dated April 20, 2007 as revised May 8, 2007 and October 10, 2007 addressing these complaints. Based on the information presented to us thus far, the catering establishment is not an accessory use because it does not comport with the Zoning Resolution's requirement that it be "clearly incidental to, and customarily found" in connection with the Church. Rather it appears to be a principal commercial establishment at the premises. Therefore, absent additional information as set forth above, the permit will be revoked.

Pending submission of further information and a resolution of the issue, the Department will continue to issue Temporary Place of Assembly permits, but only to the extent of events currently booked at the catering facility and in no event beyond six (6) months from the date of this letter and on the condition that the Department is provided with a list no later than November 5, 2007 of booked events for the period in question for which the caterer has signed contracts.

Third Church of Christ Scientist
October 29, 2007
Page 2

Please contact the undersigned with any questions regarding this notice.

Sincerely,

Phyllis Arnold
Deputy Commissioner for Legal Affairs

C:    Christopher Sanfulli
      Fatma Amer
      Michael Alacha
      Barry Romm
      Dileep Khedekar
      Max Lee
      Dennis Zambotti
      Application folder
      Revocation file
      Premises file
      Mona Sebgal
      Felicia Miller
      Angelina Martinez-Rubio
      Jay A. Segal
      Phyllis H. Weisberg