# JUDGE BATTS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------ x

THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,

                Plaintiff,

      - against -

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City Department
of Buildings

             Defendants.

------------------------------------------------ x

07 Civ.

**07 CV 10960 2**

 

 

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

 

 

**Davis Wright Tremaine LLP**
**1633 Broadway**
**New York, NY  10019**
**(212) 489-8230**
*Attorneys for Plaintiff*
*Third Church of Christ, Scientist, of New York City*

# TABLE OF CONTENTS

**Page**

Preliminary Statement................................................................................................ 1

Background ................................................................................................................ 3

    The Church and Its Historic Building.................................................................. 3

    The Church Permits the Rose Group to Host Catered Events to Raise Needed Capital ......... 4

    The Required Capital Repairs Were Undertaken In Reliance on the City's Approval of Catering Events at the Building.................................................................. 6

    Opposition by Neighboring Residents Results in the Revocation of the Pre-Consideration ........................................................................................... 7

ARGUMENT ............................................................................................................. 9

    I.    The Church Is Likely To Prevail on the Merits of Its Claims ................................... 10

        A.    The City Violated RLUIPA's "Equal-Terms" Provision ............................. 10

        B.    The City Violated The Church's Right to Equal Protection of the Laws...... 13

        C.    The Church will Prevail on its RLUIPA "Substantial Burden" Claim.......... 16

            1.    The Church's Fundraising Activities and Property Renovations Constitute "Religious Exercise" Under RLUIPA............................. 17

            2.    The City Is Substantially Burdening the Church's Exercise of Religion.................................................................................... 18

            3.    The Church Has No Reasonable Alternative Other than Hosting Catering Events at the Building....................................................... 21

            4.    The City Did Not Use the Least Restrictive Means to Further a Compelling State Interest................................................................ 21

    II.    The Court Should Grant Injunctive Relief............................................................ 22

CONCLUSION ......................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AIM Intern. Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384 (S.D.N.Y. 2002) ..................25

*Ashwander v. Tenn. Valley Authority*, 297 U.S. 288 (1936)........................................................22

*Bronx Household of Faith v. Board of Education of City of New York*,
    331 F.3d 342 (2d Cir. 2003)...................................................................................................9

*Burson v. Freeman*, 504 U.S. 191 (1992) .................................................................................22

*Cottonwood Christian Center v. Cypress Redevelopment Agency*,
    218 F. Supp. 2d 1203 (C.D. Cal. 2002) ...............................................................................19

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)..................................................................................10

*Digrugilliers v. Consolidated City of Indianapolis*, __ F.3d __,
    2007 WL 3151201 (7th Cir. Ind. Oct. 30, 2007) ................................................11, 13, 25

*Elrod v. Burns*, 427 U.S. 347 (1973) ........................................................................................22

*First National Bank of Boston v.  Bellotti*, 435 U.S. 765 (1978)...................................................13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 126 S. Ct. 1211 (2006) ...............22

*Guru Nanak Sikh Society of Yuba City v. County of Sutter*,
    456 F.3d 978 (9th Cir. 2006) ......................................................................................18, 20

*Harlen Associate v. Incorp. Village of Mineola*, 273 F.3d 494 (2d Cir. 2001) ...........................14

*Konikov v. Orange County*, 410 F.3d 1317 (11th Cir. 2005)........................................................11

*LaRouche v. Kezer*, 20 F.3d 68 (2d Cir. 1994) ..........................................................................25

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995)........................................................23

*Lighthouse Institute for Evangelism*, 2007 WL 4166239 (3d Cir. Nov. 27, 2007) ..........11, 12, 13

*Living Water Church of God v. Charter Twp. of Meridian*,
    384 F. Supp. 2d 1123 (W.D.Mich. 2005) .............................................................................20

*Local 1814, Intern. Longshoremen's Association, AFL-CIO, v. N.Y. Shipping Association,
    Inc.*, 965 F.2d 1224 (2d Cir. 1992) .....................................................................................10

*Lusk v. Village of Cold Spring*, 475 F.3d 480 (2d Cir. 2007) .......................................................9

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004) .......................11, 13

*Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005)........................................................................14

*North Syracuse First Baptist Church v. Village of North Syracuse,*
    136 A.D.2d 942, 524 N.Y.S.2d 984 (4th Dept. 1988) .......................................................14

*Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin,*
    396 F.3d 895 (7th Cir. 2005) ...........................................................................................19, 20

*Vietnamese Buddhism Study Temple In America v. City of Garden Grove,*
    460 F. Supp. 2d 1165 (C.D.Cal. 2006) .............................................................................19, 23

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ..........................................................13, 16

*Vision Church v. Village of Long Grove*, 468 F.3d 975 (7th Cir. 2006)......................................11

*Warner Brothers Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120 (2d Cir. 1989) ..........................25

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005)...............................................................23

*Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007) .............. *passim*

*Westchester Day School v. Village of Mamaroneck,*
    417 F. Supp. 2d 477 (S.D.N.Y. 2007), *aff'd*, 504 F.3d 338 (2d Cir. 2007) ...........17, 18, 20

## STATUTES

42 U.S.C. § 2000cc(a)(1) ...............................................................................................................16

42 U.S.C. § 2000cc-(a)(1)(A&B) ..................................................................................................12

42 U.S.C. § 2000cc(b)(1) ...............................................................................................................10

42 U.S.C. § 2000cc-2(b) .................................................................................................................21

42 U.S.C. § 2000cc-3(g) .................................................................................................................11

42 U.S.C. § 2000cc-5(5) .................................................................................................................10

42 U.S.C. § 2000cc-5(7) .................................................................................................................17

42 U.S.C. § 2000cc-5(7) ...........................................................................................................17, 18

Plaintiff Third Church of Christ, Scientist, of New York City (the "Church") submits this memorandum of law in support of its motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order and/or an order preliminary enjoining Defendants City of New York and Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department of Buildings ("DOB") (collectively, the "City") from revoking earlier-issued approvals and permits that had allowed the Church to use its building for catered events.

