UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

THIRD CHURCH of CHRIST, SCIENTIST of
NEW YORK CITY,

                                        Plaintiff,

                    -against-

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City Department of
Buildings,

                                        Defendants.

-------------------------------------------------------------------------x

**DECLARATION IN
OPPOSITION TO
PLAINTIFF'S MOTION
FOR A PRELIMINARY
INJUNCTION**

07 Civ. 10962 (DAB)

(ECF Case)

                    **AVE MARIA BRENNAN,** declares under the penalty of perjury, pursuant to 28

U.S.C. § 1746, as follows:

                    1.        I am an Assistant Corporation Counsel in the Office of Michael A.

Cardozo, Corporation Counsel of the City of New York, attorney for defendants the City of New

York (the "City") and Patricia J. Lancaster, in her official capacity as Commissioner of the

Department of Buildings of the City of New York ("DOB"), (sometimes hereinafter collectively

"the City"). I am an attorney admitted to practice law before the courts of the State of New York

and before this Court. I submit this declaration in opposition to plaintiff's motion for a

preliminary injunction enjoining defendants from "revoking earlier-issued approvals and permits

that had allowed the Church to use its building for catered events." Plaintiff's memorandum of

law in support of motion at 1.

                    2.        As set forth hereinafter, plaintiff cannot establish its entitlement to this

extraordinary relief: Plaintiff cannot establish the likelihood of success on the merits in this

action as the City has treated it on the same terms as it has treated nonreligious institutions, if

indeed it has "treated" those nonreligious institutions in any way at all. Moreover, the actions of the City have not placed a substantial burden on the exercise of plaintiff's religion and plaintiff is free to exercise its religion in any way it chooses. Rather, the City has lawfully acted to stop an independent and primary catering establishment business from operating out of plaintiff's church building in violation of the Zoning Resolution of the City of New York ("Zoning Resolution") which only allows catering as an "accessory use" in a residential district. As well, the City has not treated plaintiff differently from similarly situated religious organizations or nonreligious institutions by acting to stop the operation of the catering business.

3.        The City revoked the approval and permit allowing catering as an accessory use based on its determination that the catering use by the Rose Group at plaintiff's building was not an accessory use as it was not clearly incidental to plaintiff's primary use of the building. The Rose Group's use was the primary use of the building. In contrast to this all encompassing use by the independent Rose Group, plaintiff's use of the building is miniscule. When compared to the use of buildings by other religious and nonreligious groups that offer catering spaces in their buildings, plaintiff's use of its building is almost non-existent. Although plaintiff attempts to analogize its building and its use of the building to other organizations and congregations, plaintiff fails to make a believable analogy, much less a compelling one. Rather, the facts disclose that plaintiff has essentially conveyed its building to the Rose Group, ceded control of that building to the Rose Group and that the Rose Group's use of the building is not "accessory" to plaintiff's use.

4.        Finally, an injunction is not necessary to prevent irreparable harm. The Second Amendment to the Lease, the provisions of which plaintiff relies on in making this argument of irreparable harm, was never approved by the New York State Supreme Court.

Accordingly, the catering business that is operating out of plaintiff's church building cannot properly rely upon this Second Amendment to force the sale of the building in order to repay itself the sums of money it has expended to transform the building from a church into a catering and event facility. Until that Second Amendment is approved by the New York State Supreme Court, and we submit it could not be approved by virtue of its onerous terms, is cannot be the basis of a finding of irreparable harm. For all these reasons, plaintiff's motion should be denied.

## BACKGROUND FACTS

5.     Plaintiff Third Church of Christ, Scientist, of New York City ("plaintiff" or "the Church") is the owner of the building located at 583 Park Avenue in Manhattan ("the "subject premises" or "the building"). The building is located in an historic district and also in a residentially zoned district, where the Zoning Resolution prohibits commercial uses. A catering establishment is a commercial use.

### The Rose Group and "583 Park Avenue"

6.     Plaintiff "entered into a commercial relationship with a reputable caterer to conduct events" at the building (Complaint ¶ 2). That "caterer", currently operating out of the building, is the Rose Group Park Avenue LLC (the "Rose Group"). The Rose Group advertises its services on the internet and describes the venue of its services, not as the Third Church of Christ, Scientist building located at 583 Park Avenue, but rather as "583 Park Avenue New York". In fact, the name of the website is simply "583parkave.com" (see www.583parkave.com). A copy of all the pages from the website is attached hereto as Exhibit "A".

7.     The 583 Park Avenue website consists of "Event Photos", "Floor Plans", "Our History" and a "Contact Us" page. The "Event Photos" consist of thirty-seven photographs of the outside of the building and the interior event space, i.e., what used to be the "sanctuary" of the church and the auditorium/seating area filled with pews. The photographs depict, among

other things, numerous scenes of decorated tables in various configurations, a fashion show in

the round and receptions. The "Floor Plans" consist of three pages of architectural plans showing

the first floor, first floor mezzanine (i.e., the balcony overlooking the first floor space), and the

cellar level. The page entitled "Our History" states as follows:

> Designed by the renowned firm of Delano & Aldrich and
> completed in 1923, 583 Park Avenue is the ultimate venue for
> hosting your event. Orchestrated by a family with generations of
> combined experience, 583 Park Avenue is poised to deliver a
> remarkably luxurious and memorable experience to your guests.
> By combining this prestigious address with its architectural
> pedigree and coupled with outstanding food and unparalleled
> service, 583 Park Avenue will stand out as the most exciting event
> space in New York City. It is with great pleasure that we introduce
> to you this uniquely elegant venue with the hope that we will have
> the opportunity to be of service to you. Please call for an
> appointment.

The "Contact Us" page of the website references the location of the business as:

583 Park Avenue

At 63rd Street and Park Avenue

At 63rd Street and Park Avenue

New York, New York

10021

Following this location information, the contact information then lists a telephone and fax

number, as well as the email address of events@583parkave.com.

    8.    Remarkably, nowhere in all of this information is the "identity" of the

building disclosed. That is, there is not one textual reference to the fact that the building located

at 583 Park Avenue is a church or that it is the building of a religious congregation known as the

Third Church of Christ, Scientist.

    9.    It is possible to decipher on one of the two photographs of the outside of

the building in the "Event Photos" section a portion of the inscription on the frieze above the

pillars on the front of the building, i.e., "Church of Christ Scientist". Those words are blocked by the placement of a slender tree branch in the other photograph that was apparently taken at dusk. In fact, pursuant to the terms of its agreement with plaintiff, the Rose Group may cover up these words, thus obliterating any outside reference to all observers of the church function of the building.

10.     The "event space" and the business is also advertised in LocationsMagazine.com, which is a website for venues for "weddings, social occasions, & corporate events". There the business is also named "583 Park Avenue" and the venue is described as "[t]he most exciting new event space in New York City. 583 Park Avenue is a breathtakingly glorious building that is now available for private events." The description on the "Our History" page from the 583 Park Avenue website is quoted. The current LocationsMagazine listing indicates that the room capacity for a cocktail reception is 1,000 persons and 800 persons for a dinner with dancing. A copy of the LocationsMagazine.com entry is attached hereto as Exhibit "B".

11.     Bizbash, another website, has a listing for the business, 583 Park Avenue, and also repeats the description on the "Our History" page from the 583 Park Avenue website of that business. The Bizbash listing also sets forth capacity information, although this information differs from that on the LocationsMagazine listing. The former first floor seating area and "sanctuary" of the church is described as a "Ballroom" with a capacity of 1200 persons for a reception. Also, an "arcade" is described as having a capacity of 800 persons for a reception and the "Balcony" capacity is listed as 300 persons. A copy of the BizBash.com entry is attached hereto as part of Exhibit "B".

12.    Louis Rose of the Rose Group is reported to have his office at the building as well. An article published in the September 2007 edition of Vanity Fair described "the entrepreneur Louis Rose" and published a photograph of him "in his office at 583 Park Avenue…." Mr. Rose is quoted in the article as saying that he called the congregation and said that he "would be interested in renting out the space every day of the year." A copy of the Vanity Fair article is attached hereto as part of Exhibit "B".

**The January 2006 Lease Agreement**

13.    Upon information and belief, on or about January 31, 2006, plaintiff entered into a "Final Agreement of Lease" (the "Lease") with the Rose Group, a company in "the business of high end, upscale catering and hosting of events such as weddings, bar mitzvahs, family reunions, corporate meeting events and the like". See copy of the Final Agreement of Lease attached hereto as Exhibit "C" at 1. Under the terms of the Lease, plaintiff did not lease a space within the building, or even the building to the Rose Group. Rather, rather plaintiff leased the entire "land and building known as 583 Park Avenue…." Exhibit "C" – Lease at ¶ 1.1. The term of the Lease is "for a period of approximately twenty years (subject to 2 five-year renewal options)…." Exhibit "C" – Lease at ¶ 2.2.

14.    The Lease also provides that plaintiff and the Rose Group "anticipate that, as a result of this Lease, the Premises may become subject to real estate taxes." In other words, the religious exemption for real estate taxes extended to plaintiff would cease because of the non-religious activity at the subject premises. The Rose Group, and not plaintiff, is responsible for all real estate taxes that may become due and also has the authority to contest the assessed valuation. Exhibit "C" – Lease at ¶ 3.4.

15.    The Lease makes clear that plaintiff has no obligation to furnish any services for the subject premises, including heat, water, light and electric power. Instead, the

Lease requires the Rose Group to "contract directly with the local utility companies for all electric, gas and water (including any stand-by water required for any sprinkler system) used and consumed on the Premises. [The Rose Group] shall pay for all such utilities and services." Exhibit "C" – Lease at ¶ 4.1.

16.    The Lease also provides for the "removal and storage off site of the pews from the main floor of the auditorium and the first (lowest) row of the balconies …  to be reinstalled" at the termination or expiration of the Lease, all at the Rose Group's expense. Exhibit "C" – Lease at ¶ 5.3. In fact, the pews have been removed from the seating area to allow its use by 583 Park Avenue as event space.

17.    The Lease acknowledges the possibility of alterations "not customarily found in a church type facility" and provides that the plaintiff may require the removal of such items at the end of the lease term. Exhibit "C" – Lease at ¶ 6.4. This means, in effect, that elements not customarily found in a religious facility may be there for up to thirty years.

18.    The Lease also provides, at the Rose Group's expense, for the "installation of a new electronic sign compatible with the appearance of the Building at approximately eye level on the corner of the Building facing Park Avenue at 63rd Street identifying at the times herein specified the various uses of the Building as further delineated in this Lease and/or the Exhibits hereto, [and] installation of a new electronic sign to the left of the 63rd Street side entrance which will indicate the existence of [plaintiff's] Sunday School and Sunday and Wednesday services at all times except when [the Rose Group] is using or actively marketing the Premises for a 3rd party function…." Exhibit "C" – Lease at ¶ 5.3 (page 22) (emphasis added).

19.    The Lease also provides that plaintiff "shall not be required to furnish any services for the Premises, including, but not limited to, heat, water, light and electric power, and

shall not be liable for … injury or damage (including death) to person or property caused by or resulting from steam, gas, electricity, water, rain or snow, which fall upon, flow or leak from any part of the Premises … unless same are a consequence of [plaintiff's] negligence, gross negligence or willful default." Exhibit "C" – Lease at ¶ 5.9. The Lease also requires the Rose Group to maintain the sidewalks and shovel ice and snow, which is an obligation consistent with it being the primary user of the building. Exhibit "C" – Lease at ¶ 33.1.

