in advance of the actual dates on which the Church will conduct its classes. Church Classes are customarily conducted in the Board Room on the fourth floor of the Premises and are usually scheduled for 9 am – 5 pm, Monday through Sunday. TENANT will have no access to the 4th floor during the pendency of the activities contemplated by this Section 35.1E and will temporarily relocate its offices to the basement to accommodate the Church on those dates and during the specified times.

        F.     Church Corporate or Organizational Meetings. The dates for certain of these meetings are mandated by LANDLORD's by-laws. They are the third Tuesday in May from 6 pm to 11 pm or 12 midnight. The fourth Tuesday in September from 6 pm to 11 pm or 12 midnight and the fourth Saturday in January from 12 noon to 6 pm. In addition, there is a church meeting every three years on the second Tuesday in November for the purpose of electing the church readers. The first such meeting during the term of this Lease will be on the Second Tuesday of November 2008. Such meetings will be conducted from 6 pm – 10 pm. All corporate meetings will require the use of the auditorium and the entrances to the Premises.

        G.     Occasional non-regularly scheduled events, association meetings, classes and special meetings of the Church may be scheduled from time to time at times mutually agreed upon by LANDLORD and TENANT. Since it is difficult or impossible to predict when such a meeting may be required, LANDLORD and TENANT agree to consult with each other in order to schedule such meetings (i) in a manner which causes no disruption to TENANT's scheduled events in the Premises and (ii) at such times as do not conflict with TENANT's reasonably anticipated use of the Premises.

      35.2    TENANT agrees that the auditorium of the Premises will be set up for Church services or related activities at all times when not being prepared or utilized for TENANT

functions. TENANT will set up the Premises for TENANT's use as soon as reasonably practicable prior to the time scheduled for TENANT's event and will restore the Premises to LANDLORD's use following each such event. Setting up the Premises for LANDLORD's use includes setting up at least 100 chairs and the podium and opening the curtains. TENANT will turn on the lights and HVAC system and remove the protective covering from the organ pit, if any, shortly prior to the time when the Church activity is scheduled to commence as set forth above, and will turn off the lights and HVAC system and cover the organ pit promptly after the Church activity is concluded. Any items (such as tables and excess chairs) stored by TENANT in the auditorium must be stored along the walls and appropriately covered and screened from sight. TENANT also agrees to set up the Sunday School each Sunday. All of the foregoing required to be done by TENANT hereunder will be done by TENANT at TENANT's sole cost and expense.

35.3    Both LANDLORD and TENANT acknowledge and agree that during the period when TENANT is renovating the Premises to make it ready for TENANT's permitted use, Church Services will be held in the basement area where the Sunday School Services are currently conducted. LANDLORD and TENANT will mutually agree on how the set-up for such services will be handled. The hours for such services will be the same as the hours set forth above. TENANT shall maintain the access to the temporary meeting space and the meeting space itself in a clean condition, free of dust, dirt and debris. During construction, TENANT shall notify LANDLORD as far in advance as is possible of any interruption of any utilities or other services.

35.4    TENANT acknowledges and agrees that the organ currently installed in the Premises is exclusively for the use of LANDLORD in connection with Church Services and

69

related activities. TENANT shall not have the use of the organ on any occasion whatsoever unless TENANT first receives LANDLORD's prior written consent and utilizes LANDLORD's organist or such other organist as is reasonably acceptable to LANDLORD in connection with any such use. TENANT acknowledges that it has been informed that the organ is a very sensitive and expensive musical instrument. TENANT will use due care in connection with its renovation of the Premises to protect the organ and all of its appurtenances including the pipes and bells wherever located throughout the Premises. TENANT also agrees to build a custom cover for the organ pit which will be put in place whenever the organ is not being used in connection with Church Services or related activities. Part of TENANT's duties in connection with setting up the Premises for Church Services will be to remove the cover from the organ and to replace the cover at the end of the Church Service. TENANT agrees to repair any damage to the organ which may be caused as a result of TENANT's alterations or TENANT's modifications of the Premises at any time during the term of this Lease.

