# Exhibit L

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

FACSIMILE

(212) 599-1759

March 12, 2007

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL
STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER

## VIA ELECTRONIC MAIL & OVERNIGHT MAIL

Christopher Santulli, PE
Manhattan Borough Commissioner
New York City Department of Buildings
280 Broadway
New York, NY 10007

> 583 Park Avenue (the "Premises")
> Block 1398 – Lot 0001
> Job No. 104511495

Dear Commissioner Santulli:

As we have previously advised, this office represents 580 Park Avenue, Incorporated, and 570 Park Avenue Apartments, Inc, the cooperative apartment corporations that own 580 Park Avenue and 570 Park Avenue, respectively. We refer to our letters of January 9, 2007, January 16, 2007 and January 18, 2007, copies of which are enclosed.

We write to formally request the revocation of all permits and approvals related to the above job number including, without limitation, the permit for a change of use.

As we previously advised you, our clients believe that the proposed change in use is in violation of law. Since our prior letters, we have received additional information which we believe makes that even clearer. Specifically, we call to your attention a Confidential Private Placement Memorandum (the "Memorandum") filed with the New York State Attorney General and dated September 29, 2006. This was filed in connection with an offering to potential investors in Rose Group Park Avenue LLC (the "Rose Group"), the commercial caterer leasing the Premises. Relevant extracts from the Memorandum are annexed as Exhibit "A." The Memorandum establishes that the applicant is attempting to establish a commercial catering establishment, essentially a "Use Group 9" commercial use, in an R-10 Park Improvement District and that such use can in no way be considered "accessory."

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 2 of 5

In our prior letters we discussed the application for a change of use, the description of the proposed use, and the notation by Commissioner Osorio concerning that use. On March 5, 2007, we became aware, for the first time, of an additional letter and your notation concerning use. That letter was not in the file when we initially examined and reproduced same.

That letter, dated June 6, 2006, a copy of which is annexed as Exhibit "B," represents that the use by the caterer was to be for "limited periods," that the caterer was operating "under contract with the Church," that the functions were "ancillary," and that the "functions will be restricted by contract." On the basis of those representations, you agreed to "accept catered events under contract with the Church as complying with 'accessory Social Hall' requirements of April 10, 2006 determination by L. Osorio."

We submit that the Church's characterization is disingenuous. First, as discussed below and set forth in the contemporaneous liquor license application, the so-called contract with the caterer is actually a thirty (30) year <u>lease</u> (a twenty (20) year term with two (2) five year renewal options) for the premises. The difference between a contract with restrictions and a thirty (30) year lease is staggering. Among other things, a lease is an interest in real estate.

Second, the suggestion that the church building would be utilized by the caterer only "for limited periods" is simply wrong. The Memorandum describes the operation of the Premises. Nowhere is there a mention of restrictions.[1] Nowhere is there mention of use only for limited periods – except for limited Church use. Indeed, there is barely a mention of Church use. Most importantly, page 13 of the Memorandum states that "[t]he Company has entered into a Lease for the Facility Space, which permits <u>the current congregation to use the Facility Space on a limited basis at times when the Company is not using the Facility Space."</u> [Emphasis added] When read in the context of the statement on the same page that the Church only has forty members "and only a few of these members participate in the Church's Wednesday and Sunday services," it is clear that the use by the Church is extremely limited and that the use by the caterer is the primary use.

This is reinforced by the advertisements on the website of LocationsMagazine.com, which refer to the availability of the Premises every night of the week. We enclose as Exhibit "D" copies of the original listing and the modified listing; this modification was posted only <u>after</u> our clients raised the issue concerning the proposed maximum size of events as 2500. The maximum size is now described as 1000.

_____

[1] Notably, the offeror, the Rose Group, is listed on the application for a change of use as the general contractor; we annex as Exhibit "C" the relevant printout from BIS evidencing this.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 3 of 5

Nor has the Church "provided for various catered events" or are the Rose Group's events "ancillary" to events sponsored by the Church as stated in the June 2nd letter. The Memorandum describes the types of events (see page 14). None relate to the Church. Instead, there are a myriad of corporate, individual and charity functions listed. Clearly, it is the Rose Group, the tenant, that will exclusively provide for these catered events. The Church has no role or participation in providing for such events.

We believe that documents submitted to two separate governmental agencies, i.e., the Memorandum filed with the Attorney General, and the June 2nd letter submitted to your Department, both of which presumably have been certified as true, are totally inconsistent. They cannot both be correct. We believe that this inconsistency requires immediate revocation of all permits.

Moreover, the described catering use is no way consistent with your notation on the June 2, 2006 letter. Your note relates to "catered events under contract with the Church." As described in the Memorandum, there will be no catered events under contract with the Church. The catered events are to take place under contracts between the Church's tenant, the Rose Group, and the individual or entity having the event. Unlike the typical arrangement where a religious institution has an in-house caterer, but the contract is with the institution and includes rental of the institution, the Church is not a party to such contract. In fact, as discussed below, the Church has made efforts to disassociate itself from the events because liquor will be served.[2] For this reason, too, the permits should be revoked.

While we recognize that the inquiry into whether a use is an accessory use is often a fact-intensive inquiry, we believe, that based on the documentary evidence before you, this use cannot under any circumstances be viewed as an accessory use. We enclose copies of two recent BSA decisions involving Yeshiva Imrei Chaim Viznitz (the "Yeshiva case") involving similar issues. In those decisions, the BSA upheld the DOB view that the catering use was not accessory. As those decisions make clear, the DOB and the BSA look at, among other things, intensity and frequency to determine whether the use is an accessory use. Here, the Memorandum makes clear that the primary user of the premises is the caterer.

Moreover the Memorandum makes clear that the attraction of the space is the potential intensity – that it can accommodate over 500 people. Thus, on page 13 it states "[t]he Company believes that the beauty and grandeur of the building located at 583 Park Avenue, New York, New York (the 'Facility Space'), its ability to handle over 500 people, and the prestigious location on Park Avenue represents a unique business opportunity." On page 15, the Rose Group states that "[t]he Facility Space will be one of the few properties in and around its location that can accommodate seated dinners with

---

[2] Christian Scientists, we understand, do not partake of alcohol.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 4 of 5

over 500 guests." See also page 3. This is far greater than the intensity of the use in the Yeshiva case. In that case, the use was for approximately 400 guests.

As to frequency, the Rose Group has represented it will hold approximately two to three events per week on average, but acknowledges it could be more. It has acknowledged that it will likely hold events almost every night in December. Given the financial pressures created by the involvement of investors pursuant to the Memorandum, the Rose Group has every incentive to have as many events as possible. The website listing at LocationsMagazine.com makes clear that the Premises is available every night. We understand the Premises has already been booked for a number of events. And, while the use in the Yeshiva case included use for the synagogue, the use here, which involves liquor, weddings and bar mitzvahs, none of which are part of Christian Science, will not be used at all by the members of the Church. In fact, the Church currently has an application pending with the Landmarks Preservation Commission for permission to put a block over the entrance to the building to cover the name of the Church, since presumably it does not want to be associated with events at which alcohol is served.

Indeed, even if the Church used the Premises for events, given that the Memorandum states the membership is now 40, it would certainly be a very small number of events.[3] Notably, in the Yeshiva cases, that at least 50% of the events were not related to the Synagogue or School was one of the factors that led to the determination that the use was not accessory.

In the Yeshiva cases, the BSA also noted that the Zoning Resolution "does not anticipate that primary uses can normal qualify as accessory uses." Yet what is planned here is clearly a commercial catering establishment, a primary use under Use Group 9.

Finally, as noted in the Yeshiva cases, the hours of operation are relevant. Here, the catering use will only be when the Church is not using the premises. The uses are mutually exclusive. That in and of itself is one of the clearest indicia that this is not an accessory use.

We believe the foregoing establish that the contemplated use is neither consistent with the representations to you nor an accessory use under Zoning Resolution 12-10. The uses are unrelated and only share a building.

---

[3] In the Yeshiva cases the Board noted that the DOB also looks to the "relationship between the size of the membership of the religious entity and the size of events." Here, with only forty members, it is hard to imagine why or how events of over 500 would be warranted.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 5 of 5


       The construction continues to go forward; in fact, we have reason to believe that it is or will soon be substantially complete. Where the evidence is clear – for the Rose Group cannot disclaim its own filing with the Attorney General - there is no point in delaying the revocation of permits.

       For all the foregoing reasons, we respectfully request that any permits and approvals issued to date be immediately revoked.

       Thank you for your consideration.


