Exhibit M

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

———

FACSIMILE

(212) 599-1759

———

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

———

SAMUEL B. SEIDEL (1903-2003)

———

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

———

COUNSEL

STANLEY E. MARGOUES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER

March 30, 2007

<u>BY HAND & VIA OVERNIGHT MAIL</u>

Christopher Santulli, PE
Manhattan Borough Commissioner
New York City Department of Buildings
280 Broadway
New York, NY 10007



     583 Park Avenue (the "Premises")
     Block 1398 – Lot 0001
     Job No. 104511495

Dear Commissioner Santulli:

    On behalf of our clients, 580 Park Avenue, Incorporated and 570 Park Avenue Apartments, Inc, we write to address issues that you raised at the meeting with Joanne Seminara and me on March 21, 2007. We also write to provide you with additional information, including a copy of the lease between The Third Church of Christ, Scientist (the "Church") and the Rose Group and our analysis thereof. A copy of the lease is annexed as Exhibit A.

    This letter will address the following issues: 1) the significance of the leasing arrangement and the specifics of the lease; 2) the authority of the Department of Buildings ("DOB") to revoke a permit prior to the commencement of use; and 3) the implications of the Church's status as a religious institution.

    At issue here is whether this catering operation is a proper accessory use for the Church. As discussed in our March 12th letter and below, we believe it is clear that the catering use will now be the primary, and not the accessory or incidental, use. Simply put, what is proposed is a commercial catering establishment in a building owned by a church. The relationship is merely that of landlord and tenant. No interrelationship or integration exists between the church use and the catering use, as is required for an accessory use.

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 2 of 12

*The Leasing Arrangement Cedes Control of the Property and the Catering Operation*

At our meeting you raised an issue concerning the difference between a lease and a typical catering arrangement. A lease confers a possessory right. It transfers absolute possession and control of the premises to the tenant. In law, this is often referred to as a right of "exclusive possession" which, in lay terms, is the right to "exclude" others from using the property.

In the usual catering arrangement, the relationship revolves around the service to be provided and the quality of that service. Here the relationship revolves around a piece of real estate and a convenient "cover" for the tenant's use as a commercial catering establishment.

That this is a lease effectively for thirty years (twenty years plus two five year renewal terms) is critical to this issue. Unlike the typical arrangement with a caterer, either as a "house" or exclusive caterer, a long term lease – and in particular this long term lease – involves ceding control over both the building and the tenant's operation.

Granting a possessory interest for a period of thirty years is functionally equivalent to a sale of the building. New York's Religious Corporations Law §12 requires a religious institution that is selling, mortgaging or leasing for a period in excess of <u>five</u> years to obtain prior court approval.[1] This is a recognition by the New York State legislature that a lease is in many ways equivalent to a sale. As discussed below, this is particularly true here.

In contrast to the lease arrangement here, the typical religious institution that permits catering has a house or exclusive caterer; that caterer has no possessory rights, but is merely permitted entry on the property for the purpose of providing a service. The arrangement with a house caterer is usually terminable at will or lasts only for a limited period of time. In the event of a dispute, the religious institution can refuse to renew the caterer's contract or bar the caterer from entering the premises.

In the case of a lease, however, because of the possessory interest in real estate, self-help is generally not permitted and the institution's only recourse would be to institute dispossess proceedings. Such proceedings, although dubbed "summary," i.e., expedited, proceedings, often take several years to resolve. In the interim, the caterer would continue to have access to and a right to occupy and use the premises.

An example of what could happen is discussed in a decision involving the Lombardy Hotel, <u>109 East 56th Street v. 111 East 56th Street,</u> Supreme Court, New York

---

[1] The Church sought and obtained such approval in an uncontested submission to the Supreme Court, New York County. The standard for approval of such application is essentially whether fair consideration is involved for the transfer so as to protect the congregants.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 3 of 12

County, a copy of which decision is annexed as Exhibit B.  The legal proceedings were instituted by service of a notice to cure in June, 2002.  Because of motion practice and the tenant's filing  two bankruptcy cases, the matter was not finally determined until January, 2006, some three and one half years later.[2]  And even then, the tenant was given a further period to cure, and absent such cure, only then could the actual dispossess proceeding be instituted.  <u>While the action was pending, the tenant continued in occupancy and continued to operate in a manner ultimately determined to violate the lease.  In other words, the ability to control the tenant's conduct was seriously limited.</u>

In the context of a claimed accessory use, such a result is untenable.  Yet the possibility of such result demonstrates the significance of a lease creating a possessory interest, let alone one for thirty years.

The lease between the Church and the Rose Group underscores, among other things, the loss of control.  For your information, we have only recently obtained a copy of the lease.  In our settlement discussions with the Church and the Rose Group, we had requested a copy of the lease.  While the Church and the Rose Group were reluctant to provide same, they did agree that excerpts from  the lease would be made available to us, provided it appeared we were moving close to a settlement.  Since our talks broke down, they did not provide us with any of the promised excerpts.  We have, however, located a copy of the lease as public record (filed with the application pursuant to the Religious Corporations Law).

This lease highlights the difference between this arrangement and the typical arrangement with a caterer in a religious institution.  Notwithstanding the references to accessory use, the lease makes the Rose Group's use primary. The lease demonstrates the lack of any integration between the Church's operations and the Rose Group.

The lease is what is typically referred to as a "triple" net lease, where the landlord hands the key to the tenant and charges the tenant with the responsibility for maintaining the property in its entirety.  Although in this lease  the Church has retained a right to use a portion of the premises, that right is limited.  As more fully discussed below, the Church has virtually no obligations to provide services or to maintain or repair the premises. It cannot hire building staff without the Rose Group's consent.  Its ability to sell the building is limited by the Rose Group and the Church may be required to pay the entire net proceeds of a sale to the Rose Group.  And, conspicuously absent from the lease are any references to catering or religious services to be provided to the Church.  Reading the lease, one gets the distinct impression that, but for the economic terms (which we submit are irrelevant to the determination of accessory use), the Rose Group is in significant respects the owner and the Church the tenant.

---

[2] Had the tenant chosen to appeal, the matter could have gone on much longer.

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 4 of 12

Some of the more relevant portions of the lease are as follows:

1) The Premises

By its definition of the premises, the lease gives the Rose Group a possessory right not only in the entire building, but also in the land (Paragraph 1.1, p.2). The control of the interior and the exterior of the property is underscored by such provisions as that contained in Paragraph 9.1, p. 33 in which the Church is given the right to maintain a literature distribution box on the 63rd Street side of the Building" at a location "to be mutually agreed upon by the parties,...." [emphasis added]   In other words, the Church cannot even unilaterally determine where to place a box on its exterior at a side entrance to its own building.  This is one indicia of the Church's having ceded control over its own premises.

While, notwithstanding the grant to the Tenant of the right to occupy the entire building, limited portions are reserved for the Church, those are, at least in part, to be physically separated from the Tenant's space.  Thus, on the 4th floor, where, based on the plans submitted to DOB, it appears the Church will maintain what little space it is reserving for itself, the Tenant is required to "install a door separating such 4th floor TENANT space from the Church space...and the 4th floor Church space shall be designated by a sign specifying "Private Offices."' Paragraph 9.1, p. 32.  This partitioning, among other things, demonstrates the lack of integration between the Church and the catering operation.

2) The Right of First Refusal and Restrictions Upon Sale

Article 36, p. 71 contains provisions that, perhaps more than any other, highlight that this is anything but a use accessory to the Church.  This article grants the Rose Group a right of first refusal in the event of a proposed sale of the building.  This confirms that this lease is exclusively a real estate agreement.

Article 36 also restricts a sale of the premises by the Church in the first five years of the lease if the sale is to a "Non-Qualified User," i.e., an entity not a religious institution. Rather than the Church controlling its own property and its operations, the Rose Group, through the lease, is in control.  After five years, the Church may sell to a Non-Qualified User, but if such sale occurs, and if the Tenant does not chose to exercise its right of first refusal, then, unless the Rose Group has obtained a special use permit to allow the use of the building as a catering facility (Paragraph 36.2, p. 74 allows either the Church or the Rose Group to apply for a special use permit after the first five years of the term of the lease), the Tenant is to be paid the lesser of the net proceeds received from the sale or the value of both a) its business as a going concern and b) the costs of repairs and improvements to the building.  In other words, unless the Rose Group can obtain a special use permit for a commercial catering establishment, it is entitled to the entire net proceeds

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 5 of 12

of any sale or the value of its business and improvements to the premises. If it is entitled to the proceeds of any sale, its interest is, in fact, a de facto ownership interest.

3)  The Responsibility for Repairs and Maintenance

As is typical in a net lease situation, the Tenant is responsible for all repairs. See, e.g., Paragraphs 5.5 and 5.6 at p. 24, Paragraph 5.8 at p. 25.. Tenant is also required to maintain the sidewalks and shovel ice and snow (Article 33, p. 65), an obligation consistent with its being the primary user of the premises.

In addition, under Article 37, p. 75, the cost of structural repairs shall be borne by landlord and tenant according to a formula set forth in Paragraph 37.1.B. That formula is based on the useful life of the repairs and the term remaining on the lease. Given the length of the lease, it effectively means that most if not all expenses for structural repairs, at least at the outset, will be the Rose Group's responsibility.

Paragraph 5.9 at p. 25 makes clear that the Church has no obligation to furnish any services for the Premises, including heat, water, light and electric power. Pursuant to Paragraph 4.1, p. 20, the Rose Group is to contract directly for "all...utilities used and consumed in the Premises." See also Paragraph 5.11 at p. 26.

Under Paragraph 3.4, p. 6, Tenant is also responsible for all real estate taxes and has the authority to contest assessed valuation (the lease anticipates that the tenant's use will eliminate the exemption from real estate taxes).

These provisions again make clear that the primary use is that of the Rose Group, and because of that primary use, it has assumed these responsibilities with respect to the realty.

Even clearer evidence of the Rose Group's responsibility and control is found in Paragraph 5.13, p. 26. This provision contains a limitation upon hiring custodians without the Rose Group's prior consent. It states as follows:

[t]he hiring and retention by Landlord of any and all employees in the capacities of custodian and/or Building maintenance, including the terms and conditions employment, shall be subject to the prior written approval and consent of Tenant (each, an "Employee"), which may be given or withheld at Tenant's sole discretion. Tenant shall reimburse Landlord within thirty (30) days of written demand therefor, in an amount equal to any such Employee's compensation, including FICA and similar costs, provided Tenant shall have theretofore approved such amounts in writing....[t]he custodians ...shall be subject to the direction and supervision of TENANT, except when the Building is being used

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 6 of 12

exclusively for Church Activities, during which period the custodians with
respect to Church activities only shall be subject to the direction of the
Church. [emphasis added].

The unequivocal import of this provision is that the Rose Group is operating the real estate
and effectively has total control.  The Church cannot even hire employees without the
Rose Group's consent.

The Rose Group is also given permission to remove the pews, Paragraph 5.3A, p.
20 and Exhibit C to the lease, but, contrary to the public statements of the Church that
such pews are not needed or even wanted, the Rose Group is required to restore the pews
or provide new ones at the conclusion of the lease, thereby demonstrating their importance
if the building is to be used primarily as a church.

Paragraph 6.4, p. 28, acknowledges the possibility of alterations "not customarily
found in a church type facility" and provides that the Church may require the removal of
such items at the end of the lease term, which means that elements not customarily found
in a religious facility may be there for up to thirty years.

4)  Church Activities

While the lease attempts to delineate the Church's activities, it makes clear how
limited those activities are.  Thus, Article 35, p. 66, sets forth the use of the premises by
the Church.  Article 9, p. 32 sets forth the limited areas of the building which the Church
may use for its activities.[3]  The permitted use includes the use for the conduct of church
services (which occur Wednesday evenings and Sunday mornings).

As to the areas that the Church may use, notably, only with respect to services
(Paragraphs 35.1A, B, and C, p. 67) and church corporate or organization meetings
(Paragraph 35.1F, p. 68) does the lease specifically state that such use will require the use
of the "entrance to the Premises."  Presumably then, all other uses (except for Association
meetings, held four days each year, for which the Church reserves the entire building) will
require the Church to use the small side entrance toward the rear of the building on 63rd
Street.  The Church's use is so limited that it has only limited use of its own front doors.

In enumerating its uses, the Church reserves dates for Association meetings, and
provides that "LANDLORD agrees to give TENANT not less than (1) year's prior written
notice of any such change in the date of an Association Meeting and will use reasonable
efforts to accommodate TENANT's use of the Premises on those days." (Paragraph 35.D.
p. 67).  [emphasis added].  Similarly, the Church classes that are held over the summer for

---

[3]  While this Article refers to use of Sunday School in the basement, it appears, based on plans submitted to
the DOB, that the Sunday School will be sited in the back portion of the 4th floor to be used by the Church.

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 7 of 12

two, two-week sessions require notification "at least one(1) year in advance of the actual date" even though such classes require only that the Rose Group temporarily relocate its office on the 4th floor.    (Paragraph 35.1E, p. 67). [emphasis added]. Again, the unmistakable conclusion is that the Tenant's use is the primary use, and the Church's use is incidental.

While Paragraph 35.1 contains an enumeration of Church uses with great specificity as to dates, Paragraph 35.1G, p. 68 allows for

occasional non-regularly scheduled events...[to be] scheduled from time to time at times mutually agreed upon by LANDLORD and TENANT.  Since it is difficult or impossible to predict when such a meeting may be required, LANDLORD and TENANT agree to consult with each other in order to schedule such meetings (i) in a manner which causes no disruption to TENANT's scheduled events in the Premises and (ii)at such times as do not conflict with TENANT's reasonably anticipated use of the Premises.

While such terms would seem commercially reasonable from a commercial caterer's perspective, they lead to the inescapable conclusion that it is the Tenant's use that is driving the scheduling.  Again, it is the Tenant's use that is primary.

