Exhibit O

*1787*

# Greenberg Traurig

Jay A. Segal
Tel. (212) 801-9265
Fax (212) 801-6400
segalj@gtlaw.com

NYC DEPT. OF BUILDINGS
BOROUGH COMM. OFFICE, MANH
RECEIVED

2007 MAY 16 PM 6:01

Revised: May 8, 2007
April 20, 2007

**BY HAND**

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Department of Buildings
280 Broadway
New York, New York 10007

Re:     583 Park Avenue (the "Building")
        Job #104511495

Dear Commissioner Santulli:

We represent Third Church of Christ, Scientist (the "Church"), the owner of the Building known as 583 Park Avenue, New York, NY (the "Building"). This letter responds to the following requests you made at our meeting of April 5, 2007 and supersedes our letter to you dated April 20, 2007.

    A.     Provide The Following Additional
          <u>Information Regarding Church Activities</u>:

          1.     Describe Church functions in years when the Church was at full membership and expected Church functions in the future;

          2.     Compare the hours of operation for the Church to the time that there will be catered events in the Building;

          3.     Provide information about catered events at other churches and synagogues that have a membership similar to the amount of people who attended Church services in prior years;

*NY 238371559v6 5/8/2007100393.010100*

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised: May 8, 2007
Page 2

B.    Respond To Statements In Letters To You Dated
March 12, 2007 and March 30, 2007, From
Phyllis Weisberg, Esq. (The "Weisberg Letters"),
Of Kurzman Karelsen & Frank LLP, Attorneys
For Two Cooperative Apartment Buildings
Near The Building Concerning:

1.    The lease (the "Lease") between the Church and The Rose Group
Park Avenue LLC (the "Rose Group"), the caterer that the Church chose
to operate events at the Church;

2.    The Rose Group's private placement memorandum (the "PPM");
and

3.    A BSA decision pertaining to a catering hall in the cellar of the
Yeshiva Imrei Chaim Viznitz (the "Yeshiva Case").

I.    Additional Information Regarding The Church

Submitted with this letter is a letter from the Church, dated May 7, 2007 (the "2007
Church Letter"), which describes the historical and current use of the Building by the
Church.  The letter addresses the following issues which you raised at the April 5th
meeting:

(a)    Church Functions In Prior Years When
The Church Was At Full Membership And
Expected Church Functions In Future Years

As discussed in detail in the 2007 Church Letter, by the middle of the 20th
Century the Church held two services on Sundays and one on
Wednesdays, which often completely filled the 1,500 seats at the Church
and sometimes required spill over attendance to be chauffeured to other
Christian Science Churches.  Some of the attendees were driven to and
from services by limousine.  Further, the 2007 Church Letter states that
there were at least a half a dozen lectures each year attended by upwards
of 2,000 people who lined up outside the Building and around the corner
to 63rd Street, as well as a variety of committee meetings almost every day
of the week.  In addition, Christian Scientist churches have held
teenage/young adult and adult social functions that run past midnight;
while the Third Church has previously held most of these functions

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised May 8, 2007
Page 3

outside of the Building, it is expected that with the Building being restored and being made capable of accommodating these functions, future events would be in the Building.

(b)    Comparison Of Hours Of Operation For The Church And The Hours There Will Be Catered Events In The Building

At our April 5th meeting, we told you that the Church would have no more than 35 catered events in 2007 and 169 events in each calendar year thereafter. Starting in 2008, this would average approximately three catered events a week for a total of approximately 13-14 hours per week, or approximately 514 hours/months. The 2007 Church Letter contains a list of Church activities and their hours both (i) if the Church were to regain the attendance it had in the 1940's and 1950's ("Full Attendance") and (ii) the anticipated Church attendance in the next three - five years (the "3-5 Year Attendance Level") as the Church moves towards its goal of Full Attendance. In addition, the 2007 Church Letter attaches a calendar depicting those hours and the hours of expected catered events in a typical month. As can be seen from these materials, the Church will be open approximately 514 hours/months[1] at Full Attendance and 451 hours/month at the 3-5 Year Attendance Level. During this time there will be catered events for approximately 58 hours[2] (which will be 11% of the time the Church is open if the Church is at Full Attendance and 13% of the time the Church is open if the Church is at the Three-Five Year Attendance Level) and during this 58 hours the Church will be open for other Church activities for approximately 35-40 hours.

(c)    Catered Events At Other Houses Of Worship

Attachment 1 to this letter are two letters from caterers providing information about catered events at other houses of worship in Manhattan. That information shows that the average of approximately three events per week that is contemplated to be held in the Church is consistent with the events at these other houses of worship.

---

[1]    30 days x 17 hours (7am - midnight) + 4 hours after midnight for catered events.
[2]    13.5 hours/wk x 4.3 weeks/month.

NY 238371559v6 5/8/2007100393.010100

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised: May 8, 2007
Page 4

II.    The Weisberg Letters[3]

    (a)    The Lease[4]

The March 12 Weisberg Letter points to your handwritten pre-consideration, dated June 28, 2006 (the "Pre-consideration"); at the bottom of a letter from the Church dated June 2, 2006 (the "2006 Church Letter", Attachment 3). The March 12 Weisberg Letter notes that the 2006 Church Letter states that the Church would have catered events that "will be operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church" and that the "functions will be restricted by the contract with the Church". The March 12 Weisberg Letter contends that "the Church's characterization is disingenuous" supposedly because "the so called contract with the caterer is actually a thirty (30) year lease (a twenty (20) year term with two (2) five year renewal options) for the premises" (emphasis in original). The March 12 Weisberg Letter concludes that "the difference between a contract with restrictions and a thirty (30) year lease is staggering."

The March 30 Weisberg Letter (pp. 2-4) attempts to explain this conclusory statement. It states that in a "typical religious institution that permits catering" the "arrangement with a house caterer is usually terminable at will or lasts for only a limited period of time" and that in "the event of a dispute, the religious institution can refuse to renew the caterer's contract . . . ." The March 30 Weisberg Letter contends that the Lease provides the caterer with a "possessory interest" in the Building and argues that the Lease will prevent the Church from exercising control over the operations of the caterer and would prevent the Church from forcing the Rose Group from the Building if the Rose Group were not complying with the terms of the Lease. The March 30 Weisberg Letter cites to a case

---

[3]    Pursuant to your request, we are not responding to all of the factual and logic errors in the Weisberg Letters. However, just to note a few of those errors: the March 12 Weisberg Letter states that Christian Scientists do not believe in weddings - this is false as Christian Scientists get married and have wedding celebrations; the March 12 Weisberg Letter states that the Church will not be using the premises when there is a catered event - as stated in the accompanying 2007 Church Letter this is not true; and the March 12 Weisberg Letter states that because the Church has "only 40 members, it is hard to imagine why or how events of over 500 would be warranted" (p. 4, fn3) - there are two errors in this statement as the Church has over 40 members, and even if it had only 40 members, we do not see why it is hard to imagine that one of those members could invite a large amount of guests to his or her wedding.

