07 Civ. 10962 (DAB)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST of NEW
YORK CITY,

                                                  Plaintiff,

                        -against-

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as Commissioner
of the New York City Department of Buildings,

                                                  Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

*MICHAEL A. CARDOZO*

*Corporation Counsel of the City of New York*

*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  AVE MARIA BRENNAN*
*Tel:  (212) 788-0782*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS, RELEVANT STATUTES AND
REGULATORY BACKGROUND ...................................................................................... 3

      POINT I

           THE  ROSE  GROUP'S  CATERING
           ESTABLISHMENT AT THE BUILDING IS NOT
           AN ACCESSORY USE........................................................................... 3

      POINT II

           THE  CITY'S  REVOCATION  OF  THE
           APPROVAL AND PERMIT FULLY COMPORTS
           WITH THE "EQUAL TERMS" PROVISIONS OF
           RLUIPA ................................................................................................ 6

      POINT III

           THE  CITY'S  REVOCATION  OF  THE
           APPROVAL AND PERMIT FULLY COMPORTS
           WITH  THE  "SUBSTANTIAL  BURDEN"
           PROVISIONS OF RLUIPA ................................................................... 11

          A.  The Operation of a Catering Business by the
              Rose Group is not a Religious Exercise Under
               RLUIPA............................................................................... 12

          B.  The Revocation of the Approval and Permit to
               Operate  the  Catering  Establishment  by  the
               Rose Group at the Building is not a Substantial
               Burden on Religious Exercise under RLUIPA ................................... 16

      POINT IV

           THE  CITY'S  REVOCATION  OF  THE
           APPROVAL AND PERMIT FULLY COMPORTS
           WITH  PLAINTIFF'S  EQUAL  PROTECTION
           RIGHTS ................................................................................................ 18

**Page**

A.  Plaintiff Cannot Establish it has Been Treated Differently From Others Similarly Situated ...................................... 20

B.  Plaintiff has not Demonstrated Intentional Discrimination Based on an Impermissible Motive.................................................................................................. 23

C.  Plaintiff Cannot Establish Disparate Treatment Without a Rational Basis. .................................................................. 24

POINT V

PLAINTIFF'S    APPLICATION    FOR    A PRELIMINARY   INJUNCTION   SHOULD   BE DENIED........................................................................................ 25

A.  Plaintiff Cannot Establish Irreparable Harm. ...................................... 26

(i)  The Second Amendment was not Approved by the Supreme Court as Required by Statute. ...................................... 26

(ii)  The Rose Group did not Comply with the Terms of the Second Amendment. .................................................. 26

(iii) Plaintiff's Harm is Self-Created. ...................................... 30

CONCLUSION................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Pages**

303 W. 42nd St. Corp. v. Klein,
    46 N.Y.2d 686 (1979) ..............................................................................................20

Albanian Associated Fund v. Township of Wayne Planning Board,
    2007 U.S. District LEXIS 73176 (D.N.J. Oct. 1, 2007) ........................................10

Bery v. City of New York,
    97 F.3d 689 (2d Cir. 1996).....................................................................................26

Citibank, N.A. v. Citytrust,
    756 F.2d 273 (2d Cir. 1985)...................................................................................26

City of Cleburne v. Cleburne Living Ctr.,
    473 U.S. 432 (1985)................................................................................................19

Congregation Yetev Lev D'Satmar of Kiryas Joel, Inc. v. Congregation Tetev Lev
    D'Satmar, Inc., 31 A.D.3d 480, 482 (3d Dept. 2006),
    aff'd, 9 N.Y.3d 297 (2007) ....................................................................................29

Consolidated Brands, Inc. v. Mondi,
    638 F. Supp. 152 (E.D.N.Y. 1986) ........................................................................26

Cornell University v. Bagnardi,
    68 N.Y.2d 583 (1986)............................................................................................18

Digrugilliers v. Consolidated City of Indianapolis,
    506 F.3d 612 (7th Cir. 2007) .................................................................................10

Episcopal Student Foundation v. City of Ann Arbor,
    341 F. Supp. 2d 691 (E.D. Mich. 2004).................................................................17

Fabini v. Kammerer Realty Co.,
    14 Misc. 2d 95 (Westchester Co. Sup. Ct. 1958)...................................................24

FSK Drug Corp. v. Perales,
    960 F.2d 6, 10 (2d Cir. 1992) ................................................................................20

Giordano v. City of New York,
    274 F.3d 740 (2d Cir. 2001)...................................................................................24

Greater Bible Way Temple v. Jackson,
    477 Mich. 373 (2007) ............................................................................................14

**Cases**                                                                                              **Pages**

Greentree at Murray  Hill Condominium v. Good Shepard Episcopal Church,
   146 Misc. 2d 500 (Sup. Ct. N.Y.Co. 1989) ......................................................................... 3-4

Guru Nanak Sikh Society v. County of Sutter,
   326 F. Supp. 2d 1140 (E.D. Cal. 2003),
   aff'd, 456 F3d 978 (9th Cir. 2006) ...................................................................................10

Harlen Assocs. v. Village of Mineola,
   273 F.3d 494 (2d Cir. 2001)...........................................................................19, 20, 22, 23, 24

Konikov v. Orange County,
   410 F.2d 1317 (11th Cir. 2005) .........................................................................................8

LeClair v. Saunders,
   627 F.2d 606 (2d Cir. 1980),
   cert. denied, 450 U.S. 959 (1981) ................................................................................ 22-23

Lighthouse Christian Center, Inc. v. City of Reading,
   2006 U.S. District LEXIS 52432 (E.D. Penn. June18, 2006)..................................................10

Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,
   2007 U.S. App. LEXIS 27390 (3rd Cir. 2007) .........................................................................8

Midrash Sephardi, Inc. v. Young Israel,
   366 F.3d 1214 (11th Cir. 2004),
   cert. denied, 543 U.S. 1146 (2005) ....................................................................................8

Million Youth March, Inc. v. Safir,
   155 F.3d 124 (2d Cir. 1998)............................................................................................25

New Life Ministries v. Charter Township of Mt. Morris,
   2006 U.S. District LEXIS 63848 (E.D. Mich. Sept. 7, 2006)..................................................10

New York Botanical Garden v. Board of Standards and Appeals of the
   City of New York,
   91 N.Y.2d 413 (1998) ....................................................................................................3

Parkview Associates v. City of New York,
   71 N.Y.2d 274,
   cert. denied, 488 U.S. 801 (1988) .....................................................................................23

Personnel Adm'r of Massachusetts v. Feeney,
   442 U.S. 256 (1979).....................................................................................................20

**Cases**                                                                                 **Pages**

Petra Presbyterian Church v. Village of Northbrook,
    409 F. Supp. 2d 1001 (N.D. Ill. 2006),
    aff'd, 2007 U.S. App. LEXIS 13136 (7th Cir. June 7, 2007).....................................................10

Philanz Oldsmobile, Inc. v.  Keating,
    51 A.D.2d 437 (4th Dept. 1976) .....................................................................................24

Plaza Health Laboratories, Inc. v. Perales,
    878 F.2d 577 (2d Cir. 1989)...........................................................................................25

Polymer Technology Corp. v. Mimran,
    37 F.3d 74 (2d Cir. 1994)...............................................................................................25

Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,
    450 F.3d 1295 (11th Cir. 2006) .......................................................................................8

Railway Express Agency, Inc. v. New York,
    336 U.S. 106 (1949).....................................................................................................23

Redwood Christian Schools v. County of Alameda,
    2007 U.S. District LEXIS 8287 (N.D. Cal. Jan. 26, 2007).....................................................10

Scottish Rite Cathedral Association of Los Angeles v. City of Los Angeles,
    156 Cal. App. 4th 108 (Cal. App. 2d Dist., 2007)
    petition for review denied,
    2008 Cal. LEXIS 253 (Cal. Jan. 8, 2008) .......................................................... 13-14

Snowden v. Hughes,
    321 U.S. 1, reh'g denied, 321 U.S. 804 (1944) .................................................20,22

St. Andrey Bulgarian Eastern Orthodox Cathedral Church, Inc. v. Bosakov,
    272 A.D.2d 55 (1st Dept. 2000)......................................................................................28

Standard & Poor's Corp. v. Commodity Exchange, Inc.,
    683 F.2d 704 (2d Cir. 1982)...........................................................................................25

Tucker Anthony Realty Corp. v. Schlesinger,
    888 F.2d 969 (2d. Cir. 1989).........................................................................................26

United States v. Falk,
    479 F.2d 616 (7th Cir. 1973) .........................................................................................20

Vietnamese Buddhism Study Temple in America v. City of Garden Grove,
    460 F. Supp. 2d 1165 (C.D. Cal. 2006) ...........................................................................10

**Cases**                                                                                    **Pages**

<u>Village of Willowbrook v. Olech,</u>
    528 U.S. 562 (2000).................................................................................................20

<u>Weinberger v. Romero-Barcelo,</u>
    456 U.S. 305, 311 and 312 (1982 )..........................................................................25

<u>Westbury v. Samuels,</u>
    46 Misc. 2d 633 (Nassau Co. Sup. Ct. 1965).........................................................24

<u>Westchester Day School v. Village of Mamaroneck,</u>
    504 F.3d 338 (2d Cir. 2007)..............................................................................14, 16

<u>Yakus v. United States,</u>
    321 U.S. 414 (1944)..................................................................................................25

<u>Yick Wo v. Hopkins,</u>
    118 U.S. 356 (1886)..................................................................................................19

<u>Zahra v. Town of Southold,</u>
    48 F.3d 674 (2d Cir. 1995).........................................................................19, 20, 23

**Statutes**                                                                                      **Pages**

42 U.S.C. § 2000cc(a)(1) ...........................................................................................11,12

42 U.S.C. § 2000cc(b)(1) ...............................................................................................6

42 U.S.C. § 2000cc-5(7) ..............................................................................................13

New York State Not-for-Profit Law § 511 ............................................................. 27-28

New York State Religious Corporations Law §12(1)............................................. 27-28

**Miscellaneous**

Joint Statement of Senators Hatch and Kennedy,
    146 Congressional Record S 7774......................................................................13

ZR § 12-10 ....................................................................................................................1

ZR § 74-711 ................................................................................................................29

## PRELIMINARY STATEMENT

Plaintiff Third Church of Christ, Scientist, of New York City, is the owner of the land and building (the "building") located at 583 Park Avenue in Manhattan. Plaintiff has entered into a twenty-year lease (with two five-year renewal options) with the Rose Group Park Avenue LLC (the "Rose Group") of both the land and the building. The Rose Group is a business of high end, upscale catering and hosting of events for the general public such as weddings, bar mitzvahs, family reunions and corporate meetings. The Rose Group has run, and intends to run, large, catered events such as these at the building. These catered events will have no connection to the religious activities of plaintiff, but rather will be for the general public.

Plaintiff asks this Court for a preliminary injunction enjoining defendants "from revoking earlier-issued approvals and permits that had allowed the Church to use its building for catered events" (plaintiffs' memorandum at 1), i.e., enjoining the City from implementing or enforcing the determination of the Department of Buildings of the City of New York ("DOB") dated November 30, 2007 that revoked the approval and permit allowing an accessory use catering establishment at the building. In fact, that request for relief is disingenuous, as it is not plaintiff that is using the building for catered events, but rather the Rose Group that is using and will continue to use the building for its own catered events over which plaintiff has no control.

The revocation of the approval and permit allowing a change in use at the building from a church and school to a church, school and accessory catering hall was based on DOB's determination that the catering establishment run by the Rose Group at the building was not an "accessory use" under the Zoning Resolution of the City of New York ("ZR")(ZR § 12-10). On the contrary, rather than being accessory to plaintiff's use of the building as a place of worship and in contrast to plaintiff's actual limited use of the building, the Rose Group's catering business, by virtue of, among other things, the magnitude and frequency of the catered events it

runs, had become the primary use of the building. In revoking this approval and permit, DOB regulated a catering facility owned and operated by the Rose Group in violation of the ZR, and did not regulate the religious exercise of the plaintiff. Neither the Religious Land Use and Institutionalized Persons Act ("RLUIPA") nor the First and Fourteenth Amendments to the United States Constitution allow plaintiff to raise money by essentially handing over its building to an independent commercial enterprise that is operating a catering establishment in violation of the ZR. Plaintiff's need for financing is not justification to allow an otherwise illegal use in its building. Plaintiff's claim that the inability of the Rose Group to operate a commercial catering establishment at the building results in a violation of plaintiff's rights and therefore this commercial use should be allowed to continue is a misapplication of RLUIPA and constitutional protections. Moreover, plaintiff's claim of irreparable harm is speculative at best and is mostly of its own creation. The Second Amendment to the Lease, upon which plaintiff relies in showing harm, appears to be unenforceable. Unlike the Lease itself which was approved by the New York State Supreme Court, the Second Amendment post dates that required Court approval and is therefore, defendants submit, unenforceable. Nor has the Rose Group complied with a prerequisite in the Second Amendment that it "prosecute … through final approval" an application for a special permit under the ZR.

