UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------- x

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,

                Plaintiff,

        - against -

THE CITY OF NEW YORK and PATRICIA
J. LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings

                Defendants.

------------------------------------------------------------- x

07 Civ. 10962 (DAB)


# REPLY MEMORANDUM OF LAW
# IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION


DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
(212) 489-8230

*Attorneys for Plaintiff*
*Third Church of Christ, Scientist, of New York City*

# TABLE OF CONTENTS

**Page**

Tables of Authorities ................................................................................................................. i

Preliminary Statement ............................................................................................................... 1

    I.      The Catering Conducted in the Building is a Permissible Accessory Use ........................................................................................................ 1

    II.     Defendants Violated the Equal Terms Provision of RLUIPA ............................... 5

    III.    Defendants Violated the Equal Protection Clause ................................................. 8

    IV.    Defendants Have Substantially Burdened the Church's Religious Exercise and Violated Section (a) of RLUIPA .................................................... 12

    V.     The Church Will Suffer Irreparable Injury Unless the Court Enjoins Defendants ............................................................................................................ 14

# TABLE OF AUTHORITIES

## CASES

*Bais Yaakov v. Temple Emanu-el of Brooklyn*, 609 N.Y.S.2d 274 (2d Dep't 1994) ...................... 15

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ................................................. 11

*Cornell University v. Bagnardi*, 510 N.Y.S.2d 861 (1986) ............................................................... 5

*Matter of Dyno v. Village of Johnson City*, 690 N.Y.S.2d 325 (3d Dep't 1999) ............................. 4

*Episcopal Student Foundation v. Ann Arbor*, 341 F. Supp. 2d 691 (E.D. Mich. 2004) ................ 13

*Harlen Associate v. Incorp. Village of Mineola*, 273 F.3d 494 (2d Cir. 2001) ............................. 11

*Jackson v. Burke*, 256 F.3d 93 (2d Cir. 2001) ................................................................................ 11

*Konikov v. Orange County*, 410 F.3d 1317 (11th Cir. 2005) ........................................................... 6

*Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007) ................................................................................................................................... 6

*Mount Sinai Medical Center v. City of Miami Beach*, 706 F. Supp. 1525 (S.D. Fla. 1989) ........... 8

*Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005) ........................................................................ 11

*New York Botanical Garden v. City of New York*, 671 N.Y.S.2d 423 (1998) ............................ 2, 4

*Scottish Rite Cathedral Association v. Los Angeles*, 156 Cal. App. 4th 108 (Cal. App. 2d Dist. 2007) ............................................................................................................................ 1, 12

*Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005) ........................................................................................................... 13

*Support Ministries for Persons with AIDS v. Waterford*, 808 F. Supp. 120 (N.D.N.Y. 1992) ................................................................................................................................. 11

*Tenafly Eruv Association v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002) ............................. 8

*Vietnamese Buddhism Study Temple v. City of Garden Grove*, 460 F. Supp. 2d 1165 (C.D. Cal. 2006) ................................................................................................................. 15

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ................................................................ 11

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ................................................................ 15

*Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007) ................... 5, 13

*Zahra v. Town of Southold*, 48 F.3d 674 (2d Cir. 1995) ....................................................... 11, 12

## STATUTES

42 U.S.C. §2000cc-5(7) ............................................................................................................... 12

Religious Land Use and Institutionalized Persons Act (RLUIPA)
146 Cong. Rec. S7774-01 (2000) ................................................................................................... 6

## MISCELLANEOUS

Reply Declaration of Jay Segal, sworn to on February 22, 2008 ("Segal Reply Dec.") ...... *passim*

Reply Declaration of Thomas G. Draper, sworn to on February 22, 2008
("Draper Reply Dec.") ............................................................................................................ *passim*

## Preliminary Statement

Until influential neighbors began to lobby them, defendants had approved the Church's plans to permit catered events in the building. Having succumbed to the lobbying and revoked approval, defendants now seek to justify their conduct with misleading factual and legal assertions very similar to those that the neighbors made. They deride the Church's small congregation and mock its "miniscule" religious use of the building. They accuse the Church of "disingenuously" claiming that it permits catered events in the building in order to raise funds to remain in existence when instead, defendants assert, the Church simply "hand[ed] over its building" to a caterer who now "owns and operates" it as a commercial catering facility.

