UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------- x

THIRD CHURCH of CHRIST, SCIENTIST, of        :
NEW YORK CITY,                                            :        07 Civ. 10962 (DAB)
                                                                      :
                          Plaintiff,                            :
                                                                      :
             - against -                                       :        **REPLY DECLARATION**
                                                                      :        **OF JAY A. SEGAL**
THE CITY OF NEW YORK and PATRICIA J.       :
LANCASTER, in her official capacity as,               :
Commissioner of the New York City Department :
of Buildings                                                    :
                                                                      :
                          Defendants.                        :
------------------------------------------------------- x

I, JAY A. SEGAL, pursuant to 28 U.S.C. § 1746, declare as follows:

1.        I submitted a declaration in support of Plaintiff's motion for injunctive relief on December 3, 2007, and now make this declaration in further support of the Church's application for a preliminary injunction, and other and further relief (all capitalized terms used but not defined herein have the same meaning defined for them in my original declaration).

**Accessory Catering Uses in Religious and Secular Non-Profits is Customary in New York**

2.        The Building is located in an R-10 zoning district, which is the highest-density residential zoning districts in the City. The Building is located on Park Avenue, which is one of the widest avenues in the City. (A map of the Building's zoning district and its surrounding buildings is attached as Exhibit A)

3.        I previously set forth numerous examples of non-religious non-profit and religious institutions throughout the City that host catering events at their premises. The following summary provides further details for some of the previously discussed examples, and sets forth a few additional institutions that engage in the same practice of hosting catering events.

## Central Presbyterian Church

4.    The Central Presbyterian Church ("CPC"), located at 593 Park Avenue in the residential zone R10 (PI), is approximately 20 feet north of the Building and on the same block as the Building.  (*See* Ex. A; Segal Decl. ¶ 4)

5.    The affidavit filed by CPC on behalf of the City states that, since January 1, 2005, it hosted only the following events:

- five wedding receptions or rehearsal dinners;
- two receptions in its Reception Hall by not-for-profit choral/opera groups following musical performances;
- one reception following a religious event in which Central Presbyterian was a participant;
- two meetings and two fundraisers by outside not-for-profit organizations; and
- Eleven different days of movie production shooting.

(Brennan Decl., ¶ 128, Ex. DD, Grandgeorge Decl. ¶ 5).  These low numbers seem unlikely given that its website offers "The Wedding Guide" (Attached as Exhibit B, http://www.centralonpark.org/weddings.html), a booklet providing instructions on how to host a wedding at CPC.  Without discovery, however, we are unable to determine just how many weddings and other events are being held at the CPC.

6.    CPC has a contractual relationship with the caterer, Show Stoppers.  We obtained a copy of a letter agreement between Show Stoppers and an individual who was having a wedding at CPC in February 2007.  The letter provides that Show Stoppers "have worked at the church for many years, in fact our kitchen used to be on the premises, so we are very familiar with the entire building."  (A copy of this letter, and advertisements for CPC is attached as Exhibit C).  Indeed, the letter provides that the Church will provide 48" round tables for the wedding event, and notes that the Church's black metal chairs are available.  (*Id.*)  The following correspondence certainly creates the impression that (1) numerous weddings have occurred at

CPC; (2) Show Stoppers has an extremely close relationship with CPC, such that its kitchen was, at one point, located on-site; and (3) CPC actively supports these weddings by making chairs and tables, and possibly other equipment, available to wedding guests.  Without discovery, it is impossible to know the scope and terms of Show Stopper's arrangement with CPC, specifically whether Show Stoppers leases space at the church to host events in a manner substantially similar to the Church, or has some sort of profit splitting arrangement.

7.      The website suggests that anyone can host an event here, not only members of the church's congregation.  (*See* Exhibit B)

### Americas Society (a.k.a. "680 Park Ave.")

8.      The Americas Society, located on 680 Park Avenue and East 68th Street in the residential zone R10 (PI), makes its building available for private catered events for up to 250 guests.  The advertisement for this venue, like the Church's advertisements, does not state that its building is owned by the Americas Society; instead, it uses the identity "680 Park Avenue."  (A copy of the Americas Society's "680 Park Avenue" advertisement is attached as Exhibit D; *see also* Brennan Decl. Ex. W)

9.      Its designated outside caterer, The Upper Crust Presents, appears to have an exclusive relationship with the Americas Society, and the website for catering events at this institution is via the website www.TheUpperCrust.com.  (*Id.*)

10.     The Upper Crust's advertisement does not indicate that events will be held at the Americas Society.  Instead, it states: "The Upper Crust, the celebrated catering and design firm is proud of its special relationship with *680 Park Avenue*[.]"  (*Id.*, emphasis added)  Without discovery, it is impossible to know the scope and terms of the Upper Crust's contractual arrangement with the Americas Society.

11.    The Upper Crust advertisement does not state that membership in the Americas Society is necessary to host an event at its facilities.

## Council on Foreign Relations (a.k.a. "Pratt House" and "Peterson Hall")

12.    The Council on Foreign Relations ("CFR"), located on 670 Park Avenue and East 68th Street in an R-10 residential district, identifies its catering hall as "The Harold Pratt House" and "Peterson Hall." (A copy of the CFR advertisement is attached hereto as Exhibit E; Brennan Decl. Ex. V, Segal Decl. ¶ 4) It advertises these establishments under the separate website www.prattmansion.com, not under the CFR website.

13.    The advertisement states that the Pratt House is available for up to 130 guests for a seated dinner and up to 250 guests for a reception. (*Id.*) Peterson Hall available for up to 175 guests for a seated dinner and 300 guests for a reception. (*Id.*) Peterson Hall can be used in combination with the Pratt House, thereby creating events as large as a 550 guest reception.

## Asia Society

14.    The Asia Society and Museum, located on 725 Park Avenue and East 70th Street in an R-10 residential district, advertises that its building is available for private catered events for up to 150 guests for dinner or 300 guests for a reception. (New York Weddings, Winter 2008/Special Issue, attached as Exhibit F).

15.    Various auditoriums, gardens, and suites that are available at the Asia Society for a variety of events such as receptions, banquets, and corporate soirées. (Brennan Decl. ¶ 92).

16.    The Asia Society has a contractual relationship with the caterer, Great Performances. Without discovery, it is impossible to know the scope and terms of this contractual arrangement.

17.    Although an advertisement for the Asia Society's catering operation suggests that membership is required in order to throw an event there, *see* Exhibit F, to become a member of

the Asia Society, one simply needs to make a $65 donation.  *See* Exhibit G (printout of

https://asiasociety.org/membership/newyork_membership.pl)

**Universalist Church (a.k.a. "Landmark on the Park")**

18.    The Fourth Universalist Society in the City of New York/A Unitarian Universalist

congregation, located at 4 W. 76th Street in the residential zone R10-A / R8B, also has a small

congregation of approximately 150 members (Brennan Decl. ¶ 37), and, like the Third Church,

holds religious services on Sunday, in addition to other religious programs and workshops. (*Id.*)

19.    Like the Third Church, it rents out its historic building for catered events.  Its

advertisement states that it has a capacity for up to 593 guests for a reception, and 400 guests for

dinner.  (A copy of the Universalist Church's "Landmark on the Park" advertisement is attached

as Exhibit H)

20.    The Universalist Church identifies itself as the "Landmark on the Park," not as a

religious institution, when advertising itself as an available catering space.  The advertisement

uses the email address "Langlandmk@aol.com" for event inquiries, and photographs of the

interior of its building contain pictures only of tables in various configurations.  The

advertisement describes the church as follows:

> Landmark on the Park offers breath-taking neo-gothic
> surroundings, which feature masterpieces by Tiffany, Bolton, St.
> Gaudens and Steinway. The main hall offers a 70' vaulted ceiling
> acoustically designed for music.  The 20' stone columns offer a
> sense of royalty.

21.    As of August 2007, the Universalist Church launched a website for its rental

facility, Landmark on the Park, www.landmarkonthepark.org (*See* Ex. H, print out of

http://www.4thu.net/2007/08/19/new-website-for-landmark-on-the-park/).  The new website

does not mention that it is the Fourth Universalist congregation's church; instead, it identifies the

catering venue as "Landmark on the Park 4th U" and all catering inquiries are directed to the

email address "darius@4thu.org." (*Id.*) The majority of pictures on this website show the interior of the building with various table formations and events; only one small picture shows that the building is actually a church. (*Id.*)

22.    The website suggests that anyone can host an event here, not only members of the church's congregation. (*Id.*)

### Riverside Church

23.    Riverside Church, located at 490 Riverside Drive in zone R8, hosts enormous events by renting out its central nave, with a capacity of up to 1900 guests. (A copy of Riverside Church's advertisement and print-outs of its website are attached hereto as Exhibit I). It advertises that its space is available for weddings, receptions, concerts, rehearsals, conferences, video productions and meetings. In addition to the nave, other portions of the church are available for rent, which can presumably be used in conjunction with other spaces for even larger events in excess of 2000 guests. These areas include: the South Hall (500 guest capacity); the Assembly Hall, which has a full kitchen (500 guest capacity); the Ninth Floor Lounge, with full kitchen (100 guest capacity for dinner); and the theater is available (250 seat capacity). (*Id.*)

24.    Riverside Church's "Rental" website page states that organizations seeking to host an event in several of these halls are required to pay a special fee to support the work of the church. (*See* Ex. I)

25.    Riverside Church has a contractual relationship with a designated outside caterer, Madeline's Catering and Special Events. Discovery may reveal the scope and terms of Riverside Church's exclusive contractual arrangement with this caterer. (*Id.*)

26.    The website suggests that anyone can host an event here, not only members of the church's congregation. (*Id.*)

## Church of St. Ignatius Loyola (a.k.a. "Wallace Hall")

27.     Church of St. Ignatius Loyola, located on 980 Park Avenue in an R10 residential district, advertises that its building is available for private catered events. Its catering venue is identified as "Wallace Hall," not as a church. Its website states that "Wallace Hall contains 8,000 square feet of floor space . . . . The hall is air conditioned with a modern kitchen, restroom facilities and sound system. This elegant space is available for a variety of events including fund raisers, wedding receptions, cocktails, buffet, and formal banquet -style dinners from 100 to 500 guests." (*See* Exhibit J, print-out of Church's Wallace Hall space rental website page, *available at* http://www.stignatiusloyola.org/index.php/about_us/space_rentals)

28.     St. Ignatius Loyola Church appears to have a contractual relationship with an outside caterer, although absent discovery, further information about who this caterer is, and its contractual arrangement with this caterer is unavailable.

29.     The church's website suggests that anyone can host an event here, not only members of the church's congregation.

## Junior League (a.k.a. "The Astor House")

30.     The Junior League, located on 130 East 80th Street in an R8B zoning district, makes available its five-story townhouse building for catered events under the name "The Astor House." It advertises itself as being able to accommodate over 300 guests. (Copy of this advertisement is attached hereto as Exhibit K).

31.     The website advertising the Junior League's catering space is "www.theastorhouse.org" and its advertisement shows only the interior of the building, table configurations, and a bride ascending a staircase.

## Private Clubs Also Hold Large Events,
## Frequently Waiving Their Membership Requirements

32.    Several private clubs throughout the City likewise hold large catered events. Even though they ostensibly hold events only for members and their guests, upon information and belief, the membership requirements are frequently waived or ignored.

33.    Upon information and belief, the Harvard Club, located at 27 West 44th Street, is "member-sponsored" in name only.  Instead, anyone can host an event space at the building's third floor, which boasts seven banquet spaces that can accommodate up to 200 people; its catering office will simply "assign" a member to sponsor the event.  (Ex. F, New York Wedding Guide).

34.    The Metropolitan Club, located at 1 E 60th St and 5th Avenue, only permits member sponsored events.  However, upon information and belief, its catering office will assist a potential catering customer by providing a list of members organized by business affiliation which the potential customer can review to see if they know anybody on the list.  In addition, upon information and belief, the Metropolitan Club has a reciprocal relationship with the Union League and the Indian Harbor Clubs.

35.    The University Club, located at One West 54th Street, also permits only member-sponsored events at its 350 guest capacity space.  (Ex. F, New York Wedding Guide). However, upon information and belief, its catering office will permit potential catering customers to review the membership roster to determine whether they know a member that could act as the member-host of the event.  Receptions are held in its main dining room; cocktails can be hosted in either of two smaller rooms, and the catering is provided in-house.  (*Id.*)  Clubs such as the Harmonie Club, at 4 East 60th Street, upon information and belief, likewise engage in similar practices.

36.    The Yale Club, 50 Vanderbilt Avenue, also hosts events for members only.  Upon information and belief, the Yale Club's catering office will facilitate a sponsor.  The Yale Club makes available its Grand Ballroom (up to 300 guests) or its Roof Dining Room (up to 250 guests); its second-floor lounge and other lounges and Tap Room may also be available for private rental.  (Ex. F)

### The Church's Use and Marketing
### of the Building is Substantially Similar to These Institutions

37.    The Church uses and advertises its Building for catering events no differently than the aforementioned institutions use and advertise for their properties.  The City, however, singling out the Church, complains that the Building is somehow deceptively advertised as "583 Park Avenue" because "nowhere in all of the Third Church's marketing materials" is the 'identity' of the building disclosed. That is, there is not one textual reference to the fact that the building located at 583 Park Avenue is a church[.]" (Brennan Decl. ¶ 6-8).  It also complains that the 583 Park Avenue website consists of photographs of the interior event space, showing numerous scenes with decorated tables and receptions, rather than religious edifices.  (*Id.*)

38.    There is nothing deceptive about this.  It is common in advertisements for catering event space to use photographs of the interior of the building and various events hosted therein. The majority of the above-mentioned venues show pictures of the building's interior and various table configurations or receptions.  (*See, e.g.,* Exs. E, H, O).  Indeed, the Junior League's advertisement uses a photograph of a new bride ascending a staircase – not the Junior League's logo or members.  (Ex. K)

39.    Many institutions likewise use a different name in advertising their event space. The Americas Society identifies itself as "680 Park Avenue."  Its advertisements use pictures of the building's interior, and its website for its catering service is www.TheUpperCrust.com.  (Ex.

D) Similarly, the Church of St. Ignatius of Loyola identifies itself as "Wallace Hall" for catering purposes. (Ex. J) The Council of Foreign Relations identifies its building for catering purposes as the "Pratt House" and "Peterson Hall." (Ex. E) The Fourth Universalist Society advertises its building as the "Landmark on the Park 4th U" and uses an email address "darius@4thu.org" for event inquiries. (Ex. H) The Junior League identifies its building for catering space as "The Astor House." (Ex. K) The City's attempt to single out the Church's advertisements as an attempt to conceal the Building's "true identity" is belied by how common this advertising practice has become.

40.    Also without merit is the City's attempt to single out the Church's use of the Rose Group as its designated third-party caterer. It is apparently common for non-profit or religious institutions to have a designated caterer run the catering event, rather than having the institution run the event directly. Like the Church, these institutions all have some contractual relationship with the caterer. For example, upon information and belief, the caterer Show Stoppers has had an exclusive catering arrangement with the Central Presbyterian Church for several years, and had a kitchen located inside the building (*see* Ex. C). The caterer The Upper Crust has an exclusive catering arrangement with the Americas Society, and fields all inquiries to host events at this institution. (Ex. D) The caterer Madeline's Catering and Special Events has an exclusive catering arrangement with the Riverside Church. (Ex. I) These arrangements are all substantially similar to the Church's relationship with its caterer, the Rose Group, which discovery proceedings will help to illuminate.

41.    In addition, Pratt Mansions, located on 1027 Fifth Avenue at 84th Street, which rents out its Beaux-Arts mansion for special events, exclusively use the caterer "Food Matters." (Exhibit L) Its advertisement bears the caption "Food Matters *Presents* The Pratt Mansions" and

inquiries are directed to the Food Matters website.  (*Id.*)  Similarly, the Italian Academy, located

on 1161 Amsterdam Ave., which rents out its landmark building for catering events, exclusively

uses Sterling Affair Caterers.  (Exhibit M)  Its advertisement bears the caption "Sterling Affair

Caterers *presents* The Italian Academy/Casa Italiana."  (*Id.*)  The Museum of the City of New

York, on 1220 Fifth Ave., which hosts catered events for up to 500 guests, exclusively uses the

caterer Simply Divine, and all email inquiries are directed to the Simply Divine website.

(Exhibit N).  The National Academy Museum, located on 1083 Fifth Avenue., which hosts

catered events for up to 300 guests, exclusively uses the caterer Thomas Preti, and email

inquiries are directed to the Thomas Preti website.  (Exhibit O)

42.    The catering practices of various institutions throughout the City, and how they

advertise their availability for catering and space rental, is very similar to the Church's practices

and advertisements.  Several of these similarities are evident from defendants' own submissions

to the Court.  It is disappointing that defendants, having done the research into many of these

institutions, chose to omit any reference to these obvious similarities in its papers.

### The Church's Neighbors Regularly Host Similar Events

43.    The character of the Church's surrounding neighborhood is that it is a wide and

busy avenue, which includes the Armory with up to 3,000 guest events (*See* A. Mindlin "AN

ARMORY, AND A SIEGE BY REBELS WHO LIVE NEARBY" NEW YORK TIMES (Dec. 2, 2007),

attached as Exhibit P, *available at* http://www.nytimes.com/2007/12/02/nyregion/thecity/02

armo. html?_r=1&oref=slogin), and numerous hotels and institutions holding significant events

on a nightly basis.  The Church's use – catering events on an intermittent basis – is the same use

on a lesser degree.

44.    For example, the Regency Hotel is just two blocks from the Building on Park

Avenue and its eastern portion is in the R-10/(PI) district.  Nevertheless, upon information and

belief, the Regency makes itself available to the general public for short term hotel stays and catered events available to the general public in violation of its Certificate of Occupancy ("C of O") No. 103613065T001, (Brennan Decl. ¶ 80, Ex. U) which (as confirmed by the City) provides only for "catering exclusively for the hotel residents and guests of residents." (*Id.*)  However, any member of the general public can use the restaurant, not just a hotel resident, in contravention of the C of O's express limitations.  It also operates the nightclub ("Feinstein's at the Regency") and has five event spaces of differing sizes available for rent.

45.    Immediately across 63rd Street from the Church is the Beekman Hotel, which is now an apartment building.  The building rents space to a major restaurant corporation which operates a restaurant currently named Park Avenue Winter that is open to the general public, and (together with a separate banquet facility on the same premises) is available for rental to the general public for catered events.  The building's Certificate of Occupancy No. 71914, (*see* Brennan Decl. ¶ 76, Ex. S), however, provides for the use of a hotel restaurant *for tenants' use only*, a violation the City is aware of, but apparently has decided to ignore.

46.    Leaving aside the fact that the Beekman and the Regency operate in open violation of their C of O, these and other venues throughout the city also host large catering events that create the same, or greater, impact on qualities of life than the professionally monitored events occurring at the Church's Building.

47.    The City cannot credibly argue that it is unaware of these extensive catering uses in buildings located in the R-10/(PI) district in the immediate vicinity of the Church.  (*See* Brennan Decl. ¶ 116)  The City had actual notice of this practice at the latest when I wrote to the City, the Honorable Daniel L. Doctoroff, on October 10, 2007, setting forth numerous catering

uses throughout the Church's neighborhood by non-religious non-profit and religious institutions.  (*See* Segal Decl., Ex. I)

48.    It is difficult to understand the City's argument that it does not know of these open and notorious catering uses because none of these institutions have ever formally made its use known to the City through an application to the DOB.  (Brennan Decl., ¶ 116 ("it is not strange that the City does not know of this type of [catering] activity, that is accessory use catering at nonreligious institutions as well as religious organizations, because there is no legal requirement that these institutions and organizations apply to DOB for its approval.")).  I know that the Church, through my submissions to the DOB, made the City aware of these uses, and it is hard to believe they were not already aware of such uses given how prevalent and well-publicized they are.

### The Practice of Sharing Space for Catering Events is Open and Notorious

49.    Like many non-religious non-profit and religious institutions, the Church relies on revenue generated from the shared use of its space to meet its mounting financial obligations. This is a common and well-accepted practice.  Indeed, the New York Landmarks Conservancy regularly holds discussions and publishes articles concerning how a historic building may share space in order to earn much needed income.  The Conservancy's Common Bond newsletter, Volume 21, No. 1 (Summer 2006) has an article on Shared Uses of Religious property and tax liability issue.  (Exhibit Q)  The article observes:

> Many religious organizations own substantial real estate assets,
> ranging from places of worship and parsonages to office space and
> community centers.  To defray costs and generate extra income or
> to further their mission, religious institutions often rent these
> spaces to outside groups.

50.    This article then observes that renting out portions of exempt property could cause the property to become at least partially taxable, and discusses how historic property owners can

negotiate their shared space rental agreements in order to avoid or allocate unexpected taxes. The article explores tax exemption and shared use issues in New York City and States to illustrate common concerns. (*Id.*)

51.    The Landmarks Conservancy's Fall/Winter 2004 newsletter has an article on "Case Study in Shared Use: Saratoga Springs Universal Preservation Hall," which begins with a description of the Saratoga Springs Universal Preservation Hall, which mirrors the Church's plight two years ago (Ex. Q):

> This heart-breaking tale is all too familiar in many urban centers across the country. Faced with these seemingly insurmountable obstacles, what is a cash-strapped congregation to do? Demolition forces the congregation to give up its spiritual home and the city loses irreplaceable historic architecture. But what other options exist? Fundraising?
>
> Maybe enough money could be donated to shore up the building's collapsing roof. And then? How could a tiny congregation with an official roster of 150 members but only 10 or 15 regular parishioners sustain the maintenance of a 10,000-square-foot building?

(Ex. Q) This article then goes on to discuss how the Preservation Hall went on to partner with the community to share the immediate building repair costs and the ongoing maintenance costs. It concludes by observing that "[d]eteriorating urban churches, dwindling congregations, and an ever-present list of costly repairs are all too common. But they don't have to lead to demolition. . . . partnerships with other organizations – whether preservation, cultural, or social – can dramatically reverse the downward spiral." (*Id.* at 6)

52.    The Landmarks Conservancy's Winter 2002 newsletter has an article titled "Shared Space" that provides technical advice on how to share space, including suggestions on how a historic property can share space, how to identify potential tenants, how to set a fair rent, and considerations to keep in mind when drafting a lease agreement. (Ex. Q)

53.      These articles make clear that owners of historic buildings throughout the City

have a practice of partnering with various organizations to share space.  This practice frequently

can save such properties from demolition, generate much needed operating income, and permit

these historic properties to once again be enjoyed by the public.  This practice has the full

support of important groups like The Landmarks Conservancy of New York.

**The Rose Group's Agreement to Pay Any Resulting Real Estate Tax Incurred
by the Church Cannot be Construed As Somehow Transferring an Ownership Interest**

54.      The City contends that the Rose Group effectively owns the Building because the

Lease requires it to pay real estate taxes if its catering activities cause the Church to lose its tax

exempt status.  (Brennan Decl. ¶ 14).  That is not true.  Instead, the parties agreed that it was

only fair and reasonable that, if the Church lost its tax exempt status because of the Rose Group's

activities, the Rose Group would be responsible for any incurred tax liabilities.  This Lease

provision was intended to protect the Church from being responsible for liabilities it could not

afford, not to extinguish its ownership interest altogether.

**The Yeshiva Case is Distinguishable**

55.      The City cites to the Yeshiva case for the proposition that the City is treating the

Church in the same manner as other similarly situated institutions.  (Def. Br. at 22).  In the

Yeshiva case, the City likewise seeks to terminate the catering activities of a yeshiva located in a

residential district that was operating a catering establishment in its cellar as a venue for

Orthodox Jewish wedding celebrations.  *See Yeshiva Imrei Chaim Viznitz of Boro Park, Inc. v.
City of New York, et al.,* Index No. 07/4841 (Sup. Ct. Kings County).

56.      As an initial matter, it bears noting that, in the *Yeshiva* case, the City stipulated to

adjourning all enforcement actions against the Yeshiva until the action before the Board of

Standards and Appeals ("BSA") and the State Court Article 78 Proceedings were resolved.  As

of the date of this declaration, the City has not moved to lift the adjournment, and a stay of all enforcement actions has been in place for nearly one year. As such, the Yeshiva is apparently entitled to continue holding catered events until the BSA and state court litigation is resolved. (Attached as Exhibit R is the Stipulation of Adjournment, Index No. 4841/07 (March 12, 2007))

57. In the *Yeshiva* case, the petitioner commenced a series of Article 78 proceedings in New York State court, Kings County, seeking (1) a judgment annulling the BSA Resolution denying the Yeshiva's application for a variance to use the cellar of its premises, which is currently a synagogue and school, as a Use Group 9 catering establishment; and (2) a judgment annulling the BSA's Resolution denying the Yeshiva's appeal of the DOB's determination that the Use Group 9 catering establishment proposed for the cellar was not an accessory use to the synagogue and school within Zoning Regulation § 12-10; and (3) the BSA's resolution revoking and/or modifying the Certificate of Occupancy for the Yeshiva's premises. (*See* Exhibit S, BSA Decision 60-06-A (Jan. 9, 2007); BSA Decision 290-05-BZ (Jan. 9, 2007); BSA Decision 54-05-A (April 24, 2007)).

58. The *Yeshiva* case is significantly different from the instant case for at least four reasons. First, the surrounding area of the catered use is very different. Yeshiva's Orthodox Jewish catering facility was located in an R5 residential zoning district on 1824 53rd Street between 18th and 19 Avenues, Brooklyn, New York – a far less dense residential district than the Church's R10 district, Park Avenue neighborhood. (An R5 zoning district has a maximum floor area ratio ("FAR") of 1.25 while an R10 district has a maximum FAR of 10. Thus, a building can be built in an R10 district with eight times as much FAR as can be built in an R5 district.)

59. Second, the Yeshiva's catering establishment and events are unlike the catered events at the Church. The Yeshiva's catering establishment was located in the 18,000 sq. ft.

cellar of its building and was used primarily to host catering events. By contrast, the Church and the Rose Group's shared use is entirely within the same Building. Further, the Yeshiva's cellar building had a separate entrance with an awning reflecting the catering business' name. (*Id.*) That catering use also had its own accessory rooms, own set of parking and traffic impacts, and "operated on multiple consecutive days as opposed to the occasional use of a facility's space for events". (*See* Ex. S, BSA decision, 60-06-A). Also, a portion of the Yeshiva's wedding events were held outdoors, and therefore created greater disruption of the neighborhood.

60.    <u>Third</u>, the zoning regulation in dispute and the dispute's procedural history are very different. In *Yeshiva,* the premises were previously a car repair shop, a prior non-conforming UG 16 use. In December 1991, the car repair shop was converted into a school and catering establishment, the catering establishment being a non-conforming UG 9 use. Since active operation of the non-conforming car repair shop had been discontinued for more than two years, the premises could be used only for a conforming use thereafter. Since a UG 9 catering use was not a conforming use in the R5 zoning district, the UG 9 catering use was an impermissible use. The Yeshiva's CO lists the catering hall as a Use Group 9 catering hall. In February 2005, the DOB submitted an application to the BSA requested that the Yeshiva's CO be revoked because the CO improperly authorized a non-conforming use. The Yeshiva opposed this revocation, and it also made an application for a variance to permit the catering use. It likewise submitted a request to the DOB for a declaration that the catering hall was a permissible accessory use. The DOB, and ultimately the BSA, denied the Yeshiva's accessory use application and its variance application, whereupon the Yeshiva commenced its state court actions and obtained a stay from the City.

61.    <u>Fourth</u>, here the DOB initially <u>approved</u> the accessory catering use at The Church – a more than 85 year old historic building in need of extensive repairs – and millions of dollars have been invested in reliance on that approval.  By contrast, the basement catering space in the Yeshiva case was a new building, not in need of significant restoration and repair.

### Requirement to Obtain 74-711 Special Use Permit Under the Second Amendment

62.    I am informed that the City contends that failing to pursue an application for a special use permit pursuant to section 74-711 of the Zoning Resolution means that, since one of the conditions of the second amendment to the Lease between the Church and the Rose Group has not been satisfied, the Rose Group could not insist on a sale of the Building and, accordingly, the Church cannot be said to suffer irreparable harm because it cannot be forced to sell the Building.  I do not think that that contention is true.

63.    I have significant experience with the process of seeking a special use permit pursuant to section 74-711 of the Zoning Resolution.  It is a labor- and time-intensive process.  In my experience, such an application -- which involves submissions to the Landmarks Preservation Commission as well as the City Planning Commission, and numerous interactions with City officials – typically takes eighteen to twenty-four months to complete.

64.    While I have the highest respect for the City agencies involved in these types of applications, I also would not be candid were I to deny that there are certain political realities that can have an impact on how such applications are viewed.  In this case, in which I was personally involved, at least under the current political circumstances, the Church could not reasonably have expected expedited approval of the 74-711 application.

65.    When the Church received the notice from the Department of Buildings on November 30, 2007, advising that the City had revoked the previously granted pre-consideration approval for accessory catered events, the notice of revocation permitted catered events to be

held at the Church only through April 2008.  There was simply no possibility that an application

for a special use permit pursuant to section 74-711 could have been obtained prior to that time.

In fact, I estimated that a decision on such application would not have been entered until the

latter part of 2009.

66.     This left the Church in a grave situation.  Because all catering activity was

forbidden after April 2008, the source of revenue contemplated by the lease would not have been

able to be generated.  In plain terms, the caterer would have been out of business, and the Church

would have lost a critically important source of funds (both in terms of the rents due, and the

payment by the caterer of operating expenses contemplated, pursuant to the lease).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 22, 2008.

