UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------- x

THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,

                     Plaintiff,

           - against -

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City Department
of Buildings,

                    Defendants.

------------------------------------------------- x

07 Civ. 10962 (DAB)

**DECLARATION OF MONICA
PA IN SUPPORT OF
<u>MOTION TO COMPEL</u>**

I, MONICA PA, pursuant to 28 U.S.C. § 1746, declare are follows:

1.     I am associated with the firm Davis Wright Tremaine LLP, counsel for Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"). I respectfully submit this Declaration in support of the Church's motion to compel non-parties The Riverside Church ("Riverside") and St. Ignatius of Loyola Church ("St. Ignatius") to comply with the Subpoena served on March 6, 2008.

2.     Attached as Exhibit A is a true and correct copy of the Order, dated March 3, 2008, granting the parties permission to conduct pre-hearing discovery.

3.     Attached as Exhibit B is a true and accurate copy of the Subpoena *Ad Testificandum* and *Duces Tecum* served on St. Ignatius on March 6, 2008.

4.     St. Ignatius previously provided information to the City concerning social events hosted at "Wallace Hall," and its director of facilities, Sona Olson, submitted a declaration in support of the City's opposition to the Church's motion for a preliminary injunction. (Attached as Exhibit C.)

5.     When first contacted by counsel for St. Ignatius, the Church agreed to shorten significantly the period for which it sought documents (from January 1, 2000-to-date to January 1, 2005-to-date), and to extend St. Ignatius' time to respond to April 2, 2008. (Email from J. Cuti to D. Bryant, dated March 19, 2008, attached as Exhibit D; D. Bryant letter to J. Cuti, dated March 25, 2008, attached as Exhibit E.)

6.     Following this conversation, however, St. Ignatius sent a letter broadly objecting to the Subpoena without providing any support for its general complaints of over-breadth and burden.  (*See* Ex. E.)  It also objected to producing any documents showing the revenue generated by social events and to what extent St. Ignatius had discussed, analyzed and/or reported such revenues for tax purposes.  (*Id.*)

7.     On March 27, 2008, the Church wrote back informing St. Ignatius that its general objections were not legally sufficient, and set forth its reasons for serving the Subpoena. (Letter from J. Cuti to D. Bryant, dated March 27, 2008, attached as Exhibit F.)

8.     On April 1, 2008, counsel for St. Ignatius, by telephone, stated that it would not produce any documents unless the Church agreed to accept only one-year's worth of documents and to withdraw its request for deposition testimony, although it would consider submitting an affidavit.  On April 2, 2008, counsel for the Church sent an email stating that it could not accept such an extreme limitation on the scope of the Subpoena.  (Email from M. Pa to D. Bryant, dated April 2, 2008, attached as Exhibit G.)

9.     On April 10, 2008, having heard nothing from St. Ignatius in the interim, the Church sent a final email notifying St. Ignatius that it intended to file the instant motion.  (Email from J. Cuti to D. Bryant, dated April 10, 2008, attached as Exhibit H.)

10.    Attached as Exhibit I is the Subpoena *Ad Testificandum* and *Duces Tecum* served on Riverside Church on March 6, 2008.

11.    On March 20, 2008, Riverside served objections to the Subpoena, objecting to every Request on the purported ground that each calls for the production of irrelevant material and/or is overbroad, and that its catering activities are different from the Church. (Letter from F. Patton to V. Kovner, dated March 20, 2008, attached as Exhibit J.)

12.    On March 24, 2008, the Church responded that it would be willing to work with Riverside to limit the scope of the discovery requests, and would grant an extension of time, but that its flat refusal to produce documents was without any legal justification. (Letter from J. Cuti to F. Patton, attached as Exhibit K.)

13.    On April 4, 2008, Riverside again refused the Church's request for compliance, stating that it would produce only its agreement with its caterer. (Letter from F. Patton to J. Cuti, attached as Exhibit L.)

14.    On April 10, 2008, the Church sent a letter notifying Riverside that its proposal was unreasonable. (Letter from J. Cuti to F. Patton, dated April 10, 2008, attached as Exhibit M.) Thereafter, the parties exchanged further correspondence, but Riverside continued to refuse to comply with the Subpoena. (Letter from F. Patton to J. Cuti, dated April 11, 2008, attached as Exhibit N; Letter from J. Cuti to F. Patton, dated April 11, 2008, attached as Exhibit O.)

15.    On April 11, 2008, counsel for the Church spoke with counsel for Riverside and confirmed that Riverside was unwilling to produce additional documents, and that the Church

intended to file this motion.  (*See* Email from J. Cuti to F. Patton, attached as Exhibit P.)

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2008

Monica Pa

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
FIRST CHURCH OF CHRIST, SCIENTIST,
OF NEW YORK CITY,

                    Plaintiff,

          -against-                              07 Civ. 10962 (DAB)
                                                 ORDER
CITY OF NEW YORK, and PATRICIA LANCASTER,
in her official capacity as Commissioner

                    Defendants.
----------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     The Court is in receipt of correspondence from the Parties dated

February 22, 2008, February 25, 2008, and February 26, 2008.

     The Court is hereby GRANTING pre-hearing discovery including

Plaintiff's requests for documents and depositions from several

religious and non-religious institutions that may conduct similar

catered events to those at issue in this matter, as well as document

requests and depositions of City officials who may have knowledge

relevant to the Church's claims.  Further, should the City wish to

conduct pre-hearing discovery, it can take advantage of this time for

that purpose as well.  Parties shall have ninety (90) days from the

date of this Order.  There shall be no extensions.

          SO ORDERED.

Dated:    New York, New York
          March 3, 2008


                              _____
                                      Deborah A. Batts
                              United States District Judge

Exhibit B

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES     NEW YORK   PORTLAND   SAN FRANCISCO     SEATTLE   SHANGHAI   WASHINGTON, D.C.

VICTOR A. KOVNER
DIRECT (212) 489-8230                 1633 BROADWAY                          TEL  (212) 489-8230
victorkovner@dwt.com                  NEW YORK, NY 10019-6708                FAX  (212) 489-8340
                                                                             www.dwt.com

March 6, 2008

**By Hand**

St. Ignatius of Loyola
980 Park Avenue
New York, NY 10028-0805

Re:    *Third Church of Christ, Scientist v. City of New York, et al.; 07 CV 10962 (DAB)*

Dear Sir or Madam:

This firm represents plaintiff Third Church of Christ, Scientist (the "Church") in this litigation. As you may know, this federal lawsuit was filed by the Church to protect its ability to continue to use its building at 583 Park Avenue as a venue for occasional catered social events, a use that the City initially approved but, in November 2007, decided to prohibit. The United States District Court Judge handling this matter has authorized the Church to conduct what is called "discovery" which is the legal term we use to describe the process of gathering facts that are relevant to a lawsuit. I want you to know that the Church is serving the enclosed subpoena on you only with great reluctance; we would have much preferred to have resolved this matter without need for litigation because we believe the tradition of allowing religious institutions and secular non-profit groups to raise supplemental revenues by permitting their buildings to be used for catered events is good policy. (The Complaint in this matter is attached as Exhibit B to the subpoena.) Unfortunately, it became necessary to file this case to protect the Church. Regrettably, the nature of the legal claims requires us to seek information from you.

Enclosed please find a subpoena that requires you to provide the documents requested in Exhibit A to the subpoena. The subpoena also calls for your testimony, and notes that the date for providing that testimony is March 26, 2008. I understand that there may be scheduling issues, and you should of course feel free to contact me or my colleagues John Cuti and/or Moncia Pa so that we can arrange a mutually convenient date for your testimony. It is more efficient for you to provide the documents that are responsive to the subpoena prior to your testimony. Accordingly, the subpoena requires production of responsive documents on or before March 26, 2008.

St. Ignatius of Loyola
March 6, 2008
Page 2



      Finally, enclosed please also find a check in the amount of $ 44, which covers the costs of the witness fee and travel to and from my office to provide testimony pursuant to the subpoena. Again, please accept our apologies in advance for any inconvenience. Please feel free to call us if you have any questions regarding your obligations.

Respectfully submitted,

Victor A. Kovner

cc:    Ave Maria Brennan, Esq. (by email)

AO88  (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

SOUTHERN          DISTRICT OF        NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,
               Plaintiff,
       V.

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings,
              Defendants.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  07 Civ. 10962 (DAB)

TO:    St. Ignatius of Loyola ( Wallace Hall)
       980 Park Avenue
       New York, N.Y. 10028-0805

☐   **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below
to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑   **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION    Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019    Telephone: (212) 489-8230 | DATE AND TIME   3/26/2008 10:00 am |
|---|---|

☑   **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE    Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019    Telephone: (212) 489-8230 | DATE AND TIME   3/26/2008 10:00 am |
|---|---|

☐   **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)    Attorney for Plaintiff | DATE   3/6/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Victor A. Kovner, Esq.
DAVIS WRIGHT TREMAINE LLP, 1633 Broadway, New York, NY 10019 - (212) 489-8230

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number

| DATE | | | | | CHECK NUMBER | |
|------|--|--|--|--|--------------|--|
| 03-05-08 | | | | | | 55858 |

| DATE | INVOICE NO. | VOUCHER ID | INVOICE AMOUNT | NET AMOUNT | REMARKS |
|------|-------------|-----------|----------------|-----------|---------|
| 03-04-08 | PAM030408H | 880415 | 44.00 | 44.00 | witness & transportation fees |
| | | | | | |
| | | | TOTAL | | 44.00 |

DAVIS WRIGHT TREMAINE LLP
1201 THIRD AVENUE
SUITE 2200
SEATTLE, WA 98101-3045

DETACH AND RETAIN THIS STATEMENT

THE ATTACHED CHECK IS IN PAYMENT OF ITEMS LISTED ABOVE

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW. DO NOT CASH IF NOT PRESENT.

**DAVIS WRIGHT TREMAINE LLP**
1201 THIRD AVENUE, SUITE 2200
SEATTLE, WASHINGTON 98101-3045
(206) 622-3150

VENDOR NO. 29294     DATE 03-05-08     64-1278 611 GA     NO. 55858

Bank of America, N.A.
Atlanta, Dekalb County, GA
Member FDIC

PAY ONLY     FOUR FOUR 00 CTSCTS

*********$44.00

DAVIS WRIGHT TREMAINE LLP

PAY TO THE ORDER OF
**ST. IGNATIUS OF LOYOLA
WALLACE HALL
980 PARK AVENUE
NEW YORK, NY 10028-0805**

Authorized Signature

⑈00055858⑈ ⑆061112788⑆ 003359800946⑈

**Exhibit A**

## Definitions and Instructions

1.      "You" or "your" means the St. Ignatius of Loyola (Wallace Hall), located at 980 Park Avenue, New York, New York and your directors, officers, employees, agents and attorneys, each person acting on your behalf or under your control, and any parent, subsidiary, predecessor or affiliated entity, corporation, institution, or non-profit organization.

2.      "Documents" has the meaning provided for in the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Southern District of New York and, without limiting the generality of the foregoing, includes all materials (drafts, originals, and non-identical copies, whether written or electronically stored, sent, or received) such as, *inter alia*, memoranda (interoffice and otherwise), notes, letters, email messages, calendars, appointment books, newsletters, notices, minutes or transcripts of meetings, brochures, advertising copy, website pages, photographs, video recordings, annual reports, tax returns, invoices, checks, credit card receipts or records, spreadsheets, contracts, reservation lists, contact lists, vendor lists, permits, licenses, or other records.

3.      "Communications" means the transmission or exchange of information, oral or written, formal or informal, and shall include without limitation, any documents embodying, containing, constituting, discussing, memorializing, referring to or relating to any such contact.

4.      The "Action" means the lawsuit *Third Church of Christ, Scientist, of New York City v. The City of New York, et al.,* 07 Civ. 10962 (DAB), pending in the Southern District of New York.

5.      The "Complaint" means the complaint filed in the Action, attached hereto as Exhibit B.

6.      The "Church" means the Third Church of Christ, Scientist, of New York City, the Plaintiff in the Action.

7.    The "Building" means the Church edifice located at 583 Park Avenue, New York, New York.

8.    "Elected Officials" means any person serving in the United States Congress, the New York City Council, or the New York State Legislature and any member of his or her staff, including without limitation the Hon. Carolyn Maloney, Hon. Daniel Garodnick, Hon. Jonathan Bing, or the Hon. Liz Krueger.

9.    The "City" means the City of New York, and all of its officials and agencies, including without limitation the Department of Buildings, the Law Department, the Department of City Planning, the Board of Standards and Appeals, the Mayor and/or any Deputy Mayor and/or any member of their respective staffs.

10.    "Premises" means the building located at 980 Park Avenue, New York, New York.

11.    "Social Events" means any catered or other social event conducted at the Premises, whether for your congregants, or for the general public.

12.    You are required to search for the documents responsive to the requests, wherever located, which are: (a) in your actual or constructive possession, custody, care and/or control; (b) in the actual or constructive possession, custody, care and/or control of your agent, representative or employee; or (c) in the actual or constructive possession, custody, care and/or control of any person who, or entity which, is or has been acting on your behalf or under your direct or indirect control.

