UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST, OF
NEW YORK CITY

        Plaintiff,

  -against-

THE CITY OF NEW YORK AND PATRICIA J.
LANCASTER, IN HER OFFICIAL CAPACITY
AS COMMISSIONER OF THE NEW YORK
CITY DEPARTMENT OF BUILDINGS,

        Defendants.

Index No. 07-CV-10962 (DAB)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH SUBPOENA OF NON-PARTY, THE METROPOLITAN CLUB, INC.

Neil G. Sparber
Brian W. Tilker
FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, New York 10103
(212) 318-3000
nsparber@fulbright.com
btilker@fulbright.com

Attorneys for Non-Party,
The Metropolitan Club, Inc.

50071597.4

## TABLE OF CONTENTS

PAGE

Preliminary Statement ........................................................................................... 1

Factual Background ............................................................................................... 1

Argument ............................................................................................................... 7

POINT I      THE STANDARD ON A MOTION TO QUASH ................................. 7

POINT II     THE TESTIMONY SOUGHT AND DOCUMENTS REQUESTED ARE
             NOT RELEVANT TO THE CHURCH'S CLAIMS AGAINST THE
             CITY IN THE UNDERLYING ACTION ........................................... 9

1.           The Subpoena Is Only Relevant if the Club and the Church are Comparable or
             Similarly Situated ........................................................................... 9

2.           The Club is not Similarly Situated or Comparable to the Church ...................... 10

             (a)    The Club and the Church Differ in their History of Legal Use .............. 11

             (b)    The Club and the Church Differ in their History of Zoning
                    Districts ........................................................................... 12

             (c)    The Club and the Church Differ in the Nature of Use and
                    Approvals Sought ................................................................ 13

             (d)    The Club and the Church Differ in their History of Occupancy ............. 17

CONCLUSION ................................................................................................... 19

## Preliminary Statement

This Memorandum of Law is submitted on behalf of non-party The Metropolitan Club, Inc. (the "Club") in support of its motion, pursuant to Rule 45(c) of the Federal Rules of Civil Procedure, for an Order quashing the subpoena, dated March 6, 2008 (the "Subpoena"), and served upon the Club by the Third Church of Christ, Scientist, of New York City (the "Church"), the plaintiff in this action, on the grounds that the testimony sought and documents requested in the Subpoena are not relevant to the claims of the Church against the City of New York (the "City") in the underlying action.

## Factual Background

The underlying action involves a dispute between the Church, a religious corporation, and the City and Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department of Buildings (collectively, the "defendants"). The Church entered into a lease establishing a commercial relationship with the Rose Group, a caterer, to conduct events at the Church for the next 20 years, with options to renew for two additional five-year terms, in exchange for the Rose Group paying for all capital repairs required for the Church to comply with the New York City Building Code (the "Required Capital Repairs"), and paying rent and ongoing maintenance costs (the "Lease"). (Compl. ¶ 23.)[1] The Church's agreement with the Rose Group permits events at times when the Church is not using its property for its primary religious purpose. (Compl. ¶ 24.) As part of the Church's agreement with the Rose Group, the Rose Group expended approximately $6.5 million to make the Required Capital Repairs and expected to spend another $1.5 million over the coming months to complete the work. (Compl. ¶ 26.) In addition to the Required Capital Repairs, the Church alleges that the Rose Group is

---

[1]   A copy of the complaint is attached to the subpoena served on the Club, which is annexed to the affidavit of Anthony Nuttall, sworn to April 11, 2008, as Exhibit A.  References to the complaint are set forth as Compl. _____.

further obligated to undertake general maintenance of the building throughout the 20-year term, and to pay annual and percentage rent to the Church.  (Compl. ¶ 27.)

