Neil G. Sparber
Brian W. Tilker
FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, New York 10103
(212) 318-3000
nsparber@fulbright.com
btilker@fulbright.com

Attorneys for Non-Party,
The Metropolitan Club Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

THIRD CHURCH OF CHRIST,
SCIENTIST, OF NEW YORK CITY,

      Plaintiff,

   -against-

THE CITY OF NEW YORK and PATRICIA
J. LANCASTER, in her official capacity as
Commissioner of the New York City
Department of Buildings.

      Defendant.

CIVIL ACTION NO. 07-CV-10962
(DAB)

AFFIDAVIT

---------------------------------------------------------------- x

STATE OF NEW YORK )
        ) ss:
COUNTY OF NEW YORK )

Anthony Nuttall, being duly sworn, deposes and says:

1.  I am the General Manager of The Metropolitan Club (the "Club") located at 1

East 60th Street, New York, New York (the "Premises") and I am familiar with the facts herein. I

submit this affidavit in support of the Club's motion, pursuant to Rule 45 of the Federal Rules of

Civil Procedure, for an order quashing a subpoena which was served upon the Club on or about

50073627.2

March 6, 2008 by the Third Church of Christ, Scientist, of New York City (the "Church"), the plaintiff in the above-captioned action, on the grounds that the documents and information sought in the subpoena are not relevant and unduly burdensome.

Procedural Background

2.      The Club is not a party to this action.  Nevertheless, on or about March 6, 2008, the Club was served with a subpoena which requires not only testimony by a representative of the Club, but also requires the Club to produce massive amounts of documents.  A copy of the subpoena, to which the complaint in the underlying action is attached, is annexed hereto as Exhibit A.  As set forth below, the Club and the Church are not comparable or similarly situated with respect to the Church's claims in the underlying action.  As a result, the information sought, and documents requested, are not relevant and the subpoena should be quashed.

3.      As set forth in the complaint, the gravamen of the Church's claims appear to be related to land use and zoning.  The Church alleges that by imposing and implementing the land use and zoning laws and regulations of the City of New York in the manner described in the complaint, and by having granted permits to nonreligious institutions to engage in the practice of renting out their premises for catered events for non-members, the City is allegedly treating the Church on less than equal terms with comparable nonreligious institutions under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). (Compl. ¶¶ 64-65.)[1]

4.      The complaint further alleges that the Church is being discriminated against under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by, among other things, "withholding consent to allow [the Church] to engage in catering activities

---

[1]      References to the complaint, a copy of which is annexed to the subpoena (Exhibit A) are set forth as (Compl. ¶ ___).

50073627.2                                          2

substantially similar to activities that the City permits other similarly situated nonreligious organizations to conduct." (Compl. ¶ 83.)

5.      As detailed below, however, from a zoning law perspective, the Church and the Club are neither similarly situated nor comparable entities.  A review of the relevant zoning laws and regulations and historical records demonstrates that while the use of the Club for catered events dates back for over 100 years and is in all respects an integral part of its principal club use, the use of the Church for catered events was applied for two years ago, and is by the Church's own admission a use that is separate and apart from its principal religious use.

6.      Moreover, while the New York City Department of Buildings ("DOB") has building records of the use of the Club for catering activities dating back over 50 years, DOB has no records of catering activities for the Church over the last 80 years.  When the Church finally did file an application at DOB in an attempt to establish a catering use in 2006, DOB specifically requested that the Church file a restrictive declaration to limit its use to its own members.  As per public records, no restrictive declaration was ever filed on behalf of the Church.

The Club is Not Comparable to the Church Because of the History of Use

7.      The most obvious reason why the Club is not comparable with, or similarly situated to, the Church with respect to zoning is the history of use for the two buildings.

8.      The Club was built in the early 1890's specifically to be a social club by prominent New Yorkers, as an alternative to the Union Club.  The Club was opened in 1894 as a private, members only not-for-profit social club, which provided members and their guests with facilities and services including kitchen and dining facilities, lounges, a library and sleeping accommodations.  The Club provided a place for its members and guests to gather, socialize,

play cards, read and to hold and participate in social events.  The primary use of the Club as a social club has not changed since its inception in 1894.

9.      The Club has applied for and received Certificates of Occupancy from DOB dating back over fifty years.  Copies of the Certificates of Occupancy received by the Club dating back to 1954 (the "Certificates of Occupancy"), are annexed hereto as Exhibit B.  The Certificates of Occupancy document the continued operation of the Premises as a club, with, among other facilities, "private reception room," "private dining rooms," "dining rooms" and "kitchen."

10.     As is evident from the Certificates of Occupancy, not only do DOB records indicate that the Club has been legally operating reception rooms and dining rooms since 1954, but I understand that those uses that were legal prior to the enactment of the 1961 Zoning Resolution would be "grandfathered" if the 1961 Zoning Resolution rendered them nonconforming, and would continue to remain legal.

11.     In sharp contrast to the Club, the Church was established in the 1880's by a congregation of students dedicated to the Christian Science religion.  The principal use of the Church has always been, and remains, a house of worship.  (Compl. ¶¶ 12-15).

12.     While the Club has the Certificates of Occupancy setting forth the legal use of the Club for the past fifty years, according to the Church's architect the Church has no Certificate of Occupancy.  The pre-consideration received by the Church from DOB on April 10, 2006 (the "Pre-Consideration") is annexed hereto as Exhibit C.  In the Pre-Consideration, the Church's architect states "Since the [Church] building was constructed in 1921, it does not have a certificate of occupancy."

13.     The above information, based entirely on publicly available records, makes clear that there is no comparison between the history of use of the Club, which has a longstanding legal history of holding catered events as part of its principal use at the Premises, and the Church, which has no legal history of holding catered events, and only attempted to legitimize catered events as an accessory use as of the date of the Pre-Consideration.

## The Club and the Church Are Not Comparable Because of History of Zoning Districts

14.     The history of the zoning districts in which the Club and the Church are located further renders any comparison between the two meaningless.  As indicated in the Certificates of Occupancy, beginning at least as early as 1954, the Club was located in a retail zoning district, which did not preclude the Club from operating as a social club or from providing catered events.

15.     The 1960 Certificate of Occupancy included in Exhibit C indicates that the zoning district in which the Club is located was then changed to a residence and restricted retail district, which similarly did not exclude social clubs or catered events.

16.     The use of the Club for catered events was entirely consistent with the zoning in effect prior to the enactment of the 1961 Zoning Resolution.  The Zoning Resolution contained no prohibition on catering activities in Retail or Restricted Retail districts.

17.     Although the zoning district in which the Club is located is now an R10H residential zoning district, the legal use of the Club for catered events would have been "grandfathered" prior to the enactment of the 1961 Zoning Resolution, even if the catering use was later determined to be a separate use apart from the main Club use.

18.     To the best of my knowledge, the Church, however, has always been located in a residential district. A copy of the 1961 New York City Zoning Map 8c highlighting the Church property is annexed hereto as Exhibit D. This zoning map indicates that as of December 15, 1961, the effective date of the 1961 Zoning Resolution, the Church property was located in an R10 residential zoning district.

19.     Regardless of the zoning district in which the Church was located in 1961, as confirmed by the Pre-Consideration, the Church historically has seemingly never engaged in catering any events. The Church was therefore unable to benefit from any "grandfathered" provisions permitting catered events at the Church.

20.     The above information, based entirely on publicly available records, makes clear that there is no comparison between the Club and the Church based on the history of their respective zoning districts. The Club has historically engaged in catered events as part of its principal use, including immediately prior to the enactment of the 1961 Zoning Resolution, while the Church has historically never engaged in such activity, and only sought to begin hosting catered events while located in a residential zoning district.

The Club and the Church Are Not Comparable Because of Nature of Use and Approvals Sought

21.     Another compelling difference between the Club and the Church is that the Club has never had to apply to the City for permission to hold catered events, as the use by the Club of its banquet and restaurant facilities is an integral part of its principal use, as set forth in the Certificates of Occupancy.

22.    The Club has openly and notoriously conducted catered events since its inception through the present date, and has continuously been granted Certificates of Occupancy due to the longstanding, legal operations in which the Club is engaged, including catered events.

23.    Moreover, the Club has filed applications before Zoning and Land Use authorities in the City of New York within the past five years, which applications required on-site inspections by such authorities, and none of these authorities have challenged the catering activities at the Club.  A copy of resolutions of the Board of Standards and Appeals ("BSA") approving the enlargement of the Club building, dated January 27, 2004, are annexed hereto as Exhibit E.

24.    · As stated in these BSA resolutions, "the premises and surrounding area had a site and neighborhood examination by a committee of the Board consisting of Vice-Chair Satish Babbar, Commissioner James Chin, Commissioner Peter Caliendo and Commissioner Joel Miele."

25.    In contrast, the Church has to date never obtained a Certificate of Occupancy setting forth the legal use of its property for catered events separate and apart from its principal use as a house of worship.

26.    According to the Pre-Consideration, the Church's application was not even subject to full zoning review by a DOB examiner, as the architect indicated that he would be filing a "professional certification application," a procedure by which an architect can self-certify the accuracy of plans filed with DOB with regard to zoning regulations.

27.    Since the principal use of the Church is a house of worship, the Church entered into a lease with a caterer, the Rose Group, pursuant to which the Rose Group was permitted to hold catered events in the Church for twenty years, and two five-year renewal periods, in

exchange for investing millions of dollars in repairs, and paying rent and ongoing maintenance costs. (Compl. ¶ 23.)

28.    However, before undergoing the extensive repairs necessary for the Church, the Church and the Rose Group sought the City's approval for the catering arrangement through the Pre-Consideration. (Compl. ¶ 41.)    By seeking a pre-consideration, the Church thus acknowledged that there was a question concerning the acceptability of such an agreement within the definition of accessory use.

29.    While the Pre-Consideration set forth that the catering activity would constitute an "accessory use" to the primary Church use of the building, this determination was eventually reversed by the Department of Buildings. (Compl. ¶51.)    A copy the DOB letter informing the Church of the decision to revoke the approval and permits, dated October 29, 2007, is annexed hereto as Exhibit F.

30.    In the Pre-Consideration, the Church specifically stated that the use of the social hall, ballroom and catering would only be "for the periods that the hall is not being used as a church."    The Church thus admitted that the catering use would be clearly independent of the Church use.

31.    This fact resulted in a substantial question as to whether the additional facilities were "clearly incidental to, and customarily found" in connection with the principal use of the Church, as this additional use would admittedly only be engaged in when the building was not used as a house of worship.    The City thus determined that "the catering establishment is not an accessory use" because the facilities were not "clearly incidental to, and customarily found" in connection with the principal religious use.

32.    Conversely, the Club's facilities are used constantly throughout the day, every day, and are an integral part of its essential services of a social club to its members and guests, with no non-simultaneous occupancy conditions attached.    Moreover, the use of the Club's banquet, kitchen and dining facilities is not an accessory use of the Club in the context of the Zoning Resolution's definition of accessory use, but rather an integral part of its principal use as a primarily social facility, as definitively set forth in its Certificates of Occupancy.

