UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------- x

THIRD CHURCH of CHRIST, SCIENTIST, of :
NEW YORK CITY,                         :          07 Civ. 10962 (DAB)
                                       :
                          Plaintiff,   :          **DECLARATION OF MONICA**
                                       :          **PA IN SUPPORT OF**
           - against -                 :          <u>**MOTION TO COMPEL**</u>
                                       :
THE CITY OF NEW YORK and PATRICIA J.   :
LANCASTER, in her official capacity as,:
Commissioner of the New York City Department :
of Buildings,                          :
                                       :
                          Defendants.  :

------------------------------------------------- x

    I, MONICA PA, pursuant to 28 U.S.C. § 1746, declare are follows:

    1.    I am associated with the firm Davis Wright Tremaine LLP, counsel for Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"). I respectfully submit this Declaration in support of the Church's opposition to the motion to quash filed by the non-party the Metropolitan Club, Inc. (the "Metropolitan Club" or the "Club"), and in support of the Church's cross motion, pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, for an order compelling the Club to comply with the subpoena dated March 6, 2008 (the "Subpoena").

    2.    Attached as Exhibit A is a true and correct copy of the Order, dated March 3, 2008, granting the parties permission to conduct pre-hearing discovery.

    3.    As part of our representation of the Church, we engaged a private investigator who confirmed that the Metropolitan Club makes it possible for members of the general public to rent space in the Club for a wedding or other social event.

4.    Thereafter, on March 6, 2008, the Church served the Subpoena to discover additional information about the scope, intensity, and revenues generated by such social events conducted at the Club. *See* Subpoena, attached as Exhibit B.

5.    When initially contacted by the Club's counsel, the Church was flexible and offered several extensions of time. *See* Email from J. Cuti to N. Sparber, dated March 21, 2008, attached as Exhibit C.

6.    The Club then sent a letter to the Church on March 31, 2008, making points very similar to those made in its motion to quash, in an effort to avoid having to comply at all with the Subpoena. *See* Letter from N. Sparber to J. Cuti, dated March 31, 2008, attached as Exhibit D.

7.    Counsel for the Church replied with a letter making clear why those arguments were beside the point, and explaining why evidence regarding the Club's practice of renting out its space for accessory catered events for non-members was squarely relevant here. *See* Letter from J. Cuti to N. Sparber, dated April 3, 2008, attached as Exhibit E.

8.    Despite several amicable phone calls regarding possible ways to amend the Subpoena, the Club decided to take the position that it need not comply at all and filed its motion to quash.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2008

Monica Pa

**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
FIRST CHURCH OF CHRIST, SCIENTIST,
OF NEW YORK CITY,

                        Plaintiff,

            -against-                              07 Civ. 10962 (DAB)
                                                        ORDER
CITY OF NEW YORK, and PATRICIA LANCASTER,
in her official capacity as Commissioner

                        Defendants.
---------------------------------------X
DEBORAH A. BATTS, United States District Judge.

      The Court is in receipt of correspondence from the Parties dated

February 22, 2008, February 25, 2008, and February 26, 2008.

      The Court is hereby GRANTING pre-hearing discovery including

Plaintiff's requests for documents and depositions from several

religious and non-religious institutions that may conduct similar

catered events to those at issue in this matter, as well as document

requests and depositions of City officials who may have knowledge

relevant to the Church's claims.  Further, should the City wish to

conduct pre-hearing discovery, it can take advantage of this time for

that purpose as well.  Parties shall have ninety (90) days from the

date of this Order.  There shall be no extensions.

            SO ORDERED.

Dated:    New York, New York
          March 3, 2008


                                    _____
                                         Deborah A. Batts
                                    United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 3, 2008

**Exhibit B**

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

VICTOR A. KOVNER
DIRECT (212) 489-8230
victorkovner@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

March 6, 2008

***By Hand***

Metropolitan Club
1 East 60th Street
New York, NY 10022-1178

      Re:    *Third Church of Christ, Scientist v. City of New York, et al.; 07 CV 10962 (DAB)*

Dear Sir or Madam:

      This firm represents plaintiff Third Church of Christ, Scientist (the "Church") in this litigation. As you may know, this federal lawsuit was filed by the Church to protect its ability to continue to use its building at 583 Park Avenue as a venue for occasional catered social events, a use that the City initially approved but, in November 2007, decided to prohibit. The United States District Court Judge handling this matter has authorized the Church to conduct what is called "discovery" which is the legal term we use to describe the process of gathering facts that are relevant to a lawsuit. I want you to know that the Church is serving the enclosed subpoena on you only with great reluctance; we would have much preferred to have resolved this matter without need for litigation because we believe the tradition of allowing religious institutions and secular non-profit groups to raise supplemental revenues by permitting their buildings to be used for catered events is good policy. (The Complaint in this matter is attached as Exhibit B to the subpoena.) Unfortunately, it became necessary to file this case to protect the Church. Regrettably, the nature of the legal claims requires us to seek information from you.

      Enclosed please find a subpoena that requires you to provide the documents requested in Exhibit A to the subpoena. The subpoena also calls for your testimony, and notes that the date for providing that testimony is March 26, 2008. I understand that there may be scheduling issues, and you should of course feel free to contact me or my colleagues John Cuti and/or Moncia Pa so that we can arrange a mutually convenient date for your testimony. It is more efficient for you to provide the documents that are responsive to the subpoena prior to your testimony. Accordingly, the subpoena requires production of responsive documents on or before March 26, 2008.

Metropolitan Club
March 6, 2008
Page 2



Finally, enclosed please also find a check in the amount of $ 44, which covers the costs of the witness fee and travel to and from my office to provide testimony pursuant to the subpoena. Again, please accept our apologies in advance for any inconvenience. Please feel free to call us if you have any questions regarding your obligations.

Respectfully submitted,

Victor A. Kovner

cc:     Ave Maria Brennan, Esq. (by email)

AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF _____ NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,
           Plaintiff,
    v.
THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings,
           Defendants.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07 Civ. 10962 (DAB)

TO:
    Metropolitan Club
    1 East 60th Street
    New York, N.Y. 10022-1178

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☑ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019 Telephone: (212) 489-8230 | 3/26/2008 10:00 am |

☑ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE | DATE AND TIME |
| --- | --- |
| Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019 Telephone: (212) 489-8230 | 3/26/2008 10:00 am |

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| *[signature]*      Attorney for Plaintiff | 3/6/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Victor A. Kovner, Esq.
DAVIS WRIGHT TREMAINE LLP, 1633 Broadway, New York, NY 10019 - (212) 489-8230

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

| DATE | 03-05-08 | | | | CHECK NUMBER | 55850 |
|---|---|---|---|---|---|---|
| DATE | INVOICE NO. | VOUCHER ID | INVOICE AMOUNT | NET AMOUNT | REMARKS | |
| 03-04-08 | PAM030408 | 880405 | 44.00 | 44.00 | witness fee & transportation | |
| | | | | TOTAL | | 44.00 |

DAVIS WRIGHT TREMAINE LLP
1201 THIRD AVENUE
SUITE 2200
SEATTLE, WA 98101-3045

DETACH AND RETAIN THIS STATEMENT

THE ATTACHED CHECK IS IN PAYMENT OF ITEMS LISTED ABOVE

■                                      ■

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW. DO NOT CASH IF NOT PRESENT.

**DAVIS WRIGHT TREMAINE LLP**
LAW OFFICES
1201 THIRD AVENUE, SUITE 2200
SEATTLE, WASHINGTON 98101-3045
(206) 622-3150

| VENDOR NO. | DATE | 64-1278 | NO. 55850 |
|---|---|---|---|
| 29294 | 03-05-08 | 611    GA | |

Bank of America, N.A.
Atlanta, Dekalb County, GA
Member FDIC

◇◇◇◇◇◇◇ PAY ONLY  4  00 FOUR FOUR CTSCTS

*********$44.00

DAVIS WRIGHT TREMAINE LLP

PAY
TO THE
ORDER
OF

METROPOLITAN CLUB
1 EAST 60TH ST
NEW YORK, NY 10022-1178

Authorized Signature

⑈⑈00055850⑈⑈ ⑆061112788⑆ 003359800946⑈⑈

**Exhibit A**

## Definitions and Instructions

1.    "You" or "your" means the Metropolitan Club, located at 1 East 60th Street, New York, New York and your directors, officers, employees, agents and attorneys, each person acting on your behalf or under your control, and any parent, subsidiary, predecessor or affiliated entity, corporation, institution, or non-profit organization.

2.    "Documents" has the meaning provided for in the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Southern District of New York and without limiting the generality of the foregoing includes all materials (drafts, originals, and non-identical copies, whether written or electronically stored, sent, or received) such as, *inter alia*, memoranda (interoffice and otherwise), notes, letters, email messages, calendars, appointment books, newsletters, notices, minutes or transcripts of meetings, brochures, advertising copy, website pages, photographs, video recordings, annual reports, tax returns, invoices, checks, credit card receipts or records, spreadsheets, contracts, reservation lists, contact lists, vendor lists, permits, licenses, or other records.

3.    "Communications" means the transmission or exchange of information, oral or written, formal or informal, and shall include without limitation, any documents embodying, containing, constituting, discussing, memorializing, referring to or relating to any such contact.

