UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------ x

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,                          :          07 Civ. 10962 (DAB)
                                           :
                    Plaintiff,             :
                                           :
            - against -                    :
                                           :
THE CITY OF NEW YORK and PATRICIA          :
J. LANCASTER, in her official capacity as, :
Commissioner of the New York City          :
Department of Buildings                    :
                                           :
                    Defendants.            :

------------------------------------------------ x


## MEMORANDUM OF LAW IN
## SUPPORT OF PLAINTIFF'S MOTION TO COMPEL


**DAVIS WRIGHT TREMAINE LLP**
1633 Broadway
New York, New York  10019
(212) 489-8230

*Attorneys for Plaintiff*
*Third Church of Christ, Scientist, of New York City*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    A.    The Neighbors Have Aggressively Lobbied the City ............................................ 2

    B.    The Neighbors Refuse to Comply with the Subpoena. ......................................... 4

ARGUMENT ...................................................................................................................... 6

    I.    The Order Authorizes Service of Subpoenas on the Neighbors ............................ 6

    II.    The Neighbors, Non-Parties to this Action, Cannot Assert a Work Product
        Privilege ............................................................................................................ 7

    III.    The Subpoenas Are Narrowly Tailored and Not Unduly Burdensome ................. 9

    IV.    The Demand for "Fair Compensation" from the Church is Baseless ................... 11

    V.    The Beekman Should be Compelled to Produce Responsive Documents............ 12

CONCLUSION .................................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

                                                                                    **Page**

*Bridgeport Music Inc. v. UMG Recordings, Inc.*, No. 05 Civ. 6430 (VM)
    2007 WL 4410405 (S.D.N.Y. Dec. 17, 2007) ................................................................. 9

*First American Corp. v. Price Waterhouse, LLP*, 184 F.R.D. 234
    (S.D.N.Y. 1998) ................................................................................................ 12

*In  re Honeywell Intern., Inc. Securities Litigation*, 230 F.R.D. 293
    (S.D.N.Y. 2003) ........................................................................................... 11, 12

*In re Seroquel Products Liability Litigation*, No. 6:06-md-1769-Orl-22DAB
    2007 WL 4287676 (M.D. Fla. Dec. 6, 2007)................................................... 12

*Kirschner v. Klemons*, No. 99 Civ. 4828 (RCC), 2005 WL 1214330
    (S.D.N.Y. May 19, 2005) ............................................................................. 9, 10

*MacNamara v. City of New York*, No. 04 Civ. 9612 (KMK)
    2006 WL 3298911 (Nov. 13, 2006 S.D.N.Y.)................................................ 6, 9

*Ramsey v. NYP Holdings, Inc.*, No. 00 Civ.3478 (VM) (MHD),
    2002 WL 1402055 (S.D.N.Y. June 27, 2002) ................................................. 8

*Ricoh Co., Ltd. v. Aeroflex Inc.*, 219 F.R.D. 66 (S.D.N.Y. 2003) ................................................ 8

*Travelers Indemnity Co. v. Metropolitan Life Insurance Co.*,
    228 F.R.D. 111 (D. Conn. 2005)................................................................... 10

## Statutes and Rules

                                                                                    **Page**

9 Moore's Federal Practice 3D § 45.03[1], 45-24 (2007) ............................................................. 6

Fed. R. Civ. P. 26(b)(3)............................................................................................................ 7, 8

Fed. R. Civ. P. Rule 45 .................................................................................................6, 10, 11, 14

Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), submits this memorandum in support of its motion to compel non-parties 570 Park Avenue Apartments, Inc., 580 Park Avenue, Inc., Susan Relyea, as a Member of the Co-Op Board of 580 Park Avenue, Inc., and The Beekman Tenants Corporation (the "Beekman") (collectively, the "Neighbors"), to comply with subpoenas served on them. This memorandum addresses all four subpoenas.

## INTRODUCTION

The Neighbors caused this lawsuit. Until these influential Park Avenue residents mounted their NIMBY campaign, the City had approved the Church's plan to raise revenues to maintain their building by having catered events there. Though their neighborhood is full of venues that conduct restaurant and catering activities – indeed, even the Beekman houses and profits from a thriving restaurant and separate banquet hall – the Neighbors organized a sweeping and, ultimately, effective lobbying campaign. The subpoenas seek simply to discover the ways in which this campaign influenced the City to reverse course and make the unlawful land use decision that the Church challenges here.

