UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x

THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,

                   Plaintiff,

        -against-

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City Department
of Buildings,

                 Defendants,

----------------------------------------------------x

07-CV-10962
(DAB)

**COMPLAINT**

JURY TRIAL DEMANDED

       Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), by

its undersigned attorneys for its Complaint against Defendants City of New York ("City") and

Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department

of Buildings ("DOB") (collectively, the "City" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

      1.    For more than 80 years, the Church has owned and worshipped in the

historic building located at the northeast corner of Park Avenue and 63rd Street (the "Building").

Time has not been kind to the Building or the Church, whose membership dwindled as the

Building fell into disrepair.  A declining building is expensive to maintain and repair; growing

liabilities for repair and maintenance keep new members away from the Church; a smaller

membership makes it harder to raise money to pay for repairs. This was a vicious circle: if the

Church failed to raise the substantial funds necessary to renovate the building, and in turn to

grow its congregation, it would disappear.

      2.    The Church decided to do what many other religious institutions and

secular non-profit organizations routinely do to supplement revenues:  it entered into a

commercial relationship with a reputable caterer to conduct events in the Building – only at times when the Church was not using the Building for its primary religious purposes – in exchange for urgently needed funds. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the on-going expenses of maintaining the Building. This relationship was critical to the Church's survival.

       3.     The Church is a good citizen and it went to the City for approval of this traditional accessory use. The City approved the Church's request and granted the necessary permits for the Required Capital Repairs. Doing so was entirely consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution. The Church relied on the City's approval, and the Required Capital Repairs began to be made. To date, the caterer has expended approximately $6.5 million to make the Required Capital Repairs and expects to spend another $1.5 million over the coming months to complete the work. Even though the caterer is undertaking the Required Capital Repairs, the vast majority of the work also benefits the Building and its Church-related uses and will continue to provide that benefit long after the caterer's contract with the Church expires.

       4.     But something unlawful has happened. Defendants have suddenly revoked their prior approval and rescinded the permits. They have done so because a small group of affluent, influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events in the Building have transformed the Church into a

commercial catering hall that causes serious disruption in the neighborhood. The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth: the City is singling out and discriminating against the Church without any basis. If unremedied, this discrimination will have devastating consequences for the Church and likely will result in the sale of the Building so that the Church can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

5.    The Church seeks relief from this Court because the City has violated the Church's rights (1) to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions; (2) to be free from undue burdens on the exercise of its religion, as protected by Section (a) of RLUIPA; (3) to equal protection of the laws, pursuant to the Fourteenth Amendment; and (4) to the free exercise of its religion, pursuant to the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred in this district, and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## PARTIES

8.    Plaintiff Church is a religious corporation existing under the laws of the state of New York, with its principal place of business at 583 Park Avenue, New York, New York 10021.

9.    Defendant City of New York is a political subdivision of the State of New

York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a municipal corporation organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment, enforcement, and implementation of land use and zoning regulations within New York City.

10.    Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings and is authorized to enforce, among other things, provisions of the New York City Administrative Code, the New York City Building Code, and the Zoning Resolution of the City of New York. She is sued herein in her official capacity.

11.    The New York City Department of Buildings is an administrative department of the City of New York, whose offices are located in the County of New York in the State of New York.

## FACTUAL ALLEGATIONS

### The Church and its Historic Building

12.    The Church began in the 1880s as a congregation of students dedicated to the Christian Science religion. By 1895, as its membership grew substantially, the Church applied for a charter and was registered under the laws of the State of New York.

13.    In 1920, the Church purchased property at 583 Park Avenue, New York, New York, and retained the renowned architectural firm Delano & Aldrich to design a house of worship for the congregation. Completed in or around 1924, the red-brick, Georgian-Colonial building topped with its tall lantern is one of the architectural highlights of Park Avenue and is the same building that houses the Church's congregation to this day.

14.    By the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings

with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult

socials and youth forum activities, and lectures and workshops focusing on religious and

spiritual healing topics. During this period, lectures in the Church's Building would frequently

be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in

the basement.

15.    Over the years, the Church's membership has declined. It currently has

fewer than one hundred members. True to its mission, however, the Church continues to use the

Building for religious worship every Wednesday evening and Sunday morning, as well as for

other religious uses such as Sunday School and lectures.

16.    A significant contributing factor to the decline in membership has been the

growing state of disrepair of the Building and the prohibitive costs of the Required Capital

Repairs, which members of the congregation would have to bear. The Required Capital Repairs

necessary to revive the aging Building's infrastructure and to bring it into compliance with the

New York City Building Code include modernization of all major building systems, including

electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and,

where necessary, replacement of the Building's façade, roof, windows, doors and other exterior

components; and significant restoration of the main auditorium and other rooms regularly used

for Church-related activities.

