| | | | of catered events for non-members | |
|---|---|---|---|---|
| Union Club | 101 East 69th Street and Park Avenue | | Rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers Club | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. *Uses designated outside caterer* New York Catering | R8B (LH-1A) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

45-b.   Moreover, as is evident from the following chart developed from public records without the benefit of discovery proceedings, it is customary for churches, synagogues and other religious institutions to rent out their facilities to non-congregants for social events in order to offset in the extraordinary costs of maintaining their historic properties:

| | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity 500 guests | Available for private catered events and movie and commercial shooting | R10 (PI) |
| St. Bartholomew's Church | 109 East 50th Street and Park Avenue | 1250 | Available for movie and commercial filming, corporate events, fashion shows, rehearsal dinners, weddings, cocktail parties, and dances, among other events. All catering provided in house by Café St. Bart's. | C5-3 (MID) / C5-2.5 (MID) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

NYC 189965v8 0085520-000001

| Universalist Church of New York | 160 Central Park West | 500 | Church dated 1897, available for private catered events and separate attached kitchen. | R10-A / R8B |
|---|---|---|---|---|
| All Souls Church | 1157 Lexington Avenue and East 80th Street | 350; 200 seated event | | C1-8X / R8B |
| The Top Deck at the Seamen's Church Institute | 241 Water Street, near Peck Street | 130 guests | Interfaith chapel, rents out space for a variety of catered events for non-congregants. | C6-2A (Special Lower Manhattan District – South Street Seaport Subdistrict) |
| Riverside Church | 490 Riverside Drive, between 119th and 122nd Street | 500; 300 seated event | Uses designated onsite caterer, Madeline's Catering & Special Events | R8 |

45-c.  Finally, the following chart, developed from public records without the benefit of discovery proceedings, makes clear that it is customary for nonreligious non-profit institutions (including institutions, like the ones below, located in residential districts) to rent their facilities to non-members for catered events in order to offset the extraordinary costs of maintaining their historic properties:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated event; can host additional events on same night in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety of catered events for non-members | R10 (PI) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. | R8B (LH-1A) |

| Club | | | *Uses designated outside caterer* New York Catering | |
|---|---|---|---|---|
| The Frick Collection | 1 East 70th Street, near Fifth Avenue | 200 seated event; 350 cocktails | | R10 (PI) / R8B (LH-1A) |
| National Academy Museum | 1083 Fifth Avenue, near East 89th Street | 140 seated event; 240 cocktails | | R10 (PI) |
| Cooper-Hewitt, National Design Museum | 2 East 91st Street, near Fifth Avenue | 90 seated event; 500 in Terrace and Garden | Rents out space for a variety of catered events for non-members *Uses designated outside caterer* Restaurant Associates | R10 (PI) / R8B (LH-1A) |

46.     Like these secular non-profit institutions, and like other religious institutions, the Church found that it was necessary to rent out its space to cover the daunting costs of making the Required Capital Repairs and of operating and maintaining its historic Building. Like its neighbors, the Church sought to use its Building both to generate revenue and to serve as a community resource. The events already held in and planned for the Building are not meaningfully different from any of these uses at other comparable institutions.

### Opposition by Neighboring Residents Results in the Revocation of the Pre-Consideration

47.     By March 2007, after the Required Capital Repairs were well underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings on the west side of Park Avenue, across the wide avenue from the Church – 570 Park Avenue and 580 Park Avenue – began to complain about the Church's arrangement with the Rose Group. After initially discussing the matter with the Church and the Rose Group, residents of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a public relations campaign against the Church. Their avowed purpose was to maintain the "residential" character of their Park Avenue neighborhood, and their flyer contended that the Church's plans to permit catered events at its historic premises – although no different than the

NYC 189965v8 0085520-000001

practices of neighboring institutions – would cause significant disruption in their backyard. These neighbors, however, failed to mention that if the Church were unable to supplement its revenues it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

48. On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused the Church of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall. The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night." This is a selective and baseless attack on the Church. As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory just a few blocks north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

49. The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007. The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, thereby distorting the real import of the Lease.

50. Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group the limited right to use the Building for catered events when it is not being used for religious

activities.

51. Unfortunately, the City has succumbed to the demands of these influential neighbors. On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly completed.

52. The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church." The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008). The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

53. Upon receiving the letter, the Church engaged litigation counsel. Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation. Counsel for the Church advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the Building to satisfy its liabilities.

54. The Church's attempt to resolve this matter without litigation was unsuccessful.

55.     On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination"). The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

56.     By revoking the Permits and rescinding the Pre-Consideration and withholding permission allowing the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions. It also irrationally singles out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making available their premises in order to host private catered events.

57.     The Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area.

58.     By revoking the Permits and preventing the Church from hosting catered events on its premises, the City has threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease. The implementation of

the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship – the epicenter of its religious practice for the past 80 years.

59.     Further, by determining that the Church's Building is effectively a catering hall, the City mischaracterizes the Lease and wrongfully impugns the Church. Contrary to the Defendants' disparaging characterization, the Church remains a congregation devoted to the Christian Science faith, and any catering activities conducted in the Building were, and will remain, wholly incidental to its primary purpose and use of preaching and practicing its religion.

60.     Moreover, the City is impairing the Church's interest in opening up its premises to the general public, which it believes will spark new interest in the Christian Science faith.

### The Church Will Suffer Immediate and Irreparable Injury

61.     The impact of the DOB's decision will be devastating and immediate. The Final Determination rescinds the earlier-granted accessory use approval and revokes the Permits, forthwith. Therefore, pursuant to the DOB Letter and the Final Determination, as of October 29, 2007, the Church is prohibited from allowing any additional catered events to be booked for the Building, and the Church is prohibited from permitting any additional catered events in the Building to be held after April 28, 2008. Moreover, because the Final Determination revokes the Permits, the Church and the Rose Group will be forced to suspend any further Required Capital Repairs. As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled. This prohibition effectively requires the Rose Group to cease its catering operations in the Building.

