05/03/2007  14:54    2125665575                    BORO COMM OFFICE                                    PAGE  02/13

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

March 30, 2007

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2000)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL
STANLEY E. MARGOLES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET)
DAVID YAVARKOVSKY
EUGENE HABER

**BY HAND & VIA OVERNIGHT MAIL**

Christopher Santulli, PE
Manhattan Borough Commissioner
New York City Department of Buildings
280 Broadway
New York, NY 10007

> 583 Park Avenue (the "Premises")
> Block 1398 – Lot 0001
> Job No. 104511495

Dear Commissioner Santulli:

On behalf of our clients, 580 Park Avenue, Incorporated and 570 Park Avenue Apartments, Inc, we write to address issues that you raised at the meeting with Joanne Seminara and me on March 21, 2007. We also write to provide you with additional information, including a copy of the lease between The Third Church of Christ, Scientist (the "Church") and the Rose Group and our analysis thereof. A copy of the lease is annexed as Exhibit A.

This letter will address the following issues: 1) the significance of the leasing arrangement and the specifics of the lease; 2) the authority of the Department of Buildings ("DOB") to revoke a permit prior to the commencement of use; and 3) the implications of the Church's status as a religious institution.

At issue here is whether this catering operation is a proper accessory use for the Church. As discussed in our March 12th letter and below, we believe it is clear that the catering use will now be the primary, and not the accessory or incidental, use. Simply put, what is proposed is a commercial catering establishment in a building owned by a church. The relationship is merely that of landlord and tenant. No interrelationship or integration exists between the church use and the catering use, as is required for an accessory use.

161832.2

05/03/2007  14:54    2125665575                    BORO COMM OFFICE                    PAGE  03/13

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 2 of 12

*The Leasing Arrangement Cedes Control of the Property and the Catering Operation*

At our meeting you raised an issue concerning the difference between a lease and a typical catering arrangement. A lease confers a possessory right. It transfers absolute possession and control of the premises to the tenant. In law, this is often referred to as a right of "exclusive possession" which, in lay terms, is the right to "exclude" others from using the property.

In the usual catering arrangement, the relationship revolves around the service to be provided and the quality of that service. Here the relationship revolves around a piece of real estate and a convenient "cover" for the tenant's use as a commercial catering establishment.

That this is a lease effectively for thirty years (twenty years plus two five year renewal terms) is critical to this issue. Unlike the typical arrangement with a caterer, either as a "house" or exclusive caterer, a long term lease – and in particular this long term lease – involves ceding control over both the building and the tenant's operation.

Granting a possessory interest for a period of thirty years is functionally equivalent to a sale of the building. New York's Religious Corporations Law §12 requires a religious institution that is selling, mortgaging or leasing for a period in excess of *five* years to obtain prior court approval.[1] This is a recognition by the New York State legislature that a lease is in many ways equivalent to a sale. As discussed below, this is particularly true here.

In contrast to the lease arrangement here, the typical religious institution that permits catering has a house or exclusive caterer; that caterer has no possessory rights, but is merely permitted entry on the property for the purpose of providing a service. The arrangement with a house caterer is usually terminable at will or lasts only for a limited period of time. In the event of a dispute, the religious institution can refuse to renew the caterer's contract or bar the caterer from entering the premises.

In the case of a lease, however, because of the possessory interest in real estate, self-help is generally not permitted and the institution's only recourse would be to institute dispossess proceedings. Such proceedings, although dubbed "summary," i.e., expedited, proceedings, often take several years to resolve. In the interim, the caterer would continue to have access to and a right to occupy and use the premises.

An example of what could happen is discussed in a decision involving the Lombardy Hotel, <u>109 East 56th Street v. 111 East 56th Street</u>, Supreme Court, New York

---

[1] The Church sought and obtained such approval in an uncontested submission to the Supreme Court, New York County. The standard for approval of such application is essentially whether fair consideration is involved for the transfer so as to protect the congregants.

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 3 of 12

County, a copy of which decision is annexed as Exhibit B.  The legal proceedings were instituted by service of a notice to cure in June, 2002.  Because of motion practice and the tenant's filing  two bankruptcy cases, the matter was not finally determined until January, 2006, some three and one half years later.[2]  And even then, the tenant was given a further period to cure, and absent such cure, only then could the actual dispossess proceeding be instituted.  While the action was pending, the tenant continued in occupancy and continued to operate in a manner ultimately determined to violate the lease.  In other words, the ability to control the tenant's conduct was seriously limited.

