UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THIRD CHURCH OF CHRIST, SCIENTIST, :
OF NEW YORK CITY,

                                :

               Plaintiff,

                                :

    - against -

                                :       **File No. 07 Civ. 10962 (DAB)**

THE CITY OF NEW YORK and PATRICIA
J. LANCASTER, in her official capacity as, :
Commissioner of the New York City
Department of Building,            :

                Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## AFFIDAVIT AND EXHIBITS IN OPPOSITION TO MOTION TO COMPEL RIVERSIDE CHURCH TO COMPLY WITH SUBPOENA

DAVIS WRIGHT TREMAINE LLP
DATE: _____ 4/23/08_____
☐ MAIL   ☒ BY HAND
☐ FAX   ☐ FEDERAL EXPRESS

*A Hornyp for Plaintiff*
*Eddie Nunn 12:42pm*

Cullen & Dykman LLP
4/28/08
By Hand
*DA Bryant*

PATTON, EAKINS, LIPSETT, HOLBROOK & SAVAGE
Attorneys for Riverside Church
420 Lexington Avenue, Suite 2805
New York, New York 10170
Tel.: (212) 867-8280

*#612826*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THIRD CHURCH OF CHRIST, SCIENTIST, :
OF NEW YORK CITY,

                           :     **AFFIDAVIT IN OPPOSITION TO**
                  Plaintiff,           **MOTION TO COMPEL**

                            :

      - against -                         

                            :     **File No. 07 Civ. 10962 (DAB)**
THE CITY OF NEW YORK and PATRICIA
J. LANCASTER, in her official capacity as,   :
Commissioner of the New York City
Department of Building,                :

                 Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

STATE OF NEW YORK      )
                        : s.s.:
COUNTY OF NEW YORK   )

       DELBERT GLOVER, being duly sworn, deposes and says that:

          1.  I am the Chief Administrative Officer of Riverside Church and make this

affidavit in opposition to the motion of plaintiff Third Church of Christ, Scientist, to compel

Riverside Church to comply with the subpoena herein served upon it on March 6, 2008.  A copy

of the subpoena is attached as Exhibit A.  Riverside Church has submitted Objections to the

subpoena.   A copy of those Objections, dated March 20, 2008, is attached as Exhibit B.

          2.  The complaint in this case claims that the New York City Department of

Buildings unlawfully has discriminated against plaintiff Third Church by directing the Third

Page 1

Church to prohibit events catered by the Rose Group at Third Church after April 28, 2008.  The

alleged discrimination appears to be that no such prohibition has been imposed on other

organizations, such as Riverside Church, which permit catered events.

3.  By seeking information on catering arrangements at Riverside Church, Third

Church evidently hopes to show that Riverside Church is permitted to carry on catering

arrangements which are comparable to Third Church's proposed use of a caterer.  However, as

shown below,  the use of caterers by Third Church and Riverside Church is  not remotely

comparable, and the materials sought from Riverside Church in the subpoena have no bearing on

the claims asserted by Third Church in the complaint.


The claims in the complaint.

4.  As shown in the complaint, Third Church effectively has given substantial

control of its property to the Rose Group to host catered events on the understanding that the

Rose Group will pay Third Church $8 million dollars for capital repairs, undertake general

maintenance of its building for 20 years, pay annual rent and pay a percentage of gross revenue

above a threshold to Third Church.  Obviously, such large expenditures and commitments were

not made by the Rose Group without an assured ability to have extensive control over the

plaintiff's property for profit-making purposes during such 20 year period.  The complaint does

not reveal the proportion of its revenues to be derived from the Rose Group but, again, given the

payments made and to be made by the Rose Group, the proportion must be considerable.

Page 2

Catering arrangements at Riverside Church.

      5.   As noted in the Riverside Church Objections, the allegations in the complaint arise from plaintiff's lease of all or practically all of its space to a caterer for the conduct of the caterer's commercial business.  However,  only one item in the subpoena - item 9 - deals directly with the subject of catering at Riverside Church.  The caterer utilized by the Riverside Church is Sopin Corporation d/b/a "Madeline's, "  which operates under a Food Service Agreement with Riverside Church dated January 25, 2007.  A copy of that Food Service Agreement is attached as Exhibit C.

      6.  Riverside Church has a congregation membership of about 2,500 and a staff of 175 employees, including eight ordained ministers.  Riverside Church must have food service facilities for its employees, staff, worshipers, and visitors.  Rather than hire a cooking and food preparation staff of its own, Riverside contracts with its caterer to provide that food service.  As shown below,  and in sharp contrast to the Third Church situation, Riverside Church's caterer is not intended as an income source to Riverside but is a necessary expense for church operations.

      7.  Paragraph 4 of the Riverside Church Objections to the subpoena, in opposing the request for documents relating to any person performing catering services for Riverside Church, sets forth the radical differences between Riverside Church's food service agreement with its caterer "Madeline's" and plaintiff's contract with the Rose Group, as follows:

      "(a)  The Riverside catering contract is for two years, expiring on December 31, 2008, and may be terminated by either party upon three months notice.

      (b)  The contract requires no payments on Madeline's part for capital repairs or improvements to the premises.

(c)    The contract principally requires Madeline's to provide food service at the cafeteria of Riverside Church at agreed prices for Riverside Church's worshipers, visitors and employees.

(d)    Riverside Church for its own events retains the right to select and utilize a caterer other than Madeline's.

(e)    The contract does not lease any space to Madeline's, although Madeline's is given use of Riverside's kitchen equipment and is provided space for an administrative/operations office.  The caterer pays a monthly sum to Riverside Church to defray the cost of space, cleaning service and other operational expenses of Riverside Church and pays for its use of utilities.

(f)    The caterer has no right to conduct its own events at Riverside Church."

In sum, Riverside Church's arrangement with its caterer is for food service only, and the caterer's license to use the Riverside kitchen facilities is solely to enable the caterer to provide food service at Riverside Church.  Riverside Church does not forfeit any control of space or who uses Riverside Church's facilities.

8.   In order to avoid the costs of this litigation concerning the subpoena, Riverside Church offered plaintiff's attorneys the opportunity to review the Food Service Agreement with Madeline's on a confidential basis to confirm the above information, but the offer was refused.  See the Third Church Declaration, Exhibits L through O.

9.   Riverside Church receives a monthly payment from the caterer for the use of Riverside Church's kitchen facilities, but Riverside Church pays the caterer far more than that amount for food service provided by the caterer, as shown by catering-related receipts and costs for 2007, as follows:

(a)    Riverside Church has numerous congregation and program functions for which food service must be provided, and Riverside Church uses Madeline's catering

Page 4

services at many of these functions.  Riverside Church paid Madeline's $128,229.91 for food service at these functions during 2007.

(b)   Under the Food Service Agreement, in 2007 Madeline's paid Riverside Church for kitchen facility space, etc., the sum of $74,280, subject to certain offsets, for a net payment of $50,370.  This amount represents approximately *one third of one percent* of the receipts of Riverside Church from all sources during 2007.

10.   Other aspects of Madeline's activities confirm its role as ancillary and essential to the functioning of Riverside Church as a major religious institution:

(a)   Madeline's operates the cafeteria service for Riverside Church's worshipers, visitors and employees, five days a week from 8:30 A.M. to 2:00 P.M. at regulated prices.  Madeline's retains all revenues from this service.

(b)   Madeline's is the exclusive food caterer for tenants or other parties holding events at Riverside Church who wish to use a caterer (unless Madeline's declines to act as a caterer for an event in which case another caterer may be used).  Madeline's or any such other caterer retains all the revenues from such service.

11.   Apart from church functions referred to above, Riverside Church does not maintain any records as to whether other events at the Church are catered or the amounts paid for catering since  the Church neither receives nor pays any part of the catering revenues produced by such other events.

