UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------ x

THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,

                Plaintiff,

       - against -

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City Department
of Buildings,

               Defendants.

------------------------------------------------ x

07 Civ. 10962 (DAB)

**DECLARATION OF MONICA
PA IN SUPPORT OF
MOTION TO COMPEL**

I, MONICA PA, pursuant to 28 U.S.C. § 1746, declare are follows:

    1.     I am associated with the firm Davis Wright Tremaine LLP, counsel for Plaintiff Third Church of Christ, Scientist, of New York City (the "Church").  I respectfully submit this Declaration in support of the Church's motion for an order compelling the Fourth Universalist Society ("Fourth Universalist") to comply with the subpoena dated March 6, 2008 (the "Subpoena").

    2.     Attached as Exhibit A is a true and correct copy of the Order, dated March 3, 2008, granting the parties permission to conduct pre-hearing discovery.

    3.     On March 6, 2008, the Church served the Subpoena on Fourth Universalist.  *See* Subpoena, attached as Exhibit B.

    4.     The Church first spoke to a lawyer then representing Fourth Universalist on March 26, 2008, who said that her client intended to be cooperative.  In order to facilitate compliance with the Subpoena, the Church's counsel on this phone call agreed to reduce the time period covered by the Subpoena.

5.    On April 2nd, long after Fourth Universalist's time to respond or object to the Subpoena expired, counsel for the Church sent an email inquiring about the status.  *See* Email from M. Galison to J. Cuti, dated April 2, 2008, attached as Exhibit C.

6.    On April 7th, its counsel informed the Church that Fourth Universalist decided to handle the Subpoena internally, and that the Church should contact Reverend Rosemary Bray McNatt directly.

7.    After leaving several voicemails for Reverend McNatt and various other administrators at Fourth Universalist, I was told that she was on sabbatical, and would not return until the middle of May.  On April 9, 2008, I spoke with Beth Putnam, the Assistant to the Minister for Administration at Fourth Universalist, and informed her that the Church would be flexible, and would be happy to discuss ways to narrow the demands for documents.  She assured me that Fourth Universalist intended to search for documents and would comply shortly.

8.    Notwithstanding these assurances, we received no response, so on April 17th, I wrote to Ms. Putnam asking that they produce responsive documents no later than April 24th.  *See* Email from M. Pa to B. Putnam, dated April 17, 2008, attached as Exhibit C.

9.    On Friday, April 18th, I spoke with Reverend McNatt, and she informed me that they would not be able to produce documents by April 24th, but that Ms. Putnam would search for documents and provide a progress report by April 23rd.  *See* Email from R. McNatt to M. Pa, dated April 18, 2008, attached as Exhibit D.

10.    In response, I wrote to Reverend McNatt and Ms. Puttnam, offering to meet with Ms. Putnam personally at Fourth Universalist to discuss the best way to search for and produce documents.  This offer was rebuffed, but Reverend McNatt assured us that they would be

searching for documents. *See* Email from R. McNatt to M. Pa, dated April 21, 2008, attached as Exhibit E.

11.    After several deadlines for Fourth Universalist's production came and went, and after several weeks of holding off Church's counsel with various excuses and assurances, on April 28, 2008, Fourth Universalist sent a one-page letter objecting to the Subpoena outright. *See* Letter from E. Putnam to M. Potter [sic], dated April 28, 2008, attached as Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 5, 2008

Monica Pa

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
FIRST CHURCH OF CHRIST, SCIENTIST,
OF NEW YORK CITY,

                          Plaintiff,

              -against-

CITY OF NEW YORK, and PATRICIA LANCASTER,
in her official capacity as Commissioner

                          Defendants.
----------------------------------------X

```
┌────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:                          │
│ DATE FILED: March 3, 208        │
└────────────────────────────────┘
```

07 Civ. 10962 (DAB)
ORDER

DEBORAH A. BATTS, United States District Judge.

     The Court is in receipt of correspondence from the Parties dated February 22, 2008, February 25, 2008, and February 26, 2008.

     The Court is hereby GRANTING pre-hearing discovery including Plaintiff's requests for documents and depositions from several religious and non-religious institutions that may conduct similar catered events to those at issue in this matter, as well as document requests and depositions of City officials who may have knowledge relevant to the Church's claims.  Further, should the City wish to conduct pre-hearing discovery, it can take advantage of this time for that purpose as well.  Parties shall have ninety (90) days from the date of this Order.  There shall be no extensions.

          SO ORDERED.

Dated:     New York, New York
           March 3, 2008

                                   Deborah A. Batts
                                   United States District Judge

# EXHIBIT B

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

VICTOR A. KOVNER
DIRECT (212) 489-8230
victorkovner@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL  (212) 489-8230
FAX  (212) 489-8340
www.dwt.com

March 6, 2008

**By Hand**

Universalist Church of New York
160 Central Park West
New York, NY 10023-1502

      Re:    *Third Church of Christ, Scientist v. City of New York, et al.; 07 CV 10962 (DAB)*

Dear Sir or Madam:

        This firm represents plaintiff Third Church of Christ, Scientist (the "Church") in this litigation. As you may know, this federal lawsuit was filed by the Church to protect its ability to continue to use its building at 583 Park Avenue as a venue for occasional catered social events, a use that the City initially approved but, in November 2007, decided to prohibit. The United States District Court Judge handling this matter has authorized the Church to conduct what is called "discovery" which is the legal term we use to describe the process of gathering facts that are relevant to a lawsuit. I want you to know that the Church is serving the enclosed subpoena on you only with great reluctance; we would have much preferred to have resolved this matter without need for litigation because we believe the tradition of allowing religious institutions and secular non-profit groups to raise supplemental revenues by permitting their buildings to be used for catered events is good policy. (The Complaint in this matter is attached as Exhibit B to the subpoena.) Unfortunately, it became necessary to file this case to protect the Church. Regrettably, the nature of the legal claims requires us to seek information from you.

        Enclosed please find a subpoena that requires you to provide the documents requested in Exhibit A to the subpoena. The subpoena also calls for your testimony, and notes that the date for providing that testimony is March 26, 2008. I understand that there may be scheduling issues, and you should of course feel free to contact me or my colleagues John Cuti and/or Moncia Pa so that we can arrange a mutually convenient date for your testimony. It is more efficient for you to provide the documents that are responsive to the subpoena prior to your testimony. Accordingly, the subpoena requires production of responsive documents on or before March 26, 2008.

Universalist Church of New York
March 6, 2008
Page 2



       Finally, enclosed please also find a check in the amount of $ 44, which covers the costs of the witness fee and travel to and from my office to provide testimony pursuant to the subpoena. Again, please accept our apologies in advance for any inconvenience. Please feel free to call us if you have any questions regarding your obligations.

