UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIRD CHURCH of CHRIST, SCIENTIST, of
NEW YORK CITY,

                     Plaintiff,

        -against-

THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as,
Commissioner of the New York City Department of
Buildings,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No.   07 Civ. 10962

(DAB) (FM)

**DECLARATION OF PHYLLIS H.
WEISBERG IN OPPOSITION TO
MOTION TO COMPEL AND IN
SUPPORT OF CROSS-MOTION
TO QUASH AND/OR MODIFY
SUBPOENAS**

(Electronically Filed Document)

      PHYLLIS H. WEISBERG, an attorney duly admitted to practice in this court,

hereby declares, pursuant to 28 U.S.C. §1746:

      1.      I am a member of the firm of Kurzman Karelsen & Frank, LLP, attorneys

for non-parties 570 Park Avenue Apartments, Inc. ("570 Park"), 580 Park Avenue, Inc. ("580

Park"), Beekman Tenants Corporation ("Beekman") (collectively, the "Coalition Members"),

and Susan Relyea, as Member of the Co-Op Board of 580 Park ("Ms. Relyea") (hereinafter

sometimes referred to collectively as the "Neighbors").  The non-party corporations are members

of the Preservation Coalition, a coalition that presently consists of the cooperative apartment

corporations owning the following residential buildings:  116 E. 63, 125 E. 63, and 535, 550,

555, 563, 565, 570, 575, and 580 Park Avenue ("Coalition").  These residential buildings are all

located in the immediate vicinity of Park Avenue and 63rd Street, where 583 Park, the building

owned by Plaintiff, is located.  I make this declaration in opposition to Plaintiff's motion to

compel compliance with the subpoenas and in support of the Neighbors' motion to quash and/or modify the subpoenas.

2.    Plaintiff seeks to justify its extraordinarily broad discovery against the Neighbors on the ground that the Neighbors allegedly "improperly influenced" the New York City Department of Buildings ("DOB") to revoke an accessory use permit, which would have allowed a catering use in Plaintiff's building.  In making this argument, Plaintiff maligns the Neighbors as a group of "influential denizens of Park Avenue" who organized a "NIMBY campaign," "pressed pretextual complaints," used "24-hour video surveillance" to "spy" and hired a lobbyist to refine their "spin."

3.    In fact, as will be demonstrated herein, the Neighbors were properly exercising their First Amendment rights to petition the government for redress of grievances in reaction to the disingenuous efforts of the Plaintiff and its Tenant-Caterer, Rose Group Park Avenue LLC (the "Rose Group" or "Tenant-Caterer"), to mask a clearly illegal use of the church building including:

   o  Misrepresenting to the DOB regarding the nature and extent of commercial use of the church as documented by contradictory statements in other government filing and in advertisements of the use; and

   o  Failing to disclose the real estate interest and control over the property and its use granted to the Tenant-Caterer under a 20 year triple net lease.

4.    Having instituted the present action against New York City and the DOB Commissioner for a preliminary injunction, so that its Tenant-Caterer can continue its catering operation, the Plaintiff now seeks extraordinarily broad discovery from the Neighbors, the following background is presented to demonstrate that the alleged necessity for extraordinarily

broad discovery against the Neighbors because they 'improperly influenced' the City is pretextual and, therefore, such discovery should not be allowed.

## BACKGROUND

### The Coalition & Its Efforts

5.      In the fall of 2006, Kurzman Karelsen & Frank, LLP ("KK&F") was contacted and retained by 580 Park to investigate issues relating to the establishment of a catering operation at Plaintiff's building located at 583 Park Avenue; 583 Park Avenue is located in a residentially zoned district and within the Park Improvement District, as set forth in New York City's Zoning Resolution.   The results of KK&F's investigations are described below. Shortly thereafter 570 Park requested KK&F represent it, too, on these issues.   Efforts were thereafter made to reach out to the larger community to organize the opposition to the non-accessory catering operation.   With a number of buildings joining the effort, the Coalition was formed.   The Coalition has opposed the effort to establish what it maintains is an illegal commercial catering operation at 583 Park Avenue.

6.      Citizens, such as the Neighbors, have a legitimate role in presenting their viewpoints to the governmental agencies such as the DOB.   As recently reported in an Associated Press Article,  annexed as "**Exhibit A**," the DOB's failure to investigate numerous public complaints about zoning and safety problems in connection with the construction of a 43-story condominium—which the Commissioner admitted was "mistakenly approved" because it was not zoned for a height above 30 stories—contributed to circumstances that led to a crane collapse.   An overworked DOB needs to and should rely on the community in order to ensure that the information provided to it is accurate and its decisions are sound.   This is all the more so

194247.4                                                3

when the issue is one of zoning rather than construction since zoning is designed to maintain the character of the community.

<div align="center">**Results of the Coalition's Investigation**</div>

7.     In October, 2006, at a Community Board 8 ("CB8") meeting, the community learned for the very first time that the Plaintiff, accompanied by Louis Rose, a principal of the Plaintiff's Tenant-Caterer, was applying to cover the Plaintiff's signage in what appears to be a move to dissociate the Tenant-Caterer, which serves alcohol, from the Plaintiff, whose members eschew the use of alcohol.  Upon investigating the matter, the Coalition quickly learned the following: the pews had been removed from the church and a request had been made in or about April, 2006 to the DOB to legalize, as an accessory use, the use of the church as a catering hall.  Subsequently, the Coalition learned that the Plaintiff had negotiated and signed a triple net lease with the Tenant-Caterer as early as January, 2006.

8.     As discussed below, the Coalition's investigation disclosed that this claimed accessory use was anything but an accessory use; instead it discovered a disturbing pattern of inconsistencies between and among filings with governmental agencies.  Further, while these filings and the lease were in some instances modified, seemingly to address impediments to the permits and approvals that the Plaintiff and its Tenant-Caterer required, which impediments were posed by the inconsistencies, as disclosed by the Coalition, *in no way was the nature of the Tenant-Caterer's operation modified*.  Such information was relayed to the City by the Coalition via letters, including those dated March 12, 2007, annexed as "**Exhibit B**", March 30, 2007, annexed as "**Exhibit C,**" and October 5, 2007, annexed as "**Exhibit D**" (these letters are annexed without accompanying exhibits).  Plaintiff falsely characterizes these letters as "pretextual" (*see* Plaintiff's Memorandum of Law, p. 3).  These letters, however, do nothing

but reveal the true nature of the Plaintiff's relationship with its commercial Tenant-Caterer and the Tenant-Caterer's operations at 583 Park Avenue, something which the Plaintiff sought to withhold from the City.  Based on the March 12, 2007, March 30, 2007 and October 5, 2007 letters, which are in the Plaintiff's possession, *as well as* letters from the Church's representatives, cited by the City in its October 29, 2007 letter, annexed as "**Exhibit E,**" the City properly issued its notice of Intent to Revoke Approval and Permit to operate a catering establishment, since it is *not* an accessory use "clearly incidental and customarily found," in connection with the church.

**a. The misrepresentations to the DOB**

9.    On or about March 29, 2006, the Plaintiff filed pre-consideration request with the DOB, the relevant page of which is annexed as "**Exhibit F,**" for a change of use.  While the Plaintiff is the applicant to the DOB, it is the Tenant-Caterer that is the applicant to obtain permits in connection therewith.  Further, as shown on the DOB printouts annexed hereto as "**Exhibit G**," the Tenant-Caterer is the general contractor for the general construction at the church to "change the occupancy from church and school to "church, school, accessory social hall, ballroom and catering."  Thus, the Tenant-Caterer is responsible for the application along with the Plaintiff and the Plaintiff cannot distance itself from the Tenant-Caterer's representations nor vice versa.

10.    According to the fourth paragraph of the pre-consideration request as originally filed with the DOB,

> It is proposed to continue the use as a church, and add an accessory use of social hall, ballroom and catering..., for the periods that the hall is not being used as a church.  The accessory ballroom and catering meets the accessory use definition in Zoning Resolution 12-10 in that they are located in the same zoning lot as the principal use.  They will remain under the same ownership....The

> use is clearly incidental and customarily found in connection with the principal use, as <u>a catering and ballroom is substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the principal use</u>.   The use, therefore remains the same use group 4 church and accessory uses.

(emphasis supplied).

11.    After questions were raised about whether this constitutes an accessory use, Laura Osorio, then the DOB Borough Commissioner wrote the following on the pre-consideration request:

> OK to accept provided a new certificate of occupancy is obtain [sic] with a restrictive declaration and note on the C.O. that the <u>accessory social hall is to be use [sic] and operated exclusively and only by the church and for its members.</u>  [Emphasis added]

(emphasis supplied).

12.    Since, however, this description did not comport with what was intended, in that, among other things, there was no intent to use this "accessory social hall" for the Plaintiff and its members (variously described as between 32 and 64 in number), the plaintiff wrote to the DOB requesting a modification of this requirement.   In its June 2, 2006 letter, annexed as "**Exhibit H**," the plaintiff represented that the use by the Tenant-Caterer was to be for "limited periods," that the Tenant-Caterer was operating "under contract with the Church," that the functions were "ancillary," and that the "functions will be restricted by contract."   On the basis of those representations, on June 28, 2006, Christopher Santulli, the DOB's new Borough Commissioner ("Commissioner Santulli), wrote on said letter that he agreed to "accept catered events under contract with the Church as complying with 'accessory Social Hall' requirements of April 10, 2006 determination by L. Osorio."

13.    The representations to the DOB, however, were blatantly misleading. Thus, as detailed below, the Tenant-Caterer's advertisements and lease arrangement with the

Church illustrated that the events were <u>not</u> catered events under contract with the Church, were <u>not</u> ancillary and were <u>not</u> restricted by contract.

14.     Thus, the Tenant-Caterer's internet advertising belies the claim that the use for catering was for "limited times" or in any way accessory to the use as a church. For example, the Tenant-Caterer ran an advertisement on an internet website, Locationsmagazine.com, annexed as **"Exhibit I,"** in which it advertised the availability of the space for 2500 people seven days a week—clearly not an accessory use. After that advertisement had been made known to Community Board 8 [a local city agency that makes recommendations to the Borough President, City Council, Mayor and various city and state agencies regarding land use, zoning and budgetary matters affecting the Upper East Side of Manhattan], as a child caught with its hand in the cookie jar, the advertisement, also annexed as **"Exhibit I,"** was quickly changed to reflect a capacity of only 1000 people – notwithstanding that a subsequent advertisement on the website of BizBash.com, also annexed as **"Exhibit I,"** reflected and to this date continue to reflect a capacity of 1500 people, and notwithstanding that events of well over 1000 people have in fact taken place.

15.     The Coalition also discovered that Plaintiff had never disclosed to the DOB the twenty year triple net lease, with two five year renewal options with the Tenant-Caterer, (the "Lease") annexed as **"Exhibit J."** Notwithstanding the references to accessory use in the pre-consideration request to the DOB, the lease makes the Tenant-Caterer's use primary. The lease demonstrates the lack of any integration between the Plaintiff's operations and the Tenant-Caterer. The lease is what is typically referred to as a "triple" net lease, where the landlord hands the key to the tenant and charges the tenant with the responsibility for maintaining the property in its entirety. As per Article 5 of the Lease, the Plaintiff has virtually

no obligations to provide services or to maintain or repair the premises. The Plaintiff is permitted to use the building Sunday morning, Wednesday evening and on limited specified dates throughout the year, but the Plaintiff cannot change those dates without at least <u>one year's prior notice</u> to the Tenant-Caterer.   It cannot hire building staff without the Tenant-Caterer's consent. Its ability to sell the building is limited by the Tenant-Caterer and to the extent it can sell, it is subject to the Tenant-Caterer's right of first refusal.   Thus, per Article 36 of the Lease, the Plaintiff is not permitted to sell the building to certain non-qualified third parties for the first full five years of the Lease, since same could jeopardize the Tenant-Caterer's right to continue to use the building for catering purposes.   And, conspicuously absent from the lease are any references to catering or religious services to be provided to the Church.   Reading the lease, one gets the distinct impression that, but for the economic terms (which it is submitted are irrelevant to the determination of accessory use), the Tenant-Caterer is the owner and the Plaintiff the tenant. Indeed, by its definition of the premises, the lease gives the Tenant-Caterer a possessory right not only in the <u>entire</u> building, but also in the land (Paragraph 1.1).   It is as if the building had been sold to the Tenant-Caterer, who leases a small portion of the building back to the Plaintiff for limited periods.

   16. Contrary to the Plaintiff's representations to the DOB, therefore, the events were not intended to be catered under contract with the Church, were not ancillary and were not restricted by contract.   And, were that not enough, as discussed below, in a sworn September, 2006 submission by the Tenant-Caterer to the NYS Attorney General, it was made clear that it was the Tenant-Caterer that had primary use, the very antithesis of an accessory use, and the Plaintiff's use was only for limited periods.

**b. The Tenant-Caterer's representations to the NYS Attorney General**

17.    In or about September 29, 2006, pursuant to NYS's Blue Sky Laws, the Rose Group filed, under oath, a Confidential Private Placement Memorandum (the "First Memorandum") with the New York State Attorney General, the relevant pages of which are annexed as "**Exhibit K.**"  This was filed in connection with an offering to potential investors, and is commonly referred to as a private placement offering.  The First Memorandum makes abundantly clear that what was planned was nothing less than a commercial catering establishment, an impermissible use under local law.

18.    The First Memorandum describes the operation of the Premises.  Nowhere is there a mention of restrictions.  Nowhere is there mention of use only for limited periods – *except for limited Church use*.  Indeed, there is barely a mention of Church use.  Most importantly, page 13 of the First Memorandum states that "[t]he Company has entered into a Lease for the Facility Space, which permits the current congregation to use the Facility Space on a limited basis at times when the Company is not using the Facility Space."  [Emphasis added] When read in the context of the statement on the same page that the Church only has forty members "and only a few of these members participate in the Church's Wednesday and Sunday services," it is clear that the use by the Plaintiff is extremely limited and that the use by the Tenant-Caterer is the primary use.  This is reinforced by the above mentioned advertisements on the websites of LocationsMagazine.com and Bizbash.com, which refer to the availability of the Premises every day of the week.  The types of events described on page 14 of the First Memorandum do not relate to the Plaintiff.  Instead, there are a myriad of corporate, individual and charity functions listed.

19.    *Thus, the documents submitted to two separate governmental agencies, i.e., the March 29, 2006 pre-consideration request to the DOB, the June 2, 2006 letter from the Plaintiff to the DOB and the First Memorandum filed with the Attorney General on September 29, 2006 and are totally inconsistent.*    For the convenience of the Court, these documents (including the relevant portions of the First Memorandum and the DOB filings) are annexed as "**Exhibit L.**"  As is readily apparent, these are diametrically opposed.

20.    Apparently recognizing that the language of the First Memorandum precluded a finding of accessory use, the Tenant-Caterer, on March 30, 2007, filed a subsequent Confidential Private Placement Memorandum (the "Second Memorandum") (relevant portions annexed as "**Exhibit M**").   Notably, this Second Memorandum is tailored to community complaints, especially as to the size of the events (as discussed below).

21.    In the First Memorandum, page 15, the applicant stressed the ability of the Premises to accommodate in excess of 500 people and boasts as direct potential competition those event spaces that accommodated up to 2800 guests (The Pierre Hotel: 600 guests; The Waldorf-Astoria: 1300 guests; Cipriani 42nd Street: 700 guests; Tavern on the Green: 1000 guests; Gustavino's: 500 guests; Cipriani Wall Street: 900 guests; Gotham Hall: 600 guests; The Hilton: 2800 guests; Cipriani Toy Building: 400 guests; Capitale: 500 guests; The Hyatt: 800 guests;  Marriot Marquis: 1000 guests; and Sheraton: 1500 guests).   While the Second Memorandum lists, on pages 9 to 10, as direct potential competition those event spaces that accommodate up to 700 guests, we believe those changes in the offering were made to stifle the opposition to the catering establishment- since the Tenant-Caterer's advertising – and use - remains unchanged.   Thus, notwithstanding the 180 degree turn in some representations, the advertisements continue to offer larger events around the size of those represented in the First

Memorandum.  For example, in December 2007, the Tenant-Caterer had three events in a one week period with 800, 1200, and 1200 attendees, respectively; more recently, this March, the Tenant-Caterer hosted the International Asian Art Fair – which took over entire building for better part of a week and was open 11 a.m. to 7:30 p.m., except for 11 a.m. to 6 p.m. on Sunday of that week and the last day, which was a Wednesday.  And on Monday, April 21, 2008, a wine tasting event took place for six hours.

**c. The Plaintiff Failed To Disclose The Second Amendment To The Lease**

22.    Another example of their changing the story after being "caught" with their hands in the cookie jar, is the remarkable transformation to the Lease, brought about by a second amendment to the Lease ("2nd Amendment") annexed as "**Exhibit N.**"  This 2nd Amendment, executed on March 27, 2007, only four days prior to the submission of the Second Memorandum to the Attorney General, wholly shifts the risk of loss from the Tenant-Caterer to the Plaintiff and demonstrates once again, as does the Lease, that the party "calling the shots" is the Tenant-Caterer, not the Plaintiff, and that this is a case about preserving a commercial catering operation, not a church, the RLUIPA claims notwithstanding.

23.    The Plaintiff did not have the 2nd Amendment approved by the NYS Supreme Court as required by law and never disclosed to the DOB that the required approval had not been obtained.  *See* Memorandum of Law in Opposition, fn. 12.

24.    The differences between the 2nd Amendment and the original lease that was approved by the Supreme Court are material.  Under the Lease, the risk of loss, if the use is not legalized, is the Tenant-Caterer's, with the exception of an entitlement to reimbursement for expenses paid in connection with replacement of the roof (which, upon information and belief, has not yet been replaced).  The caterer's expenditures (which to date appear to have been related

principally to its own catering operation) were at its own risk and not subject to reimbursement. Further, the Church had no obligation to sell the building or otherwise take steps to reimburse the Tenant-Caterer even if the use were not legalized, the risk was solely that of the Tenant-Caterer. But under Section 3(a) of the 2nd Amendment, unless the catering use is legalized, the Church will be required to "make a disposition of" or sell the Premises to repay the Tenant-Caterer for the sums the Tenant-Caterer has allegedly spent – *not for the benefit of the Church, but to "prepare the Premises for the conduct of tenant's [catering] business"* - together with interest on such sums. The requirements to sell and to reimburse are in direct contradiction to the provisions of the original Lease.  It is not clear whether this 2nd Amendment was entered into because the parties intended to enforce it or because of the seeming strategic advantage it afforded them: Plaintiff's main argument for a temporary restraining order and preliminary injunction, as set forth in its Complaint and moving papers on the preliminary injunction, is that it would be "forced to sell the Building and its congregation will be deprived of its place of worship" if the accessory use permit is not reinstated.

       25.    Plaintiff has contended that the obligations imposed by the 2nd Amendment, including an obligation it places at $8 million, place a substantial burden on it.  But for the 2nd Amendment, however, the DOB's revocation of the permit would have had little impact. The Plaintiff could merely seek a new tenant – or ask the tenant that it had previously asked to leave to return.

       26.    Notably, however, pursuant to Section 3(e) of the 2nd Amendment,

> the obligation of the Plaintiff to pay the Tenant-Caterer pursuant to Section 3(a) of the 2[nd] Amendment is conditioned upon the [Tenant-Caterer] completing all work required to be performed by the [Tenant-Caterer] under the Lease and the [Tenant-Caterer's] prosecuting the 74-711 Application with the municipal authorities through final appeal.

Such an application was in fact made and withdrawn without explanation in the summer of 2007. Since the Plaintiff/ Tenant-Caterer withdrew the 74-711 Application, the condition precedent has failed.

**The Beekman**

27.    Although the Beekman is different from the other Coalition Members (strictly residential buildings) and Ms. Relyea (a shareholder in one of the strictly residential buildings), in that there is a restaurant, Park Avenue Café, operated by the Beekman's tenant, the Beekman is not remotely similarly situated to the Plaintiff.

28.    Unlike the Plaintiff, the Beekman, an apartment hotel, is permitted to have a restaurant in its premises pursuant to the City's Zoning Resolution §12-10, annexed as "**Exhibit O.**" The reason for having a restaurant in an apartment hotel, where the units are used for permanent occupancy but one or more hotel services are provided, such as housekeeping, is because apartment hotels are designed with kitchenettes, not full kitchens, so it is more comfortable and convenient for residents to go to the restaurant.

29.    Further as shown on its website, printouts of which are annexed as "**Exhibit P,**" unlike the Plaintiff, the Park Avenue Café can only seat up to 75 persons or 90 persons at a standing reception in its "Archive Room"[1];  can only seat up to 50 persons or 65 persons standing in its "Townhouse," a small private dining room; and can only seat up to 10 persons at the "Kitchen Table" enclosed in a glass room in its kitchen. Also, there is no dancing at the Park Avenue Café. It is definitely a far cry from the massive catering hall for over 1000 people that Plaintiff's Tenant-Caterer operates or the venues cited in the First Memorandum, such as the Waldorf Astoria.

30.     Notably, while efforts were underway to see if the dispute between the Coalition and the catering operation could be resolved, which efforts were brokered by local elected officials, Senator Liz Krueger, Assemblyman Jonathan Bing and Councilmember Dan Garodnick, representations were made on behalf of the Plaintiff/Tenant-Caterer that it would not be financially feasible to operate catered events of 100 persons or less at the church. Therefore, it defies logic to suggest that the Beekman is "similarly situated" and there is no basis for issuing discovery to the Beekman.

31.     The Park Avenue Café is a separate, non-affiliated entity whose operations are not under the control of Beekman. Plaintiff issued a separate subpoena to the Beekman's tenant, who, upon information and belief, has already responded, and, therefore, the documents are already available to Plaintiff.[2]

### KK&F's Work for the Coalition

32.     In connection with KK&F's work for the Coalition, KK&F has reached out to members of the community to enlist their assistance in this effort. KK&F has prepared for potential administrative and legal proceedings, including, without limitation, possible proceedings before the New York City Board of Standards and Appeals and any Article 78 proceeding related thereto in the Supreme Court of the State of New York in relation to the DOB

---

[1] This is operated by the Beekman's tenant in a portion of the ground floor of its sixteen (16) story building. *See* NYC Map Portal for the Beekman annexed as "**Exhibit P.**"

[2]   The subpoena Plaintiff issued to the Park Avenue Café contains requests involving "social events," which includes, but is not limited to, "catered events." "Social events," is a broad term of which "catered events" is only a small subset.   Apparently based upon Park Avenue Café's response to the subpoena concerning "social events," (we have not seen the Park Avenue Café's production), Plaintiff has bootstrapped itself into claiming that the Park Avenue Café conducts approximately 300 "catered events" per year.   Undoubtedly, Park Avenue Café has many social events, such as a couple going out for an anniversary dinner, but, upon information and belief, only  a few catered events.  Therefore, Plaintiff's representation that Park Avenue Café conducts 300 "catered events" per year, instead of "social events," appears to be incorrect.  This conflating of two terms is similar to the technique used by Plaintiff in its Complaint.  Thus, Plaintiff's Complaint magically transforms its obligation under the 2nd Amendment to reimburse the Tenant-Caterer for expenditures to prepare the building for catering into "required capital repairs," thereby suggesting, improperly, that the work done has been – and for which the Plaintiff purportedly must pay – has been for the Plaintiff's benefit.

permits. KK&F has also prepared to oppose the application for a Special Permit, to permit commercial catering use, from the New York City Planning Commission (subsequently withdrawn by the applicant) and, if necessary, to challenge any determination through administrative and New York State court proceedings.[3] In addition, KK&F has assisted the City of New York in connection with this litigation. In connection with above, the Coalition has also hired a public relations/lobbying person[4] and a videographer.[5] Depending upon the outcome of this litigation, the abovementioned proceedings and/or litigation may well lie ahead.

### The Subpoenas Issued to the Neighbors

33.    Most significantly, Plaintiff's current "needs" for broad discovery, by way of subpoena, are contradicted by Plaintiff's written representation to Judge Batts on February 22, 2008 , annexed as "**Exhibit Q**," that only "limited discovery" is sought.

34.    As expressed in its April 10, 2008 objection letters, pursuant to FRCP 45(c)(2), and its April 16, 2008 letter, annexed as "**Exhibit R**", KK&F believes that Plaintiff must either withdraw or narrowly tailor the subpoenas issued to the Coalition Members and Ms. Relyea.

---

[3] KK&F has also contacted the Landmarks Preservation Committee ("LPC") concerning the covering of the frieze lettering on Plaintiff's building, which lettering states, "Third Church of Christ, Scientist," as well as the covering of other signage relating to the Church, without a permit.

[4] In casting aspersions on the Coalition for doing so, the Plaintiff has neglected to tell the Court that Plaintiff hired, as a lobbyist, the law firm of Greenberg Traurig, LLP and its caterer-tenant hired a public relations specialist, George Arzt Communications, Inc., to lobby on their behalf and refine their own "spins". *See* website printouts, "NYC Lobbyist Search," and The New York Sun's October 30, 2007 Article, annexed as "**Exhibit S.**" Notably, in the Sun article, Arzt is quoted as speaking on behalf of the Plaintiff. Plaintiff's lobbyist and public relations specialist seem to be advocating on behalf of both parties, given the close relationship between the Plaintiff and the caterer-tenant and the fact that the caterer is acting as the general contractor, as evidenced by the filings with the DOB.

[5] The videographer has, at various times, recorded the size of the crowds at the 583 Park, the garbage generated by the caterer-tenant, the extensive number of hours required by the caterer-tenant for setup and removal (which involve far more time than represented to this Court) and the general adverse impact of the catering establishment on the neighborhood. That videographer has been falsely accused by Plaintiff, for the purpose of inflaming the Court, of conducting 24-hour surveillance. Upon information and belief, unlike the paparazzi that block the streets to take videos and photos of socialites, politicians and celebrities that attend the catered events at 583 Park, the

35.     Plaintiff's requests as to the State Liquor Authority or other state agencies are irrelevant; they are not mentioned in the Complaint; Plaintiff has not asserted any claims against them and there are no allegations that these agencies had a role in the City's determination as against the Plaintiff.

36.     As already indicated to Plaintiff on April 10, 2008, sorting out protected documents and compiling a detailing log would result in significant professional, paralegal and clerical time and expense as there are over 8,600 e-mails, some of which include attachments, 42 Redwelds, well over 500 photographs, 31 DVD videos and a substantial number of additional documents.

37.     Plaintiff's counsel's April 17, 2008 letter set forth a few proposals for resolution of this matter, and KK&F sent an e-mail to Plaintiff's counsel on same date, annexed as "**Exhibit T,"** to inform him that it was KK&F's intention to formally respond to the proposal, after consulting with general counsel for the Beekman, who were on Passover holiday and vacation.

38.     Plaintiff's counsel ignored KK&F's request and notified KK&F via e-mail on April 21, 2008, that it would be served with the motion to compel, as per a purported April 17, 2008 e-mail, which KK&F indicated (and Defendants' counsel did not dispute) it never received.

39.     On or about April 25, 2008, this office sent a letter to Plaintiff's counsel, annexed as "**Exhibit U**," proposing to resolve the dispute.

40.     Plaintiff, however, essentially rejected KK&F's clients' offer in its letter of April 28, 2008, annexed as "**Exhibit V**," in which it demanded extensive and unwarranted

---

videographer has been questioned by the caterer-tenant and the caterer-tenant's bouncer in an unpleasant manner – even though not at the Plaintiff's property or on the sidewalk in front of it.

additional materials.   KK&F responded to that letter by letter of April 29, 2008, annexed as "**Exhibit W.**"

## <u>CONCLUSION</u>

41.    The allegations as against the Neighbors are false as demonstrated above, and, in any event are irrelevant.  Accordingly, the subpoenas should be quashed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        May 5, 2008
              New York, New York

                                        /s  Phyllis H. Weisberg_____
                                        Phyllis H. Weisberg (PW 9452)

Exhibit A



**AP Associated Press**

# NYC buildings commissioner resigns after mayor's criticism

By AMY WESTFELDT – Apr 23, 2008

NEW YORK (AP) — Even critics credited Patricia Lancaster for trying to reform New York City's inefficient, corruption-riddled Buildings Department.

During her six years as commissioner, she rewrote an outdated building code, created online databases for nearly 1 million city properties, stepped up inspections and wrote new safety rules.

But the reforms couldn't stop a spike in deadly construction accidents, which brought increasing complaints about Lancaster's agency. She resigned Tuesday under fire from irate residents and Mayor Michael Bloomberg.

"I felt it was time to return to the private sector," Lancaster, one of the few Bloomberg administration commissioners to leave in a crisis, said in a statement. "I am proud of the groundbreaking work the department has done during my tenure to root out corruption, increase transparency, overhaul the building code and increase safety for workers and the public alike."

The 54-year-old Lancaster, the first woman to lead the buildings department, told Bloomberg she would leave a day after he publicly singled out her agency as a problem. Her resignation came after 13 deaths this year at high-rise construction sites, including seven in a crane collapse last month in midtown Manhattan.

Last week, Lancaster acknowledged that the department mistakenly approved construction on the 43-story condominium using the crane. The building was not zoned for a height above 30 stories, she said.

A buildings inspector had found the crane to be safe a day before the collapse; another inspector was arrested on charges of lying earlier about inspecting the same crane.

The public had complained for months about zoning and safety problems with the crane, said Bruce Silberblatt, vice president of the Turtle Bay Association, representing the neighborhood where the crane collapsed.

"The habit of just being brushed off by the Buildings Department is endemic," Silberblatt said.

Bloomberg, known for fiercely defending his agency heads during crises, on Monday

Photo 1 of 3



In this file photo of July 14, 2005, Department of Buildings Commissioner Patricia Lancaster, foreground, is seen during a news conference in New York following the collapse of a two-story building on Manhattan's Upper West Side. Lancaster resigned on Tuesday, April 22, 2008, after Mayor Michael Bloomberg said on Monday that he was unhappy with the agency. Thirteen people have died in construction accidents so far this year, one more than the total in 2007. (AP Photo/John Smock, File)

The Associated Press: NYC buildings commissioner resigns after mayor's criticism

declared: "I don't think anybody should be fully satisfied with the Department of Buildings. Whether they've done everything they can or not is something I'm looking at."

After accepting Lancaster's resignation, the mayor called her "somebody who's dedicated that time to really making a difference in a very difficult world. ... She selflessly has worked very hard and I am sorry to see her go."

He said of the commissioner's post, "It's a very difficult job, and hopefully we'll take and build on what she ... has done and take it forward."

Lancaster's departure was immediate. Robert LiMandri, the department's first deputy commissioner, agreed to serve as acting commissioner until Bloomberg names a successor.

Critics said the department has been a mess since the 1990s, when it created a "self-certification" system to streamline the permit process and drastically reduced its inspections staff. Lancaster was credited for raising the number of inspectors from less than 300 to more than 400 in recent years.

"She inherited a corrupt and dysfunctional agency and she brought it a long way," said Council Member Jessica Lappin, who represents the district where the crane collapsed and where, in a separate incident, a window installer fell nine stories to his death last week.

Louis Coletti, president of the Building Trades Employers Association, said the department had grown stronger under Lancaster's tenure but that some of the stepped-up inspections may have shut down work at sites for trivial violations that "weren't necessarily safety-related."






Hosted by **Google**

Copyright © 2008 The Associated Press. All rights reserved.

Exhibit B

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

———

FACSIMILE

(212) 599-1759

March 12, 2007

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

———

SAMUEL B. SEIDEL (1903-2003)

———

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

———

COUNSEL

STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER

VIA ELECTRONIC MAIL & OVERNIGHT MAIL

Christopher Santulli, PE
Manhattan Borough Commissioner
New York City Department of Buildings
280 Broadway
New York, NY 10007

583 Park Avenue (the "Premises")
Block 1398 – Lot 0001
Job No. 104511495

Dear Commissioner Santulli:

As we have previously advised, this office represents 580 Park Avenue, Incorporated, and 570 Park Avenue Apartments, Inc, the cooperative apartment corporations that own 580 Park Avenue and 570 Park Avenue, respectively. We refer to our letters of January 9, 2007, January 16, 2007 and January 18, 2007, copies of which are enclosed.

We write to formally request the revocation of all permits and approvals related to the above job number including, without limitation, the permit for a change of use.

As we previously advised you, our clients believe that the proposed change in use is in violation of law. Since our prior letters, we have received additional information which we believe makes that even clearer. Specifically, we call to your attention a Confidential Private Placement Memorandum (the "Memorandum") filed with the New York State Attorney General and dated September 29, 2006. This was filed in connection with an offering to potential investors in Rose Group Park Avenue LLC (the "Rose Group"), the commercial caterer leasing the Premises. Relevant extracts from the Memorandum are annexed as Exhibit "A." The Memorandum establishes that the applicant is attempting to establish a commercial catering establishment, essentially a "Use Group 9" commercial use, in an R-10 Park Improvement District and that such use can in no way be considered "accessory."

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 2 of 5

In our prior letters we discussed the application for a change of use, the description of the proposed use, and the notation by Commissioner Osorio concerning that use. On March 5, 2007, we became aware, for the first time, of an additional letter and your notation concerning use. That letter was not in the file when we initially examined and reproduced same.

That letter, dated June 6, 2006, a copy of which is annexed as Exhibit "B," represents that the use by the caterer was to be for "limited periods," that the caterer was operating "under contract with the Church," that the functions were "ancillary," and that the "functions will be restricted by contract." On the basis of those representations, you agreed to "accept catered events under contract with the Church as complying with 'accessory Social Hall' requirements of April 10, 2006 determination by L. Osorio."

We submit that the Church's characterization is disingenuous. First, as discussed below and set forth in the contemporaneous liquor license application, the so-called contract with the caterer is actually a thirty (30) year lease (a twenty (20) year term with two (2) five year renewal options) for the premises. The difference between a contract with restrictions and a thirty (30) year lease is staggering. Among other things, a lease is an interest in real estate.

Second, the suggestion that the church building would be utilized by the caterer only "for limited periods" is simply wrong. The Memorandum describes the operation of the Premises. Nowhere is there a mention of restrictions.[1] Nowhere is there mention of use only for limited periods – except for limited Church use. Indeed, there is barely a mention of Church use. Most importantly, page 13 of the Memorandum states that "[t]he Company has entered into a Lease for the Facility Space, which permits the current congregation to use the Facility Space on a limited basis at times when the Company is not using the Facility Space." [Emphasis added] When read in the context of the statement on the same page that the Church only has forty members "and only a few of these members participate in the Church's Wednesday and Sunday services," it is clear that the use by the Church is extremely limited and that the use by the caterer is the primary use.

This is reinforced by the advertisements on the website of LocationsMagazine.com, which refer to the availability of the Premises every night of the week. We enclose as Exhibit "D" copies of the original listing and the modified listing; this modification was posted only after our clients raised the issue concerning the proposed maximum size of events as 2500. The maximum size is now described as 1000.

---

[1] Notably, the offeror, the Rose Group, is listed on the application for a change of use as the general contractor; we annex as Exhibit "C" the relevant printout from BIS evidencing this.

Kurzman Karelsen & Frank, llp

Christopher Santulli, PE
March 12, 2007
Page 3 of 5

Nor has the Church "provided for various catered events" or are the Rose Group's events "ancillary" to events sponsored by the Church as stated in the June 2nd letter. The Memorandum describes the types of events (see page 14). None relate to the Church. Instead, there are a myriad of corporate, individual and charity functions listed. Clearly, it is the Rose Group, the tenant, that will exclusively provide for these catered events. The Church has no role or participation in providing for such events.

We believe that documents submitted to two separate governmental agencies, i.e., the Memorandum filed with the Attorney General, and the June 2nd letter submitted to your Department, both of which presumably have been certified as true, are totally inconsistent. They cannot both be correct. We believe that this inconsistency requires immediate revocation of all permits.

Moreover, the described catering use is no way consistent with your notation on the June 2, 2006 letter. Your note relates to "catered events under contract with the Church." As described in the Memorandum, there will be no catered events under contract with the Church. The catered events are to take place under contracts between the Church's tenant, the Rose Group, and the individual or entity having the event. Unlike the typical arrangement where a religious institution has an in-house caterer, but the contract is with the institution and includes rental of the institution, the Church is not a party to such contract. In fact, as discussed below, the Church has made efforts to disassociate itself from the events because liquor will be served.[2] For this reason, too, the permits should be revoked.

While we recognize that the inquiry into whether a use is an accessory use is often a fact-intensive inquiry, we believe, that based on the documentary evidence before you, this use cannot under any circumstances be viewed as an accessory use. We enclose copies of two recent BSA decisions involving Yeshiva Imrei Chaim Viznitz (the "Yeshiva case") involving similar issues. In those decisions, the BSA upheld the DOB view that the catering use was not accessory. As those decisions make clear, the DOB and the BSA look at, among other things, intensity and frequency to determine whether the use is an accessory use. Here, the Memorandum makes clear that the primary user of the premises is the caterer.

Moreover the Memorandum makes clear that the attraction of the space is the potential intensity — that it can accommodate over 500 people. Thus, on page 13 it states "[t]he Company believes that the beauty and grandeur of the building located at 583 Park Avenue, New York, New York (the 'Facility Space'), its ability to handle over 500 people, and the prestigious location on Park Avenue represents a unique business opportunity." On page 15, the Rose Group states that "[t]he Facility Space will be one of the few properties in and around its location that can accommodate seated dinners with

---

[2] Christian Scientists, we understand, do not partake of alcohol.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 4 of 5

over 500 guests." See also page 3. This is far greater than the intensity of the use in the Yeshiva case. In that case, the use was for approximately 400 guests.

As to frequency, the Rose Group has represented it will hold approximately two to three events per week on average, but acknowledges it could be more. It has acknowledged that it will likely hold events almost every night in December. Given the financial pressures created by the involvement of investors pursuant to the Memorandum, the Rose Group has every incentive to have as many events as possible. The website listing at LocationsMagazine.com makes clear that the Premises is available every night. We understand the Premises has already been booked for a number of events. And, while the use in the Yeshiva case included use for the synagogue, the use here, which involves liquor, weddings and bar mitzvahs, none of which are part of Christian Science, will not be used at all by the members of the Church. In fact, the Church currently has an application pending with the Landmarks Preservation Commission for permission to put a block over the entrance to the building to cover the name of the Church, since presumably it does not want to be associated with events at which alcohol is served.

Indeed, even if the Church used the Premises for events, given that the Memorandum states the membership is now 40, it would certainly be a very small number of events.[3] Notably, in the Yeshiva cases, that at least 50% of the events were not related to the Synagogue or School was one of the factors that led to the determination that the use was not accessory.

In the Yeshiva cases, the BSA also noted that the Zoning Resolution "does not anticipate that primary uses can normal qualify as accessory uses." Yet what is planned here is clearly a commercial catering establishment, a primary use under Use Group 9.

Finally, as noted in the Yeshiva cases, the hours of operation are relevant. Here, the catering use will only be when the Church is not using the premises. The uses are mutually exclusive. That in and of itself is one of the clearest indicia that this is not an accessory use.

We believe the foregoing establish that the contemplated use is neither consistent with the representations to you nor an accessory use under Zoning Resolution 12-10. The uses are unrelated and only share a building.

---

[3] In the Yeshiva cases the Board noted that the DOB also looks to the "relationship between the size of the membership of the religious entity and the size of events." Here, with only forty members, it is hard to imagine why or how events of over 500 would be warranted.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 12, 2007
Page 5 of 5

The construction continues to go forward; in fact, we have reason to believe that it is or will soon be substantially complete. Where the evidence is clear – for the Rose Group cannot disclaim its own filing with the Attorney General - there is no point in delaying the revocation of permits.

For all the foregoing reasons, we respectfully request that any permits and approvals issued to date be immediately revoked.

Thank you for your consideration.


Respectfully,

KURZMAN KARELSEN & FRANK, LLP

Phyllis H. Weisberg

PHW:alj
Encls.

cc:    Mona Seghal, Esq. (via overnight mail)
       Benjamin Colombo, Manhattan IGA Liaison, Executive Assistant to Borough
           Commissioner (via overnight mail)
       David G. Liston, Chair, Community Board 8 (via overnight mail)
       Terry Slater, Co-Chair, Zoning and Development Committee, Community Board 8
           (via overnight mail)
       Elaine Walsh, Co-Chair, Zoning and Development Committee, Community Board 8
           (via overnight mail)
       Hon. Liz Krueger (via overnight mail)
       Hon. Jonathan Bing (via overnight mail)
       Hon. Scott Stringer (via overnight mail)
       Hon. Dan Garodnick (via overnight mail)
       Board of Directors, 580 Park Avenue, Incorporated (via electronic mail)
       Board of Directors, 570 Park Avenue Apartments, Inc. (via electronic mail)

181018.1

Exhibit C

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

————

FACSIMILE

(212) 599-1759

————

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL

STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER

March 30, 2007

**BY HAND & VIA OVERNIGHT MAIL**

Christopher Santulli, PE
Manhattan Borough Commissioner
New York City Department of Buildings
280 Broadway
New York, NY 10007

> 583 Park Avenue (the "Premises")
> Block 1398 – Lot 0001
> Job No. 104511495

Dear Commissioner Santulli:

On behalf of our clients, 580 Park Avenue, Incorporated and 570 Park Avenue Apartments, Inc, we write to address issues that you raised at the meeting with Joanne Seminara and me on March 21, 2007. We also write to provide you with additional information, including a copy of the lease between The Third Church of Christ, Scientist (the "Church") and the Rose Group and our analysis thereof. A copy of the lease is annexed as Exhibit A.

This letter will address the following issues: 1) the significance of the leasing arrangement and the specifics of the lease; 2) the authority of the Department of Buildings ("DOB") to revoke a permit prior to the commencement of use; and 3) the implications of the Church's status as a religious institution.

At issue here is whether this catering operation is a proper accessory use for the Church. As discussed in our March 12th letter and below, we believe it is clear that the catering use will now be the primary, and not the accessory or incidental, use. Simply put, what is proposed is a commercial catering establishment in a building owned by a church. The relationship is merely that of landlord and tenant. No interrelationship or integration exists between the church use and the catering use, as is required for an accessory use.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 2 of 12

*The Leasing Arrangement Cedes Control of the Property and the Catering Operation*

At our meeting you raised an issue concerning the difference between a lease and a typical catering arrangement. A lease confers a possessory right. It transfers absolute possession and control of the premises to the tenant. In law, this is often referred to as a right of "exclusive possession" which, in lay terms, is the right to "exclude" others from using the property.

In the usual catering arrangement, the relationship revolves around the service to be provided and the quality of that service. Here the relationship revolves around a piece of real estate and a convenient "cover" for the tenant's use as a commercial catering establishment.

That this is a lease effectively for thirty years (twenty years plus two five year renewal terms) is critical to this issue. Unlike the typical arrangement with a caterer, either as a "house" or exclusive caterer, a long term lease – and in particular this long term lease – involves ceding control over both the building and the tenant's operation.

Granting a possessory interest for a period of thirty years is functionally equivalent to a sale of the building. New York's Religious Corporations Law §12 requires a religious institution that is selling, mortgaging or leasing for a period in excess of *five* years to obtain prior court approval.[1] This is a recognition by the New York State legislature that a lease is in many ways equivalent to a sale. As discussed below, this is particularly true here.

In contrast to the lease arrangement here, the typical religious institution that permits catering has a house or exclusive caterer; that caterer has no possessory rights, but is merely permitted entry on the property for the purpose of providing a service. The arrangement with a house caterer is usually terminable at will or lasts only for a limited period of time. In the event of a dispute, the religious institution can refuse to renew the caterer's contract or bar the caterer from entering the premises.

In the case of a lease, however, because of the possessory interest in real estate, self-help is generally not permitted and the institution's only recourse would be to institute dispossess proceedings. Such proceedings, although dubbed "summary," i.e., expedited, proceedings, often take several years to resolve. In the interim, the caterer would continue to have access to and a right to occupy and use the premises.

An example of what could happen is discussed in a decision involving the Lombardy Hotel, 109 East 56th Street v. 111 East 56th Street, Supreme Court, New York

---

[1] The Church sought and obtained such approval in an uncontested submission to the Supreme Court, New York County. The standard for approval of such application is essentially whether fair consideration is involved for the transfer so as to protect the congregants.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 3 of 12

County, a copy of which decision is annexed as Exhibit B. The legal proceedings were instituted by service of a notice to cure in June, 2002. Because of motion practice and the tenant's filing two bankruptcy cases, the matter was not finally determined until January, 2006, some three and one half years later.[2] And even then, the tenant was given a further period to cure, and absent such cure, only then could the actual dispossess proceeding be instituted. <u>While the action was pending, the tenant continued in occupancy and continued to operate in a manner ultimately determined to violate the lease. In other words, the ability to control the tenant's conduct was seriously limited.</u>

In the context of a claimed accessory use, such a result is untenable. Yet the possibility of such result demonstrates the significance of a lease creating a possessory interest, let alone one for thirty years.

The lease between the Church and the Rose Group underscores, among other things, the loss of control. For your information, we have only recently obtained a copy of the lease. In our settlement discussions with the Church and the Rose Group, we had requested a copy of the lease. While the Church and the Rose Group were reluctant to provide same, they did agree that excerpts from the lease would be made available to us, provided it appeared we were moving close to a settlement. Since our talks broke down, they did not provide us with any of the promised excerpts. We have, however, located a copy of the lease as public record (filed with the application pursuant to the Religious Corporations Law).

This lease highlights the difference between this arrangement and the typical arrangement with a caterer in a religious institution. Notwithstanding the references to accessory use, the lease makes the Rose Group's use primary. The lease demonstrates the lack of any integration between the Church's operations and the Rose Group.

The lease is what is typically referred to as a "triple" net lease, where the landlord hands the key to the tenant and charges the tenant with the responsibility for maintaining the property in its entirety. Although in this lease the Church has retained a right to use a portion of the premises, that right is limited. As more fully discussed below, the Church has virtually no obligations to provide services or to maintain or repair the premises. It cannot hire building staff without the Rose Group's consent. Its ability to sell the building is limited by the Rose Group and the Church may be required to pay the entire net proceeds of a sale to the Rose Group. And, conspicuously absent from the lease are any references to catering or religious services to be provided to the Church. Reading the lease, one gets the distinct impression that, but for the economic terms (which we submit are irrelevant to the determination of accessory use), the Rose Group is in significant respects the owner and the Church the tenant.

---

[2] Had the tenant chosen to appeal, the matter could have gone on much longer.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 4 of 12

Some of the more relevant portions of the lease are as follows:

1) The Premises

By its definition of the premises, the lease gives the Rose Group a possessory right not only in the _entire_ building, but also in the land (Paragraph 1.1, p.2). The control of the interior and the exterior of the property is underscored by such provisions as that contained in Paragraph 9.1, p. 33 in which the Church is given the right to maintain a literature distribution box on the 63rd Street side of the Building" at a location "to be _mutually_ agreed upon by the parties,...." [emphasis added]  In other words, the Church cannot even unilaterally determine where to place a box on its exterior at a side entrance to its own building.  This is one indicia of the Church's having ceded control over its own premises.

While, notwithstanding the grant to the Tenant of the right to occupy the entire building, limited portions are reserved for the Church, those are, at least in part, to be physically separated from the Tenant's space.  Thus, on the 4th floor, where, based on the plans submitted to DOB, it appears the Church will maintain what little space it is reserving for itself, the Tenant is required to "install a door separating such 4th floor TENANT space from the Church space...and the 4th floor Church space shall be designated by a sign specifying "Private Offices."  Paragraph 9.1, p. 32.  This partitioning, among other things, demonstrates the lack of integration between the Church and the catering operation.

2) The Right of First Refusal and Restrictions Upon Sale

Article 36, p. 71 contains provisions that, perhaps more than any other, highlight that this is anything but a use accessory to the Church.  This article grants the Rose Group a right of first refusal in the event of a proposed sale of the building.  This confirms that this lease is exclusively a real estate agreement.

Article 36 also restricts a sale of the premises by the Church in the first five years of the lease if the sale is to a "Non-Qualified User," i.e., an entity not a religious institution. Rather than the Church controlling its own property and its operations, the Rose Group, through the lease, is in control.  After five years, the Church may sell to a Non-Qualified User, but if such sale occurs, and if the Tenant does not chose to exercise its right of first refusal, then, unless the Rose Group has obtained a special use permit to allow the use of the building as a catering facility (Paragraph 36.2, p. 74 allows either the Church or the Rose Group to apply for a special use permit after the first five years of the term of the lease), the Tenant is to be paid the lesser of the net proceeds received from the sale or the value of both a) its business as a going concern and b) the costs of repairs and improvements to the building.  In other words, unless the Rose Group can obtain a special use permit for a commercial catering establishment, it is entitled to the entire net proceeds

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 5 of 12

of any sale or the value of its business and improvements to the premises. If it is entitled
to the proceeds of any sale, its interest is, in fact, a de facto ownership interest.

3)  The Responsibility for Repairs and Maintenance

As is typical in a net lease situation, the Tenant is responsible for all repairs. See,
e.g., Paragraphs 5.5 and 5.6 at p. 24, Paragraph 5.8 at p. 25.. Tenant is also required to
maintain the sidewalks and shovel ice and snow (Article 33, p. 65), an obligation consistent
with its being the primary user of the premises.

In addition, under Article 37, p. 75, the cost of structural repairs shall be borne by
landlord and tenant according to a formula set forth in Paragraph 37.1.B. That formula is
based on the useful life of the repairs and the term remaining on the lease. Given the
length of the lease, it effectively means that most if not all expenses for structural repairs,
at least at the outset, will be the Rose Group's responsibility.

Paragraph 5.9 at p. 25 makes clear that the Church has no obligation to furnish any
services for the Premises, including heat, water, light and electric power. Pursuant to
Paragraph 4.1, p. 20, the Rose Group is to contract directly for "all...utilities used and
consumed in the Premises." See also Paragraph 5.11 at p. 26.

Under Paragraph 3.4, p. 6, Tenant is also responsible for all real estate taxes and
has the authority to contest assessed valuation (the lease anticipates that the tenant's use
will eliminate the exemption from real estate taxes).

These provisions again make clear that the primary use is that of the Rose Group,
and because of that primary use, it has assumed these responsibilities with respect to the
realty.

Even clearer evidence of the Rose Group's responsibility and control is found in
Paragraph 5.13, p. 26. This provision contains a limitation upon hiring custodians without
the Rose Group's prior consent. It states as follows:

[t]he hiring and retention by Landlord of any and all employees in the
capacities of custodian and/or Building maintenance, including the terms
and conditions employment, shall be subject to the prior written approval
and consent of Tenant (each, an "Employee"), which may be given or
withheld at Tenant's sole discretion.  Tenant shall reimburse Landlord
within thirty (30) days of written demand therefor, in an amount equal to
any such Employee's compensation, including FICA and similar costs,
provided Tenant shall have theretofore approved such amounts in
writing....[t]he custodians ...shall be subject to the direction and
supervision of TENANT, except when the Building is being used

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 6 of 12

exclusively for Church Activities, during which period the custodians with respect to Church activities only shall be subject to the direction of the Church. [emphasis added].

The unequivocal import of this provision is that the Rose Group is operating the real estate and effectively has total control.   The Church cannot even hire employees without the Rose Group's consent.

The Rose Group is also given permission to remove the pews, Paragraph 5.3A, p. 20 and Exhibit C to the lease, but, contrary to the public statements of the Church that such pews are not needed or even wanted, the Rose Group is required to restore the pews or provide new ones at the conclusion of the lease, thereby demonstrating their importance if the building is to be used primarily as a church.

Paragraph 6.4, p. 28, acknowledges the possibility of alterations "not customarily found in a church type facility" and provides that the Church may require the removal of such items at the end of the lease term, which means that elements not customarily found in a religious facility may be there for up to thirty years.

4) Church Activities

While the lease attempts to delineate the Church's activities, it makes clear how limited those activities are.  Thus, Article 35, p. 66, sets forth the use of the premises by the Church.  Article 9, p. 32 sets forth the limited areas of the building which the Church may use for its activities.[3]  The permitted use includes the use for the conduct of church services (which occur Wednesday evenings and Sunday mornings).

As to the areas that the Church may use, notably, only with respect to services (Paragraphs 35.1A, B, and C, p. 67) and church corporate or organization meetings (Paragraph 35.1F, p. 68) does the lease specifically state that such use will require the use of the "entrance to the Premises."  Presumably then, all other uses (except for Association meetings, held four days each year, for which the Church reserves the entire building) will require the Church to use the small side entrance toward the rear of the building on 63rd Street.  The Church's use is so limited that it has only limited use of its own front doors.

In enumerating its uses, the Church reserves dates for Association meetings, and provides that "LANDLORD agrees to give TENANT not less than (1) year's prior written notice of any such change in the date of an Association Meeting and will use reasonable efforts to accommodate TENANT's use of the Premises on those days." (Paragraph 35.D. p. 67). [emphasis added].  Similarly, the Church classes that are held over the summer for

---

[3] While this Article refers to use of Sunday School in the basement, it appears, based on plans submitted to the DOB, that the Sunday School will be sited in the back portion of the 4th floor to be used by the Church.

181832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 7 of 12

two, two-week sessions require notification "at least one(1) year in advance of the actual date" even though such classes require only that the Rose Group temporarily relocate its office on the 4th floor. (Paragraph 35.1E, p. 67). [emphasis added]. Again, the unmistakable conclusion is that the Tenant's use is the primary use, and the Church's use is incidental.

While Paragraph 35.1 contains an enumeration of Church uses with great specificity as to dates, Paragraph 35.1G, p. 68 allows for

occasional non-regularly scheduled events...[to be] scheduled from time to time at times mutually agreed upon by LANDLORD and TENANT. Since it is difficult or impossible to predict when such a meeting may be required, LANDLORD and TENANT agree to consult with each other in order to schedule such meetings (i) in a manner which causes no disruption to TENANT's scheduled events in the Premises and (ii)at such times as do not conflict with TENANT's reasonably anticipated use of the Premises.

While such terms would seem commercially reasonable from a commercial caterer's perspective, they lead to the inescapable conclusion that it is the Tenant's use that is driving the scheduling. Again, it is the Tenant's use that is primary.

Although, as noted, this Article reserves certain areas of the building for the Church's use, the Church's use of those areas is not necessarily exclusive. Thus, Article 29, p. 62 provides that the Tenant shall be permitted use of the Board Room, previously reserved by the Church, on a "when Available" basis.

5) Tenant's Activities

While the Church's reservation of a right to use portions of the premises is delineated in detail, the Rose Group's right to use the premises is clearly much broader. Paragraph 22.1, p. 56 provides that "TENANT shall use and occupy the Premises solely as a high end, first class catering facility and for banquets, special events and meetings,...." Paragraph 16.1, p. 49 provides that the Tenant is granted the right of quiet enjoyment subject, only to the "LANDLORD'S right to occupy and utilize those portions of the Premises for Church purposes as set forth herein." Thus, the Tenant has the right to the whole, subject only to the express reservations by the Church.

Tenant has a right to sublet in whole or in part, subject, however, to the consent of the Church. Paragraph 22.2, p. 56. Again, this right underscores the possessory nature of

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 8 of 12

the interest and its prime focus on real estate, not the performing of a function related, even loosely, to the Church.[4]

In addition, Tenant is given control over the facade. As you may know, an application is currently pending before the Landmarks Preservation Commission concerning covering up the Church's name on the facade. Paragraph. 27.1 , p. 61 of the lease provides that "TENANT shall also remove or cover, at TENANT's option, the existing signs on the building facade and replace or cover them with blank ("faux") windows." Tenant is also obligated to install signs which "will indicate the existence of LANDLORD'S Sunday School and Church at all times except when TENANT is using the Premises for a third-party function or marketing the Premises." The attempt to separate and distinguish the uses further demonstrates the lack of integration.

While admittedly some of the provisions of the lease are consistent with a more traditional arrangement, (for example the Tenant must respect the Church's privacy and not enter any portion of the premises during hours of Church activity, Paragraph 35.5, p. 70, what is clear from the totality of this lease is that the occupancy by the Rose Group is primary, with the Church retaining limited secondary use.

\*\*\*

We annex, as Exhibit C, a copy of a resolution adopted by the Church concerning the approval of the lease. The resolution states that the Church has 64 members; at the meeting, however, only 32 attended, and only a bare majority of those approved the lease. The limited number of members, and the extensive activities proposed by the Church, underscore the primary use of the building will be as an event space and commercial catering establishment.

*Under the Facts Here the Department of Buildings May Revoke the Change of Use Permit Prior to Commencement of Use*

At our meeting, you raised the issue of enforcement and whether the DOB is authorized to revoke a permit prior to commencement of the use in question. We believe the answer is yes.

Our conclusions as to the use are not speculative. Rather, they are based on documentary evidence -- documents generated by the Church and the Rose Group themselves. These documents, the lease and the Confidential Private Placement

---

[4] This provision also has implications for your notation on the June 2, 2006 letter from the Church. The subtenant, who may be holding catered events, clearly would have no direct relationship with the Church, thereby violating the requirement that the events be "under contract with the Church." Such would violate the conditions under which DOB issued its permit. That the parties entered into a lease with such a provision, and allowing such a possibility, without disclosing it to DOB, raises a serious issue.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 9 of 12

Memorandum (the "Memorandum"), referred to in our March 12, 2007 letter, undermine the application made to DOB to obtain the permit for a change of use. Moreover, they contain clear statements as to what the use will be and, in particular, that the Rose Group's use will be primary.

As noted above, the lease demonstrates that the Rose Group's use is primary and unrelated to the Church. The Memorandum confirms that. It states that the Rose Group "has entered into a Lease for the Facility Space [583 Park Avenue], which permits <u>the current congregation [described as forty members] to use the Facility Space on a limited basis at times when the Company is not using the Facility Space</u>." [Emphasis added] How clearer could it be that the catering use will be primary and the Church use will be secondary.[5] The quoted language is in significant ways diametrically opposed to the submissions to the DOB upon which a change of use permit was granted. The submissions and the Memorandum cannot both be correct.

The "frequency" and "intensity" of the purported accessory use were referred to as highly relevant in the Board of Standards and Appeals decisions involving Yeshiva Imrei Chaim Viznitz (the "Yeshiva case"), which we discussed in our March 12, 2007 letter. As to those factors, too, the documentary evidence is clear. The Memorandum makes clear that the intent is to hold large events (the over 500 person capacity of 583 Park Avenue is cited as one of its distinguishing features). As set forth in the March 13, 2007 letter by the elected officials to Commissioner Lancaster, a copy of which is annexed as Exhibit D, the Church and the Rose Group have represented they would hold up to 208 events per year. While they have apparently in later discussions offered to reduce that number of events to 169, they have also stated that events under 100 should be unlimited in number.[6]

The submissions to the DOB do not establish the necessary interrelationship between the Church and the Rose Group or the integration of their activities. The lease between the Church and the Rose Group makes clear that no other connection exists aside from their interests in the same piece of real estate. The uses are mutually exclusive uses and unconnected. The Memorandum makes clear the Rose Group's use will be the primary use.

Accordingly, examining the application and the additional documentary evidence, it is clear that the Church has failed to make the requisite showing to entitle it to the change of use permit.

---

[5] This document was filed with a certification as to its accuracy. As an offering of securities, under the securities laws it subjects an issuer to claims if any statements are untrue.
[6] Given the size of the congregation, somewhere between 40, as set forth in the Memorandum and 64, as set forth in Exhibit C, serious question exists whether a lesser number could even meet the requirement of the Yeshiva case that the frequency and intensity bear some reasonable relationship to the size of the congregation.

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 10 of 12

Given the foregoing, under the authority of 9th & 10th Street LLC v. Board of Standards and Appeals of the City of New York, 12 Misc.3d 1183(A), decided in July, 2006, it is clear that the Department would be acting properly in revoking the permit at this time. We annex for your convenience a copy of that decision as Exhibit E. In the 9th & 10th Street case, a permit was denied for a dormitory use prior to the time the use commenced because the applicant failed to meet the criteria for a college or school dormitory (this was prior to the enactment of Rule 51-01). Both the court and the Board of Standards and Appeals upheld DOB's determination.

As in that case, the issue presented here is not whether the building might be used in a non-conforming manner, but whether the applicant made the requisite showing for the claimed future use. While the Church's application on its face would arguably appear to make the requisite showing,[7] the documentary evidence contradicts that. Had the lease and the Memorandum, or the provisions thereof, been disclosed on the application, we believe DOB would have denied the application. After review of the documentary evidence, the application fails to meet the threshold to establish the Church's right to a permit based on accessory use.

Earlier cases that stated that the DOB should not speculate about future use, are inapposite here. Here there is no speculation. In the Memorandum, a private offering filed under certification of truth with the New York State Attorney General's office, the true use of the premises was disclosed. To argue otherwise would expose the Rose Group to securities fraud claims. The lease also makes clear how the premises will be used. At issue is not possible future use, but actual intended use.

While revoking a permit in advance of commencement of use may be unusual, it is not impermissible. As the court noted in the 9th & 10th Street case, in response to the claim that what DOB had done was unprecedented, an "agency may engage in 'ad hoc decision making based on individual facts and circumstances.'....Ad hoc decision making may lead to 'unprecedented' decisions if the facts and circumstances are unique.'" Here the facts and circumstances are unique. The future use is admitted. Speculation is unnecessary.

As the court also noted in that case, "[e]ven proposed 'as-of-right' projects, when exposed to public scrutiny, may turn out to be not legitimately 'as-of-right.'" That scrutiny here has yielded documentary evidence. That evidence establishes this is not an accessory use and is, therefore, not "as-of-right." Therefore, even in advance of the commencement of the use, the permit can and should be revoked.

---

[7] As noted above, however, we do not believe it made the requisite showing of integration or interrelationship between the Church's use and the Rose Group's use. We are, therefore, not conceding the sufficiency of the application on its face.

181832.2

Kurzman Karelsen & Frank, LLP

Christopher Santulli, PE
March 30, 2007
Page 11 of 12

Furthermore, we note that the condition you wrote on the June 2, 2006 letter required "events under contract with the Church." Taken literally, anyone having an event at the Church would have to contract directly with the Church and the Church would have a house caterer under its control. The parties have acknowledged that will not be the case. As discussed above, the Church does not have the Rose Group effectively under its control. By entering into the arrangement with the Rose Group in the manner it has, the Church has acknowledged that the use will not comply with the condition set by you as a basis for granting the permit. On this ground, too, the permit may be revoked.

*The Church's Status As a Religious Institution Is Not Relevant to the Determination*

You had raised some concerns about limitations regarding operations of religious institutions. We believe you were referring to the recent decision involving St. Brigid's (Committee to Save St. Brigid v. Edward Cardinal Egan, Sup. Ct. N.Y. Co. (NYLJ 2/16/06). We annex a copy of that decision as Exhibit F. In that case, both the decision of the Archdiocese to close a parish and the decision to demolish the church were challenged. The Court refused to intervene, noting that it would not interfere with ecclesiastical decisions. In the St. Brigid case, the court noted that judicial involvement in disputes involving church property would be appropriate in cases which "can be decided solely upon the application of neutral principles of contract law...and where the underlying controversy does not involve determining religious doctrines or ecclesiastical issues.'" The court refused to interfere with the archdiocese's decision to demolish one of its churches on the grounds that "it would be an 'impermissible intrusion' into Cardinal Egan's ecclesiastical authority to mandate" that he reopen the derelict facility and/or operate a parish there.

The situation at 583 Park Avenue is clearly distinguishable from that of St. Brigid where the church's authority to select a place of worship was called into question. The decision to permit the operation of a commercial catering facility does not involve the determination of religious doctrine nor does it present an ecclesiastical issue. Were DOB to revoke the permit, its decision would neither prevent nor compel the members of the Church from using the church facility to exercise their religion. Indeed, the Church has presumably carried out its religious mandate for decades without benefit of a formal catering "arrangement."

Most importantly, St. Brigid did not involve an attempt to circumvent the Zoning Resolution to establish an otherwise illegal use in a residential district. To argue that St. Brigid prohibits DOB from enforcing the law would mean that any religious institution could with impunity violate laws as it chooses. Obviously, that is not the state of the law. Therefore, we believe that such decision in no way limits the DOB's ability to act in this matter.

*******

161832.2

KURZMAN KARELSEN & FRANK, LLP

Christopher Santulli, PE
March 30, 2007
Page 12 of 12

       For all the foregoing reasons, we respectfully request that any permits and approvals issued to date be immediately revoked.

       Thank you for your consideration.

       Respectfully,

       KURZMAN KARELSEN & FRANK, LLP

       Phyllis H. Weisberg

PHW:alj
Encls.

cc:   Mona Seghal, Esq. (by-hand delivery w/encls.)
     Benjamin Colombo, Manhattan IGA Liaison, Executive Assistant to Borough
       Commissioner (via overnight mail w/encls.)
     David G. Liston, Chair, Community Board 8 (via overnight mail w/encls.)
     Hon. Liz Krueger (via overnight mail w/encls.)
     Hon. Jonathan Bing (via overnight mail w/encls.)
     Hon. Scott Stringer (via overnight mail w/encls.)
     Hon. Dan Garodnick (via overnight mail w/encls.)
     Board of Directors, 580 Park Avenue, Incorporated (via electronic mail)
     Board of Directors, 570 Park Avenue Apartments, Inc. (via electronic mail)

Exhibit D

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH R. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
ANDREW I. BART
KRISTA HALPIN
PAUL J. McGEOUGH

COUNSEL
STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER
ARTHUR R. BLOCK

October 5, 2007

**BY HAND**

Hon. Daniel Doctoroff
Deputy Mayor for Economic Development and Rebuilding
Office of the Mayor
City Hall
New York, NY 10007

583 Park Avenue/ Third Church of Christ, Scientist

Dear Deputy Mayor Doctoroff:

We represent The Preservation Coalition, a coalition of buildings located in the vicinity of the Third Church of Christ, Scientist at 583 Park Avenue. The Preservation Coalition seeks to preserve its residentially zoned neighborhood; to that end it opposes the commercial catering hall now operating at 583 Park Avenue under guise of this commercial operation being an accessory use to the church.

We enclose for your information copies of a letter distributed this week by the Third Church of Christ, Scientist to residents of the neighborhood, along with our client's response thereto.

187879.1

KURZMAN KARELSEN & FRANK, LLP

Hon. Daniel Doctoroff
October 5, 2007
Page 2 of 2

Thank you for your attention to this matter.

Respectfully,

KURZMAN KARELSEN & FRANK, LLP

*Phylis H Weisberg*
Phyllis H. Weisberg

PHW:alj
Encls.

BY HAND DELIVERY WITH ENCLOSURES

cc:    Hon. Patricia Lancaster
       Hon. Robert Tierney
       Hon. Adrian Benepe
       Phyllis Arnold, Esq.
       David Karnovsky, Esq.
       Elizabeth Weinstein

187879.1

Exhibit E

BUILDINGS LEGAL        Fax:212-566-3843        Oct 29 2007  12:25        P.02



NYC Department of Buildings
280 Broadway, New York, NY 10007

Patricia J. Lancaster, FAIA, Commissioner

**Phyllis Arnold**
Deputy Commissioner, Legal Affairs and
Chief Code Counsel
212.566.3291
212.566.3843 fax
phyllisa@buildings.nyc.gov

October 29, 2007

R. Fulton Macdonald
Third Church of Christ, Scientist
583 Park Avenue
New York, NY 10021

Louis Rose
Rose Group Park Avenue LLC
583 Park Avenue
New York, NY 10021

Michael L. Goldblum
The Building Studio LLP
307 West 38 Street – Room 1701
New York, NY 10018

Re:    Intent to Revoke Approval and Permit
       583 Park Avenue, Manhattan (the "premises")
       Application No. 104511495

Gentlemen:

The Commissioner of Buildings intends to revoke the approval(s) and permit(s) issued for work at the premises in connection with the application referenced above, pursuant to Section 27-197 of the Administrative Code of the City of New York ("AC"), within 10 days of the posting of this letter by mail unless sufficient information is presented to the Department of Buildings ("Department") to demonstrate that the permit should not be revoked.

Pursuant to AC §27-197, the Commissioner may revoke a permit for failure to comply with the provisions of any applicable law or regulation, or a false statement or misrepresentation of material fact in the application, accompanying plans or papers on the basis of which the permit was issued, or whenever any permit has been issued in error.

We have reviewed letters dated March 12, 2007, March 30, 2007, and October 5, 2007 from counsel for neighboring buildings challenging the permit issued for a catering activity at the premises to the extent of its status as an "accessory use" to the Church at the premises. We have also reviewed letters submitted by the Church's attorney dated April 20, 2007 as revised May 8, 2007 and October 10, 2007 addressing these complaints. Based on the information presented to us thus far, the catering establishment is not an accessory use because it does not comport with the Zoning Resolution's requirement that it be "clearly incidental to, and customarily found" in connection with the Church. Rather it appears to be a principal commercial establishment at the premises. Therefore, absent additional information as set forth above, the permit will be revoked.

Pending submission of further information and a resolution of the issue, the Department will continue to issue Temporary Place of Assembly permits, but only to the extent of events currently booked at the catering facility and in no event beyond six (6) months from the date of this letter and on the condition that the Department is provided with a list no later than November 5, 2007 of booked events for the period in question for which the caterer has signed contracts.

Third Church of Christ Scientist
October 29, 2007
Page 2

Please contact the undersigned with any questions regarding this notice.

Sincerely,

Phyllis Arnold
Deputy Commissioner for Legal Affairs

C:      Christopher Santulli
        Fatma Amer
        Michael Alacha
        Barry Romm
        Dileep Khedekar
        Max Lee
        Dennis Zambotti
        Application folder
        Revocation file
        Premises file
        Mona Sehgal
        Felicia Miller
        Angelina Martinez-Rubio
        Jay A. Segal
        Phyllis H. Weisberg

Exhibit F

# NYC BUILDINGS

DEPT. OF BLDGS.

583 - 589 Park Avenue

## 1 Filing Status

| Job Number | | | As an attachment to: |
|---|---|---|---|
| Sheet Number | 1 of 1 | Sheets | Block 1398, lot 1    Third Church of Christ Scientist |

## 2 Additional Information

Respectfully request pre consideration before   filing a professional certification application that a proposed accessory social hall, ballroom and catering within the existing church is an accessory use to the existing building.

The building is an existing two story and cellar  structure, located in a landmark district, and constructed in 1921 under application NB 390/1921.  The lot is located in R-10 Park Improvement ( PI ) zoning district.

The existing plans  from 1922 indicate the first floor as the main auditorium and church, and lower level as Sunday school room. Since the building was constructed in 1921, it does not have a certificate of occupancy.

It is proposed to continue the use as a church , and add an accessory use of social hall, ballroom and catering at first floor and cellar , for the periods that the hall is not being used as a church .  The accessory ballroom and catering meets the accessory use definition in Zoning Resolution 12-10 in that they are located in the same zoning lot as the principal use. They will remain under the same ownership of the Third Church of  Christ Scientist. The use is clearly incidental and customarily found in connection with the principal use, as a catering and ballroom is substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the principal use.  The use, therefore remains the same use group 4 church and accessory uses.

The occupancy group will also remain as F occupancy as a place of assembly and will have F-1b and F-4 occupancy.  Under the old code of 1938, the occupancy of the building remains as a public building.

Based on above, there is no change in use and occupancy of the building. The work should not require a new certificate of occupancy.  The building will be upgraded for ADA and handicapped access [LL 58/87], and also for exits, and fire protection equipment. The work will be filed as ALT-2 directive 14 applications. . A place of assembly permit will also be obtained for both church and ballroom catering.

*OK To Accept provided a new certificate of occupancy is obtain with a restrictive declaration and note on The C.O. that The accessory social Hall is To be use and operated exclusively and only by The church and for its members*

[Stamp: REGISTERED ARCHITECT MICHAEL L. GOLDBLUM 019536 STATE OF NEW YORK]

## 3 Statements and Signatures

I hereby state that the above information is correct and complete to the best of my knowledge.

Falsification of any statement is a misdemeanor under Section 26-124 of the Administration Code and is punishable by a fine or imprisonment, or both.

It is unlawful to give to a city employee, or for a city employee to accept, any benefit, monetary or otherwise, either as a gratuity for properly performing the job or in exchange for special consideration. Violation is punishable by imprisonment or fine or both.

Applicant Name: MICHAEL L GOLDBLUM, R.A.

Signature

Date: 3.29.06

4/10/06

Revised 6-88 AI-1

Exhibit G





⊠ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**NYC Department of Buildings**

**Work Permit Data**

**Premises: 583 PARK AVENUE MANHATTAN**                                    **Filed At: 583 PARK AVENUE MANHATTAN**
BIN: <u>1042086</u>   **Block: 1398   Lot: 1**                                          **Job Type: A2 - ALTERATION TYPE 2**

<u>View Permit History</u>  |  <u>Printable (PDF) version of this Permit</u>

| | | | |
|---|---|---|---|
| Job No: | <u>104651609</u> | Job Type / App No.: | ALT2 | Fee: | STANDARD |
| Permit No: | 104651609-01-EW-OT | Issued: | 07/13/2007 | Expires: | 07/15/2009 |
| Seq. No.: | 02 | Filing Date: | 07/13/2007 RENEWAL | Status: | ISSUED |
| Work: | | Proposed Job Start: | 01/12/2007 | Work Approved: | 01/04/2007 |

ALTERATION TYPE 2 - GEN.CONSTRUCTN.
This application is being filed for General Construction in conjunction to
Alteration type I (No Work) application #104511495.

| | | | |
|---|---|---|---|
| Zoning: | N/A | Special District: | N/A | |
| Use: | ASSEMBLY (CHURCHES, CO | No. Dwellings: | N/A | Stories: 2 |
| Total Floor Area: | N/A | Landmark: | YES | |

**Issued to:** LOUIS ROSE                                   **Tracking No:** GC
**Business:** ROSE GROUP PARK AVENUE                        **Phone:** 212-300-6848
       583 PARK AVENUE NEW YORK NY 10128

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by
dialing 311 or (212) NEW YORK outside of New York City.





☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

## Work Permit Data

Premises: 583 PARK AVENUE MANHATTAN

BIN: <u>1042086</u>   Block: 1398   Lot: 1

Filed At: 583 PARK AVENUE MANHATTAN

Job Type: A1 - ALTERATION TYPE 1

### NO WORK PERMIT

| | | |
|---|---|---|
| **Job No:** <u>104511495</u> | **Job Type / App No.:** ALT1 | **Fee:** STANDARD |
| **Permit No:** 104511495-01-AL | **Issued:** 08/11/2006 | **Expires:** 08/11/2007 |
| **Seq. No.:** 01 | **Filing Date:** 08/11/2006 INITIAL | **Status:** ISSUED |
| **Work:** | **Proposed Job Start:** 08/11/2006 | **Work Approved:** 08/08/2006 |

ALTERATION TYPE 1 -

This no work application is being filed to change the occupancy from church and
school to church, school, accesory social hall, ballroom and catering. All work
is filed under DIR-14 application.

| | | |
|---|---|---|
| **Zoning:** N/A | **Special District:** N/A | |
| **Use:** ASSEMBLY (CHURCHES, CO | **No. Dwellings:** N/A | **Stories:** 2 |
| **Total Floor Area:** 36,511 | **Landmark:** YES | |

**Issued to:** LOUIS ROSE

**Business:** ROSE GROUP PARK AVENUE, LLC.

583 PARK AVENUE NEW YORK NY 10128

**License No:** 0999991-NW

**Phone:** 212-300-6848

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by
dialing 311 or (212) NEW YORK outside of New York City.





CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**NYC Department of Buildings**

## Query For Contractor : ROSE GROUP PARK AVE LLC

**Status:** A - ACTIVE                                                        **Entered On:** 09/14/2006

|  | Policy Number | Insurance Co. Name | Expires |
|---|---|---|---|
| **Workers' Comp:** | L 1458 513-7 | NYS INSURANCE FUND | 07/15/2009 |
| **Disability:** | D90261-001 | STANDARD SECURITY LIFE IN | |
| **General Liability:** | | | |
| **Bond:** 25K | 10BSBEG2391 | HARTFORD FIRE INS.CO | 12/31/2006 |

**State Insurance Waiver Recieved:**          **Date Waiver Recieved:**

**WC Not Valid For Demolition:**               **WC Cancelled:**                    **Cancel Date:**

**Business Address:** 583 PARK AVENUE NEW YORK, NY 10021
**Business Phone:** 555-555-5555

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

Exhibit H

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE    NEW YORK, NY 10021-7363   (212) 838-1870
E-Mail Third ChurchOffice@Juno.com

June 2, 2006

To Whom It May Concern:

"For limited periods when the church building is not being utilized for our
congregation, we have provided for various catered events which will also
contribute to the church's ability to sustain itself.  These functions will be
operated by a highly qualified, fully insured, professional caterer who will be
under contract with the Church.  These ancillary functions are necessary
because they will not only ensure our building will be upgraded and rehabilitated
but will also allow us to be exposed to and reach out to a larger community.  The
functions will be restricted by the contract with the Church and will make certain
that 583 Park Avenue continues to serve as our Church in New York City well
into the future."

Respectfully submitted,

R. Fulton Macdonald
Chairman of the Board

Thomas G. Draper, Jr.
Vice Chairman of the Board

*Ok To accept catered events under contract with the Church as complying with the "Social Hall" requirement necessary determination of April 10, 2006 by L. Oseria*

*6/28/06*

Exhibit I

# LocationsMagazine.*com*
### WEDDINGS, SOCIAL OCCASIONS, & CORPORATE EVENTS

The Largest Wedding Hall Site
In The NY/NJ Metro Area

Jan 18, 2007

Home | Search | Help Line | Partners | Business Opportunities | Contact Us

## Locations Magazine Presents

## 583 Park Avenue

Photos   Map



Address: **583 Park Avenue**
**New York, New York 10021**
Phone: **212-583-7200**
Fax: **212-583-7206**
Website: **www.583PARKAVE.com**
Email: **events@583parkave.com**
Contact: **Louis Rose**

Hotel Rating / Rest. Reviews:
Room Capacity cocktail reception: **2,500**
Room Capacity dinner w/dancing: **800**
Cuisine: **Classic American**
Kosher: **Available**
Room accommodates ceremony: **Yes**
Room available: **Monday - Sunday**

Comments:
*The most exciting new event space in New York City.*

# LocationsMagazine.com

WEDDINGS, SOCIAL OCCASIONS, &
CORPORATE EVENTS

 

**REGISTER TO WIN**
**CLICK HERE**

Largest Wedding Hall Site
In The NY/NJ Metro Area

| Jul 6, 2007 | Home | Search | Help Line | Partners | Biz Opp | Contact Us |

When contacting this venue, please mention you saw it on
LocationsMagazine.com!

### Locations Magazine Presents

## 583 Park Avenue

[ Photo ]  [ Map ]



| | |
|---|---|
| **Address: 583 Park Avenue**<br>**New York, New York 10021**<br>Phone: 212-583-7200<br>Fax: 212-583-7206<br>Website: **www.583PARKAVE.com**<br>Email: **events@583parkave.com**<br>Contact: **Louis Rose** | Room Capacity cocktail reception: **1,000**<br>Room Capacity dinner w/dancing: **800**<br>Cuisine: **Classic American**<br>Kosher: **Available**<br>Room accommodates ceremony: **Yes**<br>Room available: **Monday - Sunday** |

Comments:
*The most exciting new event space in New York City.*

**583 Park Avenue is a breathtakingly glorious building that is now available for private events.**

**Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting your event. Orchestrated by a family with generations of combined experience, 583 Park Avenue is poised to deliver a remarkably luxurious and memorable experience to your guests. By combining this prestigious address with its architectural pedigree and coupled with outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City. It is with great pleasure that we introduce to you this uniquely elegant venue with the hope that we will have the opportunity to be of service to you. Please call for an appointment.**

### info@locationsmagazine.com
© 2007 LOCATIONS® Magazine. All rights reserved.

Design by Joel Scher and RightClickTek

FAQ | Site Map | Contact Us | Affiliate Sites


**NEW YORK**
OTHER MARKETS

**Ultra** Manhattan's Newest Entertainment Venue

ADVERTISE |
SEARCH B|

SUPPLIERS | VENUES | EVENT COVERAGE | TRENDS & IDEAS | TIPS & STRATEGIES | OUR TRADE SHOWS &

PREMIUM SPONSORED LISTING                                     PRINT | SEND TO A FRIEND

# 583 Park Avenue

583 Park Ave.
New York, NY 10021
Telephone: 212.583.7200
Fax: 212.583.7206
Web: www.583parkave.com



**CONNECT TO THIS RESOURCE**

**OVERVIEW**
Designed by the renowned firm of Delano & Aldrich and completed in 1923, 583 Park Avenue is the ultimate venue for hosting
your event. Orchestrated by a family with generations of experience, 583 Park Avenue is poised to deliver a luxurious and
memorable experience for your guests. By combining this prestigious address with its architectural pedigree and coupled with
outstanding food and unparalleled service, 583 Park Avenue will stand out as the most exciting event space in New York City.

**CATEGORY OF SERVICES**

PHOTO GALLERY



Photo: 583 Park Avenue

## ROOM DIMENSIONS AND CAPACITY INFORMATION

| NAME | DIMENSIONS | SQ. FEET | RECEPTION | BANQUET | THEATER | CLASSROOM | CONFERENCE | U-SHAPE |
|---|---|---|---|---|---|---|---|---|
| 583 Park Avenue:Arcade | - x - | 3854 | 800 | - | 400 | 250 | - | - |
| 583 Park Avenue:Ballroom | - x - | 6500 | 1200 | - | 900 | 500 | - | - |
| 583 Park Avenue:Balcony | - x - | 3423 | 300 | - | 300 | 150 | - | - |

Exhibit J (Part 1a)

THIRD CHURCH CHRIST, SCIENTIST, OF NEW YORK CITY

LANDLORD

WITH

ROSE GROUP PARK AVENUE LLC

TENANT

FINAL AGREEMENT OF LEASE

PREMISES - 583 PARK AVENUE
NEW YORK, NEW YORK

NY1 26400900.3

ARTICLE 1 PREMISES ......................................................................................... 2

ARTICLE 2 TERM ................................................................................................. 2

ARTICLE 3 BASIC RENT -- ADDITIONAL RENT ........................................... 2

ARTICLE 4 UTILITIES AND SERVICES ........................................................... 4

ARTICLE 5 LANDLORD'S WORK, TENANT WORK, REPAIR AND
            MAINTENANCE ............................................................................. 20

ARTICLE 6 CHANGES AND ALTERATIONS — SURRENDER OF PREMISES ........... 27

ARTICLE 7 COMPLIANCE WITH ORDERS, ORDINANCES, ETC. .............. 29

ARTICLE 8 MECHANIC'S LIENS ...................................................................... 31

ARTICLE 9 USE OF PREMISES BY LANDLORD ............................................ 32

ARTICLE 10 RIGHT TO PERFORM COVENANTS .......................................... 32

ARTICLE 11 DAMAGE OR DESTRUCTION ..................................................... 33

ARTICLE 12 CONDEMNATION .......................................................................... 34

ARTICLE 13 BANKRUPTCY OR OTHER DEFAULT ...................................... 37

ARTICLE 14 CUMULATIVE REMEDIES — NO WAIVER ............................. 39

ARTICLE 15 SUBORDINATION ......................................................................... 48

ARTICLE 16 QUIET ENJOYMENT ..................................................................... 48

ARTICLE 17 NOTICES ......................................................................................... 49

ARTICLE 18 DEFINITION OF CERTAIN TERMS, ETC. ................................. 50

ARTICLE 19 INVALIDITY OF PARTICULAR PROVISIONS ......................... 51

ARTICLE 20 COVENANTS TO BIND AND BENEFIT RESPECTIVE PARTIES ......... 52

ARTICLE 21 INSURANCE .................................................................................... 52

ARTICLE 22 USE, ASSIGNMENT OR SUBLETTING ..................................... 52

ARTICLE 23 LANDLORD'S LIABILITY ............................................................ 56

ARTICLE 24 ENTIRE AGREEMENT ................................................................. 59

ARTICLE 25 CERTIFICATES .............................................................................. 60

ARTICLE 26 BROKER .......................................................................................... 60

ARTICLE 27 SIGNS .............................................................................................. 60

ARTICLE 28 HOLDING OVER ........................................................................... 61

ARTICLE 29 LANDLORD'S RESERVATION OF RIGHTS ............................. 61

ARTICLE 30 OPTION TO RENEW ..................................................................... 62

ARTICLE 31 GENERATOR .................................................................................. 63
                                                                  64

ARTICLE 32 RESTRICTIONS ON TENANT

ARTICLE 33 MAINTENANCE OF SIDEWALKS

ARTICLE 34 INDEMNIFICATION ........................................................................ 65

ARTICLE 35 USE OF PREMISES BY LANDLORD ........................................... 66

ARTICLE 36 RIGHT OF FIRST REFUSAL ........................................................ 71

ARTICLE 37 STRUCTURAL REPAIRS .............................................................. 75

ARTICLE 38 PREVAILING PARTY FEES .......................................................... 77

ARTICLE 39 FORCE MAJEUR .......................................................................... 77

ARTICLE 40 COMPLETION OF TENANT WORK ............................................ 77

ARTICLE 41 AFFILIATE TRANSFERS ............................................................. 78

EXHIBITS:

Exhibit A SITE PLAN

Exhibit B LANDLORD'S WORK LETTER

Exhibit C TENANT IMPROVEMENTS WORK

Exhibit D LANDLORD'S ARCHITECTURAL PLANS FOR LANDLORD'S WORK

Exhibit E PRELIMINARY LAYOUT DRAWINGS

THIS INDENTURE OF LEASE made

2006, by and between **THIRD CHURCH CHRIST, SCIENTIST, OF NEW YORK CITY**

New York Religious Corporation, with offices at 583 Park Avenue, New York, NY 10021,

hereinafter referred to as the "LANDLORD" or "CHURCH" and **ROSE GROUP PARK**

**AVENUE LLC**, a New York limited liability company, with offices at 1111 Park Avenue, New

York, NY 10128, hereinafter referred to as the "TENANT".

<u>W I T N E S S E T H</u>

WHEREAS, LANDLORD is the owner in fee of the building located at 583 Park

Avenue, New York, NY  (the "Building") which includes the Premises, as defined below,

hereinafter demised; and

WHEREAS, LANDLORD is a church organization which currently uses the

Building and the Premises for church services and related activities; and

WHEREAS, LANDLORD is desirous of leasing the Premises during those times

when there are no scheduled Church services or Church related activities as more particularly

delineated in Paragraph 35 below in order to generate income that can be used to maintain the

Building and to support the Church activities while still permitting LANDLORD to continue to

use on an exclusive and non-exclusive basis the Building for Church services and related

activities as it has in the past and as more particularly set forth in Article 35 below; and

WHEREAS, TENANT is in the business of high end, upscale catering and

hosting of events such as weddings, bar mitzvahs, family reunions, corporate meetings, events

and the like; and

WHEREAS, TENANT and LANDLORD intend that TENANT utilize the

Premises for its catering business without interfering with church services and related activities

NY1 26400900.3

such as association meetings, lectures, classes, Sunday school and similar

meetings as more particularly set forth in Article 35 below; and

WHEREAS, LANDLORD and TENANT desire to enter into this Lease.

NOW, THEREFORE, LANDLORD and TENANT covenant and agree as

follows:

## ARTICLE 1
## DEMISE

1.1    LANDLORD, for and in consideration of the rents, covenants and agreements

hereinafter reserved and contained herein, hereby leases and TENANT does hereby take and

hire, subject to the reservations, covenants and conditions hereinafter expressed which TENANT

agrees to keep and perform, the land and building known as 583 Park Avenue, New York, New

York, also known as Section 1, Block 1398, Lot 1, hereinafter called the Building or "Premises".

## ARTICLE 2
## TERM

2.1    The term of this Lease (the "Term") shall commence (the "Commencement

Date") on the second business day after LANDLORD shall have given notice of delivery of

possession of the Premises to TENANT free of all tenancies and occupancies except the use and

occupancy of certain portions of the Premises by LANDLORD as more particularly set forth

herein and the license rights of Cingular (formerly AT&T Wireless) and Nextel relating to the

operations of cellular wireless relay stations pursuant to existing or imminent license agreements,

copies of which have been initialed by the parties hereto.

2.2    The Term of this Lease shall be for a period of approximately twenty years

(subject to 2 five-year renewal options) from the December 31 following the Rent

2

provided herein, on December 31, 2026 (the "Expiration Date").

The term "Lease Year" as used herein or "year" as used herein, shall mean a twelve (12) month period. The first Lease Year, however, shall commence on the Commencement Date and end on December 31, 2007. Each succeeding Lease Year shall cover the twelve (12) full calendar months commencing the first day of January of each year.

2.3    A.    Promptly after the execution of this Lease, TENANT, at TENANT's sole cost and expense, shall apply for, and with reasonable due diligence seek, any necessary license (the **"License"**) from the New York State Liquor Authority (the **"SLA"**) and this Lease is conditioned upon the SLA issuing the License. If for any reason the License is not received prior to the end of one hundred and twenty (120) days after the execution of this Lease or if prior to such date the SLA denies the issuance of the License, TENANT may by notice to LANDLORD given within five (5) days after the earlier of the SLA denial or the end of said one hundred and twenty (120) days, cancel and terminate this Lease, in which event LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder.

B.    Promptly after the execution of this Lease, LANDLORD, at LANDLORD's sole cost and expense, shall apply for, and with reasonable due diligence seek, any necessary approval of this Lease (the "Approval") from the New York State Supreme Court (the "Court"). If for any reason the Approval is not received prior to the end of one hundred and fifty (150) days after the execution of this Lease or if prior to such date the Court denies the issuance of the Approval, the TENANT may by notice to the LANDLORD given after the end of said one hundred and fifty (150) days, cancel and terminate this Lease, in which event

LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder provided that this Lease shall automatically terminate upon the date that the Court in a final unappealable order denies the issuance of the Approval, in which event LANDLORD shall return to TENANT any sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder.

   C.  Promptly after the execution of this Lease, LANDLORD, with TENANT's assistance and cooperation, at their joint cost and expense, shall apply for an accessory use permit (the "Permit") from the New York City Department of Buildings ("DOB") to permit catering activities in the Premises as an accessory use to the use of the Premises as a church. If for any reason the Permit is not received prior to the end of one hundred and twenty (120) days after the execution of this Lease or if prior to such date the DOB denies the issuance of such Permit, either party may, by notice to the other party, given within five (5) days after the end of said one hundred and twenty (120) days, cancel and terminate this Lease, in which event LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder. The parties shall share the expense of said application, including without limitation all outside legal and other professional fees, and all other related costs and expenses, equally.

<div align="center">

### ARTICLE 3
BASIC RENT -- ADDITIONAL RENT
</div>

  3.1  Commencing upon the later to occur of the Commencement Date or the date that the last of the contingencies set forth in Article 2 above shall have been satisfied (the "Rent Commencement Date") and continuing throughout the Term and any renewal terms, TENANT shall pay an Annual Basic Rent, prorated for any portion of a calendar year, in the amount of

<div align="center">4</div>

Two Hundred and Fifty Thousand ($250,000) Dollars in equal monthly installments of twelve

of or on the first day of each month without notice or demand as provided in Section 3.2 hereof.

The Annual Basic Rent shall be adjusted as follows:

| Lease Years | Annual Basic Rent |
|---|---|
| 6th Lease Year through 10th Lease Year | $319,070.00 |
| 11th Lease Year through 15th Lease Year | $407,224.00 |
| 16th Lease Year through 20th Lease Year | $519,732.00 |

The first monthly installment of Basic Rent ($20,833.34) shall be paid upon the

execution of this Lease and shall be held in escrow by LANDLORD in a segregated, interest

bearing bank account and released to LANDLORD upon the satisfaction of all of the conditions

set forth in Paragraph 2.3 above, or to TENANT upon the cancellation and termination of the

Lease in accordance with the provisions of Paragraph 2.3 above, as the case may be.  The

fractional rent, if any, from the Rent Commencement Date to the first day of the following month

shall be paid by TENANT to LANDLORD on the first day of the first full calendar month

following the Commencement Date.

3.2     Annual Basic Rent and Additional Rent shall be payable in lawful money of the

United States to LANDLORD at 583 Park Avenue, New York, New York, or at such other place

as LANDLORD may from time to time designate, in advance, without notice, demand, offset or

deduction except as specifically set forth herein.  In the event any payment of Annual Basic Rent

or Additional Rent shall not be made to LANDLORD within ten (10) days after the due date

thereof, there shall be added to the amount a sum equal to five (5%) percent of the unpaid items

as a fee and not as a penalty to, inter alia, help defray LANDLORD'S additional costs for

bookkeeping and other costs in connection therewith.

5

3.3    Any payment to LANDLORD provided for as Additional

Rent and if no specific time period is set forth within which it is to be paid, same must be paid

within ten (10) days of TENANT's receipt of notice that same is due.

3.4    A.    The Premises is currently exempt from the payment of real estate taxes.

The parties anticipate that, as a result of this Lease, the Premises may become subject to real

estate taxes.  As Additional Rent, TENANT shall pay to LANDLORD, within ten (10) days of

LANDLORD rendering a bill therefor, all Real Estate Taxes imposed against the land and/or

Building constituting the Premises as same become due and payable to the Department of

Finance of the City of New York or to such other agency as may be duly authorized to collect

such Taxes.  Notwithstanding the foregoing, at LANDLORD's option, if monthly payments are

required by LANDLORD's mortgagee or if TENANT shall have failed to pay taxes within the

ten (10) day period stated above, thereafter TENANT shall deposit with LANDLORD within

fifteen (15) days of LANDLORD's written demand therefore a tax escrow amount equal to the

sum which, when added to the monthly payments referred to hereinafter, would be sufficient to

permit LANDLORD to pay in full the next installment of real estate taxes and any assessments at

least thirty (30) days prior to the due date, and thereafter one-twelfth of the annual taxes shall be

paid by TENANT together with the Basic Annual Rent on a monthly basis, in advance, in such

amounts so that LANDLORD shall have sufficient amounts collected to pay any tax coming due

at least thirty days prior to the due date and if said amounts are insufficient to pay the taxes

coming due, TENANT shall be billed by LANDLORD for the difference.  Any such advance

payments shall be deposited into an interest bearing account mutually agreed upon by

LANDLORD and TENANT with all interest earned thereon paid by LANDLORD to TENANT

6

attributable to the Church as reflected on the New York City Tax assessor's rate card.

B.     As further Additional Rental during the Term, TENANT shall pay or cause to be paid, within ten (10) days after LANDLORD renders a bill therefor, all other taxes, assessments, charges, rates and water and sewer charges, and other governmental charges, which shall or may, during the Term, be assessed, levied, charged, confirmed or imposed upon or become payable out of or become a lien on the land and/or Building constituting the Premises or any part thereof or the appurtenances thereto, and such franchise, license and permit fees as may be appurtenant to the use of the Premises, applicable to the period within the Term, but shall not pay any municipal, state or federal income taxes, assessed against LANDLORD or any municipal, state or federal, estate, succession, inheritance, or transfer taxes of LANDLORD, or any franchise taxes imposed upon LANDLORD or any income, profits, or revenue tax, assessment or charge imposed upon the rent received as such by LANDLORD under this Lease or any tax attributable to the Church as reflected on the New York City Tax assessor's rate card; provided, however, that if at any time during the term of this Lease, the present method of taxation or assessments shall be so changed that there shall be added to, or substituted for the whole or any part of the taxes, assessments, levies, impositions, or charges, hereafter levied, assessed, or imposed on real estate and the improvements, a capital tax or other tax imposed on the rents received by LANDLORD from the Premises or the rents reserved herein, or any part thereof, then all such capital taxes or added or substituted other taxes shall, to the extent that they are so imposed and/or substituted, be deemed to be included within items to be paid by TENANT as set forth in this Section to the extent that such tax or payment would be payable if the Premises were the only property of LANDLORD subject thereto.

7

C. Where any assessment is permitted by law to be paid in installments,

TENANT may pay such assessment to LANDLORD in installments, together with the interest

thereon, as and when each such installment becomes due. TENANT shall not be obligated to

pay the amount or portion of any installments of any assessment or assessments which are

applicable to any period prior to the Rent Commencement Date or subsequent to the expiration

or termination date of this Lease.

D.     The certificate, advice, bill, receipt or statement issued or given by the

appropriate officials authorized or designated by law to issue or give the same or to receive

payment of any tax or any payment in lieu thereof shall be prima facie evidence for all purposes

of the existence, payment, non-payment or amount of such tax or payment upon TENANT's

receipt thereof.

E.     TENANT shall have the option in LANDLORD's name and with

LANDLORD's full cooperation to contest the validity or amount of the assessed valuation for

real estate taxes levied against the Premises, for any or all of the years during the term of this

Lease. TENANT shall pay all counsel fees and disbursements in connection with said contest.

In the event TENANT is successful in reducing the taxes and obtaining a tax saving and/or tax

refund, and if TENANT has paid the taxes for which the refund has been obtained, TENANT

shall receive the full refund. In the event that there is no refund of taxes paid, but the recovery is

represented by a reduction in assessed valuation for future years, resulting in a tax savings during

the term of this Lease, TENANT shall receive the full benefit of such savings.

F.     Notwithstanding anything to the contrary contained herein, TENANT

shall not be required to pay any interest, penalties or late fees assessed by any municipality for

NYI 26400900.3

failure to pay Taxes to LANDLORD within the time periods set forth herein.

3.5    TENANT represents, warrants, covenants and agrees that it shall pay to LANDLORD at the time and in the manner set forth herein Percentage Rent as follows:

A.    (i)    In addition to the Annual Basic Rent and all other rents and charges reserved hereunder and as part of the total rent to be paid in any Lease Year in which the amount of Gross Sales exceeds an amount equal to the Annual Basic Rent then payable multiplied by ten (10) (the "Gross Sales Base") (as such amount may be prorated as provided in clause (ii) below), TENANT shall pay to LANDLORD as Additional Rent for each Lease Year or fractional part thereof from and after the Rent Commencement Date and throughout the remainder of the Term, an amount (the "Percentage Rent") equal to the sum of the product of (x) the Excess Gross Sales (as hereinafter defined) for such Lease Year, multiplied by (y) ten (10%) percent.

(ii)    As used herein, the term "Excess Gross Sales" shall mean, for the period to which reference is made, the excess of (x) Gross Sales for such period over (y) the Gross Sales Base (as pro rated for any period which is a partial Lease Year).

(iii)    Percentage Rent shall be determined and paid, without prior demand being required therefor and without any offsets or deductions whatsoever, in the manner hereinafter provided in Subsection (C) below.

B.    (i)    Each Lease Year shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rent due, if any.  The amount of Gross Sales in any Lease Year shall not be carried over into any other Lease Year.

9

(ii)    The term "Quarter" as used in this Lease shall mean

three (3) consecutive full calendar months commencing on each of the first day of January,

April, July and October.  The first Quarter shall be a period from the Rent Commencement Date

through and including the day immediately preceding the January 1, April 1, July 1, or October 1

next following, as the case may be.  The second Quarter and every subsequent Quarter shall

cover the next succeeding three (3) full calendar months commencing the first day of the next

succeeding calendar quarter provided that last Quarter shall expire upon the Expiration Date.

Each Quarter shall be considered as an independent accounting period for the purpose of

computing the amount of Percentage Rent due, if any, for the Quarter in question, subject to

adjustment at the end of each Lease Year, as set forth below.

       C.    In the event that Gross Sales for any Quarter during the Term exceeds the

Gross Sales Base divided by four (4), then TENANT shall pay to LANDLORD, at the time the

applicable Monthly Report is submitted to LANDLORD as provided in Section F (i) (a) in

respect of the last month of each such Quarter, an interim Percentage Rent payment based upon

the amount of such excess.  Any such interim payment shall be accounted for when the annual

Percentage Rent is paid as hereinafter provided.  At the end of each Lease Year, (or partial Lease

Year, if applicable) the actual Percentage Rent shall be computed on a full Lease Year (or partial

Lease Year, if applicable) basis and the balance of the Percentage Rent due, if any, shall be paid

to LANDLORD within ninety (90) days after the end of such Lease Year, including if such is the

last Lease Year (or partial Lease Year, as to which TENANT's obligation shall survive the

expiration of the Term of this Lease).  If at the end of any Lease Year the total amount of interim

Percentage Rent payments made by TENANT exceeds the total amount of Percentage Rent

required to be paid by TENANT for such Lease Year as shown in TENANT's Annual Report,

10

the maintenance thereof shall first be applied against any overdue installments...

against any past due amounts payable by TENANT under this Lease but not collected by

LANDLORD, and with respect to the balance, TENANT shall thereafter receive a credit equal to

such excess (after such application shall be made) which may be deducted by TENANT from the

next accruing payment (s) of Annual Basic Rent and Additional Rent following submission of

TENANT's annual report. If such overpayment occurred in the last Lease Year or partial Lease

Year of Term, LANDLORD shall pay the remainder (if any) of the amount of such overpayment

to TENANT within thirty (30) days after the later of (x) LANDLORD's receipt of TENANT's

Annual Report for the last Lease Year or partial Lease Year as described in Section F.(i)(c) or (y)

the final resolution of any audit performed by LANDLORD under this Section 3.5., but in no

event later than ninety (90) days following LANDLORD's receipt of TENANT's annual report

for the last Lease Year.

        D.    (i)     The term "Gross Sales" shall mean (A) the dollar aggregate of the

actual sales price collected and retained by TENANT or by any TENANT affiliates for all

facility rentals, foods and beverages, both alcoholic and non-alcoholic, and all merchandise,

wares and other goods sold or leased and the actual charges collected and retained for all services

performed, business conducted and accommodations (including, without limitation, cover

charges, admission fees, membership fees, other dues, and the like) rendered by TENANT or by

any TENANT affiliates in, at, from, or arising out of the use of the Premises (and all fees,

charges, subrents, concession payments or other payments collected and retained by TENANT

from any subtenant, licensee, concessionaire and other occupant in, at, or arising out of the Lease

of the Premises in respect of any such party's use or occupancy of the Premises), including the

fair market value of all consideration other than money received for any of the foregoing and (B)

NYI 26400900.3

its operations at the Premises; and (C) any deposit accepted and retained by TENANT as being

forfeited shall be included in Gross Sales; and (D) subject to adjustment relating to TENANT's

costs of collection, refunds, and all amounts received under insurance policies in respect of loss

of business, sales or profits, but excluding insurance proceeds received by TENANT with respect

to Basic Annual Rent (except to the extent LANDLORD collects insurance proceeds for loss of

Percentage Rent in respect thereof), shall be deemed actual sales prices collected and retained.

No franchise tax, capital stock tax, tax based upon assets or net worth, and no income or similar

tax based on income or profits shall be deducted from Gross Sales.

        (ii)     Notwithstanding the foregoing, only the following shall be

excluded from Gross Sales: (A) credits for returns to suppliers, shippers or manufacturers;

(B) cash or credit refunds to customers on transactions otherwise included in Gross Sales not

exceeding the selling price of goods and services; (C) sales of TENANT's trade fixtures,

machinery and equipment, which are not stock for sale or trade, after use thereof in the conduct

of TENANT's business; (D) amounts separately stated in the sales receipt and collected from

customers which are paid by TENANT to any government for any sales or excise tax on such

sales imposed by law at the point of sale; (E) receipts resulting from sales at a discount to

TENANT's employees made in the ordinary course of their employment; (F) monies

representing tips, gratuities and service charges paid by a customer that are directly paid by

TENANT to employees; (G) the actual amount of charges for services performed by unaffiliated

contractors and service providers which are itemized and billed to TENANT's customers

including, but not limited to, florists, musicians, lighting, performers and other entertainers,

printers, decorators, travel services, caterers and bakers (exclusive of any surcharge, mark-up or

<div align="center">12</div>

separately stated and paid to TENANT for the extension of credit by TENANT on account of

sales made or services rendered by TENANT, provided no discount on the sale price of the item

or service is provided in return; (I) proceeds of claims for damage to merchandise or fixtures;

(J) interest, finance and other charges paid to third party credit card companies; (K) uncollected

or uncollectible credit accounts in respect of which TENANT shall have made commercially

reasonable efforts to collect; (L) gross revenues of non-affiliated third party hat check, men's

room and similar concessionaires to the extent not retained, paid or remitted to and retained by

TENANT and (M) unearned deposits.  In no event shall any franchise tax or capital stock tax

income tax or any similar tax based upon income, profits or gross sales be deducted from Gross

Sales.  If TENANT shall incur any costs for collection for Gross Sales, the costs shall be

deducted from any recovery in determining such Gross Sales.

        (iii)    TENANT shall not cause the nature or location of any transaction

which would otherwise be included in the definition of Gross Sales set forth above to be altered

or changed in such a manner that would cause such transaction to be excluded from Gross Sales.

In the event of a breach of the foregoing covenant, LANDLORD, in addition to any other right

or remedy available under this Lease, at law or in equity, may require that any such transaction

be included in Gross Sales for the purpose of computation of the Percentage Rent hereunder and

for all other purposes of this Section 3.5, as though said transaction had been made at the

Premises.

        E.    TENANT shall prepare and keep, for a period of not less than one (1) year

following the end of each Lease Year, adequate books and records in customary form (including

electronic media, if used by TENANT) from which LANDLORD and its professional

13

including but not limited to records of inventories, purchases, and receipts of merchandise, and all sales and other transactions made by TENANT described in the definition of Gross Sales set forth above, which books and records shall be conveniently segregated from other business matters. TENANT shall record, at the time thereof, each sale or other transaction described in the definition of Gross Sales set forth above. No food, beverage or other item may be sold or otherwise provided in connection with TENANT's business operations at the Premises unless the transaction in respect thereof is recorded in such system. All original records, in their original and unaltered form, shall be part of the books and records required to be retained hereunder. TENANT shall keep, for at least one (1) year following the end of each Lease Year, all pertinent original sales records relating to TENANT's operation of its business at the Premises as follows: (a) such records which would normally be examined and reasonably required to be kept by an independent accountant pursuant to generally accepted auditing standards in performing an audit of TENANT's Gross Sales, (b) duplicate bank deposit slips and bank statements for all bank accounts, as well as all canceled checks and checkbooks, (c) credit card receipts and monthly reports from credit and clearing companies, (d) sales journals, and (e) cash receipts journals. If TENANT fails to maintain such books of account and records as is reasonably necessary to determine Gross Sales and the respective categories thereof as described in Section D.(i), or to make the same available as provided in Section G.(i) and such failure shall continue for fourteen (14) business days after LANDLORD shall have given TENANT written notice thereof, then LANDLORD, without limiting any other rights or remedies hereunder, at law or in equity, may hire an accountant, at TENANT's sole cost and expense (the amount of which shall be payable by TENANT to LANDLORD as Additional Rent within ten (10) business days after TENANT's

14

TENANT shall cooperate with such accountant with respect thereto.

F.    (i)    TENANT shall deliver to LANDLORD the following reports of Gross Sales (collectively, the "Reports") in the manner and at the times as set forth below, time being of the essence in each instance:

(a)    TENANT shall deliver to LANDLORD on or before the fifteenth (15th) day following the end of each month during the term hereof (including the fifteenth (15th) day of the month following the end of the Term), the statement of Gross Sales for TENANT's business in the Premises during the immediately preceding month on a cash basis (the "Monthly Report").

(b)    TENANT shall deliver to LANDLORD on or before the thirtieth (30th) day following the end of each Quarter a written statement signed by TENANT and certified by an authorized officer or member of TENANT to be true and correct, showing the amount of Gross Sales during the immediately preceding Quarter (the "Quarterly Report");and

(c)    TENANT shall deliver to LANDLORD on or before the ninetieth (90th) day following the end of each Lease Year (including the ninetieth (90th) day following the Expiration Date) a written statement signed by TENANT and certified by an authorized officer or member of TENANT to be true and correct showing the amount of Gross Sales during the preceding full or partial Lease Year, as applicable (the "Annual Report").

(ii)    Each Monthly Report, Quarterly Report and Annual Report shall be prepared using the cash method of accounting and shall have separate detailed calculations of the amounts of Gross Sales for the period covered by such statement and a reasonable detailed itemization of all inclusions and permitted deductions and exclusions used in said calculations.

NY1 26400900.3

(iii)    TENANT shall submit to LANDLORD copies of any

State or local sales tax returns concurrently with the filing of same with the appropriate

governmental agency.

(iv)    The acceptance by LANDLORD of payments of Percentage Rent

or Reports thereon shall be without prejudice and shall in no case constitute a waiver of

LANDLORD's right to examine TENANT's books and records of its Gross Sales and

LANDLORD's right to any further sums subsequently shown to be due for any period.

G.    (i)    Upon thirty (30) days' prior written notice to TENANT and not

more frequently than one (1) time in any Lease Year, LANDLORD, at its sole cost and expense

(except as set forth below), shall have the right to cause a complete audit to be made of Gross

Sales by TENANT and of all books and records pertaining thereto, including but not limited to

those specified in Section E, and TENANT will make all of TENANT's books and records

available, or cause the same to be made available, for examination (and photocopying or

duplicating) at the Premises, or at TENANT's business office in New York City by

LANDLORD or its authorized representatives (and TENANT shall make TENANT's photocopy

or duplicating machines available to LANDLORD, with the actual cost of photocopies and

duplication to be borne by LANDLORD, subject to the provisions of this Section G.(i). If the

results of any such audit described above show that TENANT's statement of Gross Sales for any

full or partial Lease Year has been understated, TENANT shall pay LANDLORD the amount of

any such deficiency, together with interest thereon computed at the Interest Rate from the date

due to the date LANDLORD shall collect payment thereof from TENANT. If any such

understatement shall exceed three (3%) percent of the actual amount of Gross Sales for the

period in question, then all reasonable, actual costs and expenses incurred by LANDLORD in

16

Exhibit J (Part 1b)

connection with such audit shall be paid by TENANT to ten (10) business days after written demand therefor, together with interest thereon at

the Interest Rate from the date due to the date LANDLORD shall collect payment thereof from

TENANT.

  (ii) Without limiting LANDLORD's rights and remedies under this

Section 3.5 or elsewhere in this Lease, or otherwise available at law and in equity, if TENANT,

at any time, is two (2) or more months delinquent in the furnishing of any Quarterly or Annual

Report and such delinquency shall continue for ten (10) days after LANDLORD gives TENANT

written notice thereof, in addition to all other remedies available to LANDLORD hereunder or at

law or in equity, LANDLORD may, on five (5) days' notice, conduct an audit on the conditions

set forth in subsection (i) above at TENANT's sole cost and expense with all reasonable, actual

costs and expenses incurred by LANDLORD in connection therewith payable by TENANT to

LANDLORD as Additional Rent, within ten (10) business days after written demand therefor.

The willful furnishing by TENANT of any materially inaccurate statement shall constitute a

default under this Lease and TENANT agrees any information obtained by LANDLORD

through the means described in Section G.(ii) above shall be deemed furnished by TENANT.

Any information obtained by LANDLORD as a result of any audit described in this Section G

shall be held in strict confidence by LANDLORD, except in any action or proceeding to recover

such deficiency or any costs or expenses in respect of such audit, or in connection with any

existing financing or any prospective sale, lease or leaseback or financing of all or any part of the

Premises, or in connection with any registration or filing with any governmental authority or

pursuant to a subpoena or other judicial process, or, if otherwise required pursuant to Legal

Requirements.

<div align="center">17</div>

(iii)    Pending the determination of any dispute in respect of

and as a condition precedent to TENANT's right to dispute the correctness of any

LANDLORD's audit (as referred to in Subsection (i) above), TENANT shall pay to

LANDLORD, as Additional Rent, the amount shown as due from TENANT based upon Gross

Sales as determined by LANDLORD's auditor.  TENANT shall have the right within thirty (30)

days of receipt of the results of LANDLORD's audit, to submit any dispute in respect  of Gross

Sales on the correctness of LANDLORD's audit to a determination by a certified public

accountant with at least ten (10) years experience, mutually selected by the parties.  Such dispute

will be determined without a hearing solely upon TENANT's books and records and

LANDLORD's audit report with respect thereto (the "Audit Documents") and the arbitrator shall

make such decision within thirty (30) days of its appointment.  If the parties cannot agree on an

accountant, or if such certified public accountant fails to make its decision within such time

period, both parties shall apply to the American Arbitration Association of the City of New York

for the appointment of an accountant possessing the qualifications set forth above, who shall

receive the Audit Documents within thirty (30) days of the appointment, and whose decision

shall be conclusive, final and binding on the parties hereto.  The party against whom the

determination is made shall bear the cost of such arbitration, and if each party is partially

successful, the arbitrator will apportion such costs between the parties.  If such dispute is

ultimately determined in TENANT's favor, LANDLORD shall, within ten (10) business days

after the arbitrator shall have rendered its final determination, pay to TENANT any amount so

overpaid by TENANT, plus interest at the Interest Rate for the period commencing on the date

such overpayment was paid by TENANT until the date TENANT shall have received payment in

full, plus interest, of the entire amount of the overpayment.

18

of 60 days in any 12 month period then, for the purpose of computing Percentage Rent (and not in lieu of any rights or remedies of LANDLORD in respect thereof), Gross Sales for the period in excess of said 60 days shall be deemed to be the average Gross sales for the corresponding period of the immediately preceding two (2) Lease Year periods (taking into account day of the week and week of the month) or the highest Gross Sales in any Lease Year for the corresponding period during the entire previous portion of the Term if the period since the Lease Commencement Date has been less than three (3) Lease Years.

I. LANDLORD and TENANT expressly agree that nothing in this Lease (including, without limitation, the payment of Additional Rent by TENANT based on a portion of Gross Sales) shall create or be deemed to create any relationship between LANDLORD and TENANT, whether as partners, joint venturers, or otherwise, other than that of LANDLORD and TENANT under this Lease.

J. The obligations of TENANT in any and all Lease Years during the Term (i) to pay Percentage Rent due under this Section 3.5 and (ii) to keep its books and records in accordance with Section 3.5E shall survive termination of this Lease for a period of one (1) year from the date on which the Percentage Rent was paid or became payable by TENANT. LANDLORD's right to audit any Annual Report pursuant to Section 3.5G shall survive the termination of this Lease for a period of twelve (12) months following the month in which TENANT delivers its Annual Report pursuant to Section 3.5.F in respect of the final Lease Year and, in any event, until the resolution of any dispute in respect of any amount of Percentage Rent which LANDLORD shall determine is due and payable under this Section 3.5, provided the dispute resolution is commenced and diligently pursued by LANDLORD within the time period

19

NY1·26400900.3

specified above. Sums collected and retained by the LANDLORD as of the date of the

termination or expiration of the Lease shall be deemed included in the final Quarter prior to said

expiration or termination, which Quarter shall be promptly readjusted after the expiration of said

six (6) month period to include such sums.

## ARTICLE 4
## UTILITIES AND SERVICES

4.1     TENANT shall contract directly with the local utility companies for all electric,

gas and water (including any stand-by water required for any sprinkler system) used and

consumed in the Premises.  TENANT shall pay for all such utilities and services.  TENANT

shall not be required to pay for any electricity supplied to Cingular or Nextel.

## ARTICLE 5
## LANDLORD'S WORK, TENANT WORK, REPAIR AND MAINTENANCE

5.1     TENANT has inspected the Premises and accepts the Premises in "as is"

condition and LANDLORD shall not be obligated to do any work other than the removal of the

existing personal property and equipment in the Sunday School section of the basement and the

storage area of the 4th floor (LANDLORD's Work").  LANDLORD's work shall be completed

prior to the Commencement Date.

5.2     TENANT at TENANT's sole cost and expense shall renovate the Premises

substantially in accordance with the preliminary plans (Exhibit C) and specifications (Exhibit E)

attached hereto (the "TENANT Work").

5.3     A.     TENANT shall provide LANDLORD with detailed plans and

specifications for the renovation of the Premises, which shall include, inter alia, electrical and

mechanical drawings (the "Plans and Specifications").  The Plans and Specifications shall

include provisions for the following, all of which shall be done by TENANT at TENANT's sole

20

cost and expense remove partition pews as to at least both sides of the center aisle

and the first (lowest) row of the balconies (and restore the balcony cosmetically so that the

removal of the first pew is not noticeable), said pews to be reinstalled by TENANT upon the

expiration or termination of this Lease (provided that TENANT, at TENANT's option may elect

not to store the pews in which case TENANT shall install new pews, of similar design and

quality to existing pews upon the expiration or termination of this Lease), renovation of a

building entrance to make it ADA compliant (as required by law), upgrading of restrooms in the

Premises and making one restroom ADA compliant (as required by law), specifications for at

least 350 custom stackable chairs to be located on the ground floor of the Premises, installation

of a fully equipped catering kitchen in the area now used by LANDLORD's Child Care and

Sunday School offices, creation of a new room in the basement to serve as LANDLORD's

Sunday School office and nursery with a door providing direct access to the Sunday School area,

cosmetic refurbishment of the auditorium as well as other rooms such as the existing Board

Room and existing storage areas, leveling of the auditorium floor and installation of high quality

carpeting, painting and repairing of the auditorium, 4th floor hallway and other public portions of

the Premises which will be used by TENANT's clients, and LANDLORD's congregation, repair

of all existing damage in the auditorium, design and installation of curtains to cover the organ

pipes if TENANT shall so elect, and existing religious messages in the auditorium, installation of

facilities and equipment to render the Premises in compliance with applicable legal requirements,

installation, if TENANT shall so elect, of a VIP room/Bridal Suite on the North side of the lower

level including separate bathroom, power and wiring upgrades as needed or required to

accommodate TENANT's catering business with TENANT removing any visible abandoned

wiring or conduit, modifications to the existing heating, ventilating and air conditioning systems

NYI 26400900.3

upgrading and repair of the existing elevator, all installations needed to bring the Premises into code compliance for TENANT's catering business, other than conditions which are in violation of applicable code on the day prior to the Commencement Date (other than conditions which are to be remedied by TENANT Work) renovation of the existing 4th floor Literature Distribution Room into TENANT's office and presentation room with the option for TENANT to relocate or expand such space, installation of replacement Literature Distribution Room/Committee Room, storage facilities and a Treasurer's office for LANDLORD in the fourth floor attic area in a location adjacent to the existing Board Room, installation of kitchen ventilation and fire suppression systems, installation of a new electronic sign compatible with the appearance of the Building at approximately eye level on the corner of the Building facing Park Avenue at 63rd Street identifying at the times herein specified the various uses of the Building as further delineated in this Lease and/or in the Exhibits hereto, installation of a new electronic sign to the left of the 63rd Street side entrance which will indicate the existence of LANDLORD's Sunday School and Sunday and Wednesday services at all times except when TENANT is using or actively marketing the Premises for a 3rd party function, provide a storage area for LANDLORD's Hymnals, hand-out literature and that upon which such literature will be displayed and signs in a location to be mutually determined installation of a new sound system with controls in the auditorium. LANDLORD will approve or provide comments on TENANT's plans and specifications within two (2) weeks after submission, and within ten (10) days after resubmission in response to comments made by LANDLORD. Except for the design and engineering in connection with the work described in this Paragraph 5.3 and in Paragraph 5.4,

NY1 26400900.3

been satisfied.

B.      In furtherance of the foregoing, subject to all the non-monetary covenants, agreements, terms, provisions and conditions of this Lease including, but not limited to, the prohibition against physical work in Paragraph 5.3.A, effective after the signing of this Lease, LANDLORD hereby grants to TENANT use of the existing Literature Distribution Room and treasurer's office on the 4th floor of the Premises and grants to TENANT's decorators, suppliers, and contractors access to the Premises for the purpose of arranging for and making improvements and installing TENANT's equipment, telephones, trade fixtures, movable partitions, furniture, and other furnishings, provided that TENANT's contractors obtain and maintain Comprehensive General Liability insurance with a combined single limit of at least $2,000,000.00 and including LANDLORD as an additional insured, and Worker's Compensation Insurance. TENANT agrees that it shall use reasonable efforts not to disturb the current occupant of the Basement portion of the Premises (the Geneva School) in connection with TENANT's preparations of its plans and specifications or in the conduct of any of TENANT Work hereunder.

5.4     In addition to the foregoing improvements and work, after the Rent Commencement Date TENANT agrees to complete the repair of the Building's roof in accordance with proposals previously obtained by LANDLORD. It is estimated that the cost of such repairs is approximately $650,000. Upon completion of the roof repair project LANDLORD shall reimburse TENANT for the cost incurred by TENANT to complete said roof repair together with an amount equal to (i) the actual rate of interest paid or payable by TENANT in connection with TENANT's financing of all or a portion of the cost of such repair

23

deducted from the Percentage Rent to be paid to LANDLORD pursuant to Section 4.3 of this Lease in an amount equal to Fifty Thousand ($50,000.00) Dollars per year until the final year of payment at which time the balance shall be due and payable. In no event shall this reimbursement obligation reduce the Basic Annual Rent payable hereunder. LANDLORD shall make available to TENANT all warranties and guarantees relating to the work heretofore performed to the roof of the Premises. LANDLORD shall cooperate with and assist TENANT should TENANT desire to enforce any of such warranties or guaranties. All warranties or guaranties relating to the roof work to be performed by TENANT shall be in the name of LANDLORD and TENANT.

5.5    TENANT covenants throughout the Term, at TENANT's sole cost and expense, to take good care of the interior of the Premises and keep the same in good order and condition and to make all repairs therein except as provided for herein.

5.6    A.    TENANT covenants throughout the term of the Lease, at TENANT's sole cost and expense, to maintain and keep in good repair the Building's sanitary, electrical, heating, air conditioning and other systems, subject to the allocation of the cost between TENANT and LANDLORD, as set forth below. LANDLORD will assign to TENANT any mechanical equipment warranties which may be in effect on the Commencement Date.

B.    In the event that TENANT fails to maintain or repair any portion of the Premises required to be maintained or repaired by TENANT hereunder, and said failure continues for a period of thirty (30) days after TENANT receives written notice of such failure, LANDLORD may, but is not obligated to, make such repair unless TENANT is then in the process of making such repair. In the event LANDLORD makes any repairs which are the

24

obligation of TENANT hereunder, LANDLORD shall submit a copy thereof to TENANT and

TENANT shall pay to LANDLORD within ten (10) days of TENANT's receipt thereof the

amount of such bill, together with interest at the Interest Rate.

5.7     Except as expressly provided otherwise in this Lease, there shall be no allowance

to TENANT or diminution of rent and no liability on the part of LANDLORD by reason of

inconvenience, annoyance or injury to business arising from the necessity to make any repairs,

alterations, additions or improvements in or to any portion of the Building or the Premises, or in

and to the fixtures, appurtenances and equipment thereof.

5.8     TENANT shall, to the extent same are cost effective, during the entire Term or

any Extended Term maintain maintenance contracts for the HVAC system, the elevator and all

other systems which as a matter of law require such maintenance contracts, at TENANT's sole

cost and expense.

5.9     LANDLORD shall not be required to furnish any services for the Premises,

including, but not limited to, heat, water, light and electric power, and shall not be liable for

interference with light or other incorporeal hereditaments or easements not caused or placed

upon the Building by LANDLORD, or for any failure of water supply or electric current or of

any services by any utility, nor for injury or damage (including death) to person or property

caused by or resulting from steam, gas, electricity, water, rain or snow, which fall upon, flow or

leak from any part of the Premises, or from any pipes, appliance or plumbing works of the same,

or from the street or sub-surface or from any other place unless same are a consequence of

LANDLORD's negligence, gross negligence or willful default.

5.10    INTENTIONALLY DELETED

25

supplied to the Premises by any utility company, whether public or private, including, but not limited to, gas, electricity, water and telephone. LANDLORD shall reimburse TENANT for all telephone charges incurred by LANDLORD or its employees, officers or trustees through its use of TENANT's communication system.

5.12    TENANT agrees to take all reasonable precautions to protect the Church's organ in the Premises during the performance of TENANT Work and promptly to repair any damage to said organ caused by TENANT or any of TENANT's employees or contractors.

5.13    The hiring and retention by Landlord at the Building of any and all employees in the capacities of custodian and/or Building maintenance, including the terms and conditions of employment, shall be subject to the prior written approval and consent of Tenant (each, an "Employee"), which may be given or withheld, at Tenant's sole discretion. The terms and conditions of employment shall include, without limitation, each Employee's working hours, compensation, job description and benefits shall be determined by Tenant at Tenant's reasonable discretion. Tenant shall reimburse Landlord within thirty (30) days of written demand therefor, in an amount equal to any such Employee's compensation, including FICA and similar costs, provided Tenant shall have theretofore approved such amounts in writing. Subject to the foregoing, LANDLORD shall continue to employ the current Church custodians. The LANDLORD shall inform the custodians, and any replacement custodians approved by TENANT, that they shall be subject to the direction and supervision of TENANT, except when the Building is being used exclusively for Church Activities, during which periods the custodians with respect to Church activities only shall be subject to the direction of the Church. Nothing in

26

## ARTICLE 6
## CHANGES AND ALTERATIONS — SURRENDER OF PREMISES

6.1     TENANT shall have the right, at any time and from time to time, during the Term to make such nonstructural changes and alterations to the interior of the Premises as TENANT shall deem necessary or desirable.  However, all changes and alterations must be made with the prior written consent of LANDLORD, which consent will not be unreasonably withheld, conditioned or delayed.  In determining the reasonableness of LANDLORD's refusal to consent the parties shall bear in mind the fact that during the term of this Lease the Premises will continue to be used by LANDLORD as a place of worship and for Sunday School services and for other Church related activities, and that the Premises is intended to be used as a church facility after the termination of this Lease.  Prior to TENANT doing any work in the Premises, TENANT shall deliver to LANDLORD a description thereof (including samples of paint colors, wallpaper and carpet) (if same are limited to cosmetic work) or detailed plans and specifications thereof prepared by a licensed architect or licensed engineer for any other work.  LANDLORD shall notify TENANT in writing of its approval or disapproval (setting forth in detail the basis of such disapproval) no later than two (2) weeks following TENANT's request for consent and shall notify TENANT of its approval no later than ten (10) days following TENANT's resubmissions satisfying LANDLORD's reasonable basis of disapproval.

6.2     TENANT without the prior written consent of LANDLORD, shall not place any signs on the roof or on or about the inside or outside of the Building, except as noted in Articles 5 and 27 of this Lease.

27

TENANT, shall at the expiration or sooner termination of this Lease be and become the property of LANDLORD without payment therefor by LANDLORD, except as hereinafter provided.

6.4    TENANT shall, upon the expiration or earlier termination of this Lease, surrender to LANDLORD the Premises, together with all alterations and replacement thereto, in good order and condition, except for reasonable wear and tear or damage by fire or casualty.  In addition to the foregoing, TENANT shall, at the expiration or sooner termination of the Lease, label all telephone and other communications wiring installed in the Premises.  TENANT shall also re-install or replace, as the case may be, all of the church pews which were removed prior to the initial alterations.

If TENANT shall make any alterations or changes or additions to the Premises other than TENANT Work, which are not customarily found in a church type facility, after the commencement of the Term, and LANDLORD shall desire the same to be removed upon the expiration of the Term, then, providing TENANT, in its request for consent, specifically requests LANDLORD to indicate whether or not such alteration must be removed and LANDLORD gives notice to TENANT of its desire to have the same removed prior to the installation of same, TENANT shall remove same prior to the expiration of the Term at TENANT's sole cost and expense and TENANT shall, at its own cost and expense, restore the Premises to the condition which they were in prior to such installation, normal wear and tear and damage by fire excepted.

6.5    In connection with any alterations to the Premises done by TENANT including decorating, prior to any work being commenced, TENANT shall supply to LANDLORD: (i) liability insurance from the Contractor doing the work in an amount not less than Two Million Dollars ($2,000,000), naming LANDLORD as an additional insured; (ii) evidence that all

28

workers doing work in the Premises are covered by Worker's Compensation insurance to the

extent required by applicable laws, rules and regulations; (iii) an agreement from TENANT's

contractor to remove all debris from the Premises after 6:00 P.M. at the end of each day's work

and prior to 7:00 a.m. the following day.  In the event TENANT's contractor shall fail to remove

debris on a daily basis, as hereinabove provided, and continue such failure after written notice

from LANDLORD, LANDLORD may order said contractors off the Premises and refuse them

access thereafter.

## ARTICLE 7
## COMPLIANCE WITH ORDERS, ORDINANCES, ETC.

7.1     TENANT covenants and agrees that all work to be done by TENANT shall

comply with all building codes and regulations, laws, ordinances and regulations and the

American's with Disabilities Act applicable thereto.  TENANT further represents that all such

work will be done in accordance with the Plans and Specifications.

7.2     TENANT covenants throughout the Term and any renewals hereof, at TENANT's

sole cost and expense, to comply with all laws and ordinances and the orders and requirements of

all federal, state and municipal governments and appropriate departments, commissions, boards

and officers thereof ("Legal Requirements"), which may be applicable to TENANT's use or

occupancy of the Premises, excepting all conditions existing at the Premises or the Building prior

to the Commencement Date (excluding these conditions which are to be remedied by TENANT

work), and LANDLORD shall comply with all Legal Requirements the compliance with which

is specifically necessitated by the use of the Building and the Premises as a Church facility.

7.3     TENANT shall have the right to contest by appropriate legal proceedings, in the

name of TENANT or LANDLORD or both, but without cost or expense to LANDLORD, the

validity of any Legal Requirement to be complied with by TENANT herein.  Provided such

29

create any dangerous or hazardous condition either to person or property, TENANT may postpone compliance therewith until the final determination of any proceedings, provided that all such proceedings shall be prosecuted with all due diligence and dispatch, and if any lien or charge is incurred by reason of noncompliance, TENANT may nevertheless make the contest aforesaid and delay compliance as aforesaid, provided that TENANT indemnifies LANDLORD against any loss or injury by reason of such noncompliance or delay therein excepting therefrom all conditions existing at the Premises prior to the Commencement Date except those conditions which are to be remedied by TENANT Work.

7.4    A.    TENANT, as to any hazardous substances brought into, on or under the Premises by TENANT or its invitees, agents, employees and contractors subsequent to the Commencement Date, hereby agrees to indemnify, defend and hold harmless LANDLORD, its employees, agents, successors, and assigns, from and against any and all damages, claims, lawsuits, liability, or loss, including reasonable attorney fees, arising out of or in any way connected with the generation, treatment, storage or disposal of hazardous substances by TENANT or any of TENANT's employees, agents, contractors, or invitees, in the Premises, under all Federal, State and Local Environmental laws, rules and ordinances, strict liability and common law. TENANT acknowledges that it has been informed by LANDLORD of the existence of asbestos containing tiles under the carpet in the auditorium and TENANT agrees to use due care during the performance of TENANT Work not to disturb any such asbestos containing materials or to remove same in accordance with applicable rules and regulations. Any hazardous substances in, on or under the Premises prior to the Commencement Date which are required to be removed pursuant to applicable law will be so removed by LANDLORD prior

30

as a result of TENANT's proposed alterations or TENANT Work.

B.     TENANT agrees promptly to notify LANDLORD of any disposal of hazardous substance in the Premises or of any discovery of hazardous substances in the Premises, or of any notice received by TENANT from a governmental authority or private party alleging that a disposal of hazardous substances on the Premises or the Building may have occurred. Furthermore, TENANT agrees to provide LANDLORD with full and complete access to any documents or information in its possession or control relevant to the question of generation, treatment, storage, or disposal of hazardous substances on the Premises or the Building.

## ARTICLE 8
## MECHANIC'S LIENS

8.1     TENANT covenants not to suffer or permit any mechanic's liens to be filed against the fee interest of LANDLORD nor against TENANT's leasehold interest in the Premises by reason of work, labor, services or materials supplied or claimed to have been supplied to TENANT or any contractor, subcontractor or any other party or person acting at the request of TENANT (other than LANDLORD), or anyone holding the Premises or any part thereof through or under TENANT. TENANT agrees that in the event any mechanic's lien shall be filed against the fee interest of LANDLORD or against TENANT's leasehold interest as the result thereof, TENANT shall, within forty five (45) days after TENANT's receiving notice of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or order of a court of competent jurisdiction or otherwise.

If TENANT shall fail to cause such lien to be discharged or bonded within the aforesaid forty five (45) day period, then, in addition to any other right or remedy, LANDLORD

31

by bonding the said lien, and in any such event, LANDLORD shall be entitled, if LANDLORD

so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and

to pay the amount of any judgment in favor of the lienor with interest, costs and allowances.

Any amount so paid by LANDLORD and all reasonable costs and expenses incurred by

LANDLORD in connection therewith, including, but not limited to premiums on any bonds and

reasonable attorneys' fees, shall constitute Additional Rental payable by TENANT to

LANDLORD within ten (10) business days of TENANT's receipt of LANDLORD's written

demand therefore.

## ARTICLE 9
## USE OF PREMISES BY LANDLORD

9.1     During the term of this Lease, LANDLORD shall continue to occupy the existing

Church office, the Board Room, the two readers' rooms, the organist's room, the new Literature

Distribution/Committee Room, Treasurer's office, 4th floor storage space, Sunday School office

and nursery in the basement and all areas of the Building which contain portions of the Church's

organ, including, but not limited to, organ pipes and mechanical equipment, which areas are not

part of the Premises and shall not be accessed by TENANT, its employees, agents, invitees and

contractors except in the event of an emergency or as otherwise specifically set forth herein.

LANDLORD shall also have access to all other parts of the Premises not specifically designated

for the exclusive use of TENANT, such as the 4th floor offices of TENANT, for the conduct of

church services, Sunday School services, lectures, corporate meetings, classes and associations

as more particularly set forth in Article 35 below.  TENANT shall install a door separating such

4th floor TENANT space from the Church space.  The 4th floor TENANT space shall be

designated by a sign specifying "583 Park," and the 4th floor Church space shall be designated by

32

sign specifying "Private Offices" LANDLORD at LANDLORD's expense shall maintain a literature distribution box on the 63rd Street side of the Building at a location to be mutually agreed upon by the parties, which shall be constructed by LANDLORD at LANDLORD's expense, and shall be of the same quality and architectural detail as the new electronic signs, and which will conform to the aesthetics of the Building, such design and the materials used to construct same to be mutually agreed upon by the parties; however, the parties agree that the box shall have a transparent front.

## ARTICLE 10
## RIGHT TO PERFORM COVENANTS

10.1    TENANT covenants and agrees that if TENANT shall, at any time, fail to make any payment or perform any other act on its part to be made or performed under this Lease, LANDLORD, after the expiration of any time limitation set forth in this Lease (except in cases of emergency) and, in all events, after not less than five (5) days' written notice having been received by TENANT, may, but shall not be obligated to, make such payment or perform such other act to the extent LANDLORD may reasonably deem necessary to protect LANDLORD's interest in the Premises or to protect the condition of the Premises or the Building, and in connection therewith to pay expenses and employ counsel. All sums so paid by LANDLORD and all expenses in connection therewith shall be deemed Additional Rent hereunder and be payable to LANDLORD on the first day of the next month following TENANT's receipt of not less than ten (10) days' written notice thereof from LANDLORD, and LANDLORD shall have the same rights and remedies for the nonpayment thereof as in the case of default in the payment of the Annual Basic Rent reserved hereunder.

33

NY1 26400900.3

11.1 A. If the Premises or any part thereof shall be damaged by fire or other casualty, TENANT shall give prompt notice thereof to LANDLORD and this Lease shall continue in full force and effect except as hereinafter set forth.

B. If the Premises are partially damaged or rendered unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of LANDLORD utilizing due diligence, and to the extent of the proceeds of the insurance policies required to be maintained by TENANT or LANDLORD hereunder, as the case may be.

C. If the Premises are rendered wholly unusable or if the Building shall be so damaged to the extent of fifty (50%) percent or more in square footage or value and LANDLORD shall decide to demolish it or not to rebuild it, then, in such event, LANDLORD or TENANT may elect to terminate this Lease by written notice to the other given within ninety (90) days after such fire or casualty specifying a date for the expiration of the Lease, which date shall not be more than thirty (30) days after receipt of such notice. Upon the date specified in a notice of termination given under and pursuant to this Article 11, the Term shall expire as fully and completely as if such date were the date set forth above for the termination of this Lease and TENANT shall forthwith quit, surrender and vacate the Premises without prejudice however, to each party's rights and remedies against the other under the Lease provisions in effect prior to such termination, and any rent owing shall be paid up to the date of the occurrence. Any payments of rent made by TENANT which were on account of any period subsequent to such date shall be returned to TENANT within thirty (30) days after the effective date of such termination. Also, LANDLORD shall repay to TENANT the balance of the cost to repair the roof as set forth in Paragraph 5.4 of this lease which has not previously been deducted by

34

TENANT from the Percentage Rent to be paid hereunder. Unless LANDLORD shall serve a termination notice as provided for herein, LANDLORD shall make the repairs and restorations under the conditions of this Article 11, with all reasonable expedition, subject to delays due to adjustment of insurance claims, labor troubles and causes beyond LANDLORD'S control.

        D.      Except as specifically provided herein, LANDLORD and TENANT each hereby releases the other, and waives its entire right of recovery against the other, for loss or damage to its respective property (real and personal) in, on or about the Premises, whether due to the negligence of LANDLORD or TENANT or their agents, employees, contractors and/or invitees and any subtenants of TENANT or otherwise. LANDLORD and TENANT further agree that their respective policies of property insurance shall contain a waiver of the insurer's right of subrogation (or a provision permitting the insured to waive the insurer's right of subrogation, in which event LANDLORD and TENANT hereby waive their insurer's right of subrogation) against the other party to this Lease for any claims for the loss or damage to the insured's property (real and personal). In the event that there are additional premiums for such waiver of subrogation, the party in whose favor such waiver is intended shall have the option to either pay the additional premium or waive the condition that the other's policy contains the same. TENANT acknowledges that LANDLORD will not carry insurance on TENANT's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by TENANT and agrees that LANDLORD will not be obligated to repair any damage thereto or replace the same. If thirty (30%) percent or more of the Premises is damaged by said fire or other casualty and less than two (2) years would remain in the Term, either LANDLORD or TENANT shall have the right to terminate this Lease upon written notice to the other within

35

thirty (30) days after said occurrence, and if such event this Lease and the estate hereby created shall cease as of the date of said occurrence, and the Base Rent and additional rent will be adjusted and apportioned as of said date.  Notwithstanding the foregoing, however, if LANDLORD shall terminate this Lease as aforesaid and TENANT shall, at that time, have not exercised either of the two (2) options to extend the Term, then, provided TENANT shall exercise the next remaining unexercised option, LANDLORD's notice shall be deemed null and void and LANDLORD, subject to the provisions of Section D hereof, shall restore the Premises as hereinbefore provided.

E.      TENANT hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this Article shall govern and control in lieu thereof.

11.2     TENANT shall not knowingly do or permit to be done any act or thing upon the Premises, which will invalidate or be in conflict with fire insurance policies covering the building of which Premises form a part, and fixtures and property therein.  TENANT shall, at its expense, comply with all rules, orders, regulations or requirements of the New York Board of Fire Underwriters, or any other similar body, which may be applicable to TENANT's use and occupancy of the Premises, provided that the necessity for such compliance results from the use and occupancy of the Premises by TENANT, and shall not do, or permit anything to be done, in or upon the Premises or bring or keep anything therein, or use the Premises in a manner which shall increase the rate of fire insurance on the building.  This provision shall not prohibit TENANT from construction of the kitchen facilities in the Premises as set forth in Paragraph 5.3A and Exhibits C and E, nor from the use of the Premises as in this Lease provided.

36

11.3   Notwithstanding anything to the contrary contained in this Lease, during any period after damage or destruction and until the Premises have been restored, TENANT shall be entitled to an abatement of Annual Basic Rent and Additional Rent for the unusable portion of the Premises.

ARTICLE 12
CONDEMNATION

12.1   If the whole of the Premises shall be taken for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain (hereinafter called "Taking"), the Term and all rights of TENANT hereunder, except as hereinafter provided, shall cease and expire as of the date of vesting of title as a result of the Taking and the rent or additional rent paid for a period after such date shall be refunded to TENANT upon demand.

12.2   In the event of a Taking of less than the whole of the Premises, this Lease shall cease and expire in respect of the portion of the Premises taken upon vesting of title as a result of the Taking, and LANDLORD shall promptly restore the remaining portion of the Premises to a complete secure building.  If the Taking results in the portion of the Premises remaining after the Taking being inadequate, in the judgment of TENANT, for the efficient, economical operation of TENANT's business conducted at such time in the Premises, TENANT may elect to terminate this Lease by giving notice to LANDLORD of such election not more than forty-five (45) days after the actual Taking by the condemning authority, stating the date of termination, which date of termination shall be not more than thirty (30) days after the date on which such notice to LANDLORD is given, and upon the date specified in such notice to LANDLORD, this Lease and the Term shall cease and expire and LANDLORD, on demand, shall reimburse TENANT for

37

the cost of all or the portion of the roof that TENANT shall not as then have recouped from the

Percentage Rent. If TENANT does not elect to terminate this Lease as aforesaid:

(i)     The Annual Basic Rent and Additional Rent payable under this Lease shall be proportionately adjusted, and

(ii)    The net award for the Taking shall be paid to and first used by LANDLORD, subject to the rights of any mortgagee, to restore the portion of the Premises and the building remaining after the Taking to substantially the same condition and tenantability (hereinafter called the "Pre-Taking Condition") as existed immediately preceding the date of the Taking; and

(iii)   The balance, if any, shall be shared by LANDLORD and TENANT, pro rata to their respective interests in the Premises.

12.3    In the event of a Taking of less than the whole of the Premises which occurs during the period of two (2) years next preceding the date of expiration of the Term, other than a de minimus taking, LANDLORD or TENANT may elect to terminate this Lease by giving notice to the other party to this Lease of such election, not more than forty-five (45) days after the actual Taking by the condemning authority, unless TENANT, if TENANT, shall at that time have not exercised either of the options to extend the Term, then TENANT shall exercise the next remaining unexercised option, in which event, LANDLORD shall promptly restore the remaining portion of the Premises to a complete secure building. If either party elects to terminate this Lease, the notice shall state the date of termination, which date of termination shall not be more than thirty (30) days after the date on which such notice of termination is given. Upon the date specified in such notice, this Lease and the term hereof shall cease and expire all Annual Basic Rent and Additional Rent paid under this Lease for a period after such date of

38

date of termination, TENANT shall vacate the Premises, and any of TENANT's property remaining in the Premises subsequent to such date of termination shall be deemed abandoned by TENANT and shall become the property of LANDLORD.

12.4    In the event of a Taking of the Premises or any part thereof, and whether or not this Lease is terminated, TENANT shall have no claim against LANDLORD or the condemning authority for the value of the unexpired term of this Lease, but TENANT may interpose and prosecute a claim in any proceedings in respect of the Taking and shall be entitled to the value of TENANT's leasehold improvements and the unreimbursed cost of the roof repairs (if any) caused to be performed by TENANT pursuant to this Lease and the reasonable value of TENANT's fixtures and its moving expenses.

12.5    If, as a result of a Taking, TENANT shall no longer have the use and occupancy of the entire Premises as provided in this Lease, the Annual Base Rent and Additional Rent and the percentage of Percentage Rents shall be reduced pro rata to the square footage of the Premises no longer usable by TENANT as contemplated in this Lease transaction.

## ARTICLE 13
### BANKRUPTCY OR OTHER DEFAULT

13.1    A.    Events of Bankruptcy. The following shall be Events of Bankruptcy under this Lease:

(i)    TENANT's becoming insolvent, as the term is defined in Title 11 of the United States Code, entitled Bankruptcy, 11 U.S.C. Sec. 101 et seq. (the "Bankruptcy Code") or under the insolvency laws of New York State;

(ii)    The appointment of a Receiver or Custodian for any or all of TENANT's property or assets;

39

Bankruptcy Code or Insolvency Laws;

(iv)   The filing of an involuntary petition against TENANT as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is either not dismissed within ninety (90) days of filing, or results in the issuance of an order for relief against the debtor, whichever is later; or,

(v)   TENANT's making or consenting to an assignment for the benefit of creditors of a common law composition of creditors.

B.   LANDLORD's Remedies

(i)   Termination of Lease.  Upon the occurrence of an Event of Bankruptcy, LANDLORD shall have the right to terminate this Lease by giving fifteen (15) days prior written notice to TENANT that LANDLORD intends to terminate this Lease and, if within said fifteen (15) day period, the Event of Bankruptcy is not cured, LANDLORD may serve a thirty (30) day notice of termination, provided, however, that this Section "13.1 (B) (i)" shall have no effect while a case in which TENANT is the subject debtor under the Bankruptcy Code is pending, unless TENANT or its Trustee in Bankruptcy is unable to comply with the provisions of Sections "13.1B (v)" and "13.1B (vi)" below.  If TENANT or its Trustee is unable to comply with Sections "13.1 B(v)" and "13.1 B(vi)" below, this Lease shall automatically cease and terminate, and TENANT shall be immediately obligated to quit the Premises upon the giving of notice pursuant to this Section "13.1 B(i)".  Any other notice to quit, or notice of LANDLORD'S intention to re-enter is hereby expressly waived.  If LANDLORD elects to terminate this Lease, everything contained in this Lease on the part of LANDLORD to be done and performed shall cease without prejudice, subject, however to the right of LANDLORD to recover from TENANT,

40

LANDLORD, whichever is later, and any other monetary damages or loss of reserved rent

sustained by LANDLORD provided that any unamortized portion of TENANT's cost for the

repair of the roof shall be refunded to TENANT prior to the Termination date.

   (ii) <u>Suit for Possession</u>.  Upon termination of this Lease, pursuant to

Section "13.1 (B) (i)", LANDLORD may proceed to recover possession under and by virtue of

the provisions of the laws of the State of New York, or by such other proceedings, including re-

entry and possession, as may be applicable.

   (iii) <u>Reletting of Premises</u>.  Upon termination of this Lease, pursuant to

Section "13.1 (B) (i)", the Premises may be relet by LANDLORD for such rent and upon such

terms as are not unreasonable under the circumstances (bearing in mind the need for

LANDLORD to continue to occupy the Premises as a church facility at all times), and if the full

rental reserved under this Lease (and any of the costs, expenses, or damages indicated below)

shall not be realized by LANDLORD, TENANT shall be liable for all damages sustained by

LANDLORD, including, without limitation, deficiency in rent, reasonable attorneys' fees,

brokerage fees, and expenses of placing the Premises in good condition.  LANDLORD, in

putting the Premises in good order or preparing the same for re-rental may, at LANDLORD'S

option, make such alterations, repairs, or replacements in the Premises as LANDLORD, in

LANDLORD'S reasonable judgment, considers advisable and necessary for the purpose of

reletting the Premises, and the making of such alterations, repairs, or replacements shall not

operate or be construed to release TENANT from liability hereunder as aforesaid.  LANDLORD

shall, in no event, be liable in any way whatsoever for failure to relet the Premises, or in the

event that the Premises are relet, for failure to collect the rent thereof under such reletting, and in

<div align="center">41</div>

Exhibit J (Part 2)

no event shall TENANT be entitled to

the sums payable by TENANT to LANDLORD hereunder.

(iv)  Monetary Damages.  Any damage or loss of rent sustained by LANDLORD as a result of an Event of Bankruptcy may be recovered by LANDLORD, at LANDLORD'S option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive relettings, or in a single proceeding deferred until the expiration of the term of this Lease (in which event TENANT hereby agrees that the cause of action shall not be deemed to have accrued until the date of expiration of said term).  In the event TENANT becomes the subject debtor in a case under the Bankruptcy Code the provisions of this Section "13.1 B(iv)" may be limited by the limitations of damage provisions of the Bankruptcy Code.

(v)  Assumption or Assignment by Trustee.  In the event TENANT becomes the subject debtor in a case pending under the Bankruptcy Code, LANDLORD'S right to terminate this Lease pursuant to this Section "13.1" shall be subject to the rights of the Trustee in Bankruptcy to assume or assign this Lease.  The Trustee shall not have the right to assume or assign this Lease unless the Trustee: (a) promptly cures all defaults under this Lease, (b) promptly compensates LANDLORD for monetary damages incurred as a result of such default, and (c) provides adequate assurance of future performance.

(vi)  Adequate Assurance of Future Performance.  LANDLORD and TENANT hereby agree in advance that adequate assurance of future performance, as used in Section "13.1 B(v)" above, shall mean that all of the following minimum criteria must be met:

(a)  The Trustee must pay to LANDLORD, at the time the next payment of the monthly installment of Annual Basic Rent is due under this Lease, in addition to

42

such payment of Annual Basic Rent (or such portion of the Annual Basic

Rent due under this Lease, said amount to be held by LANDLORD in escrow until either the

Trustee or TENANT defaults in its payment of Annual Basic Rent or other obligations under this

Lease (whereupon LANDLORD shall have the right to draw such escrow funds) or until the

expiration of this Lease (whereupon the funds shall be returned to the Trustee or TENANT);

      (b)     TENANT or Trustee must agree to pay to LANDLORD, at

any time LANDLORD is authorized to and does draw on the funds escrowed pursuant to Section

"13.1 B(vi)(a)" above, the amount necessary to restore such escrow account to the original level

required by said provision;

      (c)     TENANT must pay its estimated pro-rata share of the cost

of all services provided by LANDLORD (whether directly or through agents or contractors, and

whether or not the cost of such service is to be passed through to TENANT) in advance of the

performance or provision of such services;

      (d)     The Trustee must agree that TENANT's business shall be

conducted in a first class manner, and that no liquidating sales, auctions, or other non-first class

business operations shall be conducted on the premises;

      (e)     The Trustee must agree that the use of the Premises as

stated in this Lease will remain unchanged, including, but not limited to, the requirement that

LANDLORD continue to operate as a church in the Premises as set forth herein and that

TENANT shall continue to perform its obligations in support of such church use as set forth

herein;

      (f)     The Trustee must agree that the assumption or assignment

of this Lease will not violate or affect the rights of other tenants of LANDLORD.

43

NY1 26400900.3

unable, within the time periods in the Lease provided, to:

    (a)    Cure its defaults; or

    (b)    Reimburse LANDLORD for its monetary damages; or

    (c)    Pay the rent due under this Lease, on time (or within applicable grace and notice periods); or

    (d)    Meet the criteria and obligations imposed by Section "13.1B(vi)" above; then TENANT agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by LANDLORD in accordance with Section "13.1B(i)" above.

13.2    Events of Default.  The following shall be Events of Default under this Lease.

    (i)    TENANT's failure to pay any monthly installment of Annual Basic Rent, Percentage Rent or Additional Rent, the amount of which has been ascertained, within ten (10) business days after TENANT has received written notice of such failure from LANDLORD; nothing herein shall be deemed an election by LANDLORD of remedies and LANDLORD shall also have the right to commence a non-payment landlord/tenant proceeding against TENANT arising out of TENANT's failure to pay Annual Base Rent, Percentage Rent and Additional Rent under this Lease.

    (ii)    TENANT's failure to make any other payment required under this Lease if such failure shall continue beyond thirty (30) days after LANDLORD'S notice that the same has not been paid.

    (iii)    TENANT's violation or failure to perform any of the other terms, conditions, covenants or agreements herein made by TENANT if such violation or failure

44

continues for a period of thirty (30) days after LANDLORD'S notice to the

TENANT.

(iv)    In the event of any violation or failure to perform a covenant as

contemplated in Section 13.2 A(iii), and if such covenant cannot be performed within the said

thirty (30) day period, then and in that event, providing TENANT has promptly commenced to

cure such violation and is diligently proceeding with the cure the time within which TENANT

may cure the same shall be extended to such reasonable time as may be necessary to cure the

same with all due diligence.

B.    If an Event of Default as hereinabove specified in Section 13.2 A(i), (ii) or

(iii)' shall occur, and shall not be cured within the time period specified in LANDLORD'S

notice, or as to a default provided for in Section 13.2A(iv) if TENANT has commenced a cure

but fails to diligently proceed with same after thirty (30) days' written notice from LANDLORD

then:

(i)    LANDLORD may give TENANT a ten (10) day written notice of

its termination, and thereupon, at the expiration of said ten (10) day period following TENANT's

receipt of such notice, this Lease shall expire as fully and completely as if the day were the date

herein originally fixed for the expiration of the Term, and TENANT shall then quit and surrender

the Premises to LANDLORD but TENANT shall continue to remain liable as hereinafter

provided; or, (ii) LANDLORD, without prejudice to any other right or remedy of LANDLORD,

held hereunder or by operation of law, and notwithstanding any waiver of any breach of a

condition or Event of Default hereunder may, at its option and without further notice, dispossess

TENANT and any legal representative or successor of TENANT or other occupant of the

45

Premises by summary proceedings or other appropriate suit, action

his, her or its effects and hold the Premises as if this Lease had not been made.

13.3    Notwithstanding such default, re-entry, expiration and/or dispossession by

summary proceedings, as provided in Section '13.2' above, TENANT shall continue liable

during the full period which would otherwise have constituted the balance of the Term, and shall

pay as liquidated damages at the same times as the Annual Basic Rent and Additional Rent and

other charges become payable under the terms hereof, a sum equivalent to the Annual Basic Rent

and Additional Rent and other charges reserved herein (less only the net proceeds of reletting as

hereinafter provided), and LANDLORD may, but is not obligated to, rent the Premises either in

the name of LANDLORD or otherwise, reserving the right to rent the Premises for a term or

terms which may be less than or exceed the period which would otherwise have been the balance

of the Term or any renewal term without releasing the original TENANT from any liability,

applying any monies collected, first to the expense of resuming or obtaining possession, next to

restoring the Premises to a rentable condition, and then to the payment of any brokerage

commissions and legal fees in connection with the reletting of the Premises and then to the

payment of the Annual Basic Rent, Additional Rent and other charges due and to grow due to

LANDLORD hereunder, together with reasonable legal fees of LANDLORD therefor.

13.4    LANDLORD and TENANT do hereby mutually waive trial by jury in any action,

proceeding or counterclaim brought by either LANDLORD or TENANT against the other with

regard to any matters whatsoever arising out of or in any way connected with this Lease, the

relationship of LANDLORD and TENANT, and TENANT's use or occupancy of the Premises,

provided such waiver is not prohibited by any laws of the State of New York.  Any action or

proceeding brought by either party hereto against the other, directly or indirectly, arising out of

46

this agreement (except for a summary proceeding) in which the Premises are located and all motions in any such action shall be made in such court.

13.5    TENANT hereby agrees that in any action or summary proceeding brought by LANDLORD for the recovery of Annual Basic Rent, it will not interpose any counterclaim nor will TENANT seek to consolidate or join for trial any such action or proceeding with any other action or proceeding, unless TENANT will, as a matter of law, lose its cause of action for failure to institute such counterclaim or effectuate such joinder.

13.6    If TENANT shall default in the observance or performance of any term or covenant on TENANT's part to be observed or performed under or by virtue of any of the terms or provisions in this Article of this Lease, LANDLORD may immediately or at any time thereafter and, after at least ten (10) days' prior written notice to TENANT and the opportunity to cure or to commence to cure, perform the same for the account of TENANT, and if LANDLORD makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to, reasonable attorneys' fees in instituting, prosecuting or defending any action or proceeding such sums paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and the sum shall be due immediately upon LANDLORD incurring same and may be included as an item of additional rent in any summary proceeding instituted by LANDLORD.

13.7    In the event that TENANT shall, twice within any twelve (12) month period, fail to pay, within ten (10) days of receipt of written notice that same is due, any installment of Annual Basic Rent, Percentage Rent or Additional Rent then, in addition to all of the other rights and remedies reserved to LANDLORD herein, LANDLORD may, upon giving TENANT ten (10) days' prior written notice, require that all future payments of Annual Basic Rent, Percentage

47

Rent and Additional Rent shall be paid for the next twelve (12) calendar months and

by certified check or bank check only. The failure of TENANT to comply with the terms and

provisions of this paragraph shall be deemed to constitute a breach of a material and substantial

covenant of this Lease.

## ARTICLE 14
### CUMULATIVE REMEDIES — NO WAIVER

14.1    The specific remedies to which LANDLORD or TENANT may resort under the

terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or

means of redress of which they may be lawfully entitled in case of any breach or threatened

breach by either of them of any provision of this Lease. The failure of LANDLORD or

TENANT to insist in any one or more cases upon the strict performance of any of the covenants

of this Lease, or to exercise any option herein contained, shall not be construed as a waiver or

relinquishment for the future of such covenant or option. A receipt by LANDLORD of rent with

knowledge of the breach of any covenant thereof shall not be deemed a waiver of such breach,

and no waiver, change, modification or discharge by either party hereto of any provision in this

Lease shall be deemed to have been made or shall be effective unless expressed in writing and

signed by both LANDLORD and TENANT. In addition to the other remedies in this Lease

provided, LANDLORD or TENANT shall be entitled to restraint by injunction of any violation,

or attempted or threatened violation, of any of the covenants, conditions or provisions of this

Lease or to a decree compelling performance of any such covenants, conditions or provisions.

## ARTICLE 15
### SUBORDINATION

15.1    Subject to the provisions set forth below, it is hereby expressly agreed that this

Lease and all rights of TENANT hereunder shall be subject and subordinate at all times to any

<div align="center">48</div>

mortgages and any renewals, replacements, extensions or modifications thereof that may

be or shall hereafter become liens on the Premises provided, however, that TENANT's estate in

the Premises shall not be disturbed so long as TENANT shall be making payment of all rents due

under this Lease and shall attorn to any lender or other party which succeeds to the interest of

LANDLORD under this Lease.  TENANT agrees that at any time upon ten (10) days' written

notice, TENANT will execute and deliver to LANDLORD a subordination, nondisturbance and

attornment agreement on terms reasonably acceptable to TENANT confirming the provisions of

this Article and failure of TENANT to execute and deliver such agreement shall not affect the

subordination provided for hereunder.

    15.2    LANDLORD represents that there is currently no mortgage encumbering the

Premises.  Any future mortgage obtained by LANDLORD shall be subordinate to this Lease,

unless LANDLORD obtains a mutually acceptable subordination and non-disturbance agreement

("SNDA") from such mortgagee, in which event this Lease shall be subordinate to the mortgage

and TENANT agrees to sign such SNDA on terms reasonably acceptable to TENANT with ten

(10) days of LANDLORD presenting same to TENANT.

## ARTICLE 16
## QUIET ENJOYMENT

    16.1    LANDLORD covenants and agrees that TENANT, upon paying the Annual Basic

Rent and all other charges herein provided and observing and keeping the covenants, agreements

and conditions of this Lease on its part to be kept on the terms in this Lease provided, shall and

may peaceably and quietly hold, occupy and enjoy the Premises during the Term, subject to

LANDLORD's right to continue to occupy and utilize those portions of the Premises for Church

purposes as set forth herein.

NY1 26400900.3

ARTICLE 17

NOTICES

17.1    All notices, demands and requests, which may, or are required to, be given by either party to the other shall be in writing.  All notices, demands and requests by LANDLORD to TENANT shall be deemed to have been properly given if sent by United States registered or certified mail, return receipt requested, postage prepaid, by facsimile transmission with receipt confirmed by the sender, or by a nationally recognized overnight carrier, such as Federal Express, as follows:

    A.    If to LANDLORD:

        Clerk
        Third Church of Christ, Scientist, of New York City
        583 Park Avenue
        New York, NY 10021
        Fax No. 212-838-7824

        With a Copy to:

        SATTERLEE STEPHENS BURKE & BURKE LLP

        230 Park Avenue
        New York, NY 10169
        Attention:  J. Gregory Saver, Esq.
        Fax No. 212-818-9606

    B.    If to TENANT prior to the Commencement Date:

        1111 Park Avenue
        New York, NY 10128
        Attention:  Louis Rose
        Fax No. 212-410-1217

        If to TENANT subsequent to the Commencement Date at the Premises.

50

Seyfarth Shaw LLP
1270 Avenue of the Americas
New York, New York 10020
Attention: Barry H. Mandel, Esq.
Fax No. 212-218-5526

Either party may, by notice given to the other party, designate a new address to which notices, demands and requests will be sent and, thereafter, any of the foregoing shall be sent to the address most recently designated by such party. Notices in the aforesaid manner shall be deemed to have been served or given for all purposes under this Lease at the time such notice, demand or request shall be received by the party to whom addressed or returned by the Post Office as having been "refused" or "undeliverable". Notices given by the attorney for either party shall be deemed given by said party.

### ARTICLE 18
### DEFINITION OF CERTAIN TERMS, ETC.

18.1    The captions of this Lease are for convenience and reference only and, in no way, define, limit or describe the scope or intention of this Lease or in any way affect this Lease.

18.2    The term "TENANT" as referred to hereunder shall refer to this TENANT and any successor or assignee of this TENANT.

18.3    The term "LANDLORD" as used hereunder shall mean only the owner for the time being of the land and building of which the Premises form a part, so that in the event of any sale of the Building (subject to TENANT's right of first refusal as set forth in Article 36 below), this LANDLORD shall be and hereby is entirely free and relieved of all covenants and obligations of LANDLORD hereunder and it shall be deemed and construed without further agreement between the parties, or their successors in interest, that the purchaser of the Building agreed to carry out all of the terms and covenants and obligations of LANDLORD hereunder.

51

NY1 26400900.3

Wall Street Journal (or successor publication) plus two (2%) percent.

## ARTICLE 19
## INVALIDITY OF PARTICULAR PROVISIONS

19.1    If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## ARTICLE 20
## COVENANTS TO BIND AND BENEFIT RESPECTIVE PARTIES

20.1    It is further covenanted and agreed by and between the parties hereto that the covenants and agreements herein contained shall bind and inure to the benefit of LANDLORD, its successors and assigns, and TENANT, its successors and assigns, subject to the provisions of this Lease.

20.2    Each party hereby agrees to cooperate with and assist the other party in a commercially reasonable manner in order to carry out and effectuate the purposes of this Lease. Without limitation, the parties shall execute such documents (including all necessary or desirable governmental filings) and take such actions in compliance with the provisions of the foregoing sentence.

## ARTICLE 21
## INSURANCE

21.1    A.    TENANT shall, at all times during the Term, carry Public Liability Insurance (including liquor liability coverage if available at commercially reasonable rates) for

the Premises naming LANDLORD as an additional insured with combined single

$2,000,000.00 for injury to persons, death and property damage. LANDLORD reserves the right

during the term and any extension term to reasonably increase the limit of insurance to an

amount which is commercially reasonable and comparable to the limits required by landlords of

properties in which similar operations are carried out.

        B.    LANDLORD shall, at all times during the Term, carry Public Liability

Insurance for the Premises naming TENANT as an additional insured with combined single

limits of $2,000,000.00 for injury to persons, death and property damage. TENANT reserves the

right during the term and any extension term to reasonably increase the limit of insurance to an

amount which is commercially reasonable and comparable to the limits required by landlords of

properties in which similar operations are carried out.

    21.2   A.    Prior to taking possession, TENANT shall deliver to LANDLORD a

certificate of the insurance company licensed to do business in the State of New York with a

Bests rating of A, certifying that the aforesaid liability policy is in full force and effect. A

certificate evidencing the renewal of such liability insurance policy shall be delivered to

LANDLORD at least twenty (20) days before the expiration thereof and each such renewal

certificate shall include LANDLORD as an additional insured. TENANT may carry the

aforesaid insurance as a part of a blanket policy provided, however that a certificate thereof

naming LANDLORD as an additional insured is delivered to LANDLORD as aforesaid. Such

policy of insurance or certificate shall also provide that said insurance may not be canceled

unless ten (10) days' notice is given to LANDLORD prior to such cancellation and that the

insurance as to the interest of LANDLORD shall not be invalidated by any act or neglect of

TENANT.

NY1 26400900.3

B.    Prior to taking possession LANDLORD shall deliver to TENANT an

certificate of the insurance company licensed to do business in the State of New York with a

Bests rating of A, certifying that the aforesaid liability policy is in full force and effect.  A

certificate evidencing the renewal of such liability insurance policy shall be delivered to

TENANT at least twenty (20) days before the expiration thereof and each such renewal

certificate shall include TENANT as an additional insured.  LANDLORD may carry the

aforesaid insurance as part of a blanket policy provided, however, that a certificate thereof

naming TENANT as an additional insured is delivered to TENANT as aforesaid.  Such policy of

insurance or certificate shall also provide that said insurance may not be canceled unless ten (10)

days' notice is given to TENANT prior to such cancellation and that the insurance as to the

interest of TENANT shall not be invalidated by any act or neglect of LANDLORD.

21.3    TENANT shall, prior to doing any work in the Premises, obtain any and all

permits necessary therefor and will provide Worker's Compensation Insurance and Liability

Insurance in the limits provided for in Section "21.1" hereof if and as required by law.

21.4    LANDLORD shall throughout the term of this Lease provide and keep in force

the following insurance:

A.    All-risk insurance against loss or damage or injury or destruction to the

Building and appurtenances thereto resulting from fire or other casualty and malicious mischief

and including sprinkler leakage, in a stated amount equal to the replacement cost of the Building,

but in any event in an amount not less than eighty (80%) percent of the replacement value of the

Premises.  Such insurance shall cover the Building, LANDLORD'S Work and TENANT

Improvements.

54

B. Rent insurance in an amount equal to one year's Basic Annual Rent and

Taxes either as a separate policy or as a part of LANDLORD's casualty policy.

C.    War risk insurance upon the Building if, as and when such insurance is obtainable from the United States Government or any agency or instrumentality thereof at commercially reasonable rates, and a state of war or national or public emergency exists or threatens, in an amount not less than the full insurable value thereof.

21.5    TENANT shall pay to LANDLORD the premiums for the insurance set forth in Section 21.4 hereof as Additional Rent, which amount shall be paid to LANDLORD within ten days after LANDLORD renders a bill therefor.

21.6    The proceeds of rent insurance provided for herein shall be paid solely to LANDLORD who shall apply them, from time to time, to TENANT's obligation to pay Rent and Additional Rental during the period of any restoration as provided for herein.

21.7    TENANT shall not take out separate insurance concurrent in form or contributing in the event of loss with that carried by LANDLORD pursuant to this Article 21.  The foregoing shall in no way prohibit TENANT from having the right to take out business interruption insurance and contents insurance, among others.

21.8    TENANT shall cause LANDLORD to be named as an additional insured on any insurance policy required by TENANT from any of TENANT's vendors or suppliers in connection with any TENANT related event in the Premises.

21.9    LANDLORD shall cause TENANT to be named as an additional insured on all policies of insurance required to be maintained by LANDLORD hereunder.  The insurance coverage to be secured by LANDLORD hereunder shall be secured through an insurance broker or brokers approved by TENANT.

55

## ARTICLE 22
## USE, ASSIGNMENT OR SUBLETTING

22.1    TENANT shall use and occupy the Premises solely as a high end, first class catering facility and for banquets, special events and meetings, all of which may include the preparation and service of food and alcoholic and non-alcoholic beverages and may include music and dancing as well as the use by TENANT of LANDLORD's organ and piano located at the Premises (subject to the restrictions set forth below). TENANT may also use the Premises for related uses, including but not limited to a venue for TENANT's corporate meetings, storage, telecommunications equipment, video display terminals, computer terminals, personal computers, computer room and conference and copy rooms, all of which must be related to and ancillary to the operation of TENANT's business for the uses and purposes set forth above. Any items stored by TENANT in the auditorium during use of the auditorium by LANDLORD must be appropriately covered and screened. All events conducted by TENANT at the Premises shall be private events, not open to the general public. In connection with any event conducted by TENANT at the Premises. TENANT shall exercise commercially reasonable efforts to insure that no smoking shall be permitted at any of the front doors to the Building. TENANT shall provide and maintain sand urns to the left of the front entrance and to the right of the side entrance to the Building, similar to those utilized outside the Pierre Hotel.

22.2    Unless LANDLORD shall have given its consent thereto, this Lease may not be assigned nor may the Premises be sublet in whole or in part. In determining whether or not to consent, LANDLORD shall take into consideration the use to which the sub-tenant or assignee will put the space and the nature of the sub-tenant's or assignee's business, the location of the space within the building (in the event of a sublease), the character and reputation of the proposed subtenant or assignee, any alterations which may be necessary to accommodate the

56

subtenant or assignee and the impact of all of the foregoing on the interest and the

right to continue to occupy and utilize the Premises or portions thereof for Church purposes as

set forth herein. Notwithstanding the foregoing, LANDLORD shall not unreasonably withhold

its consent to an assignment of this Lease in connection with a sale of TENANT's business

operations on the following terms and conditions:

      A.    At least sixty (60) days prior to any proposed assignment or sublease,

TENANT shall submit to LANDLORD a statement containing the name and address of the

proposed assignee and all of the principal terms and conditions of the proposed assignment

including, but not limited to, the proposed effective date of the assignment, the nature of the

proposed assignee's business, the prior three (3) year history of the proposed assignee and its

principals, together with satisfactory proof of financial responsibility and personal references to

substantiate the required financial statements and such financial and other information as

LANDLORD may reasonably request.

      B.    LANDLORD shall not be deemed unreasonable in withholding its consent

to any assignment if LANDLORD's determines, in LANDLORD's reasonable discretion that:

      (i)    the character, reputation or nature of the business of the proposed

assignee or subtenant is not in keeping with that of the Premises or would interfere with

LANDLORD's right to continue to occupy and utilize the Premises or portions thereof for

Church purposes on the terms herein provided;

      (ii)    the proposed occupancy shall impose an extra burden on the

Premises' HVAC or other systems or Premises' services;

      (iii)    the proposed assignment shall not prohibit any further assignment

except in compliance with the provisions of this Lease;

<center>57</center>

22 (iv) TENANT is in default beyond applicable grace and cure periods

under this Lease either at the time LANDLORD's consent to such assignment is requested or at the effective date of any assignment;

(v) TENANT shall fail to reimburse Owner for Owner's reasonable costs incurred in connection with said assignment, including, without limitation, reasonable attorneys fees and disbursements, investigation as to the acceptability of a proposed assignee and the preparation and review of documents relating to such transaction;

(vi) the proposed assignee has diplomatic or sovereign immunity or is not subject to the service of process in or the jurisdiction of the courts of New York State;

(vii) the proposed assignee (or any principal thereof) is not a person held in high regard or does not have a reputation equivalent to or better than that enjoyed by the Rose Group Park Avenue LLC or does not possess the financial resources to meet the obligations of the TENANT under this Lease;

(viii) the proposed assignee has not been engaged in a business substantially similar to that conducted by TENANT on the Premises for at least three (3) years;

(ix) TENANT fails to deliver to LANDLORD the information and documents required by Article 22 or the form and substance of the assignment and all ancillary documents shall not have been approved by LANDLORD.

22.3 TENANT shall, at least thirty (30) days prior to the effective date thereof, deliver to LANDLORD a fully executed counterpart of the assignment and all ancillary documents thereto, in form and substance reasonably satisfactory to LANDLORD, and in which the assignee assumes TENANT's obligations under this Lease.

22.4    In the event that any sub-tenant or assignee should hold over in the Premises

beyond the expiration of the Term, TENANT hereunder shall be responsible to LANDLORD for

all Annual Basic Rent and additional rent until the Premises are delivered to LANDLORD in the

condition provided for in this Lease.

22.5    In the event of any sublease, notwithstanding the terms and conditions thereof, the

terms and conditions of this Lease shall be controlling between LANDLORD and TENANT and

in the event of an assignment, the assignee must execute an assumption agreement assuming all

of TENANT's obligations under this Lease.  A copy of the executed sublease and assignment

and assumption agreement shall be delivered to LANDLORD prior to the effective date thereof.

22.6    TENANT shall pay LANDLORD'S reasonable legal fees in connection with

LANDLORD's approval of any subletting or assignment.

## ARTICLE 23
## LANDLORD'S LIABILITY

23.1    In the event that LANDLORD shall default under the terms of this Lease and

TENANT shall recover a judgment against LANDLORD by reason of such default or for any

reason arising out of the tenancy or use of the Premises by TENANT or the Lease of the

Premises to TENANT, LANDLORD'S liability hereunder shall be limited to LANDLORD'S

interest in the Premises and no further, and TENANT agrees that in any proceeding to collect

such judgment, TENANT's right to recovery shall be limited to LANDLORD'S interest in the

Premises.

59

### ARTICLE 24
### ENTIRE AGREEMENT

24.1   This instrument contains the entire agreement between the parties hereto and the same may not be changed, modified or altered except by a document in writing executed and delivered by the parties hereto.

### ARTICLE 25
### CERTIFICATES

25.1   Upon request, LANDLORD or TENANT agrees to execute and deliver to the other any certificate or certificates evidencing the Commencement Date and the fact that the Lease is in full force and effect, if such is the case, and that there are no pending set-offs or other claims against the other or stating those claims which such party might have against the other.

25.2   Simultaneously with the execution of this Lease, LANDLORD and TENANT shall execute a memorandum of lease in recordable form, which memorandum shall set forth the Commencement Date, the Expiration Date and the subordination of the Lease to a permanent first mortgage to be held by an institutional lender subject to the terms of this Lease and subject to TENANT's right of attornment.

### ARTICLE 26
### BROKER

26.1   LANDLORD and TENANT each represent that it dealt only with Rhoda Forman, as broker in connection with this transaction and LANDLORD and TENANT each agree to indemnify the other against any claims or expenses which the indemnified party may incur by reason of the indemnifying party having dealt with any other broker in connection with this transaction.  LANDLORD and TENANT agree THAT EACH SHALL PAY ONE-HALF OF the commission due Rhoda Forman pursuant to a separate agreement.

<center>60</center>

## ARTICLE 27
### SIGNS

27.1    TENANT shall, subject to obtaining LANDLORD's written consent, which shall not be unreasonably withheld, conditioned or delayed, and any necessary permits therefor (including any permits needed from the Landmarks Preservation Commission, if any), install a sign above the center doorway of the center front of the Building identifying it as "583 Park Avenue" or "583". TENANT shall also remove or cover, at TENANT'S option, the existing signs on the building façade and replace or cover them with blank ("faux") windows. TENANT shall also install, in such a manner as to not damage the existing engraving a blank piece of limestone or limestone veneer over the engraved lettering over the front pillars. Tenant shall also install an electronic sign to the left of the 63rd Street side entrance (the "63rd Street Sign") and another electronic sign at approximately eye level on the corner of the Building facing Park Avenue (the "Park Avenue Sign"), both of which will indicate the existence of LANDLORD's Sunday School and Church at all times except when TENANT is using the Premises for a third-party function or marketing the Premises. TENANT shall not market the Premises whenever a Church Related Activity, as defined below, is taking place in the Premises (except for Church Classes).

## ARTICLE 28
### HOLDING OVER

28.1    TENANT covenants that it will vacate the Premises not later than 5:00 p.m. on the last day of the Term as same may be extended.

28.2    If TENANT, or anyone holding through TENANT, retains possession of the Premises or any part thereof after the termination of the Term or any renewal term, TENANT shall pay LANDLORD a fee for use and occupancy equal to one hundred fifty (150%) percent of

Term or renewal term for the period TENANT thus remains in possession. TENANT shall not become a month-to-month tenant without a writing signed by LANDLORD. The provisions of this Section do not exclude LANDLORD'S other rights hereunder, including without limitation, the right to remove TENANT through summary proceedings for holding over beyond the expiration of the Term or renewal term.

28.3    TENANT shall remove all of its property from the Premises prior to the expiration or sooner termination of the Lease. In the event TENANT should leave any fixtures, equipment or any other personal property in the Premises after the date fixed for the expiration of this Lease (or an earlier termination of this Lease), any such property shall be deemed abandoned by TENANT and shall, at LANDLORD's option, become the property of LANDLORD, or the same may be disposed of by LANDLORD at TENANT's cost and expense.

## ARTICLE 29
## LANDLORD'S RESERVATION OF RIGHTS

29.1    LANDLORD reserves to itself all rights to the use and access to the roof of the Building to install on the Building roof the antennas required by Cingular and Nextel or their successors and assigns. LANDLORD acknowledges that TENANT intends to repair the roof as hereinabove provided, and agrees that the installation of antennas on the roof will not void any roof guaranty or warranty. LANDLORD also reserves to itself all air rights or development rights appurtenant to the Building and TENANT agrees that it has no rights or interest whatsoever in or to any of said air rights or development rights or to any unused allowable floor to area ratio as permitted by the Zoning Code of the City of New York. TENANT consents to any utilization of such rights by LANDLORD and agrees promptly to execute and deliver any instruments which may be reasonably requested by LANDLORD, including instruments merging

62

NY1 26400900.3

rights under this Lease are not adversely affected, except to a de minimus extent, and

TENANT's signature is required. LANDLORD shall pay TENANT's reasonable costs and

expenses, including reasonable attorneys' fees, incurred in connection therewith. The provisions

of this paragraph shall be deemed to be and shall be construed as an express waiver by TENANT

of any interest TENANT may have as a "party in interest" (as such term is defined in Section 12-

10 of the Zoning Resolution of the City of New York) in the Building. LANDLORD also

reserves to itself all rights to use and occupy the existing church office, the two readers' rooms,

the existing Board Room, the organist's room, the new Literature Distribution/Committee Room,

4th floor storage area and Treasurer's office, the new Sunday School office and nursery in the

basement and all areas of the Building containing portions of the Church's organ, as herein

further provided in this Lease. LANDLORD agrees that TENANT shall be permitted the use of

the Board Room on a "when available" basis. TENANT agrees that its renovation of the

Premises shall include a cosmetic refurbishment of the Board Room in accordance with the Plans

and Specifications to be approved by LANDLORD, which approval is not to be unreasonably

withheld, delayed or conditioned.

### ARTICLE 30
### OPTION TO RENEW

30.1    Provided that TENANT is not in default beyond any applicable grace and notice

periods either at the time of the exercise of this option or at the commencement of the Renewal

Term, TENANT shall have the option to extend the Term of this Lease for two (2) additional

periods of five (5) years each (the "Renewal Term").

NY1 26400900.3

Exhibit J (Part 3)

exercise not later than June 30, 2025 as to the first Renewal Term and June 30, 2030 as to the second Renewal Term.

30.3   All of the terms, covenants and conditions of this Lease shall attach to the Renewal Terms and the Annual Basic Rent to be paid by TENANT during the first Renewal Term shall be $663,224.00 and during the second Renewal Term shall be $846,589.00.

## ARTICLE 31
## GENERATOR

31.1   TENANT shall have the right to install an emergency generator and related equipment in an area mutually determined by LANDLORD and TENANT.

## ARTICLE 32
## RESTRICTIONS ON TENANT

32.1   TENANT agrees that at all times during the Term, it shall:

A.   Load and unload its merchandise, equipment and supplies, and remove any rubbish, at the side or rear of the Premises, at TENANT's cost and expense.  TENANT shall supply refrigerated storage for all rubbish and maintain a system to eliminate any offensive odors.  TENANT's rubbish storage and removal system must present no unreasonable physical or aesthetic hindrance to persons entering or leaving the Premises through the 63rd Street door. TENANT shall retain the services of a private carting company to remove all rubbish from the Premises.

B.   Permit no act or practice which may tend to injure the building or its equipment or be a nuisance, or unreasonably obstruct the sidewalks or areas outside the Premises, nor burn any rubbish in or about the Premises, or, change the exterior color of the

64

advertising medium or loudspeaker, radio broadcast, etc., to be announced or

## ARTICLE 33
## MAINTENANCE OF SIDEWALKS

33.1    TENANT shall, throughout the Term, maintain the sidewalks adjacent to the

Building and shall shovel snow and sand or salt ice on the sidewalks and promptly repair same

and any curbs and curb cuts.

33.2    In the event TENANT shall fail to maintain the sidewalks, after ten (10) business

days' prior written notice from LANDLORD, LANDLORD may do any work necessary to

preserve the sidewalks and TENANT shall pay to LANDLORD the cost in connection therewith.

## ARTICLE 34
## INDEMNIFICATION

34.1    TENANT shall and does hereby hold harmless, indemnify and defend

LANDLORD and its employees, agents, servants, customers, vendors, tenants or invitees against

all claims, demands and action or loss, liability, damage, cost and expense resulting from injury

or death to any person and damage to property on or in connection with the Premises and this

lease, except that resulting from LANDLORD's negligence or willful misconduct, or from or as

a result of LANDLORD's use and occupancy of any portion of the Premises.

34.2    TENANT hereby releases LANDLORD and its agents and employees and any

lessor under an over-lease and each mortgagee in respect of any claim (other than for

LANDLORD's negligence or willful misconduct) which it might otherwise have against

LANDLORD or its agents or employees or any lessor under an over-lease or mortgagee for loss,

damage or destruction with respect to TENANT's property by fire or other casualty (including

rental value or business interest, as the case may be) occurring during the term of this Lease and

65

endorsement in the form required to be carried by TENANT pursuant to the provisions of this Lease.

34.3   LANDLORD shall and does hereby hold harmless, indemnify and defend TENANT and its employees, agents, servants, customers, vendors, tenants or invitees against all claims, demands and action or loss, liability, damage, cost and expense resulting from injury or death to any person and damage to property on or in connection with the Premises and this lease, except that resulting from TENANT's negligence or willful misconduct, or from or as a result of TENANT's use and occupancy of any portion of the Premises.

34.4   LANDLORD hereby releases TENANT and its agents and employees in respect of any claim (other than for TENANT's negligence or willful misconduct) which it might otherwise have against TENANT or its agents or employees or any lessor under an over-lease or mortgagee for loss, damage or destruction with respect to LANDLORD's property by fire or other casualty (including rental value or business interest, as the case may be) occurring during the term of this Lease and which is required to be covered under a fire insurance policy with extended coverage and endorsement in the form required to be carried by LANDLORD pursuant to the provisions of this Lease.

ARTICLE 35
USE OF PREMISES BY LANDLORD

35.1   TENANT acknowledges and agrees that during the term of this Lease and any renewal thereof, LANDLORD shall continue to use and occupy the Premises for the conduct of church services and other church related activities as herein set forth, subject to the relocation of certain Church or Church related rooms and offices and to the exclusive use by TENANT of

66

NYI 26400900.3

and other related activities are as follows:

A.     Sunday Church Services and Sunday School Services.  These services will require the use of the auditorium, the entrances to the Premises and the Sunday School Room and offices in the basement of the building from 7:00 a.m. until 1:00 p.m.

B.     Church services on each Wednesday evening and on Christmas Eve.  This will require the use of the auditorium and the entrances to the Premises from 5:30 p.m. until 9:00 p.m.

C.     Thanksgiving Church Services.  This will require the use of the auditorium and the use of the entrances to the Premises from 7:00 a.m. until 1:00 p.m. on each Thanksgiving Day.

D.     Association Meetings.  Association Meetings may be held in both the auditorium and the basement on four (4) Saturdays during each calendar year and will require the use of the entire Building from 7:00 a.m. until 7:00 p.m. on those days when such Association Meetings are scheduled.  Currently, Association Meetings are scheduled for the second Saturday in June 2006, the third Saturday in August 2006, the fourth Saturday in August 2006 and the first Saturday in November 2006.  The dates for the Association Meetings, subject to Paragraph 35.1G below, not to exceed four (4) in any calendar year, may change in the future and LANDLORD agrees to give TENANT not less than one (1) year's prior written notice of any such change in the date of an Association Meeting and will use reasonable efforts to accommodate TENANT's use of the Premises on those days.

E.     Church Classes.  Classes are held for two (2) weeks in late June/early July and two (2) weeks in August.  LANDLORD will notify TENANT in writing at least one (1) year

customarily conducted in the Board Room on the fourth floor of the premises and as usually

scheduled for 9 am – 5 pm, Monday through Sunday.  TENANT will have no access to the 4th

floor during the pendency of the activities contemplated by this Section 35.1E and will

temporarily relocate its offices to the basement to accommodate the Church on those dates and

during the specified times.

      F.     Church Corporate or Organizational Meetings.  The dates for certain of

these meetings are mandated by LANDLORD's by-laws.  They are the third Tuesday in May

from 6 pm to 11 pm or 12 midnight.  The fourth Tuesday in September from 6 pm to 11 pm or

12 midnight and the fourth Saturday in January from 12 noon to 6 pm.  In addition, there is a

church meeting every three years on the second Tuesday in November for the purpose of electing

the church readers.  The first such meeting during the term of this Lease will be on the Second

Tuesday of November 2008.  Such meetings will be conducted from 6 pm – 10 pm.  All

corporate meetings will require the use of the auditorium and the entrances to the Premises.

      G.     Occasional non-regularly scheduled events, association meetings, classes

and special meetings of the Church may be scheduled from time to time at times mutually agreed

upon by LANDLORD and TENANT.  Since it is difficult or impossible to predict when such a

meeting may be required, LANDLORD and TENANT agree to consult with each other in order

to schedule such meetings (i) in a manner which causes no disruption to TENANT's scheduled

events in the Premises and (ii) at such times as do not conflict with TENANT's reasonably

anticipated use of the Premises.

     35.2   TENANT agrees that the auditorium of the Premises will be set up for Church

services or related activities at all times when not being prepared or utilized for TENANT

68

practicable prior to the time scheduled for TENANT's event and will restore the Premises to LANDLORD's use following each such event. Setting up the Premises for LANDLORD's use includes setting up at least 100 chairs and the podium and opening the curtains. TENANT will turn on the lights and HVAC system and remove the protective covering from the organ pit, if any, shortly prior to the time when the Church activity is scheduled to commence as set forth above, and will turn off the lights and HVAC system and cover the organ pit promptly after the Church activity is concluded. Any items (such as tables and excess chairs) stored by TENANT in the auditorium must be stored along the walls and appropriately covered and screened from sight. TENANT also agrees to set up the Sunday School each Sunday. All of the foregoing required to be done by TENANT hereunder will be done by TENANT at TENANT's sole cost and expense.

35.3    Both LANDLORD and TENANT acknowledge and agree that during the period when TENANT is renovating the Premises to make it ready for TENANT's permitted use, Church Services will be held in the basement area where the Sunday School Services are currently conducted. LANDLORD and TENANT will mutually agree on how the set-up for such services will be handled. The hours for such services will be the same as the hours set forth above. TENANT shall maintain the access to the temporary meeting space and the meeting space itself in a clean condition, free of dust, dirt and debris. During construction, TENANT shall notify LANDLORD as far in advance as is possible of any interruption of any utilities or other services.

35.4    TENANT acknowledges and agrees that the organ currently installed in the Premises is exclusively for the use of LANDLORD in connection with Church Services and

unless TENANT first receives LANDLORD's prior written consent and utilizes LANDLORD's organist or such other organist as is reasonably acceptable to LANDLORD in connection with any such use. TENANT acknowledges that it has been informed that the organ is a very sensitive and expensive musical instrument. TENANT will use due care in connection with its renovation of the Premises to protect the organ and all of its appurtenances including the pipes and bells wherever located throughout the Premises. TENANT also agrees to build a custom cover for the organ pit which will be put in place whenever the organ is not being used in connection with Church Services or related activities. Part of TENANT's duties in connection with setting up the Premises for Church Services will be to remove the cover from the organ and to replace the cover at the end of the Church Service. TENANT agrees to repair any damage to the organ which may be caused as a result of TENANT's alterations or TENANT's modifications of the Premises at any time during the term of this Lease.

35.5    TENANT understands and acknowledges that TENANT must respect LANDLORD'S privacy during all Church related activities. Specifically, TENANT agrees that it shall not enter any portion of the Premises or the Building or permit or allow any of TENANT's employees, principals, clients, guests, customers, suppliers or vendors to enter the Premises or the Building during the hours set forth above for Sunday Church Services, Wednesday evening services, Christmas Eve services, Thanksgiving services, Association meetings, Church Corporate or Organizational Meetings and non regularly scheduled or special meetings of the Church (subject to Paragraph 35.1G above) (collectively, the "Church Related Activities"). During Church Classes no one other than the teachers and students will be permitted on the fourth floor of the Building.

35.6    TENANT acknowledges that a violation of the privacy of LANDLORD during church related activities is a serious and material default under this lease. In addition, to the other remedies LANDLORD has for default under this Lease, LANDLORD shall have the right to seek an injunction to enjoin TENANT from any further violations of said Section 35.5.

35.7    LANDLORD understands and acknowledges that LANDLORD must respect TENANT's privacy during all TENANT related events.

## ARTICLE 36
## RIGHT OF FIRST REFUSAL

36.1    So long as the Rose Group Park Avenue LLC is the TENANT, if LANDLORD shall desire to sell the Building, LANDLORD shall notify TENANT in writing (an "Offering Notice") that LANDLORD intends to offer to sell the Building, prior to offering to sell the Building to any third party. The Offering Notice shall set forth, among other things, the asking price and all other material terms and conditions of the proposed offer. In addition to the foregoing, in the event LANDLORD enters into a contract of sale in respect of the Building, promptly after entering into such contract with a prospective purchaser (the "Contract"), LANDLORD shall forward a copy of the executed Contract to TENANT. TENANT shall have ten (10) business days from the date of TENANT's receipt of a copy of the Contract to notify LANDLORD that it elects to purchase the Building on the same terms and conditions specified in the Contract. In such event, TENANT shall execute an agreement of sale substantially similar to the Contract. Upon TENANT's failure or refusal to match such offer within ten (10) business days after receipt of a copy of the Contract from LANDLORD (the "ROFR Date"), LANDLORD shall be free to sell the Building to such third party purchaser in accordance with the terms and conditions of the Contract, provided that the sale is consummated within 270 days but not less than 180 days from the ROFR Date. In the event of the sale of the Premises to such

third party purchaser is not consummated within such 270 day period in accordance with the

terms of the Contract, then any sale of the Premises shall again be subject to TENANT's rights

as set forth in this Article. This right of first refusal is personal to the Rose Group Park Avenue

LLC and may not be assigned and shall not apply to any sale or transfer of the Building to

another Christian Science Church. The LANDLORD acknowledges that TENANT's right to use

and occupy the Premises is contingent upon such use being approved as accessory to the

continued use and occupancy of the Building and the Premises by the Church for Church

services and Church Related Activities, and that a sale to certain third parties (each, a "Non

Qualified User") will jeopardize TENANT's right to continue to use the Premises for catering

purposes. Accordingly, for the first full five calendar (5) years of the Term, LANDLORD shall

not offer to sell the Building to a Non Qualified User and any attempt to do so will be null and

void. Thereafter, so long as this Lease is in force and effect and the Rose Group Park Avenue

LLC is the TENANT hereunder, if LANDLORD shall desire to sell the Building to a Non

Qualified User and if TENANT chooses not to exercise its right of first refusal with respect to

such a sale, simultaneously with the closing of such a sale this Lease shall terminate and

LANDLORD or the prospective purchaser shall pay to TENANT an amount equal to the lesser

of the net proceeds received by LANDLORD from the sale of the Building after paying all

customary and reasonable closing costs and expenses or the sum of (i) the then value of

TENANT's business as a going concern (the "Value"), and (ii) the unamortized costs incurred by

TENANT relating to (A) TENANT's Work (as reflected on TENANT's books and records), (B)

repairs, replacements and improvements to the Building (to the extent such costs are engineer

allocated pursuant to a provision of this Lease, as allocated between LANDLORD and

TENANT; to the extent such costs are not engineer allocated pursuant to a provision of this

72

NYI 26400900.3

Lease, then as reflected on TENANT's books and records), and (C) the balance of the costs

incurred by TENANT in connection with the repair of the roof of the Building which have not

been reimbursed to TENANT as set forth in Paragraph 5.4 above.

LANDLORD and TENANT shall negotiate in good faith to attempt to reach a

mutually acceptable agreement regarding same. In the event that the parties are unable to agree

as to the Value within thirty (30) days after TENANT has notified LANDLORD that TENANT

will not so exercise TENANT's right of first refusal, then LANDLORD and TENANT shall each

designate, as an arbitrator, a person or entity in the business of valuing businesses as on-going

concerns. Each such person or entity designated by the parties shall have a minimum of ten (10)

years experience in the New York Metropolitan area in the valuation of businesses in the food

service and catering industry. The arbitrators selected by the parties shall attempt to agree on the

Value, taking into consideration all relevant factors that would customarily be considered in

making such a determination with respect to the sale of such a business in an arms length

transaction where neither party is under any compulsion to either sell or purchase. Such factors

shall include but need not be limited to: the earnings of TENANT derived from the Premises,

adding back into net income interest, depreciation, amortization, nonrecurring costs and other

appropriate adjustments, the earnings history of the TENANT at the Premises, TENANT's good

will, the projected rate of growth of TENANT's earnings derived from the Premises, TENANT's

market share in the Manhattan marketplace, the TENANT's client list and such other reasonable

factors as the arbitrators shall determine. It is acknowledged and agreed that the LANDLORD

intends to compensate TENANT for damages sustained by TENANT as the result of the sale of

the Building to a Non Qualified User. In measuring the damages, the arbitrators shall consider

such mitigating factors as the availability to TENANT of comparable replacement Premises, and

73

the cost thereof, in the vicinity of the Building. In the event that the arbitrators selected by each

of the parties are unable to agree upon a Value, then each arbitrator shall state in writing and

deliver to each of the parties the Value which said arbitrator has determined and then the

arbitrators shall mutually select a third arbitrator who shall meet the same qualifications as the

initial arbitrators selected by the parties. In the event that the two arbitrators selected by the

parties shall fail to agree on the choice of the third arbitrator within ten (10) days after said

arbitrators have delivered their determinations of Value, then both parties shall apply to the

American Arbitration Association or any successor thereto to designate the third arbitrator. The

third arbitrator appointed by the arbitrators selected by the parties or by the American Arbitration

Association of the City of New York or its successor, as the case may be, shall conduct such

hearings and investigations as said arbitrator may deem appropriate and shall, within thirty (30)

days after being designated, determine the Value for TENANT's business, which shall not be

lower than the lowest value determined by a parties' arbitrator nor higher than the highest value

determined by a parties' arbitrator. Such determination by the third arbitrator shall be binding

upon LANDLORD and TENANT. Each party shall pay its own counsel fees and expenses in

connection with any arbitration under this clause and the parties shall share equally all other

expenses and fees of any such arbitration.

    36.2    LANDLORD or TENANT at both parties' mutual cost and expense, at any time

after the first five (5) full calendar years of the term, may apply for a special use permit which, if

granted, would permit the use of the Building as a catering facility. The foregoing

notwithstanding, the party obligated to do so by law shall make the application to the applicable

authorities, it being agreed that TENANT shall be obligated to take all steps reasonably

necessary to facilitate the process. The parties shall cooperate with and assist each other in

<div align="center">74</div>

seeking the special use permit. Thereafter, if the special use permit is granted and the TENANT's use of the Building as a catering facility would not be jeopardized by a sale of the Building by LANDLORD, then LANDLORD may sell and offer to sell the Building (subject to TENANT's right of first refusal and subject to this Lease) without being obligated to pay TENANT any sum for the Value of TENANT'S business. The parties agree that if TENANT shall exercise its right of first refusal and acquire the Building, TENANT shall, at closing, reimburse LANDLORD for LANDLORD'S share of the costs to acquire the special use permit. Similarly, if TENANT does not exercise its right of first refusal and the Building is acquired by a third party, LANDLORD shall, at closing, reimburse TENANT for TENANT'S share of the cost to acquire the special use permit.

## ARTICLE 37
## STRUCTURAL REPAIRS

37.1    A.    Notwithstanding anything contained elsewhere in this Lease to the contrary, in the event that during the term of this Lease structural repairs or capital repairs or replacements are required for any portion or component or system of the Premises (a "Capital Repair"), all such required repairs shall be performed by LANDLORD and TENANT with the cost therefor apportioned between LANDLORD and TENANT as set forth in Section 37.1.B.

B.    If the need for such a Capital Repair has been determined and the scope of the repair has been established, the parties shall endeavor in good faith to allocate the costs of the repair or replacement, including all incidental costs, in a fair and equitable manner bearing in mind the balance of the Term (assuming TENANT shall not exercise its right(s) to extend) remaining, the realistic (not pursuant to the Internal Revenue Code) useful life of the repair or replacement to be made and the effect on the component of the Premises to be repaired or replaced caused by the manner, extent and type of use of the Premises by LANDLORD and

TENANT.  In the event that the parties are unable to agree upon an equitable allocation of the cost of the repair, the parties shall retain as an arbitrator an engineer possessing skills in the area of the structural component requiring repair or replacement, said engineer to have a minimum of ten (10) years experience in the City of New York directly involving structural components similar to the structural component of the Premises requiring repair or replacement.  In the event that the parties are unable to agree on an engineer to act as arbitrator, both parties shall apply to the American Arbitration Association of the City of New York for the appointment of an engineer possessing the qualifications set forth above.  The engineer appointed either by the parties or by the American Arbitration Association shall, within thirty (30) days of his or her appointment, receive submissions from LANDLORD and TENANT concerning the position of each party on the allocation of the cost of the subject repair or replacement.  The engineer shall then determine the fair and equitable allocation of the cost of said repair or replacement between LANDLORD and TENANT taking into consideration all of the factors set forth above.  The decision of the engineer acting as arbitrator shall be conclusive, final and binding to the parties hereto.  The repair shall be completed and paid for by TENANT and LANDLORD with the cost apportioned and paid consistent with the determination of LANDLORD and TENANT or the arbitrator, as the case may be.  If at the time of the incurring of such cost, TENANT shall not have exercised either or both of its options to extend the term of this Lease, and thereafter TENANT shall exercise such option or options, within thirty (30) days following the expiration of the Lease, TENANT shall remit to LANDLORD such portion of the cost paid by LANDLORD which is attributable to the five (5) or ten (10) year extension of the Term, as the case may be together with interest thereon at the Interest Rate.

## ARTICLE 38
## PREVAILING PARTY FEES

38.1     In the event of any litigation, arbitration, or other dispute between the parties

regarding this Lease, any Lease provision or the Premises, the prevailing party in any such

litigation shall be entitled to reasonable attorneys' fees and disbursements and court costs.  All of

the sums paid or obligations that are incurred by either party as aforesaid, shall be paid to the

other party within thirty (30) days after demand accompanied by appropriate evidence of same.


## ARTICLE 39
## FORCE MAJEUR

39.1     In the event LANDLORD or TENANT shall be delayed, hindered or prevented

from the performance of any act required under this Lease (except for the payment of Rent), by

reason of governmental restrictions, scarcity of labor or materials, strikes, fire or any other

reason beyond its reasonable control, the performance of such act shall be excused for the period

of delay, and the period for the performance of any such act shall be extended for the period

necessary to complete performance.  If LANDLORD or TENANT is delayed as hereinabove

provided during the Term of this Lease, the party so delayed shall not be liable to the other for

any losses or damages resulting therefrom.


## ARTICLE 40
## COMPLETION OF TENANT WORK

40.1     TENANT covenants to use commercially reasonable efforts to complete

TENANT Work as promptly after the Commencement Date as possible.  TENANT agrees to

open for business in the Demised Premises promptly upon completion of TENANT Work.

NYI 264009003

## ARTICLE 41
## AFFILIATE TRANSFERS

41.1    Notwithstanding anything contained in this Lease to the contrary, the parties agree

that a merger, reorganization or consolidation of TENANT shall not be deemed an assignment of

this Lease provided that same is done for a bona fide business purpose and not merely to

accomplish a transfer of this Lease.  Any partner or member of TENANT shall have the right to

transfer its interest (all or part), through death or otherwise, to any family member of such

partner or member.  However, a change in control of TENANT outside of the Rose family shall

be considered an assignment of this Lease and shall require LANDLORD's consent, in

accordance with the provisions of Article 22 of this Lease.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and

seals the day and year first above written.

LANDLORD, Third Church of Christ, Scientist

BY: _____, Chairman

_____, VICE CHAIRMAN

TENANT, Rose Group Park Avenue LLC

BY: _____

NY1 26400900.3

**EXHIBIT A**

**SITE PLAN**

EXHIBIT B

## LANDLORD'S WORK LETTER

None

**EXHIBIT C**

## TENANT IMPROVEMENTS WORK

1. Upgrade all power and wiring systems as necessary for TENANT's use
2. Upgrade one entrance to the building to make entrance handicapped accessible as required by law
3. Upgrade all restrooms to make one of said restrooms handicapped accessible as required by law
4. Install a new telephone/communication system
5. Upgrade or replace the existing heating, ventilating and air-conditioning systems as required for the operation of TENANT's business in the Premises
6. Remove and store off-site all pews on the main floor of the auditorium and the first (lowest) row of pews in the balconies. Pews are to be reinstalled upon the termination or expiration of the Lease unless TENANT, at TENANT's option, elects to replace the pews with ones of substantially similar design and quality upon the termination of the Lease.
7. Install a new lighting system as required to meet the needs of TENANT's business and which will also facilitate use of the Building as a Church
8. Install two (2) new signs on the exterior of the Premises one on Park Avenue above the cornerstone and the other on the left side of the 63rd Street entrance to be electronically controlled from an office in the Premises. The signage shall identify the Premises as the Third Church of Christ, Scientist at all times except on those occasions when tenant is utilizing the Premises for the purposes permitted pursuant to this Lease or for actively marketing the Premises for a third party event. Marketing shall not be done during Church services or activities (except for classes). Install a new sign over the center front door on the Park Avenue center front of the Building.
9. If TENANT shall so elect construct on the North side of the lower level a VIP and/or bridal suite with adjoining bathroom for the sole and exclusive use of TENANT.
10. Upgrade cosmetically the existing bathrooms in a manner consistent with the current fixtures in the existing men's room to the extent reasonably possible
11. Install a complete banquet kitchen and prep-kitchen and all associated equipment
12. Install a dumb-waiter to connect the lower level with the sidewalk (at TENANT's option). TENANT shall have the right and license to utilize the dumb-waiter, subject only to the rights of the City of New York.
13. Level the floor in the auditorium and remove the existing heat and ventilation ducts above the floor
14. Re-carpet the auditorium
15. Cosmetically upgrade and refurbish the Board Room
16. Install TENANT's offices in the current Literature Distribution Room (the skylight room) with an option to expand that office space into the adjacent attic space on the fourth floor
17. Re-paint the auditorium, fourth floor hallway and, where necessary, other public areas used by TENANT's clients in the Premises and repair all existing damage within the auditorium
18. Install a new Sunday School Office and Nursery to replace the existing facilities which will be displaced by the new kitchen facilities. The size and location to be mutually agreed upon. However, there shall be a door providing direct access to the Sunday School area.

19. Construct a new Literature Distribution/Committee room and Treasurer's office for LANDLORD in the attic adjacent to existing Board Room to replace storage space and Literature Distribution Room being converted to TENANT's office space.

20. Install a door on fourth floor to separate Church office area from TENANT's office area.

C-2

NY1 26400900.3

# EXHIBIT D

## LANDLORD'S ARCHITECTURAL PLANS FOR LANDLORD'S WORK

**None**

Case 1:07-cv-10612-DAB    Document 30-14    Filed 01/03/2008    Page 27 of 28

## EXHIBIT E

## PRELIMINARY LAYOUT DRAWINGS





E-2

NYI 26400900.3

## LEASE AMENDMENT AGREEMENT

THIS LEASE AMENDMENT AGREEMENT is made and entered into as of the     day of February, 2006 (the "Effective Date"), by and between Rose Group Park Avenue LLC, hereinafter referred to as "Tenant", and Third Church Christ, Scientist, of New York City, hereinafter referred to as "Landlord" or "Church";

WHEREAS, Landlord and Tenant entered into that certain Final Agreement of Lease dated January    , 2006, hereinafter referred to as the "Lease", wherein Landlord demised to Tenant the premises known as 583 Park Avenue, New York, New York (the "Premises"); and

WHEREAS, the Lease obligates the Landlord to apply for an accessory use permit (the "Permit") from the New York City Department of Buildings ("DOB") to permit catering activities in the Premises as an accessory use to the use of the Premises as a church, and contemplates the receipt of the Permit prior to the end of one hundred and twenty (120) days after the execution of the Lease (the "Permit Receipt Period"); and

WHEREAS, the Lease obligates the Tenant to apply for, and with reasonable due diligence seek, any necessary license (the "License") from the New York State Liquor Authority (the "SLA"), and contemplates the receipt of the License prior to the end of one hundred and twenty (120) days after the execution of the Lease (the "License Receipt Period"); and

WHEREAS, the parties have determined that the Permit may not be issued by the DOB within the Permit Receipt Period; and

WHEREAS, the parties have determined that the License may not be issued by the SLA within the License Receipt Period; and

WHEREAS, in light of the foregoing, the parties desire to extend the Permit Receipt Period and the License Receipt Period;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants herein contained and of good, lawful and valuable considerations moving to and received by each of the parties to be bound hereby, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree as follows:

1.    Effect of this Document. This Lease Amendment Agreement shall operate to amend the Lease only to the extent that the terms of the Lease are inconsistent with the provisions of this Lease Amendment Agreement. Except as amended or modified by this Lease Amendment Agreement, all terms and conditions of the Lease shall remain in full force and effect and Landlord and Tenant shall be bound thereby.

2.    Permit Receipt Period. Section 2.3 C of the Lease is hereby deleted in its entirety, and the following substituted in its place and stead.

"C.    Promptly after the execution of this Lease, LANDLORD, with TENANT's assistance and cooperation, at their joint cost and expense,

Premises as an accessory use to the use of the Premises as a church and in conjunction therewith, the issuance of an amended certificate of occupancy specifying that the Premises may be utilized for an accessory catering use (the "Amended CO"). If for any reason the Permit and/or Amended CO are not received prior to the end of one hundred and twenty (120) days after the execution of this Lease or if prior to such date the DOB denies the issuance of such Permit or Amended CO, either party by notice to the other party, given within five (5) days after the end of said one hundred and twenty (120) days, may cancel and terminate this Lease, in which event LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder. The parties shall share the expense of said application, including without limitation all outside legal and other professional fees, and all other related costs and expenses, equally."

3.  <u>License Receipt Period.</u> Section 2.3 A of the Lease is hereby deleted in its entirety, and the following substituted in its place and stead:

    "A.    Promptly after the receipt of the Permit and the Amended CO, TENANT, at TENANT's sole cost and expense, shall apply for, and with reasonable due diligence seek, any necessary license (the "License") from the New York State Liquor Authority (the "SLA") and this Lease is conditioned upon the SLA issuing the License. If for any reason the License is not received prior to the end of one hundred and fifty (150) days after the receipt of the Permit and the Amended CO, or if prior to such date the SLA denies the issuance of the License, TENANT may by notice to LANDLORD given within five (5) days after the earlier of the SLA denial or the end of said one hundred and twenty (120) days, cancel and terminate this Lease, in which event LANDLORD shall return to TENANT all sums paid by TENANT to LANDLORD hereunder and neither LANDLORD nor TENANT shall have any further liability or obligation hereunder."

4.  <u>Binding Effect.</u> The covenants, agreements, terms, provisions and conditions contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, successors, legal representatives and assigns.

5.  <u>Modifications.</u> This Agreement may not be modified orally, but only by an agreement in writing signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

Agreement shall be deemed to have the meanings ascribed to them in the Lease.

7.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall constitute but one and the same instrument.

8.    <u>Authority.</u> Each individual executing this Lease Amendment Agreement on behalf of Landlord and Tenant represents and warrants that he/she is duly authorized to execute and deliver this Lease Amendment/Extension Agreement on behalf of said party and that this Lease Amendment Agreement is binding upon said party in accordance with the terms and conditions herein.

**IN WITNESS WHEREOF**, the parties have executed this Lease Amendment Agreement on the corresponding dates below.

**LANDLORD, Third Church of Christ, Scientist**

BY: _____

**TENANT, Rose Group Park Avenue LLC**

BY: _____

NY1 26404613.1 / 63739-000009

Exhibit K

For the Exclusive Use of:

Copy No. _____

## ROSE GROUP PARK AVENUE, LLC

### (A New York Limited Liability Company)

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### FOR ACCREDITED INVESTORS ONLY

**$3,000,000 (6 Units)**

**to**

**$5,000,000 (10 Units)**

Each Interest is a limited liability company interest in
ROSE GROUP PARK AVENUE, LLC

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE NOT BEEN REGISTERED WITH, OR APPROVED BY, ANY STATE SECURITIES OR BLUE SKY ADMINISTRATOR OR ANY OTHER U.S. REGULATORY AUTHORITY. NO SUCH AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM. NOR IS IT INTENDED THAT ANY SUCH AUTHORITY WILL DO SO. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

THESE SECURITIES ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. AN INVESTMENT IN THE COMPANY IS ILLIQUID AND THE COMPANY'S INVESTMENTS MAY RESULT IS THE LOSS OF AN INVESTOR'S ENTIRE INVESTMENT.

ANY DISTRIBUTION OR REPRODUCTION OF ALL OR ANY PART OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, OR THE DIVULGENCE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY, IS PROHIBITED.

The date of this Confidential Private Placement Memorandum is September 29, 2006

# GENERAL INFORMATION

Rose Group Park Avenue, LLC ("Rose Group," "our Company," the "Company," "us," or "we") is a New York limited liability company formed to operate an elegant ballroom and event space capable of handling events for over 500 people and is located in New York City on Park Avenue between 63rd and 64th Streets (the "Establishment"). This is an offering (the "Offering") of a minimum of $3,000,000 and a maximum of $5,000,000 of limited liability company membership interests (the "Interests"), in our Company solely to investors who qualify as "accredited investors" under the Securities Act of 1933, as amended (the "Securities Act"), in a private placement exempt from registration under the Securities Act and applicable state securities laws. Each unit ("Unit") of Interest requires an initial capital contribution of $500,000 per Interest. We may sell fractional Units, in our sole discretion. If this offering is over subscribed, we may, in our sole discretion, sell up to $1,000,000 of Interests to cover over-subscriptions (the "Over-allotment").

The Offering shall continue until the earlier of the sale of 6 Units (the "Minimum Amount") or January 30, 2007 (unless extended by the Company in its sole discretion for up to an additional 45 days). If, by January 30, 2007, the Company has not received subscriptions for at least the Minimum Amount, this Offering shall terminate and all funds previously deposited with the Company to purchase Interests in this Offering will be returned to prospective investors, without interest. We will not sell Interests in this Offering to any person who does not demonstrate compliance with the requirements described in this Memorandum. See "Terms of the Offering." In the event the Company receives and accepts subscriptions for the Maximum Amount, the investors in this Offering will hold twenty-five percent (25%) of the total Interests of the Company.

In addition to the funds raised pursuant to this Offering, (i) David Starling will, at the closing on the Minimum Amount, make a capital contribution of $100,000 to the Company, in exchange for one-half of a percent of the total Interests of the Company; (ii) Herbert Rose will make a capital contribution of $2,300,000 in exchange for 11.50% of the total Interests of the Company; and (iii) 583 Park LLC, a New York limited liability company (the "Company Manager") will make a capital contribution of $200,000. The remainder of the Interests will be held by the Company Manager. These purchases of these Interests will not be counted toward determining whether the Minimum Amount has been reached. Accordingly, assuming the sale of 10 Units (the "Maximum Amount"), the Company will be capitalized with an aggregate of $7,600,000.

| | Offering Price[1] | Estimated Offering Expenses[2] | Aggregate Net Proceeds to Company |
|---|---|---|---|
| Minimum Amount ......... | $3,000,000 | $100,000 | $2,900,000 |
| Maximum Amount.......... | $5,000,000 | $100,000 | $4,900,000 |

(1)   The offering price of the Interests has been unilaterally determined by the Company. The price is not the result of arm's-length negotiations and does not necessarily reflect the value of the Interests purchased.

(2)   The Company estimates that $100,000 will be used by the Company to pay fees and expenses incurred or to be incurred in respect of the organization of the Company and the Offering, including the preparation of this Confidential Private Placement Memorandum.

THE INTERESTS OF THE COMPANY OFFERED HEREBY ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT, REGULATION D, AND ANY APPLICABLE STATE SECURITIES LAWS.

WE MAY REJECT ANY SUBSCRIPTION FOR INTERESTS, IN WHOLE OR IN PART, IN ANY ORDER AND FOR ANY OR NO REASON, IN OUR SOLE DISCRETION. IN THE EVENT THIS OFFERING IS OVERSUBSCRIBED, WE MAY REDUCE (OR REJECT) SUBSCRIPTIONS BASED ON EACH INVESTORS PRO RATA PARTICIPATION IN THIS OFFERING OR ANY OTHER METHOD THAT WE DETERMINE.

AN INVESTMENT IN THE COMPANY IS SPECULATIVE AND ENTAILS A HIGH DEGREE OF RISK (SEE "RISK FACTORS" BEGINNING ON PAGE 18 OF THIS MEMORANDUM), INCLUDING, WITHOUT LIMITATION THAT:

(i)     THERE ARE NUMEROUS RISKS ASSOCIATED WITH THE OPERATION OF THE ESTABLISHMENT. THERE IS NO ASSURANCE THAT THE OPERATION OF THE ESTABLISHMENT WILL BE PROFITABLE.

(ii)    THERE IS NO READILY AVAILABLE MARKET FOR THE INTERESTS, NONE IS ANTICIPATED TO DEVELOP AND TRANSFER OF THE INTERESTS IS RESTRICTED.

(iii)   THERE ARE RISKS ASSOCIATED WITH OBTAINING AND MAINTAINING A LICENSE TO DISPENSE AND SELL ALCOHOLIC BEVERAGES.

(iv)    THE INVESTORS WILL HAVE A LIMITED VOICE IN THE CONDUCT OF THE COMPANY'S OPERATIONS AND MUST RELY UPON THE JUDGMENT AND ABILITY OF THE COMPANY MANAGER TO CONDUCT THE COMPANY'S BUSINESS.

YOU SHOULD NOT INVEST IN THE COMPANY UNLESS YOU ARE IN A POSITION TO LOSE THE ENTIRE AMOUNT OF YOUR INVESTMENT. EACH PROSPECTIVE INVESTOR MUST CONSULT WITH AND RELY UPON THE ADVICE OF SUCH PROSPECTIVE INVESTOR'S OWN COUNSEL AND OTHER ADVISERS WITH RESPECT TO THE FINANCIAL, TAX AND OTHER CONSEQUENCES OF AN INVESTMENT IN THE COMPANY.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE. THIS MEMORANDUM MAY CONTAIN SUMMARIES OF VARIOUS AGREEMENTS, DOCUMENTS, STATUTES, RULINGS AND/OR REGULATIONS. THESE SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE AGREEMENTS, DOCUMENTS, STATUTES, RULINGS AND/OR REGULATIONS MENTIONED AND BY REFERENCE ALSO TO THE DEFINITIONS CONTAINED THEREIN WHICH MAY DIFFER FROM COMMON USAGE AND ALSO FROM AGREEMENT TO AGREEMENT.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE FINANCIAL, TAX OR OTHER CONSEQUENCES AS A RESULT OF AN INVESTMENT IN THE COMPANY. NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR ITS MANAGER AS LEGAL OR TAX ADVICE.

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY STATEMENT NOT CONTAINED IN THIS MEMORANDUM AND ANY INFORMATION OR STATEMENT NOT CONTAINED HEREIN CANNOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. NO PROSPECTIVE INVESTOR SHALL RELY UPON ANY WRITTEN OR ORAL STATEMENT CONCERNING AN INVESTMENT IN THE COMPANY EXCEPT AS IS CONSISTENT WITH THE TERMS AND CONDITIONS OF THIS MEMORANDUM AND THE EXHIBITS ATTACHED HERETO. IN THE EVENT OF SUCH INCONSISTENCY, IF ANY, THE TERMS AND CONDITIONS OF THIS MEMORANDUM AND THE EXHIBITS ATTACHED HERETO SHALL BE CONTROLLING AND BINDING ON THE PROSPECTIVE INVESTOR.

THIS MEMORANDUM HAS BEEN PREPARED FOR THE EXCLUSIVE USE AND BENEFIT OF THE PROSPECTIVE INVESTORS AND THEIR ADVISERS. UNDER NO CIRCUMSTANCES SHALL IT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY UNLESS (i) THE PROSPECTIVE INVESTOR TO WHOM IT IS GIVEN SATISFIES THE SUITABILITY STANDARDS STATED HEREIN AND (ii) THE PROSPECTIVE INVESTOR'S NAME AND A MEMORANDUM NUMBER ARE INSERTED BY A REPRESENTATIVE OF THE COMPANY IN THE SPACES PROVIDED ON THE COVER PAGE OF THIS MEMORANDUM. NOTWITHSTANDING THE FOREGOING, THE COMPANY RESERVES THE ABSOLUTE RIGHT TO REJECT, FOR ANY REASON OR NO REASON, ALL OR ANY PART OF ANY TENDERED SUBSCRIPTION.

## CERTAIN NOTICES UNDER STATE SECURITIES LAWS:

### FOR NEW YORK RESIDENTS ONLY:

THIS MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

### FOR FLORIDA RESIDENTS:

UPON ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVING INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY (AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED), A PENSION OR PROFIT SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF SECURITIES OFFERED HEREBY TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO OUR COMPANY, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE INVESTOR, WHICHEVER OCCURS LATER.

TABLE OF CONTENTS
TO
CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
OF
ROSE GROUP PARK AVENUE, LLC

|  | Page |
|---|---|
| GENERAL INFORMATION | ii |
| OFFERING SUMMARY | 2 |
| TERMS OF THE OFFERING | 7 |
| USE OF PROCEEDS | 12 |
| THE BUSINESS | 13 |
| MANAGEMENT OF THE COMPANY | 16 |
| RISK FACTORS | 18 |
| CONFLICTS OF INTEREST | 24 |
| COMPANY OWNERSHIP | 25 |
| SUMMARY OF OPERATING AGREEMENT | 26 |
| UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS | 30 |
| SUITABILITY STANDARDS FOR INVESTMENT | 39 |
| ACCESS TO INFORMATION | 40 |
| STATUS OF INTERESTS UNDER SECURITIES LAWS | 41 |

EXHIBIT A - FORM OF OPERATING AGREEMENT
EXHIBIT B - FORM OF SUBSCRIPTION DOCUMENTS
EXHIBIT C - PROJECTED STATEMENT OF OPERATIONS

# OFFERING SUMMARY

The following summary describes certain provisions of this Memorandum. The summary does not purport to be complete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Memorandum and its exhibits. This Memorandum describes numerous aspects of the Company and the Establishment that we believe are material to prospective investors; however, the statements herein are only summaries of the Company and the Establishment, and are qualified in their entirety by the Exhibits attached hereto. Each prospective investor should carefully read and discuss this Memorandum and its Exhibits with their respective attorney and personal business and tax advisers.

An investment in the Company is suitable only for an investor who is sufficiently familiar with investments of this type to enable such investor to evaluate the financial merits and risks involved in investing in the Company. The Interests will be sold only to "accredited investors," as defined in Rule 501 of Regulation D under the Securities Act, who satisfy the Company's suitability standards. See "Terms of the Offering."

| | | | Capital Contributions |
|---|---|---|---|
| **Offering Size:** | | | |
| | Minimum Amount: | 6 Units | $3,000,000 |
| | Maximum Amount: | 10 Units | $5,000,000 |
| **The Offering:** | Over-allotment (if any) | 2 Units | $1,000,000 |

**Description of the Interests:**

The Company is offering a minimum of $3,000,000 and a maximum of $5,000,000 of limited liability company membership interests in the Company (the "Interests"), for an initial capital contribution of $500,000 per Interests (each, a "Unit"). In the event this Offering is over-subscribed, the Company may sell up to 2 Units, for an aggregate purchase price of $1,000,000. In the event the Company receives and accepts subscriptions for the Maximum Amount, the investors in this offering will hold twenty-five percent (25%) of the total Interests of our Company. The Company may sell fractional Units, in its sole discretion. The Offering shall continue until the earlier of when the Minimum Amount has been sold, or January 31, 2007 (unless extended by the Company in its sole discretion for an additional 45 days). If, by January 31, 2007, unless extended by the Company, the Company has not received subscriptions for at least the Minimum Amount, the Company will terminate this Offering, with all funds previously deposited with the Company returned to the prospective investors, without interest.

2

| | |
|---|---|
| Additional capital contributions to the Company: | In addition to the funds raised pursuant to this Offering, David Starling will, at the time of the first closing of the Offering, make a capital contribution of $100,000 to the Company in exchange for one-half of one percent of the total Interests in the Company and Herbert Rose will make a capital contribution of $2,300,000, in exchange for 11.50% of the total Interests in the Company. The Company Manager will make a capital contribution of $200,000 plus render senior to the Company in exchange for 63% of the Interests in the Company, assuming the Maximum Amount is sold. Accordingly, assuming the sale of $5,000,000 of Interests hereunder, the Company will be capitalized with an aggregate of $7,600,000. |
| Use of Proceeds: | Upon completion of this Offering, the Company will receive gross proceeds of approximately $5,000,000 (assuming the sale of the Minimum Amount), in addition to the aggregate $2,600,000 capital contributions by Herbert Rose, the Company Manager and David Starling. |
| | It is estimated that the expenses of the Offering will be approximately $100,000. We intend to use the net proceeds from Offering principally for construction and equipment costs, and general operating expenses. |
| The Company: | Rose Group Park Avenue, LLC is a New York limited liability company formed to operate an elegant ballroom and event space capable of handling events for over 500 people, which is located in New York City on Park Avenue between 63rd and 64th Streets (the "Establishment"). The Company's principal office will be located at 583 Park Avenue, New York, New York 10021. |
| The business of the Company: | The business of the Company is to operate the Establishment. The Company leases space at 583 Park Avenue, New York, New York (the "Facility Space"), and is subject to the terms of real estate lease agreement. See "The Business – Lease of Facility Space." |
| Governance of the Company: | The Company is governed by an Operating Agreement, a copy of which is attached hereto as Exhibit A, to which all investors in this Offering will become a party. |
| Company Manager: | The Manager of the Company is 583 Park LLC, a New York limited liability company, (the "Company Manager") the principals of which are Messrs. Louis Rose, John Rose, Berton Rose and David Starling. The manager of the Company Manager is Mr. Louis Rose. |
| Operation of the Establishment: | The Company Manager will manage the day-to-day affairs of the Establishment. |

3

**Management Fees:** The Company Manager will be entitled to receive 5% of the gross sales of the Establishment (the "Management Fee"). The Management Fee will be payable monthly, out of the gross sales, on the first day of each month, in arrears. Gross sales is defined as all receipts from the sale of food, alcoholic beverages and services of every kind and nature, except sales and equivalent taxes collected on sales and paid to the appropriate taxing authorities, rebates and gratuities.

**Distributions to Members:** In general, and as the Operating Agreement provides, the Company's "available cash flow" (generally, the Company's total revenues less operating and other expenses including the Management Fee and a reserve determined by the Company Manager), to the extent there is any, will be distributed, as determined by the Company Manager, to the Members (including the Company Manager), pro rata in proportion to their respective percentage ownership of the Interests.

**Allocation of Taxable Income and Loss:** In general, Company profits and losses (and Company income, gain, loss, deductions and credits) will be allocated to the Members and the Company Manager in accordance with the terms of the Operating Agreement. To this end, Company profits (and other Company items of income and gain) will be allocated: (i) first, to Members until the aggregate amount of profits (and income and gain) so allocated to the Members shall equal the aggregate net amount of Company losses (after taking into account previous allocations of profits, income and gain, as well as losses) previously allocated to the Members ("Loss Offset Allocations"); and (ii) then, to the Members pro rata in accordance with the aggregate amount of profits distributed to them until the aggregate amount of profits allocated to them equals the aggregate amount of profits distributed to them; and (iii) then, to the Members in accordance with their respective percentage ownership of the Interests of the Company.

Company losses will be allocated, in general: (i) first, to the Members until the aggregate amount of losses so allocated to the Members shall equal the aggregate net amount of Company profits, income and gain (after taking into account previous allocations of losses, income and gain, as well as profits, income and gain) previously allocated to the Members ("Loss Offset Allocations"); (ii) then, to the Members in proportion to their respective positive capital account balances, until the capital account balances of all the Members equals zero; and (iii) then, to the Members, pro rata in proportion to their respective percentage ownership of the Interests.

Generally, under the Operating Agreement, allocations to the Members of Company profits, income and gain are intended to "track", as closely as possible, the manner and priority of

4

distributions of the Company's "available cash". Notwithstanding, it is possible that for any taxable year, the amount of Company income and gain allocated to an Investor (and the Investor's federal income tax liability resulting from such profits, income and gain) may exceed the amount of distributions received by the Investor for such taxable year.

**Limited Liability:**

Members will not be liable for any of the debts of the Company and will not be required to contribute any capital other than their capital contribution or lend any funds to the Company. Members may be liable to the Company or its creditors to return a distribution made to them if, after such distribution, the remaining assets of the Company are not sufficient to pay the Company's then outstanding liabilities. Members will also be liable to the Company for the amount of any taxes imposed upon or withheld by the Company in respect of such Member's share of Company income. Capital contributions in excess of initial capital contributions may be required only if the Members unanimously approve such requirement and determine that such additional capital contributions are necessary or desirable to accomplish the purposes and objectives of the Company.

**Risk Factors:**

An investment in the Interests is speculative and involves a high degree of risk. You should not invest in the Interests unless you are in a position to lose your entire investment. See "Risk Factors" beginning on page 18 of this Memorandum.

**Resale Restrictions:**

We are making this Offering of Interests in reliance on exemptions from the registration requirements of the Securities Act and applicable state securities laws. Accordingly, the Interests will be "restricted securities" as defined in the Securities Act and, therefore, subject to significant restriction on resale. You may not transfer the Interests except in a transaction registered under the Securities Act and applicable state securities laws or unless you obtain a legal opinion reasonably acceptable to us that your transfer is exempt from such registration. Each certificate of Interests will be issued bearing a legend evidencing such restriction.

**Investor Requirements:**

We will sell an Interest in this offering only to investors who qualify as "accredited investors" under the Securities Act. You will be required to make certain representations as to your status as an accredited investor and certain other matters in order to purchase an Interest. We may reject any subscription for an Interest, in whole or in part, in any order and for any or no reason, in our sole discretion. In the event that this offering is over-subscribed, we may reduce (or reject) the subscriptions based on each investor's pro rata participation in this offering or in any other manner we may

5

determine.

**How to Subscribe:**          Please see "Terms of the Offering."

## USE OF PROCEEDS

If the Maximum Amount of Interests are sold, the gross proceeds to the Company from the sale of Interests will be $5,000,000 in addition to the capital contributions by the Company Manager, Herbert Rose and David Starling. Accordingly, assuming the sale of $5,000,000 of Interests hereunder, and after deducting legal, accounting and state filing fees of approximately $100,000 the Company will be capitalized with an aggregate of $7,500,000. Pending application of the proceeds, the Company intends to invest the net proceeds in high quality, interest bearing securities. The Company expects to use the net proceeds from this Offering during the next 12 months following this Offering as follows:

| Application of Proceeds | Approximate Dollar Amount | Approximate Percentage of Dollar Amount |
|---|---|---|
| Construction and Equipment Costs | $7,200,000 | 96% |
| General Operating Expenses | $ 300,000 | 4% |

Based on currently proposed plans and assumptions relating to the implementation of its business plans, the Company believes that the net proceeds of this Offering, together with proceeds from the Company's operations, will be sufficient to satisfy its contemplated cash requirements for at least 12 months following the consummation of this Offering. In the event that the Company's plans change, its assumptions change or prove to be inaccurate or if the proceeds of this Offering otherwise prove to be insufficient to implement its business plans, the Company may find it necessary or desirable to reallocate a portion of the proceeds within the above-described categories, use proceeds for other purposes and/or seek additional financing. There can be no assurance that any additional financing will be available to the Company on acceptable terms, or at all.

# THE BUSINESS

## Introduction

Rose Group Park Avenue, LLC is a New York limited liability company formed for the purpose of leasing and operating an elegant ballroom and event space which is capable of handling over 500 people, which is located at 583 Park Avenue between 63rd and 64th Streets in New York City (the "Establishment"). The Company's management team consists of a group of individuals who have developed some of the most prestigious banquet facilities in Manhattan, including Cipriani 42nd Street and The Rainbow Room. This team currently operates Capitale, a premiere setting for fine dining and elegant events and Guastavino's, a large event venue recently reopened by the Rose Group to specialize in private functions only. The Company believes that the beauty and grandeur of the building located at 583 Park Avenue, New York, New York (the "Facility Space"), its ability to handle over 500 people, and the prestigious location on Park Avenue represents a unique business opportunity.

## Background

The Facility Space was built in 1923 and designed by the world renowned architectural firm of Delano and Aldrich, which was responsible for designing some of the most spectacular and prestigious clubhouses in New York, including The Colony, The Brook, The Union, and The Knickerbocker. The Facility Space was commissioned by the Third Church of Christ Scientist to serve as their meeting hall. While the auditorium was designed to seat 1,200 people, today there are approximately only forty members of the congregation remaining, and only a few of these members participate in the Church's Wednesday and Sunday services.

The Company has entered into a lease for the Facility Space, which permits the current congregation to use the Facility Space on a limited basis at times when the Company is not using the Facility Space. The Facility Space has not been renovated since it was constructed in 1923 and very few New Yorkers have ever been inside due to its use as a meeting space for Christian Scientists.

## Renovation of the Facility Space

Following completion of this Offering and prior to the first event at the Facility Space, the Company intends to renovate the Facility Space. We anticipate that such renovations will include the following:

- Installation of banquet kitchen in the basement;
- Upgrading the facility to satisfy the requirements of the Americans with Disabilities Act;
- Installation of new HVAC systems;
- Removal of pews from the auditorium;
- Replacement of carpet;
- Refurbishment of the basement into finished attractive pre-function space;
- Construction of a VIP/Bridal Suite in the basement;

13

- Performing cosmetic upgrades throughout the interior and exterior of the facility; and
- Installation of specialized sound, lighting and projection systems.

The Company intends to use the proceeds from the this Offering for a portion of the costs of the renovations. In addition, immediately following the completion of this Offering, the Company anticipates that it will begin marketing the Facility Space to obtain commitments for holding an event at the Facility Space, including deposits for guarantee of the Facility Space's availability. The Company will utilize these deposits to fund a portion of the costs of the renovations. However, there can be no guarantee that the Company will be successful in its marketing efforts and that there will be sufficient funds available to complete the renovations to the Facility Space.

**The Clientele**

The Company plans to target a very specific clientele for corporate, charitable, social and family events. Corporate events may include buffet-style receptions during the holidays, investor meetings, new product launches, fashion shows, press conferences, concerts, and seated dinners. Charity events may include seated dinners focused on fundraising, and social and family events may include weddings, anniversaries, bar or bat mitzvahs, and birthday parties. The Company Manager anticipates marketing the Facility Space as an architecturally significant venue with a luxurious food and service product to attract clients that want a luxurious experience at an location.

**Location**

The Establishment will be located at 583 Park Avenue in New York, New York, between 63rd and 64th Streets. This section of Park Avenue is a beautiful tree-lined block in an upscale, fashionable area of Manhattan, and is home to businesses and residents who enjoy a dynamic and sophisticated urban environment. The Facility Space is favorably situated near the northern portion of Midtown Manhattan, where many businesses are located and on the lower end of the Upper East Side, one the city's most desirable residential areas.

**Lease of Real Estate**

The Company has entered into a lease agreement (the "Lease") dated January 31, 2006, for a term of twenty years, with two successive options to extend the term of the Lease, each for an additional five year period. The term of the Lease commenced on July 3, 2006 (the "Commencement Date"). See "Risk Factors-The Company is subject to governmental regulation of the Establishment and those pertaining to holding a liquor license." Rent payable under the Lease also commenced on July 3, 2006. Based upon the Company's current financial projections, the Company's occupancy cost is expected to be within current industry standards and includes a provision requiring the payment of additional rent based upon Excess Gross Sales (as that term is specifically defined in the Lease) but generally ten percent (10%) of the amount by which Gross Sales exceeds the Gross Sales Base for the commensurate period. Gross Sales Base is the product derived by multiplying the rent payable during such period by ten.

## Competition

In Manhattan there are several types of event spaces that will compete directly with the Establishment, including hotels, restaurants with private rooms, museums or public spaces and independent stand alone venues. Notwithstanding such competition, the Company believes that it has a number of significant competitive advantages, including the following:

- Unlike many of its competitors, the Facility Space will have a separate reception space large enough for the number of guests that the ballroom can accommodate;
- The Facility Space will be one of the few properties in and around its location that can accommodate seated dinners with over 500 guests;
- The Company Manager has considerable experience in the catering and events industry, with an established track record of excellence, including developing 55 Wall Street and 110 East 42nd Street for the Cipriani organization;
- The Facility Space is located near Midtown Manhattan on a beautiful tree-lined block;
- The Facility Space is a unique property;
- The Company Manager has exceptional customer service and client relationships; and
- The Establishment will be new to the banquet industry.

Below is a list of potential competitors. The competitors are listed in order of competitiveness within the Establishment's target market:

Direct Competition:

| Property: | Venue Size (estimated seated dinner capacity): |
|---|---|
| 1.  The Pierre Hotel | 600 Guests |
| 2.  The Waldorf-Astoria | 1300 Guests |
| 3.  Cipriani 42nd Street | 700 Guests |
| 4.  Tavern on the Green | 1000 Guests |
| 5.  Gustavino's | 500 Guests |
| 6.  Cipriani Wall Street | 900 Guests |
| 7.  Gotham Hall | 600 Guests |
| 8.  The Hilton | 2800 Guests |
| 9.  Cipriani Toy Building | 400 Guests |
| 10. Capitale | 500 Guests |
| 11. The Hyatt | 800 Guests |
| 12. Marriot Marquis | 1000 Guests |
| 13. Sheraton | 1500 Guests |

Peripheral Competition:

| Property: | Venue Size (estimated seated dinner capacity): |
|---|---|
| 1.  Pier 60 | 1000 Guests |
| 2.  Lighthouse | 350 Guests |
| 3.  Copacabana | 700 Guests |

15

| 4.  | Manhattan Center     | 1000 Guests |
|-----|----------------------|-------------|
| 5.  | United Nations       | 500 Guests  |
| 6.  | Bridgewaters         | 500 Guests  |
| 7.  | Puck Building        | 600 Guests  |
| 8.  | The Essex House      | 300 Guests  |
| 9.  | The Roosevelt        | 450 Guests  |
| 10. | The Millenium Hotel  | 300 Guests  |
| 11. | The Mandarin Hotel   | 300 Guests  |
| 12. | W Hotel              | 300 Guests  |

**Projected Revenue**

The Company Manager plans to begin showing the Establishment to clients and selling future events in third quarter of 2006 and anticipates the first event taking place in the second quarter of 2007. The proceeds from the sale of the future events will be used towards renovations, operations, etc. Please refer to the sales projections attached hereto as Exhibit C for additional information regarding expected operation of the business.

THE SALES PROJECTIONS PROVIDED AS EXHIBIT C ARE BASED UPON ASSUMPTIONS CONCERNING FUTURE FACTS AND EVENTS OVER WHICH THE COMPANY AND THE COMPANY MANAGER WILL HAVE LITTLE OR NO CONTROL. ACCORDINGLY, THERE IS NO GUARANTY THAT THE ACTUAL SALES WILL BE EXACTLY OR EVEN APPROXIMATELY AS SET FORTH ON EXHIBIT C. SEE "FORWARD LOOKING STATEMENTS."

## MANAGEMENT OF THE COMPANY

**Company Manager**

The Company is a manager-managed limited liability company. The Manager of the Company will be 583 Park LLC, a New York limited liability company (the "Company Manager"). The Company Manager is also a manager-managed limited liability company. The following are current members of the Company Manager:

*Louis Rose, 35, Managing Member of the Company Manager.* Mr. Rose is an event industry pioneer with more than 10 years of executive management experience. From 1997 to 2004, he served as Managing Director of Catering of Cipriani Hospitality Company. Mr. Rose is a member of The Rose Group, a group of partners which has developed and currently operate some of the most prestigious banquet facilities in Manhattan. Mr. Rose has extensive experience in catering in the New York market and has been involved in the conversions and operations of several Rose Group projects. He developed 55 Wall Street and 110 East 42nd Street for the Cipriani organization, both of which were landmarked former bank buildings and highly profitable.

*David Starling, 35, Member of the Company Manager.* David Starling has nearly 10 years of experience as operations manager of prestigious event spaces. He has worked with

16

Louis Rose since 1998, when he joined the Rose Group to manage catering operations at 55 Wall Street. Mr. Starling helped Mr. Rose oversee the development of Cipriani 42nd Street, focusing on the facility re-design and operational logistics. Since the opening of Cipriani 42nd Street, Mr. Starling has worked with Mr. Rose to seek out and develop new properties, as well as reinvigorate existing properties, such as Rainbow Room, Guastavino's and Capitale, transforming them into successful banquet facilities.

The members of the Company Manager currently, and in the future will, operate, manage and promote other companies and ballroom and event spaces in New York, New York that are, or may be, similar to the Establishment, regardless of location. See "Conflicts of Interest." The individuals referred to above currently, and in the future would likely, serve in the same capacities at the other ballroom and event spaces operated, managed or promoted by them.

## Responsibilities of the Company Manager

The Company Manager will endeavor, on behalf of and at the sole expense of the Company, to do all things and take all actions reasonable and appropriate for the operation of the Establishment including, without limitation, recruiting, hiring and paying all required personnel, purchasing goods and contracting for services, establishing menus, maintaining the premises, establishing an accounting system and taking such other actions as are necessary and appropriate in connection with the operation of the Establishment.

## Management Fee

The Company Manager will be paid a Management Fee in an amount equal to five percent (5%) of the monthly gross sales of the Establishment. See "Offering Summary." This amount will be payable monthly, out of the gross sales, on the first day of each month, in arrears. The Management Fee will be due and payable regardless of whether the Establishment is operating at a profit and whether or not the members of the Company have received distributions of any kind. This payment is in addition to cash flow distributions to which the Company Manager will be entitled as an owner of a membership interest in the Company.

17

Exhibit L

# NYC BUILDINGS

DEPT. OF BLDGS.

583 - 589 Park Avenue

| 1 Filing Status | | | | | |
|---|---|---|---|---|---|
| Job Number | | | | As an attachment to: | Third Church of Christ Scientist |
| Sheet Number | 1 | of 1 | Sheets | Block 1398, lot 1 | |

## 2 Additional Information

Respectfully request pre consideration before filing a professional certification application that a proposed accessory social hall, ballroom and catering within the existing church is an accessory use to the existing building.

The building is an existing two story and cellar structure, located in a landmark district, and constructed in 1921 under application NB 390/1921. The lot is located in R-10 Park Improvement ( PI ) zoning district.

The existing plans from 1922 indicate the first floor as the main auditorium and church, and lower level as Sunday school room. Since the building was constructed in 1921, it does not have a certificate of occupancy.

It is proposed to continue the use as a church , and add an accessory use of social hall, ballroom and catering at first floor and cellar , for the periods that the hall is not being used as a church . The accessory ballroom and catering meets the accessory use definition in Zoning Resolution 12-10 in that they are located in the same zoning lot as the principal use. They will remain under the same ownership of the Third Church of Christ Scientist. The use is clearly incidental and customarily found in connection with the principal use, as a catering and ballroom is substantially used for the benefit or convenience of the owners, occupants, employees, customers or visitors of the principal use. The use, therefore remains the same use group 4 church and accessory uses.

The occupancy group will also remain as F occupancy as a place of assembly and will have F-1b and F-4 occupancy. Under the old code of 1938, the occupancy of the building remains as a public building.

Based on above, there is no change in use and occupancy of the building. The work should not require a new certificate of occupancy. The building will be upgraded for ADA and handicapped access (LL 58/87), and also for exits, and fire protection equipment. The work will be filed as ALT-2 directive 14 applications. A place of assembly permit will also be obtained for both church and ballroom catering.

*OK To Accept provided a New certificate Of occupancy is obtain with a restrictive declaration and note on the [...] The accessory social Hall is To be use and operated exclusively and only by The church and for its members*

| 3 Statements and Signatures | | |
|---|---|---|
| I hereby state that the above information is correct and complete to the best of my knowledge. | Applicant Name: | MICHAEL L GOLDBLUM R.A. |
| Falsification of any statement is a misdemeanor under Section 26-124 of the Administration Code and is punishable by a fine or imprisonment, or both. | Signature: | Date: 2 20 06 |
| It is unlawful to give to a city employee or for a city employee to accept, any benefit, monetary or otherwise, either as a gratuity for properly performing the job or in exchange for special consideration. Violation is punishable by imprisonment or fine or both. | | |

Revised 6-88 AL-1

# Third Church of Christ, Scientist, of New York City

583 PARK AVENUE   NEW YORK, NY 10021-7363   (212) 838-1870
E-Mail Third ChurchOffice@Juno.com

June 2, 2006

To Whom It May Concern:

"For limited periods when the church building is not being utilized for our congregation, we have provided for various catered events which will also contribute to the church's ability to sustain itself. These functions will be operated by a highly qualified, fully insured, professional caterer who will be under contract with the Church. These ancillary functions are necessary because they will not only ensure our building will be upgraded and rehabilitated but will also allow us to be exposed to and reach out to a larger community. The functions will be restricted by the contract with the Church and will make certain that 583 Park Avenue continues to serve as our Church in New York City well into the future."

Respectfully submitted,


R. Fulton Macdonald
Chairman of the Board


Thomas G. Draper, Jr.
Vice Chairman of the Board

_ok To accept catered events under contract with the Church as complying with "Social Hall" requirement is necessary ... determination of Apr-1 10, 2006 by L Oseria      6/28/06_

## THE BUSINESS

### Introduction

Rose Group Park Avenue, LLC is a New York limited liability company formed for the purpose of leasing and operating an elegant ballroom and event space which is capable of handling over 500 people, which is located at 583 Park Avenue between 63rd and 64th Streets in New York City (the "Establishment"). The Company's management team consists of a group of individuals who have developed some of the most prestigious banquet facilities in Manhattan, including Cipriani 42nd Street and The Rainbow Room. This team currently operates Capitale, a premiere setting for fine dining and elegant events and Guastavino's, a large event venue recently reopened by the Rose Group to specialize in private functions only. The Company believes that the beauty and grandeur of the building located at 583 Park Avenue, New York, New York (the "Facility Space"), its ability to handle over 500 people, and the prestigious location on Park Avenue represents a unique business opportunity.

### Background

The Facility Space was built in 1923 and designed by the world renowned architectural firm of Delano and Aldrich, which was responsible for designing some of the most spectacular and prestigious clubhouses in New York, including The Colony, The Brook, The Union, and The Knickerbocker. The Facility Space was commissioned by the Third Church of Christ Scientist to serve as their meeting hall. While the auditorium was designed to seat 1,200 people, today there are approximately only forty members of the congregation remaining, and only a few of these members participate in the Church's Wednesday and Sunday services.

The Company has entered into a lease for the Facility Space, which permits the current congregation to use the Facility Space on a limited basis at times when the Company is not using the Facility Space. The Facility Space has not been renovated since it was constructed in 1923 and very few New Yorkers have ever been inside due to its use as a meeting space for Christian Scientists.

### Renovation of the Facility Space

Following completion of this Offering and prior to the first event at the Facility Space, the Company intends to renovate the Facility Space. We anticipate that such renovations will include the following:

- Installation of banquet kitchen in the basement;
- Upgrading the facility to satisfy the requirements of the Americans with Disabilities Act;
- Installation of new HVAC systems;
- Removal of pews from the auditorium;
- Replacement of carpet;
- Refurbishment of the basement into finished attractive pre-function space;
- Construction of a VIP/Bridal Suite in the basement;

13

- Performing cosmetic upgrades throughout the interior and exterior of the facility; and
- Installation of specialized sound, lighting and projection systems.

The Company intends to use the proceeds from the this Offering for a portion of the costs of the renovations. In addition, immediately following the completion of this Offering, the Company anticipates that it will begin marketing the Facility Space to obtain commitments for holding an event at the Facility Space, including deposits for guarantee of the Facility Space's availability. The Company will utilize these deposits to fund a portion of the costs of the renovations. However, there can be no guarantee that the Company will be successful in its marketing efforts and that there will be sufficient funds available to complete the renovations to the Facility Space.

**The Clientele**

The Company plans to target a very specific clientele for corporate, charitable, social and family events. Corporate events may include buffet-style receptions during the holidays, investor meetings, new product launches, fashion shows, press conferences, concerts, and seated dinners. Charity events may include seated dinners focused on fundraising, and social and family events may include weddings, anniversaries, bar or bat mitzvahs, and birthday parties. The Company Manager anticipates marketing the Facility Space as an architecturally significant venue with a luxurious food and service product to attract clients that want a luxurious experience at an location.

**Location**

The Establishment will be located at 583 Park Avenue in New York, New York, between 63rd and 64th Streets. This section of Park Avenue is a beautiful tree-lined block in an upscale, fashionable area of Manhattan, and is home to businesses and residents who enjoy a dynamic and sophisticated urban environment. The Facility Space is favorably situated near the northern portion of Midtown Manhattan, where many businesses are located and on the lower end of the Upper East Side, one the city's most desirable residential areas.

**Lease of Real Estate**

The Company has entered into a lease agreement (the "Lease") dated January 31, 2006, for a term of twenty years, with two successive options to extend the term of the Lease, each for an additional five year period. The term of the Lease commenced on July 3, 2006 (the "Commencement Date"). See "Risk Factors-The Company is subject to governmental regulation of the Establishment and those pertaining to holding a liquor license." Rent payable under the Lease also commenced on July 3, 2006. Based upon the Company's current financial projections, the Company's occupancy cost is expected to be within current industry standards and includes a provision requiring the payment of additional rent based upon Excess Gross Sales (as that term is specifically defined in the Lease) but generally ten percent (10%) of the amount by which Gross Sales exceeds the Gross Sales Base for the commensurate period. Gross Sales Base is the product derived by multiplying the rent payable during such period by ten.

14

Exhibit M

For the Exclusive Use of:

Copy No. _____

## ROSE GROUP PARK AVENUE, LLC

### (A New York Limited Liability Company)

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### FOR ACCREDITED INVESTORS ONLY

### $2,700,000 (27 Units)

**Each Interest is a limited liability company interest in
ROSE GROUP PARK AVENUE, LLC**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE NOT BEEN REGISTERED WITH, OR APPROVED BY, ANY STATE SECURITIES OR BLUE SKY ADMINISTRATOR OR ANY OTHER U.S. REGULATORY AUTHORITY. NO SUCH AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM . NOR IS IT INTENDED THAT ANY SUCH AUTHORITY WILL DO SO. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

THESE SECURITIES ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. AN INVESTMENT IN THE COMPANY IS ILLIQUID AND THE COMPANY'S INVESTMENTS MAY RESULT IS THE LOSS OF AN INVESTOR'S ENTIRE INVESTMENT.

ANY DISTRIBUTION OR REPRODUCTION OF ALL OR ANY PART OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, OR THE DIVULGENCE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY, IS PROHIBITED.

The date of this Confidential Private Placement Memorandum is March 30, 2007

# GENERAL INFORMATION

Rose Group Park Avenue, LLC ("Rose Group," "our Company," the "Company," "us," or "we") is a New York limited liability company formed to operate an elegant ballroom and event space capable of handling events, the great majority of which are expected to be for less than 500 people, subject to the determination of the new York City Department of Buildings and is located in New York City on Park Avenue between 63rd and 64th Streets (the "Establishment"). This is an offering (the "Offering") of $2,700,000 of limited liability company membership interests (the "Interests"), in our Company solely to investors who qualify as "accredited investors" under the Securities Act of 1933, as amended (the "Securities Act"), in a private placement exempt from registration under the Securities Act and applicable state securities laws. (This Confidential Private Placement Memorandum replaces a the Confidential Private Placement Memorandum dated September 29, 2006 (the "2006 PPM"). No Interests were sold in the Company pursuant to the 2006 PPM.) Each unit ("Unit") of Interest requires an initial capital contribution of $100,000 per Interest. We may sell fractional Units, in our sole discretion. If this offering is over-subscribed, we may, in our sole discretion, sell up to $900,000 of Interests to cover over-subscriptions (the "Over-allotment").

The Offering shall continue until the earlier of the sale of 27 Units (the "Maximum Amount") or June 29, 2007 (unless extended by the Company in its sole discretion for up to an additional 45 days). We will not sell Interests in this Offering to any person who does not demonstrate compliance with the requirements described in this Memorandum. See "Terms of the Offering." In the event that the Company receives and accepts subscriptions for the Maximum Amount, the investors in this Offering will hold twenty-seven percent (27%) of the total Interests of the Company.

In addition to the funds raised pursuant to this Offering, (i) David Starling will, at the final closing of this Offering, make a capital contribution of $100,000 to the Company, in exchange for one percent of the total Interests of the Company; (ii) Herbert Rose will make a capital contribution of at least $2,000,000 in exchange for 20% of the total Interests of the Company; and (iii) 583 Park LLC, a New York limited liability company (the "Company Manager") will make a capital contribution of $200,000 in exchange for 52% of the total Interests of the Company, if the entire offering is sold. These purchases of these Interests will not be counted toward determining whether the Maximum Amount has been reached. If less than $2,700,000 is raised in this offering, the Interests of the Managing Member will be increased by 1% for each $100,000 not sold. In addition to the funds raised in this offering, the Company intends to obtain a loan of up to an amount of $5,000,000. Accordingly, assuming the sale of 27 Units and the issuance of the promissory note in the full amount of $5,000,000, the Company will be capitalized with an aggregate of $10,000,000. In the event of the purchase of the full over-subscription, the Company will be capitalized with an aggregate of $10,900,000.

|                        | Offering Price[1] | Estimated Offering Expenses[2] | Aggregate Net Proceeds to Company |
|------------------------|-------------------|--------------------------------|-----------------------------------|
| Maximum Amount ........ | $2,700,000        | $100,000                       | $2,600,000                        |

(1)    The offering price of the Interests has been unilaterally determined by the Company. The price is not the result of arm's-length negotiations and does not necessarily reflect the value of the Interests purchased.

(2)    The Company estimates that $100,000 will be used by the Company to pay fees and expenses incurred or to be incurred in respect of the organization of the Company and the Offering, including the preparation of this Confidential Private Placement Memorandum.

THE INTERESTS OF THE COMPANY OFFERED HEREBY ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 4(2) OF THE SECURITIES ACT, REGULATION D, AND ANY APPLICABLE STATE SECURITIES LAWS.

WE MAY REJECT ANY SUBSCRIPTION FOR INTERESTS, IN WHOLE OR IN PART, IN ANY ORDER AND FOR ANY OR NO REASON, IN OUR SOLE DISCRETION. IN THE EVENT THIS OFFERING IS OVERSUBSCRIBED, WE MAY REDUCE (OR REJECT) SUBSCRIPTIONS BASED ON EACH INVESTORS PRO RATA PARTICIPATION IN THIS OFFERING OR ANY OTHER METHOD THAT WE DETERMINE.

AN INVESTMENT IN THE COMPANY IS SPECULATIVE AND ENTAILS A HIGH DEGREE OF RISK (SEE "RISK FACTORS" BEGINNING ON PAGE 13 OF THIS MEMORANDUM), INCLUDING, WITHOUT LIMITATION THAT:

(i)     THERE ARE NUMEROUS RISKS ASSOCIATED WITH THE OPERATION OF THE ESTABLISHMENT. THERE IS NO ASSURANCE THAT THE OPERATION OF THE ESTABLISHMENT WILL BE PROFITABLE.

(ii)    THERE IS NO READILY AVAILABLE MARKET FOR THE INTERESTS, NONE IS ANTICIPATED TO DEVELOP AND TRANSFER OF THE INTERESTS IS RESTRICTED.

(iii)   THERE ARE RISKS ASSOCIATED WITH OBTAINING AND MAINTAINING A LICENSE TO DISPENSE AND SELL ALCOHOLIC BEVERAGES.

(iv)    THE INVESTORS WILL HAVE A LIMITED VOICE IN THE CONDUCT OF THE COMPANY'S OPERATIONS AND MUST RELY UPON THE JUDGMENT AND ABILITY OF THE COMPANY MANAGER TO CONDUCT THE COMPANY'S BUSINESS.

YOU SHOULD NOT INVEST IN THE COMPANY UNLESS YOU ARE IN A POSITION TO LOSE THE ENTIRE AMOUNT OF YOUR INVESTMENT. EACH PROSPECTIVE INVESTOR MUST CONSULT WITH AND RELY UPON THE ADVICE OF SUCH PROSPECTIVE INVESTOR'S OWN COUNSEL AND OTHER ADVISERS WITH

RESPECT TO THE FINANCIAL, TAX AND OTHER CONSEQUENCES OF AN INVESTMENT IN THE COMPANY.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE. THIS MEMORANDUM MAY CONTAIN SUMMARIES OF VARIOUS AGREEMENTS, DOCUMENTS, STATUTES, RULINGS AND/OR REGULATIONS. THESE SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE AGREEMENTS, DOCUMENTS, STATUTES, RULINGS AND/OR REGULATIONS MENTIONED AND BY REFERENCE ALSO TO THE DEFINITIONS CONTAINED THEREIN WHICH MAY DIFFER FROM COMMON USAGE AND ALSO FROM AGREEMENT TO AGREEMENT.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE FINANCIAL, TAX OR OTHER CONSEQUENCES AS A RESULT OF AN INVESTMENT IN THE COMPANY. NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR ITS MANAGER AS LEGAL OR TAX ADVICE.

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY STATEMENT NOT CONTAINED IN THIS MEMORANDUM AND ANY INFORMATION OR STATEMENT NOT CONTAINED HEREIN CANNOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. NO PROSPECTIVE INVESTOR SHALL RELY UPON ANY WRITTEN OR ORAL STATEMENT CONCERNING AN INVESTMENT IN THE COMPANY EXCEPT AS IS CONSISTENT WITH THE TERMS AND CONDITIONS OF THIS MEMORANDUM AND THE EXHIBITS ATTACHED HERETO. IN THE EVENT OF SUCH INCONSISTENCY, IF ANY, THE TERMS AND CONDITIONS OF THIS MEMORANDUM AND THE EXHIBITS ATTACHED HERETO SHALL BE CONTROLLING AND BINDING ON THE PROSPECTIVE INVESTOR.

THIS MEMORANDUM HAS BEEN PREPARED FOR THE EXCLUSIVE USE AND BENEFIT OF THE PROSPECTIVE INVESTORS AND THEIR ADVISERS. UNDER NO CIRCUMSTANCES SHALL IT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY UNLESS (i) THE PROSPECTIVE INVESTOR TO WHOM IT IS GIVEN SATISFIES THE SUITABILITY STANDARDS STATED HEREIN AND (ii) THE PROSPECTIVE INVESTOR'S NAME AND A MEMORANDUM NUMBER ARE INSERTED BY A REPRESENTATIVE OF THE COMPANY IN THE SPACES PROVIDED ON THE COVER PAGE OF THIS MEMORANDUM. NOTWITHSTANDING THE FOREGOING, THE COMPANY RESERVES THE ABSOLUTE RIGHT TO REJECT, FOR ANY REASON OR NO REASON, ALL OR ANY PART OF ANY TENDERED SUBSCRIPTION.

**CERTAIN NOTICES UNDER STATE SECURITIES LAWS:**

**FOR NEW YORK RESIDENTS ONLY:**

THIS MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**FOR FLORIDA RESIDENTS:**

UPON ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVING INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY (AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED), A PENSION OR PROFIT SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF SECURITIES OFFERED HEREBY TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO OUR COMPANY, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE INVESTOR, WHICHEVER OCCURS LATER.

TABLE OF CONTENTS
TO
CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
OF
ROSE GROUP PARK AVENUE, LLC

Page

GENERAL INFORMATION ................................................................................ ii

OFFERING SUMMARY ................................................................................ 2

THE BUSINESS ................................................................................ 7

MANAGEMENT OF THE COMPANY ................................................................ 11

RISK FACTORS ................................................................................ 13

USE OF PROCEEDS ................................................................................ 20

CONFLICTS OF INTEREST ................................................................ 21

TERMS OF THE OFFERING ................................................................ 22

COMPANY OWNERSHIP ................................................................ 27

SUMMARY OF OPERATING AGREEMENT ............................................ 28

UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ................ 32

SUITABILITY STANDARDS FOR INVESTMENT ................................ 41

ACCESS TO INFORMATION ................................................................ 42

STATUS OF INTERESTS UNDER SECURITIES LAWS ........................ 43

LEGAL COUNSEL ................................................................ 44

EXHIBIT A - FORM OF OPERATING AGREEMENT
EXHIBIT B - FORM OF SUBSCRIPTION DOCUMENTS

# OFFERING SUMMARY

The following summary describes certain provisions of this Memorandum. The summary does not purport to be complete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Memorandum and its exhibits. This Memorandum describes numerous aspects of the Company and the Establishment that we believe are material to prospective investors; however, the statements herein are only summaries of the Company and the Establishment, and are qualified in their entirety by the Exhibits attached hereto. Each prospective investor should carefully read and discuss this Memorandum and its Exhibits with their respective attorney and personal business and tax advisers.

An investment in the Company is suitable only for an investor who is sufficiently familiar with investments of this type to enable such investor to evaluate the financial merits and risks involved in investing in the Company. The Interests will be sold only to "accredited investors," as defined in Rule 501 of Regulation D under the Securities Act, who satisfy the Company's suitability standards. See "Terms of the Offering."

|  |  |  | Capital Contributions |
|---|---|---|---|
| **Offering Size:** | Maximum Amount: | 27 Units | $2,700,000 |
| **The Offering:** | Over-allotment (if any) | 9 Units | $ 900,000 |

| Description of the Interests: | The Company is offering a maximum of $2,700,000 of limited liability company membership interests in the Company (the "Interests"), for an initial capital contribution of $100,000 per Interests (each, a "Unit"). In the event this Offering is over-subscribed, the Company may sell up to 9 Units, for an aggregate purchase price of $900,000. In the event the Company receives and accepts subscriptions for the Maximum Amount, the investors in this offering will hold twenty-seven percent (27%) of the total Interests of our Company. The Company may sell fractional Units, in its sole discretion. The Offering shall continue until the earlier of when the Maximum Amount has been sold, or June 29, 2007 (unless extended by the Company in its sole discretion for an additional 45 days). |
|---|---|

| | |
|---|---|
| Additional capital contributions to the Company: | In addition to the funds raised pursuant to this Offering, (i) David Starling will, at the time of the first closing of the Offering, make a capital contribution of $100,000 to the Company in exchange for one percent of the total Interests in the Company and (ii) Herbert Rose will make a capital contribution of at least $2,000,000, in exchange for 20% of the total Interests in the Company. The Company Manager will make a capital contribution of $200,000 plus render services to the Company in exchange for 52% of the Interests in the Company, assuming the Maximum Amount is sold. The Company will issue a promissory note in the aggregate principal amount of up to $5,000,000. Accordingly, assuming the sale of $2,700,000 of Interests hereunder, the Company will be capitalized with an aggregate of $10,000,000. |
| Use of Proceeds: | Upon completion of this Offering, the Company will receive gross proceeds of approximately $2,700,000 (assuming the sale of the Maximum Amount), in addition to the aggregate $2,300,000 capital contributions by Herbert Rose, the Company Manager and David Starling. |
| | It is estimated that the expenses of the Offering will be approximately $100,000. We intend to use the net proceeds from Offering principally for construction and equipment costs, and general operating expenses. |
| The Company: | Rose Group Park Avenue, LLC is a New York limited liability company formed to operate an elegant ballroom and event space capable of handling events, the great majority of which are expected to be for less than 500 people, and is located in New York City on Park Avenue between 63rd and 64th Streets (the "Establishment"). The Company's principal office will be located at 583 Park Avenue, New York, New York 10021. |
| The Business of the Company: | The business of the Company is to operate the Establishment. The Company leases space at 583 Park Avenue, New York, New York (the "Facility Space"), and is subject to the terms of real estate lease agreement. See "The Business – Lease of Facility Space." The Lease includes a provision requiring the payment of additional rent based upon Excess Gross Sales (as that term is specifically defined in the Lease) but generally ten percent (10%) of the amount by which Gross Sales exceeds the Gross Sales Base for the commensurate period. Gross Sales Base is the product derived by multiplying the rent payable during such period by ten. |
| Governance of the Company: | The Company is governed by an Operating Agreement, a copy of which is attached hereto as Exhibit A, to which all investors in this |

Offering will become a party.

| | |
|---|---|
| **Company Manager:** | The Manager of the Company is 583 Park LLC, a New York limited liability company, (the "Company Manager") the principals of which are Messrs. Louis Rose, John Rose, Berton Rose and David Starling. The manager of the Company Manager is Mr. Louis Rose. |
| **Operation of the Establishment:** | The Company Manager will manage the day-to-day affairs of the Establishment. |
| **Management Fees:** | The Company Manager will be entitled to receive 5% of the gross sales of the Establishment (the "Management Fee"). The Management Fee will be payable monthly, out of the gross sales, on the first day of each month, in arrears. Gross sales is defined as all receipts from the sale of food, alcoholic beverages and services of every kind and nature, except sales and equivalent taxes collected on sales and paid to the appropriate taxing authorities, rebates and gratuities. |
| **Distributions to Members:** | The Company's "available cash flow" (generally, the Company's total revenues less operating and other expenses including debt service and the Management Fee) shall be distributed to the Members at such time(s) as determined by the Manager in its sole and absolute discretion (but no less frequently than annually), as follows and in the following order of priority: (a) first, in proportion to, and in payment of, the Members' respective Preferred Return (as defined herein); (b) second, to the Members, in proportion to their respective unreturned capital contributions, until the Members shall have received a return of all of their capital contributions; and (c) third, as to all remaining available cash flow, to the Members pro rata in accordance with their respective percentage ownership of the Interests. (See "Summary of Operating Agreement—Distributions".) "Preferred Return" will mean an amount such that each Member shall have received cumulative distributions in an amount equal to each Member having realized a 10% per annum pre-tax cumulative return (compounded annually) on his, her or its respective Capital Contributions. |
| **Option to Purchase Interests:** | At any time, the Managing Member shall have the option to purchase all, and not less than all, of the Members' interest for cash in an amount equal to the excess of (i) three times the respective Member's Capital Contribution over (ii) any repayments of the Capital Contribution previously made to such Member. |
| **Allocation of Taxable Income and Loss:** | In general, under the Operating Agreement, allocations to the Members of Company profits, income and gain are intended to "track", as closely as possible, the manner and priority of |

4

distributions of the Company's "available cash flow". Notwithstanding, it is possible that for any taxable year, the amount of Company profits, income and gain allocated to an Investor (and the Investor's federal income tax liability resulting from such profits, income and gain) may exceed the amount of distributions received by the Investor for such taxable year.

Company losses will be allocated, in general: (i) first, to the Members until the aggregate amount of losses so allocated to the Members shall equal the aggregate net amount of Company profits, income and gain (after taking into account previous allocations of losses, as well as profits, income and gain) previously allocated to the Members ("Loss Offset Allocations"); (ii) then, to the Members in proportion to their respective positive capital account balances, until the capital account balances of all the Members equals zero; and (iii) then, to the Members, pro rata in proportion to their respective percentage ownership of the Interests.

**Limited Liability:**

Members will not be liable for any of the debts of the Company and will not be required to contribute any capital other than their capital contribution or lend any funds to the Company. Members will be liable to the Company for the amount of any taxes imposed upon or withheld by the Company in respect of such Member's share of Company income. Capital contributions in excess of initial capital contributions may be required only if all of the Members approve such requirement and determine that such additional capital contributions are necessary or desirable to accomplish the purposes and objectives of the Company.

**Risk Factors:**

An investment in the Interests is speculative and involves a high degree of risk. You should not invest in the Interests unless you are in a position to lose your entire investment. See "Risk Factors" beginning on page 13 of this Memorandum.

**Resale Restrictions:**

We are making this Offering of Interests in reliance on exemptions from the registration requirements of the Securities Act and applicable state securities laws. Accordingly, the Interests will be "restricted securities" as defined in the Securities Act and, therefore, subject to significant restriction on resale. You may not transfer the Interests except in a transaction registered under the Securities Act and applicable state securities laws or unless you obtain a legal opinion reasonably acceptable to us that your transfer is exempt from such registration. Each certificate of Interests will be issued bearing a legend evidencing such restriction.

**Investor Requirements:**

We will sell an Interest in this offering only to investors who qualify as "accredited investors" under the Securities Act. You will be

required to make certain representations as to your status as an accredited investor and certain other matters in order to purchase an Interest. We may reject any subscription for an Interest, in whole or in part, in any order and for any or no reason, in our sole discretion. In the event that this offering is over-subscribed, we may reduce (or reject) the subscriptions based on each investor's pro rata participation in this offering or in any other manner we may determine.

**How to Subscribe:**   Please see "Terms of the Offering."

# THE BUSINESS

## Introduction

Rose Group Park Avenue, LLC is a New York limited liability company formed for the purpose of leasing and operating an elegant ballroom and event space which, subject to the determination of the new York City Department of Buildings, is capable of handling events, the great majority of which are expected to be for less than 500 people and is located at 583 Park Avenue between 63rd and 64th Streets in New York City (the "Establishment"). The Company's management team consists of a group of individuals who have established some of the most prestigious banquet facilities in Manhattan, including Cipriani 42nd Street and The Rainbow Room. This team previously operated Capitale, a premiere setting for fine dining and elegant events and is currently operating Guastavino's, a large event venue recently reopened by the Rose Group to specialize in private functions only. The Company believes that the beauty and location of the building located at 583 Park Avenue, New York, New York (the "Facility Space"), and the prestigious location on Park Avenue represents a unique business opportunity.

## Background

The Facility Space was built in 1923 and designed by the world renowned architectural firm of Delano and Aldrich, which was responsible for designing some of the most spectacular and prestigious clubhouses in New York, including The Colony, The Brook, The Union, and The Knickerbocker. The Facility Space was commissioned by the Third Church of Christ Scientist to serve as their meeting hall.

The Company has entered into a lease for the Facility Space, which permits the current congregation to continue to use the building as it has for the past 80+ years. The Facility Space has not been renovated since it was constructed in 1923 and very few New Yorkers have ever been inside due to its use as a meeting space for Christian Scientists. At all times, other than on the limited occasions when the Facility Space is being utilized by the Company for functions, the Facility Space will be set up for and used by the church for services and related activities. The Company has acknowledged that it must respect the privacy of the church during all church related activities and the Company has agreed that it will not enter upon any portion of the Facility Space during the hours in which the church is conducting services or other church related activities.

## Renovation of the Facility Space

Following completion of this Offering and prior to the first event at the Facility Space, the Company intends to renovate the Facility Space. We anticipate that such renovations will include the following:

- Installation of banquet kitchen in the basement;
- Upgrading the facility to satisfy the requirements of the Americans with Disabilities Act;
- Installation of new HVAC systems;

7

- Removal of pews from the auditorium;
- Replacement of carpet;
- Refurbishment of the basement into finished attractive space;
- Construction of a VIP/Bridal Suite in the basement;
- Performing cosmetic upgrades throughout the interior and exterior of the facility; and
- Installation of specialized sound, lighting and projection systems.

The Company intends to use the proceeds from the this Offering for a portion of the costs of the renovations. In addition, the Company has begun marketing the Facility Space to obtain commitments for holding an event at the Facility Space, including accepting deposits for guarantee of the Facility Space's availability. The Company will utilize these deposits to fund a portion of the costs of the renovations. However, there can be no guarantee that the Company will be successful in its marketing efforts and that there will be sufficient funds available to complete the renovations to the Facility Space.

## The Clientele

The Company plans to target a very specific clientele for family and social events, as well as charitable and corporate events. The Company Manager anticipates marketing the Facility Space as an architecturally significant venue with a luxurious food and service product to attract clients that want a luxurious experience at a conveniently located venue where it is anticipated that at least 90% of the guests and clients will live in the surrounding neighborhood. Family and social events may include weddings, anniversaries, bar or bat mitzvahs, and birthday parties. Charity events may include seated dinners focused on fundraising. Corporate events may include buffet-style receptions during the holidays, investor meetings, new product launches, fashion shows, press conferences, concerts, and seated dinners.

## Location

The Establishment will be located at 583 Park Avenue in New York, New York, between 63rd and 64th Streets. This section of Park Avenue is a beautiful tree-lined block in an upscale, fashionable area of Manhattan, and is home to businesses and residents who enjoy a dynamic and sophisticated urban environment. The Facility Space is favorably situated near the northern portion of Midtown Manhattan, where many businesses are located and on the lower end of the Upper East Side.

## Lease of Real Estate

The Company has entered into a lease agreement (the "Lease") dated January 31, 2006, for a term of twenty years, with two successive options to extend the term of the Lease, each for an additional five year period. The term of the Lease commenced on July 3, 2006 (the "Commencement Date"). See "Risk Factors-The ability of the Company to operate events on the premises in connection with its business could be impaired." Rent payable under the Lease also commenced on July 3, 2006. Based upon the Company's current financial projections, the Company's occupancy cost is expected to be within current industry standards and includes a provision requiring the payment of additional rent based upon Excess Gross Sales (as that term is

specifically defined in the Lease) but generally ten percent (10%) of the amount by which Gross Sales exceeds the Gross Sales Base for the commensurate period. Gross Sales Base is the product derived by multiplying the rent payable during such period by ten.

## Competition

In Manhattan there are several types of event spaces that will compete directly with the Establishment, including hotels, restaurants with private rooms, museums or public spaces and independent stand alone venues. Notwithstanding such competition, the Company believes that it has a number of significant competitive advantages, including the following:

- Unlike many of its competitors, the Facility Space will have a separate reception space large enough for the number of guests that the ballroom can accommodate;
- The Facility Space will be one of the few properties in and around its location that can accommodate seated dinners with 600 guests, subject to the determination of the New York City Department of Buildings;
- The Company Manager has considerable experience in the catering and events industry, with an established track record of excellence, including developing 55 Wall Street and 110 East 42nd Street for the Cipriani organization;
- The Facility Space is located near Midtown Manhattan on a beautiful tree-lined block;
- The Facility Space is a unique property;
- The Company Manager has exceptional customer service and client relationships; and
- The Establishment will be new to the banquet industry.

Below is a list of potential competitors. The competitors are listed in order of competitiveness within the Establishment's target market:

Direct Competition:

| Property: | Venue Size (estimated seated dinner capacity): |
|---|---|
| 1. Daniel Restaurant | 200 Guests |
| 2. Union Club | 250 Guests |
| 3. Cosmopolitan Club | 250 Guests |
| 4. The Colony Club | 300 Guests |
| 5. Metropolitan Club | 300 Guests |
| 6. The Essex House | 300 Guests |
| 7. The Mandarin Hotel | 300 Guests |
| 8. W Hotel | 300 Guests |
| 9. St. Regis Hotel | 300 Guests |
| 10. University Club | 300 Guests |
| 11. Union League Club | 300 Guests |
| 12. Century Club | 300 Guests |
| 13. Cipriani Toy Building | 400 Guests |

| 14. | Museum City of New York | 400 Guests |
| 15. | Gustavino's | 500 Guests |
| 16. | Capitale | 500 Guests |
| 17. | The Pierre Hotel | 600 Guests |
| 18. | Gotham Hall | 600 Guests |
| 19. | Cipriani 42nd Street | 700 Guests |

# MANAGEMENT OF THE COMPANY

## Company Manager

The Company is a manager-managed limited liability company. The Manager of the Company will be 583 Park LLC, a New York limited liability company (the "Company Manager"). The Company Manager is also a manager-managed limited liability company. The following are current members of the Company Manager:

*Louis Rose*, 35, *Managing Member of the Company Manager*. Mr. Rose is an event industry pioneer with more than 10 years of executive management experience. From 1997 to 2004, he served as Managing Director of Catering of Cipriani Hospitality Company. Mr. Rose is a member of The Rose Group, a group of partners which has developed and currently operate some of the most prestigious banquet facilities in Manhattan. Mr. Rose has extensive experience in catering in the New York market and has been involved in the conversions and operations of several Rose Group projects. He developed 55 Wall Street and 110 East 42nd Street for the Cipriani organization, both of which were landmarked former bank buildings and highly profitable.

*David Starling*, 35, *Member of the Company Manager*. David Starling has nearly 10 years of experience as operations manager of prestigious event spaces. He has worked with Louis Rose since 1998, when he joined the Rose Group to manage catering operations at 55 Wall Street. Mr. Starling helped Mr. Rose oversee the development of Cipriani 42nd Street, focusing on the facility re-design and operational logistics. Since the opening of Cipriani 42nd Street, Mr. Starling has worked with Mr. Rose to seek out and develop new properties, as well as reinvigorate existing properties, such as Rainbow Room, Guastavino's and Capitale, transforming them into successful banquet facilities.

The members of the Company Manager currently, and in the future will, operate, manage and promote other companies and ballroom and event spaces in New York, New York that are, or may be, similar to the Establishment, regardless of location. See "Conflicts of Interest." The individuals referred to above currently, and in the future would likely, serve in the same capacities at the other ballroom and event spaces operated, managed or promoted by them.

## Responsibilities of the Company Manager

The Company Manager will endeavor, on behalf of and at the sole expense of the Company, to do all things and take all actions reasonable and appropriate for the operation of the Establishment including, without limitation, recruiting, hiring and paying all required personnel, purchasing goods and contracting for services, establishing menus, maintaining the premises, establishing an accounting system and taking such other actions as are necessary and appropriate in connection with the operation of the Establishment.

11

**Management Fee**

The Company Manager will be paid a Management Fee in an amount equal to five percent (5%) of the monthly gross sales of the Establishment. See "Offering Summary." This amount will be payable monthly, out of the gross sales, on the first day of each month, in arrears. The Management Fee will be due and payable regardless of whether the Establishment is operating at a profit and whether or not the members of the Company have received distributions of any kind. This payment is in addition to cash flow distributions to which the Company Manager will be entitled as an owner of a membership interest in the Company.

Exhibit N

## SECOND AMENDMENT TO LEASE

This Second Amendment to Lease (this "Amendment") is made as of March 27, 2007 by and between Rose Group Park Avenue LLC ("Tenant") and Third Church Christ, Scientist, of New York City ("Landlord").

Whereas, Landlord and Tenant entered into that certain Final Agreement of Lease dated as of January 11, 2006, a certain Commencement Date Agreement dated July 3, 2006 and a certain First Lease Amendment Agreement dated as of September 15, 2006 (such lease, as amended, hereinafter referred to as the "Lease"), pursuant to which Landlord demised to Tenant premises known as 583 Park Avenue, New York, New York (such premises, as more particularly described in the Lease, hereinafter referred to as the "Premises").

Whereas, Tenant has heretofore has expended approximately $2,500,000.00 in connection with improvements made to the Premises in order to prepare the Premises for the conduct of Tenant's business therein for the permitted use under the Lease ("Initial Expenditures");

Whereas, Tenant anticipates spending an additional approximately $5,000,000 to make further improvements to the Premises in order to prepare the Premises for the conduct of Tenant's business therein for the permitted use under the Lease ("Additional Expenditures"); and

Whereas, because of zoning and land use restrictions affecting the Premises and beyond the control of Landlord and Tenant, Tenant may be unable to use the Premises for the permitted use as set forth in the Lease and may be compelled to discontinue using the Premises for the permitted use under the Lease (such date of Tenant's discontinuing the permitted use of the Premises referred to herein as the "Discontinuance Date"), and Landlord and Tenant wish to set forth the rights of the respective parties in such event.

NY1 26453971.4 / 63739-000009

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms. All capitalized terms used but not defined in this Amendment shall be deemed to have the meanings ascribed to them in the Lease.

2.    Church Functions. Tenant shall provide, at cost, catering for up to twenty (20) functions during each Lease Year related to Church activity. Church functions in excess of twenty (20) in any Lease Year and functions on behalf of Church members shall be provided by Tenant at ten percent (10%) discount off Tenant's standard pricing.

3.    Tenant's Inability to Use Premises for Permitted Use. Landlord and Tenant acknowledge and agree that, because of restrictions under the New York City Zoning Resolution and other governmental regulations and requirements, Tenant may not be able to use the Premises for the permitted use under this Lease for reasons beyond the control of both Landlord and Tenant. If, notwithstanding commercially reasonable efforts exercised by both Landlord and Tenant, including such subletting as may be appropriate, Tenant is unable to use the Premises for the permitted use under the Lease, then:

(a)    Landlord shall use its best efforts to make a disposition of the Premises, mutually acceptable to Landlord and Tenant, so as to generate sufficient proceeds to pay to Tenant the Additional Expenses, together with interest as set forth in subparagraph (i) below. If Landlord and Tenant shall be unable to agree upon such disposition, then Landlord shall use its best efforts to sell the Premises in an arms-length transaction at a purchase price to be paid in cash upon closing (the proceeds derived from either a disposition or sale of the Premises hereinafter referred to as the "Proceeds"). Landlord shall at all times keep Tenant informed of its

negotiations with respect thereto and of any agreements made by Landlord in connection with the disposition or sale of the Premises and shall deliver to Tenant, within two business days of the execution and delivery thereof, a true and correct copy of any executed written agreement entered into by Landlord with respect to the Premises. Landlord and Tenant hereby agree that the Proceeds, net of Landlord's actual costs and expenses incurred in the disposition or sale of the Premises for brokerage commissions, New York City and New York State real estate transfer taxes, if any, and reasonable attorneys' fees, shall be disbursed immediately upon receipt, as follows:

(i)    First, to Tenant, in reimbursement of Tenant for its Additional Expenditures, the amount of up to $5,000,000;

(ii)    Next, to Landlord and Tenant in equal amounts until Tenant has been reimbursed in full for the Initial Expenditures plus fifty (50%) percent of all costs incurred by tenant in connection with the 74-711 application to the New York City Landmarks Commission (the "74-711 Application").

(iii)    Next, to Landlord, up to $10,000,000;

(iv)    Next, to Tenant, an amount equal to interest on the Additional Expenditures and the Initial Expenditures for the period commencing on the Discontinuance Date through and including the date upon which Tenant receives payment in full of the Additional Expenditures and Initial Expenditures, such interest to be calculated upon the rate paid by Tenant to its lender(s); and

(v)    Finally, the balance of the net Proceeds, if any, to Landlord.

(b)    If and to the extent that Tenant has realized any net profits from the use of the Premises as a catering facility prior to the Discontinuance Date, as determined by Tenant's

certified public accountant in accordance with generally accepted accounting principles, then such amounts, if any, shall be deducted from the payments to which Tenant is entitled under the provisions of Section 3(a)(i) of this Amendment.

(c)    Provided that Landlord has fully and faithfully complied with its obligations and undertakings as set forth in this Amendment, Article 36 shall not apply to Landlord's sale of the Premises pursuant to the provisions of this Amendment.

(d)    Upon the sale of the Premises in accordance with the terms and conditions set forth in this Amendment, the Lease shall be terminated and neither Landlord nor Tenant shall have any further rights or obligations thereunder except for those rights and obligations that are expressly set forth in the Lease to survive termination. All of the provisions set forth in this Amendment shall survive termination of the Lease.

(e)    Tenant's right to receive the payments due pursuant to Section 3(a) of this Amendment shall be conditioned upon Tenant's completing all work required to be performed by Tenant under the Lease and Tenant's prosecuting the 74-711 Application with the appropriate municipal authorities through final appeal.

4.    <u>Ratification of Lease.</u>   Except as expressly modified herein, the parties hereto affirm that the Lease is in full force and effect, and, as modified hereby, the Lease is hereby ratified and confirmed in all respects.

5.    <u>Standards.</u>   Landlord and Tenant shall negotiate in good faith to establish standards concerning sound, light levels, traffic control, signage, external marketing, communications, number of events and number of guests at such events. Until such time as the standards have been established and set forth in a written form to be agreed upon by Landlord and Tenant, Tenant agrees to consult with Landlord in advance concerning the anticipated sound

and light levels, signage, advertising, traffic control plans and number of guests for each planned event. Tenant shall also consult with Landlord in connection with Tenant's marketing to the public and advertising programs.

6.    Governing Law.  This Amendment shall be governed by, construed in accordance with and enforced under the laws of the State of New York, without regard to the principles of conflicts of law of such state.

7.    Binding Effect.  The covenants, agreements, terms, provisions and conditions contained in this Amendment shall bind and inure to the benefit of the parties hereto and their respective heirs, successors, legal representatives and assigns.

8.    Counterparts.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall constitute one and the same instrument.

9.    Authority.  Each individual executing this Amendment represents and warrants that he/she is duly authorized to execute and deliver this Amendment of behalf of Tenant or Landlord, as the case may be, and that this Amendment is binding upon said party in accordance with the terms and conditions contained herein.

10.    Broker.  Tenant and Landlord each represents to the other that no broker was instrumental in consummating this Amendment and that it had no conversations or prior negotiations with any broker concerning this Amendment.  Tenant and Landlord each hereby indemnifies and agrees to hold the other party harmless from and against any loss, cost, damage, expense, claim or liability (including, without limitation, attorneys' fees, disbursements and court costs suffered or paid directly or indirectly by the indemnified party in any action or

proceeding between Landlord and Tenant or between the indemnified party and any third party or otherwise) arising out of any inaccuracy or alleged inaccuracy of the above representation.

In witness whereof, the parties have executed this Amendment as of the date first above written.

Landlord:

Third Church of Christ, Scientist, of New York City

By: _____

Name: _____

Title: _____

Tenant:

Rose Group Park Avenue LLC,

By:    583 Park LLC, Manager

By: _____

Louis Rose, Managing Member

6

cc:    Edmond McQuaid

Exhibit O

*NYC Zoning Resolution*
*§ 12-10*

Hotel, apartment (8/17/90)

An "apartment hotel" is a #building# or part of a #building# in which:

(a)  the #dwelling units# or #rooming units# are used primarily for permanent occupancy;

(b)  one or more common entrances serve all such units; and

(c)  one or more of the following services are provided: housekeeping, telephone, desk, or bellhop service, or the furnishing or laundering of linens.

Restaurants, cocktail lounges, or indoor swimming pools are permitted #accessory uses#, provided that in #Residence Districts#, such facilities shall be accessible only through the lobby and there shall be no #signs# except as permitted by the applicable district regulations.  Public banquet halls, ballrooms, or meeting rooms are not permitted #accessory uses#.

Hotel, transient (8/17/90)

A "transient hotel" is a #building# or part of a #building# in which:

(a)  living or sleeping accommodations are used primarily for transient occupancy, and may be rented on a daily basis;

(b)  one or more common entrances serve all such living or sleeping units; and

(c)  twenty-four hour desk service is provided, in addition to one or more of the following services: housekeeping, telephone, or bellhop service, or the furnishing or laundering of linens.

Permitted #accessory uses# include restaurants, cocktail lounges, public banquet halls, ballrooms, or meeting rooms.

Illuminated sign – see Sign, illuminated

Incidental alteration - see Alteration, incidental

Inclusionary Housing designated area (7/25/07)

Exhibit P



Reclaimed wood from Maine was used to create the cabinetry that lines the Archive Room at Park Avenue, lending rustic warmth to this contemporary space. The cabinets showcase the most artful pieces from the restaurant's seasonal collections for your guests to enjoy. Options for an event in the Archive Room include a seated lunch or dinner, a cocktail reception, or both with cocktails prior to the meal in the handsome anteroom, which is equipped with a mobile bar.

Chef Craig Koketsu proposes a three-course menu in the Archive Room, which is offered with or without bar service. When you choose hors d'oeuvres for your event, Park Avenue will add two seasonal items to augment your selections and the festivity of the occasion.

CAPACITY: UP TO 75 GUESTS SEATED, 90 RECEPTION

Park Avenue Spring



The Townhouse is adjacent to Park Avenue, but it has an identity all its own. Designed to be a pied à terre on the Upper East Side, this luxurious space can be yours for any occasion. With rich chocolate and pristine white furnishings, the stylish surroundings are polished and sophisticated, yet comfortable and welcoming. Sit back and play host while the talented service team attends to every detail of the event. With a private entry, front hall closet, dining room, and restroom, you and your guests can enjoy an evening at "home," complete with a talented chef to create outstanding seasonal menus to your tastes.

At the close of your evening in the Townhouse, we welcome you to raid our liquor cabinet for an after-dinner drink, offered with our compliments for your guests. The shelves showcase milky white porcelain, made by Brooklyn artisans. A nightcap in the Townhouse offers a suitably refined conclusion to a magnificent party on the Upper East Side.

CAPACITY: UP TO 50 GUESTS, SEATED, 65 RECEPTION

Park Avenue Spring



Walk through the lively Park Avenue kitchen to the Kitchen Table, a temperature controlled, glassed-in room that allows a front-row seat to the action behind the stoves. Enjoy a four-course lunch or a seven-course dinner for up to ten guests, while watching some of the city's best culinary talents creating dishes for the bustling restaurant.

The chef's menus for the Kitchen Table are comprised of both composed dishes and those served family style for the table to enjoy. Items will vary day-to-day, as chef Craig Koketsu will personally oversee the creation of your menu from the day's best produce, meat, and seafood from the markets; he or his capable sous chefs will supervise your dining experience and interact with you and your guests to ensure a memorable dining experience.

CAPACITY: UP TO 10 GUESTS SEATED

# New York City Map Portal

Sign up for Email Updates

**Selected Site:**
**575 PARK AVENUE**

Zoom In | Zoom Out | Select | Lot Info

NORTH
PARK AV
E 61 ST
E 62 ST
LEXINGTON AV
SOUTH

575 PARK AVENUE, NEW YORK

**Borough:** MANHATTAN **Block:** 1397 **Lot:** 69
**Police Precinct:** 19
**Address:** 575 PARK AVENUE, NEW YORK, 10021
**Owner:** BEEKMAN TENANTS CORP
**Lot Area:** 14219
**Lot Frontage:** 75.25 **Lot Depth:** 150
**Number of Buildings:** 1 **Year Built:** 1927
**Number of Floors:** 16 **Bldg Gross Area:** 2?28?
**Flr Area Ratio:** **Max Allow Flr Area Ratio:** 10
**Residential Units:** 129 **Total # of Units:** 131
**Land Use:** 03
**Zoning:** R10, R8B **Special Dist:** PI, LH-1
**Commercial Overlay:** N/A **Zoning Map #:** 08C

Dept. of City Planning, PLUTO 05D © 2005

| Visible | Legend Name |
|---|---|
| ☐ | Cultural Center |
| ☐ | Library |
| ☐ | School |
| ☐ | University |
| ☐ | Hospital |
| ☐ | Police |
| ☐ | Fire |
| ☐ | Rec. Center |
| ☐ | Senior Center |
| ☐ | Post Office |
| ☐ | Day Care |
| ☐ | Subway |
| ☐ | After School |
| ☐ | Headstart |
| ☐ | Wi-Fi Hotspot |

**NEW MAP SEARCH**
- Enter New Address

**SITE INFORMATION**
- New York CityMap
- My Neighborhood Statistics
- School & Zone Finder
- NYC Census FactFinder
- NYC Address Translator
- NYC Health Profile
- Community District Profile
- Sanitation Schedule
- Building Information System
- Parks & Recreation
- Elections Poll Site Locator

**ADD'L INFORMATION**
For these links you may have to re-enter an address
- OEM Hurricane Evacuation
- Automated City Register Information System
- HPD Violation and Building Information Database
- DDC Project Browser
- Lower Manhattan Transportation Modes
- Lower Manhattan Virtual Tour

**Elected Officials**
City State Federal

**Mayor:**
Michael R. Bloomberg
**City Council:** (District 4)
Daniel R. Garodnick
**Borough President:**
Scott M. Stringer
**Public Advocate:**
Betsy Gotbaum
**City Comptroller:**
William C. Thompson

Copyright 2004 The City of New York

Contact Us | FAQs | Privacy Statement | Site Map

Exhibit Q

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

VICTOR A. KOVNER
DIRECT (212) 489-8230
victorkovner@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL  (212) 489-8230
FAX  (212) 489-8340
www.dwt.com

February 22, 2008

**By Hand**

Hon. Deborah A. Batts
United States District Judge
United States District Court for the
  Southern District of New York
500 Pearl Street
New York, New York  10007

Re:    *Third Church of Christ, Scientist v. City of New York, et al.;*
       07 CV 10962 (DAB)

Dear Judge Batts:

This firm represents plaintiff Third Church of Christ, Scientist in this matter. Enclosed please find a courtesy copy of the Reply Memorandum of Law and accompanying Reply Declarations of Jay Segal and Thomas G. Draper, Jr. with attached exhibits, all in further support of the Church's application for a preliminary injunction. I also write to request that the Court schedule a conference, as Your Honor suggested when we argued the application for the Temporary Restraining Order on December 3, 2007. (For the Court's convenience, a transcript of that argument is also enclosed.) The purpose of the conference would be to discuss the discovery that plaintiff wishes to conduct prior to a hearing or final briefing on the application for an injunction.

As Your Honor may recall, by my letter of December 6, 2007 plaintiff had sought permission to conduct non-party discovery prior to the submission of opposition and reply papers on the motion. Defendants, by Ms. Brennan's letter of the same date, opposed plaintiff's request. The Court granted the City's request to stay discovery until after this phase of briefing was concluded. Plaintiff continues to believe that limited discovery of the City, as well as of non-parties, would help to develop the factual record.

We hope that defendants will agree that discovery is appropriate, particularly as it appears that, notwithstanding the fact that defendants successfully opposed plaintiff's request to conduct discovery prior to the submission of its reply papers, the City conducted informal

Hon. Deborah A. Batts
February 22, 2008
Page 2

discovery and obtained declarations from several non-parties that were attached to its opposition papers. By contrast, plaintiff has limited itself to publicly available information. Given this circumstance, and the fact that the Court and the parties both acknowledged in December that discovery would be appropriate here, plaintiff respectfully requests a conference to discuss the parameters of such discovery.

By way of a preview, plaintiff believes that the pre-hearing discovery could be concluded in 90-120 days, and would include requests for documents and depositions from several religious and non-religious institutions that we believe conduct similar catered events to those held at the Church, as well as document requests and depositions of officials of the City who may have knowledge relevant to the Church's claims that it has been unfairly singled out as a result of lobbying by certain of its Park Avenue neighbors who have opposed its efforts to sustain its religious activities by permitting accessory catered events at the Church.

Thank you for your consideration.

Respectfully submitted,

Victor A. Kovner

cc:    Ave Maria Brennan, Esq. (by email)

Third Church Transcript of TRO hearing

1

7C38THIC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  THIRD CHURCH OF CHRIST, SCIENTIST
3  OF NEW YORK CITY,
4
4                    Plaintiff,
5
5       v.                              07 Cv. 10960 (DAB)
6
6  THE CITY OF NEW YORK AND PATRICIA
7  J. LANCASTER, in her Official
7  Capacity as Commissioner of the
8  New York City Department of
8  Buildings,
9
9                    Defendants.
10
10 ------------------------------x
11
11                                 December 3, 2007
12                                 4:00 p.m.
12
13 Before:
13
14             HON. DEBORAH A. BATTS
14
15                              District Judge
15
16             APPEARANCES
16
17 DAVIS WRIGHT TREMAINE LLP
17      Attorneys for Plaintiff
18 BY:  VICTOR A. KOVNER
18      JOHN R. CUTI
19      MONICA PA
19
20 MICHAEL A. CARDOZO
20      Corporation Counsel of the City of New York
21 BY:  AVE MARIA BRENNAN
21      Assistant Corporation Counsel
22
22
23
23
24
24
25
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

7C38THIC
1       (Case called)
2       THE COURT:  Are the plaintiffs ready?
3       MR. KOVNER:  We are, your Honor.
4       THE COURT:  Mr. Kovner, how nice to see you.
5       MR. KOVNER:  Nice to see you.
6       THE COURT:  With you are John Cuti and Monica Pa.
7  Good afternoon to you.

Page 1

Third Church Transcript of TRO hearing

8      And all by herself in the back is Ave Maria Brennan.
9   Good afternoon to you.
10      Who is sitting in the first row.
11      MS. DE FEO:  My name is Sandra DeFeo.  I am with the
12   firm Kurzman Karelsen & Frank.  We represent some neighboring
13   property owners.
14      THE COURT:  Do you want to come up?
15      I have not had an opportunity, obviously, to review
16   the papers in any depth, so I think that the easiest thing for
17   us to do is to give the plaintiffs an opportunity to present
18   their case to me, and then have a response from Ms. Brennan and
19   also -- what is your name?
20      MS. DE FEO:  Sandra DeFeo.  I am really here just to
21   listen, your Honor.
22      THE COURT:  Mr. Kovner, are you going to help me out
23   here?
24      MR. KOVNER:  I am, your Honor.  I may ask my partner,
25   John Cuti, to give me a hand as well.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

7C38THIC
1      First of all, we greatly appreciate the opportunity to
2   come before you on surely short notice.
3      I represent the Third Church of Christ Scientists of
4   New York City, whose home is located at 63rd and Park, in a
5   magnificent building that was built almost 100 years ago, and
6   from which they conduct their services and conduct actually
7   some central administrative services for other churches of
8   Christ Scientist elsewhere within New York City.
9      I will explain the theories of our claim.  It is, as
10   you may have seen briefly, an RLUIPA claim and an equal
11   protection claim.  Let me give you briefly the background.
12      The church in 2006, facing extraordinary financial
13   pressures because its building was collapsing, its roof was no
14   longer secure, it needed to be brought up to code in a number
15   of respects, it needed to become accessible to the disabled,
16   and it had experienced great wear and tear, and as a result,
17   its congregation had shrunk from more than a thousand in the
18   1950s, as I remember it flourishing in my childhood, to a much
19   smaller congregation that was struggling to find the money to
20   keep their facility going, and they sought a variety of
21   financing, such as sought public and foundation financing.
22      But the fact was this treasure of a building, a
23   picture of which is in the papers as an exhibit, required
24   millions of dollars of repair, and the only source of income
25   they could find and locate, after serious and vigorous efforts,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

7C38THIC
1   was to enter into a relationship, a contractual relationship
2   with a very respected company, The Rose Group, which does
3   catered events.  It does events that are for large law firms,
4   for large foundations and charitable benefits, and for weddings
5   and banquets and family celebratory occasions as well, as the
6   papers will show is commonplace within the city of York City
7   for a great number of religious institutions and for nonprofit
8   institutions as well.
9      They were simply unable to obtain anything related to
10   anything close to the financing, except this group advised them
11   that they were prepared to put in the millions of dollars, $8
12   million of repair work, to save this treasure, which is in the

Page 2

Third Church Transcript of TRO hearing

13 heart of an historic district, provided that they could run
14 appropriately handled and secure and not noisy and not
15 troublesome events when the church was not being used for
16 church-related activities.
17     They entered into a lease.  But before they entered
18 into a lease, the church went to the City of New York and asked
19 the buildings department for its approval before it embarked on
20 such an undertaking.  And in June of 2006, the Department of
21 Buildings gave its approval in the form of what they call a
22 preconsideration.  The buildings department knew when they gave
23 that preliminary approval that the church and the group with
24 whom they had intended to contract to renovate and save the
25 building would invest a lot of money in reliance on that, and

7C38THIC

1 in fact they did.  As we speak, more than six and a half
2 million dollars has been invested.
3     The work began in the summer of '06, shortly after the
4 approval in June, and events began to be held in the spring of
5 this year '07.  They were very successful.  They were large,
6 reputable events.  Sloan-Kettering, The Avon Foundation, Mayor
7 Bloomberg attended one of the events, one was attended by the
8 Queen of Sweden.  It's a very respected firm that runs these
9 events.  And they did it in a manner that didn't interfere with
10 the church's activities, so that they were able to move the
11 necessary furniture aside and to be able to permit the church
12 to conduct its church-related activities unimpaired.
13     They also began and are nearly completing the
14 installation of a kitchen, which the church needs for its
15 activities and the catering group needs for its activities.
16 They are installing an elevator.  They are installing HVAC
17 equipment.
18     I want to say construction causes some difficulty.
19 During this period of construction, which is nearly concluded,
20 a limited portion of East 63rd Street, just east of Park, down
21 maybe a quarter of the way east has been blocked off as a
22 construction site.  And the construction has caused some
23 concern among the neighbors, and the buildings across the
24 street from Park Avenue, I think the widest avenue in the city,
25 began to object.  They started submitting letters to the

7C38THIC

1 buildings department asking them to revoke the approvals that
2 had been granted.  And there is an exchange of correspondence
3 which is annexed to our papers.  So we have set forth the very
4 arguments that the neighbors set forth and our responses to the
5 City.
6     Then to our profound surprise and disappointment, on
7 October 29, the City succumbed to the pressures of the very
8 influential neighbors along Park Avenue and revoked our
9 permits.  And they said we could continue to hold events that
10 were already booked for the next six months through April 28,
11 but that we couldn't book any further events, and we couldn't
12 even hold the events that had been booked, and the events are
13 booked a year, 12 to 15 months in advance, weddings, law firm
14 annual events, etc.
15     We were engaged and we met with my adversary and
16 others in the law department and the buildings department to
17 try to resolve matters.  Their letter did not become final

                    Third Church Transcript of TRO hearing
18   until last Friday.  It's also annexed to our papers, and so we
19   have a final determination.
20         This comes as the work in the building is nearly
21   complete.  One branch of a relief which I have reason to
22   believe that my adversary will not oppose in our requested
23   temporary restraining order is that the construction permits
24   not be revoked pending our hearing and determination of our
25   motion for a preliminary injunction.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    7

     7C38THIC
1          The other branch of relief, which is opposed, is our
2    request that we be able to continue booking events and honoring
3    the commitments that were made before they revoked their
4    permits.  And I believe that the City will oppose that and that
5    is, I think, the issue before you today, your Honor.
6          Now, the theory of our case is, our first claim is
7    under the equal terms provision of RLUIPA, which says, among
8    other things, that government cannot treat religious
9    institutions on less than equal terms than they treat
10   nonreligious institutions.
11         Our papers will set forth a series of organizations in
12   the same neighborhood, and elsewhere in the City of New York,
13   that are nonprofit institutions who do this very thing.
14   Council on Foreign Relations, a couple of blocks away, is a
15   good example.  In addition to their own activities, they have a
16   Web site indicating that you can rent it for a banquet or a
17   wedding.  I attended a wedding there of my niece not so many
18   months ago.  But that kind of activity, large receptions and
19   dinners, held in the evening, which is when most of these
20   events take place, are held in a series of nonprofit and also
21   secular institutions in the area, and they are set forth in our
22   papers, and basically because the City has not given us any
23   clear reason why we are different than the other institutions.
24         They may say that we are somewhat larger, and we may
25   be larger than some, but we have agreed in our temporary
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    8

     7C38THIC
1    restraining order to have a limited number of events, limited
2    hours, to provide a monitor, size would be limited, so that
3    they would not be inconsistent with the kinds of events that
4    are held in the area.  Although I think we are entitled to
5    more, but during the pendency of our motion for a preliminary
6    injunction, we have come with what we believe is a reasonable
7    request, which is not -- we are mindful of any discussions that
8    were held by an elected official who tried to mediate the
9    dispute this fall in informal, nonbinding settlement
10   discussions with the City.
11         I don't want to discuss the details of it, but in
12   framing our request, we are mindful of what the prior
13   discussions have been.  We don't want to overreach.  We think
14   they are modest.  They will, in substance, provide that the
15   church will be using for church-related activities many, many
16   times more hours than will be held at these catered events.
17   That may be held.  We are seeking to be able to hold in this
18   period an aggregate of 125, our papers say, which is a little
19   over two per week, and they are held in the evenings.
20         This group, The Rose Group, had formerly run Cipriani.
21   It's a first-class organization, and I don't think any question
22   has been made about the caliber or quality of the service, the
                              Page 4

Third Church Transcript of TRO hearing
23  nature, the extensive security that's provided.  We have
24  off-duty police officers.  We have agreed in our TRO to provide
25  a monitor to make sure that we don't do more than we propose to
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

7C38THIC
1   do or they don't over in hours and they are not larger, the
2   kinds of issues that have been raised during the course of many
3   efforts to resolve this matter.
4           We have been unable to resolve this matter.  The City,
5   Ms. Brennan will speak for herself, basically says, No, we have
6   concluded that this is not an accessory use.  That's the term
7   of art.  Is it incidental?  It is a lesser use.  We understand
8   the term incidental, and we would attempt to establish that if
9   we can remain in business, but this decision of the City, this
10  revocation, basically puts the catering entity out of business.
11  It enables them simply to run off those events that have been
12  booked and will force the church, under the terms of its
13  contractual arrangements with the catering organization, to
14  repay the money, which will require the sale of the church.
15          The very existence of this institution is at stake
16  here, and we believe, as we will set forth in greater length in
17  the preliminary injunction papers, that this decision, if it
18  stands, threatens the vitality of religious institutions, which
19  struggle to seek ancillary income to maintain themselves in
20  this city and elsewhere, and of not-for-profit institutions.
21          The irony is that the neighbors call themselves the
22  preservation committee, as you will see in the papers.  But in
23  my view, they are really the anti-preservation committee
24  because this kind of ancillary income enables us to retain our
25  landmark buildings in this city that are able to remain in
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

7C38THIC
1   existence only if they can finance themselves by holding
2   ancillary events.  They are advertised widely on the Web sites.
3   The City, I don't know to what extent have granted permits or
4   haven't granted permits, but it's an open and notorious
5   practice.  They are well aware.  We have drawn that to their
6   attention, as set forth in our papers which are annexed to the
7   moving affidavits.
8           Now, we think that there is a forceful, compelling
9   case that singling out this church to say, No, you can't do
10  these ancillary activities, they are not accessory, places them
11  on less than equal terms with numerous secular organizations
12  doing the very same thing, perhaps at a somewhat smaller level,
13  but in smaller facilities.  They do it frequently, and they
14  should do it.
15          The City of New York, as I have argued to them, has a
16  stake in the vitality of nonprofit institutions.  They are an
17  important part of our economy and an important part of our
18  culture, and they need this ancillary income which is
19  threatened by this decision.  I respect the people who have
20  reached it, and I know they have given careful consideration,
21  obviously a lot of consideration to heavy lobbying from
22  affluent people on lower Fifth Avenue, I know they have tried
23  to do the right thing, but I think they have acted in a manner
24  which I think clearly violates RLUIPA.
25          By the way, the equal terms prong of RLUIPA is a
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 5

Third Church Transcript of TRO hearing

11

7C38THIC

1   strict liability standard.  The second prong of RLUIPA upon
2   which we are relying our argument is that this action, this
3   construction of accessory use, places a substantial burden on
4   the exercise of religion.  There the standard isn't quite as
5   high.  The City has to show there are no other alternatives
6   that are viable.  They don't have quite the same level of
7   burden they do in defending the equal terms prong.
8           Thirdly, your Honor, we have an equal protection claim
9   as well because what we are doing, what this church is doing is
10  what dozens and dozens of churches, other churches are doing in
11  the City of New York, openly and notoriously, without apparent
12  objection by the City of New York.
13          So, unfortunately, in order to make this case
14  compelling in a preliminary injunction hearing before you,
15  which we would hope to be able to bring I think just within a
16  few months or so, we need to rely not simply on the Web sites,
17  but we do need to take some depositions of third parties, and I
18  don't think it will be terribly lengthy.  We are happy to move
19  quickly on it.  But we do ask to be permitted to remain in
20  business in this period, which is why we seek a TRO.
21          THE COURT:  Thank you, Mr. Kovner.
22          Let me ask you, when you say that the size of the
23  events that are held at the Third Church of Christ are slightly
24  larger than the surrounding, give me an approximate.
25          MR. KOVNER:  The Third Church, and you will see a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

7C38THIC

1   picture of it, it's a magnificent building, it's a treasure,
2   has a very large room, and it can hold up to a thousand.  I
3   don't want to say that the Council on Foreign Relations, for
4   example, can hold a thousand, but I will say that the Council
5   on Foreign Relations holds more than one event at a time so
6   they can do 250 in one place.  We have proposed in our TRO, our
7   proposed TRO, to limit our events in terms of size so that only
8   five percent would be 900 or more, and most of them would be
9   under 500, and those are more typical.
10          Now, there are other organizations, as set forth in
11  the charts, and as I say, we haven't had the benefit of
12  discovery, that appear to hold events this large.
13          There is a larger number of people when there is a
14  reception as opposed to a seated dinner.  I think we can do 800
15  in a seated dinner.  We have provided that the room, the main
16  room is basically soundproof so that if there is music playing
17  within this facility at say a wedding, it cannot be heard on
18  the street.
19          The principal objections are that people come out at
20  night and look for cabs.  It is two blocks north of the Regency
21  which holds multiple events at any time, ten blocks north of
22  St. Barts which holds much larger events, although it's just
23  north of the Waldorf.  It's three blocks south of the Armory.
24  The Armory holds much larger events.  It holds art shows.  It
25  holds major events.  Then there is the Union League club, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

7C38THIC

1   Colony Club in the area, the Aegis Society.  All of these are
2   advertising on Web sites.  And it's not limited to this
3   neighborhood.  Riverside Church, All Souls Church.  The

Page 6

Third Church Transcript of TRO hearing

4  Universalist Church at 75th and Central Park West, according to
5  The New York Times a few years ago, in an article that is
6  annexed to our papers, gets 85 percent of its income from these
7  events.
8      That would not be the case at this church, but it will
9  need -- it can only be renovated, and indeed, of the $8
10 million, six and a half million has already been spent because
11 the City approved it, and now, which makes this so different
12 than other cases, which I think are persuasive as we have cited
13 them, but here they are revoking a permit.  They might
14 conceivably had an argument had they denied us a permit and we
15 challenged that initially, but they granted it.  We started
16 doing it in reliance and now almost last moment, the twelfth
17 hour, they seek to revoke it.
18      THE COURT:  Thank you, Mr. Kovner.
19      Ms. Brennan?
20      MS. BRENNAN:  Thank you, your Honor.
21      Your Honor, we oppose the application for a temporary
22 restraining order to the extent it seeks an order allowing The
23 Rose Group to continue to book additional events at the church
24 beyond those that were booked as of October 29.
25      Your Honor, as a matter of grace, when the City first
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              14

7C38THIC
1  notified the plaintiff of our intention to revoke the permits
2  and approvals, we said that we would allow the events that had
3  already been booked as of October 29 to be held.  However, only
4  for six months through April 29.  We didn't want to prejudice
5  those innocent third parties who had booked their events at
6  this space, and we felt that if anyone came to book at that
7  date they had ample time to find another place.  But for those
8  who had already booked, we felt their events should be able to
9  go forward.  However, there is no reason to allow bookings
10 beyond the six-month time.
11      We would also again oppose the application to allow
12 the catering hall to continue as a catering hall after April
13 29, in addition to the booking subsequent to that time and in
14 addition to having the events.
15      We do not oppose the application, which I believe is
16 just in the preliminary injunction portion of the order to show
17 cause, insofar as it seeks to allow the work that is going on
18 now at the premises to be concluded.  This is based on the
19 City's public safety concerns.  If we cut off whatever work is
20 being done now, we are concerned that perhaps it could affect
21 public safety.  So we are willing to allow that work to go
22 forward.
23      I would point out that the work at the church per se
24 is not what is objectionable.  It is the use that will be made
25 of that work.  So while the kitchen is to be renovated, that's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              15

7C38THIC
1  fine.  It's not what is being done there, it is the use that's
2  going to be made of it by The Rose Group which is the catering
3  establishment.
4      Now, all that being said, what we will agree to, we
5  will not agree to the relief that has been sought in the order
6  to show cause.  We feel that they have failed to establish what
7  they need to establish to be granted a TRO.
8      THE COURT:  I think you are getting a little bit ahead
                            Page 7

Third Church Transcript of TRO hearing

9 of me, Ms. Brennan. I guess my question is, in terms of the
10 procedure here, is it the usual procedure when a permit has
11 been granted that a subsequent complaint by a third party is
12 sufficient to have the permit revoked?
13         MS. BRENNAN:  I wouldn't characterize what occurred
14 here as that. What is taking place at the site, in our view,
15 is not an accessory use. An accessory use is a use that is
16 incidental to the primary use. This permit was not revoked
17 because we received one complaint from a neighbor. This permit
18 and approval is being revoked because the use that is being
19 made of the church building is not accessory to the church.
20         That is the standard. We have a congregation, I
21 believe, of approximately 64 members. Again, what this case is
22 about is about a commercial catering establishment entering
23 into a lease agreement with the church that will permit that
24 catering commercial establishment to conduct catering events in
25 the building. There is no connection between the events in the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              16
7C38THIC
1 building and the congregation and the church itself.
2         THE COURT:  Let me just ask you. If I understand Mr.
3 Kovner's argument, it is that it's fundamental that if the
4 catering does not take place with the individual who has put
5 millions of dollars into the renovation, that the church will
6 no longer exist, and so it seems to me that it's not
7 necessarily accessory; it's probably a little bit more
8 fundamental than that.
9         So I guess my question is, what is the problem with
10 the church preserving itself by this means of having someone
11 else invest millions of dollars in the structure, not changing
12 it from a church but renovating it and bringing it up to code
13 and bringing it up to safety standards so that it may be used
14 as a church by the congregation, and also, the people who are
15 paying for this get to have the use of the church during
16 non-church hours? I guess I am sort of confused as to why this
17 is so offensive.
18         MS. BRENNAN:  Your Honor, the building is located in a
19 residential district. In a residential district, under the
20 zoning resolution of the City of New York, you cannot have a
21 commercial use. You cannot have a commercial establishment
22 operating. You can have an accessory use. The issue is, what
23 is an accessory use to the primary use? Here, we do not have
24 an accessory use to the church. We have a company coming in,
25 running their events in this building structure. That is the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              17
7C38THIC
1 difference, your Honor.
2         THE COURT:  So then tell me about the Aegis society or
3 some of the others that have events there as well and how come
4 they are accessory and this isn't.
5         MS. BRENNAN:  In the limited time that I had to look
6 into the particular other locations, it would appear that those
7 events are not of the magnitude and extent of these events.
8         THE COURT:  Magnitude meaning frequency?
9         MS. BRENNAN:  Frequency and scope, number of people.
10 I would think, your Honor, if you have a private club,
11 it's functions. There may be 2,000 members of that club. Here
12 we have a building with a congregation of 64 members,
13 approximately, that meets two times a week and a few times a
                        Page 8

Third Church Transcript of TRO hearing

14  year.
15         THE COURT:  They meet two times a week just a few
16  times a year?
17         MS. BRENNAN:  No.  They meet two times a week, and in
18  addition to those, I believe, church services, they also meet a
19  few times a year on administrative matters.  That's my
20  understanding.  And then this structure is taken over by a
21  business that's running a business.  That is the difference,
22  your Honor.
23         I understand your question about why shouldn't they be
24  allowed to take money in order to be preserved.  Your Honor, if
25  an institution is permitted to accept cash to preserve their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

7C38THIC
1  structure so that a non-accessory use can take place there,
2  then any use not permitted in a residential district could be
3  justified.  That is the danger, your Honor.
4         THE COURT:  Well, I guess the difficulty I am having
5  here is that this is not an extraordinary or unique use.  It is
6  the same type of use of facilities that occurs and has
7  occurred.  It's not as if they have turned it into a parking
8  lot, or it's not as if they have done anything to bring down
9  the neighborhood.  If the example of people getting taxies is
10  an undue burden, everyone lives in New York, everyone tries to
11  get taxies, everyone would love to get a taxi when they need
12  it.  It's not clear to me that this is a basis for revoking a
13  permit.
14         I must say I am very troubled by the literal
15  application or definition -- I guess it would wind up being a
16  matter of law whether this is an accessory use or not.  But it
17  just seems to me that to say cavalierly that, Look, sell your
18  church, pay off the people who are doing this, we shouldn't
19  have let you do it so we are not letting you do it now, it
20  seems almost arbitrary, and certainly it seems that the impact
21  is permanent and devastating.
22         That's one of the reasons that I am concerned.  The
23  only argument -- I am not even talking about the individuals
24  who are not pleased with the activity.  I am not even going to
25  that.  I am just going to:  Was it that the plaintiff deceived

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

7C38THIC
1  the City when they told them what the original arrangement was
2  going to be?  Was it that they changed it from what it was?  I
3  don't understand.
4         MS. BRENNAN:  My understanding is that the initial
5  preconsideration that was issued to The Rose Group as a matter
6  of fact, not even to the plaintiff, I believe The Rose Group,
7  the catering company, was the applicant to the Department of
8  Buildings.
9         THE COURT:  Well, they had the money.
10         MS. BRENNAN:  Indeed.  Was for an accessory use for
11  members of the church.  I believe that that application or the
12  approval then did change to reflect that there would be
13  contracts out to non-church parties.
14         However, the approval that was issued was issued by a
15  borough commissioner at the Department of Buildings, who I
16  imagine understood the facts to be a certain way.
17         THE COURT:  Who understood what?
18         MS. BRENNAN:  Who understood the facts to be a certain

Page 9

Third Church Transcript of TRO hearing
19  way.  And his approval clearly reflected his interpretation of
20  accessory use.
21          However, the Department of Buildings has to have a
22  cohesive interpretation of accessory use, and we have to look
23  at this legal interpretation citywide.  It is not a bright
24  line, your Honor, as to what is and is not an accessory use,
25  but it is the Department of Buildings' position here in this
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                20
7C38THIC
1  case --
2          THE COURT:  Or in this neighborhood.
3          MS. BRENNAN:  In this case, your Honor, the line has
4  been crossed.  This is not a case where a church or synagogue
5  has events in their space for weddings or other life events
6  that have taken place in that building itself.  They are hiring
7  out the hall to anyone and running large catered events.  This
8  is not an accessory use to the primary use of the church.
9          THE COURT:  I understand that you have not had an
10  opportunity to respond to these papers, and I would be
11  interested in seeing your response to these papers.  It seems
12  to me that you are saying, in order to be consistent throughout
13  the five boroughs, that no place in the Bronx or in Queens or
14  in Staten Island or in Brooklyn are similar situations existing
15  or have been permitted by the City?
16          MS. BRENNAN:  Your Honor, I know of one in particular
17  where we are litigating right now, for example, where we have a
18  synagogue and school in Brooklyn that is running a -- our
19  position is that they are running a catering establishment in
20  the cellar of the school or synagogue.  The synagogue is
21  challenging that determination.  It has challenged it before
22  the Board of Standards and Appeals, and we currently are
23  involved in litigation in supreme court in Brooklyn about this
24  very issue whether or not the use of a space is an accessory
25  use.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                21
7C38THIC
1          So, in fact, your Honor, I think the City is looking
2  at these issues, and I just happen to know of this one instance
3  in Brooklyn where we are dealing with the exact same thing.
4  The City's position is that the synagogue rents this space out
5  to anyone who wants to use it.
6          THE COURT:  Wouldn't they have to under another branch
7  of law?
8          MS. BRENNAN:  If you are in a residential
9  neighborhood, you cannot have a commercial catering
10  establishment.  This particular synagogue in Brooklyn is in a
11  residential neighborhood.  It is our position that they are
12  operating a commercial catering establishment, which is not an
13  accessory use to the principal use of the synagogue.
14          That is really the issue here, your Honor.  What is
15  the principal use of the premises?  And is the catering use
16  accessory or not?  Here we think that the line has been crossed
17  from a catering use accessory to the main functioning of the
18  church, and we are into the realm of commercial catering
19  establishment, and that is the City's position, your Honor.
20          Your Honor, I note that the terms of the 30-year lease
21  or 20-year lease that the church entered into with The Rose
22  Group, I think it's renewable for two five-year terms so it's a
23  30-year lease, may provide that the premises can be sold if The
                        Page 10

Third Church Transcript of TRO hearing
24  Rose Group cannot recoup its investment or the moneys that it
25  has expended to make the renovations.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

7C38THIC
1   Your Honor, the church entered into this lease.
2   THE COURT: Wait. You're saying that because The Rose
3   Group wouldn't mind having the church sold to get its money
4   back, that the primary purpose by which the church entered into
5   this agreement is sort of obliterated? In other words, I think
6   that is such an extreme solution. Even though it may be
7   in the lease, it was probably not contemplated that it would be
8   called into action by third parties.
9   It is difficult in this time for nonprofit
10  organizations to prosper. I am surprised that the landmark's
11  preservation group isn't helping out this church.
12  Mr. Kovner.
13  MR. KOVNER: Very briefly in response to Ms. Brennan,
14  some of her comments.
15  One is on the synagogue litigation in state supreme
16  court, it's a lengthy, complex litigation. I know Ms. Brennan
17  will agree with me on that. The City has agreed to a stay,
18  effectively a stay, which is all we are asking here, for the
19  time to show you at a preliminary injunction hearing or on
20  motion papers that we meet the accessory standard, but we are
21  going to need some discovery to do that.
22  Two, as to any misrepresentation, Jay Segal of the
23  Greenberg Traurig firm, a zoning counsel, did a lot of this
24  work before. His affidavit is before you. Paragraph 23 says
25  explicitly, "There were follow-up conversations and meetings
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

7C38THIC
1   with senior DOB officials, in which the church's
2   representatives made clear that there would be numerous catered
3   events in the building, and that because of the building's
4   capacity, many events would have large numbers. During these
5   conversations, DOB's consistent position had been that catered
6   private events at the building for nonmembers would be a
7   permissible accessory use of the church, and in Commissioner
8   Santulli's view" -- that's the commissioner who gave the
9   preconsideration -- "the only limitation was on the size of
10  events related to the capacity of the building."
11  So I don't think discovery is going to lead to any
12  substance that there was any misleading on these points.
13  Yes, the congregation number is small, but that's
14  because the building was falling down. Yes, you're right, your
15  Honor, the lease does require, if, for example, the City
16  prevails here, the church is going to have to pay back the
17  money and sell the building. There is simply no alternative.
18  Whether it's an accessory use or not is the critical
19  issue of law. We think we can establish that to your
20  satisfaction at a preliminary injunction hearing, and we ask
21  only for the status quo, we be able to continue to hold events
22  and book events, because if we can't book events we are out of
23  business, during the pendency of whatever months it takes. It
24  shouldn't be terribly long, and I will be happy to work with my
25  adversary here on arrangements so that we can get it to you in
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

Third Church Transcript of TRO hearing

7C38THIC

1  a reasonably expeditious manner.
2          THE COURT:  Ms. Brennan.
3          MS. BRENNAN:  I did not mean to suggest that anyone
4  misled anyone.  I think perhaps plaintiff's counsel
5  misunderstood me.  I did not mean to suggest that anyone was
6  misled at DOB.  Mr. Santulli, who issued that determination,
7  was incorrect in issuing it.
8          THE COURT:  He had the apparent authority to do so.
9          MS. BRENNAN:  He is the borough commissioner, yes,
10  your Honor.  However, when the Department of Buildings looked
11  at that, they decided that this was the wrong determination.
12          THE COURT:  OK.  What is the timing that you all would
13  like?  I want to be reasonable in terms of putting demands on
14  you.
15          I expect that I will be issuing a TRO.  I would like
16  you all to agree what the terms of the TRO will be.  I am
17  inclined to permit bookings into the future because if what is
18  going on in the supreme court in Brooklyn is any indication,
19  this is not going to be resolved in 24 or 48 hours, and
20  meanwhile, opportunity to keep the church functioning, going,
21  and be contract in full, force and effect seems to me to make
22  sense.
23          This is unfair to the City because you have not had an
24  opportunity to brief it, but on the other hand, it's not unfair
25  because I haven't really read the plaintiff's papers either, so
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    25

7C38THIC

1  we are all sort of on the same playing field here where I am
2  just listening to the arguments.  My initial reaction is that
3  there is a great likelihood or greater likelihood than not that
4  the City will not prevail, or put it another way, that the
5  plaintiffs might prevail.  So that I would be inclined,
6  certainly at this stage, to enter the TRO.
7          What are the terms of the TRO that you do not agree
8  on, Ms. Brennan?
9          MS. BRENNAN:  I am not authorized to consent to the
10  terms of the TRO.
11          THE COURT:  I understand that.  I am asking you what
12  are the terms that you don't agree to so that I can make a
13  ruling.
14          MS. BRENNAN:  If you are looking at the language in
15  the TRO --
16          THE COURT:  Bear with me just one second.
17          MS. BRENNAN:  I would ask that -- I know I can't get
18  back to you on that, but there are very specific terms here.
19          THE COURT:  Terms in terms of what they are willing to
20  agree to?
21          MS. BRENNAN:  I am looking at page 3 of the order to
22  show cause, your Honor.
23          I'm sorry.  I may be looking at another document.
24          THE COURT:  If we are looking at the order to show
25  cause with the declarations and complaint and the first four
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    26

7C38THIC

1  pages, are we looking at page 3 of that?
2          MR. CUTI:  Yes.
3          MS. BRENNAN:  Yes.  I would also point out that we
4  would agree to allow the current work to continue.

                            Page 12

Third Church Transcript of TRO hearing

 5      THE COURT:  Excellent.  That, obviously, then, on the
 6  consent of the City, will be granted and the current work can
 7  continue.
 8      MS. BRENNAN:  As to the listing on page 3, I am not
 9  prepared as I stand here now to agree to any of those terms,
10  your Honor.
11      THE COURT:  OK.  Certainly, I will grant the condition
12  that the events currently scheduled even beyond April 2008
13  shall be permitted to go forward.
14      MS. BRENNAN:  For clarity, I am not sure if in these
15  papers we know those events that have been currently scheduled
16  which you will now permit to proceed beyond.
17      MR. KOVNER:  We can supply you with that.
18      THE COURT:  This seems to say, During the period
19  December 1, 2007, to November 30, 2008, for the 37 events
20  already booked.  Yes, they will go forward.
21      Now, I do have a question, Mr. Kovner.  What is the
22  rate at which these bookings occur?
23      MR. KOVNER:  They do vary, in candor, your Honor.
24  December is the most popular time of the year, not
25  surprisingly, and January and February.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

7C38THIC

 1      We have presently bookings through the end of '08.
 2  It's either November or December.  Those were already
 3  commitments that were made before the City stopped us as of
 4  October 29, and we haven't made any commitments since.  But
 5  there are a number of people out there, who are frantic as
 6  well, post-April 28 events, and obviously we want to be able to
 7  hold those.
 8      THE COURT:  I just said that you could.  During the
 9  period December 1, 2007, through November 30, 2008, for the 37
10  events already booked.  Of the 88 events to be booked.  So
11  other events to be booked.
12      MR. KOVNER:  Our request here is to be able to
13  continue booking no more than 125 annually, which would permit
14  us to book only an additional 88 between December 1, '07 and
15  November 30, '08 because 37 have already been booked.
16      THE COURT:  I guess my question is, I thought you said
17  that Christmas is a very --
18      MR. KOVNER:  It is, and a number of those 37 are in
19  December.
20      THE COURT:  Why don't I say that the size of events
21  through December 31, 2008, the 37 you booked or any number you
22  need up to the 125 you may book.  So that to the extent it
23  takes you through December 31st, New Year's Eve 2008, you may
24  book events up to the 125 that you said that you would.
25      Obviously, as things move on, and if there is a need,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

7C38THIC

 1  Ms. Brennan, for the City to seek an adjustment of this,
 2  obviously, you will be coming back and we will be talking and
 3  working together anyway.  At this point, it seems to me that
 4  the need to not stop things at least through 2008 makes sense
 5  to me.
 6      MS. BRENNAN:  Just so I understand, the plaintiff will
 7  be permitted to book 125 events through December 31, 2008.
 8      THE COURT:  Up to 125 because they already have 37.
 9      MS. BRENNAN:  I am not following.

Page 13

Third Church Transcript of TRO hearing

10      THE COURT:  I am reading paragraph C.  It says, During
11  the period December 1, 2007 to November 30, 2008, for the 37
12  events already booked.  So they have already 37 events.  And
13  they are only asking to be permitted to book a total of 125.
14  So what I am saying and ordering is that they are permitted to
15  book up to the 88, if that adds up to 125.  That's what I am
16  saying.  We are not talking about 126 events.  We are not
17  talking about 127.  We are talking about 125.
18      MS. BRENNAN:  I think that's what I said.  In other
19  words, they will be permitted to book 125 events, correct,
20  which includes the 37?
21      THE COURT:  Thank you.  Now we are on the same page.
22  That's it.
23      MR. KOVNER:  We had a proviso in here.  I hope Ms.
24  Brennan won't object to it.  That is, where there is an event
25  of under 100, it doesn't count toward that total.

7C38THIC
1       It was my understanding from the -- I wasn't party to
2   it -- mediation discussions that no one was objecting to events
3   of under 100 because they were not the kind of concerns that
4   had arisen.
5       MS. BRENNAN:  Again, as I stand here, I don't have
6   that authority.
7       THE COURT:  What I am going to do is I am going to
8   split the baby here.  Make sure all your events are over 100,
9   and up to the 125.  So think big.
10      MR. KOVNER:  Yes, your Honor.
11      THE COURT:  The independent monitor the plaintiff will
12  take care of.
13      MR. KOVNER:  Yes, your Honor.
14      THE COURT:  The duration of the events seems to me
15  reasonable.  So that the 60 percent of events to conclude by or
16  before 11 p.m., 30 percent to conclude by or before midnight,
17  and 10 percent to conclude by or before 2 a.m. seems quite
18  reasonable.
19      I would tend to think that, considering the caliber of
20  the people who are probably going to be guests at these things,
21  that there are not going to be very many people who will be
22  able because of age to stay out to 2 a.m.  However, we will
23  just cover that and let that stay that way.
24      Now, when do you want to have the hearing?
25      Before I do that, Ms. Brennan, when would it be

7C38THIC
1   convenient for you to get your formal response in to this?
2       MS. BRENNAN:  If the Court is inclined, as I think you
3   are, to impose a stay, if you haven't already --
4       THE COURT:  I just did.
5       MS. BRENNAN:  I thought so.
6       THE COURT:  This is December, Ms. Brennan.  Keep that
7   in mind.
8       MS. BRENNAN:  I am well aware of that, your Honor.  I
9   am losing two weeks at the end of the year.
10      Was the Court anticipating the City getting their
11  opposition papers in before December 21?
12      THE COURT:  No.  That's why I asked you.  When do you
13  want to get them in?
14      MS. BRENNAN:  Mid-January.

Third Church Transcript of TRO hearing

15    THE COURT:  Fine.  Will that give you enough time?
16    MS. BRENNAN:  If it doesn't, could I then make another
17 application to the Court?
18    THE COURT:  Why don't we do this.  If you get them in
19 before, obviously that's fine, but if you don't, then why don't
20 I just say that they are due by January 31.
21    MS. BRENNAN:  Yes, your Honor.
22    THE COURT:  If you get them in before, fine.  If not,
23 you have up until January 31.  If you need time beyond January
24 31, I expect I will be hearing from you and plaintiffs.
25    There is no point in being arbitrary about saying that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

7C38THIC

1 we have got to get it done by this time.  This is actually a
2 case of first impression for me, and I am very interested in
3 giving everyone as much of an opportunity as possible to
4 present all the evidence and the best evidence in the best
5 form.  So I am not rushing this.
6    MR. KOVNER:  With your permission, we would like two
7 weeks to reply.
8    THE COURT:  Fine.
9    Would you like to have some discovery before the
10 preliminary injunction hearing?
11    MR. KOVNER:  We are anticipating taking some
12 discovery, limited of the City, but at least some third-party
13 discovery that will be necessary.  We will turn to it promptly.
14 I don't know what the City would want to do.
15    MS. BRENNAN:  Your Honor, insofar as we haven't seen
16 what the discovery requests to the City would be, I hesitate to
17 say absolutely.  Also, I wouldn't want to be hindered by having
18 to oppose a very substantial motion for preliminary injunction
19 and also deal with responding to discovery requests at the same
20 time.  That could be onerous.  So I would ask that the Court
21 limit the discovery that plaintiff is going to be seeking
22 against the City.  It's going to be fighting at two fronts.
23 It's going to be very difficult.
24    THE COURT:  We have gotten the dates for the
25 submissions of the response and the reply.  After all of that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

7C38THIC

1 is in, why don't we have a conference call so that everyone can
2 figure out what you need, if any, in terms of discovery before
3 actually going on to have the hearing for the preliminary
4 injunction.  It's sort of very ephemeral at this point, and I
5 think that when things get solidified, it will be easier to
6 see, well, I only need the depositions here and there, I don't
7 need depositions, or I just need responses to interrogatories.
8 So why don't we just leave that, and once the pleadings have
9 closed, why don't we see where we are going from there.
10    I am anxious to put this on at a time that is
11 convenient for the parties and also for any witnesses.  I don't
12 want to set a date right now, but I will expect a conference
13 call from you all to set a date once the completion of the
14 pleadings, and then having some idea of what kind of discovery,
15 if anything, and then we can set a date for the preliminary
16 injunction hearing.
17    Anything else that we need to do based on this
18 schedule that I have given you?
19    MR. KOVNER:  That's fine, your Honor.

Page 15

Third Church Transcript of TRO hearing

20      THE COURT:  Mr. Kovner, I am going to ask you to send
21  an order to the Court so that I can sign it based on what I
22  have said here today.
23          I am ordering the minutes on a daily basis, so please
24  see Eve.  At the moment, I am splitting the cost between the
25  parties.  So please see Eve so that you can fill that out.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

7C38THIC

 1          Anything else I expect that I will hear from you.  So
 2  at this moment, if there is nothing further, then we can
 3  adjourn.
 4          This matter is adjourned.
 5          (Adjourned)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit R

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

www.kurzman.com

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
PAUL J. McGEOUGH
SANDRA DEFEO
ANTHONY T. AGOLIA

COUNSEL
STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER
ARTHUR R. BLOCK

April 16, 2008

**VIA FIRST CLASS AND ELECTRONIC MAIL**

John R. Cuti, Esq.
Davis Wright Tremaine LLP
1633 Broadway – 27th Floor
New York, New York 10019-6708

> *Third Church of Christ, Scientist v. City of New York, et al.*
> *07 CV 10962 (DAB)*

Dear Mr. Cuti:

This is in response to your letter, dated April 14, 2008, concerning the subpoenas served upon our clients, 570 Park Avenue Apartments, Inc., 580 Park Avenue, Inc., Susan Relyea, as Member of the Co-op Board of 580 Park Avenue, Inc. and Beekman Tenants Corporation (the "Beekman").

Preliminarily, please correct the address of our firm on your future correspondence; our address is 230 Park Avenue, not 787 Seventh Avenue.

We appreciate your willingness to resolve this matter amicably. We, too, are eager to do so. We still, however, have serious concerns. For example, your April 14, 2008 letter appears, among other things, to characterize the demands more narrowly than set forth in the subpoenas and essentially ignores the subpoenas' definitions and broad preamble. Moreover, while we welcome your agreement to narrow the temporal scope of three of the subpoenas by six years, we believe that your willingness to do so is evidence that the subpoenas as originally drafted were overly broad.

The following discussion is divided in six parts to address Points A through F in your letter.

193898.1

John R. Cuti, Esq.
April 16, 2008
Page 2 of 6

### A. The Order Does Not Authorize Issuance Of The Subpoenas To Our Clients

It appears that Plaintiff now takes the position that, during the 90-day period granted in the Order, Plaintiff has the right to pursue full, rather than limited, discovery. This stance, however, contradicts Plaintiff's written representation to Judge Batts on February 22, 2008 that only "limited discovery" is needed. Even assuming, but not conceding, that the Order's scope includes discovery of our clients, the broad nature of the requests goes well beyond the "limited discovery" contemplated by the Order.

### B. The Objections Based On Undue Burden Have Merit

Plaintiff misconstrues our "undue burden" objections. The objections do not set forth a blanket refusal on this ground. Rather, the gravamen of our objections is that we should not be required to review the voluminous documents, let alone produce them, without adequate and fair compensation, and, of course, subject to our other objections.[1] The express language of FRCP Rule 45(c)(2)(B) provides that "...an order to compel production shall protect any person who is not a party...from significant expense resulting from the inspection and copying commanded." Under this section, a demanding party can be ordered to reimburse a nonparty for a portion of the reasonable costs of compliance, including the costs of producing, inspecting, and photocopying the requested documents. *See In re First American Corp.*, 184 F.R.D. 234, 240 (S.D.N.Y. 1998) citing *In re Exxon Valdez*, 142 F.R.D. 380, 383-85 (D.D.C. 1992). A nonparty's legal fees, especially where the work benefits the requesting party, have been considered a cost of compliance reimbursable under FRCP Rule 45(c)(2)(B). *See First American Corp. supra.*

Although our clients have an interest in the outcome of this litigation, that does not preclude them from recovering costs from Plaintiff. *See In re First American Corp.* at 242 (non-party required to absorb only a portion of the costs for which it seeks reimbursement).

Plaintiff's comment that it cannot reimburse our clients because it faces "grave financial challenges" seems disingenuous and without basis, in light of Plaintiff's failure to demonstrate its ability to bear costs of the "limited discovery" demanded by it, while, at the same time, retaining three large law firms in connection with various stages of this matter—Greenberg Traurig, LLP, Satterlee Stephens Burke & Burke, LLP and your firm-- and collecting rent and presumably profits from its caterer-tenant, which

---

[1] Beekman Tenants Corporation actually has 42 Redwelds in its actual and/or constructive possession, not 22 Redwelds as suggested on page 3 of your letter.

John R. Cuti, Esq.
April 16, 2008
Page 3 of 6

conducts frequent events. Further, our clients reject Plaintiff's suggestion that our clients are among the wealthiest cooperative building associations in New York City as without basis.

Please be advised that if Plaintiff is not willing to compensate our clients at all and makes a motion to compel, we will request the Court to award our clients costs and fees pursuant to FRCP Rule 45. *See McCabe v. Ernst & Young, LLP*, 221 F.R.D. 423 (D.N.J. 2004).

In addition, Plaintiff's requests are unduly burdensome to the extent that some of the documents demanded by Plaintiff from our clients are publicly available (e.g. certificates of occupancy, letters to governmental agencies). These public documents are available from Defendant City of New York and/or other governmental agencies and should be sought from those sources. As stated in the case cited by Plaintiff on page 3 of your letter, *Travelers Indemnity Co. v. Metropolitan Life Ins. Co.*, 228 F.R.D. 111, 114 (D. Conn. 2005), where "the information appears to be publicly available from a source that is more convenient, less burdensome or less expensive," it is an undue burden on the non-party to have to produce it. In fact, we are aware that Plaintiff has already obtained, through FOIL requests[2] and through the Defendants' submissions in this case, documents demanded from our clients.

### C. Assuming, Without Conceding, Plaintiff Has A Need For Information Sought In The Subpoenas, The Need Is Outweighed By The Burden Upon Our Clients And Availability Elsewhere

Plaintiff relies on the definition of "relevance" under FRCP Rule 26(b)(1) that applies to discovery generally. However, Plaintiff fails to dispute the showing in our April 10, 2008 letters that relevance is a factor in a balancing test that applies to non-party subpoenas. An evaluation of undue burden requires the court to weigh the burden to the subpoenaed party against the value of the information to the serving party and requires the court to consider *such factors as relevance*, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed. *See Moon v. SCP Pool Corporation*, 232 F.R.D. 633 (C.D. Cal. 2005) citing *Travelers* at 113 and *United States v. IBM*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979). In this case, the value of the information to the Plaintiff is outweighed by the burden upon our clients and the availability elsewhere. As noted above, we are aware that Plaintiff has already

---

[2] Through FOIL requests, we have obtained copies of letters from Plaintiff responding to letters we have written to governmental officials.

John R. Cuti, Esq.
April 16, 2008
Page 4 of 6

obtained, through FOIL requests and through the Defendants' submissions in this case, documents demanded from our clients.

### D.   The Confidentiality Objections Have Merit

Plaintiff misconstrues our objections based on confidentiality. The confidential documents are not included on the Categorical Privileged Documents Log. With regard to such documents, subject to our objections, protective measures should be put in place before responsive confidential documents are provided. For example, subject to resolution of our other objections as they affect the minutes, we would be willing to produce minutes, which are non-privileged and relevant to this litigation, provided they are redacted. This is a solution which you seem to indicate you are willing to accept.

### E.   Given The Improper And Overly Broad Scope Of The Subpoenas, The Privilege Log Is Not Defective

Plaintiff ignores our reservation of right to provide a more detailed privilege log upon an agreement with respect to compensation and scope (relevance, burdensomeness, etc.). The fact that Plaintiff withdrew six years' worth of documents demonstrates that our initial reluctance to go through thousands of documents to determine whether any of same were privileged was warranted (though most of the documents in our possession are dated 2006 and later).

As to your request to specify whether we represent every cooperative apartment corporation that is "purportedly" a member of the Preservation Coalition, for purposes of attorney client privilege, please be advised that we have been retained by each of the cooperative apartment corporations listed in the Declaration of Phyllis Weisberg, ¶1.

As to the work product privilege assertions that you contest, while the general rule is that the protection of FRCP 26(b)(3) ("Trial Preparation: Materials") does not extend to "documents prepared by and in the hands of a third person," the courts make an exception for a non-party who is "interested in the action," and courts have construed broadly the definition of who is "interested." *See Polycast Tech. v. Uniroyal,* No. 87 Civ. 3297, *2, 1990 WL 138968 (S.D.N.Y. Sept. 20, 1990). In *Polycast,* whether a non-party was "legally aligned" with a party and "consistently maintained" that it had an interest in the outcome of the litigation were factors in determining whether it was "interested." *See Id.* In this case, our clients are "interested" because they are "legally aligned" with Defendants since they share the same interest in upholding the City's determination, as demonstrated by the fact that they would have had standing to sue if the City had rendered a decision favorable to the Plaintiff. Additionally, our clients have

John R. Cuti, Esq.
April 16, 2008
Page 5 of 6

"consistently maintained" that they have an interest in the outcome of this litigation; Plaintiff even concedes on page two of your letter that our clients "played such an active role in this controversy." Accordingly, contrary to Plaintiff's assertions, the documents prepared by us in the course of representation of our clients, "interested parties," are protected by the work product doctrine.

To be clear, however, our clients are not asserting work product with respect to any <u>actual</u> communication (but not drafts or related documents) with the State Liquor Authority, elected officials, the Landmarks Preservation Commission or, although not listed in your letter, the Department of Buildings.

## F.    The Beekman's Objections Have Merit

We dispute that the term "social events" is relevant to the Plaintiff's claim, insofar as it can be construed to mean any event in the private residences within the building, such as small dinner parties and small social gatherings—events that are not commercial and no way comparable to the commercial catering events held at 583 Park. Indeed, your failure to clarify the definition of "social events" is indicative of your failure to address the vagueness issues raised in our April 10, 2008 letters.

Similarly, your letter, read without reference to the subpoena, suggests that you merely seek the lease agreements, to which we have not specifically objected. To the contrary, the subpoena seeks "any and all documents concerning or in any way related to" the lease, which could include, for example, numerous drafts, internal memos, etc. These are unnecessary given the purpose stated on page six of your letter, and as to those, we must continue to object.

We further note that the documents sought by the subpoena are presumably within the control and possession of the Beekman's tenant, not Beekman. We understand that Plaintiff issued a separate subpoena to the Beekman's tenant, and, therefore, the documents should be obtained from it. Further, such documents as the certificate of occupancy and communications with the City regarding same are public documents, and as such, accessible to you. They are also available through the Defendants. *See Travelers, supra.*

\*       \*       \*

Finally, we take issue with Plaintiff's characterization that our clients somehow improperly or unduly pressured governmental and elected officials into making an "improper" zoning decision. Rather, our clients were exercising their First Amendment right to petition the government for redress. Our clients' actions in petitioning the government were all the more necessary due to Plaintiff's and its

193898.1

John R. Cuti, Esq.
April 16, 2008
Page 6 of 6

tenant's numerous misstatements, omissions and inconsistencies in dealing with various governmental agencies.    Indeed, given the extraordinary breadth of the subpoenas, it seems Plaintiff is issuing the subpoenas in an effort to silence citizens who have exposed the improper catering use for what it is and petitioned for redress in connection therewith.

If you believe there is a basis for discussion of these discovery issues, we would welcome your telephone call.

Very truly yours,

KURZMAN KARELSEN & FRANK, LLP

Charles Palella

CP:sd

cc:    Ave Maria Brennan, Esq. (via electronic mail)
       Assistant Corporation Counsel

193898.1

Exhibit S

**NYC LOBBYIST SEARCH**

Go to Business Search Home  |  New Search  |  Directory  |  Help Guide

# Information for THIRD CHURCH OF CHRIST SCIENTIST

**CLIENT.** Multiple matches were found for "**THIRD CHURCH OF CHRIST SCIENTIST**". Please select from the following list:

| Client Name H | Client Address H | Begin Date H | End Date H | Principal & Additional Lobbyists H | Lobbyist Address H | Lobbyist Officer H | Details H    VIEW ALL    HIDE ALL |
|---|---|---|---|---|---|---|---|
| Third Church of Christ Scientist | 583 Park Avenue New York, NY 10021 (212) 838-1870 | 01/01/2007 | 12/31/2007 | Greenberg Traurig Deirdre Carson Jay Segal Meloney McMurray Margo Flug | Greenberg Traurig 200 Park Avenue, 15th Floor New York, NY 10166 (212) 801-9355 | John Mascalino | |

Target: Borough President, City Planning, City Council
Subject: Determination of Board or Commission

|  | Compensation | Reimbursement |
|---|---|---|
| P1 | $0.00 | $0.00 |
| P2 | $0.00 | $0.00 |
| P3 | $32,453.50 | $0.00 |
| P4 | $23,050.00 | $0.00 |
| **Total** | **$55,503.50** | **$0.00** |

# NYC LOBBYIST SEARCH

## Information for ROSE GROUP PARK AVE LLC. DBA 583 PARK AVENUE

**CLIENT.** Multiple matches were found for "**ROSE GROUP PARK AVE LLC. DBA 583 PARK AVENUE**". Please select from the following list:

| Client Name H | Client Address H | Begin Date H | End Date H | Principal & Additional Lobbyists H | Lobbyist Address H | Lobbyist Officer H | Details H | VIEW ALL | HIDE ALL |
|---|---|---|---|---|---|---|---|---|---|
| Rose Group Park Ave LLC. dba 583 Park Avenue | 583 Park Avenue New York, NY 10021 (212) 583-7200 | 01/01/2008 | 12/31/2008 | George Arzt Communications, Inc. Robert Liff George Arzt Jane Crotty | George Arzt Communications, Inc. 123 William Street, 22nd Floor New York, NY 10038 (212) 608-0333 | George Arzt | Hide Details |  |  |

Target: NY City Council, NYC Department of Buildings
Subject: Catering permit

|  | Compensation | Reimbursement |
|---|---|---|
| P1 | $6,000.00 | $0.00 |
| P2 | $0.00 | $0.00 |
| P3 | $0.00 | $0.00 |
| P4 | $0.00 | $0.00 |
| P5 | $0.00 | $0.00 |
| P6 | $0.00 | $0.00 |
| **Total** | **$6,000.00** | **$0.00** |



# NEW YORK
# The Sun

October 30, 2007 Edition > Section: <u>New York</u> > Printer-Friendly Version

# City Moves To Shutter East Side Church Catering Hall

BY ELIOT BROWN - Special to the Sun
October 30, 2007
URL: http://www2.nysun.com/article/65525

Facing pressure from elected officials and residents, the Bloomberg administration is moving to halt the use of a private catering hall in an Upper East Side church.

In recent months, the Third Church of Christ Scientist at 583 Park Avenue has rented out its space to a catering company, hosting Oscar de la Renta fashion shows and weddings, among other events, in an attempt to raise cash for renovations.

But the city's Department of Buildings yesterday said it intended to revoke renovation permits for the church, claiming that its uses were in violation of the zoning. Upset by the city's action, church leaders are vowing a legal challenge that could reverse the decision.

ADVERTISEMENT



Building Israel. One Child at a Time.
THE CAMPAIGN FOR SDEROT
I Want To Help!

ADVERTISEMENT



SICK AROUND THE WORLD
OTHER RICH COUNTRIES HAVE UNIVERSAL HEALTH CARE. WHY DON'T WE?
WATCH IT ON AIR & ONLINE APRIL 15    FRONTLINE
www.PBS.org/FRONTLINE    Ads by Goooooogle

ADVERTISEMENT



**LONDON FARES ARE FALLING DOWN.**

Announcing new flights to London Heathrow.

Roundtrip fares from **$189** each way

Continental Airlines ®

Additional taxes and fees apply.

─ SEARCH FOR FLIGHTS ─

**From:**

**To:**

**Depart:**
MM/DD/YYYY

**Return:**
MM/DD/YYYY

GO

continental.com

The ionic column-lined, red brick church at East 63rd and Park has said declining revenues from a dwindling membership are crimping its ability to operate, and thus it entered into an agreement with the Rose Group catering company to rent the space for its events.

The agreement has incensed neighbors of the church, who charge that a party hall has no place inside the church or in the largely residential area.

"It's not within the character of the neighborhood, and it's not within the law, as we understand it," the leader of a group of area residents who oppose the catering hall use, George Davis, said. "They advertise up to 1,500 people, and they've been having some pretty big parties."

Mr. Davis' group brought on attorneys and months ago urged the city's Department of Buildings to put an end to the practice, saying the use as a catering hall goes against the zoning code.

Finding support from elected officials such as state Senator Liz Krueger and Council Member Daniel Garodnick, the city seems to have heeded the residents' appeals. The Department of Building's deputy commissioner for legal affairs, Phyllis Arnold, wrote yesterday in a letter that the catering hall "is not an accessory use," and thus violates the zoning.

The battle seems far from over, as the church yesterday claimed it would bring on a prominent First Amendment lawyer who served as the city's top in-house lawyer from 1990 to 1991, Victor Kovner, to challenge the decision.

"We believe at the end of the day, logic will prevail and so will the Church," a spokesman for the church, George Arzt, said in a statement.

"The city has acquiesced to other religious and non-profit institutions in the immediate area holding similar events," Mr. Arzt said. "We are confident the courts will reverse this decision."

October 30, 2007 Edition > Section: <u>New York</u> > Printer-Friendly Version

Exhibit T

**Palella, Charles**

| | |
|---|---|
| **From:** | Palella, Charles |
| **Sent:** | April 21, 2008 5:13 PM |
| **To:** | Cuti, John |
| **Cc:** | abrennan@law.nyc.gov |
| **Subject:** | RE: Third Church v. NYC |

John,

We have no record of receiving your e-mail of Thursday evening. Furthermore, we have checked with Ave Maria Brennan, Esq., of the Office of the Corporation Counsel, who was purportedly copied on the e-mail, and she advises that she also did not receive that e-mail.

We are quite disappointed that plaintiff, who brings claims based upon its religious status, has seen fit to bring a motion after being advised that we were unable to consult with General Counsel to the Beekman because of holidays and vacations.  Surely you were aware of the occurrence of the Passover holidays and that many religious observers including the individual with whom we are dealing at the Stroock firm would not be available until after sundown this evening.  We intended to respond in good faith to your proposals; the fact that you could not wait one more day to accommodate the observance of a religious holiday compels the conclusion that the motion has not been made in good faith.  To the extent that your motion papers rely on the e-mail of Thursday evening, you are now on notice of its non-delivery.

Charles Palella

Law Offices

KURZMAN KARELSEN & FRANK, LLP

230 Park Avenue-23rd Floor

New York, New York 10169

212-867-9500 ext. 270

Fax 212-599-1759

email: cpalella@kurzman.com

Web site: www.kurzman.com

CONFIDENTIALITY NOTICE: This electronic message transmission contains information which is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged,

1

confidential and exempt from disclosure under applicable law.  Any
dissemination, distribution or copying of this communication is strictly
prohibited without our prior permission. If the reader of this message is
not the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, please notify us
immediately by calling (212) 867-9500 or by electronic mail
(lbeckerman@kurzman.com) and delete the original message and any copies of
it from your computer system.


IRS Circular 230 Disclosure: Internal Revenue Service regulations generally
provide that, for the purpose of avoiding federal tax penalties, a taxpayer
may rely only on formal written advice meeting specific requirements. Any
tax advice in this message does not meet those requirements. Accordingly,
any such tax advice was not intended or written to be used, and it cannot
be used, for the purpose of avoiding federal tax penalties that may be
imposed on you or for the purpose of promoting, marketing or recommending
to another party any tax-related matters.


-----Original Message-----
From: Cuti, John [mailto:JohnCuti@dwt.com]
Sent: April 21, 2008 3:36 PM
To: Palella, Charles; Kovner, Victor; Pa, Monica
Cc: abrennan@law.nyc.gov
Subject: RE: Third Church v. NYC

Charles,

Not having heard from you this morning, we filed the motion to compel with
the Court a few minutes ago.  You will be served today.

As I said in my email of Thursday evening, we wanted to get the motion on
file to preserve the Church's rights in view of the impending discovery
cut-off.  We still would far prefer to work out a way for your clients to
produce the documents sought by the subpeona without having to have the
Court issue an order to compel.  I will be around all day tomorrow if you'd
like to discuss whether there's a way to do that.

Thanks,

John

John Cuti | Davis Wright Tremaine LLP
1633 Broadway, 27th Floor | New York, NY 10019
Tel: (212) 603-6486 | Fax: (212) 489-8340
Email: johncuti@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco
| Seattle | Shanghai | Washington, D.C.

-----Original Message-----
From: Cuti, John
Sent: Thursday, April 17, 2008 6:43 PM

To: 'cpalella@Kurzman.com'; Kovner, Victor; Pa, Monica
Cc: 'abrennan@law.nyc.gov'
Subject: Re: Third Church v. NYC

Charles,

Thanks for your response.  You still haven't stated that your clients are
willing to produce anything.  That puts us in a tough spot given the
deadline.  We don't think it's fair to ask us to wait until Tuesday, given
how long we extended your time to make your original responses to the
subpoenas.  We had planned to move tomorrow, but will wait to hear from you
Monday morning that you are willing to produce documents.  If you can't
give that assurance by then, we will have to get the motion on file to
preserve the Church's rights.

John

----- Original Message -----
From: Palella, Charles <cpalella@Kurzman.com>
To: Cuti, John
Cc: abrennan@law.nyc.gov <abrennan@law.nyc.gov>
Sent: Thu Apr 17 16:48:55 2008
Subject: RE: Third Church v. NYC

John,

We are in receipt of you letter of April 17, 2008, and it is our intention
to formally respond to same.

We are considering the proposals set forth in your letter; however, before
we can respond to the proposals, we must consult with certain individuals,
including general counsel for the Beekman, and due to the holidays and
vacation schedules this cannot be accomplished until next Tuesday morning,
at which time we will communicate with you.


Charles Palella

Law Offices

KURZMAN KARELSEN & FRANK, LLP

230 Park Avenue-23rd Floor

New York, New York 10169

212-867-9500 ext. 270

Fax 212-599-1759

email: cpalella@kurzman.com
<blocked::blocked::mailto:cpalella@kurzman.com>

Web site: www.kurzman.com <http://www.kurzman.com/>

CONFIDENTIALITY NOTICE: This electronic message transmission contains information which is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, please notify us immediately by calling (212) 867-9500 or by electronic mail (lbeckerman@kurzman.com) and delete the original message and any copies of it from your computer system.


IRS Circular 230 Disclosure: Internal Revenue Service regulations generally provide that, for the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written advice meeting specific requirements. Any tax advice in this message does not meet those requirements. Accordingly, any such tax advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding federal tax penalties that may be imposed on you or for the purpose of promoting, marketing or recommending to another party any tax-related matters.

---

From: Cuti, John [mailto:JohnCuti@dwt.com]
Sent: April 17, 2008 2:28 PM
To: Palella, Charles
Cc: abrennan@law.nyc.gov; Kovner, Victor; Pa, Monica
Subject: Third Church v. NYC


Charles,

Please see the attached letter,

John

<<4-17-08 letter to Charles Palella (counsel for Neighbors).pdf>>

John Cuti | Davis Wright Tremaine LLP

1633 Broadway, 27th Floor | New York, NY 10019

Tel: (212) 603-6486 | Fax: (212) 489-8340

Email: johncuti@dwt.com <mailto:johncuti@dwt.com>  | Website: www.dwt.com <http://www.dwt.com/>

Exhibit U

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

www.kurzman.com

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
KEVIN J. LAKE
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

SAMUEL B. SEIDEL (1903-2003)

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
PAUL J. McGEOUGH
SANDRA DEFEO
ANTHONY T. AGOLIA

COUNSEL
STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
    (JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER
ARTHUR R. BLOCK

April 25, 2008

**VIA FIRST CLASS AND ELECTRONIC MAIL**

John R. Cuti, Esq.
Davis Wright Tremaine LLP
1633 Broadway – 27th Floor
New York, New York 10019-6708

> *Third Church of Christ, Scientist v. City of New York, et al.*
> *07 CV 10962 (DAB)*

Dear Mr. Cuti:

Reserving our issues with respect to your motion to compel, we propose that the dispute regarding the 4 subpoenas be resolved on the following basis:

1.  To the extent not produced by the City of New York in its document production, we shall produce communications with respect to 583 Park Avenue or the use thereof, between our firm on behalf of the Preservation Coalition or any member thereof, and New York City elected officials, the Department of Buildings, the Landmarks Preservation Commission, the Parks Department, Community Board 8, the Mayor's Office or other city agencies, if any, excluding however communications between our firm and the New York City Law Department;

2.  We shall produce communications with respect to 583 Park Avenue or the use thereof, between our firm on behalf of the Preservation Coalition or any member thereof, and New York State elected officials and state agencies including the State Liquor Authority and the Charities Bureau of the Attorney General's Office;

3.  As applies to the Beekman, we shall produce copies of the Certificate of Occupancy, filings with the Department of Buildings with respect to the first floor and /or Restaurant space, and subject to an appropriate confidentially agreement, the Lease

194248.1

KURZMAN KARELSEN & FRANK, LLP

John R. Cuti, Esq.
April 25, 2008
Page 2 of 2

with the restaurant operator and the Sale and Leaseback documents with the restaurant operator;

    4.  Provided your client agrees to  pay for duplication costs, we shall produce copies of photographs and videotapes.  Please note that since our correspondence of April 10, 2008, we have obtained 7 additional DVD videos.

    5.  The production outlined above shall be deemed full compliance with the 4 subpoenas identified in our letters of April 10, 2008.

    6.  Notwithstanding the foregoing, this voluntary compliance would be subject to all of the objections previously stated and would not constitute a waiver of any of said objections, including without limitation that the subpoenas themselves exceed the scope of the Court's order.

    Please advise.

Very truly yours,

KURZMAN KARELSEN & FRANK, LLP

Charles Palella

CP:hp

cc:  Ave Maria Brennan, Esq. (via electronic mail)
     Assistant Corporation Counsel

194248.1

Exhibit V

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

JOHN CUTI
DIRECT (212) 603-6442
johncuti@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

April 28, 2008

*VIA EMAIL AND US MAIL*

Charles Palella, Esq.
Kurzman Karelsen & Frank LLP
230 Park Avenue
New York, New York 10169

Re:   Subpoenas Served on non-parties 570 Park Avenue Apartments, Inc., 580
Park Avenue, Inc., Susan Relyea, as a Member of the Co-Op Board of 580
Park Avenue, Inc., and The Beekman Tenants Corporation
*Third Church of Christ, Scientist v. City of New York;* 07 Civ. 10962 (DAB)

Dear Charles:

Thank you for your letter of April 25, 2008. You propose that the Neighbors be permitted to produce a limited category of documents, and request that this production be deemed full compliance with the four subpoenas. Specifically, you offer to produce (1) communications between the Neighbors and New York elected officials, the DOB, the Landmarks Preservation Commission, the Parks Department, the Community Board 8, the Mayor's Office or other city agencies; (2) the Beekman's Certificate of Occupancy, filings with the DOB, and the lease with Fourth Wall Restaurants, LLC and leaseback documents; and (3) photographs and videotapes, provided we pay for duplication costs.

In making these proposals, you do not set forth any legal arguments or factual reasons why we should so substantially limit our right to discover documents to which we are entitled under the Federal Rules. For example, I read your letter to refuse to produce a single document reflecting conversations between or among your clients – not to counsel – about the facts underlying this lawsuit. That information is demanded, and relevant, and your letter does not begin to identify a reason to justify refusing to produce it. You also provide no legal basis for withholding communications with the New York City Law Department. If the ground for this position is that you believe we already have received all of these documents from the City, then we can discuss ways to compare what your clients have on this topic against what the City has produced; but if the claim is that these communications are somehow privileged, I confess I

Charles Palella, Esq.
April 28, 2008
Page 2



cannot understand what privilege even arguably applies.  Please let me know your thinking on these issues.

Because we would rather resolve this between counsel, let me make this counter-proposal.  In addition to those categories that you have offered to produce, please also produce:

(1)    Documents and communications between and among the Neighbors concerning the Rose Group, the Church, Social Events at 583 Park Ave., and this litigation;

(2)    Communications between the Neighbors and the New York City Law Department concerning the Rose Group, the Church, Social Events at 583 Park Ave., and this litigation;

(3)    Communications among the Neighbors or with third-parties concerning the Christian Science religion from 2006-present; and

(4)    Communications concerning Social Events at any institution set forth in paragraph 45 of the Complaint; and

(5)    For the Beekman, documents and communications concerning Social Events (with the definition as narrowed by my letter of April 17th), set forth in Requests 1, 3, 8, 9, 10, 11, and 15.

In addition, we would also require you to produce Susan Relyea for a deposition at a time mutual agreeable for both parties.

As we have emphasized throughout our correspondence with you, time is of the essence, and we cannot afford any further delay in obtaining discovery from your clients.  Accordingly, please let us know by the end of business on Tuesday, April 29th, whether the Neighbors will accept this counter-proposal.  Your letter never mentions that the motion to compel has been filed.  When we corresponded by email last Monday, I offered to be flexible about scheduling on the pending motion to compel.  We will be flexible regarding scheduling if this dispute cannot be resolved, but more than a week has passed (more time than the applicable rules even allow for

Charles Palella, Esq.
April 28, 2008
Page 3



response), and the Court likely will want to get the motion fully briefed as quickly as is practicable.

    We look forward to your response.

                                    Very truly yours,

                                    John Cuti /mP

                                    John Cuti

cc:    Ave Marie Brennan, Esq. (by email)
       Victor A. Kovner, Esq.

Exhibit W

LAW OFFICES

# KURZMAN KARELSEN & FRANK, LLP

230 PARK AVENUE

NEW YORK, NY 10169

(212) 867-9500

FACSIMILE

(212) 599-1759

www.kurzman.com

ERNEST L. BIAL
LEE D. UNTERMAN
PHYLLIS H. WEISBERG
M. DAVIS JOHNSON
ISAAC A. SAUFER
CHARLES PALELLA
JOSEPH P. TUCKER
JOANNE SEMINARA

———

SAMUEL B. SEIDEL (1903-2003)

———

NEW JERSEY DIAL
(973) 273-0455
FAX (973) 273-0458

MARISSA A. WINTER
PAUL J. McGEOUGH
SANDRA DEFEO
ANTHONY T. AGOLIA

———

COUNSEL

STANLEY E. MARGOLIES
RICHARD E. MILLER
JOSEPH F. SEMINARA
HON. LOUIS C. PALELLA
(JUSTICE, NYS SUPREME COURT, RET.)
DAVID YAVARKOVSKY
EUGENE HABER
ARTHUR R. BLOCK

April 29, 2008

**ELECTRONIC MAIL**

John Cuti, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, NY  10019-6708

*583 Park*
*Third Church of Christ, Scientist v. City of New York, et al.*
*07 CV 10962 (DAB)*

Dear Mr. Cuti:

This is in response to your letter of April 28, 2008 addressed to Charles Palella.  For your information Mr. Palella left early yesterday and is out today for a medical procedure.

Under the circumstances and given the pendency of your motion, we do not see why you could not wait until his return tomorrow for a response.  This is all the more so, given that we have previously advised you that as to the Beekman, we must also consult with its general counsel on these issues.  We believe that your insistence upon a response within 24 hours raises issues as to your willingness to resolve this amicably.

Moreover, your response to our proposal appears to do little in the way of addressing our objections.  Among other things, it does little to limit the extraordinarily broad, burdensome and irrelevant requests in your subpoenas.  It would appear, therefore, that this dispute must await Court resolution.

You seem to imply that our responding papers are overdue.  We disagree and refer you to Local Rule 6.1(b) which provides for response within ten business days after service on all motions other than those specified in 6.1(a).  The only Rule 45 motion referred to in Rule 6.1(a) is one made pursuant to (c)(3) to quash or modify a subpoena.  Your motion is made pursuant to Rule 45(c)(2)(B).  Therefore, Rule 6.1 (b)

194370.1

John Cuti, Esq.
April 29, 2008
Page 2 of 2

applies. According to our calculations, our papers are due on May 5th and we shall serve them on that day.

Very truly yours,

KURZMAN KARELSEN & FRANK, LLP

Phyllis H. Weisberg

PHW/yb

cc: Ave Marie Brennan, Esq. (via electronic mail)

194370.1