UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------- x

THIRD CHURCH of CHRIST,
SCIENTIST, of NEW YORK CITY,         :     07 Civ. 10962 (DAB)
                                     :
            Plaintiff,               :
                                     :
      - against -                    :
                                     :
THE CITY OF NEW YORK and             :
PATRICIA J. LANCASTER, in her        :
official capacity as, Commissioner of the :
New York City Department of Buildings :
                                     :
            Defendants.              :
                                     x
------------------------------------


**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF ITS MOTION TO COMPEL AND IN
<u>OPPOSITION TO THE NEIGHBORS' CROSS-MOTION TO QUASH</u>**


DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
(212) 489-8230

*Attorneys for Plaintiff
Third Church of Christ, Scientist, of New York City*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 3

    A.    The Court's Discovery Order Encompasses Discovery From the Neighbors ................... 3

    B.    The Subpoenas Are Not Overbroad or Burdensome ......................................................... 4

        1.    The Church Served and Enforced the Subpoenas in Good Faith ................................ 4

        2.    The Church Has Already Accommodated the Neighbors' Concerns .......................... 6

        3.    The Bulk of Documents Sought By the Church Are Not Publicly Available ............ 6

        4.    Discovery From Susan Relyea Is Appropriate ............................................................. 7

    C.    The Neighbors' Assertion of Work Product Is Contrary To Law ..................................... 8

    D.    The Neighbors Should Bear Their Own Costs ................................................................. 9

    E.    Discovery From the Beekman Is Appropriate .................................................................. 9

CONCLUSION ............................................................................................................................. 10

# TABLE OF AUTHORITIES

## CASES

*Polycast Technology Corp. v. Uniroyal, Inc.*, No. 87-Civ. 3297 (CSH), 1990 WL 138968
    (S.D.N.Y. Sept. 20, 1990) .................................................................................................. 9

*Ramsey v. NYP Holdings, Inc.*, No. 00 Civ. 3478, 2002 WL 1402055
    (S.D.N.Y. June 27, 2002) ................................................................................................... 9

*United Coal Co. v. Powell Const. Co.*, 839 F.2d 958 (3d Cir. 1988) .......................................... 9

## STATUTES

Fed. R. Civ. P. Rule 26.3 ............................................................................................................. 7

Fed. R. Civ. P. Rule 26(b)(3)(A) ................................................................................................. 9

The Church submits this reply memorandum in support of its motion to compel non-parties 570 Park Avenue Apartments, Inc., 580 Park Avenue, Inc., Susan Relyea, as a Member of the Co-Op Board of 580 Park Avenue, Inc., and The Beekman Tenants Corporation (the "Neighbors"), to comply with the subpoenas dated March 6, 2008 (the "Subpoenas"), and to Oppose the Neighbors' Cross-Motion to Quash.

## INTRODUCTION

The Neighbors submit what is essentially a brief on the merits, claiming that that the Church repeatedly misled the Department of Buildings; they paint themselves as humble citizen protesters, rather than powerful Park Avenue residents who hired lobbyists, lawyers, and even a videographer to win their battle against the Church; they go so far as to invoke the recent horror of a crane accident that took seven lives to justify their lobbying campaign to keep catered events out of their neighborhood. This rhetoric is designed to avoid the relevant point: that the Neighbors' role in causing the City to revoke its earlier-issued accessory use approval is directly relevant to the Church's Equal Protection and other claims. Discovery of the communications between and among the Neighbors themselves – as well as their communications with various governmental actors – is entirely proper.

Before turning to the discovery dispute, however, the record should be clear. The Neighbors' attack on the Church's integrity is baseless and offensive. The City conceded in open Court, with counsel for the Neighbors present, that the Church did *not* mislead the DOB in connection with its June 2006 approval of accessory catered events at the Church:

> Mr. Kovner: . . . as to any misrepresentation, Jay Segal of the Greenberg Traurig firm, a zoning counsel . . . His affidavit is before you. Paragraph 23 says explicitly, "there were follow-up conversations and meetings with senior DOB officials, in which the church's representatives made clear that there would be numerous catered events in the building, and that because of the building's capacity, many events would have large numbers. During these conversations, DOB's consistent position had been that catered private events

> at the building for nonmembers would be a permissible accessory use of the church, and in Commissioner Santulli's view . . . the only limitation was on the size of events related to the capacity of the building.