## **Preliminary Statement**

For more than 80 years, the Church has worshipped in the historic building it owns on the northeast corner of Park Avenue and 63rd Street (the "Building"). Time has not been kind to the Building or the Church, whose membership dwindled as the Building fell into disrepair. A declining building is expensive to maintain; growing liabilities for repair keep new congregants away; a smaller membership makes it harder to raise money to pay for repairs. This was a vicious circle: if the Church failed to raise the substantial funds necessary to renovate the Building and in turn to grow its congregation, it would disappear.

The Church did what many other religious institutions and secular non-profit organizations routinely do to raise needed revenues: it entered into a commercial relationship with a reputable caterer to conduct events in the Building – only at times when the Building was not being used for its primary religious purposes. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the ongoing expenses of maintaining the Building. This relationship was critical to the Church's survival.

The Church went to the City for approval of this accessory catering use. The City approved the Church's request and granted the necessary permits for the Required Capital

Repairs.  This was consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for guests not otherwise affiliated with the non-profit or religious institution.  The Church relied on the City's approval, and the Required Capital Repairs were begun.

But something unlawful has happened.  Defendants have suddenly revoked their prior approval and rescinded the permits.  They have done so because a small group of influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events held so far have transformed the Building into a commercial catering hall that causes serious disruption in the neighborhood.  The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth:  the City has singled out and discriminated against the Church without any basis.  If unremedied, this discrimination will devastate the Church, which will be forced to sell the Building so that it can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

This memorandum demonstrates that:

(i)     the City has violated Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions.  *See* Point I(A), *infra*;

(ii)    The City's discriminatory enforcement of its zoning rules violates the Church's right to equal protection of the laws.  *See* Point I(B), *infra*;

(iii)   The City's improper implementation of its zoning rules substantially burdens the religious exercise of the Church in violation of RLUIPA.  *See* Point I(C), *infra*; and,

(iv)    the Church is entitled to injunctive relief because it is likely to prevail on the merits, is suffering irreparable injury, and the balance of hardships tilts decidedly in its favor.  *See* Point II, *infra*.

## Background[1]

### The Church and Its Historic Building

The Church began in the 1880s as a congregation of students dedicated to the Christian Science religion. In 1920, the Church purchased property at 583 Park Avenue, New York, New York, and, a few years later, retained a renowned architectural firm to design a house of worship. That Building, built in 1924, houses the Church's congregation to this day. *See* Draper Decl. ¶¶ 2-4, Ex. A.

In the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult socials and youth forum activities, and lectures and workshops focusing on religious and spiritual healing topics. Over the years, the Church's membership has declined. It currently has fewer than one hundred members. True to its mission, however, the Church continues to use the Building for religious worship every Wednesday evening and Sunday morning, as well as for other religious uses such as Sunday School and lectures. *Id.* ¶¶ 5-6.

A significant contributing factor to the decline in membership has been the growing state of disrepair of the Building and the prohibitive costs of the Required Capital Repairs, which include modernization of all major building systems, including electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and possibly replacement of the Building's

---

[1]   The facts are set forth in the Declaration of Thomas G. Draper, Jr. sworn to on December 3, 2007 ("Draper Decl.") and the Declaration of Jay A. Segal, sworn to on December 3, 2007 ("Segal Decl.").

façade, roof, windows, doors and other exterior components; and significant restoration of the main auditorium and other rooms. *Id.* ¶¶ 7-8.

In order to save the historic Building, the Church needed to raise substantial capital. Beginning in the late 1990s, the Church explored several alternatives, including government loans and private foundation grants. The Church considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a church because of the public relations ramifications of having later to foreclose on a church. The Church also supplemented its income by renting out various space in the Building to educational and other religious institutions, but none of these relationships yielded enough money to fund the Required Capital Repairs. Thus, after considering numerous alternatives, the Church did what many other religious institutions and non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events. *Id.* ¶¶ 10-15.

### The Church Permits the Rose Group to Host Catered Events to Raise Needed Capital

As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. *Id.* ¶ 16. The agreement, dated January 31, 2006 and amended twice thereafter, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and on-going maintenance costs (the "Lease"). *Id.* ¶ 17, Ex. B. The Rose Group is further obligated to undertake general maintenance of the Building throughout the term of the Lease, and to pay annual and percentage rent to the Church. *Id.* ¶ 21.

The express purpose of the Lease is to supplement the Church's income, and the catering use remains subordinate to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, *Id.* ¶ 18, Ex. B (Lease at p. 1 (emphasis added)).

Although the Rose Group is required to expend considerable sums and to make extensive improvements to the Building, unlike a typical commercial tenant, it does not have an exclusive right to occupy the premises. *Id.* ¶ 22. The Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities. Specifically, it provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" *Id.* ¶¶ 22-23, Ex. B (Lease at ¶ 35.1).