20.    The costs of structural repairs are to be borne by both plaintiff and the Rose Group according to a formula set forth in the Lease. That formula is based on the useful life of the repairs and the term remaining on the Lease. Given the length of the Lease, it effectively means that most, if not all expenses for structural repairs, at least at the outset will be the responsibility of the Rose Group, and not plaintiff. Exhibit "C" – Lease at ¶ 37.1.

21.    The Lease also contains a provision that limits the hiring by plaintiff of custodians without the Rose Group's prior written consent. The Lease specifically provides that the "hiring and retention by [plaintiff] at the Building of any and all employees in the capacities of custodian and/or Building maintenance, including the terms and conditions of employment, shall be subject to the prior written approval and consent of [the Rose Group], which may be given or withheld, at [the Rose Group's] sole discretion. … The [plaintiff] shall inform the custodians, and any replacement custodians approved by [the Rose Group], that they shall be subject to the direction and supervision of [the Rose Group], except when the Building is being used exclusively for church activities, during which periods the custodians with respect to Church activities only shall be subject to the direction of the church." Exhibit "C" – Lease at ¶ 5.13.

22.    The Lease also provides that plaintiff "shall also maintain a literature distribution box on the 63rd Street side of the Building at a location to be mutually agreed upon by the parties, which … shall be of the same quality and architectural detail as the new electronic signs, and which will conform to the aesthetics of the Building, such design and the materials used to construct same to be mutually agreed upon by the parties…." Exhibit "A" – Lease at ¶ 9.1 (emphasis added).

23.    The Lease cedes control over the façade of the building and provides that the Rose Group may remove or cover, at its own option, "the existing signs on the building façade" which indicate that the building is a church and also may install "a blank piece of limestone or limestone veneer over the engraved lettering over the front pillars." Exhibit "C" – Lease at ¶ 27.1.

24.    In the article of the Lease entitled "Use of Premises by Landlord", the Lease provides for the occupancy by plaintiff of limited portions of the building and also allows plaintiff access to "all other parts of the Premises not specifically designated for the exclusive use of [the Rose Group], such as the 4th floor offices of [the Rose Group], for the conduct of church services, Sunday School services, lectures, corporate meetings classes and associations as more particularly set forth in Article 35 below." The Lease further provides that the Rose Group "shall install a door separating such 4th floor TENANT space from the Church space. The 4th floor TENANT space shall be designated by a sign specifying '583 Park,' and the 4[th] floor church space shall be designated by a sign specifying 'Private Offices." Exhibit "C" – Lease at ¶ 9.1.

25.    The Lease also contains provisions that grant the Rose Group a right of first refusal in the event of the proposed sale of the building and restrict its sale by plaintiff in the

first five years of the lease if the sale is to a "Non-Qualified User", i.e., an entity not a religious organization. Exhibit "C" – Lease at ¶ 36.1. After five years, plaintiff may sell to a Non-Qualified User, but if such sale occurs, and if the Rose Group does not chose to exercise its right of first refusal, then, unless the Rose Group has obtained a special use permit to allow the use of the building as a catering facility (the Lease at ¶ 36.2 allows either plaintiff or the Rose Group to apply for a special use permit after the first five years of the term of the Lease), the Rose Group is to be paid the lesser of the net proceeds received from the sale or the value of both a) its business as a going concern and b) the costs of repairs and improvements to the building.

26.    The Lease provides that plaintiff may use certain limited areas of the building for the "conduct of church services and church related activities…." Exhibit "C" – Lease ¶ 35.1. However, the Lease specifically provides that plaintiff is permitted to use "the entrances to the Premises" for only some of those activities, i.e., Sunday services, Wednesday evening services, Christmas Eve and Thanksgiving services, and church corporate and organizational meetings. Exhibit "C" – Lease at ¶ 35.1 A, B, C and F. Presumably then, all the other allowed uses by plaintiff (except for Association meetings, held four days each year, for which plaintiff reserves the entire building) will require plaintiff to use the small side entrance toward the rear of the building on 63rd Street.

27.    In enumerating plaintiff's permitted uses, the Lease reserves dates for Association meetings, and provides that plaintiff "agrees to give TENANT not less than (1) year's prior written notice of any such change in the date of an Association Meeting and will use reasonable efforts to accommodate TENANT's use of the Premises on those days." Exhibit "C" – Lease at ¶ 35.1 D (emphasis added). Similarly, the church classes that are held over the summer for two, two-week sessions require notification "at least one (1) year in advance of the

actual date" even though such classes require only that the Rose Group temporarily relocate its office on the 4[th] floor. Exhibit "C" – Lease at ¶ 35.1 E.

28.    While the Lease contains an enumeration of plaintiff's church uses with great specificity as to dates and times, the Lease also allows for the following:

> Occasional non-regularly scheduled events … may be scheduled from time to time at times mutually agreed upon by LANDLORD and TENANT. Since it is difficult or impossible to predict when such a meeting may be required, LANDLORD and TENANT agree to consult with each other in order to schedule such meetings (i) in a manner which causes <u>no disruption to TENANT's scheduled events</u> in the Premises and (ii) <u>at such times as do not conflict with TENANT's reasonably anticipated use of the Premises.</u> (Emphasis added) Exhibit "C" – Lease at ¶35.1 G.

29.    In addition, although the Lease reserves certain specific areas of the building to plaintiff's use, the plaintiff's use of those areas is not necessarily exclusive. For example, the Rose Group is permitted to use the Board Room, previously reserved for the plaintiff, "on a 'when available' basis." Exhibit "C" – Lease at ¶ 29.1.

30.    The Lease broadly provides that the Rose Group "shall use and occupy the Premises solely as a high end, first class catering facility and for banquets, special events and meetings...." Exhibit "C" – Lease at ¶ 22.1. The Lease further provides that the Rose Group is granted the right of quiet enjoyment subject only to plaintiff's "right to occupy and utilize those portions of the Premises for Church purposes as set forth herein." Exhibit "C" – Lease at ¶ 16.1. According to the Lease, plaintiff's reservation of a right to use portions of the premises is delineated in detail and the Rose Group's right to use the premises is clearly much broader. Thus, the Rose Group has the right to the whole, subject only to the express reservations by plaintiff. Exhibit "C" – Lease at ¶ 22.2.

31.    Under the Lease, there is no obligation to sell the subject premises and to reimburse the Rose Group for its expenditures even if the catering use is not legalized. Only the

cost of the repairs of the roof is the subject of reimbursement by plaintiff to the Rose Group (see Exhibit "C" – Lease at ¶¶ 5.2 and 5.4). Any other work at the subject premises is at the Rose Group's expense and risk, even if the catering use is not legalized and the catering business cannot operate. Under the Lease, the Rose Group's only right to reimbursement for items other than the roof arises under limited circumstances: only if plaintiff elected to and did sell the subject premises to a non-religious institution, thereby making a legal use no longer legal (see Exhibit "C" - Lease ¶ 36).

**Plaintiff's Resolution Approving the Lease**

32.    At the time of plaintiff's approval of the Lease, there were sixty-four members. However, only thirty-two members were present when the motion to approve the Lease was made. Of those thirty-two members present, only seventeen members voted in favor of approving the Lease and fourteen members opposed the approval. The members resolution specifically states that "the Board of Trustees [is] authorized to change the terms of the lease in ways that do not significantly affect the costs and benefits to the church…." Thereafter, the Trustees of the Church adopted a Resolution approving the Lease. A copy of the document regarding the members vote and the Resolution of the Board of Trustees is attached hereto as Exhibit "D".

**The New York State Supreme Court Proceeding to Approve the Lease**

33.    Under New York law, to be valid, a lease in excess of five years or the sale of substantially all a religious corporation's property must be approved by the New York State Supreme Court, after notice to the Attorney General. Pursuant to Section 12 of the Religious Corporations Law of the State of New York, plaintiff sought the required court approval of the Lease (which was for a term of twenty years with two renewal periods of five years each). The Supreme Court Petition makes clear that there is no obligation to reimburse the

Rose Group for any expenses other than the costs associated with the roof, and that the Rose Group will make other improvements at its own expense ("an upgrade of all power and wiring systems, the installation of a new telephone systems, the upgrade or replacing of heating, ventilation and air condition systems, etc.") See copy of the Petition, dated May 16, 2006, attached hereto as Exhibit "E" at ¶ 8.

34.     On May 22, 2006, the New York State Supreme Court issued an Order granting plaintiff's petition to lease the property to the Rose Group. A copy of the Order is attached as part of Exhibit "E".

**The Geneva School**

35.     In or about 1999, the Geneva School became plaintiff's tenant and rented out space at the building. A school is a permitted community facility use in a residential zoning district.

36.     In February 2006, after entering into the Lease with the Rose Group, plaintiff notified the Geneva School that it had to leave the building by the end of June 2006. A copy of the letter from the Board of Trustees to the Geneva School, dated February 3, 2006, is attached hereto as Exhibit "E-1".

**Request for Pre-consideration to DOB**

37.     By pre-consideration dated March 29, 2006, the Rose Group's architect requested from DOB a pre-consideration[1] "that a proposed accessory social hall, ballroom and catering within the existing church is an accessory use to the existing building." A copy of the pre-consideration, dated March 29, 2006 is attached hereto as Exhibit "F". The pre-consideration

---

[1] A pre-consideration is a request to DOB for a preliminary approval of any aspect of a proposed plan prior to the filing of an application and complete set of plans.

stated that:

> It is proposed to continue the use as a church, and add an accessory use of social hall, ballroom and catering at first floor and cellar, for the periods that the hall is not being used as a church. The accessory ballroom and catering meets the accessory use definition in Zoning Resolution 12-10 in that they are located in the same zoning lot as the principal use. They will remain under the same ownership of the Third Church of Christ Scientist. <u>The use is clearly incidental and customarily found in connection with the principal use, as a catering and ballroom is substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the principal use. The use, therefore, remains the same use group 4 church and accessory uses.</u> (Emphasis added.)

38.    On April 10, 2006, Laura V. Osorio, the then Manhattan Borough Commissioner of DOB endorsed on the pre-consideration the following: "OK to accept provided a new certificate of occupancy is obtain[ed] with a restrictive declaration and note on the C.O. [Certificate of Occupancy] that the accessory social hall is to be use[d] and operated exclusively and only by the church and for its members."

39.    Thereafter, by letter dated June 2, 2006, plaintiff requested a modification of the pre-consideration granted by Borough Commissioner Osorio that had allowed an accessory catering hall to be used and operated only by plaintiff and its members. Plaintiff's letter states the following:

> For limited periods when the church building is not being utilized for our congregation, we have provided for various catered events which will also contribute to the church's ability to sustain itself. These functions will be operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church. These ancillary functions are necessary because they will not only ensure our building will be upgraded and rehabilitated but will also allow us to be exposed to and reach out to a larger community. The function will be restricted by the contract with the church and will make certain that 583 Park Avenue continues to serve as our Church in New York City well into the future.

A copy of the letter dated June 2, 2006 is attached hereto as Exhibit "G".

40.    Thereafter, on June 28, 2006, on the basis of these representations, e.g., that the use by the caterer would be for "limited periods", that the caterer "will be under contract with the church", that the functions would be "ancillary" and that the functions "will be restricted by the contract with the Church", Christopher Santulli, the current Manhattan Borough Commissioner of DOB endorsed the following on this letter: "OK to accept catered events under contract with the Church as complying with 'accessory Social Hall' requirement of April 10, 2006 determination by Laura Osorio." Exhibit "G".