35.5    TENANT understands and acknowledges that TENANT must respect LANDLORD'S privacy during all Church related activities. Specifically, TENANT agrees that it shall not enter any portion of the Premises or the Building or permit or allow any of TENANT's employees, principals, clients, guests, customers, suppliers or vendors to enter the Premises or the Building during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve services, Thanksgiving services, Association meetings, Church Corporate or Organizational Meetings and non regularly scheduled or special meetings of the Church (subject to Paragraph 35.1G above) (collectively, the "Church Related Activities"). During Church Classes no one other than the teachers and students will be permitted on the fourth floor of the Building.

35.6    TENANT acknowledges that a violation of the privacy of LANDLORD during church related activities is a serious and material default under this lease.  In addition, to the other remedies LANDLORD has for default under this Lease, LANDLORD shall have the right to seek an injunction to enjoin TENANT from any further violations of said Section 35.5.

35.7    LANDLORD understands and acknowledges that LANDLORD must respect TENANT's privacy during all TENANT related events.

## ARTICLE 36
## RIGHT OF FIRST REFUSAL

36.1    So long as the Rose Group Park Avenue LLC is the TENANT, if LANDLORD shall desire to sell the Building, LANDLORD shall notify TENANT in writing (an "Offering Notice") that LANDLORD intends to offer to sell the Building, prior to offering to sell the Building to any third party.  The Offering Notice shall set forth, among other things, the asking price and all other material terms and conditions of the proposed offer. In addition to the foregoing, in the event LANDLORD enters into a contract of sale in respect of the Building, promptly after entering into such contract with a prospective purchaser (the "Contract"), LANDLORD shall forward a copy of the executed Contract to TENANT.  TENANT shall have ten (10) business days from the date of TENANT's receipt of a copy of the Contract to notify LANDLORD that it elects to purchase the Building on the same terms and conditions specified in the Contract.  In such event, TENANT shall execute an agreement of sale substantially similar to the Contract.  Upon TENANT's failure or refusal to match such offer within ten (10) business days after receipt of a copy of the Contract from LANDLORD (the "ROFR Date"), LANDLORD shall be free to sell the Building to such third party purchaser in accordance with the terms and conditions of the Contract, provided that the sale is consummated within 270 days but not less than 180 days from the ROFR Date.  In the event of the sale of the Premises to such

71

third party purchaser is not consummated within such 270 day period in accordance with the terms of the Contract, then any sale of the Premises shall again be subject to TENANT's rights as set forth in this Article. This right of first refusal is personal to the Rose Group Park Avenue LLC and may not be assigned and shall not apply to any sale or transfer of the Building to another Christian Science Church. The LANDLORD acknowledges that TENANT's right to use and occupy the Premises is contingent upon such use being approved as accessory to the continued use and occupancy of the Building and the Premises by the Church for Church services and Church Related Activities, and that a sale to certain third parties (each, a "Non Qualified User") will jeopardize TENANT's right to continue to use the Premises for catering purposes. Accordingly, for the first full five calendar (5) years of the Term, LANDLORD shall not offer to sell the Building to a Non Qualified User and any attempt to do so will be null and void. Thereafter, so long as this Lease is in force and effect and the Rose Group Park Avenue LLC is the TENANT hereunder, if LANDLORD shall desire to sell the Building to a Non Qualified User and if TENANT chooses not to exercise its right of first refusal with respect to such a sale, simultaneously with the closing of such a sale this Lease shall terminate and LANDLORD or the prospective purchaser shall pay to TENANT an amount equal to the lesser of the net proceeds received by LANDLORD from the sale of the Building after paying all customary and reasonable closing costs and expenses or the sum of (i) the then value of TENANT's business as a going concern (the "Value"), and (ii) the unamortized costs incurred by TENANT relating to (A) TENANT's Work (as reflected on TENANT's books and records), (B) repairs, replacements and improvements to the Building (to the extent such costs are engineer allocated pursuant to a provision of this Lease, as allocated between LANDLORD and TENANT; to the extent such costs are not engineer allocated pursuant to a provision of this

72

Lease, then as reflected on TENANT's books and records), and (C) the balance of the costs incurred by TENANT in connection with the repair of the roof of the Building which have not been reimbursed to TENANT as set forth in Paragraph 5.4 above.