       Respectfully,

       KURZMAN KARELSEN & FRANK, LLP

       Phyllis H. Weisberg

PHW:alj
Encls.

cc:    Mona Seghal, Esq. (via overnight mail)
       Benjamin Colombo, Manhattan IGA Liaison, Executive Assistant to Borough
         Commissioner (via overnight mail)
       David G. Liston, Chair, Community Board 8 (via overnight mail)
       Terry Slater, Co-Chair, Zoning and Development Committee, Community Board 8
         (via overnight mail)
       Elaine Walsh, Co-Chair, Zoning and Development Committee, Community Board 8
         (via overnight mail)
       Hon. Liz Krueger (via overnight mail)
       Hon. Jonathan Bing (via overnight mail)
       Hon. Scott Stringer (via overnight mail)
       Hon. Dan Garodnick (via overnight mail)
       Board of Directors, 580 Park Avenue, Incorporated (via electronic mail)
       Board of Directors, 570 Park Avenue Apartments, Inc. (via electronic mail)

181018.1

Exhibit A

NYSOAG Real Estate Financing Bureau: Form 99: Notification Filing          http://207.198.35.22:84/investors/form99.html

File # S 31-66-61

**FORM 99**

# STATE OF NEW YORK DEPARTMENT OF LAW
## BUREAU OF INVESTOR PROTECTION AND SECURITIES // REAL ESTATE FINANCING BUREAU
## NOTIFICATION FILING

**Pursuant to National Securities Markets Improvement Act of 1996 ("NSMIA")**

[✓] Submission to: INVESTOR PROTECTION AND SECURITIES BUREAU ("IPS")
    [✓] Securities
    [ ] Theatrical Syndications

[ ] REAL ESTATE FINANCING BUREAU ("REF")

Type of Filing:
    [✓] New Filing
    [ ] Amendment or Renewal (If name, address or offering has changed, indicate change):

## A. BASIC IDENTIFICATION DATA

Full Name of Issuer (and Theatrical Production company, if applicable): Rose Group Park Avenue LLC

Address of Executive Offices:     Telephone Number (212) 583 - 7200

| 583 Park Avenue | New York | NY 10021 |
|---|---|---|
| (Number and Street) | (City or Town) | (State & ZIP) |

**Type of Organization:**

| | | |
|---|---|---|
| [ ] business corporation | [✓] limited liability company | [ ] limited partnership |
| [ ] not-for-profit corporation | [ ] business trust | [ ] political subdivision of state |
| [ ] common fund | [ ] state agency or authority | [ ] other (specify): |
| [ ] county, city, town or village | ( [ ] agency, authority or instrumentality corporation) | |

**Category of "Covered Security" (NSMIA):**

    [ ] Offering to "Qualified Purchasers" [1933 Act* §18(b)(3)]
    [✓] Rule 506 Offering [1933 Act* § 4(2) - per §18(b)(4)(D)]
    [ ] Other qualifying offering (specify):
* Securities Act of 1933, as amended

**The Securities Will Be Sold By:**

6/27/00 10:24 AM

[✓] officers or directors of issuer        [   ] salespersons employed by issuer

[   ] officers or directors of an affiliated    [   ] underwriter, dealer or broker registered in New
person                                          York

**For Theatrical Syndication Offerings, add the following information:**
Name of proposed production:
Location of production:
Proposed opening date:

## B. INFORMATION ABOUT OFFERING

Total Offering Amount (maximum) $ 5,000,000 ___ Minimum Offering Amount
$ 3,000,000

**Type of Security Offered (brief description):**

**Enclosures (add additional sheets if necessary):**
[✓] Copy of Consent to Service of Process (original to Department of State, Albany NY)
[✓] Offering Documents
[✓] Confidential Attachment to Form 99
[   ] Further information as to [   ] issuer [   ] affiliated persons
[✓] Form D, with Part D (State portion), plus: [   ] copy "as filed" with the S.E.C. " [✓]as
filed" copy will follow
[   ] Theatrical Venture Amendment - Required Supplemental Information

## C . INFORMATION ABOUT ISSUER, PRINCIPALS AND CONTROLLING PERSONS

**As to issuer:**

| | |
|---|---|
| 1. Is issuer subject to, or a respondent in any legal action for, any injunction, cease-and-desist order or order or stipulation to desist or refrain from any act or practice relating to the offering of securities in New York or any other jurisdiction? | [   ] Yes  [✓] No |
| 2. (a) Has issuer ever been convicted of or pleaded guilty to any crime (i) involving any fraud, or (ii) relating to any financial transaction or handling of funds of another person, or (iii) pertaining to any dealings in any securities? | [   ] Yes  [✓] No |
| 2. (b) Is issuer now a defendant in any such criminal proceeding ? | [   ] Yes  [✓] No |

**As to each Principal\*, each Controlling Person, and any Sponsoring Entity of issuer:**

NYSOAG Real Estate Financing Bureau: Form 99: Notification Filing                    http://207.198.35.22:84/investors/form99.html

| | |
|---|---|
| 3. Is any one of the above subject to or a respondent in any legal action for, any injunction, cease-and-desist order or order or stipulation to desist or refrain from any act or practice relating to the offering of securities in New York or any other jurisdiction? | [ ] Yes   [ ] No |
| 4. (a) Has any one of the above ever been convicted of or pleaded guilty to any crime (i) involving any fraud, or (ii) relating to any financial transaction or handling of funds of another person, or (iii) pertaining to any dealings in any securities? | [ ] Yes   [ ] No |
| 4. (b) Is any one of the above now a defendant in any such criminal proceeding ? | [ ] Yes   [ ] No |
| 5. Has any of the above ever been suspended or expelled from membership in any securities or commodities exchange or association or had a securities or commodities license or registration denied, suspended or revoked? | [ ] Yes   [ ] No |
| 6. Has any of the above been a controlling person or sponsor with respect to any issuer which engaged in a distribution of securities or any public offering within the past three (3) years? | [ ] Yes   [ ] No |

If the answer to any of the above is "yes", give material facts on an attached sheet.
* Capitalized terms are defined in Section E of Form 99.

## D. CERTIFICATION

The undersigned affirms and certifies, to his or her knowledge and belief after due investigation and inquiry, and under penalty of perjury, that any and all information provided in this Form 99 is true and complete, and that there are no misrepresentations, omissions or untruths contained herein. The undersigned further understands and intends that the information supplied in this Form will be relied upon by the New York State Department of Law and that any false statement made herein is punishable as a Class A misdemeanor under New York Penal Law §175.30, §210.45, or both.

Dated: October 13 , 20 06

Issuer (name of entity) : Rose Group Park Avenue LLC

By: _____
Authorized Principal or Controlling Person

Louis Rose, Managing Member of 583 Park LLC,
Company Manager
Print Name & Title or Affiliation

10/13/06

Angela A. Russo

ANGELA A. RUSSO
Notary Public, State Of New York
No. 01RU6044882
Cert. Filed In Queens County
Term Expires July 17, 2006 2010

## CONFIDENTIAL ATTACHMENT TO FORM 99

Issuer Name:  Rose Group Park Avenue LLC

NYSOAG Real Estate Financing Bureau: Form 99: Notification Filing                                    http://207.198.35.22:84/investors/form99.html

Form 99 dated: October_____, 20 06

## ACCESS TO THE FOLLOWING INFORMATION WILL BE WITHHELD PURSUANT TO NEW YORK PUBLIC OFFICERS LAW ("FOIL") §89(2)(b):

Identity of Principals (i) of issuer, (ii) of Controlling Person(s)* and (iii) of Sponsoring Entity:

| Name | Date of Birth | Social Security Number |
|------|---------------|------------------------|
| 583 Park LLC | 10-19-06 | 20-5758308 |
| Louis Rose | ▓▓▓▓▓▓ | ▓▓▓▓▓▓▓▓ |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*Capitalized terms are defined in Section E of Form 99.

## E. INSTRUCTIONS

### 1. General Instructions.

**Who May File:**

All persons engaging in an offering of or transaction in securities within or from New York which are defined as "covered securities" (other than "listed securities" or open-end management type companies registered with the S.E.C. under the Investment Company Act of 1940) under §18 of the 1933 Act as amended by NSMIA. No filing is required for listed securities. Open-end management type companies registered within the S.E.C. under the Investment Company Act of 1940 must file Form NF; other registered investment companies may file Form NF instead of Form 99.

An issuer which may be entitled to submit a Notification Filing for real estate securities may elect instead to submit to REF a filing under New York General Business Law ("GBL") §352-e or an exemption application under GBL §352-g

or §359-f(2) pursuant to Policy Statements 100, 101, 102, 103 or 104. An issuer which may be entitled to submit a Notification Filing for other securities may elect instead to file with IPS an M-11 Issuer Statement under GBL §359-e or an application for exemption under §359-f(2), or in the case of theatrical productions, a filing under New York Arts and Cultural Affairs Law ("ACAL") 23.03 et seq. Theatrical ventures must also file, within ten (10) business days of the occurrence, a supplemental statement (in the form of an Amendment to Form 99) advising IPS of the (i) date of the first expenditure of investors' funds and (ii) date of the last public performance, if any, of the original production in New York State.

A request for a "No-Filing Required" letter under Policy Statement 105 (revised 1997) may also be submitted, when the issuer seeks a confirmation by the Department of Law ("DOL") that no Notification Filing is required for the proposed offering or transaction. Such request should be made under the No-Filing Category entitled: "(7) Covered Securities or Transactions Pursuant to NSMIA".