Although, as noted, this Article reserves certain areas of the building for the Church's use, the Church's use of those areas is not necessarily exclusive.  Thus, Article 29, p. 62 provides that the Tenant shall be permitted use of the Board Room, previously reserved by the Church, on a "when Available" basis.

5)  Tenant's Activities

While the Church's reservation of a right to use portions of the premises is delineated in detail, the Rose Group's right to use the premises is clearly much broader. Paragraph 22.1, p. 56 provides that "TENANT shall use and occupy the Premises solely as a high end, first class catering facility and for banquets, special events and meetings,...." Paragraph 16.1, p. 49 provides that the Tenant is granted the right of quiet enjoyment subject, only to the "LANDLORD'S right to occupy and utilize those portions of the Premises for Church purposes as set forth herein."  Thus, the Tenant has the right to the whole, subject only to the express reservations by the Church.

Tenant has a right to sublet in whole or in part, subject, however, to the consent of the Church. Paragraph 22.2, p. 56.  Again, this right underscores the possessory nature of

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 8 of 12

the interest and its prime focus on real estate, not the performing of a function related, even loosely, to the Church.[4]

In addition, Tenant is given control over the facade.  As you may know, an application is currently pending before the Landmarks Preservation Commission concerning covering up the Church's name on the facade.  Paragraph. 27.1 , p. 61 of the lease provides that "TENANT shall also remove or cover, at TENANT's option, the existing signs on the building facade and replace or cover them with blank ("faux") windows." Tenant is also obligated to install signs which "will indicate the existence of LANDLORD'S Sunday School and Church at all times except when TENANT is using the Premises for a third-party function or marketing the Premises."  The attempt to separate and distinguish the uses further demonstrates the lack of integration.

While admittedly some of the provisions of the lease are consistent with a more traditional arrangement, (for example the Tenant must respect the Church's privacy and not enter any portion of the premises during hours of Church activity, Paragraph 35.5, p. 70, what is clear from the totality of this lease is that the occupancy by the Rose Group is primary, with the Church retaining limited secondary use.

***

We annex, as Exhibit C, a copy of a resolution adopted by the Church concerning the approval of the lease.  The resolution states that the Church has 64 members; at the meeting, however, only 32 attended, and only a bare majority of those approved the lease.   The limited number of members, and the extensive activities proposed by the Church, underscore the primary use of the building will be as an event space and commercial catering establishment.

*Under the Facts Here the Department of Buildings May Revoke the Change of Use Permit Prior to Commencement of Use*

At our meeting, you raised the issue of enforcement and whether the DOB is authorized to revoke a permit prior to commencement of the use in question.  We believe the answer is yes.

Our conclusions as to the use are not speculative.  Rather, they are based on documentary evidence – documents generated by the Church and the Rose Group themselves.   These documents, the lease and the Confidential Private Placement

---

[4] This provision also has implications for your notation on the June 2, 2006 letter from the Church.  The subtenant, who may be holding catered events, clearly would have no direct relationship with the Church, thereby violating the requirement that the events be "under contract with the Church."  Such would violate the conditions under which DOB issued its permit.  That the parties entered into a lease with such a provision, and allowing such a possibility, without disclosing it to DOB, raises a serious issue.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 9 of 12

Memorandum (the "Memorandum"), referred to in our March 12, 2007 letter, undermine the application made to DOB to obtain the permit for a change of use. Moreover, they contain clear statements as to what the use will be and, in particular, that the Rose Group's use will be primary.

As noted above, the lease demonstrates that the Rose Group's use is primary and unrelated to the Church. The Memorandum confirms that. It states that the Rose Group "has entered into a Lease for the Facility Space [583 Park Avenue], which permits the current congregation [described as forty members] to use the Facility Space on a limited basis at times when the Company is not using the Facility Space." [Emphasis added] How clearer could it be that the catering use will be primary and the Church use will be secondary.[5] The quoted language is in significant ways diametrically opposed to the submissions to the DOB upon which a change of use permit was granted. The submissions and the Memorandum cannot both be correct.

The "frequency" and "intensity" of the purported accessory use were referred to as highly relevant in the Board of Standards and Appeals decisions involving Yeshiva Imrei Chaim Viznitz (the "Yeshiva case"), which we discussed in our March 12, 2007 letter. As to those factors, too, the documentary evidence is clear. The Memorandum makes clear that the intent is to hold large events (the over 500 person capacity of 583 Park Avenue is cited as one of its distinguishing features). As set forth in the March 13, 2007 letter by the elected officials to Commissioner Lancaster, a copy of which is annexed as Exhibit D, the Church and the Rose Group have represented they would hold up to 208 events per year. While they have apparently in later discussions offered to reduce that number of events to 169, they have also stated that events under 100 should be unlimited in number.[6]

The submissions to the DOB do not establish the necessary interrelationship between the Church and the Rose Group or the integration of their activities. The lease between the Church and the Rose Group makes clear that no other connection exists aside from their interests in the same piece of real estate. The uses are mutually exclusive uses and unconnected. The Memorandum makes clear the Rose Group's use will be the primary use.

Accordingly, examining the application and the additional documentary evidence, it is clear that the Church has failed to make the requisite showing to entitle it to the change of use permit.

---

[5] This document was filed with a certification as to its accuracy. As an offering of securities, under the securities laws it subjects an issuer to claims if any statements are untrue.

[6] Given the size of the congregation, somewhere between 40, as set forth in the Memorandum and 64, as set forth in Exhibit C, serious question exists whether a lesser number could even meet the requirement of the Yeshiva case that the frequency and intensity bear some reasonable relationship to the size of the congregation.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 10 of 12

Given the foregoing, under the authority of 9th & 10th Street LLC v. Board of Standards and Appeals of the City of New York, 12 Misc.3d 1183(A), decided in July, 2006, it is clear that the Department would be acting properly in revoking the permit at this time. We annex for your convenience a copy of that decision as Exhibit E. In the 9th & 10th Street case, a permit was denied for a dormitory use prior to the time the use commenced because the applicant failed to meet the criteria for a college or school dormitory (this was prior to the enactment of Rule 51-01). Both the court and the Board of Standards and Appeals upheld DOB's determination.

As in that case, the issue presented here is not whether the building might be used in a non-conforming manner, but whether the applicant made the requisite showing for the claimed future use. While the Church's application on its face would arguably appear to make the requisite showing,[7] the documentary evidence contradicts that. Had the lease and the Memorandum, or the provisions thereof, been disclosed on the application, we believe DOB would have denied the application. After review of the documentary evidence, the application fails to meet the threshold to establish the Church's right to a permit based on accessory use.

Earlier cases that stated that the DOB should not speculate about future use, are inapposite here. Here there is no speculation. In the Memorandum, a private offering filed under certification of truth with the New York State Attorney General's office, the true use of the premises was disclosed. To argue otherwise would expose the Rose Group to securities fraud claims. The lease also makes clear how the premises will be used. At issue is not possible future use, but actual intended use.

While revoking a permit in advance of commencement of use may be unusual, it is not impermissible. As the court noted in the 9th & 10th Street case, in response to the claim that what DOB had done was unprecedented, an "agency may engage in 'ad hoc decision making based on individual facts and circumstances.'....Ad hoc decision making may lead to 'unprecedented' decisions if the facts and circumstances are unique.'" Here the facts and circumstances are unique. The future use is admitted. Speculation is unnecessary.

As the court also noted in that case, "[e]ven proposed 'as-of-right' projects, when exposed to public scrutiny, may turn out to be not legitimately 'as-of-right.'" That scrutiny here has yielded documentary evidence. That evidence establishes this is not an accessory use and is, therefore, not "as-of-right." Therefore, even in advance of the commencement of the use, the permit can and should be revoked.

---

[7] As noted above, however, we do not believe it made the requisite showing of integration or interrelationship between the Church's use and the Rose Group's use. We are, therefore, not conceding the sufficiency of the application on its face.

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007

Furthermore, we note that the condition you wrote on the June 2, 2006 letter required "events under contract with the Church." Taken literally, anyone having an event at the Church would have to contract directly with the Church and the Church would have a house caterer under its control. The parties have acknowledged that will not be the case. As discussed above, the Church does not have the Rose Group effectively under its control. By entering into the arrangement with the Rose Group in the manner it has, the Church has acknowledged that the use will not comply with the condition set by you as a basis for granting the permit. On this ground, too, the permit may be revoked.

*The Church's Status As a Religious Institution Is Not Relevant to the Determination*

You had raised some concerns about limitations regarding operations of religious institutions. We believe you were referring to the recent decision involving St. Brigid's (Committee to Save St. Brigid v. Edward Cardinal Egan, Sup. Ct. N.Y. Co. (NYLJ 2/16/06). We annex a copy of that decision as Exhibit F. In that case, both the decision of the Archdiocese to close a parish and the decision to demolish the church were challenged. The Court refused to intervene, noting that it would not interfere with ecclesiastical decisions. In the St. Brigid case, the court noted that judicial involvement in disputes involving church property would be appropriate in cases which "can be decided solely upon the application of neutral principles of contract law...and where the underlying controversy does not involve determining religious doctrines or ecclesiastical issues.'" The court refused to interfere with the archdiocese's decision to demolish one of its churches on the grounds that "it would be an 'impermissible intrusion' into Cardinal Egan's ecclesiastical authority to mandate" that he reopen the derelict facility and/or operate a parish there.

The situation at 583 Park Avenue is clearly distinguishable from that of St. Brigid where the church's authority to select a place of worship was called into question. The decision to permit the operation of a commercial catering facility does not involve the determination of religious doctrine nor does it present an ecclesiastical issue. Were DOB to revoke the permit, its decision would neither prevent nor compel the members of the Church from using the church facility to exercise their religion. Indeed, the Church has presumably carried out its religious mandate for decades without benefit of a formal catering "arrangement."

Most importantly, St. Brigid did not involve an attempt to circumvent the Zoning Resolution to establish an otherwise illegal use in a residential district. To argue that St. Brigid prohibits DOB from enforcing the law would mean that any religious institution could with impunity violate laws as it chooses. Obviously, that is not the state of the law. Therefore, we believe that such decision in no way limits the DOB's ability to act in this matter.

*******

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 12 of 12

   For all the foregoing reasons, we respectfully request that any permits and approvals issued to date be immediately revoked.

   Thank you for your consideration.

       Respectfully,

       KURZMAN KARELSEN & FRANK, LLP

       Phyllis H. Weisberg

PHW:alj
Encls.

cc: Mona Seghal, Esq. (by-hand delivery w/encls.)
  Benjamin Colombo, Manhattan IGA Liaison, Executive Assistant to Borough
   Commissioner (via overnight mail w/encls.)
  David G. Liston, Chair, Community Board 8 (via overnight mail w/encls.)
  Hon. Liz Krueger (via overnight mail w/encls.)
  Hon. Jonathan Bing (via overnight mail w/encls.)
  Hon. Scott Stringer (via overnight mail w/encls.)
  Hon. Dan Garodnick (via overnight mail w/encls.)
  Board of Directors, 580 Park Avenue, Incorporated (via electronic mail)
  Board of Directors, 570 Park Avenue Apartments, Inc. (via electronic mail)

181832.2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 46

_____

109 EAST 56ᵗʰ STREET, LLC,
d/b/a ETOILE RESTAURANT,                                Index No. 113896/02

                    Plaintiff,                         **DECISION, ORDER**
                                                       **AND JUDGMENT**
                    - against -                        **AFTER TRIAL**
111 EAST 56ᵗʰ STREET INC., d/b/a
THE LOMBARDY HOTEL,

                    Defendant.

_____

Nicholas Figueroa, J.:

        The commercial lease at the heart of this five day bench trial was executed on

December 1, 1996 by plaintiff, Etoile Restaurant (Tenant), and defendant, The Lombardy Hotel

(Hotel).  The leased premises, located on 56th Street, east of Park Avenue, cover some 17,000

square feet, and include a large dining room, a bar area, and a bistro at ground level.  The lease also

provided distinctive rooms for catered and private parties on a lower level, which the Tenant

regularly rented to various groups including major business and professional associations.

        The Hotel's large dining room, underutilized for over six years, was formerly the site of

Laurent, a fashionable French restaurant of some renown.  Wanting to renew the Laurent's former

ambiance, the Hotel specified in paragraph 46(a) of the Use Clause that the Tenant shall use and

occupy the demised premises as a first class, high grade, white linen tablecloth restaurant (as such

quoted term is used in the restaurant industry)."  Immediately following this provision was the

second category of uses that were permitted: "The Tenant may hold seminars, meetings, private

parties, banquets and other functions such as weddings (collectively referred to herein as Private

1

Parties).

Paragraph 46(b) prohibited using the premises for a nightclub or discotheque. Other provisions of the lease imposed an obligation on the Tenant, during its events, to monitor crowds outside the 21 story hotel.

During April, 1997, plaintiff opened the Park Restaurant, a formal, white tablecloth French restaurant with a tuxedoed wait-staff, and seating capacity for 145 diners. It is clear that this restaurant, awarded two stars by the New York Times, fulfilled the parties' idea of a "first class, high grade" restaurant. After a promising start, however, business gradually declined, and Tenant, having already defaulted on nearly a year's rent, filed on August 4, 1999 for protection under Chapter 11 of the Federal Bankruptcy Code.

With the Hotel's help, which included a $35,000 rent forbearance, the Tenant emerged from bankruptcy on March 22, 2000, and reassessed his business concept. This review led the Tenant to open the smaller American-styled Etoile Restaurant, while utilizing the former Park Restaurant's large dining room for catered parties and, pursuant to a May, 2000 lease modification, an upscale private club, which was short lived. The Tenant, however, continued to use the large dining room for varied private parties, such as weddings and bar-mitzas, also rented the premises to various cultural and ethnic entities for private parties based on various "theme nights" such as a French Night, or an Indian Night.