[4]    The Lease and the First and Second Amendments thereto are provided as Attachment 2.

NY 238371559v6 5/8/2007100393.010100

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised May 8, 2007
Page 5

at the Lombardy Hotel in which it took more than 3 ½ years to remove a tenant from that building and suggests that this is typical of the time it takes to remove a commercial tenant from a building if it breaches its lease obligations.

Thus, in sum, the March 30 Weisberg Letter is arguing that DOB should revoke the Church's permit that allows the Building to have accessory catering functions because, supposedly, if a dispute were to arise between the Church and the Rose Group regarding the Rose Group's handling of catered events at the Church, it would take the Church far longer to remove the Rose Group from the Building because of the Lease than it would if the Church had another type of contract with the Rose Group. However, as set forth in the Attachment 4 letter from Michael Manning, of Greenberg Traurig's Real Estate Operations Department, there is no merit to this conclusion. To the contrary, the Attachment 4 letter explains that in many instances a lease, such as the Lease, will allow the owner of a building to remove a tenant who violates the controls in the lease from a building far more quickly than the owner of a building could remove a person who had been in a building pursuant to a different type of contract.[5]

The March 30 Weisberg Letter also takes issue with the fact that the Lease provides the Rose Group with certain rights if the Church decides to sell the Building. The Rose Group is investing approximately $8 million to: bring the Building into compliance with the New York City Building Code; make necessary repairs to the Building's infrastructure; and make the Building suitable for catered functions. It is necessary for the Rose Group to have some assurance that the Building would not be sold in a way to frustrate its ability to recapture these costs.

The March 30 Weisberg Letter (pp. 8-11) also contends that your Department should revoke the permit allowing accessory catering before the facility is used for catering. The March 30 Weisberg Letter admits that

---

[5]    The Court of Appeals has made it clear that a lease is just one form of a contract. For example, in Farrell Lines Inc. v. City of New York, 30 N.Y.2d 76, 82 (1972), the Court instructed:

"A lease, like any other contract, is to be interpreted in light of the purposes sought to be obtained by the parties. 'An agreement of lease possesses no peculiar sanctity requiring the application of rules of construction different from those applicable to an ordinary contract'". (Citations omitted).

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised: May 8, 2007
Page 6

"revoking a permit in advance of commencement of use may be unusual"
(p.10) and that court decisions have "stated that the DOB should not
speculate about future uses" (p. 10). However, the March 30 Weisberg
Letter states that the usual DOB policy of not revoking a permit before the
commencement of a use and the Courts' instruction not to speculate about
future uses should not be followed here because of (i) a PPM filed by the
Rose Group with the New York State Attorney General and (ii) and the
BSA decision in the Yeshiva Case.

We show below in Section (b) that the PPM to which the Weisberg Letters
refer has been superseded by a revised PPM that shows that the facility
will be used in a manner fully consistent with the 2006 Church Letter and
your Pre-consideration. And Section (c) below shows that the Yeshiva
Case is readily differentiated from the instant situation. The only judicial
authority provided by the March 30 Weisberg Letter in support of its
request that you ignore the Courts' policy against speculating regarding
future uses is the 9th and 10th Street LLC v. BSA case in which the
Department revoked a permit allowing a building to be built as a
dormitory. In that case, the Department had determined that in order to be
a dormitory a building had to be leased for a stated period of years to a
college or university. The developer in the 9th and 10th Street case
admitted that this would not be the situation and that he intended to lease
directly to students who might be attending a variety of institutions in New
York City. Because the developer admitted that it could not meet the
Department's standard for a dormitory, the permit was revoked. These
facts are not present here as the basis for the Weisberg Letters' claim that
the catering use will not be accessory to the Church is based not on a
bright line test such as that found in the 9th and 10 Street case, but instead
upon a series of suppositions about the size, frequency and type of events
that may be held in the Building.

(b)     The PPM

The Weisberg Letters point to inconsistencies between the statements
made in the 2006 Church Letter and those in a PPM filed by the Rose
Group with the New York State Attorney General's office. That PPM has
been superseded by a revised PPM, submitted to the Attorney General by
letter dated April 3, 2007, which is fully consistent with the 2006 Church
Letter and your pre-consideration (Attachment 5, - see, for example, page
7 stating that "At all times, other than on the limited occasions when the

Greenberg Traurig, LLP

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised May 8, 2007
Page 7

Facility Space is being utilized by the Company for functions, the Facility Space will be set up for and used by the Church for services and related activities.")

(c)    The Yeshiva Case

The Weisberg Letters note that in the Yeshiva Case the BSA upheld DOB's view that the catering use in that case was not accessory to the school and synagogue located in the same building. The Weisberg Letters attempt to analogize to the Yeshiva Case and urge that you conclude that the proposed catering in the Building should be rejected because of principles set forth in the Yeshiva Case. However, the Yeshiva Case is readily differentiated from the instant situation for many reasons, including the following:    First, the BSA itself, included within its resolution deciding the Yeshiva Case a caution about applying the principles stated therein to another set of facts:

> "Whereas, as an initial matter, the Board must once again point out that prior accessory use determinations on a set of facts entirely different than those present here are not binding nor particularly helpful in determining whether the Catering Establishment is an accessory use"

Here, this is especially so, because of a number of significant distinctions between the facts in the Yeshiva Case and the proposed catering for the Building, including:

(1)    In the Yeshiva Case, a C of O had been obtained for that building stating that there was a Use Group 9 catering hall in the cellar - the Use Group 9 designation had been granted based upon a nonconforming use theory.    When the nonconforming use was shown to have lapsed, the Yeshiva attempted to reclassify the catering activity as accessory to the school and synagogue.    The BSA stated "Appellant has failed to explain why a UG 9 designation for the Catering Establishment was sought in 1999 if the use was actually operated as an accessory use to the synagogue".    Here, of course, there are no comparable facts as from the outset the Church has represented that the catering use would be accessory to the Church.