Accordingly, as explained hereinafter and in the accompanying declaration of Ave Maria Brennan ("Brennan Decl.") and all the exhibits thereto, plaintiff has not and cannot demonstrate the requirements for a preliminary injunction.

## STATEMENT OF FACTS, RELEVANT STATUTES AND REGULATORY BACKGROUND

A complete statement of facts, relevant statutes and regulatory background is set forth in the accompanying Brennan Declaration, and for the sake of brevity, is not repeated herein.

### POINT I

### THE ROSE GROUP'S CATERING ESTABLISHMENT AT THE BUILDING IS NOT AN ACCESSORY USE

Under the ZR, only certain uses are allowed in the residential district where plaintiff's building is located and a use "accessory" to the primary use of plaintiff's building would be permitted. However, the operation of the commercial catering business by the Rose Group in the building is not a use that is accessory to plaintiff's use of the building under the ZR. "Whether a proposed accessory use is clearly incidental to and customarily found in connection with the principal use depends on an analysis of the nature and character of the principal use of the land in question in relation to the accessory use, taking into consideration the over-all character of the particular area in question (citations omitted)." New York Botanical Garden v. Board of Standards and Appeals of the City of New York, 91 N.Y.2d 413, 420 (1998). In the Botanical Garden case, the New York State Court of Appeals rejected the claim that a radio tower on the grounds of Fordham University in the Bronx was not an accessory use to the university and specifically noted that the radio tower was "a legally recognized institutional use that is integral to the educational mission" of the university. New York Botanical Garden, 91 N.Y.2d at 424.

"It has long been held that a church or synagogue may be used for accessory uses and activities which go beyond just prayer and worship (citation omitted)." Greentree at Murray

Hill Condominium v. Good Shepard Episcopal Church, 146 Misc. 2d 500, 506 (Sup. Ct. N.Y.Co.

1989). The Greentree court noted that

> permissible "accessory uses" for a church or synagogue include a
> Sunday school, men's and women's clubs, youth and community
> centers (NY City Zoning Resolution § 12-10); a guest house for a
> rabbi...; a school and meeting room at a church...; a day-care
> center...; a drug program... as well as a temporary shelter for the
> homeless operated by a church, such as in the case at
> bar....(Citations omitted.)

The Greentree court concluded, based on its recitation of permissible accessory uses, that "the

Church's temporary homeless shelter sanctuary program is, as a matter of law, a permissible

'accessory use' of the Church which is a protected activity under section 12-10 of the" ZR.

Greentree at Murray Hill Condominium, 146 Misc. 2d at 507.

When measured against the uses found by New York courts to be uses accessory

to a house of worship, the use of the building by the Rose Group as a commercial catering

business for hire goes far beyond any activity that could be deemed "incidental to" plaintiff's use

and thus is not an accessory use. A comparison of the religious use by plaintiff with the catering

use by the Rose Group makes this crystal clear. Plaintiff itself is a congregation of approximately

sixty-four people. Plaintiff uses the building for religious worship on Wednesday nights and

Sunday mornings (including Sunday school), Christmas Eve and Thanksgiving, association

meeting held four days a year, church classes held in the summer and other sporadic meetings. In

contrast, the Rose Group uses, and under the Lease is permitted to use the building for catered

events and parties for hundreds of people. Indeed, under the Lease, the Rose Group is permitted

to use the building at all times other than the times delineated in the Lease for plaintiff's use.

The degree of control that the Rose Group maintains over the building and its

operation under the Lease, control that should remain with plaintiff, is telling. In fact, the terms

of the Lease further demonstrate that the Rose Group's catering business has become the primary

use of the building, and plaintiff's use and control has dwindled away. For example, the Rose Group has leased the entire "land and building known as 583 Park Avenue" and not just the portion of the building where the catering events will be held and for the times they will be held (Exhibit "C" – Lease at ¶ 1.1)[1]; the Rose Group and not plaintiff will pay the real estate taxes that will become due if the current religious exemption is lost because of the catering business (Lease at ¶ 3.4); the Rose Group and not the plaintiff shall contract directly for, and pay for, all utilities (Lease at ¶ 4.1); plaintiff is not required to furnish any services for the premises, including, but not limited to, heat, water, light and electric power (Lease at ¶ 5.9); the Rose Group must give prior approval to plaintiff's hiring of custodial and maintenance employees and approve the conditions of the employment, the Rose Group's approval is given or withheld in its discretion, and the custodians are subject to the Rose Group's supervision, except when the building is being used exclusively for church activities (Lease at ¶ 5.13). The Rose Group and plaintiff must even jointly agree on the design and materials used to construct plaintiff's literature distribution box, as well as its location on the 63rd Street side of the building (Lease at ¶ 9.1).

In an astonishing manifestation of plaintiff's relinquishment of the building to the Rose Group and the group's catering business, the Rose Group may remove or cover, at its own option, the existing signs on the building façade and cover the engraved lettering over the front pillars which state "Third Church of Christ Scientist" (Lease at ¶ 27.1). So as to leave no doubt about the Rose Group's further control of the building and the predominance of the catering use is the provision that an electronic sign on the building will not "indicate the existence of [plaintiff's] Sunday School and Sunday and Wednesday services … when [the Rose Group] is

---

[1] All exhibits referenced herein are exhibits to the accompanying Brennan Declaration.

using or actively marketing the Premises for a 3rd party function...." (Lease at ¶ 5.3 (page 22)). The Rose Group in promoting this venue, refers to it as "583 Park Avenue" and not, for example, an event space located in the Third Church of Christ, Scientist building. See Exhibit "A". The Rose Group has literally wiped away the building's outward appearance as a house of worship and transformed it into a catering hall.

Accordingly, DOB concluded that the use of the building by the Rose Group was not "clearly incidental to" plaintiff's primary use and that the Rose Group's use had become the principal commercial catering use at the building. On this basis, the approval and permit for "accessory use" were revoked. The determination of DOB that the catering establishment operating out of plaintiff's building is not an accessory use because it is not "incidental to" plaintiff's religious use was rational and reasonable.

### POINT II

### THE CITY'S REVOCATION OF THE APPROVAL AND PERMIT FULLY COMPORTS WITH THE "EQUAL TERMS" PROVISIONS OF RLUIPA

RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Plaintiff claims the City violated section 2000cc(b) of RLUIPA by "treating the Church on less than equal terms with comparable nonreligious organizations" when it revoked the approval and permit which allowed accessory use catering at the building. Plaintiff alleges that the City allows comparable nonreligious institutions to engage in what it describes as "the similar practice of renting out their premises for catered events for non-members." Complaint ¶¶ 64, 65.

Plaintiff is fundamentally wrong. First, these other nonreligious institutions are not comparable to plaintiff nor are the so-called catering uses at these other nonreligious institutions comparable to the Rose Group's catering use at the building. Thus, in contrast to plaintiff's sixty-four member congregation that meets twice a week and a few other times a year, the other nonreligious institutions are large and active institutions with their own frequent events and meetings. The use by the nonreligious institutions at those buildings is the primary use and any catering use is clearly incidental to that primary activity. The Rose Group's catering use at the building contrasts markedly with these cited uses; it has effectively become the building's primary use.

Second, while plaintiff alleges that the City has treated it differently than it has treated these nonreligious institutions, in fact the City has not sanctioned or otherwise "treated" the other nonreligious institutions at all, much less differently. The City never was asked for its approval of an accessory catering use, nor did the City ever issue an approval or permit for an accessory catering use to these nonreligious institutions.[2] Thus, there is a distinction between an accessory catering use that has been applied for, approved by the City, for which a permit was issued and which approval or permit was then revoked (as was the approval and permit to the Rose Group) and an accessory catering use that occurs outside the City's approval and permitting process. Plaintiff's "equal terms" argument ignores this crucial distinction. In fact, the City has not "treated" these other nonreligious institutions at all. Moreover, there is no basis for plaintiff's surmise that the City is aware of or made any determination about the purportedly similar

_____

[2] The Certificate of Occupancy for The Regency Hotel allows an accessory use catering facility. However, commercial catering facilities are permitted in the zoning district where the hotel is located (i.e., C5-1 zoning district).

catering uses at the nonreligious venues cited by plaintiff. For all these reasons, plaintiff's "equal terms" claim fails.

"A plaintiff bringing an as-applied Equal Terms challenge must present evidence that a *similarly situated* nonreligious comparator received differential treatment under the challenged regulation. If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof." Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3d 1295, 1311 (11th Cir. 2006) (emphasis in original).[3]

The Equal Terms "provision does in fact require … a secular comparator that is similarly situated as to the regulatory purpose of the regulation in question…." Lighthouse Institute for Evangelism, Inc. v. City of Long Branch, 2007 U.S. App. LEXIS 27390, *25-26 (3rd Cir. 2007).[4] In other words, "the Equal Terms section does require … that the plaintiff show that it was treated less well than a nonreligious comparator that had an equivalent negative impact on the aims of the land-use regulation." Lighthouse Institute, 2007 U.S. App. LEXIS at *42. Here, plaintiff, a religious institution with a non-accessory commercial catering facility, must identify and compare itself to a nonreligious institution with such a non-accessory use commercial catering facility and show that it was treated less well.

---

[3] In Primera Iglesia, the Eleventh Circuit distinguished Midrash Sephardi, Inc. v. Young Israel, 366 F.3d 1214, 1230 (11th Cir. 2004), cert. denied, 543 U.S. 1146 (2005)(a facial Equal Terms challenge) with Konikov v. Orange County, 410 F.2d 1317, 1329 (11th Cir. 2005) (as-applied Equal Terms challenge), and found that nonreligious comparators need be similarly situated to the religious plaintiff. Primera Iglesia, 450 F.3d 1295, 1311 n.11.

[4] In Lighthouse, the Third Circuit agreed with the District Court and the United States which appeared as amicus and "declined ... to adopt the Eleventh's Circuit's expansive reading" in Midrash Sephardi, Inc. v. Young Israel, 366 F.3d 1214, 1220 (11th Cir. 2004) which found that an RLUIPA plaintiff does not need to identify a comparator. Lighthouse, 2007 U.S. App. LEXIS 27390, at *34. In any event, even under the Eleventh Circuit's view, that "if a zoning regulation allows a secular assembly, all religious assemblies must be permitted" Lighthouse, 2007 U.S. App. LEXIS 27390, at *36 citing Midrash, 366 F.3d at 1230-31, plaintiff still cannot make out an equal terms claim as the City here will allow a secular assembly (with accessory use catering) and a religious assembly (with accessory use catering). Of course, plaintiff's dilemma is that the Rose Group is operating a commercial catering establishment that is not an "accessory use" to the plaintiff's religious use.

First, the nonreligious institutions pointed out by plaintiff do not use their buildings in a way that is comparable to plaintiff's use of its building. The occupancy and use of the nonreligious institutions at the buildings they occupy is an active primary use, all are active and thriving organizations with members and operate various programs at the buildings. By contrast, the occupancy and use of plaintiff's building by the plaintiff and its members has greatly diminished over the years and is now essentially two time a week for services, Christmas Eve and Thanksgiving services, association meetings held four days a year, church classes held in the summer and other meetings. Second, any catering use at the nonreligious institutions is not comparable to the catering use at plaintiff's church building. To the extent there is a catering use at the cited nonreligious institutions, it is an "accessory use" to the institutions' "primary use" under the ZR. In contrast, the catering use by the Rose Group at plaintiff's building is not an "accessory use" at all, as it is not "incidental to" plaintiff's use of the building by any stretch of the imagination. Rather, unlike any catering at the nonreligious institutions, the Rose Group has essentially taken over plaintiff's building and is operating it as a commercial event space. The Lease itself delineates when plaintiff can use the building (and what areas it can use), at all other times it can be used by the Rose Group. Exhibit "C" - Lease at ¶ 35.1. The catering use by the Rose Group has become the primary use at the building. See Brennan Decl. ¶¶ 75-111. Plaintiff's memorandum repeatedly states that the City permits nonreligious institutions to hold catered events for nonmembers, but has now prohibited the Church from doing so. This is disingenuous, as it is not the plaintiff at all that is having catered events, but rather the independent Rose Group.