Having created this false factual impression, defendants then cite *Scottish Rite Cathedral*, a case they insist is "strikingly similar" to this one and involves "exactly" the Church's argument here when, in fact, that case is irrelevant because it involved a building in which *no* religious activity was conducted or even planned for the future. Defendants also insist that though they knowingly permit extensive catering activities at secular non-profits and religious institutions all over town, their pattern of permission somehow does not matter in evaluating whether they have unlawfully treated the Church on less than equal terms.

Such distortions cannot change reality: the Church owns the building, uses it primarily for religious activities, and has the same right that defendants afford other religious and secular non-profit groups to supplement revenues by permitting accessory catering use of its premises.

### I. The Catering Conducted in the Building is a Permissible Accessory Use

Since 1924, the Church has used the building as its place of worship and the hub of its activity in the community. *See* Draper Reply Dec. ¶42. Though it has fewer members now than it did before the building began to deteriorate, the Church still conducts multiple services every week, hosts frequent lectures, and conducts numerous important association meetings, committee

meetings, educational classes, trustees meetings, and youth group events. *Id.* Moreover, the building is where the Church administers its neighborhood Christian Science reading room, organizes Spanish-language outreach efforts, and schedules lectures and workshops. *Id.* ¶44. These extensive religious activities are the primary use of the building.

The Church also chose to make a secondary use of its building as a venue for catered social events in order to raise funds to renovate and defray the costs of maintaining and operating its edifice for years to come.[1] These catered events are the type of "accessory use" permitted by the Zoning Resolution ("ZR") – *i.e.*, a use that is "clearly incidental to and customarily found in connection with the principal use." *New York Botanical Garden v. City of New York*, 671 N.Y.S.2d 423, 426 (1998).

Catering is the incidental means the Church chose to accomplish its principal end: to restore and preserve the building as a place of worship. In other words, religious activities are the primary *purpose* for which the building is maintained and occupied; the purpose of the catering is ancillary. And "purpose" is the key component of the ZR's definition of "use." *See* ZR § 12-10 (definition of "use").

In practice, as well as in purpose, the principal use is religious and the catering is incidental. In 2007, for example, only 45 catered events were held. *See* Draper Reply Dec. ¶41. Because on average the preparation and conduct of an event takes 7.5 hours, the total catering use at the building consumed 28 hours per month. *Id.* By contrast, approximately two hundred

---

[1] Defendants repeatedly suggest that the Church has "handed over" the building to the Rose Group which now "owns" it, *see* Def. Br. 2, and criticize many terms of the lease. *Id.* at 5. But the Church still owns the building and having catered events was its decision. Indeed, many of the lease terms defendants criticize – such as the tenant's responsibility to pay operating costs and any real estate taxes that might be owed – are enormously *beneficial* to the Church, *see* Draper Reply Dec. ¶28, as an independent appraiser has confirmed. *Id.* at ¶20, Ex. D. Nor is there anything sinister about the Church entering into a lease to facilitate catered events at the building. First, the Church did not have the expertise or staff to conduct the events, and its teaching prohibited serving alcohol directly (although it does not judge others who serve or consume it). *See Id.* ¶58. Second, as the independent appraisal conducted by the Staubach Company shows, leases between religious groups and caterers are common. *Id.* Ex D.

hours per month were spent on particular religious activities in 2007. *Id.* ¶43. Moreover, like many active religious institutions, the Church is available to any congregant or member of the community seeking a place for meditation or prayer. *Id.* ¶46. Thus, the catering use is and will continue to be "clearly incidental" to the primary religious use.