JAY A. SEGAL





Legend = Event Spaces



Legend = Event Spaces



PARK
AVE.
PARK
R-10
R-10
LEXINGTON
AVE.
LEXINGTON
THIRD
AVE.
THIRD
ST.
C5-2.5
C1-8X
CHRIST METH. EPIS. CHURCH
HOTEL DELMONICO
CONDOMINIUM
COLONY CLUB
MAYFAIR HOUSE
THE BEEKMAN
CENTRAL PRESB. CH.
42ND INFANTRY DIVN NATL. GUARD ARMORY
1401
1402
1397
1398
1399
1400
1394
1395
1396
HUNTER COLLEGE
THOS. HUN
COPYRIGHT SANBORN MAP COMPANY, INC.
COSMOPOLITAN CLUB
CHINA INST.
GARAGE
STATION
SUBWAY
Corporation of New York
DOMINICAN FATHERS
SCHOOL
ST. VINCENT FERRER R.C. CHURCH
SWEDISH M.E. CH.
FIRE ENG. N°39 H & L N°16
SYNAGOGUE
HUNTER COLLEGE CITY OF N.Y.

February 20, 2008

# CENTRAL PRESBYTERIAN CHURCH

Welcome    Events    Staff    History    Membership    Contact Us    Letter From The Pastor    Deacon's Corner

Newsletter
Prayer Request
Weddings
Cornell Fund
Surgeons of Hope
School Affiliates
Faith In Action
Central's Forum
Past Events
Home
Sunday Service
11:00 AM

## WEDDINGS

Please fill out the form below to receive your free The Wedding Guide booklet. This booklet will give you all the information you will need to plan your wedding at Central Presbyterian Church.




Name
Street Address
Apartment / Suite
City
State
Zip
Email



http://www.centralonpark.org/weddings.html

weddings

Comments or
Questions

Submit

Reset

Copyright © 2003 Central Presbyterian Church. All rights reserved.
Website design by Stephen W. Andrus

Page 2 of 2

2/20/2008

# SHOWSTOPPERS



## INCORPORATED

### EVENT PLANNING · CATERING · ENTERTAINMENT

*Date of Proposal: January 5, 2007*

| | |
|---|---|
| O'Donnell and Rachel Lee | Wedding Reception and Dinner |
| 333 East 43rd Street | Central Pres. Church |
| Apartment #921 | 593 Park Avenue at 64th Street |
| New York City 10017 | New York City |
| | 212 838.0808 |
| | |
| 561 386.6059 (cell for O'Donnell) | Saturday, February 3, 2007 |
| odonnell.lee@gmail.com | 7PM-11PM |
| | Estimated Guests: 100 |

**PROPOSED SCHEDULE**

| | |
|---|---|
| 4PM | Showstoppers Kitchen Arrives at CPC |
| 4:30PM | Showstoppers Wait Staff Arrives at CPC |
| 7PM | Invitation: Drinks Served Hors D'oeuvres Passed |
| 8PM-8:15PM | Guests invited to Sit. First Course Served. Followed by Dancing and perhaps toasts |
| 9PM | Main Course Served followed by Dancing/Toasts |
| 10PM | Dessert and Coffee/Tea Service |
| 11PM | Conclusion of Event |
| Midnight | Showstoppers Staff Exits CPC |

Dear O'Donnell,

It was a pleasure speaking with you on the phone and thank you very much for choosing Showstoppers New York to cater your wedding reception at Central Presbyterian Church on Saturday, February 3, 2007.

The following is a preliminary proposal based on our conversation. Please take a look at it at your earliest convenience and get back to us with any changes you may have. Our Executive Chef Thom has selected what he thought would be most appropriate based on the cuisine we spoke about on the phone. We gave a choice of a fish, beef and vegetarian, which your guests would pre-select. You mentioned bringing in a wedding cake. We also suggested a dessert, but that is entirely up to you. Of course we could alter the menu based on your personal preferences.

As far as rentals for the party are concerned, we will have to bring in chairs, linens, china, silver service and glasses. The church does provide 48" round tables which could seat up to eight guests. I don't think you will want to use their black metal chairs. We will need to talk about color schemes and we will place the rental order, which we suggest you pay directly to the rental company, at no additional mark-up from Showstoppers.

We have worked at the church for many years, in fact our kitchen used to be on the premises, so we are very familiar with the entire building.

We will do everything possible to make your New York wedding party a memorable one for you and Rachel and your invited guests. Enjoy Hawaii; I think it's the most beautiful place on earth!

Congratulations and best wishes to you both.

Sincerely,

Lee Tannen
Showstoppers New York







P A R K   A V E N U E

*The Upper Crust Presents*
**680 Park Avenue**
**New York, NY 10021**

*The Upper Crust*
**(212) 691-4570**

*www.TheUpperCrust.com*

## A Sampling

### Hors d'Oeuvres

*Creole Spiced Crab Cakes*
chipotle aioli

*Sambuca Cured Salmon*
black pepper flatbread & cucumber leek slaw

*Spicy Beef in Rice Paper*
scallions, peanut & lime

*Five Spice Duck & Scallion Crepe*
orange chipotle marmalade

*Black Truffle Cream*
on miniature baked potatoes

### Dinner

*Grilled Sea Scallops*
avocado & purple potato salad

*

*Herb Crusted Rack of Lamb*
shallots, figs & natural jus

or

*Roasted Striped Bass*
saffron & fines herbes infusion

Grilled Pencil Asparagus
Golden Smashed Potato Timbale

*

*The Wedding Cake*

*

### The Chef's Sweets
*Praline Lace*
*Espresso Chocolate Squares*
*Golden Apple Tartlettes*

U pon entering 680 Park Avenue, guests encounter a breathtaking marble foyer with the grand sweeping staircase leading to the second floor. In the center of the suite of rooms is The Salon decorated with crystal chandeliers, antique gilt-framed mirrors (circa 1780) and a magnificent 15-foot high Adams ceiling with panels by the 18th century decorative painter Angelica Kaufman. The walls are padded silk fabric and draperies frame 10-foot windows with wrought iron balconies beyond.

Adjoining The Salon to the east side is the inviting wood-paneled library and to the west the dramatic dining salon. Original wide plank wood flooring, vaulted ceilings, rich Italian marble base molding and impressive marble fireplaces unify all the rooms.

680 Park was designed by the renowned architects McKim, Mead & White in 1909, designated a New York Landmark in 1970 and is listed in the National Register of Historic Places.

The Upper Crust, the celebrated catering and design firm is proud of its special relationship with 680 Park Avenue and remains at your service to coordinate all your wedding needs in this premier mansion.

| | | | | | |
|---|---|---|---|---|---|
| PRICE RANGE......$100 & UP + SITE FEE | CUISINE.........CONTEMPORARY/FUSION | BRIDAL SUITE AVAILABLE.................YES | OFF PREMISES AVAILABLE...............YES |
| # OF AFFAIRS AT A TIME......................1 | CEREMONY CAPABILITY ..................YES | VALET PARKING....................AVAILABLE | KOSHER ..............................AVAILABLE |
| CAPACITY..............................UP TO 250 | OUTDOOR CAPABILITY......................NO | IN-HOUSE PARTY PLANNER ............YES | GUEST ACCOMMODATIONS................NO |

# Harold Pratt House and Peterson Hall



MANHATTAN ~ MANSIONS



*the*
## Harold Pratt House

*58 East 68th Street*
*at*
*Park Avenue*
*New York*

*212.434.9576*

www.prattmansion.com



The Harold Pratt House was constructed in 1919 as one of New York's grand Park Avenue mansions. Ideal for wedding ceremonies, receptions, celebrations or corporate meetings and dinners. The Harold Pratt House features a majestic marble stairway connecting the ballroom with a variety of other beautiful spaces including a library, reception and drawing room. All feature cathedral ceilings, fireplaces and antique chandeliers.

Rockefeller Room Dinner: 130   •   Reception: 250   •   In-house caterer: no



19

Case 1:07-cv-10962-DAB Document 17-7 Filed 02/22/2008 Page 2 of 5

MANHATTAN - MANSIONS

Flowers by DeJuan Stroud

Photo by Gruber Photographers



The Harold Pratt House - Rockefeller Room



Peterson Hall



Peterson Hall

### the *Peterson Hall* at the Harold Pratt House
212.434.9576 • www.prattmansion.com

The Peterson G. Peterson Hall has its own private limestone townhouse entrance and can be used alone or in combination with the Harold Pratt House. The sophisticated lighting system can transform this room from a well-lit meeting space featuring state-of-the-art technology into a stunning setting for dining and dancing. This facility offers limitless solutions to enhance your meetings.

Reception: 300 • Meetings: 250 • Dinner: 175
Tables, Chairs, and A/V capabilities: Yes

18

The Council on Foreign Relations presents

## The Harold Pratt House & Peterson Hal

TOUR          WEDDINGS          CORPORATE/SOCIAL EVENTS          HISTO



IN THE PRESS  |  CONTACT US

58 E. 68th St. at Park Ave. New York, NY.10065 • Tel: 212 434 9576

Ideal for wedding ceremonies, receptions, celebrations or corporate meetings and dinners, the Harold Pratt Mansion & Peterson H
of New York, to meet your needs. Our professional staff, with years of experience hosting heads of state, brings the highest stand
and taste to your event.

The Council on Foreign Relations presents

# The Harold Pratt House & Peterson Hall

TOUR                    WEDDINGS          CORPORATE/SOCIAL EVENTS              HIST(



IN THE PRESS  |  CONTACT US

58 E. 68th St. at Park Ave. New York, NY 10065 • Tel: 212 434 9576

The Council on Foreign Relations presents

# The Harold Pratt House & Peterson Hall

TOUR          WEDDINGS          CORPORATE/SOCIAL EVENTS          HISTO

*Ceremonies    Receptions    Dinners    After-Hours*



IN THE PRESS  |  CONTACT US

58 E. 68th St. at Park Ave. New York, NY. 10065 • Tel: 212 434 9576



WINTER 2008/SPECIAL ISSUE

# Weddings
## NEW YORK

## The Perfect New York Wedding

gorgeous **gowns**

*fantasy honeymoons*

dream **receptions**

*original engagement parties*

bridal **showers**

*top chefs' wedding menus*

design pros' registry **gifts**

PLUS
*How to keep bridesmaids happy, where to put guests up, and more*

$5.99 (CANADA $6.99)

0 09281 01913 8    74

WWW.NYMAG.COM
DISPLAY UNTIL

TRADEOFF

   

250-person reception at the Mandarin Oriental (approx. **$140,000**)

=

20-percent down-payment on a Brooklyn Heights 1-bedroom (**$119,800**)

+

Sending your first child to preschool at 92nd Street Y (**$12,400**)

+

Two tickets to Paris and week-long accommodation on the Champs-Élysées (**$7,800**)

There is nothing more romantic than taking your vows against the backdrop of the Manhattan skyline. Spring and summer weddings are often held on the outside deck, while cold-weather weddings are held indoors on the upper deck (which seats up to 80 for dinner) or in the River Room (which seats up to 175 for dinner and has room for dancing). Prices start at $185 per person.

### WESTSIDE LOFT
336 W. 37th St., nr. Eighth Ave.
212-871-0940; westsideloft.com
Opened in December 2003, the Westside Loft was the site of Jay-Z's 34th-birthday party. Located in the same building as Loft Eleven and Penthouse 15, it is the most classically decorated of the trio, marked by fireplaces, chandeliers, and a "garden room" with slate floors. The space holds 200 for dinner or 350 for drinks. Prices range from $5,000 to $7,500 (the building's other venues can be rented simultaneously).

## MUSEUMS AND PUBLIC VENUES

### AMERICAN MUSEUM OF NATURAL HISTORY
Central Park W., at 79th St.
212-769-5817; amnh.org
A membership fee of $3,500 will give you access to the Powerhouse, which accommodates up to 300 guests for a seated dinner. This 5,000-square-foot loftlike space features French doors that open onto the Arthur Ross Terrace, offering dramatic views of the spectacular Rose Center for Earth and Space. Pre-event receptions can also be held in the North Galleria, a glass-walled space linking the Powerhouse to the Rose Center. Catering is provided by Restaurant Associates.

### AMERICAS SOCIETY
680 Park Ave. at 68th St.
212-249-8950; americas-society.org
This cultural society, housed in a historic mansion, has a wood-paneled library with a barrel-vaulted ceiling that's perfect for a ceremony or reception; the dining room holds 120 seated guests with dancing (your caterer must provide furnishings). A $5,150 fee ($2,800 of which is tax-deductible) buys you eight hours, day or night, except in August.

### ANGEL ORENSANZ FOUNDATION
172 Norfolk St., nr. Houston St.
212-529-7194; orensanz.org
The oldest synagogue in New York, this dramatic 1849 building is now open to anyone who wants to throw a party. It is designed to replicate the Cathedral of Cologne: thick Gothic-style windows, a deep-blue, incredibly dramatic rib-vaulted ceiling, and even an elaborate Gothic arch. Prices vary depending on the day of the week and the number of guests (seats 260).

### BARTOW-PELL MANSION MUSEUM
895 Shore Rd., nr. Roosevelt Pl., the Bronx
718-885-1461
bartowpellmansionmuseum.org
Nestled in the heart of Pelham Bay Park, this nineteenth-century stone mansion is a stunning backdrop for weddings held in its large formal garden, which has a fountain and reflecting pool. Rental fees from $3,500,

depending on the number of guests. Outdoor and tented weddings only.

### BROOKLYN ACADEMY OF MUSIC
30 Lafayette Ave., at Ashland Pl.,
Fort Greene, Brooklyn
718-636-4198; bam.org
This performing-arts mecca has been around since the Civil War, and it's a truly impressive place to hold a wedding, both for its exclusivity and for the significant red tape a couple faces in planning an event there. BAMcafé, located above the Grand Lobby, holds up to 400 for a cocktail reception and the rental fee is just $1,500; Brooklyn residents get a significant discount. Great Performances is the in-house caterer. Interested couples should note that house fees can significantly raise the price.

### BROOKLYN MUSEUM
200 Eastern Pkwy., nr. Washington Ave.,
Prospect Heights, Brooklyn
718-501-6409; brooklynmuseum.org
This museum houses internationally acclaimed collections of everything from Egyptian to contemporary art. You can host a five-hour event starting after 7 p.m. (from $11,000). The Iris and B. Gerald Cantor Auditorium is popular for ceremonies, and you can serve hors d'oeuvre in the Cantor Gallery. The Grand Lobby and Entrance Pavilion accommodate up to 1,000 if you need more space.

### CENTRAL PARK ZOO
830 Fifth Ave., nr. 64th St.
212-439-6500; nyzoosandaquarium.com
Known for its stunning architecture and exotic animals, the Central Park Zoo is a New York landmark. Prices range from $5,000 to $24,150.

### COOPER-HEWITT, NATIONAL DESIGN MUSEUM
2 E. 91st St., nr. Fifth Ave.
212-849-8341; ndm.si.edu
Boasting the largest private garden in Manhattan, Cooper-Hewitt provides an extraordinary space for a wedding. It can accommodate up to 90 guests for an indoor seated event and up to 500 in the Arthur Ross Terrace and Garden. Upon renting out Cooper-Hewitt, you have access to the entire space, including the Great Hall and galleries. Catering is provided through Restaurant Associates. Fee for a five-hour event is $25,000.

### THE COUNCIL ON FOREIGN RELATIONS/ HAROLD PRATT HOUSE
58 E. 68th St., at Park Ave.
212-434-9400; cfr.org
The grand turn-of-the-century mansion features a marble staircase that connects the ballroom to a variety of smaller, wedding-ready spaces, from a library complete with fireplace and wraparound balcony, to the dainty drawing room. The various spaces can hold up to 180 for a seated dinner; prices start at $5,500.

### THE DELEGATES DINING ROOM, UNITED NATIONS BUILDING
First Ave. at 45th St.

212-963-7099; aramark-un.com
The U.N. Building doesn't allow religious ceremonies but will host your reception. Start with cocktails on the West Terrace, followed by dinner in the Delegates Dining Room, a modernist restaurant with floor-to-ceiling windows overlooking the East River. From $5,000 for security and $175 per person for catering by Aramark.

### FACULTY HOUSE AT COLUMBIA UNIVERSITY
400 W. 117th St., nr. Morningside Dr.
212-854-7192; columbia.edu/cu/fachouse
This former men's club is a popular reception spot for couples getting married at St. Paul's Chapel, just across the street. On weekends, renters have access to the whole house, decorated with brass chandeliers, period furniture, grandfather clocks, and fireplaces. The average cost is $120 per person for catering, plus $1,500 for the rental of the entire space.

### THE FRICK COLLECTION
1. E. 70th St., nr. Fifth Ave.
212-288-0700; frick.org
If you're lucky enough to be a private member ($35,000 and up) of the collection, you're granted the privilege of using the space for a once-in-a-lifetime event. The lofty space, full of huge brick arched doorways and restored gilding, is separated into three different rooms—the entrance and reception hall, the Garden Court, and the Music Room—and accommodates up to 350 for cocktails and 200 for dinner. The cost of the reception starts at $35,000, plus $10,000 to $15,000 for security, cleaning, insurance, and the like.

### GRAND CENTRAL TERMINAL
42nd St. at Park Ave.
212-340-3404; grandcentralterminal.com
Vanderbilt Hall, the old 12,000-square-foot main waiting room decorated with five of the original 1913 gold chandeliers and tons of pink marble, can be rented for weddings after 6 p.m., albeit at a cost: $20,000 and up. Choose from twelve exclusive caterers to provide food and furnishings (that's extra, of course). The space is unavailable from mid-November to the end of December.

### THE HOUSE OF THE REDEEMER
7 E. 95th St., nr. Fifth Ave.
212-289-0399; houseoftheredeemer.org
The contents of the fifteenth-century wood-paneled library in this Italian-style palazzo were all imported by Cornelius Vanderbilt's great-granddaughter, and the effect is straight out of the Renaissance. The first floor of the landmarked house is available for a 100-person sit-down dinner; the second can hold receptions for 100 or fewer. Rental fees are $2,500 to $4,500.

### HUDSON THEATRE
141 W. 44th St., nr. Broadway
212-789-7502; millenniumbroadway.com
Opened in 1903, this landmarked theater is one of the city's oldest showplaces, offering soaring architecture and backlit stained-glass Tiffany ceilings. For weddings, theater seating is replaced by beautifully appointed tables that match the burgundy stage curtains and draperies. Prices start at $150 per person, which includes a cocktail

PHOTOGRAPH: GEORGE APOSTOLIDIS/COURTESY OF THE MANDARIN ORIENTAL

reception, five-hour open bar, full dinner, wedding cake, and an overnight suite in the Millennium Hotel.

**JAZZ AT LINCOLN CENTER**
33 W. 60th St., at Columbus Circle
212-258-9829; jalc.org
Start with your ceremony at the adaptable Rose Theater and follow with a reception in the Allen Room, a majestic, adaptable amphitheater that holds up to 600 for cocktails. Its most glorious feature is a wall of glass through which Central Park and Columbus Circle look nothing short of magical. Catering is by Great Performances; prices upon request.

**MERCHANTS HOUSE MUSEUM**
29 E. 4th St., nr. Bowery
212-777-1089; merchantshouse.com
Not only does this preserved nineteenth-century home boast two Greek Revival parlors that seat up to 50, it also has a granite-tiled garden filled with lush plantings and cast-iron furniture. On the ground floor there is a dining room and a period kitchen, which holds 70 guests for a cocktail reception.

**MUSEUM OF THE CITY OF NEW YORK**
1220 Fifth Ave., at 103rd St.
212-534-1672; mcny.org
It's a thrill being able to sit and dine among the museum's nineteenth-century oil paintings. The walls of the galleries are fortified by large Greek columns, and arched hallways connect the various galleries. The first and second floors of the museum (as well as its auditorium) are available to rent: $6,000 for the first floor, $4,500 for the second, or $7,500 for both. Available only after 5 p.m.

**NEUE GALERIE**
1048 Fifth Ave., at 86th St.
212-628-6200; neuegalerie.org
A cool, original location for a wedding, this restored 1914 mansion features several event spaces for couples to reserve. Mingle with your guests among the Klimts and Schieles on the two gallery floors, or take advantage of the intimate, speakeasy feel of Cafés Sabarsky and Fledermaus. It should be noted that usage of the various rooms is donation-based: for $5,000 you can host up to 60 guests; for $25,000 you can host 100 or more.

**NATIONAL ACADEMY MUSEUM**
1083 Fifth Ave., nr. 89th St.
212-369-4880; nationalacademy.org
The Academy houses one of the country's largest collections of nineteenth-through-twentieth-century American art, and it's also a fantastic wedding venue: Located in a gorgeously detailed Beaux Arts townhouse with a statue-flanked spiral staircase at its center, the onetime private residence can accommodate up to 240 for cocktails or 140 for a seated dinner. Prices average $2,000 to $5,000.

**NEW YORK AQUARIUM**
602 Surf Ave., at 8th St.,
Coney Island, Brooklyn
718-265-4740; nyaquarium.org
Say "I do" outdoors, surrounded by walruses, penguins, and Willie the sea otter. Follow with a candlelit reception in a room walled on one side by a 150,000-gallon coral garden. The rental fee is $1,875 to $10,000 (depending on which exhibition space you use). Parties must start after closing and can run as long as you're willing to stay.

**NEW YORK CITY FIRE MUSEUM**
278 Spring St., nr. Hudson St.
212-691-1303; nycfiremuseum.org
On the outskirts of Soho sits this museum filled with two floors of antique fire trucks and equipment. Rent the 3,000-plus-square-foot third floor for your wedding and reception ($3,300) and get access to the whole museum for eight hours (three of which are allotted for setup and cleanup).

**NEW YORK HALL OF SCIENCE**
47-01 111th St.,
Flushing Meadows–Corona Park,
Corona, Queens
718-699-0005; nyscience.org

**PLANNERS' PICKS**

# Child Care for Out-of-Town Guests

**BABYSITTER'S GUILD**
60 E. 42nd St., nr. Park Ave., Ste. 912
212-682-0227; babysittersguild.com

**PINCH SITTER'S AGENCY**
799 Broadway, nr. 11th St., Ste. 204
212-260-6005; pinchsitters.com

**MITZVAH NANNY**
845-300-9479; mitzvahnanny.com

**SITTERS IN THE CITY**
646-246-6024; sittersinthecity.com

With more than 400 interactive exhibits, the Hall of Science will entertain your most jaded guests. For $4,000 to $6,000, you can hold a wedding and reception for up to 350 with dancing in the stained-glass-filled, curvilinear Great Hall, serve cocktails for up to 3,400 in the exhibition halls (which boast a climbing wall and virtual arm wrestling, among other amenities), or toast in the colorful, high-ceilinged Viscusi Gallery.

**THE NEW YORK PUBLIC LIBRARY**
476 Fifth Ave., at 41st St.
212-930-0730; nypl.org/spacerental
What bride wouldn't want a picture of herself descending the majestic steps of the New York Public Library on the day of her wedding? This New York landmark may be out of many couples' budgets, but it boasts three amazing spaces: the Celeste Bartos Forum, Astor Hall, and the McGraw Rotunda. Expect a lot of red tape to accompany just about every decision you make. Prices upon request.

**ST. BARTHOLOMEW'S CHURCH**
Park Ave. at 50th St.
212-378-0200; stbarts.org
Midtown landmark St. Bart's is best suited for couples who want the church to play a hands-on role in helping them plan a traditional ceremony: The church has music directors and a florist, and offers several options for using the chapel or other adjoining rooms for the reception. Outside musicians and florists must consult with the church's wedding planners to ensure compliance with various restrictions. The basic fee for a ceremony is $3,000.

**THE TOP DECK AT THE SEAMEN'S CHURCH INSTITUTE**
241 Water St., nr. Peck Slip
212-349-9090; seamenschurch.org
Windows and skylights illuminate this interfaith chapel, which seats 75 people. With glass walls and a wraparound terrace, the Top Deck provides spectacular views of the Brooklyn Bridge and the lower Manhattan skyline. The Ships Gallery can be used as your cocktail room and holds up to 130 guests. Fees start at $3,800.

**SOUTH STREET SEAPORT MUSEUM**
12 Fulton St., nr. East River Dr.
212-748-8600; southstseaport.org
The unique spaces available at South Street Seaport aren't just for nautical enthusiasts—anyone with an affinity for open air and a respect for history will be thrilled at what's offered, from the high-ceilinged Melville Gallery, which hosts up to 125 for cocktails, to the ships (the Tall Ship Peking and Ambrose Barge, as well as the Pioneer, a nineteenth-century schooner that can take you and your guests on a sail up the river). Gallery rates start at $2,500; boat and pier rentals range from $5,000 to $15,000.

**THE WATERFRONT MUSEUM & SHOWBOAT BARGE**
290 Conover St., at Pier 44,

**Red Hook, Brooklyn**
718-624-4719;
waterfrontmuseum.org
It may be out of the way, but this restored 1914 wooden barge is a funky destination with great views of New York Harbor and Manhattan, and an appealingly rustic look. They've also recently built a garden pier that's perfect for an outdoor reception, and the city's promise of a future Red Hook ferry could make the venue that much more accessible. Capacity on the boat is 100 for cocktails, 90 for a seated dinner. Prices start at $2,500 for a 90-person seated dinner.

## PRIVATE CLUBS

**ASIA SOCIETY AND MUSEUM**
725 Park Ave., at 70th St.
212-327-9322; asiasociety.org
Membership (up to $1,500) is required to rent a space in this red-granite building, which houses paintings, ceramics, and bronzes dating from 2000 B.C. The eighth floor has sky-blue-silk-covered walls and a 42-foot arched window, and can accommodate 150 dinner guests, while the glass-enclosed Garden Court holds 120 for dinner or 200 to 300 for cocktails (rent both spaces for $7,500, which includes membership fee). Great Performances is the exclusive caterer.

**THE EXPLORERS CLUB**
46 E. 70th St., nr. Madison Ave.
212-628-8383; explorers.org
This elegant, Gothic-style townhouse has an elegant lobby that is only the beginning of exploring the great history of this club. A grand staircase transports you to the second floor, which contains the wood-paneled Clark Room and Library, both of which are available for private events and can hold up to 250 guests for cocktails or 120 for a seated dinner. For nonmembers, prices start at $4,500 on weekends, $3,500 on weekdays. Catering by New York Catering.

**HARVARD CLUB**
27 W. 44th St., nr. Fifth Ave.
212-840-6600; hcny.org
This landmarked, members-only haven for Harvard grads boasts many great spaces for those with wedding privileges. The building's third floor boasts seven banquet spaces that can accommodate up to 200 people and are decorated in Ivy League fashion (think oil paintings, mahogany, and brass bars). Prices upon request.

**THE MIDTOWN EXECUTIVE CLUB**
40 W. 45th St., nr. Fifth Ave.
212-626-9308; midtownexecutiveclub.com
The Chemists' Club hosts weddings for members and nonmembers alike in its century-old quarters, which were recently restored to the way they looked in 1903. After cocktails in the Rumford Hall, you and up to 80 guests can sit down to a four-course meal—and wedding cake—in the dining room ($130 a head; no outside catering).

**THE PENN CLUB**
30 W. 44th St., nr. Fifth Ave.
212-403-6618; pennclub.org
This midtown club for University of Pennsylvania alumni offers customized menus for wedding parties held in one of their classic spaces, like the Benjamin Franklin living room or two-story formal dining room. With 39 overnight rooms for guests, a library, and a fitness center, the club offers everything your guests will need to keep themselves occupied. Spaces available for members only. Prices upon request.

**THE PRINCETON CLUB OF NEW YORK**
15 W. 43rd St., nr. Fifth Ave.
212-596-1210; princetonclub.com
The three party rooms (which hold 220 guests each) in this 131-year-old club are available to members and to individuals sponsored by a member. As you'd expect, all have cozy atmospheres. The James Madison Room has large brass chandeliers; the Presidents Room is outfitted with traditional furnishings, sconces, columns, and Audubon prints. Catering is provided by the in-house chef for $145 per person, including cock-

## HOW TO

# Have a Green Wedding

**1** **Choose an eco-friendly venue.** 632 on Hudson, in Greenwich Village, is a popular spot for green-themed weddings because the building runs on solar energy. Banchet Flowers—a flower shop in the meatpacking district—is also a popular choice, because all of the flowers are already there.

**2** **Have your caterer serve local and organic food.** The Cleaver Co.'s founder and chef, Mary Cleaver, has promoted green cuisine for over 25 years. Not just for vegetarians, the Cleaver Co. serves meat from grass-fed lamb and cows and free-range chickens, as well as seasonal organic produce from the Hudson Valley.

**3** **Instead of buying new attire,** go vintage. Frock on Orchard Street, in the Lower East Side, stocks vintage couture dresses, and the Bridal Garden has a gorgeous selection of pre-owned and donated designer gowns (and the proceeds go to benefiting impoverished children in NYC).

CATHERINE CORENO

---

tails. No outside catering except kosher.

**THE SOCIETY OF ILLUSTRATORS**
128 E. 63rd St., nr. Lexington Ave.
212-838-2560; societyillustrators.org
Works by N.C. Wyeth, Maxfield Parrish, and Norman Rockwell grace the dining-room walls in this 1871 carriage house, complete with leather chairs and wood-burning fireplaces. For $1,200 to $2,400, nonmembers can celebrate with 25 to 75 guests. In-house catering is available but not required. Not available in August.