13.    In the event that any document responsive to any document request is withheld from production upon a claim of attorney-client, work product or other privilege or immunity, you are required to furnish a list, verified by counsel, of the documents withheld from such

production, setting forth for each document: (a) the nature of the privilege or immunity claim; (b) the date of the document; (c) the title and general subject matter of the document; (d) the identity of each person who made, prepared or signed the document; (e) the identity of each person to whom the document was addressed and each person to whom a copy was indicated to have been sent or was sent; and (f) the present location of the document.

14.    Each document request is continuing in nature, requiring the production of additional documents, should you become aware of or acquire them, in your possession, custody or control after initially responding to these requests.

15.    The past tense shall be construed to include the present tense and vice versa, to make the request inclusive rather than exclusive.  The singular shall be construed to include the plural and vice versa to make the request inclusive rather than exclusive.  "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

16.    Unless otherwise stated, the relevant period for these requests shall be from January 1, 2000 to the present.

### Document Requests

All Documents concerning or in any way related to:

1.    Any Social Event conducted on or in the Premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

2.    The total number of hours each year that the Premises are used for Social Events, including the number of hours it takes to set up for and clean up after each Social Event.

3.    The Certificate of Occupancy for the Premises (the "CO"), including any amendments thereto.

4.    Any communication with the City regarding the use of the Premises, including communications regarding the CO, and/or whether any past, current, or planned use of the Premises is or was an "accessory use" under the City's Zoning Resolution or other applicable land use regulations.

5.    Any portion of the annual report or financial statements of St. Ignatius of Loyola and/or of Wallace Hall, or any submission to any taxing or other authority, regarding revenues generated by Social Events.

6.    Any analysis, investigation, or communication regarding the taxation of revenues generated by Social Events.

7.    Any application for any permit, license or other permission from the City to conduct Social Events, and the issuance or renewal of any such permit, license or other permission, whether formal or informal.

8.    Any communication with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct Social Events at the Premises.

9.    Any independent person or entity that performs catering-related services (an "Outside Caterer") with which you have a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the Outside Caterer's use of, or performance of services on or in, the Premises; (c) any repairs or improvements to the Premises made by, and/or for the benefit or use of, the Outside Caterer ; and (d) rent or use payments made by, or other financial arrangements with, the Outside Caterer.

10. Any trade names, trademarks, or other names, marks, or designations that you use to identify the availability of catering and Social Events at the Premises (e.g., "Wallace Hall").

11. Any document or communication related to or concerning any allegation in the Complaint, or any relevant fact, claim or defense in the Action.

12. Any communication with the City or with Elected Officials concerning the Action.

13. Whether a Social Event at your institution may be hosted by any member of the general public or only by an existing member of your congregation, and, if the latter, what, if any, policy you have for admitting or accepting a new member of your institution.

14. Whether any signs or other indicia of the religious identification of the Premises are removed, obscured or covered during Social Events.

15. Any communication with the City concerning the making of the declaration that you submitted in support of the City's Opposition to the Church's Motion for a Preliminary Injunction.

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,                                        :

               Plaintiff,                            :     07-CV-10962
                                                             (CDAB)

               -against-                            :     **COMPLAINT**

THE CITY OF NEW YORK and PATRICIA J.          :
LANCASTER, in her official capacity as             :     JURY TRIAL DEMANDED
Commissioner of the New York City Department       :
of Buildings,                                      :

               Defendants,                           :
-----------------------------------------------------------------x

     Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), by

its undersigned attorneys for its Complaint against Defendants City of New York ("City") and

Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department

of Buildings ("DOB") (collectively, the "City" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

     1.     For more than 80 years, the Church has owned and worshipped in the

historic building located at the northeast corner of Park Avenue and 63rd Street (the "Building").

Time has not been kind to the Building or the Church, whose membership dwindled as the

Building fell into disrepair. A declining building is expensive to maintain and repair; growing

liabilities for repair and maintenance keep new members away from the Church; a smaller

membership makes it harder to raise money to pay for repairs. This was a vicious circle: if the

Church failed to raise the substantial funds necessary to renovate the building, and in turn to

grow its congregation, it would disappear.

     2.     The Church decided to do what many other religious institutions and

secular non-profit organizations routinely do to supplement revenues: it entered into a

commercial relationship with a reputable caterer to conduct events in the Building – only at times when the Church was not using the Building for its primary religious purposes – in exchange for urgently needed funds. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the on-going expenses of maintaining the Building. This relationship was critical to the Church's survival.

3.      The Church is a good citizen and it went to the City for approval of this traditional accessory use. The City approved the Church's request and granted the necessary permits for the Required Capital Repairs. Doing so was entirely consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution. The Church relied on the City's approval, and the Required Capital Repairs began to be made. To date, the caterer has expended approximately $6.5 million to make the Required Capital Repairs and expects to spend another $1.5 million over the coming months to complete the work. Even though the caterer is undertaking the Required Capital Repairs, the vast majority of the work also benefits the Building and its Church-related uses and will continue to provide that benefit long after the caterer's contract with the Church expires.

4.      But something unlawful has happened. Defendants have suddenly revoked their prior approval and rescinded the permits. They have done so because a small group of affluent, influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events in the Building have transformed the Church into a

commercial catering hall that causes serious disruption in the neighborhood. The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth: the City is singling out and discriminating against the Church without any basis. If unremedied, this discrimination will have devastating consequences for the Church and likely will result in the sale of the Building so that the Church can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

5.    The Church seeks relief from this Court because the City has violated the Church's rights (1) to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions; (2) to be free from undue burdens on the exercise of its religion, as protected by Section (a) of RLUIPA; (3) to equal protection of the laws, pursuant to the Fourteenth Amendment; and (4) to the free exercise of its religion, pursuant to the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred in this district, and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## PARTIES

8.    Plaintiff Church is a religious corporation existing under the laws of the state of New York, with its principal place of business at 583 Park Avenue, New York, New York 10021.

9.    Defendant City of New York is a political subdivision of the State of New

York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a municipal corporation organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment, enforcement, and implementation of land use and zoning regulations within New York City.

10.    Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings and is authorized to enforce, among other things, provisions of the New York City Administrative Code, the New York City Building Code, and the Zoning Resolution of the City of New York. She is sued herein in her official capacity.

11.    The New York City Department of Buildings is an administrative department of the City of New York, whose offices are located in the County of New York in the State of New York.

## FACTUAL ALLEGATIONS

### The Church and its Historic Building

12.    The Church began in the 1880s as a congregation of students dedicated to the Christian Science religion. By 1895, as its membership grew substantially, the Church applied for a charter and was registered under the laws of the State of New York.

13.    In 1920, the Church purchased property at 583 Park Avenue, New York, New York, and retained the renowned architectural firm Delano & Aldrich to design a house of worship for the congregation. Completed in or around 1924, the red-brick, Georgian-Colonial building topped with its tall lantern is one of the architectural highlights of Park Avenue and is the same building that houses the Church's congregation to this day.

14.    By the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings

with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult socials and youth forum activities, and lectures and workshops focusing on religious and spiritual healing topics. During this period, lectures in the Church's Building would frequently be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in the basement.

15.     Over the years, the Church's membership has declined. It currently has fewer than one hundred members. True to its mission, however, the Church continues to use the Building for religious worship every Wednesday evening and Sunday morning, as well as for other religious uses such as Sunday School and lectures.

16.     A significant contributing factor to the decline in membership has been the growing state of disrepair of the Building and the prohibitive costs of the Required Capital Repairs, which members of the congregation would have to bear. The Required Capital Repairs necessary to revive the aging Building's infrastructure and to bring it into compliance with the New York City Building Code include modernization of all major building systems, including electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and, where necessary, replacement of the Building's façade, roof, windows, doors and other exterior components; and significant restoration of the main auditorium and other rooms regularly used for Church-related activities.

17.     In order to save the historic Building, the Church needed to raise substantial capital. For many years, the Church survived largely because of bequests made by deceased members of its congregation. But as the membership declined, the bequests declined, and the Church, year after year, was running at a significant deficit.

18.     Beginning at least in the late 1990s, the Church explored several alternatives to raise capital, including low-cost loans from the Historic Properties Fund

(administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

19.    From 1999 to 2006 the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship did not yield enough money to meet the Church's needs.

20.    In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

21.    Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for renovation and maintenance of the Building.

22.    After considering numerous alternatives, the Church did what many other religious institutions and nonreligious non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events
### In Order to Raise Needed Capital

23.    As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and ongoing maintenance costs (the "Lease").

24.     The express purpose of the Lease is to supplement the Church's income,

and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at p. 1 (emphasis added).

25.     In addition to hosting weddings and other celebrations, as well as events

for non-profit groups, companies and other firms – to date, events for New Yorkers for

Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups

have been held in the Building – the Lease requires the Rose Group to conduct catered events

for members of the Church at reduced cost. 2nd Amn. to Lease, at ¶ 2.

26.     Upon information and belief, the Rose Group will invest more than $8

million on the Required Capital Repairs, of which $6.5 million has already been spent.  Because

the Building lies within the Upper East Side Historic District, any renovations to the exterior of

the Building must be undertaken in a painstaking manner so as to preserve, wherever possible,

the Building's original architectural details.  Among the significant work that remains to be

completed, the Rose Group plans to restore the Building's roof with slate from the same

Vermont quarry that supplied the Church more than 80 years ago.

27.     In addition to Required Capital Repairs, the Rose Group is further

obligated to undertake general maintenance of the Building throughout the 20-year Lease term,

and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain

threshold, from the catered events) to the Church.  This supplemental income is a crucial source

of operating revenue for the Church's religious activities, which will be especially necessary

when new community activities and outreach programs are implemented.

28.    Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities.

29.    Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1. Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities. Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5. Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief. Lease, at ¶ 35.6.

30.    The primary purpose of the Building is to serve as the Church's place of worship. But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a

reasonable chance to profit from the arrangement. In the second amendment to the Lease, dated March 27, 2007, the parties provided that, in the event that the Building could not be used for catering activity, the Rose Group would be able to require the Church to reimburse the Rose Group for Required Capital Repairs it had undertaken, even if the Church had to sell the Building. 2nd Amn. to Lease, at ¶ 3.

31.    The Church went out of its way to be sensitive to its neighbors. Thus, the Lease requires the Rose Group to "[p]ermit no act or practice which may … be a nuisance," and to "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the premises." Lease, at ¶ 32.1.

32.    The Church also insisted that the Rose Group take the extraordinary step of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors[.]" When this system is completed, all trash from catered events will be stored and refrigerated within the Building and taken to 63rd Street only when it is to be collected by the trash truck. Lease, at ¶ 32.1.

33.    Moreover, the Lease does not "permit any advertising medium or loud speaker, radio broadcast, etc. to be heard outside of the premises." Lease, at ¶ 32.1.

34.    In addition, the Second Amendment to the Lease provides that the Church and the Rose Group will together "establish standards concerning sound, light levels, traffic control, signage." 2nd Amn. to Lease, at ¶ 5.

35.    The Rose Group has retained a highly professional and comprehensive security team, Global Security Service, in order to ensure that all events at the Church are orderly, quiet, and safe. At all events, in addition to other security measures, there are usually off-duty members of the New York City Police Department patrolling the area, monitoring the event and managing any crowds. There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws. These security measures are implemented from an abundance of caution. Thus far, all of the catered events that have occurred in the Building have occurred without incident.

### The Purpose of the Building Remains the Same: It Is a Place of Worship for the Church Congregation

36.     The primary purpose of the Building is to remain a house of worship. For over 80 years, the Building has been property devoted to the Christian Science faith, and it remains the center of the Church's congregation. The Church currently conducts Sunday Church Services and Sunday School services, Wednesday evening church service, Thanksgiving and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church classes (all-day class for a two-week period, twice a year), Church corporate or organizational meetings, and occasional non-regularly scheduled events and Association meetings. Lease, at ¶ 35.1.

37.     The Church has been attracting new members because of the recent repairs to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be able to hold additional services and lectures for its members and other attendees. Among other events, the Church expects to host additional Sunday church services and Sunday school sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee meetings, youth forum activities, musical rehearsals and recitals, and various religious workshops. In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years. Following the renewal of the Church and its congregation, the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members.

38.     Finally, the Church's purpose in working with the Rose Group is more

NYC 189965v8 0085520-000001

than merely economical; the Church also hopes that opening up the Building to public events will introduce the Christian Science faith to the larger community, thereby aiding the Church in augmenting its membership. In addition to increased exposure, the historic Building will again be enjoyed and appreciated by the general public, as it had been for many decades until the Building began its decline.

### The Required Capital Repairs Were Undertaken in Reliance on the City's Approval of Catering Events at the Building

39.    Like many religious and nonreligious non-profit institutions, the Church is located in an area zoned for residential use. The Building is in an R-10 zoning district, which is the highest density residential area under the Zoning Resolution of the City of New York (the "Zoning Resolution"). In Manhattan, much of Midtown and Downtown as well as cross-town streets and avenues are zoned R-10.

40.    Only residences, community facilities (such as churches, synagogues and non-profit institutions) and uses that are "accessory" to residences and community facilities are permitted in residential districts under Article II, Chapter 2 of the Zoning Resolution. While catering facilities are permitted, and commonly found, as accessory uses in community facility buildings, stand-alone catering facilities are not permitted in residential districts. Section 12-10 of the Zoning Resolution provides that for a use to be considered "accessory" it must be (i) conducted on the same zoning lot as the principal use, (ii) clearly incidental to, and customarily found in connection with, the principal use and (iii) substantially for the benefit or convenience of the principal use.