The primary purpose of the Church is a house of worship.  (Compl. ¶ 36.)  The Church is located in an area zoned for residential use (the "R-10 zone").  (Compl. ¶ 39.)  In accordance with Section 22-00 of the Zoning Resolution of the City of New York, as amended (the "Zoning Resolution" or "ZR"), stand-alone catering facilities are not permitted as-of-right in the R-10 zone.  ZR Section 12-10 generally provides that a catering facility would be permitted as an "accessory use" if it is (i) conducted on the same zoning lot as the principal use, (ii) clearly incidental to, and customarily found in connection with, the principal use and (iii) substantially for the benefit or convenience of the principal use.  Prior to initiating the Required Capital Repairs, the Church and the Rose Group allegedly sought the City's approval for this catering arrangement.  (Compl. ¶ 41.)  On April 19, 2006, the Manhattan Borough Commissioner of the New York City Department of Buildings ("DOB") issued the Church a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006 (the "Pre-Consideration").  (Compl. ¶ 41.)  The Pre-Consideration provided that catering activity would constitute an accessory use to the Church's primary use of the building, pursuant to ZR Section 12-10  (Compl. ¶ 41.)  The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").  (Compl. ¶ 42.)

By March 2007, after the Required Capital Repairs were underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings allegedly began to complain about the Church's arrangement with the Rose Group.  (Compl. ¶¶ 47-48.)  The neighbors sent three letters to the DOB, dated March 12, 2007, March 20, 2007, and October 5, 2007.  (Compl. ¶ 49.)  On October 29, 2007, the DOB sent a letter reversing itself and notifying

the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration as well as the Permits, even though the Required Capital Repairs were nearly completed.  (Compl. ¶ 51.)  The DOB's letter concluded that the catering events would not be an accessory use to the Church's primary use.  (Compl. ¶ 52.)  The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008, and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events.  (Compl. ¶ 52.)  On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination").  (Compl. ¶ 55.)  The Final Determination rescinded the earlier approval for catering events, and revoked the building permits authorizing the Required Capital Repairs. (Compl. ¶ 55.)

The Church alleges that by revoking the Permits and rescinding the Pre-Consideration and withholding permission to allow the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions.  (Compl. ¶ 56.)  The Church further alleges that the defendants irrationally singled out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making their premises available to host private catered events.  (Compl. ¶ 56.)  Therefore, the Church alleges that, among other things, defendants have violated the Church's rights to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §2000cc ("RLUIPA"), and have deprived the Church of rights and privileges in violation of 42 U.S.C. 1983, including

the right to equal protection of the laws pursuant to the Fourteenth Amendment (the "Equal Protection Clause").  (Compl. ¶¶ 63-66, 81-89.)

On or about March 6, 2008, the Church served the Subpoena upon the Club, a  non-profit social club, presumably in an attempt to demonstrate that the Club, which has banquet and catering facilities is comparable with, and similarly situated to, the Church.   However, the objective facts demonstrate that from a zoning and land use perspective, the Club's use of its banquet and catering facilities is entirely different than that of the Church.   The Club was established in 1894 as a private social club.  (Nuttall Aff. ¶ 8.)  Since its inception, the Club has used its restaurant and banquet facilities in much the same manner as it does today.  (Nuttall Aff. ¶ 8.)   The Club has Certificates of Occupancy dating back to 1954 (the "Certificates of Occupancy") which document the continued operation of the Club with, among other facilities, "private reception room," "private dining rooms," "dining rooms" and "kitchen." (Nuttall Aff. ¶ 9 and Exh. B thereto.)

Unlike the Church, the Club has never had to apply to the City for permission to hold catered events, as the Club's use of its banquet and catering facilities is an integral part of its principal use, as set forth in the Certificates of Occupancy.   The Club's 1954 and 1960 Certificates of Occupancy state that the Club was a "Heretofore Erected Existing Class "B" Club" and that the permissible uses of the Club included a lounge, bar room, dining rooms, club rooms, and kitchens.  (Nuttall Aff. ¶ 9, Exh. B.)  While the zoning district in which the Club is located changed from "Retail" to "Residence & Restricted Retail" between the issuance of the 1954 and 1960 Certificates of Occupancy, the permissible use and occupancy of the Club remained the same.  (Nuttall Aff. ¶ 9, Exh. B.)