33.    There are other notable differences that make the Club and Church neither similarly situated nor comparable entities.    The Department of Buildings determined that entering into a long-term lease with an outside caterer, the Rose Group, would not be an "accessory use" to the Church's primary use "because it does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church." (Compl. ¶53.)

34.    In contrast, the Club has all of its own facilities and services necessary to hold banquets and other functions on site.    The Club has dining rooms, kitchens, and bar areas and a full staff of chefs, kitchen staff, hosts, waiters and waitresses, bartenders and other facility employees.    In fact, other than an occasional kosher caterer, the Club does not permit events to be catered by any entity other than the Club itself.

35.    The difference in the nature of the facilities of each entity, as well as the application by the Church for a pre-consideration and the resulting revocation letter, demonstrate the stark differences between the Club and the Church with respect to the nature of the use of each building and the approvals required.    While the Church needed to "add an accessory use of the social hall, ballroom and catering at first floor and cellar," the Club was always permitted to have such functions as part of its principal use.

36. As a result, the Club and the Church are not comparable with respect to needing approval for a catering function. The Club is thus not comparable with or similarly situated to the Church, and any information or documents sought from the Club would not be relevant to the Church's claims against the City.

The Club and the Church Are Not Comparable Because of History of Occupancy

37. As can be seen from the Certificates of Occupancy, the Club has historically been considered a Class "B" Club under the Multiple Dwelling Law (the "MDL"). The MDL in New York State has historically governed aspects of multiple dwellings such as light and air, egress and sanitation.

38. The Club's status as a Class "B" Club is indicated on the Certificates of Occupancy from 1954 through 1977, after which such classifications were modified.

39. The 1954, 1960 and 1971 Certificates of Occupancy list the Club as a Class "B" Club on page 1 thereof.

40. The 1977 Certificate of Occupancy lists the Club as a "Heretofore erected existing Class 'B' Club" on page 2 thereof.

41. The MDL defines a "class B" multiple dwelling as "a multiple dwelling which is occupied, as a rule, transiently, as the more or less temporary abode of individuals or families who are lodged with or without meals." The class includes, among other things, "hotels, lodging houses, rooming houses, boarding houses, boarding schools, furnished room houses, lodgings" and "club houses."

42. Pursuant to the MDL, the Club was always considered to be a class of building which would be used, as part of its principal use, for temporary accommodations with meals. It

is entirely consistent that facilities for catered events would be part of its function, as such functions are commonly found in "hotels," similarly defined as "Class B" Multiple Dwellings.

43.    The Church, however, was never considered to be a "Class "B" Multiple Dwelling."

44.    The above information, based entirely on publicly available records, makes clear that there is no comparison between the Club and the Church based on the history of their occupancy. The Club has historically been considered a Class B Multiple Dwelling, which class includes hotels and club houses, while the Church has historically never been considered a Class B building.

45.    This distinction in the history of occupancy of the Club and the Church further dilutes any useful comparison of the two buildings.

46.    Thus, the Club is not comparable with, or similarly situated to, the Church and any information or documents sought from the Club would not be relevant to the Church's claims against the City.

47.    Finally, the document request in the subpoena is unduly burdensome. By way of example only, the subpoena requests all documents relating to any Social Event (which is defined as any catered or social event conducted at the Club), including "(a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events" for the period January 1, 2000 through the present.

48.    The Club is a social club, one of the primary purposes of which is to hold social events. The Club holds on the average one "Social Event" each day. Production of the requested documents for the several thousand social events held at the Club since January 1, 2000 would result in the production of hundreds of thousands of pages.

49.    While this document request, as well as others, is unduly burdensome on its face, this document request is even more burdensome because the documents are not relevant to the Church's claims against the City in the above-captioned action.  Thus, the Club has also served upon the Church its Responses and Objections To Production of Documents Pursuant to Rule 45(c)(2)(B).

_____
Anthony Nuttall

Sworn to and subscribed before me
on this __11__ th day of April, 2008

_____
Notary Public
       ALENA VYTERNA
  Notary Public, State of New York
       No. 01VY6131637
   Qualified in New York County
  Commission Expires August 15, 2009

**EXHIBIT A**

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF _____ NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,          Plaintiff,
                    V.
THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings,
                        Defendants.

TO:
    Metropolitan Club
    1 East 60th Street
    New York, N.Y. 10022-1178

### SUBPOENA IN A CIVIL CASE

Case Number:[1]  07 Civ. 10962 (DAB)

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below
to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION     Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019  Telephone: (212) 489-8230 | DATE AND TIME  3/26/2008 10:00 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE    Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019  Telephone: (212) 489-8230 | DATE AND TIME  3/26/2008 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)  Attorney for Plaintiff | DATE  3/6/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Victor A. Kovner, Esq.
DAVIS WRIGHT TREMAINE LLP, 1633 Broadway, New York, NY 10019 - (212) 489-8230

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

| DATE | | CHECK NUMBER | | | |
|---|---|---|---|---|---|
| 03-05-08 | | | | | 55850 |
| DATE | INVOICE NO. | VOUCHER ID | INVOICE AMOUNT | NET AMOUNT | REMARKS |
| 03-04-08 | PAM030408 | 880405 | 44.00 | 44.00 | witness fee & transportation |
| | | | | TOTAL | |
| | | | | | 44.00 |

DAVIS WRIGHT TREMAINE LLP
1201 THIRD AVENUE
SUITE 2200
SEATTLE, WA 98101-3045

DETACH AND RETAIN THIS STATEMENT

THE ATTACHED CHECK IS IN PAYMENT OF ITEMS LISTED ABOVE



THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW. DO NOT CASH IF NOT PRESENT.

**DAVIS WRIGHT TREMAINE LLP**
1201 THIRD AVENUE, SUITE 2200
SEATTLE, WASHINGTON 98101-3045
(206) 622-3150

VENDOR NO. 29294    DATE 03-05-08    64-1278/ 611   GA    NO. **55850**

Bank of America, N.A.
Atlanta, Dekalb County, GA
Member FDIC

PAY ONLY    44 00    FOUR FOUR    CTSCTS

*********$44.00

DAVIS WRIGHT TREMAINE LLP

PAY
TO THE
ORDER
OF

**METROPOLITAN CLUB**
**1 EAST 60TH ST**
**NEW YORK, NY 10022-1178**

Authorized Signature

⑈000 5 5850⑈ ⑈06 1 1 1 278 8⑈ 003 3 59800 946⑈

Exhibit A

**Definitions and Instructions**

1. "You" or "your" means the Metropolitan Club, located at 1 East 60th Street, New

York, New York and your directors, officers, employees, agents and attorneys, each person

acting on your behalf or under your control, and any parent, subsidiary, predecessor or affiliated

entity, corporation, institution, or non-profit organization.

2. "Documents" has the meaning provided for in the Federal Rules of Civil

Procedure and the local rules of the United States District Court for the Southern District of New

York and without limiting the generality of the foregoing includes all materials (drafts, originals,

and non-identical copies, whether written or electronically stored, sent, or received) such as,

*inter alia*, memoranda (interoffice and otherwise), notes, letters, email messages, calendars,

appointment books, newsletters, notices, minutes or transcripts of meetings, brochures,

advertising copy, website pages, photographs, video recordings, annual reports, tax returns,

invoices, checks, credit card receipts or records, spreadsheets, contracts, reservation lists, contact

lists, vendor lists, permits, licenses, or other records.

3. "Communications" means the transmission or exchange of information, oral or

written, formal or informal, and shall include without limitation, any documents embodying,

containing, constituting, discussing, memorializing, referring to or relating to any such contact.

4. The "Action" means the lawsuit *Third Church of Christ, Scientist, of New York

City v. The City of New York, et al.,* 07 Civ. 10962 (DAB), pending in the Southern District of

New York.

5. The "Complaint" means the complaint filed in the Action, attached hereto as

Exhibit B.

6. The "Church" means the Third Church of Christ, Scientist, of New York City, the

Plaintiff in the Action.

7.    The "Building" means the Church edifice located at 583 Park Avenue, New York, New York.

8.    "Elected Officials" means any person serving in the United States Congress, the New York City Council, or the New York State Legislature and any member of his or her staff, including without limitation the Hon. Carolyn Maloney, Hon. Daniel Garodnick, Hon. Jonathan Bing, or the Hon. Liz Krueger.

9.    The "City" means the City of New York, and all of its officials and agencies, including without limitation the Department of Buildings, the Law Department, the Department of City Planning, the Board of Standards and Appeals, the Mayor and/or any Deputy Mayor and/or any member of their respective staffs.

10.    "Premises" means the building located at 1 East 60th Street, New York, New York.

11.    "Social Events" means any catered or other social event conducted at the Premises, whether for your members or for the general public.

12.    You are required to search for the documents responsive to the requests, wherever located, which are: (a) in your actual or constructive possession, custody, care and/or control; (b) in the actual or constructive possession, custody, care and/or control of your agent, representative or employee; or (c) in the actual or constructive possession, custody, care and/or control of any person who, or entity which, is or has been acting on your behalf or under your direct or indirect control.

13.    In the event that any document responsive to any document request is withheld from production upon a claim of attorney-client, work product or other privilege or immunity, you are required to furnish a list, verified by counsel, of the documents withheld from such

production, setting forth for each document: (a) the nature of the privilege or immunity claim; (b) the date of the document; (c) the title and general subject matter of the document; (d) the identity of each person who made, prepared or signed the document; (e) the identity of each person to whom the document was addressed and each person to whom a copy was indicated to have been sent or was sent; and (f) the present location of the document.

14.     Each document request is continuing in nature, requiring the production of additional documents, should you become aware of or acquire them, in your possession, custody or control after initially responding to these requests.

15.     The past tense shall be construed to include the present tense and vice versa, to make the request inclusive rather than exclusive. The singular shall be construed to include the plural and vice versa to make the request inclusive rather than exclusive. "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

16.     Unless otherwise stated, the relevant period for these requests shall be from January 1, 2000 to the present.

## Document Requests

All Documents concerning or in any way related to:

1.     Any Social Event conducted on or in the Premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

2.     The total number of hours each year that the Premises are used for Social Events, including the number of hours it takes to set up for and clean up after each Social Event.

3.     The Certificate of Occupancy for the Premises (the "CO"), including any amendments thereto.

4.      Any communication with the City regarding the use of the Premises, including communications regarding the CO, and/or whether any past, current, or planned use of the Premises is or was an "accessory use" under the City's Zoning Resolution or other applicable land use regulations.

5.      Any portion of the annual report of the Metropolitan Club, or any submission to any taxing or other authority, regarding revenues generated by Social Events.

6.      Any analysis, investigation, or communication regarding the taxation of revenues generated by Social Events.

7.      Any application for any permit, license or other permission from the City to conduct Social Events, and the issuance or renewal of any such permit, license or other permission, whether formal or informal.