4.    The "Action" means the lawsuit *Third Church of Christ, Scientist, of New York City v. The City of New York, et al.,* 07 Civ. 10962 (DAB), pending in the Southern District of New York.

5.    The "Complaint" means the complaint filed in the Action, attached hereto as Exhibit B.

6.    The "Church" means the Third Church of Christ, Scientist, of New York City, the Plaintiff in the Action.

7. The "Building" means the Church edifice located at 583 Park Avenue, New York, New York.

8. "Elected Officials" means any person serving in the United States Congress, the New York City Council, or the New York State Legislature and any member of his or her staff, including without limitation the Hon. Carolyn Maloney, Hon. Daniel Garodnick, Hon. Jonathan Bing, or the Hon. Liz Krueger.

9. The "City" means the City of New York, and all of its officials and agencies, including without limitation the Department of Buildings, the Law Department, the Department of City Planning, the Board of Standards and Appeals, the Mayor and/or any Deputy Mayor and/or any member of their respective staffs.

10. "Premises" means the building located at 1 East 60th Street, New York, New York.

11. "Social Events" means any catered or other social event conducted at the Premises, whether for your members or for the general public.

12. You are required to search for the documents responsive to the requests, wherever located, which are: (a) in your actual or constructive possession, custody, care and/or control; (b) in the actual or constructive possession, custody, care and/or control of your agent, representative or employee; or (c) in the actual or constructive possession, custody, care and/or control of any person who, or entity which, is or has been acting on your behalf or under your direct or indirect control.

13. In the event that any document responsive to any document request is withheld from production upon a claim of attorney-client, work product or other privilege or immunity, you are required to furnish a list, verified by counsel, of the documents withheld from such

production, setting forth for each document: (a) the nature of the privilege or immunity claim; (b) the date of the document; (c) the title and general subject matter of the document; (d) the identity of each person who made, prepared or signed the document; (e) the identity of each person to whom the document was addressed and each person to whom a copy was indicated to have been sent or was sent; and (f) the present location of the document.

14.     Each document request is continuing in nature, requiring the production of additional documents, should you become aware of or acquire them, in your possession, custody or control after initially responding to these requests.

15.     The past tense shall be construed to include the present tense and vice versa, to make the request inclusive rather than exclusive.  The singular shall be construed to include the plural and vice versa to make the request inclusive rather than exclusive.  "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

16.     Unless otherwise stated, the relevant period for these requests shall be from January 1, 2000 to the present.

## Document Requests

All Documents concerning or in any way related to:

1.     Any Social Event conducted on or in the Premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

2.     The total number of hours each year that the Premises are used for Social Events, including the number of hours it takes to set up for and clean up after each Social Event.

3.     The Certificate of Occupancy for the Premises (the "CO"), including any amendments thereto.

4.      Any communication with the City regarding the use of the Premises, including communications regarding the CO, and/or whether any past, current, or planned use of the Premises is or was an "accessory use" under the City's Zoning Resolution or other applicable land use regulations.

5.      Any portion of the annual report of the Metropolitan Club, or any submission to any taxing or other authority, regarding revenues generated by Social Events.

6.      Any analysis, investigation, or communication regarding the taxation of revenues generated by Social Events.

7.      Any application for any permit, license or other permission from the City to conduct Social Events, and the issuance or renewal of any such permit, license or other permission, whether formal or informal.

8.      Any communication with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct Social Events at the Premises.

9.      Any independent person or entity that performs catering-related services (an "Outside Caterer") with which you have a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the Outside Caterer's use of, or performance of services on or in, the Premises; (c) any repairs or improvements to the Premises made by, and/or for the benefit or use of, the Outside Caterer ; and (d) rent or use payments made by, or other financial arrangements with, the Outside Caterer.

10.     Any trade names, trademarks, or other names, marks, or designations that you use to identify the availability of catering and Social Events at the Premises.

11.    Any document or communication related to or concerning any allegation in the Complaint, or any relevant fact, claim or defense in the Action.

12.    Any communication with the City or with Elected Officials concerning the Action.

13.    Any membership requirement that would permit entry into the Premises and/or the use of the Premises for Social Events, including (a) your organization's membership policy; (b) whether Social Events must be hosted by a member or a guest of a member; (c) whether hosting a Social Event requires a minimum financial donation or contribution to your organization; and (d) whether Social Events hosted by a member or a guest of the member may be attended by members of the general public.

**Exhibit B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,                                      :

              Plaintiff,                       :       07-CV-*10962*
                                                           *(DAB)*
          -against-                                   :

                                             :       **COMPLAINT**

THE CITY OF NEW YORK and PATRICIA J.        :
LANCASTER, in her official capacity as                **JURY TRIAL DEMANDED**
Commissioner of the New York City Department :
of Buildings,                                      :

             Defendants,                      :
------------------------------------------------------------x

        Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), by

its undersigned attorneys for its Complaint against Defendants City of New York ("City") and

Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department

of Buildings ("DOB") (collectively, the "City" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

      1.      For more than 80 years, the Church has owned and worshipped in the

historic building located at the northeast corner of Park Avenue and 63rd Street (the "Building").

Time has not been kind to the Building or the Church, whose membership dwindled as the

Building fell into disrepair.  A declining building is expensive to maintain and repair; growing

liabilities for repair and maintenance keep new members away from the Church; a smaller

membership makes it harder to raise money to pay for repairs.  This was a vicious circle: if the

Church failed to raise the substantial funds necessary to renovate the building, and in turn to

grow its congregation, it would disappear.

      2.      The Church decided to do what many other religious institutions and

secular non-profit organizations routinely do to supplement revenues:  it entered into a

commercial relationship with a reputable caterer to conduct events in the Building – only at times when the Church was not using the Building for its primary religious purposes – in exchange for urgently needed funds. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the on-going expenses of maintaining the Building. This relationship was critical to the Church's survival.

3.      The Church is a good citizen and it went to the City for approval of this traditional accessory use. The City approved the Church's request and granted the necessary permits for the Required Capital Repairs. Doing so was entirely consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution. The Church relied on the City's approval, and the Required Capital Repairs began to be made. To date, the caterer has expended approximately $6.5 million to make the Required Capital Repairs and expects to spend another $1.5 million over the coming months to complete the work. Even though the caterer is undertaking the Required Capital Repairs, the vast majority of the work also benefits the Building and its Church-related uses and will continue to provide that benefit long after the caterer's contract with the Church expires.

4.      But something unlawful has happened. Defendants have suddenly revoked their prior approval and rescinded the permits. They have done so because a small group of affluent, influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events in the Building have transformed the Church into a

commercial catering hall that causes serious disruption in the neighborhood. The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth: the City is singling out and discriminating against the Church without any basis. If unremedied, this discrimination will have devastating consequences for the Church and likely will result in the sale of the Building so that the Church can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

5.     The Church seeks relief from this Court because the City has violated the Church's rights (1) to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions; (2) to be free from undue burdens on the exercise of its religion, as protected by Section (a) of RLUIPA; (3) to equal protection of the laws, pursuant to the Fourteenth Amendment; and (4) to the free exercise of its religion, pursuant to the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred in this district, and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## PARTIES

8.     Plaintiff Church is a religious corporation existing under the laws of the state of New York, with its principal place of business at 583 Park Avenue, New York, New York 10021.

9.     Defendant City of New York is a political subdivision of the State of New

York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a municipal corporation organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment, enforcement, and implementation of land use and zoning regulations within New York City.

10.    Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings and is authorized to enforce, among other things, provisions of the New York City Administrative Code, the New York City Building Code, and the Zoning Resolution of the City of New York. She is sued herein in her official capacity.

11.    The New York City Department of Buildings is an administrative department of the City of New York, whose offices are located in the County of New York in the State of New York.

## FACTUAL ALLEGATIONS

### The Church and its Historic Building

12.    The Church began in the 1880s as a congregation of students dedicated to the Christian Science religion. By 1895, as its membership grew substantially, the Church applied for a charter and was registered under the laws of the State of New York.

13.    In 1920, the Church purchased property at 583 Park Avenue, New York, New York, and retained the renowned architectural firm Delano & Aldrich to design a house of worship for the congregation. Completed in or around 1924, the red-brick, Georgian-Colonial building topped with its tall lantern is one of the architectural highlights of Park Avenue and is the same building that houses the Church's congregation to this day.

14.    By the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings

with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult socials and youth forum activities, and lectures and workshops focusing on religious and spiritual healing topics. During this period, lectures in the Church's Building would frequently be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in the basement.

15.    Over the years, the Church's membership has declined. It currently has fewer than one hundred members. True to its mission, however, the Church continues to use the Building for religious worship every Wednesday evening and Sunday morning, as well as for other religious uses such as Sunday School and lectures.

16.    A significant contributing factor to the decline in membership has been the growing state of disrepair of the Building and the prohibitive costs of the Required Capital Repairs, which members of the congregation would have to bear. The Required Capital Repairs necessary to revive the aging Building's infrastructure and to bring it into compliance with the New York City Building Code include modernization of all major building systems, including electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and, where necessary, replacement of the Building's façade, roof, windows, doors and other exterior components; and significant restoration of the main auditorium and other rooms regularly used for Church-related activities.

17.    In order to save the historic Building, the Church needed to raise substantial capital. For many years, the Church survived largely because of bequests made by deceased members of its congregation. But as the membership declined, the bequests declined, and the Church, year after year, was running at a significant deficit.