The Neighbors have done far more than merely write a few letters to state their views. They have conducted extensive surveillance of the Church, lobbied not just the City, but other elected officials, the State Liquor Authority and other agencies, reached out to other co-ops in the neighborhood, retained lawyers, and apparently even hired Howard Rubenstein to help them refine their spin on what the Church is "really" doing. The Complaint alleges that these extensive lobbying efforts played a key role in this case.

The Neighbors do not want their conduct discovered. They have raised numerous objections to the subpoenas and spurned the Church's several offers to compromise regarding their scope. Each objection is baseless. This memorandum establishes that:

- this Court's discovery order authorized issuance of the Subpoenas (*see* Point I, *infra*);

• the Neighbors' assertion of work-product privilege to protect the substantial bulk of their production is contrary to established federal law because they are non-parties to this action (*see* Point II, *infra*);

• the boilerplate assertions of over-breadth and burden fatally lack the requisite supporting details (*see* Point III, *infra*);

• the Neighbors' demand that the Church pay the costs associated with compliance reflects hardball tactics only, and fee-shifting here is irreconcilable with the equities (*see* Point IV, *infra*); and,

• the Beekman's relevance and other objections – directed at the separate subpoena that seeks information concerning commercial restaurant and banquet activity there – are also without merit (*see* Point V, *infra*).

## BACKGROUND

### A.    The Neighbors Have Aggressively Lobbied the City

The City previously authorized the Church to host social events at its building to earn supplemental income, a decision consistent with its established practice of permitting non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution.  In reliance on the City's decision, the Church and its caterer undertook a multi-million dollar renovation of the Church's building.  *See* Compl. ¶ 44. [1]

After the repairs were well underway, and its caterer had hosted several events (without incident) and booked numerous events going forward, the City revoked its prior approval.  *Id.* ¶ 55.  The City now claims it did so only because the prior approval was a "mistake."  *See* Hrg. Tr.

---

[1]    This Memorandum of Law in Opposition to the Club's Motion to Quash and in Support of Plaintiff's Motion to Compel refers to various papers submitted on its motion for a preliminary injunction.  Specifically, references are made to the Complaint, filed Dec. 3, 2007; the Declaration of Jay A. Segal, dated Dec. 3, 2007 ("Segal Decl."); the Reply Declaration of Jay A. Segal, dated Feb. 22, 2008 ("Segal Reply Decl."); the Declaration in Opposition to Plaintiff's Motion for a Preliminary Injunction, dated Feb. 8, 2008 ("Brennan Decl.").

All defined terms set forth in the Subpoena and the Complaint are incorporated herein.

12/3/07 at 24:3-7, Compl. ¶ 52.  But the Complaint alleges that the City reversed course only because of political pressure.  *See* Compl. ¶ 4.

The City changed its position and revoked approval only after a group of influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, and many other institutions that regularly host large social events – complained that catered events in the Church's building had transformed the Church into a commercial catering hall that causes serious disruption in the neighborhood.  *Id.* ¶ 4.  These residents of 570, 575 and 580 Park Avenue, branding themselves the "The Preservation Coalition," initiated a public relations campaign against the Church, with the avowed purpose of maintaining the purported "residential" character of their Park Avenue neighborhood.  *Id.* ¶ 47.  They circulated flyers claiming that the Church's hosting of catered events at its historic premises – although not materially different than the practices of neighboring institutions – would cause significant disruption in their backyard.  *Id.*; Pa. Decl. Ex. F.  They then pressed these pretextual complaints on the City, sending at least three letters to the Department of Buildings ("DOB"), dated March 12, 2007, March 30, 2007, and October 5, 2007.  *See* Pa Decl. ¶ 8, Ex. G.

On November 30, 2007, the City succumbed to the demands of these influential neighbors, and the DOB sent a letter reversing itself and notifying the Church and its caterer that it revoked its prior approval for the repairs and the catering at the Church's premises.  *See* Compl. ¶ 51; Pa Decl. Ex. H.  The DOB stated that it re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use as a house of worship.  *Id.* ¶ 52.  As a result of

the City's illegal conduct, directly encouraged and instigated by the Neighbors, the Church has been forced to initiate the instant lawsuit. *Id.* ¶ 53.