17.    In order to save the historic Building, the Church needed to raise

substantial capital. For many years, the Church survived largely because of bequests made by

deceased members of its congregation. But as the membership declined, the bequests declined,

and the Church, year after year, was running at a significant deficit.

18.    Beginning at least in the late 1990s, the Church explored several

alternatives to raise capital, including low-cost loans from the Historic Properties Fund

(administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

19.    From 1999 to 2006 the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship did not yield enough money to meet the Church's needs.

20.    In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

21.    Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for renovation and maintenance of the Building.

22.    After considering numerous alternatives, the Church did what many other religious institutions and nonreligious non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events In Order to Raise Needed Capital

23.    As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and ongoing maintenance costs (the "Lease").

NYC 189965v8 0085520-000001

24.    The express purpose of the Lease is to supplement the Church's income, and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at p. 1 (emphasis added).

25.    In addition to hosting weddings and other celebrations, as well as events for non-profit groups, companies and other firms – to date, events for New Yorkers for Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups have been held in the Building – the Lease requires the Rose Group to conduct catered events for members of the Church at reduced cost. 2nd Amn. to Lease, at ¶ 2.

26.    Upon information and belief, the Rose Group will invest more than $8 million on the Required Capital Repairs, of which $6.5 million has already been spent. Because the Building lies within the Upper East Side Historic District, any renovations to the exterior of the Building must be undertaken in a painstaking manner so as to preserve, wherever possible, the Building's original architectural details. Among the significant work that remains to be completed, the Rose Group plans to restore the Building's roof with slate from the same Vermont quarry that supplied the Church more than 80 years ago.

27.    In addition to Required Capital Repairs, the Rose Group is further obligated to undertake general maintenance of the Building throughout the 20-year Lease term, and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain threshold, from the catered events) to the Church. This supplemental income is a crucial source of operating revenue for the Church's religious activities, which will be especially necessary

when new community activities and outreach programs are implemented.

28.    Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities.

29.    Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1. Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities. Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5. Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief. Lease, at ¶ 35.6.

30.    The primary purpose of the Building is to serve as the Church's place of worship. But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a

reasonable chance to profit from the arrangement. In the second amendment to the Lease, dated March 27, 2007, the parties provided that, in the event that the Building could not be used for catering activity, the Rose Group would be able to require the Church to reimburse the Rose Group for Required Capital Repairs it had undertaken, even if the Church had to sell the Building. 2nd Amn. to Lease, at ¶ 3.

31.    The Church went out of its way to be sensitive to its neighbors. Thus, the Lease requires the Rose Group to "[p]ermit no act or practice which may … be a nuisance," and to "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the premises." Lease, at ¶ 32.1.

32.    The Church also insisted that the Rose Group take the extraordinary step of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors[.]" When this system is completed, all trash from catered events will be stored and refrigerated within the Building and taken to 63rd Street only when it is to be collected by the trash truck. Lease, at ¶ 32.1.

33.    Moreover, the Lease does not "permit any advertising medium or loud speaker, radio broadcast, etc. to be heard outside of the premises." Lease, at ¶ 32.1.

34.    In addition, the Second Amendment to the Lease provides that the Church and the Rose Group will together "establish standards concerning sound, light levels, traffic control, signage." 2nd Amn. to Lease, at ¶ 5.

35.    The Rose Group has retained a highly professional and comprehensive security team, Global Security Service, in order to ensure that all events at the Church are orderly, quiet, and safe. At all events, in addition to other security measures, there are usually off-duty members of the New York City Police Department patrolling the area, monitoring the event and managing any crowds. There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws. These security measures are implemented from an abundance of caution. Thus far, all of the catered events that have occurred in the Building have occurred without incident.

### The Purpose of the Building Remains the Same: It Is a Place of Worship for the Church Congregation

36.    The primary purpose of the Building is to remain a house of worship. For over 80 years, the Building has been property devoted to the Christian Science faith, and it remains the center of the Church's congregation. The Church currently conducts Sunday Church Services and Sunday School services, Wednesday evening church service, Thanksgiving and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church classes (all-day class for a two-week period, twice a year), Church corporate or organizational meetings, and occasional non-regularly scheduled events and Association meetings. Lease, at ¶ 35.1.

37.    The Church has been attracting new members because of the recent repairs to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be able to hold additional services and lectures for its members and other attendees. Among other events, the Church expects to host additional Sunday church services and Sunday school sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee meetings, youth forum activities, musical rehearsals and recitals, and various religious workshops. In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years. Following the renewal of the Church and its congregation, the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members.

38.    Finally, the Church's purpose in working with the Rose Group is more