62.     If the Church can no longer make the Building available for catered

events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed. For these reasons, and more, if the City's decision is not enjoined, the Church will be forced to sell the Building and its congregation will be deprived of its place of worship.

### First Claim for Relief
### RLUIPA EQUAL TERMS CLAIM
### 42 U.S.C. § 2000cc(b)

63. Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64. By imposing and implementing the City's land-use and zoning laws and regulations in the manner described above, and by the conduct described above, the City is treating the Church on less than equal terms with comparable nonreligious institutions.

65. By revoking the Permits and rescinding the Pre-Consideration and thereby forbidding the Church to permit catered events at the Building, Defendants have discriminated against the Church because they freely permit comparable nonreligious institutions to engage in the similar practice of renting out their premises for catered events for non-members.

66. By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(b), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Second Claim for Relief
### RLUIPA SUBSTANTIAL BURDEN CLAIM
### 42 U.S.C. § 2000cc(a)

67. Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68. The Church entered into the Lease because it needed to preserve its Building so that its congregation could worship and perform other religious activities in it. The Church's use, renovation, and restoration of its real property constitute "religious exercise."

69. Among other improvements, the Lease requires the creation of a new room for the Church's Sunday School, and this conversion of real property is also "religious exercise" under RLUIPA.

70. Congress requires that the Court construe RLUIPA "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-3(g).

71. Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its congregation, spreading its religious teaching, and thereby impeding its religious exercise.

72. If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

73. The revocation of the Permits and prohibition on any future catered events is an arbitrary, irrational decision that does not bear any substantial relation to the public health, safety and welfare.

74. The revocation of the Permits and prohibition on any future catered events reflects the Defendants' inconsistent application and implementation of its zoning rules, a

decision made to placate a small but influential number of disgruntled neighbors and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, noise, or other factors relating to quality of life, given that Defendants allow events similar to the catered events in other facilities in the immediate neighborhood.

75. By imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above, Defendants have imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

76. The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

77. This substantial burden on the religious exercise of the Church is imposed by Defendants in the implementation of a system of land use regulations under which Defendants make, and have in place formal and informal procedures or practices that permit them to make, individualized assessments of proposed land uses, as contemplated by 42 U.S.C. § 2000cc(a)(2)(C).

78. This substantial burden on the religious exercise of the Church, and the removal of the substantial burden, will affect commerce among the several states, as contemplated by 42 U.S.C. § 2000cc(a)(2)(B).

79. By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief,

injunctive relief, compensatory damages, and the costs and expenses of this action.

### Third Claim for Relief
### EQUAL PROTECTION CLAIM
### PURSUANT TO 42 U.S.C. § 1983

80. Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81. The Church is a "class of one" and is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

82. Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct.

83. Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated nonreligious institutions to conduct.

84. This differential treatment was based on impermissible considerations, including baseless community opposition to the Church, the nature of the Church's religious beliefs, and the bad faith attempt to harm the Church's ability to maintain its premises.

85. Defendants' actions are designed for the purpose of hampering the exercise of the Church's religious activities in its chosen house of worship, and to prevent the Church from generating the same sort of supplemental income from the rental of event spaces that other similarly situated institutions are permitted to generate.

86. By singling out Plaintiff for unequal adverse treatment, and bowing to pressure from the neighborhood opponents, Defendants deprive Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

87. Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

88. By virtue of the foregoing conduct, Defendants have caused the Church immediate and irreparable harm.

89. The Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Fourth Claim for Relief
### FIRST AMENDMENT FREE EXERCISE CLAIM PURSUANT TO 42 U.S.C. § 1983

90. Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91. Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, by imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above.

92. The Defendants' implementation of the City's land use laws is not neutral and generally applicable to all, but instead discriminates unfairly against the Church.

93. The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any compelling reason.

94. The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any rational basis.

95. By singling out Plaintiff for unequal, adverse, treatment, and bowing to pressure from neighborhood opponents, Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

96. Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

97. By virtue of the foregoing conduct, Defendants have caused immediate and irreparable injury to the Church.

98. The Church is entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

WHEREFORE, judgment should be entered as follows:

A. Declaring that Defendants' actions violated section (b)(1) of RLUIPA;

B. Declaring that Defendants' actions violated section (b)(2) of RLUIPA;

C. Declaring that Defendants' actions violated section (a) of RLUIPA;

D. Declaring that Defendants' actions violated Plaintiff's right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution;

E. Declaring that Defendants' actions violated Plaintiff's right to the free exercise of religion pursuant to the First and Fourteenth Amendments to the United States Constitution;

F. Temporarily, preliminarily and permanently enjoining Defendants from revoking the Permits or prohibiting the Church, pursuant to the Lease, from continuing to permit catered events for non-members in the Building pursuant to the Lease;

G. Awarding compensatory damages against all Defendants;

H. Awarding Plaintiff's attorney fees and other reasonable expenditures, together with the costs and expenses of this action pursuant to 42 U.S.C. § 1988; and

I. Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
December 3, 2007

DAVIS WRIGHT TREMAINE LLP

BY: _____
Victor A. Kovner (VAK-2248)
John Cuti (JC-3365)
Monica Pa (MP-3307)

1633 Broadway
New York, New York 10019-6708
Telephone: (212) 489-8230
Facsimile: (212) 489-8340

*Attorneys for Plaintiff
Third Church of Christ, Scientist,
of New York City*

NYC 189965v8 0085520-000001