In the context of a claimed accessory use, such a result is untenable.  Yet the possibility of such result demonstrates the significance of a lease creating a possessory interest, let alone one for thirty years.

The lease between the Church and the Rose Group underscores, among other things, the loss of control.  For your information, we have only recently obtained a copy of the lease.  In our settlement discussions with the Church and the Rose Group, we had requested a copy of the lease.  While the Church and the Rose Group were reluctant to provide same, they did agree that excerpts from  the lease would be made available to us, provided it appeared we were moving close to a settlement.  Since our talks broke down, they did not provide us with any of the promised excerpts.  We have, however, located a copy of the lease as public record (filed with the application pursuant to the Religious Corporations Law).

This lease highlights the difference between this arrangement and the typical arrangement with a caterer in a religious institution.  Notwithstanding the references to accessory use, the lease makes the Rose Group's use primary.  The lease demonstrates the lack of any integration between the Church's operations and the Rose Group.

The lease is what is typically referred to as a "triple" net lease, where the landlord hands the key to the tenant and charges the tenant with the responsibility for maintaining the property in its entirety.  Although in this lease  the Church has retained a right to use a portion of the premises, that right is limited.  As more fully discussed below, the Church has virtually no obligations to provide services or to maintain or repair the premises.  It cannot hire building staff without the Rose Group's consent.  Its ability to sell the building is limited by the Rose Group and the Church may be required to pay the entire net proceeds of a sale to the Rose Group.  And, conspicuously absent from the lease are any references to catering or religious services to be provided to the Church.  Reading the lease, one gets the distinct impression that, but for the economic terms (which we submit are irrelevant to the determination of accessory use), the Rose Group is in significant respects the owner and the Church the tenant.

---

[2] Had the tenant chosen to appeal, the matter could have gone on much longer.

181832.2

Christopher Santulli, PE
March 30, 2007
Page 4 of 12

Some of the more relevant portions of the lease are as follows:

1) The Premises

. By its definition of the premises, the lease gives the Rose Group a possessory right not only in the <u>entire</u> building, but also in the land (Paragraph 1.1, p.2). The control of the interior and the exterior of the property is underscored by such provisions as that contained in Paragraph 9.1, p. 33 in which the Church is given the right to maintain a literature distribution box on the 63rd Street side of the Building" at a location "to be <u>mutually</u> agreed upon by the parties,...." [emphasis added]  In other words, the Church cannot even unilaterally determine where to place a box on its exterior at a side entrance to its own building. This is one indicia of the Church's having ceded control over its own premises.

While, notwithstanding the grant to the Tenant of the right to occupy the entire building, limited portions are reserved for the Church, those are, at least in part, to be physically separated from the Tenant's space. Thus, on the 4th floor, where, based on the plans submitted to DOB, it appears the Church will maintain what little space it is reserving for itself, the Tenant is required to "install a door separating such 4th floor TENANT space from the Church space...and the 4th floor Church space shall be designated by a sign specifying "Private Offices."  Paragraph 9.1, p. 32. This partitioning, among other things, demonstrates the lack of integration between the Church and the catering operation.

2) The Right of First Refusal and Restrictions Upon Sale

Article 36, p. 71 contains provisions that, perhaps more than any other, highlight that this is anything but a use accessory to the Church. This article grants the Rose Group a right of first refusal in the event of a proposed sale of the building. This confirms that this lease is exclusively a real estate agreement.

Article 36 also restricts a sale of the premises by the Church in the first five years of the lease if the sale is to a "Non-Qualified User," i.e., an entity not a religious institution. Rather than the Church controlling its own property and its operations, the Rose Group, through the lease, is in control. After five years, the Church may sell to a Non-Qualified User, but if such sale occurs, and if the Tenant does not chose to exercise its right of first refusal, then, unless the Rose Group has obtained a special use permit to allow the use of the building as a catering facility (Paragraph 36.2, p. 74 allows either the Church or the Rose Group to apply for a special use permit after the first five years of the term of the lease), the Tenant is to be paid the lesser of the net proceeds received from the sale or the value of both a) its business as a going concern and b) the costs of repairs and improvements to the building. In other words, <u>unless the Rose Group can obtain a special use permit for a commercial catering establishment, it is entitled to the entire net proceeds</u>

181832.2

Exhibit A

Christopher Santulli, PE
March 30, 2007
Page 5 of 12

of any sale or the value of its business and improvements to the premises. If it is entitled to the proceeds of any sale, its interest is, in fact, a de facto ownership interest.