12.   In order apparently to shift the focus on the issues in the action from the revenue-sharing catering arrangements between Third Church and the Rose Group and the resulting substantial control given to the Rose Group over its property, Third Church seeks to

expand the inquiry under the subpoena into any revenues obtained by Riverside Church over eight years from parties who held social events at the church.

13.   Riverside Church considers it well within its mission and as part of its continuing effort to reach out to its membership and into the community to permit use of space in Riverside Church at uniform rates for events, whether social or otherwise, involving any of its over 2,500 members or other parties.  That use of church space is under the control of Riverside Church and not of any caterer or other party. (As noted above, Madeline's is not permitted to conduct its own events at the Riverside Church.)   The revenues received for the use of the event space are paid entirely to Riverside Church and used to further its numerous religious, charitable and educational endeavors.  This contrasts sharply with the arrangements for use of Third Church space under which such use is evidently substantially under the control of the Rose Group and the resulting revenues are shared by Third Church and the Rose Group.  On this basis Riverside Church considers the far reaching requests of the subpoena relating to social events held at Riverside Church to be well beyond the bounds of the facts and claims in the complaint and that it constitutes an undue burden upon Riverside Church to comply with that request.


Objections to specific subpoena items..

14.   In its Objections,  Riverside Church has objected to the extensive requests in items 1, 2, 5, 6, 7, 8, 13 and 14 of the subpoena demanding documents relating in considerable detail to social events at Riverside Church.  See specific objections contained in Objections, p. 2 (Exhibit B hereto).

15.   Regarding requests in the subpoena contained in items 4, 7, 8, 10, 11 and 12

Page 6

for documents relating to communications with or permission from the City of New York concerning use of the premises or concerning tradenames to indicate the availability of catering or social events or concerning this action, Riverside Church states that it has not located any such documents and is unaware of any such communications.   In making that statement, Riverside Church does not concede that the requests in items 4, 7, 8 and 10 are proper and does not withdraw its objections to any of those items.

16.   In objecting to the requests in the subpoena, Riverside Church does not intend to convey any opinion regarding the merits of plaintiff's complaint but only to convey its position that the items requested in the subpoena are not within the scope of such complaint and would not contribute to establishing any of the facts or claims actually set forth in the complaint.

WHEREFORE, I request that plaintiff's motion to compel be denied in all respects.

_____
DELBERT GLOVER

Sworn to before me this

24  day of April, 2008.

_____
NOTARY PUBLIC

**JOHN ROMANO**
**NOTARY PUBLIC STATE OF NEW YORK**
**NO. 01RO6025808**
**QUALIFIED IN SUFFOLK COUNTY**
**COMMISSION EXPIRES JULY 02, 2011**

# EXHIBIT A

AO88  (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

SOUTHERN

DISTRICT OF _____ NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,         Plaintiff,
        v.

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings,
                  Defendants.

## SUBPOENA IN A CIVIL CASE

Case Number:[1]  07 Civ. 10962 (DAB)

TO:
    Riverside Church
    490 Riverside Drive
    New York, N.Y. 10027-5706

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below
   to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
   in the above case.

| PLACE OF DEPOSITION     Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019  Telephone:  (212) 489-8230 | DATE AND TIME  3/26/2008 10:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
   place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE     Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019  Telephone:  (212) 489-8230 | DATE AND TIME  3/26/2008 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)  Attorney for Plaintiff | DATE  3/6/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Victor A. Kovner, Esq.
DAVIS WRIGHT TREMAINE LLP, 1633 Broadway, New York, NY 10019 - (212) 489-8230

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

Exhibit A

## Definitions and Instructions

1. "You" or "your" means the Riverside Church, located at 490 Riverside Drive, New York, New York and your directors, officers, employees, agents and attorneys, each person acting on your behalf or under your control, and any parent, subsidiary, predecessor or affiliated entity, corporation, institution, or non-profit organization.

2. "Documents" has the meaning provided for in the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Southern District of New York and, without limiting the generality of the foregoing, includes all materials (drafts, originals, and non-identical copies, whether written or electronically stored, sent, or received) such as, *inter alia*, memoranda (interoffice and otherwise), notes, letters, email messages, calendars, appointment books, newsletters, notices, minutes or transcripts of meetings, brochures, advertising copy, website pages, photographs, video recordings, annual reports, tax returns, invoices, checks, credit card receipts or records, spreadsheets, contracts, reservation lists, contact lists, vendor lists, permits, licenses, or other records.

3. "Communications" means the transmission or exchange of information, oral or written, formal or informal, and shall include without limitation, any documents embodying, containing, constituting, discussing, memorializing, referring to or relating to any such contact.

4. The "Action" means the lawsuit *Third Church of Christ, Scientist, of New York City v. The City of New York, et al.,* 07 Civ. 10962 (DAB), pending in the Southern District of New York.

5. The "Complaint" means the complaint filed in the Action, attached hereto as Exhibit B.

6. The "Church" means the Third Church of Christ, Scientist, of New York City, the Plaintiff in the Action.

7.     The "Building" means the Church edifice located at 583 Park Avenue, New York, New York.

8.     "Elected Officials" means any person serving in the United States Congress, the New York City Council, or the New York State Legislature and any member of his or her staff, including without limitation the Hon. Carolyn Maloney, Hon. Daniel Garodnick, Hon. Jonathan Bing, or the Hon. Liz Krueger.

9.     The "City" means the City of New York, and all of its officials and agencies, including without limitation the Department of Buildings, the Law Department, the Department of City Planning, the Board of Standards and Appeals, the Mayor and/or any Deputy Mayor and/or any member of their respective staffs.

10.     "Premises" means the building located at 490 Riverside Drive, New York, New York.

11.     "Social Events" means any catered or other social event conducted at the Premises, whether for your congregants, or for the general public.

12.     You are required to search for the documents responsive to the requests, wherever located, which are: (a) in your actual or constructive possession, custody, care and/or control; (b) in the actual or constructive possession, custody, care and/or control of your agent, representative or employee; or (c) in the actual or constructive possession, custody, care and/or control of any person who, or entity which, is or has been acting on your behalf or under your direct or indirect control.

13.     In the event that any document responsive to any document request is withheld from production upon a claim of attorney-client, work product or other privilege or immunity, you are required to furnish a list, verified by counsel, of the documents withheld from such

production, setting forth for each document: (a) the nature of the privilege or immunity claim; (b) the date of the document; (c) the title and general subject matter of the document; (d) the identity of each person who made, prepared or signed the document; (e) the identity of each person to whom the document was addressed and each person to whom a copy was indicated to have been sent or was sent; and (f) the present location of the document.

14.    Each document request is continuing in nature, requiring the production of additional documents, should you become aware of or acquire them, in your possession, custody or control after initially responding to these requests.

15.    The past tense shall be construed to include the present tense and vice versa, to make the request inclusive rather than exclusive. The singular shall be construed to include the plural and vice versa to make the request inclusive rather than exclusive. "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

16.    Unless otherwise stated, the relevant period for these requests shall be from January 1, 2000 to the present.

## Document Requests

All Documents concerning or in any way related to:

1.    Any Social Event conducted on or in the Premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

2.    The total number of hours each year that the Premises are used for Social Events, including the number of hours it takes to set up for and clean up after each Social Event.

3.    The Certificate of Occupancy for the Premises (the "CO"), including any amendments thereto.

4.      Any communication with the City regarding the use of the Premises, including communications regarding the CO, and/or whether any past, current, or planned use of the Premises is or was an "accessory use" under the City's Zoning Resolution or other applicable land use regulations.

5.      Any portion of the annual report of the Riverside Church, or any submission to any taxing or other authority, regarding revenues generated by Social Events.

6.      Any analysis, investigation, or communication regarding the taxation of revenues generated by Social Events.

7.      Any application for any permit, license or other permission from the City to conduct Social Events, and the issuance or renewal of any such permit, license or other permission, whether formal or informal.