                              Respectfully submitted,

                              Victor A. Kovner

cc:     Ave Maria Brennan, Esq. (by email)

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF _____ NEW YORK

THIRD CHURCH of CHRIST, SCIENTIST,
of NEW YORK CITY,         Plaintiff,
                    V.
THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City
Department of Buildings,
TO:              Defendants.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07 Civ. 10962 (DAB)

TO:
    Universalist Church of New York (a.k.a. Landmark on the Park)
    160 Central Park West
    New York, N.Y. 10023-1502

[ ]  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below
     to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

[✓]  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
     in the above case.

| PLACE OF DEPOSITION Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019 Telephone: (212) 489-8230 | DATE AND TIME 3/26/2008 10:00 am |
|---|---|

[✓]  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
     place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE Davis Wright Tremaine LLP, 1633 Broadway - 27th Fl., NY, NY 10019 Telephone: (212) 489-8230 | DATE AND TIME 3/26/2008 10:00 am |
|---|---|

[ ]  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) Attorney for Plaintiff | DATE 3/6/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Victor A. Kovner, Esq.
DAVIS WRIGHT TREMAINE LLP, 1633 Broadway, New York, NY 10019 - (212) 489-8230

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

| DATE | 03-05-08 | | | | CHECK NUMBER | 55860 |
|---|---|---|---|---|---|---|
| DATE | INVOICE NO. | VOUCHER ID | INVOICE AMOUNT | NET AMOUNT | REMARKS | |
| 03-04-08 | PAM030408J | 880417 | 44.00 | 44.00 | witness & transportation fees | |
| | | | | TOTAL | | 44.00 |

DAVIS WRIGHT TREMAINE LLP
1201 THIRD AVENUE
SUITE 2200
SEATTLE, WA 98101-3045

DETACH AND RETAIN THIS STATEMENT

THE ATTACHED CHECK IS IN PAYMENT OF ITEMS LISTED ABOVE

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW. DO NOT CASH IF NOT PRESENT.

**DAVIS WRIGHT TREMAINE LLP**
LAW OFFICES
1201 THIRD AVENUE, SUITE 2200
SEATTLE, WASHINGTON 98101-3045
(206) 622-3150

| VENDOR NO. | DATE | 64-1278 | NO. 55860 |
|---|---|---|---|
| 29294 | 03-05-08 | 611     GA | |

Bank of America, N.A.
Atlanta, Dekalb County, GA
Member FDIC

▷▷▷▷▷▷▷PAY ONLY 44 FOUR FOUR 00 CTSCTS

*********$44.00

DAVIS WRIGHT TREMAINE LLP

PAY
TO THE
ORDER
OF

UNIVERSALIST CHURCH OF NEW YORK
A/K/A LANDMARK ON THE PARK
160 CENTRAL PARK WEST
NEW YORK, NY 10023-1502

Authorized Signature

⑈"000055860"⑈ ⑆061112788⑆: 003359800946⑈"

# Exhibit A

## Definitions and Instructions

1. "You" or "your" means the Universalist Church of New York (a.k.a. Landmark on the Park), located at 160 Central Park West, New York, New York and your directors, officers, employees, agents and attorneys, each person acting on your behalf or under your control, and any parent, subsidiary, predecessor or affiliated entity, corporation, institution, or non-profit organization.

2. "Documents" has the meaning provided for in the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Southern District of New York and, without limiting the generality of the foregoing, includes all materials (drafts, originals, and non-identical copies, whether written or electronically stored, sent, or received) such as, *inter alia*, memoranda (interoffice and otherwise), notes, letters, email messages, calendars, appointment books, newsletters, notices, minutes or transcripts of meetings, brochures, advertising copy, website pages, photographs, video recordings, annual reports, tax returns, invoices, checks, credit card receipts or records, spreadsheets, contracts, reservation lists, contact lists, vendor lists, permits, licenses, or other records.

3. "Communications" means the transmission or exchange of information, oral or written, formal or informal, and shall include without limitation, any documents embodying, containing, constituting, discussing, memorializing, referring to or relating to any such contact.

4. The "Action" means the lawsuit *Third Church of Christ, Scientist, of New York City v. The City of New York, et al.,* 07 Civ. 10962 (DAB), pending in the Southern District of New York.

5. The "Complaint" means the complaint filed in the Action, attached hereto as Exhibit B.

6.      The "Church" means the Third Church of Christ, Scientist, of New York City, the Plaintiff in the Action.

7.      The "Building" means the Church edifice located at 583 Park Avenue, New York, New York.

8.      "Elected Officials" means any person serving in the United States Congress, the New York City Council, or the New York State Legislature and any member of his or her staff, including without limitation the Hon. Carolyn Maloney, Hon. Daniel Garodnick, Hon. Jonathan Bing, or the Hon. Liz Krueger.

9.      The "City" means the City of New York, and all of its officials and agencies, including without limitation the Department of Buildings, the Law Department, the Department of City Planning, the Board of Standards and Appeals, the Mayor and/or any Deputy Mayor and/or any member of their respective staffs.

10.     "Premises" means the building located at 160 Central Park West, New York, New York.

11.     "Social Events" means any catered or other social event conducted at the Premises, whether for your congregants, or for the general public.

12.     You are required to search for the documents responsive to the requests, wherever located, which are: (a) in your actual or constructive possession, custody, care and/or control; (b) in the actual or constructive possession, custody, care and/or control of your agent, representative or employee; or (c) in the actual or constructive possession, custody, care and/or control of any person who, or entity which, is or has been acting on your behalf or under your direct or indirect control.

13.     In the event that any document responsive to any document request is withheld from production upon a claim of attorney-client, work product or other privilege or immunity, you are required to furnish a list, verified by counsel, of the documents withheld from such production, setting forth for each document: (a) the nature of the privilege or immunity claim; (b) the date of the document; (c) the title and general subject matter of the document; (d) the identity of each person who made, prepared or signed the document; (e) the identity of each person to whom the document was addressed and each person to whom a copy was indicated to have been sent or was sent; and (f) the present location of the document.

14.     Each document request is continuing in nature, requiring the production of additional documents, should you become aware of or acquire them, in your possession, custody or control after initially responding to these requests.

15.     The past tense shall be construed to include the present tense and vice versa, to make the request inclusive rather than exclusive.  The singular shall be construed to include the plural and vice versa to make the request inclusive rather than exclusive.  "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive.

16.     Unless otherwise stated, the relevant period for these requests shall be from January 1, 2000 to the present.

## Document Requests

All Documents concerning or in any way related to:

1.     Any Social Event conducted on or in the Premises, including (a) the advertising, booking, and frequency of, (b) the attendance at, (c) the revenues generated by, and (d) any communication about such events.

2.      The total number of hours each year that the Premises are used for Social Events, including the number of hours it takes to set up for and clean up after each Social Event.

3.      The Certificate of Occupancy for the Premises (the "CO"), including any amendments thereto.

4.      Any communication with the City regarding the use of the Premises, including communications regarding the CO, and/or whether any past, current, or planned use of the Premises is or was an "accessory use" under the City's Zoning Resolution or other applicable land use regulations.

5.      Any portion of the annual report of the Universalist Church of New York (a.k.a. Landmark on the Park), or any submission to any taxing or other authority, regarding revenues generated by Social Events.

6.      Any analysis, investigation, or communication regarding the taxation of revenues generated by Social Events.

7.      Any application for any permit, license or other permission from the City to conduct Social Events, and the issuance or renewal of any such permit, license or other permission, whether formal or informal.

8.      Any communication with the City concerning the (a) issuance, (b) absence, and/or (c) need for a permit, license or other permission, formal or informal, to conduct Social Events at the Premises.

9.      Any independent person or entity that performs catering-related services (an "Outside Caterer") with which you have a contractual relationship, including without limitation (a) the terms and scope of that contractual relationship (whether it is oral or reduced to writing); (b) the frequency of the Outside Caterer's use of, or performance of services on or in, the

Premises; (c) any repairs or improvements to the Premises made by, and/or for the benefit or use of, the Outside Caterer ; and (d) rent or use payments made by, or other financial arrangements with, the Outside Caterer.

10.    Any trade names, trademarks, or other names, marks, or designations that you use to identify the availability of catering and Social Events at the Premises (such as "Landmark on the Park").

11.    Any document or communication related to or concerning any allegation in the Complaint, or any relevant fact, claim or defense in the Action.

12.    Any communication with the City or with Elected Officials concerning the Action.

13.    Whether a Social Event at your institution may be hosted by any member of the general public or only by an existing member of your congregation, and, if the latter, what, if any, policy you have for admitting or accepting a new member of your institution.