* * *

> Ms. Brennan: I did not mean to suggest that anyone misled anyone. I think perhaps plaintiff's counsel misunderstood me. I did not mean to suggest that anyone was misled at DOB.

Hrg. Tr. 22:22-23:10, 24:3-24:6. The City is the party here, not the Neighbors. That the Neighbors have chosen to ignore this concession and instead continue falsely to malign the Church speaks volumes about the nature of their opposition.

The City has now produced several email messages that both explain its concession and highlight the need to obtain additional discovery from the Neighbors. Counsel for the Neighbors sent two long, detailed letters to Mr. Santulli in March 2007, making the same arguments asserted here. *See* Pa Reply Decl. Exs. A and B. Mr. Santulli, then the DOB's Manhattan Borough Commissioner, had approved the accessory catering in June 2006. For months after he received these letters, Mr. Santulli apparently was pressed by both the Neighbors and elected officials from the Neighbors' district to rescind his earlier approval. But, even after receiving the Neighbors' lengthy submissions, Mr. Santulli continued to adhere to his decision.

This apparently made the Neighbors quite upset. Day after day, elected officials were barraged with complaints. One staffer characterized it this way on June 7, 2007:

> It seems I get a phone call daily from them saying the Rose Group is having events and the neighbors are really upset. Wonder if they're upset because [the Rose Group is] having events despite their efforts to stop them or if the events are actually out of control. My guess would be the former. . . . I haven't received any noise complaints yet.

*See* Pa Reply Decl. Ex. C. Consistent with this view of benign catering activity at the Church, a July 3, 2007 email makes clear that Mr. Santulli was well aware of the Neighbors' allegations but believed that "[n]othing the Church is doing is dangerous or illegal[,]" that "[c]hurches and

2

synagogues all around the City hold catered events on a regular basis[,]" and that nothing about the fact that the Church had a twenty year lease with its caterer changed his views. *See* Pa Reply Decl. Ex D.

What changed? At 10:00 am on July 31, 2007, Howard Rubenstein, the Neighbors' lobbyist, emailed Deputy Mayor Doctoroff to complain. Fifteen minutes later, Mr. Doctoroff wrote to his staff: "I guess we are going to have to look at this. Let's meet." *See* Pa Reply Decl. Ex. E. Within a couple of months, the DOB reversed course and informed the Church that it would revoke Mr. Santulli's well-considered earlier approval. When the City singles out the Church by making a land use decision because it succumbs to baseless complaints from well-placed constituents – rather than deciding based on the facts and consistent with long-settled practices – its decision is irrational and violates the Equal Protection Clause. *See* Reply Br. at 10-11. At a minimum, the Church has shown a basis to obtain discovery from the Neighbors to identify additional evidence to support its claims that the City has unfairly singled it out.

## ARGUMENT

### A.     The Court's Discovery Order Encompasses Discovery From the Neighbors

The Neighbors argue that the Court's order does not permit the Church to obtain discovery from them because they are not comparable to the Church. *See* Neigh. Br. at 7. Of course, because the Beekman conducts for-profit catering activities for non-residents of that building, it is directly comparable. In any event, the Court's order does not limit discovery only to other catering venues, and references catering establishments only by way of example. The Court granted the Church's application to develop a fuller factual record on which the Court could base its ruling on the motion for preliminary injunction. The Neighbors rely on the Church's February 22, 2008 letter to the Court, which said that only "limited discovery" was being sought. *Id.* at 8. But they fail to note that this very same letter highlights the Neighbors'

3

role in this dispute as a reason why pre-hearing discovery was necessary, or that the Church's reply brief on the preliminary injunction motion, also submitted on February 22nd, makes clear that the extent and effect of the Neighbors' lobbying was a topic to be explored further in discovery. *See* Reply Br. at 9-10. The Church's subpoenas to the Neighbors are proper, and do not violate the discovery order.