Moreover, the Lease requires the Rose Group to be sensitive to the surrounding neighborhood, to limit the way it disposes rubbish, to restrict the times that it loads and unloads equipment and supplies for events, and to be conscientious of sound, light levels, traffic control, and signage. The Lease likewise prohibits loud speakers or radio broadcasts to be heard outside of the premises. *Id.* ¶¶ 25-28, Ex. B (Lease at ¶ 32.1. & 2nd Amn. to Lease at ¶ 5).

The Church, of course, did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. The Lease accordingly permits the Rose Group to hold a variety of functions at the Building, and is of a sufficient duration – a twenty-year term, with options for two five-year

renewal terms -- to permit the Rose Group a reasonable chance to profit from the arrangement. *Id.* ¶ 24. In the second amendment to the Lease, the parties provided that, in the event that the Building could not be used for catering activity, the Rose Group would be able to require the Church to reimburse it for any undertaken Required Capital Repairs, even if the Church had to sell the Building. *Id.*, Ex. B. (2nd Amn. to Lease, at ¶ 3).

While the Rose Group has begun to host catered events at the Building, the primary purpose of the Building remains the congregation's house of worship. In fact, the Church has recently been attracting new members and it expects that, after the renovations are completed, it will be able to hold additional services and lectures for its members and other attendees. In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years. By then, the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members. *Id.* ¶¶ 31-33, Ex. D.

### The Required Capital Repairs Were Undertaken In Reliance on the City's Approval of Catering Events at the Building

Like many religious and non-profit institutions, the Church is located in an area zoned for residential use. The Building is in an R-10 zoning district, which is the highest density residential area under the Zoning Resolution of the City of New York (the "Zoning Resolution"). In Manhattan, much of Midtown and Downtown as well as cross-town streets and avenues are zoned R-10. *See* Segal Decl. ¶ 2.

Only residences, community facilities (such as churches, synagogues and non-profit institutions) and uses that are "accessory" to residences and community facilities are permitted in residential districts. While catering facilities are permitted, and commonly found, as accessory uses, stand-alone catering facilities are not permitted in residential districts. Nevertheless,

private catered events, much like the events held at the Church, are commonly hosted by religious and non-profit institutions located throughout the R-10 zoned district. *Id.* ¶ 3. Several of these institutions, and their respective catering uses, are set forth in some detail in the Segal Declaration, sworn to on December 3, 2007 *Id.* ¶¶ 3-4, 8-13.

Given this zoning regime, the Church sought the City's approval for this catering arrangement prior to initiating the extensive and costly Required Capital Repairs. On April 19, 2006, the City issued a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-Consideration"), which provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building. Draper Decl. ¶ 36, Ex. F. The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits"). *Id.* ¶ 38, Ex. G.

The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with other senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees. During these conversations, the DOB's consistent position had been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and that the only limitation on the size of events related to the capacity of the Building. *Id.* ¶ 40.

**Opposition by Neighboring Residents Results
in the Revocation of the Pre-Consideration**

By March 2007, after the Required Capital Repairs were well underway and the Rose Group had hosted several catered events, residents of two neighboring buildings on the west side of Park Avenue, across from the Church – 570 and 580 Park Avenue – began complaining about the Church's arrangement with the Rose Group. Dubbing themselves the "The Preservation

Coalition," these neighbors initiated a public relations campaign against the Church for the avowed purpose of maintaining the "residential" character of their Park Avenue neighborhood. They claimed that the Church's plans to permit catered events at its historic premises – although no different than the practices of neighboring institutions – would cause significant disruption in their neighborhood. One flyer accused the Church of being "less than forthcoming about the use of the church" and insisted that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall. The flyer states that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night." *Id.* ¶¶ 40-42.

The disgruntled neighbors have pressed these pre-textual complaints on the City, sending numerous letters that make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group. The City succumbed to their demands. On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs, which had begun in reliance on the City's approval more than a year ago, were nearly completed. *Id.* ¶¶ 44-46, Ex. J.

The DOB stated that it had re-evaluated its position in light of such vocal opposition, and now concluded that catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church." *Id.* The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and

further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008). *Id.* ¶ 47, Ex. J. The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs. *Id.* ¶ 47. The Church, in turn, would be liable to Rose Group for the multi-million dollar repair costs. *Id.* ¶ 24, Ex. B. (2nd Amn. To Lease, at ¶ 3).

The Church voiced its concerns regarding the City's unfair and unequal treatment through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). *Id.* ¶ 49. The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area. On Friday, November 30, 2007, notwithstanding attempts by the Church's counsel to reach a compromise solution, the DOB informed counsel for the Church that the Defendants refused to reconsider its revocation of the earlier-granted approvals, and revoked the approvals and the construction permits forthwith. Segal Decl. ¶ 31 & Ex. K. This action followed.

## ARGUMENT

The Church is entitled to a preliminary injunction if it can demonstrate: "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007); *Bronx Household of Faith v. Board of Educ. of City of New York*, 331 F.3d 342, 348-49 (2d Cir. 2003). The standards for granting a temporary

restraining order and granting a preliminary injunction are the same. *Local 1814, Intern. Longshoremen's Ass'n, AFL-CIO, v. N.Y. Shipping Ass'n, Inc.* 965 F.2d 1224, 1228 (2d Cir. 1992).

The Court should grant the TRO and enter a preliminary injunction. Given the plain terms of RLUIPA and the City's arbitrary and discriminatory conduct, the Church is likely to prevail on the merits. And, absent injunctive relief, the Church will be irreparably harmed. Indeed, it will lose its home indefinitely – an injury that far outweighs any conceivable interest the City has in preventing this one institution from hosting catered events, while it permits numerous surrounding institutions to host similar events.