**The Permit Issued by DOB**

41.    The Rose Group (listing a business address as 583 Park Avenue), and not plaintiff, filed an application with DOB "to change the occupancy from church and school to church, school, accesory [sic] social hall, ballroom and catering." DOB issued the permit allowing accessory use catering on August 11, 2006. A copy of the permit and the DOB Work Permit Data regarding this permit is attached hereto as Exhibit "H".[2]

**The First Amendment to the Lease**

42.    The Lease was amended by agreement dated September 15, 2006. Among other things, the First Amendment amended the amounts of insurance to be secured and maintained, clarified and amended the definition of gross sales in the Lease and amended a provision about the removal, storage and replacement of the pews in the building. A copy of the First Lease Amendment Agreement is attached hereto as Exhibit "J".

---

[2] DOB has also issued permits for interior demolition, construction equipment, plumbing, sprinkler installation, fire suppression system installation and general construction work at the building. There are currently ten outstanding permits for this work at the building, i.e., permit numbers 104564213-01-PL, 104754847-01-EQ-SH, 104506991-01-EW-OT, 104677208-01-EW-OT, 104650147-01-PL, 104650165-01-EW-SP, 104650165-01-PL, 104878900-01-EW-FP, 104564213-01-EW-OT and 104651609-01-EW-OT. A copy of these permits is attached hereto as Exhibit "I". These permits have not been revoked.

**The Second Amendment to the Lease**

43.    The Lease was amended a second time by agreement dated March 27,

2007. The Second Amendment to the Lease provides, in part, as follows:

> Whereas, Tenant has heretofore has [sic] expended approximately $2,500,000.00 in connection with improvements made to the Premises in order to prepare the Premises for the conduct of Tenant's business therein for the permitted use under the Lease ("Initial Expenditures");
>
> Where Tenant anticipates spending an additional approximately $5,000,000.00 to make further improvements to the Premises in order to prepare the Premises for the conduct of Tenant's business therein for the permitted use under the Lease ("Additional Expenditures");
>
> . . . .
>
> NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:
>
> . . . .
>
> 3..    Tenant's Inability to Use Premises for Permitted Use. Landlord and Tenant acknowledge and agree that, because of restrictions under the New York City Zoning Resolution and other governmental regulations and requirements, Tenant may not be able to use the Premises for the permitted use under this Lease for reasons beyond the control of both Landlord and Tenant. If, notwithstanding commercially reasonable efforts exercised by both Landlord and Tenant, including such subletting as may be appropriate, Tenant is unable to use the premises for the permitted use under the Lease, then:
>
> (a) Landlord shall use its best efforts to make a disposition of the Premises, mutually acceptable to Landlord and Tenant, so as to generate sufficient proceeds to pay to Tenant the Additional Expenses, together with interest as set forth in subparagraph (i) below. If Landlord and Tenant shall be unable to agree upon such disposition, then Landlord shall use its best efforts to sell the Premises in an arms-length transaction at a purchase price to be paid in cash upon closing…. Landlord and Tenant hereby agree that the Proceeds, net of Landlord's actual costs and expenses

- 16 -

incurred in the disposition or sale of the Premises ... shall be disbursed immediately upon receipt, as follows:

(i) First, to Tenant, in reimbursement of Tenant for its Additional Expenditures, the amount of up to $5.000.000;

(ii) Next, to Landlord and Tenant in equal amounts until tenant has been reimbursed in full for the Initial Expenditures plus fifty (50%) percent of all costs incurred by tenant in connection with the 74-711 application to the New York City Landmarks Commission (the "74-711 Application")[;]

....

(e) Tenant's right to receive the payments due pursuant to Section 3(a) of this Amendment shall be conditioned upon Tenants completing all work required to be performed by Tenant under the Lease and Tenant's prosecuting the 74-711 Application with the appropriate municipal authorities through final appeal.

A copy of the Second Amendment to the Lease is attached hereto as Exhibit "K" (emphasis added).

44.    The reference in the Second Amendment to the Lease to a "74-711 Application" is an application pursuant to Zoning Resolution § 74-711 for a special permit to allow a modification of the applicable use regulations, that is, to allow the commercial catering use by the Rose Group in the residential district. Section 74-711 of the Zoning Resolution states in relevant part the following:

Landmark preservation in all districts

In all districts, for *zoning lots*[3] containing a landmark designated by the Landmarks Preservation Commission, or for *zoning lots* with existing *buildings* located with Historic Districts designated by the Landmarks Preservation Commission, the City Planning Commission may permit modification of the *use* and *bulk* regulations ... provided that:

(a) The following conditions are met:

---

[3] Terms italicized in the Zoning Resolution are terms that are defined in Zoning Resolution § 12-10.

(1) any application pursuant to this Section shall include a report from the Landmarks Preservation Commission stating that a program has been established for continuing maintenance that will result in the preservation of the subject *building* or *buildings*, and that such *use* or *bulk* modifications or restorative work required under the continuing maintenance program, contributes to a preservation purpose;

....

(b) In order to grant a special permit, the City Planning Commission shall find that:

....

(2) such *use* modifications shall have minimal adverse effects on the conforming *uses* within the *building* and in the surrounding area.

The property is located in the Upper East Side Historic District.

45.    Under the explicit terms of the Second Amendment, the Rose Group's "right" to receive payments out of the proceeds of the sale of the property in the event that the Rose Group cannot use the property "for the permitted use under the Lease", i.e., a commercial catering establishment, is contingent upon the Rose Group's "prosecuting the 74-711 Application with the appropriate municipal authorities through final appeal."

46.    In connection with any application to the New York City Planning Commission ("CPC") under ZR § 74-711, plaintiff had to apply to the Landmarks Preservation Commission ("LPC") for its approval and finding that the preservation purpose required under Zoning Resolution § 74-711 would be met by the application. If, after a public hearing, LPC made the required finding, it would then issue the report referenced in ZR § 74-711. See ZR § 74-711(a)(1).

47.    The application to LPC in connection with the special permit under Zoning Resolution § 74-711 was filed in June of 2007 and then scheduled for a July 24, 2007

- 18 -

public hearing. Shortly before the hearing, the application was laid over at the applicant's request and has since been abandoned, without explanation.

48.    Also, although pre-application meetings were held at CPC regarding a possible special permit application, no application was ever filed with CPC.

49.    Plaintiff also applied to the LPC for its approval of certain signage at the building, i.e., to cover the words "Third Church of Christ, Scientist" that are carved in the stone frieze above the pillars and portico at the front of the building and to install a small LED sign explaining the scheduled event at the building (the application for the LED sign was later withdrawn). Plaintiff also sought permission to cover two stone recessed reliefs depicting religious iconography that flanked the Park Avenue entrance to the building with metal panels painted to resemble the existing stone, with the address of the building in gold lettering and a symbol, similar to a crown.

## Letters Submitted to DOB About The Rose Group's Primary Use of the Premises as a Catering Establishment

50.    By letter to DOB dated March 12, 2007, Phyllis H. Weisberg, the attorney for neighboring cooperative apartment buildings, requested that DOB revoke all permits and approvals issued to the Rose Group including the permit for the change in use for an accessory social hall (the "March 12 Letter"). A copy of the letter dated March 12, 2007, and exhibits, is attached hereto as Exhibit "L".

51.    The March 12 Letter forwarded, among other things, a Confidential Private Placement Memorandum filed with the New York State Attorney General, dated September 29, 2006, in connection with an offering to potential investors in the Rose Group. See Exhibit "L". The March 12 Letter stated that the Private Placement Memorandum "establishes that the applicant is attempting to establish a commercial catering establishment, essentially a

'Use Group 9' commercial use, in an R-10 Park Improvement District and that such use can in no way be considered 'accessory.'"

52.    For example, the Rose Group's Private Placement Memorandum states that: "While the auditorium was designed to seat 1,200 people, today there are approximately only forty members of the congregation remaining, and only a few of these members participate in the Church's Wednesday and Sunday services. The Company has entered into a lease for the Facility Space, <u>which permits the current congregation to use the Facility space on a limited basis at times when the company is not using the Facility Space</u>." (See Exhibit "L" – Private Placement Memorandum at 13)(emphasis added).

53.    The Private Placement Memorandum also describes the "clientele" of the Rose Group at the subject premises:

> The Company plans to target a very specific clientele for corporate, charitable, social and family events. Corporate events may include buffet-style receptions during the holidays, investor meetings, new product launches, fashion shows, press conferences, concerts, and seated dinners. Charity events may include seated dinners focused on fundraising, and social and family events may include weddings, anniversaries, bar or bat mitzvahs, and birthday parties. The Company Manager anticipates marketing the Facility Space as an architecturally significant venue with a luxurious food and service product to attract clients that want a luxurious experience at an [sic] location.

See Exhibit "L" – Private Placement Memorandum at 14.

54.    The    March    12    Letter    also    forwarded    advertisements    in LocationsMagazine.com which indicate that the building was available seven days a week with a capacity of 2,500 for a cocktail reception (in the January 18, 2007 advertisement) and a capacity of 1,000 for a cocktail reception (in the March 12, 2007 advertisement). See Exhibit "L" - copy of the LocationsMagazine.com advertisements. The Private Placement Memorandum itself states

that the subject premises has an "ability to handle over 500 people." <u>See</u> Exhibit "L" – Private Placement Memorandum at 13.

55.    By letter to DOB dated March 30, 2007, the attorney for neighboring cooperative apartment buildings again addressed the use of the subject premises by the Rose Group as a primary catering hall, and not as an accessory use to the church. A copy of the March 30, 2007 letter with exhibits (except the Lease exhibit) is attached hereto as Exhibit "M". The letter stated that "[s]imply put, what is proposed is a commercial catering establishment in a building owned by a church. The relationship is merely that of landlord and tenant. No interrelationship or integration exists between the church use and the catering use, as is required for an accessory use." Exhibit "M" at 1.

56.    The March 30 Letter emphasized the difference between the Lease between plaintiff and the Rose Group and the typical catering arrangement. For example, a lease confers a possessory right (in this case the Lease is for twenty years with two five-year renewal periods), while the usual catering arrangement "revolves around the service to be provided and the quality of that service." Exhibit "M" at 2. The March 30 Letter explains how, while the plaintiff "has retained a right to use a portion of the premises, that right is limited. … the Church has virtually no obligation to provide services or to maintain or repair the premises. It cannot hire building staff without the Rose Group's consent. Its ability to sell the building is limited by the Rose Group and the Church may be required to pay the entire net proceeds of a sale to the Rose Group." Exhibit "M" at 3.

57.    The March 30 Letter also emphasized that "[a]s to the areas that the Church may use, notably, only with respect to services … and church corporate or organization meetings … does the lease specifically state that such use will require the use of the 'entrance to

the Premises.' Presumably then, all other uses (except for Association meetings, held four days each year, for which the Church reserves the entire building) will require the church to use the small side entrance toward the rear of the building on 63rd Street. The Church's use is so limited that it has only limited use of its own front doors." Exhibit "M" at 6.

58.    By letter to then Deputy Mayor Daniel L. Doctoroff, dated October 5, 2007, the attorney for neighboring cooperative apartment buildings again expressed their concern about the commercial catering facility operating at plaintiff's building. That letter forwarded a copy of a letter sent by plaintiff's Board of Trustees to residents of the neighborhood, along with the responsive letter of the neighboring cooperative apartment buildings. A copy of the October 5, 2007 letter and enclosures is attached hereto as Exhibit "N".

**Letters Submitted to DOB by Plaintiff**

59.    By letter to DOB dated April 20, 2007, the attorney for plaintiff responded to "requests" made by DOB at an April 5, 2007 meeting regarding the activities at the building. A copy of the April 20, 2007 letter, as revised May 8, 2007, and attachments, is attached hereto as Exhibit "O".

60.    By letter to then Deputy Mayor Daniel L. Doctoroff, dated October 10, 2007, plaintiff's attorney again attempted to address the issue of whether or not the catering activity at the church was the primary activity there, or was an accessory use to the church. A copy of the October 10, 2007 letter and attachments is attached hereto as Exhibit "P".