LANDLORD and TENANT shall negotiate in good faith to attempt to reach a mutually acceptable agreement regarding same. In the event that the parties are unable to agree as to the Value within thirty (30) days after TENANT has notified LANDLORD that TENANT will not so exercise TENANT's right of first refusal, then LANDLORD and TENANT shall each designate, as an arbitrator, a person or entity in the business of valuing businesses as on-going concerns. Each such person or entity designated by the parties shall have a minimum of ten (10) years experience in the New York Metropolitan area in the valuation of businesses in the food service and catering industry. The arbitrators selected by the parties shall attempt to agree on the Value, taking into consideration all relevant factors that would customarily be considered in making such a determination with respect to the sale of such a business in an arms length transaction where neither party is under any compulsion to either sell or purchase. Such factors shall include but need not be limited to: the earnings of TENANT derived from the Premises, adding back into net income interest, depreciation, amortization, nonrecurring costs and other appropriate adjustments, the earnings history of the TENANT at the Premises, TENANT's good will, the projected rate of growth of TENANT's earnings derived from the Premises, TENANT's market share in the Manhattan marketplace, the TENANT's client list and such other reasonable factors as the arbitrators shall determine. It is acknowledged and agreed that the LANDLORD intends to compensate TENANT for damages sustained by TENANT as the result of the sale of the Building to a Non Qualified User. In measuring the damages, the arbitrators shall consider such mitigating factors as the availability to TENANT of comparable replacement Premises, and

the cost thereof, in the vicinity of the Building. In the event that the arbitrators selected by each of the parties are unable to agree upon a Value, then each arbitrator shall state in writing and deliver to each of the parties the Value which said arbitrator has determined and then the arbitrators shall mutually select a third arbitrator who shall meet the same qualifications as the initial arbitrators selected by the parties. In the event that the two arbitrators selected by the parties shall fail to agree on the choice of the third arbitrator within ten (10) days after said arbitrators have delivered their determinations of Value, then both parties shall apply to the American Arbitration Association or any successor thereto to designate the third arbitrator. The third arbitrator appointed by the arbitrators selected by the parties or by the American Arbitration Association of the City of New York or its successor, as the case may be, shall conduct such hearings and investigations as said arbitrator may deem appropriate and shall, within thirty (30) days after being designated, determine the Value for TENANT's business, which shall not be lower than the lowest value determined by a parties' arbitrator nor higher than the highest value determined by a parties' arbitrator. Such determination by the third arbitrator shall be binding upon LANDLORD and TENANT. Each party shall pay its own counsel fees and expenses in connection with any arbitration under this clause and the parties shall share equally all other expenses and fees of any such arbitration.

36.2    LANDLORD or TENANT at both parties' mutual cost and expense, at any time after the first five (5) full calendar years of the term, may apply for a special use permit which, if granted, would permit the use of the Building as a catering facility. The foregoing notwithstanding, the party obligated to do so by law shall make the application to the applicable authorities, it being agreed that TENANT shall be obligated to take all steps reasonably necessary to facilitate the process. The parties shall cooperate with and assist each other in

74

seeking the special use permit. Thereafter, if the special use permit is granted and the

TENANT's use of the Building as a catering facility would not be jeopardized by a sale of the

Building by LANDLORD, then LANDLORD may sell and offer to sell the Building (subject to

TENANT's right of first refusal and subject to this Lease) without being obligated to pay

TENANT any sum for the Value of TENANT'S business. The parties agree that if TENANT

shall exercise its right of first refusal and acquire the Building, TENANT shall, at closing,

reimburse LANDLORD for LANDLORD'S share of the costs to acquire the special use permit.