**Where To File: Address for both bureaus - 120 Broadway, 23rd Floor, New York, NY 10271**

(a) **IPS if:**

    i.  within New York General Business Law ("GBL") §359-e
    ii.  exemptible under GBL §359-f(2) and not within clause (v) below
    iii.  within ACAL §23.03 etseq

**REF if:**

    iv.  real estate securities or other securities deemed within purview of GBL §352-e or §352-g
    v.  real estate securities exemptible under GBL §359-f(2), including governmental issuers and debt instruments secured by or resting upon revenues, earnings or proceeds of resale or disposition of real estate

**When To File:** Prior to any sale or offer for sale of securities in or from New York. For theatrical ventures, supplemental statements are required within ten (10) business days of the occurrence, advising DOL (in the form of Amendment to Form 99) of (i) date of the first expenditure of investors' funds and (ii) date of the last public performance, if any, of the original production in New York State.

**Copies Required:** Two (2) copies of Form 99 must be filed, one of which must be manually signed, along with a photocopy of the manually signed copy. One (1) copy of the Offering Documents must also be filed

**Information Required:** A new filing must contain all information requested. Amendments require only notification of changes with respect to information given in Form 99.

**Form D:** In addition to Form 99, submit a copy of Form D as filed. In the event that form D has not yet been filed with the S.E.C., submit a copy of the unfiled Form D (including Part D), and provide information as to when such filing will be effected ("as filed" copy must be submitted when so filed).

**Non-Resident Issuers:** Consent to Service of Process must be filed with the Department of State, 41 State Street, Albany, NY 12231; a copy must be filed with Form 99.

**Effect of Filing:** A Notification Filing is deemed made when received at the address given on Form 99. In the event that the information given in the Notification Filing is incomplete, or conflicts with or is otherwise inconsistent with other information in the possession of DOL, the issuer will be notified. Notification Filings shall not be effective for the following offerings or transactions:

 a. Any offering wherein the issuer, or its Controlling Person(s) or its Sponsor(s), or one or more of its Principals, or one or more principals of a Controlling Person or a Sponsor (i) are, or during the past six years have been, enjoined from the offer or sale of securities within or from the State of New York, or (ii) have entered into a stipulation or consent, which remains currently in effect, to desist or refrain from making offers of sales of securities within or from the State of New York unless and until the Attorney General makes a determination that these facts or circumstances do not appear to amount to a violation of such prior judgment, order or stipulation, or do not themselves constitute a violation of GBL Article 23-A, or that such action as to the Form 99 filing is not necessary to protect the public interest; and

 b. Any offering which involves the purchasers' rights to occupy or utilize real estate or facilities which constitute cooperative interests in realty or a User Syndication requiring a full filing under GBL §352-e.

## 2. Definitions.

The terms set forth below shall be defined as follows for purposes of completing this Form 99:

 a. **Controlling Person** shall mean: Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under §11 or §12 of the 1933 Act, as amended.

 b. **Offering Documents** shall mean: Any printed materials in which is presented, without limitation, the terms of the transaction, a description of the securities offered, the operative documents for the entity which may be formed, any supporting documents and/or the subscription instruments for the investor.

c. **Principal** or **principals** shall mean: One or more (i) general partners of a partnership, (ii) managing members of a limited liability company, (iii) trustees of a trust, (iv) managing directors of an association or other organization, (v) directors of a corporation who hold or control 10% or more of its voting shares or who are also officers, (v) the six highest-ranking officers of a corporation, association or similar entity, including the chief executive officer, the chief operating officer, the chief financial officer, the chief legal officer, and the three highest-ranking vice-presidents (including any previously referred to), (vi) individuals or entities holding 33% or more of the voting equity interest in an entity, **and/or** (vii) individuals who have the status of a person in one or more of the previous clauses with respect to any entity that itself is a principal of the issuer.

d. **Sponsor** or **Sponsoring Entity** shall mean: One or more individuals or entities (i) for whose account or benefit, indirect or otherwise, an issue of securities or an issuer has been created or originated, or (ii) who or which has a proprietary interest in and who directs or takes an active role in the creation, origination or promotion of the issuer or in the acquisition of business activities, business property or investment portfolio items thereof, <u>but excluding</u> attorneys, accountants, engineers, architects, appraisers, real estate brokers, property managers or other contractors or professionals performing services for contractual compensation.

e. **User Syndication** shall mean: Any offering of real estate securities wherein the investors (i) will be entitled to occupy a portion of the issuer's real property, or (ii) will be privileged to utilize the issuer's property or facilities, as members or participants (and not as members of the general public).

**3. Filing Fees:** Payment should be made by check or money order to "New York State Department of Law" in accordance with GBL §352-e(7)(a) and §359-e(5), or the following schedule may be used:

**FORM D**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Expires: | |
| Estimated average burden | |
| hours per response......16.00 | |

# FORM D

## NOTICE OF SALE OF SECURITIES
## PURSUANT TO REGULATION D,
## SECTION 4(6), AND/OR
## UNIFORM LIMITED OFFERING EXEMPTION

| SEC USE ONLY | |
|---|---|
| Prefix | Serial |
| DATE RECEVED | |

**Name of Offering**   ( ☐ check if this is an amendment and name has changed, and indicate change.)
Rose Group Park Avenue LLC

**Filing Under** (Check box(es) that apply):   ☐ Rule 504   ☐ Rule 505   ☑ Rule 506   ☐ Section 4(6)   ☐ ULOE

**Type of Filing:**   ☑ New Filing   ☐ Amendment

---

### A. BASIC IDENTIFICATION DATA

**I.**   Enter the information requested about the issuer

**Name of Issuer**   ( ☐ check if this is an amendment and name has changed, and indicate change.)
Rose Group Park Avenue LLC

| Address of Executive Offices          (Number and Street, City, State, Zip Code) | Telephone Number (Including Area Code) |
|---|---|
| 583 Park Avenue, New York, NY 10021 | |
| Address of Principal Business Operations          (Number and Street, City, State, Zip Code)<br>(if different from Executive Offices) | Telephone Number (Including Area Code) |

**Brief Description of Business**
Operation of an elegant ballroom and event space capable of handling events for over 500 people in New York City, New York

**Type of Business Organization**

☐ corporation          ☐ limited partnership, already formed          ☑ other (please specify):
☐ business trust          ☐ limited partnership, to be formed                   Limited liability company

| | Month | Year | | |
|---|---|---|---|---|
| Actual or Estimated Date of Incorporation or Organization: | 0 1 | 0 6 | ☑ Actual | ☐ Estimated |

Jurisdiction of Incorporation or Organization: (Enter two-letter U.S. Postal Service abbreviation for State;
CN for Canada; FN for other foreign jurisdiction)   N Y

### GENERAL INSTRUCTIONS

**Federal:**

*Who Must File:* All issuers making an offering of securities in reliance on an exemption under Regulation D or Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

*When To File:* A notice must be filed no later than 15 days after the first sale of securities in the offering. A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due, on the date it was mailed by United States registered or certified mail to that address.

*Where To File:* U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

*Copies Required:* Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

*Information Required:* A new filing must contain all information requested. Amendments need only report the name of the issuer and offering, any changes thereto, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B. Part E and the Appendix need not be filed with the SEC.

*Filing Fee:* There is no federal filing fee.

**State:**
This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form. Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made. If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form. This notice shall be filed in the appropriate states in accordance with state law. The Appendix to the notice constitutes a part of this notice and must be completed.

---
### ATTENTION

**Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption unless such exemption is predictated on the filing of a federal notice.**

Persons who respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB control number.

**A. BASIC IDENTIFICATION DATA**

2.   Enter the information requested for the following:

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer.
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☑ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
583 Park LLC

Business or Residence Address    (Number and Street, City, State, Zip Code)
583 Park Avenue, New York, NY 10021

| Check Box(es) that Apply: | ☐ Promoter | ☑ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
Rose, Herbert

Business or Residence Address    (Number and Street, City, State, Zip Code)
583 Park Avenue, New York, NY 10021

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Business or Residence Address    (Number and Street, City, State, Zip Code)

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Business or Residence Address    (Number and Street, City, State, Zip Code)

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Business or Residence Address    (Number and Street, City, State, Zip Code)

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Business or Residence Address    (Number and Street, City, State, Zip Code)

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Business or Residence Address    (Number and Street, City, State, Zip Code)

(Use blank sheet, or copy and use additional copies of this sheet, as necessary)

**E. INFORMATION ABOUT OFFERING**

|  |  | Yes | No |
|---|---|---|---|
| 1. | Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering? | ☐ | ☒ |

Answer also in Appendix, Column 2, if filing under ULOE.