Over the next several years, the Hotel, as requested by the Tenant, participated in a series of inconclusive but earnest negotiations aimed at modifying the use restrictions. The immediate cause of the cessation of these negotiations was the Tenant's permitting a discotheque function on the premises during the Spring of 2002. Even more objectionable to the Hotel, were the resulting

queues of discotheque patrons outside the Hotel, and the disturbance they caused upon the discotheque's closing for the night. These crowds, and the police response they often necessitated, the Hotel claims, irretrievably damaged the Hotel's reputation for having conservative standards and tastes, by being rowdy, noisy, and combative, which disrupted the peace and sleep of its guests, and violated paragraph 46(d) by causing, outside the demised premises, any unreasonable nuisance, annoyance or disturbance to the occupants of The Lombardy".

The Hotel's response to these incidents was the June 3, 2002 notice to cure, alleging that, in addition to other violations, the Tenant had breached the Use Clause's paragraph 46(a) by failing to operate a first class restaurant, and paragraph 46(b) alleging that the Tenant operated a discotheque in violation of the specific prohibition contained in the lease. Other allegations were also discotheque connected, and concerned violations of paragraph 48, subsections (c), (d), and (f), dealing with the Tenant's discotheque customers' noisiness, and obstruction of the Hotel's adjacent sidewalk.

Shortly after receiving the June 3, 2002 notice to cure, the Tenant was granted a Yellowstone injunction staying the proceedings. Two years later, on the eve of trial in July 2004, the Tenant filed his second petition under Chapter 11, resulting in an automatic stay of the trial and any state proceedings.

On February 9, 2005 the Bankruptcy Court, effectively lifted the stay by referring the case back to Supreme Court for adjudication of the violations alleged in the June, 2002 notice to cure.

<u>Discussions</u>

The two principal issues before the court are whether there was a waiver of the lease provisions governing the Tenant's obligation to operate a high class restaurant and whether the

3

lease terms were breached by the Tenant permitting a discotheque on the premises. A history of the parties' interactions is helpful in confronting these questions:

Sympathetic to the Tenant's need to generate income upon exiting Chapter 11 on March 22, 2000, and also being aware of the Tenant's use of the premises during this critical period, the Hotel began to consider amending the lease so as to have it conform to the Tenant's then use. There resulted an understanding that the Tenant's deviations from the use restrictions, which Tenant had already put into practice, would not be challenged by the Hotel while it studied their impact.

Accordingly, a proposed modification of the Use Clause, dated May 6, 2000 was drafted by the Hotel. By way of background, it recited that because of the Tenant's "experimental use" of the premises, the Hotel needed time to assess the effects of such use, but this period of evaluation would not constitute a waiver. Another section provided that after nine months the Hotel was required to notify the Tenant of any objections, otherwise the use requirement  would automatically be deemed modified. Another section of the modification contained an amendment urged by the Tenant permitting him to have "a private club, nightclub and/or discotheque, having dancing, music...". This draft was never signed.

A second proposed modification, actually signed by the parties on June 29, 2000, specifically deleted permission for a "nightclub and/or discotheque", but retained the consent for the Tenant to operate a "private club". Also deleted was  the automatic modification provision, which was consistent with the Hotel's position concerning the non-waivability of lease restrictions without a writing. Moreover, sections 6(b) of this modification emphasized that all sections of the lease, particularly paragraph 46 of the Use Clause, were to "remain in full force and effect" while the Hotel studied the potential impact of its acceptance of Tenant's current use of the premises.

This trial period continued uneventfully until May 1, 2001 when the Tenant, hoping to enhance his prospects for a modification, wrote to the Hotel's board of directors announcing his intention to establish "more of a restaurant presence", and to make various other improvements, but that before committing the necessary financial resources "to operate a better restaurant", he needed the board's assurance that "his current use will be approved. "

In a follow-up letter the same month, the Tenant acknowledged that he would prefer to operate a successful restaurant making him less dependent on the "late night crowd" .

At the Board of Directors meeting on June 14, 2001, the board agreed to amend the lease consistent with the Tenant's suggestions, including the Tenant's proposed "private club", as opposed to night clubs and/or discotheques.  In exchange for the Hotel's modification and acceptance of his then current use of the premises, the board  required the Tenant to make a series of improvements to enhance his business prospects.  The draft of the proposed modification included a "time table for performance" by the tenant to implement these improvements.

Among the sundry improvements was that Tenant retain a public relations consultant to promote the "new restaurant and café", and that Tenant redecorate the bistro and refurbish the bar area so as to convert it into a dining room comparable to a first class restaurant accommodating some 85 seats "up to the standards of two star restaurants in the better hotels," as per the lease.

Yet another proposed modification scheduled to be signed during September, 2001 acknowledges that the "Tenant, with the Hotel's knowledge but without its consent, has been emphasizing a club format, attracting a different upscale crowd, and that Tenant's recent use differs from what is permitted in paragraphs 46 and 47 of the lease." Lastly, this document requested that the lease was to remain unchanged unless expressly modified.  There followed a list

of improvements Tenant was supposed to implement.

On September 10, 2001 Tenant's attorney, in anticipation of the modification, wrote the Hotel promising that any assignee of the lease would continue to operate a private club in accordance with Tenant's current operation, similar to that of the former Le Club and Regines. The following day, September 11, 2001, the World Trade Center bombing occurred. On September 25th, the Hotel notified the Tenant that its board was undecided and would table further consideration of the proposals until early in 2002.

The immediate effect of 911 was to put further discussions of lease changes on hold until February 25, 2002, at which time the Tenant's attorney sought to resuscitate the prior September discussions by mailing the Hotel a list of the Hotel's recommendations which Tenant had completed. This list included varied tasks, such as the renovation of the bistro and the hiring of media and restaurant consultants.

The board's meeting minutes for February 28, 2002 reflect that based on the Tenant's compliance, as described in Tenant's February 25th letter, "the Board agreed to approve the current use" of the premises, and directed its counsel to prepare an appropriate lease amendment to reflect the proposed variances.

On March 22, 2002 the Hotel wrote Tenant's counsel informing him that the Board had voted in favor of a modification permitting Tenant to continue operation of its club concept. The (J) club format was also authorized as set forth in an attached "schedule B". Before this understanding could be formalized the weather changed.

With the coming of Spring, the weather improved, and so did Tenant's business. Increased business, however, brought in its wake sidewalk queues of discotheque patrons awaiting entry to

6

the premises. These queues were viewed unfavorably by people connected with the Hotel. Of even more vexatious concern to the Hotel were the nightly altercations and tumult created by rambunctious discotheque patrons as they exited the club upon closing. As a result, on May 9, 2002, the Hotel wrote Tenant that in contrast to the "private club" concept, which they had been willing to approve, Tenant had operated a discotheque in direct violation of the lease. This, the Hotel complained, brought queues and noisy crowds to the Hotel's sidewalk, disturbing the peace and quiet of its guests, some of whom had complained bitterly that the noise had lasted until 4:00 A.M. These "guests of conservative standards and tastes" as described in paragraph 46(e), the Hotel opined, were lost to it forever.

The Hotel's June 3, 2002 notice to cure followed.

<u>Conclusions</u>

Paragraph 46(b) of the lease specifically provides that the premises "shall not be used as a night club, a discotheque...which the parties agree would violate the requirements and prohibitions set forth herein." This paragraph next proceeds to define a night club or discotheque as being similar to dancing, and music currently found at Le Bar and Tatou, which the Tenant had visited. Therefore, both sides knew what a discotheque represented.

The evidence also supports the conclusion that there was a meeting of the minds as to what was meant by a first class restaurant. Indeed, the Tenant demonstrated his understanding by opening the Park Restaurant with its 145 seating capacity in the large dining room. Furthermore, he knew that any restaurant he operated under the lease had to satisfy the standards set by the Rainbow Room and The Carlyle as set forth in the lease.

It is equally clear that upon the Tenant's return from Chapter 11, he decided to leave the main dining room and transfer his restaurant to the smaller Etoile Restaurant with its 35 to 40 seating capacity.

The Hotel's toleration of this transfer, inspired by a practical concern for its financially challenged Tenant, was not the equivalent of a waiver. Written reminders to this effect during subsequent negotiations support this conclusion. For instance, even in the August, 2001 proposed modification, the Hotel was still insisting on "a first-class restaurant (as defined in the Lease) accommodating approximately 85 seats."

Tenant claims that since the Etoile is a high class restaurant with white linen tablecloths, and serves excellent food, he is in compliance since there is no mention of a minimum capacity in the lease.

This interpretation is contrary to a reading of the lease's use clause.

The primacy of a restaurant with substantial seating capacity is indicated in the wording of the lease. It reads that the Tenant "*shall* use and occupy the [17000 square feet] premises as a high class restaurant." The same clause next provides that Tenant "*may* hold seminars, meetings, private parties, banquets, and other functions, such as weddings (collectively referred to herein as Private Parties)." (emphasis supplied)

Nor was a waiver of the discotheque prohibition. This conclusion is reinforced by its specific deletion appearing from the proposed modification dated May 6, 2000, and its consequent absence from the June 29, 2000 draft. This rejection by the Hotel of a discotheque was repeated. The unsigned August, 2001 proposed amendment in paragraphs 6 and 7 refers to Tenant's operation of a "club/disco", but the next proposed modification, during September, 2001, also unsigned,

8

deleted the words club/disco and merely provides that ... "Tenant may utilize the 'Club' format at the premises". Permitting a discotheque was never discussed by the parties after this deletion.

In both of these later drafts, the Tenant promises to operate the permitted "Club Format" in adherence to the standards of Regines and The Carlyle.

Nor is it reasonable to conclude, as has been suggested, that merely because check-off lists were utilized at the club's entrance, that the Tenant was holding a private party, as differentiated from a discotheque, which is open to the public. That the Tenant, rather than the promoter, was the main party in interest is clear from the fact that the Tenant rented the space for a relatively nominal sum, and made the bulk of his profit from food sales and a cash bar.

The unruliness of the crowds generated by Tenant's discotheques, was directly traceable to the Tenant's reliance on promoters who indiscriminately invited patrons from lists of names via e-mail. The Tenant cannot disassociate himself from his choice of promoter any more than a tenant can sever his accountability for his subtenant. The choice of promoter was a substantial factor in producing the chaos shown in the videos taken by the Hotel's investigator. Especially is this true where, as here, the Tenant's main connection with the promoter appears to be the $1000 room rental.

That the behavior of Tenant's discotheque customers was injurious to the Hotel's image can be inferred by viewing a composite of some 156 video tapes taken by Mark Thompson, the Hotel's investigator. These videos, depicting the combative and noisy discotheque customers at closing time could have no other effect on a neutral observer but to hurt the Hotel's image.

This deleterious effect on the Hotel's image was exacerbated by the Police Department's closing of the street to vehicular traffic on numerous nights and the presence of Police Department

squad cars in close proximity to the Hotel.

On a different note, the court does not accept the testimony of Tenant's expert, especially when comparing the Tenant's discotheque clientele with those of the Rainbow Room at a private party. He failed to show that the Rainbow Room tolerates noisy, unruly crowds on the sidewalk adjacent to its entrance. Nothing in his testimony shows any similarity between the crowds at the Hotel and the Rainbow Room. In sum, the court found Tenant's expert testimony biased, noncommital, and sometimes evasive. This testimony was of little value concerning the trial issues.

### The Video Tapes

These tapes are probably among the most persuasive items of evidence presented by the Hotel. They show instances of fights, rowdiness, shouting, arrests and general turmoil caused ostensibly by discotheque patrons either waiting or exiting from the Tenant's entrance to the premises. Understandably, the instances shown were selectively chosen. Nevertheless, they depict what the Hotel's complaint entailed.

Aside from the video, the investigator observed individuals distributing flyers to individuals coming out of Tenant's club entrance, and putting flyers on the windshields of parked cars.

It is probable that these flyers were about invitations to a future event, such as a discotheque. To the extent that they were discotheque invitations, it could hardly be reasonably claimed that they were for private parties, as argued by the Tenant concerning his events.

The court has been asked by the Tenant to determine violations alleged in the notice to cure, and if there are violations, to give specific direction as to what curative measures should be

taken by the Tenant to effect a cure.

Conversely, the Hotel asks for a declaratory judgment that Tenant has breached the lease, and a description of the prohibited conduct, and a denial of injunctive relief to Tenant.

### The Notice to Cure

1.     This section alleges a violation of the Tenant's obligation to have a restaurant as described in the lease. The court finds that paragraph 46(a) was violated by the Tenant, and that the violation was not waived.  There is no doubt that the parties understood what was meant by a first class, white tablecloth restaurant.  It was a restaurant comparable in size and quality to the former Laurent located in the Hotel's large dining room.  The Tenant's understanding was amply expressed by the first class, high grade restaurant he initially inaugurated.  The primary importance of the restaurant to the Hotel is shown by its being put first in the use clause and by the insertion of the words "shall" as opposed to "may" in the following use provision.

Upon the Tenant's return from Chapter 11, he was in violation of the lease by not having a first class restaurant in the main dining room.  The fact that the Hotel did not then enforce its rights, but chose instead to explore the possibility of accommodating the Tenant, did not amount to a waiver of its rights under the lease.

Militating against a waiver are the standard lease provisions against waivers without the written consent of the owner (*Avenue of the Americas Deli Corp. v. MA Enterprises, Inc.*, 4 Misc.3d 139A (A.T. 1st Dep't 2004).  The instant lease specifically provides that "failure of owner to seek redress for violation of, or to insist upon the strict performance of any covenant condition will not prevent subsequent violation from having all the force and effect of an original violation."  Such non-waiver language in the lease defeats any claim of waiver as a matter of law (*JEF Paul*

*Garage Corp. v. Presbyterian Hospital*, 61 NY2d 442, 446 (1984)). When written in clear and unambiguous language, such provisions have uniformly and strictly been upheld in our courts. The clause should be enforced to preclude a finding of waiver.