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised: May 8, 2007
Page 8

(2)    In the Yeshiva Case the synagogue and school were located on the first and second floors of a building which contained 3,280 SF. The catering was located in a 18,000 SF cellar that had separate entrances to the street with awnings announcing the name of the catering business[6]. On the other hand, the catered events that are proposed for the Church will be held in the main Church sanctuary and as such will be fully integrated within the existing Church Building. And when catering events are held, the seats will be removed and then immediately replaced thereafter. People who enter the Building to attend events will use the same entrance as people who enter the Building to attend Church services. There are no special awnings and no special signs announcing the name of the caterer. Instead, the functions will be physically integrated into the Church Building.

(3)    The BSA noted that most of the events in the Yeshiva Case were weddings and that most of those weddings would be outdoors under a chuppah. Here all of the events will be within the Building.

(4)    The BSA noted that the hours of operation of the catering facility have no relationship to the hours of operation of the school. Here, as noted above and in the accompanying 2007 Church Letter, there is a significant overlap of the hours of operation of the Church and the hours in which there will be catering within the Building.

---

[6]    The Board noted that the school apparently used the cellar for a cafeteria and assembly room.

NY 238371559v6 5/8/2007 100393.010100

Greenberg Traurig, LLP

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Revised May 8, 2007
Page 9

We hope that the foregoing responds completely to the information you requested and believe that it shows that the proposed catering activity in the Building would meet the accessory use definition in Section 12-10. If you need additional information, please call me or Ronny Livian.

Very truly yours,

Jay A. Segal

JAS/rd

cc:     Ronny Livian
        Fulton Macdonald
        Thomas Draper, Esq.
        Dora Redman
        Barry Mandel, Esq.

583 PARK AVENUE    NEW YORK, NY 10021-7363   (212) 838-1870
E-Mail Third ChurchOffice@Juno.com

# MEMORANDUM

Date:   May 7, 2007

Re:    **Church Activities, Past and Expected Church Use of Our Building, 583 Park**

1.    <u>Perspective</u>

Third Church of Christ, Scientist began in the 1880's as a group of dedicated students of Christian Science, which by 1895 applied for a charter and was registered under the laws of the State of New York.

By 1905, the members had purchased an existing building, formerly the Harlem Presbyterian Church, able to seat 800 people, as membership grew substantially.

By 1918 Third Church members had concluded that it could best serve the growing nature of New York City by relocating to the southern portion of its literature distribution territory[i]. The Church first opened a Reading Room at 680 Madison (61st/62nd and Madison) and then in 1920 purchased the property at 583 Park. Engaging the architects Delano and Aldrich, the members funded and built a classic Georgian-Colonial building, simple while elegant, both in interior and exterior, with a seating capacity of 1500[ii].

First Sunday services were held at 583 Park in December 1923.

By the middle of the 20th Century, Third Church evidenced the following dynamic activity:

- o  Two Sunday Services, mornings and afternoons, with attendance sometimes at the 1,500 seating capacity.

- o  Wednesday Testimony Meeting in the evening with attendance in the 1,000 to 1,400 levels. Note: Some other NYC Christian Science (C.S.) Churches had two Meetings: Noon and Evening, to handle Wednesday Testimony demand.

- o  Thanksgiving Services similarly packed with attendance.

- o  Folding chairs added in the aisles and in the Sunday School basement space would expand seating to close to 2,000 attendees.

- o  Spillover attendance chauffeured[iii] to other Christian Science churches when seating was full.

- o  A half-dozen or more Christian Science Lectures each year that would result in lines of people outside the church building and around the corner from Park to 63rd waiting to be ushered in.

- o  Significant Committee Meetings held most days of each week: Ushers, Sunday School, Reading Room, Property, Music, Finance, Care, Reception, Cloak Room, Literature Sales Room, Literature Distribution (which alone had dozens of members involved in sorting, organizing, and distributing free literature to dozens of locations in the immediate neighborhood and Greater New York City area), and other committees.

- o On average four Corporate Meetings for the full membership in the main auditorium each year that often ran well into the evening to complete (10 - 11 PM).

- o Trustee Meetings at least once each month (up to 10 – 11 PM).

- o Special workshop meetings, frequently running two or more days and evenings with emphasis on the Bible and spiritual healing topics.

In addition, the Christian Science Movement concurrently stimulated and sponsored[iv]:

- o Youth Forum activities for late teens and young adult singles emphasizing wholesome social as well as church related activities (many revolving around the Christian Science Monitor). Socials could run past midnight.

- o Some adult socials (such as a dance) that could run past midnight.

- o Encouragement of use of church auditoriums as a place for quiet prayer, reading of Christian Science literature made available on tables in the Foyer and elsewhere, and informal Q&A between visitors and active members.

## 2. Third Church Renewal

The effort to structure the church and its building, so that it can provide sufficient economic self-sufficiency to restore 583 Park to quality and full-functioning status, includes with it an expectancy of renewed growth of membership and attendance. Just within the past year, with the beginning of renewal, Third Church has added more members than in any previous year within the past fifteen.

While the direction of its Founder, Mary Baker Eddy, is not to focus on or publish membership numbers, it can be reasonably assumed that Third Church at 583 Park Avenue was built for and can support church activity well exceeding 1,000 in attendance.

In addition, the needs of New York City and of contemporary lifestyles encourage a less formal and more open outreach process to serve the community such as making the church available specific evenings for such as *Prayer Time at Third Church, NY*, with appropriate reading material, soft music accompaniment, and some access to "Class Taught" Christian Scientists[v] to answer questions and provide a level of immediate ministry. Thus the Church could, when ready[vi], open its doors to the community from 9 PM to Midnight on Wednesdays and Sundays -- as a prayerful retreat in the middle of Manhattan.

Further, the inclusion of a working kitchen[vii] – generally present in most churches and synagogues today, opens up for the members the opportunity to extend and expand meetings (inclusion of lunch or dinner in support of long study and discussion sessions) and makes church activities more convenient and efficient (not having to break for 1.5-2 hours while participants scatter across the neighborhood seeking meal service).