Moreover, it appears that plaintiffs in the reported cases discussing equal terms are all plaintiffs seeking to build or operate a house of worship but, because of zoning

restrictions, are unable to do so.[5] Unlike plaintiff here, they are not houses of worship seeking to allow a non-sectarian business such as an independent catering company like the Rose Group to operate in the house of worship. In fact, they are not even seeking to operate their own catering establishment or other business, in the house of worship.

In addition, the City has not in fact, "treated" all these other nonreligious institutions at all, much less differently. That is, leaving aside The Regency Hotel, none of these nonreligious institutions have applied to the City for its approval of a catering accessory use at their buildings and none of the Certificates of Occupancy for these nonreligious institutions permit an accessory catering facility.[6] Only the Certificate of Occupancy for The Regency Hotel allows an accessory use catering facility and it specifically provides "[c]atering exclusively for the hotel residents and guest of residents." In any event, a commercial catering establishment is permitted in the zoning district where the hotel is located.

Thus, while accessory use catering may be occurring at these nonreligious institutions, it is not because the City has "treated" them differently. That is, insofar as DOB has not been requested to approve that accessory use and has not approved that use, the City has not

---

[5] See also, Digrugilliers v. Consolidated City of Indianapolis, 506 F. 3d 612 (7th Cir. 2007)(conduct religious services); Albanian Associated Fund v. Township of Wayne Planning Board, 2007 U.S. District LEXIS 73176 (D.N.J. Oct. 1, 2007)(build a mosque and religious education building); Redwood Christian Schools v. County of Alameda, 2007 U.S. District LEXIS 8287 (N.D. Cal. Jan. 26, 2007)(build a religious school); Vietnamese Buddhism Study Temple in America v. City of Garden Grove, 460 F. Supp. 2d 1165 (C.D. Cal. 2006)(assemble and practice Buddhist faith in a building); New Life Ministries v. Charter Township of Mt. Morris, 2006 U.S. District LEXIS 63848 (E.D. Mich. Sept. 7, 2006)(use property for religious services); Lighthouse Christian Center, Inc. v. City of Reading, 2006 U.S. District LEXIS 52432 (E.D. Penn. June 18, 2006)(use property for religious worship); Guru Nanak Sikh Society v. County of Sutter, 326 F. Supp. 2d 1140 (E.D. Cal. 2003), aff'd, 456 F3d 978 (9th Cir. 2006)(build Sikh temple on its land); Petra Presbyterian Church v. Village of Northbrook, 409 F. Supp. 2d 1001 (N.D. Ill. 2006), aff'd, 2007 U.S. App. LEXIS 13136 (7th Cir. June 7, 2007)(conducting religious services).

[6] To the extent a nonreligious institution has accessory use catering, no prior approval of DOB is required as there is no requirement to get a permit to have an accessory use or to have a Certificate of Occupancy reflect the accessory use. It is only if an applicant wants the accessory use reflected on the Certificate of Occupancy, or otherwise submits an application for DOB's approval of the accessory use or an alteration requiring approval, would there be any application for DOB to approve.

in fact "treated" those nonreligious institutions one way or the other. In any event, the catering use at plaintiff's building is not an accessory use; it is the primary use of the building. To the extent that plaintiff suggests that the other cited uses are similarly illegal, DOB has not sanctioned them at all. Indeed, were the agency to receive complaints directed at the catering uses at these other institutions, it would investigate and take appropriate enforcement action, if necessary.

For all these reasons, plaintiff cannot demonstrate that the City has violated the Equal Terms provisions of RLUIPA or a likelihood of success on this claim and plaintiff's motion for a preliminary injunction should be denied.

**POINT III**

**THE CITY'S REVOCATION OF THE APPROVAL AND PERMIT FULLY COMPORTS WITH THE "SUBSTANTIAL BURDEN" PROVISIONS OF RLUIPA**

Plaintiff also alleges that the City has "imposed a substantial burden on the religious exercise of the Church" and violated section 2000cc(a)(1) of RLUIPA by the issuance of the November 30, 2007 letter which revoked the prior approval and permit for accessory use catering at the building. On the contrary, the issuance of the letter is based on DOB's determination that the commercial catering use at the building is not an accessory use and therefore not permitted in a residential district under the ZR. The revocation does not preclude plaintiff from, nor does it place a substantial burden on, its religious exercise. Rather, the revocation stops the operation of a commercial catering establishment by the Rose Group at the building.

To argue that it cannot exercise its religion without allowing the operation of a commercial catering establishment by the Rose Group and therefore that the revocation of the

permit violates RLUIPA is without basis in law. Plaintiff's argument that it needs the money generated by the independent catering establishment to fund the building repairs is not relevant to an RLUIPA claim. Moreover, if this argument is accepted here, any commercial activity at a building owned by a church or other religious organization would remove that building from the City's zoning regulatory reach. This is not the intent of RLUIPA and plaintiff's arguments should be rejected by this Court.

Essentially, plaintiff alleges that the City's refusal to allow the Rose Group's commercial catering establishment to operate as the primary use at the building in violation of the ZR is a substantial burden on plaintiff's religious exercise. Plaintiff is mistaken. RLUIPA does not require the City to allow this commercial use as it does not constitute protected religious exercise at all. The fact that plaintiff serves to gain financially from the operation of the commercial catering establishment by the Rose Group and that this financial gain will allow the physical structure of the church building to be repaired does not bring this matter under the RLUIPA umbrella. That the Rose Group will itself pay for certain renovations so that it can operate its business at plaintiff's building catapults this matter even farther out of the RLUIPA context.

**A.    The Operation of a Catering Business by the Rose Group is not a Religious Exercise under RLUIPA**

RLUIPA prohibits the government from imposing or implementing a land use regulation in a manner that "imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1).

Religious exercise under RLUIPA is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Using, building or converting real property for religious exercise purposes is considered to be religious exercise under RLUIPA. 42 U.S.C. § 2000cc-5(7)(B).

However, as broad as this language may be, it was not the intent of Congress to extend the meaning of "religious exercise" to a commercial enterprise used to fund a religious organization, such as the Rose Group's catering business at the building. The Joint Statement of Senators Hatch and Kennedy in the Congressional Record introduced upon the Senate's consideration of RLUIPA, states in relevant part, as follows:

> The definition of "religious exercise" under this Act includes the "use, building, or conversion" of real property for religious exercise. However, not every activity carried out by a religious entity or individual constitutes "religious exercise." In many cases, real property is used by religious institutions for purposes that are comparable to those carried out by other institutions. While recognizing that these activities or facilities may be owned, sponsored or operated by a religious institution, or may permit a religious institution to obtain additional funds to further its religious activities, this alone does not automatically bring these activities or facilities with the bill's definition or [sic] "religious exercise." For example, a burden on a commercial building, which is connected to religious exercise primarily by the fact that the proceeds from the building's operation would be used to support religious exercise, is not a substantial burden on "religious exercise."(Emphasis added) 146 Cong. Rec. S 7774, S 7776.

Relying upon this language, one court explicitly rejected arguments virtually identical to the arguments made by plaintiff here, i.e., that "RLUIPA extends its protection even to those nonreligious activities necessary to financially support the [church's] continued operation." Scottish Rite Cathedral Association of Los Angeles v. City of Los Angeles, 156 Cal. App. 4th 108, 119 (Cal. App. 2d Dist., 2007), petition for review denied, 2008 Cal. LEXIS 253 (Cal. Jan. 8, 2008). In a case strikingly similar to the case herein, Scottish Rite Cathedral

Association of Los Angeles ("SRCALA"), the church owner of a cathedral in Los Angeles whose "activities became fiscally insufficient to sustain SRCALA's operation of the Cathedral" leased out the cathedral to a private entity that would conduct events at the site. Scottish Rite Cathedral, 156 Cal. App. 4th at 119. Use of the building for commercial purposes was not permitted under the relevant zoning and the certificate of occupancy was ultimately revoked. SRCALA challenged the revocation on RLUIPA grounds because the nonreligious commercial activity was necessary to financially support the Cathedral's continued operation. This is exactly what plaintiff argues here. The court soundly rejected this argument, quoting the joint statement before Congress, and citing Greater Bible Way Temple v. Jackson, 477 Mich. 373, 393 (2007) (the building of an apartment is not "religious exercise" and "would be considered a commercial exercise").

Similarly, in the context of a RLUIPA challenge to the denial of an application of a religious school to construct a building, the Second Circuit has suggested that the proper inquiry is "whether the proposed facilities were for a religious purpose rather than simply whether the school was religiously-affiliated." Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007).

Here, the City has not denied an application by plaintiff to construct a church or a religious school connected to a church. The application submitted to DOB by the Rose Group was submitted so that it, and not plaintiff, could conduct events and parties at the church building. DOB ultimately concluded that this commercial use was not accessory to the church use itself and therefore the use was illegal in a residential district. Accordingly, the City issued the November 30 letter revoking its prior approval of the accessory use catering establishment. This commercial catering business operated by the Rose Group is not a religious use. In fact, the

catered events to be held at the church, now transformed by the Rose Group into an event space, will have no connection to the plaintiff.

The complaint repeatedly uses the term "Required Capital Repairs" (defined as "necessary major capital repairs and renovations to the Building's aging infrastructure [to] bring the Building into compliance with the New York City Building Code…." Complaint ¶ 2) in describing the work at the building. The complaint also alleges that plaintiff "will be required to reimburse the Rose Group for the amount of "Required Capital Repairs already completed." Complaint ¶ 62. Therefore, if the revocation is not enjoined, the complaint alleges that "the Church will be forced to sell the Building…." Complaint ¶ 62.

However, the requirement to sell the building in order to reimburse the Rose Group for its expenditures does not so define those expenditures. That is, the Second Amendment to the Lease refers to monies spent by the Rose Group "in connection with improvements made to the Premises in order to prepare the Premises for the conduct of [the Rose Group's] business therein" as "Initial Expenditures". The Second Amendment then refers to additional monies spent by the Rose Group "to make further improvements to the Premises in order to prepare the Premises for the conduct of [the Rose Group's] business therein" as "Additional Expenditures". Exhibit "K". Thus, rather than describe the Rose Group's expenditures for what they are, i.e., improvements so that the Rose Group can run its catering business, plaintiff disingenuously transforms those expenditures into something entirely different.

There is no legal basis to conclude that RLUIPA should be manipulated to allow an illegal use at the building to supply a revenue stream for a religious entity that is unable to support itself through traditional means. Plaintiff cites no legal support for this argument, which,

15

if accepted would obliterate zoning regulations and allow any religious institution to operate a commercial enterprise in a residential district if the proceeds from that commercial enterprise would support its religious exercise.

Therefore, plaintiff's argument that "the purpose of the catering arrangement is to raise funds necessary to improve, renovate, and convert parts of the Building to facilitate religious practices" (plaintiff's memorandum at 17-18) and therefore is protected by RLUIPA should be rejected by this Court as well. Plaintiff's attempt to use RLUIPA as a sword, rather than a shield, should not succeed.

**B.    The Revocation of the Approval and Permit to Operate the Catering Establishment by the Rose Group at the Building is not a Substantial Burden on Religious Exercise under RLUIPA**

Leaving aside that plaintiff cannot overcome the threshold legal barrier in that the Rose Group's catering establishment operating at plaintiff's building is not "religious exercise" by plaintiff, protected by RLUIPA (and therefore the first prong of the plaintiff's "substantial burden" claim fails), the second prong fails as well. That is, revocation of the approval to operate an accessory use catering is not a "substantial burden" on plaintiff's religious exercise.

In <u>Westchester Day School v. Village of Mamaroneck</u>, 504 F.3d 338, 349 (2d Cir. 2007), the Second Circuit stated that:

> We recognize further that where the denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, even when the denial is definitive. There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise.

Here, the City did not deny a permit for construction at a church. Instead, the City determined that the <u>use</u> at the building was not a permitted use and revoked the approval and permit regarding that accessory use. Nevertheless, here there is no close nexus between the

16

"impeded conduct" (the ability of the Rose Group to carry on commercial catering activities unrelated to the church) and the church's religious exercise. In fact, there is no nexus between the impeded conduct and plaintiff's religious exercise at all.