Defendants ignore these facts, preferring to speculate that, under the lease, catered events can be held at all times when there is not a particular Church service. *See* Def. Br. at 4. While in future years the Church expects significantly more than the 45 events that were held in the lease's first year, there is no need to indulge in defendants' parade of horribles. Consider that under the TRO in place, up 125 catered events are permitted in 2008. *See* Draper Reply Dec. ¶41. That would amount to 78 hours a month for catering, still far less than the hours consumed by particular religious activities at the Church, and a fraction of the time that the Church is open as a sanctuary and resource for its members. *Id.* ¶¶41-46. Moreover, religious activities at the building are expected to expand in the future as a result of the renovated building and the Church's improved financial condition, and of course the Church will remain open as a resource for its congregants and the community. *Id.* ¶¶46-49. There is every reason to conclude that religious activities will remain the primary use of the building for the remainder of the term of the lease and beyond, even if the caterer is able to book more than the current number of events the Court has allowed.

As to the other prong of accessory use analysis, catering activities are plainly customarily found in connection with the primary uses of religious and secular non-profit buildings. *See, e.g.*, Segal Reply Dec. ¶49, Ex. Q (common for non-profits to make "shared space" arrangements with third parties so as to generate supplemental revenues necessary to maintain their aging edifices); Brennan Dec. ¶¶85, 92, 138 (citing websites of non-profit and religious groups

advertising the availability of space for catered events).[2] The well-publicized existence of these accessory catering uses shows that such use has become "customary." *See Matter of Dyno v. Village of Johnson City*, 690 N.Y.S.2d 325 (3d Dep't 1999) (presence of basketball backboards in many yards evidence that backboards were customary accessory use of residential property).

The "accessory use" analysis does not occur in a vacuum; the Court must also consider "the overall character of the particular area in question." *Botanical Garden*, 671 N.Y.S.2d at 426. Park Avenue in the sixties is zoned R-10 – the highest-density residential zone – and is the widest avenue in the City, only blocks north of midtown, and a block west of heavily commercial Lexington Avenue. Moreover, the Church is surrounded by buildings that engage in extensive catering and restaurant activity, such as the Regency Hotel (Park and 61st) which has commercial catering facilities, an active restaurant and a night-club open to the general public,[3] the Beekman (Park and 63rd) which has an active restaurant and a separate commercial catering facility, the Council on Foreign Relations (Park and 68th) which conducts extensive catering operations, including multiple events in different rooms on the same night, and the Seventh Regiment Armory (Park and 66th) which has for years hosted events with up to 3,000 guests. *See* Segal Reply Dec. ¶¶12-13, 43-46.

New York law requires the City to give reasonable latitude to religious organizations because stringent application of the zoning rules would "'fail[] to recognize that educational and religious uses ordinarily have inherent beneficial effects that must be weighed against their

---

[2] The City falsely suggests that by permitting the Rose Group to market the building as "583 Park Avenue" for catered events the Church has somehow turned itself into a catering hall. *See* Brennan Dec. ¶6. But many non-profit groups advertise the availability of their spaces under different brand names, such as "Landmark on the Park" (Universalist Church), "Wallace Hall" (St. Ignatius of Loyola), "Pratt House" (Council on Foreign Relations), and "680 Park Avenue" (Americas Society). *See* Segal Reply Dec. ¶39. This customary marketing tactic has no bearing on identifying the primary use of the Church or these other reputable religious and non-profit spaces.

[3] While the City's brief carefully avoids acknowledging this fact, *see* Def. Br. at 7 n.2, the Regency sits in part in the same R-10 zoning district as does the Church. *See* Segal Reply Dec. ¶44.

potential for harming the community.'" *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 351 (2d Cir. 2007) (quoting *Cornell Univ. v. Bagnardi*, 510 N.Y.S.2d 861, 868 (1986)). In view of this public policy, and given the combination of relevant factors – the primary religious use of the building, the fact that catered events at churches, synagogues and non-profits are commonplace in the City, and the bustling nature of the particular neighborhood in question – it is no surprise that DOB initially *approved* the Church's accessory use application. That decision was correct.[4]

## II. Defendants Violated the Equal Terms Provision of RLUIPA

Defendants implement the ZR in a way that consistently allows non-religious non-profits to support their primary mission with revenues from accessory catered events held in their buildings, but prohibits the Church from doing essentially the same thing. By treating the Church on less than equal terms with these non-religious groups, defendants violated RLUIPA. In an effort to avoid liability, defendants make two arguments: (i) there is so little religious activity conducted there that one cannot compare the Church to "active and thriving" secular non-profits which are permitted to conduct accessory catered events, *see* Def. Br. at 7; and, in any event (ii) the Church cannot claim that it is being treated on less than equal terms with non-religious groups because the defendants do not "treat" the non-religious groups at all. *Id.* Both arguments lack merit.