**THE UNIVERSITY CLUB**
1 W. 54th St., at Fifth Ave.
212-247-2100; universityclubny.org
This club's landmark building dates from 1899. Receptions are held in the main dining room, with oak-paneled walls, a gilded ceiling, and marble floors. Cocktails can be hosted in either of two smaller rooms; ceremonies are generally held in the white-painted, light-filled first-floor ballroom. There is a $3,000 space fee, plus a starting price of $210 per person for catering for 175 to 350 guests. No outside catering.

**3 WEST CLUB**
3 W. 51st St., nr. Fifth Ave.
212-582-5454, ext. 2110; 3westclub.com
Also known as the Women's National Republican Club, 3 West opens its doors to everyone, regardless of political affiliation. Built in 1933, the building has several party spaces: the Grand Salon, outfitted with fireplaces and brass chandeliers; the cocktail-ready Pratt Lounge; and the Grand Ballroom, accessed by a dramatic marble staircase. Prices are $115 per person and include five hours of open bar, cocktail hour, and four-course dinner.

**THE YALE CLUB**
50 Vanderbilt Ave., nr. 44th St.
212-716-2100; yaleclubnyc.com
Just a stone's throw from Grand Central Terminal, the Yale Club allows couples to choose from the classic Grand Ballroom (150 to 300 guests) or opt for a reception al fresco in the Roof Dining Room, complete with a terrace and great views (90 to 250 guests). The second-floor lounge, with 25-foot ceilings, is often used for ceremonies, framing couples with huge columns. For a more relaxed fête, the club also offers a variety of lounges and their low-key Tap Room. Prices upon request.

## GARDENS AND ESTATES

**THE BARN AT QUEENS COUNTY FARM MUSEUM**
73-50 Little Neck Pkwy.,
Floral Park, Queens
718-347-3276; queensfarm.org
Grazing livestock and a Dutch farmhouse set the scene

for a country-style celebration on a 47-acre estate in Queens. Weddings can be held in the reception room of the museum's two-story thirties barn ($1,200 for four hours, up to 120 guests). For big parties, you can rent the apple orchard, which runs $2,000 (six hours for the event, plus two days to set up and clean). They also offer a smaller pavilion space, which can be rented on its own or in addition to the others ($500).

**BATTERY GARDENS IN BATTERY PARK**
Opposite 17 State St., nr. Pearl St.
212-809-5508; batterygardens.com
The Harbor View Room at Battery Gardens offers the most remarkable views of the Statue of Liberty and Ellis Island in the city. Wraparound floor-to-ceiling windows are sure to impress you and your guests. The ethereal surroundings and simple, unfussy dining room evoke a sense of subdued elegance. They also provide separate menus and pricing for children as well as an option for kosher catering. Prices start at $150 to $200 per person.

**BLUE HILL AT STONE BARNS**
630 Bedford Rd.,
Pocantico Hills, N.Y.
914-366-9606; bluehillstonebarns.com
Located in the scenic Westchester town of Pocantico Hills (near Tarrytown), Blue Hill at Stone Barns combines a working farm and restaurant. The private dining rooms can accommodate up to 64 guests for a seated dinner, and in the warmer seasons a cocktail reception may be held on the outdoor terrace. At the height of the season, 80 percent of ingredients used are grown on-site. Events begin at $170 per person.

**BROOKLYN BOTANIC GARDEN**
1000 Washington Ave., nr. Montgomery St.,
Crown Heights, Brooklyn
718-623-7220; bbg.org
The 52-acre Botanic Garden has numerous sites for ceremonies: the Japanese Hill-and-Pond Garden, the Italian-style Osborne Garden, and the Cranford Rose Garden. Charles, Sally & Charles will exclusively cater your reception in the Palm House on the Lily Terrace (which can host 400 guests for cocktails and 300 for seated dinner) for a site fee of $2,000 to $4,000, plus $120 to $170 per person. Open year-round.

**CARAMOOR**
149 Girdle Ridge Rd., Katonah, N.Y.
914-232-5035; caramoor.org
Built in the thirties on 90 rolling acres, Caramoor is a replica of a Mediterranean villa—whole rooms were imported from European palazzos. It's unavailable for eight weeks in summer, and events must end by the un-Continental hour of 10 p.m.—but these are small shortcomings for an exuberant Tuscan affair so close to home. To rent various areas of the villa, the cost runs from $7,500 for an outdoor space to $25,000 for the House Museum.

**CENTRAL PARK**
212-360-2766; centralparknyc.org
Central Park has lots of possibilities for weddings, but you'll need a permit for a party with more than twenty guests (call 212-408-0226), and even for those with fewer people, a permit is recommended. The Bethesda Terrace has a fountain and looks across the boat pond. Cherry Hill has a smaller fountain surrounded by cherry trees that bloom in the spring. The Conservatory Garden's three gardens, at Fifth Avenue and 105th Street, are in bloom from early spring through late October; a permit for this spot costs $400, plus $100 for photography, and the time must be reserved.

**HUDSON RIVER PARK**
Chambers St. to W. 59th St.,
at the Hudson River
212-627-2020; hudsonriverpark.org
You'll likely be forced to deal with some red tape, but you'll be richly rewarded for your efforts: The park includes five miles of waterfront property from Tribeca to west midtown, and includes piers, fields, and boathouses. Prices upon request.

**THE NEW YORK BOTANICAL GARDEN**
Bronx River Parkway
Fordham Rd., the Bronx
718-220-0300; abigailkirsch.com
There are two sites to choose from in these beautifully maintained gardens. For large parties, the Garden Terrace Room, with hush-looking murals on the walls and soft sconce lighting, will seat 300 guests. Smaller, seated groups of 110 might prefer Snuff Mill, an 1840 tobacco factory with a beamed ceiling and nearby waterfall. Catering is provided by Abigail Kirsch, starting at $120 per person (including alcohol).

**THE PICNIC HOUSE IN PROSPECT PARK**
95 Prospect Park W., nr. 4th St.,
Park Slope, Brooklyn
718-287-6215; prospectpark.org
The 4,000-square-foot glass-and-brick enclosed pavilion features a wood fireplace, new hardwood floors, and elegant French doors leading out to a rear balcony. It's available in eight-hour blocks (five for event, three for setup) and hosts up to 175. Tables, chairs, upright piano, and security are included in the $3,500 fee. Catering is additional and limited to a list of vendors.

**TAPPAN HILL MANSION, TARRYTOWN**
81 Highland Ave., Tarrytown, N.Y.
914-631-3030; abigailkirsch.com
The signature property in Abigail Kirsch's coterie, this landmark estate just 40 minutes from Manhattan was once home to Mark Twain. The magnificent stone mansion has lush, fairy-tale gardens that overlook the Hudson River and amazing terrace views, and the stately staircase entryway is gorgeous for photos and the bouquet toss. Capacity is 500 for a cocktail reception. Prices upon request.

**WAVE HILL**
W. 249th St. and Independence Ave.,
the Bronx
718-549-3200; wavehill.org
Teddy Roosevelt's and Mark Twain's families once rented the Wave Hill—a mansion with two great party rooms set in one of the city's most astonishingly transporting parks. The Large Gallery has sixteen-foot ceilings, silk wall coverings, and French doors. The Armor Hall has stone floors, vaulted beamed ceilings, and cathedral windows overlooking the Hudson River. Prices vary by season (around $6,000, $5,000 of which is tax-deductible). Catering is exclusively by Great Performances.

## HAMPTONS

**BEDELL CELLARS**
36225 Main Rd.,
Cutchogue, N.Y.
631-734-7537; bedellcellars.com
This recently renovated vineyard is a ravishing place to host a summer wedding. The bi-level, mahogany-wood pavilion holds up to 200 guests, and the adjacent loft and tasting room offer extra space for before and after



Our Sites

Preparing Asians and Americans for a

HOME    CALENDAR    RESOURCES    SUPPORT    ABOUT ►    VISIT ►    ASIASTORE ►

Support

**Corporate Members**
Global Corporate Leaders
Corporate Partners
Corporate Contributors

**Become a Corporate Member at 1 or more Asia Society Centers**
Global Membership
New York
Northern California
Southern California
Texas
Washington D.C.
AustralAsia
China
Hong Kong
India
Philippines

General Membership | Patron Groups | Corporate Membership

# Asia Society and Museum
# New York City Membership Benefits

### GENERAL MEMBERSHIP

#### Individual ($65) Join
*If applicable, your entire membership fee is tax deductible*

- Unlimited free admission to the Asia Society Museum
- Invitations to Members-only exhibition previews and other events
- Discounted admission to all performances, films, lectures and symposia
- 10% discount at the AsiaStore, a unique venue for books on Asia and exquisitely designed Asian artifacts
- 10% discount at the Garden Court Café
- 15% discount at select New York-area Asian restaurants through the Tastes of Asia program
- Free admission to the China Institute Gallery
- Discounted admission to China Institute performances, films and lectures
- Bi-monthly calendar of events
- Members-only holiday shopping
- Invitations to special day trips
- Weekly email update of Asia Society events (if email address is provided)

### OTHER INDIVIDUAL MEMBERSHIPS
(allows for all benefits of Individual Membership)

*If applicable, your entire membership fee is tax deductible*

**SENIOR CITIZEN ($40)**: age 65 and older*
**STUDENT ($40)**: full-time students*
**TEACHER ($40)**: grades K through 12
**ASSOCIATE ($40)**: those living in the United States beyond a 150-mile radius of New York City

*Please send a copy of valid identification for application
**Join**

#### DUAL/FAMILY ($120) Join
*If applicable, your entire membership fee is tax deductible*

Privileges include all benefits of Individual Membership plus:

- Unlimited access for Members' children, age 16 and younger, to the Asia Society Galleries

## OTHER DUAL MEMBERSHIPS
(allows for all benefits of Dual Membership)
*If applicable, your entire membership fee is tax deductible*

### DUAL ASSOCIATE ($80) Join
2 adults living beyond a 150-mile radius of New York City
This membership is designed for those who live beyond a 150-mile radius of New York City

### DUAL SENIOR CITIZEN ($80): Join
2 adults age 65 and older*
*Please send a copy of valid identification for application

### CONTRIBUTING ($250) Join
*If applicable, your entire membership fee is tax deductible*

This level marks the beginning of our upper-level category membership, which includes greater access to the Society's resources and invitations to special events.

Privileges include all benefits of Dual Membership plus:

- Invitations to luncheons and receptions with Asian leaders
- Free admission for two guests to the Asia Society Museum
- Reciprocal complimentary membership at 65 other art museums

### SUSTAINING ($500) Join
*If applicable, $475 of this membership fee is tax deductiblee*

Privileges include all benefits of Contributing Membership plus:

- Invitations to V.I.P. exhibition previews and receptions
- Invitations to black-tie Gala events
- Invitations to select breakfast briefings and corporate luncheons
- An Asia Society publication covering contemporary developments in Asia
- Free admission for four guests to the Asia Society Museum

## UNIQUE MEMBERSHIP GROUPS

Please see the New York Patron Groups for the following levels:
**Asia Circle (Young Patrons Group)**
**Chairman's Circle**
**President's Circle**
**Friends of Asian Arts**
**Corporate Membership**

**JOIN ASIA SOCIETY - STEP 1:**
**CHOOSE YOUR MEMBERSHIP OPTIONS**

Is this membership a new membership, a renewal, or a gift?

○ New    ○ Renewal    ○ Gift

---

Select a membership level:
(Click here for membership benefits information)

| MEMBERSHIP LEVEL | COST (USD) |
| --- | --- |
| ○ INDIVIDUAL | $65 |
| ○ SENIOR CITIZEN | $40 |
| ○ STUDENT | $40 |
| ○ TEACHER | $40 |
| ○ ASSOCIATE | $40 |
| ○ DUAL/FAMILY | $120 |
| ○ DUAL ASSOCIATE | $80 |
| ○ DUAL SENIOR CITIZEN | $80 |
| ○ CONTRIBUTING | $250 |
| ○ SUSTAINING | $500 |

---

**Additional Contribution: $USD** [............]

---

[ NEXT ]

©2008 Asia Society | 725 Park Avenue at 70th Street NY, NY 10021 | 212-288-6400 | Press Releases | Contact | FAQ | Become a Member

# Landmark on the Park

MANHATTAN – EVENT SITES






| | | | |
|---|---|---|---|
| Address: | 160 Central Park West | Email: | langlandmk@aol.com |
| City/State/Zip: | New York, NY 10023 | Contact: | Darius Lang |
| Phone: | 212-595-8410 | Room size - (sq. ft.): | 5,500 - 7,500 |
| Fax: | 212-595-0134 | Reception capacity: | 593 |
| Website: | www.fourthuniversalist.org | Dinner capacity: | 400 |

| | |
|---|---|
| Kitchen on premises: | Yes |
| Must use in-house caterer: | No |
| Max # of events (at same time): | 1 |
| Room accommodates ceremony: | Yes |
| Live music / DJ allowed: | Yes |

Comments:
One of the most elegant and spectacular locations in New York. Designed by noted architect William Stuart Potter in 1898. "The atmosphere is extraordinary, the acoustics are fantastic, and the staff were very helpful with all our requests." Masterpieces by Tiffany, Bolton, St. Gaudens and Steinway.

Featured in *The New York Times, Modern Bride, Meetings & Conventions, New Yorker* and *The Wall Street Journal.*

# A LANDMARK BUILDING IN THE HEART OF CHELSEA
# & BRILLIANT PENTHOUSE VIEWS IN SOHO



## TRANSFORMATIONS ARE AS LIMITLESS AS YOUR IMAGINATION...

THE ALTMAN BUILDING and 101 RIVERVIEWS are quintessential New York event venues. Through two sets of 15' high arched mahogany and glass doors, guests enter into 14,000 square feet of column free, street level space at The Altman Building with vaulted ceilings and original details. Combining three unique spaces, 101 Riverviews boasts over 15,000 square feet with panoramic views of the majestic city skyline. The versatility of these one-of-a-kind locations welcomes weddings, bar and bat mitzvahs, social and non profit clients, corporate meetings and events, trade shows, product and automobile launches and fashion runway shows.



135 West 18th Street, New York NY 10011
Contact: Amanda Jassin, Director Sales & Marketing
Contact: Ken Ruby, President
Tel: 212.741.3400    Fax: 212.741.3424
sales@altmanbldg.com



101 Avenue of the Americas, New York, NY 10013
Contact: Sana Bindra    646.206.0430
Contact: Ken Ruby, President
Tel: 212.431.2262    Fax: 212.624.0281
sales@101riverviews.com

# Landmark on the Park



Landmark on the Park offers breath-taking neo-gothic surroundings, which feature masterpieces by Tiffany, Bolton, St. Gaudens and Steinway. The main hall offers a 70' vaulted ceiling acoustically designed for music. The 20' stone columns offers a sense of royalty.

**LANDMARK ON THE PARK**

160 Central Park West
New York, NY 10023

212.595.8410 ext. 24
212.595.8094 fax

Email: darius@4thU.org
**www.landmarkonthepark.org**

Contact Person: Darius Lang

**CAPACITY: 50-593**



Landmark in the Park has Manhattan's best combination of beautiful environment, flexible space and afforda
have attracted groups from all over the world.

Our spaces range from efficient conference rooms to a gymnasium; from an intimate chapel to a magnificen
hall.

Landmark on the Park has an outstanding reputation as one of the best event spaces in New York City. Whether you are:



- A bride needing a fabulous wedding or reception space

- A corporation looking to host that all important event

- A consultant in need of an elegant space for a fundraiser

- In search of a great space for a holiday party

- An event planner or producer seeking space for film shoots, a holding area, or other even

## Landmark on the Park has the right space for you!

"Overall, the facility is one the BEST. One of the most helpful staffs I have worked with in twelve years." – Steve Kemble, Event Design

**Please e-mail any technical problems or inquiries about the website to the _webmaster._**



LANDMARK
ON THE PARK
160 CENTRAL PARK WEST N.Y.

*Beautiful | lifestyle |*

## WHAT PEOPLE ARE SAYING ABOUT US



▨ "Your venue is beautiful. We are really e:
hosting the Hunchback [of Notre Dame] par
Disney Studios

▨ "Overall, the facility is one of the BEST. (
most helpful staffs I have worked with in tw
Steve Kemble, Event Design

▨ "Beautiful space - helpful staff." CBS-TV

▨ "One of our favorite spaces to work in." (
Performances Caterers

▨ "Landmark on the Park has got to be one
fabulous spaces in New York City." Canadi
Bank of Commerce

▨ "This year, thanks to you, your outstanding staff and the spectacular setting of Landmark on the Park, we reached our pinnacle. The evening was truly magical. Our opera stars and accompanists were thrilled by the acoustics of your majestic building. Our artists, decorators and caterers were honored to have the opportunity to perform and enhance the majestic surroundings of the Landmark. It was an ethereal experience for all of us." Agvar Company



▨ "We had a very successful party at your place. All our guests said they had a wonderful time, and we received a lot of feedback on how great the space looked with the decorations. With the help of you and your staff, I think this was our best party yet." EMI Music Publishing

▨ "The soaring structural details and cavernous grandeur of the 100-year-old Landmark echoed the site that inspired the Manolo fashion show." The New York Times

▨ "Right in the heart of Manhattan, couples celebrate in a majestic setting of vaulted ceilings and marble floors. The atmosphere, the location and the incredible historic feel make this site appealing for weddings." Modern Bride Magazine



## WHAT CAN WE OFFER YOU?
Take a look:

▓ Weddings and Memorials - Landmark on the Park is an experienced host of rites of passage of every kind. From child dedications to engagement parties, from weddings and receptions to memorial services, we can help you create your special event with sensitivity and style.

▓ Parties and Fundraisers - Our facility has the ambience and architecture to handle the most elegant fundraiser, and the flexibility to accommodate both intimate and casual events. We're pleased to offer a 15% discount for not-for-profit groups, as well as special rates for religious institutions; just ask us.

▓ Holiday Parties - Our neo-gothic main hall is perfect for that special holiday event; our outstanding acoustics are sure to amplify your special celebration at any time of year.

▓ Special Events - Landmark on the Park has hosted important fashion shows, including those by Anna Sui and Manolo; we're also the annual uptown production host of New York's legendary Macy's Thanksgiving Day parade. We can easily handle multi-day events, making our space useful for fashion shows, film shoots and business conferences.

▓ Sports - Our facility includes a gymnasium with a full basketball court. Our gym can be rented by the hour for sports and exercise programs. Have a martial arts tournament coming up? Our gym is perfect! We handle "out of the box" programs, such as dog training, as well.

▓ Community Meetings - As part of our commitment to our Upper West Side neighborhood, Landmark on the Park makes available for rental to community groups a number of smaller rooms for a nominal fee. Please contact us for a fee quote.





## OUR FACILITIES AND SERVICES

Only a few steps away from historic Central Park West, in the center of Manhattan's Upper West Side, we provide our clients with a prestigious location; a beautiful and spacious interior; excellent acoustics, lighting, and catering facilities.

General Information
- The main hall is 55' X 100' (7,500 sq. feet). It holds 593 people; 400 seated banquet style and 550 for a meeting.
- The gymnasium is 35' X 100' (3,500 sq. feet). with an attached catering kitchen.
- There are six conference rooms: C-4 (19' X 22') C-5, C-6 (17' X 23') C-14 (19' X 22') and C-20 (13' X 23'). Each room holds 15 to 20 people.
- A catering kitchen is available.
- The rehearsal room is a private space with a piano.
- The chapel is 20' x 20' with a capacity for 22 persons.



Included Free in the Rental
- Twenty 60" round tables (seats 8-10)
  Eight 36" round tables (seats 4)
  Fourteen 8' X 30" tables (seats 8-10 or can be used for buffet and bar
  Three hundred and fifty folding chairs (200 plastic and 150 metal)
  Crew to assist in setting items up



- Kitchens
  Upstairs kitchen is 80 square feet with a gas stove and large commercial refrigerator. [Downstairs kitchen is 500 square feet with two fridges, two ovens, one broiler, one grill and six gas burners.]



- Sound Systems
  Four Bose speakers, one Samson MPL 1502 fifteen -channel mixer
  Two JF80 speakers, one QSC MX 1500 amplifier
  One PEAVEY 1DL1000 digital delay
  One RANE ME60 stereo 1/3 octave EQ
  One CALZONE 12-space rack with mixer mount
  One CALZONE casters
  One PROCO SCSM snake, assorted cables, connectors, etc.
  One OPTIMUS stereo cassette deck, three Shure SM58 microphones





Landmark on the Park
Case 1:07-cv-10962-DAB    Document 17-10    Filed 02/22/2008    Page 8 of 12
Page 2 of 2

▓ Theatrical Lighting
NSI remote controlled, 16 channel, 19,200 watt dimmer system connecting four 500 watt Fresnels and fourteen 500 watt Lekos.

▓ Other Items Included
Six coat racks with 600 hangers, seven garbage cans (40 gallon), seventy-eight electrical outlets, twenty circuits (20 amp), five circuits (15 amp) and five coffee urns (four 100-cup and one 50-cup)





*Contact Information*

Location: 160 Central Park West, New York, NY 10023
corner of 76th Street and Central Park West

Office Hours: Monday - Friday, 9 a.m. to 5 p.m.

Phone: 212-595-1658 extension 24

E-mail: *darius@4thu.org*

To start planning your event, please contact Darius Lang and provide the
following information:



- Name
- Company (if applicable)
- Address
- E-mail Address
- Phone Number
- Fax Number
- Date of Event
- Number of Expected Guests
- Event (Corporate, Community Meeting, Fundraiser, Holiday, Wedding, Sports, Memorial, Other)

Case 1:07-cv-10962-DAB Document 17-10 Filed 02/22/2008 Page 10 of 12

# Fourth Universalist Society in the City of New York

## A Unitarian Universalist Congregation

- Subscribe
- Home
- About Us
- Contact Us
- News and Announcements
- Calendar
- Newsletter
- Giving

« Can you host our guest musicians Sept. 21-23? Worship Associate Training »

## New Website for Landmark on the Park

Posted by 4thUadmin Aug 19 2007 under News Items

We are now live with a newly designed, professional website for our rental facility, Landmark on the Park. You can visit it at www.landmarkonthepark.org. Many, many thanks to Vincent Lopez, George Kuhn's partner, who volunteered to design and build the site for us. Additional thanks go to Alex Glass, our Communications Committee chair for doing all the legwork involved with getting the site set up.

Increasing our short-term rentals in the the Landmark on the Park facility are a crucial component of meeting our budget in the 2007/2008 fiscal year. If you have any leads on companies or people who may be interested in renting the facility for an event, please forward them the link to the website, and give them Darius Lang's contact information (darius@4thU.org).

If you have feedback about the website, ideas for other ways to do fundraising, or are interested in helping to market 4th U or Landmark on the Park, please contact Liz Wolfe at lwolfe@wintecgroup.com or 646-334-9427.

No responses yet

Trackback URI | Comments RSS

## Leave a Reply

Name (required)

Mail (hidden) (required)

Website

Submit Comment

- **Come and Join Us**

  **Sunday Services
  and Children's Programs
  begin at 10:45 AM.**
  Location: Central Park West and
  West 76th Street (map/directions)
  E-mail: info@4thu.org
- **Upcoming Events**

  o Wednesday, Feb 20
    Workshop: The Joyful Progressive Life (7:00 PM)
  o Sunday, Feb 24
    Sunday Service (10:45 AM)
- **Spiritual Life**

  o Sunday Services
  o Sermons
  o Music at 4th U
  o Unitarian Universalism
  o Why I Am A UU

  ### Programs/Activities

  o Committees

- o Religious Education
- o First Thursdays at Fourth U
- o Faith in Action

**Information**

- o Our Minister
- o Membership
- o Weddings/Space Rental
- o Who's Who At 4th U
- **News and Announcements Categories**

- o A Time To Serve
- o Educational
- o For Newcomers
- o For Parents/Families
- o Meetings
- o News Items
- o Pastoral
- o Services
- o Social Events
- o Spirituality
- o Uncategorized

 160 Central Park West
New York, NY 10023
212-595-1658

- 
- **Members Login**

Enter the Members Only area of the website
- **Links**

Here are some useful links
- **Search this site**

[_____]  [ Search ]

Quality WordPress Theme**Fourth Universalist Society in the City of New York** Copyright © 2008 All Rights Reserved.

*Podcast Powered by **podPress (v8.2)***







MANHATTAN – CHURCH

Lina Jang Photography

Wade Tanev Photography

| (02) Address | 490 Riverside Drive |
| (03) City/State/Zip | New York, NY 10027 |
| (04) Telephone for catering | 212-870-6820 |
| Telephone for wedding ceremony | 212-870-6762 |
| (06) Website | www.theriversidechurchny.org |
| | www.madelinecatering.com |
| (07) Email | agregory@theriversidechurchny.org |
| | info@madelinecatering.com |
| (08) Contact person | Events Director |
| (11) Room cap. - cocktail reception | 200 / 400 / 150 |
| (12) Room cap. - dinner w/dancing | 175 / 300 / 100 |
| (13) Cuisine | American Global |
| (16) Must use in-house caterer | Yes |

| (20) Separate reception room | Yes |
| (22) Bridal changing room | Yes |
| (27) Live music / DJ allowed | Yes |
| (35) Price range per person | $70 - $129 |
| (36) Room fee | Varies |

You've been dreaming of your wedding day for 25 years and *The Riverside Church* has been waiting 75 years for you! Imagine your wedding in a beautiful gothic cathedral on the heights of the historic Upper Westside of Manhattan overlooking the Hudson River.

With several chapels to choose from, *The Riverside Church* can ensure that your wedding will be unforgettable for you, your guests, and your family. The elegant reception areas are just steps away from the Nave and the other chapels. You may choose from several spaces, including an intimate, gothic reception room complete with a working fireplace and a terrace that overlooks the Hudson.

The onsite caterer, *Madeline's Catering and Special Events*, one of Manhattan's premier caterers, perfectly blends the art of gourmet cooking with a sense of professionalism and attention to detail, to produce the reception of your dreams. Their event professionals can assist you with decor, floral arrangements, and creating the perfect menu.

At *The Riverside Church*, they strive to make your wedding memorable, beautiful, and as enjoyable to plan as possible. They have the perfect facility, solid experience, knowledge and training to host your wedding and make it exceptional.

The Riverside Church - Rentals

Worship    Music & Events    Membership    Get Involved    Spiritual Renewal
About Us    Riverside News    Stewardship    Gift Shop    Contact Us

Site Tools:

Printable Version

Search:    About Us    [   ]  GO

Explore Programs & Ministries....    [v]

## About Us

Our Mission
Senior Minister
Sr. Min. Emeritus
Sr. Min. Search
Clergy & Senior Staff
Leaders
History of Riverside
Library
Weddings
Rentals
Jobs
Riverside Links

Visiting Riverside:
Directions & Hours
Tours
Art & Architecture
Riverside Café
Gift Shop

## Rentals & Services

### Let Riverside be the Site for Your Next Special Event!

Organizations and individuals looking to hold weddings, receptions, concerts, rehearsals, conferences, video productions and meetings in a unique public space will feel right at home at The Riverside Church.

We offer a wonderful blend of history and architectural design which translates beautifully to the many locations within the building. This historic landmark provides both grand and intimate spaces and some premium amenities from staging to working fireplaces, all lending warmth and ambience to your special event. We also provide in house catering, dressing rooms, event planners and floral options.

Riverside's 400-ft tower, which is home to the world's largest tuned bell, also contains 20-floors of meeting rooms and several rehearsal rooms with pianos.

The spaces listed below may also be used for orchestra

For information, call Loleta Nicholson, Manager, Rentals & Programs Services, at 212.870.6766 or email LNicholson@theriversidechurchny.org

For weddings, please call Angela Gregory, at 212.870.6762 or email weddings@theriversidechurchny.org

For memorials and funerals, please call Angela Haddock at 212.870.6703 or email ahaddock@riversidechurch.net

For Theater Rentals, please call Jewel Kinch at 212.870.6877 or email jkinch@@riversidechurch.net

The Riverside Church - Rentals

and/or chorus rehearsals, recitals and concerts. Contact Rental Manager Loleta Nicholson for booking arrangements and rehearsal fees for the Assembly Hall, 9T Lounge and South Hall. We also rent bass stools, music stands, stand lights and selected rehearsal equipment.

**PLEASE NOTE:**

Reception spaces include roundtables, long tables, and chairs, but the rates do not include security deposits or cleanup fees.

### THE NAVE

The splendor of our main worship space with its stained glass windows should serve as the perfect backdrop for any event that requires a room of this size.

Size: The nave is 215 feet long, 89 feet wide and 100 feet high

Capacity: With its two balconies, seats about 1900.

Fee: The cost for concerts, rehearsals, lectures, etc., varies. Please contact us for the fee schedule.

### THE SOUTH HALL

Size: Our largest reception hall, South Hall, measures 86 feet in length and 62 feet in width and comes with a full stage area and lobby. Capacity: The space can accommodate a party of 350 for a formal sit-down dinner with cocktail reception area or 500 for an open floor reception.

Fee: Organizations using the South Hall for special events are required to pay a fee to support the work of the church. Please contact Angela Gregory for all fees.

### THE ASSEMBLY HALL

This large gothic-style space with stone pillars and a stage, includes a full kitchen with an ice machine.



Graduation in the Nave



South Hall

http://www.theriversidechurchnv.org/ahout/?rentals

http://www.theriversidechurchv.org/about/?rentals

Size: The space can accommodate a party of 250 for a formal sit-down dinner and 500 for an open floor reception.