41.    Prior to initiating the extensive and costly Required Capital Repairs, the Church and the Rose Group sought the City's approval for this catering arrangement. On April 19, 2006, the City issued a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-

Consideration"). The Pre-Consideration provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building, pursuant to Section 12-10 of the Zoning Resolution.

42.    The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").

43.    Based on the Church's truthful representation that the catered events were to be "operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church" and that the "functions will be restricted by the contract with the Church," the DOB granted its Pre-Consideration permitting the Church to have catered events in the Building.

44.    The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees. During these conversations, DOB's consistent position has been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and, the Manhattan Borough Commissioner of DOB stated that the only limitation on the size of events related to the capacity of the Building. Approximately $6.5 million has been expended on the Required Capital Repairs in reliance on the City's June 2006 approvals.

**Defendants Routinely Permit Other Religious And Nonreligious Non-Profit Groups to Conduct Similar Catered Events, Including In The Church's Immediate Vicinity**

45.    The Church's reliance on the Pre-Consideration was reasonable on several levels. After all, as detailed below, (a) there are many buildings in the immediate vicinity of the Building, all in residential zoning districts, that are rented to members of the general public for large social events, (b) there are many similarly situated churches, synagogues and other

religious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events, and (c) there are many nonreligious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events.

45-a.   The following is a chart, developed from public records without the benefit of discovery proceedings, showing establishments in the immediate vicinity of the Building, all of which are located in Residential zoning districts, and which rent their facilities to members of the general public for catered events:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| The Beekman | 575 Park Avenue – directly south of the Building | Total capacity (restaurant plus separate catering venue) approx 200 | A restaurant open to the general public as well as a separate facility for catered events | R10 (Special Park Improvement District ("PI")) / R8B (Limited Height District No. 1A ("LH-1A")) |
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity: 500 | Available for private catered events and movie and commercial shooting | R10 (PI) |
| The Colony Club | 564 Park Avenue – two blocks south of the Building | | Private club, rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Regency Hotel | 540 Park Avenue – two blocks south of the Building | 4,400 square feet of flexible function space, accommodate up to 200 | Rents out space for a variety of catered events, uses in-house catering operation | R10 (PI) / C5-1 (Special Madison Avenue Preservation District) |
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated; additional events on same night can be held in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety | R10 (PI) |

| | | | of catered events for non-members | |
|---|---|---|---|---|
| Union Club | 101 East 69th Street and Park Avenue | | Rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers Club | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. *Uses designated outside caterer* New York Catering | R8B (LH-1A) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

45-b.    Moreover, as is evident from the following chart developed from public records without the benefit of discovery proceedings, it is customary for churches, synagogues and other religious institutions to rent out their facilities to non-congregants for social events in order to offset in the extraordinary costs of maintaining their historic properties:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity 500 guests | Available for private catered events and movie and commercial shooting | R10 (PI) |
| St. Bartholomew's Church | 109 East 50th Street and Park Avenue | 1250 | Available for movie and commercial filming, corporate events, fashion shows, rehearsal dinners, weddings, cocktail parties, and dances, among other events. All catering provided in house by Café St. Bart's. | C5-3 (MID) / C5-2.5 (MID) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

| Universalist Church of New York | 160 Central Park West | 500 | Church dated 1897, available for private catered events and separate attached kitchen. | R10-A / R8B |
|---|---|---|---|---|
| All Souls Church | 1157 Lexington Avenue and East 80th Street | 350; 200 seated event | | C1-8X / R8B |
| The Top Deck at the Seamen's Church Institute | 241 Water Street, near Peck Street | 130 guests | Interfaith chapel, rents out space for a variety of catered events for non-congregants. | C6-2A (Special Lower Manhattan District – South Street Seaport Subdistrict) |
| Riverside Church | 490 Riverside Drive, between 119th and 122nd Street | 500; 300 seated event | Uses designated onsite caterer, Madeline's Catering & Special Events | R8 |

45-c.  Finally, the following chart, developed from public records without the benefit of discovery proceedings, makes clear that it is customary for nonreligious non-profit institutions (including institutions, like the ones below, located in residential districts) to rent their facilities to non-members for catered events in order to offset the extraordinary costs of maintaining their historic properties:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated event; can host additional events on same night in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety of catered events for non-members | R10 (PI) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. | R8B (LH-1A) |

| Club | | | *Uses designated outside caterer* New York Catering | |
|---|---|---|---|---|
| The Frick Collection | 1 East 70th Street, near Fifth Avenue | 200 seated event; 350 cocktails | | R10 (PI) / R8B (LH-1A) |
| National Academy Museum | 1083 Fifth Avenue, near East 89th Street | 140 seated event; 240 cocktails | | R10 (PI) |
| Cooper-Hewitt, National Design Museum | 2 East 91st Street, near Fifth Avenue | 90 seated event; 500 in Terrace and Garden | Rents out space for a variety of catered events for non-members *Uses designated outside caterer* Restaurant Associates | R10 (PI) / R8B (LH-1A) |

46.     Like these secular non-profit institutions, and like other religious institutions, the Church found that it was necessary to rent out its space to cover the daunting costs of making the Required Capital Repairs and of operating and maintaining its historic Building.  Like its neighbors, the Church sought to use its Building both to generate revenue and to serve as a community resource.  The events already held in and planned for the Building are not meaningfully different from any of these uses at other comparable institutions.

### Opposition by Neighboring Residents Results in the Revocation of the Pre-Consideration

47.     By March 2007, after the Required Capital Repairs were well underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings on the west side of Park Avenue, across the wide avenue from the Church – 570 Park Avenue and 580 Park Avenue – began to complain about the Church's arrangement with the Rose Group.  After initially discussing the matter with the Church and the Rose Group, residents of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a public relations campaign against the Church.  Their avowed purpose was to maintain the "residential" character of their Park Avenue neighborhood, and their flyer contended that the Church's plans to permit catered events at its historic premises – although no different than the

practices of neighboring institutions – would cause significant disruption in their backyard. These neighbors, however, failed to mention that if the Church were unable to supplement its revenues it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

48.     On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused the Church of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall. The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night." This is a selective and baseless attack on the Church. As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory just a few blocks north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

49.     The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007. The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, thereby distorting the real import of the Lease.

50.     Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group the limited right to use the Building for catered events when it is not being used for religious

activities.

51.     Unfortunately, the City has succumbed to the demands of these influential neighbors.  On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly completed.

52.     The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church."  The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008).  The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

53.     Upon receiving the letter, the Church engaged litigation counsel.  Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation.  Counsel for the Church advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the Building to satisfy its liabilities.

54.     The Church's attempt to resolve this matter without litigation was unsuccessful.

55.     On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination"). The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

56.     By revoking the Permits and rescinding the Pre-Consideration and withholding permission allowing the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions. It also irrationally singles out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making available their premises in order to host private catered events.

57.     The Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area.

58.     By revoking the Permits and preventing the Church from hosting catered events on its premises, the City has threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease. The implementation of

the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship – the epicenter of its religious practice for the past 80 years.

59.    Further, by determining that the Church's Building is effectively a catering hall, the City mischaracterizes the Lease and wrongfully impugns the Church.  Contrary to the Defendants' disparaging characterization, the Church remains a congregation devoted to the Christian Science faith, and any catering activities conducted in the Building were, and will remain, wholly incidental to its primary purpose and use of preaching and practicing its religion.

60.    Moreover, the City is impairing the Church's interest in opening up its premises to the general public, which it believes will spark new interest in the Christian Science faith.

## The Church Will Suffer Immediate and Irreparable Injury

61.    The impact of the DOB's decision will be devastating and immediate. The Final Determination rescinds the earlier-granted accessory use approval and revokes the Permits, forthwith.  Therefore, pursuant to the DOB Letter and the Final Determination, as of October 29, 2007, the Church is prohibited from allowing any additional catered events to be booked for the Building, and the Church is prohibited from permitting any additional catered events in the Building to be held after April 28, 2008.  Moreover, because the Final Determination revokes the Permits, the Church and the Rose Group will be forced to suspend any further Required Capital Repairs.  As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled.  This prohibition effectively requires the Rose Group to cease its catering operations in the Building.

62.    If the Church can no longer make the Building available for catered

events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed. For these reasons, and more, if the City's decision is not enjoined, the Church will be forced to sell the Building and its congregation will be deprived of its place of worship.

### First Claim for Relief
### RLUIPA EQUAL TERMS CLAIM
### 42 U.S.C. § 2000cc(b)

63.    Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.    By imposing and implementing the City's land-use and zoning laws and regulations in the manner described above, and by the conduct described above, the City is treating the Church on less than equal terms with comparable nonreligious institutions.

65.    By revoking the Permits and rescinding the Pre-Consideration and thereby forbidding the Church to permit catered events at the Building, Defendants have discriminated against the Church because they freely permit comparable nonreligious institutions to engage in the similar practice of renting out their premises for catered events for non-members.

66.    By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(b), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Second Claim for Relief
### RLUIPA SUBSTANTIAL BURDEN CLAIM
### 42 U.S.C. § 2000cc(a)

67.    Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.    The Church entered into the Lease because it needed to preserve its Building so that its congregation could worship and perform other religious activities in it. The Church's use, renovation, and restoration of its real property constitute "religious exercise."

69.    Among other improvements, the Lease requires the creation of a new room for the Church's Sunday School, and this conversion of real property is also "religious exercise" under RLUIPA.

70.    Congress requires that the Court construe RLUIPA "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-3(g).

71.    Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its congregation, spreading its religious teaching, and thereby impeding its religious exercise.

72.    If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

73.    The revocation of the Permits and prohibition on any future catered events is an arbitrary, irrational decision that does not bear any substantial relation to the public health, safety and welfare.

74.    The revocation of the Permits and prohibition on any future catered events reflects the Defendants' inconsistent application and implementation of its zoning rules, a

decision made to placate a small but influential number of disgruntled neighbors and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, noise, or other factors relating to quality of life, given that Defendants allow events similar to the catered events in other facilities in the immediate neighborhood.

75. By imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above, Defendants have imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

76. The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

77. This substantial burden on the religious exercise of the Church is imposed by Defendants in the implementation of a system of land use regulations under which Defendants make, and have in place formal and informal procedures or practices that permit them to make, individualized assessments of proposed land uses, as contemplated by 42 U.S.C. § 2000cc(a)(2)(C).

78. This substantial burden on the religious exercise of the Church, and the removal of the substantial burden, will affect commerce among the several states, as contemplated by 42 U.S.C. § 2000cc(a)(2)(B).

79. By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief,

injunctive relief, compensatory damages, and the costs and expenses of this action.

## Third Claim for Relief
## EQUAL PROTECTION CLAIM
## PURSUANT TO 42 U.S.C. § 1983

80.     Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.     The Church is a "class of one" and is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

82.     Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct.

83.     Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated nonreligious institutions to conduct.

84.     This differential treatment was based on impermissible considerations, including baseless community opposition to the Church, the nature of the Church's religious beliefs, and the bad faith attempt to harm the Church's ability to maintain its premises.

85.     Defendants' actions are designed for the purpose of hampering the exercise of the Church's religious activities in its chosen house of worship, and to prevent the Church from generating the same sort of supplemental income from the rental of event spaces that other similarly situated institutions are permitted to generate.

86.     By singling out Plaintiff for unequal adverse treatment, and bowing to pressure from the neighborhood opponents, Defendants deprive Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

87.     Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

88.     By virtue of the foregoing conduct, Defendants have caused the Church immediate and irreparable harm.

89.     The Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Fourth Claim for Relief
### FIRST AMENDMENT FREE EXERCISE CLAIM
### PURSUANT TO 42 U.S.C. § 1983

90.     Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.     Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, by imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above.

92.     The Defendants' implementation of the City's land use laws is not neutral and generally applicable to all, but instead discriminates unfairly against the Church.

NYC 189965v8 0085520-000001

93.     The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any compelling reason.

94.     The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any rational basis.

95.     By singling out Plaintiff for unequal, adverse, treatment, and bowing to pressure from neighborhood opponents, Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

96.     Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

97.     By virtue of the foregoing conduct, Defendants have caused immediate and irreparable injury to the Church.

98.     The Church is entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

WHEREFORE, judgment should be entered as follows:

A.     Declaring that Defendants' actions violated section (b)(1) of RLUIPA;

B.    Declaring that Defendants' actions violated section (b)(2) of RLUIPA;

C.    Declaring that Defendants' actions violated section (a) of RLUIPA;

D.    Declaring that Defendants' actions violated Plaintiff's right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution;

E.    Declaring that Defendants' actions violated Plaintiff's right to the free exercise of religion pursuant to the First and Fourteenth Amendments to the United States Constitution;

F.    Temporarily, preliminarily and permanently enjoining Defendants from revoking the Permits or prohibiting the Church, pursuant to the Lease, from continuing to permit catered events for non-members in the Building pursuant to the Lease;

G.    Awarding compensatory damages against all Defendants;

H.    Awarding Plaintiff's attorney fees and other reasonable expenditures, together with the costs and expenses of this action pursuant to 42 U.S.C. § 1988; and

I.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
          December 3, 2007

                              DAVIS WRIGHT TREMAINE LLP

                              BY: _____
                                  Victor A. Kovner (VAK-2248)
                                  John Cuti (JC-3365)
                                  Monica Pa (MP-3307)

                              1633 Broadway
                              New York, New York  10019-6708
                              Telephone:  (212) 489-8230
                              Facsimile:  (212) 489-8340

                              *Attorneys for Plaintiff*
                              *Third Church of Christ, Scientist,*
                              *of New York City*

Exhibit C

**SONA OLSON**, declares under the penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Director of Facilities of the Church of Saint Ignatius Loyola located at 980 Park Avenue in Manhattan (the "Church"). I make this declaration based on my personal knowledge.