Similarly, the Club's 1971 Certificate of Occupancy indicates that the zoning district was changed to a "C 5-3 & R10" zoning district, and that the permissible use and occupancy of the Club remained the same.  (Nuttall Aff. ¶ 9, Exh. B.)  The 1977 Certificate of Occupancy indicated the subject zoning district had been changed to R-10, and the permissible uses remained the same. (Nuttall Aff. ¶ 9, Exh. B.)  The Club's 1995 Certificate of Occupancy indicated the Club's present zoning district of R10H, and maintains the legality of the same uses mentioned above.  (Nuttall Aff. ¶ 9, Exh. B.)  Thus, the Club and the Church are neither comparable nor similarly situated, as the Club has been continually operating its catering facilities as part of its principal use since 1894, and has Certificates of Occupancy indicating the legal use of the Club with catering facilities dating back to 1954.  Conversely, over the last 80 years the Church has never obtained a Certificate of Occupancy for catering facilities, and only sought DOB approval of catering as an accessory use to its principal religious use in 2006.

On or about March 6, 2008, the Church served the Subpoena upon the Club as a non-party.  Since the Church assumed it was comparable with, or similarly situated to, the Club, the Subpoena requests testimony and all documents concerning or in any way related to the following:

> 1.    Any social event conducted on or in the premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

> 2.    The total number of hours each year that the premises are used for social events, including the number of hours it takes to set up for and clean up after each social event.

> 3.    The certificate of occupancy for the premises, including any amendments thereto.

> 4.    Any communication with the City regarding the use of the premises, including communication regarding the certificate of occupancy, and/or whether any past, current, or planned use of the premises is or was an "accessory use" under the City's Zoning Resolution or other applicable land use regulations.

5.    Any portion of the annual report of the Club, or any submission to any tax authority or other authority, regarding revenues generated by social events.

6.    Any analysis, investigation or communication regarding the taxation of revenues generated by social events.

7.    Any application for any permit, license or other permission from the City to conduct social events, and the issuance or renewal of any such permit license or other permission, whether formal or informal.

8.    Any communication with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct social events at the premises.

9.    Any independent person or entity that performs catering-related services (an "outside caterer") with which the Club has a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the outside caterer's use of, or performance of services on or in, the premises; (c) any repairs or improvements to the premises made by, and/or for the benefit or use of, the outside caterer; and (d) rent or use payments made by, or other financial arrangements with, the outside caterer.

10.    Any trade names, trademarks, or other names, marks or designations that the Club uses to identify the availability of catering social events at the premises.

11.    Any document or communication related to or concerning any allegation in the complaint, or any relevant fact, claim or defense in the action.

12.    Any communication with the City or with elected officials concerning the action.

13.    Any membership requirement that would permit entry into the premises and/or the use of the premises for social events, including (a) your organizations' membership policy; (b) whether social events must be hosted by a member or a guest of a member; (c) whether hosting a social event requires a minimum financial donation or contribution to your organization; and (d) whether social events hosted by a member or guest of the member may be attended by members of the general public.

The Club is not comparable with, or similarly situated to, the Church with respect to the Church's claims against the City. The Club is a social club, which has been holding social events since 1894 as permitted by the relevant zoning laws and its Certificates of Occupancy.

The Church is a house of worship which sought permission from the City over the last several years to hold catered events. The Club has longstanding dining rooms, kitchens and bar areas and a full staff of chefs, kitchen staff, hosts, waiters and waitresses, bartenders and other facility employees to conduct catered events, and its facilities are used every day. The Church entered into a lease with an outside caterer to provide catering services, and only "for the periods that the hall is not being used as a church." The Subpoena requests information that is not relevant to the underlying action and the Subpoena is unduly burdensome as a result. Accordingly, it is respectfully requested that the Subpoena be quashed in its entirety.