8.      Any communication with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct Social Events at the Premises.

9.      Any independent person or entity that performs catering-related services (an "Outside Caterer") with which you have a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the Outside Caterer's use of, or performance of services on or in, the Premises; (c) any repairs or improvements to the Premises made by, and/or for the benefit or use of, the Outside Caterer ; and (d) rent or use payments made by, or other financial arrangements with, the Outside Caterer.

10.      Any trade names, trademarks, or other names, marks, or designations that you use to identify the availability of catering and Social Events at the Premises.

11.    Any document or communication related to or concerning any allegation in the Complaint, or any relevant fact, claim or defense in the Action.

12.    Any communication with the City or with Elected Officials concerning the Action.

13.    Any membership requirement that would permit entry into the Premises and/or the use of the Premises for Social Events, including (a) your organization's membership policy; (b) whether Social Events must be hosted by a member or a guest of a member; (c) whether hosting a Social Event requires a minimum financial donation or contribution to your organization; and (d) whether Social Events hosted by a member or a guest of the member may be attended by members of the general public.

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,

                 Plaintiff,

          -against-

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City Department
of Buildings,

             Defendants,
-------------------------------------------------------------x

07-CV-10962
(DAB)

**COMPLAINT**

JURY TRIAL DEMANDED

      Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), by

its undersigned attorneys for its Complaint against Defendants City of New York ("City") and

Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department

of Buildings ("DOB") (collectively, the "City" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

     1.    For more than 80 years, the Church has owned and worshipped in the

historic building located at the northeast corner of Park Avenue and 63rd Street (the "Building").

Time has not been kind to the Building or the Church, whose membership dwindled as the

Building fell into disrepair.  A declining building is expensive to maintain and repair; growing

liabilities for repair and maintenance keep new members away from the Church; a smaller

membership makes it harder to raise money to pay for repairs.  This was a vicious circle: if the

Church failed to raise the substantial funds necessary to renovate the building, and in turn to

grow its congregation, it would disappear.

     2.    The Church decided to do what many other religious institutions and

secular non-profit organizations routinely do to supplement revenues:  it entered into a

commercial relationship with a reputable caterer to conduct events in the Building – only at times when the Church was not using the Building for its primary religious purposes – in exchange for urgently needed funds. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the on-going expenses of maintaining the Building. This relationship was critical to the Church's survival.

3.    The Church is a good citizen and it went to the City for approval of this traditional accessory use. The City approved the Church's request and granted the necessary permits for the Required Capital Repairs. Doing so was entirely consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution. The Church relied on the City's approval, and the Required Capital Repairs began to be made. To date, the caterer has expended approximately $6.5 million to make the Required Capital Repairs and expects to spend another $1.5 million over the coming months to complete the work. Even though the caterer is undertaking the Required Capital Repairs, the vast majority of the work also benefits the Building and its Church-related uses and will continue to provide that benefit long after the caterer's contract with the Church expires.

4.    But something unlawful has happened. Defendants have suddenly revoked their prior approval and rescinded the permits. They have done so because a small group of affluent, influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events in the Building have transformed the Church into a

commercial catering hall that causes serious disruption in the neighborhood. The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth: the City is singling out and discriminating against the Church without any basis. If unremedied, this discrimination will have devastating consequences for the Church and likely will result in the sale of the Building so that the Church can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

5.    The Church seeks relief from this Court because the City has violated the Church's rights (1) to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions; (2) to be free from undue burdens on the exercise of its religion, as protected by Section (a) of RLUIPA; (3) to equal protection of the laws, pursuant to the Fourteenth Amendment; and (4) to the free exercise of its religion, pursuant to the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred in this district, and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## PARTIES

8.    Plaintiff Church is a religious corporation existing under the laws of the state of New York, with its principal place of business at 583 Park Avenue, New York, New York 10021.

9.    Defendant City of New York is a political subdivision of the State of New

York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a municipal corporation organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment, enforcement, and implementation of land use and zoning regulations within New York City.

10.   Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings and is authorized to enforce, among other things, provisions of the New York City Administrative Code, the New York City Building Code, and the Zoning Resolution of the City of New York. She is sued herein in her official capacity.

11.   The New York City Department of Buildings is an administrative department of the City of New York, whose offices are located in the County of New York in the State of New York.

## FACTUAL ALLEGATIONS

### The Church and its Historic Building

12.   The Church began in the 1880s as a congregation of students dedicated to the Christian Science religion. By 1895, as its membership grew substantially, the Church applied for a charter and was registered under the laws of the State of New York.

13.   In 1920, the Church purchased property at 583 Park Avenue, New York, New York, and retained the renowned architectural firm Delano & Aldrich to design a house of worship for the congregation. Completed in or around 1924, the red-brick, Georgian-Colonial building topped with its tall lantern is one of the architectural highlights of Park Avenue and is the same building that houses the Church's congregation to this day.

14.   By the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings

with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult

socials and youth forum activities, and lectures and workshops focusing on religious and

spiritual healing topics.  During this period, lectures in the Church's Building would frequently

be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in

the basement.

       15.     Over the years, the Church's membership has declined.  It currently has

fewer than one hundred members.  True to its mission, however, the Church continues to use the

Building for religious worship every Wednesday evening and Sunday morning, as well as for

other religious uses such as Sunday School and lectures.

       16.     A significant contributing factor to the decline in membership has been the

growing state of disrepair of the Building and the prohibitive costs of the Required Capital

Repairs, which members of the congregation would have to bear.  The Required Capital Repairs

necessary to revive the aging Building's infrastructure and to bring it into compliance with the

New York City Building Code include modernization of all major building systems, including

electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and,

where necessary, replacement of the Building's façade, roof, windows, doors and other exterior

components; and significant restoration of the main auditorium and other rooms regularly used

for Church-related activities.

       17.     In order to save the historic Building, the Church needed to raise

substantial capital.  For many years, the Church survived largely because of bequests made by

deceased members of its congregation.  But as the membership declined, the bequests declined,

and the Church, year after year, was running at a significant deficit.

       18.     Beginning at least in the late 1990s, the Church explored several

alternatives to raise capital, including low-cost loans from the Historic Properties Fund

(administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

19.    From 1999 to 2006 the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship did not yield enough money to meet the Church's needs.

20.    In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

21.    Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for renovation and maintenance of the Building.

22.    After considering numerous alternatives, the Church did what many other religious institutions and nonreligious non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events
### In Order to Raise Needed Capital

23.    As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and ongoing maintenance costs (the "Lease").

NYC 189965v8 0085520-000001

24.     The express purpose of the Lease is to supplement the Church's income, and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at p. 1 (emphasis added).

25.     In addition to hosting weddings and other celebrations, as well as events for non-profit groups, companies and other firms – to date, events for New Yorkers for Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups have been held in the Building – the Lease requires the Rose Group to conduct catered events for members of the Church at reduced cost.  2nd Amn. to Lease, at ¶ 2.

26.     Upon information and belief, the Rose Group will invest more than $8 million on the Required Capital Repairs, of which $6.5 million has already been spent.  Because the Building lies within the Upper East Side Historic District, any renovations to the exterior of the Building must be undertaken in a painstaking manner so as to preserve, wherever possible, the Building's original architectural details.  Among the significant work that remains to be completed, the Rose Group plans to restore the Building's roof with slate from the same Vermont quarry that supplied the Church more than 80 years ago.

27.     In addition to Required Capital Repairs, the Rose Group is further obligated to undertake general maintenance of the Building throughout the 20-year Lease term, and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain threshold, from the catered events) to the Church.  This supplemental income is a crucial source of operating revenue for the Church's religious activities, which will be especially necessary

when new community activities and outreach programs are implemented.

28.     Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities.

29.     Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1. Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities. Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5. Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief. Lease, at ¶ 35.6.

30.     The primary purpose of the Building is to serve as the Church's place of worship. But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a

reasonable chance to profit from the arrangement. In the second amendment to the Lease, dated March 27, 2007, the parties provided that, in the event that the Building could not be used for catering activity, the Rose Group would be able to require the Church to reimburse the Rose Group for Required Capital Repairs it had undertaken, even if the Church had to sell the Building. 2nd Amn. to Lease, at ¶ 3.

31.    The Church went out of its way to be sensitive to its neighbors. Thus, the Lease requires the Rose Group to "[p]ermit no act or practice which may … be a nuisance," and to "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the premises." Lease, at ¶ 32.1.

32.    The Church also insisted that the Rose Group take the extraordinary step of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors[.]" When this system is completed, all trash from catered events will be stored and refrigerated within the Building and taken to 63rd Street only when it is to be collected by the trash truck. Lease, at ¶ 32.1.

33.    Moreover, the Lease does not "permit any advertising medium or loud speaker, radio broadcast, etc. to be heard outside of the premises." Lease, at ¶ 32.1.

34.    In addition, the Second Amendment to the Lease provides that the Church and the Rose Group will together "establish standards concerning sound, light levels, traffic control, signage." 2nd Amn. to Lease, at ¶ 5.

35.    The Rose Group has retained a highly professional and comprehensive security team, Global Security Service, in order to ensure that all events at the Church are orderly, quiet, and safe. At all events, in addition to other security measures, there are usually off-duty members of the New York City Police Department patrolling the area, monitoring the event and managing any crowds. There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws. These security measures are implemented from an abundance of caution. Thus far, all of the catered events that have occurred in the Building have occurred without incident.

### The Purpose of the Building Remains the Same: It Is a
### Place of Worship for the Church Congregation

36.    The primary purpose of the Building is to remain a house of worship. For over 80 years, the Building has been property devoted to the Christian Science faith, and it remains the center of the Church's congregation. The Church currently conducts Sunday Church Services and Sunday School services, Wednesday evening church service, Thanksgiving and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church classes (all-day class for a two-week period, twice a year), Church corporate or organizational meetings, and occasional non-regularly scheduled events and Association meetings. Lease, at ¶ 35.1.

37.    The Church has been attracting new members because of the recent repairs to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be able to hold additional services and lectures for its members and other attendees. Among other events, the Church expects to host additional Sunday church services and Sunday school sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee meetings, youth forum activities, musical rehearsals and recitals, and various religious workshops. In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years. Following the renewal of the Church and its congregation, the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members.

38.    Finally, the Church's purpose in working with the Rose Group is more

than merely economical; the Church also hopes that opening up the Building to public events will introduce the Christian Science faith to the larger community, thereby aiding the Church in augmenting its membership. In addition to increased exposure, the historic Building will again be enjoyed and appreciated by the general public, as it had been for many decades until the Building began its decline.

### The Required Capital Repairs Were Undertaken in Reliance on the City's Approval of Catering Events at the Building

39.     Like many religious and nonreligious non-profit institutions, the Church is located in an area zoned for residential use. The Building is in an R-10 zoning district, which is the highest density residential area under the Zoning Resolution of the City of New York (the "Zoning Resolution"). In Manhattan, much of Midtown and Downtown as well as cross-town streets and avenues are zoned R-10.