18.    Beginning at least in the late 1990s, the Church explored several alternatives to raise capital, including low-cost loans from the Historic Properties Fund

(administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

19.    From 1999 to 2006 the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship did not yield enough money to meet the Church's needs.

20.    In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

21.    Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for renovation and maintenance of the Building.

22.    After considering numerous alternatives, the Church did what many other religious institutions and nonreligious non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events
### In Order to Raise Needed Capital

23.    As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and ongoing maintenance costs (the "Lease").

NYC 189965v8 0085520-000001

24.    The express purpose of the Lease is to supplement the Church's income, and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at p. 1 (emphasis added).

25.    In addition to hosting weddings and other celebrations, as well as events for non-profit groups, companies and other firms – to date, events for New Yorkers for Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups have been held in the Building – the Lease requires the Rose Group to conduct catered events for members of the Church at reduced cost. 2nd Amn. to Lease, at ¶ 2.

26.    Upon information and belief, the Rose Group will invest more than $8 million on the Required Capital Repairs, of which $6.5 million has already been spent. Because the Building lies within the Upper East Side Historic District, any renovations to the exterior of the Building must be undertaken in a painstaking manner so as to preserve, wherever possible, the Building's original architectural details. Among the significant work that remains to be completed, the Rose Group plans to restore the Building's roof with slate from the same Vermont quarry that supplied the Church more than 80 years ago.

27.    In addition to Required Capital Repairs, the Rose Group is further obligated to undertake general maintenance of the Building throughout the 20-year Lease term, and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain threshold, from the catered events) to the Church. This supplemental income is a crucial source of operating revenue for the Church's religious activities, which will be especially necessary

when new community activities and outreach programs are implemented.

28.    Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities.

29.    Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1. Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities. Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5. Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief. Lease, at ¶ 35.6.

30.    The primary purpose of the Building is to serve as the Church's place of worship. But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a

reasonable chance to profit from the arrangement.  In the second amendment to the Lease, dated March 27, 2007, the parties provided that, in the event that the Building could not be used for catering activity, the Rose Group would be able to require the Church to reimburse the Rose Group for Required Capital Repairs it had undertaken, even if the Church had to sell the Building.  2nd Amn. to Lease, at ¶ 3.

31.    The Church went out of its way to be sensitive to its neighbors.  Thus, the Lease requires the Rose Group to "[p]ermit no act or practice which may … be a nuisance," and to "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the premises."  Lease, at ¶ 32.1.

32.    The Church also insisted that the Rose Group take the extraordinary step of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors[.]"  When this system is completed, all trash from catered events will be stored and refrigerated within the Building and taken to 63rd Street only when it is to be collected by the trash truck.  Lease, at ¶ 32.1.

33.    Moreover, the Lease does not "permit any advertising medium or loud speaker, radio broadcast, etc. to be heard outside of the premises."  Lease, at ¶ 32.1.

34.    In addition, the Second Amendment to the Lease provides that the Church and the Rose Group will together "establish standards concerning sound, light levels, traffic control, signage."  2nd Amn. to Lease, at ¶ 5.

35.    The Rose Group has retained a highly professional and comprehensive security team, Global Security Service, in order to ensure that all events at the Church are orderly, quiet, and safe.  At all events, in addition to other security measures, there are usually off-duty members of the New York City Police Department patrolling the area, monitoring the event and managing any crowds.  There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws.  These security measures are implemented from an abundance of caution.  Thus far, all of the catered events that have occurred in the Building have occurred without incident.

### The Purpose of the Building Remains the Same:  It Is a Place of Worship for the Church Congregation

36.    The primary purpose of the Building is to remain a house of worship.  For over 80 years, the Building has been property devoted to the Christian Science faith, and it remains the center of the Church's congregation.  The Church currently conducts Sunday Church Services and Sunday School services, Wednesday evening church service, Thanksgiving and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church classes (all-day class for a two-week period, twice a year), Church corporate or organizational meetings, and occasional non-regularly scheduled events and Association meetings.  Lease, at ¶ 35.1.

37.    The Church has been attracting new members because of the recent repairs to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be able to hold additional services and lectures for its members and other attendees.  Among other events, the Church expects to host additional Sunday church services and Sunday school sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee meetings, youth forum activities, musical rehearsals and recitals, and various religious workshops.  In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years.  Following the renewal of the Church and its congregation, the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members.

38.    Finally, the Church's purpose in working with the Rose Group is more

than merely economical; the Church also hopes that opening up the Building to public events will introduce the Christian Science faith to the larger community, thereby aiding the Church in augmenting its membership. In addition to increased exposure, the historic Building will again be enjoyed and appreciated by the general public, as it had been for many decades until the Building began its decline.

### The Required Capital Repairs Were Undertaken in Reliance on the City's Approval of Catering Events at the Building

39.    Like many religious and nonreligious non-profit institutions, the Church is located in an area zoned for residential use. The Building is in an R-10 zoning district, which is the highest density residential area under the Zoning Resolution of the City of New York (the "Zoning Resolution"). In Manhattan, much of Midtown and Downtown as well as cross-town streets and avenues are zoned R-10.

40.    Only residences, community facilities (such as churches, synagogues and non-profit institutions) and uses that are "accessory" to residences and community facilities are permitted in residential districts under Article II, Chapter 2 of the Zoning Resolution. While catering facilities are permitted, and commonly found, as accessory uses in community facility buildings, stand-alone catering facilities are not permitted in residential districts. Section 12-10 of the Zoning Resolution provides that for a use to be considered "accessory" it must be (i) conducted on the same zoning lot as the principal use, (ii) clearly incidental to, and customarily found in connection with, the principal use and (iii) substantially for the benefit or convenience of the principal use.

41.    Prior to initiating the extensive and costly Required Capital Repairs, the Church and the Rose Group sought the City's approval for this catering arrangement. On April 19, 2006, the City issued a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-

Consideration"). The Pre-Consideration provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building, pursuant to Section 12-10 of the Zoning Resolution.

42.    The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").

43.    Based on the Church's truthful representation that the catered events were to be "operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church" and that the "functions will be restricted by the contract with the Church," the DOB granted its Pre-Consideration permitting the Church to have catered events in the Building.

44.    The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees. During these conversations, DOB's consistent position has been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and, the Manhattan Borough Commissioner of DOB stated that the only limitation on the size of events related to the capacity of the Building. Approximately $6.5 million has been expended on the Required Capital Repairs in reliance on the City's June 2006 approvals.

**Defendants Routinely Permit Other Religious And Nonreligious Non-Profit Groups to Conduct Similar Catered Events, Including In The Church's Immediate Vicinity**

45.    The Church's reliance on the Pre-Consideration was reasonable on several levels. After all, as detailed below, (a) there are many buildings in the immediate vicinity of the Building, all in residential zoning districts, that are rented to members of the general public for large social events, (b) there are many similarly situated churches, synagogues and other

religious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events, and (c) there are many nonreligious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events.

45-a.    The following is a chart, developed from public records without the benefit of discovery proceedings, showing establishments in the immediate vicinity of the Building, all of which are located in Residential zoning districts, and which rent their facilities to members of the general public for catered events:

|  | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Beekman | 575 Park Avenue – directly south of the Building | Total capacity (restaurant plus separate catering venue) approx 200 | A restaurant open to the general public as well as a separate facility for catered events | R10 (Special Park Improvement District ("PI")) / R8B (Limited Height District No. 1A ("LH-1A")) |
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity: 500 | Available for private catered events and movie and commercial shooting | R10 (PI) |
| The Colony Club | 564 Park Avenue – two blocks south of the Building | | Private club, rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Regency Hotel | 540 Park Avenue – two blocks south of the Building | 4,400 square feet of flexible function space, accommodate up to 200 | Rents out space for a variety of catered events, uses in-house catering operation | R10 (PI) / C5-1 (Special Madison Avenue Preservation District) |
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated; additional events on same night can be held in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety | R10 (PI) |

| | | | of catered events for non-members | |
|---|---|---|---|---|
| Union Club | 101 East 69th Street and Park Avenue | | Rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers Club | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. *Uses designated outside caterer* New York Catering | R8B (LH-1A) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

45-b.   Moreover, as is evident from the following chart developed from public records without the benefit of discovery proceedings, it is customary for churches, synagogues and other religious institutions to rent out their facilities to non-congregants for social events in order to offset in the extraordinary costs of maintaining their historic properties:

| | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Central Presbyterian Church | 593 Park Avenue -- approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity 500 guests | Available for private catered events and movie and commercial shooting | R10 (PI) |
| St. Bartholomew's Church | 109 East 50th Street and Park Avenue | 1250 | Available for movie and commercial filming, corporate events, fashion shows, rehearsal dinners, weddings, cocktail parties, and dances, among other events. All catering provided in house by Café St. Bart's. | C5-3 (MID) / C5-2.5 (MID) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

| | | | | |
|---|---|---|---|---|
| Universalist Church of New York | 160 Central Park West | 500 | Church dated 1897, available for private catered events and separate attached kitchen. | R10-A / R8B |
| All Souls Church | 1157 Lexington Avenue and East 80th Street | 350; 200 seated event | | C1-8X / R8B |
| The Top Deck at the Seamen's Church Institute | 241 Water Street, near Peck Street | 130 guests | Interfaith chapel, rents out space for a variety of catered events for non-congregants. | C6-2A (Special Lower Manhattan District – South Street Seaport Subdistrict) |
| Riverside Church | 490 Riverside Drive, between 119th and 122nd Street | 500; 300 seated event | Uses designated onsite caterer, Madeline's Catering & Special Events | R8 |