The Neighbors have not stopped at pressing their pretextual complaints on the City and on various local and state elected officials. The Church has since learned that the Neighbors' lobbying efforts continue to be far-reaching, from petitioning local Elected Officials, mobilizing neighborhood organizations, lobbying the State Liquor Authority, and even going so far as to install video equipment so they can spy on the Church. *See* Pa Decl. ¶ 10, 14, Ex. O, Weisberg Decl. ¶ 4-5.

### B.    The Neighbors Refuse to Comply with the Subpoena.

On March 3, 2008, the Court granted the Church's request and issued an Order permitting the parties to conduct pre-hearing discovery. *See* Pa Decl. ¶ 2, Ex. A. Soon thereafter, the Church served subpoenas on various non-parties, including the Neighbors, seeking narrow categories of documents and deposition testimony from Susan Relyea, in her capacity as a member of the 580 Park Avenue Building Cooperative Association. *Id.* Exs. B-E. When initially contacted by the Neighbors' counsel, the Church was flexible and offered to extend their time to respond from March 26th to April 10th. *See id.* ¶ 12, Ex. I. On April 10, 2008, however, the Neighbors served blanket objections to all of the requests in the Subpoenas, and claimed – for the first time – that they were not required to respond at all to the subpoena because the Court's order permitting pre-hearing discovery did not permit the Church to seek discovery from them. *Id.* ¶ 13, Exs. J-M. The Neighbors also served a Categorical Privileged Documents Log that refused to produce broad categories of documents and communications with various third-parties, such as the City, Elected Officials, the Landmark Preservation Commission, the State Liquor Authority, and other third-party entities and individuals, on the grounds of attorney client and work product privileges. *Id.* ¶ 14, Ex. 14. They also served the Declaration of Phyllis H.

Weisberg, dated 10, 2008, ostensibly to set forth their justification for their privilege assertions. *Id*. Ex. O.

On April 14, 2008, counsel for the Church replied with a letter disputing the Neighbors' arguments and explaining why evidence from them was highly relevant and discoverable. *Id*. ¶ 15, Ex. P. The Church explained that the subpoenas were appropriate under the discovery Order given how central a role the Neighbors played in this dispute, and that their vague assertions of privilege were unsupportable. Yet, in an attempt to accommodate the Neighbors' complaints of burden and over-breadth, the Church agreed to limit the temporal scope of the Subpoenas by several years, and welcomed other suggestions for compromise.

On April 16, 2008, counsel for the Neighbors responded by letter. *Id*. ¶ 16, Ex. Q. Though never objecting that the documents the Neighbors possess are irrelevant, counsel continued in his insistence that the Subpoenas were overbroad and outside the scope of the Court's discovery order. He also demanded "fair compensation" for incurred expenses. Not only did the Neighbors spurn the Church's attempts at compromise, they used the Church's willingness to reduce the temporal scope of the Subpoena as a purported concession that they were overly broad.

On April 17, 2008, the Church wrote back in another attempt to resolve this impasse. *Id*. ¶ 17, Ex. R. It offered further to further limit various categories of documents sought by the Subpoena. That afternoon, the Neighbors wrote back seeking additional time to respond. *Id*. ¶ 18, Ex. S. The Church, however, explained that, given the June 3, 2008 discovery cut-off date, and the Neighbors' consistent refusal to acknowledge that they were going to produce responsive documents, the Church would be required to file this motion in order to protect its rights.

## ARGUMENT

Rule 45 governs the issuance of and compliance with subpoenas and the sanctions for non-compliance. Discovery under Rule 45 "is intended to be as broad against a nonparty as against a party[.]" *See* Fed. R. Civ. P. Rule 45, Commentary 45-6; 9 MOORE'S FEDERAL PRACTICE 3D § 45.03[1], 45-24 (2007). The party resisting discovery bears the burden of showing that the subpoena is improper and/or that compliance with the "subpoena would be unduly burdensome." *MacNamara v. City of New York*, No. 04 Civ. 9612 (KMK) (JCF), 2006 WL 3298911, 15 (S.D.N.Y. Nov. 13, 2006).