    3) The Responsibility for Repairs and Maintenance

    As is typical in a net lease situation, the Tenant is responsible for all repairs. See, e.g., Paragraphs 5.5 and 5.6 at p. 24, Paragraph 5.8 at p. 25.. Tenant is also required to maintain the sidewalks and shovel ice and snow (Article 33, p. 65), an obligation consistent with its being the primary user of the premises.

    In addition, under Article 37, p. 75, the cost of structural repairs shall be borne by landlord and tenant according to a formula set forth in Paragraph 37.1.B. That formula is based on the useful life of the repairs and the term remaining on the lease. Given the length of the lease, it effectively means that most if not all expenses for structural repairs, at least at the outset, will be the Rose Group's responsibility.

    Paragraph 5.9 at p. 25 makes clear that the Church has no obligation to furnish any services for the Premises, including heat, water, light and electric power. Pursuant to Paragraph 4.1, p. 20, the Rose Group is to contract directly for "all...utilities used and consumed in the Premises." See also Paragraph 5.11 at p. 26.

    Under Paragraph 3.4, p. 6, Tenant is also responsible for all real estate taxes and has the authority to contest assessed valuation (the lease anticipates that the tenant's use will eliminate the exemption from real estate taxes).

    These provisions again make clear that the primary use is that of the Rose Group, and because of that primary use, it has assumed these responsibilities with respect to the realty.

    Even clearer evidence of the Rose Group's responsibility and control is found in Paragraph 5.13, p. 26. This provision contains a limitation upon hiring custodians without the Rose Group's prior consent. It states as follows:

    [t]he hiring and retention by Landlord of any and all employees in the capacities of custodian and/or Building maintenance, including the terms and conditions employment, shall be subject to the prior written approval and consent of Tenant (each, an "Employee"), which may be given or withheld at Tenant's sole discretion. Tenant shall reimburse Landlord within thirty (30) days of written demand therefor, in an amount equal to any such Employee's compensation, including FICA and similar costs, provided Tenant shall have theretofore approved such amounts in writing....[t]he custodians ...shall be subject to the direction and supervision of TENANT, except when the Building is being used

181832.2

Exhibit A

05/03/2007  14:54    2125665575                    BORO COMM OFFICE                    PAGE  07/13

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 6 of 12

exclusively for Church Activities, during which period the custodians with respect to Church activities only shall be subject to the direction of the Church. [emphasis added].

The unequivocal import of this provision is that the Rose Group is operating the real estate and effectively has total control. The Church cannot even hire employees without the Rose Group's consent.

The Rose Group is also given permission to remove the pews, Paragraph 5.3A, p. 20 and Exhibit C to the lease, but, contrary to the public statements of the Church that such pews are not needed or even wanted, the Rose Group is required to restore the pews or provide new ones at the conclusion of the lease, thereby demonstrating their importance if the building is to be used primarily as a church.

Paragraph 6.4, p. 28, acknowledges the possibility of alterations "not customarily found in a church type facility" and provides that the Church may require the removal of such items at the end of the lease term, which means that elements not customarily found in a religious facility may be there for up to thirty years.

4) Church Activities

While the lease attempts to delineate the Church's activities, it makes clear how limited those activities are. Thus, Article 35, p. 66, sets forth the use of the premises by the Church. Article 9, p. 32 sets forth the limited areas of the building which the Church may use for its activities.[3] The permitted use includes the use for the conduct of church services (which occur Wednesday evenings and Sunday mornings).

As to the areas that the Church may use, notably, only with respect to services (Paragraphs 35.1A, B, and C, p. 67) and church corporate or organization meetings (Paragraph 35.1F, p. 68) does the lease specifically state that such use will require the use of the "entrance to the Premises." Presumably then, all other uses (except for Association meetings, held four days each year, for which the Church reserves the entire building) will require the Church to use the small side entrance toward the rear of the building on 63rd Street. The Church's use is so limited that it has only limited use of its own front doors.