8.      Any communication with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct Social Events at the Premises.

9.      Any independent person or entity (including but not limited to the caterer Madeline's Catering and Special Events) that performs catering-related services (an "Outside Caterer") with which you have a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the Outside Caterer's use of, or performance of services on or in, the Premises; (c) any repairs or improvements to the Premises made by, and/or for the benefit or use of, the Outside Caterer; and (d) rent or use payments made by, or other financial arrangements with, the Outside Caterer.

10.    Any trade names, trademarks, or other names, marks, or designations that you use to identify the availability of catering and Social Events at the Premises.

11.    Any document or communication related to or concerning any allegation in the Complaint, or any relevant fact, claim or defense in the Action.

12.    Any communication with the City or with Elected Officials concerning the Action.

13.    Whether a Social Event at your institution may be hosted by any member of the general public or only by an existing member of your congregation, and, if the latter, what, if any, policy you have for admitting or accepting a new member of your institution.

14.    Whether any signs or other indicia of the religious identification of the Premises are removed, obscured or covered during Social Events.

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,                                    :
                                                  :
                    Plaintiff,                    :        07-CV-*10962*
                                                  :             *(DAB)*
              -against-                           :
                                                  :        **COMPLAINT**
                                                  :
THE CITY OF NEW YORK and PATRICIA J.              :
LANCASTER, in her official capacity as            :        JURY TRIAL DEMANDED
Commissioner of the New York City Department      :
of Buildings,                                     :
                                                  :
                    Defendants,                   :
-------------------------------------------------------------x

      Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), by its undersigned attorneys for its Complaint against Defendants City of New York ("City") and Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department of Buildings ("DOB") (collectively, the "City" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

    1.    For more than 80 years, the Church has owned and worshipped in the historic building located at the northeast corner of Park Avenue and 63rd Street (the "Building"). Time has not been kind to the Building or the Church, whose membership dwindled as the Building fell into disrepair. A declining building is expensive to maintain and repair; growing liabilities for repair and maintenance keep new members away from the Church; a smaller membership makes it harder to raise money to pay for repairs. This was a vicious circle: if the Church failed to raise the substantial funds necessary to renovate the building, and in turn to grow its congregation, it would disappear.

    2.    The Church decided to do what many other religious institutions and secular non-profit organizations routinely do to supplement revenues:  it entered into a

commercial relationship with a reputable caterer to conduct events in the Building — only at times when the Church was not using the Building for its primary religious purposes – in exchange for urgently needed funds. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the on-going expenses of maintaining the Building. This relationship was critical to the Church's survival.

3.     The Church is a good citizen and it went to the City for approval of this traditional accessory use. The City approved the Church's request and granted the necessary permits for the Required Capital Repairs. Doing so was entirely consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution. The Church relied on the City's approval, and the Required Capital Repairs began to be made. To date, the caterer has expended approximately $6.5 million to make the Required Capital Repairs and expects to spend another $1.5 million over the coming months to complete the work. Even though the caterer is undertaking the Required Capital Repairs, the vast majority of the work also benefits the Building and its Church-related uses and will continue to provide that benefit long after the caterer's contract with the Church expires.

4.     But something unlawful has happened. Defendants have suddenly revoked their prior approval and rescinded the permits. They have done so because a small group of affluent, influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events in the Building have transformed the Church into a

commercial catering hall that causes serious disruption in the neighborhood. The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth: the City is singling out and discriminating against the Church without any basis. If unremedied, this discrimination will have devastating consequences for the Church and likely will result in the sale of the Building so that the Church can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

5.       The Church seeks relief from this Court because the City has violated the Church's rights (1) to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions; (2) to be free from undue burdens on the exercise of its religion, as protected by Section (a) of RLUIPA; (3) to equal protection of the laws, pursuant to the Fourteenth Amendment; and (4) to the free exercise of its religion, pursuant to the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.

7.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred in this district, and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## PARTIES

8.       Plaintiff Church is a religious corporation existing under the laws of the state of New York, with its principal place of business at 583 Park Avenue, New York, New York 10021.

9.       Defendant City of New York is a political subdivision of the State of New

York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a

municipal corporation organized and existing under the laws of the State of New York.  At all

times relevant hereto, the City was and is responsible for the establishment, enforcement, and

implementation of land use and zoning regulations within New York City.

10.    Defendant Patricia J. Lancaster is the Commissioner of the New York City

Department of Buildings and is authorized to enforce, among other things, provisions of the

New York City Administrative Code, the New York City Building Code, and the Zoning

Resolution of the City of New York.  She is sued herein in her official capacity.

11.    The New York City Department of Buildings is an administrative

department of the City of New York, whose offices are located in the County of New York in

the State of New York.

## FACTUAL ALLEGATIONS

### The Church and its Historic Building

12.    The Church began in the 1880s as a congregation of students dedicated to

the Christian Science religion.  By 1895, as its membership grew substantially, the Church

applied for a charter and was registered under the laws of the State of New York.

13.    In 1920, the Church purchased property at 583 Park Avenue, New York,

New York, and retained the renowned architectural firm Delano & Aldrich to design a house of

worship for the congregation.  Completed in or around 1924, the red-brick, Georgian-Colonial

building topped with its tall lantern is one of the architectural highlights of Park Avenue and is

the same building that houses the Church's congregation to this day.

14.    By the 1940s and 1950s, the Church's congregation – which by then had

grown to approximately 1,000 – utilized the Building for numerous religious services and

events, including two full-capacity Sunday services, Wednesday evening testimony meetings

with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult socials and youth forum activities, and lectures and workshops focusing on religious and spiritual healing topics. During this period, lectures in the Church's Building would frequently be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in the basement.

15.    Over the years, the Church's membership has declined. It currently has fewer than one hundred members. True to its mission, however, the Church continues to use the Building for religious worship every Wednesday evening and Sunday morning, as well as for other religious uses such as Sunday School and lectures.

16.    A significant contributing factor to the decline in membership has been the growing state of disrepair of the Building and the prohibitive costs of the Required Capital Repairs, which members of the congregation would have to bear. The Required Capital Repairs necessary to revive the aging Building's infrastructure and to bring it into compliance with the New York City Building Code include modernization of all major building systems, including electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and, where necessary, replacement of the Building's façade, roof, windows, doors and other exterior components; and significant restoration of the main auditorium and other rooms regularly used for Church-related activities.

17.    In order to save the historic Building, the Church needed to raise substantial capital. For many years, the Church survived largely because of bequests made by deceased members of its congregation. But as the membership declined, the bequests declined, and the Church, year after year, was running at a significant deficit.

18.    Beginning at least in the late 1990s, the Church explored several alternatives to raise capital, including low-cost loans from the Historic Properties Fund

(administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

19.    From 1999 to 2006 the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship did not yield enough money to meet the Church's needs.

20.    In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

21.    Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for renovation and maintenance of the Building.

22.    After considering numerous alternatives, the Church did what many other religious institutions and nonreligious non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events
### In Order to Raise Needed Capital

23.    As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and ongoing maintenance costs (the "Lease").

NYC 189965v8 0085520-000001

24.    The express purpose of the Lease is to supplement the Church's income, and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises *during those times when there are no scheduled Church services or Church related activities* . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at p. 1 (emphasis added).

25.    In addition to hosting weddings and other celebrations, as well as events for non-profit groups, companies and other firms – to date, events for New Yorkers for Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups have been held in the Building – the Lease requires the Rose Group to conduct catered events for members of the Church at reduced cost.  2nd Amn. to Lease, at ¶ 2.

26.    Upon information and belief, the Rose Group will invest more than $8 million on the Required Capital Repairs, of which $6.5 million has already been spent.  Because the Building lies within the Upper East Side Historic District, any renovations to the exterior of the Building must be undertaken in a painstaking manner so as to preserve, wherever possible, the Building's original architectural details.  Among the significant work that remains to be completed, the Rose Group plans to restore the Building's roof with slate from the same Vermont quarry that supplied the Church more than 80 years ago.