14.    Whether any signs or other indicia of the religious identification of the Premises are removed, obscured or covered during Social Events.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THIRD CHURCH of CHRIST, SCIENTIST, of   :
NEW YORK CITY,                           :
                                         :
                    Plaintiff,           :       07-CV-*10962*
                                         :              *(DAB)*
            -against-                    :       **COMPLAINT**
                                         :
                                         :       JURY TRIAL DEMANDED
THE CITY OF NEW YORK and PATRICIA J.     :
LANCASTER, in her official capacity as   :
Commissioner of the New York City Department :
of Buildings,                            :
                                         :
                    Defendants,          :
------------------------------------------------------------x

      Plaintiff Third Church of Christ, Scientist, of New York City (the "Church"), by its undersigned attorneys for its Complaint against Defendants City of New York ("City") and Patricia J. Lancaster, in her official capacity as Commissioner of the New York City Department of Buildings ("DOB") (collectively, the "City" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

    1.    For more than 80 years, the Church has owned and worshipped in the historic building located at the northeast corner of Park Avenue and 63rd Street (the "Building"). Time has not been kind to the Building or the Church, whose membership dwindled as the Building fell into disrepair. A declining building is expensive to maintain and repair; growing liabilities for repair and maintenance keep new members away from the Church; a smaller membership makes it harder to raise money to pay for repairs. This was a vicious circle: if the Church failed to raise the substantial funds necessary to renovate the building, and in turn to grow its congregation, it would disappear.

    2.    The Church decided to do what many other religious institutions and secular non-profit organizations routinely do to supplement revenues: it entered into a

commercial relationship with a reputable caterer to conduct events in the Building – only at times when the Church was not using the Building for its primary religious purposes – in exchange for urgently needed funds. And, most significantly, the caterer agreed to spend millions of dollars to make necessary major capital repairs and renovations to the Building's aging infrastructure and bring the Building into compliance with the New York City Building Code (the "Required Capital Repairs"), as well as to pay the on-going expenses of maintaining the Building. This relationship was critical to the Church's survival.

3.      The Church is a good citizen and it went to the City for approval of this traditional accessory use. The City approved the Church's request and granted the necessary permits for the Required Capital Repairs. Doing so was entirely consistent with years of past practice; Defendants routinely permit non-profit groups and religious institutions to use their facilities for catered events for people or companies not otherwise affiliated with the non-profit or religious institution. The Church relied on the City's approval, and the Required Capital Repairs began to be made. To date, the caterer has expended approximately $6.5 million to make the Required Capital Repairs and expects to spend another $1.5 million over the coming months to complete the work. Even though the caterer is undertaking the Required Capital Repairs, the vast majority of the work also benefits the Building and its Church-related uses and will continue to provide that benefit long after the caterer's contract with the Church expires.

4.      But something unlawful has happened. Defendants have suddenly revoked their prior approval and rescinded the permits. They have done so because a small group of affluent, influential denizens of Park Avenue – all of whom live within a few blocks of the Regency Hotel, the Park Avenue Café, the Park Avenue Armory, the Council on Foreign Relations, the Asia Society and many other institutions that regularly host large social events – have complained that the catered events in the Building have transformed the Church into a

commercial catering hall that causes serious disruption in the neighborhood. The City's uncritical adoption of these baseless complaints is a pretext to conceal the truth: the City is singling out and discriminating against the Church without any basis. If unremedied, this discrimination will have devastating consequences for the Church and likely will result in the sale of the Building so that the Church can reimburse the caterer for the millions of dollars it has spent on the Required Capital Repairs.

5.      The Church seeks relief from this Court because the City has violated the Church's rights (1) to equal treatment under Section (b) of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), which ensures that religious institutions are treated on equal terms with nonreligious institutions; (2) to be free from undue burdens on the exercise of its religion, as protected by Section (a) of RLUIPA; (3) to equal protection of the laws, pursuant to the Fourteenth Amendment; and (4) to the free exercise of its religion, pursuant to the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the underlying events occurred in this district, and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## PARTIES

8.      Plaintiff Church is a religious corporation existing under the laws of the state of New York, with its principal place of business at 583 Park Avenue, New York, New York 10021.

9.      Defendant City of New York is a political subdivision of the State of New

York comprising the Counties of New York, Queens, Kings, Bronx and Richmond, and is a municipal corporation organized and existing under the laws of the State of New York. At all times relevant hereto, the City was and is responsible for the establishment, enforcement, and implementation of land use and zoning regulations within New York City.

10.    Defendant Patricia J. Lancaster is the Commissioner of the New York City Department of Buildings and is authorized to enforce, among other things, provisions of the New York City Administrative Code, the New York City Building Code, and the Zoning Resolution of the City of New York. She is sued herein in her official capacity.

11.    The New York City Department of Buildings is an administrative department of the City of New York, whose offices are located in the County of New York in the State of New York.

## FACTUAL ALLEGATIONS

### The Church and its Historic Building

12.    The Church began in the 1880s as a congregation of students dedicated to the Christian Science religion. By 1895, as its membership grew substantially, the Church applied for a charter and was registered under the laws of the State of New York.

13.    In 1920, the Church purchased property at 583 Park Avenue, New York, New York, and retained the renowned architectural firm Delano & Aldrich to design a house of worship for the congregation. Completed in or around 1924, the red-brick, Georgian-Colonial building topped with its tall lantern is one of the architectural highlights of Park Avenue and is the same building that houses the Church's congregation to this day.

14.    By the 1940s and 1950s, the Church's congregation – which by then had grown to approximately 1,000 – utilized the Building for numerous religious services and events, including two full-capacity Sunday services, Wednesday evening testimony meetings

with attendance of 1,000 to 1,400 attendees, Sunday school in the Building's basement, adult socials and youth forum activities, and lectures and workshops focusing on religious and spiritual healing topics. During this period, lectures in the Church's Building would frequently be attended by as many as 2,000 listeners, with spillover seating in the Sunday school facility in the basement.

15.    Over the years, the Church's membership has declined. It currently has fewer than one hundred members. True to its mission, however, the Church continues to use the Building for religious worship every Wednesday evening and Sunday morning, as well as for other religious uses such as Sunday School and lectures.

16.    A significant contributing factor to the decline in membership has been the growing state of disrepair of the Building and the prohibitive costs of the Required Capital Repairs, which members of the congregation would have to bear. The Required Capital Repairs necessary to revive the aging Building's infrastructure and to bring it into compliance with the New York City Building Code include modernization of all major building systems, including electrical, mechanical, plumbing, and heating, ventilation and air-conditioning; repair and, where necessary, replacement of the Building's façade, roof, windows, doors and other exterior components; and significant restoration of the main auditorium and other rooms regularly used for Church-related activities.

17.    In order to save the historic Building, the Church needed to raise substantial capital. For many years, the Church survived largely because of bequests made by deceased members of its congregation. But as the membership declined, the bequests declined, and the Church, year after year, was running at a significant deficit.

18.    Beginning at least in the late 1990s, the Church explored several alternatives to raise capital, including low-cost loans from the Historic Properties Fund

(administered by the New York Landmarks Conservancy), as well as government and private foundation grants. The Church also considered taking out a mortgage on the Building, but faced the reality that most lenders will not make loans to a Church because of the public relations ramifications of having later to foreclose on a church's property.

19.    From 1999 to 2006 the Church rented space in the basement of the Building to the Geneva School, a non-profit educational institution, five days a week. This relationship did not yield enough money to meet the Church's needs.

20.    In addition, the Church had several discussions with other religious institutions about the possibility of sharing space in the Building. These other religious organizations were willing to pay some rent for their use of the Building; but none of them was interested in sharing the burden of funding the Required Capital Repairs.