      **B.**    **The Subpoenas Are Not Overbroad or Burdensome**

            **1.**    **The Church Served and Enforced the Subpoenas in Good Faith**

The Neighbors contend that the Church's offers of compromise amount to a concession that it knew "its request was 'out of line'" and overbroad. *See* Neigh. Br. at 10. That uncharitable suggestion is unfounded. All of the subpoenas that the Church served originally sought documents from 2000 to date. The Church chose that date range in order to show that many religious and secular non-profits have long rented their premises for social events. This date range also made sense for the Beekman, which also has long been conducting catered events, and for other Neighbors (for their failure to complain about the commercial catering operation next door is relevant to their true motivation here). But when some non-parties (including the Neighbors) objected to the time period, the Church agreed to limit it to three years.

Still, the Neighbors insist that the Church knowingly issued subpoenas with over-broad date ranges as part of some scheme to serve defective legal instruments only to foster motion practice to prolong the TRO and "delay the preliminary injunction hearing, knowing that its claims cannot be substantiated." *See* Neigh. Br. at 5, 8, 10. This sort of attack on counsel for the Church is unfortunate. Do the Neighbors truly believe that counsel for the Church would engage in such sanctionable conduct?

In fact, the Church has acted with alacrity at every stage of this case.[1] The Court issued its discovery order on March 3, 2008. Within a few days, the Church had issued 13 subpoenas to non-parties and propounded interrogatories and document requests to the City. *See* Pa Reply Decl. ¶ 7. It was the Neighbors who requested an extension, which the Church granted as a courtesy. Pa Decl. ¶ 13. After obtaining a two-week extension to respond, the Neighbors then asserted that the Subpoenas were improper and refused to produce the requested information. These objections were served Thursday, April 10th; the Church responded Monday, April 14th. *Id.*, Exs. J-M, ¶ 15, Ex. P. The Neighbors wrote back April 16th, and the Church responded April 17th. *Id.* Exs. Q and R. Unable to reach a compromise, on April 21st, the Church moved to compel. From its first letter to the Neighbors (enclosing the Subpoena), to all the correspondence thereafter, the Church emphasized that time was of the essence, and acted accordingly. *See, e.g.,* Pa Decl. Ex. B. The Neighbors, by contrast, took the full amount of time under the Federal Rules to respond to the Church's motion. They also have filed duplicative and unnecessary cross-motions to quash the Subpoenas, the effect of which is not only to "get the last word" but also to extend the briefing schedule.

Finally, the Neighbors point to the fact that a few other non-parties (*e.g.*, Riverside, St. Ignatius and the Metropolitan Club) have also resisted the Church's subpoenas as proof that the subpoenas are overbroad. Neigh. Br. at 3, 10. That someone resists discovery does not mean that the resistance is justified. To the contrary, for the reasons stated in those motion papers, the

---

[1] As we informed the Court in our letter of February 27, 2008, the Church has diligently prosecuted this action. The facts speak for themselves: (i) the City served its final notice of revocation of its earlier-granted accessory use approval on Friday, November 30, 2007; (ii) because this revocation posed a risk of irreparable harm to the Church, the Church filed this action on Monday, December 3, 2007, together with its motion for a TRO, which the Court heard argument on and granted that afternoon; (iii) the Church was prepared immediately to commence discovery and asked for permission to do so, but the City, citing the burden of responding to the motion, asked for and obtained a stay of all discovery; (iv) the City then asked for two months to respond to the motion, and later asked for an additional week to submit its papers, and (v) the Church, as originally scheduled, served its reply papers in two weeks. The request for pre-hearing discovery was not a dilatory tactic.

5

Church's discovery demands are proper.[2] The Church has moved with dispatch to gather relevant information, and has been flexible in its efforts to address any legitimate concerns.

### 2. The Church Has Already Accommodated the Neighbors' Concerns

The Neighbors' complaint that the Subpoenas were originally overbroad in temporal scope and that their original definition of "Social Events" was too broad, *see* Neigh. Br. at 9-10, is mooted by their acknowledgement that the Church voluntarily accommodated both of these concerns by narrowing the time frame and the definition. *See id.* at 11.