## I.    <u>The Church Is Likely To Prevail on the Merits of Its Claims</u>

### A.    The City Violated RLUIPA's "Equal-Terms" Provision

Section (b)(1) of RLUIPA provides that:

> No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

42 U.S.C. § 2000cc(b)(1) (the "equal-terms provision").[2]  As the Supreme Court has noted, RLUIPA is "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." *Cutter v. Wilkinson*, 544 U.S. 709, 714, 125 S.Ct. 2113, 2117-18 (2005).  Congress has made its intention to protect religious institutions unmistakably clear: "This Act shall be construed in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the

---

[2]    RLUIPA defines a "land use regulation" as a "zoning or landmarking law, or the application of such a law, that restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership . . . or other property interest in the regulated land. . . ." 42 U.S.C. § 2000cc-5(5).  There can be no question that the Zoning Resolution and the City's application of the Zoning Resolution to the Church meets this definition.

Constitution." 42 U.S.C. § 2000cc-3(g).

The equal-terms provision is exacting. When the City implements its Zoning Resolution, it must treat religious institutions at least as well as it treats nonreligious institutions, even if such institutions are not "similarly situated" in the way that phrase is used in Equal Protection jurisprudence. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230 (11th Cir. 2004) (statute requires courts to consider only whether religious institutions are treated differently from non-religious institutions, without detailed analysis of the nature of each institution); *Konikov v. Orange County*, 410 F.3d 1317, 1324 (11th Cir. 2005) (same); *accord Vision Church v. Village of Long Grove*, 468 F.3d 975, 1002-03 (7th Cir. 2006).[3]

The plain language of the statute makes clear that the equal-terms provision "is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses." *Digrugilliers v. Consolidated City of Indianapolis*, __ F.3d __, 2007 WL 3151201, at *2 (7th Cir. Ind. Oct. 30, 2007) (Posner, J.) ("If proof of substantial burden were an ingredient of the equal-terms provision, the provisions [of section (a) and (b) of RLUIPA] would be identical, which could not have been Congress's intent"); *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, __ F.3d __, No. 07-1358, 2007 WL 4166239 at *6 (3d Cir. N.J. Nov. 27, 2007) ("substantial burden requirement does not apply to claims under . . . Equal Terms provision").

---

[3] In *Lighthouse Institute for Evangelism*, 2007 WL 4166239, the Third Circuit noted that it was error to require a showing that religious and nonreligious institutions were similar in all respects, but did hold that similarity "with respect to regulatory purpose" is required. *Id.* at *10. Even if the equal-terms provision does require the plaintiff to establish this limited similarity, the Church can easily do so. Like the Church, any nonreligious non-profit located in a residential district is subject to the same restrictions on permissible accessory uses and other requirements imposed by the Zoning Resolution. The only difference is that the City permits the nonreligious non-profits, such as the Council on Foreign Relations, to hold catered social events for non-members, but has now prohibited the Church from doing so.

Because a plaintiff does not need to establish that the government has imposed a "substantial burden" on its religious exercise to prevail on an equal-terms claim under RLUIPA, it follows that the traditional "strict scrutiny" or "rational basis" balancing tests do not apply. This is evident from the structure of the RLUIPA statute. Even where it imposes a substantial burden on religious exercise, a government can avoid a violation of section (a) of RLUIPA by showing that it has addressed a compelling governmental interest with a narrowly tailored, least restrictive response. *See* 42 U.S.C. § 2000cc-(a)(1)(A&B). But section (b) of RLUIPA does not provide any such defense. The plain language of the equal-terms provision does not permit the City to justify disparate treatment – even if it could show that its actions were narrowly tailored to further a compelling state interest. In other words, as the Third Circuit recently held, the equal-terms provision "operates on a strict liability standard." *Lighthouse Institute for Evangelism,* 2007 WL 4166239, at *11.

Against this legal backdrop, the City's disparate treatment of the Church plainly violates the equal-terms provision. The City historically, and apparently without exception, has implemented its Zoning Resolution so as to permit nonreligious non-profit institutions in residential districts to advertise and make their buildings available for catered social events for members of the general public. *See* Segal Decl. ¶¶ 4, 8-13, Exs. A-F. For months leading up to this litigation, representatives of the Church repeatedly reminded the City of the numerous other institutions, including many nonreligious non-profits in the Church's immediate vicinity, that the City has long permitted to host catered social events for members of the general public. *Id.* ¶ 29. Yet Defendants have done nothing to prevent these nonreligious non-profit groups from continuing to conduct money-raising catered social events in their buildings. By contrast, Defendants have now issued a final determination that the Church may not host any catered

events in its Building. *Id.* ¶ 31, Ex. K. Accordingly, the City is implementing its land use laws in a way that treats the Church, a religious institution, on less than equal terms with nonreligious assemblies and institutions. That is a textbook violation of RLUIPA's equal-terms provision. *See Lighthouse Institute*, 2007 WL 4166239, at *15 (holding that zoning ordinance that allowed a range of different nonreligious uses in the commercial district, but did not permit religious assembly use in this area, violated the RLUIPA Equal Terms provision as a matter of law); *Digrugilliers,* 2007 WL 3151201, at *1-2 (reversing district court's denial of church's motion for a preliminary injunction to enjoin enforcement of city's zoning code, which required church to obtain variance to make religious use of land in city's commercial office district even though numerous other similar nonreligious uses, such as assembly halls, were permitted in that district as of right).[4]