**The October 29, 2007 Letter from DOB to Plaintiff and the Rose Group Regarding its Intention to Revoke Approval and Permit for Accessory Use**

61.    By letter dated October 29, 2007, DOB notified plaintiff and the Rose Group of its intention to revoke the approval and permit allowing accessory use catering at the

building. A copy of the letter from DOB to plaintiff and the Rose Group is attached hereto as Exhibit "Q". The October 29 Letter states in relevant part, as follows:

> We have reviewed letters dated March 12, 2007, March 30, 2007, and October 5, 2007 from counsel from neighboring buildings challenging the permit issued for a catering activity at the premises to the extent of its status as an "accessory use" to the Church at the premises. We have also reviewed letters submitted by the Church's attorney dated April 20, 2007 as revised May 8, 2007 and October 10, 2007 addressing these complaints. Based on the information presented to us thus far, the catering establishment is not an accessory use because it does not comport with the Zoning Resolution's requirement that it be "clearly incidental to, and customarily found" in connection with the church. Rather it appears to be a principal commercial establishment at the premises. Therefore, absent additional information as set forth above, the permit will be revoked.

62.    In order to take into consideration the situation of any innocent third parties who may have already contracted with the Rose Group to hold their catered event at the subject premises, DOB agreed "to continue to issue Temporary Place of Assembly permits, but only to the extent of events currently booked at the catering facility and in no event beyond six (6) months from [October 29, 2007] and on the condition that the Department is provided with a list" of booked events for which the Rose Group has contracts.

**The November 30, 2007 Revocation Letter from DOB to Plaintiff and the Rose Group**

63.    By letter dated November 30, 2007, DOB revoked the approval and permit allowing the change in the occupancy and use of the building from a "church and school" to a "church, school, accessory social hall, ballroom and catering." The basis for the revocation was "the failure of the catering establishment at the premises to comply with the Zoning Resolution's accessory use provisions." DOB specifically found that "the catering establishment is not 'clearly incidental to' the Church's primary use of the premises. Rather it appears to be a principal commercial establishment there." Exhibit "R" - a copy of the Revocation Letter.

64.   DOB did not revoke any other permits that had been issued for work at the building and they are still valid permits.

**The Procedural History of this Action**

65.   On December 3, 2007, plaintiff filed the complaint in this action. That same day, plaintiff sought a temporary restraining order enjoining the City from implementing or enforcing the approval and permit revocation pending determination of plaintiff's motion for a preliminary injunction. On December 3, 2007, the Court conducted oral argument, granted plaintiff temporary injunctive relief, set a briefing schedule for the preliminary injunction motion and directed to parties to submit a proposed order in conformance with the Court's ruling. On December 6, 2007, the Court signed a Temporary Restraining Order.

66.   The complaint challenges the revocation of the permit and approval issued by DOB to operate an accessory use catering hall at the subject premises as set forth in the November 30, 2007 letter. However, the complaint incorrectly alleges that the November 30, 2007 revocation letter also "revokes, forthwith, the building permits authorizing" what it describes as the "Required Capital Repairs". Complaint ¶ 55. As explained above, only the approval and permit for an accessory use catering facility was revoked by the November 30, 2007 letter, but not any other permits issued for actual work at the building.

67.   The complaint alleges that the revocation violates both the "Equal Terms" and "Substantial Burden" provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), i.e., that the City has not treated plaintiff, a religious organization, on the same terms as it treats nonreligious institutions and that the revocation constitutes a substantial burden on the exercise of its religion, as well as violates the First and Fourteenth Amendments of the Constitution. However, as explained hereinafter and in the accompanying memorandum of law, the revocation of the permit and approval was based on the fact that the catering establishment

- 24 -

operating at the subject premises by the Rose Group is not an "accessory use" to the plaintiff church and was not "incidental to" the plaintiff church, but is instead the "primary use" at the building. Having determined that the Rose Group's catering use was not incidental to the church use, DOB properly revoked the approval and permit. The nonreligious institutions relied upon by plaintiff, unlike plaintiff, have a primary use as a nonreligious institution and any catering at those institutions is "accessory". In addition, RLUIPA does not protect the ability of the Rose Group to carry on a primary commercial catering business in plaintiff's church building under the guise of an "accessory use". Plaintiff's reliance on the substantial burden provisions of RLUIPA is misplaced. Nor is plaintiff's constitutional right to free exercise of religion or equal protection of the law violated by the Rose Group's inability to carry on this commercial enterprise at the church building.

## RELEVANT STATUTES AND REGULATORY BACKGROUND

68.     Section (a) of 42 U.S.C. § 2000cc sets forth the "substantial burden" provisions of RLUIPA, as follows:

> (1) General rule. No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution –
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrict means of furthering that compelling

69.     Section (b) of 42 U.S.C. § 2000cc sets forth the relevant "equal terms" provisions of RLUIPA as follows:

> (1) Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

- 25 -

70.    Section 645(b) of the New York City Charter sets forth the power of the

Commissioner of DOB, in relevant part, as follows:

> (b) With respect to buildings and structures, the commissioner
> shall have the following powers and duties exclusively, subject to
> review only by the board of standards and appeals as provided by
> law: (1) to examine and approve or disapprove plans for the
> construction or alteration of any building or structure,....
>
> (2) to require that the construction or alteration of any building or
> structure, ... shall be in accordance with the provisions of law and
> the rules, regulations and orders applicable thereto....

71.    Section 12-10 of the New York City Zoning Resolution defines "accessory

use" as follows:

> (a) is a *use* conducted on the same *zoning lot* as the principal *use* to
> which it is related (whether located within the same or an
> *accessory building or other structure*, or as an *accessory use* of
> land), except that, where specifically provided in the applicable
> district regulations or elsewhere in this Resolution, *accessory*
> docks, off-street parking or off-street loading need not be located
> on the same *zoning lot*; and
>
> (b) is a *use* which is clearly incidental to, and customarily found in
> connection with, such principal *use*; and
>
> (c) is either in the same ownership as such principal *use*, or is
> operated and maintained on the same *zoning lot* substantially for
> the benefit or convenience of the owners, occupants, employees,
> customers, or visitors of the principal *use*.[4]

72.    Section 74-711 of the Zoning Resolution provides a mechanism for a

building located in a Historic District to seek modification of applicable use or bulk provisions,

---

[4] ZR § 12-10 also sets forth examples of what is considered an "accessory use", e.g., living or sleeping accommodations for certain servants or caretakers, or in connection with commercial or manufacturing uses; keeping of domestic animals, but not for sale or hire; certain swimming pools whose use is restricted to occupants of the principal use; home occupations; certain newsstands operating for the convenience of the occupants of a building; incinerators; storage of certain goods; certain incidental repairs; removal for sale of certain sand, gravel, etc.; accessory off-street parking spaces, loading berths, signs, radio or television towers; accessory activities when conducted underground as part of the operation of railroad passenger terminals; certain accessory sewage disposal plants; and certain ambulance outposts.

such as allowing a commercial catering use by the Rose Group in plaintiff's building. Section

74-711 of the Zoning Resolution states in relevant part the following:

> **Landmark preservation in all districts**
>
> In all districts, for *zoning lots* containing a landmark designated by the Landmarks Preservation Commission, or for *zoning lots* with existing *buildings* located with Historic Districts designated by the Landmarks Preservation Commission, the City Planning Commission may permit modification of the *use* and *bulk* regulations ... provided that:
>
> (a) The following conditions are met:
>
> (1) any application pursuant to this Section shall include a report from the Landmarks Preservation Commission stating that a program has been established for continuing maintenance that will result in the preservation of the subject *building* or *buildings,* and that such *use* or *bulk* modifications or restorative work required under the continuing maintenance program, contributes to a preservation purpose;
> ....
> (b) In order to grant a special permit, the City Planning Commission shall find that:
> ....
> (2) such *use* modifications shall have minimal adverse effects on the conforming *uses* within the *building* and in the surrounding area.

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

### A.    Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits

### (i)    The City's Revocation of the Approval and Permit Fully Comports with the "Equal Terms" provisions of RLUIPA

73.    In alleging its "Equal Terms" claim, plaintiff points to other nonreligious

institutions, alleges that these nonreligious institutions are comparable to plaintiff and then

alleges that the City allows these allegedly comparable nonreligious organizations to rent out

their premises for catered events. Therefore, by not allowing plaintiff to do what it allows the

nonreligious institutions to do, plaintiff alleges that the City violates the "Equal Terms" provisions of RLUIPA.

74.    However, as explained below, in the first instance, the nonreligious institutions pointed out by plaintiff are not comparable to plaintiff and secondly, any catering use at the nonreligious institutions is not comparable to the catering use at plaintiff's church building. That is, the occupancy and use of the nonreligious institutions at the buildings they occupy is an active primary use, all are active and thriving organizations with members and they operate various programs. The occupancy and use of plaintiff's building by the plaintiff and its members has greatly diminished over the years and is now essentially two times a week for services, Christmas Eve and Thanksgiving services, association meetings held four days a year, church classes held in the summer and other meetings. To the extent there is a catering use at the nonreligious institutions, it is an "accessory use" to the institutions' "primary use" under the Zoning Resolution. In contrast, the catering use by the Rose Group at plaintiff's building is not an "accessory use" as it is not "incidental to" plaintiff's use of the building. Rather, unlike any catering at the nonreligious institutions, the Rose Group has essentially taken over plaintiff's building and is operating it as an event space. The catering use by the Rose Group has become the primary use at the building.

The Nonreligious Institutions Cited by Plaintiff are not Comparable to Plaintiff

75.    The nonreligious institutions cited by plaintiff are as follows:

The Beekman Hotel

The Colony Club

The Regency Hotel

Council on Foreign Relations

Americas Society

Union Club

The Asia Society and Museum

The Explorers Club

The Frick Collection

National Academy Museum

Cooper-Hewitt, National Design Museum

As explained below, the buildings occupied by these nonreligious institutions have a primary use and any catering use at these institutions is an accessory use, i.e., the use is "incidental to" this primary use. Moreover, any accessory use at these locations is not unreasonable in light of the intensity of their primary uses.

76.     The Beekman Hotel is located at 575 Park Avenue in Manhattan in a residential district (R10/R8B). The current Certificate of Occupancy No. 71914, dated April 14, 1972, for the building located at 575 Park Avenue indicates, among other things, that it is located in a residential district, and that its occupancy classification is "Heretofore Erected Existing Class 'A' Hotel" of fifteen stories and a penthouse. The second through fourteenth stories have between eight to eleven apartments per story, and the penthouse story has five apartments. The use of the first story is a hotel restaurant (for tenants' use), private dining rooms, hotel offices, lobby and lounge, doctor's suite and school for adults. A copy of Certificate of Occupancy No. 71914 is attached hereto as Exhibit "S".

77.     The website "Cityrealty.com" describes the premises at 575 Park Avenue as "having 130 cooperative apartments, all with fireplaces." This printout also indicates that there is a "large restaurant in the building, the Park Avenue Café" that "has its own entrance on 63rd Street and its space was formerly occupied by two other famous restaurants, Hubert's and Le

Perigord Park." The "Park Avenue Winter" restaurant (apparently the particular season in the name of the restaurant changes as the season changes) also has its own website and identifies its address as 100 East 63rd Street. A copy of a printout from the Cityrealty website and the Park Avenue Winter website is attached as part of Exhibit "S".