Similarly, if TENANT does not exercise its right of first refusal and the Building is acquired by a

third party, LANDLORD shall, at closing, reimburse TENANT for TENANT'S share of the cost

to acquire the special use permit.

## ARTICLE 37
## STRUCTURAL REPAIRS

37.1    A.    Notwithstanding anything contained elsewhere in this Lease to the

contrary, in the event that during the term of this Lease structural repairs or capital repairs or

replacements are required for any portion or component or system of the Premises (a "Capital

Repair"), all such required repairs shall be performed by LANDLORD and TENANT with the

cost therefor apportioned between LANDLORD and TENANT as set forth in Section 37.1.B.

B.    If the need for such a Capital Repair has been determined and the scope of

the repair has been established, the parties shall endeavor in good faith to allocate the costs of the

repair or replacement, including all incidental costs, in a fair and equitable manner bearing in

mind the balance of the Term (assuming TENANT shall not exercise its right(s) to extend)

remaining, the realistic (not pursuant to the Internal Revenue Code) useful life of the repair or

replacement to be made and the effect on the component of the Premises to be repaired or

replaced caused by the manner, extent and type of use of the Premises by LANDLORD and

TENANT. In the event that the parties are unable to agree upon an equitable allocation of the cost of the repair, the parties shall retain as an arbitrator an engineer possessing skills in the area of the structural component requiring repair or replacement, said engineer to have a minimum of ten (10) years experience in the City of New York directly involving structural components similar to the structural component of the Premises requiring repair or replacement. In the event that the parties are unable to agree on an engineer to act as arbitrator, both parties shall apply to the American Arbitration Association of the City of New York for the appointment of an engineer possessing the qualifications set forth above. The engineer appointed either by the parties or by the American Arbitration Association shall, within thirty (30) days of his or her appointment, receive submissions from LANDLORD and TENANT concerning the position of each party on the allocation of the cost of the subject repair or replacement. The engineer shall then determine the fair and equitable allocation of the cost of said repair or replacement between LANDLORD and TENANT taking into consideration all of the factors set forth above. The decision of the engineer acting as arbitrator shall be conclusive, final and binding to the parties hereto. The repair shall be completed and paid for by TENANT and LANDLORD with the cost apportioned and paid consistent with the determination of LANDLORD and TENANT or the arbitrator, as the case may be. If at the time of the incurring of such cost, TENANT shall not have exercised either or both of its options to extend the term of this Lease, and thereafter TENANT shall exercise such option or options, within thirty (30) days following the expiration of the Lease, TENANT shall remit to LANDLORD such portion of the cost paid by LANDLORD which is attributable to the five (5) or ten (10) year extension of the Term, as the case may be together with interest thereon at the Interest Rate.

76

## ARTICLE 38
## PREVAILING PARTY FEES

38.1    In the event of any litigation, arbitration, or other dispute between the parties regarding this Lease, any Lease provision or the Premises, the prevailing party in any such litigation shall be entitled to reasonable attorneys' fees and disbursements and court costs. All of the sums paid or obligations that are incurred by either party as aforesaid, shall be paid to the other party within thirty (30) days after demand accompanied by appropriate evidence of same.

## ARTICLE 39
## FORCE MAJEUR

39.1    In the event LANDLORD or TENANT shall be delayed, hindered or prevented from the performance of any act required under this Lease (except for the payment of Rent), by reason of governmental restrictions, scarcity of labor or materials, strikes, fire or any other reason beyond its reasonable control, the performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for the period necessary to complete performance. If LANDLORD or TENANT is delayed as hereinabove provided during the Term of this Lease, the party so delayed shall not be liable to the other for any losses or damages resulting therefrom.

## ARTICLE 40
## COMPLETION OF TENANT WORK

40.1    TENANT covenants to use commercially reasonable efforts to complete TENANT Work as promptly after the Commencement Date as possible. TENANT agrees to open for business in the Demised Premises promptly upon completion of TENANT Work.