2. What is the minimum investment that will be accepted from any individual? ........................................ $ 500,000.00

|  |  | Yes | No |
|---|---|---|---|
| 3. | Does the offering permit joint ownership of a single unit? | ☒ | ☐ |

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) ........................................................ ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) ........................................................ ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) ........................................................ ☐ All States

| AL | AK | AZ | AR | CA | CO | CT | DE | DC | FL | GA | HI | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO |
| MT | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA |
| RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY | PR |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

## OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

1. Enter the aggregate offering price of securities included in this offering and the total amount already sold. Enter "0" if the answer is "none" or "zero." If the transaction is an exchange offering, check this box ☐ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | Aggregate Offering Price | Amount Already Sold |
|---|---|---|
| Debt | $_____ | $_____ |
| Equity | $_____ | $_____ |
| ☐ Common   ☐ Preferred | | |
| Convertible Securities (including warrants) | $_____ | $_____ |
| Partnership Interests | $_____ | $_____ |
| Other (Specify  LLC Interest          ) | $ 5,000,000.00 | $ 0.00 |
| Total | $ 5,000,000.00 | $ 0.00 |

Answer also in Appendix, Column 3, if filing under ULOE.

2. Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases. For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines. Enter "0" if answer is "none" or "zero."

| | Number Investors | Aggregate Dollar Amount of Purchases |
|---|---|---|
| Accredited Investors | _____ | $_____ |
| Non-accredited Investors | _____ | $_____ |
| Total (for filings under Rule 504 only) | _____ | $_____ |

Answer also in Appendix, Column 4, if filing under ULOE.

3. If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, in the twelve (12) months prior to the first sale of securities in this offering. Classify securities by type listed in Part C — Question 1.

| Type of Offering | Type of Security | Dollar Amount Sold |
|---|---|---|
| Rule 505 | _____ | $_____ |
| Regulation A | _____ | $_____ |
| Rule 504 | _____ | $_____ |
| Total | _____ | $ 0.00 |

4 a. Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering. Exclude amounts relating solely to organization expenses of the insurer. The information may be given as subject to future contingencies. If the amount of an expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | |
|---|---|---|
| Transfer Agent's Fees | ☐ | $_____ |
| Printing and Engraving Costs | ☑ | $ 5,000.00 |
| Legal Fees | ☑ | $ 85,000.00 |
| Accounting Fees | ☑ | $ 10,000.00 |
| Engineering Fees | ☐ | $_____ |
| Sales Commissions (specify finders' fees separately) | ☐ | $_____ |
| Other Expenses (identify) _____ | ☐ | $_____ |
| Total | ☐ | $ 100,000.00 |

**OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS**

   b.   Enter the difference between the aggregate offering price given in response to Part C — Question 1 and total expenses furnished in response to Part C — Question 4.a. This difference is the "adjusted gross proceeds to the issuer." ................................................................................................................................... $    4,900,000.00

5.   Indicate below the amount of the adjusted gross proceed to the issuer used or proposed to be used for each of the purposes shown. If the amount for any purpose is not known, furnish an estimate and check the box to the left of the estimate. The total of the payments listed must equal the adjusted gross proceeds to the issuer set forth in response to Part C — Question 4.b above.

| | Payments to Officers, Directors, & Affiliates | Payments to Others |
|---|---|---|
| Salaries and fees ................................................................ | ☐ $_____ | ☐ $_____ |
| Purchase of real estate ...................................................... | ☐ $_____ | ☐ $_____ |
| Purchase, rental or leasing and installation of machinery and equipment ...................................................................... | ☐ $_____ | ☐ $_____ |
| Construction or leasing of plant buildings and facilities ...... | ☑ $_____ | ☐ $ 4,700,000.00 |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets or securities of another issuer pursuant to a merger) ........................................ | ☐ $_____ | ☐ $_____ |
| Repayment of indebtedness ................................................ | ☐ $_____ | ☐ $_____ |
| Working capital .................................................................. | ☑ $_____ | ☐ $ 200,000.00 |
| Other (specify): _____ | ☐ $_____ | ☐ $_____ |
| _____ | ☐ $_____ | ☐ $_____ |
| Column Totals ................................................................... | ☐ $ 0.00 | ☐ $ 4,900,000.00 |
| Total Payments Listed (column totals added) ...................... | | ☐ $ 4,900,000.00 |

**D. FEDERAL SIGNATURE**

The issuer has duly caused this notice to be signed by the undersigned duly authorized person. If this notice is filed under Rule 505, the following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type) | Signature | Date |
|---|---|---|
| Rose Group Park Avenue LLC | _Jnne_ | 10 · 13 · 06 |
| **Name of Signer (Print or Type)** | **Title of Signer (Print or Type)** | |
| Louis Rose | Managing Member of 583 Park, LLC - Comany Manager | |

10/13/06

_Angela A. Russo_

ANGELA A. RUSSO
Notary Public, State Of New York
No. 01RU6044882
Cert. Filed In Queens County
Term Expires July 17, 2006 2010

——— **ATTENTION** ———
Intentional misstatements or omissions of fact constitute federal criminal violations. (See 18 U.S.C. 1001.)

**F. STATE SIGNATURE**

|  |  |  | Yes | No |
|---|---|---|---|---|
| 1. | Is any party described in 17 CFR 230.262 presently subject to any of the disqualification provisions of such rule? ........................................................................................ |  | ☑ | ☐ |

See Appendix, Column 5, for state response.

2. The undersigned issuer hereby undertakes to furnish to any state administrator of any state in which this notice is filed a notice on Form D (17 CFR 239.500) at such times as required by state law.

3. The undersigned issuer hereby undertakes to furnish to the state administrators, upon written request, information furnished by the issuer to offerees.

4. The undersigned issuer represents that the issuer is familiar with the conditions that must be satisfied to be entitled to the Uniform limited Offering Exemption (ULOE) of the state in which this notice is filed and understands that the issuer claiming the availability of this exemption has the burden of establishing that these conditions have been satisfied.

The issuer has read this notification and knows the contents to be true and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

| Issuer (Print or Type) | Signature | Date |
|---|---|---|
| Rose Group Park Avenue LLC | *[signature]* | 10·13·06 |
| Name (Print or Type) | Title (Print or Type) | |
| Louis Rose | Managing Member of 583 Park, LLC - Comany Manager | |

10/13/06

*[signature]*

ANGELA A. RUSSO
Notary Public, State Of New York
No. 01RU6044882
Cert. Filed In Queens County
Term Expires July 17, 2006 2010

**Instruction:**
Print the name and title of the signing representative under his signature for the state portion of this form. One copy of every notice on Form D must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

For the Exclusive Use of: _____          Copy No. _____

**ROSE GROUP PARK AVENUE, LLC**

**(A New York Limited Liability Company)**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**FOR ACCREDITED INVESTORS ONLY**

**$3,000,000 (6 Units)**
**to**
**$5,000,000 (10 Units)**

**Each Interest is a limited liability company interest in**
**ROSE GROUP PARK AVENUE, LLC**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE NOT BEEN REGISTERED WITH, OR APPROVED BY, ANY STATE SECURITIES OR BLUE SKY ADMINISTRATOR OR ANY OTHER U.S. REGULATORY AUTHORITY. NO SUCH AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM . NOR IS IT INTENDED THAT ANY SUCH AUTHORITY WILL DO SO. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

THESE SECURITIES ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. AN INVESTMENT IN THE COMPANY IS ILLIQUID AND THE COMPANY'S INVESTMENTS MAY RESULT IS THE LOSS OF AN INVESTOR'S ENTIRE INVESTMENT.

ANY DISTRIBUTION OR REPRODUCTION OF ALL OR ANY PART OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, OR THE DIVULGENCE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY, IS PROHIBITED.

The date of this Confidential Private Placement Memorandum is September 29, 2006

# GENERAL INFORMATION

Rose Group Park Avenue, LLC ("Rose Group," "our Company," the "Company," "us," or "we") is a New York limited liability company formed to operate an elegant ballroom and event space capable of handling events for over 500 people and is located in New York City on Park Avenue between 63rd and 64th Streets (the "Establishment"). This is an offering (the "Offering") of a minimum of $3,000,000 and a maximum of $5,000,000 of limited liability company membership interests (the "Interests"), in our Company solely to investors who qualify as "accredited investors" under the Securities Act of 1933, as amended (the "Securities Act"), in a private placement exempt from registration under the Securities Act and applicable state securities laws. Each unit ("Unit") of Interest requires an initial capital contribution of $500,000 per Interest. We may sell fractional Units, in our sole discretion. If this offering is over subscribed, we may, in our sole discretion, sell up to $1,000,000 of Interests to cover over-subscriptions (the "Over-allotment").

The Offering shall continue until the earlier of the sale of 6 Units (the "Minimum Amount") or January 30, 2007 (unless extended by the Company in its sole discretion for up to an additional 45 days). If, by January 30, 2007, the Company has not received subscriptions for at least the Minimum Amount, this Offering shall terminate and all funds previously deposited with the Company to purchase Interests in this Offering will be returned to prospective investors, without interest. We will not sell Interests in this Offering to any person who does not demonstrate compliance with the requirements described in this Memorandum. See "Terms of the Offering." In the event the Company receives and accepts subscriptions for the Maximum Amount, the investors in this Offering will hold twenty-five percent (25%) of the total Interests of the Company.