The Tenant knowledgeable in law, and an experienced restauranteur, with at least two prior restaurants to his credit, is no stranger to the non-waiver terms in the lease.

Moreover, written in all the subsequent draft modifications, the Hotel inserted a reminder that any changes were dependent upon a written signed agreement by the Hotel.

Even accepting the Tenant's theory that the discotheque constituted a private club, there is nothing to indicate the discotheque was up to the standards of Regines or Le Club, as prescribed in the last sentence of paragraph of 46(b), which specifically provides that the premises shall not be used as a "night club, a discotheque... which the parties agree would violate the terms of the lease."

It is evident to note that the lease used the word "shall" in reference to the restaurant in the first sentence of the Use Clause. Later, it uses the word "may" relative to Tenant's other right to have private parties.

It is clear that giving words their ordinary meaning, and judging from the prominence of the restaurant clause and its use of the word "shall" in the first sentence that a high class restaurant was intended as the premises' primary use, and that it was intended to occupy the Hotel's largest space, the main dining room. That the 145 seat Park Restaurant would eventually be supplanted by the 40 seat Etoile was inconsistent with the lease, besides being beyond the contemplation of the parties upon signing the lease.

2.      The court finds that paragraph 46(b) was violated by having a discotheque in the leased premises. Tenant claims that a discotheque was consistent with the lease's permitted use of

a private party facility. This notion is contrary to the restrictions in the lease, that "the premises shall not be used as a night club, discotheque" and certainly contrary to a discotheque's deletion and absence from contemplated amendments to the use provisions. The use provisions in the lease are clear, "Tenant may hold seminars, meetings, private parties, banquets and other functions (collectively referred to herein as 'Private Parties')." Tenant points to a provision permitting "entertainment and/or singing including disco". The word disco, however, is not the equivalent of discotheque, and does not infer that a discotheque is permitted. Moreover, the lease precisely forbids a discotheque. To equate the discotheque patrons with attendees at Theme Nights which are permissible under the Private Parties use provision of 46(a) the lease is an unreasonable interpretation. Private parties are just that, private functions held by groups having a common identity, such as cultural, professional or fraternal. It does not connote a license to admit the public at large, which is what characterizes a discotheque. The fact that promoters invited people in advance, or sold admissions via flyers or e-mail, militates against the notion that these were private parties. Nor does the fact that names on a clip-board were checked at the premises' entrance transform what was ostensibly a discotheque function into a private one.

3.    This alleged violation claims that the resulting nuisance and crowds resulting from Tenant's discotheque is inconsistent with the character of the Lombardy, whose guests and tenant shareholders are "of conservative standards and tastes." This reference concerning the character of the Hotel as "presently of the highest grade" appears at several places in the lease. It is sufficient, merely upon viewing the investigator's video tapes, to conclude that the avoidance of the "nuisance" and "injury to the reputation of the Lombardy" mentioned in paragraph 46(e) was violated by the discotheque crowds outside the Hotel, and the police response they necessitated.

4.    In effect this paragraph, alleges a violation of paragraph 46(f) in that Tenant conducted a business outside the uses specified in paragraph 46 of the lease. In so far as it refers to the discotheque, the violation, is substantiated. In the instant case it is clear that the business referred to is the discotheque since that is the sole business that has been disputed for over the last two years.

5.    This alleges a violation of paragraph 48(c) in that Tenant obstructed or permitted the sidewalks and entrance of the Hotel to be obstructed by allowing crowds to congregate thereat. This alleged violation is specific and finds support in a viewing of the videos taken by the Hotel's investigator.

6.    This section alleges a violation of paragraph 48(d) in that Tenant's activities encourage waiting lines and noisy crowds outside the premises thereby resulting in a nuisance. This allegation is likewise supported by the videos depicting the crowds.

Concerning the Tenant's claim that the Notice of Default is defective, the court finds that the Notice is proper. The mere fact that it says that the Lombardy "may", instead of will, commence a holdover proceeding does not invalidate the entire Notice and Default.

As to the Notice's lack of specificity, this is not a situation wherein a technically flawed notice is served on a lay person tenant of an apartment who may not be able to decipher the import of a Default Clause. On the contrary, the instant commercial lease involves an experienced restauranteur, who is a law graduate, had legal training, and former operator of several restaurants, represented throughout by extremely able counsel. There is no basis to conclude that this commercial Tenant or his counsel was confused by the text of the Notice. Specification of a date certain is not legally required (*Jendor Industries v. Harvest Year Seafood Restaurant*, 187 Misc2d

14

293). Moreover, it has been over two years since the notice to cure, and this commercial Tenant has had more than sufficient time to cure the alleged violations. In sum, I hold that this notice to cure is proper and fulfills its function of apprising the Tenant of the alleged violations, and that if uncured for 30 days after the notice will serve a written ten day notice of intention to end the lease term, cf., *Chatam Apartments, Inc., v. Chu Cho Lam*, 51 NY2d 78. The purpose of a notice to cure is to specifically oppose the Tenant of claimed lease violations, and the consequences of said violations not being cured within a set period of time (see *Filmtrucks, Inc., v. Express Industries and Terminal Corporation*, 127 AD2d 509). The above prerequisites were established by the Hotel's notice to cure. I find that the Tenant has violated the lease between the parties. Paragraph 46 of the rider to the lease is binding on both parties.

I find that in violation of paragraphs 46(a) and (b), the Tenant is operating its business as a night club or discotheque. While the lease permits the Tenant to use the premises in connection with private parties, the Tenant allowed party "promoters" to solicit members of the general public to patronize its club.

I find that the Tenant, in violation of lease paragraph 46(d), is operating the premises in a manner constituting an unreasonable nuisance, annoyance and disturbance to the occupants of the Hotel by allowing noise from crowds congregating outside the premises.

I find that Tenant, also by operating its establishment as a nightclub or discotheque, and by allowing music, entertainment and attractions inconsistent with the character of the Hotel, violated paragraph 46(e) of the lease.

I find that Tenant also violated paragraph 46(e) of the lease by allowing entertainment and music that is not consistent with the standards of the Rainbow Room and The Carlyle.

I find that the Tenant violated paragraph 46(f) of the lease by conducting a business other than one permitted by the use provisions of the lease.

I find that Tenant breached paragraph 48(c) of the lease by obstructing or permitting an obstruction of the sidewalk adjacent to the Hotel and entrances to the Hotel by allowing crowds to congregate on those sidewalk and Hotel entrance.

I find that the Tenant breached paragraph 46(a) of the lease by failing to operate a "white linen table cloth" restaurant and that it is in violation of that provision because it offers meals only in the bistro.

I find that the Tenant committed the above-mentioned lease violations both before its Yellowstone injunction was granted and that it continues to violate those lease provisions.

I find that the Hotel has not waived any of its rights under the lease; it has not waived any objection to Tenant's lease violations. The lease provides that the Hotel's failure to seek redress for a lease  violation is not a waiver. Nor is its acceptance of rent a waiver. Under the lease provision, paragraph 24, there is no waiver unless it is made in writing. I find that the landlord did not execute a written agreement waiving the Tenant's objectionable conduct. I further find that to the extent the landlord permitted tenant to operate as a private club, it did so based on the Tenant's misrepresentation that the entity would operate as an elegant dancing establishment such as Regines and similar establishments existing at the time.

I find that the Tenant's lease violations continued after the notice to cure and are continuing. The Tenant's continuing lease violations demonstrate that it is not willing to comply with the lease provisions.

16

Based on my findings, I conclude that the Tenant materially breached the lease between the parties; that the previously issued Yellowstone injunction must be vacated; that the previously served notice to cure is in full force and effect; that in order to comply with the notice of cure, the tenant must: cease and desist from using the leased premises as a nightclub or disco; must cease and desist from allowing promoters to use the premises; that the premises must be used as a white linen table cloth restaurant and catering facility for *bona fide* private parties such as weddings, and corporate functions, and to provide room service to the Hotel.

Although the Tenant's conduct shows that it does not have a desire to cure its continuing lease violations (see *Camco Restaurants, Inc.*, 135 AD2d 461), the court will, as a matter of discretion, stay the enforcement of this order and judgment for a period of ninety days, during which time the violations shall cease and be cured.

Accordingly, it is

ORDERED AND ADJUDGED that the June 3, 2002 notice to cure served by the defendant 111 East 56th Street, Inc., d/b/a The Lombardy Hotel on the plaintiff 109 East 56th Street LLC, d/b/a Etoile Restaurant, is in full force and effect; and it is further

ORDERED AND ADJUDGED that the Yellowstone injunction previously issued by this court is vacated; and it is further

ORDERED AND ADJUDGED that the vacatur of the injunction ordered in the immediately preceding paragraph is stayed for a period of ninety days from service of a copy of this order and judgment with notice of entry, during which tie plaintiff shall comply with all terms and provisions of the June 2, 2002 notice to cure by ceasing and desisting from using the leased premises as a nightclub or disco; by ceasing and desisting from allowing promoters to use the

premises, or to engage their use by others; by limiting the use of the premises to a first class white linen table cloth restaurant and catering facility for *bona fide* private parties, and to provide room service for defendant; and it is further

ORDERED AND ADJUDGED that the in the event plaintiff fails to comply with the terms of the immediately preceding paragraph within the time specified, defendant shall be permitted to commence such action or proceeding in any court of competent jurisdiction for such relief as it may be advised to seek.

This constitutes the decision, order and judgment of the court.

Dated:          January 19, 2006

ENTER

_____

J.S.C.

It was **MOVED and SECONDED** to approve the lease with the Rose Group LLC, which lease has been presented to the membership at this meeting and will be attached to the minutes of the meeting, and to authorize the Chairman and Vice Chairman of the Board of Trustees to sign the lease on behalf of the Church.

It was **MOVED, SECONDED,** but **NOT CARRIED** to amend the above motion to require a two thirds majority vote to approve the motion.
**No 19  Yes 13**

The main motion **CARRIED.**

    Total number of members of the church is 64
    Number of members present is 32
    Number of members in favor is 17
    Number of members who voted against is 14
    Quorum is 14 (see Article IX, Section 5 of Church By-Laws)

It was **MOVED, SECONDED,** and **CARRIED** that until the completion of the initial installation by the Rose Group LLC (defined as Tenant's Work in the lease), the Board of Trustees be authorized to make structural alteration in the Church edifice and to the character of its decorations and furnishings, and in the character of any additions thereto, consistent with the plans and specifications contained in the lease that has been approved by the corporate body.

It was **MOVED, SECONDED,** and **CARRIED** that the Board of Trustees be authorized to change the terms of the lease in ways that do not significantly affect the costs and benefits to the church and that will enable the lease to conform to the requirements of the authorities from which the parties must obtain a necessary determination, license or order.



**DANIEL R. GARODNICK**
COUNCIL MEMBER, 4TH DISTRICT

**DISTRICT OFFICE**
211 EAST 43RD STREET, SUITE. 2004
NEW YORK, NY 10017
(212) 818-0580
FAX: (212) 818-0706

**CITY HALL OFFICE**
250 BROADWAY, ROOM 1841
NEW YORK, NY 10007
(212) 788-7393
FAX: (212) 442-1457

garodnick@council.nyc.ny.us

**CHAIR**
PLANNING, DISPOSITIONS & CONCESSIONS

**COMMITTEES**
LAND USE
EDUCATION
TRANSPORTATION
PUBLIC SAFETY
STANDARDS & ETHICS
RULES, PRIVILEGES & ELECTIONS
CULTURAL AFFAIRS

THE COUNCIL
OF
THE CITY OF NEW YORK

## Via Facsimile and U.S. Mail

March 13, 2007

Patricia Lancaster
Commissioner
Department of Buildings
280 Broadway
New York, NY 10007

Re: <u>583 Park Avenue; Block 1398 – Lot 001; Job No. 104511495</u>

Dear Commissioner Lancaster:

We write to you regarding the above-referenced matter.

Collectively, we are the local Council Member, Assembly Member and State Senator representing 583 Park Avenue, the address of the Third Church of Christ Scientist ("the Church"). As you know, the church has filed applications to the Department of Buildings for a change of use and for construction. We write today with serious concerns about the change of use permit that has been granted by the DOB.

<u>Brief History</u>

On March 29, 2006, the Church requested DOB permission to add as an "accessory use" a social hall, ballroom, and catering facility for the periods in which the building was not in use as a church. Former DOB Manhattan Borough Commissioner, Laura Ossorio, responded by handwritten notation on April 10, 2006, approving the application, provided that a new certificate of occupancy was obtained -- with a restrictive declaration that the accessory social hall was to be used and operated "exclusively and only by the church and for its neighbors."[1]

On June 2, 2006, the Church clarified to the DOB that it would be allowing certain catered events that would contribute to the Church's ability to sustain itself. It described the functions as "ancillary" and operated by a professional caterer under contract with the Church. By handwritten notation, Christopher Santulli, Manhattan

---

[1] A copy of this application, and DOB notation, is attached.

Borough Commissioner of DOB accepted that catered events would comply with the "accessory" social hall requirement, as set forth by the DOB on April 10.[2]

Our Concerns

We believe that the proposed uses of the church are far beyond any reasonable "accessory" use. Today, this space is being billed "the most exciting new event space in New York City."[3]  It touts its availability as a location for cocktails (accommodating 1,000 people), dinner and dancing (accommodating 800 people), and open for events Monday through Sunday.

In a meeting with our offices on February 2, 2006, the Church represented its desire to have events in this space on approximately 100 days per year. We have more recently been advised that the Church seeks to use it for events on 208 days per year – which breaks down to four events per week. We do not know whether all of these events will have 800-1,000 people, but the mere possibility raises great concerns for us.

Indeed, we find it difficult to believe that a catering hall of this type is an "accessory" use of a 100 member church under any reasonable definition. Rather, the plans are for a catering hall that will be operating throughout the entire year. We appreciate the need for the Church to make money in order to survive; nevertheless, the plans contemplate changing a sleepy religious institution into, as they describe it, an "exciting new event space." We are concerned that your Agency may not have considered the implications of such a significant change on the surrounding residential neighborhood. Furthermore, it is unclear if the written determination on June 28, 2006 was intended to allow the Church to become a catering hall for non-members, with church activities statistically becoming the accessory use in this building.