Changes and improvements to the building provide the Church with greater flexibility in configuring space and conducting meetings tailored to the needs and convenience of its congregation and the range of activities hosted by the Church. This new building flexibility includes:

- o Removal of fixed, tightly-spaced pews
- o Availability of stackable chairs that can be positioned in rows, semi-circles, study group circles, or however best serves the function needs
- o Digital-controls that can set thematic light framing, tailored to a specific church meeting or event

- o Substantially strengthened and more effective elevator system, especially desirable for attendees in wheel chairs or of elder age
- o More bathrooms – modernized and now ADA-compliant, though in restorative quality and design
- o Planned replacement of the worn physical sign on Park Avenue by a digitally-controlled sign that facilitates updating of church activities to passers-by and the community, designed with highest quality aesthetics

Finally, the Church has wanted to give back to the community even more and to become clearly integrated with the neighborhood; consideration is being given, for example, to being available for Open House tours (www.OpenHouseNY.org) and/or also to offering two or more specially prepared free organ concerts for the general public.

3.    Church Standards Affecting the Community

Members typically join Third Church after experiencing spiritual healing. As their understanding of Christian Science grows, they choose to abstain from drugs and other material dependencies. Often they attend services, use the Reading Room, study the Bible and the writings of Mary Baker Eddy, Founder and Pastor Emeritus, for months or even years before they are ready to commit to the mission of Christian Science through church membership. Attendance is often much larger than membership, especially evident at Christian Science Lectures and such popular services as Thanksgiving.

Church services, Lectures, the Reading Rooms and many other outreach activities are open to "all honest seekers of Truth[viii]."

Third Church historically has been known as an institution and body of members holding high standards, and sensitive to neighbors, the community, and the City. Christian Scientists believe in the Golden Rule, and just as they would not want impositions placed on their practice of Christian Science, they do not impose restrictions or Christian Science rules on others.

Concurrently, however, the Church strives to be sensitive to its neighbors and to any impact the Church or anyone associated with it might have on the community. Members abstain from alcohol and smoking and urge others to also, but seek only to impose standards reached by community consensus. These standards currently include the ban on smoking in public places, laws against disorderly conduct, driving while intoxicated, noise pollution, and illegal parking.

Third Church chose to enter into an agreement with the Rose Group, skilled caterers, because it believes they share the Church's appreciation of high standards. The following steps have been taken or are being taken to cushion any material impact that expanded use of the Church and its building might create:

- o Refrigeration of garbage within the sub-basement of the Church building. Reactivation of the "Sidewalk Lift" (once used to transport coal into the building) to move trash up to 63rd Street during authorized garbage removal periods only when authorized trash removal vehicles arrive.

- o Master-system digital control of all sound and light systems within 583 Park so that individual participants cannot project sound or light above or beyond pre-set limits, in keeping with established standards and rules.

- o Employment of a professional Sound Study by Third Church to measure acoustic and decibel level impacts inside and outside its building and, especially, what might be heard or seen by neighboring buildings. The Church ordered proposals from three qualified NYC sound study firms and has selected one for this important work; all reasonable steps from study recommendations will be taken.

o  Use of upwards of a half-dozen ushers to speed passenger drop-off in front of the Church building.  Employment of Valet Parking for many events as well as arrangements with nearby parking garages to handle private vehicles.

o  Planned use of off-duty policemen from the nearby Precinct to control traffic on Park Avenue and 63rd Street, to mitigate illegal parking, double-parking, or other hindrances.   Enforcement of the "no parking zone" in front of 583 Park.

4.    Church Activities Expected (I) Within a Few Years Following Restoration and Restoral, and also (II) When Third Church Approximates its Earlier Attendance Levels

For most of its existence and up to just four years ago, Third Church sponsored and held two Sunday Services.  With renewal -- stimulated by physical restoration of its decaying 85-year old building coupled with sustained increases in income permitting a growth agenda once again, the Church expects to bring back an array of activities and services that were prevailing not long ago and/or have been considered, to reflect a more contemporary set of church-going needs.

The following table reflects the activities of the Church and expected use of hours, drawing on its rich and dynamic history as well as present experience of other Christian Science churches with dynamic, community-serving programs.

5.    Expected Weekly and Monthly Church Activities

| Activity | General Hours of Use | At Full Activity[1] Comments | Within a Few Years[2] Comments |
|---|---|---|---|
| Sunday Church Services | 9:30-1 PM, 6-9:30 PM | Two/week; up to 1,500 attendees | Two/week; up to 200 attendees |
| Sunday School | 10 – 1 PM | Located in basement. 80-100 children and adult staff | Located in basement. 25- 30 children and adult staff |
| Wednesday Testimony Meetings | 11-1:30 PM, 6-9:30 PM | Two/week[ix]; often with 1,000 or more attendees | Two/week; often with 100 - 150 or more attendees |
| Thanksgiving Service | 9:30-1 PM | Popular service on Thanksgiving Day, up to 1,500 attendees. | Popular service on Thanksgiving Day, up to 500 attendees. |
| Christian Science Lectures | 11-2 PM for Noontime, 6-10:30 PM Evening | About six/year; up to 2,000 attendees | About four/year; up to 800 attendees |
| C.S. Association Meetings[x] | 7 AM – 8 PM, Saturdays prep days before, after | About seven/year; up to 800 members each. | About four/year; up to 600 members each. |
| C.S. Class Instruction[xi] | 7:30 AM – 7 PM, Mon-Fri for two weeks | About five/year[xii]; up to 30 students + Teacher | About four/year; up to 30 students + Teacher |
| Branch Committee Meetings | AM, PM, Evenings, upwards of three/day. | At minimum several times per week year-round; 5-50 members per meeting | At minimum several times per week year-round; 5-20 members per meeting |
| Third Church Trustee Meetings | Evenings 5:30 – 11 PM | Up to two/month, 6 members | Up to two/month, 6 members |

---

[1] Based on Church attendance regaining levels of the 1940's and 1950's
[2] Based on expected attendance and Church activity within three-five years (2010-2012).