Mere imposition of costs on religious organizations associated with enforcement of zoning laws does not constitute a substantial burden under RLUIPA:

> [A]lthough [a religious entity] may incur additional financial burdens, such as rental expenses to accommodate its entire congregation on occasion, or if it seeks additional growth, such financial burdens are not "substantial" under the RLUIPA. *See Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F. Supp. 2d 961, 986 (holding zoning ordinance that prohibited religious institution from conducting worship services in district where it owned land did not substantially burden plaintiff's free exercise, despite the fact that "the congregation is forced to spend a considerable amount of money to rent space where worship services may be held."); *Lakewood,* 699 F. 2d at 307 (no infringement on religious exercise where plaintiff was not prevented from practicing its faith in other venues throughout the city, even though ordinance prohibited plaintiff from building church on land it owned.) Similarly, although [the religious entity] complains that other suitable land in the vicinity is too costly, or that others outbid [the entity] when such land becomes available, those burdens do not render the city's permit denial actionable under the RLUIPA. *See Lakewood,* 699 F.2d at 307 (although "the lots available to the Congregation may not meet its budget or satisfy its tastes", the Free Exercise Clause "does not require the City to make all land or even the cheapest ... land available to churches."

Episcopal Student Foundation v. City of Ann Arbor, 341 F. Supp. 2d 691, 706 (E.D. Mich. 2004). Therefore, notwithstanding the claimed financial consequences, DOB's conclusion that the Rose Group's catering establishment is not an accessory use and therefore not permitted in this residential district, does not constitute a substantial burden under RLUIPA.

All of the cases upon which plaintiff relies herein relate to zoning regulations and permits explicitly relating to the construction of a house of worship or the exercise of religion and are inapposite (plaintiff's memorandum at 18-19). The issue here is not whether plaintiff can

17

construct a church or exercise its religion. The issue is whether or not the Rose Group can conduct an independent commercial catering facility in plaintiff's building in violation of the ZR.

Indeed, even in cases dealing directly with an uncontested religious use, New York State courts have allowed localities to impose reasonable conditions. In Cornell University v. Bagnardi, 68 N.Y.2d 583 (1986), the New York State Court of Appeals specifically stated that "reasonable conditions directly related to the public's health, safety and welfare may be imposed [on educational and religious uses] to the same extent they may be imposed on noneducational applicants (citations omitted)." Cornell University, 68 N.Y.2d at 596.

The Cornell court ruled that such institutions must meet the normal criteria in the zoning ordinance and are not exempt from these requirements because of the First Amendment:

> The controlling consideration in reviewing the request of a school or church for permission to expand into a residential area must always be the overall impact on the public's welfare.
> ....
> There is simply no conclusive presumption that any religious or educational use automatically outweighs its ill effects (citation omitted).

Cornell University, 68 N.Y.2d at 595.

For all these reasons, plaintiff cannot demonstrate a likelihood of success on its "substantial burden" claim and its request for a preliminary injunction should be denied.

## POINT IV

### THE CITY'S REVOCATION OF THE APPROVAL AND PERMIT FULLY COMPORTS WITH PLAINTIFF'S EQUAL PROTECTION RIGHTS

Plaintiff alleges in the third claim of the complaint that the City violated its right to Equal Protection and "singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in

18

catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct." Complaint ¶ 74. However, plaintiff, a church with a congregation of approximately sixty-four people that has now leased the entire church building and land upon which is sits to the Rose Group, has not shown how it is being treated differently from similarly situated churches. In fact, plaintiff's use of the building, compared to its use by the Rose Group, is very limited, both temporally and physically. The catered events conducted by the Rose Group have absolutely no connection to the plaintiff or to its religious mission. At these events, alcohol is served and drunk, which upon information and belief, is antithetical to the church's own beliefs. Plaintiff's claim of selective enforcement fails and the preliminary injunction should be denied on these grounds as well.

"The Equal Protection Clause requires that the government treat all similarly situated people alike." Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)(citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). This principle protects against the selective enforcement of laws applied "with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances...." Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886). Here, as plaintiff challenges the enforcement of the ZR insofar as DOB has determined that the use by the Rose Group of the building is not an accessory use to the church, but instead is the primary use, the claim is one of selective enforcement. See Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995).

To succeed on a claim of selective enforcement in this circuit, plaintiff must establish both that (1) compared with others similarly situated, plaintiff was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on an impermissible

consideration, such as religion or race, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. Zahra, 48 F.3d at 683, citing FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992); Harlen, 273 F.3d at 499. As the Supreme Court has made clear, "a discriminatory purpose is not presumed; there must be a showing of clear and intentional discrimination." Snowden v. Hughes, 321 U.S. 1, 8, reh'g denied, 321 U.S. 804 (1944)( internal citations and quotations omitted).

To succeed on an equal protection claim as a "class of one", plaintiff must establish that it (1) was "intentionally treated differently from others similarly situated" and (2) "that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

"The burden of proving a claim of discriminatory enforcement is a weighty one. Common sense and public policy dictate that it be so. The presumption is that the enforcement of laws is undertaken in good faith and without discrimination...." 303 W. 42nd St. Corp. v. Klein, 46 N.Y.2d 686, 694 (1979) (citing United States v. Falk, 479 F.2d 616, 620 (7th Cir. 1973)).

## A.    Plaintiff Cannot Establish it has Been Treated Differently From Others Similarly Situated

Under any theory, plaintiff has not demonstrated that it was intentionally treated differently than any others similarly situated. The United States Supreme Court has stated that discriminatory intent, "implies more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979).

Plaintiff has not demonstrated any impermissible selective or differential treatment. Rather DOB's letter to plaintiff and the Rose Group makes clear that DOB revoked

the approval and permit allowing accessory use catering at the building as "the catering establishment is not 'clearly incidental to' the Church's primary use of the premises. Rather it appears to be a principal commercial establishment there." Exhibit "R".

There is nothing to support plaintiff's allegations that DOB does not enforce against similarly situated churches (Complaint ¶ 31). First, plaintiff's building is now effectively a catering hall, having been leased to the Rose Group for a term of twenty years with two five-year renewal options. Second, the use of the building by plaintiff's small congregation is minimal (twice a week and a few other times a year), as compared with the frequency of the Rose Group's catered events attended by hundreds of people. The catering use at other churches that plaintiff points to, but alleges that DOB does not enforce against, does not equal the intensity of the catering use at the subject premises. Also, plaintiff essentially concedes that the catered events at the church building are completely unrelated to any church activity and the Lease confirms that fact.

The determination of whether or not a use is an accessory use is a question of degree. To the extent that a nonreligious institution or a religious organization rents its space to nonmembers, this does not automatically make the catering a non-accessory use. Thus, occasional use by nonmembers is a permissible accessory use. However, there still must be an active and primary use of the building by the nonreligious institution or religious organization. The catering must primarily service the needs of the nonreligious institution or religious organization. The catering activity cannot dominate the use of the building by the nonreligious institution or religious organization. In all the examples cited by plaintiff, the activities of the nonreligious institution or religious organization are by far the prevailing and primary activity at the buildings. The availability of catering is ancillary and occasional at best.

Much like DOB is enforcing against plaintiff because the catering use at the church building is not an accessory use, DOB is also enforcing against a yeshiva in Brooklyn. That yeshiva operates a catering establishment in the cellar as a venue for wedding celebrations of members of the greater orthodox Jewish community in Brooklyn. Like plaintiff herein, the yeshiva is located in a residential district and therefore can only have catering as an accessory use to the primary use of the yeshiva or synagogue. Because, among other things, the catered wedding celebrations were so frequent and were not for members of the congregation of that synagogue itself, but rather for anyone, DOB determined that this was not an accessory use. The Board of Standards and Appeals of the City of New York upheld the determination of DOB that this use was not an accessory use and that finding itself is the subject of a pending Article 78 state court proceeding in Brooklyn Supreme Court. A copy of the BSA Resolution is attached in the appendix hereto.

Plaintiff does not have any support for the notion that the City acted improperly or without a rational basis towards it. As stated in Harlen: "A [municipality's] decision can be considered irrational only when the [it] acts with no legitimate reason for its decision." Harlen, 273 F.3d at 500 (internal quotation marks omitted). Here, plaintiff cannot demonstrate how the revocation was irrational, nor can it overcome the legitimate concerns underlying such revocation, that is, the operation of a commercial catering establishment as a primary use in a residential district where such use is not permitted by the ZR.

Finally, even if plaintiff could somehow show discriminatory treatment, plaintiff cannot support a claim that such treatment was intentional and purposeful. See Snowden, 321 U.S. at 8. "[E]qual protection does not require that all evils of the same genus be eradicated or none at all." LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980), cert. denied, 450 U.S. 959

22

(1981)(citing Railway Express Agency, Inc. v. New York, 336 U.S. 106, 109-10 (1949)); Zahra, 48 F.3d at 684.

**B.    Plaintiff has not Demonstrated Intentional Discrimination Based on an Impermissible Motive**

Plaintiff must demonstrate that an impermissible factor, such as malicious or bad faith intent, was the "motivating factor" behind the revocation. However, plaintiff has not demonstrated that this alleged selective treatment was motivated by such an impermissible consideration.

In Harlen, as here, plaintiff sought to sustain a claim of animus against the public entity and argued that the denial of the special use permit was motivated by "community animus" against the franchise. The Circuit squarely rejected this contention, noting that the permit was denied because of safety and traffic concerns. Harlen, 273 F.3d at 503.

Here, plaintiff argues that the City acted because of "political pressure exerted by influential residents of Park Avenue" (plaintiff's memorandum at 15). Such allegations, of course, ignore the actual basis of the City's revocation, that the Rose Group's catering activities at the building were the primary use of the building. To the extent that the City had determined, if at all, that the Rose Group's catering facility was an accessory use and therefore permitted that use, the City was incorrect. When the City determined that the use was primary (and that its prior determination that the use was an accessory use was, in fact, an erroneous determination), the City acted to correct that erroneous determination.

The City is not estopped from correcting a mistake. It is well-settled that equitable estoppel may not be invoked against a municipality to prevent it from discharging its statutory duties, enforcing its laws, or correcting errors, even when there are harsh results. Parkview Associates v. City of New York, 71 N.Y.2d 274, cert. denied, 488 U.S. 801 (1988). For example,

a municipality may maintain an action to enjoin the violation of a zoning ordinance even if the violation has existed for many years without objection by officials. Fabini v. Kammerer Realty Co., 14 Misc.2d 95 (Westchester Co. Sup. Ct. 1958). See also Philanz Oldsmobile, Inc. v. Keating, 51 A.D.2d 437 (4th Dept. 1976) and Westbury v. Samuels, 46 Misc.2d 633 (Nassau Co. Sup. Ct. 1965).

**C.    Plaintiff Cannot Establish Disparate Treatment Without a Rational Basis**

Even if plaintiff's claim is not one of selective enforcement but rather irrational or intentionally discriminatory enforcement, the Second Circuit has held that under the "class of one" theory, plaintiff must prove that the City's treatment of plaintiff was "irrational and wholly arbitrary," Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001) and there was "no legitimate reason" or "no basis in fact" for the City's action. Harlen, 273 F.3d at 500, 501.

As set forth above, DOB's determination to revoke the approval and permit had a rational basis. While plaintiff claims that DOB's determination was because of "political pressure", plaintiff cannot support a claim that the determination was wholly arbitrary or had no basis in fact. As in Harlen, plaintiff's "argument really addresses the merits of the [DOB's] decision rather than its constitutionality and is better raised in a state court challenge." Harlen, 273 F.3d at 502.

Therefore, as plaintiff cannot establish that it was intentionally discriminated against either because of an impermissible motive or without a rational basis, plaintiff's equal protection claim against the City must fail and plaintiff cannot demonstrate a likelihood of success on this claim. For this reason too, plaintiff's request for a preliminary injunction should be denied.[7]

---

[7] Plaintiff did not address its First Amendment claim in its moving papers, but reserved the right to brief the claim later in the proceedings. Accordingly, defendants also reserve their right to brief this claim after plaintiff does so, if at all, in the future.

## POINT V

## PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

To obtain a preliminary injunction, plaintiff must establish (a) that it is necessary to prevent irreparable harm; and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Polymer Technology Corp. v. Mimran, 37 F.3d 74, 77-78 (2d Cir. 1994). However, in a case in which "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party meets the more rigorous likelihood of success standard. Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989).