It is not for defendants to decree what counts as a sufficiently "active and thriving" religious or non-profit group, *see* Def. Br. at 9, or to judge the size of a Church's congregation. *Id.* at 4. At most, defendants would need to satisfy themselves that a group was sincerely pursuing its religious or secular non-profit mission before it made a land use decision involving

---

[4] The City *concedes* that the Church did not mislead the DOB when it applied for and received approval. *See* Transcript of Oral Argument of motion for TRO, December 3, 2007 ("TRO Tr."), at 23-24.

such an institution. Here, the Church's religious activities are genuine and plainly the building's *raison d'être*. No case holds that a government can make an inquiry into the size of a church's membership or the vibrancy of its programmatic offerings in order to determine the extent to which it can make accessory use of its property. Indeed, such a regime would favor large, popular faiths over small, unpopular denominations and would lead to the very type of discrimination that Congress enacted RLUIPA to prevent. *See* 146 *Cong. Rec.* S7774-01 (noting legislative finding that "small, or unfamiliar churches . . . are frequently discriminated against . . . in the highly individualized and discretionary processes of land use regulation").

Still, defendants contend that the Church (which they prohibit from holding catered events) is not "similarly situated" to neighboring non-religious groups (which they permit to conduct accessory catering uses). That is the wrong standard; the equal-terms provision does not require plaintiff to be "similarly situated" with these neighboring non-religious groups. *See Konikov v. Orange County*, 410 F.3d 1317, 1324 (11th Cir. 2005). But some comparison of the two groups is of course necessary to reveal discrimination between them. Assuming *arguendo* that the equal-terms provision requires a showing of a more limited similarity "with respect to regulatory purpose" as between a religious and non-religious group, *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007), the Church has plainly made that showing here. After all, the purpose of the City's zoning rules is to "protect public health, safety and general welfare." *See* ZR, Preamble. The catered events held at the Council on Foreign Relations and many other non-profit groups create precisely the same potential impact on the public health, safety, and welfare as catered events held at the Church. So far as the relevant "regulatory purpose" is concerned, the Church is no different from the many secular comparators discussed in the papers. The only difference is that the defendants

prohibit the Church from doing what it permits the secular groups to do. That discrimination violates RLUIPA's equal terms provision.[5]

Unable to deny that the Church is prohibited from doing what comparable non-religious groups routinely do, the City is reduced to arguing that there is no lesser treatment because they do not "treat" these non-religious groups at all. That argument is frivolous.

First, defendants' assertion that "there is no basis" for the "surmise" that they are "aware of or [have] made any determination about the purportedly similar catering uses at the nonreligious venues cited by plaintiff," see Def. Br. at 7-8, is flatly false. As defendants' own papers make clear, counsel for the Church supplied the DOB with numerous examples of similar catering uses at both religious and secular non-profit organizations throughout the City. See Brennan Dec. Ex. P (submission by Greenberg Traurig to DOB, months before this litigation commenced, explaining that it was customary and permissible for non-profit organizations to advertise and conduct catered social events). Moreover, that religious groups and secular non-profits rent their space out to third parties to conduct catered events so as to raise revenue was well known as far back as 1992, see Segal Dec. Ex D, and "shared space" arrangements that provide the means to preserve the "sacred spaces" that so many religious and non-profit groups own have become increasingly prevalent. See Segal Reply Dec. Ex Q .