Fee: Organizations using the Assembly Hall for special events are required to pay a fee to support the work of the church. Please contact Angela Gregory for all fees and rates.

## THE NINTH FLOOR LOUNGE

Of all Riverside's reception halls, the most spectacular is the Ninth Floor Lounge with its view of the Hudson River and New Jersey on one side and urban sprawl on the other. This beautiful gothic space with its own wood-burning fireplace comes with a full kitchen and a smaller side room perfect for coat-check or waiting room.

Size: The Lounge measures 37 feet in length and 65 feet in width.

Capacity: The space can accommodate a party of 100 for a formal sit-down dinner.

Fee: Organizations using the Ninth Floor Lounge for special events are required to pay a fee to support the work of the church. Please contact Angela Gregory for all fees and rates.

## THEATER RENTALS

The Theatre of The Riverside Church is available for rentals to produce your theater, dance, and film programs.... To book a performance, call Jewell Kinch, Theatre Manager, at 212.870.6877.

**General Description:**

Traditional **Proscenium** Theater with Apron extension and false proscenium legs (masking soft goods) creating full DS



Room 9T

Room 9T

Assembly Hall



Case 1:07-cv-10962-DAB    Document 17-11    Filed 02/22/2008    Page 5 of 5

of curtain line with exits SR and SL. Total of 250 seats (180 raked and 70 free) located at front and rear levels. Lighting Booth located in back of house on C/L with full view of stage. Two (2) dressing rooms located off SL to accommodate 10-15 people each; both equipped with toilets, hot and cold sinks, and make-up mirrors with lights.

⌦⌦ Download the full specifications (pdf)



Theater - Rear View



Theater - Audience View

**About Us | Jobs | Directions | Contact Us | Links**

© 2005-2008 The Riverside Church New York City, 490 Riverside Drive New York, New York 10027, 212-870-6700 All Rights Reserved

Space Rentals | Church of St. Ignatius Loyola, NYC

type your search here    SEARCH

Becoming Catholic
Bulletins
Church History/Tour
Directions to the Church
Links
Mission
Parish Staff
Register in the Parish
Space Rentals
Stewardship/Giving

Anointing of the Sick
Baptism
Confirmation
Eucharist
Funerals
Liturgical Ministries
Liturgies in Spanish
Marriage
Reconciliation
Sacramental Records

Adult Education
Bible Study
Book Clubs
Centering Prayer
Christian Life Community
Fordham on Park
Ignatian Teens
Ignatian Young Adults
Praying the Stations of the Cross
Retreats
Rite of Christian Initiation for Adults (RCIA)
Spiritual Direction

Bereavement
English as a Second Language Classes (ESL)
Ignatian Social Justice
Inter-Faith Conversations
Met-St. Ignatius Collaboration
Pastoral Care for the Sick

St. Vincent de Paul
Self Help Groups

Day Nursery
Grammar School
Interparish Religious Education

Choirs
Liturgical Music
The Mander Organ
Music Funds
Music Staff
Sacred Music in a Sacred Space Concerts
St. Ignatius Loyola Recordings

# Space Rentals

Home › About Us › Space Rentals

Renting Wallace Hall
Renting space in the Parish House

**WALLACE HALL**

Below the main level of the Church of St. Ignatius Loyola, on Park Avenue and 84th Street, lies Wallace Hall, one of Manhattan's most beautiful and versatile rental spaces. Built in the 1880's as a lower Church and auxiliary chapel, the hall was fully renovated in 1990. The magnificent atrium retains the beauty of its original Gothic design. The Park Avenue entrance leads through a





## Contact

Vitina Varone, Events
Coordinator
(212) 288-3588
Contact by email
To book an event in Wallace
Hall or any of our meeting
spaces in the Parish House,
contact Vitina.

Space Rentals | Church of St. Ignatius Loyola, NYC

stone archway into a soaring vaulted- ballroom, interspersed with stone columns rising to the 30-foot ceiling. Colorful stained glass windows (backlit at night) adorn the Hall on three sides, and the stage at the far end is made of intricately carved solid oak. The design of the terrazzo floor, which is suitable for dancing, subtly suggests the rows of pews of long ago.

Wallace Hall contains 8,000 square feet of floor space and a fully equipped stage over 30 feet deep. The hall is air conditioned with a modern kitchen, restroom facilities and sound system. This elegant space is available for a variety of events including fund raisers, wedding receptions, cocktails, buffet, and formal banquet -style dinners from 100 to 500 guests. This versatile space is also excellent for special exhibits, auctions, cultural performances, business and sales conferences, lectures, workshops, auditions and filmshoots.

## Overall Features and Dimensions

Park Avenue Entrance. Wallace Hall is 8,000 square feet of usable floor space with 30 foot high ceiling. Stained glass windows on north and south walls, stage at west end, entrance and restrooms at east end. Terrazzo floor or stage floor suitable for dancing.

## Stage

Well-suited for concerts, lectures, performances
Stage dimensions: 40 ft wide x 30 ft deep
Steps on both sides of stage for convenient access
Track lighting
Removable railings at front
Piano available for rent

## Sound System

This state of the art sound system consists of:
Speaker podium
2 independent wireless microphone systems
CD and Tape player

## Kitchen

The kitchen is well-suited for preparation of hors d'oeuvres, and the warming and serving of full meals.

Space Rentals | Church of St. Ignatius Loyola, NYC

Set-up, prep and warming space
Stove with two ovens, microwave
Sinks
Large refrigerator
Institutional coffeemaker
Optional kitchen extension with use of screens

**Additional Amenities**

Security personnel
Dinner tables and chairs available for rent

**Additional Meeting Rooms with Kitchen**

Small conference rooms are available, suitable for business meetings, small gatherings and receptions, luncheons and dinners. An excellent choice for Baptism Receptions!

**AT THE PARISH HOUSE**

There are several meeting rooms available in our Parish House for smaller events from workshops, board meetings, parties, to small receptions following baptisms, funerals or memorial services in the Church.

**The Parish Lounge** - (15 x 40) (approximately 550 square feet)

The Parish Lounge can seat 45 people audience style or 25-30 around large tables for luncheons or Board Meetings, etc. For catered events, the space can accommodate stand up receptions for 40-50 people or a full luncheon for 25.

**The Hoefner Lounge** - (15 x 19) (285 square feet) is ideal as a break-out room for larger events and for extended reception space.

**Kitchen**

A full size kitchen adjoins both lounges. Large stove, homestyle refrigerator and plenty of counter space. Pass thru window into Parish Lounge.

This entire floor is ideal for events that require additional space for larger groups.

**Meeting Room** (15 x 29) (420 square feet) on the street level is suitable for meetings, workshops, classes or lectures for 20-45 people.

Space Rentals | Church of St. Ignatius Loyola, NYC

**Rest Rooms** are on both floors.

**TV/Video monitor** in the Parish Lounge are available upon request for an additional charge..

**Air conditioning** available for an additional charge.

© 2008 The Church of St. Ignatius Loyola, 980 Park Avenue, New York, NY 10028 All rights reserved. Credits

# The Astor House













The Astor House is a five-story townhouse on Manhattan's Upper East Side that serves as the headquarters for The Junior League of the City of New York, Inc. (NYJL). This elegant Georgian limestone townhouse was designed by the celebrated architect Mott B. Schmidt in 1927 for Vincent Astor and his family. It was purchased by the NYJL in 1947 and designated a landmark by the New York City Landmarks Preservation Commission in 1966.

Fourteen private rooms are available for social and corporate events, each offering its own timeless charm and history. Dining and mingling in the elegance of the original Astor House décor offers a unique New York City experience. For more information about special events, meeting planning, or to arrange a private function in our historic mansion, please contact the Headquarters Manager at 212.288.6220, ext. 237 or email at info@theastorhouse.org.

Various rooms and seating arrangements are available to accommodate groups ranging in size from 10 to 300+ guests. Rooms with integrated entertainment and video/computer technology are available.

The Astor House  •  130 East 80th Street  •  New York, New York 10021  •  www.theastorhouse.org

http://www.theastorhouse.org/

index.gif



The Astor House is a five-story townhouse on Manhattan's Upper East Side owned by The Junior League of the City of New York. Designed by the celebrated architect Mott Schmidt in 1927 for Vincent Astor and his young family, the limestone Georgian townhouse was designated a landmark by the New York City Landmarks Preservation Commission in 1966.

The building is used year-round for New York Junior League committee meetings and special events.

The Astor House is available to individuals or businesses for conferences, meetings, luncheons, receptions and other private events.

Corporate Function

Private Function

Our Facilities

Planning Your Event

Our History

The Astor House

2/20/2008

http://www.theastorhouse.org/

index.gif







Corporate Functions

Private Functions

Our Facilities

Planning Your Event

Our History

Our facilities accommodate events spanning from 10 to 200 people. Meeting rooms are fully equipped with top-of-the-line audio video and computer equipment. Various rooms and seating arrangements are available to accommodate groups ranging in size from 10 to 300+ people. Please call our Events Manager at 212-606-0237, or email info@theastorhouse.org to schedule a



menuTop.gif

tour and discuss planning your event.

## Corporate Events

**\* Business meetings**

Private conference rooms are available for conventions, client meetings, training, seminars, workshops, holiday parties and other business meetings.

**\* Business Entertainment**

Private rooms are available for business luncheons, dinners and holiday parties.

**\* Alumni and Social Club**

Private rooms are available for cocktail and dinner receptions, guest speakers, and other special events.

130 East 80th Street, New York City 10028 (212) 288-6290

NYU Alumni Connection



http://www.theastorhouse.org/corporateFunctions.htm

menuTop.gif

Corporate Functions

Private Functions

Our Facilities

Planning Your Event

Our History

First Floor  Second Floor  Third Floor  Fourth Floor

Our landmark historic townhome is an ideal location to host corporate and private events. We



menuTop.gif

can accommodate groups as small
as 5 to as large as 250 with elegant service and attention to every detail.

Our Events Manager and Chef will collaborate with you to be sure that your needs and
wishes are attended to: from the menu and audio/visual or other conference planning needs
to the most attentive staff at your private reception.

130 East 80th Street    New York City 10021    212-288-6220    NH Alumni Connection

http://www.theastorhouse.org/facilities.htm

2/20/2008

# Food Matters Presents The Pratt Mansions

MANHATTAN – MANSIONS



Photo By: Sarah Merians Photography

| | |
|---|---|
| (01) Room name | The Ballroom & Salons |
| (02) Address | 1027 Fifth Avenue @ 84 St., NY, NY 10028 |
| (04) Telephone | 212-427-2818  x307 |
| (06) Website | www.whenfoodmatters.com |
| (07) Email | jessica@salsberggroup.com |
| (08) Contact person | Jessica Gerstein |
| (11) Room cap. - cocktail reception | 150 |
| (12) Room cap. - dinner w/dancing | 125 - 150 |
| (13) Cuisine | Client's  Choice |
| (19) Max number affairs (at same time) | 1 |
| (20) Separate reception room | Yes |
| (21) Room accommodates ceremony | Yes |
| (22) Bridal changing room | Yes |
| (26) Dance floor | Yes |
| (27) Live music / DJ allowed | Yes |



Photo By: Paul D'Innocenzo

Beautiful Beaux-Arts mansions on Fifth Avenue's Upper East Side are the perfect setting for weddings, private parties and corporate functions.

Exclusive location directly opposite the *Metropolitan Museum of Art* with magnificent views of *Central Park*.

Stunning Ballroom and Reception areas, full-service kitchen and on-site event coordinator to help you meet all your wedding and private party needs.

Host your next event at Pratt Mansion  with all the resources of the Salsberg Group
**www.salsberggroup.com**

# Sterling Affair Caterers presents
## The Italian Academy / Casa Italiana



Teatro

| | |
|---|---|
| (02) Address | 1161 Amsterdam Ave |
| (03) City/State/Zip | New York, NY 10027 |
| (04) Telephone | 212-686-4075 |
| (05) Fax | 212-686-4077 |
| (06) Website | www.sterlingaffair.com |
| (07) Email | postmaster@sterlingaffair.com |
| (08) Contact person | Peter Fazio |
| (11) Room cap. - cocktail reception | 250 |
| (12) Room cap. - dinner w/dancing | 150 |
| (19) Max number affairs (at same time) | 1 |
| (22) Bridal changing room | Yes |
| (23) Outdoor reception area | Yes |
| (24) Garden | Yes |
| (27) Live music / DJ allowed | Yes |
| (29) Valet parking | Available |



Comments:

**Sterling Affair** Caterers, introduces
**Casa Italiana** at the Italian Academy.

This Renaissance inspired NYC landmark building was designed by McKim, Mead and White and built in 1926. Th building was renovated in 1993 by the renowned architects Sam White (great-grandson of Stanford White one of original designers) and Italo Rota.

Large French doors open to an outside terrace, The Teatro is complemented with a Minstrel Gallery, stage ε chandelier lit ceilings. **Sterling Affair** will create a sumptuous experience reflective of the beauty and pedi such a space. Here your dreams will become a reality. *Truly an affair to remember.*

# The Museum of the City of New York



On Fifth Avenue at the top of Museum Mile stands the Museum of the City of New York, a magnificent colonial revival building with stately interiors. The dramatic marble rotunda and its winding staircase connect two floors of spacious galleries and the landscaped front courtyard and back terrace provide an opportunity for outdoor entertaining. Up to 500 guests can be accommodated for cocktails, 300 for seated dinners and the Museum's theater seats 248. The Museum is available for private, corporate and non-profit events, including weddings, meetings and executive retreats.

The Museum is represented for kosher catering by Simply Divine, NY's premier upscale kosher event planning and catering company.

**THE MUSEUM OF THE CITY OF NEW YORK**

1220 Fifth Avenue
New York, NY 10029

917.492.3309/212.423.0758 fax

Email: srice@mcny.org
**www.mcny.org**

Contact Person: Stephanie Rice

CAPACITY: 500

**SIMPLY DIVINE**

212.541.7300 x226

Email: Jmarlow@simplydivine.com
**www.simplydivine.com**

Contact Person: Judy Marlow

*Simply divine*

# National Academy Museum



Thomas Preti, caterer of choice in New York's top locations for 20 years, is pleased to be catering at The National Academy Museum. The National Academy Museum is located in a handsome Beaux-Arts townhouse on Fifth Avenue at 89th Street. This elegant structure was once the home of philanthropist Archer M. Huntington and his wife, sculptor Anna Hyatt. The house, built at the turn of the century, retains the feel of a private home and reflects the lifestyle of a more gracious era. The National Academy is the ideal venue for luncheons, teas, intimate parties, elaborate receptions, dinners, weddings and corporate events. Up to 240 can be accommodated for cocktails and 140 for seated dinners. Every spring the National Academy has an Annual Exhibition where you and your guest can dine in the galleries surrounded by the finest contemporary art. The National Academy Museum's striking interiors also lend themselves for use as elegant backgrounds for fashion shows, commercial film, video and photography shoots.

**NATIONAL ACADEMY MUSEUM**

1083 Fifth Avenue
New York, NY 10128

212.764.3188
718.786.0965 fax

Email: info@thomaspreti.com
www.thomaspreti.com

Contact Person: Nancy Curtin

CAPACITY: 15-300

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY

December 2, 2007

UPPER EAST SIDE

# An Armory, and a Siege by Rebels Who Live Nearby

### By ALEX MINDLIN

THE Seventh Regiment Armory, the massive, crenellated red-brick building that occupies a full square block on the Upper East Side, spent much of the 1990s falling apart. "When we took it over," said Rebecca Robertson, president of the Seventh Regiment Armory Conservancy, "it had rats, it had lead contamination, there was litter everywhere."

Last November, with the support of some of the city's best-known preservationist groups, the conservancy was given a 99-year lease on the building and embarked on plans for a $200 million restoration. The renovated space will be used both for the art shows that have made the armory famous and for plays, concerts and performance art for audiences of up to 1,500.

But some of the armory's neighbors take a dim view of its plans. And given the affluence of the neighborhood surrounding the armory, which is on the block bounded by 66th and 67th Streets and Park and Lexington Avenues, those neighbors wield considerable firepower.

Among those who have spoken against the project are Henry Kravis, the billionaire investor; Michael Skol, a lobbyist and former ambassador to Venezuela; and the television journalist Mike Wallace. All three men are board members of a new group called Save Park Avenue's Residential Character, which sent letters last month to more than 9,000 Upper East Siders declaring the armory to be "under assault by those who claim they want to save it."

The group predicts that performances at the armory will flood the residential neighborhood with cars and crowds. "We're worried about the disruptive commercial chaos that exists when theaters let out," said Marc Sklar, who owns two glass-treatment companies and serves on the group's board.

In response, Ms. Robertson said that crowds of nearly 3,000 people had been arriving for art show previews at the armory for years. And in any case, she added, the armory's first show next summer will "start small," with an audience of 800 or 900.

The letter to residents also warns that, "without public knowledge," the conservancy could

Case 1:07-cv-10962-DAB    Document 17-18    Filed 02/22/2008    Page 2 of 2

revise the building's capacity upward to 4,150. But A. J. Carter, a spokesman for the Empire State Development Corporation, said any such change would require a public hearing and solicitation of public comment; and Ms. Robertson said the conservancy had no intention of seeking to raise the building's permitted capacity.

The group also objects to the conservancy's plan to cut new fire exits into the armory's facade. Ms. Robertson said the exits would probably be inserted in tall, bricked-up former windows, rather than in the original facade.

Mr. Sklar said that his group planned to hire a lobbyist and had considered a number of ways to dramatize its cause.

"We were going to get a permit and block off the street for I-don't-know-how-many hours, and put 4,000 seats there, and show how many people that is, relative to the size of the area," he said. "You think I'm going to be able to put my car into the garage during one of those performances?"

Copyright 2007 The New York Times Company

*Landmarks Conservancy*

# COMMON BOND

Volume 21, No. 1
*Summer 2006*

## *Cooling*
spaces

## *Saving*
energy

## *Seeking*
grants



# COMMON

Volume 21, Number 1, Summer 2006

The Landmarks Conservancy's Sacred Sites Program offers congregations throughout New York State financial and technical assistance to maintain, repair, and restore their buildings. In addition to providing hundreds of thousands of dollars in matching grants each year, the Conservancy offers technical help, workshops for building caretakers, and publications.

*Common Bond* is the technical journal of the Sacred Sites Program. It is funded by grants from the James A. Macdonald Foundation; State Senator Liz Krueger/New York State Office of Parks, Recreation, and Historic Preservation; and contributions from friends and readers.

Editor: Ann Isabel-Friedman
Managing Editor and Designer: John Chaich

One-year subscriptions are available for $15. Back issues are available in print and online. For additional information about the Sacred Sites Program or *Common Bond*:
New York Landmarks Conservancy
141 Fifth Avenue, Third Floor
New York, New York 10010
800-880-NYLC
nylandmarks@nylandmarks.org
*www.nylandmarks.org*

*Landmarks Conservancy*
Peg Breen, President
Ann-Isabel Friedman, Sacred Sites Program Director
Elizabeth McTigue, Manager of Grants and Technical Services

*Sacred Sites Committee*
Paul K. Herzan, Chair
Justin Abelow
Oscar K. Anderson III
Robert C. Graham, Jr.
John J. Kerr, Jr., Esq.
Marjorie Flannigan MacLachlan, Esq.
John Morning
The Reverend Dr. Thomas F. Pike
Marc P. Schappell
Joanne M. Stern
The Reverend Canon Frederick B. Williams

Copyright © 2006 New York Landmarks Conservancy, Inc.

# Contents

*Cooling Sanctuaries* — 4

*$aving Energy* — 7

*Interview: Engineer Ernest Conrad* — 10

*Shared Use & Tax-Exemption* — 11

*A Guide to Grants* — 13

*2005 Sacred Sites Grants* — 16

*News & Notes* — 19

# On the Cover



*Detail of Emmanuel Baptist Church in Brooklyn*

# Contributors

*Melissa Izzo* is a former Conservancy staffer, now based in Denver.

*Claire Kelly* is a preservation consultant based in New York.

*Amy Radbill* is a California-based freelance writer and editor.

*Rachel Shattuck* is a freelance writer and development professional based in New York City.

Photography courtesy of Conservancy staff.
Additional photography courtesy of: Ed Bennett (p. 8), Jay Butler Engineering (p. 6, above), Landmark Facilities Group (p. 5, 10), Historic Albany Foundation (p. 19, top right), Jewish Expressions (p. 19, lower left), Li/Saltzman Architects (p. 4), Rob Powers for eco-absence.org (p. 19, lower right, below), Andy Rudin (p. 6, below) Soulofamerica.com (p.19, lower right, top), and Unitarian Universalist Church, Canton (p.7, below)

## Correction

We regret these omissions in *Common Bond, Vol. 20, 1 &2.*

Featured in "Lighting Design for Historic Houses of Worship," **Tillet Lighting Design, Inc.** can be reached at:
172 North 11th Street, Studio 5
Brooklyn, New York 11211
718-218-6578
info@tillettlighting.com
contact: Linnaea Tillett, PhD, IESNA

**Platt Byrd Dovel & White**, architects, contributed to the window lighting design installation of St. Michael's church, featured in "Innovations in Lighting Interior Stained Glass: St. Michael's Church and LumePanel."

## Message from the President

Dear Reader,

This issue celebrates the 21st anniversary of *Common Bond*. We think it certainly has come of age! Through the years, we have tried to provide interesting, useful, and clear articles on maintaining religious institutions, fundraising, and ecclesiastical architecture. This issue is no exception.

*Common Bond* grew out of the Landmarks Conservancy's financial and technical help to religious institutions in New York State. We realized that our beautiful houses of worship are often complex and costly to maintain. Yet there were few places where clergy or building committees could turn for grants or expert building advice. Unfortunately, that is still the case.

Our Sacred Sites Program has now assisted some 600 congregations since 1986. But it is confined to New York State. When we realized that issues we addressed here would be common to institutions across the country, we started this magazine. Our once-fledgling publication has grown and now reaches 6000 congregations across the country.

We believe that houses of worship are the most important, and often the most beautiful, structures in their communities. Their importance goes beyond the congregations they serve. They show the history and populations patterns of areas. And they inspired treasured works of art in stained glass and marble. So we believe offering *Common Bond* is one of our most important missions.

We offer *Common Bond* free of charge. But it is costly to produce. So if you can, please send a donation to help us continue publishing. If you currently do support us, please consider an increased gift. We believe our articles are saving your congregation far more than a voluntary subscription price.

Through the years, we've had valued council from clergy. We mourn the recent loss of one of our longtime advisors, The Reverend Canon Frederick Williams, retired rector of the Church of the Intercession in Manhattan. Canon struggled with the maintenance of a large church complex. But he valued preservation and helped us initiate special grant programs for Harlem and Upper Manhattan congregations. So his legacy will continue.

Twenty one years is a good record for a publication. But it's a blink in the length of time religious institutions can stand and serve evolving communities. We want you—and us—to continue for years to come.

Sincerely,

Peg Breen, President



*Completed in 1897 and located on Manhattan's Upper West Side, the Church of St. Paul and St. Andrew, United Methodist shares space with many groups and programs, including: the largest food pantry in New York City, a large neighborhood synagogue, a Hispanic congregation and a Muslim group, four theater companies, a chorus, and an after-school tutoring program.*

# Shared Use & Tax-Exemption

### by Claire Kelly

Many religious organizations own substantial real estate assets, ranging from places of worship and parsonages to office space and community centers. To defray costs and generate extra income or to further their mission, religious institutions often rent these spaces to outside groups. In doing so, they should be aware that despite their tax-exempt status, congregations may be incurring state real property tax liability. Many jurisdictions are carefully reviewing exempt organizations' rental arrangements for compliance with state law. But with proper planning, unexpected taxes can be avoided. Here, *Common Bond* explores tax-exemption and shared use issues in New York City and State to illustrate common concerns.

## Exemption

Most religious institutions in New York State are incorporated under state law as tax-exempt organizations. This exempt status generally applies to most real property taxes as well as income taxes. According to the New York State Office of Real Property Services Assessor's Manual, real property owned by a nonprofit organization and used exclusively for its exempt purpose is free from state real property taxation. New York also permits local jurisdictions (counties, cities, town, etc.) to offer similar exemptions to other groups that aren't incorporated as nonprofits. These "permissive" exemptions apply to groups involved in bible study, library functions, missionary goals, and other functions for the public benefit. However, exempt organizations still may be subject to local assessments for sewer and water, street improvement, and other municipal capital expenditures. The decision to levy these taxes and their amounts will vary from jurisdiction to jurisdiction.

## Rental

Renting out portions of exempt property can cause the property to become at least partially taxable. Exempt organizations can rent all or part of their property to other exempt organizations (either a nonprofit or one of the groups organized for the aforementioned social benefits) without incurring tax liability as long as the rent charged does not exceed the rented property's carrying cost. Carrying costs, as defined by the New York City Department of Finance, include mortgage interest, taxes, insurance, repairs, and assessments for garbage disposal, sewer, and water. Management and accounting fees also can be included in this calculation. "The nonprofit is not supposed to making a profit over the carrying costs and thereby competing with for-profit landlords who pay property taxes," states Michael Rebic, Director of Property Support for the Episcopal Diocese of New York.

By contrast, renting space to a for-profit entity will result in that portion of the property being reentered into the tax rolls. Any tax liability incurred will be proportional to the percentage of the property rented and the duration of the rental. Similarly, renting to an exempt organization at a fee that exceeds the rented property's carrying cost results in that portion of the property being reentered into tax rolls.

## Reporting

Real property tax law is a state matter, but collection and administration is a local matter. Many local government entities, including the New York City Department of Finance

Exemption Unit, carefully examine charitable organizations' rental activity. The transfer of an exempt organization's property to the tax rolls means an increase in tax collection for the City. As such, exempt organizations must be careful to identify and report any taxable property use.

Nonprofits have always been required to complete an annual "Renewal Application For Real Property Tax Exemption for Nonprofit Organizations," which requires disclosure of rental to outside entities. However, New York City now also requires property owning exempt organizations to complete a "Real Property Income and Expense" (RPIE) report. This document requires a greater amount of detail pertaining to rental activity.

In particular, the City is looking for a breakdown of the property's various uses, showing what percent is leased to other organizations. Copies of leases, renter's articles of incorporation, and evidence of tax-exempt status also are required. Failure to complete a renewal form or RPIE report can result in the loss of the tax-exempt status of the rented property or even the exemption for the entire property. Furthermore, the City reviews exempt property use on an ongoing basis, and organizations may find themselves responsible for back taxes not previously reported.

## Compliance

Before deciding to lease, sell, or mortgage a real property, organizations should become familiar with both state laws concerning their particular denomination and their denomination's own internal rules for property disposition. State law differs for entities incorporated under New York's Religious Corporations Law according to their denomination but typically reflects the denomination's internal reporting structure. For instance, within the Episcopal diocese, the Bishop and the Standing Committee must grant permission for leases over five years, as well as for the sale or mortgage of real property. Although the permission may vary between denominations, in each case, state law requires that religious corporations looking to implement leases of more than five years must seek the approval of the court of the county in which they were incorporated.

## Strategies

When preparing to lease property, religious property owners need to assess potential tax liability. If the proposed use will impact the property's exemption, rents should be adjusted to cover the organization's tax liability. In addition, compliance with state law comes with its own expenses, such as legal and accounting fees associated with tax filings. These expenses also should be taken in to account when setting rents.

One way of handling property tax liability, regardless of the use, is to assign the tax liability to the tenant. Michael Rebic

suggests a triple-net lease, where the tenant pays all taxes, utilities, and maintenance in addition to the negotiated rent. Unfortunately, many religious property owners do not fully consider the overhead costs, such as taxes, maintenance, repairs, administrative costs, utilities, depreciation, and other costs associated with renting out their property. As such, Rebic notes, "many nonprofits wind up losing money over the long-run." He continues: "We suggest that all of churches insert a clause in the lease stating that the nonprofit renting the space is liable for tax liabilities should they ever come up to protect the church—no matter what the situation is."

This brief overview of real property tax issues facing religious property owners is not meant as a substitute for legal advice. "The key," Rebic recommends, "is seeking professional real estate counsel for every step of the renting process, from establishing fair market value to negotiating the lease to managing the rental in a professional manner." Always seek legal council and accounting advice when making property management decisions. A good lawyer may be able to help reduce or eliminate a religious property owner's tax liability through a careful assessment of the legislation and the particulars of the rental situation.

*Special thanks to Knox Mcilwain for consultation on this article.*

---

### Resources

The IRS' "Guide for Churches and Religious Organizations: Benefits and Responsibilities Under Federal Tax Law" outlines shared use and exemption. *www.irs.gov/pub/irs-pdf/p1828.pdf*

*Remember the Future: Financial Leadership and Asset Management in Churches,* by Gerald W. Keucher, the Controller & Acting CAO of the Episcopal Diocese of New York, addresses these issues. (Church Publishing, Inc.)