2. One of the facilities at the Church is Wallace Hall. For the time period of September 2006 to September 2007 Wallace Hall was used for 168 "events".

3. There were one hundred twenty-six (126) parish related events, _e.g._, a shelter for fourteen weekends a year, memorial receptions, ministry nights, lectures, music programs, spiritual direction programs and religious education in Wallace Hall during this time period. In addition to these 126 events, Wallace Hall was used for Mass every Sunday for ten months a year. During this time period (and excluding the use for Sunday Mass), seventy-five percent (75%) of the events at Wallace Hall were parish related events.

4. The Loyola School, Saint Ignatius Loyola Grammar School and Regis High School (all parish affiliated schools) and certain non-affiliated schools also held twenty-four (24) school related events in Wallace Hall. None of these events were catered events and sometimes parents would bring their own food for a type of "potluck" dinner. Sixteen percent (16%) of the total number (168) of events were of this type.

5. In addition, to the Parish related and affiliated school events, there were nine (9) rental events held at Wallace Hall that were "catered" events with outside caterers. There is no one "Wallace Hall" caterer. These nine events comprise five percent (5%) of the number of events (168) at Wallace Hall.

6.     Finally, four percent (4%) of the events at Wallace Hall were rental events without caterers.

Dated:          New York, New York
                February 5, 2008

_____
                                SONA OLSON

Exhibit D

**Pa, Monica**

| | |
|---|---|
| **From:** | Cuti, John |
| **Sent:** | Wednesday, March 19, 2008 5:34 PM |
| **To:** | 'dbryant@cullenanddykman.com' |
| **Cc:** | Kovner, Victor; Pa, Monica |
| **Subject:** | Third Church of Christ, Scientist; subpoena to St. Ignatius of Loyala |

Deborah,

It was a pleasure chatting with you about the case.

This email confirms that we consent to an extension of time of one week for you to file any objections to the subpoena.

We just debated at some length whether we were entitled to tax-related documents. I stated that documents from your client regarding discussions or communications about its tax exempt status and whether revenue from catered events would have any impact on that tax-exempt status was a relevant issue in the case, particularly given the City's argument that the agreement regarding this issue in the lease between the Rose Group and Third Church somehow shows that the Third Church no longer is truly a church but is instead a commercial catering hall. We want to show that other religious groups -- as well as secular non-profits -- may well have similar agreements with caterers or other third parties concerning the issue of whether revenues from catered events (or art shows, etc) might have an impact on the tax-exempt status of a particular organization. Discovery on this issue is relevant. You disagreed with this position, and stated that your client did not intend to produce tax returns (though you did suggest that to the extent there were documents, e.g., agreements, between your client and a third party that pertained to this tax issue you would consider producing them.) I then suggested that you produce the other categories of documents. We would review them, and then we could decide whether we needed to litigate whether the tax-related documents were discoverable. Finally, I said that to ease compliance with the subpoena, your client could start by producing documents for the period 1/1/05 to date. Please let me know when you think you will be able to produce documents.

Finally, we think it's more efficient to schedule a deposition after the documents are produced, and we can have that scheduling discussion at a later time.

Thanks for your courtesy and cooperation,

John

**John Cuti** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax: (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

Exhibit E

# CULLEN and DYKMAN LLP

44 Wall Street
New York, New York 10005-2407
Telephone (212) 732-2000 • Facsimile (212) 571-2838

**DEBORAH A. BRYANT**
Associate
Direct Dial: 212-510-2256
Direct Fax: 212-742-8268
dbryant@cullenanddyman.com

March 19, 2008

John Cuti, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, New York 10019

DAVIS WRIGHT TREMAINE LLP
DATE: _____ 3/25/08 _____
☑ MAIL   ☐ BY HAND
☐ FAX    ☐ FEDERAL EXPRESS

Re:   *Subpoena served on St. Ignatius of Loyola*

   *Third Church of Christ, Scientist v. City of New York, et al*
   <u>Our file No.:  70000-46903</u>

Dear Mr. Cuti:

   We represent St. Ignatius of Loyola ("St. Ignatius"), and are in receipt of the non-party subpoena, returnable March 26, 2008 (the "Subpoena"), that your client, plaintiff (Third Church of Christ, Scientist) in the above-referenced action, served upon St. Ignatius, and write pursuant to the Federal Rules of Civil Procedure, Rule 45(c)(B), to object to the Subpoena for the reasons, inter alia, stated herein.

   We understand that Third Church of Christ, Scientist, claims that its catering use is "accessory" as defined in the N.Y.C. Zoning Resolution, and therefore not in violation of the Resolution. The Subpoena, seeking St. Ignatius' tax and other records covering an eight (8) year period, is immaterial to that issue, may be determined by expert testimony, and improperly demands records that are proprietary in nature. Furthermore, the Subpoena demands a search and production that would be unduly burdensome and costly.

   We appreciate our recent conversation wherein you agreed to limit the scope of the Subpoena to a three (3) year period beginning 2005 to present. However, the objections stated herein are not cured by that change in scope. St. Ignatius is willing to assist in this matter to the extent required by law and looks forward to speaking with you to discuss mutually agreeable limitations to the Subpoena.

   Please call me at your earliest convenience to discuss this matter further.

Sincerely,

Deborah A. Bryant

***Founded 1850***

BROOKLYN      LONG ISLAND      MANHATTAN      WASHINGTON, D.C.      NEW JERSEY

Exhibit F

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

JOHN R. CUTI
DIRECT (212) 603-6486
johncuti@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

March 27, 2008

***By Email and Regular Mail***

Deborah A. Bryant, Esq.
Cullen and Dykman, LLP
44 Wall Street
New York, NY 10005-2407

Re:    Subpoena Served on St. Ignatius of Loyola Church
*Third Church of Christ, Scientist v. City of New York;* 07 Civ. 10962 (DAB)

Dear Ms. Bryant:

I write to respond to your March 19, 2008 letter, which I received yesterday, concerning the subpoena served on your client St. Ignatius of Loyola Church ("St. Ignatius") on March 6, 2008.

Your letter broadly objects to the Subpoena on the grounds that it calls for the production of irrelevant material, proprietary material and/or casts too broad a net. These Objections, however, lack any specificity as to which Requests you find objectionable, or the grounds for these objections. We have already sought to accommodate your concerns by extending your time to respond by one week and by limiting the temporal scope of the Subpoena to the period from January 1, 2005 to date. Though you state that the "objections stated [in your letter] are not cured by that change in scope[,]" you never specify those objections.

Based on our last telephone conversation, we understood that you would be producing documents on April 2, 2008, and that your only outstanding objection was to the production of St. Ignatius' tax returns for the past three years. As we previously stated in our March 19, 2007 email, we believe such information is directly relevant and discoverable. Rather than litigating this issue now, however, we ask that you provide all documents (other than tax returns) concerning any discussions, analyses, or considerations by St. Ignatius concerning the impact of revenue received from Social Events on your client's tax-exempt status. We will then explore this issue further during the deposition of your client. Of course, because we do not believe there could be any valid objection to producing documents responsive to the requests for

Deborah A. Bryant, Esq.
March 27, 2008
Page 2



information about the catering activities conducted at your client's facilities – after all, your client voluntarily shared information about such activities with the City in connection with this very litigation – or about communications with the City or the other topics identified in the Subpoena, we expect production of such records as well.

We assume that the person most knowledgeable about catering at St. Ignatius is Sona Olson, the individual who provided the declaration to the City, but if there is someone else more knowledgeable, please let us know so we can schedule his or her deposition.

Can you confirm that you will be producing documents responsive to the Subpoena – other than tax returns – on April 2, 2008, and that we will be scheduling a deposition shortly thereafter?  If not, and/or if you intend to withhold other categories of documents, please let us know immediately.  Because the court has limited us to a three-month time period to conduct discovery, we would like to resolve our discovery issues sooner rather than later.  Please feel free contact me or my colleague, Monica Pa, if you have any other questions.

Very truly yours,

John R. Cuti

Exhibit G

## Pa, Monica

| | |
|---|---|
| **From:** | Pa, Monica |
| **Sent:** | Wednesday, April 02, 2008 6:47 PM |
| **To:** | 'dbryant@cullenanddyman.com' |
| **Cc:** | Cuti, John; Kovner, Victor; Pa, Monica |
| **Subject:** | Third Church v. NYC: Subpoena on St. Ignatius |

Dear Deborah,

I am writing to follow up on our telephone conversation on April 1st. Although we previously agreed to limit the scope of discovery for past three years, you have asked to produce documents for only one year. Discovery of St. Ignatius' catering activities at Wallace Hall, however, is highly relevant to our case, and sought pursuant to a court order permitting non-party discovery. We cannot accept your restrictive limitation on the subpoena, and must insist that you produce responsive documents for the past three years. In addition, we ask that you submit a witness for deposition pursuant to the subpoena.

As a courtesy, we would be willing to extend your time to respond by an additional week, so that documents would be due April 9, 2008. Please let me know whether you will be able to comply. Given the short amount of time that we have to conduct discovery, absent an accommodation, we will move to compel your client's cooperation.

Very truly yours,
Monica Pa

**Monica Pa** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6465 | Fax: (212) 489-8340
Email: monicapa@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/PaMonica.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

Disclaimer: This message may contain confidential communications protected by the attorney client privilege. If you received this message in error, please delete it and notify the sender.

Exhibit H

## Pa, Monica

| | |
|---|---|
| **From:** | Cuti, John |
| **Sent:** | Thursday, April 10, 2008 4:32 PM |
| **To:** | 'dbryant@cullenanddyman.com' |
| **Cc:** | Kovner, Victor; Pa, Monica |
| **Subject:** | RE: Third Church v. NYC: Subpoena on St. Ignatius |

Deborah,

      Not having had any response to Monica's email of April 2nd, we assume you are not interested in agreeing to the various accommodations we have previously suggested. Unfortunately, therefore, tomorrow we intend to file a motion to compel.

      We regret that we could not work this out without the assistance of the Court.

John

**John Cuti** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax: (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** Pa, Monica
**Sent:** Wednesday, April 02, 2008 6:47 PM
**To:** 'dbryant@cullenanddyman.com'
**Cc:** Cuti, John; Kovner, Victor; Pa, Monica
**Subject:** Third Church v. NYC: Subpoena on St. Ignatius

Dear Deborah,
I am writing to follow up on our telephone conversation on April 1st. Although we previously agreed to limit the scope of discovery for past three years, you have asked to produce documents for only one year. Discovery of St. Ignatius' catering activities at Wallace Hall, however, is highly relevant to our case, and sought pursuant to a court order permitting non-party discovery. We cannot accept your restrictive limitation on the subpoena, and must insist that you produce responsive documents for the past three years. In addition, we ask that you submit a witness for deposition pursuant to the subpoena.

As a courtesy, we would be willing to extend your time to respond by an additional week, so that documents would be due April 9, 2008. Please let me know whether you will be able to comply. Given the short amount of time that we have to conduct discovery, absent an accommodation, we will move to compel your client's cooperation.

Very truly yours,
Monica Pa

**Monica Pa** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6465 | Fax: (212) 489-8340
Email: monicapa@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/PaMonica.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

Disclaimer: This message may contain confidential communications protected by the attorney client privilege. If you received this message in error, please delete it and notify the sender.

Exhibit I

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

VICTOR A. KOVNER
DIRECT (212) 489-8230
victorkovner@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

March 6, 2008

***By Hand***

Riverside Church
490 Riverside Drive
New York, NY 10027-5706

Re:   *Third Church of Christ, Scientist v. City of New York, et al.; 07 CV 10962 (DAB)*

Dear Sir or Madam:

This firm represents plaintiff Third Church of Christ, Scientist (the "Church") in this litigation. As you may know, this federal lawsuit was filed by the Church to protect its ability to continue to use its building at 583 Park Avenue as a venue for occasional catered social events, a use that the City initially approved but, in November 2007, decided to prohibit. The United States District Court Judge handling this matter has authorized the Church to conduct what is called "discovery" which is the legal term we use to describe the process of gathering facts that are relevant to a lawsuit. I want you to know that the Church is serving the enclosed subpoena on you only with great reluctance; we would have much preferred to have resolved this matter without need for litigation because we believe the tradition of allowing religious institutions and secular non-profit groups to raise supplemental revenues by permitting their buildings to be used for catered events is good policy. (The Complaint in this matter is attached as Exhibit B to the subpoena.) Unfortunately, it became necessary to file this case to protect the Church. Regrettably, the nature of the legal claims requires us to seek information from you.

Enclosed please find a subpoena that requires you to provide the documents requested in Exhibit A to the subpoena. The subpoena also calls for your testimony, and notes that the date for providing that testimony is March 26, 2008. I understand that there may be scheduling issues, and you should of course feel free to contact me or my colleagues John Cuti and/or Moncia Pa so that we can arrange a mutually convenient date for your testimony. It is more efficient for you to provide the documents that are responsive to the subpoena prior to your testimony. Accordingly, the subpoena requires production of responsive documents on or before March 26, 2008.