## Argument

## POINT I

## THE STANDARD ON A MOTION TO QUASH

Rule 45(c)(3) of the Federal Rules of Civil Procedure, which tracks the provisions for discovery found in Rule 26(c) of the Federal Rules of Civil Procedure, explicitly authorizes the quashing of a subpoena as a means of protecting a person subject to a subpoena from misuse of the subpoena power. 9A Wright & Miller, Federal Practice and Procedure, § 2463.1 (3d Ed. 2008). The decision whether to quash a subpoena is within the district court's discretion. See Powell v. Gardner, 891 F.2d 1039, 1046 (2d. Cir. 1989) (district court did not abuse its discretion in quashing subpoena). Rule 45(c)(3)(A)(iv) expressly requires district judges to quash a subpoena deemed to impose an undue burden[2] on anyone subject to the subpoena. International Broth. of Teamsters v. Eastern Conference of Teamsters, 162 F.R.D. 25, 28 (S.D.N.Y. 1995) (to

---

[2]    The words "undue burden" in Rule 45(c)((A)(iv) replace the traditional language of "unreasonable and oppressive," however, this change in the language for quashing a subpoena is semantic only, and was not intended to change existing law. 9A Wright & Miller, Federal Practice and Procedure, § 2463.1.

the extent that a nonparty objected to subpoenas on ground that subpoena subjected it to an undue burden, its objection was properly subject of motion to quash or modify).    The determination of whether a subpoena is an undue burden raises the question of the reasonableness of the subpoena.  9A Wright & Miller, Federal Practice and Procedure, § 2463.1. The subpoena's reasonableness requires a court to weigh a subpoena's benefits and burdens by considering whether the information is relevant.  See United States v. International Bus. Mach. Corp., 83 F.R.D. 97, 104 (S.D.N.Y. 1979) ("whether a subpoena imposes . . . an 'undue burden' depends upon 'such factors as relevance. . . .'"), New York State Energy Research & Dev. Authority v. Nuclear Fuel Servs., Inc., 97 F.R.D. 709, 712 (W.D.N.Y. 1983) (relevance of subpoenaed information has an important bearing upon the determination of a claim that a subpoena duces tecum is unreasonable or oppressive); see also Fago v. City of Hartford, No. Civ. 3:02 CV 1189, 2003 WL 23689571, at *2 (D. Conn. Dec. 31, 2003) (granting motion to quash subpoena on grounds of irrelevancy).

The right to subpoena shall not be permitted to degenerate into a pure fishing expedition and an unreasonable burden on the possessor of documents and records.  Chase Nat. Bank of City of New York v. Portland General Electric Co., 2 F.R.D. 484, 484 (S.D.N.Y. 1942) (quashing irrelevant items in subpoena).  Only those documents that are "reasonably calculated to lead to the discovery of admissible evidence" are relevant under the federal discovery rules. Fed. R. Civ. P. § 26(b)(1).  Courts accord special weight to the burden on non-parties of producing documents for others involved in litigation.  Ebbert v. Nassau County, No. CV 05-5445, 2007 WL 674725, at *4 (E.D.N.Y. Mar. 5, 2007).

As set forth below, the Subpoena seeks testimony and documents from the Club based upon the Church's assumption that the Church and the Club are comparable or similarly situated

with respect to the Church's claims against the City.  Since the Church and the Club are not comparable or similarly situated under the applicable land use and zoning laws, the documents and information being sought are not relevant, and unduly burdensome, and the Subpoena should be quashed.

## POINT II

### THE TESTIMONY SOUGHT AND DOCUMENTS REQUESTED ARE NOT RELEVANT TO THE CHURCH'S CLAIMS AGAINST THE CITY IN THE UNDERLYING ACTION

Although there is nothing in the Subpoena which explains the relevancy of the documents being sought, a review of the complaint reveals that the requested testimony and documents are being sought to demonstrate that the Club and the Church are comparable or similarly situated, presumably to allow the Church to contend that it is being treated differently from the Club by the City.  However, the Church and the Club are neither comparable nor similarly situated and, therefore, the testimony and documents being sought are not relevant.