40.     Only residences, community facilities (such as churches, synagogues and non-profit institutions) and uses that are "accessory" to residences and community facilities are permitted in residential districts under Article II, Chapter 2 of the Zoning Resolution. While catering facilities are permitted, and commonly found, as accessory uses in community facility buildings, stand-alone catering facilities are not permitted in residential districts. Section 12-10 of the Zoning Resolution provides that for a use to be considered "accessory" it must be (i) conducted on the same zoning lot as the principal use, (ii) clearly incidental to, and customarily found in connection with, the principal use and (iii) substantially for the benefit or convenience of the principal use.

41.     Prior to initiating the extensive and costly Required Capital Repairs, the Church and the Rose Group sought the City's approval for this catering arrangement. On April 19, 2006, the City issued a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-

Consideration"). The Pre-Consideration provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building, pursuant to Section 12-10 of the Zoning Resolution.

42.    The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").

43.    Based on the Church's truthful representation that the catered events were to be "operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church" and that the "functions will be restricted by the contract with the Church," the DOB granted its Pre-Consideration permitting the Church to have catered events in the Building.

44.    The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees. During these conversations, DOB's consistent position has been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and, the Manhattan Borough Commissioner of DOB stated that the only limitation on the size of events related to the capacity of the Building. Approximately $6.5 million has been expended on the Required Capital Repairs in reliance on the City's June 2006 approvals.

### Defendants Routinely Permit Other Religious And Nonreligious Non-Profit Groups to Conduct Similar Catered Events, Including In The Church's Immediate Vicinity

45.    The Church's reliance on the Pre-Consideration was reasonable on several levels. After all, as detailed below, (a) there are many buildings in the immediate vicinity of the Building, all in residential zoning districts, that are rented to members of the general public for large social events. (b) there are many similarly situated churches, synagogues and other

religious institutions throughout the City that routinely rent out their buildings to non-members

for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events, and (c)

there are many nonreligious institutions throughout the City that routinely rent out their

buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well

as corporate events.

45-a.   The following is a chart, developed from public records without the

benefit of discovery proceedings, showing establishments in the immediate vicinity of the

Building, all of which are located in Residential zoning districts, and which rent their facilities to

members of the general public for catered events:

|  | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Beekman | 575 Park Avenue – directly south of the Building | Total capacity (restaurant plus separate catering venue) approx 200 | A restaurant open to the general public as well as a separate facility for catered events | R10 (Special Park Improvement District ("PI")) / R8B (Limited Height District No. 1A ("LH-1A")) |
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity: 500 | Available for private catered events and movie and commercial shooting | R10 (PI) |
| The Colony Club | 564 Park Avenue – two blocks south of the Building | | Private club, rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Regency Hotel | 540 Park Avenue – two blocks south of the Building | 4,400 square feet of flexible function space, accommodate up to 200 | Rents out space for a variety of catered events, uses in-house catering operation | R10 (PI) / C5-1 (Special Madison Avenue Preservation District) |
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated; additional events on same night can be held in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety | R10 (PI) |

| | | | of catered events for non-members | |
|---|---|---|---|---|
| Union Club | 101 East 69th Street and Park Avenue | | Rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers Club | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. *Uses designated outside caterer* New York Catering | R8B (LH-1A) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

45-b.   Moreover, as is evident from the following chart developed from public records without the benefit of discovery proceedings, it is customary for churches, synagogues and other religious institutions to rent out their facilities to non-congregants for social events in order to offset in the extraordinary costs of maintaining their historic properties:

| | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity 500 guests | Available for private catered events and movie and commercial shooting | R10 (PI) |
| St. Bartholomew's Church | 109 East 50th Street and Park Avenue | 1250 | Available for movie and commercial filming, corporate events, fashion shows, rehearsal dinners, weddings, cocktail parties, and dances, among other events. All catering provided in house by Café St. Bart's. | C5-3 (MID) / C5-2.5 (MID) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

| Universalist Church of New York | 160 Central Park West | 500 | Church dated 1897, available for private catered events and separate attached kitchen. | R10-A / R8B |
|---|---|---|---|---|
| All Souls Church | 1157 Lexington Avenue and East 80th Street | 350; 200 seated event | | C1-8X / R8B |
| The Top Deck at the Seamen's Church Institute | 241 Water Street, near Peck Street | 130 guests | Interfaith chapel, rents out space for a variety of catered events for non-congregants. | C6-2A (Special Lower Manhattan District – South Street Seaport Subdistrict) |
| Riverside Church | 490 Riverside Drive, between 119th and 122nd Street | 500; 300 seated event | Uses designated onsite caterer, Madeline's Catering & Special Events | R8 |

45-c.   Finally, the following chart, developed from public records without the benefit of discovery proceedings, makes clear that it is customary for nonreligious non-profit institutions (including institutions, like the ones below, located in residential districts) to rent their facilities to non-members for catered events in order to offset the extraordinary costs of maintaining their historic properties:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated event; can host additional events on same night in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety of catered events for non-members | R10 (PI) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. | R8B (LH-1A) |

| Club | | | *Uses designated outside caterer* New York Catering | |
|------|------|------|------|------|
| The Frick Collection | 1 East 70th Street, near Fifth Avenue | 200 seated event; 350 cocktails | | R10 (PI) / R8B (LH-1A) |
| National Academy Museum | 1083 Fifth Avenue, near East 89th Street | 140 seated event; 240 cocktails | | R10 (PI) |
| Cooper-Hewitt, National Design Museum | 2 East 91st Street, near Fifth Avenue | 90 seated event; 500 in Terrace and Garden | Rents out space for a variety of catered events for non-members *Uses designated outside caterer* Restaurant Associates | R10 (PI) / R8B (LH-1A) |

46.     Like these secular non-profit institutions, and like other religious

institutions, the Church found that it was necessary to rent out its space to cover the daunting

costs of making the Required Capital Repairs and of operating and maintaining its historic

Building. Like its neighbors, the Church sought to use its Building both to generate revenue and

to serve as a community resource. The events already held in and planned for the Building are

not meaningfully different from any of these uses at other comparable institutions.

### Opposition by Neighboring Residents Results in the Revocation of the Pre-Consideration

47.     By March 2007, after the Required Capital Repairs were well underway

and after the Rose Group had hosted several catered events, residents of two neighboring

buildings on the west side of Park Avenue, across the wide avenue from the Church – 570 Park

Avenue and 580 Park Avenue – began to complain about the Church's arrangement with the

Rose Group. After initially discussing the matter with the Church and the Rose Group, residents

of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a

public relations campaign against the Church. Their avowed purpose was to maintain the

"residential" character of their Park Avenue neighborhood, and their flyer contended that the

Church's plans to permit catered events at its historic premises -- although no different than the

practices of neighboring institutions – would cause significant disruption in their backyard. These neighbors, however, failed to mention that if the Church were unable to supplement its revenues it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

48.    On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused the Church of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall.  The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night."  This is a selective and baseless attack on the Church.  As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory just a few blocks north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

49.    The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007.  The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, thereby distorting the real import of the Lease.

50.    Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group the limited right to use the Building for catered events when it is not being used for religious

activities.

51.    Unfortunately, the City has succumbed to the demands of these influential neighbors. On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly completed.

52.    The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church." The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008). The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

53.    Upon receiving the letter, the Church engaged litigation counsel. Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation. Counsel for the Church advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the Building to satisfy its liabilities.

54.    The Church's attempt to resolve this matter without litigation was unsuccessful.

55.    On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination"). The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

56.    By revoking the Permits and rescinding the Pre-Consideration and withholding permission allowing the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions. It also irrationally singles out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making available their premises in order to host private catered events.

57.    The Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area.

58.    By revoking the Permits and preventing the Church from hosting catered events on its premises, the City has threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease. The implementation of

the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship – the epicenter of its religious practice for the past 80 years.

59.    Further, by determining that the Church's Building is effectively a catering hall, the City mischaracterizes the Lease and wrongfully impugns the Church.  Contrary to the Defendants' disparaging characterization, the Church remains a congregation devoted to the Christian Science faith, and any catering activities conducted in the Building were, and will remain, wholly incidental to its primary purpose and use of preaching and practicing its religion.

60.    Moreover, the City is impairing the Church's interest in opening up its premises to the general public, which it believes will spark new interest in the Christian Science faith.

### The Church Will Suffer Immediate and Irreparable Injury

61.    The impact of the DOB's decision will be devastating and immediate. The Final Determination rescinds the earlier-granted accessory use approval and revokes the Permits, forthwith.  Therefore, pursuant to the DOB Letter and the Final Determination, as of October 29, 2007, the Church is prohibited from allowing any additional catered events to be booked for the Building, and the Church is prohibited from permitting any additional catered events in the Building to be held after April 28, 2008.  Moreover, because the Final Determination revokes the Permits, the Church and the Rose Group will be forced to suspend any further Required Capital Repairs.  As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled.  This prohibition effectively requires the Rose Group to cease its catering operations in the Building.

62.    If the Church can no longer make the Building available for catered

events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed. For these reasons, and more, if the City's decision is not enjoined, the Church will be forced to sell the Building and its congregation will be deprived of its place of worship.

## First Claim for Relief
## RLUIPA EQUAL TERMS CLAIM
## 42 U.S.C. § 2000cc(b)

63.     Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.     By imposing and implementing the City's land-use and zoning laws and regulations in the manner described above, and by the conduct described above, the City is treating the Church on less than equal terms with comparable nonreligious institutions.

65.     By revoking the Permits and rescinding the Pre-Consideration and thereby forbidding the Church to permit catered events at the Building, Defendants have discriminated against the Church because they freely permit comparable nonreligious institutions to engage in the similar practice of renting out their premises for catered events for non-members.

66.     By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(b), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

## Second Claim for Relief
## RLUIPA SUBSTANTIAL BURDEN CLAIM
## 42 U.S.C. § 2000cc(a)

67.     Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.     The Church entered into the Lease because it needed to preserve its Building so that its congregation could worship and perform other religious activities in it.  The Church's use, renovation, and restoration of its real property constitute "religious exercise."

69.     Among other improvements, the Lease requires the creation of a new room for the Church's Sunday School, and this conversion of real property is also "religious exercise" under RLUIPA.

70.     Congress requires that the Court construe RLUIPA "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution."  42 U.S.C. § 2000cc-3(g).

71.     Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its congregation, spreading its religious teaching, and thereby impeding its religious exercise.

72.     If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

73.     The revocation of the Permits and prohibition on any future catered events is an arbitrary, irrational decision that does not bear any substantial relation to the public health, safety and welfare.