45-c.   Finally, the following chart, developed from public records without the benefit of discovery proceedings, makes clear that it is customary for nonreligious non-profit institutions (including institutions, like the ones below, located in residential districts) to rent their facilities to non-members for catered events in order to offset the extraordinary costs of maintaining their historic properties:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated event; can host additional events on same night in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety of catered events for non-members | R10 (PI) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. | R8B (LH-1A) |

| Club | | | Uses designated outside caterer New York Catering | |
|------|--|--|--|--|
| The Frick Collection | 1 East 70th Street, near Fifth Avenue | 200 seated event; 350 cocktails | | R10 (PI) / R8B (LH-1A) |
| National Academy Museum | 1083 Fifth Avenue, near East 89th Street | 140 seated event; 240 cocktails | | R10 (PI) |
| Cooper-Hewitt, National Design Museum | 2 East 91st Street, near Fifth Avenue | 90 seated event; 500 in Terrace and Garden | Rents out space for a variety of catered events for non-members *Uses designated outside caterer* Restaurant Associates | R10 (PI) / R8B (LH-1A) |

46.    Like these secular non-profit institutions, and like other religious institutions, the Church found that it was necessary to rent out its space to cover the daunting costs of making the Required Capital Repairs and of operating and maintaining its historic Building.  Like its neighbors, the Church sought to use its Building both to generate revenue and to serve as a community resource.  The events already held in and planned for the Building are not meaningfully different from any of these uses at other comparable institutions.

**Opposition by Neighboring Residents Results
in the Revocation of the Pre-Consideration**

47.    By March 2007, after the Required Capital Repairs were well underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings on the west side of Park Avenue, across the wide avenue from the Church — 570 Park Avenue and 580 Park Avenue — began to complain about the Church's arrangement with the Rose Group.  After initially discussing the matter with the Church and the Rose Group, residents of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a public relations campaign against the Church.  Their avowed purpose was to maintain the "residential" character of their Park Avenue neighborhood, and their flyer contended that the Church's plans to permit catered events at its historic premises — although no different than the

practices of neighboring institutions – would cause significant disruption in their backyard. These neighbors, however, failed to mention that if the Church were unable to supplement its revenues it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

48.    On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused the Church of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall. The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night." This is a selective and baseless attack on the Church. As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory just a few blocks north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

49.    The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007. The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, thereby distorting the real import of the Lease.

50.    Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group the limited right to use the Building for catered events when it is not being used for religious

activities.

51.    Unfortunately, the City has succumbed to the demands of these influential neighbors. On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly completed.

52.    The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church." The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008). The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

53.    Upon receiving the letter, the Church engaged litigation counsel. Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation. Counsel for the Church advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the Building to satisfy its liabilities.

54.    The Church's attempt to resolve this matter without litigation was unsuccessful.

55.    On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination"). The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

56.    By revoking the Permits and rescinding the Pre-Consideration and withholding permission allowing the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions. It also irrationally singles out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making available their premises in order to host private catered events.

57.    The Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area.

58.    By revoking the Permits and preventing the Church from hosting catered events on its premises, the City has threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease. The implementation of

the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship – the epicenter of its religious practice for the past 80 years.

59.     Further, by determining that the Church's Building is effectively a catering hall, the City mischaracterizes the Lease and wrongfully impugns the Church.  Contrary to the Defendants' disparaging characterization, the Church remains a congregation devoted to the Christian Science faith, and any catering activities conducted in the Building were, and will remain, wholly incidental to its primary purpose and use of preaching and practicing its religion.

60.     Moreover, the City is impairing the Church's interest in opening up its premises to the general public, which it believes will spark new interest in the Christian Science faith.

## The Church Will Suffer Immediate and Irreparable Injury

61.     The impact of the DOB's decision will be devastating and immediate. The Final Determination rescinds the earlier-granted accessory use approval and revokes the Permits, forthwith.  Therefore, pursuant to the DOB Letter and the Final Determination, as of October 29, 2007, the Church is prohibited from allowing any additional catered events to be booked for the Building, and the Church is prohibited from permitting any additional catered events in the Building to be held after April 28, 2008.  Moreover, because the Final Determination revokes the Permits, the Church and the Rose Group will be forced to suspend any further Required Capital Repairs.  As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled.  This prohibition effectively requires the Rose Group to cease its catering operations in the Building.

62.     If the Church can no longer make the Building available for catered

events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed. For these reasons, and more, if the City's decision is not enjoined, the Church will be forced to sell the Building and its congregation will be deprived of its place of worship.

### First Claim for Relief
### RLUIPA EQUAL TERMS CLAIM
### 42 U.S.C. § 2000cc(b)

63.    Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.    By imposing and implementing the City's land-use and zoning laws and regulations in the manner described above, and by the conduct described above, the City is treating the Church on less than equal terms with comparable nonreligious institutions.

65.    By revoking the Permits and rescinding the Pre-Consideration and thereby forbidding the Church to permit catered events at the Building, Defendants have discriminated against the Church because they freely permit comparable nonreligious institutions to engage in the similar practice of renting out their premises for catered events for non-members.

66.    By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(b), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Second Claim for Relief
### RLUIPA SUBSTANTIAL BURDEN CLAIM
### 42 U.S.C. § 2000cc(a)

67.    Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

NYC 189965v8 0085520-000001

68.    The Church entered into the Lease because it needed to preserve its Building so that its congregation could worship and perform other religious activities in it. The Church's use, renovation, and restoration of its real property constitute "religious exercise."

69.    Among other improvements, the Lease requires the creation of a new room for the Church's Sunday School, and this conversion of real property is also "religious exercise" under RLUIPA.

70.    Congress requires that the Court construe RLUIPA "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-3(g).

71.    Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its congregation, spreading its religious teaching, and thereby impeding its religious exercise.

72.    If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

73.    The revocation of the Permits and prohibition on any future catered events is an arbitrary, irrational decision that does not bear any substantial relation to the public health, safety and welfare.

74.    The revocation of the Permits and prohibition on any future catered events reflects the Defendants' inconsistent application and implementation of its zoning rules, a

decision made to placate a small but influential number of disgruntled neighbors and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, noise, or other factors relating to quality of life, given that Defendants allow events similar to the catered events in other facilities in the immediate neighborhood.

75.    By imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above, Defendants have imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

76.    The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

77.    This substantial burden on the religious exercise of the Church is imposed by Defendants in the implementation of a system of land use regulations under which Defendants make, and have in place formal and informal procedures or practices that permit them to make, individualized assessments of proposed land uses, as contemplated by 42 U.S.C. § 2000cc(a)(2)(C).

78.    This substantial burden on the religious exercise of the Church, and the removal of the substantial burden, will affect commerce among the several states, as contemplated by 42 U.S.C. § 2000cc(a)(2)(B).

79.    By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief,

injunctive relief, compensatory damages, and the costs and expenses of this action.

### Third Claim for Relief
### EQUAL PROTECTION CLAIM
### PURSUANT TO 42 U.S.C. § 1983

80.    Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.    The Church is a "class of one" and is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

82.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct.

83.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated nonreligious institutions to conduct.

84.    This differential treatment was based on impermissible considerations, including baseless community opposition to the Church, the nature of the Church's religious beliefs, and the bad faith attempt to harm the Church's ability to maintain its premises.

85.    Defendants' actions are designed for the purpose of hampering the exercise of the Church's religious activities in its chosen house of worship, and to prevent the Church from generating the same sort of supplemental income from the rental of event spaces that other similarly situated institutions are permitted to generate.

86.    By singling out Plaintiff for unequal adverse treatment, and bowing to pressure from the neighborhood opponents, Defendants deprive Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

87.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

88.    By virtue of the foregoing conduct, Defendants have caused the Church immediate and irreparable harm.

89.    The Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Fourth Claim for Relief
### FIRST AMENDMENT FREE EXERCISE CLAIM
### PURSUANT TO 42 U.S.C. § 1983

90.    Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.    Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, by imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above.

92.    The Defendants' implementation of the City's land use laws is not neutral and generally applicable to all, but instead discriminates unfairly against the Church.