Subpoenas are not voluntary requests. Each is issued in the name of the Court and non-compliance can constitute contempt. *See* 9 MOORE'S FEDERAL PRACTICE 3D § 45.02[1]; Fed. R. Civ. P 45(e) ("Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued.").

## I.      The Order Authorizes Service of Subpoenas on the Neighbors

The Neighbors claim that they need not comply with the Subpoenas because the pre-hearing discovery Order does not encompass discovery from them. *See* Pa Decl. Ex. A. This narrow reading flouts the intention of the Order to permit the parties to develop a fuller factual record on which the Court could base its ruling on the motion for preliminary injunction. There is no question that the Neighbors are central to this case. The Church has always maintained that the scope, nature, and intensity of their lobbying efforts, and the impact of those efforts on the City, are at the very heart of this case. *See, e.g.,* Compl. ¶ 47-51, Pl. Br. ¶ 2. The Court has read extensive briefing, and heard oral argument on the application for the TRO in December (with the Neighbors' counsel present in the courtroom, whom the Court invited to participate), and therefore was well aware of the central role that the Neighbors' played when it granted the Church's request to conduct discovery. *See* Hrg. Tr. 12/3/07, 2:11-13.

The Neighbors, however, selectively quote from the Court's order, claiming that it permits limited discovery *only* to religious and non-profit secular institutions that may conduct catered events. *See* Pa Decl., ¶ 13, Ex. J at 1. The Order is not no so narrow. Instead, it granted "pre-hearing discovery *including* Plaintiff's requests for documents and depositions from several religious and non-religious institutions that may conduct similar catered events to those issues in this matter" (emphasis added). The Order grants the right to take party and non-party discovery; it uses the word "including" only in its normal, illustrative sense.

## II.  The Neighbors, Non-Parties to this Action, Cannot Assert a Work Product Privilege

The Neighbors assert boilerplate attorney-client and work-product privilege objections to every Request in the Subpoenas, and they submit a "Categorical Privileged Documents Log" that sets forth categories of documents purportedly covered by these privileges. *See* Pa Decl. Ex. N. The privilege log is telling. The Neighbors seek to withhold *all* documents concerning communications between and among the Neighbors and third parties, including the City, CIVITAS and Defenders of the Historic Upper East Side (neighborhood groups that unsuccessfully sought to submit an amicus brief in this action), the State Liquor Authority, Elected Officials, Landmark Preservation Commission, the Church's neighbors and potential Coalition members, and other consultants, videographers, and agents assisting the Neighbors.

The Neighbors maintain that all internal communications and documents between and among themselves are protected by work product privilege. *See* Pa Decl. ¶ 14, Exs. N, Q. This is not the law. Instead, the express language of Rule 26(b)(3) and federal case law provides that, because the Neighbors are not parties to this action, they cannot assert a work product privilege *at all. See Ricoh Co., Ltd. v. Aeroflex Inc.*, 219 F.R.D. 66, 69 (S.D.N.Y. 2003) (holding that "Courts have routinely held that documents prepared by one who is not a party to the case at bar

are not protected by Rule 26(b)(3), even if the non-party is itself a party to a closely related

lawsuit in which he will be disadvantaged if he must disclose in the instant suit."); *Ramsey v.*

*NYP Holdings, Inc.*, No. 00 Civ. 3478, 2002 WL 1402055, *6 (S.D.N.Y. June 27, 2002)

("federal courts have repeatedly held . . . that a non-party witness may not invoke work-product

protection under [Fed. R. Civ. P. 26(b)(3)] to preclude production of materials prepared by or for

that witness, even if created in contemplation of the witness's own pending or anticipated

litigation") (citing cases).

> This is true even if the interests of both the non-party and a party to the action are closely
aligned.  For example, in *Ramsey*, parents brought a libel claim on behalf of their minor son
when a newspaper article said that their son had been involved in the murder of his younger
sister.  2002 WL 1402055 at *1.  The court ordered discovery of more than 2,400 documents in
Mr. and Mrs. Ramsey's possession concerning the investigation into the crime, which was
undertaken by their lawyers, finding that, "in accordance with the substantial weight of legal
authority . . . a non-party cannot invoke the work-product immunity of Fed. R. Civ. P. 26(b)(3)."
*Id.* at *2.  There, the interests of the non-party and party could not have been more aligned.
Nevertheless, because the senior Ramsey's appeared in the lawsuit only as representatives of
their minor son, and were not parties in their own capacity, they could not invoke the work-
product privilege.  *Id.* at *8.