In enumerating its uses, the Church reserves dates for Association meetings, and provides that "LANDLORD agrees to give TENANT not less than (1) year's prior written notice of any such change in the date of an Association Meeting and will use reasonable efforts to accommodate TENANT's use of the Premises on those days." (Paragraph 35.D. p. 67). [emphasis added]. Similarly, the Church classes that are held over the summer for

---

[3] While this Article refers to use of Sunday School in the basement, it appears, based on plans submitted to the DOB, that the Sunday School will be sited in the back portion of the 4th floor to be used by the Church.

181832.2

Christopher Santulli, PE
March 30, 2007
Page 7 of 12

two, two-week sessions require notification "at least one(1) year in advance of the actual date" even though such classes require only that the Rose Group temporarily relocate its office on the 4th floor.    (Paragraph 35.1E, p. 67). [emphasis added]. Again, the unmistakable conclusion is that the Tenant's use is the primary use, and the Church's use is incidental.

While Paragraph 35.1 contains an enumeration of Church uses with great specificity as to dates, Paragraph 35.1G, p. 68 allows for

occasional non-regularly scheduled events...[to be] scheduled from time to time at times mutually agreed upon by LANDLORD and TENANT. Since it is difficult or impossible to predict when such a meeting may be required, LANDLORD and TENANT agree to consult with each other in order to schedule such meetings (i) in a manner which causes no disruption to TENANT's scheduled events in the Premises and (ii)at such times as do not conflict with TENANT's reasonably anticipated use of the Premises.

While such terms would seem commercially reasonable from a commercial caterer's perspective, they lead to the inescapable conclusion that it is the Tenant's use that is driving the scheduling. Again, it is the Tenant's use that is primary.

Although, as noted, this Article reserves certain areas of the building for the Church's use, the Church's use of those areas is not necessarily exclusive. Thus, Article 29, p. 62 provides that the Tenant shall be permitted use of the Board Room, previously reserved by the Church, on a "when Available" basis.

5)  Tenant's Activities

While the Church's reservation of a right to use portions of the premises is delineated in detail, the Rose Group's right to use the premises is clearly much broader. Paragraph 22.1, p. 56 provides that "TENANT shall use and occupy the Premises solely as a high end, first class catering facility and for banquets, special events and meetings,...." Paragraph 16.1, p. 49 provides that the Tenant is granted the right of quiet enjoyment subject, only to the "LANDLORD'S right to occupy and utilize those portions of the Premises for Church purposes as set forth herein." Thus, the Tenant has the right to the whole, subject only to the express reservations by the Church.

Tenant has a right to sublet in whole or in part, subject, however, to the consent of the Church. Paragraph 22.2, p. 56. Again, this right underscores the possessory nature of

181832.2

Exhibit A

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 8 of 12

the interest and its prime focus on real estate, not the performing of a function related, even loosely, to the Church.[4]

In addition, Tenant is given control over the facade.  As you may know, an application is currently pending before the Landmarks Preservation Commission concerning covering up the Church's name on the facade.  Paragraph. 27.1 , p. 61 of the lease provides that "TENANT shall also remove or cover, at TENANT's option, the existing signs on the building facade and replace or cover them with blank ("faux") windows." Tenant is also obligated to install signs which "will indicate the existence of LANDLORD'S Sunday School and Church at all times except when TENANT is using the Premises for a third-party function or marketing the Premises."  The attempt to separate and distinguish the uses further demonstrates the lack of integration.

While admittedly some of the provisions of the lease are consistent with a more traditional arrangement, (for example the Tenant must respect the Church's privacy and not enter any portion of the premises during hours of Church activity, Paragraph 35.5, p. 70, what is clear from the totality of this lease is that the occupancy by the Rose Group is primary, with the Church retaining limited secondary use.

***

We annex, as Exhibit C, a copy of a resolution adopted by the Church concerning the approval of the lease.  The resolution states that the Church has 64 members; at the meeting, however, only 32 attended, and only a bare majority of those approved the lease.  The limited number of members, and the extensive activities proposed by the Church, underscore the primary use of the building will be as an event space and commercial catering establishment.

*Under the Facts Here the Department of Buildings May Revoke the Change of Use Permit Prior to Commencement of Use*

At our meeting, you raised the issue of enforcement and whether the DOB is authorized to revoke a permit prior to commencement of the use in question.  We believe the answer is yes.