27.    In addition to Required Capital Repairs, the Rose Group is further obligated to undertake general maintenance of the Building throughout the 20-year Lease term, and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain threshold, from the catered events) to the Church.  This supplemental income is a crucial source of operating revenue for the Church's religious activities, which will be especially necessary

when new community activities and outreach programs are implemented.

28.    Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities.

29.    Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1. Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities. Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5. Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief. Lease, at ¶ 35.6.

30.    The primary purpose of the Building is to serve as the Church's place of worship. But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a

reasonable chance to profit from the arrangement. In the second amendment to the Lease, dated

March 27, 2007, the parties provided that, in the event that the Building could not be used for

catering activity, the Rose Group would be able to require the Church to reimburse the Rose

Group for Required Capital Repairs it had undertaken, even if the Church had to sell the

Building. 2nd Amn. to Lease, at ¶ 3.

31.     The Church went out of its way to be sensitive to its neighbors. Thus, the

Lease requires the Rose Group to "[p]ermit no act or practice which may … be a nuisance," and

to "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the

side or rear of the premises." Lease, at ¶ 32.1.

32.     The Church also insisted that the Rose Group take the extraordinary step

of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any

offensive odors[.]" When this system is completed, all trash from catered events will be stored

and refrigerated within the Building and taken to 63rd Street only when it is to be collected by

the trash truck. Lease, at ¶ 32.1.

33.     Moreover, the Lease does not "permit any advertising medium or loud

speaker, radio broadcast, etc. to be heard outside of the premises." Lease, at ¶ 32.1.

34.     In addition, the Second Amendment to the Lease provides that the Church

and the Rose Group will together "establish standards concerning sound, light levels, traffic

control, signage." 2nd Amn. to Lease, at ¶ 5.

35.     The Rose Group has retained a highly professional and comprehensive

security team, Global Security Service, in order to ensure that all events at the Church are

orderly, quiet, and safe. At all events, in addition to other security measures, there are usually

off-duty members of the New York City Police Department patrolling the area, monitoring the

event and managing any crowds. There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws. These security measures are implemented from an abundance of caution. Thus far, all of the catered events that have occurred in the Building have occurred without incident.

### The Purpose of the Building Remains the Same:  It Is a Place of Worship for the Church Congregation

36.     The primary purpose of the Building is to remain a house of worship.  For over 80 years, the Building has been property devoted to the Christian Science faith, and it remains the center of the Church's congregation.  The Church currently conducts Sunday Church Services and Sunday School services, Wednesday evening church service, Thanksgiving and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church classes (all-day class for a two-week period, twice a year), Church corporate or organizational meetings, and occasional non-regularly scheduled events and Association meetings. Lease, at ¶ 35.1.

37.     The Church has been attracting new members because of the recent repairs to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be able to hold additional services and lectures for its members and other attendees.  Among other events, the Church expects to host additional Sunday church services and Sunday school sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee meetings, youth forum activities, musical rehearsals and recitals, and various religious workshops.  In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years.  Following the renewal of the Church and its congregation, the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members.

38.     Finally, the Church's purpose in working with the Rose Group is more

than merely economical; the Church also hopes that opening up the Building to public events will introduce the Christian Science faith to the larger community, thereby aiding the Church in augmenting its membership. In addition to increased exposure, the historic Building will again be enjoyed and appreciated by the general public, as it had been for many decades until the Building began its decline.

## The Required Capital Repairs Were Undertaken in Reliance on the City's Approval of Catering Events at the Building

39.    Like many religious and nonreligious non-profit institutions, the Church is located in an area zoned for residential use. The Building is in an R-10 zoning district, which is the highest density residential area under the Zoning Resolution of the City of New York (the "Zoning Resolution"). In Manhattan, much of Midtown and Downtown as well as cross-town streets and avenues are zoned R-10.

40.    Only residences, community facilities (such as churches, synagogues and non-profit institutions) and uses that are "accessory" to residences and community facilities are permitted in residential districts under Article II, Chapter 2 of the Zoning Resolution. While catering facilities are permitted, and commonly found, as accessory uses in community facility buildings, stand-alone catering facilities are not permitted in residential districts. Section 12-10 of the Zoning Resolution provides that for a use to be considered "accessory" it must be (i) conducted on the same zoning lot as the principal use, (ii) clearly incidental to, and customarily found in connection with, the principal use and (iii) substantially for the benefit or convenience of the principal use.

41.    Prior to initiating the extensive and costly Required Capital Repairs, the Church and the Rose Group sought the City's approval for this catering arrangement. On April 19, 2006, the City issued a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-

Consideration"). The Pre-Consideration provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building, pursuant to Section 12-10 of the Zoning Resolution.

42.    The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").

43.    Based on the Church's truthful representation that the catered events were to be "operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church" and that the "functions will be restricted by the contract with the Church," the DOB granted its Pre-Consideration permitting the Church to have catered events in the Building.

44.    The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees. During these conversations, DOB's consistent position has been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and, the Manhattan Borough Commissioner of DOB stated that the only limitation on the size of events related to the capacity of the Building. Approximately $6.5 million has been expended on the Required Capital Repairs in reliance on the City's June 2006 approvals.

**Defendants Routinely Permit Other Religious And Nonreligious Non-Profit Groups to Conduct Similar Catered Events, Including In The Church's Immediate Vicinity**

45.    The Church's reliance on the Pre-Consideration was reasonable on several levels. After all, as detailed below, (a) there are many buildings in the immediate vicinity of the Building, all in residential zoning districts, that are rented to members of the general public for large social events, (b) there are many similarly situated churches, synagogues and other

religious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events, and (c) there are many nonreligious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events.

45-a.    The following is a chart, developed from public records without the benefit of discovery proceedings, showing establishments in the immediate vicinity of the Building, all of which are located in Residential zoning districts, and which rent their facilities to members of the general public for catered events:

|  | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| The Beekman | 575 Park Avenue – directly south of the Building | Total capacity (restaurant plus separate catering venue) approx 200 | A restaurant open to the general public as well as a separate facility for catered events | R10 (Special Park Improvement District ("PI")) / R8B (Limited Height District No. 1A ("LH-1A")) |
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity: 500 | Available for private catered events and movie and commercial shooting | R10 (PI) |
| The Colony Club | 564 Park Avenue – two blocks south of the Building | | Private club, rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Regency Hotel | 540 Park Avenue – two blocks south of the Building | 4,400 square feet of flexible function space, accommodate up to 200 | Rents out space for a variety of catered events, uses in-house catering operation | R10 (PI) / C5-1 (Special Madison Avenue Preservation District) |
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated; additional events on same night can be held in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety | R10 (PI) |

NYC 189965v8 0085520-000001

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | of catered events for non-members |  |
| Union Club | 101 East 69th Street and Park Avenue |  | Rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers Club | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. *Uses designated outside caterer* New York Catering | R8B (LH-1A) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

45-b.    Moreover, as is evident from the following chart developed from public records without the benefit of discovery proceedings, it is customary for churches, synagogues and other religious institutions to rent out their facilities to non-congregants for social events in order to offset in the extraordinary costs of maintaining their historic properties:

|  | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity 500 guests | Available for private catered events and movie and commercial shooting | R10 (PI) |
| St. Bartholomew's Church | 109 East 50th Street and Park Avenue | 1250 | Available for movie and commercial filming, corporate events, fashion shows, rehearsal dinners, weddings, cocktail parties, and dances, among other events. All catering provided in house by Café St. Bart's. | C5-3 (MID) / C5-2.5 (MID) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers.* | R10 (PI) |

| Universalist Church of New York | 160 Central Park West | 500 | Church dated 1897, available for private catered events and separate attached kitchen. | R10-A / R8B |
|---|---|---|---|---|
| All Souls Church | 1157 Lexington Avenue and East 80th Street | 350; 200 seated event | | C1-8X / R8B |
| The Top Deck at the Seamen's Church Institute | 241 Water Street, near Peck Street | 130 guests | Interfaith chapel, rents out space for a variety of catered events for non-congregants. | C6-2A (Special Lower Manhattan District – South Street Seaport Subdistrict) |
| Riverside Church | 490 Riverside Drive, between 119th and 122nd Street | 500; 300 seated event | Uses designated onsite caterer, Madeline's Catering & Special Events | R8 |