21.    Despite these efforts, the Church has been unable to generate enough revenue to meet its needs for renovation and maintenance of the Building.

22.    After considering numerous alternatives, the Church did what many other religious institutions and nonreligious non-profit groups routinely do: it decided to raise funds by allowing its building to be used by non-members as a venue for social events.

### The Church Permits the Rose Group to Host Catered Events
### In Order to Raise Needed Capital

23.    As is common, the Church contracted with a third party to conduct these events. The Church entered into a lease agreement with the Rose Group Park Avenue LLC (the "Rose Group"), a highly regarded, family-run catering company. The agreement, dated January 31, 2006 and amended on September 15, 2006 and March 27, 2007, permits the Rose Group to hold catered events in the Building for the next twenty years (with two five-year renewal options) in exchange for investing millions of dollars in the Building on Required Capital Repairs, and paying rent and ongoing maintenance costs (the "Lease").

NYC 189965v8 0085520-000001

24.     The express purpose of the Lease is to supplement the Church's income, and the catering use remains secondary to use of the Building for Church services:

> [The Church] is desirous of leasing the Premises **during those times when there are no scheduled Church services or Church related activities** . . . in order to generate income that can be used to maintain the Building and to support the Church activities while still permitting [the Church] to continue to use on an exclusive and non-exclusive basis the Building for Church services and related activities as it has in the past[.]

"Whereas" provision, Lease, at p. 1 (emphasis added).

25.     In addition to hosting weddings and other celebrations, as well as events for non-profit groups, companies and other firms – to date, events for New Yorkers for Children, Sloan Kettering, the Hispanic Society, the United Jewish Appeal and other groups have been held in the Building – the Lease requires the Rose Group to conduct catered events for members of the Church at reduced cost.  2nd Amn. to Lease, at ¶ 2.

26.     Upon information and belief, the Rose Group will invest more than $8 million on the Required Capital Repairs, of which $6.5 million has already been spent.  Because the Building lies within the Upper East Side Historic District, any renovations to the exterior of the Building must be undertaken in a painstaking manner so as to preserve, wherever possible, the Building's original architectural details.  Among the significant work that remains to be completed, the Rose Group plans to restore the Building's roof with slate from the same Vermont quarry that supplied the Church more than 80 years ago.

27.     In addition to Required Capital Repairs, the Rose Group is further obligated to undertake general maintenance of the Building throughout the 20-year Lease term, and to pay annual and percentage rent (*i.e.*, a percentage of gross revenue, above a certain threshold, from the catered events) to the Church.  This supplemental income is a crucial source of operating revenue for the Church's religious activities, which will be especially necessary

when new community activities and outreach programs are implemented.

28.    Thus, the Rose Group is required under the Lease to expend considerable sums and to make extensive improvements to the Building. But unlike a typical commercial tenant, it does *not* have an exclusive right to occupy the premises. To the contrary, the Lease makes clear that the Church retains the right to conduct its religious activities in the Building and prohibits the Rose Group from hosting events at any time that conflicts with the Church's religious services or activities.

29.    Specifically, the Lease provides that the Rose Group "acknowledges and agrees that during the term of this Lease and any renewal thereof, [the Church] shall continue to use and occupy the Premises for the conduct of church services and other church related activities[.]" Lease, at ¶ 35.1. Further, it provides that the Rose Group "must respect [the Church's] privacy during all Church related activities. Specifically, [the Rose Group] agrees that it shall not enter any portion of the Premises or the Building . . . during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve lectures, Thanksgiving services, Association meetings, Church Corporate or Organization Meetings and on regularly scheduled or special meetings of the Church[.]" Lease, at ¶ 35.5. Indeed, failure to respect the Church's privacy during its services amounts to a "serious and material default under this lease" and may entitle the Church to injunctive relief. Lease, at ¶ 35.6.

30.    The primary purpose of the Building is to serve as the Church's place of worship. But the Church could not and did not expect to induce the Rose Group to spend millions on improving and maintaining the Building without a reasonable opportunity to recoup its investment. Accordingly, the Lease permits the Rose Group to hold a variety of corporate, individual and charity functions at the Building, and is of a sufficient duration – a twenty-year term, with options to renew for two additional five-year terms – to permit the Rose Group a

reasonable chance to profit from the arrangement. In the second amendment to the Lease, dated March 27, 2007, the parties provided that, in the event that the Building could not be used for catering activity, the Rose Group would be able to require the Church to reimburse the Rose Group for Required Capital Repairs it had undertaken, even if the Church had to sell the Building. 2nd Amn. to Lease, at ¶ 3.

31.    The Church went out of its way to be sensitive to its neighbors. Thus, the Lease requires the Rose Group to "[p]ermit no act or practice which may … be a nuisance," and to "[l]oad and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the premises." Lease, at ¶ 32.1.

32.    The Church also insisted that the Rose Group take the extraordinary step of "supply[ing] refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors[.]" When this system is completed, all trash from catered events will be stored and refrigerated within the Building and taken to 63rd Street only when it is to be collected by the trash truck. Lease, at ¶ 32.1.

33.    Moreover, the Lease does not "permit any advertising medium or loud speaker, radio broadcast, etc. to be heard outside of the premises." Lease, at ¶ 32.1.

34.    In addition, the Second Amendment to the Lease provides that the Church and the Rose Group will together "establish standards concerning sound, light levels, traffic control, signage." 2nd Amn. to Lease, at ¶ 5.

35.    The Rose Group has retained a highly professional and comprehensive security team, Global Security Service, in order to ensure that all events at the Church are orderly, quiet, and safe. At all events, in addition to other security measures, there are usually off-duty members of the New York City Police Department patrolling the area, monitoring the event and managing any crowds. There also are usually two on-duty uniformed police officers

present to direct traffic and ensure that private cars obey traffic laws. These security measures are implemented from an abundance of caution. Thus far, all of the catered events that have occurred in the Building have occurred without incident.

### The Purpose of the Building Remains the Same: It Is a Place of Worship for the Church Congregation

36.    The primary purpose of the Building is to remain a house of worship. For over 80 years, the Building has been property devoted to the Christian Science faith, and it remains the center of the Church's congregation. The Church currently conducts Sunday Church Services and Sunday School services, Wednesday evening church service, Thanksgiving and Christmas Eve lectures, Association Meetings (four Saturdays each calendar year), Church classes (all-day class for a two-week period, twice a year), Church corporate or organizational meetings, and occasional non-regularly scheduled events and Association meetings. Lease, at ¶ 35.1.

37.    The Church has been attracting new members because of the recent repairs to the Building, and it hopes that, after the Required Capital Repairs are completed, it will be able to hold additional services and lectures for its members and other attendees. Among other events, the Church expects to host additional Sunday church services and Sunday school sessions, Wednesday testimony meetings, Christian Science lectures, committee and trustee meetings, youth forum activities, musical rehearsals and recitals, and various religious workshops. In total, the Church expects to utilize the Building for several hours almost every day of the week within the next five years. Following the renewal of the Church and its congregation, the Building will be open for religious activities for approximately 400-500 hours per month, far more than the approximately 60 hours per month that is contemplated for catered events for non-members.

38.    Finally, the Church's purpose in working with the Rose Group is more

than merely economical; the Church also hopes that opening up the Building to public events will introduce the Christian Science faith to the larger community, thereby aiding the Church in augmenting its membership. In addition to increased exposure, the historic Building will again be enjoyed and appreciated by the general public, as it had been for many decades until the Building began its decline.