The Neighbors also object to the Church's use of the standard phrase "all documents concerning or in any way related to." But that phrase properly tracks the definition of "concerning" set forth in Local Rule 26.3. They further claim that a request that seeks "documents concerning the Church" is overbroad. But that is not so. To the extent the Neighbors possess any documents concerning the Church (for example, regarding its physical condition, noise levels, disposal of garbage, or other matters), such information is relevant to this dispute. To the extent there are any specific categories of documents encompassed by the Requests that the Neighbors believe are irrelevant, the Church is willing to work through these objections so that it can timely obtain the discovery it seeks. Indeed, as evidenced by the Church's letter of April 28, 2008, the Church already has agreed to narrow the scope of the Subpoenas substantially and to work with counsel for the Neighbors to facilitate compliance. *See* Weisberg Decl. Ex. V.

### 3. The Bulk of Documents Sought By the Church Are Not Publicly Available

The Neighbors further resist the Subpoenas by claiming that the requested documents are

---

[2] Given the Neighbors' argument that the conduct of other non-parties is relevant, it is worth noting that many other non-parties – represented by some of the best law firms in the City – already have cooperated and responded to the Subpoena, including the Regency Hotel (represented by Kramer Levin Naftalis & Frankel), the Council on Foreign Relations (Debevoise & Plimpton), the Americas Society (Sullivan & Cromwell), Central Presbyterian Church (Sidley Austin), and the New York Landmarks Conservancy (Simpson Thacher & Bartlett).

publicly available. It is true that counsel for the Rose Group has obtained some documents *via* a FOIL request to the State Liquor Authority. But the Church reasonably believes that the bulk of documents sought by the Subpoenas are communications between and among the Neighbors and with the City's Law Department concerning the Rose Group, the Church, Social Events at 583 Park Avenue and/or this Litigation. These documents are not publicly available. The Church has requested documents from the City, which it is producing on a rolling basis. The Church has simply requested that the Neighbors collect responsive documents, produce all non-publicly available documents first, and leave documents they believe have been produced by the City to the end. *See* Pa Decl. Ex. R at 2. This compromise fully addresses the Neighbors' concerns.[3]

### 4.    Discovery From Susan Relyea Is Appropriate

The Neighbors argue that discovery from Susan Relyea (including documents and deposition testimony) is overbroad because it seeks information from her both as a co-op board member and in her individual capacity. Ms. Relyea's building – 580 Park Avenue – is a member of the Preservation Coalition, and she is one of its leading members.[4] Ms. Relyea's conduct in support of Coalition-related activities was undertaken in her capacity as the vice-president of the Co-op Board of 580 Park Avenue. But that is a technical nicety. If Ms. Relyea has documents that reflect her participation in the Coalition's activities, they are relevant, and the Subpoena demands their production. To the extent counsel for the Neighbors truly believes the Subpoena

---

[3] The Neighbors' confidentiality concerns also are misplaced. They complain that the Subpoenas call for the production of sensitive information, such as board minutes, tax returns, and other non-public information, and claim that such information should not be produced without a protective order. *See* Neigh. Br. at 13. Though their counsel has sent numerous letters, this is the first time the Neighbors assert a confidentiality concern. If there are legitimate confidentiality issues, the Church would happily enter into confidentiality agreement. Indeed, to address the potential confidentiality concerns of a different non-party, the Church has agreed to a protective order and circulated a draft to the City, the Neighbors' avowed ally. *See id.* at 18.

[4] On September 10, 2007, Ms. Relyea was able to meet personally with Deputy Mayor Daniel Doctoroff, one of his principal assistants (Elizabeth Weinstein), the senior DOB official responsible for the issues raised (Phyllis Arnold) and the General Counsel of the City's Department of Planning (David Karnovsky). *See* Pa Reply Decl. Ex. F (email from S. Relyea to D. Doctoroff, dated September 11, 2007).

was seeking information regarding dinner parties Ms. Relyea may have thrown, *see* Neigh. Br. at 10-11, the Church hereby narrows the subpoena to exclude such events.