## B. The City Violated The Church's Right to Equal Protection of the Laws

The Church will prevail on its Equal Protection claim if it shows that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074 (2000) (per curiam) (a valid equal protection claim may be brought by a "class of

---

[4]    As noted above, the equal-terms provision is a strict liability regime. *Lighthouse Institute*, 2007 WL 4166239, at *11. But even assuming for the sake of argument that the Court were to agree with the Eleventh Circuit that a governmental entity could justify treating a religious institution on less than equal terms with a non-religious institution by satisfying the "strict scrutiny" test, *see Midrash*, 366 F.3d at 1232, the City could not conceivably do so here where it has flatly prohibited the Church from hosting the same sort of catered social events it routinely permits nonreligious institutions to conduct. *See, e.g., First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 793, 98 S.Ct. 1407, 1425 (1978) (underinclusiveness of a regulation "undermines the likelihood of a genuine state interest" in the purported goal). Moreover, conclusory assertions of noise and traffic concerns are insufficient to establish a compelling state interest. *See, e.g., Westchester Day School*, 504 F.3d 338, 353 (2d Cir. 2007) (holding that village's conclusory assertions of concerns about parking and traffic did not satisfy its burden of establishing a compelling state interest).

one" that has been unfairly singled out by municipal zoning authority). A zoning law decision will be sufficiently "irrational" to violate the Equal Protection Clause when the City can show "no legitimate reason for its decision," *Harlen Assoc. v. Incorp. Village of Mineola*, 273 F.3d 494, 500 (2d Cir. 2001) (internal quotations omitted), as in a case, like this one, where "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff [supports] the inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005).

The evidence of improper discriminatory treatment is stark. Not only does the City routinely permit nonreligious non-profit organizations to host catered social events, *see* Point I(A), *supra*, it also routinely permits churches, synagogues and other religious institutions to rent out their facilities to members of the general public for catered social events. *See* Segal Decl. at ¶ 8, Ex. A (Riverside Church); Ex. B (All Souls Church); Ex. C (St. Bartholomew's Church); Ex. D (*New York Times* article detailing common practice of religious groups raising money through catered events); Ex. E (letters from caterers concerning events held in houses of worship). The Church's conduct (hosting catered events) is no different from the conduct of these similarly situated religious and nonreligious institutions that likewise host catered events. The City has not and cannot adduce a legitimate justification for this differential treatment. Nor can this differential treatment be chalked up to municipal error; as the numerous correspondence between the Church and City make clear, the City is well aware that its treatment of the Church is discriminatory and unfair.[5]

---

[5]    The City's discriminatory conduct is particularly indefensible given that, in New York, "a

The facts here support an inference that the City has singled the Church out, not for rational reasons relating to the zoning regulations, but because of political pressure exerted by influential residents of Park Avenue. *See* Draper Decl. ¶ 47. After all, the City initially *approved* the Church's request to permit catered social events in the Building, and granted building permits necessary for the Church to undertake the Required Capital Repairs. *Id.* ¶¶ 36-38, Exs. F and G. This decision was consistent with the City's longstanding land use policy of permitting religious institutions and secular non-profit groups to use their property for catered events. And when it made this decision, the DOB knew the Church was in a residential district, knew that millions of dollars would be invested to repair the Building in reliance on its approval, knew that a third party was going to run the catered events pursuant to contract with the Church, knew that the Building was quite large and would accommodate sizable events, and knew that there would be numerous events. *Id.* ¶ 40. All that changed between the time approval was granted and the time approval was revoked was the public relations campaign and political pressure applied by the neighbors. When a municipality makes a zoning decision "because of undue deference to the opposition of a small group of neighbors," *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007), and ignores the factors that supported approval in the first instance, there is a solid basis to infer the requisite impermissible motive.

---

religious institution enjoys a presumptively favored status with respect to the police powers sought to be protected by zoning laws." *North Syracuse First Baptist Church v. Village of North Syracuse*, 136 A.D.2d 942, 524 N.Y.S.2d 984, 895 (4th Dept. 1988). In the application of local zoning laws, "greater flexibility is required in evaluating an application for a religious use than an application for another use and every effort to accommodate the religious use must be made." *Id.* (citing *Cornell Univ. v. Bagnardi*, 68 N.Y.2d 583, 595, 510 N.Y.S.2d 861 (1986)); *see also Westchester Day School*, 504 F.3d at 351 ("[U]nder New York law, a municipality may not demand that a religious institution show that '*no* ill effects will result from the proposed use in order to receive a special permit,' because such a requirement 'fails to recognize that educational and religious uses ordinarily have inherent beneficial effects that must be weighed against their potential for harming the community.'") (emphasis in original; internal quotation omitted).

*See id.* (Mamaroneck officials inappropriately disregarded facts that should have supported approval).

"'The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against every intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Village of Willowbrook*, 528 U.S. at 564 (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)). The City has intentionally discriminated against the Church by implementing its zoning rules not to further a legitimate purpose but to placate politically influential neighbors. That conduct violates the Equal Protection Clause.