78.     The Colony Club is located at 564 Park Avenue in Manhattan. The current Certificate of Occupancy No. 36022, dated August 18, 1949, for the building located at 564 Park Avenue indicates, among other things, that it is located in a residential district, and that its occupancy classification is "Heretofore Erected Class 'B' Club" of seven stories. The Certificate of Occupancy indicates uses of, among other things, "Pool, dressing rooms and storage" (cellar), "Ballroom and Clubrooms" (1st story), "Bookkeeper's and manager's office" (Mezzanine), "Clubrooms and Lounge" (2nd story), "Club rooms" (3rd story), "Bedrooms", "Maid's rooms", "Sitting room", "Offices", "fan room", "valet room" and "Squash Court" (4th through 7th story). A copy of Certificate of Occupancy No. 36022 is attached hereto as Exhibit "T".

79.     The Colony Club is a strictly private social club that operates twenty-four hours a day and has approximately two thousand six hundred members and ninety-five employees. Only a member, or someone sponsored by a member, may host an event at The Colony Club. In 2007, there were only fourteen wedding celebrations, all of which were either member or member sponsored. See declaration of the General Manager of The Colony Club attached as part of Exhibit "T".

80.     The Regency Hotel is located at 540 Park Avenue in Manhattan, a district zoned for both commercial and residential use, i.e., R10/C5-1. The current temporary Certificate of Occupancy No. 103613065T001, dated May 3, 2007, for the building located at 540 Park Avenue indicates, among other things, that its occupancy classification is residential, that it is 18

stories tall and contains 321 dwelling units on the first through eighteenth story. The temporary Certificate of Occupancy also indicates that the use in the basement is a "hotel restaraunt[sic], cocktail lounge, private dining rooms, concession area and catering (see note below), storage & garage for sixty-six (66) motor vehicles." The "note" referenced in the description of the use in the basement states the following: "Catering exclusively for the hotel residents and guests of residents." A copy of temporary Certificate of Occupancy No. 103613065T001 is attached hereto as Exhibit "U".

81.    The prior Certificate of Occupancy No. 106395, dated January 10, 1995 for these premises noted that the catering use in the basement of the building was "Catering exclusively for the hotel residents and guests of residents only." A copy of Certificate of Occupancy No. 106395 is attached hereto as part of Exhibit "U".

82.    The website for the Loews Regency Hotel at 540 Park Avenue indicates that the hotel features, among other things, 353 guest rooms, a nightclub ("Feinstein's at the Regency"), a fitness center, a 24-hour concierge, a laundry and dry cleaning service, a hair salon, a dog-walking service and Wi-Fi available in the public space. As well, the website indicates that the Regency Hotel has five event spaces of differing sizes for events such as board meetings and "intimate weddings". A copy of a printout from the website is attached as part of Exhibit "U".

83.    The Council on Foreign Relations is located in the building at 56-60 East 68th Street in Manhattan. The alternate address for this premises is 670 Park Avenue. The current Certificate of Occupancy No. 110179, dated September 27, 1996, for the building located at 56-60 East 68th Street indicates, among other things, that it is a five-story building in a residential district, with the following uses: "library and stack", "library and coat room", "library meeting

room", "offices" and "study and research". A copy of Certificate of Occupancy No. 110179 is attached hereto as Exhibit "V".

84.     The website for the Council on Foreign Relations indicates that it is an "independent, nonpartisan membership organization, think tank, and publisher dedicated to being a resource for its members, government officials, business executives, journalists, educators and students, civic and religious leaders and other interested citizens in order to help them better understand the world and the foreign policy choices facing the United States and other countries." There are three types of membership in the Council (life members, term members, and corporate members) and there are approximately 4,300 life members. The headquarters of the Council are in the building located at 56-60 East 68th Street and approximately 160 employees work out of this headquarters. The "Council's New York headquarters hosts more than 250 events annually, including panel discussions, lectures, interviews, symposia, town hall meetings, film screening, book clubs and conference calls. Senior government officials, global leaders, and prominent thinkers regularly come together with council members as part of the New York Meeting, Studies, and Corporate programs to debate and discuss major foreign policy issues….. The main purpose of these meetings is to provide a nonpartisan forum for informed policy debate." A copy of selected pages from the Council's website is attached as part of Exhibit "V".

85.     The website for the Council also indicates that it rents space for "wedding ceremonies, receptions, celebrations or corporate meeting and dinners…." See Exhibit "V".

86.     The Americas Society is located in the building at 680 Park Avenue in Manhattan. There is no Certificate of Occupancy for the building (buildings constructed prior to 1938 are not required to have a Certificate of Occupancy).

87.    The website for the Americas Society describes the Society as "the premier organization dedicated to education, debate, and dialogue in the Americas. Established by David Rockefeller in 1965, its mission is to foster an understanding of the contemporary political, social and economic issues confronting Latin America, the Caribbean, and Canada, and to increase public awareness and appreciation of the diverse cultural heritage of the Americas and the importance of the inter-American relationship." The website describes the programs held by the Society on hemispheric policy issues including the annual Latin American Conference, the Economic, Financial and Business Predictions Conference, Latin American Cities Conference, the President's of the Americas Conference ("the premier platform for Latin American leaders to discuss pressing hemispheric issues") and other public and private meetings and panel discussions. The Society also has ongoing "Literature, Music, and Visual Arts programs" that advance its "mission by bringing celebrated and emerging writers, scholars, musicians and artists from Latin America, the Caribbean, and Canada to U.S. audiences." A copy of selected pages from the Americas Society's website is attached as part of Exhibit "W".

88.    The Union Club is located in the building at 701-707 Park Avenue/101-107 East 66th Street in Manhattan. The current Certificate of Occupancy No. 54601, dated September 29, 1961 for the building located at this address indicates, among other things, that it is a six-story building in a residential district, with the some of the following uses: "Café lounge, billiard rooms, barber shop, coat room, entrance & lockers" (Basement), "Lounges, card room and office" (1st story), "Private dining rooms and pantry" (2nd story), "Dining room, kitchen and library" (3rd story), "bedrooms" and "storage" (4th story), "Squash courts, lounge and storage" (5th story) and "Squash Court" (roof). A copy of Certificate of Occupancy No. 54601 is attached hereto as Exhibit "X".

89.    A website describes The Union Club as America's oldest private club with 1300 members, and a staff of 70 full time and 40 part time employees. The Union Club itself does not appear to maintain its own website. A copy of the website is attached as part of Exhibit "X".

90.    The Asia Society and Museum is located in the building at 725 Park Avenue in Manhattan in a residential district. The current Certificate of Occupancy No. 102077217, dated April 25, 2003 for the building located at 725 Park Avenue indicates, among other things, that it is located in a residential district, and sets forth the following uses at the building: "Lower part of auditorium" (Sub-cellar), "Upper part of auditorium", "Kitchen", "Coat Room" (Cellar), "Vistor [sic] Center, Eating & Drinking Pantry, Gift Shop & Office" (1st story), "Exhibition" (2nd and 3rd stories), "Research Instruction & Reference" (4th through 7th stories), "Board Room, Seminars, Instruction, Kitchen & Storage" and "Multipurpose Rooms" (8th Floor). The auditorium has a capacity of 380 persons, the visitor center has a capacity of 300 persons and the exhibition area has a capacity of 480 persons. A copy of the Certificate of Occupancy No. 102077217 is attached hereto as Exhibit "Y".

91.    The website for the Asia Society describes the Society as "the leading global organization working to strengthen relationships and promote understanding among the people, leaders, and institutions of Asia and the United States." The Asia Society is a "nonpartisan, nonprofit educational institution with offices in Hong Kong, Houston, Los Angeles, Manila, Melbourne, Mumbai, New York, San Francisco, Shanghai, and Washington, DC." The Asia Society describes is mission as follows: "We seek to increase knowledge and enhance dialogue, encourage creative expression, and generate new ideas across the fields of policy, business, education, arts, and culture." The Asia Society and Museum is open Tuesday

through Sunday from 11:00am to 6:00pm, with extended hours on Friday nights to 9:00pm (except during the summer). There are daily exhibition tours offered twice every weekday (three times on Friday) and once a day on the weekend. The Asia Society and Museum also has school and educational programs offering "interactive guided tours for school groups (grades 3-12). In the exhibition galleries, teachers and students can learn about the works of art on view, discuss how art relates to their own experiences, and discover what's new and compelling about art today."

92.    The website for the Asia Society and Museum also indicates that it "underwent a dramatic renovation which doubled the public and gallery areas and significantly improved the conference, education and performance facilities." The website describes the available rooms as follows: "Lila Acheson Wallace Auditorium" (cherry wood auditorium and stage facility), "Garden Court" (equipped with its own kitchen and audio-visual facilities "for almost any type of event, from elegant receptions and dinners to artistic salons and corporate soirees"), "Conference and Banquet Suite" (three large rooms "for receptions and banquets" and also equipped with high-tech projection and audio equipment to accommodate presentation needs), "The Mr. and Mrs. Frederick P. Rose Room" (serves as both the entrance and reception room of the suite), "The Rose Conference Hall" (suitable for luncheons and dinners), "The Henry Luce Room" ("can be used as a separate break-out room for conferences or as an additional dining area"), and "The Sidney D. Gamble Room" (private conference room for small meetings). A copy of selected pages from the website is attached as part of Exhibit "Y".

93.    The Explorers Club is located in the building at 46 East 70th Street in Manhattan. The current Certificate of Occupancy No. 60630, dated December 15, 1964 for the building located at 46 East 70th Street indicates, among other things, that it is a six-story building

in a residential district, with the following uses: "Storage and laundry" (Cellar) and "Non-commercial club…" (1st through 6th story). A copy of the Certificate of Occupancy No. 60630 is attached hereto as Exhibit "Z".

94.    The website for The Explorers Club states that it "is an international multidisciplinary professional society dedicated to the advancement of field research and the ideal that it is vital to preserve the instinct to explore." The Club "provides expedition resources including funding, online information, and member-to-member consultation." The Club "actively encourages public interest in exploration and the sciences through its public lectures program, publications, travel program, and other events. The Club also maintains Research Collections, including a library and map room, to preserve the history of the Club and to assist those interested and engaged in exploration and scientific research." The Club has approximately 3000 members and is open to members at all times during its hours of operation, i.e., Monday through Friday 9:00am to 9:00pm and Saturday 9:00am to 2:00pm. Designated rooms are open to the public when attending the public lectures given at the Club. This website does not have any information regarding rental space. A copy of selected pages from The Explorers Club website, as well as a calendar of events for 2007 held by The Explorers Club for its members as well as nonmembers, is also attached as part of Exhibit "Z".

95.    The Frick Collection is located in the buildings located at 5, 7 and 9 East 70th Street in Manhattan in a residential district. The current Certificates of Occupancy Nos. 77832, 77824, and 77825 dated August 2, 1977 for these premises indicate, among other things, that the building at 5 East 70th Street is a one-story building with a mezzanine with a "Waiting area & coat room & sales room", the building at 7 East 70th Street is a one-story building with a mezzanine with a "waiting area, coat room; outside formal garden", and that the premises at 9

East 70th street is the "museum's formal garden" on the first floor with accessory storage in the three cellar levels below. A copy of Certificates of Occupancy Nos. 77832, 77824, and 77825 dated August 2, 1977 is attached hereto as Exhibit "AA".

96.    The Frick is open to the public six days a week, from 10:00am to 6:00pm on Tuesdays through Saturdays and from 1:00pm to 6:00pm on Sundays. The Frick is closed on Mondays and also on four legal holidays throughout the year. The Frick also has a museum shop, offers group visits and also holds public programs throughout the year. The website of The Frick indicates that "[m]embers at various levels are invited to attend lectures and concerts in the collection in addition to special celebrations and galas." In addition, it states that "[c]orporate and Individual members at the $35,000 level and above are invited to host their own special event at The Frick Collection. …. Membership at this level entitles a corporation or a private host to a one-time opportunity to utilize the intimate event spaces offered by the Frick for entertaining guests and clients." A copy of selected pages from the website is attached as part of Exhibit "AA".