## ARTICLE 41
## AFFILIATE TRANSFERS

41.1    Notwithstanding anything contained in this Lease to the contrary, the parties agree that a merger, reorganization or consolidation of TENANT shall not be deemed an assignment of this Lease provided that same is done for a bona fide business purpose and not merely to accomplish a transfer of this Lease.  Any partner or member of TENANT shall have the right to transfer its interest (all or part), through death or otherwise, to any family member of such partner or member.  However, a change in control of TENANT outside of the Rose family shall be considered an assignment of this Lease and shall require LANDLORD's consent, in accordance with the provisions of Article 22 of this Lease.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the day and year first above written.

**LANDLORD, Third Church of Christ, Scientist**

BY: _____ Chairman

_____, Vice CHAIRMAN

**TENANT, Rose Group Park Avenue LLC**

BY: _____

1-31-06

**EXHIBIT A**

**SITE PLAN**

**EXHIBIT B**

**LANDLORD'S WORK LETTER**

**None**

# EXHIBIT C

# TENANT IMPROVEMENTS WORK

1. Upgrade all power and wiring systems as necessary for TENANT's use

2. Upgrade one entrance to the building to make entrance handicapped accessible as required by law

3. Upgrade all restrooms to make one of said restrooms handicapped accessible as required by law

4. Install a new telephone/communication system

5. Upgrade or replace the existing heating, ventilating and air-conditioning systems as required for the operation of TENANT's business in the Premises

6. Remove and store off-site all pews on the main floor of the auditorium and the first (lowest) row of pews in the balconies. Pews are to be reinstalled upon the termination or expiration of the Lease unless TENANT, at TENANT's option, elects to replace the pews with ones of substantially similar design and quality upon the termination of the Lease.

7. Install a new lighting system as required to meet the needs of TENANT's business and which will also facilitate use of the Building as a Church

8. Install two (2) new signs on the exterior of the Premises one on Park Avenue above the cornerstone and the other on the left side of the 63rd Street entrance to be electronically controlled from an office in the Premises. The signage shall identify the Premises as the Third Church of Christ, Scientist at all times except on those occasions when tenant is utilizing the Premises for the purposes permitted pursuant to this Lease or for actively marketing the Premises for a third party event. Marketing shall not be done during Church services or activities (except for classes). Install a new sign over the center front door on the Park Avenue center front of the Building.

9. If TENANT shall so elect construct on the North side of the lower level a VIP and/or bridal suite with adjoining bathroom for the sole and exclusive use of TENANT.

10. Upgrade cosmetically the existing bathrooms in a manner consistent with the current fixtures in the existing men's room to the extent reasonably possible

11. Install a complete banquet kitchen and prep-kitchen and all associated equipment

12. Install a dumb-waiter to connect the lower level with the sidewalk (at TENANT's option). TENANT shall have the right and license to utilize the dumb-waiter, subject only to the rights of the City of New York.

13. Level the floor in the auditorium and remove the existing heat and ventilation ducts above the floor

14. Re-carpet the auditorium

15. Cosmetically upgrade and refurbish the Board Room

16. Install TENANT's offices in the current Literature Distribution Room (the skylight room) with an option to expand that office space into the adjacent attic space on the fourth floor

17. Re-paint the auditorium, fourth floor hallway and, where necessary, other public areas used by TENANT's clients in the Premises and repair all existing damage within the auditorium

18. Install a new Sunday School Office and Nursery to replace the existing facilities which will be displaced by the new kitchen facilities. The size and location to be mutually agreed upon. However, there shall be a door providing direct access to the Sunday School area.

19. Construct a new Literature Distribution/Committee room and Treasurer's office for LANDLORD in the attic adjacent to existing Board Room to replace storage space and Literature Distribution Room being converted to TENANT's office space.

20. Install a door on fourth floor to separate Church office area from TENANT's office area.

C-2

**EXHIBIT D**

**LANDLORD'S ARCHITECTURAL PLANS FOR LANDLORD'S WORK**

**None**

# EXHIBIT E

## PRELIMINARY LAYOUT DRAWINGS





E-2