In addition to the funds raised pursuant to this Offering, (i) David Starling will, at the closing on the Minimum Amount, make a capital contribution of $100,000 to the Company, in exchange for one-half of a percent of the total Interests of the Company; (ii) Herbert Rose will make a capital contribution of $2,300,000 in exchange for 11.50% of the total Interests of the Company; and (iii) 583 Park LLC, a New York limited liability company (the "Company Manager") will make a capital contribution of $200,000. The remainder of the Interests will be held by the Company Manager. These purchases of these Interests will not be counted toward determining whether the Minimum Amount has been reached. Accordingly, assuming the sale of 10 Units (the "Maximum Amount"), the Company will be capitalized with an aggregate of $7,600,000.

| | Offering Price[1] | Estimated Offering Expenses[2] | Aggregate Net Proceeds to Company |
|---|---|---|---|
| Minimum Amount ........ | $3,000,000 | $100,000 | $2,900,000 |
| Maximum Amount......... | $5,000,000 | $100,000 | $4,900,000 |

[1]  The offering price of the Interests has been unilaterally determined by the Company. The price is not the result of arm's-length negotiations and does not necessarily reflect the value of the Interests purchased.

[2]  The Company estimates that $100,000 will be used by the Company to pay fees and expenses incurred or to be incurred in respect of the organization of the Company and the Offering, including the preparation of this Confidential Private Placement Memorandum.

THE INTERESTS OF THE COMPANY OFFERED HEREBY ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT, REGULATION D, AND ANY APPLICABLE STATE SECURITIES LAWS.

WE MAY REJECT ANY SUBSCRIPTION FOR INTERESTS, IN WHOLE OR IN PART, IN ANY ORDER AND FOR ANY OR NO REASON, IN OUR SOLE DISCRETION. IN THE EVENT THIS OFFERING IS OVERSUBSCRIBED, WE MAY REDUCE (OR REJECT) SUBSCRIPTIONS BASED ON EACH INVESTORS PRO RATA PARTICIPATION IN THIS OFFERING OR ANY OTHER METHOD THAT WE DETERMINE.

AN INVESTMENT IN THE COMPANY IS SPECULATIVE AND ENTAILS A HIGH DEGREE OF RISK (SEE "RISK FACTORS" BEGINNING ON PAGE 18 OF THIS MEMORANDUM), INCLUDING, WITHOUT LIMITATION THAT:

(i)     THERE ARE NUMEROUS RISKS ASSOCIATED WITH THE OPERATION OF THE ESTABLISHMENT. THERE IS NO ASSURANCE THAT THE OPERATION OF THE ESTABLISHMENT WILL BE PROFITABLE.

(ii)    THERE IS NO READILY AVAILABLE MARKET FOR THE INTERESTS, NONE IS ANTICIPATED TO DEVELOP AND TRANSFER OF THE INTERESTS IS RESTRICTED.

(iii)   THERE ARE RISKS ASSOCIATED WITH OBTAINING AND MAINTAINING A LICENSE TO DISPENSE AND SELL ALCOHOLIC BEVERAGES.

(iv)    THE INVESTORS WILL HAVE A LIMITED VOICE IN THE CONDUCT OF THE COMPANY'S OPERATIONS AND MUST RELY UPON THE JUDGMENT AND ABILITY OF THE COMPANY MANAGER TO CONDUCT THE COMPANY'S BUSINESS.

YOU SHOULD NOT INVEST IN THE COMPANY UNLESS YOU ARE IN A POSITION TO LOSE THE ENTIRE AMOUNT OF YOUR INVESTMENT. EACH PROSPECTIVE INVESTOR MUST CONSULT WITH AND RELY UPON THE ADVICE OF SUCH PROSPECTIVE INVESTOR'S OWN COUNSEL AND OTHER ADVISERS WITH RESPECT TO THE FINANCIAL, TAX AND OTHER CONSEQUENCES OF AN INVESTMENT IN THE COMPANY.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE. THIS MEMORANDUM MAY CONTAIN SUMMARIES OF VARIOUS AGREEMENTS, DOCUMENTS, STATUTES, RULINGS AND/OR REGULATIONS. THESE SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE AGREEMENTS, DOCUMENTS, STATUTES, RULINGS AND/OR REGULATIONS MENTIONED AND BY REFERENCE ALSO TO THE DEFINITIONS CONTAINED THEREIN WHICH MAY DIFFER FROM COMMON USAGE AND ALSO FROM AGREEMENT TO AGREEMENT.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE FINANCIAL, TAX OR OTHER CONSEQUENCES AS A RESULT OF AN INVESTMENT IN THE COMPANY. NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR ITS MANAGER AS LEGAL OR TAX ADVICE.

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY STATEMENT NOT CONTAINED IN THIS MEMORANDUM AND ANY INFORMATION OR STATEMENT NOT CONTAINED HEREIN CANNOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. NO PROSPECTIVE INVESTOR SHALL RELY UPON ANY WRITTEN OR ORAL STATEMENT CONCERNING AN INVESTMENT IN THE COMPANY EXCEPT AS IS CONSISTENT WITH THE TERMS AND CONDITIONS OF THIS MEMORANDUM AND THE EXHIBITS ATTACHED HERETO. IN THE EVENT OF SUCH INCONSISTENCY, IF ANY, THE TERMS AND CONDITIONS OF THIS MEMORANDUM AND THE EXHIBITS ATTACHED HERETO SHALL BE CONTROLLING AND BINDING ON THE PROSPECTIVE INVESTOR.

THIS MEMORANDUM HAS BEEN PREPARED FOR THE EXCLUSIVE USE AND BENEFIT OF THE PROSPECTIVE INVESTORS AND THEIR ADVISERS. UNDER NO CIRCUMSTANCES SHALL IT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY UNLESS (i) THE PROSPECTIVE INVESTOR TO WHOM IT IS GIVEN SATISFIES THE SUITABILITY STANDARDS STATED HEREIN AND (ii) THE PROSPECTIVE INVESTOR'S NAME AND A MEMORANDUM NUMBER ARE INSERTED BY A REPRESENTATIVE OF THE COMPANY IN THE SPACES PROVIDED ON THE COVER PAGE OF THIS MEMORANDUM. NOTWITHSTANDING THE FOREGOING, THE COMPANY RESERVES THE ABSOLUTE RIGHT TO REJECT, FOR ANY REASON OR NO REASON, ALL OR ANY PART OF ANY TENDERED SUBSCRIPTION.

**CERTAIN NOTICES UNDER STATE SECURITIES LAWS:**

**FOR NEW YORK RESIDENTS ONLY:**

THIS MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**FOR FLORIDA RESIDENTS:**

UPON ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVING INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY (AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED), A PENSION OR PROFIT SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF SECURITIES OFFERED HEREBY TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO OUR COMPANY, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE INVESTOR, WHICHEVER OCCURS LATER.

TABLE OF CONTENTS
TO
CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
OF
ROSE GROUP PARK AVENUE, LLC

Page

GENERAL INFORMATION ................................................................................. ii

OFFERING SUMMARY ....................................................................................... 2

TERMS OF THE OFFERING .............................................................................. 7

USE OF PROCEEDS ........................................................................................... 12

THE BUSINESS .................................................................................................... 13

MANAGEMENT OF THE COMPANY ............................................................. 16

RISK FACTORS ................................................................................................... 18

CONFLICTS OF INTEREST .............................................................................. 24

COMPANY OWNERSHIP .................................................................................. 25

SUMMARY OF OPERATING AGREEMENT ................................................. 26

UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ............. 30

SUITABILITY STANDARDS FOR INVESTMENT ....................................... 39

ACCESS TO INFORMATION ........................................................................... 40

STATUS OF INTERESTS UNDER SECURITIES LAWS ............................... 41


EXHIBIT A -  FORM OF OPERATING AGREEMENT
EXHIBIT B -  FORM OF SUBSCRIPTION DOCUMENTS
EXHIBIT C -  PROJECTED STATEMENT OF OPERATIONS

## OFFERING SUMMARY

The following summary describes certain provisions of this Memorandum. The summary does not purport to be complete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Memorandum and its exhibits. This Memorandum describes numerous aspects of the Company and the Establishment that we believe are material to prospective investors; however, the statements herein are only summaries of the Company and the Establishment, and are qualified in their entirety by the Exhibits attached hereto. Each prospective investor should carefully read and discuss this Memorandum and its Exhibits with their respective attorney and personal business and tax advisers.