We ask that you clarify the June 28 determination and reconsider all prior determinations by the DOB on the subject of the "accessory use" permit for this property. Please follow up with Council Member Garodnick at your earliest convenience.

Sincerely,

Liz Krueger
New York State Senator

Jonathan L. Bing
New York State Assembly Member

Daniel R. Garodnick
New York City Council Member

---

[2] A copy of this communication, and the DOB notation, is also attached.
[3] Magazine article from LocationsMagazine.com dated Feb. 22, 2007 is attached.

Westlaw.

824 N.Y.S.2d 764 (Table)

12 Misc.3d 1183(A), 824 N.Y.S.2d 764 (Table), 2006 WL 2000128 (N.Y.Sup.), 2006 N.Y. Slip Op. 51392(U)
**Unreported Disposition**

**(Cite as: 12 Misc.3d 1183(A), 824 N.Y.S.2d 764, 2006 WL 2000128 (N.Y.Sup.))**

Page 1

**Motions, Pleadings and Filings**

(The decision of the Court is referenced in a table in the New York Supplement.)

Supreme Court, New York County, New York.
9th & 10th STREET L.L.C., Petitioner,
v.
BOARD OF STANDARDS AND APPEALS OF the CITY OF NEW YORK, Respondent.
No. 116091/05.

July 18, 2006.

Anderson Kill & Olick, P.C., of Counsel Jeffrey E. Glen, Esq., Steven Cooper, Esq., Gail M. Eckstein, Esq., New York, for Petitioner.

Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, Virginia Waters, of Counsel, New York, for Respondent.

MICHAEL D. STALLMAN, J.

**\*\*\*1** This Article 78 proceeding seeks to annul a decision of respondent Board of Standards and Appeals, which affirmed the denial by the City's **Department** of **Buildings** of petitioner 9th & 10th Street L.L.C.'s application for building permits for a 19 story residence within a R7-2 zoning district at 605 East 9th Street in Manhattan. At issue is whether the **Department** of **Buildings** acted arbitrarily or capriciously when it determined that petitioner did not adequately demonstrate that the proposed residence will be used as a "college or school student dormitory," as set forth in the City's Zoning Resolution.

BACKGROUND

Petitioner purchased the property from the City of New York at auction; title passed to petitioner on July 21, 1999. A restriction in the deed limits the use of the property to "Community Facility Use' as such use is defined in the New York Zoning Resolution as existing on [the] date of the auction." R18. [FN1] Currently, a five-story building (formerly a public school) sits on the parcel.

> FN1. The Record of Proceedings before the Board of Standards and Appeals, Volumes I-IV, pages 1-1710 are cited by page number prefaced by a "R." Petitioner also submit two volumes of exhibits, but agrees that respondent's record is more complete.

The parcel is located in a R7-2 zoning district, which is a medium-density apartment house district. Pursuant to the Zoning Resolution, the relevant permitted uses in this district include uses listed in Use Group 2(UG2), which include all residential development which is not single-family detached development, and Use Group 3(UG3), which consists of "community facilities." *See generally* Zoning Resolution §§ 22-12, 22-13.

The Zoning Resolution lists the following as "community facilities":
(1) college or universities; (2) college or school student dormitories and fraternity or sorority houses; (3) domiciliary care facilities for adults; (4) libraries, museums or non-commercial art galleries, (5) monasteries, convents or novitiates; (6) non-profit hospital staff dwellings; and (7) nursing homes and health-related facilities.
All of the specified "community facilities" are institutional-type uses viewed as necessary or beneficial to the larger community.

The distinction between UG2 and UG3 requires, among other things, different permissible floor area ratios (FAR), which determines how much can be built upon the zoning lot, [FN2] and different

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 N.Y.S.2d 764 (Table)                                                                    Page 2

12 Misc.3d 1183(A), 824 N.Y.S.2d 764 (Table), 2006 WL 2000128 (N.Y.Sup.), 2006 N.Y. Slip Op. 51392(U)
**Unreported Disposition**

**(Cite as: 12 Misc.3d 1183(A), 824 N.Y.S.2d 764, 2006 WL 2000128 (N.Y.Sup.))**

parking requirements. In the R7-2 zoning district, the maximum FAR for a UG2 residence is 3.44, and the building must accommodate off-street parking for half of its units. By contrast, the maximum FAR for a UG3 "community facility" is 6.5, which permits a bigger building to be built on the zoning lot, and the "community facility" need not provide off-street parking.

FN2. The higher the FAR, the greater the density is allowed on the zoning lot. For example, if a 5,000 square foot lot has a FAR of 10, then 50,000 square feet of usable floor area can be constructed on the lot (10 x 5,000 square feet). If the same lot had a maximum FAR of 5, then only 25,000 square feet of usable floor area could be constructed on the lot.

In October 2004, petitioner applied for a building permit from the New York City **Department of Buildings** (DOB) to construct a 19 story "college or school student dormitory" on the parcel. Petitioner claims that it intends to rent units to students from a number of different schools and colleges. Individual dwelling units include one or more bedrooms, a living room, a bathroom, and a kitchen.

**\*\*\*2** On November 29, 2004, DOB stated six objections to petitioner's application. Only Objection No. 4 is at issue in this action: DOB was not persuaded that petitioner substantiated the proposed building's use as a UG3 "college or school student dormitory." *See* R20. DOB viewed proposed Floors 3-19 as having a layout for residential apartments, not student housing.

By a letter dated March 1, 2005 to DOB, petitioner stated that the building will be used solely for students because of the deed restriction, and that the design of the apartments was consistent with student dormitory use. Petitioner contended that DOB had no right to require petitioner to prove that the use stated in the application will occur. R23.

In a letter dated March 21, 2005 to petitioner, DOB Borough Commissioner Osorio responded:

"As you know, the **Department [of Buildings]** requires an institutional nexus in order for construction to be classified as a dormitory. This is necessary to distinguish a "student dormitory" which is a community facility use and entitled to extra floor area, from other types of housing that are classified as Use Group 2, including buildings that house students, and that are not eligible for additional bulk."
R11. Osorio addressed petitioner's arguments and directed petitioner to provide DOB with a "deed or lease from a school," stating that, "without a deed or lease with an educational institution, the Department is not satisfied that a dormitory use is being established." R12. On this basis, DOB Borough Commissioner Osorio denied reconsideration of Objection No.4.

Meanwhile, on March 3, 2005, DOB proposed Rule 51-01, which provided, among other things, that no permit shall be issued to create a student dormitory without documents submitted to DOB establishing, generally speaking, a nexus with an educational institution, and a restrictive declaration that the facility shall only be used as a student dormitory, as classified under Use Group 3 of the Zoning Resolution. According to its Statement of Basis and Purpose, Proposed Rule 51-01 was "intended to codify the Department's current practice of requiring a "dormitory to have an institutional nexus to a school(s)." *See* R27.

Petitioner wrote to DOB on March 24 and March 28, 2005 to comment on Proposed Rule 51-01 and to supplement its March 1, 2005 letter. Petitioner contended that Proposed Rule 51-01, which requires a nexus with an educational institution, is illegal and beyond DOB's power. In any event, petitioner argued that it could meet the documentation requirements Section (c)(1) of Proposed Rule 51-01. Petitioner states that it intends to enter into a ten-year lease of the proposed dormitory with University House Corp. (UHC), a non-profit entity chartered for the benefit of participating educational institutions. According to its certificate of incorporation, UHC's initial board of directors will consist of a lawyer and an

824 N.Y.S.2d 764 (Table)                                      Page 3

12 Misc.3d 1183(A), 824 N.Y.S.2d 764 (Table), 2006 WL 2000128 (N.Y.Sup.), 2006 N.Y. Slip Op. 51392(U)
**Unreported Disposition**

**(Cite as: 12 Misc.3d 1183(A), 824 N.Y.S.2d 764, 2006 WL 2000128 (N.Y.Sup.))**

accountant, who each has no apparent connection with an educational institution, and a third individual represented as being a Director of Housing and Residential Life from Pace University. R66-67.

**\*\*\*3** By a letter dated March 29, 2005, Borough Commissioner Osorio responded that, under Proposed Rule 51-01, a 10-year lease with a nonprofit entity "chartered for the benefit of participating educational institutions" could place the proposed building under UG3. R43. She stated, however, that DOB intended that the board members of the non-profit entity would have to "consist of each of the participating educational institutions." *Ibid.*

Petitioner then offered to submit a draft of its 10-year lease with UHC, and offered to amend UHC's bylaws to require a board of directors consisting solely of members appointed by participating educational institutions, which would be provided to DOB as a supplement to the pending application for a work permit. R45-46. Borough Commissioner Osorio rejected the proposal as speculative, because the proposal provided no assurance that one or more educational institutions will operate a dormitory at the premises.

On April 20, 2005, petitioner filed an administrative appeal with the Board of Standards and Appeals (BSA). Meanwhile, on May 16, 2005, Proposed Rule 51-01 was published in the City Record, and became effective on June 20, 2005.

The BSA held a public hearing on petitioner's application on August 16, 2005. On October 18, 2005, BSA issued a resolution denying the appeal.

On November 17, 2005, petitioner commenced this Article 78 proceeding. Petitioner essentially contends that it is entitled to a building permit as-of-right, because the proposed building would constitute a "community facility" under Use Group 3, as set forth in the use regulations of the Zoning Resolution, which is an as-of-right use for the R7-2 zoning district.

BSA contends that a building housing students is not *per se* a community facility. Rather, BSA insists upon an institutional nexus between the housing for students and a college or other school to distinguish between a UG3 dormitory from a UG2 residence for students. According to BSA, petitioner failed to establish this institutional nexus.

Proposed Rule 51-01, codified at 1 RCNY 51-01, is not at issue in this petition. BSA claims that the Proposed Rule was not applied to petitioner's application. Rather, BSA asserts that DOB engaged in a review process and applied standard DOB practices, and that the Proposed Rule simply codified pre-existing practice of requiring an institutional nexus.

I.

"[T]he BSA is comprised of experts in land use and planning, and ... its interpretation of the Zoning Resolution is entitled to deference. So long as its interpretation is neither irrational, unreasonable nor inconsistent with the governing statute,' it will be upheld." *Matter of New York Botanical Garden v. Board of Stds. and Appeals of City of NY,* 91 N.Y.2d 413, 418 (1998). "Courts may set aside a zoning board determination only where the record reveals that the board acted illegally or arbitrarily, or abused its discretion, or that it merely succumbed to generalized community pressure." *Matter of Pecoraro v. Board of Appeals of Town of Hempstead,* 2 NY3d 608, 613 (2004).

**\*\*\*4** According to petitioner, the requirement of an "institutional nexus" in the work permit application is "unprecedented," in that no other project has ever been required to meet this standard. Petitioner's Mem. at 1.

Whether an agency decision is considered "unprecedented" does not establish that the agency has acted arbitrarily or capriciously. An agency may engage in "ad hoc decision making based on individual facts and circumstances.' " *Matter of DeJesus v. Roberts,* 296 A.D.2d 307, 310 (1st Dept 2002), quoting *Matter of Alca Indus. v. Delaney,* 92 N.Y.2d 775, 778 (1999). Ad hoc decision making

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 N.Y.S.2d 764 (Table)                                        Page 4

12 Misc.3d 1183(A), 824 N.Y.S.2d 764 (Table), 2006 WL 2000128 (N.Y.Sup.), 2006 N.Y. Slip Op. 51392(U)
**Unreported Disposition**

**(Cite as: 12 Misc.3d 1183(A), 824 N.Y.S.2d 764, 2006 WL 2000128 (N.Y.Sup.))**

may lead to "unprecedented" decisions if the facts and circumstances are unique. A decision which is "unprecedented" might warrant further inquiry as to whether petitioner was arbitrarily singled out. However, the codification of the "institutional nexus" requirement belies such an assertion. The issue is not whether DOB's requirements are unprecedented, but rather whether the requirements are arbitrary and capricious.

DOB inquired as to whether the proposed building was affiliated with an educational institution instead of looking to the building's potential occupants. BSA agreed with DOB's interpretation, reasoning that

"if there was no requirement of institutional control, any private party could build UG2 residences and market them to students from any school, negating the presumed beneficial effect for a specific community-based education and thus for the community as a whole, and resulting in an unjustified financial windfall (in terms of developable floor area) for the private developer." R5.

It cannot be said that this approach is arbitrary and capricious as a matter of law. The Zoning Resolution lists "college or school student dormitory" among the as-of-right uses in Use Group 3, but it does not define those terms. *See* Zoning Resolution § 22-13 A. Because the layouts and floor plans of school dormitories may resemble those of residential apartments and rental units envisioned as student housing, it is reasonable for DOB to articulate criteria to differentiate UG2 residences that simply target a student rental market from UG3 college or school student dormitories.

The Zoning Resolution does not simply use the term "dormitory" or "student housing." Rather, it specifies that it be a "college or school student" dormitory. Because a student, by definition, attends a college or school, the phrase "college or school" would be redundant if it were intended to modify "student." Rather, the phrase "college or school" therefore speaks in terms of use by an educational institution, as opposed to a use generally for

housing for students. *See Matter of Baskin v. Zoning Board of Appeals,* 40 N.Y.2d 942 (1976), *rev on dissent below,* 48 A.D.2d 667, 668 (2d Dept 1975)("neither the design of [a] house nor the nature of its occupancy ... controls. The combination of the design of the house and the nature of the occupancy is the twofold test"). [FN3] Indeed, other types of community facilities specified in the Zoning Resolution refer to institutions, such as fraternity or sorority student houses, monasteries, and non-profit hospital staff dwellings. *See* Zoning Resolution § 22-13.