| Activity | General Hours of Use | At Full Activity Comments | Within a Few Years Comments |
|---|---|---|---|
| Corporate Meetings of Membership | Full day Saturday in Jan, May, Sept, other usually in evenings, up to 11 PM | Minimum of three, to five/year; full Membership expected. | Minimum of three, to five/year; full Membership expected. |
| Readers Rehearsals | Generally: Wed, 5-6 PM, Fri, 7-8:PM, Sun 9-10 | Usually at least three/week; some Readers in church many hours, many days; have their own suites | Usually at least three/week; some Readers in church many hours, many days; have their own suites |
| Soloist Rehearsals | Sat or early Sun AM | Generally one, Sunday prep | Generally one, Sunday prep |
| Organist Rehearsals | Wed, Sun hours before services start | Generally two/week, though more necessary for special meetings, Lectures, other | Generally two/week, though more necessary for special meetings, Lectures, other |
| Piano Rehearsals | 2-3 hours each week, usually late PM Thurs/Fri | For the Sunday School | For the Sunday School |
| Clerk/Treasurer/Building Mgmt. | Six-seven days/week | Physically on 4th Floor, all over the building during day | Physically on 4th Floor, all over the building during day |
| Superintendent Staff focused on Church activities and needs | In parallel with all Church meetings, services, events, before and after, six-seven days/week | Housed in Superintendent Office but all over the building during day and evenings | Housed in Superintendent Office but all over the building during day and evenings |
| Coordinated support to 3rd Church Reading Room now on 62nd and also Jointly-Maintained Reading Room now on Church Street in area of City Hall | Six-seven days/week Involves Clerk's Office + special committee work | Reading Rooms are located elsewhere but coordination is from 583 Park | Reading Rooms are located elsewhere but coordination is from 583 Park |
| Coordinated support for Spanish-speaking Services, Lectures, and radio lectures for the Tri-State area | Weekly planning, coordi-nation, staffing as well as financial support | Spanish speaking services are held at 9th Church but run from 3rd | Spanish speaking services are held at 9th Church but run from 3rd |
| Tri-State C.S. Committee Meetings | Either Saturdays or Evenings, up to 11 PM | One-two per month; 5-50 per | One-two per month; 5-20 per |
| Coordinated support for Tri-State advertising that spans several institutions and activities | Weekly planning, coordi-nation, and commitment of other resources to specific missions | Generally about a half dozen C.S. supporting institutions look to 3rd | Generally about a half dozen C.S. supporting institutions look to 3rd |
| Bookmobile coordination and prep for the Tri-State area | Generally once a week involving many hours; up to 12 people involved. | In support of special events, some outdoors (NYC street fairs, etc) | In support of special events, some outdoors (NYC street fairs, etc) |
| Periodic Special Meetings for the Tri-State area that often include senior representatives from The Mother Church (TMC) | Can cover two-four days each; meetings generally in the evenings or on Saturdays | TMC: The First Church of Christ, Scientist, in Boston, MA; C.S. Headquarters 3-4 per year | TMC: The First Church of Christ, Scientist, in Boston, MA; C.S. Headquarters 1-2 per year |
| Literature Distribution prep and coordination for Third Church area | Twice/week involving many hours: daytime, evenings. | Can be intense, time- and people-demanding work. Up to 50 people involved | Can be intense, time- and people-demanding work. Up to 20 people involved |
| Special Workshops, generally Bible-centered, encouraged by TMC, sponsored by Third Ch. | Sometimes two-three days; can be all day Sat or several evenings. | Attendance from a couple dozen to many hundreds, depending on focus, scope | Attendance from a couple dozen to hundreds, depending on focus, scope |

| Ancillary Activity | General Hours of Use | **At Full Activity**<br>Comments | **Within a Few Years**<br>Comments |
|---|---|---|---|
| Youth Forum activities (see: www.TMCYouth.com), quasi-social | From a couple to many hours, centered generally on young adult singles. Some quite deep metaphysically; a few 9 PM – Past Midnight. | Can concentrate on The Christian Science Monitor or Spiritual Activist Summits; some events merely social, such as a dance; about ten active events/year. | Can concentrate on The Christian Science Monitor or Spiritual Activist Summits; some events merely social, such as a dance; two-three/year. |
| Operation of an active, information-current website for Third Church to connect members, attendees, guests, the young, all interested. (re: http://www.thirdchurchny.com/ plan) | Several hours per day six days per week to maintain and enrich an interactive website that is relevant. | Headquartered in 583 Park Avenue, communicating locally and as far as the Internet spans. | Headquartered in 583 Park Avenue, communicating locally and as far as the Internet spans. |
| "Prayer Time at Third Church"[xiii] | Two evenings per week keeping Church open to the public for quiet prayer, study, Q&A with Class Taught Christian Scientists;9 PM-Midnight | Providing the City and the immediate community a safe prayer-focus haven. Soft music accompaniment[xiv]. | Providing the City and the immediate community a safe prayer-focus haven. Soft music accompaniment. |
| Adult socials[xv] | On a Friday or Saturday evening; 9 PM – Past Midnight. | Dance, dinner event, or centered on a serious subject. 3-4/year | Dance, dinner event, or centered on a serious subject 1-2/year |
| Weddings and Memorial Services[xvi] | As needed. Planning, coordinating, overseeing. Weddings can run late. | As needed; at least a dozen per year. Memorial Services handled by First Reader. Weddings require an outside Minister. | As needed; at least a dozen per year. Memorial Services handled by First Reader. Weddings require an outside Minister. |

## 6.    Expected Average Hourly Use of Church Building

| Activity | Timing of Use | **At Full Activity[3]**<br>Average Hours in Use/Month[xvii] | **Within a Few Years[4]**<br>Average Hours in Use/Month |
|---|---|---|---|
| Sunday Church Services | AM, PM | 7/week = (calculated into Totals) | 7/week = (calculated into Totals) |
| Sunday School (basement space) | AM to about 1 PM | 3/week = (within same hours as church) | 3/week = (within same hours as church) |
| Wednesday Testimony Meet. | Noon and eve periods | 6/week = (totals by month) | 6/week = (totals by month) |
| Thanksgiving Service | AM to about 1 PM | Thanksgiving Day only | Thanksgiving Day only |
| Christian Science Lectures | Eve period during week Noon period on a Sat | Lecture Day + planning meeting, at least ½ day every two months | Lecture Day + planning meeting, almost ½ day every two months |
| C.S. Association Meetings[xviii] | All day on a Saturday | 10-12 hours for event, 2-3 hours day before, after. About 7 Saturdays during the year | 10-12 hours for event, 2-3 hours day before, after. About 5-6 Saturdays during the year |

---
[3] Based on Church attendance regaining levels of the 1940's and 1950's
[4] Based on expected attendance and Church activity within three-five years (2010-2012).