An injunction "is not a remedy which issues as of course." "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 and 312 (1982). See, also, Million Youth March, Inc. v. Safir, 155 F.3d 124 (2d Cir. 1998) (Second Circuit modified injunction because district court failed to consider government's interest in public health, safety and convenience in balance against First Amendment rights). In considering an injunction, the Court must balance the interests and possible injuries to both parties. Yakus v. United States, 321 U.S. 414, 440 (1944). Whether the relief sought is in the public interest is a factor which may be considered. Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704, 711 (2d Cir. 1982).

The Second Circuit has held that "[v]iolations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." <u>Bery v. City of New York</u>, 97 F.3d 689, 693 (2d Cir. 1996). Although the complaint alleges, among other things, that plaintiff will be deprived of its First Amendment right to exercise religious beliefs, defendants submit that plaintiff's First Amendment rights are not implicated here, and that plaintiff must establish irreparable harm. In any event, plaintiff has not even briefed the First Amendment claim at this point.

For all the reasons set forth above, <u>supra</u>, Points I through IV, plaintiff has not and cannot demonstrate a likelihood of success on the merits and therefore plaintiff's motion for a preliminary injunction should be denied.

**A.      Plaintiff Cannot Establish Irreparable Harm**

Plaintiff cannot meet this element of the standard for a preliminary injunction. "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." <u>Citibank, N.A. v. Citytrust</u>, 756 F.2d 273, 275 (2d Cir. 1985).

"To establish irreparable harm, plaintiffs must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'" <u>Tucker Anthony Realty Corp. v. Schlesinger</u>, 888 F.2d 969, 975 (2d. Cir. 1989) (quoting <u>Consolidated Brands, Inc. v. Mondi</u>, 638 F. Supp. 152, 155 (E.D.N.Y. 1986)). Moreover, to warrant the granting of a preliminary injunction, the alleged irreparable harm "must be one requiring a remedy of more than mere monetary damages. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation." <u>Tucker Anthony</u>, <u>supra</u>, 888 F.2d at 975.

Here, plaintiff alleges that if the Rose Group cannot operate its commercial catering facility at plaintiff's building, then the building will have to be sold so that the Rose Group can recoup what it has expended to renovate the building so that it could operate its business. Plaintiff argues that if the Court does not grant injunctive relief, it "will put the Rose Group out of business and will deprive the Church of the revenue it needs to meet its obligations [and] the Church will be forced to sell the Building...." Plaintiff's memorandum at 24. As explained below, at best, this harm is speculative as the agreement containing these forced sale provisions was never approved by the Court, nor was the Attorney General's office given notice, as required by New York statutes. In addition, the Rose Group did not comply with a prerequisite for reimbursement set forth in that agreement.

## (i) The Second Amendment was not Approved by the Supreme Court as Required by Statute

Section 12(1) of the Religious Corporations Law of New York states, in relevant part, as follows: "A religious corporation shall not sell, mortgage or lease for a term exceeding five years any of its real property without applying for and obtaining leave of the court therefore pursuant to section five hundred eleven of the not-for-profit corporation law...." Section 511 of the Not-for-Profit Corporation Law entitled "Petition for leave of court" provides, in relevant part at (a)(6), the petition shall set forth, among other things: "That the consideration and terms of the sale, lease, exchange or other disposition of the assets of the corporation are fair and reasonable to the corporation, and that the purposes of the corporation, or the interests of its members will be promoted thereby,...." The law requires that the Attorney General receive notice of the petition (section 511(b)). If it "shall appear to the satisfaction of the court, that the consideration and the terms of the transaction are fair and reasonable to the corporation and that the purposes of the corporation or the interests of the members will be promoted, it may

27

authorize the sale, lease, exchange or other disposition of all or substantially all the assets of the corporation...." Section 511(d).

Plaintiff applied to the Supreme Court for approval of the Lease and represented that it would benefit

> by way of Rose Group's obligation to advance the costs associated with the construction of a new roof for the property along with other improvements to the property <u>to be completed at the expense of the tenant</u>, including but not limited to, an upgrade of all power and wiring systems, the installation of new telephone systems, the upgrade or replacing of heating, ventilation and air conditioning systems, etc.''....If not for the obligations of Rose Group under the Final Agreement of Lease, the Church would not have the finances to provide these necessary renovations to the Property. (Emphasis added.) Exhibit "E" - Petition ¶ 8.

Plaintiff also alleged that the "consideration and terms provided by the Lease are fair and reasonable to the Church...." Petition ¶ 19. By order dated May 22, 2006, the Supreme Court granted plaintiff leave to lease the property to the Rose Group according to the terms set forth in the Lease. Exhibit "E".

However, plaintiff never sought the required Court approval of the March 27, 2007 Second Amendment to the Lease. It is this document that requires that the property be sold if the Rose Group is unable to operate its catering business at the building and that plaintiff reimburse the Rose Group the money it spent on "improvements" out of the sale proceeds. <u>See</u> Exhibit "K". Nor did plaintiff notify the Attorney General of the Second Amendment.

A transfer of property has been found to be "invalid because of a failure of compliance with the statutory requirement that notice of the transfer be given to the Attorney General (<u>see</u>, Religious Corporations Law § 12; Not-For-Profit Corporation Law § 511)...." <u>St. Andrey Bulgarian Eastern Orthodox Cathedral Church, Inc. v. Bosakov</u>, 272 A.D.2d 55, 56 (1st Dept. 2000). Moreover, should plaintiff seek court approval now, we submit that no court would

approve the terms of the Second Amendment nunc pro tunc because of its onerous terms requiring the sale of the land and building. The Appellate Division reversed a lower court's nunc pro tunc approval of a transfer emphasizing that it was "incumbent" upon the proponent to "establish that the transfer of an interest in the [real estate] for a nominal consideration was intended to promote the interests of the grantor by furthering a religious or charitable object generally." Congregation Yetev Lev D'Satmar of Kiryas Joel, Inc. v. Congregation Tetev Lev D'Satmar, Inc., 31 A.D.3d 480, 482 (3d Dept. 2006), aff'd, 9 N.Y.3d 297 (2007) ("the transfer was not in the best interests of the Brooklyn Congregation. ... Here, where the transfer was at least in part plainly designed to advance one side of the factional dispute ... no such showing was made"). The onerous terms in the Second Amendment arising only if the Rose Group cannot conduct its catering business at the building cannot be found to be in the best interests of plaintiff. Rather, these terms only protect the Rose Group's ability to be reimbursed for its expenditures made for its own benefit. For these reasons, the Second Amendment is not enforceable, nor could it be found to be enforceable nunc pro tunc.

### (ii) The Rose Group did not Comply with the Terms of the Second Amendment

The Second Amendment explicitly conditions the Rose Group's "right to receive the payments" upon it "prosecuting the 74-711 Application ... through final appeal." The initial part of the 74-711 application has been abandoned at the Landmarks Preservation Commission. No application was ever submitted to the City Planning Commission. Therefore, the Rose Group cannot receive any reimbursement out of the sale of the premises and plaintiff is not required to sell the land and building. Thus, even assuming that the terms of the Second Amendment are enforceable without the Supreme Court's approval, without fulfillment of the 74-711 application requirements, there is no right to reimbursement under the terms of the Second Amendment itself and therefore no need to sell the premises.

### (iii) Plaintiff's Harm is Self Created

The Geneva School (the "School") was plaintiff's tenant at the building and, without any prior warning in February of 2006, was told that it had to vacate the building at the end of June 2006. Plaintiff does not explain if it made any efforts to renegotiate the terms of any agreement with the School or asked the School to contribute to the cost of any repairs.

Instead of attempting to work out a better deal with the School, plaintiff instead entered into the Lease with the Rose Group. Then, plaintiff agreed to the onerous terms of the Second Amendment. Therefore, it is unclear how, having entered into this Second Amendment on its own accord, plaintiff can now rely on it for its irreparable harm allegation. Clearly, the harm plaintiff now alleges is mostly of its own creation and should not be a predicate for the necessary finding of irreparable harm.

### CONCLUSION

For the foregoing reasons, plaintiff's application for a preliminary injunction should be denied in its entirety.

Dated:      New York, New York
            February  8  , 2008


                        MICHAEL A. CARDOZO
                        Corporation Counsel of the City of New York
                        Attorneys for Defendants
                        100 Church Street, Room 5-162
                        New York, NY 10007
                        (212) 788-0782


                        By: *Ave Maria Brennan*
                        AVE MARIA BRENNAN
                        Assistant Corporation Counsel

# APPENDIX

60-06-A

APPLICANT – Stuart A. Klein, for Yeshiva Imrei Chaim Viznitz, owner.

SUBJECT – Application April 5, 2006 – Request pursuant to Section 666 of the New York City Charter for a reversal of DOB's denial of a reconsideration request to allow a catering use as an accessory use to a synagogue and yeshiva in an R5 zoning district.

PREMISES AFFECTED – 1824 53rd Street, south side, 127.95' east of the intersection of 53rd and 18th Avenue, Block 5480, Lot 14, Borough of Brooklyn.

**COMMUNITY BOARD #12BK**

APPEARANCES –

For Applicant: Stuart A. Klein.

**ACTION OF THE BOARD** – Appeal denied.

THE VOTE TO GRANT –

Affirmative: .................................................................0

Negative: Chair Srinivasan, Vice Chair Collins and Commissioner Ottley-Brown.........................................3

THE RESOLUTION[1]:

WHEREAS, this is an appeal of a Department of Buildings final determination dated March 31, 2006, issued by the Brooklyn Borough Commissioner (the "Final Determination"); and

WHEREAS, the Final Determination reads in pertinent part: "Proposed Catering Use (UG 9) is not an Accessory use to the Synagogue and School (UG 4 & 3) in an R5 zone"; and

WHEREAS, the appeal was brought on behalf of Yeshiva Imrei Chaim Viznitz, a not for profit religious institution (hereinafter "Appellant"), the owner of the building at the subject premises; and

WHEREAS, a public hearing was held on this application on June 13, 2006 after due notice by publication in *The City Record*; and

WHEREAS, a continued hearing was held on August 15, 2006, on which date the hearing was closed and decision was set for September 19, 2006; and

WHEREAS, at the request of Appellant, the decision date was deferred to September 26, 2006; and

WHEREAS, the Board reopened the hearing on this date, but Appellant's counsel was unable to attend; and

WHEREAS, decision was deferred to October 24, 2006; and

WHEREAS, the matter was again reopened on October 24, and a continued hearing date was set for November 21, 2006; and

WHEREAS, a continued hearing was held on November 21, and a decision was set for January 9, 2007; and

_____

1 Headings are utilized only in the interest of clarity and organization.

WHEREAS, DOB appeared and made submissions in opposition to this appeal, as did certain neighbors; and

WHEREAS, many members of the Viznitz community appeared in support of the appeal; and

WHEREAS, in addition, Appellant provided letters from other individuals supporting the appeal; and

WHEREAS, the Board notes that while Appellant claimed to have the support of certain elected officials, no elected official appeared at hearing and no letters of support from elected officials were submitted; and

THE PREMISES AND BUILDING

WHEREAS, the subject premises is located in an R5 residence zoning district on 53rd Street between 18th and 19th Avenues and is currently improved upon with a three-story with cellar building (the "Building"); and

WHEREAS, the Building is across the street from and adjacent to numerous two-story semi-attached dwellings; and

WHEREAS, Certificate of Occupancy No. 300131122, issued for the Building on May 26, 1999 (the "CO"), lists the following uses: (i) Use Group ("UG") 4 assembly hall and kitchen and UG 9 catering use in the cellar; (ii) UG 4 synagogue and UG 3 classrooms on the first and second floors; and (iii) UG 3 classrooms on the third floor; and

THE APPLICATION TO REVOKE THE CERTIFICATE OF OCCUPANCY

WHEREAS, this CO was the subject of a 2005 application by DOB, who sought to revoke or modify it pursuant to City Charter §§ 666.6(a) and 645(b)(3)(e), on the basis that the CO allows conditions at the referenced premises that are contrary to the Zoning Resolution and the Administrative Code; and

WHEREAS, DOB argued that the catering use did not possess lawful non-conforming UG 9 status and was therefore illegal; and

WHEREAS, specifically, DOB suggested that the prior UG 16 use on which the status of the UG 9 designation was predicated had been discontinued for more than two years and that the prior building housing this use had been demolished; DOB contended that this had not been revealed by the permit Appellant; and

WHEREAS, under either circumstance, DOB alleged that there is no legal basis for a UG 9 catering use designation on the CO for the cellar of the Building; and