The conclusion is therefore inescapable that defendants have known of and permitted this sort of accessory catering activity for many years. If there were some requirement that there be a particular ratio of non-profit activity to accessory catering usage, why is there no DOB regulation that establishes the ratio, and why was there no effort to determine whether all of

---

[5] Perhaps concerned about parroting the complaints of the Church's neighbors too closely, defendants never claim that the catering use of the Church has had a negative impact on the quality of life in the neighborhood. That is a sensible concession. The NYPD has "never issued any summonses or otherwise taken any action against the Rose Group or anyone else responsible for events held at 583 Park Avenue" in connection with a 311 "quality of life" complaint or any other reason. See Draper Reply Dec. ¶64, Ex. K.

these cited catering uses were lawful? What possible difference can it make whether catered events are hosted for congregants or the general public when the impact on the public health and welfare is the same? Why, so far as the record reveals, has the City never asked secular non-profits how many catered events they hold every year? The answer is that it has long been the City's policy – and we think it is a wise one – to permit non-profit organizations to use their spaces for catered events to raise funds without unduly intrusive inquiries by the City.

Even assuming that defendants have never officially approved such uses – and discovery may reveal that they have – their tacit approval of catering uses at secular non-profits over the years makes clear that their selective prohibition of catering at the Church constitutes unlawful discrimination. *See Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 167-68 (3d Cir. 2002) (town's practice of tacitly permitting posting of house numbers, lost animal signs, ribbons and other items to utility poles showed that decision to bar orthodox Jewish group from posting *lechis* on such poles was discriminatory); *Mount Sinai Medical Center v. City of Miami Beach*, 706 F. Supp. 1525, 1528 (S.D. Fla. 1989) (fact that city tacitly permitted two neighboring hospitals to construct and rent accessory hospital towers was evidence that supported enjoining city from prohibiting plaintiff hospital from constructing similar towers).

### III. Defendants Violated the Equal Protection Clause

Defendants violated the equal-terms provision of RLUIPA by treating non-religious non-profit groups better than they treat the Church. Defendants also have violated the Church's rights under the Equal Protection clause, because there is no rational basis for defendants to allow robust catering activities at similarly situated non-profit groups – both religious and non-religious – all over the City while at the same time relenting to political pressure and prohibiting *all* catering at the Church.

In addition to the comparable catering activities at non-religious groups detailed above, the facts developed so far also show extensive catering uses at religious institutions that are similarly situated to plaintiff. For example, St. Ignatius of Loyola, a church located on Park Avenue in the same residential district as the Church, has a separate catering facility which it markets as "Wallace Hall" that can accommodate hundreds of guests, and where 168 events were held last year for non-congregants. *See* Brennan Dec. ¶135. The Church happens to have a large auditorium which can hold 1,000 or more people, but that is not unprecedented. Indeed, Riverside Church, which is located in an R-8 residential district (less dense than the Church's R-10 zone) advertises the availability of numerous spaces in its complex that may be rented for private catered affairs, including its Nave which can accommodate 1,900 guests. *See* Segal Reply Dec. ¶23, Ex. I. Moreover, plaintiff cited numerous additional examples in its moving papers of religious organizations located in residential districts that make extensive use of their buildings for catered events, including the Park Avenue Synagogue, which uses an outside caterer and holds events for up to 500 people three nights a week, *see* Segal Dec. Ex. I (letter from Neuman & Leventhal Caterers), the Park East Synagogue, which also can accommodate 500 seated guests for catered events, which it holds on average four nights a week, *id.*, and the Universalist Church, which markets its catering space as "Landmark on the Park" and can accommodate 400 seated guests (and up to 600 for receptions). *See id.* (letter from Crystal Plaza caterers). Defendants never attempt to distinguish these examples; their only response is the misguided (and meritless) argument that the Church isn't comparable to such other institutions because its congregation is too small and insufficiently "active" even to permit any accessory catering at all:

The unfortunate reality is that only one thing distinguishes the Church from these other religious (and non-religious) institutions that are permitted to conduct extensive catering

operations: the Church's neighbors organized themselves, lobbied, and persuaded the City to shut down catered events at the Church.