*Property-Tax Exemption for Charities: Mapping the Battlefield,* edited by Evelyn Brody, is a collection of essays exloring legal, economic, political, historical, and municipal-administration persectives. (Urban Institute Press)

The New York State Office of Real Property Services (OPRS) provides general information on the state regulations for real property taxation. *www.orps.state.ny.us*

NYC Department of Finance's "Tax Reductions & Rebate Programs" describes available exemptions and filing guidelines. *www.nyc.gov/html/dof/html/property/property.shtml*

With greater competition among organizations and shifting priorities among donors, the fundraising climate for faith-based and other nonprofit organizations continues to be challenging. Although congregation members traditionally have been generous and consistent in donating to their places of worship, religious institutions can expand their resources with grant funding from private and community foundations or government agencies. Many foundations, especially corporate, do not feel comfortable giving grants to directly to religious organizations, but with good research and strategy, congregations can find grants to help support community service projects. Preparing grants is a strategic process based in solid research, strong writing, and professional relationships. To help religious institutions secure the grants they seek in order to preserve the building they treasure, *Common Bond* shares these tips.

# A Guide to Grants

### by Rachel Shattuck

## A Master Plan

Before soliciting funds to support building preservation, a congregation must first assess its building's needs and draw up a master plan. By clearly defining and illustrating a congregation's short- and long-term capital project needs, this plan will be a critical, deciding component of any grant application. The master plan should include an existing buildings condition assessment and a wish-list of buildings and facility improvements needed to support current and future programming over a long-term horizon of ten to thirty years.

Congregations unfamiliar with historic preservation should connect with preservation and building professionals who can help with their master plan. In New York, the Conservancy's Sacred Sites staff can offer hands-on assistance throughout the entire process of assessing property needs and planning and implementing restoration and repairs. Across the country, other regional sacred sites program may offer similar assistance and referrals. The Philadelphia-based national organization, Partners for Sacred Places, trains clergy and lay leaders on how to evaluate and promote their community programming to potential outside funders. For grant-seekers, staff at these organizations are excellent resources for advice and referrals.

## Research

A range of regional, national, private, community, and corporate foundations, as well as some government sources, provide grants for religious organizations. Today, many foundations have their own websites that detail contacts, areas of interest, and list trustees; when browsing such a site, applicants may even find that members of the congregation or community already are involved with a foundation.

An excellent resource for locating foundations is the Foundation Center, a nonprofit organization devoted to supporting philanthropy throughout the United States. Available

online for a small fee and at their offices, their up-to-date database, *The Foundation Directory,* allows potential grantees to search for funders' interests, application guidelines, names of staff and trustees, and past funded projects, and other relevant information.

Both the Foundation Directory and the free website, *www.Guidestar.org,* provide one of the most important documents about a foundation: its IRS 990 form. A 990 form details a foundation's current funding interests. Because a foundation may change its funding priorities over time without updating the information it provides to the public, the 990 provides the most accurate picture. The 990 also shows the amount of money the foundation disburses each year and will indicate the typical size of grants, helping a congregation determine how much money to request.

In addition, because foundations are most likely to fund programs and organizations that are similar to those they have funded in recent years, look at the 990 to make sure that the project for which funds are requested is a good fit.

Further research may reveal unique qualities about the funder or your project that would appeal to the foundation. For example, if the original benefactor of a foundation was a Presbyterian from Schenectady, the foundation may take an interest in funding Presbyterian churches in the Schenectady region. More typically, if a foundation focuses on grants to youth programs but provides capital funds for building improvement projects, an applicant should emphasize how its youth programming can be enhanced by these building repairs.

## Requirements

Once an appropriate source of funding has been identified, carefully review the funder's application requirements. Although all foundations have their own specific requirements, most grant proposals have consistent features. These commonly

New York Landmarks Conservancy

# COMMONBOND

*Friends Groups*








# COMMON

Volume 19, Number 1 *Fall–Winter 2004*

The New York Landmarks Conservancy's Sacred Sites Program offers congregations throughout New York State financial and technical assistance to maintain, repair, and restore their buildings. In addition to providing hundreds of thousands of dollars in matching grants each year, the Conservancy offers technical help, workshops for building caretakers, and publications.

*Common Bond* is the technical journal of the Sacred Sites Program. It is funded by grants from State Senator Liz Krueger/New York State Office of Parks, Recreation and Historic Preservation, James A. Macdonald Fund, Vinmont Foundation Inc., and contributions from friends and readers.

One-year subscriptions are available for $15. Back issues are available. For additional information about the Landmarks Conservancy's Sacred Sites Program or *Common Bond*:

New York Landmarks Conservancy
141 Fifth Avenue, Third Floor
New York, New York 10010
800-880-NYLC
nylandmarks@nylandmarks.org
www.nylandmarks.org

For advertising rate information, contact Kalyani Glass, Manager of Communications, at kalyaniglass@nylandmarks.org or 800-880-NYLC.

*New York Landmarks Conservancy*
Peg Breen, President
Ann-Isabel Friedman, Sacred Sites Program Director
Elizabeth McTigue, Manager of Grants and Technical Services

*Sacred Sites Committee*
Paul K. Herzan, Chair
Anne Coffin
Stuart P. Feld
Robert C. Graham, Jr.
Margaret Brennan Hassett
John J. Kerr, Jr., Esq.
Marjorie Flannigan MacLachlan, Esq.
The Reverend Dr. Thomas F. Pike
Marc P. Schappell
Joanne M. Stern
The Reverend Canon Frederick B. Williams

Unless otherwise noted, all photographs were taken by Sacred Sites staff.

Copyright © 2004 New York Landmarks Conservancy, Inc.

## Contents

*A Friend in Deed: Strategies to Generate Wider Community Support* — 1

*Case Study in Shared Use: Saratoga Springs Universal Preservation Hall* — 5

*The Importance of Attics* — 7

*Cell Towers and Historic Religious Properties* — 10

*2003 Grant Awards* — 14

*2002 Grant Awards Update* — 17

*News and Notes* — 18

*Spring Maintenance Reminder* — 20

## On the Cover



Friends of Historic New Utrecht brings the history of the church in Bensonhurst, Brooklyn alive. The only remaining Liberty Pole in the United States is celebrated every year with historic reenactors. School children tour the church and learn about the early Dutch settlers and the Revolutionary War.

Photo credits:
Friends of Historic New Utrecht,
New York Landmarks Conservancy



*This former Methodist Church is experiencing a renaissance as a performing arts and conference venue.*





# A Case Study in Shared Use:

## *Saratoga Springs Universal Preservation Hall*

By Jane Cowan

A deteriorating historic church that has become a public safety hazard. A dwindling urban congregation. A long list of necessary and costly repairs. A building condemnation.

This heart-breaking tale is all too familiar in many urban centers across the country. Faced with these seemingly insurmountable obstacles, what is a cash-strapped congregation to do? Demolition forces the congregation to give up its spiritual home and the city loses irreplaceable historic architecture. But what other options exist? Fundraising? Maybe enough money could be donated to shore up the building's collapsing roof. And then? How could a tiny congregation with an official roster of 150 members but only 10 or 15 regular parishioners sustain the maintenance of a 10,000-square-foot building?

The resourceful, dedicated, and creative citizens of Saratoga Springs refused to accept this outcome for the Universal Baptist Church. "We just said we can't let that building go," explained Tom Lewis, president of Saratoga Springs Universal Preservation Hall (SSUPH). Instead, they formed a remarkable partnership that married the congregation with the local preservation foundation, in order to devise a plan that would simultaneously save the building, as well as the congregants' worship space; create a revenue stream for ongoing maintenance; and provide the city of Saratoga Springs with a new performing arts venue: The Saratoga Springs Universal Preservation Hall (SSUPH). This non-profit enterprise will provide worship space for the Universal Baptist Church on the ground floor, while upstairs, the great hall will become a 600-seat theater for acoustic music, theater productions, and dance

companies. The Hall will also operate as a conference venue. Profits from ticket sales will go directly towards the continuing maintenance and restoration of the building.

### *A Common Tale of Decline*

The history of the SSUPH begins in 1841 when the building was first constructed as the Episcopal Methodist Church of Saratoga Springs. An 1871 remodeling included the construction of two steeples, installation of stained-glass windows, and enlargement of the space to accommodate 1200 worshipers. One of the country's earliest examples of High Victorian Gothic, its two spires were prominent features on the Saratoga Springs horizon. A 1903 fire destroyed the south tower, but the remaining tower continues to be the tallest structure in Saratoga Springs.

By 1976, the Methodists, their numbers dwindling and the challenges of maintaining the vast church ever more daunting, sold the building to the Universal Baptist Church, an historically African-American congregation. Like the Methodists before them and like many other urban congregations, the Universal Baptist Church put maintenance of the building on the back burner while attending to its spiritual, charitable, and educational missions. Over time, the remaining tower and roof trusses deteriorated, and eventually a brick detached and crashed into the window of an adjacent structure. "Saratoga Springs watched that building deteriorate for 25 years," observed Jeff Pfeil, the treasurer and construction manager of SSUPH.



*The partnership of the Baptist congregation with the local preservation foundation created a vibrant new vision for the deteriorating building.*



*With funding from the Landmarks Conservancy, massive shoring was installed from basement to roof to support failing trusses until repairs are completed.*



*A computer generated rendering shows the huge capacity of the converted sanctuary.*

After the city condemned the building in 1999, demolition seemed imminent. Saratogians mobilized, and the local preservation organization, Saratoga Springs Preservation Foundation, took action. Meeting with the Universal Baptist Church, they developed a creative plan that benefits the congregation, the community, and the city.

The Landmarks Conservancy helped in 2000 with a $5,000 consulting grant to fund an engineering study, which showed the building was viable but needed shoring to stabilize the building, allowing time to fundraise for substantial structural and roof repairs. A $10,000 grant went towards the $55,000 costs for shoring. Total project costs are anticipated to be $2.5 million, including architectural services, temporary shoring, and renovation. In 2003, the project received a $30,000 Robert W. Wilson Sacred Sites Challenge Grant.

## Partnering with the Community for Success

Although the Saratoga Springs Preservation Foundation initially took the lead, it soon became clear that a non-profit organization separate from the Church and the preservation group would best be able to save the building. And the Saratoga Springs Universal Preservation Hall was born, with a board representing the Universal Baptist congregation, the Preservation Foundation, and the community. Cooperation was the key to success. "I can't stress enough that this was a community effort," says Mr. Lewis of the Preservation Hall. "It was the partnerships and relationships that made this whole project possible."

"We are grateful to the Lord for this partnership," said Rev. Minnie Burns, Pastor of the Universal Baptist Church. "We have the lower part of the building where we have worshiped for so many years. It's furnished so beautifully!" To preserve the congregation's worship space in perpetuity, the agreement set forth that the Universal Baptist Church would own the land while the SSUPH would own the building. During the restoration, the congregation is worshipping in another space immediately across the street. "If they had not taken us in, we don't know where we would have been," added Rev. Burns.

With half of the fundraising goal met, the project is well underway, and a December 2005 completion date is expected. The success of this project has garnered local and national attention. The National Trust for Historic Preservation is planning to publish a guidebook for struggling urban congregations using SSUPH's experience.

Deteriorating urban churches, dwindling congregations, and an ever-present list of costly repairs are all too common. But they don't have to lead to demolition. As the story of the Saratoga Springs Universal Preservation Hall illustrates, partnerships wi    ther organizations – whether preservation, cultural, or social – can dramatically reverse the downward spiral.

6

John G. Waite Associates Architects PLLC

# COMMON BOND

**Volume 17, Number 1** *Winter 2002*

*Common Bond* is the technical journal of the New York Landmarks Conservancy's *Sacred Sites Program.*

Working with congregations of all denominations, the *Sacred Sites Program* provides financial and technical assistance to preserve historic religious properties throughout New York State.

*New York Landmarks Conservancy*
Peg Breen, *President*
Ken M. Lustbader, *Sacred Sites Program Director*
Ann-Isabel Friedman, *Manager of Grants and Technical Services*

*Sacred Sites Committee*
John Forelle, *Chair*
Anne Coffin
Stuart P. Feld
Robert C. Graham, Jr.
Margaret Brennan Hassett
Paul K. Herzan
Holly Hotchner
John J. Kerr
Marjorie Flannigan MacLachlan
Joan B. Maynard
Marc P. Schappel
Joanne M. Stern
The Reverend Canon Frederick B. Williams

*Common Bond*
*Editor:* Shari P. Goldberg
*Contributors:* Jane Cowan, Kim Lovejoy, Ned Pratt, Michael Rebic
*Design:* Shari P. Goldberg

*Common Bond* is published three times a year by the New York Landmarks Conservancy.

Subscriptions (USA): One year, $15 for religious institutions, individuals, nonprofit organizations, and municipalities; $25 for design professionals and contractors.

Index and back issues are available.
Copyright © 2002 New York Landmarks Conservancy, Inc.

*For information about the Landmarks Conservancy's Sacred Sites Program or Common Bond:*
New York Landmarks Conservancy
141 Fifth Avenue, Third Floor
New York, New York 10010
800-880-NYLC
nylandmarks@nylandmarks.org
www.nylandmarks.org

*Common Bond* is funded by grants from The Achelis and Bodman Foundation, James A. Macdonald Foundation, Natural Heritage Trust, The Norman and Rosita Winston Foundation, and contributions from friends and readers.

*Cover photo:* Larry Racioppo

## Contents

| | |
|---|---|
| *On the Cover* | 2 |
| *Shared Space* | 3 |
| *Shaker Architecture* | 6 |
| *Historic Paint Analysis* | 9 |
| *Case Study on Plaster Restoration* | 10 |
| *From Survey to Scope* | 12 |
| *Creating a Building Archive* | 14 |
| *2001 Sacred Sites Grant Awards* | 16 |
| *Resources for further research* | 18 |
| *Financial & Technical Assistance* | 19 |

## On the Cover



The Church of the Holy Trinity (Barney & Chapman, 1897), located on Manhattan's Upper East Side, has long opened its doors to the community as well as to worshipers. In addition to several Sunday services, the church complex houses a summer day camp (pictured here), an after school care program, a soup kitchen, a homeless shelter, a senior lunch program, and theater and dance companies. It also hosts Rachel's Room, which provides professional and life skills to unemployed and underemployed women in the New York area. Read the article on space sharing, page 3, to learn how congregations can successfully offer their buildings to outside organizations.

*Common Bond is now easier to read and more fun to flip through! We're thrilled with the new design and hope you enjoy it, too.*

*Shari P. Goldberg, Editor*

*The life-sized Vagabond Puppets from Rockland County were among those blessed on St. Francis's Day at St. Mark's Church-in-the-Bowery in Manhattan. The church often hosts art installations and dramatizations.*

Mark Scheflen

# Shared
# Space

*by Michael Rebic*

*Community groups—from day care centers and summer camps to theater troupes and art collectives—have long appreciated the open doors of houses of worship. To maintain programming that is beneficial to all involved, congregations should develop thoughtful space-sharing arragements.*

A comprehensive space-sharing policy offers a congregation new outreach opportunities, income, and a tangible link to the community. However, such arrangements require careful planning. Congregations should begin by reviewing their available space and setting goals for the program, in order to identify potential tenants. Then they will want to assess the expense of renting and determine appropriate rates. Finally, congregations should draw up a thorough legal document that serves both itself and the outside organization.

*Initial Planning*
To begin, congregations must examine their motivations for seeking outside organizations. Is space being made available as part of the congregation's community outreach? As a way to recruit new members? To provide additional income? The congregation's goals for inviting new users should be clearly defined in order to identify which organizations to recruit.

A congregation that seeks to promote community service, for example, may decide to only accept groups that meet identifiable community needs, such as a soup kitchen, day care center, or drop-in clinic. If membership growth is the primary goal, the congregation may seek organizations that match its ideological orientation or cultural interests. In that case, the true return for space would be determined by an increase in membership rather than financial gain. If income is desired, a tenant may be sought who will provide the maximum financial return for the space occupied. In cases when income is not the primary goal, the congregation will still have to determine whether it wishes to subsidize organizations, break even, or make a profit on them.

*Michael Rebic is the Director of Property Support of the Episcopal Diocese of New York.*

At the Church of the Holy Apostles in New York, both community ministry and the need for income were identified as important. Janet Gracey, director of administration, noted, "The reality is we do need the income. Recognizing that need as well as our desire to help the community guides us in deciding appropriate uses and rates." Although the basic terms and conditions are the same for nonprofit and for-profit users at Holy Apostles, certain fees are waived for nonprofits as part of Holy Apostles' outreach.

In addition to determining the reasons for sharing space and the type of organizations desired, congregations also need to define the space that will be made available. Often, religious institutions are reluctant to allow outside use of their worship spaces. Temple Beth Elohim in Brooklyn has an active space-sharing program with a variety of community groups from the neighborhood. "Generally, the sanctuary is off limits," according to Nancy Rubinger, the synagogue's executive director, "although we do make exceptions based on the nature of the intended use."

---

## While the charitable aspects of space sharing shouldn't be overlooked, neither should the real expenses involved.

### Determining Expenses and Income

Once the congregation has identified the organizations to which it will offer space, a rate schedule must be developed. While the charitable aspects of space sharing shouldn't be overlooked, neither should the real expenses involved. "Before entering into any type of agreement, religious institutions need to take a hard and conservative look at the impact renting their space will have on their finances and their congregational life," said Jonathan Denham of Denham Wolf Real Estate Services, a New York City-based agency that brokers for nonprofit organizations. "Most religious institutions undervalue their space, and ancillary amenities and services—such as furniture, use of a kitchen, access to phone lines, the presence of support staff—are not appropriately valued." Lighting, heating, insurance, security, maintenance, and trash removal are just a few of the many charges that may increase when an outside organization is invited to share or rent a space. Other hidden costs include improvements needed to make the space available and depreciation or wear-and-tear of furnishings and buildings.

Further, many congregations give little consideration to the amount of time it will take the clergy or administrative personnel to manage outside users. Scheduling, answering the phone

and door, sorting mail, setting up for events and cleaning up afterwards all require time. It may be well worth committing a congregation's staff for these activities; however, before a decision is reached an assessment should be made of the actual dollar cost for providing these services.

Congregations may fail to realize that their insurance premiums can be affected as the building's usage changes. Scott Konrad of Church Insurance emphasized that religious institutions "should keep in close contact with their carriers and look carefully at the ramifications of any space-renting or leasing. If the congregation transfers liability to the outside organization, it is possible that premiums decrease. On the other hand, if new liabilities are created by sharing or renting, charges could increase."

Changes in energy use should also be assessed. The Interfaith Coalition on Energy (ICE) believes that it is best to estimate energy costs in two ways: one for the occasional user—for instance, someone who wants to rent the space for a wedding—and one for the regular user, such as a local group that will meet weekly over a long period of time. ICE publishes an informational package aimed at congregations thinking about sharing or renting space, including step-by-step instructions for determining energy costs. (See page 18 for more information.)

As a general formula for covering rental costs, the Episcopal Diocese of New York recommends implementing a "triple net" provision. This arrangement asserts that the outside organization is responsible for paying an agreed upon rent, maintenance and repair costs, and any tax liabilities that may arise from the use.

Indeed, congregations should note that renting, even to non-profits, can affect their tax exemption status. "There are important thresholds that are looked at by both the Internal Revenue Service as well as the local property taxing authority," Denham said. "While renting to nonprofits is often less problematic, religious groups should consult with legal and accounting professionals."

New York's Congregation Shearith Israel sees its long-term tenant, a children's day school, as part of its outreach and its income stream. "Having a Hebrew day school is important to us, but the school increases our expenses and so we carefully calculated our cost per square foot to determine what we should be charging," said Alan Singer, executive director of the synagogue. Like Shearith Israel, Holy Apostles and Beth Elohim investigated what their space was worth by talking to realtors, calling other congregations, and looking at similar community facilities. Congregations may also want to request a potential tenant's financial statement; an organization may be able and willing to spend more on space than the congregation anticipates.

4

*Legal Considerations*

When congregations opt to share their space, a written agreement is essential for the protection of both the religious institution and the outside organization. Denham stated, "Often the best agreements are those that are approached in a business like manner. Outside expert advice should always be sought." Advice can come from financial, real estate, and legal consultants as well as denominational organizations. Denominational offices will often have had experience with similar situations and can offer advice about avoiding common pitfalls.

Singer affirmed the value of developing legally binding documents to clarify the both parties' expectations. "For my protection and for the synagogue's," he said, "it's important that we have a clear, written agreement with our space users. Twenty years ago, perhaps a handshake would suffice, but today, everything is reviewed by a lawyer before we commit." Singer continued, "Our success with our tenants is that we treat the relationship in a business-like manner. Whether it be our long-term tenant or a local co-op board wanting to hold a meeting, we require a written agreement and especially proof of insurance."

The agreement between the Episcopal Holy Apostles and the Jewish Congregation Beit Simchat Torah, which shares the church's worship space, states what each congregation expects of the other. Provisions spell out how the actual worship space will be set up; for example, each congregation's religious articles are removed from the worship space after services. "We are both flexible and understanding, but the basic obligations are clearly defined," said Gracey of Holy Apostles. She added, "Having mutual obligations set down in writing enables us to work together as partners and prevents misunderstandings."

Depending on the duration and type of sharing arrangement, congregations may want to employ either a lease or a license agreement. In a previous issue of Common Bond, Victoria Bjorklund of the law firm Simpson, Thacher & Bartlett discussed the difference: "While a lease gives exclusive possession of the premises to the lessee against the whole world, including the owner, a license confers the privilege to occupy the space under or with the owner or with other licensees. A license, unlike a lease, may be revocable at the discretion of the owner." When the congregation wishes to have the most control over the outsiders' use of the building, licenses are probably the best option. "If you lease your sanctuary to a group and do not describe prohibited acts, a discotheque could be installed in your sanctuary, and you could not legally prevent that use," Bjorklund pointed out. "A license, on the other hand, grants occupancy only so far as is necessary to engage in the agreed-upon activities." She also recommended that any and all provisions be explicitly spelled out: "Any license or lease must unambiguously describe the physical space that the user is entitled to occupy or use. This should include storage space, closets, kitchens, restrooms, and parking space. The agreement should list the hours during which the user is entitled to use the space and note any special times or circumstances under which the user cannot have access." Holidays, unanticipated funerals, and weddings should be taken into account. "If provision is not made," Bjorklund explained, "the user is entitled to the space, no matter how inconvenient it is for the congregation."

Although each congregation handles sharing space differently, those who are successful have all chosen appropriate tenants and set fair rates. They emphasize the need for three key elements: written agreements, protection of the religious institution from liability, and clear and on-going communication with the space user. "We are first and foremost a religious institution," noted Rubinger of Beth Elohim, "we are not landlords and therefore can be flexible, but the best interests of the congregation always need to come first and be served. Sharing our space has made us many friends in our community, and that's part of who we are—good neighbors."

# Considerations

Questions that congregations may consider asking themselves before embarking on any agreement:

~ What effect will sharing or renting space have on the congregation and staff?



~ Will sharing supplemental space preclude further development of the congregation's own programming?

~ What types of organizations should be permitted to use the facility?

*Holy Trinity of Inwood*

~ How do the organizations' goals and purposes fit within our mission?

~ Should different rate schedules and agreements be established for different types of organizations and uses?

~ What criteria will be used to financially evaluate the organizations?

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------- x

YESHIVA IMREI CHAIM VIZNITZ OF BORO PARK,
INC.,

                              Petitioner,

For a Judgment under Article 78 of the Civil Practice Law
and Rules

                -against-

THE CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF BUILDINGS, and THE NEW YORK
CITY BOARD OF STANDARDS AND APPEALS

                          Respondents.
------------------------------------------------------- X

**STIPULATION OF
ADJOURNMENT**

Index No. 4841/07

"Article 78 Proceeding No. 1"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------- x

YESHIVA IMREI CHAIM VIZNITZ OF BORO PARK,
INC.,

                              Petitioner,

For a Judgment under Article 78 of the Civil Practice Law
and Rules

                -against-

THE CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF BUILDINGS, and THE NEW YORK
CITY BOARD OF STANDARDS AND APPEALS

                          Respondents.
------------------------------------------------------- X

Index No. 5347/07

"Article 78 Proceeding No. 2"

        WHEREAS, on or about February 9, 2007, petitioner commenced the above-referenced Article 78 Proceeding No. 1 seeking a judgment annulling the Board of Standards and Appeals' ("BSA") Resolution under BSA Calendar No. 290-05-BZ, which denied petitioner's application for a variance to use the cellar of the premises known as 1824 53rd Street, Brooklyn, New York ("the subject premises") as a Use Group 9 catering establishment; and

WHEREAS, Article 78 proceeding No. 1 is currently returnable on March 6, 2007 in the motion support part of the courthouse located at 360 Adams Street, Brooklyn, New York; and

WHEREAS, on or about February 15, 2007, petitioner commenced the above-referenced Article 78 Proceeding No. 2 seeking a judgment annulling the BSA's Resolution under BSA Calendar No. 60-06-A, which denied petitioner's appeal of the Department of Buildings' ("DOB") determination that the Use Group 9 catering establishment proposed for the cellar of the subject premises is not an Accessory use to the synagogue and school operating at the subject premises; and

WHEREAS, Article 78 proceeding No. 2 is currently returnable on March 8, 2007 in the motion support part of the courthouse located at 360 Adams Street, Brooklyn, New York; and

WHEREAS, on or about March 21, 2007, the BSA is scheduled to hold a continued public hearing on DOB's application to revoke and/or modify the Certificate of Occupancy ("C of O") that has been issued to the subject premises [BSA Calendar No. 54-05-A]; and

WHEREAS, based upon the application and the powers invested in it pursuant to New York City Charter Section 666, the BSA may grant DOB's application under Calendar No. 54-05-A; and

WHEREAS, petitioner has expressed its intent to make an application for a stay to enjoin the BSA from proceeding with the scheduled March 21, 2007 hearing under BSA Calendar No. 54-05-A and/or filing a Resolution revoking the C of O issued to the subject premises; and

2

WHEREAS, petitioner has expressed that if the BSA grants DOB's application under BSA Calendar No. 54-05-A, petitioner will commence a third Article 78 proceeding to challenge that determination; and

WHEREAS, the potential third Article 78 proceeding is factually similar and has some legal issues in common with the pending above-referenced Article 78 proceedings, such that the parties desire to have all three Article 78 petitions presented to the Court at or around the same time;

IT IS HEREBY STIPULATED AND AGREED by the attorneys for the respective parties that the BSA will proceed with the scheduled March 21, 2007 hearing under BSA Calendar No. 54-05-A; and

IT IS FURTHER STIPULATED AND AGREED that when the BSA determines that it is appropriate to do so, the BSA will conclude the public hearing process and issue a determination under BSA Calendar No. 54-05-A; and

IT IS FURTHER STIPULATED AND AGREED that the BSA will not file a Certified copy of its Resolution under BSA Calendar No. 54-05-A in the Board's offices; and

IT IS FURTHER STIPULATED AND AGREED that if the BSA grants DOB's application and decides to either revoke or modify the C of O, petitioner will file any Article 78 proceeding to challenge the BSA's determination under BSA Calendar No. 54-05-A within 30 days of the date on which the BSA issues its determination; and

IT IS FURTHER STIPULATED AND AGREED that the BSA will not object to petitioner challenging its determination under BSA Calendar No. 54-05-A without a Certified Resolution having first been filed in the Board's offices; and

IT IS FURTHER STIPULATED AND AGREED that if petitioner does not file an Article 78 proceeding to challenge the BSA's determination under BSA Calendar No. 54-05-

3

A within 30 days of the date on which the BSA issues its determination, the BSA will file its Resolution under BSA Calendar No. 54-05-A in the Board's offices and petitioner agrees not to challenge the Resolution after its filing; and

IT IS FURTHER STIPULATED AND AGREED that once Article 78 proceedings Nos. 1 and 2 are assigned to a Justice of the Kings County Supreme Court, the parties will execute a stipulation adjourning the matters to a date that is convenient for the court and that is on or around June 28, 2007; and

IT IS FURTHER STIPULATED AND AGREED that respondents will have until May 15, 2007 to serve their responsive papers in Article 78 proceedings Nos. 1 and 2 upon counsel for petitioners; and

IT IS FURTHER STIPULATED AND AGREED that petitioner will have until June 27, 2007 to serve reply papers in Article 78 proceedings Nos. 1 and 2 upon counsel for respondents; and

IT IS FURTHER STIPULATED AND AGREED that the parties are amenable to modifying the briefing schedule set forth above for Article 78 proceedings Nos. 1 and 2 if the potential third Article 78 proceeding referenced above is filed and if such modification is necessary to ensure that all three Article 78 proceedings are presented to the court at the same time; and

IT IS FURTHER STIPULATED AND AGREED that the parties reserve any and all rights they may have regarding the subject matter covered by this stipulation, except as otherwise specified herein; and

4

NYC LAW DEPARTMENT    Fax:2127919714    May 15 2007 14:46    P.06
03/13/2007 10:28 FAX  2125647040                    Mar 12 2007 11:54    P.06
NYC LAW DEPARTMENT    Fax:2127919714

IT IS FURTHER STIPULATED AND AGREED that a faxed copy of a

signature is deemed an original for purposes of this stipulation.

Dated:      New York, New York
            March 12, 2007

STUART KLEIN, ESQ.                    MICHAEL A. CARDOZO
Attorney for Petitioner               Corporation Counsel of the
498 Seventh Avenue, 8th Floor           City of New York
New York, New York 10018              Attorney for Defendants
(212) 564-7560                        100 Church Street, Room 5-188
                                      New York, New York 10007
                                      (212) 788-1035

By:                                   By:
    Stuart Klein, Esq.                    Sheryl R. Neufeld
                                          Assistant Corporation Counsel

TC of Stuart Klein

5

60-06-A

APPLICANT – Stuart A. Klein, for Yeshiva Imrei Chaim Viznitz, owner.