Riverside Church
March 6, 2008
Page 2



       Finally, enclosed please also find a check in the amount of $ 44, which covers the costs of the witness fee and travel to and from my office to provide testimony pursuant to the subpoena. Again, please accept our apologies in advance for any inconvenience. Please feel free to call us if you have any questions regarding your obligations.

                    Respectfully submitted,

                    Victor A. Kovner

cc:    Ave Maria Brennan, Esq. (by email)

☜AO88  (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF _____ NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,
                    Plaintiff,
            V.

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings,
                    Defendants.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  07 Civ. 10962 (DAB)

TO:
    Riverside Church
    490 Riverside Drive
    New York, N.Y. 10027-5706

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below
to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION     Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019   Telephone: (212) 489-8230 | DATE AND TIME   3/26/2008 10:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE   Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019   Telephone: (212) 489-8230 | DATE AND TIME   3/26/2008 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   Attorney for Plaintiff | DATE   3/6/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Victor A. Kovner, Esq.

DAVIS WRIGHT TREMAINE LLP, 1633 Broadway, New York, NY 10019 - (212) 489-8230

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

| DATE | | | | | CHECK NUMBER **55859** |
|------|---|---|---|---|---|
| DATE | INVOICE NO. | VOUCHER ID | INVOICE AMOUNT | NET AMOUNT | REMARKS |
| 03-04-08 | PAM030408I | 880416 | 44.00 | 44.00 | witness & transportation fees |
| | | | | TOTAL | 44.00 |

03-05-08

DAVIS WRIGHT TREMAINE LLP
1201 THIRD AVENUE
SUITE 2200
SEATTLE, WA 98101-3045

DETACH AND RETAIN THIS STATEMENT

THE ATTACHED CHECK IS IN PAYMENT OF ITEMS LISTED ABOVE



THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW. DO NOT CASH IF NOT PRESENT.

DAVIS WRIGHT TREMAINE LLP
1201 THIRD AVENUE, SUITE 2200
SEATTLE, WASHINGTON 98101-3045
(206) 622-3150

| VENDOR NO. | DATE | | NO. 55859 |
|---|---|---|---|
| 29294 | 03-05-08 | 64-1278 611 GA | |

Bank of America, N.A.
Atlanta, DeKalb County, GA
Member FDIC

PAY ONLY FOUR FOUR 00 CTSCTS

*********$44.00

DAVIS WRIGHT TREMAINE LLP

PAY
TO THE
ORDER
OF

RIVERSIDE CHURCH
490 RIVERSIDE DRIVE
NEW YORK, NY 10027-5706

Authorized Signature

⑈00055859⑈ ⑆061112788⑆ 003359800946⑈

Exhibit A

## **Definitions and Instructions**

1.    "You" or "your" means the Riverside Church, located at 490 Riverside Drive, New York, New York and your directors, officers, employees, agents and attorneys, each person acting on your behalf or under your control, and any parent, subsidiary, predecessor or affiliated entity, corporation, institution, or non-profit organization.

2.    "Documents" has the meaning provided for in the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Southern District of New York and, without limiting the generality of the foregoing, includes all materials (drafts, originals, and non-identical copies, whether written or electronically stored, sent, or received) such as, *inter alia*, memoranda (interoffice and otherwise), notes, letters, email messages, calendars, appointment books, newsletters, notices, minutes or transcripts of meetings, brochures, advertising copy, website pages, photographs, video recordings, annual reports, tax returns, invoices, checks, credit card receipts or records, spreadsheets, contracts, reservation lists, contact lists, vendor lists, permits, licenses, or other records.

3.    "Communications" means the transmission or exchange of information, oral or written, formal or informal, and shall include without limitation, any documents embodying, containing, constituting, discussing, memorializing, referring to or relating to any such contact.

4.    The "Action" means the lawsuit *Third Church of Christ, Scientist, of New York City v. The City of New York, et al.,* 07 Civ. 10962 (DAB), pending in the Southern District of New York.

5.    The "Complaint" means the complaint filed in the Action, attached hereto as Exhibit B.

6.    The "Church" means the Third Church of Christ, Scientist, of New York City, the Plaintiff in the Action.

7.    The "Building" means the Church edifice located at 583 Park Avenue, New York, New York.

8.    "Elected Officials" means any person serving in the United States Congress, the New York City Council, or the New York State Legislature and any member of his or her staff, including without limitation the Hon. Carolyn Maloney, Hon. Daniel Garodnick, Hon. Jonathan Bing, or the Hon. Liz Krueger.

9.    The "City" means the City of New York, and all of its officials and agencies, including without limitation the Department of Buildings, the Law Department, the Department of City Planning, the Board of Standards and Appeals, the Mayor and/or any Deputy Mayor and/or any member of their respective staffs.

10.    "Premises" means the building located at 490 Riverside Drive, New York, New York.

11.    "Social Events" means any catered or other social event conducted at the Premises, whether for your congregants, or for the general public.

12.    You are required to search for the documents responsive to the requests, wherever located, which are: (a) in your actual or constructive possession, custody, care and/or control; (b) in the actual or constructive possession, custody, care and/or control of your agent, representative or employee; or (c) in the actual or constructive possession, custody, care and/or control of any person who, or entity which, is or has been acting on your behalf or under your direct or indirect control.

13.    In the event that any document responsive to any document request is withheld from production upon a claim of attorney-client, work product or other privilege or immunity, you are required to furnish a list, verified by counsel, of the documents withheld from such

production, setting forth for each document: (a) the nature of the privilege or immunity claim; (b) the date of the document; (c) the title and general subject matter of the document; (d) the identity of each person who made, prepared or signed the document; (e) the identity of each person to whom the document was addressed and each person to whom a copy was indicated to have been sent or was sent; and (f) the present location of the document.

14.    Each document request is continuing in nature, requiring the production of additional documents, should you become aware of or acquire them, in your possession, custody or control after initially responding to these requests.

15.    The past tense shall be construed to include the present tense and vice versa, to make the request inclusive rather than exclusive. The singular shall be construed to include the plural and vice versa to make the request inclusive rather than exclusive. "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

16.    Unless otherwise stated, the relevant period for these requests shall be from January 1, 2000 to the present.

## Document Requests

All Documents concerning or in any way related to:

1.    Any Social Event conducted on or in the Premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

2.    The total number of hours each year that the Premises are used for Social Events, including the number of hours it takes to set up for and clean up after each Social Event.

3.    The Certificate of Occupancy for the Premises (the "CO"), including any amendments thereto.

4.       Any communication with the City regarding the use of the Premises, including communications regarding the CO, and/or whether any past, current, or planned use of the Premises is or was an "accessory use" under the City's Zoning Resolution or other applicable land use regulations.

5.       Any portion of the annual report of the Riverside Church, or any submission to any taxing or other authority, regarding revenues generated by Social Events.

6.       Any analysis, investigation, or communication regarding the taxation of revenues generated by Social Events.

7.       Any application for any permit, license or other permission from the City to conduct Social Events, and the issuance or renewal of any such permit, license or other permission, whether formal or informal.

8.       Any communication with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct Social Events at the Premises.

9.       Any independent person or entity (including but not limited to the caterer Madeline's Catering and Special Events) that performs catering-related services (an "Outside Caterer") with which you have a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the Outside Caterer's use of, or performance of services on or in, the Premises; (c) any repairs or improvements to the Premises made by, and/or for the benefit or use of, the Outside Caterer; and (d) rent or use payments made by, or other financial arrangements with, the Outside Caterer.

10.    Any trade names, trademarks, or other names, marks, or designations that you use to identify the availability of catering and Social Events at the Premises.

11.    Any document or communication related to or concerning any allegation in the Complaint, or any relevant fact, claim or defense in the Action.

12.    Any communication with the City or with Elected Officials concerning the Action.

13.    Whether a Social Event at your institution may be hosted by any member of the general public or only by an existing member of your congregation, and, if the latter, what, if any, policy you have for admitting or accepting a new member of your institution.

14.    Whether any signs or other indicia of the religious identification of the Premises are removed, obscured or covered during Social Events.

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
THIRD CHURCH of CHRIST, SCIENTIST, of :
NEW YORK CITY, :
                      :
            Plaintiff, :
                      :
         -against- :
                      :
THE CITY OF NEW YORK and PATRICIA J. :
LANCASTER, in her official capacity as :
Commissioner of the New York City Department :
of Buildings, :
                      :
            Defendants, :
------------------------------------------------------------------x

07-CV-*10962*
*(DAB)*

**COMPLAINT**

JURY TRIAL DEMANDED

       Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), by its undersigned attorneys for its Complaint against Defendants City of New York ("City") and Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department of Buildings ("DOB") (collectively, the "City" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

    1.    For more than 80 years, the Church has owned and worshipped in the historic building located at the northeast corner of Park Avenue and 63rd Street (the "Building"). Time has not been kind to the Building or the Church, whose membership dwindled as the Building fell into disrepair. A declining building is expensive to maintain and repair; growing liabilities for repair and maintenance keep new members away from the Church; a smaller membership makes it harder to raise money to pay for repairs. This was a vicious circle: if the Church failed to raise the substantial funds necessary to renovate the building, and in turn to grow its congregation, it would disappear.

    2.    The Church decided to do what many other religious institutions and secular non-profit organizations routinely do to supplement revenues: it entered into a

commercial relationship with a reputable caterer to conduct events in the Building – only at times when the Church was not using the Building for its primary religious purposes – in exchange for urgently needed funds. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the on-going expenses of maintaining the Building. This relationship was critical to the Church's survival.

3.    The Church is a good citizen and it went to the City for approval of this traditional accessory use. The City approved the Church's request and granted the necessary permits for the Required Capital Repairs. Doing so was entirely consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution. The Church relied on the City's approval, and the Required Capital Repairs began to be made. To date, the caterer has expended approximately $6.5 million to make the Required Capital Repairs and expects to spend another $1.5 million over the coming months to complete the work. Even though the caterer is undertaking the Required Capital Repairs, the vast majority of the work also benefits the Building and its Church-related uses and will continue to provide that benefit long after the caterer's contract with the Church expires.

4.    But something unlawful has happened. Defendants have suddenly revoked their prior approval and rescinded the permits. They have done so because a small group of affluent, influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events in the Building have transformed the Church into a

commercial catering hall that causes serious disruption in the neighborhood. The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth: the City is singling out and discriminating against the Church without any basis. If unremedied, this discrimination will have devastating consequences for the Church and likely will result in the sale of the Building so that the Church can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

5.    The Church seeks relief from this Court because the City has violated the Church's rights (1) to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions; (2) to be free from undue burdens on the exercise of its religion, as protected by Section (a) of RLUIPA; (3) to equal protection of the laws, pursuant to the Fourteenth Amendment; and (4) to the free exercise of its religion, pursuant to the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred in this district, and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## PARTIES

8.    Plaintiff Church is a religious corporation existing under the laws of the state of New York, with its principal place of business at 583 Park Avenue, New York, New York 10021.

9.    Defendant City of New York is a political subdivision of the State of New

York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a municipal corporation organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment, enforcement, and implementation of land use and zoning regulations within New York City.

10.     Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings and is authorized to enforce, among other things, provisions of the New York City Administrative Code, the New York City Building Code, and the Zoning Resolution of the City of New York. She is sued herein in her official capacity.

11.     The New York City Department of Buildings is an administrative department of the City of New York, whose offices are located in the County of New York in the State of New York.

## FACTUAL ALLEGATIONS

### The Church and its Historic Building

12.     The Church began in the 1880s as a congregation of students dedicated to the Christian Science religion. By 1895, as its membership grew substantially, the Church applied for a charter and was registered under the laws of the State of New York.

13.     In 1920, the Church purchased property at 583 Park Avenue, New York, New York, and retained the renowned architectural firm Delano & Aldrich to design a house of worship for the congregation. Completed in or around 1924, the red-brick, Georgian-Colonial building topped with its tall lantern is one of the architectural highlights of Park Avenue and is the same building that houses the Church's congregation to this day.

14.     By the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings

with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult socials and youth forum activities, and lectures and workshops focusing on religious and spiritual healing topics. During this period, lectures in the Church's Building would frequently be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in the basement.

15.    Over the years, the Church's membership has declined. It currently has fewer than one hundred members. True to its mission, however, the Church continues to use the Building for religious worship every Wednesday evening and Sunday morning, as well as for other religious uses such as Sunday School and lectures.

16.    A significant contributing factor to the decline in membership has been the growing state of disrepair of the Building and the prohibitive costs of the Required Capital Repairs, which members of the congregation would have to bear. The Required Capital Repairs necessary to revive the aging Building's infrastructure and to bring it into compliance with the New York City Building Code include modernization of all major building systems, including electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and, where necessary, replacement of the Building's façade, roof, windows, doors and other exterior components; and significant restoration of the main auditorium and other rooms regularly used for Church-related activities.

17.    In order to save the historic Building, the Church needed to raise substantial capital. For many years, the Church survived largely because of bequests made by deceased members of its congregation. But as the membership declined, the bequests declined, and the Church, year after year, was running at a significant deficit.