1. The Subpoena Is Only Relevant if the Club and the Church are Comparable or Similarly Situated.

The Church contends that the defendants have violated the Church's rights to equal treatment under Section (b)(1) of RLUIPA (the "Equal Terms Clause") and the Equal Protection Clause of the United States Constitution.  The Equal Terms Clause provides, "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc-2(b)(1).  The purpose of this section is to forbid governments from prohibiting religious assembly uses while allowing equivalent, and often more intensive, non-religious assembly uses. Ventura County Christian High School v. City of San Buenaventura, 233 F. Supp. 2d 1241, 1246

(C.D. Cal. 2002) (holding that private school failed to satisfy likelihood of succeeding on merits requirement for preliminary injunction, based on claims of disparate treatment violating Equal Terms Clause and Equal Protection Clause).  Section 2(b) of RLUIPA codifies "existing Supreme Court decisions under the Free Exercise and Establishment clauses of the First Amendment as well as under the Equal Protection Clause of the Fourteenth Amendment." Id. (quoting Freedom Baptist Church v. Twp. of Middletown, 204 F. Supp. 2d 857, 869 (E.D. Pa. 2002)).  Therefore, in evaluating plaintiff's claims under either the Equal Terms Clause or the Equal Protection Clause, the Court must first inquire whether defendants have treated plaintiffs in an unequal manner to similar situated or comparable entities.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 137 (3d. Cir. 2002) ("[T]he initial burden [is] on the complaining party first to demonstrate that it is similarly situated to an entity that it is being treated differently before the local municipality must offer a justification for its ordinance.").  The Equal Terms Clause "requir[es] equal treatment of secular and religious assemblies [and] allow courts to determine whether a particular system of classifications adopted by a city *subtly or covertly departs from requirements of neutrality and general applicability*." Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1232 (11th Cir. 2004) (emphasis added).  Under the statute, the plaintiff bears the initial burden of "produc[ing] prima facie evidence to support a claim alleging a[n Equal Terms] violation." 42 U.S.C. § 2000cc-2(b).

      2.     The Club is not Similarly Situated or Comparable to the Church.

The information sought in the Subpoena is not relevant to the underlying action because the Club is not similarly situated to the Church.  See Primera Iglesia Bautista Hispana of Boca Raton, 450 F.3d 1295, 1311-12 (affirming dismissal of RLUIPA Equal Terms Clause claim where school that had obtained relief from zoning ordinance was not a similarly situated

comparator to religious organization that had unsuccessfully applied for variance); <u>Vision Church, United Methodist v. Village of Long Grove</u>, 397 F. Supp. 2d 917, 930 (N.D. Ill. 2005) (granting motion for summary judgment dismissing RLUIPA Equal Terms Clause claim where public school that plaintiff claimed was excluded from ordinance was built before zoning ordinance applied to plaintiff was made law). There are significant differences between the Club and the Church which render the Church neither comparable with, nor similarly situated to, the Club.

(a)    <u>The Club and the Church Differ in their History of Legal Use.</u>

The Club is clearly neither comparable with, nor similarly situated to, the Church based on the history of legal use for the two buildings. The Club was built in the early 1890's specifically to be a social club by prominent New Yorkers, as an alternative to the Union Club. (Nuttall Aff. ¶ 8.) The Club was opened in 1894 as a private, members only not-for-profit social club, which provided members and their guests with facilities and services including kitchen and dining facilities, lounges, a library and sleeping accommodations. The primary use of the Club as a social club has not changed since its inception in 1894. <u>Id.</u>

In accordance with this continued history of legal use, the Club has applied for and received Certificates of Occupancy from DOB dating back over fifty years. (Nuttall Aff. ¶ 9, Exh. B.) The Certificates of Occupancy document the continued operation of the Club's building as a club, with, among other facilities, "private reception room," "private dining rooms," "dining rooms" and "kitchen." As per the Zoning Resolution and as is evident from the Certificates of Occupancy, the Club has been legally operating reception rooms and dining rooms since 1954, and any uses that were legal prior to the enactment of the 1961 Zoning Resolution would be "grandfathered" if the Zoning Resolution rendered them non-conforming, and would continue to remain legal. ZR Section 52-11.