74.     The revocation of the Permits and prohibition on any future catered events reflects the Defendants' inconsistent application and implementation of its zoning rules, a

decision made to placate a small but influential number of disgruntled neighbors and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, noise, or other factors relating to quality of life, given that Defendants allow events similar to the catered events in other facilities in the immediate neighborhood.

75.    By imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above, Defendants have imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

76.    The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

77.    This substantial burden on the religious exercise of the Church is imposed by Defendants in the implementation of a system of land use regulations under which Defendants make, and have in place formal and informal procedures or practices that permit them to make, individualized assessments of proposed land uses, as contemplated by 42 U.S.C. § 2000cc(a)(2)(C).

78.    This substantial burden on the religious exercise of the Church, and the removal of the substantial burden, will affect commerce among the several states, as contemplated by 42 U.S.C. § 2000cc(a)(2)(B).

79.    By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief,

injunctive relief, compensatory damages, and the costs and expenses of this action.

### Third Claim for Relief
### EQUAL PROTECTION CLAIM
### PURSUANT TO 42 U.S.C. § 1983

80.     Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth

herein.

81.     The Church is a "class of one" and is protected by the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution.

82.     Defendants have arbitrarily and selectively interpreted and enforced the

City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective

enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to

engage in catering activities substantially similar to activities that the City permits other

similarly situated religious organizations to conduct.

83.     Defendants have arbitrarily and selectively interpreted and enforced the

City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective

enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to

engage in catering activities substantially similar to activities that the City permits other

similarly situated nonreligious institutions to conduct.

84.     This differential treatment was based on impermissible considerations,

including baseless community opposition to the Church, the nature of the Church's religious

beliefs, and the bad faith attempt to harm the Church's ability to maintain its premises.

85.     Defendants' actions are designed for the purpose of hampering the

exercise of the Church's religious activities in its chosen house of worship, and to prevent the

Church from generating the same sort of supplemental income from the rental of event spaces

that other similarly situated institutions are permitted to generate.

86.    By singling out Plaintiff for unequal adverse treatment, and bowing to pressure from the neighborhood opponents, Defendants deprive Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

87.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

88.    By virtue of the foregoing conduct, Defendants have caused the Church immediate and irreparable harm.

89.    The Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Fourth Claim for Relief
### FIRST AMENDMENT FREE EXERCISE CLAIM
### PURSUANT TO 42 U.S.C. § 1983

90.    Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.    Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, by imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above.

92.    The Defendants' implementation of the City's land use laws is not neutral and generally applicable to all, but instead discriminates unfairly against the Church.

93.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any compelling reason.

94.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any rational basis.

95.    By singling out Plaintiff for unequal, adverse, treatment, and bowing to pressure from neighborhood opponents, Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

96.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

97.    By virtue of the foregoing conduct, Defendants have caused immediate and irreparable injury to the Church.

98.    The Church is entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

WHEREFORE, judgment should be entered as follows:

A.    Declaring that Defendants' actions violated section (b)(1) of RLUIPA;

B.    Declaring that Defendants' actions violated section (b)(2) of RLUIPA;

C.    Declaring that Defendants' actions violated section (a) of RLUIPA;

D.    Declaring that Defendants' actions violated Plaintiff's right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution;

E.    Declaring that Defendants' actions violated Plaintiff's right to the free exercise of religion pursuant to the First and Fourteenth Amendments to the United States Constitution;

F.    Temporarily, preliminarily and permanently enjoining Defendants from revoking the Permits or prohibiting the Church, pursuant to the Lease, from continuing to permit catered events for non-members in the Building pursuant to the Lease;

G.    Awarding compensatory damages against all Defendants;

H.    Awarding Plaintiff's attorney fees and other reasonable expenditures, together with the costs and expenses of this action pursuant to 42 U.S.C. § 1988; and

I.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated:        New York, New York
              December 3, 2007

                                      DAVIS WRIGHT TREMAINE LLP

                                      BY: _____
                                          Victor A. Kovner (VAK-2248)
                                          John Cuti (JC-3365)
                                          Monica Pa (MP-3307)

                                      1633 Broadway
                                      New York, New York  10019-6708
                                      Telephone:  (212) 489-8230
                                      Facsimile:  (212) 489-8340

                                      *Attorneys for Plaintiff*
                                      *Third Church of Christ, Scientist,*
                                          *of New York City*

**EXHIBIT B**

Form 54-35M-701421(51)    114

## DEPARTMENT OF HOUSING AND BUILDINGS

BOROUGH OF     MANHATTAN     , CITY OF NEW YORK

No. **42504**

Date **April 21, 1954**

## CERTIFICATE OF OCCUPANCY

(Standard form adopted by the Board of Standards and Appeals and issued pursuant to Section 646 of the New York Charter, and Sections C26-181.0 to C26-187.0 inclusive Administrative Code 2.1.3.1. to 2.1.3.7. Building Code.)

This certificate supersedes C. O. No.

To the owner or owners of the building or premises:

THIS CERTIFIES that the ~~new~~ altered—existing—building—premises located at

**1 East 60th Street**                          Block **1375** Lot **1-9**

, conforms substantially to the approved plans and specifications, and to the requirements of the building code and all other laws and ordinances, and of the rules and regulations of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646f of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.

~~N. B. or~~ Alt. No.— **1345-1949**                          **Main Bldg.—Class 1 fireproof**

Occupancy classification—Heretofore Erected Existing      6 stories,  98½ **Annex Bldg—Cla—** ft.**—nonfireproof**

Class "B" Club          Located in **Retail**  Use District.

Date of completion— **April 14, 1954**

B Area  1½         Height Zone at time of issuance of permit

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:  499—1953; 1904—1952; 1976— 1950—1952; 1926—1926

(Calendar numbers to be inserted here)

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOADS Lbs. per Sq. Ft. | MALE | FEMALE | TOTAL | USE |
|---|---|---|---|---|---|
| | **MAIN BUILDING** | | | | 5 × 394 |
| Cellar | on ground | | | 20 | Boiler room, storage, house laundry, dressing and locker rooms. |
| 1st story | 100 | | | 150 | Lounge, Bar room, private reception room, lobby and offices. |
| Mezzanine | 50 | | | 40 | Private dining room and offices. |
| 2nd story | 75 | | | 125 | Library, club rooms and upper part of lobby. |
| Mezzanine | 40 | | | | Steward's bedroom. |
| 3rd story | 100 | | | 138 | Private dining room and pantries. |
| 4th story | 40 | | | 25 | Twenty-four (24) bedrooms, valet pressing and storage rooms. |
| 5th story | 40 | | | 30 | Twenty (20) bedrooms and three (3) living rooms. |
| 6th story | 60 | | | 40 | Dining room, kitchen and storage. |
| | **ANNEX BUILDING** | | | | |
| Cellar | on ground | | | | Storage. |
| 1st story | 40 | | | 10 | One (1) bedroom and reception room. |
| 2nd story | 40 | | | 5 | Two (2) bedrooms. |
| 3rd to 6th story, incl. | 40 each | | | 5 each | Three (3) bedrooms and one (1) living room on each story. |

**FIRE DEPARTMENT APPROVALS**
Sprinkler system—November 23, 1951.
Standpipe system—December 22, 1953.
Watchman's Time Detector system—October 27, 1953.

NOTE: The main building and annex building comply with Section 67 of the Multiple Dwelling Law.

Borough Superintendent.

(Page 1)

**NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT**

Unless an approval for the same has been obtained from the Borough Superintendent, no change or rearrangement in the structural parts of the building, or affecting the light and ventilation of any part thereof; or in the exit facilities, shall be made; no enlargement, whether by extending on any side or by increasing in height shall be made; nor shall the building be moved from one location or position to another; nor shall there be any reduction or diminution of the area of the lot or plot on which the building is located.

The building or any part thereof shall not be used for any purpose other than that for which it is certified.

The superimposed, uniformly distributed loads, or concentrated loads producing the same stresses in the construction in any story shall not exceed the live loads specified on reverse side; the number of persons of either sex in any story shall not exceed that specified when sex is indicated, nor shall the aggregate number of persons in any story exceed the specified total; and the use to which any story may be put shall be restricted to that fixed by this certificate except as specifically stated.

This certificate does not in any way relieve the owner or owners or any other person or persons in possession or control of the building, or any part thereof from obtaining such other permits, licenses or approvals as may be prescribed by law for the uses or purposes for which the building is designed or intended; nor, from obtaining the special certificates required for the use and operation of elevators; nor from the installation of fire alarm systems where required by law; nor from complying with any lawful order for additional fire extinguishing appliances under the discretionary powers of the fire commissioner; nor from complying with any lawful order issued with the object of maintaining the building in a safe or lawful condition; nor from complying with any authorized direction to remove encroachments into a public highway or other public place, whether attached to or part of the building or not.

If this certificate is marked "Temporary", it is applicable only to those parts of the building indicated on its face, and certifies to the legal use and occupancy of only such parts of the building; it is subject to all the provisions and conditions applying to a final or permanent certificate; it is not applicable to any building under the jurisdiction of the Housing Division unless it is also approved and endorsed by them, and it must be replaced by a full certificate at the date of expiration.

If this certificate is for an existing building, erected prior to March 14, 1916, it has been duly inspected and it has been found to have been occupied or arranged to be occupied prior to March 14, 1916, as noted on the reverse side, and that on information and belief, since that date there has been no alteration or conversion to a use that changed its classification as defined in the Building Code, or that would necessitate compliance with some special requirement or with the State Labor Law or any other law or ordinance; that there are no notices of violations or orders pending in the Department of Housing and Buildings at this time; that Section 646F of the New York City Charter has been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent, and that, so long as the building is not altered, except by permission of the Borough Superintendent, the existing use and occupancy may be continued.

"§ 646 F. No certificate of occupancy shall be issued for any building, structure, enclosure, place or premises wherein containers for combustibles, chemicals, explosives, inflammables and other dangerous substances, articles, compounds or mixtures are stored, or wherein automatic or other fire alarm systems or fire extinguishing equipment are required by law to be or are installed, until the fire commissioner has tested and inspected and has certified his approval in writing of the installation of such containers, systems or equipment to the Borough Superintendent of the borough in which the installation has been made. Such approval shall be recorded on the certificate of occupancy."

Additional copies of this certificate will be furnished to persons having an interest in the building or premises, upon payment of a fee of fifty cents per copy.

a 54-4 M 70-50-6(72) ▭▭▭ 114

# DEPARTMENT OF BUILDINGS

BOROUGH OF MANHATTAN        , THE CITY OF NEW YORK        NO.

A BUILDING A CERTIFICATE No.  FORM  52394

UNDER SECTION 301 OR THE    Date  June 13, 1960

# CERTIFICATE OF OCCUPANCY

At Item adopted by the Board of Standards and Appeals and issued pursuant to Section 646 of the
York Charter, and Sections C26-181.0 to C26-187.0 inclusive Administrative Code 2.1.3.1. to 2.1.3.7.
ding Code.)