93.     The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any compelling reason.

94.     The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any rational basis.

95.     By singling out Plaintiff for unequal, adverse, treatment, and bowing to pressure from neighborhood opponents, Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

96.     Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

97.     By virtue of the foregoing conduct, Defendants have caused immediate and irreparable injury to the Church.

98.     The Church is entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

## **Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

WHEREFORE, judgment should be entered as follows:

A.     Declaring that Defendants' actions violated section (b)(1) of RLUIPA;

B.  Declaring that Defendants' actions violated section (b)(2) of RLUIPA;

C.  Declaring that Defendants' actions violated section (a) of RLUIPA;

D.  Declaring that Defendants' actions violated Plaintiff's right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution;

E.  Declaring that Defendants' actions violated Plaintiff's right to the free exercise of religion pursuant to the First and Fourteenth Amendments to the United States Constitution;

F.  Temporarily, preliminarily and permanently enjoining Defendants from revoking the Permits or prohibiting the Church, pursuant to the Lease, from continuing to permit catered events for non-members in the Building pursuant to the Lease;

G.  Awarding compensatory damages against all Defendants;

H.  Awarding Plaintiff's attorney fees and other reasonable expenditures, together with the costs and expenses of this action pursuant to 42 U.S.C. § 1988; and

I.  Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
          December 3, 2007

                          DAVIS WRIGHT TREMAINE LLP

                          BY: _____
                              Victor A. Kovner (VAK-2248)
                              John Cuti (JC-3365)
                              Monica Pa (MP-3307)

                          1633 Broadway
                          New York, New York  10019-6708
                          Telephone:  (212) 489-8230
                          Facsimile:  (212) 489-8340

                          *Attorneys for Plaintiff*
                          *Third Church of Christ, Scientist,*
                          *of New York City*

**Pa, Monica**

| | |
|---|---|
| **From:** | Cuti, John |
| **Sent:** | Friday, March 21, 2008 10:10 AM |
| **To:** | 'dcatalano@fulbright.com' |
| **Cc:** | Pa, Monica |
| **Subject:** | RE: subpeona |

Doug,

I just saw your letter of yesterday. I don't recall consenting to a 3 week extension. When Neil called, I returned his call and left him a message, consistent with the email below, that I had no problem with 2 weeks.

That said, I don't necessarily have a problem April 9, although I do hope that you'll be producing documents on that date, rather than merely asserting objections. If you can clarify this, I'd appreciate it.

Thanks.

**John Cuti** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

| | |
|---|---|
| **From:** | Cuti, John |
| **Sent:** | Wednesday, March 19, 2008 11:42 AM |
| **To:** | dcatalano@fulbright.com |
| **Subject:** | subpeona |

Sorry about that -- I was on a call I couldn't get off.

Just heard your message.

You can certainly have an extension of a week, and I can't imagine 2 weeks is a problem either.

Our only constraint is a tight time limit for discovery set by the judge (she gave us only 90 days from March 3). So long as we can work through this cooperatively, I think the timing won't be a concern.

Touch base with me next week when you return.

**John Cuti** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**Exhibit D**

# FULBRIGHT & JAWORSKI L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
666 FIFTH AVENUE, 31ST FLOOR
NEW YORK, NEW YORK 10103-3198
WWW.FULBRIGHT.COM

NSPARBER@FULBRIGHT.COM                                    TELEPHONE:    (212) 318-3000
DIRECT DIAL: (212) 318-3038                                 FACSIMILE:    (212) 318-3400

March 31, 2008

**BY EMAIL**

John Cuti, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, NY 10019-6708

   Re: Third Church of Christ, Scientist v. City of New York, et al.-07 CV 10962
     (DAB)/service of subpoena on The Metropolitan Club

Dear Mr. Cuti:

  As you are aware, we are the attorneys for The Metropolitan Club (the "Club"), which was served with a subpoena in the above-referenced action on or about March 6, 2008. We have reviewed the allegations contained in the complaint, the document requests contained in the subpoena, the applicable law underlying the claims of the Third Church of Christ, Scientist (the "Church"), the relevant zoning laws of the City of New York (the "City"), and the factual basis that would make the information requested in the subpoena relevant to the Church's claims against the City. While the Club is sympathetic to the Church's position, as set forth below it does not appear that the documents requested in the subpoena are relevant.

  The gravamen of the Church's claims appear to be that by imposing and implementing the City's land-use and zoning laws and regulations in the manner described in the complaint, and by having granted permits to nonreligious institutions to engage in the practice of renting out their premises for catered events for non-members, the City is allegedly treating the Church on less than equal terms with comparable nonreligious institutions under the Religious Land Use and Institutionalized Persons Act of 2000 (the "RLUIPA"). (Complaint, ¶¶ 64 and 65) Similarly, the complaint alleges that the Church is being discriminated against under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by, among other things, "withholding consent to allow [the Church] to engage in catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct." (Complaint, ¶ 82) In connection therewith, it appears that the Church applied to the City for an accessory use permit that would have allowed the Church to conduct the catering arrangements with the Rose Group, for which the Church originally received a favorable pre-consideration determination, and which was subsequently revoked by the City. The City eventually concluded that "the catering events would not be an 'accessory use' to the Church's primary use 'because

AUSTIN · BEIJING · DALLAS · DENVER · DUBAI · HONG KONG · HOUSTON · LONDON · LOS ANGELES · MINNEAPOLIS
MUNICH · NEW YORK · RIYADH · SAN ANTONIO · ST. LOUIS · WASHINGTON DC

John Cuti, Esq.
March 31, 2008
Page 2

[the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church." (Complaint, ¶ 52).

The Club is not comparable with, or similarly situated to the Church with respect to the Church's claims against the City for a number of reasons. The primary difference between the Club and the Church is that the Club has never applied to the City for an accessory use permit and, in fact, the use by the Club of its banquet and restaurant facilities is as of right and not an accessory use for which a permit is required. I have annexed hereto as Exhibit A a copy of the certificate of occupancy issued to the Club on or about April 21,1954. As set forth in the certificate of occupancy, the Club was a "heretofore erected class 'B' club" located in a retail use district and the permissible uses of the Club included a lounge, bar room private dining rooms, club rooms and kitchens. These were permitted uses of the Club for which no permit was necessary. To the contrary, the Church requires a permit to use its building for banquets.

Similarly, I have annexed hereto as Exhibit B a copy of the certificate of occupancy issued to the Club on or about June 13, 1960, which superseded the earlier certificate of occupancy. While the zoning classification of the district had been changed to a "Residence & Restricted Retail Use District, the permissible use and occupancy of the Club remained the same. Annexed hereto as Exhibit C is the certificate of occupancy issued to the Club on or about September 16, 1971, which amended Exhibit B. The zoning district was changed to a "C 5-3 & R10" zoning district and, once again, the permissible use and occupancy of the Club remained the same, i.e., the permitted uses for lounges, bar rooms, dining rooms, kitchens, etc. Also annexed hereto as Exhibit D is a certificate of occupancy issued to the Club on or about August 18, 1977 in which the zoning district was changed to R-10 and the permissible uses remained the same.

An additional certificate of occupancy was issued to the Club on or about February 9, 1995, a copy of which is annexed hereto as Exhibit E. In this certificate of occupancy, which amends the prior certificates of occupancy, the zoning district had been changed to R10H and the permissible uses remained the same. Significantly, the Club is currently located in a R10H zoning district, which expressly allows the operation of hotels, while the Church is in a R10 zoning district. Since the Club has always been permitted to use its property for banquet and restaurant facilities as a right, there was never a need for the Club to apply for a permit from the City. If such a permit was required, it would have been noted on the certificates of occupancy. In any event, even if the Club's as of right uses did not specifically include the restaurant and banquet facilities, the Club would qualify as a transient hotel[*] in the R10H zoning district, the permissible uses of which include "restaurants, cocktail lounges, public banquet halls, ballrooms, or meeting rooms."

---

[*]The zoning regulations define transient hotel as a building in which (i) living or sleeping accommodations are used primarily for transient occupancy, (ii) one or more common entrances serve all such living or sleeping units, and twenty-four hour desk service is provided in addition to one or more of housekeeping, telephone, or bellhop service, or the furnishing or laundering of linen. The Club meets all of the definition's requirements.

John Cuti, Esq.
March 31, 2008
Page 3

        As a result, the Club and the Church are not comparable or similarly situated with respect to obtaining a permit from the City, as the Club never sought such a permit.  Moreover, the use by the Club of its restaurant and banquet facilities would not, under any circumstances, have been an accessory use of the Club since it is, and always has been, an as of right use.  We have also reviewed the case law under the RLUIPA and it appears to us that the significant differences between the Church and the Club, including that the Club never sought an accessory use permit, that the Club is permitted to use its banquet and restaurant facilities as of right, that the Club docs not use a "caterer" for events but has all of the necessary facilities and staff in its location, the difference in zoning districts, and even that the Club had the permissible use since its inception in 1894 while the Church has only recently applied for the accessory use permit, would render any information or documents sought from the Club to be not relevant.  We would request, therefore, that the Church withdraw the subpoena that was served on the Club.  In the event that the Church decides otherwise, we will promptly file an appropriate motion with the Court.

                                        Very truly yours,

                                        Neil G. Sparber

NGS/dwj

EXHIBIT A



Form 54—J536-701421(51)   ⸺ 114

# DEPARTMENT OF HOUSING AND BUILDINGS

BOROUGH OF  MANHATTAN  , CITY OF NEW YORK

No. 42504

Date  April 21, 1954

## CERTIFICATE OF OCCUPANCY

(Standard form adopted by the Board of Standards and Appeals and issued pursuant to Section 646 of the New York Charter, and Sections C26-181.0 to C26-187.0 inclusive Administrative Code 2.1.3.1. to 2.1.3.7. Building Code.)

This certificate supersedes C. O. No.

To the owner or owners of the building or premises:

THIS CERTIFIES that the new altered existing building premises located at

1 East 60th Street   Block 1375 Lot 1=9

, conforms substantially to the approved plans and specifications, and to the requirements of the building code and all other laws and ordinances, and of the rules and regulations of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and
CERTIFIES FURTHER that, any provisions of Section 616F of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.