> Even if a close alignment of interest could be sufficient to grant a non-party some
protection under the work product doctrine, in this case, the Neighbors and City's interests are
not sufficiently aligned.  The Neighbors' "interest" in having the City prohibit the Church from
engaging in an ordinary practice that it permits many other comparable non-profit organizations
to engage in is not the sort of direct financial stake in the litigation that might permit a non-party

to invoke the work product doctrine.  Accordingly, because the Neighbors are not parties to this lawsuit, they must produce all documents and communications with third-parties (including but not limited to the City), and between and among each other, to the extent such documents are responsive to the subpoenas.

### III.    The Subpoenas Are Narrowly Tailored and Not Unduly Burdensome

The Neighbors' general complaints of over-breadth and undue burden are not sufficient to quash the subpoenas.  "Whether a subpoena imposes an 'undue burden' depends upon such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Bridgeport Music Inc. v. UMG Recordings, Inc.*, No. 05 Civ. 6430 (VM) (JCF), 2007 WL 4410405, at *2 (S.D.N.Y. Dec. 17, 2007) (finding no undue burden notwithstanding claim that production would require non-party to "go through hundreds of files that were in storage" and that search could take months).  In considering a claim of burden, "inconvenience alone will not justify an order to quash a subpoena that seeks potentially relevant [evidence]." *Kirschner v. Klemons*, No. 99 Civ. 4828(RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (citations omitted).

For example, in *MacNamara v. City of New York*, the court ordered the non-party New York County District Attorney's Office ("DANY") to retrieve files for 1,200 non-party arrestees in a wrongful arrest and excessive force case, notwithstanding the DANY's claim that compliance with the Subpoenas would be onerous, time-consuming and expensive.  The court reasoned that the Subpoenas called for the production of "a narrow set of specific relevant documents" in the DANY's exclusive possession.  2006 WL 3298911 at 16 *(citing Travelers Indemnity Co.,* 228 F.R.D. at 114 (where subpoena of non-party called for review of all documents associated with over 1,000 insurance policies, stored in various offices and

warehouses in several states, "the sheer volume of documents would be no reason, in and of itself, to quash the subpoenas" if there was no other means for the party to obtain the information)).

Under Rule 45, a recipient of a subpoena is required to set forth "the manner and extent of the burden and the probable negative consequences of insisting on compliance." *Kirschner*, 2005 WL 1214330, at *2 (citations omitted). That has not been, and cannot be, done here. The Neighbors' claim that compliance with the Subpoenas would cause them to produce several thousand emails (although a sizeable portion may be protected by attorney-client privilege), 42 Redwelds, 500 photographs, and more than 24 DVD videos (*see* Pa Decl. Ex. Q), shows that they possess a significant amount of information that is highly likely to bear directly on the issues raised in this case. But the sheer volume of responsive documents is not sufficient under the Federal Rules to avoid compliance.

Moreover, the Church has been remarkably flexible in seeking to obtain the Neighbors' compliance. It has reduced by more than half the time-period for which it seeks information, has freely granted extensions of time, and has signaled a willingness to limit certain requests where possible. *See* Pa Decl. ¶ 15, Ex. P at 1. The Church has also agreed that, to the extent that the City produces documents that merely duplicate what the Neighbors possess, then there would be no need to produce such documents. *Id.* ¶ 17, Ex. R. at 2. The Church proposed that the Neighbors collect responsive documents and make a rolling production, leaving documents they believe the Defendants possess to the end. *Id.* Yet, these offers at accommodation have been met with stonewalling.

As a final matter, the Neighbors do not (because they cannot) claim that the information sought is irrelevant. Instead, they incorporate boilerplate relevance objections as part of their

claims for burden, claiming simply that the "value of information to the Plaintiff is outweighed
by the burden upon [the Neighbors] and the availability elsewhere[.]" *See* Pa Decl. Ex. Q at 3;
Ex. N. Apparently, the Neighbors have created thousands of pages of documents that record
their efforts to force the City to revoke its prior permission. These documents likely shed light
on the City's actions, and their relevance is plain. That there is a trove of highly relevant
information in the Neighbors' possession is not a basis for quashing the Subpoenas; to the
contrary, production of such information should be compelled.