Our conclusions as to the use are not speculative.  Rather, they are based on documentary evidence – documents generated by the Church and the Rose Group themselves.  These documents, the lease and the Confidential Private Placement

---

[4] This provision also has implications for your notation on the June 2, 2006 letter from the Church.  The subtenant, who may be holding catered events, clearly would have no direct relationship with the Church, thereby violating the requirement that the events be "under contract with the Church."  Such would violate the conditions under which DOB issued its permit.  That the parties entered into a lease with such a provision, and allowing such a possibility, without disclosing it to DOB, raises a serious issue.

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 9 of 12

Memorandum (the "Memorandum"), referred to in our March 12, 2007 letter, undermine the application made to DOB to obtain the permit for a change of use. Moreover, they contain clear statements as to what the use will be and, in particular, that the Rose Group's use will be primary.

As noted above, the lease demonstrates that the Rose Group's use is primary and unrelated to the Church. The Memorandum confirms that. It states that the Rose Group "has entered into a Lease for the Facility Space [583 Park Avenue], which permits the current congregation [described as forty members] to use the Facility Space on a limited basis at times when the Company is not using the Facility Space." [Emphasis added] How clearer could it be that the catering use will be primary and the Church use will be secondary.[5] The quoted language is in significant ways diametrically opposed to the submissions to the DOB upon which a change of use permit was granted. The submissions and the Memorandum cannot both be correct.

The "frequency" and "intensity" of the purported accessory use were referred to as highly relevant in the Board of Standards and Appeals decisions involving Yeshiva Imrei Chaim Viznitz (the "Yeshiva case"), which we discussed in our March 12, 2007 letter. As to those factors, too, the documentary evidence is clear. The Memorandum makes clear that the intent is to hold large events (the over 500 person capacity of 583 Park Avenue is cited as one of its distinguishing features). As set forth in the March 13, 2007 letter by the elected officials to Commissioner Lancaster, a copy of which is annexed as Exhibit D, the Church and the Rose Group have represented they would hold up to 208 events per year. While they have apparently in later discussions offered to reduce that number of events to 169, they have also stated that events under 100 should be unlimited in number.[6]

The submissions to the DOB do not establish the necessary interrelationship between the Church and the Rose Group or the integration of their activities. The lease between the Church and the Rose Group makes clear that no other connection exists aside from their interests in the same piece of real estate. The uses are mutually exclusive uses and unconnected. The Memorandum makes clear the Rose Group's use will be the primary use.

Accordingly, examining the application and the additional documentary evidence, it is clear that the Church has failed to make the requisite showing to entitle it to the change of use permit.

---

[5] This document was filed with a certification as to its accuracy. As an offering of securities, under the securities laws it subjects an issuer to claims if any statements are untrue.

[6] Given the size of the congregation, somewhere between 40, as set forth in the Memorandum and 64, as set forth in Exhibit C, serious question exists whether a lesser number could even meet the requirement of the Yeshiva case that the frequency and intensity bear some reasonable relationship to the size of the congregation.

181832.2

Christopher Santulli, PE
March 30, 2007
Page 10 of 12

Given the foregoing, under the authority of 9th & 10th Street LLC v. Board of Standards and Appeals of the City of New York, 12 Misc.3d 1183(A), decided in July, 2006, it is clear that the Department would be acting properly in revoking the permit at this time. We annex for your convenience a copy of that decision as Exhibit E. In the 9th & 10th Street case, a permit was denied for a dormitory use prior to the time the use commenced because the applicant failed to meet the criteria for a college or school dormitory (this was prior to the enactment of Rule 51-01). Both the court and the Board of Standards and Appeals upheld DOB's determination.

As in that case, the issue presented here is not whether the building might be used in a non-conforming manner, but whether the applicant made the requisite showing for the claimed future use. While the Church's application on its face would arguably appear to make the requisite showing,[7] the documentary evidence contradicts that. Had the lease and the Memorandum, or the provisions thereof, been disclosed on the application, we believe DOB would have denied the application. After review of the documentary evidence, the application fails to meet the threshold to establish the Church's right to a permit based on accessory use.

Earlier cases that stated that the DOB should not speculate about future use, are inapposite here. Here there is no speculation. In the Memorandum, a private offering filed under certification of truth with the New York State Attorney General's office, the true use of the premises was disclosed. To argue otherwise would expose the Rose Group to securities fraud claims. The lease also makes clear how the premises will be used. At issue is not _possible_ future use, but _actual_ intended use.