45-c.  Finally, the following chart, developed from public records without the benefit of discovery proceedings, makes clear that it is customary for nonreligious non-profit institutions (including institutions, like the ones below, located in residential districts) to rent their facilities to non-members for catered events in order to offset the extraordinary costs of maintaining their historic properties:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated event; can host additional events on same night in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety of catered events for non-members | R10 (PI) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. | R8B (LH-1A) |

| Club | | | Uses designated outside caterer New York Catering | |
|---|---|---|---|---|
| The Frick Collection | 1 East 70th Street, near Fifth Avenue | 200 seated event; 350 cocktails | | R10 (PI) / R8B (LH-1A) |
| National Academy Museum | 1083 Fifth Avenue, near East 89th Street | 140 seated event; 240 cocktails | | R10 (PI) |
| Cooper-Hewitt, National Design Museum | 2 East 91st Street, near Fifth Avenue | 90 seated event; 500 in Terrace and Garden | Rents out space for a variety of catered events for non-members *Uses designated outside caterer* Restaurant Associates | R10 (PI) / R8B (LH-1A) |

46.    Like these secular non-profit institutions, and like other religious institutions, the Church found that it was necessary to rent out its space to cover the daunting costs of making the Required Capital Repairs and of operating and maintaining its historic Building.  Like its neighbors, the Church sought to use its Building both to generate revenue and to serve as a community resource.  The events already held in and planned for the Building are not meaningfully different from any of these uses at other comparable institutions.

## Opposition by Neighboring Residents Results
## in the Revocation of the Pre-Consideration

47.    By March 2007, after the Required Capital Repairs were well underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings on the west side of Park Avenue, across the wide avenue from the Church — 570 Park Avenue and 580 Park Avenue — began to complain about the Church's arrangement with the Rose Group.  After initially discussing the matter with the Church and the Rose Group, residents of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a public relations campaign against the Church.  Their avowed purpose was to maintain the "residential" character of their Park Avenue neighborhood, and their flyer contended that the Church's plans to permit catered events at its historic premises – although no different than the

practices of neighboring institutions – would cause significant disruption in their backyard. These neighbors, however, failed to mention that if the Church were unable to supplement its revenues it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

48.    On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused the Church of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall. The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night." This is a selective and baseless attack on the Church. As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory just a few blocks north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

49.    The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007. The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, thereby distorting the real import of the Lease.

50.    Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group the limited right to use the Building for catered events when it is not being used for religious

activities.

51.     Unfortunately, the City has succumbed to the demands of these influential neighbors.  On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly completed.

52.     The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church."  The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008).  The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

53.     Upon receiving the letter, the Church engaged litigation counsel.  Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation.  Counsel for the Church advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the Building to satisfy its liabilities.

54.     The Church's attempt to resolve this matter without litigation was unsuccessful.

55.      On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination"). The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

56.      By revoking the Permits and rescinding the Pre-Consideration and withholding permission allowing the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions. It also irrationally singles out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making available their premises in order to host private catered events.

57.      The Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area.

58.      By revoking the Permits and preventing the Church from hosting catered events on its premises, the City has threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease. The implementation of

the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship – the epicenter of its religious practice for the past 80 years.

59.    Further, by determining that the Church's Building is effectively a catering hall, the City mischaracterizes the Lease and wrongfully impugns the Church. Contrary to the Defendants' disparaging characterization, the Church remains a congregation devoted to the Christian Science faith, and any catering activities conducted in the Building were, and will remain, wholly incidental to its primary purpose and use of preaching and practicing its religion.

60.    Moreover, the City is impairing the Church's interest in opening up its premises to the general public, which it believes will spark new interest in the Christian Science faith.

## The Church Will Suffer Immediate and Irreparable Injury

61.    The impact of the DOB's decision will be devastating and immediate. The Final Determination rescinds the earlier-granted accessory use approval and revokes the Permits, forthwith. Therefore, pursuant to the DOB Letter and the Final Determination, as of October 29, 2007, the Church is prohibited from allowing any additional catered events to be booked for the Building, and the Church is prohibited from permitting any additional catered events in the Building to be held after April 28, 2008. Moreover, because the Final Determination revokes the Permits, the Church and the Rose Group will be forced to suspend any further Required Capital Repairs. As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled. This prohibition effectively requires the Rose Group to cease its catering operations in the Building.

62.    If the Church can no longer make the Building available for catered

events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed. For these reasons, and more, if the City's decision is not enjoined, the Church will be forced to sell the Building and its congregation will be deprived of its place of worship.

## First Claim for Relief
### RLUIPA EQUAL TERMS CLAIM
### 42 U.S.C. § 2000cc(b)

63.     Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.     By imposing and implementing the City's land-use and zoning laws and regulations in the manner described above, and by the conduct described above, the City is treating the Church on less than equal terms with comparable nonreligious institutions.

65.     By revoking the Permits and rescinding the Pre-Consideration and thereby forbidding the Church to permit catered events at the Building, Defendants have discriminated against the Church because they freely permit comparable nonreligious institutions to engage in the similar practice of renting out their premises for catered events for non-members.

66.     By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(b), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

## Second Claim for Relief
### RLUIPA SUBSTANTIAL BURDEN CLAIM
### 42 U.S.C. § 2000cc(a)

67.     Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.    The Church entered into the Lease because it needed to preserve its Building so that its congregation could worship and perform other religious activities in it. The Church's use, renovation, and restoration of its real property constitute "religious exercise."

69.    Among other improvements, the Lease requires the creation of a new room for the Church's Sunday School, and this conversion of real property is also "religious exercise" under RLUIPA.

70.    Congress requires that the Court construe RLUIPA "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-3(g).

71.    Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its congregation, spreading its religious teaching, and thereby impeding its religious exercise.

72.    If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

73.    The revocation of the Permits and prohibition on any future catered events is an arbitrary, irrational decision that does not bear any substantial relation to the public health, safety and welfare.

74.    The revocation of the Permits and prohibition on any future catered events reflects the Defendants' inconsistent application and implementation of its zoning rules, a

decision made to placate a small but influential number of disgruntled neighbors and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, noise, or other factors relating to quality of life, given that Defendants allow events similar to the catered events in other facilities in the immediate neighborhood.

75.     By imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above, Defendants have imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

76.     The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

77.     This substantial burden on the religious exercise of the Church is imposed by Defendants in the implementation of a system of land use regulations under which Defendants make, and have in place formal and informal procedures or practices that permit them to make, individualized assessments of proposed land uses, as contemplated by 42 U.S.C. § 2000cc(a)(2)(C).

78.     This substantial burden on the religious exercise of the Church, and the removal of the substantial burden, will affect commerce among the several states, as contemplated by 42 U.S.C. § 2000cc(a)(2)(B).

79.     By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief,

injunctive relief, compensatory damages, and the costs and expenses of this action.

### Third Claim for Relief
### EQUAL PROTECTION CLAIM
### PURSUANT TO 42 U.S.C. § 1983

80.    Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.    The Church is a "class of one" and is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

82.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct.

83.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated nonreligious institutions to conduct.

84.    This differential treatment was based on impermissible considerations, including baseless community opposition to the Church, the nature of the Church's religious beliefs, and the bad faith attempt to harm the Church's ability to maintain its premises.