### The Required Capital Repairs Were Undertaken in Reliance on the City's Approval of Catering Events at the Building

39.     Like many religious and nonreligious non-profit institutions, the Church is located in an area zoned for residential use. The Building is in an R-10 zoning district, which is the highest density residential area under the Zoning Resolution of the City of New York (the "Zoning Resolution"). In Manhattan, much of Midtown and Downtown as well as cross-town streets and avenues are zoned R-10.

40.     Only residences, community facilities (such as churches, synagogues and non-profit institutions) and uses that are "accessory" to residences and community facilities are permitted in residential districts under Article II, Chapter 2 of the Zoning Resolution. While catering facilities are permitted, and commonly found, as accessory uses in community facility buildings, stand-alone catering facilities are not permitted in residential districts. Section 12-10 of the Zoning Resolution provides that for a use to be considered "accessory" it must be (i) conducted on the same zoning lot as the principal use, (ii) clearly incidental to, and customarily found in connection with, the principal use and (iii) substantially for the benefit or convenience of the principal use.

41.     Prior to initiating the extensive and costly Required Capital Repairs, the Church and the Rose Group sought the City's approval for this catering arrangement. On April 19, 2006, the City issued a pre-consideration determination, which was subsequently affirmed and clarified on June 28, 2006, by the Manhattan Borough Commissioner of the DOB (the "Pre-

Consideration"). The Pre-Consideration provides that the catering activity would constitute an "accessory use" to the primary Church use of the Building, pursuant to Section 12-10 of the Zoning Resolution.

42.    The DOB also issued the necessary permits to authorize the Required Capital Repairs (the "Permits").

43.    Based on the Church's truthful representation that the catered events were to be "operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church" and that the "functions will be restricted by the contract with the Church," the DOB granted its Pre-Consideration permitting the Church to have catered events in the Building.

44.    The Church relied in good faith on the Pre-Consideration, as well as on follow-up conversations and meetings with senior DOB officials in which the Church made clear that there would be numerous catered events in the Building and that, because of the Building's capacity, many events would have large numbers of attendees. During these conversations, DOB's consistent position has been that catered private events at the Building for non-members would be a permissible "accessory use" of the Church, and, the Manhattan Borough Commissioner of DOB stated that the only limitation on the size of events related to the capacity of the Building. Approximately $6.5 million has been expended on the Required Capital Repairs in reliance on the City's June 2006 approvals.

**Defendants Routinely Permit Other Religious And Nonreligious Non-Profit Groups to Conduct Similar Catered Events, Including In The Church's Immediate Vicinity**

45.    The Church's reliance on the Pre-Consideration was reasonable on several levels. After all, as detailed below, (a) there are many buildings in the immediate vicinity of the Building, all in residential zoning districts, that are rented to members of the general public for large social events, (b) there are many similarly situated churches, synagogues and other

religious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events, and (c) there are many nonreligious institutions throughout the City that routinely rent out their buildings to non-members for weddings, bar mitzvahs, birthday parties, and non-profit as well as corporate events.

45-a.    The following is a chart, developed from public records without the benefit of discovery proceedings, showing establishments in the immediate vicinity of the Building, all of which are located in Residential zoning districts, and which rent their facilities to members of the general public for catered events:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| The Beekman | 575 Park Avenue – directly south of the Building | Total capacity (restaurant plus separate catering venue) approx 200 | A restaurant open to the general public as well as a separate facility for catered events | R10 (Special Park Improvement District ("PI")) / R8B (Limited Height District No. 1A ("LH-1A")) |
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity: 500 | Available for private catered events and movie and commercial shooting | R10 (PI) |
| The Colony Club | 564 Park Avenue – two blocks south of the Building | | Private club, rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Regency Hotel | 540 Park Avenue – two blocks south of the Building | 4,400 square feet of flexible function space, accommodate up to 200 | Rents out space for a variety of catered events, uses in-house catering operation | R10 (PI) / C5-1 (Special Madison Avenue Preservation District) |
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated; additional events on same night can be held in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety | R10 (PI) |

| | | | of catered events for non-members | |
|---|---|---|---|---|
| Union Club | 101 East 69th Street and Park Avenue | | Rents out space for a variety of catered events for non-members | R10 (PI) / R8B (LH-1A) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers Club | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. *Uses designated outside caterer* New York Catering | R8B (LH-1A) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers*. | R10 (PI) |

45-b.   Moreover, as is evident from the following chart developed from public records without the benefit of discovery proceedings, it is customary for churches, synagogues and other religious institutions to rent out their facilities to non-congregants for social events in order to offset in the extraordinary costs of maintaining their historic properties:

| | **Location** | **Capacity** | **Availability** | **Zoning** |
|---|---|---|---|---|
| The Central Presbyterian Church | 593 Park Avenue – approximately 20 feet north of the Building and on the same block as the Building | 3 floors and other rooms available, total capacity 500 guests | Available for private catered events and movie and commercial shooting | R10 (PI) |
| St. Bartholomew's Church | 109 East 50th Street and Park Avenue | 1250 | Available for movie and commercial filming, corporate events, fashion shows, rehearsal dinners, weddings, cocktail parties, and dances, among other events. All catering provided in house by Café St. Bart's. | C5-3 (MID) / C5-2.5 (MID) |
| Church of St. Ignatius Loyola | 980 Park Avenue, near East 83rd Street | 250 | Wallace Hall is available for rental for events for non-congregants. *Uses designated outside caterers*. | R10 (PI) |

| Universalist Church of New York | 160 Central Park West | 500 | Church dated 1897, available for private catered events and separate attached kitchen. | R10-A / R8B |
|---|---|---|---|---|
| All Souls Church | 1157 Lexington Avenue and East 80th Street | 350; 200 seated event | | C1-8X / R8B |
| The Top Deck at the Seamen's Church Institute | 241 Water Street, near Peck Street | 130 guests | Interfaith chapel, rents out space for a variety of catered events for non-congregants. | C6-2A (Special Lower Manhattan District – South Street Seaport Subdistrict) |
| Riverside Church | 490 Riverside Drive, between 119th and 122nd Street | 500; 300 seated event | Uses designated onsite caterer, Madeline's Catering & Special Events | R8 |

45-c.    Finally, the following chart, developed from public records without the benefit of discovery proceedings, makes clear that it is customary for nonreligious non-profit institutions (including institutions, like the ones below, located in residential districts) to rent their facilities to non-members for catered events in order to offset the extraordinary costs of maintaining their historic properties:

| | Location | Capacity | Availability | Zoning |
|---|---|---|---|---|
| Council on Foreign Relations | 670 Park Avenue and East 68th Street | 180 seated event; can host additional events on same night in other rooms of the mansion. | Rents space for a variety of catered events for non-members | R10 (PI) |
| Americas Society | 680 Park Avenue and East 68th Street | 120 seated event with dancing | Not-for-profit education institution and museum; rents out space for a variety of catered events for non-members | R10 (PI) |
| The Asia Society and Museum | 725 Park Avenue and East 70th Street | 150 seated event; 300 cocktails | Rents out space for a variety of catered events for non-members. *Uses designated outside caterer* Great Performances. | R10 (PI) |
| The Explorers | 46 East 70th Street, near Park Avenue | 120 seated event; 250 cocktails | Private club rents out space for a variety of catered events for non-members. | R8B (LH-1A) |

| Club | | | *Uses designated outside caterer* New York Catering | |
|------|------|------|------|------|
| The Frick Collection | 1 East 70th Street, near Fifth Avenue | 200 seated event; 350 cocktails | | R10 (PI) / R8B (LH-1A) |
| National Academy Museum | 1083 Fifth Avenue, near East 89th Street | 140 seated event; 240 cocktails | | R10 (PI) |
| Cooper-Hewitt, National Design Museum | 2 East 91ˢᵗ Street, near Fifth Avenue | 90 seated event; 500 in Terrace and Garden | Rents out space for a variety of catered events for non-members *Uses designated outside caterer* Restaurant Associates | R10 (PI) / R8B (LH-1A) |

46.     Like these secular non-profit institutions, and like other religious institutions, the Church found that it was necessary to rent out its space to cover the daunting costs of making the Required Capital Repairs and of operating and maintaining its historic Building. Like its neighbors, the Church sought to use its Building both to generate revenue and to serve as a community resource. The events already held in and planned for the Building are not meaningfully different from any of these uses at other comparable institutions.