### C. The Neighbors' Assertion of Work Product Is Contrary To Law

The Neighbors concede the general rule that, as non-parties, they have no work product protection. *See* Neigh. Br. at 17-18. Yet, they ask the Court to create an exception based on their alleged "interest" in this litigation. *Id.* The Church has already addressed this claim in its moving brief, which demonstrated that no work product privilege exists merely because the non-party's interests somehow are aligned with one of the parties. *See* Church Br. at 7-8. The Neighbors claim that the Church "relies too much on *Ramsey v. NYP Holdings, Inc.*, No. 00 Civ. 3478, 2002 WL 1402055 (S.D.N.Y. June 27, 2002)" – but never explain why. Indeed, in that case, the parents who brought suit on behalf of their minor son were held *not* to be sufficiently aligned in interest with their son to permit invocation of the work-product privilege. *Id.*

Unable to distinguish *Ramsey*, the Neighbors then rely on a case – *Polycast Technology Corp. v. Uniroyal, Inc.*, No. 87-Civ. 3297 (CSH), 1990 WL 138968, * 3 (S.D.N.Y. Sept. 20, 1990) – in which the court *rejected* the assertion of work product privilege. There, an accounting firm sought to protect notes made in preparation of its accountant's meeting with in-house counsel, but the court rejected the firm's assertion of privilege because it was neither a party nor *legally* aligned with a party. *Id.* The snippet the Neighbors quote from *Polycast* is *dicta* based on an inapplicable Third Circuit case, *United Coal Co. v. Powell Const. Co.*, 839 F.2d 958, 966 (3d Cir. 1988), which permitted an insurer to invoke the work product doctrine. *Id.* That insurers – which have a direct financial stake in litigation even when they are not parties – differ materially from merely "aligned" non-parties is reflected in Rule 26(b)(3)(A) itself (which includes insurers as the kind of representative of the party entitled to work product protection).

### D. The Neighbors Should Bear Their Own Costs

The Neighbors do not refute the Church's claim that they seek such compensation not out of any financial need, but simply to raise the Church's costs. Though the Church's brief spelled out the three factors to be considered by the Court in awarding costs (*see* Church Br. at 11), the Neighbors never bother to address them. That is because all three factors weigh against shifting the costs to the Church: (i) the Neighbors are very interested in the outcome of this case; (ii) they can more readily bear the cost of production; and (iii) this case is in the public interest. The Neighbors argue simply that they are not *barred* from recovering fees due to their interest in this litigation, and that the Church can afford to pay their cost of production because it can afford to pay its lawyers. *See* Church Br. at 20. Neither argument, however, amounts to an equitable reason *for* ordering the Church to pay the Neighbors' costs.

### E. Discovery From the Beekman Is Appropriate

The Neighbors argue that, although the Beekman permits the Park Avenue Café and Townhouse to operate within its building – therefore falling within even the Neighbors' cramped reading of the discovery Order – the Beekman need not comply with the Subpoena because it is not substantially similar to the Church. That contention is baseless. The Beekman leases space to an active commercial restaurant and catering hall which hosts hundreds of events per year. *See* Church Br. at 13 (234 events in 2007, 307 events in 2006). The Neighbors challenge these numbers. *See* Weisberg Decl. ¶ 28. But that factual dispute only underscores the need to obtain discovery from the Beekman.[5]

---

[5] The Church also should be permitted to explore the Beekman's claim that it operates a lawful "tenants restaurant" because it is an apartment hotel "designed with kitchenettes, not full kitchens, so it is more comfortable and convenient for residents to go to the restaurant." *See* Weisberg Decl. ¶ 28. The Church believes that the restaurant in the basement of the Beekman operates as a restaurant open to the general public, not as a tenants' restaurant. The City's tacit permission of this apparently unlawful use is relevant to the question of whether its far more stringent application of its zoning rules against the Church violates RLUIPA. Discovery from the Beekman bears directly on this issue.

The Beekman is a member of the Preservation Coalition yet it profits from the same sort of commercial catering activity it seeks to prohibit at the Church. Discovering facts that reveal that there was no legitimate basis for the opposition to the Church's plans bears directly on the Equal Protection claim. The Beekman should be ordered to comply with the subpoena.

## CONCLUSION

Because the Subpoena is valid, and neither unduly burdensome nor overbroad, the Court should compel the Neighbors to comply and produce the requested documents and produce Susan Relyea for the demanded deposition.

Dated: New York, New York
May 9, 2008

                          Respectfully submitted,

                          DAVIS WRIGHT TREMAINE LLP

                          By: _____
                          Victor A. Kovner (VK 2248)
                          John Cuti (JC 3365)
                          Monica Pa (MP 3307)

                          1633 Broadway
                          New York, New York  10019
                          (212) 489-8230

                          *Attorneys for Plaintiff, Third Church of Christ, Scientist, of New York City*