### C.    The Church will Prevail on its RLUIPA "Substantial Burden" Claim

RLUIPA also prohibits municipalities from imposing or implementing a land use regulation in a manner that:

> imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc(a)(1). A "substantial burden" claim may be brought only if one or more of the jurisdictional predicates of section (a) exist. *Id.* at (a)(2). Here, the claim is proper for two reasons. First, the substantial burden on the Church's religious exercise arises from the City's "implementation of land use regulations" pursuant to which it has made "individualized assessments of the proposed uses" of the Building. *See id.* at (a)(2)(C). Second, because the City's decision to rescind its earlier-granted approval and revoke the Permits imposes a substantial burden and will halt a multi-million dollar renovation project, section (a)'s interstate

commerce jurisdictional predicate is satisfied.  *See id.* at (a)(2)(B); *see also Westchester Day School v. Village of Mamaroneck,* 504 F.3d at 354 (religious school's $9 million renovation project had requisite impact on interstate commerce to satisfy RLUIPA's jurisdictional requirement).

        1.    *The Church's Fundraising Activities and Property Renovations Constitute "Religious Exercise" Under RLUIPA*

"Religious exercise under RLUIPA is defined as 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.' 42 U.S.C. § 2000cc-5(7)(A).  Further, using, building, or converting real property for religious exercise purposes is considered to be religious exercise under the statute. 42 U.S.C. § 2000cc-5(7)(B)." *Westchester Day School,* 504 F.3d at 347.

In *Westchester Day School,* the Second Circuit held that expanding a school to add new facilities constituted "religious exercise" under RLUIPA because those facilities would "be used *at least in part* for religious education and practice[.]" *Id.* at 348 (emphasis added).  There, the real property at issue was a new structure, to be used, at least in part, for religiously informed educational purposes. *Id.* at 345.  Here, the real property at issue is the Building – *i.e.,* the Church's *only* place of worship.  Although the Building is also used to host catered events for members of the general public, these incidental uses of the Building do not undermine its primary religious nature.  "Where a building is to be used for the purpose of 'religious exercise,' the building is not denied protection under RLUIPA merely because it includes certain facilities that are not at all times themselves devoted to, but are inextricably integrated with and reasonably necessary to facilitate, such 'religious exercise.'" *Westchester Day School v. Village of Mamaroneck*, 417 F. Supp.2d 477, 544 (S.D.N.Y. 2007), *aff'd,* 504 F.3d at 348.  Indeed, the purpose of the catering arrangement is to raise funds necessary to improve, renovate, and convert

parts of the Building to facilitate religious practices. *See* Draper Decl. ¶¶ 8, 9, 18. Under the plain terms of the statute, this "use" and "conversion" of real property qualifies as "religious exercise." 42 U.S.C. § 2000cc-5(7)(B).

       2.       *The City Is Substantially Burdening the Church's Exercise of Religion*

"When there has been a denial of a religious institution's building application, courts appropriately speak of government action that directly coerces the religious institution to change its behavior, rather than government action that forces the religious entity to choose between religious precepts and government benefits." *Westchester Day School*, 504 F.3d at 349. The "burden need not be found insuperable to be held substantial" and a substantial burden may exist where government zoning action leaves the religious institution with "no ready alternatives or where the alternatives require substantial 'delay, uncertainty, and expense[.]'" *Id.* (internal quotation omitted).

     A religious organization needs adequate facilities to fulfill its religious purposes. Thus, in its decision affirmed by the Second Circuit in *Westchester Day School*, the District Court noted that "[b]y precluding the construction of much needed facilities, defendants significantly interfered with [the religious school's] ability to provide an adequate and effective [facility for its students], and so limited its ability to retain and attract students and faculty as to imperil its continued existence." 417 F. Supp.2d at 547. Here, by revoking its earlier-granted approval and prohibiting any catered events, the City has deprived the Church of the means to pay for the Required Capital Repairs, which in turn will result in loss of the Building. Such a direct impingement on a religious institution's ability to maintain or expand its facilities in order to conduct its religious activities and attract new members constitutes a substantial burden on religious exercise under RLUIPA. *See Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 456 F.3d 978, 989 (9th Cir. 2006) (holding that preventing conditional use permit to build

Sikh temple on land zoned for agriculture substantially burdened religious exercise); *Vietnamese Buddhism Study Temple In America v. City of Garden Grove*, 460 F. Supp.2d 1165, 1172 (C.D.Cal. 2006) (substantial burden found because zoning regulation prevented 300 member Buddhist congregation from "practic[ing] their faith at their chosen site of worship."). Indeed, where the "physical constraints of its current facility" limits a church's ability "to conduct outreach to potential new members[,]"*Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F. Supp.2d 1203, 1212 (C.D. Cal. 2002), "[p]reventing [that] church from building a worship site fundamentally inhibits its ability to practice its religion." *Id*. at 1226 (finding substantial burden and granting preliminary injunction enjoining city's condemnation proceedings).

The Church entered into the Lease because it desperately needed to preserve its Building so its congregation could worship and perform other religious activities in it. The City's revocation does not merely prevent an expansion of the Church's facilities; instead, because the City's actions will (if not enjoined) result in the forced sale of the Building, the revocation is tantamount to a condemnation of the Church's house of worship. "Churches are central to the religious exercise of most religions." *Id*. It is hard to imagine a more substantial burden imposed on a church than the loss of its sanctuary. Even if the Church could sell the Building for a price sufficiently high not only to reimburse the Rose Group for the Required Capital Repairs but to have funds left over to try to buy a new home, the significant "delay, uncertainty, and expense" involved in looking for a new building constitutes a substantial burden under RLUIPA. *See Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005) (finding "substantial burden" existed because precluding church from building in

particular area would require it to incur expense of locating other parcels of land, or force the church to continue filing additional zoning applications with city).