97.    The National Academy Museum is located at 1083 Fifth Avenue in Manhattan. This building was built prior to 1938 and there is no Certificate of Occupancy for this premises.

98.    The website for the National Academy describes the institution as playing a "critical role in preserving and fostering the visual arts in America. Through a program of exceptional exhibitions in the Museum and quality instruction in the School of Fine Arts, the Academy serves as a link to the art of our past, and a bridge to the art of our present, and future." The website states that the "fundamental mission of the Academy has never changed-the annual exhibitions have been held every year since 1826; the School of Fine Arts has functioned almost

without interruption since that date; and, in recognition of the ever-changing character of American art, over 2,000 artists have been honored with election" to the National Academy. The National Academy is open from noon to 5:00pm on Wednesdays and Thursdays and from 11:00am to 6:00pm on Fridays through Sundays. The Academy offers, among other things, docent tours, school group admissions, lunchtime lectures, The Review Panel (monthly discussions of prominent art critics), family art programs and senior art programs. The website also lists past exhibits at the National Academy for the years from 2000 to 2007. The National Academy also "provides a variety of ideal setting for intimate dinners, evening receptions, luncheons, business presentations, and fashion, commercial and film shoots. Striking interiors ... provide the perfect setting for a full range of events." A copy of selected pages from the website is attached as apart of Exhibit "BB".

99.    The Cooper-Hewitt, National Design Museum is located at 9 East 90th Street in Manhattan. The current Certificate of Occupancy No. 63596, dated September 29, 1966 for the building located at 9 East 90th Street indicates, among other things, that it is a five-story building with a roof exercise area in a residential district, with the following uses: "Office and kitchen" (1st story), "Seminar rooms" (2nd and 3rd story), "Offices" (4th and 5th story). A copy of Certificate of Occupancy No. 63596 is attached hereto as Exhibit "CC".

100.    The website for the Cooper-Hewitt National Design Museum indicates that the Museum is open seven days a week from 10:00 to 5:00pm (Monday-Thursday), from 10:00am-9:00pm (Friday), from 10:00am to 6:00pm (Saturday) and from noon to 6:00pm (Sunday). The Museum offers tours and youth and adult programs. The Museum allows its Corporate Members ($10,000 membership) to host events at certain spaces within the Museum, i.e., in "The Great Hall" and the "Arthur Ross Terrace and Garden". At the $5,000 Corporate

Membership level, contributors can host an event in the "Agnes Bourne Bridge Gallery" and the "Barbara Riley Levin Conservatory". A copy of selected pages from the website is attached as apart of Exhibit "CC".

101.    As is clear from the Certificates of Occupancy for the buildings occupied by the nonreligious institutions referenced by plaintiff, all but one are located in a residential district. The Regency Hotel is located in a district zoned for both residential and commercial use (R10/C5-1), therefore any commercial catering use is permitted at the hotel. For this reason alone, it is not comparable to plaintiff.

102.    The other Certificates of Occupancy for the buildings occupied by the nonreligious institutions, as well as the websites for those institutions, demonstrate that there is a current, frequent and intense primary use of the buildings by the nonreligious institutions themselves. For example, the Certificate of Occupancy for The Beekman Hotel indicates that this building was a fourteen-story hotel with a penthouse and the Cityrealty website indicates it is now a cooperative apartment building with 130 units. The Colony Club is located in a seven-story building, with numerous different and active club related uses on each floor. The Council on Foreign Relations occupies a five-story building as its headquarters and approximately 160 employees work there. The Council of Foreign Relations hosts more than 250 events annually at the building. The Americas Society has ongoing programs on policy issues as well as literature, music and art programs. The Union Club occupies a six-story building with numerous different and active club-related uses on each floor and its own staff of many full-time and part-time employees. The Asia Society and Museum occupies a five-story building with public and gallery areas as well as conference, education and performance facilities and is open every day except Monday for exhibitions and school and educational programs. The Explorers Society occupies a

six-story building, operates six days a week, has public lecture programs, publishes materials, maintains a research collection and has approximately 3000 members. The Frick, The National Academy Museum and the Cooper-Hewitt Museum are all active and operating institutions with numerous exhibitions and education programs.

103.    As set forth above, the nonreligious institutions are the primary occupants of their buildings and the activities of the nonreligious institutions are the primary activities throughout their buildings. This is not the case with plaintiff.

104.    Plaintiff's use of the building and the activities of plaintiff at the building are not comparable to that of the nonreligious institutions. Plaintiff's membership is approximately sixty-four persons. Plaintiff's use of the building consists of religious services on Wednesday nights and Sunday mornings, Christmas Eve and Thanksgiving Day services, association meeting four times a year, church classes for a period of time in the summer, and church corporate and organizational meetings. Plaintiff's use of the building is limited by the Lease with the Rose Group.

105.    The catering use of the building by the Rose Group is not incidental to the use of the building by plaintiff.

106.    Plaintiff also alleges that the City allows the nonreligious institutions to engage in what it describes as the similar practice of renting out their premises for catered events for non-members. However, there is no "similarity" between what the nonreligious institutions relied upon by plaintiff in arguing its "Equal Terms" claim do and what the plaintiff does. First, none of the nonreligious institutions rent out their "premises" as does plaintiff. Rather, based on the information in the Certificates of Occupancy and the available websites, some of the nonreligious institutions may have limited spaces available in their buildings for rent. For

example, The Beekman Hotel had a hotel restaurant (for tenants' use) and private dining rooms on the first floor only of the fourteen-story building; The Council on Foreign Relations is a five-story building and the second floor can hold 201 persons (the Certificate of Occupancy does not indicate specifically a type of space where a reception might be held, but the occupancy on the other four floors and cellar levels does not exceed 31 persons); the Americas Society occupies a five-story building and only the cellar and first floor have occupancy levels of seventy and forty persons, respectively; The Union Club occupies a six-story building and only two floors have occupancy uses of dining rooms; The Asia Society occupies an eight-story building and the rooms available for catered events are located on the eighth floor of the building; and The National Academy Museum occupies its entire building and allows portions of it to be used for rental. Thus, the space these institutions dedicate to rental for catering is clearly incidental to that occupied by the primary use.

107.    Of the five remaining nonreligious institutions cited by plaintiff, The Regency Hotel is eighteen stories tall and only the basement can be used for a catering use (in any event the catering use is permitted in the C5-1 district); The Colony Club is a private club and only a member or a member sponsored event may be held there; The Explorers Club website does not indicate that it has space available for public rental (in any event, even if it does, this club occupies a six-story building); The Frick Collection only allows "a one-time opportunity" to host "their own special event" to corporate and individual members who have donated more than $35,000; and the Cooper-Hewitt National Design Museum allows corporate members at the $5,000 and $10,000 membership level to host events in certain spaces at the museum.

108.    Thus, the rental by certain nonreligious institutions of selected space within their buildings for catered events to nonmembers is not comparable to the events at the

plaintiff's building that are conducted by the Rose Group and its clients. These events are held in the former seating area/sanctuary of the building, the balcony of the building and the basement level. Moreover, the Lease specifically sets forth what parts of the building plaintiff may use and specific times when plaintiff may use those parts of the building. See Exhibit "C" – Lease ¶ 35.1. Thus, at all other times, it is the Rose Group that can use those parts of the building for its catering activities.

109.    Plaintiff's activities at the building are fundamentally different than the activities of the nonreligious institutions in the buildings they occupy.

110.    To allege that the infrequent actions of the nonreligious institutions in renting out limited space in their buildings to the public for catered events is "similar" to the actions of plaintiff here is unsupported by the facts. Plaintiff has presented no evidence that these other nonreligious institutions have entered into long term leases for virtually the entire building, as has plaintiff with the Rose Group.

111.    Plaintiff is not comparable to the nonreligious institutions it cites. Plaintiff's use and occupancy of the building is not comparable to the use and occupancy of the buildings occupied by the nonreligious institutions. Plaintiff's leasing of its entire building and the land upon which it is built to the Rose Group for a term of twenty years (with two five-year renewals) so that the Rose Group can operate its business at the building as well as cater and conduct an event (in what is now the "event space" and no longer the seating area/sanctuary of the building) is not comparable to the rental by the nonreligious institutions of certain space in their buildings.

112.    For all these reasons, plaintiff's allegations that the City violated the "Equal Terms" provisions of RLUIPA when it revoked the approval and permit that allowed accessory use catering at the building cannot succeed.

113.    In addition, the City has not in fact, "treated" these other nonreligious institutions vis-à-vis any accessory use catering at their premises at all, much less "treated" them differently. For example, under the Zoning Resolution accessory uses are permitted as of right in residential districts (subject to certain specific exceptions not applicable here) and no DOB approval is required. ZR §§ 22-11, 22-12, 22-13 and 22-14. Thus, to the extent a nonreligious institution has accessory use catering at its premises, no prior approval by DOB is required as there is no requirement to get a permit to have an accessory use or to have a Certificate of Occupancy reflect the accessory use.

114.    If however, an applicant wants an accessory use, such as a catering use, reflected on the Certificate of Occupancy for the building, then the applicant must submit what is called an ALT 1 application to DOB.[5] Applications for approvals to alter a space used or to be used as an accessory use may be filed under an ALT 2 application and do not involve any DOB approval of such use. Therefore, unless the applicant files an ALT 1 application seeking a new Certificate of Occupancy to reflect the accessory use of the building there would be no application for DOB to "approve" such use.

115.    Leaving aside The Regency Hotel, none of these nonreligious institutions have submitted applications to DOB for its approval of accessory use catering at their buildings

---

[5] DOB divides construction work into two main categories: new buildings (NB) and alterations (ALT). Alterations are further divided into three types (ALT 1s, ALT 2s and ALT 3s) depending upon the scope of work. An ALT 1 application must be filed when a new certificate of occupancy will be issued to reflect a change in the use or occupancy of an existing property; an ALT 2 application is an alteration in which the use or occupancy of an existing property does not change, but includes multiple work types (i.e., plumbing and construction); an ALT 3 is a simple alteration involving only one work type.

and none of the Certificates of Occupancy for these nonreligious institutions indicate an accessory catering facility. Only the Certificate of Occupancy for The Regency Hotel indicates an accessory catering use and it specifically provides "[c]atering exclusively for the hotel residents and guest of residents." In any event, a commercial catering establishment is permitted in the C5-1 zoning district.

116.    Moreover, it is not strange that the City does not know of this type of activity, that is accessory use catering at nonreligious institutions as well as religious organizations, because there is no legal requirement that these institutions and organizations apply to DOB for its approval.

117.    Thus, while accessory use catering may be occurring at these nonreligious institutions (as allowed under the Zoning Resolution), it is not because the City has sanctioned it or otherwise "treated" them differently. That is, insofar as the City has not been requested to approve that accessory use and has not approved that use, the City has not in fact "treated" those nonreligious institutions one way or the other.

118.    For all these reasons, as well as the reasons set forth in the accompanying defendants' memorandum of law in opposition to plaintiff's motion for a preliminary injunction, plaintiff cannot demonstrate a likelihood of success on the merits of its "Equal Terms" claim.