An investment in the Company is suitable only for an investor who is sufficiently familiar with investments of this type to enable such investor to evaluate the financial merits and risks involved in investing in the Company. The Interests will be sold only to "accredited investors," as defined in Rule 501 of Regulation D under the Securities Act, who satisfy the Company's suitability standards. See "Terms of the Offering."

|  |  |  | Capital Contributions |
|---|---|---|---|
| **Offering Size:** | Minimum Amount: | 6 Units | $3,000,000 |
|  | Maximum Amount: | 10 Units | $5,000,000 |
| **The Offering:** | Over-allotment (if any) | 2 Units | $1,000,000 |

Description of the Interests:

The Company is offering a minimum of $3,000,000 and a maximum of $5,000,000 of limited liability company membership interests in the Company (the "Interests"), for an initial capital contribution of $500,000 per Interests (each, a "Unit"). In the event this Offering is over-subscribed, the Company may sell up to 2 Units, for an aggregate purchase price of $1,000,000. In the event the Company receives and accepts subscriptions for the Maximum Amount, the investors in this offering will hold twenty-five percent (25%) of the total Interests of our Company. The Company may sell fractional Units, in its sole discretion. The Offering shall continue until the earlier of when the Minimum Amount has been sold, or January 31, 2007 (unless extended by the Company in its sole discretion for an additional 45 days). If, by January 31, 2007, unless extended by the Company, the Company has not received subscriptions for at least the Minimum Amount, the Company will terminate this Offering, with all funds previously deposited with the Company returned to the prospective investors, without interest.

2

| | |
|---|---|
| **Additional capital contributions to the Company:** | In addition to the funds raised pursuant to this Offering, David Starling will, at the time of the first closing of the Offering, make a capital contribution of $100,000 to the Company in exchange for one-half of one percent of the total Interests in the Company and Herbert Rose will make a capital contribution of $2,300,000, in exchange for 11.50% of the total Interests in the Company. The Company Manager will make a capital contribution of $200,000 plus render senior to the Company in exchange for 63% of the Interests in the Company, assuming the Maximum Amount is sold. Accordingly, assuming the sale of $5,000,000 of Interests hereunder, the Company will be capitalized with an aggregate of $7,600,000. |
| **Use of Proceeds:** | Upon completion of this Offering, the Company will receive gross proceeds of approximately $5,000,000 (assuming the sale of the Minimum Amount), in addition to the aggregate $2,600,000 capital contributions by Herbert Rose, the Company Manager and David Starling. |
| | It is estimated that the expenses of the Offering will be approximately $100,000. We intend to use the net proceeds from Offering principally for construction and equipment costs, and general operating expenses. |
| **The Company:** | Rose Group Park Avenue, LLC is a New York limited liability company formed to operate an elegant ballroom and event space capable of handling events for over 500 people, which is located in New York City on Park Avenue between 63rd and 64th Streets (the "Establishment"). The Company's principal office will be located at 583 Park Avenue, New York, New York 10021. |
| **The business of the Company:** | The business of the Company is to operate the Establishment. The Company leases space at 583 Park Avenue, New York, New York (the "Facility Space"), and is subject to the terms of real estate lease agreement. See "The Business – Lease of Facility Space." |
| **Governance of the Company:** | The Company is governed by an Operating Agreement, a copy of which is attached hereto as <u>Exhibit A</u>, to which all investors in this Offering will become a party. |
| **Company Manager:** | The Manager of the Company is 583 Park LLC, a New York limited liability company, (the "Company Manager") the principals of which are Messrs. Louis Rose, John Rose, Berton Rose and David Starling. The manager of the Company Manager is Mr. Louis Rose. |
| **Operation of the Establishment:** | The Company Manager will manage the day-to-day affairs of the Establishment. |

3

**Management Fees:**

The Company Manager will be entitled to receive 5% of the gross sales of the Establishment (the "Management Fee"). The Management Fee will be payable monthly, out of the gross sales, on the first day of each month, in arrears. Gross sales is defined as all receipts from the sale of food, alcoholic beverages and services of every kind and nature, except sales and equivalent taxes collected on sales and paid to the appropriate taxing authorities, rebates and gratuities.

**Distributions to Members:**

In general, and as the Operating Agreement provides, the Company's "available cash flow" (generally, the Company's total revenues less operating and other expenses including the Management Fee and a reserve determined by the Company Manager), to the extent there is any, will be distributed, as determined by the Company Manager, to the Members (including the Company Manager), pro rata in proportion to their respective percentage ownership of the Interests.

**Allocation of Taxable Income and Loss:**

In general, Company profits and losses (and Company income, gain, loss, deductions and credits) will be allocated to the Members and the Company Manager in accordance with the terms of the Operating Agreement. To this end, Company profits (and other Company items of income and gain) will be allocated: (i) first, to Members until the aggregate amount of profits (and income and gain) so allocated to the Members shall equal the aggregate net amount of Company losses (after taking into account previous allocations of profits, income and gain, as well as losses) previously allocated to the Members ("Loss Offset Allocations"); and (ii) then, to the Members pro rata in accordance with the aggregate amount of profits distributed to them until the aggregate amount of profits allocated to them equals the aggregate amount of profits distributed to them; and (iii) then, to the Members in accordance with their respective percentage ownership of the Interests of the Company.

Company losses will be allocated, in general: (i) first, to the Members until the aggregate amount of losses so allocated to the Members shall equal the aggregate net amount of Company profits, income and gain (after taking into account previous allocations of losses, as well as profits, income and gain) previously allocated to the Members ("Loss Offset Allocations"); (ii) then, to the Members in proportion to their respective positive capital account balances, until the capital account balances of all the Members equals zero; and (iii) then, to the Members, pro rata in proportion to their respective percentage ownership of the Interests.

Generally, under the Operating Agreement, allocations to the Members of Company profits, income and gain are intended to "track", as closely as possible, the manner and priority of

4

distributions of the Company's "available cash". Notwithstanding, it is possible that for any taxable year, the amount of Company profits, income and gain allocated to an Investor (and the Investor's federal income tax liability resulting from such profits, income and gain) may exceed the amount of distributions received by the Investor for such taxable year.

**Limited Liability:**

Members will not be liable for any of the debts of the Company and will not be required to contribute any capital other than their capital contribution or lend any funds to the Company. Members may be liable to the Company or its creditors to return a distribution made to them if, after such distribution, the remaining assets of the Company are not sufficient to pay the Company's then outstanding liabilities. Members will also be liable to the Company for the amount of any taxes imposed upon or withheld by the Company in respect of such Member's share of Company income. Capital contributions in excess of initial capital contributions may be required only if the Members unanimously approve such requirement and determine that such additional capital contributions are necessary or desirable to accomplish the purposes and objectives of the Company.

**Risk Factors:**

An investment in the Interests is speculative and involves a high degree of risk. You should not invest in the Interests unless you are in a position to lose your entire investment. See "Risk Factors" beginning on page 18 of this Memorandum.

**Resale Restrictions:**

We are making this Offering of Interests in reliance on exemptions from the registration requirements of the Securities Act and applicable state securities laws. Accordingly, the Interests will be "restricted securities" as defined in the Securities Act and, therefore, subject to significant restriction on resale. You may not transfer the Interests except in a transaction registered under the Securities Act and applicable state securities laws or unless you obtain a legal opinion reasonably acceptable to us that your transfer is exempt from such registration. Each certificate of Interests will be issued bearing a legend evidencing such restriction.

**Investor
Requirements:**

We will sell an Interest in this offering only to investors who qualify as "accredited investors" under the Securities Act. You will be required to make certain representations as to your status as an accredited investor and certain other matters in order to purchase an Interest. We may reject any subscription for an Interest, in whole or in part, in any order and for any or no reason, in our sole discretion. In the event that this offering is over-subscribed, we may reduce (or reject) the subscriptions based on each investor's pro rata participation in this offering or in any other manner we may

determine.

**How to Subscribe:**          Please see "Terms of the Offering."

## USE OF PROCEEDS

If the Maximum Amount of Interests are sold, the gross proceeds to the Company from the sale of Interests will be $5,000,000 in addition to the capital contributions by the Company Manager, Herbert Rose and David Starling. Accordingly, assuming the sale of $5,000,000 of Interests hereunder, and after deducting legal, accounting and state filing fees of approximately $100,000 the Company will be capitalized with an aggregate of $7,500,000. Pending application of the proceeds, the Company intends to invest the net proceeds in high quality, interest bearing securities. The Company expects to use the net proceeds from this Offering during the next 12 months following this Offering as follows:

| Application of Proceeds | Approximate Dollar Amount | Approximate Percentage of Dollar Amount |
|---|---|---|
| Construction and Equipment Costs | $7,200,000 | 96% |
| General Operating Expenses | $ 300,000 | 4% |

Based on currently proposed plans and assumptions relating to the implementation of its business plans, the Company believes that the net proceeds of this Offering, together with proceeds from the Company's operations, will be sufficient to satisfy its contemplated cash requirements for at least 12 months following the consummation of this Offering. In the event that the Company's plans change, its assumptions change or prove to be inaccurate or if the proceeds of this Offering otherwise prove to be insufficient to implement its business plans, the Company may find it necessary or desirable to reallocate a portion of the proceeds within the above-described categories, use proceeds for other purposes and/or seek additional financing. There can be no assurance that any additional financing will be available to the Company on acceptable terms, or at all.