> FN3. In *Baskin,* DOB granted a variance to a one-family home, allowing the homeowner to install a second kitchen, on a finding that the house met the criteria for a one-family residence despite the possibility that it could later be converted into an illegal two-family home.

***5 Petitioner's reliance on *Matter of Di Milia v. Bennett* (149 A.D.2d 592 [2d Dept 1989] ) is misdirected. In *Di Milia,* DOB denied a permit for a single-family house which could, theoretically, be used later as a non-conforming two-family home. The court held that the proposed structure met the criteria for a single-family home at the time when the permit was required, and that was enough to require the issuance of a permit as-of-right. The *Di Milia* Court held that "[t]he standard to be applied herein is the actual use of the building in question, not its possible future use." *Id.* at 593.

Unlike *Di Milia,* DOB's objection to petitioner's application is not based on whether the proposed building could later be used in a non-conforming manner. The issue is whether petitioner has met the criteria for a college or school student dormitory use in the first instance. As respondents indicate, without a showing of the institutional nexus presupposed by the wording of the definition of "community facility," there would be no practical way to distinguish between a UG3 "community facility" and a UG2 residence. DOB did not deny petitioner's application based on possible future use, but rather on the inadequacy of petitioner's of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 N.Y.S.2d 764 (Table)                                              Page 5

12 Misc.3d 1183(A), 824 N.Y.S.2d 764 (Table), 2006 WL 2000128 (N.Y.Sup.), 2006 N.Y. Slip Op. 51392(U)
**Unreported Disposition**

**(Cite as: 12 Misc.3d 1183(A), 824 N.Y.S.2d 764, 2006 WL 2000128 (N.Y.Sup.))**

intended use.

Nevertheless, petitioner asserts that DOB has no right to ask for proof of the building's proposed use as a condition of granting a work permit. Petitioner argues that, because DOB is an **enforcement** agency, it may cancel the building's **Certificate of Occupancy** only if petitioner later fails to comply with its UG3 use. The Court disagrees. As BSA indicates, the NYC Building Code vests DOB with the authority to examine all applications for permits for compliance with the building code and applicable laws and regulations. NY City Building Code [Administrative Code of the City of NY] § 27-191. Thus, the law does not require the agency to grant a permit for a nonconforming use (i.e., a use not a "community facility"), and then wait until the owner constructs a building to the larger scale and bulk permitted only for a conforming use, and then effectuates a plan to use the building for a use not consonant with the permit.

It was not arbitrary and capricious for DOB to insist upon documentary proof that the building would be used a college or school student dormitory, as opposed to accepting the use restriction in the deed and petitioner's stated purpose. As discussed above, the Zoning Resolution permits college and school dormitories to exceed FAR and bulk requirements that would normally apply to residences. Once erected, the building cannot be unbuilt (without great expense), and its impact on the neighborhood cannot be undone. Students residing in the building may be forced to relocate at an inopportune time if the building's **certificate of occupancy** is later revoked. A proposed as-of-right use in this case therefore does not give petitioner a right to dispense with DOB verification of the building's compliance with applicable zoning regulations.

***6 Neither does the deed with the City of New York require the City to grant petitioner a permit to build the 19 story structure currently envisioned. Although the deed requires petitioner to build a "community facility," and provides that a failure to do so would, in theory, allow the City to close the premises, the deed cannot be viewed as a blank check permitting petitioner to build whatever it chooses under the rubric of "community facility." The deed is not a substitute for the permit process, and petitioner, like every other applicant, has the burden of proving entitlement to the permit. The availability of other remedies for the City in the event of petitioner's breach, such as revoking the building's **certificate of occupancy**, does not diminish DOB's responsibility to vet the permit application.

Petitioner's proffer of a non-profit entity, consisting of a board of directors that is not entirely affiliated with an educational institution, does not establish an institutional nexus. Petitioner has failed to establish that the proposed housing will be operated by an entity whose sole interests reflect the required institutional nexus. Furthermore, DOB's insistence on a long term lease to establish an institutional nexus was not irrational. No educational institution owns the parcel, and DOB rationally concluded that a leasehold interest with an educational institution or non-profit entity composed of educational institutions could satisfy the requirement of an "institutional nexus." The Zoning Resolution permits a community facility greater bulk and height because of the articulated assumption that the facility and the institution provide concomitant benefit to the community at large. This trade-off would be not be fair to the community if the proposed lease were short term.

II.
Petitioner argues that "[a]n agency determining a proposed land use, must issue a permit if the application meets all of the requirements of the code or resolution. The agency has no power to *add* conditions, for that is legislating and is beyond the agency's authority [emphasis in original]." Petitioner's Mem. at 20. Petitioner argues that DOB is only an enforcement agency, and cannot "compel an institutional nexus' as a condition of being able to build what can only be used as a college or school student dormitory" without usurping the legislative function. *Id.* at 21.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 N.Y.S.2d 764 (Table)

12 Misc.3d 1183(A), 824 N.Y.S.2d 764 (Table), 2006 WL 2000128 (N.Y.Sup.), 2006 N.Y. Slip Op. 51392(U)
**Unreported Disposition**

(Cite as: 12 Misc.3d 1183(A), 824 N.Y.S.2d 764, 2006 WL 2000128 (N.Y.Sup.))

This argument is unpersuasive. An agency may adopt a regulation that goes beyond the text of the enabling legislation so as to "fill in the interstices in the legislative product." *Matter of General Elec. Capital Corp. v. New York State Div. of Tax Appeals, Tax Appeals Trib.,* 2 NY3d 249, 254 (2004). As mentioned above, the Zoning Resolution does not define "college or school student dormitory." Zoning Resolution § 71-00 provides that DOB shall "administer and **enforce**" the Zoning Resolution, "except as specifically provided in the New York City Charter and in this Resolution." Thus, DOB had the authority to adopt criteria that reflected its reasonable interpretation of the meaning of "college or school student dormitory" as having an institutional nexus.

***7** Petitioner's position assumes that DOB added criteria to petitioner's application in an illegal manner, in order to deny petitioner's application. There is no evidence that DOB acted arbitrarily, irrationally or capriciously, or solely to deny petitioner's application. Neither does it appear that DOB exceeded its authority as an **enforcement** agency by adding conditions to the Zoning Resolution. As previously discussed, DOB did not add any new criteria for evaluation of petitioner's application, and did not apply Proposed Rule 51-01, which had not yet been enacted. Instead, DOB relied on existing administrative requirements for an institutional nexus already presupposed by the Zoning Resolution. This is not legislation; rather, it is permissible interpretation by the administrative agency having the responsibility and expertise to assure that permit applicants are entitled to build what they propose. DOB's insistence that petitioner fulfill the existing requirements of the Zoning Resolution was legal, rational and within its jurisdiction.

### III.

Petitioner argues that the respondents are judicially and otherwise estopped from refusing to grant petitioner a permit. The doctrine of judicial estoppel "precludes a party who assumes a certain position in a prior legal proceeding and who secured a judgment in his or her favor from assuming a

contrary position in another action simply because his or her interests have changed [internal quotation marks and citation omitted]." *Gale P. Elston, P.C. v. Dubois,* 18 AD3d 301, 303 (1st Dept 2005); *see also Warnecke v. Warnecke,* 12 AD3d 502 (2d Dept 2004).

The petition refers to state and federal actions by certain community groups to prevent the sale of the property to petitioner. *El Bohio Pub. Dev. Corp. v. Diamond,* Sup Ct, N.Y. County, Index No. 105380/1997, *aff'd; El Bohio Pub. Dev. Corp. v. Giuliani,* 99 Civ 3533(MBM) (SD N.Y.1999). In the course of that litigation, Lori Fierstein, Deputy Commissioner of the Division of Real Estate Services in the New York City Department of Citywide Administrative Services, signed an affidavit discussing the sale of the property to petitioner. R501. The purpose of the affidavit appears to have been to convince the judge that a sale of the property to petitioner would fulfill the obligations required by the deed, especially the requirement that a "Community Facility" would be built on the property. In her affidavit, Fierstein represented, among other things, that petitioner had "credibly and rationally explained that he could not specify an exact use [of the property] until he was able to further inspect the property and formulate plans with prospective partners or contractors," but that she "found this to be a reasonable position and thus concluded that [petitioner] properly established the requisite good faith intent to comply with the community use restriction. Therefore, there is no basis for plaintiff's suggestion that my determination that the closing can proceed was without rational basis." R517.

***8** Petitioner considers this, and other statements in the prior record, to be proof that the City adopted a position in the present litigation that conflicts with its position in the earlier litigation. However, the City's belief, prior to the sale and prior to petitioner's specific proposal for the site, that petitioner intended in good faith to fulfill its duty to build a "community facility" is not inconsistent with the City's position here. Rather, the City's view, after vetting petitioner's plans, including petitioner's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

824 N.Y.S.2d 764 (Table)

12 Misc.3d 1183(A), 824 N.Y.S.2d 764 (Table), 2006 WL 2000128 (N.Y.Sup.), 2006 N.Y. Slip Op. 51392(U)
**Unreported Disposition**

**(Cite as: 12 Misc.3d 1183(A), 824 N.Y.S.2d 764, 2006 WL 2000128 (N.Y.Sup.))**

failure to provide the required documentation as to a proper UG3 use, is that petitioner did not live up to the City's expectations. Thus, it cannot be said that the City took conflicting or contradictory positions in the two litigations. In the absence of a conflicting position, there can be no estoppel of any kind.

### IV.

Finally, petitioner asserts that DOB bowed to community pressure, and thereby acted in an arbitrary and capricious manner. No principle of law forbids a public agency from considering input from community residents or organizations. Rather, the hearing and submission process seeks to give members of the community an opportunity to examine development proposals and the way the various City agencies consider them. Even proposed "as-of-right" projects, when exposed to public scrutiny, may turn out to be not legitimately "as-of-right." Public participation helps open a window on a decision-making process that can affect the future course of a community's development. Here, despite the stridency of some persons objecting to the project, examination of the hearings and the documentary submissions shows a range of opinion which the DOB could consider in meeting its obligation under the law. Petitioner's argument lacks merit.

### CONCLUSION

Petitioner has not met its burden of proving that respondent acted arbitrarily or capriciously or contrary to law. Rather, DOB had a rational basis for refusing to grant a premises permit to build a dormitory without adequate proof of an institutional nexus between the proposed dormitory and a known school (or schools), or a nonprofit entity representing such school(s). BSA's decision to uphold DOB's denial of petitioner's application for permits was not arbitrary and capricious, and had a rational basis. Accordingly, it is

ADJUDGED that the petition is denied, and the proceeding is dismissed.

This constitutes the decision and judgment of the

Court. Copies to both sides.

**Motions, Pleadings and Filings (Back to top)**

• 0116091/2005 (Docket) (Nov. 28, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2/16/2006 NYLJ 19, (col. 1)                                              Page 1

  2/16/2006 N.Y.L.J. 19, (col. 1)

                              New York Law Journal
                                  Volume 235
                Copyright 2006 ALM Properties, Inc. All rights reserved.

                          Thursday, February 16, 2006

                          Decision of Interest

                    NEW YORK COUNTY SUPREME COURT

         Court Considers Mandate to Keep **Church** Open 'Impermissible Intrusion' Into
                            Ecclesiastical Issues

Justice Kapnick

  COMMITTEE TO SAVE ST. BRIGID v. EDWARD CARDINAL EGAN--This action concerns the
future of the building located at 119 Avenue B in Manhattan which houses the **Church**
of St. Brigid, formerly known as the **Church** of St. Bridget.

  The **Church**, designed by the Irish-American Architect Patrick C. Keely, was built
by Irish shipwrights in 1848, during the large-scale immigration resulting from
the Great Famine. Incorporated under the Religious Corporation Law (RCL) in 1869,
St. Brigid is one of the oldest Roman Catholic **churches** in New York City. During
its history, the **Church** served the Irish immigrant community and other largely
immigrant communities of New York's Lower East Side. On or about October 30, 1940,
Archbishop Francis Spellman conveyed the **Church** building and the associated land
to the **Church** of St. Brigid.

  In June 2001, defendant Edward Cardinal Egan visited the parish and ordered that
the **Church** be closed, because serious structural problems had made the **Church**
building unsafe. The then pastor of the **Church**, Father Michael Conway, thereupon
began celebrating Mass in the cafeteria of the parish school, adjacent to the
**Church**, and also began a restoration fund which, the parties agree, eventually
collected approximately $103,000. [FN1]

  Plaintiffs Edwin Torres, Catherine King, Nilsa Fiol, Maria Tornin and Ruth Burgos
were all parishioners of St. Brigid and claim to have contributed to the
restoration fund in reliance on Father Conway's promise that the **church** was going
to be repaired.

  In September 2003, the Archdiocese, through its architect, filed an application
with the New York City Department of Buildings for the conversion of the **Church**
into residential apartments. Sometime in 2004, The Trinitarian Order which had
provided priests for St. Brigid, notified the Archdiocese that they could no
longer renew their commitment to serve St. Brigid, and, in fact, withdrew from all
the parishes they were staffing in the Archdiocese of New York. In August 2004,

                  Copyright © 2007 The New York Law Pub. Co.

2/16/2006 N.Y.L.J. 19, (col. 1)

Bishop Robert Brucato, the Vicar General for the Archdiocese, announced that the St. Brigid parish would be closed within two weeks. The last Mass was held at St. Brigid on September 12, 2004.