| **Activity** | **Timing of Use** | At Full Activity<br>**Average Hours in Use/ Month** | Within a Few Years<br>**Average Hours in Use/ Month** |
|---|---|---|---|
| C.S. Class Instruction[xix] | Generally Summer months | 9-10 hours for two weeks straight. Space for 30 people. | 9-10 hours for two weeks straight. Space for 30 people. |
| Branch Committee Meetings | Concentrated in eves, Sat, Sun (outside of services) | 30-40 hours/week. Space for from 5 – 50 per meeting. | 15-20 hours/week. Space for from 5 – 15 per meeting. |
| Third Church Trustee Meetings | 6 PM – completion, can be as late as 11 PM | Including prep work, averages 20 hours per month. 4th Floor Board Room. | Including prep work, averages 20 hours per month. 4th Floor Board Room. |
| Corporate Meetings of Membership | 3rd Saturday in January, May, Sept, Other Eves | Including prep, averages 14 hours per quarter. Main space | Including prep, averages 14 hours per quarter. Main space |
| Readers Rehearsals | Usually squeezed in Fri Eve Sun AM, Wed early Eve | 6-11 hours/week = Readers' Suites + Platform time | 6-11 hours/week = Readers' Suites + Platform time |
| Soloist Rehearsals | Usually squeezed in early Sun AM | 2-3 hours/week = | 2-3 hours/week = |
| Organist Rehearsals | Usually squeezed in Wed early eve, Sun AM | 3-4 hours/week = | 3-4 hours/week = |
| Piano Rehearsals | Fri eve or Sun AM, Sunday School space | 1-2 hours/week = | 1-2 hours/week = |
| Clerk/Treasurer/Building Mgmt. | Better part of seven days/wk | 60-100 hours/week = 4th Floor + "walking the church" | 50-80 hours/week = 4th Floor + "walking the church" |
| Superintendent Staff focused on Church activities and needs | Better part of seven days/wk | 70-90 hours/week = Maintenance Office + "working the church building" | 70-90 hours/week = Maintenance Office + "working the church building" |
| Coordinated support to 3rd Church Reading Room (RR) and also Jointly-Maintained RR | Varies by need but usually some every day | 3-8 hours/week = Largely done from 4th Floor | 2-4 hours/week = Largely done from 4th Floor |
| Coordinated support for Spanish-speaking Services & Lectures | Varies by time period, some months relatively quiet. | 1-5 hours/week = Largely done from 4th Floor | 1-2 hours/week = Largely done from 4th Floor |
| Tri-State C.S. Committee Meetings | Some activity every month, some quite demanding | 1-5 hours/week = Coordination from 4th Floor, meetings can take major space and involve many participants | 1-3 hours/week = Coordination from 4th Floor, meetings can take major space and involve many participants |
| Coordinated support for Tri-State advertising | Varies by time period, some months quiet. | A couple hours per week. Largely done from 4th Floor | A couple hours per week. Largely done from 4th Floor |
| Bookmobile coordination and prep for the Tri-State area | Some activity every month, some quite demanding | 2-8 hours/week = Coordination from 4th Floor, team work takes space | 2-3 hours/week = Coordination from 4th Floor, team work takes space |
| Periodic Special Meetings for the Tri-State area | Varies by time period, some months relatively quiet. | Coordination from 4th Floor. Special Meetings usually involve a lot of people and much space. | Coordination from 4th Floor. Special Meetings usually involve a lot of people and much space. |

| Activity | Timing of Use | At Full Activity<br>Average Hours in Use/Month | Within a Few Years<br>Average Hours in Use/Month |
|---|---|---|---|
| Literature Distribution | Late PM, evenings; some Sat and Sun work | 4-8 hours/week ≈ Involves a lot of people and much space to sort, prep. | 3-5 hours/week = Involves a lot of people and much space to sort, prep. |
| Special Workshops | Daytime, evening and Sat prep. Workshops can be relatively intimate or huge (a couple hundred people). | Workshops themselves run from ½ day to several days, from two to a few times per year. Much coord. and prep. Attendance can be very large. | Workshops themselves run from ½ day to several days, from one to a few times per year. Much coord. and prep. Attendance can be sizeable. |
| Youth Forum activities (see: www.TMCYouth.com), quasi-social | Keyed on non-school timing so weekends are priorities as are Summer months. | 2-8 hours/week by Youth task forces; much prep around school holidays/breaks. Youth workshops from 1-3 days. Socials can run past midnight. | 1-3 hours/week by Youth task forces; much prep around school holidays/breaks. Youth workshops from 1-3 days. Socials can run past midnight. |
| Operation of an active, information-current website for Third Church http://www.thirdchurchny.com/ plan | Most work done during daytime hours.<br><br>Maintenance 24x7 (largely uses an outside hosting service). | Maintaining a dynamic, interactive website requires a "Webmaster" 20-40 hrs/wk ≈ Largely directed from 4th Floor. Keys into ALL Church activities and outreach. | Maintaining a dynamic, interactive website requires a "Webmaster" 20-40 hrs/wk = Largely directed from 4th Floor. Keys into ALL Church activities and outreach. |
| "Prayer Time at Third Church" | Targeting Wednesday and Sunday evenings/late. | 10 hours of focused time, 6 open to public. | 10 hours of focused time, 6 open to public. |
| Adult socials | Generally Friday or Saturday events, in the evening. | 1-6 hours/week. Coordination includes Clerk's Office and adult special subcommittees. Socials can run past midnight. | 1-6 hours/month. Coordination includes Clerk's Office and adult special subcommittees. Socials can run past midnight. |
| Weddings and Memorial Services | Memorial Services can be anytime, as requested (First Reader presides). Weddings similar to general practice (Ordained Minister). | As requested[xx]. From a couple of hours to a couple of days/month. Requires major space (one of two major church floor spaces). | As requested[xxi]. From a couple of hours to a couple of days/month. Requires major space (one of two major church floor spaces). |