WHEREAS, a public hearing was held on DOB's application on May 17, 2005, but before the next continued hearing, Appellant obtained a court order, dated July 8, 2005, enjoining the Board from acting on the application and from conducting further proceedings on it; and

WHEREAS, this court order also directs Appellant to file a variance application at the Board; and

WHEREAS, months later, Appellant filed the

**60-06-A**

variance application under BSA Cal. No. 290-05-BZ; and

WHEREAS, Appellant also filed the instant appeal; and

WHEREAS, since the two matters were filed at the same time and both concerned the use of the Building's cellar for commercial catering purposes, the Board, with the consent of all parties, heard the cases together and the record is the same; and

THE SUBJECT BUILDING

WHEREAS, Appellant states that the Building currently contains a UG 3 religious school for approximately 625 boys (the "School"), a UG 4 synagogue space (the "Synagogue"), and a UG 9 catering establishment that serves the needs of the orthodox Jewish community in the vicinity of the site (the "Catering Establishment"); and

WHEREAS, the Synagogue is located on parts of the first and second floors; and

WHEREAS, specifically, as illustrated on the plans for the first floor submitted by Appellant, stamped May 5, 2006, the first floor Synagogue space is for men, and adjoins a classroom with a removable partition; it is approximately 1,900 sq. ft.; and

WHEREAS, the second floor Synagogue space is for women, and is 1,380 sq. ft; and

WHEREAS, Appellant states that the Synagogue is attended by approximately 300 people on the Sabbath, and approximately 100 people and approximately 400 students on weekdays; and

WHEREAS, the remainder of the first and second floors, and the entirety of the third floor, appear to be occupied by classrooms and other School-related spaces; and

WHEREAS, Appellant claims that the School serves many economically disadvantaged children, and that 85 percent of the children receive government-sponsored school lunch money; and

WHEREAS, both the School and Synagogue are permitted uses in the subject R5 zoning district; and

THE CATERING ESTABLISHMENT

WHEREAS, the Catering Establishment, which is not a permitted use in the subject R5 zoning district, was listed on the CO on the alleged basis that it is a lawful non-conforming use, as discussed above; and

WHEREAS, the Catering Establishment is located in the cellar of the Building; the same cellar space is also apparently used for the School's cafeteria and assembly hall; and

WHEREAS, the Catering Establishment occupies approximately 18,000 sq. ft. of floor space in the cellar, with a primary event space, two adjoining lobbies and bathroom areas (one for men and one for women), as well as two kitchens; and

WHEREAS, the record indicates that the Catering Establishment has separate management and staff from the School and separate entrances with awnings reflecting the business name, that the food for events is made on the premises, that a guard is provided from 6 pm to 12 pm to assist with guest parking, and that waiters and busboys are hired on an "as needed" basis; and

WHEREAS, Appellant alleges that most events are held from approximately 6 pm to 12 am, and that 90 percent of the guests leave the Building at 11:30 pm; and

WHEREAS, Appellant states that ceremonies (held under Chuppahs, which look like canopies) related to the catered events are often conducted outside; and

WHEREAS, Appellant alleges that attendance at each event ranges between 340 and 400 people, though evidence submitted by Appellant indicates that some events are scheduled to have at least 500 guests; and

WHEREAS, Appellant provided information revealing that 166 events were held in 2004, and 154 events were held in 2005; and

WHEREAS, Appellant states that the catered events are offered at reduced rates relative to other catering establishments, with weddings costing approximately 25 dollars per plate; and

WHEREAS, members of the broader Viznitz community stated that the reduced rates were attractive to members of the larger orthodox and Hasidic Jewish community in Brooklyn; and

WHEREAS, these same members stated that the Catering Establishment serves the needs of this community; and

WHEREAS, the Catering Establishment has a license from the Department of Consumer Affairs for a catering establishment; and

WHEREAS, the Board notes that the Catering Establishment advertises in the Verizon Yellow Pages (both on-line and in print) under the listing "Banquet Facilities" as "Ohr Hachaim Ladies" and "Ohr Hachaim Men", with the address and phone number listed; and

WHEREAS, Appellant does not address the Verizon Yellow Pages advertisement, but in its last submission alleges that it does not pay for similar advertising that apparently runs in the Borough Park Community Yellow Pages, does not desire this advertising, and has asked the publisher of the Borough Park Community Yellow Pages to stop running the advertisements; and

THE ACCESSORY USE ISSUE

WHEREAS, this appeal requires the Board to consider whether the Catering Establishment -- a use historically and currently operated pursuant to a primary commercial UG 9 designation on the CO (albeit a potentially unlawful one) – can nevertheless properly be characterized as a UG 3 school or UG 4 synagogue

**60-06-A**

accessory use; and

WHEREAS, ZR § 12-10 "Accessory use" reads "An 'accessory use': (a) is a use conducted on the same zoning lot as the principal use to which it is related (whether located within the same or an accessory building or other structure, or as an accessory use of land), except that, where specifically provided in the applicable district regulations or elsewhere in this Resolution, accessory docks, off-street parking or off-street loading need not be located on the same zoning lot; and (b) is a use which is clearly incidental to, and customarily found in connection with, such principal use; and (c) is either in the same ownership as such principal use, or is operated and maintained on the same zoning lot substantially for the benefit or convenience of the owners, occupants, employees."; and

WHEREAS, there is no disagreement that the Catering Establishment is located on the same zoning lot as the School and Synagogue; and

WHEREAS, further, Appellant alleges that it owns all three uses; and

WHEREAS, thus, the primary issues in this appeal that require resolution are: (1) whether the catering establishment is clearly incidental to the School or Synagogue; and (2) whether such an establishment is customarily found in connection with religious schools or synagogues; and

WHEREAS, for the reasons set forth below, the Board disagrees that the Catering Establishment is an accessory use to either the School or the Synagogue; and

WHEREAS, moreover, all of Appellant's arguments to the contrary, whether based on case law, DOB policy, or past Board decisions, are without merit; and

FACTORS IN DETERMINING ACCESSORY USE

WHEREAS, as a threshold matter, the Board notes that a determination of whether a particular use is accessory to another use requires a review of the specific facts of each situation; and

WHEREAS, as held by the Court of Appeals in New York Botanical Garden v. Board of Standards and Appeals, 91 N.Y.2d 413 (1998), "[w]hether a proposed accessory use is clearly incidental to and customarily found in connection with the principal use depends on an analysis of the nature and character of the principal use of the land in question in relation to the accessory use, taking into consideration the over-all character of the particular area in question . . [t]his analysis is, to a great extent, fact-based . . ."; and

WHEREAS, thus, the Board finds that Appellant's argument that information relating to the operation of the Catering Establishment has no bearing on whether it is an accessory use, as expressed at the first hearing, is contrary to law; and

WHEREAS, DOB, which must review questions of accessory use in the first instance, cites to various factors that it evaluates when it is determining whether a particular use is accessory to another use; and

WHEREAS, when the proposed accessory use is catering, DOB states that it looks to the intensity of the use and its impact, the frequency of the catered events, the hours of operation, parking availability, the management of the food operations, whether food prepared there was delivered off-site, whether events were confined to the interior catering space or also occurred outside, and whether the use was advertised as a catering hall or banquet facility; and

WHEREAS, DOB also examines the relationship between the size of the membership of the religious entity and the size of events; and

WHEREAS, the Board concurs that these are reasonable factors to examine; and

WHEREAS, however, it notes that the list should not be considered exhaustive; and

WHEREAS, the Board also notes that given the factually-driven nature of any accessory use inquiry, certain factors may be more pertinent depending on the types of uses in question and that other factors not mentioned might be pertinent if the uses are different; and

WHEREAS, as discussed at the first hearing, the Board considered the following items to be among the relevant considerations and asked for information as to each of them: (1) whether the Catering Establishment has separate entrances and lobbies from the School and Synagogue; (2) the hours of operation; (3) whether the Catering Establishment has separate garbage pick-up from the other uses; (4) the frequency of outdoor activities related to catered events; (5) the relationship of the events to Synagogue members or School students/staff/family members; and (6) traffic and parking impacts; and

DOB'S POSITION AS TO THE CATERING ESTABLISHMENT

WHEREAS, as noted above, DOB takes the position that Appellant has not established that the catering establishment is incidental to either the School or the Synagogue or that such an establishment is customarily found with such uses; and

WHEREAS, based upon its review of the record, the Board agrees with DOB, for the reasons set forth below; and

WHEREAS, as to the question of whether the catering is incidental, the Board notes at the outset that the Catering Establishment appears to have a more significant relationship with the broader Jewish

60-06-A

community as opposed to the Synagogue or the School; and

WHEREAS, as discussed above, Appellant concedes that the catering establishment serves the broader community, and that at least 50 percent of all events are not related to the Synagogue or School; and

WHEREAS, the Board notes that Appellant has submitted no evidence that 50 percent of the catered events relate to the Synagogue or the School, even though Appellant committed to do doing so; and

WHEREAS, however, even assuming that this is true, it is clear that a substantial amount of the establishment's operation is entirely unrelated to either the School or the Synagogue; and

WHEREAS, further, the Board disagrees that merely because a student of the School is having a bar mitzvah or a member of the Synagogue is getting married and uses the Catering Establishment automatically renders the use of the Catering Establishment for such purposes accessory in all instances, given the other factors that must be weighed; and

WHEREAS, second, the Board notes that Appellant has not suggested to the Board that the Synagogue is used during all catered events; and

WHEREAS, to the contrary, Appellant has indicated on more than one occasion that most of the celebrants prefer to have the ceremony outside in a Chuppah; and

WHEREAS, specifically, in its July 11, 2006 submission, Appellant notes that the usual schedule for a catered event features a Chuppah, which is held outdoors when possible; and

WHEREAS, third, Appellant has not provided any credible evidence that the School has any integration whatsoever with the Catering Establishment; and

WHEREAS, the Catering Establishments has separate entrances, its own accessory rooms, hours of operation that do not relate correspond to the School, and its own set of parking and traffic impacts; and

WHEREAS, additionally, the fact that income generated by the Catering Establishment is used to support the operation of the School does not make the Catering Establishment incidental to the School; and

WHEREAS, the Catering Establishment can still be a primary use under such circumstances; and

WHEREAS, Appellant has not provided any precedent that establishes that a use is accessory to another merely based on the direction of the income stream; and

WHEREAS, even assuming *arguendo* that the direction of income flow is an important consideration

as to whether a use is incidental, it is far from clear that the Catering Establishment exclusively serves the School in this respect; and

WHEREAS, one could just as easily argue that it is the School's ability to obtain federal school lunch money that enables the Catering Establishment to offer reduced rates for its services and that it is the School, therefore, that subsidizes the Catering Establishment; and

WHEREAS, in sum, any argument based on income generation is unavailing; and

WHEREAS, fourth, the Board observes that the UG 9 designation for the Catering Establishment set forth on the CO was specifically sought by Appellant based on the alleged lawful non-conforming status and because of the proposed commercial operation of the establishment, an operation contemplated by Appellant to be primary rather than accessory; and

WHEREAS, presumably, absent the DOB application to modify the CO, Appellant would prefer to maintain this UG 9 designation, since the constraints of a UG 3 or UG 4 accessory designation would not exist; and

WHEREAS, Appellant has failed to explain why a UG 9 designation for the Catering Establishment was sought in 1999 if the use was actually operating as an accessory use to the Synagogue; and

WHEREAS, finally, the Board observes that the ZR does not anticipate that primary uses can normally qualify as accessory uses; and

WHEREAS, the Board notes that ZR § 12-10 "Accessory use" provides a list of examples of accessory uses; such uses include servants' quarters, caretaker apartments, the keeping of pets, swimming pools for guests of facilities, domestic or agricultural storage in barns, home occupations, a newsstand within a building, incinerators, storage of goods for commercial or manufacturing purposes, incidental repairs, the removal for sale of sod, clay, etc. for construction purposes, off-street parking and off-street loading berths related to the use of the site, signage, radio towers, railroad switching facilities, small sewage disposal facilities, or ambulance outposts connected with a fire or police station; and

WHEREAS, while certain of these uses (storage, for instance) could be primary uses, it is clear that the majority of them are ancillary uses that support the site's primary use (though they might not be necessary for the primary use to exist); and

WHEREAS, as established above, the record does not support a finding that the Catering Establishment is secondary to the School or Synagogue or supports in any direct manner the day to day function of these uses in a tangible manner comparable to the uses listed in