Not surprisingly, defendants deny that they succumbed to lobbying in deciding to revoke the earlier-granted approval. But that denial has not been tested by discovery and is not credible given the conceded facts. First, the Church's application accurately described the nature of the intended catering activity, *see* n. 4, *supra*, and the DOB granted pre-consideration approval noting that the only limitation on size of events was the physical capacity of the building. *See* TRO Tr. at 23. Second, when the Church's neighbors learned of the approval, they organized a lobbying campaign targeting key political officials. *See* Brennan Dec. Ex. L. Third, the DOB, after being lobbied, reversed course and revoked approval, even though only 45 events were held at the Church in 2007, with an average number of 447 guests (far smaller than the capacity of the building), and notwithstanding that there has not been a single sustained "quality of life" complaint relating to the events. *See* n. 5, *supra*. Indeed, even the City appears to concede that the only reason the DOB revoked approval is because of the neighbors' complaints. *See* Def. Br. at 11 (DOB would not disturb catering activities unless it received complaints).[6]

Defendants erroneously assert that the Church must show that this disparate treatment resulted from their "intention to discriminate on an impermissible consideration, such as religion or race, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith

---

[6] Defendants point to the fact that the DOB revoked approval for catered events at a yeshiva in Brooklyn as evidence that the Church is not the *only* religious group that it has singled out. *See* Def. Br. at 22. Of course, in that case, opposition from neighbors also appears to have motivated the denial of permission, *see* Segal Reply Dec. Ex. S (BSA determination citing community opposition). And in any event, the yeshiva case is very different from this one. The yeshiva has an 18,000 square foot catering hall that is a separate structure from the school with its own separate entrance; that building is new and was not, like the Church, in need of extensive renovations; many of the catered events held at the yeshiva's facility are conducted in part outside on the street; there, the yeshiva had initially sought approval for a stand-alone commercial catering business and switched gears only when it became clear that they could not obtain such approval; and, finally, the catering operation there takes place in a R-5 district in a quiet residential neighborhood in Brooklyn that is nothing at all like the bustling Park Avenue neighborhood where the Church and so many other institutions regularly conduct large social events. *Id.* ¶58-60.

intent to injure." Def Br. at 19-20 (citing *Zahra v. Town of Southold*, 48 F.3d 674 (2d Cir. 1995).) Instead, a "class of one" equal protection claim exists where plaintiff "has been intentionally treated differently from others similarly situated and ...there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).[7] A land use decision is sufficiently "irrational" to violate the Equal Protection Clause when the City can show "no legitimate reason for its decision." *Harlen*, 273 F.3d at 500.

Here, the presence of so many similarly situated religious and secular groups that "received more favorable treatment than the plaintiff [supports] the inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005); *see also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447-448 (1985) (finding violation of Equal Protection clause under rational basis review because it was irrational for city to allow boarding houses, fraternities, and nursing homes but prohibit a home for the mentally ill where impact of all these uses on the relevant neighborhood was materially similar).

Though defendants claim that the disparate treatment of the Church results from some "mistake" by the DOB, *see* Def. Br. at 23, the conceded facts strongly suggest that the true reason for the DOB's about-face was lobbying by the Church's neighbors. Succumbing to the baseless claims of disgruntled neighbors, while ignoring the factors that should have resulted in approval, is the kind of evidence that demonstrates unlawful discrimination. *See Support Ministries for Persons with AIDS v. Waterford*, 808 F. Supp. 120, 134 (N.D.N.Y. 1992) (zoning

---

[7] The Second Circuit has suggested that plaintiff is *not* required to show subjective malice, *see Jackson v. Burke*, 256 F.3d 93 (2d Cir. 2001), but has yet to resolve whether such a showing is required. *See Harlen Assoc. v. Incorp. Village of Mineola*, 273 F.3d 494, 500 (2d Cir. 2001).

officials who "bowed to political pressure" by those with animus against people with disabilities violated Fair Housing Act even if officials themselves had no such animus).