SUBJECT – Application April 5, 2006 – Request pursuant to Section 666 of the New York City Charter for a reversal of DOB's denial of a reconsideration request to allow a catering use as an accessory use to a synagogue and yeshiva in an R5 zoning district.

PREMISES AFFECTED – 1824 53rd Street, south side, 127.95' east of the intersection of 53rd and 18th Avenue, Block 5480, Lot 14, Borough of Brooklyn.

**COMMUNITY BOARD #12BK**

APPEARANCES –

For Applicant: Stuart A. Klein.

**ACTION OF THE BOARD** – Appeal denied.

THE VOTE TO GRANT –

Affirmative: ..............................................................0

Negative: Chair Srinivasan, Vice Chair Collins and Commissioner Ottley-Brown.........................................3

THE RESOLUTION1:

WHEREAS, this is an appeal of a Department of Buildings final determination dated March 31, 2006, issued by the Brooklyn Borough Commissioner (the "Final Determination"); and

WHEREAS, the Final Determination reads in pertinent part: "Proposed Catering Use (UG 9) is not an Accessory use to the Synagogue and School (UG 4 & 3) in an R5 zone"; and

WHEREAS, the appeal was brought on behalf of Yeshiva Imrei Chaim Viznitz, a not for profit religious institution (hereinafter "Appellant"), the owner of the building at the subject premises; and

WHEREAS, a public hearing was held on this application on June 13, 2006 after due notice by publication in *The City Record*; and

WHEREAS, a continued hearing was held on August 15, 2006, on which date the hearing was closed and decision was set for September 19, 2006; and

WHEREAS, at the request of Appellant, the decision date was deferred to September 26, 2006; and

WHEREAS, the Board reopened the hearing on this date, but Appellant's counsel was unable to attend; and

WHEREAS, decision was deferred to October 24, 2006; and

WHEREAS, the matter was again reopened on October 24, and a continued hearing date was set for November 21, 2006; and

WHEREAS, a continued hearing was held on November 21, and a decision was set for January 9, 2007; and

WHEREAS, DOB appeared and made submissions in opposition to this appeal, as did certain neighbors; and

WHEREAS, many members of the Viznitz community appeared in support of the appeal; and

WHEREAS, in addition, Appellant provided letters from other individuals supporting the appeal; and

WHEREAS, the Board notes that while Appellant claimed to have the support of certain elected officials, no elected official appeared at hearing and no letters of support from elected officials were submitted; and

THE PREMISES AND BUILDING

WHEREAS, the subject premises is located in an R5 residence zoning district on 53rd Street between 18th and 19th Avenues and is currently improved upon with a three-story with cellar building (the "Building"); and

WHEREAS, the Building is across the street from and adjacent to numerous two-story semi-attached dwellings; and

WHEREAS, Certificate of Occupancy No. 300131122, issued for the Building on May 26, 1999 (the "CO"), lists the following uses: (i) Use Group ("UG") 4 assembly hall and kitchen and UG 9 catering use in the cellar; (ii) UG 4 synagogue and UG 3 classrooms on the first and second floors; and (iii) UG 3 classrooms on the third floor; and

THE APPLICATION TO REVOKE THE CERTIFICATE OF OCCUPANCY

WHEREAS, this CO was the subject of a 2005 application by DOB, who sought to revoke or modify it pursuant to City Charter §§ 666.6(a) and 645(b)(3)(e), on the basis that the CO allows conditions at the referenced premises that are contrary to the Zoning Resolution and the Administrative Code; and

---

1 Headings are utilized only in the interest of clarity and organization.

WHEREAS, DOB argued that the catering use did not possess lawful non-conforming UG 9 status and was therefore illegal; and

WHEREAS, specifically, DOB suggested that the prior UG 16 use on which the status of the UG 9 designation was predicated had been discontinued for more than two years and that the prior building housing this use had been demolished; DOB contended that this had not been revealed by the permit Appellant; and

WHEREAS, under either circumstance, DOB alleged that there is no legal basis for a UG 9 catering use designation on the CO for the cellar of the Building; and

WHEREAS, a public hearing was held on DOB's application on May 17, 2005, but before the next continued hearing, Appellant obtained a court order, dated July 8, 2005, enjoining the Board from acting on the application and from conducting further proceedings on it; and

WHEREAS, this court order also directs Appellant to file a variance application at the Board; and

WHEREAS, months later, Appellant filed the
variance application under BSA Cal. No. 290-05-BZ; and

WHEREAS, Appellant also filed the instant appeal; and

WHEREAS, since the two matters were filed at the same time and both concerned the use of the Building's cellar for commercial catering purposes, the Board, with the consent of all parties, heard the cases together and the record is the same; and

THE SUBJECT BUILDING

WHEREAS, Appellant states that the Building currently contains a UG 3 religious school for approximately 625 boys (the "School"), a UG 4 synagogue space (the "Synagogue"), and a UG 9 catering establishment that serves the needs of the orthodox Jewish community in the vicinity of the site (the "Catering Establishment"); and

WHEREAS, the Synagogue is located on parts of the first and second floors; and

WHEREAS, specifically, as illustrated on the plans for the first floor submitted by Appellant, stamped May 5, 2006, the first floor Synagogue space is for men, and adjoins a classroom with a removable partition; it is approximately 1,900 sq. ft.; and

WHEREAS, the second floor Synagogue space is for women, and is 1,380 sq. ft; and

WHEREAS, Appellant states that the Synagogue is attended by approximately 300 people on the Sabbath, and approximately 100 people and approximately 400 students on weekdays; and

WHEREAS, the remainder of the first and second floors, and the entirety of the third floor, appear to be occupied by classrooms and other School-related spaces; and

WHEREAS, Appellant claims that the School serves many economically disadvantaged children, and that 85 percent of the children receive government-sponsored school lunch money; and

WHEREAS, both the School and Synagogue are permitted uses in the subject R5 zoning district; and

THE CATERING ESTABLISHMENT

WHEREAS, the Catering Establishment, which is not a permitted use in the subject R5 zoning district, was listed on the CO on the alleged basis that it is a lawful non-conforming use, as discussed above; and

WHEREAS, the Catering Establishment is located in the cellar of the Building; the same cellar space is also apparently used for the School's cafeteria and assembly hall; and

WHEREAS, the Catering Establishment occupies approximately 18,000 sq. ft. of floor space in the cellar, with a primary event space, two adjoining lobbies and bathroom areas (one for men and one for women), as well as two kitchens; and

WHEREAS, the record indicates that the Catering Establishment has separate management and staff from the School and separate entrances with awnings reflecting the business name, that the food for events is made on the premises, that a guard is provided from 6 pm to 12 pm to assist with guest parking, and that waiters and busboys are hired on an "as needed" basis; and

WHEREAS, Appellant alleges that most events are held from approximately 6 pm to 12 am, and that 90 percent of the guests leave the Building at 11:30 pm; and

WHEREAS, Appellant states that ceremonies (held under Chuppahs, which look like canopies) related to the catered events are often conducted outside; and

WHEREAS, Appellant alleges that attendance at each event ranges between 340 and 400 people, though evidence submitted by Appellant indicates that some events are scheduled to have at least 500 guests; and

WHEREAS, Appellant provided information revealing that 166 events were held in 2004, and 154 events were held in 2005; and

WHEREAS, Appellant states that the catered events are offered at reduced rates relative to other catering establishments, with weddings costing approximately 25 dollars per plate; and

WHEREAS, members of the broader Viznitz community stated that the reduced rates were attractive to members of the larger orthodox and Hasidic Jewish community in Brooklyn; and

WHEREAS, these same members stated that the Catering Establishment serves the needs of this community; and

WHEREAS, the Catering Establishment has a license from the Department of Consumer Affairs for a catering establishment; and

WHEREAS, the Board notes that the Catering Establishment advertises in the Verizon Yellow Pages (both on-line and in print) under the listing "Banquet Facilities" as "Ohr Hachaim Ladies" and "Ohr Hachaim Men", with the address and phone number listed; and

WHEREAS, Appellant does not address the Verizon Yellow Pages advertisement, but in its last submission alleges that it does not pay for similar advertising that apparently runs in the Borough Park Community Yellow Pages, does not desire this advertising, and has asked the publisher of the Borough Park Community Yellow Pages to stop running the advertisements; and

THE ACCESSORY USE ISSUE

WHEREAS, this appeal requires the Board to consider whether the Catering Establishment – a use historically and currently operated pursuant to a primary commercial UG 9 designation on the CO (albeit a potentially unlawful one) – can nevertheless properly be characterized as a UG 3 school or UG 4 synagogue accessory use; and

WHEREAS, ZR § 12-10 "Accessory use" reads "An 'accessory use': (a) is a use conducted on the same zoning lot as the principal use to which it is related (whether located within the same or an accessory building or other structure, or as an accessory use of land), except that, where specifically provided in the applicable district regulations or elsewhere in this Resolution, accessory docks, off-street parking or off-street loading need not be located on the same zoning lot; and (b) is a use which is clearly incidental to, and customarily found in connection with, such principal use; and (c) is either in the same ownership as such principal use, or is operated and maintained on the same zoning lot substantially for the benefit or convenience of the owners, occupants, employees."; and

WHEREAS, there is no disagreement that the Catering Establishment is located on the same zoning lot as the School and Synagogue; and

WHEREAS, further, Appellant alleges that it owns all three uses; and

WHEREAS, thus, the primary issues in this appeal that require resolution are: (1) whether the catering establishment is clearly incidental to the School or Synagogue; and (2) whether such an establishment is customarily found in connection with religious schools or synagogues; and

WHEREAS, for the reasons set forth below, the Board disagrees that the Catering Establishment is an accessory use to either the School or the Synagogue; and

WHEREAS, moreover, all of Appellant's arguments to the contrary, whether based on case law, DOB policy, or past Board decisions, are without merit; and

FACTORS IN DETERMINING ACCESSORY USE

WHEREAS, as a threshold matter, the Board notes that a determination of whether a particular use is accessory to another use requires a review of the specific facts of each situation; and

WHEREAS, as held by the Court of Appeals in New York Botanical Garden v. Board of Standards and Appeals, 91 N.Y.2d 413 (1998), "[w]hether a proposed accessory use is clearly incidental to and customarily found in connection with the principal use depends on an analysis of the nature and character of the principal use of the land in question in relation to the accessory use, taking into consideration the over-all character of the particular area in question . . [t]his analysis is, to a great extent, fact-based . . ."; and

WHEREAS, thus, the Board finds that Appellant's argument that information relating to the operation of the Catering Establishment has no bearing on whether it is an accessory use, as expressed at the first hearing, is contrary to law; and

WHEREAS, DOB, which must review questions of accessory use in the first instance, cites to various factors that it evaluates when it is determining whether a particular use is accessory to another use; and

WHEREAS, when the proposed accessory use is catering, DOB states that it looks to the intensity of the use and its impact, the frequency of the catered events, the hours of operation, parking availability, the management of the food operations, whether food prepared there was delivered off-site, whether events

were confined to the interior catering space or also occurred outside, and whether the use was advertised as a catering hall or banquet facility; and

WHEREAS, DOB also examines the relationship between the size of the membership of the religious entity and the size of events; and

WHEREAS, the Board concurs that these are reasonable factors to examine; and

WHEREAS, however, it notes that the list should not be considered exhaustive; and

WHEREAS, the Board also notes that given the factually-driven nature of any accessory use inquiry, certain factors may be more pertinent depending on the types of uses in question and that other factors not mentioned might be pertinent if the uses are different; and

WHEREAS, as discussed at the first hearing, the Board considered the following items to be among the relevant considerations and asked for information as to each of them: (1) whether the Catering Establishment has separate entrances and lobbies from the School and Synagogue; (2) the hours of operation; (3) whether the Catering Establishment has separate garbage pick-up from the other uses; (4) the frequency of outdoor activities related to catered events; (5) the relationship of the events to Synagogue members or School students/staff/family members; and (6) traffic and parking impacts; and

DOB'S POSITION AS TO THE CATERING ESTABLISHMENT

WHEREAS, as noted above, DOB takes the position that Appellant has not established that the catering establishment is incidental to either the School or the Synagogue or that such an establishment is customarily found with such uses; and

WHEREAS, based upon its review of the record, the Board agrees with DOB, for the reasons set forth below; and

WHEREAS, as to the question of whether the catering is incidental, the Board notes at the outset that the Catering Establishment appears to have a more significant relationship with the broader Jewish community as opposed to the Synagogue or the School; and

WHEREAS, as discussed above, Appellant concedes that the catering establishment serves the broader community, and that at least 50 percent of all events are not related to the Synagogue or School; and

WHEREAS, the Board notes that Appellant has submitted no evidence that 50 percent of the catered events relate to the Synagogue or the School, even though Appellant committed to doing so; and

WHEREAS, however, even assuming that this is true, it is clear that a substantial amount of the establishment's operation is entirely unrelated to either the School or the Synagogue; and

WHEREAS, further, the Board disagrees that merely because a student of the School is having a bar mitzvah or a member of the Synagogue is getting married and uses the Catering Establishment automatically renders the use of the Catering Establishment for such purposes accessory in all instances, given the other factors that must be weighed; and

WHEREAS, second, the Board notes that Appellant has not suggested to the Board that the Synagogue is used during all catered events; and

WHEREAS, to the contrary, Appellant has indicated on more than one occasion that most of the celebrants prefer to have the ceremony outside in a Chuppah; and

WHEREAS, specifically, in its July 11, 2006 submission, Appellant notes that the usual schedule for a catered event features a Chuppah, which is held outdoors when possible; and

WHEREAS, third, Appellant has not provided any credible evidence that the School has any integration whatsoever with the Catering Establishment; and

WHEREAS, the Catering Establishments has separate entrances, its own accessory rooms, hours of operation that do not relate correspond to the School, and its own set of parking and traffic impacts; and

WHEREAS, additionally, the fact that income generated by the Catering Establishment is used to support the operation of the School does not make the Catering Establishment incidental to the School; and

WHEREAS, the Catering Establishment can still be a primary use under such circumstances; and

WHEREAS, Appellant has not provided any precedent that establishes that a use is accessory to another merely based on the direction of the income stream; and

WHEREAS, even assuming *arguendo* that the direction of income flow is an important consideration as to whether a use is incidental, it is far from clear that the Catering Establishment exclusively serves the School in this respect; and

WHEREAS, one could just as easily argue that it is the School's ability to obtain federal school lunch money that enables the Catering Establishment to offer reduced rates for its services and that it is the

School, therefore, that subsidizes the Catering Establishment; and

WHEREAS, in sum, any argument based on income generation is unavailing; and

WHEREAS, fourth, the Board observes that the UG 9 designation for the Catering Establishment set forth on the CO was specifically sought by Appellant based on the alleged lawful non-conforming status and because of the proposed commercial operation of the establishment, an operation contemplated by Appellant to be primary rather than accessory; and

WHEREAS, presumably, absent the DOB application to modify the CO, Appellant would prefer to maintain this UG 9 designation, since the constraints of a UG 3 or UG 4 accessory designation would not exist; and

WHEREAS, Appellant has failed to explain why a UG 9 designation for the Catering Establishment was sought in 1999 if the use was actually operating as an accessory use to the Synagogue; and

WHEREAS, finally, the Board observes that the ZR does not anticipate that primary uses can normally qualify as accessory uses; and

WHEREAS, the Board notes that ZR § 12-10 "Accessory use" provides a list of examples of accessory uses; such uses include servants' quarters, caretaker apartments, the keeping of pets, swimming pools for guests of facilities, domestic or agricultural storage in barns, home occupations, a newsstand within a building, incinerators, storage of goods for commercial or manufacturing purposes, incidental repairs, the removal for sale of sod, clay, etc. for construction purposes, off-street parking and off-street loading berths related to the use of the site, signage, radio towers, railroad switching facilities, small sewage disposal facilities, or ambulance outposts connected with a fire or police station; and

WHEREAS, while certain of these uses (storage, for instance) could be primary uses, it is clear that the majority of them are ancillary uses that support the site's primary use (though they might not be necessary for the primary use to exist); and

WHEREAS, as established above, the record does not support a finding that the Catering Establishment is secondary to the School or Synagogue or supports in any direct manner the day to day function of these uses in a tangible manner comparable to the uses listed in ZR § 12-10; and

WHEREAS, accordingly, the Board concludes that Appellant has failed to provide evidence in support of its contention that the catering establishment is incidental to either the Synagogue or the School; and

WHEREAS, as to the "customarily found" issue, DOB notes that a catering establishment that has heretofore operated as a primary UG 9 catering establishment is not customarily found in connection with either religious schools or synagogues; and

WHEREAS, again, the Board agrees with DOB; and

WHEREAS, the Board acknowledges that churches, synagogues, schools, and other institutions on occasion use space within their buildings for events on an accessory basis; and

WHEREAS, however, the Board notes that a distinction must be made between an 18,000 sq. ft. catering establishment that operates on multiple consecutive days as opposed to the occasional use of a facility's space for events; and

WHEREAS, the Board observes that this distinction is made in the ZR, which carefully separates UG 3 and UG 4 accessory uses, lawful in residential districts, from UG 9 catering establishments, commercial in nature and lawful only in commercial districts; and

WHEREAS, Appellant cites to other non-profit institutions that use space in their facilities for the contention that DOB has allowed UG 9 catering establishments to be accessory uses in other instances; and

WHEREAS, the underlying but unfounded assumption is that catered events at such institutions occur at the same frequency and intensity as at the Catering Establishment; and

WHEREAS, however, Appellant has not produced any evidence that convinces this Board that establishments comparable to the Catering Establishment are customarily found in connection with such institutions; and

WHEREAS, in particular, Appellant has offered no proof that any of the cited institutions are offering services that approximate, in frequency and intensity, the catering establishment in question; and

WHEREAS, in fact, the materials (as well as Appellant's scant discussion of them) fail to establish how many events such facilities host, who attends, the type of event, or the hours of operation; and

WHEREAS, Appellant, in a July 26, 2006 submission, provides a list of community facilities alleged to provide commercial catering, and divides this list between six "religious institutions" and five museums, gardens or institutes; and

WHEREAS, the first religious institution is the 92nd Street "Y"; while this institution advertises the availability of its spaces on its web-site, it is not clear if the frequency of events or their intensity in terms of the amount of guests rises to the level of a primary commercial occupancy, as does the Catering Establishment; and

WHEREAS, further, this facility, which combines many different uses, including lecture hall, school, performance space and health center, to name a few, is a distinct use from a religious school and synagogue, given the very different nature of operations and mission; and

WHEREAS, thus, this example does not support the conclusion that a UG 9 catering establishment is customarily found in connection with a synagogue or religious school; and

WHEREAS, Appellant then cites to Saint Bartholomew's Church; and

WHEREAS, the Board notes that this church is within a commercial zoning district where any commercial catering use would be permitted as of right; to the extent that such is offered at the church, it would be a legal primary use; and

WHEREAS, again, Appellant also fails to provide any information as to the frequency or intensity of the events held at this church; and

WHEREAS, Appellant then cites to Earl Hall of Columbia University, which like many churches makes its space available for rent for weddings and other events; and

WHEREAS, however, no evidence is provided in support of the contention that Columbia engages in catering, or as to the frequency or intensity of events; and

WHEREAS, Appellant next cites to the West Side Jewish Center, but only submits a web-site print-out describing a single mid-Summer Bar B-Q; and

WHEREAS, such evidence hardly supports the conclusion that the center is running a catering establishment; and

WHEREAS, further, as with Saint Bartholomew's Church, the center is located within a commercial zoning district where a UG 9 catering establishment would be allowed on a primary basis; and

WHEREAS, Appellant next cites to Congregation Ohab Zedek, and submits a web-site print-out describing the daily scheduled activities for a particular day; and

WHEREAS, nothing on this print-out indicates that the congregation is operating a catering establishment; and

WHEREAS, Appellant then cites to Landmark on the Park, a Universalist Church facility; and

WHEREAS, a print-out from the web-site indicates that this facility rents out its space for events; however, once again this does not mean it is running a catering establishment or that the frequency or intensity of events is comparable to the Catering Establishment; and

WHEREAS, Appellant cites next to Congregation Adereth El; and

WHEREAS, one of the many pages of web-site print-outs that Appellant submits indicates that this congregation recently added an in-house caterer; and

WHEREAS, the recent addition of the in-house caterer to this facility does not lead to the conclusion that such a use is customarily found with houses of worship; and

WHEREAS, further, Appellant once again fails to provide any information about the frequency and intensity of any catering events at this facility; and

WHEREAS, as noted above, Appellant also cites to five non-religious institutions: the City's Fire Museum, the Seaman's Institute, the American Museum of Natural History, the New York Botanical Garden, and the Museum of the City of New York; and

WHEREAS, Appellant submits web-site print-outs for the first three that indicates that they rent out space for events; and

WHEREAS, the Board observes that none of these institutions are houses of worship or religious schools; thus, whether they house a commercial catering establishment is not relevant; and

WHEREAS, further, the Fire Museum and the Seaman's Institute are in either commercial or manufacturing zoning districts, where catering is allowed; and

WHEREAS, finally, once again, Appellant fails to establish whether such facilities host events in manner comparable to what occurs at the Catering Establishment; and

WHEREAS, Appellant also cites to two other houses of worship; and

WHEREAS, first, at the initial hearing, Appellant mentioned the Temple Emmanuel at 4902 14th Avenue, Brooklyn, and claimed that the certificate of occupancy for this facility indicates that it has a catering hall; and

WHEREAS, the most recent certificate of occupancy for this facility indicates that it has a social hall and

kitchen; and

WHEREAS, however, like the other facilities cited by Appellant, this does not mean that Temple Emmanuel is operating a catering establishment similar to the one at issue here; and

WHEREAS, second, Appellant cites to the Riverside Church, which, according to web-site print-outs, provides on-site catering; and

WHEREAS, as has already been stated repeatedly, Appellant failed to provide the Board with any evidence that the catering here rises to the level of a commercial catering establishment in terms of frequency and intensity and other relevant factors; and

WHEREAS, in sum, Appellant has cited to only a few houses of worship that provide on-site catering services in a district where a UG 9 catering establishment would not be permitted, and has failed to provide any evidence that such commercial catering occurs in these houses of worship; and

WHEREAS, the Board is personally aware that there are hundreds of houses of worship in the City, and many, many more in the State; and

WHEREAS, citation to only a few potentially comparable facilities to the Catering Establishment does not allow the Board to conclude that a catering facility operating at the intensity and frequency that the Catering Establishment does is a use customarily found in connection with houses of worship; and

WHEREAS, further, Appellant has not provided a single example of a religious school that has a comparable facility as an accessory use; and

WHEREAS, most importantly, the Board observes that all of the facilities mentioned by Appellant are not before this Board; and

WHEREAS, to the extent that any of the other institutions operate UG 9 catering establishments illegally, in violation of their certificates of occupancy or zoning, this would support enforcement action by DOB, rather than a determination that such an operation is always fundamentally accessory; and

WHEREAS, accordingly, the Board concludes that Appellant has failed to provide evidence in support of its contention that catering establishments like the one in question here are customarily found in connection with schools or houses of worship; and

WHEREAS, that being said, the Board acknowledges that houses of worship often rent out their space for events; and

WHEREAS, however, the occasional use of such spaces for outside events should not be, in terms of frequency and intensity, the equivalent of the operation of a primary UG 9 commercial catering establishment; and

WHEREAS, while there admittedly may be some borderline cases where it is difficult to ascertain whether a particular house of worship is engaging in a primary commercial enterprise as opposed to the occasional accessory renting of space, such is not the case here: as noted above, the Catering Establishment is a primary use, the type of which is neither incidental to houses of worship or religious schools nor customarily found with such institutions; and

APPELLANT'S CITATION TO CASE LAW

WHEREAS, as noted above, Appellant cites to a variety of cases for the proposition that the UG 9 catering establishment may be considered an accessory use; and

WHEREAS, as a threshold matter, the Board finds that no prior determination as to what may or may not be an accessory use given a particular fact pattern will ever be prefect precedent as to a different set of facts; and

WHEREAS, however, the Board has reviewed all of these cases and finds that none of them dictate the outcome that Appellant desires; and

WHEREAS, many of the cases do nothing more than establish that generally municipalities must provide some deference in the implementation and enforcement of zoning schemes for religious and educational uses (*see generally* Cornell v. Bagniardi, 68 N.Y.2d 583 (1986)); and

WHEREAS, the Board notes that the City's zoning scheme already allows both the School and the Synagogue to be located within the subject R5 district as of right; and

WHEREAS, further, Appellant can use the cellar space for religious events so long as the use of the space is accessory to the School and/or Synagogue; and

WHEREAS, thus, the required deference is already reflected in the existing text; and

WHEREAS, in sum, the Board does not dispute that religious and educational institutions are permitted to engage in social, recreational or athletic activities that are reasonably associated with the religious or education purposes; and

WHEREAS, nevertheless, nothing in the line of cases cited by Appellant requires the Board to rewrite the ZR § 12-10 definition of "accessory use" to include catering establishments that would otherwise qualify as UG 9 commercial uses based upon actual operation; and

WHEREAS, Appellant also cites to cases that address specific accessory uses in relation to either educational or religious uses, and attempts to analogize the facts in those cases to those present in this appeal; and

WHEREAS, specifically, Appellant cites to these cases in support of the proposition that courts are liberal when assessing whether a particular use is accessory to educational and religious institutions so long as the facts support an accessory use determination; and

WHEREAS, at hearing, the Board asked Appellant to explain in greater detail why these cases had any bearing on the instant appeal; Appellant failed to do so; and

WHEREAS, the Board notes that the instant matter was brought by Appellant and is the responsibility of Appellant to argue; thus, Appellant's failure to do more than merely cite to the cases with the inclusion of a very brief one sentence synopsis compels the Board to attempt to discern what Appellant's actual argument is; and

WHEREAS, accordingly, the Board conducted its own review of these cases and finds that all of them are distinguishable; and

WHEREAS, for instance, Town of Islip v. Dowling College, 275 A.D. 366 (2000) concerned a town declaration that "catering events" held at the educational institution in question were non-permitted uses under the town zoning code; and

WHEREAS, the court disagreed, stating that the catering events "are permitted educational uses"; and

WHEREAS, the opinion does not provide detail about the frequency or duration of the "catering events", but there is no indication that the court was reviewing the operation of a catering establishment comparable to Appellant's; and

WHEREAS, because the opinion does not specify with any precision what was being reviewed, Appellant's reliance on the case as justification for the argument that it requires the Board to find that the Catering Establishment is accessory to the School or Synagogue is misplaced; and

WHEREAS, moreover, the court did not hold that the catering events were in fact accessory uses; the court instead declared that the catering events were permitted uses under the town code; the exact nature of how the court arrived at this determination is not specified; and

WHEREAS, further, the Board notes that the ZR contains a very specific and well-crafted "Accessory use" definition, and the Town of Islip case does not consider this definition; and

WHEREAS, finally, the catered events considered by the court were for students of the college; here, Appellant concedes that not all catered events are related to School students or staff or to the Synagogue's congregants; and

WHEREAS, Appellant also cites to the New York Botanical Garden decision referenced above; and

WHEREAS, in this matter, the court upheld a Board determination that a university's radio station was permitted a 480-ft. radio tower as an accessory educational use; and

WHEREAS, the court upheld the Board's determination that high-power radio stations and towers were both incidental to, and customarily found in connection with, college campuses in New York and elsewhere in the United States; and

WHEREAS, as established above, Appellant did not provide any evidence that the Catering Establishment is an incidental use to the School or Synagogue, nor any evidence that such a catering establishment is customarily found in other religious schools or houses of worship, either in the City, New York State, or elsewhere in the United States; and

WHEREAS, the Board also notes that a radio tower has an inextricable accessory relationship to a college radio station, and therefore to the educational mission of the college; and

WHEREAS, the Catering Establishment has no such connection to the mission of the School or the Synagogue; and

WHEREAS, Appellant next cites to Greentree at Murray Hill Condominium v. Good Shepard Episcopal Church, 146 Misc. 2d 500 (1989); and

WHEREAS, in this case, the court found that a church-run shelter for ten homeless men could properly be characterized as an accessory use under ZR § 12-10; and

WHEREAS, the court cited to other cases where social and recreational activities of a religious institution were found to be accessory uses; and

WHEREAS, the Board understands that if the School or Synagogue were to shelter homeless individuals in the cellar of the Building, the Greentree case would have some applicability to a determination as to whether such use was accessory; and

WHEREAS, however, the temporary shelter of ten homeless men is not analogous to the approximately 150 catered events, with approximately 400 guests, that occur at the Catering Establishment on a yearly basis; and

WHEREAS, thus, the Board concludes that the Greentree case is distinguishable; and

WHEREAS, Appellant also cites to Flagg v. Murdock, 172 Misc. 1048 (1939); and

WHEREAS, in this case, the court found that a dancing school within a residential building in a residence zone was actually a school for purposes of the zoning code then in effect, and was thus permitted as a primary use; and

WHEREAS, ironically, the Flagg court also addressed six commercial uses present in the same residential building: a barbershop, a dress shop, a gift shop, a shoe repair shop, a tailor shop, a restaurant, and a beauty parlor; and

WHEREAS, such uses were not permitted in the residence district, so the operators of certain of these uses argued that they were accessory to the residential use since they served the occupants of the building; and

WHEREAS, the court rejected this argument, noting that such business uses were not permitted as an accessory use by the zoning code then in effect; and

WHEREAS, again, the Board finds that this case does not support Appellant's position; rather, it is contrary to it; and