18.    Beginning at least in the late 1990s, the Church explored several alternatives to raise capital, including low-cost loans from the Historic Properties Fund

(administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

19.    From 1999 to 2006 the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship did not yield enough money to meet the Church's needs.

20.    In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

21.    Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for renovation and maintenance of the Building.

22.    After considering numerous alternatives, the Church did what many other religious institutions and nonreligious non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events In Order to Raise Needed Capital

23.    As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and ongoing maintenance costs (the "Lease").

NYC 189965v8 0085520-000001

24.    The express purpose of the Lease is to supplement the Church's income, and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at p. 1 (emphasis added).

25.    In addition to hosting weddings and other celebrations, as well as events for non-profit groups, companies and other firms – to date, events for New Yorkers for Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups have been held in the Building – the Lease requires the Rose Group to conduct catered events for members of the Church at reduced cost. 2nd Amn. to Lease, at ¶ 2.

26.    Upon information and belief, the Rose Group will invest more than $8 million on the Required Capital Repairs, of which $6.5 million has already been spent. Because the Building lies within the Upper East Side Historic District, any renovations to the exterior of the Building must be undertaken in a painstaking manner so as to preserve, wherever possible, the Building's original architectural details. Among the significant work that remains to be completed, the Rose Group plans to restore the Building's roof with slate from the same Vermont quarry that supplied the Church more than 80 years ago.

27.    In addition to Required Capital Repairs, the Rose Group is further obligated to undertake general maintenance of the Building throughout the 20-year Lease term, and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain threshold, from the catered events) to the Church. This supplemental income is a crucial source of operating revenue for the Church's religious activities, which will be especially necessary

when new community activities and outreach programs are implemented.

28.    Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities.

29.    Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1. Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities. Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5. Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief. Lease, at ¶ 35.6.

30.    The primary purpose of the Building is to serve as the Church's place of worship. But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a

reasonable chance to profit from the arrangement. In the second amendment to the Lease, dated

March 27, 2007, the parties provided that, in the event that the Building could not be used for

catering activity, the Rose Group would be able to require the Church to reimburse the Rose

Group for Required Capital Repairs it had undertaken, even if the Church had to sell the

Building. 2nd Amn. to Lease, at ¶ 3.

     31.    The Church went out of its way to be sensitive to its neighbors. Thus, the

Lease requires the Rose Group to "[p]ermit no act or practice which may ... be a nuisance," and

to "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the

side or rear of the premises." Lease, at ¶ 32.1.

     32.    The Church also insisted that the Rose Group take the extraordinary step

of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any

offensive odors[.]" When this system is completed, all trash from catered events will be stored

and refrigerated within the Building and taken to 63rd Street only when it is to be collected by

the trash truck. Lease, at ¶ 32.1.

     33.    Moreover, the Lease does not "permit any advertising medium or loud

speaker, radio broadcast, etc. to be heard outside of the premises." Lease, at ¶ 32.1.

     34.    In addition, the Second Amendment to the Lease provides that the Church

and the Rose Group will together "establish standards concerning sound, light levels, traffic

control, signage." 2nd Amn. to Lease, at ¶ 5.

     35.    The Rose Group has retained a highly professional and comprehensive

security team, Global Security Service, in order to ensure that all events at the Church are

orderly, quiet, and safe. At all events, in addition to other security measures, there are usually

off-duty members of the New York City Police Department patrolling the area, monitoring the

event and managing any crowds. There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws. These security measures

are implemented from an abundance of caution. Thus far, all of the catered events that have

occurred in the Building have occurred without incident.

### The Purpose of the Building Remains the Same:  It Is a
### Place of Worship for the Church Congregation

36.    The primary purpose of the Building is to remain a house of worship. For

over 80 years, the Building has been property devoted to the Christian Science faith, and it

remains the center of the Church's congregation. The Church currently conducts Sunday

Church Services and Sunday School services, Wednesday evening church service, Thanksgiving

and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church

classes (all-day class for a two-week period, twice a year), Church corporate or organizational

meetings, and occasional non-regularly scheduled events and Association meetings. Lease, at ¶

35.1.

37.    The Church has been attracting new members because of the recent repairs

to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be

able to hold additional services and lectures for its members and other attendees. Among other

events, the Church expects to host additional Sunday church services and Sunday school

sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee

meetings, youth forum activities, musical rehearsals and recitals, and various religious

workshops. In total, the Church expects to utilize the Building for several hours almost every

day of the week within the next five years. Following the renewal of the Church and its

congregation, the Building will be open for religious activities for approximately 400-500 hours

per month, far more than the approximately 60 hours per month that is contemplated for catered

events for non-members.

38.    Finally, the Church's purpose in working with the Rose Group is more

than merely economical; the Church also hopes that opening up the Building to public events will introduce the Christian Science faith to the larger community, thereby aiding the Church in augmenting its membership. In addition to increased exposure, the historic Building will again be enjoyed and appreciated by the general public, as it had been for many decades until the Building began its decline.

### The Required Capital Repairs Were Undertaken in Reliance on the City's Approval of Catering Events at the Building

39.     Like many religious and nonreligious non-profit institutions, the Church is located in an area zoned for residential use. The Building is in an R-10 zoning district, which is the highest density residential area under the Zoning Resolution of the City of New York (the "Zoning Resolution"). In Manhattan, much of Midtown and Downtown as well as cross-town streets and avenues are zoned R-10.

40.     Only residences, community facilities (such as churches, synagogues and non-profit institutions) and uses that are "accessory" to residences and community facilities are permitted in residential districts under Article II, Chapter 2 of the Zoning Resolution. While catering facilities are permitted, and commonly found, as accessory uses in community facility buildings, stand-alone catering facilities are not permitted in residential districts. Section 12-10 of the Zoning Resolution provides that for a use to be considered "accessory" it must be (i) conducted on the same zoning lot as the principal use, (ii) clearly incidental to, and customarily found in connection with, the principal use and (iii) substantially for the benefit or convenience of the principal use.

41.     Prior to initiating the extensive and costly Required Capital Repairs, the Church and the Rose Group sought the City's approval for this catering arrangement. On April 19, 2006, the City issued a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-

Consideration"). The Pre-Consideration provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building, pursuant to Section 12-10 of the Zoning Resolution.

42.    The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").

43.    Based on the Church's truthful representation that the catered events were to be "operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church" and that the "functions will be restricted by the contract with the Church," the DOB granted its Pre-Consideration permitting the Church to have catered events in the Building.

44.    The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees. During these conversations, DOB's consistent position has been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and, the Manhattan Borough Commissioner of DOB stated that the only limitation on the size of events related to the capacity of the Building. Approximately $6.5 million has been expended on the Required Capital Repairs in reliance on the City's June 2006 approvals.

**Defendants Routinely Permit Other Religious And Nonreligious Non-Profit Groups to Conduct Similar Catered Events, Including In The Church's Immediate Vicinity**

45.    The Church's reliance on the Pre-Consideration was reasonable on several levels. After all, as detailed below, (a) there are many buildings in the immediate vicinity of the Building, all in residential zoning districts, that are rented to members of the general public for large social events, (b) there are many similarly situated churches, synagogues and other

religious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events, and (c) there are many nonreligious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events.

45-a.   The following is a chart, developed from public records without the benefit of discovery proceedings, showing establishments in the immediate vicinity of the Building, all of which are located in Residential zoning districts, and which rent their facilities to members of the general public for catered events:

| | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Beekman | 575 Park Avenue – directly south of the Building | Total capacity (restaurant plus separate catering venue) approx 200 | A restaurant open to the general public as well as a separate facility for catered events | R10 (Special Park Improvement District ("PI")) / R8B (Limited Height District No. 1A ("LH-1A")) |
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity: 500 | Available for private catered events and movie and commercial shooting | R10 (PI) |
| The Colony Club | 564 Park Avenue – two blocks south of the Building | | Private club, rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Regency Hotel | 540 Park Avenue – two blocks south of the Building | 4,400 square feet of flexible function space, accommodate up to 200 | Rents out space for a variety of catered events, uses in-house catering operation | R10 (PI) / C5-1 (Special Madison Avenue Preservation District) |
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated; additional events on same night can be held in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety | R10 (PI) |

| | | | of catered events for non-members | |
|---|---|---|---|---|
| Union Club | 101 East 69th Street and Park Avenue | | Rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers Club | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. *Uses designated outside caterer* New York Catering | R8B (LH-1A) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

45-b.   Moreover, as is evident from the following chart developed from public records without the benefit of discovery proceedings, it is customary for churches, synagogues and other religious institutions to rent out their facilities to non-congregants for social events in order to offset in the extraordinary costs of maintaining their historic properties:

| | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity 500 guests | Available for private catered events and movie and commercial shooting | R10 (PI) |
| St. Bartholomew's Church | 109 East 50th Street and Park Avenue | 1250 | Available for movie and commercial filming, corporate events, fashion shows, rehearsal dinners, weddings, cocktail parties, and dances, among other events. All catering provided in house by Café St. Bart's. | C5-3 (MID) / C5-2.5 (MID) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

| Universalist Church of New York | 160 Central Park West | 500 | Church dated 1897, available for private catered events and separate attached kitchen. | R10-A / R8B |
| All Souls Church | 1157 Lexington Avenue and East 80th Street | 350; 200 seated event | | C1-8X / R8B |
| The Top Deck at the Seamen's Church Institute | 241 Water Street, near Peck Street | 130 guests | Interfaith chapel, rents out space for a variety of catered events for non-congregants. | C6-2A (Special Lower Manhattan District – South Street Seaport Subdistrict) |
| Riverside Church | 490 Riverside Drive, between 119th and 122nd Street | 500; 300 seated event | Uses designated onsite caterer, Madeline's Catering & Special Events | R8 |

45-c.    Finally, the following chart, developed from public records without the benefit of discovery proceedings, makes clear that it is customary for nonreligious non-profit institutions (including institutions, like the ones below, located in residential districts) to rent their facilities to non-members for catered events in order to offset the extraordinary costs of maintaining their historic properties:

| | __Location__ | __Capacity__ | __Availability__ | __Zoning__ |
|---|---|---|---|---|
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated event; can host additional events on same night in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety of catered events for non-members | R10 (PI) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. | R8B (LH-1A) |

| Club | | | Uses designated outside caterer New York Catering | |
|---|---|---|---|---|
| The Frick Collection | 1 East 70th Street, near Fifth Avenue | 200 seated event; 350 cocktails | | R10 (PI) / R8B (LH-1A) |
| National Academy Museum | 1083 Fifth Avenue, near East 89th Street | 140 seated event; 240 cocktails | | R10 (PI) |
| Cooper-Hewitt, National Design Museum | 2 East 91st Street, near Fifth Avenue | 90 seated event; 500 in Terrace and Garden | Rents out space for a variety of catered events for non-members *Uses designated outside caterer* Restaurant Associates | R10 (PI) / R8B (LH-1A) |

46.    Like these secular non-profit institutions, and like other religious institutions, the Church found that it was necessary to rent out its space to cover the daunting costs of making the Required Capital Repairs and of operating and maintaining its historic Building. Like its neighbors, the Church sought to use its Building both to generate revenue and to serve as a community resource. The events already held in and planned for the Building are not meaningfully different from any of these uses at other comparable institutions.

### Opposition by Neighboring Residents Results in the Revocation of the Pre-Consideration

47.    By March 2007, after the Required Capital Repairs were well underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings on the west side of Park Avenue, across the wide avenue from the Church – 570 Park Avenue and 580 Park Avenue – began to complain about the Church's arrangement with the Rose Group. After initially discussing the matter with the Church and the Rose Group, residents of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a public relations campaign against the Church. Their avowed purpose was to maintain the "residential" character of their Park Avenue neighborhood, and their flyer contended that the Church's plans to permit catered events at its historic premises – although no different than the

practices of neighboring institutions – would cause significant disruption in their backyard. These neighbors, however, failed to mention that if the Church were unable to supplement its revenues it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

48.    On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused the Church of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall.  The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night."  This is a selective and baseless attack on the Church.  As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory just a few blocks north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

49.    The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007.  The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, thereby distorting the real import of the Lease.

50.    Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group the limited right to use the Building for catered events when it is not being used for religious

activities.

51.    Unfortunately, the City has succumbed to the demands of these influential neighbors.  On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly completed.

52.    The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church."  The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008).  The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

53.    Upon receiving the letter, the Church engaged litigation counsel.  Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation.  Counsel for the Church advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the Building to satisfy its liabilities.

54.    The Church's attempt to resolve this matter without litigation was unsuccessful.

55.    On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination"). The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

56.    By revoking the Permits and rescinding the Pre-Consideration and withholding permission allowing the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions. It also irrationally singles out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making available their premises in order to host private catered events.

57.    The Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area.

58.    By revoking the Permits and preventing the Church from hosting catered events on its premises, the City has threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease. The implementation of

the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship – the epicenter of its religious practice for the past 80 years.

59.     Further, by determining that the Church's Building is effectively a catering hall, the City mischaracterizes the Lease and wrongfully impugns the Church.  Contrary to the Defendants' disparaging characterization, the Church remains a congregation devoted to the Christian Science faith, and any catering activities conducted in the Building were, and will remain, wholly incidental to its primary purpose and use of preaching and practicing its religion.

60.     Moreover, the City is impairing the Church's interest in opening up its premises to the general public, which it believes will spark new interest in the Christian Science faith.