In sharp contrast to the Club, the Church was established in the 1880's as a congregation of students dedicated to the Christian Science religion.  The principal use of the Church has always been, and remains, a house of worship.  (Compl. ¶¶ 12-15).  While the Club has the Certificates of Occupancy setting forth the legal use of the Club for the past fifty years, according to the Church's architect the Church has no Certificate of Occupancy.  (Nuttall Aff. ¶ 12, Exh. C.)  The pre-consideration received by the Church from DOB on April 10, 2006 (the "Pre-Consideration") is annexed to the Affidavit of Anthony Nuttall as Exhibit C.  In the Pre-Consideration, the Church's architect states "Since the [Church] building was constructed in 1921, it does not have a certificate of occupancy."

The above information makes clear that there is no comparison between the history of use of the Club, which has a longstanding legal history of holding catered events as part of its principal use at the Premises, and the Church, which has no legal history of holding catered events, and only attempted to legitimize catered events as an accessory use as of the date of the Pre-Consideration.

(b)     The Club and the Church Differ in their History of Zoning Districts

The history of the respective zoning districts in which the Club and the Church are located further renders any comparison between the two meaningless.  As indicated in the Certificates of Occupancy, beginning at least as early as 1954, the Club was located in a retail zoning district, which did not preclude the Club from operating as a social club or from providing catered events.  (Nuttall Aff. ¶ 9, Exh. B.)  The Club's 1960 Certificate of Occupancy indicates that the zoning district in which the Club is located was then changed to a residence and restricted retail district, which similarly did not exclude social clubs or catered events.  Id.

The use of the Club for catered events was entirely consistent with the zoning in effect prior to the enactment of the 1961 Zoning Resolution.  Prior to the enactment of the 1961 Zoning

Resolution, the 1916 Zoning Resolution contained no prohibition on catering activities in Retail or Restricted Retail districts. Although the zoning district in which the Club is located is now an R10H residential zoning district, the legal use of the Club for catered events would have been "grandfathered" prior to the enactment of the 1961 Zoning Resolution, even if the catering use was later determined to be a separate use apart from the main Club use. ZR Section 52-11

The Church, however, has since at least 1961 been located in a residential district. (Nuttall Aff. ¶ 8, Exh. D.) The 1961 New York City Zoning Map indicates that as of December 15, 1961, the effective date of the 1961 Zoning Resolution, the Church property was located in an R10 residential zoning district. Id. Regardless of the zoning district in which the Church was located in 1961, as confirmed by the Pre-Consideration, the Church historically has never engaged in catering any events. The Church was therefore unable to benefit from any "grandfathered" provisions permitting catered events at the Church.

Thus, there is also no relevant comparison between the Club and the Church based on the history of their respective zoning districts. The Club has historically engaged in catered events as part of its principal use, including immediately prior to the enactment of the 1961 Zoning Resolution, while the Church has historically never engaged in such activity, and only sought to begin hosting catered events while located in a residential zoning district, where such activity is not permitted as-of-right. ZR Section 22-00.

(c)    The Club and the Church Differ in the Nature of Use and Approvals Sought

Another important difference between the Club and the Church is that the Club has never had to apply to the City for permission to hold catered events, as the use by the Club of its banquet and restaurant facilities is an integral part of its principal use, as set forth in the Certificates of Occupancy. See City of New York v. 330 Continental LLC, 18 Misc.3d 381, 392,

N.Y.S.2d 705, 714 (Sup. Ct. N.Y. Co. 2007). The Club has openly and notoriously conducted catered events since its inception through the present date, and has continuously been granted Certificates of Occupancy due to the longstanding, legal operations in which the Club is engaged, including catered events. (Nuttall Aff. ¶ 23.)