This certificate supersedes C. O. No.    42524

the owner or owners of the building or premises:

THIS CERTIFIES that the new altered existing building—premises located at

1 East 60th Street;  790-793 Fifth Avenue        Block 1375 Lot 1

, conforms substantially to the approved plans and specifications, and to the requirements
f e building code and all other laws and ordinances, and of the rules and regulations of the Board of Stand-
and Appeals, applicable to a building of its class and kind at the time the permit was issued; and
CERTIFIES FURTHER that, any provisions of Section 646F of the New York Charter have been
lied with as certified by a report of the Fire Commissioner to the Borough Superintendent.

Class 1-Fireproof (Main Bld'
TTT Alt. No.— 859-1958                Construction classification—Class 3-Nonfireproof

Heretofore Erected Existing        (Annex)
upancy classification—Class "B"  Club      . Height    6      stories,    98    feet.

. Located in Residence & Restricted  Use District.  RETAIL

at completion—June 1, 1960

B      Area    2        . Height Zone at time of issuance of permit    2096-1959

This certificate is issued subject to the limitations hereinafter specified and to the following reso-
ons of the Board of Standards and Appeals:

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | | | USE |
|---|---|---|---|---|---|
| | | MALE | FEMALE | TOTAL | 7043 |
| **MAIN BUILDING** | | | | | |
| llar | on ground | | | 20 | Storage, boiler room, house laundry, Dressing and locker rooms. |
| story | 100 | | | 150 | Lounge, bar room, showroom, offices and lobby of building. |
| zzanine | 50 | | | 40 | Offices. |
| d story | 75 | | | 125 | Library, club rooms and upper part of lobby. |
| zzanine | 40 | | | | Steward's bedroom. |
| story | 100 | | | 133 | Private dining rooms and pantries. |
| story | 40 | | | 25 | Twenty-four (24) bedrooms, valet, pressing and storage rooms. |
| story | 40 | | | 30 | Twenty (20) bedrooms and three (3) living rooms. |
| story | 60 | | | 40 | Dining rooms, kitchen and storage. |
| **ANNEX BUILDING** | | | | | |
| llar | on ground | | | | Storage. |
| t story | 50 | | | 10 | Offices. |
| d story | 50 | | | 5 | Offices. |
| d to 6th tory, incl. | 50 each | | | 5 each | Three (3) bedrooms and one (1) living room, on each story. |
| | | | | | NOTE: The main building and annex building comply with Section 67 of the Multiple Dwelling Law. |

PERTINENT APPROVALS

nkler system—November 13, 1958.
hipe system—November 12, 1958.
ermal-type detector system—October 27, 1960.

Borough Superintendent

NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHA
BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT

Unless an approval for the same has been obtained from the Borough Superintendent, no change rearrangement in the structural parts of the building, or affecting the light and ventilation of any part ther or in the exit facilities, shall be made, no enlargement, whether by extending on any side or by increase, height shall be made; nor shall the building be moved from one location or position to another; nor shall th be any reduction or diminution of the area of the lot or plot on which the building is located.

The building or any part thereof shall not be used for any purpose other than that for which it is certifi

The superimposed, uniformly distributed loads, or concentrated loads producing the same stresses in construction in any story shall not exceed the live loads specified on reverse side; the number of persons of eit sex in any story shall not exceed that specified when sex is indicated, nor shall the aggregate number of per in any story exceed the specified total; and the use to which any story may be put shall be restricted to that fi by this certificate except as specifically stated.

This certificate does not in any way relieve the owner or owners or any other person or persons in possess or control of the building, or any part thereof from obtaining such other permits, licenses or approvals as a be prescribed by law for the uses or purposes for which the building is designed or intended; nor from obtain the special certificates required for the use and operation of elevators; nor from the installation of fire ala systems where required by law; nor from complying with any lawful order for additional fire extinguisl appliances under the discretionary powers of the fire commissioner; nor from complying with any lawful or issued with the object of maintaining the building in a safe or lawful condition; nor from complying with authorized direction to remove encroachments into a public highway or other public place, whether attache or part of the building or not.

If this certificate is marked "Temporary", it is applicable only to those parts of the building indica on its face, and certifies to the legal use and occupancy of only such parts of the building; it is subject to all provisions and conditions applying to a final or permanent certificate; it is not applicable to any building under jurisdiction of the Housing Division unless it is also approved and endorsed by them, and it must be repl by a full certificate at the date of expiration.

If this certificate is for an existing building, erected prior to March 14, 1916, it has been duly inspec and it has been found to have been occupied or arranged to be occupied prior to March 14, 1916, as noted the reverse side, and that on information and belief, since that date there has been no alteration or conver to a use that changed its classification as defined in the Building Code, or that would necessitate compliance some special requirement or with the State Labor Law or any other law or ordinance; that there are no not of violations or orders pending in the Department of Buildings at this time; that Section 646F of the New York Charter has been complied with as certified by a report of the Fire Commissioner to the Borough Superinted and that, so long as the building is not altered, except by permission of the Borough Superintendent, the exis use and occupancy may be continued.

"§ 646 F.  No certificate of occupancy shall be issued for any building, structure, enclosure, place premises wherein containers for combustibles, chemicals, explosives, inflammables and other dangerous substan articles, compounds or mixtures are stored, or wherein automatic or other fire alarm systems or fire extinguish equipment are required by law to be or are installed, until the fire commissioner has tested and inspected and certified his approval in writing of the installation of such containers, systems or equipment to the Boro Superintendent of the borough in which the installation has been made. Such approval shall be recorded the certificate of occupancy."

Additional copies of this certificate will be furnished to persons having an interest in the building or premises, upon payment of a fee of fifty cents per copy.

Form 34 C (Rev. 4/62) 47M-701190163)—••• 114

## DEPARTMENT OF BUILDINGS

BOROUGH OF   MANHATTAN   , THE CITY OF NEW YORK

Date       September 16, 19 71        No.   71043

# CERTIFICATE OF OCCUPANCY

### NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT

This certificate supersedes C. O. No.   52394   AMENDS

THIS CERTIFIES that the new—altered—existing—building—premises located at
1 East 60th Street                              Block  1375   Lot   1

That the zoning lot and premises above referred to are situated, bounded and described as follows:

BEGINNING at a point on the   north   side of   East 60th Street
distant   225   feet   east   from the corner formed by the intersection of
                5th Avenue                    and         East 60th Street
running thence   north 100'5"   feet; thence   West 225   feet;
thence   south 100'5"   feet; thence   east 225   feet;
running thence _____ feet; thence _____ feet;
to the point or place of beginning, conforms substantially to the approved plans and specifications, and to the requirements of the Building Code, the Zoning Resolution and all other laws and ordinances, and of the rules of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646e of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.   Class 1
XXXXX Alt. No.—   546-1970                Construction classification—   Fireproof
Occupancy classification—   Heretofore Erected   Height  6   stories,  98   feet.
                            Existing Class "B" Club
Date of completion—   September 1, 1971   Located in   C 5-3 & R 10   Zoning District.
at time of issuance of permit.

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:                    )(Calendar numbers to
and The City Planning Commission:                                      )be inserted here)

### PERMISSIBLE USE AND OCCUPANCY

Off-Street Parking Spaces ...........................................................................................................

Off-Street Loading Berths ...........................................................................................................

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| **MAIN BUILDING** | | | |
| Clr. | On Ground | 20 | Storage, boiler room, house laundry, dressing and locker rooms. |
| 1st | 100 | 150 | Lounge, bar room, showroom, offices and lobby of building. |
| Mezz. | 50 | 40 | Offices. |
| 2nd | 75 | 125 | Library, club rooms and upper part of lobby. |
| Mezz. | 40 | | Steward's bedroom. |
| 3rd | 100 | 138 | Private dining rooms and pantries. |
| 4th | 40 | 15 | Fifteen (15) bedrooms and storage. |
| 5th | 40 | 30 | Twenty (20) bedrooms and three (3) living rooms. |
| 6th | 60 | 40 | Dining rooms, kitchen and storage. |
| **ANNEX BUILDING** | | | |
| Clr. | On Ground | | Storage. |
| 1st | 50 | 10 | Offices. |
| 2nd | 50 | 5 | Offices. |
| 3rd to 6th,Incl. | 50 each | 5 each | Three (3) bedrooms and one (1) living room on each story. |

— OVER —                    _Cornelius F. Dennis_
                                              (Borough Superintendent)

OFFICE COPY—DEPARTMENT OF BUILDINGS

THIS CERTIFICATE OF OCCUPANCY MUST BE POSTED WITHIN THE BUILDING IN ACCORDANCE WITH THE RULES OF THE DEPARTMENT PROMULGATED MARCH 31ST, 1967.

PERMISSIBLE USE AND OCCUPANCY (continued)

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|-------|------------------------------|----------------------|-----|
| | | | |

NOTE:  The main building and annex building
comply with Section 67 of the Multiple Dwelling
Law.

FIRE DEPARTMENT APPROVALS:
Sprinkler System-November 23, 1951.
Standpipe System-November 22, 1953.
Watchman's Time Detector System-
October 27, 1953.

NOTE:  This is an AMENDED Certificate of
Occupancy for change of use on 4th
story only.

THIS CERTIFICATE SHALL ALSO BE CONSIDERED A CERTIFICATE
OF COMPLIANCE OR OCCUPANCY UNDER SECTION 301 OF THE
MULTIPLE DWELLING LAW.

Kornelius F. Kennis
................................................
Borough Superintendent

FORM 540 (REV. 6/69)-25M-703942(69)

THE CITY OF NEW YORK

1 of 2 pages.

HOUSING AND DEVELOPMENT ADMINISTRATION

# DEPARTMENT OF BUILDINGS

## CERTIFICATE OF OCCUPANCY

BOROUGH  MANHATTAN          DATE:   8/18/77        NO.  C O  77863

This certificate supersedes C.O. No. 71G43 & 52394          ZONING DISTRICT   R-70
THIS CERTIFIES that the new—altered—existing—building—premises located at
1 East 60th Street                                   Block  1375   Lot  1
CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES AND
REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING — DWELLING OR ROOMING UNITS | RESOLUTION — USE GROUP | BUILDING CODE — HABITABLE ROOMS | OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| **Main Bldg.** | | | | | | | |
| Cellar | O. G. | 20 | | | | | Storage, boiler room, house laundry, dressing and locker rooms. |
| 1st | 100 | 390 | | | | | Lounge, bar room, showroom, offices and building lobby. |
| Mezz. | 50 | 40 | | | | | Offices. |
| 2nd | 75 | 125 | | | | | Library, clubrooms, and upper part of lobby. |
| Mezz. | 40 | | | | | | Steward's bedroom. |
| 3rd | 100 | 175 | | | | | Private dining rooms, pantry and kitchen. |
| 4th | 40 | 15 | | | | | Fifteen (15) bedrooms and storage. |
| 5th | 40 | 30 | | | | | Twenty (20) bedrooms and three (3) living rooms. |
| 6th | 60 | 40 | | | | | Dining room, kitchen and storage. |
| **Annex Bldg.** | | | | | | | |
| Cellar | O. G. | | | | | | Storage. |
| 1st | 50 | 10 | | | | | Offices. |
| 2nd | 50 | 5 | | | | | Offices. |

OPEN SPACE USES                  (continued)
                                 (SPECIFY—PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

THIS CERTIFICATE OF OCCUPANCY MUST BE POSTED
WITHIN THE BUILDING ... ... ... ... OF THE RULES
OF THE DEPARTMENT OF BUILDINGS.

### NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS
### A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED

THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE.

_____                    JEREMIAH T. WALSH
     BOROUGH SUPERINTENDENT                        COMMISSIONER

COPY

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at a point on the _____ side of

distant _____ northeast feet ~~XXXX~~ from the corner formed by the intersection of

~~XXXXX~~ _____ ~~XXXXXXXXXX~~

running thence East 60th Street _____ feet ; thence ~~Fifth Avenue~~ _____ feet ;

thence _____ north 100.5 _____ feet ; thence east 225.0 _____ feet ;

thence _____ south 100.5 _____ feet ; thence west 225.0 _____ feet ;

thence _____ feet ; thence _____ feet ;

to the point or place of beginning.

| N.B. or ALT. No. | | DATE OF COMPLETION | | CONSTRUCTION CLASSIFICATION |
|---|---|---|---|---|
| ~~EXISTING~~ OCCUPANCY GROUP CLASSIFICATION 015-076 | | 8/5/98 ~~HEIGHT~~ | STORIES. | Class - 1 - Fireproof. |
| | | | 6 | 98 |

Heretofore erected existing
Class "B" club.

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS.

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| STANDPIPE SYSTEM (C26-1702.1) | | | AUTOMATIC SPRINKLER SYSTEM (C26-1703.1) | | |
| YARD HYDRANT SYSTEM (C26-1702.2) | | | CENTRAL STATION SUPERVISION (C26-1703.2 & 4) | | |
| PRIVATE HYDRANT SYSTEM (C26-1702.17) | | | WATER FLOW ALARM (C26-1703.4) | | |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM (C26-1702.21) | | | SIAMESE (C26-1703.9) | | |
| SMOKE DETECTOR (C26-1703.1.1) | | | TWO AUTOMATIC SOURCES (C26-1703.9(a)) | | |
| FIRE ALARM AND SIGNAL SYSTEM. (C26-1704.1) | | | ONE AUTOMATIC SOURCE (C26-1703.9(b)) | | |
| | | | DOMESTIC WATER SUPPLY SOURCE (C26-1703.9(c)) | | |

THE FOLLOWING PERMITTED ALTERNATE TO A REQUIRED STANDPIPE SYSTEM WAS PROVIDED OR INSTALLED (C26-1702.14)

| | YES | NO |
|---|---|---|
| HAND OR PORTABLE FIRE EXTINGUISHERS SUBJECT TO FIRE DEPARTMENT APPROVAL (C26-1702.14(1)) | | |
| AUTOMATIC SPRINKLER SYSTEM CONNECTED TO A CENTRAL SUPERVISORY STATION (C26-1702.14(2)) | | |

THE FOLLOWING PERMITTED ALTERNATES TO A REQUIRED AUTOMATIC SPRINKLER SYSTEM WERE INSTALLED

| | YES | NO |
|---|---|---|
| PARTIAL SYSTEM (TABLE 17-2), CLARIFY EXTENT OF SYSTEM BELOW. | | |
| AUTOMATIC DRY SPRINKLER SYSTEM (TABLE 17-2) | | |
| NON AUTOMATIC DRY SPRINKLER SYSTEM (TABLE 17-2 FOOTNOTE (c)) | | |
| SMOKE DETECTOR ALARM SYSTEM (C26-1703.2) | | |

EXTINGUISHING AGENT IF OTHER THAN WATER: _____

EXTENT OF PARTIAL SYSTEM: _____

LIMITATIONS OR RESTRICTIONS: .

BOARD OF STANDARDS AND APPEALS CAL. NO _____

CITY PLANNING COMMISSION CAL. NO. _____

OTHERS: _____

PAGE 1 OF 2 PAGES

B Form 34 (Rev. 8/85)



THE CITY OF NEW YORK

ALT 100627626



# DEPARTMENT OF BUILDINGS

## CERTIFICATE OF OCCUPANCY AMENDED

106575

**BOROUGH** MANHATTAN **DATE:** FEB 09 1995 **NO.**

AMENDED

This certificate supersedes C.O. NO 77863 ~~PRIOR~~ ZONING DISTRICT R10H

*THIS CERTIFIES that the ~~new~~—altered—~~existing~~—building—premises located at*

1-11 EAST 60TH STREET Block 1375 Lot 1

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS PER SQ FT | MAXIMUM NO OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OR USE |
|---|---|---|---|---|---|---|---|
| MAIN BUILDING | | | | | | | |
| CELLAR | O.G. | 20 | | | | | STORAGE, BOILER ROOM, HOUSE LAUNDRY, DRESSING AND LOCKER ROOMS |
| 1ST FLOOR | 100 | 390 | | | | | LOUNGE, BAR ROOM, SHOWROOM, OFFICES AND BUILDING LOBBY |
| MEZZANINE | 50 | 40 | | | | | OFFICES |
| 2ND FLOOR | 75 | 125 | | | | | LIBRARY, CLUBROOMS, AND UPPER PART OF LOBBY |
| MEZZANINE | 40 | | | | | | STEWARD'S BEDROOMS |
| 3RD FLOOR | 100 | 175 | | | | | PRIVATE DINING ROOMS, PANTRY AND KITCHEN |
| 4TH FLOOR | 40 | 16 | | | | | TWELVE (12) BEDROOMS, OFFICES AND STORAGE |
| 5TH FLOOR | 40 | 30 | | | | | TWENTY (20) BEDROOMS AND THREE (3) LIVING ROOMS |
| 6TH FLOOR | 60 | 40 | | | | | DINING ROOMS, KITCHEN AND STORAGE |
| ANNEX BUILDING | | | | | | | |

(CONTINUED)

OPEN SPACE USES_____ (SPECIFY—PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

M.C.       **NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED**

THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE.

BOROUGH SUPERINTENDENT          COMMISSIONER

☐ ORIGINAL    ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS    ☐ COPY

B. Form 54 (Back) (Rev. 8.82)

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at a point on the ___N|E___ side of
distant _____ feet from the corner formed by the intersection of
EAST 60TH STREET and __ 5TH AVENUE

running thence _____ feet; thence _____ feet;
thence ___NORTH 100.5_____ feet; thence __E. 225.0_____ feet;
thence ___SOUTH 100.5_____ feet; thence __W. 225.0_____ feet;
thence _____ feet; thence _____ feet;
to the point or place of beginning.

XXOOEXXALT. NO. __100627626__    DATE OF COMPLETION __5|6|94__    CONSTRUCTION CLASSIFICATION __CLASS 1 FIREPROOF__
BUILDING OCCUPANCY GROUP CLASSIFICATION    HEIGHT    STORIES,    FEET
___RESIDENTIAL___    __6 + C__    __98'__

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS.

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| STANDPIPE SYSTEM | | | AUTOMATIC SPRINKLER SYSTEM | | |
| YARD HYDRANT SYSTEM | | | | | |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM | | | | | |
| SMOKE DETECTOR | | | | | |
| FIRE ALARM AND SIGNAL SYSTEM | | | | | |

STORM DRAINAGE DISCHARGES INTO:
A) STORM SEWER ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

SANITARY DRAINAGE DISCHARGES INTO:
A) SANITARY SEWER ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

LIMITATIONS OR RESTRICTIONS.
BOARD OF STANDARDS AND APPEALS CAL. NO. _____
CITY PLANNING COMMISSION CAL. NO. _____
OTHERS:

**EXHIBIT C**

06/29/2006  11:44   2126190550   AEC

03/29/2006  13:29   2126190550   AEC

PAGE  03/03

PAGE  02/03


**BUILDINGS**

Additional Information

| 1 Filing Status | | | | 583 - 589  Park  Avenue |
|---|---|---|---|---|
| Job Number | | | | |
| Sheet Number | 1 | of  1 | Sheets | As an attachment to: |
| | | | | Block 1398, lot 1 |
| 2 Additional Information | | | | Third Church of Christ Scientist |

Respectfully request pre consideration before   filing a professional certification application that a proposed accessory social hall.  ballroom  and catering within the existing church is an accessory use to the existing building.

The building is an existing two story and cellar  structure,  located in a landmark district, and constructed in 1921 under application NB 390/1921.  The lot is located in R-10 Park improvement ( PI ) zoning district.

The existing plans  from 1922 indicate the first floor as the main auditorium and church, and lower level as Sunday school room. Since the building was constructed in 1921, it does not have a certificate of occupancy.

It is proposed to continue the use as a church , and add an accessory use of social hall,  ballroom and catering at first floor and cellar , for the periods that the hall is not being used as a church .  The accessory ballroom and catering meets the accessory use definition in Zoning Resolution 12-10 in that they are located in the same zoning lot as the principal use. They will remain under the same ownership of the Third Church of  Christ Scientist. The use is clearly incidental and customarily found in connection with the principal use, as a catering and ballroom is substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the principal use.  The use, therefore remains the same use group 4 church and accessory uses.

The occupancy group will also remain as F occupancy as a place of assembly and will have F-1b and F-4 occupancy. Under the old code of 1938, the occupancy of the building remains as a public building.

Based on above, there is no change in use and occupancy of the building. The work should not require a new certificate of occupancy.  The building will be upgraded for ADA and handicapped access (LL 58/87), and also for exits, and fire protection equipment. The work will be filed as ALT-2 directive 14 applications.  A place of assembly permit will also be obtained for both church and ballroom catering.