N. B. or Alt. No.— 1345-1949

Occupancy classification— Heretofore Erected Existing Class "B" Club

Main Bldg-Class 1 fireproof
Annex Bldg-Cla-nonfireproof

6 stories, 985' height.

Date of completion— April 14, 1954  . Located in  Retail Use District.

B  Area  1¼  Height Zone at time of issuance of permit 1950:1951:1904;1953;1904=1952;1976=

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:  (Calendar numbers to be inserted here)

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | | | USE |
|---|---|---|---|---|---|
| | | MALE | FEMALE | TOTAL | |
| **MAIN BUILDING** | | | | | |
| Cellar | on ground | | | 20 | Boiler room, storage, house laundry, dressing and locker rooms. |
| 1st story | 100 | | | 150 | Lounge, Bar room, private reception room, lobby and offices. |
| Mezzanine | 50 | | | 40 | Private dining room and offices. |
| 2nd story | 75 | | | 125 | Library, club rooms and upper part of lobby. |
| Mezzanine | 40 | | | | Steward's bedroom. |
| 3rd story | 100 | | | 138 | Private dining room and pantries. |
| 4th story | 40 | | | 25 | Twenty-four (24) bedrooms, valet pressing and storage rooms. |
| 5th story | 40 | | | 30 | Twenty (20) bedrooms and three (3) living rooms. |
| 6th story | 60 | | | 40 | Dining room, kitchen and storage. |
| **ANNEX BUILDING** | | | | | |
| Cellar | on ground | | | | Storage. |
| 1st story | 40 | | | 10 | One (1) bedroom and reception room. |
| 2nd story | 40 | | | 5 | Two (2) bedrooms. |
| 3rd to 6th story,incl. | 40 each | | | 5 each | Three (3) bedrooms and one (1) living room on each story. |

NOTE: The main building and annex building comply with Section 67 of the Multiple Dwelling Law.

### FIRE DEPARTMENT APPROVALS

Sprinkler system— November 23, 1951.
Standpipe system— December 22, 1953.
Watchman's Time Detector system—October 27,1953.

Borough Superintendent.

(Page 1)

**NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT**

Unless an approval for the same has been obtained from the Borough Superintendent, no change or rearrangement in the structural parts of the building, or affecting the light and ventilation of any part thereof, or in the exit facilities, shall be made; no enlargement, whether by extending on any side or by increasing in height shall be made; nor shall the building be moved from one location or position to another; nor shall there be any reduction or diminution of the area of the lot or plot on which the building is located.

The building or any part thereof shall not be used for any purpose other than that for which it is certified.

The superimposed, uniformly distributed loads, or concentrated loads producing the same stresses in the construction in any story shall not exceed the live loads specified on reverse side; the number of persons of either sex in any story shall not exceed that specified when sex is indicated, nor shall the aggregate number of persons in any story exceed the specified total; and the use to which any story may be put shall be restricted to that fixed by this certificate, except as specifically stated.

This certificate does not in any way relieve the owner or owners or any other person or persons in possession or control of the building, or any part thereof from obtaining such other permits, licenses or approvals as may be prescribed by law for the uses or purposes for which the building is designed or intended; nor from obtaining the special certificates required for the use and operation of elevators; nor from the installation of fire alarm systems where required by law; nor from complying with any lawful order for additional fire extinguishing appliances under the discretionary powers of the fire commissioner; nor from complying with any lawful order issued with the object of maintaining the building in a safe or lawful condition; nor from complying with any authorized direction to remove encroachments into a public highway or other public place, whether attached to or part of the building or not.

If this certificate is marked "Temporary", it is applicable only to those parts of the building indicated on its face, and certifies to the legal use and occupancy of only such parts of the building; it is subject to all the provisions and conditions applying to a final or permanent certificate; it is not applicable to any building under the jurisdiction of the Housing Division unless it is also approved and endorsed by them, and it must be replaced by a full certificate at the date of expiration.

If this certificate is for an existing building, erected prior to March 14, 1916, it has been duly inspected and it has been found to have been occupied or arranged to be occupied prior to March 14, 1916, as noted on the reverse side, and that on information and belief, since that date there has been no alteration or conversion to a use that changed its classification as defined in the Building Code, or that would necessitate compliance with some special requirement or with the State Labor Law or any other law or ordinance; that there are no notices of violations or orders pending in the Department of Housing and Buildings at this time; that Section 646F of the New York City Charter has been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent, and that, so long as the building is not altered, except by permission of the Borough Superintendent, the existing use and occupancy may be continued.

"§ 646F. No certificate of occupancy shall be issued for any building, structure, enclosure, place or premises wherein containers for combustibles, chemicals, explosives, inflammables and other dangerous substances, articles, compounds or mixtures are stored, or wherein automatic or other fire alarm systems or fire extinguishing equipment are required by law to be or are installed, until the fire commissioner has tested and inspected and has certified his approval in writing of the installation of such containers, systems or equipment to the Borough Superintendent of the borough in which the installation has been made. Such approval shall be recorded on the certificate of occupancy."

Additional copies of this certificate will be furnished to persons having an interest in the building or premises, upon payment of a fee of fifty cents per copy.

**EXHIBIT B**

# DEPARTMENT OF BUILDINGS

BOROUGH OF MANHATTAN , THE CITY OF NEW YORK    NO. 52339

SECTION 301 OR 310    Date June 13, 1963

## CERTIFICATE OF OCCUPANCY

at the form adopted by the Board of Standards and Appeals and issued pursuant to Section 646 of the York Charter, and Sections C26-181.0 to C26-187.0 inclusive Administrative Code 2.1.3.1. to 2.1.3.7. ding Code).

This certificate supersedes C. O. No.    42504

the owner or owners of the building or premises:

THIS CERTIFIES that the new altered existing building—premises located at

1 East 60th Street; 790-795 Fifth Avenue    Block 1375 Lot 1

, conforms substantially to the approved plans and specifications, and to the requirements he building code and all other laws and ordinances, and of the rules and regulations of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646F of the New York Charter have been died with as certified by a report of the Fire Commissioner to the Borough Superintendent.

Class 1—Fireproof (Main Bl')

FFR AR. No. 859-1958    Construction classification—Class 3—Nonfireproof

pancy classification—Class "B" Club    Height 6 stories, 90 feet. (Annex)

e of completion June 1, 1963    Located in Residence & Restricted Use District.

B    Area 2    Height Zone at time of issuance of permit 1896-1959

This certificate is issued subject to the limitations hereinafter specified and to the following reasons of the Board of Standards and Appeals:

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOADS (lbs. per Sq. Ft.) | PERSONS ACCOMMODATED | | | USE |
|---|---|---|---|---|---|
| | | MALE | FEMALE | TOTAL | |
| **MAIN BUILDING** | | | | | |
| llar | on ground | | | 20 | Storage, boiler room, house laundry, dressing and locker rooms. |
| story | 100 | | | 150 | Lounge, bar room, showroom, offices and lobby of building. |
| zzanine | 50 | | | 40 | Offices. |
| d story | 75 | | | 125 | Library, club rooms and upper part of lobby. |
| zzanine | 40 | | | | Steward's bedroom. |
| story | 100 | | | 133 | Private dining rooms and pantries. |
| story | 40 | | | 25 | Twenty-four (24) bedrooms, valet, pressing and storage rooms. |
| story | 40 | | | 30 | Twenty (20) bedrooms and three (3) living rooms. |
| story | 60 | | | 40 | Dining rooms, kitchen and storage. |
| **ANNEX BUILDING** | | | | | |
| llar | on ground | | | | Storage. |
| t story | 50 | | | 10 | Offices. |
| story | 50 | | | 5 | Offices. |
| 4 to 6th tory, incl. | 50 each | | | 5 each | Three (3) bedrooms and one (1) living room, on each story. |
| | | | | | NOTE: The main building and annex building comply with Section 67 of the Multiple Dwelling Law. |

SPRINKLER APPROVALS
nkler system—November 13, 195 .
pipe system—November 12, 195 .
Mechanical elevator system—October , 1963

Borough Superintendent

CERTIFICATE WILL BE NULL AND VOID IF ALTERED IN ANY MANNER OR ADDITIONS ARE MADE THERETO.
(Page 1)

NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHA
BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT

Unless an approval for the same has been obtained from the Borough Superintendent, no change
rearrangement in the structural parts of the building, or affecting the light and ventilation of any part ther
or in the exit facilities, shall be made, no enlargement, whether by extending on any side or by increasi
height shall be made; nor shall the building be moved from one location or position to another; nor shall tl
be any reduction or diminution of the area of the lot or plot on which the building is located.

The building or any part thereof shall not be used for any purpose other than that for which it is certifi

The superimposed, uniformly distributed loads, or concentrated loads producing the same stresses in
construction in any story shall not exceed the live loads specified on reverse side; the number of persons of ci
sex in any story shall not exceed that specified when sex is indicated, nor shall the aggregate number of per
in any story exceed the specified total; and the use to which any story may be put shall be restricted to that fi
by this certificate except as specifically stated.