### IV. The Demand for "Fair Compensation" from the Church is Baseless

The Neighbors' claim that they should not have to produce documents "without fair
compensation" is made not out of any financial need. *Id.* Ex. J at 2. Instead, it is made solely to
discourage the Church from pursuing discovery. Although in some circumstances Rule 45
provides for some apportionment of costs, "the required protection from significant expense does
not mean that the requesting party necessarily must bear the entire cost of compliance. A non-
party can be required to bear some *or all* of its expense where the equities of a particular case
demand it." *In re Honeywell Intern., Inc. Securities Litig.,* 230 F.R.D. 293, 302-03 (S.D.N.Y.
2003) (emphasis added, internal quotation marks and citations omitted). Three factors are
relevant to who should bear the costs: "whether the nonparty actually has an interest in the
outcome of the case, whether the nonparty can more readily bear the costs than the requesting
party and whether the litigation is of public importance." *Id.*

Where, as here, a non-party was "substantially involved in the underlying transaction . . .
expenses should not be awarded." *First American Corp. v. Price Waterhouse, LLP*, 184 F.R.D.
234, 242 (S.D.N.Y. 1998) (internal citation omitted); *In re Honeywell Intern.,* 230 F.R.D. at 302-
03 (denying all claims for compensation where producing non-party was not disinterested); *In re
Seroquel Products Liability Litig.,* 6:06-md-1769-Orl-22DAB, 2007 WL 4287676, at *3 (M.D.

Fla. Dec. 6, 2007) (citing *In re First American Corp.*, holding that "[w]hen a party from whom documents are sought is not a classic disinterested non-party . . . court can order that the non-party produce the documents at its own expense.").

Here, there is no equitable basis to shift the expenses to the Church. The Neighbors, some of the wealthiest cooperative building associations in New York City, are better able to bear the cost of the production than the Church, a small Christian Science congregation. Further, this case is in the public interest. If the Church is prevented from raising supplemental income in this way by the City, not only will it face a grave risk of losing its building, but many other churches and non-profits throughout the City that rely on this sort of supplemental income from shared space arrangements may suffer. Finally, and perhaps most important, the Neighbors are not "innocent bystanders"; to the contrary, they have played an active, central part in this controversy. The Neighbors rely heavily on their purported quasi-party status in arguing that they should enjoy the protections of the work-product doctrine, but then characterize themselves as passive, innocent non-parties when they say the Church should pay their expenses. This litigation posturing should not be countenanced. The Neighbors must bear their own costs.

**V.     The Beekman Should be Compelled to Produce Responsive Documents**

The Beekman, a member of the "Preservation Coalition," has a restaurant (currently named Park Avenue Spring) and catering event space (called the Townhouse) within its building. *See* Segal Reply Decl. ¶ 45. The Church's subpoena to the Beekman therefore differs from the Subpoenas sent to the other Neighbors. *See* Pa Decl., Ex. D. While the Beekman mirrors the Responses and Objections to the Subpoena raised by the other Neighbors, it also objects to additional Requests concerning its catering activities.

The parties have debated the extent and scope of catering at the restaurant and separate catering event facility in the Beekman. *Compare* Compl. ¶ 45-a; Segal Decl. ¶ 4, Segal Reply

Decl. ¶ 45; *with* Brennan Decl. ¶¶s 76-77.  The Beekman rents space to a restaurant corporation, Fourth Wall Restaurants, LLC, which operates a restaurant currently named Park Avenue Spring that is open to the general public, and (together with a separate banquet facility on the same premises, named the Townhouse) is available for rental to the general public for catered events. Based on information from Fourth Wall Restaurants, the Church has learned that 234 catered events were held in the Beekman's banquet facility in 2007, and 307 events were held there in 2006.