While revoking a permit in advance of commencement of use may be unusual, it is not impermissible. As the court noted in the 9th & 10th Street case, in response to the claim that what DOB had done was unprecedented, an "agency may engage in 'ad hoc decision making based on individual facts and circumstances.'....Ad hoc decision making may lead to 'unprecedented' decisions if the facts and circumstances are unique.'" Here the facts and circumstances are unique. The future use is admitted. Speculation is unnecessary.

As the court also noted in that case, "[e]ven proposed 'as-of-right' projects, when exposed to public scrutiny, may turn out to be not legitimately 'as-of-right.'" That scrutiny here has yielded documentary evidence. That evidence establishes this is not an accessory use and is, therefore, not "as-of-right." Therefore, even in advance of the commencement of the use, the permit can and should be revoked.

---

[7] As noted above, however, we do not believe it made the requisite showing of integration or interrelationship between the Church's use and the Rose Group's use. We are, therefore, not conceding the sufficiency of the application on its face.

181832.2

Exhibit A

Christopher Santulli, PE
March 30, 2007
Page 11 of 12

Furthermore, we note that the condition you wrote on the June 2, 2006 letter required "events under contract with the Church." Taken literally, anyone having an event at the Church would have to contract directly with the Church and the Church would have a house caterer under its control. The parties have acknowledged that will not be the case. As discussed above, the Church does not have the Rose Group effectively under its control. By entering into the arrangement with the Rose Group in the manner it has, the Church has acknowledged that the use will not comply with the condition set by you as a basis for granting the permit. On this ground, too, the permit may be revoked.

*The Church's Status As a Religious Institution Is Not Relevant to the Determination*

You had raised some concerns about limitations regarding operations of religious institutions. We believe you were referring to the recent decision involving St. Brigid's (Committee to Save St. Brigid v. Edward Cardinal Egan, Sup. Ct. N.Y. Co. (NYLJ 2/16/06). We annex a copy of that decision as Exhibit F. In that case, both the decision of the Archdiocese to close a parish and the decision to demolish the church were challenged. The Court refused to intervene, noting that it would not interfere with ecclesiastical decisions. In the St. Brigid case, the court noted that judicial involvement in disputes involving church property would be appropriate in cases which "can be decided solely upon the application of neutral principles of contract law...and where the underlying controversy does not involve determining religious doctrines or ecclesiastical issues.'" The court refused to interfere with the archdiocese's decision to demolish one of its churches on the grounds that "it would be an 'impermissible intrusion' into Cardinal Egan's ecclesiastical authority to mandate" that he reopen the derelict facility and/or operate a parish there.

The situation at 583 Park Avenue is clearly distinguishable from that of St. Brigid where the church's authority to select a place of worship was called into question. The decision to permit the operation of a commercial catering facility does not involve the determination of religious doctrine nor does it present an ecclesiastical issue. Were DOB to revoke the permit, its decision would neither prevent nor compel the members of the Church from using the church facility to exercise their religion. Indeed, the Church has presumably carried out its religious mandate for decades without benefit of a formal catering "arrangement."

Most importantly, St. Brigid did not involve an attempt to circumvent the Zoning Resolution to establish an otherwise illegal use in a residential district. To argue that St. Brigid prohibits DOB from enforcing the law would mean that any religious institution could with impunity violate laws as it chooses. Obviously, that is not the state of the law. Therefore, we believe that such decision in no way limits the DOB's ability to act in this matter.

*******

181832.2

Exhibit A

Christopher Santulli, PE
March 30, 2007
Page 12 of 12

   For all the foregoing reasons, we respectfully request that any permits and approvals issued to date be immediately revoked.

   Thank you for your consideration.

          Respectfully,

          KURZMAN KARELSEN & FRANK, LLP

          Phyllis H. Weisberg

PHW:alj
Encls.

cc: Mona Seghal, Esq. (by-hand delivery w/encls.)
  Benjamin Colombo, Manhattan IGA Liaison, Executive Assistant to Borough
   Commissioner (via overnight mail w/encls.)
  David G. Liston, Chair, Community Board 8 (via overnight mail w/encls.)
  Hon. Liz Krueger (via overnight mail w/encls.)
  Hon. Jonathan Bing (via overnight mail w/encls.)
  Hon. Scott Stringer (via overnight mail w/encls.)
  Hon. Dan Garodnick (via overnight mail w/encls.)
  Board of Directors, 580 Park Avenue, Incorporated (via electronic mail)
  Board of Directors, 570 Park Avenue Apartments, Inc. (via electronic mail)

181832.2

Exhibit A