85.    Defendants' actions are designed for the purpose of hampering the exercise of the Church's religious activities in its chosen house of worship, and to prevent the Church from generating the same sort of supplemental income from the rental of event spaces that other similarly situated institutions are permitted to generate.

86.    By singling out Plaintiff for unequal adverse treatment, and bowing to pressure from the neighborhood opponents, Defendants deprive Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

87.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

88.    By virtue of the foregoing conduct, Defendants have caused the Church immediate and irreparable harm.

89.    The Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

## <u>Fourth Claim for Relief</u>
## FIRST AMENDMENT FREE EXERCISE CLAIM
## PURSUANT TO 42 U.S.C. § 1983

90.    Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.    Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, by imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above.

92.    The Defendants' implementation of the City's land use laws is not neutral and generally applicable to all, but instead discriminates unfairly against the Church.

93.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any compelling reason.

94.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any rational basis.

95.    By singling out Plaintiff for unequal, adverse, treatment, and bowing to pressure from neighborhood opponents, Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

96.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

97.    By virtue of the foregoing conduct, Defendants have caused immediate and irreparable injury to the Church.

98.    The Church is entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

WHEREFORE, judgment should be entered as follows:

A.    Declaring that Defendants' actions violated section (b)(1) of RLUIPA;

B.      Declaring that Defendants' actions violated section (b)(2) of RLUIPA;

C.      Declaring that Defendants' actions violated section (a) of RLUIPA;

D.      Declaring that Defendants' actions violated Plaintiff's right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution;

E.      Declaring that Defendants' actions violated Plaintiff's right to the free exercise of religion pursuant to the First and Fourteenth Amendments to the United States Constitution;

F.      Temporarily, preliminarily and permanently enjoining Defendants from revoking the Permits or prohibiting the Church, pursuant to the Lease, from continuing to permit catered events for non-members in the Building pursuant to the Lease;

G.      Awarding compensatory damages against all Defendants;

H.      Awarding Plaintiff's attorney fees and other reasonable expenditures, together with the costs and expenses of this action pursuant to 42 U.S.C. § 1988; and

I.      Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated:      New York, New York
            December 3, 2007

                            DAVIS WRIGHT TREMAINE LLP

                            BY: _____
                                Victor A. Kovner (VAK-2248)
                                John Cuti (JC-3365)
                                Monica Pa (MP-3307)

                            1633 Broadway
                            New York, New York  10019-6708
                            Telephone:  (212) 489-8230
                            Facsimile:  (212) 489-8340

                            *Attorneys for Plaintiff*
                            *Third Church of Christ, Scientist,*
                            *of New York City*

# EXHIBIT B

*#612554*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
THIRD CHURCH OF CHRIST, SCIENTIST, :
of NEW YORK CITY,

                Plaintiff,   :

                          **OBJECTIONS TO SUBPOENA**

       V.           :

THE CITY OF NEW YORK and PATRICIA :      <u>Case No. 07 Civ. 10962 (DAB)</u>
J. LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings,      :

               :

             Defendants.

               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

      The Riverside Church in the City of New York ("Riverside Church"), by its attorneys,

Patton, Eakins, Lipsett, Holbrook & Savage, herewith objects for the following reasons pursuant

to Rule 45(c) of the Federal Rules of Civil Procedure to the production of materials designated in

the subpoena in this case dated March 6, 2008, as set forth below.

<u>General objections.</u>

      Production of the documents demanded are not reasonably likely to lead to the production

of admissible evidence for the following reasons:

      A. The allegations in the complaint arise from plaintiff's lease of all, or practically all, of

its space to a caterer for the conduct of the caterer's commercial business. Riverside neither

leases nor licenses any event space to any caterer.

      B. The allegations of the complaint arise from plaintiff's lease of event space to a single

Page 1

commercial entity for 20 years or more, while Riverside does not lease or license any event space to the caterer.

      C. The allegations in the complaint arise from plaintiff's lease which apparently gives its caterer-lessee almost complete control over the church facility for a substantial portion of the building and a substantial portion of the time during term of the lease. In contrast, Riverside Church transfers no control to its caterer.

      D. The allegations of the complaint arise from plaintiff's lease by which the lessee's consideration for a very long-term lease for all, or practically all, of plaintiff's space, is a very substantial capital investment and repair commitment. Riverside Church has no such arrangement with its caterer.


**Specific objections.**

Riverside Church objects to the specific requests as follows:

      **1.** Items 1, 2, 5, 6, 7, 8, 13 and 14, insofar as they demand documents over eight years relating in considerable detail to "Social Events" are overbroad on their face and would subject Riverside Church to undue and extreme burden, in addition to seeking information totally irrelevant to the issues in the complaint. Riverside Church has over 2,500 members and numerous committees, and Riverside Church and its members and committees hold a large number of events and meetings every year which in many instances may have a social component. Also, in furtherance of Riverside Church's longstanding outreach efforts in the community, Riverside permits use of available space at Riverside Church at reasonable uniform rates by persons and not-for-profit organizations for events and meetings which may have a

social component. The permission to use church space for such events is subject to the approval and rules of Riverside Church. Production of documents relating to such events, to the extent available, would require extensive effort and in addition would have no possible bearing on the issues raised by the complaint.

2. Item 3 of the subpoena seeks the certificate of occupancy for Riverside Church. Riverside Church objects to this item because there does not appear to be any issue in the complaint relating to a certificate of occupancy and no possible relevance to Riverside's certificate of occupancy.

3. Item 4 of the subpoena seeks "any communications with the City regarding the use of the Premises . . ." This demand is overbroad and burdensome, and seeks communications having no possible relevance to present action. Item 4 also seeks communications with the City concerning "accessory use" under the Zoning Resolution. Based on preliminary review, it does not appear Riverside Church has any such communications

4. Item 9 of the subpoena seeks documents relating to any independent person or entity, including Madeline's, that performs catering-related services with which Riverside Church has a contractual relationship. Riverside Church objects to this item because the catering contract of Riverside Church with Madeline's is not remotely comparable to plaintiff's contract with The Rose Group. The substantial differences are the following:

(a) The Riverside catering contract is for two years, expiring on December 31, 2008, and may be terminated by either party upon three months notice.

(b) The contract requires no payments on Madeline's part for capital repairs or improvements to the premises.

Page 3

(c) The contract principally requires Madeline's to provide food service at the cafeteria of Riverside Church at agreed prices for Riverside Church's worshipers, visitors and employees.

(d) Riverside Church for its own events retains the right to select and utilize a caterer other than Madeline's.

(e) The contract does not lease any space to Madeline's, although Madeline's is given use of Riverside's kitchen equipment and is provided space for an administrative/operations office. The caterer pays a monthly sum to Riverside Church to defray the cost of space, cleaning service and other operational expenses of Riverside Church and pays for its use of utilities.

(f) The caterer has no right to conduct its own events at Riverside Church.


Riverside Church's catering arrangements serve the Church by providing a consistent standard of supervision with respect to such catered events, including strict control concerning the serving of alcohol.

5. Items 10, 11, and 12 of the subpoena. Riverside Church has no documents designated in these items.


Dated:  March 20, 2008

PATTON, EAKINS, LIPSETT, HOLBROOK & SAVAGE

by _____
        Frank Patton, Jr.
Attorneys for The Riverside Church in the
        City of New York
420 Lexington Avenue
New York, New York 10170
Tel. 212-867-8280


Page 4

*#612570*

## AFFIDAVIT OF SERVICE
## BY OVERNIGHT FEDERAL EXPRESS DELIVERY

STATE OF NEW YORK       )
                            : ss.:

COUNTY OF NEW YORK    )

FRANK PATTON, JR., being duly sworn, deposes and says:

I am not a party to these proceedings.  I am over the age of 18 years and reside at 201 East 87th Street, New York, New York 10128.