### Opposition by Neighboring Residents Results in the Revocation of the Pre-Consideration

47.     By March 2007, after the Required Capital Repairs were well underway and after the Rose Group had hosted several catered events, residents of two neighboring buildings on the west side of Park Avenue, across the wide avenue from the Church – 570 Park Avenue and 580 Park Avenue – began to complain about the Church's arrangement with the Rose Group. After initially discussing the matter with the Church and the Rose Group, residents of 570 and 580 Park Avenue, calling themselves the "The Preservation Coalition," initiated a public relations campaign against the Church. Their avowed purpose was to maintain the "residential" character of their Park Avenue neighborhood, and their flyer contended that the Church's plans to permit catered events at its historic premises – although no different than the

practices of neighboring institutions – would cause significant disruption in their backyard. These neighbors, however, failed to mention that if the Church were unable to supplement its revenues it likely will be forced to sell the Building to a developer or other entity far less likely to want to preserve the Building in its present form.

48.    On October 3, 2007, the objecting neighbors circulated another flyer throughout the Church's neighborhood which accused the Church of being "less than forthcoming about the use of the church" and insisting that the Church "insult[s] [their] intelligence" by (truthfully) denying that the Church is not being converted into a commercial catering hall. The flyer concluded that "there is no question about the effect these large events have had and will continue to have on the peace and quiet of our neighborhood – commercial deliveries, traffic jams, double parking, noise and after-party sidewalk life and cleaning up well into the night." This is a selective and baseless attack on the Church. As detailed above, there are many institutions in this very neighborhood – including the far larger Park Avenue Amory just a few blocks north – that host large catered events and that take far fewer steps than the Church has taken to minimize the impact on local quality of life.

49.    The disgruntled neighbors have pressed these pretextual complaints on the City, sending at least three letters to the DOB, dated March 12, 2007, March 30, 2007, and October 5, 2007. The letters make the untrue claim that the Lease essentially transfers ownership of the Building to the Rose Group, thereby distorting the real import of the Lease.

50.    Contrary to the arguments made in the letters the disgruntled neighbors submitted to Defendants, the Lease is simply a contract pursuant to which the Church obtains urgently needed income, funds for the Required Capital Repairs, and a commitment by the Rose Group to pay for ongoing maintenance of its Building in exchange for granting the Rose Group the limited right to use the Building for catered events when it is not being used for religious

activities.

51.    Unfortunately, the City has succumbed to the demands of these influential neighbors.  On October 29, 2007, the DOB sent a letter (the "DOB Letter") reversing itself and notifying the Church and the Rose Group that it intended to revoke the approval set forth in the Pre-Consideration and the Permits, even though the Required Capital Repairs were nearly completed.

52.    The DOB Letter stated that the DOB had re-evaluated its position in light of vocal opposition by the Church's neighbors, and had now concluded that the catering events would not be an "accessory use" to the Church's primary use "because [the use of the Building for catered events] does not comport with the Zoning Resolution's requirement that it be 'clearly incidental to, and customarily found' in connection with the Church."  The DOB directed the Church to forbid the Rose Group from conducting any catered events after April 28, 2008 (even if such events had already been booked), and further prohibited the Church from permitting the Rose Group to enter into any new contracts for catered events (even if such a new engagement could be held prior to April 28, 2008).  The DOB Letter effectively terminates the Rose Group's ability to use the Building for catered events and to recoup the significant investments it has made in the Required Capital Repairs.

53.    Upon receiving the letter, the Church engaged litigation counsel.  Through counsel, the Church contacted the Defendants to attempt to resolve this matter short of litigation.  Counsel for the Church advised the Defendants that if the DOB continued in its decision to revoke approval for the catered events to continue, the Church likely would be forced to sell the Building to satisfy its liabilities.

54.    The Church's attempt to resolve this matter without litigation was unsuccessful.

55.    On November 30, 2007, the DOB wrote to the Church's counsel confirming that its October 29, 2007 letter, which set forth the Notice of Intent to Revoke its prior approval for catering events at the Church, was the DOB's final decision (the "Final Determination"). The Final Determination rescinds the earlier-granted approval for catering events, and revokes, forthwith, the building permits authorizing the Required Capital Repairs.

56.    By revoking the Permits and rescinding the Pre-Consideration and withholding permission allowing the Church to hold catered events by the Rose Group, the City is implementing its land use laws in a way that treats the Church on less than equal terms with nonreligious institutions. It also irrationally singles out the Church by treating it more harshly than it treats similarly situated religious organizations or comparable nonreligious non-profit organizations, many of which engage in the identical practice of renting, leasing or otherwise making available their premises in order to host private catered events.

57.    The Church voiced its concerns regarding the City's unfair and unequal treatment of the Church through numerous communications with the DOB, specifically identifying the fact that other substantially similar institutions engage in the identical practice (many within the same or even lower density residential zoning districts). The City, notwithstanding such knowledge, nonetheless knowingly and intentionally discriminated against the Church by implementing the City's land use and zoning laws in a manner that treats the Church unlike any other institution in the surrounding area.

58.    By revoking the Permits and preventing the Church from hosting catered events on its premises, the City has threatened the very existence of the Church by making it impossible for the Church to raise the funds necessary to operate and maintain its Building and effectively forcing the Church to sell the Building to reimburse the Rose Group for the millions of dollars of Required Capital Repairs completed pursuant to the Lease. The implementation of

the unfair zoning determination by the DOB imposes a substantial burden on the Church and its congregation's ability to freely exercise its religion at its chosen house of worship – the epicenter of its religious practice for the past 80 years.

59.    Further, by determining that the Church's Building is effectively a catering hall, the City mischaracterizes the Lease and wrongfully impugns the Church. Contrary to the Defendants' disparaging characterization, the Church remains a congregation devoted to the Christian Science faith, and any catering activities conducted in the Building were, and will remain, wholly incidental to its primary purpose and use of preaching and practicing its religion.

60.    Moreover, the City is impairing the Church's interest in opening up its premises to the general public, which it believes will spark new interest in the Christian Science faith.

### The Church Will Suffer Immediate and Irreparable Injury

61.    The impact of the DOB's decision will be devastating and immediate. The Final Determination rescinds the earlier-granted accessory use approval and revokes the Permits, forthwith. Therefore, pursuant to the DOB Letter and the Final Determination, as of October 29, 2007, the Church is prohibited from allowing any additional catered events to be booked for the Building, and the Church is prohibited from permitting any additional catered events in the Building to be held after April 28, 2008. Moreover, because the Final Determination revokes the Permits, the Church and the Rose Group will be forced to suspend any further Required Capital Repairs. As a result, the 27 events for which contracts have been made by October 29, 2007, but which were scheduled to be held after the 6-month deadline of April 29, 2008 set by the DOB Letter, will have to be canceled. This prohibition effectively requires the Rose Group to cease its catering operations in the Building.

62.    If the Church can no longer make the Building available for catered

events, it will be unable to generate the revenue it needs to maintain the Building and sustain its membership and its religious activities, and it will be required to reimburse the Rose Group for the millions of dollars of Required Capital Repairs already completed. For these reasons, and more, if the City's decision is not enjoined, the Church will be forced to sell the Building and its congregation will be deprived of its place of worship.