The City's motives also are relevant to the substantial burden analysis.  Because the City permits numerous similarly situated organizations to engage in the same fundraising activities as the Church, its disparate treatment of the Church's catering activities strongly supports the inference that its decision now to preclude all catering activities at the Building was made from improper motives and without reasonable basis.  *See* Point I(B), *supra*.  The arbitrary way in which a municipality implements its land use restrictions shows an intent to substantially burden religion.  *Westchester Day School,* 504 F.3d at 351 (finding that a substantial burden may exist where the "restrictions are imposed on the religious institution arbitrarily, capriciously, or unlawfully."); *see Sts. Constantine*, 396 F.3d at 899-01 (holding that substantial burden was demonstrated in circumstances where the "decision maker cannot justify" the challenged ruling and where "repeated legal errors by the City's officials casts doubt on their good faith."); *Guru Nanak Sikh Soc'y*, 456 F.3d at 989-91 (holding that substantial burden demonstrated where government officials "inconsistently applied" specific policies and disregarded relevant findings "without explanation.").[6]

---

[6]    It bears noting that for well more than a year, the Church and the Rose Group have worked diligently with the City and relied in good faith on the City's Pre-Consideration in expending millions on the Required Capital Repairs and booking multiple events for the next several months.  The district court in *Westchester Day School* found a substantial burden existed where the zoning board denied the religious day school's land use application despite the school having "worked for over one-and-a-half years to address the [zoning board's] concerns and offered to make changes to, inter alia, parking, the size of [the proposed construction,] landscaping, [the] enrollment cap[, and] a bus departure management plan to mitigate the traffic impact."  417 F. Supp.2d at 548; *see also Living Water Church of God v. Charter Twp. of Meridian*, 384 F. Supp.2d 1123, 1134 (W.D.Mich. 2005) (finding substantial burden where Township denied the church's land use proposal after the church had "worked diligently and in good faith with the Township to address its concerns before submitting a revised . . .proposal").  So too, in this case, the Church was willing to agree to numerous conditions in order to minimize the impact, if any,

3. *The Church Has No Reasonable Alternative Other than Hosting Catering Events at the Building*

In analyzing a claim under section (a) of RLUIPA, the Second Circuit considers "whether there are quick, reliable, and financially feasible alternatives [the religious institution] may utilize to meet its religious needs." *Westchester Day School,* 504 F.3d at 352. The Church has no feasible alternatives. The Church has explored low-cost loans, a mortgage, and foundation grants, but was unable to secure adequate financing. *See* Draper Decl. ¶ 11. It also has entered into rental arrangements with a non-profit school and explored rental arrangements with other religious organizations, but none of these other institutions was able or willing to share the burden of funding the Required Capital Repairs. *Id.* ¶ 12. The Church is out of options. If prevented from working with the Rose Group, it will have no other ready source of funds necessary to perpetuate its mission and its existence, or to pay back the millions of dollars expended in making the Required Capital Repairs. It will be forced to sell the Building.

4. *The City Did Not Use the Least Restrictive Means to Further a Compelling State Interest*

Under RLUIPA, once the Church meets its burden of persuasion in showing that the City's actions have imposed a substantial burden on its religious exercise, the burden of persuasion shifts to the City to prove that the imposition furthers a compelling government interest and is the least restrictive means of furthering that interest. *See* 42 U.S.C. § 2000cc-2(b). This the City cannot do.

---

that these events would have on the neighborhood, and negotiated at length with the City in order to reach a compromise solution. The City, however, would not budge from its position, and its revocation of permission to the Church is now final. *Westchester Day Sch.,* 504 F.3d at 346 ("whether the denial of the application was absolute is important" in finding a substantial burden).

To satisfy its burdens under the applicable strict scrutiny analysis, a "Government's mere invocation" of broadly defined interests "cannot carry the day." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 126 S.Ct. 1211, 1221 (2006); *see also Burson v. Freeman,* 504 U.S. 191, 199 (1992) ("[t]o survive strict scrutiny ... a State must do more than assert a compelling state interest, it must demonstrate that its law is necessary to serve the asserted interest."). Only "compelling," and not even "significant," governmental interests will rise to the requisite level.

The revocation of the Permits and prohibition on any future catering events is an arbitrary and irrational decision that does not bear any substantial relation to the City's interest in maintaining the general public's health, safety and welfare. Indeed, this decision was made to placate a small but influential number of disgruntled neighbors, and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, public safety, noise, or other factors relating to quality of life, given that it allows events similar to the catered events in other non-profit facilities in the immediate neighborhood. Further, even assuming *arguendo* that the City has a compelling interest in reducing traffic, noise or other neighborhood concerns, a flat prohibition on all events is plainly not the least restrictive means of furthering that interest.[7]

## II.    The Court Should Grant Injunctive Relief

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1973); *see*

---

[7]    The Church also has asserted a claim that Defendants have violated its First Amendment right to freely exercise its religion. *See* Complaint ¶ 89-97. This claim substantially overlaps with the "substantial burden" claim under RLUIPA, and because courts will resolve statutory claims prior to constitutional claims, *see Ashwander v. Tenn. Valley Auth*, 297 U.S. 288, 346-47, 56 S.Ct. 466, 482 (1936) (Brandeis, J. concurring), plaintiff respectfully reserves its right to brief the First Amendment claim later in the proceedings.