**(ii)    The City's Revocation of the Approval and Permit Fully Comports with the "Substantial Burden" provisions of RLUIPA**

119.    Plaintiff alleges that it entered into the Lease with the Rose Group because it needs to preserve its building so that its congregation could worship and perform other religious activities in it. Complaint ¶ 68. Under the terms of the Lease, the Rose Group at its "sole cost and expense" was to "renovate" the building in accordance with the "preliminary plans" and "specifications" attached to the Lease. Exhibit "C" – Lease ¶ 5.2 and 5.3. Of course,

- 44 -

the Second Amendment changed those terms and shifted the burden of payment of those costs and expenses from the Rose Group onto plaintiff if the Rose Group cannot use the building for its catering business. If the Rose Group cannot carry on its catering business at the building as a result of the revocation of the permit and approval "(in effect, forcing a cancellation of the Lease)", plaintiff alleges that it will "coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility…." Complaint ¶ 71.

120.    Therefore, plaintiff argues, the City must allow a commercial catering establishment that is not permitted in a residential district under the Zoning Resolution to operate out of plaintiff's building because the income generated from that commercial catering establishment will fund the renovations of plaintiff's building by the Rose Group. Not to allow this commercial catering establishment to operate at the building and to generate income for the Rose Group, plaintiff argues, is a substantial burden on its exercise of religion.

121.    The complaint repeatedly uses the term "Required Capital Repairs" (defined as "necessary major capital repairs and renovations to the Building's aging infrastructure [to] bring the Building into compliance with the New York City Building Code…." Complaint ¶ 2) in describing the work at the building. The complaint also alleges that plaintiff will be required to reimburse the Rose Group for the amount of "Required Capital Repairs already completed." Complaint ¶ 62. Therefore, if the revocation is not enjoined, the complaint alleges that "the Church will be forced to sell the Building…." Complaint ¶ 62.

122.    However, the requirement to sell the building in order to reimburse the Rose Group for its expenditures does not so define those expenditures. That is, the Second Amendment to the Lease refers to monies spent by the Rose Group "in connection with improvements made to the Premises in order to prepare the Premises for the conduct of [the Rose

Group's] business therein" as "Initial Expenditures". The Second Amendment then refers to additional monies spent by the Rose Group "to make further improvements to the Premises in order to prepare the Premises for the conduct of [the Rose Group's] business therein" as "Additional Expenditures". <u>See</u> Exhibit "K". Thus, rather than describe the Rose Group's expenditures for what they are, <u>i.e.</u>, improvements so that the Rose Group can run its catering business, plaintiff disingenuously transforms those expenditures into something entirely different.

123.    As set forth in the accompanying memorandum of law, the operation of a commercial catering establishment in plaintiff's building is not a religious exercise protected by RLUIPA. Moreover, a burden on a commercial enterprise used to fund a religious organization does not constitute a substantial burden on religious exercise (even if this were religious exercise, which it is not) within the meaning of RLUIPA. The statute is not intended to protect income streams generated by commercial endeavors that are for the benefit of religious institutions. RLUIPA cannot be read so broadly as to make the City's zoning regulations inapplicable to plaintiff's building just because plaintiff is a religious organization.

124.    For all these reasons, as well as the reasons set forth in the accompanying defendants' memorandum of law in opposition to plaintiff's motion for a preliminary injunction, plaintiff cannot demonstrate a likelihood of success on the merits of its "Substantial Burden" claim.

**(iii)    The City's Revocation of the Approval and Permit Fully Comports with Plaintiff's Equal Protection Rights**

125.    Plaintiff alleges that it is similarly situated to other religious organizations and that the City allows those other similarly situated religious organizations to engage in catering activities. However, plaintiff alleges that the City does not allow it to engage in catering

activities substantially similar to those religious organizations in violation of the Fourteenth Amendment. Complaint ¶ 82.

126.    Plaintiff points to the following religious organizations in making its equal protection claim:

The Central Presbyterian Church

St. Bartholomew's Church

Church of St. Ignatius Loyola

Universalist Church of New York

All Souls Church

The Seamen's Institute Church

Riverside Church

127.    However, as explained below, these religious organizations are not similarly situated to plaintiff and the catering use at those religious organizations is not similar to the catering use by the Rose Group at plaintiff's building. The catering uses at these religious organizations are not unreasonable, in light of the intensity of their primary uses. Also, catering is allowed as of right in certain commercially zoned districts, i.e., C2, C4, C5, C6 and C8 districts. Here, three of the seven religious institutions proffered by plaintiff are located in commercial districts where commercial catering is permitted as of right, i.e., Saint Bartholomew's Church, All Souls Church and The Seamen's Church Institute. For this reason alone, plaintiff is not similarly situated to those three religious organizations and the catering use there is irrelevant to plaintiff's equal protection claim. As for the four remaining religious organizations, any catering use is incidental to the primary use as a church.

128.   The Central Presbyterian Church is located at 593 Park Avenue in Manhattan (on the same block and just north of the plaintiff's church). The Certificate of Occupancy No. 93620, dated February 8, 1989 for the building located at 593 Park Avenue indicates, among other things, that it is located in a residential district ("R-10"), and that in addition to the "church" use (1st floor and gallery), there is a "society room" and "nursery school" use with a legal capacity of 200 persons on the second floor and a "playground" use on the roof. A copy of Certificate of Occupancy No. 93620 is attached hereto as Exhibit "DD".

129.   The website of the Central Presbyterian Church indicates, among other things, that there is an adult bible study session and a worship service on Sundays, adult Christian education classes, a women's Bible Study program approved for winter/spring Tuesday mornings, a prayer group approved to meet after worship on Sundays, as well as special services on religious holidays throughout the year. The Church also administers a "sizable bequest" to develop a ministry for the benefit of underprivileged children, is a founding partner of "Surgeons of Hope Foundation, an international charity which provides life-saving and life-altering surgery to underprivilaged [sic] children around the world" and participates in "Faith in Action" an interfaith volunteer caregiving program. There is also a monthly newsletter published on the website as well. Nothing in the website indicates that any spaces in the Church building are available for catered events. A copy of a printout from the Central Presbyterian Church website is attached as part of Exhibit "DD".

130.   Since January 1, 2005, there have been only twelve catered events held at the Central Presbyterian Church: (i) five wedding receptions or rehearsal dinners and all were in connection with a wedding conducted at the Church; (ii) two receptions following musical concerts or performances in the Church sanctuary by not-for-profit groups; (iii) one reception

following a religious event held in the Church sanctuary in which the Church was a participant; and (iv) two meetings and two fundraisers were held at the Church for outside not-for-profit organizations. See declaration of Pastor of Central Presbyterian Church attached as part of Exhibit "DD".

131.    St. Bartholomew's Church is located at 109 East 50th Street in Manhattan. The Certificate of Occupancy No. 110104, dated September 13, 1996, for the building located at 109 East 50th Street indicates, among other things, that it is located in a commercial district (C5-3/C5-2.5). The Certificate of Occupancy indicates uses of, among other things, "Church Parish House" (cellar, basement, 2nd through 4th floor), "Child Day Care Center and Auditorium" (1st floor), "Child Day Care Center Offices" (5th Floor), and "Playground" (Roof). A copy of Certificate of Occupancy No. 110104 is attached hereto as Exhibit "EE".

132.    The website of St. Bartholomew's Church describes the church as having a membership of "nearly 4,000" and lists activities of, among other things, Sunday services, daily morning and evening prayer services as well as the daily Eucharist service, concerts, and "Centering Prayer" meetings. A copy of a printout from the website is attached as part of Exhibit "EE".

133.    The Church of St. Ignatius Loyola is located at 980 Park Avenue in Manhattan. There is no Certificate of Occupancy for this building (buildings constructed prior to 1938 are not required to have a Certificate of Occupancy).

134.    The website for St. Ignatius Loyola states that the parish "offers a wide range of ministries" as well as "daily and weekly masses, celebration of the sacraments, education opportunities and ... service and music programs." Three masses are offered six days a week (plus an additional 5:30pm mass on Saturday) and five masses are offered on Sunday. The

website also indicates that the parish offers adult education, bible study, book clubs, Centering Prayer groups, Christian Life Community groups, a Young Adult group, retreats and various outreach groups. The parish calendar from the website lists numerous activities at the church. A copy of a printout from the website is attached as part of Exhibit "FF".

135.    Wallace Hall is a space below the main level of the Church of St. Ignatius Loyola that is used for a variety of parish and school related events, as well as other events. It is also used for Sunday mass ten months of the year. From September 2006 to September 2007 (leaving aside the Sunday masses held in Wallace Hall) there were a total of 168 events at Wallace Hall. Only nine (9) of these events were rental events with outside caterers and seven (7) were rental events without caterers. See declaration of the Director of Facilities of the Church of Saint Ignatius Loyola attached as part of Exhibit "FF".

136.    The Fourth Universalist Society in the City of New York/A Unitarian Universalist congregation is located in the building at 4 West 76th Street in Manhattan. The current Certificate of Occupancy No. 95035, dated October 18, 1989, for the building located at 4 West 76th Street indicates, among other things, that it is a three-story building with a bell tower, with some of the following uses: "Church, chapel", "meeting room" "offices", "classrooms, library, offices" (1st floor), "Classroom, offices, library" (2nd floor), and "Classroom" (3rd floor). A copy of Certificate of Occupancy No. 95035 is attached hereto as Exhibit "GG".

137.    The website for the Fourth Universalist Society in the City of New York/A Unitarian Universalist congregation indicates that it is the remaining Universalist church in New York City and that it "now has about 150 members." The Church holds religious services on Sundays for adults and children. The Church's website lists the following programs at the

Church: 4th U Choir, Family Choir, Dream Catchers, Humanistic UU and Human Relations, Men's Group, Moon Circle, Nature Walk, Nursing Home Ministry, TaKala, Theater Group, Underground Gourmet and Westsiders' Together. The Church has office hours weekdays from 9:00am to 5:00pm and publishes a monthly newsletter as well. A copy of selected pages from the 4th Universalist Society Council's website is attached as part of Exhibit "GG".

138. The website for the Church also has information about spaces available at the Church for rent. See Exhibit "GG".

139. All Souls Church is located in the building at 150-160 East 80th Street a/k/a 1151-61 Lexington Avenue in Manhattan in a commercial zoning district. The current Certificate of Occupancy No. 101470, dated October 80, 1992 for the building indicates, among other things, that it is a four-story building (in a C1-8x zoning district), with a play roof and penthouse, with some of the following uses: "Banquet Room/Meeting Room with Performing Stage", "Meeting Rooms", "Classrooms", "Kitchen and Boiler Room" (Cellar), "Church-and Classrooms" (1st Floor), "Church Balcony and Organ Room and Classrooms" (2nd floor), "Classrooms" (3rd Floor), "Classrooms and Offices" (4th Floor), and "Play Roof and Play Room" (Roof). A copy of Certificate of Occupancy No. 101470 is attached hereto as Exhibit "HH".

140. The website for All Souls Church states that it is a "congregation of nearly 1,500 people" that "is proud of its 25 social outreach programs. These include feeding the homeless at the Monday evening 'Homeless Hospitality', the Friday noon soup kitchen, tutoring children at our adopted elementary school PS 102, and others." All Souls Church also holds two separate Sunday morning services, and a midweek worship service once a month. All Souls Church offers a Religious Education Program for Children and Youth on Sunday mornings and an Adult Education Program on Sunday mornings and weeknight programming. The website

also describes Community Building Groups and Programs at All Souls Church including The Caring Team, Cinema All Souls, Historical Society, Interweave, Journey Toward Wholeness, Lifelines Center, LifeScapes, All Souls Media and Entertainment Group, Peace Task Force, People of Color Gathering, All Souls Quarterly Review, Stories With Soul, Thirties-forties Fellowship, Women's Alliance, Women's Reading Group and All Souls Young Adults. A copy of selected pages from All Souls Church website is attached as part of Exhibit "HH".