# THE BUSINESS

## Introduction

Rose Group Park Avenue, LLC is a New York limited liability company formed for the purpose of leasing and operating an elegant ballroom and event space which is capable of handling over 500 people, which is located at 583 Park Avenue between 63rd and 64th Streets in New York City (the "Establishment"). The Company's management team consists of a group of individuals who have developed some of the most prestigious banquet facilities in Manhattan, including Cipriani 42nd Street and The Rainbow Room. This team currently operates Capitale, a premiere setting for fine dining and elegant events and Guastavino's, a large event venue recently reopened by the Rose Group to specialize in private functions only. The Company believes that the beauty and grandeur of the building located at 583 Park Avenue, New York, New York (the "Facility Space"), its ability to handle over 500 people, and the prestigious location on Park Avenue represents a unique business opportunity.

## Background

The Facility Space was built in 1923 and designed by the world renowned architectural firm of Delano and Aldrich, which was responsible for designing some of the most spectacular and prestigious clubhouses in New York, including The Colony, The Brook, The Union, and The Knickerbocker. The Facility Space was commissioned by the Third Church of Christ Scientist to serve as their meeting hall. While the auditorium was designed to seat 1,200 people, today there are approximately only forty members of the congregation remaining, and only a few of these members participate in the Church's Wednesday and Sunday services.

The Company has entered into a lease for the Facility Space, which permits the current congregation to use the Facility Space on a limited basis at times when the Company is not using the Facility Space. The Facility Space has not been renovated since it was constructed in 1923 and very few New Yorkers have ever been inside due to its use as a meeting space for Christian Scientists.

## Renovation of the Facility Space

Following completion of this Offering and prior to the first event at the Facility Space, the Company intends to renovate the Facility Space. We anticipate that such renovations will include the following:

- Installation of banquet kitchen in the basement;
- Upgrading the facility to satisfy the requirements of the Americans with Disabilities Act;
- Installation of new HVAC systems;
- Removal of pews from the auditorium;
- Replacement of carpet;
- Refurbishment of the basement into finished attractive pre-function space;
- Construction of a VIP/Bridal Suite in the basement;

- Performing cosmetic upgrades throughout the interior and exterior of the facility; and
- Installation of specialized sound, lighting and projection systems.

The Company intends to use the proceeds from the this Offering for a portion of the costs of the renovations. In addition, immediately following the completion of this Offering, the Company anticipates that it will begin marketing the Facility Space to obtain commitments for holding an event at the Facility Space, including deposits for guarantee of the Facility Space's availability. The Company will utilize these deposits to fund a portion of the costs of the renovations. However, there can be no guarantee that the Company will be successful in its marketing efforts and that there will be sufficient funds available to complete the renovations to the Facility Space.

## The Clientele

The Company plans to target a very specific clientele for corporate, charitable, social and family events. Corporate events may include buffet-style receptions during the holidays, investor meetings, new product launches, fashion shows, press conferences, concerts, and seated dinners. Charity events may include seated dinners focused on fundraising, and social and family events may include weddings, anniversaries, bar or bat mitzvahs, and birthday parties. The Company Manager anticipates marketing the Facility Space as an architecturally significant venue with a luxurious food and service product to attract clients that want a luxurious experience at an location.

## Location

The Establishment will be located at 583 Park Avenue in New York, New York, between 63rd and 64th Streets. This section of Park Avenue is a beautiful tree-lined block in an upscale, fashionable area of Manhattan, and is home to businesses and residents who enjoy a dynamic and sophisticated urban environment. The Facility Space is favorably situated near the northern portion of Midtown Manhattan, where many businesses are located and on the lower end of the Upper East Side, one the city's most desirable residential areas.

## Lease of Real Estate

The Company has entered into a lease agreement (the "Lease") dated January 31, 2006, for a term of twenty years, with two successive options to extend the term of the Lease, each for an additional five year period. The term of the Lease commenced on July 3, 2006 (the "Commencement Date"). See "Risk Factors-The Company is subject to governmental regulation of the Establishment and those pertaining to holding a liquor license." Rent payable under the Lease also commenced on July 3, 2006. Based upon the Company's current financial projections, the Company's occupancy cost is expected to be within current industry standards and includes a provision requiring the payment of additional rent based upon Excess Gross Sales (as that term is specifically defined in the Lease) but generally ten percent (10%) of the amount by which Gross Sales exceeds the Gross Sales Base for the commensurate period. Gross Sales Base is the product derived by multiplying the rent payable during such period by ten.

## Competition

In Manhattan there are several types of event spaces that will compete directly with the Establishment, including hotels, restaurants with private rooms, museums or public spaces and independent stand alone venues. Notwithstanding such competition, the Company believes that it has a number of significant competitive advantages, including the following:

- Unlike many of its competitors, the Facility Space will have a separate reception space large enough for the number of guests that the ballroom can accommodate;
- The Facility Space will be one of the few properties in and around its location that can accommodate seated dinners with over 500 guests;
- The Company Manager has considerable experience in the catering and events industry, with an established track record of excellence, including developing 55 Wall Street and 110 East 42nd Street for the Cipriani organization;
- The Facility Space is located near Midtown Manhattan on a beautiful tree-lined block;
- The Facility Space is a unique property;
- The Company Manager has exceptional customer service and client relationships; and
- The Establishment will be new to the banquet industry.

Below is a list of potential competitors. The competitors are listed in order of competitiveness within the Establishment's target market:

Direct Competition:

| Property: | Venue Size (estimated seated dinner capacity): |
|---|---|
| 1.  The Pierre Hotel | 600 Guests |
| 2.  The Waldorf-Astoria | 1300 Guests |
| 3.  Cipriani 42nd Street | 700 Guests |
| 4.  Tavern on the Green | 1000 Guests |
| 5.  Gustavino's | 500 Guests |
| 6.  Cipriani Wall Street | 900 Guests |
| 7.  Gotham Hall | 600 Guests |
| 8.  The Hilton | 2800 Guests |
| 9.  Cipriani Toy Building | 400 Guests |
| 10. Capitale | 500 Guests |
| 11. The Hyatt | 800 Guests |
| 12. Marriot Marquis | 1000 Guests |
| 13. Sheraton | 1500 Guests |

Peripheral Competition:

| Property: | Venue Size (estimated seated dinner capacity): |
|---|---|
| 1.  Pier 60 | 1000 Guests |
| 2.  Lighthouse | 350 Guests |
| 3.  Copacabana | 700 Guests |

| | | |
|---|---|---|
| 4. | Manhattan Center | 1000 Guests |
| 5. | United Nations | 500 Guests |
| 6. | Bridgewaters | 500 Guests |
| 7. | Puck Building | 600 Guests |
| 8. | The Essex House | 300 Guests |
| 9. | The Roosevelt | 450 Guests |
| 10. | The Millenium Hotel | 300 Guests |
| 11. | The Mandarin Hotel | 300 Guests |
| 12. | W Hotel | 300 Guests |

**Projected Revenue**

The Company Manager plans to begin showing the Establishment to clients and selling future events in third quarter of 2006 and anticipates the first event taking place in the second quarter of 2007. The proceeds from the sale of the future events will be used towards renovations, operations, etc. Please refer to the sales projections attached hereto as Exhibit C for additional information regarding expected operation of the business.

THE SALES PROJECTIONS PROVIDED AS EXHIBIT C ARE BASED UPON ASSUMPTIONS CONCERNING FUTURE FACTS AND EVENTS OVER WHICH THE COMPANY AND THE COMPANY MANAGER WILL HAVE LITTLE OR NO CONTROL. ACCORDINGLY, THERE IS NO GUARANTY THAT THE ACTUAL SALES WILL BE EXACTLY OR EVEN APPROXIMATELY AS SET FORTH ON EXHIBIT C. SEE "FORWARD LOOKING STATEMENTS."

## MANAGEMENT OF THE COMPANY

**Company Manager**

The Company is a manager-managed limited liability company. The Manager of the Company will be 583 Park LLC, a New York limited liability company (the "Company Manager"). The Company Manager is also a manager-managed limited liability company. The following are current members of the Company Manager:

*Louis Rose, 35, Managing Member of the Company Manager.* Mr. Rose is an event industry pioneer with more than 10 years of executive management experience. From 1997 to 2004, he served as Managing Director of Catering of Cipriani Hospitality Company. Mr. Rose is a member of The Rose Group, a group of partners which has developed and currently operate some of the most prestigious banquet facilities in Manhattan. Mr. Rose has extensive experience in catering in the New York market and has been involved in the conversions and operations of several Rose Group projects. He developed 55 Wall Street and 110 East 42nd Street for the Cipriani organization, both of which were landmarked former bank buildings and highly profitable.

*David Starling, 35, Member of the Company Manager.* David Starling has nearly 10 years of experience as operations manager of prestigious event spaces. He has worked with

16

Louis Rose since 1998, when he joined the Rose Group to manage catering operations at 55 Wall Street. Mr. Starling helped Mr. Rose oversee the development of Cipriani 42nd Street, focusing on the facility re-design and operational logistics. Since the opening of Cipriani 42nd Street, Mr. Starling has worked with Mr. Rose to seek out and develop new properties, as well as reinvigorate existing properties, such as Rainbow Room, Guastavino's and Capitale, transforming them into successful banquet facilities.