Recently, the Archdiocese has removed the altar, tabernacle, statues, organ, and pews from the **Church**, and has begun to take the steps necessary to obtain a permit to **demolish** it. [FN2]

Plaintiffs' Complaint sets forth claims based on promissory estoppel (first cause of action), breach of fiduciary duty (second cause of action), alleged violation of RCL §91 (third cause of action), and breach of express or implied contract (fourth cause of action), and seeks a judgment:

(a) enjoining Cardinal Egan or anyone acting on his behalf or at his direction from taking any steps to **demolish** the building, in whole or in part;

(b) directing Cardinal Egan to reopen St. Brigid and allow it to continue to operate as a parish **church**;

(c) directing Cardinal Egan to use all funds collected for the repair and renovation of the building housing St. Brigid for that purpose and that purpose alone;

(d) subjecting St. Brigid to a constructive trust to be administered in accord with the purpose for which said funds were collected, to wit, as a parish **church**;

(e) directing Cardinal Egan to take all steps necessary to establish a proper Board of Trustees for St. Brigid which Board of Trustees shall work to further the repair and renovation of the building housing St. Brigid and its operation as a parish **church**; and

(f) declaring any permit issued for the whole or partial demolition of the building housing St. Brigid, including but not limited to that issued pursuant to Application No. 103562681, null and void, and enjoining defendant Patricia J. Lancaster, as Commissioner of the New York City Department of Buildings, from issuing any other permits.

Plaintiffs now move by Order to Show Cause for a preliminary injunction: (a) enjoining defendant Egan from demolishing, in whole or in part, the building known as the **Church** of St. Brigid; and (b) directing defendant Lancaster to revoke any permit heretofore issued which would allow the total or partial demolition of said building, [FN3] on the grounds that:

(1) plaintiffs' contributions to the restoration fund established by Father Conway created an enforceable obligation on the part of the Archdiocese to restore and reopen the **Church** (see, First Methodist Episcopal **Church** of Mount Vernon v. Howard, 133 Misc. 723 [Sup. Ct., Westchester Co. 1929], aff'd, 233 A.D. 753 [2nd Dep't 1931]);

(2) no legal decision has been or can be made to close or **demolish** St. Brigid absent an action by a Board of Trustees, as set forth in Religious Corporations

Copyright © 2007 The New York Law Pub. Co.

2/16/2006 NYLJ 19, (col. 1)

2/16/2006 N.Y.L.J. 19, (col. 1)

Law §91; and

(3) Cardinal Egan is subject to a constructive trust to act in the interests of the parishioners of St. Brigid who desire to keep the **Church** open. [FN4]

Defendant opposes the motion for a preliminary injunction and cross-moves for an order pursuant to CPLR §3211(a)(1), (2), (5) and (7) dismissing plaintiff's Complaint on the grounds that: (i) this Court is without subject matter jurisdiction because the plaintiffs' claims are barred by the Establishment and Free Exercise Clauses of the First Amendment; (ii) the complaint fails to state a cause of action; (iii) the plaintiffs are without standing; and (iv) the claims are barred by the Statute of Frauds.

Specifically, the defendant argues that the hierarchal Roman Catholic **Church** has the authority to administer **church** property according to the ecclesiastical law of the **Church**, 'even in disregard of the wishes of the congregation' (see, Faith United Christian **Church** v. United Christian **Church**, 266 A.D.2d 428, 429 [2nd Dep't 1999]); plaintiffs lack standing to seek the imposition of a constructive trust because Cardinal Egan owes no fiduciary duty to the plaintiffs; and plaintiffs' claim that the Archdiocese has a contractual obligation to keep the **Church** open in perpetuity is barred by the Statute of Frauds.

It is well settled that '[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of **church** property can be determined conclusively.' Jones v. Wolf, 443 U.S. 595, 602 (1979). See also, Presbyterian **Church** v. Hull **Church**, 393 U.S. 440 (1969).

However, it is also clear that the First Amendment of the United States Constitution 'prohibits civil courts from resolving **church** property disputes on the basis of religious doctrine and practice' (Jones v. Wolf, supra at 602) and 'requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchial **church** organization. ' (Id.)

Thus, a civil court may resolve a dispute involving **church** property only where the 'case can be decided solely upon the application of neutral principles of contract law, without reference to any religious principle' (Avitzur v. Avitzur, 58 N.Y.2d 108, 115 [1983], cert. denied, 464 U.S. 817 [1983]) and where 'the underlying controversy does not involve determining religious doctrines or ecclesiastical issues' (Trustees of the Diocese of Albany v. Trinity Episcopal **Church** of Gloversville, 250 A.D.2d 282, 285 [3rd Dep't 1999]).

Plaintiffs argue that this action is not barred by the First Amendment because this case does not implicate ecclesiastical matters (see, First Presbyterian **Church** of Schenectady v. United Presbyterian **Church** in the United States of America, 62 N.Y.2d 110 [1984]; Park Slope Jewish Center v. Cong. B'nai Jacob, 90 N.Y.2d 517 [1997]), but rather involves the application of 'neutral principles' of contract law and promissory estoppel based on the funds collected by Father Conway for the repair of the building, and a determination as to whether the decision to **demolish** the building was made in compliance with RCL §91 absent a properly constituted

Copyright © 2007 The New York Law Pub. Co.

2/16/2006 NYLJ 19, (col. 1)

2/16/2006 N.Y.L.J. 19, (col. 1)

Board of Trustees, including two lay leaders. [FN5]

However, this action does not involve a dispute regarding the ownership of the funds collected, but rather seeks an order directing the Cardinal to use those funds for a specific purpose; namely, the restoration and eventual reopening of the **church**.

Based on the papers submitted and the oral argument held on the record on August 30, 2005, this Court finds that it would be an 'impermissible intrusion' into Cardinal Egan's ecclesiastical authority to mandate that he use those funds to reopen the building as a **church** and/or to require him to operate a parish therein, as plaintiffs seek in their first, second and fourth causes of action. Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 625 N.E.2d 1352 (1994), cert. denied, 511 U.S. 1142 (1994). See also, Serbian Eastern Orthodox Diocese for United States of America and Canada v. Milivojevich, 426 U.S. 696 (1976), rehearing denied, 429 U.S. 873 (1976) (in which the United States Supreme Court held that the state court exceeded its jurisdiction in reviewing the Mother **Church's** reorganization of the American-Canadian Diocese, and should have deferred to the highest ecclesiastical tribunals); Burke v. Rector, Churchwardens and Vestrymen of Trinity **Church**, 63 Misc. 43 (Sup. Ct, N.Y. Co. 1909), aff'd 132 A.D. 930 (1st Dept 1909) (in which the court denied plaintiff's motion for a preliminary injunction barring vestry from closing a chapel and from interfering with the continuation of the usual religious services therein).

The third cause of action which is based solely on the application of the Religious Corporation Law does not appear to implicate any religious doctrine or ecclesiastical issue. See, e.g., Filetto v. St. Mary of the Assumption **Church** of Binghamton, 61 Misc.2d 278 (Sup. Ct., Broome Co. 1969).

However, the defendant concedes that St. Brigid does not currently have a properly constituted board of trustees, and acknowledged on the record during the oral argument that no demolition of the **Church** building could be undertaken absent a duly made decision by such a board. [FN6]

Therefore, this Court finds that plaintiffs' third cause of action and the corresponding branch of their motion for injunctive relief, are not ripe for determination.

Accordingly, based on the papers submitted and the oral argument held on the record on August 30, 2005, plaintiffs' motion for a preliminary injunction is denied, and defendant's cross-motion to dismiss the Complaint is granted.

The temporary restraining order contained in the Order to Show Cause is, therefore, vacated, and plaintiffs' Complaint is dismissed without costs or disbursements. The Clerk may enter judgment accordingly.

This constitutes the decision and order of this Court.

Pending final submission of this motion (or any cross-motion), Cardinal Egan or any person acting as his agent or representative, is restrained from demolishing, in whole or in part, the building at 119 Avenue B, NY, NY, known as the **Church** of

Copyright © 2007 The New York Law Pub. Co.

2/16/2006 N.Y.L.J. 19, (col. 1)

St. Brigid. Nothing herein shall prevent Cardinal Egan or his agents representatives from removing and preserving any personalty (including fixtures) from the **Church** interior; or from seeking any appropriate permit/permission/license or making any application to any City agency concerning the building, including seeking authorization for demolition/alteration; or from erecting/installing any scaffolding or other equipment in or around or on the building (subject to any necessary permit) necessary to maintain the building and/or the safety of others.

This Court continued the temporary restraining order, as modified, on the record on August 30, 2005, pending the determination of this motion and cross-motion.

[t]he archbishop or bishop and the vicar-general of the diocese to which any incorporated Roman Catholic **church** belongs, the rector of such **church**, and their successors in office shall, by virtue of their offices, be trustees of such **church**. Two laymen, members of such incorporated **church**, selected by such officers or by a majority of them, shall also be trustees of such incorporated **church**, and such officers and such laymen trustees shall together constitute the board of trustees thereof.

FN1. Although defendant contends that this fund, which was set up by Father Conway, was unauthorized, the Archdiocese has stated that it is committed to return all money collected to refurbish or rebuild the **Church**, up to the sum of $103.000.00, if said contributions can be verified.

FN2. Defendant claims that its construction consultants concluded in February 2005 that it would cost $6.9 million to restore the building. Plaintiffs, on the other hand, contend that the condition of the building may not be as dire as defendant claims and suggest that the cost of repairing the building may only be about $500,000.00. The plaintiffs further request that their expert be granted an opportunity to inspect the building.

FN3. Pursuant to Stipulation dated July 13, 2005 (so-ordered by the Hon. Michael Stallman, to whom this case was originally assigned), plaintiffs' complaint against the City of New York (i.e., Commissioner Lancaster) was discontinued with prejudice.

FN4. Pursuant to the July 13, 2005 Stipulation, the temporary restraining order contained in the Order to Show Cause was modified to provide as follows:

FN5. RCL §91 provides, in relevant part, that

FN6. The Archdiocese indicates that it plans to form a board and to schedule a meeting once the necessary permits are obtained, and prior to commencing any demolition work.

2/16/2006 NYLJ 19, (col. 1)

END OF DOCUMENT

Copyright © 2007 The New York Law Pub. Co.

Westlaw.

2/13/2006 NYLJ 1, (col. 4)                                    Page 1

 2/13/2006 N.Y.L.J. 1, (col. 4)

New York Law Journal
Volume 235
Copyright 2006 ALM Properties, Inc. All rights reserved.

Monday, February 13, 2006

COURT DECLINES TO INTERVENE IN DEMOLITION OF OLD **CHURCH**

Tom Perrotta

 PARISHIONERS at one of the oldest Roman Catholic **churches** in New York City cannot stop the Archdiocese of New York from demolishing the building, a Manhattan judge has ruled.

 Supreme Court Justice Barbara R. Kapnick, writing in Committee to Save St. Brigid v. Edward Cardinal Egan, 109536/05, ruled that the court had no place to interfere with a decision the diocese had made about its property.

 The **church**, St. Brigid, at 119 Avenue B in the Lower East Side, was built in 1848 by Irish shipwrights during the immigration that resulted from the Great Famine.

 In the late 1980s and early 1990s, structural problems began to show. One wall split off from the rest of the building and other cracks appeared. A contractor was hired to reinforce the building, but the work was done poorly and did not help matters. Then, in 2001, Cardinal Edward Egan visited the **church** and ordered it closed out of concern for the safety of parishioners.

 The pastor at the time, Reverend Michael Conway, began celebrating Mass in the cafeteria of the adjacent school. He also started a fund to repair the **church**, eventually collecting $103,000.

 The **church** remained closed. Two years later, the archdiocese filed an application with the Department of Buildings to convert it in-to residential apartments. The archdiocese closed the parish for good in September 2004 and has since said it would **demolish** the building, but it has not announced what it will eventually do with the property. While the archdiocese claims it would cost millions of dollars to repair the **church**, the plaintiffs say they have received estimates of about $250,000.

 The parishioners sued, seeking a court order that would have forced the archdiocese to reopen the **church** and direct the $103,000 toward its repair. The archdiocese countered that it had the authority to administer **church** property as it wished, even if members of the congregation disagreed with its decisions.

 In ruling for the archdiocese, Justice Kapnick said the suit implicated ecclesiastical matters.

Copyright © 2007 The New York Law Pub. Co.

2/13/2006 N.Y.L.J. 1, (col. 4)

'This Court finds that it would be an 'impermissible intrusion' into Cardinal Egan's ecclesiastical authority to mandate that he use those funds to reopen the building as a **church** and/or to require him to operate a parish therein, ' the judge wrote.

According to a footnote in the decision, the archdiocese has committed itself to returning all the money collected to refurbish or rebuild the **church** if contributors can be verified.

The plaintiffs also challenged the decision to **demolish** the building on the grounds that the archdiocese had not created a properly constituted board of trustees for St. Brigid, in violation of Religious Corporation Law.

Justice Kapnick said this cause of action was not ripe for relief. The archdiocese said it planned to create a board and schedule a meeting once the demolition permits are obtained.

Harry M. Kresky, who represents the plaintiffs, said his clients were considering their legal options.

Neil M. Merkl of Kelley Drye & Warren represented the archdiocese.

Tom Perrrotta can be reached at tperrotta@alm.com.

2/13/2006 NYLJ 1, (col. 4)

END OF DOCUMENT

Copyright © 2007 The New York Law Pub. Co.

Exhibit N

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL

STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER
ARTHUR R. BLOCK

October 5, 2007

**BY HAND**

Hon. Daniel Doctoroff
Deputy Mayor for Economic Development and Rebuilding
Office of the Mayor
City Hall
New York, NY 10007

583 Park Avenue/ Third Church of Christ, Scientist

Dear Deputy Mayor Doctoroff:

We represent The Preservation Coalition, a coalition of buildings located in the vicinity of the Third Church of Christ, Scientist at 583 Park Avenue. The Preservation Coalition seeks to preserve its residentially zoned neighborhood; to that end it opposes the commercial catering hall now operating at 583 Park Avenue under guise of this commercial operation being an accessory use to the church.

We enclose for your information copies of a letter distributed this week by the Third Church of Christ, Scientist to residents of the neighborhood, along with our client's response thereto.

187879.1

KURZMAN KARELSEN & FRANK, LLP

Hon. Daniel Doctoroff
October 5, 2007
Page 2 of 2

Thank you for your attention to this matter.