**Catering Support**

| | | | |
|---|---|---|---|
| Catering for Church-Specific | Church activities, meetings, Lectures, weddings, and the like. | 4-6 hours/week, once in full operational use. Most large scale. | 4-6 hours/week, once in full operational use. Some small scale. |
| Catering for Outside Events | Mostly in evenings; some late; Sunday after morning Church and Sunday School services | 13 hours/week for "live" events, "prep time" is behind kitchen and other workspace areas, not interfering with Church. | 13 hours/week for "live" events, "prep time" is behind kitchen and other workspace areas, not interfering with Church. |
| Total Catering Activity | As needed (see above) | 17-19 hours/week, some with other church functions | 17-19 hours/week, some with other church functions |

| TOTAL HOURS OF USE | At Full Activity[5] | | Within a Few Years[6] | |
|---|---|---|---|---|
| | **Average Participants** | **Average Hours Per Month[xxii]** | **Average Participants** | **Average Hours Per Month[xxiii]** |
| **Categories of Church Use** | | | | |
| 1) Totals for Church-only activities[xxiv]: | 800 – 1,000 | 102 - 128 discrete[xxv] hours | 100 – 600[xxvi] | 98 - 101 discrete hours |
| 2) Totals for Church activities mandating that other activities are isolated[xxvii]: | 30 | 58 - 70 discrete[xxviii] hours | 30 | 58 - 64 discrete hours |
| 3) Totals for Church activities that can work around other schedules[xxix]: | 20 - 70 | 280 - 340 overlap: more than one activity at the same time | 12 - 25 | 260 - 310 overlap: more than one activity at the same time |
| 4) Totals for Church activities that are largely "behind the scenes"[xxx]: | 10 | 510[xxxi] more than one activity at a time | 10 | 447 more than one activity at a time |
| **Totals for Catering Support** | | | | |
| 5) Church membership primarily: | staffed by event need | 22 work runs in parallel to other Church activities | staffed by event need | 22 work runs in parallel to other Church activities |
| 6) Others/outside events: | staffed by event | 58 hours/month[xxxii] | staffed by event | 58 hours/month |
| 7) Total catering support: | defined by nature of event | 80 hours/month[xxxiii] | defined by nature of event | 80 hours/month |
| **Total Church Operating Hours** | | | | |
| 8) Expected Hours of Church Operations: | | 7am-Midnight[xxxiv] | | Varies by day, 4 days: 7am-10pm, 2 days: 7am-12pm, 1 day: 9am-8pm |
| 9) Total Church operating hours[xxxv]: | | 514[xxxvi] hours/month | | 451[xxxvii] hours/month |
| **Other or Outside Events** (category 6 above) vs. **Total Church Use** (category 9 above): | | 11% | | 13% |

[5] Based on Church attendance regaining levels of the 1940's and 1950's
[6] Based on expected attendance and Church activity within three-five years (2010-2012).

7.    Average[xxxvii] Monthly Calendars of Use of Church Building by Hour by Day
(totaled and summarized into categories; color coded)

(Calendar summary follows, attached)

[i] Each branch church has a Literature Distribution Committee that makes available Christian Science Literature where it is welcome and needed. Third Church covered the Upper East Side down to 59th Street.

[ii] From The History of Third Church of Christ, Scientist, New York City, a pamphlet published by the church in 1953 at the celebration of its complete payment of debt, referred to as Dedication.

[iii] As part of its large Usher Committee, a transportation subcommittee stood by with cars to take visitors and members to other nearby Christian Science churches when absolutely no seating was left available.

[iv] Most of the Youth Forum and all of the socials were held outside of the Church. However, with removal of the fixed pews and a more open Church building, it is expected that Third Church could hold a number of these quasi-social events going forward.

[v] Those who have successfully gone through two weeks of authorized Christian Science instruction by a designated Christian Science Teacher, one who is authorized by TMC to use the initials C.S.B. following his/her name. Each student of Christian Science is allowed to be "Class Taught" once. See other references on C.S. Classes and C.S. Associations (those who have been Taught by a C.S. Teacher and meet once/year in an Association Meeting addressed by the Teacher or authorized substitute.

[vi] Current restoration is helping to prepare the Church: making bathrooms and access ADA compliant, constructing the Auditorium to be more visitor-friendly and flexible, improving lighting, clarity and precision of sound for listeners, installation of sprinkler systems and other steps to make the church building safer, improved security systems, and more.

[vii] Designed and installed by the catering-proficient Rose Group in support of church and outside meetings and events.

[viii] From the Preface to Science and Health with Key to the Scriptures by Mary Baker Eddy.

[ix] In the past, Third Church has held one Wednesday Testimony Meeting/week but would consider two to meet demand at attendance levels of its peak periods and contemporary work and lifestyles.

[x] All day events, usually on a Saturday. Associations also have prep meetings the day before and some have follow-on meetings the day after as well.

[xi] Each student of Christian Science is eligible to take Class Instruction from an authorized by The Mother Church, Boston, MA) Teacher. Classes are not expected to be larger than 30 in size, run all day, Mon-Fri, for two weeks. At Third Church, classes, depending upon size, can be held in the Sunday School space (Basement), Board Room (4th Floor) and potentially in the renewed Church Committee Room (4th Floor). Class Instruction cannot be disturbed.

[xii] Because Class Instruction requires complete privacy, an increase of the number of Classes at two weeks each would be coordinated with the Caterer and might include the construction of a more privately sealed-off study and meeting room, which could probably be accommodated in what is now referred to as Attic space, off the 4th Floor.

[xiii] All significant activities and programs of Third Church require Membership approval and those not specifically called for in The Manual of The Mother Church by Mary Baker Eddy can be added or dropped according to Membership wishes.

[xiv] At appropriate times, the Church will also offer free organ concerts emphasizing more popular music though keeping with the dignity of the Church

[xv] Some other Christian Science individually or grouped have sponsored adult socials that are almost only independent of a church building; however, the restoration and renovation of Third Church, NY, lends itself for occasional socials for its members and their guests and/or for Tri-State socials in upper-mid Manhattan

[xvi] Not commonly conducted in Christian Science church buildings but can be; the more flexible structure of the restored 583 Park facilitates a much wider range of events and activities than historically capable

[xvii] Based on 4.5 weeks/month as an average calculation

[xviii] All day events, usually on a Saturday. Associations also have prep meetings the day before and some have follow-on meetings the day after as well.

[xix] Each student of Christian Science is eligible to take Class Instruction from an authorized (by The Mother Church, Boston, MA) Teacher. Classes are not expected to be larger than 30 in size, run all day, Mon-Fri, for two weeks. At Third Church, classes, depending upon size, can be held in the Sunday School space (Basement), Board Room (4th Floor) and potentially in the renewed Church Committee Room (4th Floor). Class Instruction cannot be disturbed.

[xx] Time needs not calculated into totals.

[xxi] Time needs not calculated into totals.

[xxii] Approximate, as this deals with a forecast, though based on substantive experience

[xxiii] Approximate, as this deals with a forecast, though based on substantive experience

[xxiv] Such as main Church Services and C.S. Lectures, can also include major workshops

[xxv] Nothing can happen in the Church but those Church activities/Services/Meetings

[xxvi] C.S. Lectures are already pulling in between 400-500; Thanksgiving Service very well attended, Association Meetings today are in the many hundreds and can be higher

[xxvii] Such as Trustee Meetings and C.S. Class Instruction

[xxviii] Nothing can happen anywhere in the vicinity, such as on the 4th Floor or Basement while these activities are going on

[xxix] The many Church Committee Meetings, Rehearsals, Literature Distribution, etc.