60-06-A

ZR § 12-10; and

WHEREAS, accordingly, the Board concludes that Appellant has failed to provide evidence in support of its contention that the catering establishment is incidental to either the Synagogue or the School; and

WHEREAS, as to the "customarily found" issue, DOB notes that a catering establishment that has heretofore operated as a primary UG 9 catering establishment is not customarily found in connection with either religious schools or synagogues; and

WHEREAS, again, the Board agrees with DOB; and

WHEREAS, the Board acknowledges that churches, synagogues, schools, and other institutions on occasion use space within their buildings for events on an accessory basis; and

WHEREAS, however, the Board notes that a distinction must be made between an 18,000 sq. ft. catering establishment that operates on multiple consecutive days as opposed to the occasional use of a facility's space for events; and

WHEREAS, the Board observes that this distinction is made in the ZR, which carefully separates UG 3 and UG 4 accessory uses, lawful in residential districts, from UG 9 catering establishments, commercial in nature and lawful only in commercial districts; and

WHEREAS, Appellant cites to other non-profit institutions that use space in their facilities for the contention that DOB has allowed UG 9 catering establishments to be accessory uses in other instances; and

WHEREAS, the underlying but unfounded assumption is that catered events at such institutions occur at the same frequency and intensity as at the Catering Establishment; and

WHEREAS, however, Appellant has not produced any evidence that convinces this Board that establishments comparable to the Catering Establishment are customarily found in connection with such institutions; and

WHEREAS, in particular, Appellant has offered no proof that any of the cited institutions are offering services that approximate, in frequency and intensity, the catering establishment in question; and

WHEREAS, in fact, the materials (as well as Appellant's scant discussion of them) fail to establish how many events such facilities host, who attends, the type of event, or the hours of operation; and

WHEREAS, Appellant, in a July 26, 2006 submission, provides a list of community facilities alleged to provide commercial catering, and divides this list between six "religious institutions" and five museums, gardens or institutes; and

WHEREAS, the first religious institution is the 92nd Street "Y"; while this institution advertises the availability of its spaces on its web-site, it is not clear if the frequency of events or their intensity in terms of the amount of guests rises to the level of a primary commercial occupancy, as does the Catering Establishment; and

WHEREAS, further, this facility, which combines many different uses, including lecture hall, school, performance space and health center, to name a few, is a distinct use from a religious school and synagogue, given the very different nature of operations and mission; and

WHEREAS, thus, this example does not support the conclusion that a UG 9 catering establishment is customarily found in connection with a synagogue or religious school; and

WHEREAS, Appellant then cites to Saint Bartholomew's Church; and

WHEREAS, the Board notes that this church is within a commercial zoning district where any commercial catering use would be permitted as of right; to the extent that such is offered at the church, it would be a legal primary use; and

WHEREAS, again, Appellant also fails to provide any information as to the frequency or intensity of the events held at this church; and

WHEREAS, Appellant then cites to Earl Hall of Columbia University, which like many churches makes its space available for rent for weddings and other events; and

WHEREAS, however, no evidence is provided in support of the contention that Columbia engages in catering, or as to the frequency or intensity of events; and

WHEREAS, Appellant next cites to the West Side Jewish Center, but only submits a web-site print-out describing a single mid-Summer Bar B-Q; and

WHEREAS, such evidence hardly supports the conclusion that the center is running a catering establishment; and

WHEREAS, further, as with Saint Bartholomew's Church, the center is located within a commercial zoning district where a UG 9 catering establishment would be allowed on a primary basis; and

WHEREAS, Appellant next cites to Congregation Ohab Zedek, and submits a web-site print-out describing the daily scheduled activities for a particular day; and

WHEREAS, nothing on this print-out indicates that the congregation is operating a catering establishment; and

WHEREAS, Appellant then cites to Landmark on the Park, a Universalist Church facility; and

WHEREAS, a print-out from the web-site indicates that this facility rents out its space for events; however, once again this does not mean it is running a catering

60-06-A

establishment or that the frequency or intensity of events is comparable to the Catering Establishment; and

WHEREAS, Appellant cites next to Congregation Adereth El; and

WHEREAS, one of the many pages of web-site print-outs that Appellant submits indicates that this congregation recently added an in-house caterer; and

WHEREAS, the recent addition of the in-house caterer to this facility does not lead to the conclusion that such a use is customarily found with houses of worship; and

WHEREAS, further, Appellant once again fails to provide any information about the frequency and intensity of any catering events at this facility; and

WHEREAS, as noted above, Appellant also cites to five non-religious institutions: the City's Fire Museum, the Seaman's Institute, the American Museum of Natural History, the New York Botanical Garden, and the Museum of the City of New York; and

WHEREAS, Appellant submits web-site print-outs for the first three that indicates that they rent out space for events; and

WHEREAS, the Board observes that none of these institutions are houses of worship or religious schools; thus, whether they house a commercial catering establishment is not relevant; and

WHEREAS, further, the Fire Museum and the Seaman's Institute are in either commercial or manufacturing zoning districts, where catering is allowed; and

WHEREAS, finally, once again, Appellant fails to establish whether such facilities host events in manner comparable to what occurs at the Catering Establishment; and

WHEREAS, Appellant also cites to two other houses of worship; and

WHEREAS, first, at the initial hearing, Appellant mentioned the Temple Emmanuel at 4902 14th Avenue, Brooklyn, and claimed that the certificate of occupancy for this facility indicates that it has a catering hall; and

WHEREAS, the most recent certificate of occupancy for this facility indicates that it has a social hall and kitchen; and

WHEREAS, however, like the other facilities cited by Appellant, this does not mean that Temple Emmanuel is operating a catering establishment similar to the one at issue here; and

WHEREAS, second, Appellant cites to the Riverside Church, which, according to web-site print-outs, provides on-site catering; and

WHEREAS, as has already been stated repeatedly, Appellant failed to provide the Board with any evidence that the catering here rises to the level of a commercial catering establishment in terms of frequency and intensity and other relevant factors; and

WHEREAS, in sum, Appellant has cited to only a few houses of worship that provide on-site catering services in a district where a UG 9 catering establishment would not be permitted, and has failed to provide any evidence that such commercial catering occurs in these houses of worship; and

WHEREAS, the Board is personally aware that there are hundreds of houses of worship in the City, and many, many more in the State; and

WHEREAS, citation to only a few potentially comparable facilities to the Catering Establishment does not allow the Board to conclude that a catering facility operating at the intensity and frequency that the Catering Establishment does is a use customarily found in connection with houses of worship; and

WHEREAS, further, Appellant has not provided a single example of a religious school that has a comparable facility as an accessory use; and

WHEREAS, most importantly, the Board observes that all of the facilities mentioned by Appellant are not before this Board; and

WHEREAS, to the extent that any of the other institutions operate UG 9 catering establishments illegally, in violation of their certificates of occupancy or zoning, this would support enforcement action by DOB, rather than a determination that such an operation is always fundamentally accessory; and

WHEREAS, accordingly, the Board concludes that Appellant has failed to provide evidence in support of its contention that catering establishments like the one in question here are customarily found in connection with schools or houses of worship; and

WHEREAS, that being said, the Board acknowledges that houses of worship often rent out their space for events; and

WHEREAS, however, the occasional use of such spaces for outside events should not be, in terms of frequency and intensity, the equivalent of the operation of a primary UG 9 commercial catering establishment; and

WHEREAS, while there admittedly may be some borderline cases where it is difficult to ascertain whether a particular house of worship is engaging in a primary commercial enterprise as opposed to the occasional accessory renting of space, such is not the case here: as noted above, the Catering Establishment is a primary use, the type of which is neither incidental to houses of worship or religious schools nor customarily found with such institutions; and

APPELLANT'S CITATION TO CASE LAW

WHEREAS, as noted above, Appellant cites to a variety of cases for the proposition that the UG 9

60-06-A

catering establishment may be considered an accessory use; and

WHEREAS, as a threshold matter, the Board finds that no prior determination as to what may or may not be an accessory use given a particular fact pattern will ever be prefect precedent as to a different set of facts; and

WHEREAS, however, the Board has reviewed all of these cases and finds that none of them dictate the outcome that Appellant desires; and

WHEREAS, many of the cases do nothing more than establish that generally municipalities must provide some deference in the implementation and enforcement of zoning schemes for religious and educational uses (see generally Cornell v. Bagniardi, 68 N.Y.2d 583 (1986)); and

WHEREAS, the Board notes that the City's zoning scheme already allows both the School and the Synagogue to be located within the subject R5 district as of right; and

WHEREAS, further, Appellant can use the cellar space for religious events so long as the use of the space is accessory to the School and/or Synagogue; and

WHEREAS, thus, the required deference is already reflected in the existing text; and

WHEREAS, in sum, the Board does not dispute that religious and educational institutions are permitted to engage in social, recreational or athletic activities that are reasonably associated with the religious or education purposes; and

WHEREAS, nevertheless, nothing in the line of cases cited by Appellant requires the Board to rewrite the ZR § 12-10 definition of "accessory use" to include catering establishments that would otherwise qualify as UG 9 commercial uses based upon actual operation; and

WHEREAS, Appellant also cites to cases that address specific accessory uses in relation to either educational or religious uses, and attempts to analogize the facts in those cases to those present in this appeal; and

WHEREAS, specifically, Appellant cites to these cases in support of the proposition that courts are liberal when assessing whether a particular use is accessory to educational and religious institutions so long as the facts support an accessory use determination; and

WHEREAS, at hearing, the Board asked Appellant to explain in greater detail why these cases had any bearing on the instant appeal; Appellant failed to do so; and

WHEREAS, the Board notes that the instant matter was brought by Appellant and is the responsibility of Appellant to argue; thus, Appellant's failure to do more than merely cite to the cases with the inclusion of a very brief one sentence synopsis compels the Board to attempt to discern what Appellant's actual argument is; and

WHEREAS, accordingly, the Board conducted its own review of these cases and finds that all of them are distinguishable; and

WHEREAS, for instance, Town of Islip v. Dowling College, 275 A.D. 366 (2000) concerned a town declaration that "catering events" held at the educational institution in question were non-permitted uses under the town zoning code; and

WHEREAS, the court disagreed, stating that the catering events "are permitted educational uses"; and

WHEREAS, the opinion does not provide detail about the frequency or duration of the "catering events", but there is no indication that the court was reviewing the operation of a catering establishment comparable to Appellant's; and

WHEREAS, because the opinion does not specify with any precision what was being reviewed, Appellant's reliance on the case as justification for the argument that it requires the Board to find that the Catering Establishment is accessory to the School or Synagogue is misplaced; and

WHEREAS, moreover, the court did not hold that the catering events were in fact accessory uses; the court instead declared that the catering events were permitted uses under the town code; the exact nature of how the court arrived at this determination is not specified; and

WHEREAS, further, the Board notes that the ZR contains a very specific and well-crafted "Accessory use" definition, and the Town of Islip case does not consider this definition; and

WHEREAS, finally, the catered events considered by the court were for students of the college; here, Appellant concedes that not all catered events are related to School students or staff or to the Synagogue's congregants; and

WHEREAS, Appellant also cites to the New York Botanical Garden decision referenced above; and

WHEREAS, in this matter, the court upheld a Board determination that a university's radio station was permitted a 480-ft. radio tower as an accessory educational use; and

WHEREAS, the court upheld the Board's determination that high-power radio stations and towers were both incidental to, and customarily found in connection with, college campuses in New York and elsewhere in the United States; and

WHEREAS, as established above, Appellant did not provide any evidence that the Catering Establishment is an incidental use to the School or Synagogue, nor any evidence that such a catering establishment is customarily found in other religious

60-06-A

schools or houses of worship, either in the City, New York State, or elsewhere in the United States; and

WHEREAS, the Board also notes that a radio tower has an inextricable accessory relationship to a college radio station, and therefore to the educational mission of the college; and

WHEREAS, the Catering Establishment has no such connection to the mission of the School or the Synagogue; and

WHEREAS, Appellant next cites to Greentree at Murray Hill Condominium v. Good Shepard Episcopal Church, 146 Misc. 2d 500 (1989); and

WHEREAS, in this case, the court found that a church-run shelter for ten homeless men could properly be characterized as an accessory use under ZR § 12-10; and

WHEREAS, the court cited to other cases where social and recreational activities of a religious institution were found to be accessory uses; and

WHEREAS, the Board understands that if the School or Synagogue were to shelter homeless individuals in the cellar of the Building, the Greentree case would have some applicability to a determination as to whether such use was accessory; and