IV. **Defendants Have Substantially Burdened the Church's Religious Exercise and Violated Section (a) of RLUIPA**

That defendants fundamentally misconstrue the Church's substantial burden claim is demonstrated by their heavy reliance on *Scottish Rite Cathedral Assoc. v. Los Angeles*, 156 Cal.App.4th 108 (Cal. App. 2d Dist. 2007). *See* Def. Br. at 13-14. There, a Masonic group owned a cathedral that it leased to a third party to conduct boxing matches and other entertainment events. They filed a substantial burden claim under RLUIPA when the city's zoning authority sought to limit such activity. The court rejected the claim because plaintiff admitted that it "had not conducted *any* Masonic functions at the Cathedral since 1993 and *had no intentions of doing so in the future.*" *Id.* at 120 (emphasis added). How defendants could claim that *Scottish Rite Cathedral* is "strikingly similar" to this case, *see* Def. Br. at 13, is a mystery. The only building at issue here is the Church itself, which is used, and intended in the future to be used, for religious worship.

Contrary to defendants' suggestion, plaintiff has never argued that the "commercial catering business operated by the Rose Group is a . . . religious use." *Id.* at 14. Defendants cannot seem to accept that it was the *Church* that decided to enter into the lease because the *Church* desired to find a way to restore the building so that it could continue to worship there. That has always been the purpose of its arrangement with the Rose Group. The extensive capital repairs to the building, including the conversion of some spaces in the building for use by the Church's Sunday School, are precisely the sort of "use . . . or conversion of real property for the purpose or religious exercise" that "*shall* be considered to be religious exercise of the . . . entity that uses or intends to use the property for that purpose." 42 U.S.C. §2000cc-5(7)(B) (emphasis

added). It makes no difference that the tenant also makes use of the premises. *See Westchester Day School*, 504 F.3d at 348 (finding "religious exercise" under RLUIPA because facilities would "be used *at least in part* for religious education and practice[.]") (emphasis added).[8]

Defendants have substantially burdened the Church's religious exercise. More than $6.5 million has been invested renovating the building in reliance on the DOB's earlier approval. *See* Draper Dec. ¶40. If the defendants' decision to revoke that approval is not enjoined, at a minimum the Church no longer will receive the substantial annual rent and payment of operating costs that come from the tenant. *See* Draper Reply Dec. ¶¶26-27. Whether or not the Church will be forced immediately to sell the building, *see* Point V, *infra*, it is unlikely to be able to operate the building without the supplemental revenues from catered events and may decide that selling the building and finding a more affordable home is the only way to continue its religious mission. *Id.* ¶71. Exposing the Church to the significant "delay, uncertainty, and expense" involved in looking for a new building constitutes a substantial burden under RLUIPA. *See Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005).[9]

---

[8] Accusing the Church of "disingenuously" claiming that the building's restoration will redound to its benefit, defendants insist that the building was renovated only "so that the Rose Group can run its catering business." *See* Def. Br. at 15. That baseless charge is offensive to the members of this Church, who have long struggled to find a way to save the building. *See* Draper Reply Dec. ¶18. The Rose Group did not make the decision to lease the premises; the Church did. While the tenant will benefit during the term of the lease from the $6.5 million of improvements, so too will the Church; and it is the Church that will own the improvements long after the lease expires. *Id.* ¶19.

[9] Defendants never cite, much less distinguish, Judge Posner's opinion in *Sts. Constantine and Helen*, a decision that the Second Circuit recently cited with approval. *Westchester Day School*, 504 F.3d at 349. Instead, defendants cite *Episcopal Student Foundation v. Ann Arbor*, 341 F. Supp.2d 691 (E.D. Mich. 2004), which held that denying permission to a church which claimed it needed to demolish its historic building which was in good repair, *id.* at 695, and construct a larger one in order to accommodate the needs of its congregation did not impose a substantial burden because the church had ample space in its existing building that it was renting to others but could easily use itself. *Id.* at 704. Here, the Church had a deteriorating building and no easy solution. In any event, that court's rejection of the idea that merely imposing additional costs can constitute a substantial burden, *see id.* at 706, is inconsistent with Judge Posner's analysis. *See Sts. Constantine and Helen*, 396 F.3d at 901. Moreover, the district court in *Episcopal Student Foundation* acknowledged (341 F. Supp.2d at 707 n.8) that its decision was contrary to Judge Conner's ruling in *Westchester Day School*, which, of course, the Second Circuit affirmed.