WHEREAS, Appellant then cites to four out-of-state cases; and

WHEREAS, the Board finds that these cases are not particularly good precedent, since none of them concern ZR § 12-10 ("Accessory use") or the case law of this state; thus, it is unnecessary to examine them; and

WHEREAS, however, in passing, the Board observes that none of the cases concern a commercial catering establishment alleged to be operating at the intensity and frequency of the establishment in question; and

WHEREAS, in sum, the Board finds that none of the cases cited by Appellant require the Board to deem the Catering Establishment an accessory use to the School or Synagogue; and

APPELLANT'S REFERENCE TO "BINGO/LAS VEGAS NIGHT" EVENTS

WHEREAS, Appellant argues that since non-profit institutions can conduct bingo and "Las Vegas night" events on an accessory basis in order to raise money for charitable purposes, the Catering Establishment must also be deemed an accessory use; and

WHEREAS, despite repeated requests by the Board to provide a more detailed explanation, a review of Appellant's submissions and statements made at hearing reveals that this argument was never substantiated; and

WHEREAS, instead, Appellant submitted documentation in purported support of the argument without explanation; and

WHEREAS, for example, Appellant submitted lists of entities that are authorized by the State of New York to conduct such activities; and

WHEREAS, what Appellant failed to submit was any information as to how many of these entities in fact engaged in bingo or Las Vegas nights, and if so, to what extent; and

WHEREAS, thus, at most, the lists do nothing more than establish that numerous entities throughout the State seek approval for bingo or Las Vegas night activities; and

WHEREAS, Appellant also cites to a DOB letter, dated September 28, 1978, which reads in pertinent part "[p]lace of Assembly permits have been issued for bingo only where premises can be lawfully occupied as meeting halls, whether as a primary use (Use Group 6 in the Zoning Resolution), or accessory to a primary use such as a church, synagogue, non-profit intuition, etc. on the same site. Games of chance may be substituted for bingo only when such use was clearly on the same site, and accessory to, such primary uses as churches, synagogues, etc. When not accessory to such a primary use, a premises devoted exclusively to 'games of chance' as an alternate to bingo (meeting halls) can become indistinguishable from amusement arcades and the like, posing a problem for ... communities in general . . . Obviously, in such instances, a new certificate of

occupancy should be obtained (if the Zoning Resolution so permits) after the filing of an Alteration application, and a new P.A. permit obtained predicated on such new use."; and

WHEREAS, while this letter indicates that bingo and gaming nights may be accessory to religious institutions, it does not state that they are always accessory to religious institutions; and

WHEREAS, instead, the letter indicates that such uses may not always be accessory, and if they are not, they must be legalized if possible; and

WHEREAS, nothing in this letter suggests that DOB cannot or will not scrutinize each particular instance of bingo or gaming nights in order to determine if such use is accessory; and

WHEREAS, nonetheless, Appellant argues that because of this letter, the Catering Establishment must be recognized as accessory by DOB as well; and

WHEREAS, presumably, Appellant believes that there is no difference between hosting a bingo or Las Vegas night and the operation of a catering establishment; and

WHEREAS, however, DOB states, and the Board agrees, that the 1978 letter does not give non-profit institutions the ability to conduct bingo or Las Vegas nights to whatever degree is desired; and

WHEREAS, DOB states that it would allow occasional use of non-profit facilities  for such activities provided that they were intended primarily for participation by members of the non-profit; and

WHEREAS, here, the information provided by Appellant indicates that the Catering Establishment is in operation on a daily or near-daily basis many times during the year, and serves not just individuals with a direct relation to the School and Synagogue, but members of the larger Jewish community, in New York City and elsewhere; and

WHEREAS, additionally, another relevant factor is the frequency of the activity; and

WHEREAS, DOB states that it would allow bingo or Las Vegas nights one to two nights per week, which means that a non-profit could engage in such nights a total of 52 to 104 times per year;  and

WHEREAS, however, such activities would not occur every night for weeks at a time; and

WHEREAS, nor would such activities be the equivalent of a primary commercial use, as the Catering Establishment is; and

WHEREAS, finally, the Board notes that Appellant believes that bingo and Las Vegas nights are purely revenue producing events, and therefore are clearly not incidental to the principal use; and

WHEREAS, assuming that Appellant is correct, then analogy to such events provides no guidance, since such uses would not meet the definition of "accessory use"; and

WHEREAS, again, the Board reiterates that the categorization of a use as accessory is a fact-intensive inquiry that depends on a variety of factors specific to each institution and each proposed accessory use, as well as the surrounding neighborhood; and

WHEREAS, thus, the Board finds that DOB has no authority to predetermine whether a particular use is accessory in all circumstances, and further finds that the 1978 letter cannot be read in this manner; and

WHEREAS, instead, like the listing of accessory use examples set forth in ZR § 12-10, the 1978 letter is merely a guideline, useful to DOB in determining what should occur when a bingo or gaming night use fails to meet the test for accessory use; and

WHEREAS, in sum, the ability of institutions to engage in occasional bingo nights or other recreational activities on an accessory basis does not mandate that the Board find that the Catering Establishment is an accessory use; and

APPELLANT'S REFERENCE TO THE BOARD'S PRIOR DETERMINATION

WHEREAS, during the hearing process, Appellant discussed a prior Board decision made under BSA Cal. No. 121-00-A; and

WHEREAS, in this matter, the Board considered: (1) whether the construction of a 3,000 seat baseball facility for St. John's University (the "University") was an accessory use to the University; and (2) whether the time-limited use of the baseball facility by a professional baseball team negated the accessory use status; and

WHEREAS, as reflected in its resolution, dated June 27, 2000, the Board concluded that the facility was an accessory use and that the time-limited use of the facility by a professional team did not compromise the status of the field as an accessory use; and

WHEREAS, the Board based its conclusion as to the second issue, in part, on evidence that colleges and universities elsewhere rented out their athletic facilities to professional sports teams; and

WHEREAS, the Board also noted that the use of the facility by the professional team was part of an arrangement between the University, the professional team, and the City's Economic Development Corporation

("EDC"); and

WHEREAS, the Board's determination was subsequently upheld in court (*see* Padavan v. City of New York, Index No. 26763/98 (July 20, 2000)); and

WHEREAS, Appellant argues that the Board's decision as to the University compels a finding that the Catering Establishment is an accessory use to the School; and

WHEREAS, Appellant claims that since the baseball facility would be rented out to a professional team and apparently used by community groups and not just the University, the Board was in effect holding that not all use of accessory facility must relate directly to the primary uses; and

WHEREAS, as an initial matter, the Board must once again point out that prior accessory use determinations on a set of facts entirely different than those present here are not binding nor particularly helpful in determining whether the Catering Establishment is an accessory use; and

WHEREAS, the Board is not considering whether the School may create a field for its baseball team (presuming it has one) nor whether, if such a field was built, it could be rented out to a commercial sports league on a time-limited basis; and

WHEREAS, as noted above, the factors evaluated in a particular accessory use question will vary depending on the use; and

WHEREAS, here, the Board is presented with a catering facility that, by Appellant's own admission, hosts approximately 75 events per year, both historically and going forward, that have no relation whatsoever to the School or Synagogue; and

WHEREAS, in the case involving the University, the use of the field by the professional team was limited to 38 home games, practices and perhaps some playoff games, only for a maximum two-year period, while the field would actually be in service for University purposes for at least seven years; and

WHEREAS, further, the Board was satisfied that such professional use of the field was customarily found in connection with institutions of higher learning; and

WHEREAS, here, Appellant has not established that other houses of worship customarily conduct catering activities unrelated to the institution to the extent that the Catering Establishment does; and

WHEREAS, Appellant also suggests that the Board's prior determination was unfounded because there is actually no basis to conclude that colleges and universities actually lease their facilities to professional sports teams such that it can be considered customary; and

WHEREAS, since the prior Board did make this finding and since this was upheld by a court, the Board declines to revisit the issue now; and

WHEREAS, in any event, Appellant has no standing to challenge this determination; and

WHEREAS, in sum, the Board does not find that its prior decision is determinative of the matter at hand; and

THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

WHEREAS, finally, Appellant appears to suggest that the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), a federal law, requires that the Board grant this appeal; and

WHEREAS, RLUIPA provides that no government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest; and

WHEREAS, first, the Board observes that regardless of whether the Board finds that the Catering Establishment is an accessory use, the School and the Synagogue are permitted uses under the R5 zoning district regulations, and may remain legally on the site; and

WHEREAS, further, Appellant is free to hold, and eve., charge money for events, in the cellar to the extent that they are accessory; and

WHEREAS, there is simply no evidence that would support the conclusion that the Board, in denying this appeal, is imposing a substantial burden on or even interfering with the exercise of religious freedom or religious practices of the School or the Synagogue; and

WHEREAS, Appellant's contention that the School and the Synagogue would not be able to cover expenses without the on-site Catering Establishment, even if proved to be a fact, does not lead to a contrary conclusion; and

WHEREAS, further, it is difficult for the Board to understand why RLUIPA should function to

support an otherwise unsupportable accessory use determination in order to support a revenue stream for a religious entity that is unable to support its non-commercial uses through traditional means; and

WHEREAS, accordingly, the Board declines to apply RLUIPA in the novel way that Appellant suggests; and

WHEREAS, the Board observes that the court in Episcopal Student Foundation vs City of Ann Arbor, 341 FSupp2d 691 (ED Michigan 2004) held that zoning regulations that imposed financial burdens on a church do not constitute substantial burdens under RLUIPA; and

WHEREAS, thus, even if the Catering Establishment is required to be relocated at a cost, or if the activities conducted there are limited to events that are accessory to the School or Synagogue, with a resulting decrease in revenue, this is not a substantial burden under RLUIPA; and

WHEREAS, in addition, the Episcopal Student Foundation court held that a zoning ordinance does not infringe on the free exercise of religion where religious activity can occur elsewhere in the municipality; and

WHEREAS, thus, even if the operation of the Catering Establishment can properly be characterized as religious in nature (despite its status under the ZR as a commercial use), since it is allowed in certain commercial zoning districts that are mapped liberally throughout the City, including in the vicinity of the subject site, Appellant's alleged free exercise rights are not compromised; and

CONCLUSION

WHEREAS, in sum, the Board has reviewed the record and finds that the Catering Establishment as currently operating is not an accessory use to either the School or the Synagogue; and

WHEREAS, accordingly, the Final Determination must be upheld and this appeal must be denied; and

WHEREAS, in so concluding the Board notes the following: (1) this determination does not render the School or Synagogue illegal in any respect; (2) the cellar may still be used as a cafeteria in conjunction with the School; (3) events that are accessory to the School and/or Synagogue may be held in the cellar pursuant to the approval of DOB and in accordance with this decision.

*Therefore it is Resolved* that this appeal, which challenges a Department of Buildings final determination dated March 31, 2006 issued by the Brooklyn Borough Commissioner, is denied.

Adopted by the Board of Standards and Appeals, January 9, 2007.

**290-05-BZ**
APPLICANT – Stuart A. Klein, for Yeshiva Imrei Chaim Viznitz, owner.
SUBJECT – Application September 19, 2005 and updated April 19, 2006 – Variance pursuant to Z.R. §72-21 to permit a catering hall (Use Group 9) accessory to a synagogue and yeshiva (Use Groups 4 and 3). The site is located in an R5 zoning district.
PREMISES AFFECTED – 1824 53rd Street, south side, 127.95' east of the intersection of 53rd and 18th Avenue, Block 5480, Lot 14, Borough of Brooklyn.
**COMMUNITY BOARD #12BK**
APPEARANCES –
For Applicant: Stuart A. Klein.
**ACTION OF THE BOARD** – Application denied.
THE VOTE TO GRANT –
Affirmative: …………………................................................0
Negative: Chair Srinivasan, Vice Chair Collins and Commissioner Ottley-Brown.......................................3
THE RESOLUTION:
    WHEREAS, the decision of the Brooklyn Borough Commissioner, dated February 28, 2006, acting on Department of Buildings Application No. 301984342, reads in pertinent part:
    "Proposed Catering Use (UG 9) is not permitted in an R5 Zone"; and
    WHEREAS, this is an application under ZR § 72-21 to permit, within an R5 zoning district, the use of the cellar of a three-story building for a Use Group ("UG") 9 catering establishment, which is contrary to ZR § 22-00; and
    WHEREAS, the appeal was brought on behalf of Yeshiva Imrei Chaim Viznitz, a not for profit religious institution (hereinafter "Applicant"), the owner of the building at the subject premises; and
    WHEREAS, a public hearing was held on this application on June 13, 2006 after due notice by publication in *The City Record*; and
    WHEREAS, a continued hearing was held on August 15, 2006, on which date the hearing was closed and decision was set for September 19, 2006; and
    WHEREAS, at the request of Applicant, the decision date was deferred to September 26, 2006; and
    WHEREAS, the Board reopened the hearing on this date, but Applicant's counsel was unable to attend; and
    WHEREAS, decision was deferred to October 24, 2006; and
    WHEREAS, the matter was again reopened on October 24, and a continued hearing date was set for November 21, 2006; and
    WHEREAS, a continued hearing was held on November 21, and a decision was set for January 9, 2007; and
    WHEREAS, the site was inspected by a committee of the Board; and
    WHEREAS, the Board also notes that at the request of Applicant, the Board's counsel and staff met with Applicant during the hearing process to provide suggestions on how to approach the application; and
    WHEREAS, Community Board 12, Brooklyn, recommends approval of this application, on condition that the catering use at the premises close by 1 am and that Applicant consult with elected officials and the Community Board to address traffic concerns on the subject block; and
    WHEREAS, certain neighbors appeared and made submissions in opposition to this application; and
    WHEREAS, many members of the broader Viznitz community appeared in support of the application; and
    WHEREAS, in addition, Applicant provided letters from other individuals supporting the application; and
    WHEREAS, the Board notes that while Applicant claimed to have the support of certain elected officials, no elected official appeared at hearing and no letters of support from elected officials were submitted; and
    WHEREAS, the subject premises is located in an R5 residential zoning district on 53rd Street between 18th and 19th Avenues and is currently improved upon with a three-story with cellar building (the "Building"); and
    WHEREAS, the Building is across the street from and adjacent to numerous two-story semi-detached dwellings; and
    WHEREAS, Certificate of Occupancy No. 300131122, issued for the Building on May 26, 1999 (the "CO"), lists the following uses: (i) UG 4 assembly hall and kitchen and UG 9 catering use in the cellar; (ii) UG 4 synagogue and UG 3 classrooms on the first and second floors; and (iii) UG 3 classrooms on the third floor; and
    WHEREAS, this CO was the subject of a 2005 application by DOB, who sought to revoke or modify it pursuant to City Charter §§ 666.6(a) and 645(b)(3)(e), on the basis that the CO allows conditions at the referenced premises that are contrary to the Zoning Resolution and the Administrative Code; and

WHEREAS, DOB argued that the catering use did not possess lawful non-conforming UG 9 status and was therefore illegal; and

WHEREAS, specifically, DOB suggested that the prior UG 16 use on which the status of the UG 9 designation was predicated had been discontinued for more than two years and that the prior building housing this use had been demolished; DOB contended that this had not been revealed by the permit applicant; and

WHEREAS, under either circumstance, DOB alleged that there is no legal basis for a UG 9 catering establishment designation on the CO for the cellar of the Building; and

WHEREAS, a public hearing was held on DOB's application on May 17, 2005, but before the next continued hearing, Applicant obtained a court order, dated July 8, 2005, enjoining the Board from acting on the application and from conducting further proceedings on it; and

WHEREAS, this court order also directs Applicant to file a variance application at the Board; and

WHEREAS, months later, Applicant filed the instant variance application; and

WHEREAS, Applicant also filed an appeal of a DOB determination that the UG 9 catering use in the cellar was not a UG 3 school or UG 4 synagogue accessory use, under BSA Cal. No. 60-06-A; and

WHEREAS, since the two matters were filed at the same time and both concerned the use of the Building's cellar for commercial catering purposes, the Board, with the consent of all parties, heard the cases together and the record is the same; and

WHEREAS, Applicant states that the Building currently contains a UG 3 religious school for approximately 625 boys (the "School"), a UG 4 synagogue space (the "Synagogue"), and a UG 9 catering establishment that serves the needs of the broader orthodox Jewish community in the vicinity of the site (the "Catering Establishment"); and

WHEREAS, the Synagogue is located on parts of the first and second floor mezzanine; and

WHEREAS, specifically, as illustrated on the plans for the first floor submitted by Applicant, stamped May 5, 2006, the first floor Synagogue space is for men, and adjoins a classroom with a removable partition; it is approximately 1,900 sq. ft.; and

WHEREAS, the second floor Synagogue space is for women, and is 1,380 sq. ft; and

WHEREAS, Applicant states that the Synagogue is attended by approximately 300 people on the Sabbath, and approximately 100 people and approximately 400 students on weekdays; and

WHEREAS, the remainder of the first and second floors, and the entirety of the third floor, appear to be occupied by the School's classrooms and other School-related spaces; and

WHEREAS, Applicant claims that the School serves many economically disadvantaged children, and that 85 percent of the children receive government-sponsored school lunch money; and

WHEREAS, both the School and Synagogue are permitted uses in the subject R5 zoning district; and

WHEREAS, the Catering Establishment, which is not a permitted use in the subject R5 zoning district, was listed on the CO on the alleged basis that it is a lawful non-conforming use, as discussed above; and

WHEREAS, the Catering Establishment is located in the cellar of the Building; the same cellar space is also apparently used for the School's cafeteria and assembly hall; and

WHEREAS, the Catering Establishment occupies approximately 18,000 sq. ft. of floor space in the cellar, with a primary event space, two adjoining lobbies and bathroom areas (one for men and one for women), as well as two kitchens; and

WHEREAS, the record indicates that the Catering Establishment has separate management and staff from the School and separate entrances with awnings reflecting the business name, that the food for events is made on the premises, that a guard is provided from 6 pm to 12 pm to assist with guest parking, and that waiters and busboys are hired on an "as needed" basis; and

WHEREAS, Applicant alleges that most events are held from approximately 6 pm to 12 am, and that 90 percent of the guests leave the Building at 11:30 pm; and

WHEREAS, Applicant states that ceremonies (held under Chuppahs, which look like canopies) related to the catered events are often conducted outside; and

WHEREAS, Applicant alleges that attendance at each event ranges between 340 and 400 people, though evidence submitted by Applicant indicates that some events are scheduled to have at least 500 guests; and

WHEREAS, Applicant provided information revealing that 166 events were held in 2004, and 154 events were held in 2005; and

WHEREAS, Applicant states that the catered events are offered at reduced rates relative to other catering establishments, with weddings costing approximately 25 dollars per plate; and

WHEREAS, members of the broader Viznitz community stated that the reduced rates were attractive to members of the larger orthodox and Hasidic Jewish community in Brooklyn; and

WHEREAS, these same members stated that the Catering Establishment serves the needs of this community; and

WHEREAS, the Catering Establishment has a license from the Department of Consumer Affairs for a catering establishment; and

WHEREAS, the Board notes that the Catering Establishment advertises in the Verizon Yellow Pages (both on-line and in print) under the listing "Banquet Facilities" as "Ohr Hachaim Ladies" and "Ohr Hachaim Men", with the address and phone number listed; and

WHEREAS, Applicant does not address the Verizon Yellow Pages advertisement, but in its last submission alleges that it does not pay for similar advertising that apparently runs in the Borough Park Community Yellow Pages, does not desire this advertising, and has informed the publisher of the Borough Park Community Yellow Pages to stop running the advertisements; and

WHEREAS, the applicant, in sum and substance, represents that the finding set forth at ZR § 72-21(a) may be satisfied in the case of a applicant that is a non-profit religious entity solely with evidence that that the requested waiver is necessary because of a programmatic need of the religious entity; and

WHEREAS, ZR § 72-21(a) requires that the Board find that the applicant has submitted substantial evidence of unique physical conditions related to the site that create practical difficulties or unnecessary hardship in using the site in strict conformance with the applicable use regulation; and

WHEREAS, Applicant claims that the Catering Establishment satisfies a religious duty on the part of the broader Viznitz community and also provides a funding stream for the costs of operating the Synagogue and School that cannot be offset by tuition and donations alone; and

WHEREAS, Applicant claims that the Viznitz community totals about 6,500 members, but the Board notes that there is nothing in the record specifying where these 6,500 members reside; and

WHEREAS, moreover, the Board notes that there is nothing in the record to suggest that all 6,500 members of the Viznitz community cited by Applicant are regular members of the Synagogue or students or family members of students of the School; and

WHEREAS, in fact, the Board observes that the Synagogue attendance figures and School enrollment figures provided by Applicant would belie any such claim; and

WHEREAS, nevertheless, Applicant claims that there is a direct relationship based upon programmatic need between the School and the Synagogue and the Catering Establishment; and

WHEREAS, the Board recognizes that many variances it has granted in the past to religious or educational institutions have been predicated, in part, on the programmatic needs of the institution; and

WHEREAS, further, the Board does not question the sincerity of Applicant's belief that the provision of space for weddings, receptions, and other life events in general fulfills a religious need, nor the veracity of the contention that the revenue raised from the catering function is used in part for School and Synagogue purposes; and

WHEREAS, however, the Board does not consider either of the two alleged programmatic needs to be the equivalent of the type of programmatic need that can justify a use variance at this location; and

WHEREAS, first, as to the question of fulfillment of religious duty, while Applicant has claimed that in the Jewish faith there is a custom of incorporating wedding festivities as part of the marriage ritual, no explanation has been given as to how such a custom justifies the location of a UG 9 commercial catering establishment in a zoning district where it is not allowed; and

WHEREAS, the Board observes that Applicant has not made any credible claim that the lawful existence or operation of the School or the Synagogue depends on the existence of a UG 9 catering establishment within the Building; and

WHEREAS, the Board further observes that both the Synagogue and the School are as of right uses, and no claim is made that the Building's square footage is somehow incapable of accommodating the current congregation and enrollment absent the presence of the Catering Establishment; and

WHEREAS, the Board notes that Applicant has not claimed that the Synagogue is used during all catered events; and

WHEREAS, to the contrary, Applicant indicated during the hearing process that most of the celebrants prefer to have the ceremony outside in a Chuppah; and

WHEREAS, specifically, in its July 11, 2006 submission, Applicant notes that the usual schedule for a catered event features a Chuppah, which is held outdoors when possible; and

WHEREAS, further, Applicant has not provided any credible evidence that the School has any operational integration whatsoever with the Catering Establishment; and

WHEREAS, most importantly, the Board notes that it is not the School or Synagogue use that is generating the alleged programmatic need; rather, as conceded on multiple occasions by Applicant, the need appears to arise from general demand for low-cost catered events from the broader Hasidic and orthodox Jewish community in Brooklyn, regardless of any connection to the School or Synagogue; and

WHEREAS, a letter from another caterer, submitted to the Board by Applicant, confirms that the

alleged programmatic need has nothing to do with the School or the Synagogue; this letter specifically states "[i]f the [Catering Establishment] would cease to function, it would cause much hardship to the Boro Park Community"; and

WHEREAS, the Board has never granted a variance based on such a broad-based need that is non-specific to the religious institution making the application and occupying the site; instead, the Board looks for a clear nexus between the requested variance and the specific programmatic needs of the institution on the site; and

WHEREAS, the Board observes that none of the cases cited by Applicant in its submission require the Board to grant the requested variance; and

WHEREAS, nor do any of the Board's prior decisions cited by Applicant in its initial submission; and

WHEREAS, three of these prior decisions were for bulk variances, needed by congregations in order to create a building with sufficient square footage to accommodate increased attendance; none of them were commercial use variances for a catering establishment; and

WHEREAS, the record also contains mention of two other occasions on which the Board has considered an application for a commercial catering variance: (1) BSA Cal. No. 194-03-BZ, concerning 739 East New York Avenue, Brooklyn, decided on December 14, 2004; and (2) BSA Cal. No. 136-96-BZ, concerning 129 Elmwood Avenue, Brooklyn, decided on June 3, 1997; and

WHEREAS, first, the Board notes that generally prior variances are not viewed as precedent for future applications; and

WHEREAS, instead, because each variance is based upon special circumstances relating to the site for which it is proposed, the past grant or denial of variances for other properties in the area does not mandate similar action on the part of the Board; and

WHEREAS, second, even assuming that past grants do function as binding precedent, the Board finds that both of these matters are distinguishable from the instant matter, and support the Board's rejection of it; and

WHEREAS, in the East New York Avenue matter, the applicant, a religious school, originally attempted to argue that the variance could be predicated on the alleged programmatic need of creation of a revenue stream for the school; and

WHEREAS, however, the Board rejected this argument, and instructed the applicant to approach the case as if it were a for-profit applicant, since the proposed use was UG 9 commercial catering that would serve the larger community; and

WHEREAS, thus, the applicant was required to establish that the site presented a unique physical condition and to submit a feasibility study in order to establish hardship; and

WHEREAS, as reflected in the resolution for that matter, the applicant was able to meet these requirements and the variance was granted; and

WHEREAS, as conceded by Applicant at the August 15, 2006 hearing, there is no such uniqueness present at the subject site or as to the Building; and

WHEREAS, accordingly, Applicant did not even attempt to make a similar argument in this proceeding, but instead attempted to argue the application based solely on programmatic needs; and

WHEREAS, in the Elmwood Avenue matter, the applicant, another religious school, applied to the Board for multiple bulk waivers related to the proposed construction of a religious school on a site split by M1-1, R3-1 and R5 zoning district boundaries; and

WHEREAS, the applicant applied for a use variance for the school in the M1-1 zoning district, and also for various height, setback and rear yard requirements; and

WHEREAS, as initially argued by the applicant, the site suffered a hardship due to irregular shape, substandard depth, grade condition and adjacency to a railroad cut; and

WHEREAS, a catering hall was also proposed, though initially the applicant did not request a use variance for it; and

WHEREAS, instead, the catering hall was proposed to be located entirely within the M-1 zoning district, on an as of right basis; and

WHEREAS, however, during the course of the hearing process, the applicant revealed that the kitchen for the catering facility (which was also the kitchen for the school) was partially within the residential zone; and

WHEREAS, accordingly, a use variance for this small portion of the catering facility was required; and

WHEREAS, the Board asked that the applicant attempt to isolate the catering use to the M1-1 zoning district through the erection of a wall in the cellar; and

WHEREAS, the applicant explained that the site was split by a district boundary, and it was this

unique physical condition that caused the need for the small use waiver for the catering establishment; and

WHEREAS, the Board observes that it was only the presence of the district boundary line that caused the need for a minor use variance for the kitchen; and

WHEREAS, the resolution for this matter also cites to the irregular shape and narrow depth of the site as the cause of the practical difficulties and unnecessary hardship; and

WHEREAS, as noted above, the subject site suffers no unique physical hardship, a fact conceded by Applicant; and

WHEREAS, in sum, neither of the two prior commercial catering variance applications require the Board to grant the requested variance here, since they were predicated on the site's actual physical uniqueness; and

WHEREAS, in addition to the guidance that these two cases provide, the Board notes that when it grants applications from religious and educational institutions for variances based upon programmatic need, it routinely places conditions in said grants to prohibit commercial catering within the schools or places of worship; and

WHEREAS, the applicants in such cases accept this condition without question, and agree to make only accessory use of the spaces within the buildings; rarely if ever do applicants argue, as has Applicant here, that unrestricted UG 9 commercial catering is a programmatic need; and

WHEREAS, the second claimed programmatic need is that income from the Catering Establishment is purportedly used to support the School and Synagogue and that the School and Synagogue would close without this income; and

WHEREAS, the Board again disagrees that this is the type of programmatic need that can be properly considered sufficient justification for the requested use variance; and

WHEREAS, while the Board recognizes that the Applicant believes that the School and Synagogue are important to the broader Jewish community in Brooklyn, it is not required on this basis to grant a use variance for a commercial use on the same site as the School and Synagogue; and

WHEREAS, were it to adopt Applicant's position and accept income-generation as a legitimate programmatic need sufficient to sustain a variance, then any religious institution could ask the Board for a commercial use variance in order to fund its schools, worship spaces, or other legitimate accessory uses; and

WHEREAS, again, none of the case law or prior Board determinations cited by Applicant stand for this proposition; and

WHEREAS, the Board observes, in fact, that the East New York Avenue case is a repudiation of Applicant's unfounded contention; and

WHEREAS, further, the Board observes that such a theory, if accepted, would subvert the intent of the ZR's distinction between community facility uses, which are allowed in residential districts, from commercial uses, which are not; and

WHEREAS, the Board notes that UG 9 catering establishments are only permitted in commercial zoning districts, and, pursuant to ZR § 32-18, is the type of commercial use that provides "primarily . . . business and other services that (1) serve a large area and are, therefore, appropriate in secondary, major or central commercial shopping areas, and (2) are also appropriate in local service districts, since these are typically located on the periphery of major secondary centers"; and

WHEREAS, the Board further observes that the goals of the commercial regulations in the ZR include the protection of nearby residences against congestion that can result from commercial uses; and

WHEREAS, Appellant has offered no justification for its blanket assertion that a primary commercial use should be permitted in a residential district anytime a religious institution desires to generate revenue by engaging in commercial activity; and

WHEREAS, based on the above, the Board finds that Applicant has failed to establish that it has a programmatic need that requires the requested variance; and

WHEREAS, in a later submission, Applicant also argued that it was entitled to the proposed use variance based upon its good faith reliance on the DOB-issued permit that precipitated the issuance of the CO; and

WHEREAS, Applicant claims that it spent "millions" of dollars constructing the Building and then "hundreds of thousands" more subsequent to the issuance of the CO; and