### The Church Will Suffer Immediate and Irreparable Injury

61.     The impact of the DOB's decision will be devastating and immediate. The Final Determination rescinds the earlier-granted accessory use approval and revokes the Permits, forthwith.  Therefore, pursuant to the DOB Letter and the Final Determination, as of October 29, 2007, the Church is prohibited from allowing any additional catered events to be booked for the Building, and the Church is prohibited from permitting any additional catered events in the Building to be held after April 28, 2008.  Moreover, because the Final Determination revokes the Permits, the Church and the Rose Group will be forced to suspend any further Required Capital Repairs.  As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled.  This prohibition effectively requires the Rose Group to cease its catering operations in the Building.

62.     If the Church can no longer make the Building available for catered

events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed. For these reasons, and more, if the City's decision is not enjoined, the Church will be forced to sell the Building and its congregation will be deprived of its place of worship.

### First Claim for Relief
### RLUIPA EQUAL TERMS CLAIM
### 42 U.S.C. § 2000cc(b)

63.    Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.    By imposing and implementing the City's land-use and zoning laws and regulations in the manner described above, and by the conduct described above, the City is treating the Church on less than equal terms with comparable nonreligious institutions.

65.    By revoking the Permits and rescinding the Pre-Consideration and thereby forbidding the Church to permit catered events at the Building, Defendants have discriminated against the Church because they freely permit comparable nonreligious institutions to engage in the similar practice of renting out their premises for catered events for non-members.

66.    By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(b), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Second Claim for Relief
### RLUIPA SUBSTANTIAL BURDEN CLAIM
### 42 U.S.C. § 2000cc(a)

67.    Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.    The Church entered into the Lease because it needed to preserve its Building so that its congregation could worship and perform other religious activities in it. The Church's use, renovation, and restoration of its real property constitute "religious exercise."

69.    Among other improvements, the Lease requires the creation of a new room for the Church's Sunday School, and this conversion of real property is also "religious exercise" under RLUIPA.

70.    Congress requires that the Court construe RLUIPA "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-3(g).

71.    Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its congregation, spreading its religious teaching, and thereby impeding its religious exercise.

72.    If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

73.    The revocation of the Permits and prohibition on any future catered events is an arbitrary, irrational decision that does not bear any substantial relation to the public health, safety and welfare.

74.    The revocation of the Permits and prohibition on any future catered events reflects the Defendants' inconsistent application and implementation of its zoning rules, a

decision made to placate a small but influential number of disgruntled neighbors and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, noise, or other factors relating to quality of life, given that Defendants allow events similar to the catered events in other facilities in the immediate neighborhood.

75.    By imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above, Defendants have imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

76.    The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

77.    This substantial burden on the religious exercise of the Church is imposed by Defendants in the implementation of a system of land use regulations under which Defendants make, and have in place formal and informal procedures or practices that permit them to make, individualized assessments of proposed land uses, as contemplated by 42 U.S.C. § 2000cc(a)(2)(C).

78.    This substantial burden on the religious exercise of the Church, and the removal of the substantial burden, will affect commerce among the several states, as contemplated by 42 U.S.C. § 2000cc(a)(2)(B).

79.    By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief,

injunctive relief, compensatory damages, and the costs and expenses of this action.

### Third Claim for Relief
### EQUAL PROTECTION CLAIM
### PURSUANT TO 42 U.S.C. § 1983

80.    Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.    The Church is a "class of one" and is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

82.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct.

83.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated nonreligious institutions to conduct.

84.    This differential treatment was based on impermissible considerations, including baseless community opposition to the Church, the nature of the Church's religious beliefs, and the bad faith attempt to harm the Church's ability to maintain its premises.

85.    Defendants' actions are designed for the purpose of hampering the exercise of the Church's religious activities in its chosen house of worship, and to prevent the Church from generating the same sort of supplemental income from the rental of event spaces that other similarly situated institutions are permitted to generate.

86.    By singling out Plaintiff for unequal adverse treatment, and bowing to pressure from the neighborhood opponents, Defendants deprive Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

87.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

88.    By virtue of the foregoing conduct, Defendants have caused the Church immediate and irreparable harm.

89.    The Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Fourth Claim for Relief
### FIRST AMENDMENT FREE EXERCISE CLAIM
### PURSUANT TO 42 U.S.C. § 1983

90.    Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.    Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, by imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above.

92.    The Defendants' implementation of the City's land use laws is not neutral and generally applicable to all, but instead discriminates unfairly against the Church.

NYC 189965v8 0085520-000001

93.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any compelling reason.

94.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any rational basis.

95.    By singling out Plaintiff for unequal, adverse, treatment, and bowing to pressure from neighborhood opponents, Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

96.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

97.    By virtue of the foregoing conduct, Defendants have caused immediate and irreparable injury to the Church.

98.    The Church is entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

WHEREFORE, judgment should be entered as follows:

A.    Declaring that Defendants' actions violated section (b)(1) of RLUIPA;

B.  Declaring that Defendants' actions violated section (b)(2) of RLUIPA;

C.  Declaring that Defendants' actions violated section (a) of RLUIPA;

D.  Declaring that Defendants' actions violated Plaintiff's right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution;

E.  Declaring that Defendants' actions violated Plaintiff's right to the free exercise of religion pursuant to the First and Fourteenth Amendments to the United States Constitution;

F.  Temporarily, preliminarily and permanently enjoining Defendants from revoking the Permits or prohibiting the Church, pursuant to the Lease, from continuing to permit catered events for non-members in the Building pursuant to the Lease;

G.  Awarding compensatory damages against all Defendants;

H.  Awarding Plaintiff's attorney fees and other reasonable expenditures, together with the costs and expenses of this action pursuant to 42 U.S.C. § 1988; and

I.  Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
          December 3, 2007

                              DAVIS WRIGHT TREMAINE LLP

                              BY: _____
                                   Victor A. Kovner (VAK-2248)
                                   John Cuti (JC-3365)
                                   Monica Pa (MP-3307)

                              1633 Broadway
                              New York, New York  10019-6708
                              Telephone:  (212) 489-8230
                              Facsimile:  (212) 489-8340

                              *Attorneys for Plaintiff
                              Third Church of Christ, Scientist,
                              of New York City*

Exhibit J

# PATTON, EAKINS, LIPSETT, HOLBROOK & SAVAGE

ATTORNEYS AT LAW

GRAYBAR BUILDING

420 LEXINGTON AVENUE

NEW YORK, N.Y. 10170

(212) 867-8280

WILLIAM S. EAKINS
WILLIAM S. ELLIS
DEAN HOLBROOK
JOHN G. LIPSETT
MATTHEW J. MARTIN
FRANK PATTON, JR
ARTHUR V SAVAGE

TELEFAX (212) 370-5637
(212) 599-0342

CARL S. FORSYTHE III*
COUNSEL

*ALSO ADMITTED
IN CONNECTICUT

**BY FEDERAL EXPRESS**

March 20, 2008

Davis Wright Tremaine LLP
Attention: Victor A. Kovner, Esq.
1633 Broadway
New York, New York 10019-6708

Re:    Third Church of Christ, Scientist v. City of New York et al, 07 CV 10962 (DAB)
       - Subpoena issued to The Riverside Church -

Gentlemen/Ladies

    We are attorneys for The Riverside Church, 490 Riverside Drive, New York, NY.

    Enclosed are Objections by The Riverside Church to the subpoena dated 3/6/08 issued by the plaintiff in the above matter.

    If you wish to discuss the Objections, please call me.

Very truly yours,

Frank Patton, Jr.

#612554

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - x
THIRD CHURCH OF CHRIST, SCIENTIST,  :
of NEW YORK CITY,

                Plaintiff,    :

        V.    :

THE CITY OF NEW YORK and PATRICIA    :
J. LANCASTER, in her official capacity as,
Commissioner of the New York City    :
Department of Buildings,

             :

         Defendants.    :

             :
- - - - - - - - - - - - - - - - - - - - - - - - - -x

**OBJECTIONS TO SUBPOENA**

<u>**Case No. 07 Civ. 10962 (DAB)**</u>

     The Riverside Church in the City of New York ("Riverside Church"), by its attorneys,

Patton, Eakins, Lipsett, Holbrook & Savage, herewith objects for the following reasons pursuant

to Rule 45(c) of the Federal Rules of Civil Procedure to the production of materials designated in

the subpoena in this case dated March 6, 2008, as set forth below.

<u>**General objections.**</u>

     Production of the documents demanded are not reasonably likely to lead to the production

of admissible evidence for the following reasons:

     A. The allegations in the complaint arise from plaintiff's lease of all, or practically all, of

its space to a caterer for the conduct of the caterer's commercial business.  Riverside neither

leases nor licenses any event space to any caterer.

     B. The allegations of the complaint arise from plaintiff's lease of event space to a single

Page 1

commercial entity for 20 years or more, while Riverside does not lease or license any event space to the caterer.

C. The allegations in the complaint arise from plaintiff's lease which apparently gives its caterer-lessee almost complete control over the church facility for a substantial portion of the building and a substantial portion of the time during term of the lease. In contrast, Riverside Church transfers no control to its caterer.

D. The allegations of the complaint arise from plaintiff's lease by which the lessee's consideration for a very long-term lease for all, or practically all, of plaintiff's space, is a very substantial capital investment and repair commitment. Riverside Church has no such arrangement with its caterer.

**Specific objections.**

Riverside Church objects to the specific requests as follows:

1. Items 1, 2, 5, 6, 7, 8, 13 and 14, insofar as they demand documents over eight years relating in considerable detail to "Social Events" are overbroad on their face and would subject Riverside Church to undue and extreme burden, in addition to seeking information totally irrelevant to the issues in the complaint. Riverside Church has over 2,500 members and numerous committees, and Riverside Church and its members and committees hold a large number of events and meetings every year which in many instances may have a social component. Also, in furtherance of Riverside Church's longstanding outreach efforts in the community, Riverside permits use of available space at Riverside Church at reasonable uniform rates by persons and not-for-profit organizations for events and meetings which may have a

social component. The permission to use church space for such events is subject to the approval and rules of Riverside Church. Production of documents relating to such events, to the extent available, would require extensive effort and in addition would have no possible bearing on the issues raised by the complaint.

    2.  Item 3 of the subpoena seeks the certificate of occupancy for Riverside Church. Riverside Church objects to this item because there does not appear to be any issue in the complaint relating to a certificate of occupancy and no possible relevance to Riverside's certificate of occupancy.

    3.  Item 4 of the subpoena seeks "any communications with the City regarding the use of the Premises . . ." This demand is overbroad and burdensome, and seeks communications having no possible relevance to present action. Item 4 also seeks communications with the City concerning "accessory use" under the Zoning Resolution. Based on preliminary review, it does not appear Riverside Church has any such communications

    4.  Item 9 of the subpoena seeks documents relating to any independent person or entity, including Madeline's, that performs catering-related services with which Riverside Church has a contractual relationship. Riverside Church objects to this item because the catering contract of Riverside Church with Madeline's is not remotely comparable to plaintiff's contract with The Rose Group. The substantial differences are the following:

    (a) The Riverside catering contract is for two years, expiring on December 31, 2008, and may be terminated by either party upon three months notice.

    (b) The contract requires no payments on Madeline's part for capital repairs or improvements to the premises.

(c) The contract principally requires Madeline's to provide food service at the cafeteria of Riverside Church at agreed prices for Riverside Church's worshipers, visitors and employees.

(d) Riverside Church for its own events retains the right to select and utilize a caterer other than Madeline's.

(e) The contract does not lease any space to Madeline's, although Madeline's is given use of Riverside's kitchen equipment and is provided space for an administrative/operations office. The caterer pays a monthly sum to Riverside Church to defray the cost of space, cleaning service and other operational expenses of Riverside Church and pays for its use of utilities.

(f) The caterer has no right to conduct its own events at Riverside Church.

Riverside Church's catering arrangements serve the Church by providing a consistent standard of supervision with respect to such catered events, including strict control concerning the serving of alcohol.

**5.** Items 10, 11, and 12 of the subpoena. Riverside Church has no documents designated in these items.

Dated: March 20, 2008

PATTON, EAKINS, LIPSETT, HOLBROOK & SAVAGE

by _____

Frank Patton, Jr.
Attorneys for The Riverside Church in the
City of New York
420 Lexington Avenue
New York, New York 10170
Tel. 212-867-8280

Page 4



Exhibit K

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

JOHN R. CUTI
DIRECT (212) 603-6486
johncuti@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

March 24, 2008

*By Fax:  (212) 370-5637 and Regular Mail*

Frank Patton, Jr., Esq.
Patton, Eakins, Lipsett, Holbrook & Savage
420 Lexington Avenue
New York, NY 10170

Re:    *Third Church of Christ, Scientist v. City of New York;* 07 Civ. 10962 (DAB)
Riverside Church

Dear Mr. Patton:

I write to respond to the Objections filed by your client Riverside Church ("Riverside Church") to the Subpoena we served on behalf of our client, the Third Church of Christ, Scientist, of New York City (the "Third Church") on March 6, 2008.

You object to nearly every Request on the purported ground that each calls for the production of irrelevant material and/or casts too broad a net. Those Objections are not well founded. I would be happy to discuss ways to narrow the documents requested, including the time frame for which documents are sought, but Riverside Church is required to produce responsive documents.