Moreover, the Club has filed applications before Zoning and Land Use authorities in the City of New York within the past five years, which required on-site inspections by such authorities, and none of these authorities ever challenged the catering activities at the Club. A copy of resolutions of the New York City Board of Standards and Appeals ("BSA") approving an enlargement to the Club building, dated January 27, 2004, is annexed to the Nuttall Affidavit as Exhibit E. As stated in these BSA resolutions, "the premises and surrounding area had a site and neighborhood examination by a committee of the Board consisting of Vice-Chair Satish Babbar, Commissioner James Chin, Commissioner Peter Caliendo and Commissioner Joel Miele."

In contrast, the Church has never obtained a Certificate of Occupancy setting forth the legal use of its property for catered events separate and apart from its principal use as a house of worship. (Nuttall Aff. ¶ 12, Exh. C.) According to the Pre-Consideration, the Church's application was not even subject to full zoning review by a DOB examiner, as the architect indicated that he would be filing a "professional certification application," a procedure by which an architect can self-certify the accuracy of plans filed with DOB with regard to zoning regulations. See, e.g., 27 Jefferson Avenue v. Emergi, 18 Misc.3d 336, 338, 846 N.Y.S.2d 868, 870 (Sup. Ct. Kings Co. 2007).

Since the principal use of the Church is a house of worship, the Church entered into a lease with a caterer, the Rose Group, pursuant to which the Rose Group was permitted to hold

Case 1:07-cv-10962-DAB    Document 24    Filed 04/11/2008    Page 17 of 21

catered events in the Church for twenty years, and two five-year renewal periods, in exchange for investing millions of dollars in repairs, and paying rent and ongoing maintenance costs. (Compl. ¶ 23.)  However, before undergoing the extensive repairs necessary for the Church, the Church and the Rose Group sought the City's approval for the catering arrangement through the Pre-Consideration. (Compl. ¶ 41.)    By seeking a pre-consideration, the Church clearly acknowledged that there was a question concerning the acceptability of such an agreement within the definition of accessory use.

While the Pre-Consideration set forth that the catering activity would constitute an "accessory use" to the primary Church use of the building, this determination was eventually reversed by the Department of Buildings. (Compl. ¶51.)  A copy the DOB letter informing the Church of the decision to revoke the approval and permits, dated October 29, 2007, is annexed to the Nuttall Affidavit as Exhibit F.

In the Pre-Consideration, the Church specifically stated that the use of the social hall, ballroom and catering would only be "for the periods that the hall is not being used as a church." The Church thus admitted that the catering use would be clearly independent of the Church use. This fact resulted in a substantial question as to whether the additional facilities were "clearly incidental to, and customarily found" in connection with the principal use of the Church, as this additional use would admittedly only be engaged in when the building was not used as a house of worship.  The City thus determined that "the catering establishment is not an accessory use" because the facilities were not "clearly incidental to, and customarily found" in connection with the principal religious use.  New York Botanical Gardens v. BSA, 91 N.Y.2d 413, 420, 694 N.E. 424, 427, 671 N.Y.S.2d 423, 426 (1998).

Unlike the Church, the Club's facilities are used constantly throughout the day, every day, and are an integral part of its essential services of a social club to its members and guests, with no non-simultaneous occupancy conditions attached.  (Nuttall Aff. ¶ 32.)  Moreover, the use of the Club's banquet, kitchen and dining facilities is not an accessory use of the Club in the context of the Zoning Resolution's definition of accessory use, but rather an integral part of its principal use as a primarily social facility, as definitively set forth in its Certificates of Occupancy.  See, e.g., Exxon Corp. v BSA, 128 A.D.2d 289, 298, 515 N.Y.S.2d 768, 774 (1st Dep't 1987).