*OK To Accept provided a new certificate of occupancy is obtain with a restrictive declaration and note on The C.O that the accessory social Hall is to be use and operated exclusively and Only by The church and for its members*

[Registered Architect stamp: MICHAEL L. GOLDBLUM, STATE OF NEW YORK, 019536]

| 3 Statements and Signatures | |
|---|---|
| I hereby state that the above information is correct and complete to the best of my knowledge. | Applicant Name  MICHAEL L. GOLDBLUM, R.A. |
| Persudicated of ... under ... of the Administration Code and is punishable by a fine or imprisonment or both. | Signature |
| It is unlawful to give to a city employee or for a city employee to accept... | Date  3.29.06 |

Revised 6-88 A1-1

**EXHIBIT D**



**EXHIBIT E**

**294-03-BZ**
**CEQR #04-BSA-045M**
APPLICANT - Robert Loos, Esq., Sybil H. Pollet, Esq., for The Metropolitan Club, Inc., owner.
SUBJECT - Application September 10, 2003 - under Z.R. §72-21 to permit in an R10-H and C5-1 zoning district, and in the Special Park Improvement District, the proposed enlargement of an existing six story community facility that does not comply with the zoning requirements for lot coverage, rear yard, rear yard equivalent and front walls, contrary to Z.R. §§24-11, 33-26, 24-36, 54-31 and 92-042(c).
PREMISES AFFECTED - One East 60th Street, northeast corner of Fifth Avenue, Block 1375, Lot 1, Borough of Manhattan.
**COMMUNITY BOARD #8M**
APPEARANCES -
For Applicant: Sybil Pollet.
**ACTION OF THE BOARD -** Application granted on condition.
THE VOTE TO GRANT -
Affirmative: Vice-Chair Babbar, Commissioner Caliendo and Commissioner Miele.............................3
Negative:......................................................................0
Abstain: Chair Srinivasan.............................................1
Absent: Commissioner Chin.........................................1
THE RESOLUTION -
    WHEREAS, the decision of the Borough Commissioner, dated August 21, 2003, acting on Department of Buildings Alteration Application No. 103495004, reads:
    "1. The proposed enlargement in an R10-H zoning district exceeds the permitted lot coverage, pursuant to §24-11 of the Zoning Resolution.
    2. The proposed enlargement in a C5-1 zoning district does not satisfy the rear yard requirements, pursuant to §33-26 of the zoning resolution.
    3. The proposed enlargement in an R10-H zoning district does not satisfy rear yard requirements pursuant to §24-36 of the zoning resolution.
    4. The proposed enlargement increases the degree of non-compliance pursuant to §54-31 of the zoning resolution.
    5. The proposed enlargement does not comply with §92-042(c), limits on recesses in front walls in the special park improvement district."; and
    WHEREAS, a public hearing was held on this application on January 6, 2004 after due notice by publication in *The City Record,* and then laid over to January 27, 2004 for decision; and
    WHEREAS, the premises and surrounding area had a site and neighborhood examination by a committee of the Board consisting of Vice-Chair Satish Babbar, Commissioner James Chin, Commissioner Peter Caliendo and Commissioner Joel Miele; and
    WHEREAS, this is an application under Z.R. §72-21, to permit, in an R10-H and C5-1 zoning district, and in the Special Park Improvement District, the proposed enlargement of an existing six-story community facility that does not comply with the zoning requirements for lot coverage, rear yard, rear yard equivalent and front walls, contrary to Z.R. §§24-11, 33-26, 24-36, 54-31 and 92-042(c); and
    WHEREAS, the Board notes that the N.Y.C. Landmarks Preservation Commission has granted a Certificate of Appropriateness for the proposed work on November 14, 1997, renewed December 5, 2002, and that said approval and renewal are in the record; and
    WHEREAS, the subject zoning lot is a 100'5" by 225' lot, with a total lot area of 22,593.75 sq. ft; and
    WHEREAS, the zoning lot is divided by R10-H and C5-1 district boundaries, and that portion of the zoning lot from Fifth Avenue to 125' east of Fifth Avenue lies within the Special Park Improvement District; and
    WHEREAS, the subject lot is occupied by a non-complying landmarked six-story building designed by McKim, Mead and White, which currently houses the Metropolitan Club (the "Club"), a not for profit corporation; and
    WHEREAS, the applicant states that the Club was formerly for the exclusive use of men, who were served by an all male staff; and
    WHEREAS, the applicant further states that the original design of the building contemplated 250 members; and
    WHEREAS, the applicant represents that the Club now has approximately 1560 male and female

members and for the status of its exists on both men and women; and

WHEREAS, the Club would like to ensure safe entrance and egress for its predominantly elderly members, provide adequate elevators for disabled members, and provide sufficient handicapped-accessible bathrooms for both men and women; and

WHEREAS, in light of the above stated goals, the Club proposes to install new fire-rated, fully enclosed egress staircases from each floor to the street; to install an elevator accessible to the disabled, in compliance with both the Americans with Disabilities Act and Local Law 58/87; and to install bathrooms for male and female members in compliance with Local Law 58/87 and Building Code Reference Standard 16; and

WHEREAS, the applicant states that the following are unique physical conditions that create practical difficulties and unnecessary hardships in constructing the proposed improvements to the building in conformity with underlying district regulations: lack of available open space on the lot, the landmarked status of the building and its courtyard, the lack of space in the interior of the building for the necessary improvements, the need to preserve the architecturally significant interior space, the irregular rear yard, and the division of the lot by district boundaries and inclusion of part of the lot within the Special Park Improvement District; and

WHEREAS, the applicant states that the Club explored as-of-right alternatives and subsequently determined that no such alternative was feasible, thus necessitating the need for a variance; and

WHEREAS, the Board finds that the aforementioned unique physical conditions, when considered in the aggregate as to this particular building and in conjunction with the stated programmatic need of creating a handicapped-accessible facility, with amenities for both men and women, create practical difficulties in developing the site in strict conformity with current zoning; and

WHEREAS, the Board finds that the applicant need not address Z.R. §72-21(b) since the applicant is a not-for-profit organization and the development will be in furtherance of its not-for-profit status; and

WHEREAS, the applicant states that the proposed work would increase the lot coverage of the building by only 1.84% and not diminish the light and air to the Club or to legal windows in the adjacent building; and

WHEREAS, the proposal will result in the removal of exterior open metal stairs in the rear yard; and

WHEREAS, the applicant claims that of the improvements would be recessed from Fifth Avenue, thereby reducing the view of the improvements from the street; and

WHEREAS, based on the above, the Board finds that this action will not alter the essential character of the surrounding neighborhood or impair the use or development of adjacent properties, nor will it be detrimental to the public welfare; and that, in fact, the proposal will be of benefit to the public welfare; and

WHEREAS, the hardship herein was not created by the owner or a predecessor in title; and

WHEREAS, this proposal is the minimum necessary to afford the owner relief; and

WHEREAS, therefore, the Board has determined that the evidence in the record supports the findings required to be made under Z.R. §72-21; and

WHEREAS, the Board has conducted an environmental review of the proposed action and the Final Environmental Assessment Statement and has carefully considered all relevant areas of environmental concern; and

WHEREAS, the evidence demonstrates no foreseeable significant environmental impacts that would require the preparation of an Environmental Impact Statement.

*Resolved*, that the Board of Standards and Appeals issues a Negative Declaration under 6 NYCRR Part 617 and §6-07(b) of the Rules of Procedure for City Environmental Quality Review and makes each and every one of the required findings under Z.R. §72-21 and grants a variation in the application of the Zoning Resolution, limited to the objection cited, under Z.R. §72-21, to permit, in an R10-H and C5-1 zoning district, and in the Special Park Improvement District, the proposed enlargement of an existing six story community facility that does not comply with the zoning requirements for lot coverage, rear yard, rear yard equivalent and front walls, contrary to Z.R. §§24-11, 33-26, 24-36, 54-31 and 92-042(c); *on condition* that all work shall substantially conform to drawings as they apply to the objections above noted, filed with this application marked "Received September 10, 2003"- (16) sheets, and *on further condition*:

THAT the premises shall be maintained free of debris and graffiti;

THAT any graffiti located in the premises shall be removed within 48 hours;

THAT the premises shall comply with all applicable fire safety measures;

THAT the above conditions shall be noted in the Certificate of Occupancy;

THAT substantial construction shall be completed in accordance with Z.R. §72-23;

THAT this approval is limited to the relief granted by the Board in response to specifically cited and

THAT the approved plans shall be considered approved only for the portions related to the specific relief granted; and

THAT the Department of Buildings must ensure compliance with all other applicable provisions of the Zoning Resolution, the Administrative Code and any other relevant laws under its jurisdiction irrespective of plan(s) and/or configuration(s) not related to the relief granted.

Adopted by the Board of Standards and Appeals, January 27, 2004.

A true copy of resolution adopted by the Board of Standards and Appeals, January 27, 2004.
Printed in Bulletin No. 5-6, Vol. 89.
  Copies Sent
    To Applicant
      Fire Com'r.
        Borough Com'r.

**EXHIBIT F**



NYC Department of Buildings
280 Broadway, New York, NY 10007

Patricia J. Lancaster, FAIA, Commissioner

Phyllis Arnold
Deputy Commissioner, Legal Affairs and
Chief Code Counsel
212.566.3291
212.566.3843 fax
phyllisa@buildings.nyc.gov

October 29, 2007

R. Fulton Macdonald
Third Church of Christ, Scientist
583 Park Avenue
New York, NY 10021

Louis Rose
Rose Group Park Avenue LLC
583 Park Avenue
New York, NY 10021

Michael L. Goldblum
The Building Studio LLP
307 West 38 Street – Room 1701
New York, NY 10018

Re:    Intent to Revoke Approval and Permit
       583 Park Avenue, Manhattan (the "premises")
       Application No. 104511495

Gentlemen:

The Commissioner of Buildings intends to revoke the approval(s) and permit(s) issued for work at the premises in connection with the application referenced above, pursuant to Section 27-197 of the Administrative Code of the City of New York ("AC"), within 10 days of the posting of this letter by mail unless sufficient information is presented to the Department of Buildings ("Department") to demonstrate that the permit should not be revoked.

Pursuant to AC §27-197, the Commissioner may revoke a permit for failure to comply with the provisions of any applicable law or regulation, or a false statement or misrepresentation of material fact in the application, accompanying plans or papers on the basis of which the permit was issued, or whenever any permit has been issued in error.

We have reviewed letters dated March 12, 2007, March 30, 2007, and October 5, 2007 from counsel for neighboring buildings challenging the permit issued for a catering activity at the premises to the extent of its status as an "accessory use" to the Church at the premises. We have also reviewed letters submitted by the Church's attorney dated April 20, 2007 as revised May 8, 2007 and October 10, 2007 addressing these complaints. Based on the information presented to us thus far, the catering establishment is not an accessory use because it does not comport with the Zoning Resolution's requirement that it be "clearly incidental to, and customarily found" in connection with the Church. Rather it appears to be a principal commercial establishment at the premises. Therefore, absent additional information as set forth above, the permit will be revoked.

Pending submission of further information and a resolution of the issue, the Department will continue to issue Temporary Place of Assembly permits, but only to the extent of events currently booked at the catering facility and in no event beyond six (6) months from the date of this letter and on the condition that the Department is provided with a list no later than November 5, 2007 of booked events for the period in question for which the caterer has signed contracts.

Third Church of Christ Scientist
October 29, 2007
Page 2

Please contact the undersigned with any questions regarding this notice.

Sincerely,

Phyllis Arnold
Deputy Commissioner for Legal Affairs


C:      Christopher Sanfulli
        Fatma Amer
        Michael Alacha
        Barry Romm
        Dileep Khedekar
        Max Lee
        Dennis Zambotti
        Application folder
        Revocation file
        Premises file
        Mona Sehgal
        Felicia Miller
        Angelina Martinez-Rubio
        Jay A. Segal
        Phyllis H. Weisberg

NYC.gov/buildings