This certificate does not in any way relieve the owner or owners or any other person or persons in posses
or control of the building, or any part thereof from obtaining such other permits, licenses or approvals as i
be prescribed by law for the uses or purposes for which the building is designed or intended; nor from obtain
the special certificates required for the use and operation of elevators; nor from the installation of fire ah
systems where required by law; nor from complying with any lawful order for additional fire extinguisl
appliances under the discretionary powers of the fire commissioner; nor from complying with any lawful or
issued with the object of maintaining the building in a safe or lawful condition; nor from complying with
authorized direction to remove encroachments into a public highway or other public place, whether attache
or part of the building or not.

If this certificate is marked "Temporary", it is applicable only to those parts of the building indic
on its face, and certifies to the legal use and occupancy of only such parts of the building; it is subject to all
provisions and conditions applying to a final or permanent certificate; it is not applicable to any building under
jurisdiction of the Housing Division unless it is also approved and endorsed by them, and it must be repl
by a full certificate at the date of expiration.

If this certificate is for an existing building, erected prior to March 14, 1916, it has been duly inspe
and it has been found to have been occupied or arranged to be occupied prior to March 14, 1916, as noted
the reverse side, and that on information and belief, since that date there has been no alteration or conver
to a use that changed its classification as defined in the Building Code, or that would necessitate compliance v
some special requirement of with the State Labor Law or any other law or ordinance; that there are no viol
of violations or orders pending in the Department of Buildings at this time; that Section 646F of the New York C
Charter has been complied with as certified by a report of the Fire Commissioner to the Borough Superintend
and that, so long as the building is not altered, except by permission of the Borough Superintendent, the exis
use and occupancy may be continued.

"§ 646 F. No certificate of occupancy shall be issued for any building, structure, enclosure, place
premises wherein containers for combustibles, chemicals, explosives, inflammables and other dangerous substan
articles, compounds or mixtures are stored, or wherein automatic or other fire alarm systems or fire extinguisl
equipment are required by law to be or are installed, until the fire commissioner has tested and inspected and
certified his approval in writing of the installation of such containers, systems or equipment to the Boro
Superintendent of the borough in which the installation has been made. Such approval shall be recorded
the certificate of occupancy."

Additional copies of this certificate will be furnished to persons having an interest in the building or
premises, upon payment of a fee of fifty cents per copy.

**EXHIBIT C**

Form 56-C (Rev. 4/62) 47M-201190163)

# DEPARTMENT OF BUILDINGS

BOROUGH OF  MANHATTAN , THE CITY OF NEW YORK

Date  September 16, 19 71  No.  71043

## CERTIFICATE OF OCCUPANCY

**NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT**

APPLIES

This certificate supersedes C. O. No. 52394

THIS CERTIFIES that the new–altered–existing building–premises located at
1 East 60th Street  Block 1375  Lot  1

That the zoning lot and premises above referred to are situated, bounded and described as follows:

BEGINNING at a point on the  north  side of  East 60th Street
distant  225  feet  east  from the corner formed by the intersection of
5th Avenue  and  East 60th Street

running thence  north 100'5"  feet; thence  West 225  feet;
thence  feet; thence  east 225'  feet;
running thence  feet; thence  feet;

to the point or place of beginning, conforms substantially to the approved plans and specifications, and to the requirements of the Building Code, the Zoning Resolution and all other laws and ordinances, and of the rules of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER, that, any provisions of Section 646e of the New York Charter have been complied with as certified by a report of the Fire Commissioner to the Borough Superintendent.

Prior Alt. No.—  585-1970  Construction classification—  Class 1  Fireproof

Occupancy classification—  Heretofore Erected  Height  6  stories,  98  feet.
Existing Class "B" Club

Date of completion—  September 1, 1971  Located in  C 5-3 & R 10  Zoning District.
at time of issuance of permit.

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals:
and The City Planning Commission:

(Calendar numbers to be inserted here)

### PERMISSIBLE USE AND OCCUPANCY

Off-Street Parking Spaces ..............

Off-Street Loading Berths ..............

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| **MAIN BUILDING** | | | |
| Clr. | On Ground | 20 | Storage, boiler room, house laundry, dressing and locker rooms. |
| 1st | 100 | 150 | Lounge, bar room, showroom, offices and lobby of building. |
| Mezz. | 50 | 40 | Offices. |
| 2nd | 75 | 125 | Library, club rooms and upper part of lobby. |
| Mezz. | 40 | | Steward's bedroom. |
| 3rd | 100 | 138 | Private dining rooms and pantries. |
| 4th | 40 | 15 | Fifteen (15) bedrooms and storage. |
| 5th | 40 | 30 | Twenty (20) bedrooms and three (3) living rooms. |
| 6th | 60 | 40 | Dining rooms, kitchen and storage. |
| **ANNEX BUILDING** | | | |
| Clr. | On Ground | | Storage. |
| 1st | 50 | 10 | Offices. |
| 2nd | 50 | 5 | Offices. |
| 3rd to 6th incl. | 50 each | 5 each | Three (3) bedrooms and one (1) living room on each story. |

– OVER –

Borough Superintendent

OFFICE COPY—DEPARTMENT OF BUILDINGS

THIS CERTIFICATE IN * * * * * MUST BE POSTED * * * * * IN THE BUILDING IN ACCORDANCE WITH THE RULES OF THE DEPARTMENT PROMULGATED MARCH 31ST, 1967.

PERMISSIBLE USE AND OCCUPANCY (continued)

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|

NOTE:  The main building and annex building
comply with Section 67 of the Multiple Dwelling
Law.

FIRE DEPARTMENT APPROVALS:
Sprinkler System-November 23, 1951.
Standpipe System-November 22, 1953.
Watchman's Time Detector System-
October 27, 1953.

NOTE:  This is an AMENDED Certificate of
Occupancy for change of use on 4th
story only.

..... . ... .... .... BE CONSIDERED A CERTIFICATE
OF COMPLIANCE OR OCCUPANCY UNDER SECTION 301 OF THE
MULTIPLE DWELLING LAW.

_Cornelius F. Dennis_
Borough Superintendent

**EXHIBIT D**

1 of 2 pages.

THE CITY OF NEW YORK

HOUSING AND DEVELOPMENT ADMINISTRATION

# DEPARTMENT OF BUILDINGS

## CERTIFICATE OF OCCUPANCY

BOROUGH   MANHATTAN        DATE:    3/18/77       NO.   NBCO  77863

This certificate supersedes C.O. No. 71G43 & 52394          ZONING DISTRICT   R-10

THIS CERTIFIES that the new — altered — existing — building — premises located at

1 East 60th Street                                    Block   1375      Lot   1

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES AND
REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING RESOLUTION | | BUILDING CODE | | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| | | | DWELLING OR ROOMING UNITS | USE GROUP | HABITABLE ROOMS | OCCUPANCY GROUP | |
| Main Bldg. | | | | | | | |
| Cellar | O. G. | 20 | | | | | Storage, boiler room, house laundry, dressing and locker rooms. |
| 1st | 100 | 390 | | | | | Lounge, bar room, showroom, offices and building lobby. |
| Mezz. | 50 | 40 | | | | | Offices. |
| 2nd | 75 | 125 | | | | | Library, clubrooms, and upper part of lobby. |
| Mezz. | 40 | | | | | | Steward's bedroom. |
| 3rd | 100 | 175 | | | | | Private dining rooms, pantry and kitchen. |
| 4th | 40 | 15 | | | | | Fifteen (15) bedrooms and storage. |
| 5th | 40 | 30 | | | | | Twenty (20) bedrooms and three (3) living rooms. |
| 6th | 60 | 40 | | | | | Dining rooms, kitchen and storage. |
| Annex Bldg. | | | | | | | |
| Cellar | O. G. | | | | | | Storage. |
| 1st | 50 | | 10 | | | | Offices. |
| 2nd | 50 | | 5 | | | | Offices. |

OPEN SPACE USES          (contined)

THIS CERTIFICATE IS

OPEN SPACE USES          (SPECIFY — PARKING SPACES, LOADING BERTHS, OTHER USES — NONE)

**NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED**

THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE

BOROUGH SUPERINTENDENT                    JEREMIAH T. WALSH
                                          COMMISSIONER

COPY

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at a point on the ................ side of ................

distant ................ northeast feet ................ from the corner formed by the intersection of

xxxxx ................ xxxxxxxxxxx

running thence  East 60th Street ................ feet;  thence  Fifth Avenue ................ feet;

thence  north 100.5 ................ feet; thence  east 225.0 ................ feet;

thence  south 100.5 ................ feet; thence  west 225.0 ................ feet;

thence ................ feet; thence ................ feet;

to the point or place of beginning.

PUB. or ALT. No. ................ DATE OF COMPLETION ................ CONSTRUCTION CLASSIFICATION

EXISTING OCCUPANCY CLASSIFICATION  16-07      8/5/97 HT  STORIES.      Class - 1 - Fireproof.
                                                          6            98

"Heretofore erected existing
Class "B" club.