Significantly, the Beekman's Certificate of Occupancy No. 71914 (*See* Brennan Decl. ¶ 76, Ex. S) prohibits this sort of activity; instead, it provides for the use of a hotel restaurant *for tenants' use only*.  *See* Segal Reply Decl. ¶ 45.  The City (and the Neighbors) apparently are aware of, but have decided to ignore, this fact.  *See* Brennan Decl. ¶ 76-77.  That the Beekman openly engages in robust commercial catering activity *across the street* from the Church while making strident claims that catered events held at the Church are a threat to the neighborhood is hypocrisy at its starkest.

The Beekman has categorically refused to produce any documents in response to the Subpoena.  *See* Pa Decl. Ex. M.  It objects to each Request, except for one,[2] on grounds of relevance, privilege and over-breadth.  For the reasons discussed above, its claims of over-breadth and burden are insufficient.   To the extent that any documents are allegedly protected by attorney client privilege, the Beekman is required to produce a privilege log with sufficient information to permit the Church to assess the applicability of any such privilege.  The Beekman, a non-party, cannot assert a work-product privilege.

---

[2] With the exception of Request 4, in which the Beekman does not assert a relevance objection. This Request calls for the production of "all documents concerning or in any way related to the number of guests that visit the Restaurant and/or the Separate Catering Facility . . . ."  The Beekman's response indicates that such documents are not in its possession or control.

Under the broad scope of discovery under Rule 45, each of the Requests seeks relevant and discoverable information.

### A.    Information Concerning Social Events is Relevant

Requests 1, 3, 8, 9, 10, 11, 15 seek information about Social Events held at the Beekman. To accommodate the Beekman's objection to the Subpoena's definition of "Social Events," the Church agreed to narrow the definition of "Social Event" to cover only social events held in the restaurant and separate banquet facilities located on the ground floor and in the basement of the building.

These Requests seek documents concerning:

> 1.    Any Social Event – including any such event held in the Restaurant or the Separate Catering Facility – conducted on or in the Premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

> 3.    The total number of hours each year that the Separate Catering Facility, the Restaurant, or any other part of the Premises is used for Social Events, including the number of hours it takes to set up for and clean up after each Social Event.

> 9.    Any complaints made concerning operation of the Restaurant and/or the Separate Catering Facility, including complaints about noise, traffic, or trash, by your residents, or by others, including residents of neighboring buildings.

> 10.    Any application for any permit, license or other permission from the City to conduct Social Events, and the issuance or renewal of any such permit, license or other permission, whether formal or informal.

> 11.    Any Communications with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct Social Events at the Premises.

> 15.    Any Communications with the City concerning: (a) Social Events, (b) the Church, (c) 583 Park Avenue, (d) the Rose Group,

or Louis Rose, (e) the Action or any allegations in the Complaint, and (f) the Certificate of Occupancy for the Premises.

Each of these Requests is directly relevant to the Church's claims that the City prohibits it from hosting Social Events when numerous secular institutions in the same residential district also conduct catered events on their premises. In order to rebut the City's claims, the Court has permitted the Church to conduct discovery of non-parties, such as the Beekman, in order to develop additional evidence regarding the number of catered events, the hours of operation, who books them, how many guests attend, complaints resulting from catering activities, and similar information. Also relevant is whether the Beekman earns income from Social Events, whether it operates with the explicit or tacit approval from the City, whether it has received any "quality of life" complaints for the operation for the Restaurant or the Separate Catering Facility, and whether it has communicated with the City concerning Social Events at its Premises. This information is especially relevant given that the Preservation Coalition, of which the Beekman apparently is a member, complains that the Church's catering activities would harm the quality of life of the neighborhood. Documents that show that one of its own members, located directly across the street from the Church, also hosts large social events and rents out a large catering facility on its premises on nearly a daily basis are plainly relevant to exploring this issue.

### B.    Information Concerning the Beekman's Agreement With Its Restaurant Leasee Is Relevant

Requests 2 and 12 seek documents concerning the lease between the Beekman Tenants Corporation and its Leasee, White & Witkowsky, Inc. and/or Fourth Wall Restaurants LLC, including without limitation, the lease dated November 1, 1999.

> 2.    The lease or other contractual relationship between the Beekman Tenants Corporation (and any predecessor, successor and/or affiliated entity) and White & Witkowsky, Inc. (and any successor, subsidiary, parent, and/or affiliated entity, including without limitation Fourth Wall Restaurants LLC), including

without limitation the lease dated as of November 1, 1999 and all amendments, renewals, or other agreements related thereto.