On March 20, 2008, I served the within

## OBJECTIONS BY THE RIVERSIDE CHURCH IN THE
## CITY OF NEW YORK TO SUBPOENA DATED 3/6/08

by dispatching a copy by Federal Express for overnight delivery to each of the following person(s) at the last known address set forth after each name:

Davis Wright Tremaine LLP
Attention:  Victor A. Kovner, Esq.
1633 Broadway
New York, New York 10019-6708
Attorneys for plaintiff, Third Church of Christ Scientist

Signature: _____
Print name:      Frank Patton, Jr.

Sworn to before me this

21st day of March , 2008

_____

**MATTHEW J. MARTIN**
**Notary Public, State of New York**
**No. 4991682**
**Qualified in New York County**
**Commission Expires Feb. 10, 20_10_**

# EXHIBIT C

#610397

# THE RIVERSIDE CHURCH IN THE CITY OF NEW YORK

## FOOD SERVICE AGREEMENT

THIS AGREEMENT made as of this 25 th day of January , 200 7 between THE RIVERSIDE CHURCH IN THE CITY OF NEW YORK, 490 Riverside Drive, New York, NY (hereinafter referred to the "Church") and SOPIN CORPORATION, a New York corporation, 60 West 39th Street, New York, New York 10018, doing business as "MADELINE'S") (hereinafter referred to as "Madeline's").

WHEREAS, Madeline's has heretofore provided food service for the Church, and the Church and Madeline's wish to enter into a revised agreement providing for such food service, as provided below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1. Any and all prior agreements between the parties, written and oral, are hereby terminated as of the date hereof and are superseded by this Agreement.

2. Madeline's agrees to provide food service at the cafeteria of the Church (herein the "Food Service") for the Church's worshipers, visitors and employees. The Food Service shall consist of wholesome, high quality breakfast, lunch, dessert, beverages, coffee and tea on each Sunday, Tuesday, Wednesday, Thursday and Friday during the hours of 8:30 AM until 2 PM each such day. At the request of the Church, Madeline's shall also provide Food Service at other hours or days for special worship services or other Church events or functions. All food items provided and/or prepared by Madeline's are herein referred to as "Food".

3. The term of this Agreement shall commence January 1, 2007 and continue until December 31, 2008, unless earlier terminated under the terms of this Agreement. This Agreement may be terminated by either party at any time upon three months written notice to the other party.

4. In providing the Food Service, Madeline's shall have use of the cafeteria kitchen equipment belonging to Church. Madeline's may use such space and equipment solely for food service preparation and for no other purpose. Madeline's shall repair and maintain all such kitchen equipment in good order. In the event Madeline's damages necessary kitchen equipment which cannot be repaired, Madeline's shall replace such kitchen equipment. All contracts/agreements with contractors for the repair and maintenance of the kitchen equipment shall be submitted in advance to the Church for approval. The Church will replace necessary kitchen equipment which becomes inoperable through no fault of Madeline's. The Church shall

also be responsible for cleaning the cafeteria dining area after use by Madeline's. The Church will also provide Madeline's with space for an administrative/operations office.

5.  Madeline's shall be solely responsible for the following:

(i)  Cleaning and maintaining the kitchen equipment and the food service area of the cafeteria in a clean, neat, healthful condition. Madeline's shall also properly clean and dispose of grease from grease traps, at such intervals as required by law, regulations, and proper procedures. Madeline's shall also pay the cost (as billed by the Church) of regular extermination service for the kitchen and food service area of the cafeteria, utilizing the exterminator selected by the Church.

(ii)  Properly dispose of all trash, wet and dry. If the Church requests that Madeline's place its trash in container(s), Madeline's shall purchase and provide proper container(s).

(iii)  Fire extinguishers, fire suppression system, and grease exhaust system, in the kitchen and food service area of the cafeteria, shall be regularly serviced by vendors selected by the Church, with the cost thereof to be paid for by Madeline's, as billed by the Church.

(iv)  The clean, safe and healthful preparation, service, refrigeration and storage of all Food;

(v)  The selection, purchase and preparation of all Food and Food related products and materials required for the preparation of the Food Service.

(vi)  The cleanup of all Food preparation equipment, plates, glasses and utensils.

(vii)  The appropriate recycling of empty containers (glass, metal, plastics, etc.) and disposal of leftover Food and waste products.

(viii)  Paying all vendors and all employees and/or independent contractors retained or employed by Madeline's in connection with the delivery of the Food Service. Except as expressly provided in this Agreement, the Church shall not be required to pay for, or incur any expense relating to the Food Service, or the preparation and serving of the Food.

6.  The cafeteria dining area furniture shall be provided and maintained by the Church.

7.  The Church agrees to distribute a Madeline's menu with price to all staff, lay leaders, and tenant organizations of the Church. Prior to January 1, 2007, Madeline's will provide the Church with Madeline's 2007 menu showing all food prices for 2007. Madeline's agrees not to change any such prices without the prior written notification to the Church.

8. Madeline's is currently, and during the term of this Agreement will continue to be, listed as the Church's exclusive food caterer on Church's leases or facilities license agreements with tenants and other organizations. Madeline's may decline to act as caterer for any particular event in which case another caterer may be used.. The Church retains the right, for its own functions and events, to select and utilize a caterer other than Madeline's.

9. Madeline's agrees that all personnel who prepare and provide the Food Service shall be employees of Madeline's and will not be, and will not be deemed to be, employees of the Church. Madeline's will comply with all legal and regulatory requirements concerning its personnel and their employment by Madeline's. Madeline's will also comply with all laws, ordinances, rules and regulations applicable to Madeline's delivering the Food Service, and will obtain and keep in full force and effect during the term of this Agreement all permits and authorizations required by it in providing the Food Service. Madeline's shall upon request provide the Church with written proof of its compliance with all such laws, ordinances, rules and regulations, and shall exhibit to the Church on request all permits and other authorizations as may be required in providing the Food Service.

10. Madeline's shall ensure that its employees are properly attired in clean uniforms, and behave with decorum and professionalism in providing the Food Service.

11. The Church shall make no payment to Madeline's for providing the Food Service, except that the Church will pay the charges of Madeline's when the Church itself engages Madeline's to provide Food Service for a particular function. Madeline's shall charge the customers for the Food Service and shall retain all proceeds from such charges. Madeline's shall be solely responsible for payment of all applicable sales taxes in connection with the Food Service.

12. Madeline's shall be solely responsible for and pay when due all applicable federal, state and local taxes, payments and/or withholding relating to its operation of the Food Service, including without limitation all such taxes, payments and withholdings relating to its employees and/or independent contractors. Madeline's shall be solely responsible for the payment of all contributions, assessments, deductions and contributions for labor unions or associations, welfare funds, salaries, taxes and other payments of unemployment funds, unemployment benefits, workers' compensation benefits, disability benefits, social security benefits, and pensions which are required under any present or future federal, state or local laws, rules and regulations relating to salaries, wages and other compensation. Madeline's is not, and shall not represent itself to be, an agent or entity of the Church.

13.   (i) Madeline's shall obtain and maintain in effect all permits and licenses required by Federal, state and local laws, rules, and regulations in connection with providing the Food Service, including without limitation food vendor licenses and the appropriate license to permit the sale of alcoholic beverages.

(ii)  All such permits and licenses shall be exhibited to the Church on request by the Church. In the event that any such license or permit or other regulatory authorization is terminated, suspended or modified, Madeline's shall so inform the Church both verbally and in writing within 24 hours after learning of the termination, suspension or modification.

(iii)  In the event Madeline's learns of any governmental violation issued with respect any matter or activity for which Madeline's is responsible or which is under its control, Madeline's shall so inform the Church both verbally and in writing within 24 hours after learning of the violation. All such violations shall be cured, at Madeline's sole cost, within the period prescribed by law or regulation but in any event not longer than 30 days. Any violation not so cured by Madeline's may be cured by the Church, with the cost thereof plus a 20% administrative fee to be billed by the Church to Madeline's.