### First Claim for Relief
### RLUIPA EQUAL TERMS CLAIM
### 42 U.S.C. § 2000cc(b)

63.    Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.    By imposing and implementing the City's land-use and zoning laws and regulations in the manner described above, and by the conduct described above, the City is treating the Church on less than equal terms with comparable nonreligious institutions.

65.    By revoking the Permits and rescinding the Pre-Consideration and thereby forbidding the Church to permit catered events at the Building, Defendants have discriminated against the Church because they freely permit comparable nonreligious institutions to engage in the similar practice of renting out their premises for catered events for non-members.

66.    By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(b), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Second Claim for Relief
### RLUIPA SUBSTANTIAL BURDEN CLAIM
### 42 U.S.C. § 2000cc(a)

67.    Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.     The Church entered into the Lease because it needed to preserve its Building so that its congregation could worship and perform other religious activities in it. The Church's use, renovation, and restoration of its real property constitute "religious exercise."

69.     Among other improvements, the Lease requires the creation of a new room for the Church's Sunday School, and this conversion of real property is also "religious exercise" under RLUIPA.

70.     Congress requires that the Court construe RLUIPA "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-3(g).

71.     Defendants' decision to renege on the earlier-granted approval and now to revoke the Permits and to prohibit any further catering agreements (in effect, forcing a cancellation of the Lease) will coerce the Church into attempting to continue to conduct its religious activities in an inadequate facility, thereby preventing it from reviving its congregation, spreading its religious teaching, and thereby impeding its religious exercise.

72.     If not enjoined, Defendants' revocation of the Permits and prohibition of further catered events will leave the Church with no ready alternative to raise the funds it needs to perpetuate its mission and its existence; at best, the Church will be required to undergo substantial delay, uncertainty and expense in an effort to rehabilitate its facility to enable religious exercise.

73.     The revocation of the Permits and prohibition on any future catered events is an arbitrary, irrational decision that does not bear any substantial relation to the public health, safety and welfare.

74.     The revocation of the Permits and prohibition on any future catered events reflects the Defendants' inconsistent application and implementation of its zoning rules, a

decision made to placate a small but influential number of disgruntled neighbors and not to further any legitimate governmental interest. The City cannot demonstrate any substantial, much less compelling, interest vis-à-vis reduction in traffic, noise, or other factors relating to quality of life, given that Defendants allow events similar to the catered events in other facilities in the immediate neighborhood.

75.     By imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above, Defendants have imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

76.     The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

77.     This substantial burden on the religious exercise of the Church is imposed by Defendants in the implementation of a system of land use regulations under which Defendants make, and have in place formal and informal procedures or practices that permit them to make, individualized assessments of proposed land uses, as contemplated by 42 U.S.C. § 2000cc(a)(2)(C).

78.     This substantial burden on the religious exercise of the Church, and the removal of the substantial burden, will affect commerce among the several states, as contemplated by 42 U.S.C. § 2000cc(a)(2)(B).

79.     By virtue of the foregoing conduct, Defendants have violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and the Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief,

injunctive relief, compensatory damages, and the costs and expenses of this action.

### Third Claim for Relief
### EQUAL PROTECTION CLAIM
### PURSUANT TO 42 U.S.C. § 1983

80.    Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.    The Church is a "class of one" and is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

82.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated religious organizations to conduct.

83.    Defendants have arbitrarily and selectively interpreted and enforced the City's zoning code and land use laws, and have singled out Plaintiff for arbitrary and selective enforcement, by revoking the Pre-Consideration and by withholding consent to allow Plaintiff to engage in catering activities substantially similar to activities that the City permits other similarly situated nonreligious institutions to conduct.

84.    This differential treatment was based on impermissible considerations, including baseless community opposition to the Church, the nature of the Church's religious beliefs, and the bad faith attempt to harm the Church's ability to maintain its premises.

85.    Defendants' actions are designed for the purpose of hampering the exercise of the Church's religious activities in its chosen house of worship, and to prevent the Church from generating the same sort of supplemental income from the rental of event spaces that other similarly situated institutions are permitted to generate.

86.     By singling out Plaintiff for unequal adverse treatment, and bowing to pressure from the neighborhood opponents, Defendants deprive Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

87.     Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

88.     By virtue of the foregoing conduct, Defendants have caused the Church immediate and irreparable harm.

89.     The Church is accordingly entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### Fourth Claim for Relief
### FIRST AMENDMENT FREE EXERCISE CLAIM
### PURSUANT TO 42 U.S.C. § 1983

90.     Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.     Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, by imposing and implementing the City's land use and zoning laws and regulations in the manner described above, and by the conduct described above.

92.     The Defendants' implementation of the City's land use laws is not neutral and generally applicable to all, but instead discriminates unfairly against the Church.

93.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any compelling reason.

94.    The Defendants have imposed a substantial burden on the Church's free exercise of its religion, without any rational basis.

95.    By singling out Plaintiff for unequal, adverse, treatment, and bowing to pressure from neighborhood opponents, Defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, the right to free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution.

96.    Defendants, acting through and in concert with each other, under color of law and in their respective official positions, and in furtherance of a custom or policy of the City, have deprived the Church of its constitutionally protected rights.

97.    By virtue of the foregoing conduct, Defendants have caused immediate and irreparable injury to the Church.

98.    The Church is entitled to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

WHEREFORE, judgment should be entered as follows:

A.    Declaring that Defendants' actions violated section (b)(1) of RLUIPA;

B.      Declaring that Defendants' actions violated section (b)(2) of RLUIPA;

C.      Declaring that Defendants' actions violated section (a) of RLUIPA;

D.      Declaring that Defendants' actions violated Plaintiff's right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution;

E.      Declaring that Defendants' actions violated Plaintiff's right to the free exercise of religion pursuant to the First and Fourteenth Amendments to the United States Constitution;

F.      Temporarily, preliminarily and permanently enjoining Defendants from revoking the Permits or prohibiting the Church, pursuant to the Lease, from continuing to permit catered events for non-members in the Building pursuant to the Lease;

G.      Awarding compensatory damages against all Defendants;

H.      Awarding Plaintiff's attorney fees and other reasonable expenditures, together with the costs and expenses of this action pursuant to 42 U.S.C. § 1988; and

I.      Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated:      New York, New York
            December 3, 2007

                                        DAVIS WRIGHT TREMAINE LLP

                                        BY: _____
                                            Victor A. Kovner (VAK-2248)
                                            John Cuti (JC-3365)
                                            Monica Pa (MP-3307)

                                        1633 Broadway
                                        New York, New York 10019-6708
                                        Telephone: (212) 489-8230
                                        Facsimile: (212) 489-8340

                                        *Attorneys for Plaintiff*
                                        *Third Church of Christ, Scientist,*
                                        *of New York City*

# EXHIBIT C

**Pa, Monica**

| | |
|---|---|
| **From:** | Cuti, John |
| **Sent:** | Monday, April 07, 2008 11:29 AM |
| **To:** | 'mgalison@herrick.com' |
| **Cc:** | Pa, Monica |
| **Subject:** | RE: Third Church; subpoena to Fourth Universalist Church |

Marni,

Thanks for your voicemail informing me that the Universalist Church was going to handle the response to the subpoena.  Do you have contact information for the person there who is handling?  If so, we'd much appreciate it if you could send that info to us.

Many thanks.

John

**John Cuti** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax: (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** Cuti, John
**Sent:** Wednesday, April 02, 2008 3:15 PM
**To:** 'mgalison@herrick.com'
**Cc:** Pa, Monica
**Subject:** Third Church; subpoena to Fourth Universalist Church

Marni,

Can you let me know where you are with your client re responding to the subpoena?