*also, LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir. 1995). A presumption of

irreparable injury also applies to claims that the government is discriminating against religious

exercise in violation of RLUIPA. *Vietnamese Buddhism Study Temple*, 460 F. Supp.2d at 1172

(granting preliminary injunction where movant asserted violation of RLUIPA "equal terms'

provision, reasoning that "[e]very day the [Buddhist] Abbot is forced to deny religious services

to his congregation is a day that the Temple congregation is denied the First Amendment");

*Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (raising colorable claim that exercise

of religious beliefs has been infringed under RLUIPA sufficiently establishes irreparable injury).

Though it applies, the Church needs no presumption; the harm here is immediate, grave, and

irreparable.

Consider the facts. The Church sought approval from the City to host catered events in

the Building so as to make the Required Capital Repairs. Draper Decl. ¶ 36. The DOB issued its

Pre-Consideration approvals and the Permits only after conversations and meetings with

representatives of the Church in which it was made clear that there would be numerous catered

events in the Building and that, because of the Building's capacity, many events would have

large numbers of attendees. *Id.* at Exs. F and G. The Church relied on the approval and the

permits, as the City knew that it would. *Id.* ¶ 40. As a result, $6.5 million has been invested in

the Building, a liability the Church planned to repay by permitting the Building to be used for

catered events. *See* Draper Decl. ¶¶ 20, 24. Then, some sixteen months later, because some

influential neighbors complained that what the City had already approved as permissible

accessory catered events had transformed the Church into a commercial catering hall that caused

intolerable noise and traffic, the City revoked their earlier approvals, without even attempting to

support the decision with evidence of actual disruption, nuisance or other misconduct, and

without any attempt to explain how it could permit so many of the Church's neighbors to conduct catered social events while it flatly prohibited the Church from doing so. *Id.* ¶¶ 44, 46. This arbitrary and discriminatory decision to prohibit catering at the Building leaves the Church with no means to pay for the already completed repairs other than to sell its very home.

It is no answer that the City has permitted the Church to allow catered events through April 2008. *Id.* ¶ 47. Because the City has prohibited *any* new events to be booked, and also has required the Rose Group to cancel any already-booked events that were to take place after April 2008 (some of which already have been booked), *see* Segal Decl. ¶ 31, the word will quickly spread to the community and competitors that the Building is no longer a viable event space, and that the Church and Rose Group are simply in a "run-off" phase. This will put the Rose Group out of business and will deprive the Church of the revenue it needs to meet its obligations. Without injunctive relief, the Church will be forced to sell the Building, its home for the last 80 years. *See* Draper Decl. ¶ 51. The devastating effect that this will have on the Church, whose congregation is at an all-time low, is all too plain.

The City permits religious and secular institutions all over town to use their buildings as sites for catered social events for members of the general public. *See* Segal Decl. ¶¶ 4-13. The Church simply wants the City to give it the same latitude in applying the accessory use rules that it gives to these other non-profit institutions that rent their spaces for catered events to raise supplemental revenues. Even if the City were justified in treating the Church differently from the way it treats these other institutions by prohibiting catered social events in the Building – and we think there is no basis for the discrimination – what real harm does the City face if these activities are allowed to continue while the Court reviews the evidence here and makes its

decision on the motion for a preliminary injunction?  None.  Catered events of similar size and impact happen all over the Church's neighborhood, and life on Park Avenue in the 60s goes on.

But life will not go on for the Church if injunctive relief is denied.  It will lose its home of 80 years, forced to sell its Building to pay for capital repairs it undertook only after the City approved its plans to finance the work by hosting catered events.  This Court will decide whether the City's reversal violated RLUIPA and/or the Constitution.  But while that decision is being made, the balance of hardships tilts overwhelmingly in favor of the Church, particularly given that the Church is willing to agree to a series of restrictions on the size, frequency, and duration of catered events *pendente lite*.  As Judge Posner put it recently, "[i]f [the] church must vacate its premises while [the] case wends its way to completion, the church's religious activities will be hampered.  It is hard to see what difference it can make to the City if the church is allowed to remain in its current premises" for the duration of the litigation notwithstanding the City's contention that doing so violates its zoning rules.  *Digrugilliers*, 2007 WL 3151201, at *4.

For all these reasons, Plaintiff respectfully submits that the Court should issue a preliminary injunction and that a TRO plainly is appropriate to preserve the status quo for a limited period of time until the Court has the opportunity to pass on the merits of the demand for a preliminary injunction.  *See Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1125 (2d Cir. 1989); *LaRouche v. Kezer*, 20 F.3d 68, 74 (2d Cir. 1994) ("To preserve the status quo a court may require the parties to act or to refrain from acting"); *see, e.g., AIM Intern. Trading LLC v. Valcucine SpA.*, 188 F. Supp.2d 384, 388 (S.D.N.Y. 2002) (issuing TRO to preclude defendant supplier from terminating exclusive distributorship agreement, since plaintiff distributor was likely to suffer irreparable harm as a result of supplier's allegedly improper termination of agreement).

## CONCLUSION

For the foregoing reasons, the Church requests that the Court issue a Temporary

Restraining Order and Preliminary Injunction on the terms set forth on the attached proposed

order and/or grant such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
           December 3, 2007

                          DAVIS WRIGHT TREMAINE LLP

                          BY: _____
                                Victor A. Kovner (VAK-2248)
                                John Cuti (JC-3365)
                                Monica Pa (MP-3307)

                          1633 Broadway
                          New York, New York  10019-6708
                          Telephone:  (212) 489-8230
                          Facsimile:  (212) 489-8340

                          *Attorneys for Plaintiff*
                          *Third Church of Christ, Scientist, of New York City*