141.    The Seamen's Institute Church is located in the building at 237-243 Water Street in Manhattan. The current Certificate of Occupancy No. 98314, dated April 30, 1991 for the building located at this address indicates, among other things, that it is a six-story building in a commercial district, with the some of the following uses: "Stores", "chapel" (1st Floor), "Offices", "dining room", "kitchen" (2nd Floor), "Offices", "classrooms" (3rd Floor), "Offices" (4th and 5th Floors), and "Dining room", "pantry" (6th Floor). The Church is located in a C6-2A zoning district. A copy of Certificate of Occupancy No. 98314 is attached hereto as Exhibit "II".

142.    The website of The Seamen's Church Institute states that the Institute "is the largest, most comprehensive mariners' agency in North America. Annually, its chaplains visit 3,400 vessels in the Port of New York and New Jersey and along 2,200 miles of America's inland waterways…." In addition, "[c]haplains and staff also provide social services and pastoral care to over 7,000 cruise ship workers at the New York Cruise Ship Terminal in Manhattan and at Cape Liberty in Bayonne, NJ. …. From its headquarters in New York City, SCI provides a center for research, legal assistance and training on issues relating to seafarers' abuse and exploitation. It offers free legal counseling, assistance and referrals to merchant seafarers and seafarers' welfare agencies worldwide." The Seamen's Church Institute offers a rental space to

host events (the "Top Deck"). A copy of selected pages from The Seamen's Church Institute website is attached as part of Exhibit "II".

143.    The Riverside Church is located in the building at 490 Riverside Drive in Manhattan. The current Certificate of Occupancy No. 19959, dated November 13, 1934, for the building located at 485-97 Riverside Drive indicates, among other things, that it is a twenty-one story building in a residential district with some of the following uses: "Church and Chapel" (1st story), "Church" (2nd story and 1st gallery), "Church and Assembly" (3rd story and 2nd gallery), and "Assembly" (4th through 15th story). A copy of Certificate of Occupancy No. 19959 is attached hereto as Exhibit "JJ".

144.    Another Certificate of Occupancy No. 51887, dated February 17, 1960, for the building located at 480-487 Riverside Drive indicates, among other things, that it is a seven-story building with a roof and that these premises are "to be occupied as an accessory to Riverside church, a religious organization." The Certificate of Occupancy lists some of the following uses: "Assembly hall and kitchen" (1st story), "Dining rooms" (2nd story), "Library, classrooms and assembly rooms" (3rd story), "Classrooms and assembly rooms" (4th story), "Church offices" (5th Story) and "Classrooms, assembly rooms and offices" (6th and 7th story). A copy of Certificate of Occupancy No. 51887 is attached hereto as part of Exhibit "JJ".

145.    The website for The Riverside Church describes the Church as having 2,400 members and affiliates and sets forth the "Worship Schedule" for Sunday and weekday services, as well as prayer and meditation services. In addition, The Riverside Theatre at the Church also "presents a diverse range of programming, that includes cutting edge choreography in [its] dance festival" and documentaries. There are "as many as 120 annual performances of dance, music and drama" at the theater. The Riverside Church also rents spaces for various

events, e.g., the nave of the church "for concerts, rehearsals, lectures, etc.", the South Hall, the Assembly Hall and the Ninth Floor Lounge for "receptions", and the Theatre of The Riverside Church "to produce … theater, dance, and film programs…." A copy of selected pages from The Riverside Church website is attached as part of Exhibit "JJ".

146.    As set forth above, all of these religious organizations (including the three that are not relevant to the equal protection claim) are active, functioning organizations that carry on a wide range of religious activities and other activities at their buildings in furtherance of their mission. In contrast, plaintiff's membership is approximately sixty-four persons, its religious services take place one evening and one morning a week and on Christmas Eve and Thanksgiving, its association meetings are held four times a year, church classes are held for two, two week sessions in the summer, and certain church corporate and organizational meetings are held at the building. Plaintiff's own use of its building is thus fundamentally different from the use by the cited religious organizations themselves of their buildings.

147.    Also different from plaintiff's building is the nature of any catering use at these religious organizations, i.e., it is an "accessory use", that is, the catering use is "incidental to" the primary use of the building. Thus, the churches offer space for rent for catered events for members of their congregation that are having religious ceremonies at the building, and also for other members of the public. But these rentals are not the primary activities advertised or sanctioned by the Certificates of Occupancy.

148.    Plaintiff also alleges that it is similarly situated to other nonreligious institutions that have similar catering activities and that the City allows those other similarly situated nonreligious institutions to engage in those catering activities. However, plaintiff alleges that the City does not allow it to engage in catering activities substantially similar to those

- 54 -

nonreligious institutions. Complaint ¶ 83. Therefore, plaintiff alleges that the City has violated its rights to equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution.

149.    However, as set forth at length above, supra ¶¶ 75-111, the nonreligious institutions are not similarly situated to plaintiff. Unlike plaintiff, these nonreligious institutions are institutions that carry on a primary use as an organization at their locations. On the other hand, plaintiff's use of its building is infrequent in time and the actual space that plaintiff can use is explicitly delineated by the terms of the Lease with the Rose Group. Unlike the nonreligious institutions relied upon by plaintiff in making its equal protection argument, plaintiff has leased its entire land and building to the Rose Group, and has not simply made available a room or limited space at its building for catering activity. Plaintiff is not similarly situated to these nonreligious institutions.

150.    Moreover, any catering use at the other locations is an accessory catering use that is incidental to the primary use by the nonreligious institution. In contrast to those accessory uses is the frequency and intensity of the catering use by the Rose Group at plaintiff's building. Rather than accessory, the Rose Group's catering use has become the primary use at the building.

151.    The determination of whether or not a use is an accessory use is a question of degree. Thus, to the extent that a nonreligious institution or a religious organization rents its space to nonmembers, this does not automatically make the catering a non-accessory use. Occasional use by nonmembers is a permissible accessory use. However, there still must be an active and primary use of the building by the nonreligious institution or religious organization. The catering facility must primarily service the needs of the nonreligious institution or religious

organization. The catering activity cannot dominate the use of the building by the nonreligious institution or religious organization. In all the examples cited by plaintiff, this is clearly the case. The activities of the nonreligious institution or religious organization are by far the prevailing and primary activity at the buildings. The availability of catering is ancillary and occasional at best.

152.    For these reasons, plaintiff cannot establish that, compared to other similarly situated uses, it was selectively treated by the City. To do so, plaintiff would have to proffer a religious organization (or a nonreligious institution) with a small membership that uses its building twice a week (and on two holidays, only four weeks of church classes, occasional corporate church meetings and four times a year for association meetings) that has turned over practically the entire building and land upon which it is built to an independent caterer that is operating its catering business full time out of the building. It cannot be disputed that plaintiff did not, and cannot, make this proffer.

153.    Nor can plaintiff demonstrate that the alleged selective treatment was motivated by an intention to discriminate on an impermissible basis, such as religion or race, to punish or inhibit the exercise of a constitutional right, or by a malicious or bad faith intent to injure plaintiff. There has been no showing of discrimination by the City, much less a showing of clear and intentional discrimination based on an improper motive.

154.    For all these reasons, as well as the reasons set forth in the accompanying defendants' memorandum of law in opposition to plaintiff's motion for a preliminary injunction, , plaintiff has not demonstrated a likelihood of success on the merits of its equal protection claim.

**B.    Plaintiff Cannot Demonstrate that the Injunction is Necessary to Prevent Irreparable Harm**

155.    Plaintiff argues that if the Court does not grant injunctive relief, it "will put the Rose Group out of business and will deprive the Church of the revenue it needs to meet its obligations [and] the Church will be forced to sell the Building...." Plaintiff's memorandum 24. At best, this harm is speculative and mostly self-created. Also, while plaintiff alleges in a conclusory manner that its relationship with the Geneva School "did not yield enough money to meet" its needs (Complaint ¶ 19), plaintiff is silent as to any attempts to have that relationship yield more money.

**(i)    The Second Amendment to the Lease was Never Approved by the Court**

156.    The requirement to sell the building is set forth in the Second Amendment to the Lease and arises if the Rose Group "is unable to use the Premises for the permitted use under the Lease", i.e., to use plaintiff's building as the venue for its catering business. Exhibit "K" - Second Amendment ¶ 3. The proceeds of the sale (minus certain costs and fees) have to be disbursed "immediately upon receipt" in a specified, five-level order. The first disbursement must be to the Rose Group "in reimbursement ... for its Additional Expenditures, the amount of up to $5,000,000". The second disbursement is to plaintiff and the Rose Group in equal amounts until the Rose Group "has been reimbursed in full for the Initial Expenditures plus fifty (50%) percent of all costs incurred by [the Rose Group] in connection with the 74-711 application to the New York City Landmarks Commission".[6]

157.    However, unlike the Lease, the Second Amendment was never approved by the New York State Supreme Court. Moreover, as of this point in time, the Attorney

---

[6] The Second Amendment defines "Initial Expenditures" as the monies ("approximately $2,500,000.00") the Rose Group spent "in connection with improvements made to the Premises in order to prepare the premises for the conduct of Tenant's business therein...."and "Additional Expenditures" as the monies ("approximately $5,000,000.00") "to make further improvement to the Premises in order to prepare the Premises for the conduct of [the Rose Group's] business therein...." Second Amendment at page 1.

General's Office has never received an application for court approval of the Second Amendment or any notice that such an application was made. As explained in the accompanying memorandum of law, agreements such as these must be approved by the Court. Insofar as the Second Amendment was not approved by the Court, nor has the Attorney General Office's ever received an application or notice of an application for court approval, it is not enforceable.

**(ii)    The Rose Group did not Comply with the terms of the Second Amendment**

158.    The Second Agreement explicitly conditions the Rose Group's "right to receive the payments" upon it "prosecuting the 74-711 Application ... through final appeal." The initial part of the 74-711 application has been abandoned at the Landmarks Preservation Commission. No application was ever submitted to the City Planning Commission. Therefore, the Rose Group cannot receive any reimbursement out of the sale of the premises and plaintiff is not required to sell the building. Thus, even if the terms of the Second Amendment are enforceable without the Supreme Court's approval, without fulfillment of the 74-711 application requirements, there is no right to reimbursement and therefore no need to sell the building.

**(iii)    Plaintiff's Unilateral Termination of the Geneva School's Rental of Space**

159.    Plaintiff does not explain the circumstances under which it terminated its relationship with the Geneva School, which rented space at the building. Plaintiff does not explain if it made any efforts to get more money from the Geneva School or sought in any way to renegotiate the terms of any agreement they had. Plaintiff does not state if it asked the Geneva School whether the School would contribute to the cost of any repairs to the building.

160.    Moreover, it appears that plaintiff unilaterally chose not to continue its agreement with the Geneva School, as plaintiff entered into the Lease with the Rose Group on January 31, 2006 before it notified the Geneva School by letter dated February 3, 2006 that it had to vacate the building in June.

161.    Then, over a year later after signing the Lease, plaintiff and the Rose Group executed the Second Amendment, which contains the onerous sale terms upon which plaintiff now relies in arguing irreparable harm. Plaintiff also does not explain if it explored other means that were available to it to avoid the "hardship" they claim in arguing irreparable harm. Therefore, it is unclear how, having entered into this Second Amendment on its own accord, plaintiff can now rely on it for its irreparable harm allegation. Clearly, the harm plaintiff now alleges is mostly of its own creation.

162.    In sum, plaintiff's claim of irreparable harm is not supported by the facts or the law.

## CONCLUSION

163.    For all of the reasons set forth in the accompanying memorandum of law, plaintiff's motion for an order granting a preliminary injunction should be denied in its entirety.

Dated:      New York, New York
            February 8 , 2008

                                    *Ave Maria Brennan*
                                    AVE MARIA BRENNAN (AB 7488)

- 59 -