The members of the Company Manager currently, and in the future will, operate, manage and promote other companies and ballroom and event spaces in New York, New York that are, or may be, similar to the Establishment, regardless of location. See "Conflicts of Interest." The individuals referred to above currently, and in the future would likely, serve in the same capacities at the other ballroom and event spaces operated, managed or promoted by them.

### Responsibilities of the Company Manager

The Company Manager will endeavor, on behalf of and at the sole expense of the Company, to do all things and take all actions reasonable and appropriate for the operation of the Establishment including, without limitation, recruiting, hiring and paying all required personnel, purchasing goods and contracting for services, establishing menus, maintaining the premises, establishing an accounting system and taking such other actions as are necessary and appropriate in connection with the operation of the Establishment.

### Management Fee

The Company Manager will be paid a Management Fee in an amount equal to five percent (5%) of the monthly gross sales of the Establishment. See "Offering Summary." This amount will be payable monthly, out of the gross sales, on the first day of each month, in arrears. The Management Fee will be due and payable regardless of whether the Establishment is operating at a profit and whether or not the members of the Company have received distributions of any kind. This payment is in addition to cash flow distributions to which the Company Manager will be entitled as an owner of a membership interest in the Company.

17

## CONFLICTS OF INTEREST

The Company is subject to various conflicts of interest arising out of its relationship with the Company Manager, its members and its affiliates. The Operating Agreement grants broad discretion to the Company Manager in managing the Company's affairs.

The Company Manager shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the business of the Company shall reasonably require. The Company Manager will not be obligated to and does not intend to devote full time to the supervision of Company affairs.

The Company Manager may engage in any other business or activity whether or not such business or activity is competitive with the business of the Company. The Company Manager may, in its sole discretion, open ballroom and event spaces similar to, and which compete directly with, the Establishment in other locations. If the Company Manager decides to open a similar ballroom and event space in another location, neither the Company nor any Member shall have any right in or to such other businesses or activities. Several of the members of the Company Manager are currently involved in the operation of Capitale, a premiere setting for fine dining and elegant events and Gustavino's, a large event venue and restaurant.

Possible areas of conflict of interest in the management of the activities of the Company and such other entities could arise as follows:

(1)    The allocation of time between the activities of the Company and the activities of such presently formed and to-be-formed entities of the Company Manager and/or its members.

(2)    The allocation of services by the Company Manager and/or its members between the Company and other presently formed and to-be-formed entities of the Company Manager and/or its members.

(3)    Agreements entered into between the Company and such other presently formed and to-be-formed entities of the Company Manager and/or its members may not be the result of arm's-length negotiations, because the Company Manager and/or its members would represent all parties thereto.

## COMPANY OWNERSHIP

The following table sets forth, as of the date hereof, certain information regarding the ownership of Interests of the Company prior to the Offering and upon completion of the Offering assuming the Maximum Amount of Units are sold:

| Name | Minimum Amount | | Maximum Amount | |
| --- | --- | --- | --- | --- |
| | Capital Contribution | Percent of Total Interests | Capital Contribution | Percent of Total Interests |
| 583 Park LLC | $200,000[1] | 73% | $200,000[1] | 63% |
| New Investors | $3,000,000 | 15% | $5,000,000 | 25% |
| David Starling | $100,000 | 0.5% | $100,000 | 0.5% |
| Herbert Rose | $2,300,000 | 11.5% | $2,300,000 | 11.5% |
| Total: | $5,600,000 | 100% | $7,600,000 | 100% |

[1] 583 Park LLC will be providing development and management services for the Company

03/01/2007   13:54    12128166766

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE   NEW YORK, NY 10021-7363   (212) 838-1870
E-Mail Third ChurchOffice@Juno.com

June 2, 2006

To Whom It May Concern:

"For limited periods when the church building is not being utilized for our
congregation, we have provided for various catered events which will also
contribute to the church's ability to sustain itself.  These functions will be
operated by a highly qualified, fully insured, professional caterer who will be
under contract with the Church.  These ancillary functions are necessary
because they will not only ensure our building will be upgraded and rehabilitated
but will also allow us to be exposed to and reach out to a larger community.  The
functions will be restricted by the contract with the Church and will make certain
that 583 Park Avenue continues to serve as our Church in New York City well
into the future."

Respectfully submitted,

R. Fulton Macdonald
Chairman of the Board

Thomas G. Draper, Jr.
Vice Chairman of the Board

*Ok To accept catered
events under contract with
the Church as complying with
a necessary "Social Hall" requirement
of April 10, 2006 determination
by L. Oseria*

6/28/06

Work Permit Data

Page 1 of 2

FAQs | Glossary    Mar 6, 2007

# NYC BUILDINGS



.gov
always open

⊠ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

### NYC Department of Buildings
### Work Permit Data

Premises: 583 PARK AVENUE MANHATTAN

Filed At: 583 PARK AVENUE MANHATTAN

BIN: <u>1042086</u>   Block: 1398   Lot: 1

## NO WORK PERMIT

### Printable (PDF) version of this Permit

| | | |
|---|---|---|
| Job No: <u>104511495</u> | Job Type / App No.: ALT1 | Fee: STANDARD |
| Permit No: 104511495-01-AL | Issued: 08/11/2006 | Expires: 08/11/2007 |
| Seq. No.: 01 | Filing Date: 08/11/2006 INITIAL | Status: ISSUED |
| Work: | Proposed Job Start: 08/11/2006 | Work Approved: 08/08/2006 |

ALT1 - This no work application is being filed to change the occupancy from church and
school to church, school, accesory social hall, ballroom and catering. All work
is filed under DIR-14 application.

| | | |
|---|---|---|
| Zoning:  R10,, | Special District:  N/A | |
| Use:  ASSEMBLY (CHURCHES, CO | No. Dwellings:  N/A | Stories:  2 |
| Total Floor Area:  36,511 | Landmark:  YES | |

Contractor:    LOUIS ROSE

Business:      ROSE GROUP PARK AVENUE, LLC.

    583 PARK AVENUE NEW YORK NY 10128

Lic:   0999991-NW

Phone:   212-300-6848

Superintendent of Construction:      LOUIS ROSE

Business:      ROSE GROUP PARK AVENUE, LLC.

    583 PARK AVENUE NEW YORK NY 10128

Phone:   212-300-6848

Filing Rep:

Business:

Phone:

Site Mgr:

Business:

Phone:

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by
dialing 311 or (212) NEW YORK outside of New York City.

Locations Magazine Presents 583 Park Avenue                                    Page 1 of 2

# LocationsMagazine.*com*
WEDDINGS, SOCIAL OCCASIONS, & CORPORATE EVENTS

The Largest Wedding Hall Site
In The NY/NJ Metro Area

### Locations Magazine Presents

### 583 Park Avenue





| | |
|---|---|
| **Address: 583 Park Avenue**<br>**New York, New York 10021**<br>**Phone: 212-583-7200**<br>**Fax: 212-583-7206**<br>**Website: www.583PARKAVE.com**<br>**Email: events@583parkave.com**<br>**Contact: Louis Rose** | Hotel Rating / Rest. Reviews:<br>Room Capacity cocktail reception: **2,500**<br>Room Capacity dinner w/dancing: **800**<br>Cuisine: **Classic American**<br>Kosher: **Available**<br>Room accommodates ceremony: **Yes**<br>Room available: **Monday - Sunday** |

Comments:
*The most exciting new event space in New York City.*

http://www.locationsmagazine.com/display.php?id=7951                              1/18/2007

# LocationsMagazine.*com*

WEDDINGS, SOCIAL OCCASIONS, & CORPORATE EVENTS

**The Largest Wedding Hall Site
In The NY/NJ Metro Area**

Mar 12, 2007

Home | Search | Help Line | Partners | Business Opportunities | Contact Us

## Locations Magazine Presents

## 583 Park Avenue





Address: **583 Park Avenue
New York, New York 10021**
Phone: **212-583-7200**
Fax: **212-583-7206**
Website: **www.583PARKAVE.com**
Email: **events@583parkave.com**
Contact: **Louis Rose**

Room Capacity cocktail reception: **1,000**
Room Capacity dinner w/dancing: **800**
Cuisine: **Classic American**
Kosher: **Available**
Room accommodates ceremony: **Yes**
Room available: **Monday - Sunday**

Comments:
*The most exciting new event space in New York City.*

Locations Magazine Presents 583 Park Avenue

**583 Park Avenue is a breathtakingly glorious building that is now available for private events.**

**Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of combined experience, 583 Park Avenue is poised to deliver a remarkably luxurious and memorable experience to your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City. It is with great pleasure that we introduce to you this uniquely elegant venue with the hope that we will have the opportunity to be of service to you. Please call for an appointment.**

# info@locationsmagazine.com
© 2007 LOCATIONS® Magazine. All rights reserved.

Design by Joel Scher and MacService

FAQ | Site Map | Contact Us