Respectfully,

KURZMAN KARELSEN & FRANK, LLP

Phyllis H. Weisberg

PHW:alj
Encls.

BY HAND DELIVERY WITH ENCLOSURES

cc:   Hon. Patricia Lancaster
      Hon. Robert Tierney
      Hon. Adrian Benepe
      Phyllis Arnold, Esq.
      David Karnovsky, Esq.
      Elizabeth Weinstein

187679.1

# THE PRESERVATION COALITION
**570 PARK AVENUE**
**NEW YORK, NEW YORK 10065**
thepreservationcoalition@gmail.com.

October 3, 2007

Dear Neighbor:

Recently, you may have received a letter from The Third Church of Christ, Scientist on Park Avenue and 63rd Street in which its Board of Trustees said it was writing to "clarify communications forwarded to you concerning our church." Rather than clarifying the issues, the letter is less than forthcoming about the use of the church by a large commercial catering business, and it mischaracterizes the Preservation Coalition.

**The Preservation Coalition** is spearheaded by the seven neighboring buildings listed below; it was formed to preserve the residential character of our neighborhood. We have been joined by residents from at least 24 buildings (not "a few of our neighbors" as the church claims), who have attended numerous committee and board hearings of Community Board 8, and who have written hundreds of e-mails and letters to local and state officials opposing the use of the church as a commercial catering hall.

**The church has entered into a 20-year multi-million dollar net lease, with two 5-year renewal options, with a catering concern called the Rose Group.** Both the Rose Group and the church claim the catering facility is an "accessory use" of the church. In fact, the reverse is true. **The church – with only a small number of members - has become an accessory use to the catering business.** All the pews have been removed from the main sanctuary and the church name has been covered.

It is an insult to our intelligence that the church's letter states, "Our church is not being converted into a 'large scale catering operation.'" **The caterer's own words demonstrate otherwise, as set forth in the attached copies of the Rose Group's online ads.**

We believe that **this use of the church as a commercial catering hall violates the New York City zoning laws.** Serious concerns also exist about whether serving liquor at these events complies with State Liquor Authority regulations.

And there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood -- commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night.

The church's statement that "requests for a meeting have been rebuffed" is simply untrue. Our outreach to the church began in November 2006, when the Board of 580 Park Avenue invited the Church Trustees and tenant to meet and start a dialogue about their plans, but **the church declined.**

We are disappointed that the church has now resorted to the scare tactic of suggesting the property might have to be sold to a developer unless the commercial catering operation is allowed to continue. Nevertheless, we understand that the church has financial problems. **We believe appropriate alternatives exist.** A commercial catering hall, however, especially for events of up to 1,500 people, is simply unacceptable for our *residentially zoned* neighborhood.

We are meeting with various City agencies and officials to urge them to stop granting temporary permits for these events and to rule that this use violates the law. If such a ruling is not forthcoming, we shall continue to challenge what we believe to be a clearly illegal use of the church building through various administrative channels, and, if necessary, in court.

Sincerely,

The Preservation Coalition Steering Committee
Representing the Boards of Directors of 550, 555, 563, 565, 570, 575, and 580 Park Avenue

583 Park Avenue in BizBash New York

 

**NEW YORK**

OTHER MARKETS

SUPPLIERS    VENUES    EVENT COVERAGE    TRENDS & IDEAS    TIPS & STRATEGIES

PREMIUM SPONSORED LISTING

PRINT | SEND TO A FRIEND

# 583 Park Avenue

583 Park Ave.
New York, NY 10021
Telephone: 212.583.7200
Fax: 212.583.7206
Web: www.583parkave.com



CONNECT TO THIS RESOURCE

**OVERVIEW**
Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of experience, 583 Park Avenue is poised to deliver a luxurious and memorable experience for your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City.

**BIZBASH EDITORIAL COVERAGE**
New Yorkers for Children Decor Underscores Evening's Message
De la Renta Leaves Tents, Gets Exclusive With Church

**ROOM DIMENSIONS AND CAPACITY INFORMATION**

| NAME | DIMENSIONS | SQ.FEET | RECEPTION | BANQUET | THEATER | CLASSROOM | CONFERENCE | U-SHAPE |
|------|-----------|---------|-----------|---------|---------|-----------|-----------|---------|
| 583 Park Avenue:Arcade | - x - | 3854 | 800 |  | 400 | 250 |  |  |
| 583 Park Avenue:Ballroom | - x - | 6500 | 1200 |  | 900 | 500 |  |  |
| 583 Park Avenue:Balcony | - x - | 3423 | 300 |  | 300 | 150 |  |  |

http://www.bizbash.com/newyork/content/resource/r815236.php

PHOTO GALLERY



Photo: 583 Park Avenue

# LocationsMagazine.*com*

WEDDINGS, SOCIAL OCCASIONS, & CORPORATE EVENTS

**WIN A FREE**
**Honeymoon to**
**Jamaica or Brazil**

Largest Wedding Hall Site
In The NY/NJ Metro Area

Oct 3, 2007

Home | Search | Help Line | Partners | Biz Opp | Contact (

## 583 Park Avenue

Photo    Map



Address: 583 Park Avenue
New York, New York 10021
Phone: 212-583-7200
Fax: 212-583-7206
Website: www.583PARKAVE.com
Email: events@583parkave.com
Contact: Louis Rose

Room Capacity cocktail reception: 1,000
Room Capacity dinner w/dancing: 800
Cuisine: Classic American
Kosher: Available
Room accommodates ceremony: Yes
Room available: Monday - Sunday

Comments:
*The most exciting new event space in New York City.*

583 Park Avenue is a breathtakingly glorious building that is now available for private events.

Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of combined experience, 583 Park Avenue is poised to deliver a remarkably luxurious and memorable experience to your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City. It is with great pleasure that we introduce to you this uniquely elegant venue with the hope that we will have the opportunity to be of service to you. Please call for an appointment.

http://www.locationsmagazine.com/display.php?id=7951

info@locationsmagazine.com

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE, NEW YORK, NY 10065  (212) 838-1870

September 18, 2007

Dear The       Family:

**We are writing to clarify communications forwarded to you concerning our church.  We believe we will mutually benefit from this explanation.  Please consider the following:**

- o   Our Church began in the 1880's and has occupied 583 Park Avenue, designed by the famed architectural firm Delano and Aldrich, since its construction in 1923.

- o   Over the years, congregants and visitors have attended meetings and lectures, often more than 1,500 at a time, for which the size of our Church was constructed.

- o   Over the last several decades, our congregation has become smaller.  For several years, our membership has shared the use of its space with a tenant in an effort to maintain our building.

- o   After examining numerous alternatives, it became clear that we must make new arrangements to secure urgently-needed funds for required capital repairs as well as the costly maintenance of our building.

In light of these serious challenges, we were pleased to enter into an arrangement that would permit our building, like many other houses of worship in our community, to be used for catered functions. After careful deliberations, the Church entered into an agreement with the Rose Group, prominent caterers, because it shares the Church's dedication to high standards.

- o   The Rose family has generations of experience in managing elegant events and restoring historic buildings to their previous grandeur.

- o   They have carefully preserved, wherever possible, the original architectural details of the building's interior and would restore our roof with slate from the same Vermont quarry that supplied the church more than 80 years ago.

- o   They have been responsive to our concerns and to the concerns of our neighbors regarding the impact of the special events on the neighborhood.

At a series of meetings, the Rose Group has provided the community a detailed program of steps that it would take to mitigate both traffic and noise (see following).  We have been willing to limit the number of functions per year and the number of persons at each event.  This would distinguish our building from other houses of worship, for which there are no limitations.

4004

The Rose Group and the Church plan the following to mitigate traffic and noise:

o  **We have already monitored the sound audible outside the church** during a few events held in June and found the functions not to be audible from across either street outside the church. Nevertheless, we have retained an acoustical engineer to objectively measure sound levels and to advise us on steps to reduce sound outside the building.

o  **Deliveries to our building will be minimal,** once improvements have been completed, as we are building in storage, trash refrigeration, kitchen and other self-contained facilities.

o  **Trash collection is being scheduled at a time that should not inconvenience** or disturb our neighbors. Any trash that can spoil will be refrigerated within the building and then brought onto the street only when a collection truck has arrived.

o  **Professional management will oversee taxi and limousine drop-off and pick-up.** A drop-off zone already exists in front of the Church. Persons authorized to prevent double parking are being employed. Valet parking service will be provided. For larger events, organizations can legally arrange for limousines to park after a late evening hour in the bus lane on Fifth Avenue.

o  **New York City Police Department personnel off-duty are being engaged** to make certain that our neighbors are not inconvenienced or disturbed by sidewalk traffic.

Our Church is **not being converted into a "large scale catering operation"** as has been asserted.

Our building, **583 Park Avenue, will be used continuously by our Church** for services, testimony meetings, lectures, committee meetings, Sunday School, and other Church activities.

On those occasions when specific catered events are scheduled, there will not be church activity during the hours of the event. It should be noted that **our building was constructed to house well over 1,000,** while almost all -- more than 85% -- of the Rose Group functions expected to take place at the church building will be for **less than 450 people.**

It is our hope and expectation that with a restored and well-maintained building, we will experience renewed growth of Church membership and attendance. As we have historically, we very much want to work together with our neighbors to maintain this wonderful community, in this great City.

A few of our neighbors who call themselves "The Preservation Coalition," have opposed our efforts. We have sought to meet with them to find a method of operation that is acceptable to all concerned. **To date, our requests for a meeting have been rebuffed.**

o  If no accommodation can be reached and the city agencies deny permits that would allow use of our building for catered events, it is likely that our church would not survive at its current location.

o  The next owner or developer would determine how the building and the site would thereafter be used.

Please consider the facts set forth above and we trust that you too will conclude that we should be **able to sit together and work out a compromise** concerning the use of our Church building.

Very truly yours,
Board of Trustees

*Christian Science*

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE   NEW YORK, NY 10065-7363   (212) 838-1870
E-Mail: thirdchurchoffice@Juno.com

September 11, 2007

Dear *Neighbor*:

**We are writing to clarify communications forwarded to you concerning our church.  We
believe we will mutually benefit from this explanation.**  Please consider the following:

- o   Our Church began in the 1880's and has occupied 583 Park Avenue, designed by the famed
     architectural firm Delano and Aldrich, since its construction in 1923.

- o   Over the years, congregants and visitors have attended meetings and lectures, often more than 1,500
     at a time, for which the size of our Church was constructed.

- o   Over the last several decades, our congregation has become smaller.  For several years, our
     membership has shared the use of its space with a tenant in an effort to maintain our building.

- o   After examining numerous alternatives, it became clear that we must make new arrangements to
     secure urgently-needed funds for required capital repairs as well as the costly maintenance of our
     building.

In light of these serious challenges, we were pleased to enter into an arrangement that would permit
our building, like many other houses of worship in our community, to be used for catered functions.
After careful deliberations, the Church entered into an agreement with the Rose Group, prominent
caterers, because it shares the Church's dedication to high standards.

- o   The Rose family has generations of experience in managing elegant events and restoring historic
     buildings to their previous grandeur.

- o   They have carefully preserved, wherever possible, the original architectural details of the building's
     interior and would restore our roof with slate from the same Vermont quarry that supplied the church
     more than 80 years ago.

- o   They have been responsive to our concerns and to the concerns of our neighbors regarding the impact
     of the special events on the neighborhood.

At a series of meetings, the Rose Group has provided the community a detailed program of steps that
it would take to mitigate both traffic and noise (see following).  We have been willing to limit the
number of functions per year and the number of persons at each event.  This would distinguish our
building from other houses of worship, for which there are no limitations.

The Rose Group and the Church plan the <u>following to mitigate traffic and noise</u>:

o **We have already monitored the sound audible outside the church** during a few events held in June and found the functions not to be audible from across either street outside the church. Nevertheless, **we have retained an acoustical engineer** to objectively measure sound levels and to advise us on steps to reduce sound outside the building.

o **Deliveries to our building will be minimal**, once improvements have been completed, as we are building in storage, trash refrigeration, kitchen and other self-contained facilities.

o **Trash collection is being scheduled at a time that should not inconvenience** or disturb our neighbors. Any trash that can spoil will be refrigerated within the building and then brought onto the street only when a collection truck has arrived.

o **Professional management will oversee taxi and limousine drop-off and pick-up.** A drop-off zone already exists in front of the Church. Persons authorized to prevent double parking are being employed. Valet parking service will be provided. For larger events, organizations can legally arrange for limousines to park after a late evening hour in the bus lane on Fifth Avenue.

o **New York City Police Department personnel** off-duty are being engaged to make certain that our neighbors are not inconvenienced or disturbed by sidewalk traffic.

Our Church is **not being converted into a "large scale catering operation" as has been asserted.**

Our building, **583 Park Avenue, will be used continuously by our Church** for services, testimony meetings, lectures, committee meetings, Sunday School, and other Church activities.

On those occasions when specific catered events are scheduled, there will not be church activity during the hours of the event. It should be noted that **our building was constructed to house well over 1,000**, while almost all -- more than 85% -- of the Rose Group functions expected to take place at the church building will be for **less than 450 people.**

It is our hope and expectation that with a restored and well-maintained building, we will experience renewed growth of Church membership and attendance. As we have historically, we very much want to work together with our neighbors to maintain this wonderful community, in this great City.

A few of our neighbors who call themselves "The Preservation Coalition," have opposed our efforts. We have sought to meet with them to find a method of operation that is acceptable to all concern. . **To date, our requests for a meeting have been rebuffed.**

o If no accommodation can be reached and city agencies should deny permits that would allow use of our building for catered events, it is likely that our church would not survive at its current location.

o The next owner or developer would determine how the building and the site would thereafter be used.

Please consider the facts set forth above and we trust that you too will conclude that we should be **able to sit together and work out a compromise** concerning the use of our Church building.

Very truly yours,
Board of Trustees