[xxx] Church Office, Treasurer, Clerk, church-focused custodial work, Church website maintenance and updating, etc.

[xxxi] Clerk, Office, Custodial, Website maintenance, support that parallels Church hours

[xxxii] Note: many Church activities can continue behind the scenes

[xxxiii] Note: many Church activities can continue behind the scenes

[xxxiv] Based on Expected Use at membership and attendance of the 1940's, 50's and contemporary use of building to meet modern lifestyle and spiritual-searching needs

[xxxv] Note: 2, 3, 4 & 5 can overlap. Activities from 4 and some of 3 can occur with Activity 6

[xxxvi] 451 vs. 447, as an average of four hours/month would run past midnight to complete catered events

[xxxvii] Wed-Sun: to Midnight, Mon. Tues, Thurs, Fri: to 10 pm except special church events. Sat: 9am-8pm, though can run longer for special church events.

[xxxviii] Using two calendar months such as April and August to provide a balanced perspective of Church activity, which varies slightly through the year.

Third Church of Christ, Scientist, of New York City
Typical Month of Activities

KEY

| | |
|---|---|
| | "Church Only" Activities |
| | Church Activities with "isolated other activities" |
| | Church Activities that "Work around other schedules" |
| | Church Activities that are "Behind the Scenes" |
| | Church Catering Events |
| | Church Operating Hours |
| | Outside Catering Events |

Attachment #4
Submitted w/ 5/8 letter

# Greenberg
# Traurig

Michael P. Manning
Tel. (212) 801-6861
Fax (212) 801-6400
manningm@gtlaw.com

May 8, 2007

Mr. Christopher Santulli, P.E.
Manhattan Borough Commissioner
Department of Buildings
280 Broadway
New York, New York  10007

Re:    583 Park Avenue (the "Building")
       Job #104511495

Dear Commissioner Santulli:



We represent Third Church of Christ, Scientist (the "Church"), the owner of the building located at 583 Park Avenue, New York, New York (the "Building"), and submit the following in response to certain allegations regarding landlord-tenant litigation set forth in the letter dated March 30, 2007 to you from counsel for 580 Park Avenue, Incorporated and 570 Park Avenue Apartments, Inc. (the "March 30 Letter").  In arguing that a lease would afford greater protections to a tenant engaging in objectionable conduct than another contract type, the March 30 Letter states that summary proceedings "often take several years to resolve" during which time "the caterer would continue to have access to and a right to occupy the premises."  We submit that the estimate of the time involved in evicting a commercial tenant for a material breach of lease set forth in the March 30 Letter is too high and the rights granted to the Church in the lease are substantially the same as if the agreement with The Rose Group Park Avenue LLC (the "Rose Group") were another form of contract.

A review of the lease (the "Lease") between the Church and the Rose Group shows that it contains as many restrictions on the operation by the Rose Group as would any other type of contract.  For example, it requires that the tenant "[p]ermit no act or practice which may . . . be a nuisance," "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the premises," "supply refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors," and that it not "permit any advertising medium or loud speaker, radio broadcast, etc. to be heard outside of the premises."  See Lease Article 32.  In addition, the Second Amendment to the Lease provides that the Church and the Rose Group will together "establish standards concerning sound, light levels, traffic control, signage."  The Lease also contains conditional limitation provisions applicable to non-monetary defaults such as a breach of any restriction described in Article 32.  See Lease Article 13.2.  Such a provision permits the Church, in the event of a default relating to violation of the restrictions, to serve a notice to cure and, if such notice is not complied with, a notice of termination of the Lease.  Following expiration of the time set forth in the notice of termination, the Church could serve a notice of petition and petition commencing a "holdover summary proceeding" against the Rose Group in the Civil Court pursuant to RPAPL § 711(1).

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
WILMINGTON
ZURICH

NY 238395263v8



Page 2

The Real Estate Operations Department at Greenberg Traurig represents real estate firms in connection with their use, management, and operation of commercial real estate, including commercial landlord/tenant disputes. In our experience, contested commercial holdover proceedings typically last four to nine months not including appeals. If the Church serves a notice to cure pursuant to a conditional limitation provision, the Rose Group may commence a declaratory judgment action in the Supreme Court and seek a "*Yellowstone* injunction" to toll the expiration of the cure period set forth in the notice while the parties litigate the merits of the default. *Yellowstone* actions in Supreme Court generally take longer to resolve than summary proceedings in Civil Court and typically last from one to two years. Of course, there are a smaller percentage of cases that take longer. Although it is impossible to predict the length of future legal proceedings, the case cited in the March 30 Letter, *109 East 56th Street v. 111 East 56th Street*, appears to be an extreme one and is atypical of the time involved to complete a commercial landlord/tenant dispute.

Contrary to counsel's characterization of dispossess proceedings, the Civil Court of the City of New York has established a special landlord-tenant part with specific expertise to expeditiously decide commercial-landlord tenant disputes. A prospective action against the Rose Group for violation of the restrictions may be brought as a *summary* proceeding, as part of a process that was created by statute to provide expeditious relief. *New York University v. Farkas*, 121 Misc. 2d 643, 468 N.Y.S.2d 808 (Civ.Ct. 1983) ("the invention of the summary proceeding was designed to provide the landlord with a simple, expeditious and inexpensive means of regaining possession of his premises").

Moreover, the March 30 Letter fails to address that the Lease specifically provides for the remedy of injunctive relief if the Rose Group violated the restrictions. *See* Lease Article 14. The length of time to complete a future case for eviction based on the Rose Group's conduct would be immaterial if the behavior was restrained pending disposition of the case. The March 30 Letter also fails to account for the fact that delays are inherent in all litigations, and that delays could result regardless of the form of contract utilized.

In sum, the rights granted to the Church in the Lease are substantially the same as if the agreement with the Rose Group were another form of contract, plus the Church may have the benefit of commencing a summary proceeding in Civil Court, a statutorily created process designed to provide expeditious relief in a lease dispute that is not available in other types of contract disputes.

Very truly yours,

Michael P. Manning

cc: Daniel J. Ansell, Esq.
    (Greenberg Traurig, LLP
    Chair, Real Estate Operations Department)
NY 238395263v8