WHEREAS, however, the temporary shelter of ten homeless men is not analogous to the approximately 150 catered events, with approximately 400 guests, that occur at the Catering Establishment on a yearly basis; and

WHEREAS, thus, the Board concludes that the Greentree case is distinguishable; and

WHEREAS, Appellant also cites to Flagg v. Murdock, 172 Misc. 1048 (1939); and

WHEREAS, in this case, the court found that a dancing school within a residential building in a residence zone was actually a school for purposes of the zoning code then in effect, and was thus permitted as a primary use; and

WHEREAS, ironically, the Flagg court also addressed six commercial uses present in the same residential building: a barbershop, a dress shop, a gift shop, a shoe repair shop, a tailor shop, a restaurant, and a beauty parlor; and

WHEREAS, such uses were not permitted in the residence district, so the operators of certain of these uses argued that they were accessory to the residential use since they served the occupants of the building; and

WHEREAS, the court rejected this argument, noting that such business uses were not permitted as an accessory use by the zoning code then in effect; and

WHEREAS, again, the Board finds that this case does not support Appellant's position; rather, it is contrary to it; and

WHEREAS, Appellant then cites to four out-of-state cases; and

WHEREAS, the Board finds that these cases are not particularly good precedent, since none of them concern ZR § 12-10 ("Accessory use") or the case law of this state; thus, it is unnecessary to examine them; and

WHEREAS, however, in passing, the Board observes that none of the cases concern a commercial catering establishment alleged to be operating at the intensity and frequency of the establishment in question; and

WHEREAS, in sum, the Board finds that none of the cases cited by Appellant require the Board to deem the Catering Establishment an accessory use to the School or Synagogue; and

APPELLANT'S REFERENCE TO "BINGO/LAS VEGAS NIGHT" EVENTS

WHEREAS, Appellant argues that since non-profit institutions can conduct bingo and "Las Vegas night" events on an accessory basis in order to raise money for charitable purposes, the Catering Establishment must also be deemed an accessory use; and

WHEREAS, despite repeated requests by the Board to provide a more detailed explanation, a review of Appellant's submissions and statements made at hearing reveals that this argument was never substantiated; and

WHEREAS, instead, Appellant submitted documentation in purported support of the argument without explanation; and

WHEREAS, for example, Appellant submitted lists of entities that are authorized by the State of New York to conduct such activities; and

WHEREAS, what Appellant failed to submit was any information as to how many of these entities in fact engaged in bingo or Las Vegas nights, and if so, to what extent; and

WHEREAS, thus, at most, the lists do nothing more than establish that numerous entities throughout the State seek approval for bingo or Las Vegas night activities; and

WHEREAS, Appellant also cites to a DOB letter, dated September 28, 1978, which reads in pertinent part "[p]lace of Assembly permits have been issued for bingo only where premises can be lawfully occupied as meeting halls, whether as a primary use (Use Group 6 in the Zoning Resolution), or accessory to a primary use such as a church, synagogue, non-profit intuition, etc. on the same site. Games of chance may be substituted for bingo only when such use was clearly on the same site on, and accessory to, such primary uses as churches, synagogues, etc. When not accessory to such a primary use, a premises devoted exclusively to 'games of chance' as an alternate to bingo (meeting halls) can become indistinguishable from amusement arcades and the like,

60-06-A

posing a problem for … communities in general . . . Obviously, in such instances, a new certificate of occupancy should be obtained (if the Zoning Resolution so permits) after the filing of an Alteration application, and a new P.A. permit obtained predicated on such new use."; and

WHEREAS, while this letter indicates that bingo and gaming nights may be accessory to religious institutions, it does not state that they are always accessory to religious institutions; and

WHEREAS, instead, the letter indicates that such uses may not always be accessory, and if they are not, they must be legalized if possible; and

WHEREAS, nothing in this letter suggests that DOB cannot or will not scrutinize each particular instance of bingo or gaming nights in order to determine if such use is accessory; and

WHEREAS, nonetheless, Appellant argues that because of this letter, the Catering Establishment must be recognized as accessory by DOB as well; and

WHEREAS, presumably, Appellant believes that there is no difference between hosting a bingo or Las Vegas night and the operation of a catering establishment; and

WHEREAS, however, DOB states, and the Board agrees, that the 1978 letter does not give non-profit institutions the ability to conduct bingo or Las Vegas nights to whatever degree is desired; and

WHEREAS, DOB states that it would allow occasional use of non-profit facilities for such activities provided that they were intended primarily for participation by members of the non-profit; and

WHEREAS, here, the information provided by Appellant indicates that the Catering Establishment is in operation on a daily or near-daily basis many times during the year, and serves not just individuals with a direct relation to the School and Synagogue, but members of the larger Jewish community, in New York City and elsewhere; and

WHEREAS, additionally, another relevant factor is the frequency of the activity; and

WHEREAS, DOB states that it would allow bingo or Las Vegas nights one to two nights per week, which means that a non-profit could engage in such nights a total of 52 to 104 times per year; and

WHEREAS, however, such activities would not occur every night for weeks at a time; and

WHEREAS, nor would such activities be the equivalent of a primary commercial use, as the Catering Establishment is; and

WHEREAS, finally, the Board notes that Appellant believes that bingo and Las Vegas nights are purely revenue producing events, and therefore are clearly not incidental to the principal use; and

WHEREAS, assuming that Appellant is correct, then analogy to such events provides no guidance, since such uses would not meet the definition of "accessory use"; and

WHEREAS, again, the Board reiterates that the categorization of a use as accessory is a fact-intensive inquiry that depends on a variety of factors specific to each institution and each proposed accessory use, as well as the surrounding neighborhood; and

WHEREAS, thus, the Board finds that DOB has no authority to predetermine whether a particular use is accessory in all circumstances, and further finds that the 1978 letter cannot be read in this manner; and

WHEREAS, instead, like the listing of accessory use examples set forth in ZR § 12-10, the 1978 letter is merely a guideline, useful to DOB in determining what should occur when a bingo or gaming night use fails to meet the test for accessory use; and

WHEREAS, in sum, the ability of institutions to engage in occasional bingo nights or other recreational activities on an accessory basis does not mandate that the Board find that the Catering Establishment is an accessory use; and

APPELLANT'S REFERENCE TO THE BOARD'S PRIOR DETERMINATION

WHEREAS, during the hearing process, Appellant discussed a prior Board decision made under BSA Cal. No. 121-00-A; and

WHEREAS, in this matter, the Board considered: (1) whether the construction of a 3,000 seat baseball facility for St. John's University (the "University") was an accessory use to the University; and (2) whether the time-limited use of the baseball facility by a professional baseball team negated the accessory use status; and

WHEREAS, as reflected in its resolution, dated June 27, 2000, the Board concluded that the facility was an accessory use and that the time-limited use of the facility by a professional team did not compromise the status of the field as an accessory use; and

WHEREAS, the Board based its conclusion as to the second issue, in part, on evidence that colleges and universities elsewhere rented out their athletic facilities to professional sports teams; and

WHEREAS, the Board also noted that the use of the facility by the professional team was part of an arrangement between the University, the professional team, and the City's Economic Development Corporation ("EDC"); and

WHEREAS, the Board's determination was subsequently upheld in court (see Padavan v. City of New York, Index No. 26763/98 (July 20, 2000)); and

WHEREAS, Appellant argues that the Board's decision as to the University compels a finding that the

60-06-A

Catering Establishment is an accessory use to the School; and

WHEREAS, Appellant claims that since the baseball facility would be rented out to a professional team and apparently used by community groups and not just the University, the Board was in effect holding that not all use of accessory facility must relate directly to the primary uses; and

WHEREAS, as an initial matter, the Board must once again point out that prior accessory use determinations on a set of facts entirely different than those present here are not binding nor particularly helpful in determining whether the Catering Establishment is an accessory use; and

WHEREAS, the Board is not considering whether the School may create a field for its baseball team (presuming it has one) nor whether, if such a field was built, it could be rented out to a commercial sports league on a time-limited basis; and

WHEREAS, as noted above, the factors evaluated in a particular accessory use question will vary depending on the use; and

WHEREAS, here, the Board is presented with a catering facility that, by Appellant's own admission, hosts approximately 75 events per year, both historically and going forward, that have no relation whatsoever to the School or Synagogue; and

WHEREAS, in the case involving the University, the use of the field by the professional team was limited to 38 home games, practices and perhaps some playoff games, only for a maximum two-year period, while the field would actually be in service for University purposes for at least seven years; and

WHEREAS, further, the Board was satisfied that such professional use of the field was customarily found in connection with institutions of higher learning; and

WHEREAS, here, Appellant has not established that other houses of worship customarily conduct catering activities unrelated to the institution to the extent that the Catering Establishment does; and

WHEREAS, Appellant also suggests that the Board's prior determination was unfounded because there is actually no basis to conclude that colleges and universities actually lease their facilities to professional sports teams such that it can be considered customary; and

WHEREAS, since the prior Board did make this finding and since this was upheld by a court, the Board declines to revisit the issue now; and

WHEREAS, in any event, Appellant has no standing to challenge this determination; and

WHEREAS, in sum, the Board does not find that its prior decision is determinative of the matter at hand;

and

THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

WHEREAS, finally, Appellant appears to suggest that the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), a federal law, requires that the Board grant this appeal; and

WHEREAS, RLUIPA provides that no government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest; and

WHEREAS, first, the Board observes that regardless of whether the Board finds that the Catering Establishment is an accessory use, the School and the Synagogue are permitted uses under the R5 zoning district regulations, and may remain legally on the site; and

WHEREAS, further, Appellant is free to hold, and even charge money for events, in the cellar to the extent that they are accessory; and

WHEREAS, there is simply no evidence that would support the conclusion that the Board, in denying this appeal, is imposing a substantial burden on or even interfering with the exercise of religious freedom or religious practices of the School or the Synagogue; and

WHEREAS, Appellant's contention that the School and the Synagogue would not be able to cover expenses without the on-site Catering Establishment, even if proved to be a fact, does not lead to a contrary conclusion; and

WHEREAS, further, it is difficult for the Board to understand why RLUIPA should function to support an otherwise unsupportable accessory use determination in order to support a revenue stream for a religious entity that is unable to support its non-commercial uses through traditional means; and

WHEREAS, accordingly, the Board declines to apply RLUIPA in the novel way that Appellant suggests; and

WHEREAS, the Board observes that the court in Episcopal Student Foundation vs City of Ann Arbor, 341 FSupp2d 691 (ED Michigan 2004) held that zoning regulations that imposed financial burdens on a church do not constitute substantial burdens under RLUIPA; and

WHEREAS, thus, even if the Catering Establishment is required to be relocated at a cost, or if the activities conducted there are limited to events that

60-06-A

are accessory to the School or Synagogue, with a resulting decrease in revenue, this is not a substantial burden under RLUIPA; and

WHEREAS, in addition, the Episcopal Student Foundation court held that a zoning ordinance does not infringe on the free exercise of religion where religious activity can occur elsewhere in the municipality; and

WHEREAS, thus, even if the operation of the Catering Establishment can properly be characterized as religious in nature (despite its status under the ZR as a commercial use), since it is allowed in certain commercial zoning districts that are mapped liberally throughout the City, including in the vicinity of the subject site, Appellant's alleged free exercise rights are not compromised; and

CONCLUSION

WHEREAS, in sum, the Board has reviewed the record and finds that the Catering Establishment as currently operating is not an accessory use to either the School or the Synagogue; and

WHEREAS, accordingly, the Final Determination must be upheld and this appeal must be denied; and

WHEREAS, in so concluding the Board notes the following: (1) this determination does not render the School or Synagogue illegal in any respect; (2) the cellar may still be used as a cafeteria in conjunction with the School; (3) events that are accessory to the School and/or Synagogue may be held in the cellar pursuant to the approval of DOB and in accordance with this decision.

*Therefore it is Resolved* that this appeal, which challenges a Department of Buildings final determination dated March 31, 2006 issued by the Brooklyn Borough Commissioner, is denied.

Adopted by the Board of Standards and Appeals, January 9, 2007.

**A true copy of resolution adopted by the Board of Standards and Appeals, January 9, 2007. Printed in Bulletin Nos. 1-3, Vol. 92.**

Copies Sent
    To Applicant
        Fire Com'r.
            Borough Com'r.



CERTIFIED RESOLUTION

Chair/Commissioner of the Board