## V. The Church will Suffer Irreparable Injury Unless the Court Enjoins Defendants

Defendants do not dispute that on November 30, 2007, the DOB revoked its prior approval and ordered a halt to any catered events at the Church after April 2008. This Court temporarily restrained enforcement of that order. But were it to take effect, the Church would almost immediately be in peril of losing its building. The reason is plain. The Church had explored multiple ways to raise the funds required to repair and maintain its building, but, until its lease with the Rose Group, it had been unable to do so. *See* Draper Reply Dec. ¶18.[10] If the catering contemplated by the lease were forced to cease, the Rose Group could no longer generate revenue. Without that revenue, the Church would be back where it was before the lease – staring at years of operating deficits, with no way to meet them. *Id.* ¶¶69, 71.

Defendants appear to suggest that things would not be so bad for the Church because they would have benefited from the more than $6.5 million of improvements made to the building, and would be free to walk away from the Rose Group – which invested that money in reliance on the DOB's earlier approval and with the expectation of conducting operations for the full term of the lease – because the second amendment to the lease is unenforceable. *See* Def. Br. at 27-29. The suggestion is baseless.

The Church agreed to the second amendment in March 2007 because the Rose Group was having trouble obtaining financing to finish the capital repairs due to concerns that the DOB might succumb to the political pressure that the Church's neighbors were beginning to apply. *See* Draper Reply Dec. ¶¶66-69. Because the Church wanted the construction work completed, it chose to enter into the second amendment that gave the Rose Group security in the event approval was revoked. *Id.* Though there was concern that the DOB would reverse course, the

---

[10] Defendants' argument that any harm is self-created because the Church could have sustained itself with revenues from a continued lease with the Geneva School, *see* Def. Br. at 30, is baseless. *See* Draper Reply Dec. ¶¶14-17.

Church still believed that DOB would adhere to its initial decision, and that the sale of the building contemplated by the amendment would not become necessary. Therefore, the second amendment did not need to be approved by a state court. *See id.* ¶70, Ex. M (submission to NY Attorney General explaining that no approval required because second amendment contemplated a sale only upon contingent events; approval not required until conditions triggering sale occur); *see Bais Yaakov v. Temple Emanu-el of Brooklyn*, 609 N.Y.S.2d 274 (2d Dep't 1994) (same).

Finally, defendants erroneously contend that because the Church has not pursued an application for a "special use permit" under section 74-711 of the ZR, no sale can be forced under the second amendment. That argument elevates form over substance. Once the DOB revoked approval, the Church simply did not have enough time to pursue a 74-711 application; the catering activities would have ceased long before a 74-711 permit could be granted. *See* Segal Reply Dec. ¶¶63-66. Even if the Church were to decide to renege on its commitment to the Rose Group and seek to avoid enforcement of the second amendment in order to keep all the benefits of the capital improvements without paying for them – a hardball tactic not consistent with the Church's values – without the catering revenues, the Church would have no realistic way to continue to maintain and operate the building. Not only would it likely have to deal with litigation from the Rose Group, it also likely would have to sell the building. *See* Draper Reply Dec. ¶¶68-69, 71. That constitutes irreparable harm.[11]

Dated:   New York, New York
         February 22, 2008

DAVIS WRIGHT TREMAINE LLP

By: _____
    Victor A. Kovner (VK-2248)

---

[11] Finally, defendants ignore two cases cited in plaintiff's moving brief that make clear that irreparable injury is presumed, where, as here, there is a violation of RLUIPA. *See Vietnamese Buddhism Study Temple v. City of Garden Grove*, 460 F. Supp.2d 1165, 1172 (C.D.Cal. 2006); *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005)