WHEREAS, the record is devoid of any evidence of these expenditures or the precise amount, but even if such had been established, the Board notes that the Building includes the School and the Synagogue, as well as a cellar that can lawfully be used as the School's cafeteria and for other accessory uses; and

WHEREAS, thus, all such expenditures would not be wasted; and

WHEREAS, additionally, since Applicant has had the benefit of the Catering Establishment since the CO was issued, consideration of the cumulative financial gain over the last seven years would be a relevant consideration;  Applicant did not engage in this analysis however; and

WHEREAS, even had expenditures been proven and discussed in any comprehensible manner by Applicant, the Board observes that the good faith reliance doctrine is not a categorical substitute for uniqueness or hardship; and

WHEREAS, rather, expenditure made in good faith reliance upon a permit is merely one of the factors that may be considered by the Board, and physical uniqueness is still relevant; and

WHEREAS, as noted above, Applicant concedes that the site and the Building present no unique physical features; instead, the site is regular in size and shape, and the Building is recently constructed and not obsolete as a school or synagogue building; and

WHEREAS, again, the site itself does not present any hardship; and

WHEREAS, additionally, Applicant made no attempt to establish that the purported reliance was made in good faith; and

WHEREAS, the Board notes that it is Applicant's responsibility to convince the Board that the permit and CO were obtained with all relevant facts being disclosed to DOB by the owner of the premises and the filing professional who obtains the permit; and

WHEREAS, here, the record contains no evidence that this responsibility was met; and

WHEREAS, in sum, the Board notes that Applicant failed to present any evidence as to alleged good faith reliance that would allow it to fully determine this claim, notwithstanding the fact that the Board stood ready to consider such evidence; and

WHEREAS, finally, Applicant suggests that the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), a federal law, requires that the Board issue the requested variance; and

WHEREAS, RLUIPA provides that no government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest; and

WHEREAS, first, the Board observes that whether the Board grants the variance or not, the School and the Synagogue are permitted uses under the R5 zoning district regulations and may remain legally on the site; and

WHEREAS, further, as expressed in the resolution for the companion appeal, Applicant is free to hold, and charge money for, events in the cellar to the extent that they are accessory to the School or Synagogue; and

WHEREAS, there is no evidence that would support the conclusion that the Board, in denying this variance application, is imposing a substantial burden on or even interfering with the exercise of religious freedom or religious practices of the School or the Synagogue; and

WHEREAS, Applicant's contention that the School and the Synagogue would not be able to cover expenses without the on-site Catering Establishment, even if proved to be a fact, does not lead to a contrary conclusion; and

WHEREAS, additionally, it is difficult for the Board to understand why RLUIPA should function to support the granting of a commercial use variance in order to support a revenue stream for a religious entity that is unable to support its non-commercial uses through traditional means; and

WHEREAS, accordingly, the Board declines to apply RLUIPA in the novel way that Applicant suggests; and

WHEREAS, further, the Board notes that the court in Episcopal Student Foundation vs. City of Ann Arbor, 341 FSupp2d 691 (ED Michigan 2004) held that that zoning regulations that imposed financial burdens on a church do not constitute substantial burdens under RLUIPA; and

WHEREAS, thus, even if the Catering Establishment is required to be relocated at a cost, or if the activities conducted there are limited to events that are accessory, with a resulting decrease in revenue, this is not a substantial burden under RLUIPA; and

WHEREAS, in addition, the Episcopal Student Foundation court held that a zoning ordinance does not infringe on the free exercise of religion where religious activity can occur elsewhere in the municipality; and

WHEREAS, thus, even if the operation of the Catering Establishment can properly be characterized as religious in nature (despite its status under the ZR as a commercial use), since it is allowed in commercial zoning districts that are mapped liberally throughout the City, Applicant's alleged free exercise

rights are not compromised; and

WHEREAS, in sum, the Board finds that all of Applicant's arguments as to why the finding set forth at ZR § 72-21(a) is met or why the request for the variance is otherwise justified are without merit; and

WHEREAS, because Applicant has failed to provide substantial evidence in support of this finding or persuade the Board as to why the finding should be overlooked, consideration of the remaining findings is unnecessary; and

WHEREAS, however, merely because this application was fundamentally flawed and poorly presented does not mean that the Board is blind to the concerns of Applicant; and

WHEREAS, the Board again observes that Applicant can use the cellar legally for accessory purposes; and

WHEREAS, further, if Applicant determines that it must engage in commercial catering activities, there is no reason why these activities may not occur on a site that is commercially zoned; the income that is generated can still be used to support the School and Synagogue; and

WHEREAS, the Board finds that these alternative measures will enable Applicant to pursue its proposed catering use in full compliance with the law without incurring excessive additional costs.

*Therefore it is Resolved* that the decision of the decision of the Brooklyn Borough Commissioner, dated February 28, 2006, acting on Department of Buildings Application No. 301984342 is upheld and this variance application is denied.

Adopted by the Board of Standards and Appeals, January 9, 2007.

**54-05-A**

APPLICANT – NYC Department of Buildings.

OWNER OF PREMISES: Yeshiva Imrei Chaim Viznitz.

SUBJECT – Application March 4, 2005 – Application to revoke Certificate of Occupancy No. 300131122, on the basis that the Certificate of Occupancy allows conditions at the subject premises that are contrary to the Zoning Resolution and the Administrative Code.

PREMISES AFFECTED – 1824 53rd Street, southeast corner of 18th Avenue, Block 5480, Lot 14, Borough of Brooklyn.

**COMMUNITY BOARD #12BK**

APPEARANCES –

For Applicant: Angelina Martinez-Rubio.

**ACTION OF THE BOARD** – Appeal granted

THE VOTE TO GRANT –

Affirmative:   Chair   Srinivasan,   Vice-Chair   Collins   and   Commissioner   Ottley-Brown ............................3

Recused: Commissioner Hinkson.........................1

Negative:.................................................................0

THE RESOLUTION:

WHEREAS, the Department of Buildings ("DOB") seeks to modify Certificate of Occupancy Number 300131122 (the "Current CO"), issued to the subject premises on May 26, 1999, on the basis that it improperly authorizes a non-conforming commercial use that had been discontinued for over two years in a building located in an R5 zoning district; and

WHEREAS, the Current CO reflects the following uses: (i) Use Group ("UG") 4 assembly hall and kitchen and UG 9 catering use in the cellar; (ii) UG 4 synagogue and UG 3 classrooms on the first and second floors; and (iii) UG 3 classrooms on the third floor; and

WHEREAS, the premises is owned and occupied by the Yeshiva Imrei Chaim Viznitz, a not for profit religious institution (hereinafter, the "Yeshiva"), and is improved upon with a three-story plus cellar building (the "New Building"); and

WHEREAS, the New Building currently contains a UG 3 religious school for approximately 625 boys, a UG 4 synagogue space, and a UG 9 catering establishment that serves the needs of the broader orthodox Jewish community in the vicinity of the site, located in the cellar; and

WHEREAS, when this application was originally filed, DOB sought a full revocation on the Current CO, based on concerns about bulk non-compliances; and

WHEREAS, a public hearing was held on the originally-filed version of the application on May 17, 2005, after due notice by publication in the *City Record*, and was then scheduled for a continued hearing on July 12, 2005; and

WHEREAS, however, before this hearing, the Yeshiva obtained a court order, dated July 8, 2005, enjoining the Board from acting on the application and from conducting further proceedings; and

WHEREAS, this court order also directed the Yeshiva to file a variance application at the Board for the UG 9 catering use; and

WHEREAS, the Yeshiva filed such an application under BSA Cal. No. 290-05-BZ; and

WHEREAS, the Yeshiva also filed an appeal of a DOB determination that the UG 9 catering use was not a UG 3 school or UG 4 synagogue accessory use, under BSA Cal. No. 60-06-A; and

WHEREAS, since the two matters were filed at the same time and both concerned the use of the New Building's cellar for non-conforming commercial catering purposes, the Board, with the consent of all parties, heard the cases together; and

WHEREAS, through resolutions dated January 9, 2007, the Board denied both the variance application and the interpretive appeal; and

WHEREAS, these decisions are now the subject of a legal challenge; and

WHEREAS, subsequent to these denials, the Board was again permitted to hear DOB's application concerning the Current CO; and

WHEREAS, by letter dated February 27, 2007, DOB amended its application such that it now seeks a modification of the Current CO to eliminate the UG 9 catering use listing at the cellar level; and

WHEREAS, however, in its most recent submission, dated April 17, 2007, DOB suggests that it may

wish to revisit in the future the validity of the Current CO in its entirety; and

WHEREAS, specifically, DOB notes that during the course of this proceeding, counsel for the Yeshiva admitted in a submission that the one-story building that used to exist on the site (the "Prior Building") was completely demolished, with all existing walls removed; and

WHEREAS, DOB claims that the Yeshiva, when pursuing permits that ultimately led to the issuance of the Current CO, never revealed this fact; and

WHEREAS, therefore, DOB states that it reserves the right to pursue a full revocation in the future, though it understands that the Board will proceed to decision on the cellar use issue since the hearing was closed and a decision date was set; and

WHEREAS, the Board agrees that while a full revocation is no longer sought in the current application, the decision reflected herein is without prejudice to further DOB enforcement action regarding the premises, including future applications to further modify or revoke the Current CO; and

WHEREAS, the premises, although currently located in an R5 zoning district, has a history of commercial use; and

WHEREAS, specifically, the record reflects that a certificate of occupancy was issued on July 29, 1927 authorizing a public garage in the Prior Building; and

WHEREAS, DOB states that the Prior Building was converted to a motor vehicle repair shop (the "Repair Shop") in 1931, and a certificate of occupancy was issued on April 25, 1939 listing this use; and

WHEREAS, the record reflects that on May 27, 1958, the Board granted a use variance for a term of three years to allow the storage and shipping of U.S. servicemen's belongings in addition to the Repair Shop; and

WHEREAS, DOB states that on September 8, 1961, it issued another CO that indicates that the use of the premises reverted back to solely the Repair Shop; and

WHEREAS, DOB represents that the Repair Shop became a lawful, non-conforming UG 16 use in a residential district upon adoption of the revised Zoning Resolution in 1961; and

WHEREAS, DOB further represents that Z.R. § 52-332, a provision in the 1961 Zoning Resolution, allows a non-conforming UG 16 motor vehicle repair shop use to partially change to another UG 16 use as-of-right; and

WHEREAS, however, despite the existence of Z.R. § 52-332 in the 1961 Zoning Resolution, the record reflects that the Board re-opened the 1958 variance and issued a second variance on April 13, 1962, permitting the Prior Building to include a UG 16 storage garage as well as the Repair Shop; and

WHEREAS, the Board agrees with DOB that this 1962 variance is a nullity, since at the time of the second variance grant the applicant could have proceeded as-of-right at DOB to legalize the storage garage use; no variance was authorized since there was no non-compliance with the ZR; and

WHEREAS, thus, at this time, the Repair Shop and garage were lawful non-conforming uses by virtue of the zoning change, rather than Board-granted uses; and

WHEREAS, DOB represents that another CO was issued on October 21, 1965 listing both the Repair Shop and the garage use; and

WHEREAS, the Repair Shop use apparently continued at the premises for a period of time thereafter, under particular ownership and within the Prior Building; and

WHEREAS, however, the record indicates that a new owner purchased the Prior Building and held it during a period lasting from approximately 1982 to 1992; and

WHEREAS, certain neighbors to the site testified at hearing that during the time of this new ownership, no repair business operated at the site; in fact, one of the neighbors testified that the property was used for the storage of furniture; and

WHEREAS, the record indicates that on December 16, 1991, the Yeshiva, after purchasing the site, filed a permit application with DOB to change the occupancy of the Prior Building to a UG 3 school, a conforming use in an R5 district, as well as to relocate partitions and install a curb cut; DOB approved the application and issued a work permit on November 4, 1992; and

WHEREAS, DOB states that its records indicate that from December 1990 through July 1998, the premises was not operated as a Repair Shop or any other commercial use, but instead was either vacant or undergoing intermittent construction; and

WHEREAS, DOB further states that the Yeshiva filed several post-approval amendments ("PAAs") between July of 1995 and March of 1998, seeking to extend the cellar and add a second and third story to the building for use as a conforming synagogue and school; and

WHEREAS, none of the PAAs during this time period proposed a non-conforming UG 9 catering use; and

WHEREAS, DOB denies that it approved any of the PAAs; and

WHEREAS, however, the record reflects that a temporary certificate of occupancy ("TCO") was issued by DOB for a three-story building on July 29, 1998, authorizing a UG 4 assembly hall and kitchen in the cellar, a UG 4 synagogue and UG 3 classrooms on the first and second floors, and UG 3 classrooms on the third floor; and

WHEREAS, this July 1998 TCO only authorized conforming uses; no authorization for the UG 9 catering use was given, since the Yeshiva never proposed it; and

WHEREAS, in a letter dated August 26, 1998, a DOB Deputy Commissioner stated that he had no objection to the filing of a PAA requesting that the use schedule be amended to add a UG 9 catering establishment; and

WHEREAS, DOB suggests that this August 26 letter is merely an invitation to apply for such an amendment, rather than confirmation that such an amendment was approvable or lawful; and

WHEREAS, the Board has reviewed the letter and agrees with DOB; and

WHEREAS, the context of the letter indicates that the Deputy Commissioner was responding to a request for permission to make such a filing, as evidenced by the reference to consideration of the short time the July 29 TCO had been in effect and then the statement "this office has no objection to the filing of" a PAA; and

WHEREAS, in other words, the letter is merely an authorization to proceed with a PAA, rather than a binding conclusion based on submitted evidence that the addition of the non-conforming use was justified; and

WHEREAS, all of the Board members, and, in a prior position, an individual commissioner (specifically, Commissioner Hinkson, a former DOB commissioner), have reviewed numerous DOB determinations, and are familiar enough with them to distinguish between an actual DOB substantive conclusion about a zoning issue and a mere authorization to submit an application for a permit amendment; and

WHEREAS, the record reveals that after the PAA application was made, the Yeshiva obtained TCOs reflecting the UG 9 catering use in the cellar on September 28, 1998 and December 29, 1998; and

WHEREAS, DOB states that an audit conducted on May 29, 2002 revealed that the PAAs that precipitated the issuance of these TCOs were approved in error; accordingly, the PAAs were marked disapproved and returned to the owner; and

WHEREAS, DOB subsequently sent out a letter revoking the underlying permit on October 17, 2002; and

WHEREAS, DOB's primary argument is that the prior non-conforming UG 16 use was discontinued pursuant to ZR § 52-61; and

WHEREAS, Z.R. § 52-61 provides, in pertinent part, "If, for a continuous period of two years . . . the active operation of substantially all of the non-conforming uses in any building . . . is discontinued, such . . . building . . . shall thereafter be used only for a conforming use. Intent to resume active operations shall not affect the foregoing."; and

WHEREAS, because the Current CO lists UG 9 catering at the cellar level in apparent reliance upon the prior UG 16 Repair Shop use, DOB further argues that the Current CO should be modified to remove this listing; and

WHEREAS, in support of its discontinuance argument, DOB submitted inspection reports from December 1990 and March 1991 that state that the Prior Building was vacant and the front entrance doors were masonry sealed; and

WHEREAS, DOB also cited to the Yeshiva's application to change the Prior Building to a conforming UG 3 use; and

WHEREAS, further, DOB submitted telephone book reports as evidence that there was no telephone line at the building from 1992 to 1997, a fact that DOB asserts is inconsistent with the active operation of a commercial motor vehicle repair shop; and

WHEREAS, additionally, DOB submitted a violation dated August 2, 1995 that states that the owner failed to provide required fencing during construction and that the entire premises was excavated approximately 16-feet deep; and

WHEREAS, DOB concludes that since the active operation of the non-conforming UG 16 use at the premises w    discor⁻ued for more than two years, the premises could only be used for a conforming use thereafter, and a UG 9 catering use is not a conforming use in an R5 zoning district; and

WHEREAS, the Board has reviewed the evidence submitted by DOB in support of its claim of discontinuance and finds it sufficient and credible; and

WHEREAS, there is no evidence in the record contradicting DOB's submitted records with respect to discontinuance of the non-conforming Repair Shop use; and

WHEREAS, nor did the Yeshiva attempt to argue that the Repair Shop in fact remained in active operation while the Prior Building was removed and the new three-story with cellar building was constructed; and

WHEREAS, accordingly, the Board finds that for a period of at least two years, the active operation of the lawful non-conforming use of the first floor of the Prior Building as a UG 16 use had been discontinued; and

WHEREAS, consequently, the UG 9 catering use listing on the Current CO is in error and the CO must be modified to eliminate it; and

WHEREAS, the Yeshiva makes the following arguments in opposition: (1) that the filing of the initial permit application in 1991 – which sought only to change the occupancy of the one-story building to a UG 3 school, as well as to relocate partitions and install a curb cut – tolled the discontinuance period of ZR § 52-61; (2) the evidence of discontinuance is not compelling; (3) DOB should be prohibited from pursuing this application based upon the equitable defense of laches; (4) DOB should be estopped from pursuing this application; and

WHEREAS, as to the first argument, the Yeshiva claims that it has been DOB's long-standing policy to toll the two-year discontinuance period of ZR § 52-61 upon the filing of any permit for construction at the premises; and

WHEREAS, however, the Yeshiva fails utterly to cite to a single instance of the application of this alleged policy, nor is there any indication of such policy in any DOB procedure notice, letter, rule or directive that the Board is aware of; and

WHEREAS, further, the Board observes that the ZR contains no provision that codifies such a policy; and

WHEREAS, in fact, DOB disclaims such policy, explaining that at most it would allow a valid building permit to toll the discontinuance of a non-conforming use "only when the work is necessary to resume the non-conforming use or when a permit for legally mandated work on the non-conforming use prevents the continuance of the non-conforming use during the pending construction"; and

WHEREAS, here, the Yeshiva's 1991 permit application was for a change to a conforming use only; there was no application for retention of the UG 16 Repair Shop use, nor was there an application for a change in use to UG 9 catering; and

WHEREAS, these facts do not indicate that the proposed work was necessary to resume the non-conforming use, nor do they indicate that the permitted work was related to the non-conforming use; and

WHEREAS, the Board agrees that there is no preservation of the ability to maintain a prior non-conforming use or to change to another non-conforming use when there has been a two year or more discontinuance of such, pursuant to ZR § 52-61; and

WHEREAS, here, the Yeshiva did not initiate an application to modify the 1992 permit to propose a UG 9 use until approximately six years later, a period of time in which there was an actual discontinuance of the UG 16 use for a period of two years or more; and

WHEREAS, in fact, the Yeshiva went so far as to obtain a TCO that listed only conforming uses; and

WHEREAS, the Board finds it absurd to argue that the right to include a UG 9 catering establishment at the premises was preserved after the New Building was authorized for occupancy by only conforming uses, especially in light of the actual discontinuance; and

WHEREAS, the Yeshiva was unable to cite to any DOB or BSA precedent where in support of its argument; and

WHEREAS, as a supplement to its argument that DOB's policy is toll the discontinuance period upon issuance of any permit, the Yeshiva cites to Hoffman v. Board of Zoning and Appeals of Russell Gardens, 155 A.D.2d 600 (2nd Dep't, 1989); and

WHEREAS, in the Hoffman case, the court held that where a lawful non-conforming restaurant suffered fire damage and the owner filed to reconstruct the restaurant, the applicable non-conforming use discontinuance provision would be tolled while the restaurant underwent reconstruction and was not open for business; and

WHEREAS, DOB responds that it has not applied Hoffman broadly to non-fire damaged buildings, and it would expect, as occurred in Hoffman, that the permit applicant apply for a permit to reconstruct the non-conforming use within the tolling period; and

WHEREAS, the Board also agrees that <u>Hoffman</u> must be applied with some common sense, and approves of the approach proposed by DOB; and

WHEREAS, here, the Yeshiva's course of action during the permitting and construction process is not similar to what occurred in <u>Hoffman</u>: the building was not fire damaged and there was no permit filing for reconstruction of the non-conforming use until after the tolling period had expired and the non-conforming use was discontinued for two years of more; and

WHEREAS, unlike in <u>Hoffman</u>, the Yeshiva sought approval only for conforming uses, and demolished the Prior Building and constructed the New Building in furtherance of that goal;

WHEREAS, accordingly, the Board finds that the Yeshiva's reliance upon <u>Hoffman</u> for its tolling argument is misplaced and the arguments based on the case are without merit; and

WHEREAS, the Yeshiva contends, however, that to the extent the Board is concluding that an intent to maintain the non-conforming use must be evident from the initial permit or permit application, as was the case in <u>Hoffman</u>, such conclusion is contrary to law; and

WHEREAS, the Yeshiva cites to <u>Matter of Toys "R" Us v Silva</u>, 89 NY2d 411 (1996) in support of this argument; and

WHEREAS, the Yeshiva argues that the <u>Toys "R" Us</u> decision stands for the proposition that this Board may not consider the initial intent as expressed by the 1991 permit application when determining whether the two year period of ZR § 52-61 commenced or was tolled; and

WHEREAS, the Board observes, however, that the <u>Toys "R" Us</u> court, in its discussion of ZR 52-61, was addressing that part of the provision that reads: "An intent to resume active operations" shall not affect a determination that actual discontinuance of a non-conforming use mandates that the land only be used for conforming uses thereafter; and

WHEREAS, it is clear that the court was addressing the possibility that a property owner might somehow memorialize an intent to resume a non-conforming use but not actually engage in that non-conforming use; and

WHEREAS, the court merely observed that ZR § 52-61 would not allow consideration of such intent; the only consideration is actual cessation of use; and

WHEREAS, applying this observation here, the Board concludes that the Yeshiva is not entitled to reinstatement of the UG 16 use or the change to UG 9 use, since there was an actual cessation of use for more than the two year time period set forth in ZR 52-61; and

WHEREAS, in fact, the <u>Toys "R" Us</u> decision does not pertain to or even touch upon the argument presented here, which is that the filing of a permit tolls the ZR 52-61 discontinuance period; and

WHEREAS, when this argument is made, this Board may conclude that the intent reflected in the Yeshiva's permit is in fact relevant, since the reflected intent is to abandon the non-conforming use; and

WHEREAS, the Board notes that ZR §52-61 only provides that an intent to <u>resume</u> a non-conforming use is not relevant; it does not say that an <u>intent</u> to abandon non-conforming use is never relevant; and

WHEREAS, in light of the Yeshiva's argument about the permit issuance tolling the discontinuance period, the Board concludes that an examination of the permit is relevant; and

WHEREAS, in sum, since there was actual discontinuance of the UG 16 use, an application of <u>Toys "R" Us</u> dictates and ZR 52-61 dictates that there was no right to the UG 16 use nor the change to the UG 9 catering use in 1998; and

WHEREAS, regardless of the Yeshiva's tolling argument, the Board observes that the Yeshiva had absolutely no right whatsoever to accommodate the UG 9 catering use in the New Building, since it reflects, at a minimum, a structural alteration of the Prior Building; and

WHEREAS, pursuant to ZR § 52-22, "no structural alterations shall be made in a building . . . substantially occupied by a non-conforming use, except when made . . . in order to accommodate a conforming use" unless certain other Article V provisions apply; and

WHEREAS, here, the significant demolition of most, if not all, of the Prior Building, the creation of a new cellar and the addition of floors all constitute structural alteration, and none of the Article V provisions regarding permitted enlargements apply to commercial uses in residential districts; and

WHEREAS, in other words, the ZR does not authorize the Yeshiva to both change the prior UG 16 non-conforming use to UG 9 non-conforming use and also structurally alter the Prior Building; instead, it prevents this from happening; and

WHEREAS, thus, the 1998 amendment to the 1992 permit to reflect UG 9 catering use was unlawful; and

WHEREAS, even if one accepted the proposition that tolling could retroactively occur upon such

amendment (which the Board does not), clearly such an amendment would have to be lawful; and

WHEREAS, nevertheless, the Yeshiva suggests that the alterations made to the building were in fact authorized by the ZR; and

WHEREAS, specifically, the Yeshiva cites to ZR § 11-412, which allows the Board to authorize alterations and enlargements to uses subject to Board variances granted under the 1916 zoning code; and

WHEREAS, the Yeshiva cites to the 1958 variance mentioned above; and

WHEREAS, however, as previously explained, this variance was time limited, and the subsequent action on the variance in 1961 was a nullity; and

WHEREAS, thus, any citation to ZR § 11-412 is entirely irrelevant, since there is no Board grant that affects the site; and

WHEREAS, further, even if the 1961 variance still was in effect, this Board would have to affirmatively approve upon formal application and hearing any alteration or enlargement to a pre-1961 variance-affected building pursuant to ZR § 11-412; and

WHEREAS, moreover, the Board would have to approve the change in use from UG 16 to UG 9 pursuant to ZR § 11-413; however, no alteration application under ZR § 11-412 is allowed in furtherance of a use authorized under ZR § 11-413; and

WHEREAS, in any event, the Yeshiva never sought from this Board any approval to enlarge or otherwise structurally alter the Prior Building; and

WHEREAS, instead, the Yeshiva only sought allegedly as of right building permits from DOB; and

WHEREAS, further, the addition of two new stories clearly violated the cap on additional floor area of 50 percent of existing floor area, as set forth in ZR § 11-412; and

WHEREAS, accordingly, the Board finds that the argument that ZR § 11-412 somehow validates the otherwise impermissible structural alteration and enlargement undertaken to accommodate, in part, the UG 9 catering use is without any merit whatsoever; and

WHEREAS, in sum, the Yeshiva's argument that the 1992 permit and the 1998 amendment somehow magically act together to preserve the right to a non-conforming use in the absence of any actual use for a period of more than two years is entirely without merit, because it is contrary to both DOB policy and the ZR and is not otherwise supported by case law; and

WHEREAS, further, even assuming *arguendo* that the Yeshiva's argument is correct, the UG 9 catering listing on the Current CO is still invalid because the Yeshiva impermissibly structurally altered the Prior Building to accommodate the UG 9 use; and

WHEREAS, as to the sufficiency of evidence, the Yeshiva argues that the 1995 inspection report should not be relied upon since the violation was dismissed, and that the phone records should not be used when public utility records are more appropriate evidence; and

WHEREAS, the Board disagrees with the Yeshiva on both points; and

WHEREAS, first, the observations of the inspector may be relied upon even if the violation was dismissed, a position supported by a case cited by the Yeshiva in its March 13, 2006 submission (Culp v. City of New York, 146 A.D. 326 (2nd Dep't, 1911); and

WHEREAS, second, the lack of phone records is considered by this Board to be credible evidence of a lack of a commercial establishment, and has been in the past as well; and

WHEREAS, in fact, the absence of such records supported, in part, the Board's conclusion in the Toys "R" Us case; and

WHEREAS, further, the Board notes that there was considerable testimony from the public at hearing establishing that the use of the Repair Shop was ceased while the Yeshiva sought to alter and enlarge the Prior Building, eventually replacing it with an entirely different three-story building; and

WHEREAS, the Board also notes that the earlier DOB inspections from 1991 establish the beginning of the period of the cessation of non-conforming use for purposes of ZR § 52-61; and

WHEREAS, finally, leaving aside the Yeshiva's failure to refute DOB's evidence of discontinuance, the Board again observes that there was not even a single attempt by the Yeshiva to introduce evidence that would establish actual continuance, which strikes the Board as being the most expedient way to refute DOB's argument; and

WHEREAS, however, the Board notes that its determination as to the actual discontinuance is based upon its review and acceptance of DOB's cited evidence; and

WHEREAS, accordingly, the Board reiterates that the evidence in the record supporting the claim of

discontinuance for the period of December 1990 to at least December 1997 is credible and sufficient; and

WHEREAS, the Yeshiva's third argument is that the Board must deny this application based on laches; specifically, the Yeshiva alleges that DOB delayed pursuing revocation or modification to the Current CO and prevented the Yeshiva from obtaining records that would prove that their was no discontinuance of the Repair Shop use; and

WHEREAS, the Board notes that it is not a quasi-judicial tribunal as alleged, so it is not appropriate for it to entertain equitable defenses; and

WHEREAS, further, none of the alleged precedent cited by the Yeshiva in support of the notion that the Board can determine equitable defenses stands for this proposition; and

WHEREAS, accordingly, the Board declines to review this argument; and

WHEREAS, the Board reaches a similar conclusion about its ability to hear an argument based on principles of equitable estoppel, and thus declines to review this argument as well; and

WHEREAS, based upon its consideration of the record and all the arguments made by DOB and the Yeshiva, the Board concludes that the reference on the Current CO to UG 9 catering facility use in the cellar was issued in error and is without legal effect; and

WHEREAS, the Board also concludes that the cellar of the New Building must hereafter be used only for conforming uses currently permitted in the underlying R5 zoning district, notwithstanding the existence of any prior certificate of occupancy issued to the subject premises; and

WHEREAS, in passing, the Board notes that pursuant to a stipulation entered into between the City and the Yeshiva and related to the above-mentioned legal challenge, this resolution will not be certified and filed immediately subsequent to decision; however, it is a final determination of the Board.

*Therefore it is Resolved* that the application brought by the Commissioner of the Department of Buildings, dated March 4, 2005, as amended, seeking modification of the cellar listing set forth on Certificate of Occupancy No. 300131122, is hereby granted, said listing shall be removed from the CO and the cellar of the building at the premises shall now only be used for conforming uses.

Adopted by the Board of Standards and Appeals, April 24, 2007.