As you know, discovery under Rule 45 is governed by the definition of relevance under Rule 26. Rule 26(b)(1) permits the discovery of any unprivileged matter "reasonably calculated to lead to the discovery of admissible evidence." As such, discovery under Rule 45 "is intended to be as broad against a nonparty as against a party[.]" *See* Fed. R. Civ. P. Rule 45, Commentary 45-6. Under that standard, the Subpoena's targeted requests for relevant information are plainly proper.

Under this broad standard, every Request in the Subpoena calls for relevant information. For example, the Subpoena defines a "Social Event" as any catered or other social

Frank Patton, Jr., Esq.
March 24, 2008
Page 2



event at the Riverside Church's Premises,[1] and seeks specific information about such events. Though your letter concedes that Riverside Church does host such events, the Subpoena calls for more than your brief description of such activities. For example, Requests 1, 2, 4, 5, 6, 8, 9 all seek information about Social Events at Riverside Church. Each such Request is directly relevant to Third Church's claims that the City is unlawfully discriminating against it by prohibiting it from hosting Social Events when numerous religious and secular non-profit institutions engage in substantially similar conduct. In order to rebut the City's claims, the Court has permitted Third Church to conduct discovery of non-parties, such as Riverside Church, in order to develop additional evidence regarding the number of catered events held, who books them, how many guests attend, and similar information. Also relevant is whether the Riverside Church earns considerable income from Social Events, or whether it operates with the explicit or tacit approval from the City. In addition to seeking relevant information, the Subpoena is narrowly tailored. It makes specific requests for documents that will show information regarding your client's catering activities, and does not require you to fish through all of your client's files; we would be surprised if there is not a practice of separately accounting for, administering, and/or otherwise keeping track of documents relating to the ancillary catered events held at Riverside Church (and advertised on its website).

        You also object to specific Requests on the grounds of relevancy. As outlined below, each of these objections is without merit:

- Request 9 seeks documents concerning your designated caterer for Social Events. Your letter asserts that Riverside Church's relationship with its caterer, Madeline's Catering and Special Events, is unlike the Third Church's relationship with its caterer. But we are entitled to the relevant facts, not just your characterization. If, as appears, written contracts or other documents exist that reveal the details of Riverside Church's arrangement with Madeline's, and how Madeline's operates within the church, your client must produce them. It will be up to the parties to the case to argue the significance of these facts.

- Request 3 seeks documents concerning Riverside Church's Certificate of Occupancy, and Request 4 seeks communications with the City concerning any use of the Premises, including whether any past, current, or future use of the Premises is or was an "accessory use." This case involves the manner in which the City, and its Department of Buildings, regulates the accessory use of buildings owned by religious and secular non-profit groups for catered events. If correspondence or other documents shed light on Riverside Church's Certificate of Occupancy and/or any communications with the City about your client's use of its Premises, such information would bear directly on Third Church's claim that while the City routinely permits extensive catering uses at institutions like Riverside Church located in a residential zoning district, it is unfairly applying a more stringent standard to the Third Church. You state that, based on your

---

[1] All defined terms set forth in the Subpoena are incorporated herein.

Frank Patton, Jr., Esq.
March 24, 2008
Page 3



"preliminary review," no such documents exist. We ask that you conduct a search to the fullest extent required under the Federal Rules, and confirm that there are no such Documents responsive to Request 4 in Riverside Church's custody or control.

- <u>Requests 5 and 6</u> seek documents showing the revenue generated by Social Events and how these revenues are reported for tax purposes. Such information is relevant because the City has claimed that the Third Church's arrangement with its caterer – specifically, that its caterer shall bear the burden for any incurred tax liabilities as a result of catering activates – has somehow converted the Third Church from a church into a commercial catering hall. Thus, if Riverside Church has custody or control over documents that show that it has a similar arrangement regarding liability for taxes and/or that it has considered the issue of whether revenues from ancillary catering or other non-religious use of its space might have an impact on the Riverside Church's tax-exempt status, then we are entitled to discover those facts so that we can rebut the City's argument.

Finally, we note that you have not sought to quash the Subpoena Ad Testificandum, which calls for the production of a witness to testify at our offices on March 26, 2008. As we noted in the cover letter that accompanied the Subpoena, we believe the most efficient course is to conduct the deposition after documents are produced. We look forward to discussing a convenient date for the deposition, which we expect will be relatively brief.

Please contact me or my colleague, Monica Pa, to let us know if and when you intend to provide us with documents. It is in both of our client's interest to avoid costly litigation over this Subpoena; however, given the limited three-month time period that we have to complete discovery, we will be constrained to move for an order compelling your client's compliance if we cannot reach an accommodation.

Very truly yours,

John R. Cuti

Exhibit L

## PATTON, EAKINS, LIPSETT, HOLBROOK & SAVAGE

ATTORNEYS AT LAW

GRAYBAR BUILDING

420 LEXINGTON AVENUE

NEW YORK, N.Y. 10170

(212) 867-8280

WILLIAM S. EAKINS
WILLIAM S. ELLIS
DEAN HOLBROOK
JOHN G. LIPSETT
MATTHEW J. MARTIN
FRANK PATTON, JR
ARTHUR V. SAVAGE

TELEFAX (212) 370-5637
(212) 599-0342

CARL S. FORSYTHE III*
COUNSEL

*ALSO ADMITTED
IN CONNECTICUT

**BY EMAIL AND BY MAIL**

April 4, 2008

John R. Cuti, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, New York 10019-6708

      Re:    Third Church of Christ, Scientist v. City of New York et al, 07 CV 10962 (DAB)
               - Subpoena issued to The Riverside Church -

Dear Mr. Cuti:

      In response to your letter of March 24, 2008, the Riverside Church continues to believe that nothing identified in this subpoena can be reasonably expected to lead to evidence relevant in your suit.

      However, to minimize expense of litigation on this issue, we propose to provide you with a copy of Riverside Church's food service agreement with Sopin Corporation, d/b/a Madeline's, dated January 25, 2007, which is the currently effective agreement between Riverside Church and its caterer. We believe this agreement will show the limited role performed by the caterer at The Riverside Church and will make clear that further information concerning Riverside's catering activities will not be relevant to your pending litigation.

      The food service agreement does not provide for any renovations or rebuilding at Riverside Church to accommodate any catering arrangements or catered functions or in exchange for any such arrangements. Accordingly, Riverside has not applied to New York City for any building permits or other permits for the purpose of renovating or creating spaces or facilities to carry on catering functions under the food service agreement. The food service agreement makes clear that Madeline's role is purely to provide food service for worshipers, visitors and staff and

PATTON, EAKINS, LIPSETT, HOLBROOK & SAVAGE

John R. Cuti, Esq.
April 4, 2008
Page TWO

for events and programs at Riverside. The food service agreement gives the caterer no authority to independently contract for, or arrange to conduct, its own events at Riverside, and Riverside has informed us that Riverside does not and would not permit any such actions by its caterer.

We will provide you with a copy of that food service agreement upon your confirming agreement to the following conditions:

1. The food service agreement is delivered without prejudice to our Objections to the subpoena.

2. The food service agreement may not be shared outside of counsel at your firm working directly on this case.

3. Our providing you with the food service agreement does not constitute production for purposes of use in discovery or trial of your action without further written consent of The Riverside Church or order of the court.

If those conditions are acceptable please sign this letter in the space below and return a copy to me. I will then send you a copy of the food service agreement.

Very truly yours,

Frank Patton, Jr.


THE FOREGOING CONDITIONS ARE AGREED TO.

DAVIS WRIGHT TREMAINE LLP

By _____

Dated: _____

Exhibit M

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

JOHN R. CUTI
DIRECT (212) 603-6486
johncuti@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

April 10, 2008

*By Fax: (212) 370-5637 and Regular Mail*

Frank Patton, Jr., Esq.
Patton, Eakins, Lipsett, Holbrook & Savage
420 Lexington Avenue
New York, NY 10170

Re:    *Third Church of Christ, Scientist v. City of New York;* 07 Civ. 10962 (DAB);
Riverside Church

Dear Mr. Patton:

I write to respond to your letter of April 4th.  The proposal you make – to supply a single document, which we can't use even in this litigation without your further consent, and which you will produce only if we withdraw the Subpoena for all the other documents we seek and the deposition it calls for – is unreasonable and we reject it.  We have been flexible and tried to accommodate your client, but your proposal makes clear that those efforts were in vain.  Subpoenas are not voluntary requests.

We have prepared a motion to compel which we will file and serve tomorrow.

Very truly yours,

John R. Cuti

Exhibit N

# PATTON, EAKINS, LIPSETT, HOLBROOK & SAVAGE

ATTORNEYS AT LAW

GRAYBAR BUILDING

420 LEXINGTON AVENUE

NEW YORK, N.Y. 10170

(212) 867-8280

WILLIAM S. EAKINS
WILLIAM S. ELLIS
DEAN HOLBROOK
JOHN G. LIPSETT
MATTHEW J. MARTIN
FRANK PATTON, JR
ARTHUR V. SAVAGE

TELEFAX (212) 370-5637
(212) 599-0342

CARL S. FORSYTHE III*
COUNSEL

*ALSO ADMITTED
IN CONNECTICUT

**BY FAX**

April 11, 2008

John R. Cuti, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, New York 10019-6708

Re:   Third Church of Christ, Scientist v. City of New York et al, 07 CV 10962 (DAB)
      - Subpoena issued to The Riverside Church -

Dear Mr. Cuti:

Your letter of April 10, 2008, incorrectly describes the proposal I made by letter of April 4, 2008, to provide a copy of the catering agreement for Riverside Church.

You state that our proposal requires you to withdraw the subpoena for all other documents you seek. There is no such requirement in my letter. Your receiving and reviewing the Riverside catering agreement, on the terms proposed, would have no effect on the status of your subpoena.

We believe your review of the catering agreement would make clear that Riverside Church's catering practices have no relevance whatever to the situation arising in the above suit. If after reviewing our catering agreement you disagreed with us, you would obviously be free to pursue your subpoena.

We note the requirement under F.R.C.P 45(c)(1) that a party issuing a subpoena shall take reasonable steps to avoid imposing undue burden or expense on the person subject to that subpoena.

I renew our proposal that we provide you with a copy of the catering agreement, under the terms of my letter of April 4, 2008.

Very truly yours,

Frank Patton, Jr.

Exhibit O

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

JOHN R. CUTI
DIRECT (212) 603-6486
johncuti@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

April 11, 2008

*By Fax: (212) 370-5637 and Regular Mail*

Frank Patton, Jr., Esq.
Patton, Eakins, Lipsett, Holbrook & Savage
420 Lexington Avenue
New York, NY 10170

Re:    *Third Church of Christ, Scientist v. City of New York;* 07 Civ. 10962 (DAB);
Riverside Church

Dear Mr. Patton:

   Thank you for your letter of this morning. What is your client's position on the Subpoena? Is it going to comply by producing information about the catered events it advertises on its website and conducts? Your letter of April 4th is not entirely clear on the issue of catering. It appears to state that the outside caterer is prohibited from booking events at Riverside Church. But are you contending that Riverside Church does not itself book catered events for members of the general public? If it does so, do you still refuse to produce documents regarding such events? If your client does refuse to agree to produce such documents, then we will have to move to compel in view of the looming discovery cutoff. Please call me as soon as possible to discuss, because I would like to file the motion this afternoon if we cannot obtain compliance with the Subpoena.

Very truly yours,

John R. Cuti

Exhibit P

**Pa, Monica**

| | |
|---|---|
| **From:** | Cuti, John |
| **Sent:** | Friday, April 11, 2008 12:13 PM |
| **To:** | 'fpattonlaw@aol.com' |
| **Cc:** | Kovner, Victor; Pa, Monica |
| **Subject:** | Riverside Church; motion to compel |

Frank,

I just want to confirm the conversation we just had on the phone.

When we spoke, you continued to take the position that because (in your view) the contract between Riverside and its outside caterer is unlike the Third Church's agreement with the Rose Group (e.g., because the Rose Group itself books events, but Madeline's (Riverside's caterer) does not), there is no basis for our Subpoena. I explained that it is the underlying catering activity itself that is relevant – i.e., the fact that Riverside advertises the availability of its buildings for rental, that a member of the general public can book a party to be held at Riverside, that Riverside earns revenue from making its facilities available for that purpose, and that the City has never done anything to explore the frequency of such events or taken any steps to stop it. You disagreed and said that you thought that the catering activity at Riverside – which you conceded does in fact take place – was not relevant to our case because the catering at Riverside was "truly ancillary." I told you that I believed the catering at Third Church was also ancillary, and it was for the Court to determine what was "truly" ancillary. You did not agree with me, and continued to say that you would not produce information regarding revenues derived from, or other details concerning, catered events held at Riverside. I told you we then would file the motion to compel, in view of the approaching discovery deadline.

By the way, when I mentioned the discovery cut-off, you said that you had seen the correspondence between the parties leading up to the Court's March 3, 2008 Order. That correspondence was not filed, and, so far as I know, is not available on Pacer. I therefore presume that you received it from the City. Please note that the Subpoena calls for production of any documents concerning Communications with the City.

We will file and serve the motion to compel this afternoon. If your client decides upon reviewing it that it wishes to produce the demanded information, I would far prefer to resolve this between ourselves without requiring the Court to spend its time resolving the motion. Let me know what you think after reviewing the papers.

Thanks,

John

**John Cuti** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax: (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.