There are other notable differences that make the Club and Church neither similarly situated nor comparable entities.  DOB determined that entering into a long-term lease with an outside caterer, the Rose Group, would not be an "accessory use" to the Church's primary use "because it does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church."  (Compl. ¶53.)

In contrast, the Club has all of its own facilities and services necessary to hold banquets and other functions on site.  The Club has dining rooms, kitchens, and bar areas and a full staff of chefs, kitchen staff, hosts, waiters and waitresses, bartenders and other facility employees.   In fact, other than an occasional kosher caterer, the Club does not permit events to be catered by any entity other than the Club itself.  (Nuttall Aff. ¶ 34.)

The difference in the nature of the facilities of each entity, as well as the application by the Church for a pre-consideration and the resulting revocation letter, demonstrate the stark differences between the Club and the Church with respect to the nature of the use of each building and the approvals required.  While the Church needed to "add an accessory use of the social hall, ballroom and catering at first floor and cellar," the Club was always permitted to have

such functions as part of its principal use.  The Club is thus not comparable with or similarly situated to the Church, and any information or documents sought from the Club would not be relevant to the Church's claims against the City.

      (d)    <u>The Club and the Church Differ in their History of Occupancy</u>

As can be seen from the Certificates of Occupancy, the Club has historically been considered a Class "B" Club under the Multiple Dwelling Law (the "MDL").  The MDL in New York State has historically governed aspects of multiple dwellings such as light and air, egress and sanitation.  <u>Noyes v. Wulson</u>, 181 Misc. 481, 485, 46 N.Y.S.2d 408, 411 (N.Y. Mun. Ct. 1944).  The Club's status as a Class "B" Club is indicated on the Certificates of Occupancy from 1954 through 1977, after which such classifications were modified.

The 1954, 1960 and 1971 Certificates of Occupancy list the Club as a "Class 'B' Club" on page 1 thereof.  The 1977 Certificate of Occupancy lists the Club as a "Heretofore erected existing Class "B" Club on page 2 thereof.  The MDL defines a "class B" multiple dwelling as "a multiple dwelling which is occupied, as a rule, transiently, as the more or less temporary abode of individuals or families who are lodged with or without meals."  The class includes, among other things, "hotels, lodging houses, rooming houses, boarding houses, boarding schools, furnished room houses, lodgings" and "club houses."  MDL § 4(9).

Pursuant to the MDL, the Club was always considered to be a class of building which would be used, as part of its principal use, for temporary accommodations with meals.  It is entirely consistent that facilities for catered events would be part of its function, as such functions are commonly found in "hotels," similarly defined as "Class B" Multiple Dwellings. MDL § 4(9).  The Church, however, was never considered to be a "Class "B" Multiple Dwelling."

There is simply no comparison between the Club and the Church based on the history of their occupancy.  The Club has historically been considered a Class B Multiple Dwelling, which class includes hotels and club houses, while the Church has historically never been considered a Class B building.  This distinction in the history of occupancy of the Club and the Church further dilutes any useful comparison of the two buildings.

The Church cannot establish that it is similarly situated or comparable to the Club and, as a result, the Subpoena should be quashed.  See Congregation Kol Ami, 309 F.3d at 137 ("[T]he initial burden [is] on the complaining party first to demonstrate that it is similarly situated to an entity that it is being treated differently before the local municipality must offer a justification for its ordinance."); Fago v. City of Hartford, No. Civ. 3:02 CV 1189, 2003 WL 23689571, at *2 (granting motion to quash subpoena on grounds of irrelevancy).

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the motion to quash the

Subpoena be granted in all respects.

Dated: New York, New York
      April 11, 2008

                     FULBRIGHT & JAWORSKI L.L.P

                     By: _____
                          Neil G. Sparber
                          Brian W. Tilker
                          666 Fifth Avenue
                          New York, New York  10103
                          (212) 318-3000
                          nsparber@fulbright.com
                          btilker@fulbright.com

                          Attorneys for Non-Party,
                          Metropolitan Club Inc.