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS

|  | YES | NO |  | YES | NO |
|---|---|---|---|---|---|
| STANDPIPE SYSTEM (C26-1702.1) |  |  | AUTOMATIC SPRINKLER SYSTEM (C26-1703.1) |  |  |
| YARD HYDRANT SYSTEM (C26-1702.2) |  |  | CENTRAL STATION SUPERVISION (C26-1703.2 & 4) |  |  |
| PRIVATE HYDRANT SYSTEM (C26-1702.17) |  |  | WATER FLOW ALARM (C26-1703.4) |  |  |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM (C26-1702.23) |  |  | SIAMESE (C26-1703.4) |  |  |
|  |  |  | TWO AUTOMATIC SOURCES (C26-1703.9(A)) |  |  |
| SMOKE DETECTOR (C26-1702.1.1) |  |  | ONE AUTOMATIC SOURCE (C26-1703.9(A)) |  |  |
| FIRE ALARM AND SIGNAL SYSTEM (C26-1704.1) |  |  | DOMESTIC WATER SUPPLY SOURCE (C26-1703.9(F)) |  |  |

THE FOLLOWING PERMITTED ALTERNATE TO A REQUIRED STANDPIPE SYSTEM WAS PROVIDED OR INSTALLED (C26-1702.14)

|  | YES | NO |
|---|---|---|
| HOSE OR PORTABLE FIRE EXTINGUISHERS SUBJECT TO FIRE DEPARTMENT APPROVAL (C26-1702.15(B).1) |  |  |
| AUTOMATIC SPRINKLER SYSTEM CONNECTED TO A CENTRAL SUPERVISORY STATION (C26-1702.15(B).2) |  |  |

THE FOLLOWING PERMITTED ALTERNATES TO A REQUIRED AUTOMATIC SPRINKLER SYSTEM WERE INSTALLED

|  | YES | NO |
|---|---|---|
| PARTIAL SYSTEM (TABLE 17-2); CLARIFY EXTENT OF SYSTEM BELOW |  |  |
| AUTOMATIC DRY SPRINKLER SYSTEM (TABLE 17-2) |  |  |
| NON AUTOMATIC DRY SPRINKLER SYSTEM (TABLE 17-2 FOOTNOTE 1.9) |  |  |
| SMOKE DETECTOR ALARM SYSTEM (C26-1703.2) |  |  |

EXTINGUISHING AGENT IF OTHER THAN WATER:

EXTENT OF PARTIAL SYSTEM:

LIMITATIONS OR RESTRICTIONS:
    BOARD OF STANDARDS AND APPEALS CAL. NO
    CITY PLANNING COMMISSION CAL. NO ................
    OTHERS

**EXHIBIT E**

PAGE 1 OF 2 PAGES

B Form 54 (Rev. 8/85)



THE CITY OF NEW YORK

ALT 100627626

# DEPARTMENT OF BUILDINGS
## CERTIFICATE OF OCCUPANCY AMENDED

No. 106575

**BOROUGH** MANHATTAN    **DATE:** FEB 09 1995    ZONING DISTRICT R10H

AMENDED

This certificate supersedes~~~~~ C.O. NO  77863

THIS CERTIFIES that the ~~new~~—altered—~~existing~~—building—premises located at

1-11 EAST 60TH STREET    Block 1375    Lot 1

CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

## PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS PER SQ FT | MAXIMUM NO OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| MAIN BUILDING | | | | | | | |
| CELLAR | O.G. | 20 | | | | | STORAGE, BOILER ROOM, HOUSE LAUNDRY, DRESSING AND LOCKER ROOMS |
| 1ST FLOOR | 100 | 390 | | | | | LOUNGE, BAR ROOM, SHOWROOM, OFFICES AND BUILDING LOBBY |
| MEZZANINE | 50 | 40 | | | | | OFFICES |
| 2ND FLOOR | 75 | 125 | | | | | LIBRARY, CLUBROOMS, AND UPPER PART OF LOBBY |
| MEZZANINE | 40 | | | | | | STEWARD'S BEDROOMS |
| 3RD FLOOR | 100 | 175 | | | | | PRIVATE DINING ROOMS, PANTRY AND KITCHEN |
| 4TH FLOOR | 40 | 16 | | | | | TWELVE (12) BEDROOMS, OFFICES AND STORAGE |
| 5TH FLOOR | 40 | 30 | | | | | TWENTY (20) BEDROOMS AND THREE (3) LIVING ROOMS |
| 6TH FLOOR | 60 | 40 | | | | | DINING ROOMS, KITCHEN AND STORAGE |
| ANNEX BUILDING | | | | | | | |

(CONTINUED)

OPEN SPACE USES _____ (SPECIFY—PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

M.C.

NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED

THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE.

BOROUGH SUPERINTENDENT    COMMISSIONER

☐ ORIGINAL    ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS    ☐ COPY

B. Form 34 (Back) (1 Rev. # 42)

THAT THE ZONING LOT ON WHICH THE PREMISES IS LOCATED IS BOUNDED AS FOLLOWS:

BEGINNING at a point on the _____ N|E _____ side of

distant _____ feet from the corner formed by the intersection of

EAST 60TH STREET _____ and _____ 5TH AVENUE

running thence _____ feet; thence _____ feet;

thence _____ NORTH 100.5 _____ feet; thence _____ E. 225.0 _____ feet;

thence _____ SOUTH 100.5 _____ feet; thence _____ W. 225.0 _____ feet;

thence _____ feet; thence _____ feet;

to the point or place of beginning.

XXXXX ALT. No. _____ 100627626 _____ DATE OF COMPLETION 5|6|94 _____ CONSTRUCTION CLASSIFICATION CLASS 1 FIREPROOF

BUILDING OCCUPANCY GROUP CLASSIFICATION _____ HEIGHT _____ STORIES, _____ FEET

RESIDENTIAL _____ 6 + C _____ 98'

THE FOLLOWING FIRE DETECTION AND EXTINGUISHING SYSTEMS ARE REQUIRED AND WERE INSTALLED IN COMPLIANCE WITH APPLICABLE LAWS.

| | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|
| STANDPIPE SYSTEM | | | AUTOMATIC SPRINKLER SYSTEM | | | |
| YARD HYDRANT SYSTEM | | | | | | |
| STANDPIPE FIRE TELEPHONE AND SIGNALLING SYSTEM | | | | | | |
| SMOKE DETECTOR | | | | | | |
| FIRE ALARM AND SIGNAL SYSTEM | | | | | | |

STORM DRAINAGE DISCHARGES INTO:

A) STORM SEWER ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

SANITARY DRAINAGE DISCHARGES INTO:

A) SANITARY SEWER ☐    B) COMBINED SEWER ☐    C) PRIVATE SEWAGE DISPOSAL SYSTEM ☐

LIMITATIONS OR RESTRICTIONS.

BOARD OF STANDARDS AND APPEALS CAL. NO. _____

CITY PLANNING COMMISSION CAL. NO. _____

OTHERS:

**Preliminary List of Witnesses and Locations:**

**R. J. Reynolds Tobacco Company**
401 North Main Street
Winston-Salem, NC 27101

Todd Southern
Mark Rutledge
LeeAnn Brewer

**Kaart/ Mess Marketing**
640 North LaSalle Street, Suite 650
Chicago, IL 60610

Marc Weinstock
Natasha Kwan

**Mullen, In.**
Park Building
101 North Cherry Street - 6th Floor
Winston-Salem, NC 27101

Carol Sterling (formerly of)

**Brown Advertising**
Atlanta, Georgia

Byron Brown

**Rolling Stone**
Wenner Media LLC
1290 Avenue of the Americas
New York, NY 10104

Ray Chelstowski, Publisher
Ed Hecht, Advertising Director
Joe Newton, (formerly) Deputy Art Director
Will Dana, Managing Editor

**Exhibit E**

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

JOHN R. CUTI
DIRECT (212) 603-6486
johncuti@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

April 3, 2008

**By Email and Regular Mail**

Neil Sparber
Fulbright & Jaworski LLP
666 Fifth Avenue, 31st Floor
New York, New York 10103

Re:     _Third Church of Christ, Scientist v. City of New York_

Dear Neil:

Thank you for your letter of March 31st on behalf of the Metropolitan Club (the "Club") on which my client (the "Church") has served a non-party subpoena.

As you know, so long as a subpoena is reasonably likely to lead to the discovery of relevant evidence, it is proper. Your letter makes extensive arguments why you think that the information that the subpoena seeks would not be relevant or useful for the Church. But that is a judgment for the Church to make. The Church has served the Club with the subpoena because the Club's catering activities and the other items addressed in the subpoena bear directly on key issues in the lawsuit.

Your contrary conclusion about the relevance of the Club's activities stems from a mistaken premise. Catering as an "accessory use" of a property primarily used for religious, as well as club, purposes is "as of right" even if such properties are located in a residential zone. There is no need for a special permit or other special approval; the Church sought approval here only as a precaution. We believe that many of the instances cited in the Complaint of catering conducted at other religious institutions, at secular non-profits, and at clubs are conducted as as-of-right accessory uses with the express or tacit consent of the City.

The authorized principal use of the Club's premises is as a club, as you concede. To the extent that the Club permits its facilities to be used for catered events conducted by or for the benefit of persons who are not its members – and we are informed that this is the case – then such catering is being conducted as an accessory use. The City permits that use. But it prohibits

Neil Sparber
April 3, 2008
Page 2



the similar use that the Church seeks to make of its building. Hence the lawsuit, and hence the subpoena.

     As I've mentioned, the Church would very much like to work out a reasonable way for the Club to produce documents. But, of course, the Church will move to compel if the Club is unwilling to comply with the subpoena. I will be out of town at our firm's retreat today and tomorrow, but be back in the office on Monday. I look forward to hearing from you.

     Very truly yours,

John R. Cuti /ma

John R. Cuti