12.     Any independent person or entity, including without limitation White & Witkowsky, Inc., the Smith & Wollensky Restaurant Group, and/or Fourth Wall Restaurants LLC, that operates the Restaurant, the Separate Catering Facility, or otherwise performs catering-related services (an "Outside Caterer") with which you have a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the Outside Caterer's use of, or performance of services on or in, the Premises; (c) any repairs or improvements to the Premises made by, and/or for the benefit or use of, the Outside Caterer ; and (d) rent or use payments made by, or other financial arrangements with, the Outside Caterer.

This Request calls for relevant information because the City and the Neighbors have claimed that the terms of the lease between the Church and the Rose Group have somehow converted the Church into a commercial catering hall. The Church seeks discovery of the Beekman's lease agreements that govern the operation of the Restaurant and the Separate Catering Facility because the terms of these agreements may show that several of the terms in the Church's lease agreement, to which the City objects, are reasonable and common in the industry. The Church also seeks communications, memoranda, notes, correspondence and other documents that reflect discussions about the lease, including whether it might violate the CO for the Beekman, and/or whether the restaurant and banquet activity might cause tenant and neighbor complaints. This is not necessarily information that its lessee, Fourth Wall Restaurants LLC, would possess. But it is relevant given that the City and the Neighbors have complained about the Church's lease, asserting that it violates municipal land use laws and raises "quality of life" concerns.

### C.     Information Concerning the Beekman's Certificate of Occupancy Is Relevant

Requests 5 and 6 seek documents concerning:

5. The Certificate of Occupancy for the Premises (the "CO"), including any amendments thereto.

6. Any Communications with the City regarding the use of the Premises, including communications regarding the CO, and/or whether any past, current, or planned use of the Premises is or was an " accessory use" under the City's Zoning Resolution or other applicable land use regulations.

The Church's "Equal Terms" claim under RLUIPA raises the question of whether the City and its Department of Buildings treat the Church differently from secular institutions in the enforcement of its land use laws.  The Beekman permits an active restaurant and a separate catering event space open to the general public to be operated on its premises.  The Beekman's CO, however, provides for a hotel restaurant *for tenants' use only*, a violation that the City is aware of, but apparently has decided to ignore.  The Beekman, a member of the "Preservation Coalition," has actively lobbied the City to enforce the zoning regulations against the Church, even though it apparently operates in violation of its own CO.  The Church is entitled to obtain discovery to explore the City's apparently selective enforcement of its zoning laws.

### D.    Communications with Third Parties Are Relevant

Requests 14, 15, and 16 call for communications with the City and Elected Officials concerning this Action, the Church, 583 Park Avenue, the Rose Group or Louis Rose.

Specifically, the Requests seek:

14. Any Communications with the City or with Elected Officials concerning the Action.

15. Any Communications with the City concerning: (a) Social Events, (b) the Church, (c) 583 Park Avenue, (d) the Rose Group, or Louis Rose, (e) the Action or any allegations in the Complaint, and (f) the Certificate of Occupancy for the Premises.

16. Any Communications with Elected Officials concerning: (a) Social Events, (b) the Church, (c) 583 Park Avenue, (d) the Rose Group, or Louis Rose, (e) the Action or any allegations in the Complaint, and (f) the Certificate of Occupancy for the Premises.

Remarkably, the Beekman makes a blanket objection to producing this information on the ground that such information is not relevant to this Action and is protected by an undefined privileged.  As discussed above, lobbying efforts by the Neighbors, including the Beekman, is directly relevant to the Church's claims that the City has unfairly discriminated against it.  As also noted above, the Beekman does not enjoy any work-product protection.  All other non-privileged documents responsive to these Requests must be produced.

## CONCLUSION

Because the Subpoenas are valid, and neither unduly burdensome nor overbroad, the Court should compel the Neighbors to comply and produce the requested documents and

produce Susan Relyea for the demanded deposition.

Dated: New York, New York
April 21, 2008

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:_____
Victor A. Kovner (VK 2248)
John Cuti (JC 3365)
Monica Pa (MP 3307)

1633 Broadway
New York, New York 10019
(212) 489-8230

*Attorneys for Plaintiff, Third Church of Christ,
Scientist, of New York City*