(iv) In the event any inspector from a municipal or governmental agency arrives at the Church to conduct any inspection of the space or facilities utilized by Madeline's, Madeline's shall immediately notify the office of the Church's building manager and the office of the Church's Chief Administrative Officer personally or by telephone.

14.  Madeline's shall comply strictly with the rules of the Church concerning the serving of alcohol at functions on Church property. Those rules are currently the following:

(i) Do not offer or serve alcoholic drinks to persons under 21 years of age. In case of any doubt, require photo proof of age.

(ii)  Do not sell alcoholic drinks without a license.

(iii)  Monitor the event for any behavior which indicates an individual is intoxicated or is becoming intoxicated.

(iv) Limit the opportunities for multiple alcoholic drinks, in order to minimize the risk of intoxication..

(v)  At Church-sponsored functions, no hard liquor may be served.

The Church reserves the right to revise the foregoing rules, and, if any such revisions are made, the Church will promptly give Madeline's a copy of the revised rules.

15.  (a) Madeline's shall pay the Church the sum of $6,190.00 each month during 2007 and the sum of $6,345.00 each month during 2008, to defray the cost of space, cleaning service, and other operational expenses of the Church. Said monthly payments shall be due and paid the first day of each month.

(b) Madeline's will also reimburse the Church each month for the Church's cost in providing Madeline's with gas, electricity, water and pest infestation control; the Church will

invoice Madeline's monthly for such items, and Madeline's will pay such invoices. In the event additional or special pest infestation treatments are required because of unusual or extensive infestation, Madeline's will also pay the cost thereof, upon being billed by the Church. In the event Madeline's utilizes the food preparation and/or food service space after the Church's normal hours (_____ AM to _____ PM), Madeline's shall reimburse the Church for any additional costs thereby incurred by the Church including, without limitation, costs of security and maintenance personnel and costs of heat and air conditioning if applicable.

(c) On execution of this Agreement, Madeline's will deposit with the Church $12,380.00, which amount will be held by the Church as security for Madeline's performance of its obligations under this Agreement. Said amount will be returned to Madeline's, without interest, on the termination of this Agreement, subject to reduction by any amounts then owed by Madeline's to the Church.

(d) All amounts which, pursuant to this Agreement, are billed or invoiced to Madeline's and are to be paid by Madeline's to the Church, shall be paid within five business days of Madeline's receipt of the bill or invoice.

16. During the term of this agreement, Madeline's shall carry the following insurance coverage:

(i) General liability $1,000,000/$1,000,000 per occurrence including contractual and products liability.
(ii) Liquor liability of $1,000,000/$1,000,000 per occurrence
(iii) Umbrella liability coverage of $5,000,000 per occurrence.

The Church and its subsidiary corporations shall be named as additional insureds. Grubb & Ellis Management Services, Inc., as building manager, shall also be named as an additional insured. All such insurance shall specify that it is primary, and any insurance purchased by the Church is non-contributory. Madeline's shall provide the Church with certificates of insurance evidencing such insurance coverage. Madeline's shall also maintain proper workers' compensation insurance, and will provide the Church with evidence of such coverage.

17. Madeline's shall, to the maximum extent permitted by law, indemnify, protect, defend and hold harmless the Church, its trustees, officers, directors, employees, representatives and agents, and its subsidiary corporations, as well as successors and assigns of any of the foregoing, against all costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, claims and demands of every kind and nature, including reasonable counsel fees, by or on behalf of any person, party, governmental authority whatsoever arising out of: (i) any failure by Madeline's and any of its trustees, officers, directors, employees, invitees, licenses, representatives and agents, as well as successors and assigns, to perform any of the agreements, terms, covenants or conditions of this agreement; (ii) any accident, injury or damage, relating to provision of Food Service by Madeline's, including without limitation, injuries to persons and/or damage to property, which shall occur in or about the premises or appurtenances of the Church, however occurring, and maintenance, use or operation of the premises; (iii) failure to comply

with any laws, rules, regulations, requirements, orders or directions of any federal, state or local governmental authority; (iv) any mechanic's lien, conditional bill of sale or chattel mortgage filed against the Church's premises or any equipment therein or any materials used in connection with the Food Service; and (v) claims of any employees, agents or other persons performing services for Madeline's, whether performed at the Church or elsewhere. Notwithstanding Madeline's obligations under this paragraph, the Church shall have the right to cause to be conducted inspections and reviews by its personnel and independent parties as to the operation of the Food Service, with or with prior notice, and Madeline's shall cooperate fully in any such inspections and reviews.

18. Before January _____, 2007, Sopin Corporation will provide the Church with current financial information, acceptable to the Church, confirming Sopin Corporation's financial stability such as a net worth statement for the preceding twelve months, for Sopin Corporation, certified by James Kang as president as being accurate. Sopin will also promptly furnish the Church with such additional information pertaining to the financial stability or financial operations of Sopin Corporation as may be requested by the Church. In the event the Church determines for any reason that such financial information is unsatisfactory, the Church may, in its sole discretion, elect to terminate this Agreement on 30 days written notice to Madeline's.

19. (i) In the event Madeline's proposes any alterations to the food preparation space or food service space, Madeline's shall submit written request to the Church, including relevant plans and specifications, and shall pay any costs incurred by the Church in the Church's review of such requests, plans and specifications. Any such alterations require the Church's consent, which may be granted or withheld in the sole discretion of the Church, and Madeline's shall reimburse the Church for all costs of any such alterations.

20. Notwithstanding any other provision of this Agreement, the Church may terminate this Agreement at any time in case of the failure of Madeline's to comply with the terms of this Agreement.

21. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly delivered to a party only if delivered in person, or if sent by certified or registered first class mail, return receipt requested, postage pre-paid, or is sent by overnight courier addressed to a party at the addresses set forth below, or as such party may have stipulated by notice delivered in accordance with the provisions of this paragraph and such notice shall be deemed given on the day of delivery:

*If to the Church:*
The Riverside Church
Attention: Delbert Glover, Chief Administrative Officer
490 Riverside Drive
New York, New York 10027

-with a copy to -

Grubb & Ellis Management Services, Inc.
Attention: Jose Toro, building management office
490 Riverside Drive
New York, New York 10027


*If to Madeline's:*
Madeline's
Attention: James Kang
490 Riverside Drive,
New York, New York 10027

-with a copy to -

Sopin Corporation
Attention: James Kang
60 West 39th Street
New York, New York 10018

22.   The failure of either party to insist upon the strict performance of any of the terms, conditions and provisions of this agreement shall not be construed as a waiver or relinquishment of compliance therewith, and said terms, conditions and provisions shall remain in full force and effect. No waiver of any term or condition of the agreement on the part of either party shall be effective for any purpose whatsoever unless such waiver is in writing and signed by such party.

23.   This agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, oral and written, between the parties with respect to the subject matter hereof, and the parties are not bound by any agreements, understandings or conditions other than as expressly set forth herein.

24.   This agreement may not be changed, amended or modified except by a writing signed by both parties.

25.   This agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements to be made and performed solely within such state.

26.   Any and all disputes or controversies between the parties arising out of or relating to this agreement of a breach by either party shall be settled by arbitration in New York, New York, under the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the arbitration award may be entered in any court having jurisdiction.  In the event of any

such arbitration, each party will bear its own attorney's fees and costs in connection with such arbitration.

*SIGNATURES ON NEXT PAGE*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

THE RIVERSIDE CHURCH IN THE CITY OF NEW YORK

by _Delbert C George_ 1/25/2007

Delbert Glover
Chief Administrative Officer.

SOPIN CORPORATION

by _____ 1/25/07

James Kang
President

_Angela M. Haddock_

ANGELA M. HADDOCK
Notary Public, State of New York
No. 244777379
Qualified in Kings County
Commission Expires
Nov. 23, 2010

Page 9