Thanks,

John

**John Cuti** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax: (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

# EXHIBIT D

## Pa, Monica

| | |
|---|---|
| **From:** | Rosemary Bray McNatt [revrose@4thu.org] |
| **Sent:** | Friday, April 18, 2008 9:07 PM |
| **To:** | Pa, Monica; bputnam@4thu.org |
| **Subject:** | Re: Third Church Subpoena |
| **Importance:** | High |

Dear Monica--

Thank you for our conversations on Friday. I can completely understand your concern about the discovery deadline of your case, but the unfortunate combination of my sabbatical travels, the departure of our previous counsel, and the need to track down the volumes of information you require, have all led to the delay. As I told you during both our conversations, a deadline of April 24th is simply not possible for us to meet, though I believe we will be able to get information for you in ample time for you to review before your June 3rd deadline.

I'm writing to confirm the church's plan to continue locating as many documents as we are able to find, and to have the assistant to the minister for administration, Beth Putnam, be in touch with you on Wednesday, April 23rd, with a progress report on how we are doing. Of course we will continue to consult our attorneys about protecting the privacy of our congregation and its clients, and any information we are able to provide will be in keeping with those boundaries. We very much appreciate your cooperation in this matter.

--
Faithfully,
Rosemary

The Rev. Rosemary Bray McNatt, Senior Minister
The Fourth Universalist Society in the City of New York
UUA Trustee, Metropolitan NY District

160 Central Park West at 76th St.
New York, NY 10023
212-595-1658, ext. 22
revrose@4thu.org
www.4thu.org

---

From: **Pa, Monica** <MonicaPa@dwt.com>

Date: Thu, Apr 17, 2008 at 10:22 AM
Subject: Third Church Subpoena
To: bputnam@4thu.org
Cc: "Cuti, John" <JohnCuti@dwt.com>

Dear Beth,

I am writing to follow up on our telephone conversation on Tuesday, April 15.  As we previously discussed,  Universalist Church is currently gathering information to respond to the Subpoena, served on March 6, 2008.  As you know, the Subpoena required compliance by March 26, 2008, but we have granted you and your former counsel multiple extensions of time to respond.

As we have discussed, Third Church is interested in working with you to obtain the requested documents and information, and are open to discussing ways to reduce any burdens associated with the document production.  We are willing to limit the temporal scope of the Subpoena, and to discuss means of producing documents.  That said, documents and information from Universalist Church are highly relevant to our case. We have a court order permitting us to take discovery from churches that host social events at their premises, such as your church.

The Court granted us only three months to conduct discovery -- and this period expires on June 3rd.  We therefore must receive responsive documents from you no later than Thursday, April 24th, because we need to review and analyze these documents prior to deposing someone at Universalist Church. If we do not receive documents by then, we will have to ask the Court to compel your compliance in order to protect our client's rights.

Please contact me as soon as you are able.  I look forward to resolving this issue with you.

Very truly yours,
Monica Pa

**Monica Pa** | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6465 | Fax: (212) 489-8340
Email: monicapa@dwt.com <mailto:monicapa@dwt.com> | Website: www.dwt.com
<http://www.dwt.com/>
Bio: www.dwt.com/lawdir/attorneys/PaMonica.cfm
<http://www.dwt.com/lawdir/attorneys/PaMonica.cfm>

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

Disclaimer: This message may contain confidential communications protected by the attorney client privilege. If you received this message in error, please delete it and notify the sender.

# EXHIBIT E

## Pa, Monica

| | |
|---|---|
| **From:** | Rosemary Bray McNatt [revrose@4thu.org] |
| **Sent:** | Monday, April 21, 2008 2:38 PM |
| **To:** | Pa, Monica; bputnam@4thu.org |
| **Cc:** | Cuti, John; Kovner, Victor |
| **Subject:** | Re: Third Church Subpoena |

Dear Monica--

Thanks for acknowledging my email, and for your offer to come to the church on April 23rd. As I said in last week's email, Beth will be calling you with a progress report. When the two of you speak then, she'll have a better understanding of whether or not a meeting will be productive, and when she or someone else might be available for that meeting. It's our hope that at that time, we'll also have a cost estimate for you regarding the staff time necessary to be in compliance with your subpoena. I'll check in again at the end of my travels.


--
Faithfully,
Rosemary

The Rev. Rosemary Bray McNatt, Senior Minister
The Fourth Universalist Society in the City of New York
UUA Trustee, Metropolitan NY District

160 Central Park West at 76th St.
New York, NY 10023
212-595-1658, ext. 22
revrose@4thu.org
www.4thu.org


On 4/21/08 1:58 PM, "Pa, Monica" <MonicaPa@dwt.com> wrote:

> Dear Reverend McNatt and Beth,
>
> Thank you for your email on April 18th. We appreciate your efforts and will do our best to limit any undue burden on your church. The best course may be for me to meet with Beth personally at your Church on April 23rd. That way, I can see what documents you have and figure out which documents are most helpful.
>
> Also, please keep in mind that the Subpoena permits us to depose a person at your church who is the most knowledgeable about catering at Landmark on the Park. You are allowed (but not required) to have a lawyer at the deposition. My law firm will do the questioning, and a lawyer for the City will be there as well. We must take this deposition before June 3rd, and so we'd like your documents at least one week before the deposition.
>
> Beth, please contact me directly so we can schedule a meeting. I look forward to working with both of you.

Best,

Monica Pa

**From:** Rosemary Bray McNatt [mailto:revrose@4thu.org]
**Sent:** Friday, April 18, 2008 9:07 PM
**To:** Pa, Monica; bputnam@4thu.org
**Subject:** Re: Third Church Subpoena
**Importance:** High

Dear Monica--

Thank you for our conversations on Friday. I can completely understand your concern about the discovery deadline of your case, but the unfortunate combination of my sabbatical travels, the departure of our previous counsel, and the need to track down the volumes of information you require, have all led to the delay. As I told you during both our conversations, a deadline of April 24th is simply not possible for us to meet, though I believe we will be able to get information for you in ample time for you to review before your June 3rd deadline.

I'm writing to confirm the church's plan to continue locating as many documents as we are able to find, and to have the assistant to the minister for administration, Beth Putnam, be in touch with you on Wednesday, April 23rd, with a progress report on how we are doing. Of course we will continue to consult our attorneys about protecting the privacy of our congregation and its clients, and any information we are able to provide will be in keeping with those boundaries. We very much appreciate your cooperation in this matter.

# EXHIBIT F



**The Fourth Universalist Society**
160 Central Park West, New York, NY 10023
212-595-1658 www.4thu.org

April 28, 2008

Monica Potter
Davis, Wright & Tremaine, LLP
1633 Broadway
New York, NY 10019-6708

Dear Monica Potter,

Since our last conversation regarding the subpoena issued by your client, Third Church of Christ Scientist of New York City, to the Fourth Universalist Society of New York for documents that it requested for current action with the City of New York and Patricia J. Lancaster (07-CV-10962 (DAB)), I have been able to renew conversations with legal counsel. Pursuant to those conversations, I am writing to object to the subpoena on the grounds of relevance. First, your client's action with the city is unique and the documents you seek are not relevant to your action. Further, our rental arrangement with our renters is significantly different as we provide space rental and no food or other services. Consequently, we are objecting to your requests in their entirety and we will not be producing documents in response to them.

In addition, we are not able to produce the documents requested in the request as the range of documents requested violates the confidentiality of our renter relationships.

Sincerely,

*Elizabeth Putnam*

Elizabeth Putnam
Assistant to the Minister for Administration
Fourth Universalist Society of New York
A Unitarian Universalist Congregation